UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 17-cr-64-DWF-KMM |
| | ) | |
| v. | ) | **MEMORANDUM IN** |
| | ) | **SUPPORT OF DEFENDANT'S** |
| EDWARD S. ADAMS, | ) | **MOTION FOR A BILL OF** |
| | ) | **PARTICULARS** |
| Defendant. | ) | |

**INTRODUCTION**

The Indictment, which alleges mail and wire fraud, concerns complex transactions occurring over a ten-year time period. It refers to unnamed "others" and to acts that Mr. Adams allegedly undertook "indirectly." And, it blends (i) allegations that, if proven and if statute of limitations problems could be overcome, under some circumstances theoretically could support liability, with (ii) allegations that cannot support liability in light of *Skilling v. United States*, 561 U.S. 358 (2010), and *United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012). *Skilling* established that (with exceptions not pertinent here) the mail and wire fraud statutes do not extend to a breach by a corporate officer, director, employee, or agent of the intangible right of "honest services." *Steffen* established that those statutes do not reach passive as opposed to active concealment. The language of the Indictment here, given its vagueness and breadth, implicates both of these impermissible theories.

For these and other reasons elaborated below, a bill of particulars is essential.

# BACKGROUND

According to the Indictment, Mr. Adams was a Professor at the University of Minnesota Law School (as he still is); a partner in a Minneapolis law firm, Adams Monahan LLP ("AMLLP"), formerly Adams, Monahan & Sankovitz; and "at various times" a corporate officer of Apollo Diamond, Inc. ("Apollo Diamond") and its subsidiary Apollo Diamond Gemstone Corporation ("Apollo Gemstone") (collectively, "Apollo"). (¶¶ 4–5).[1]

The Indictment contains eight counts charging mail fraud (18 U.S.C. § 1341) and six counts charging wire fraud (18 U.S.C. § 1343). It refers to conduct from 2003 (¶ 10) to 2013 (¶¶ 1–2, 58), although it does not allege that any criminal activity occurred before 2006 (*see* ¶ 1 (alleging that a scheme began "at least in or about 2006")).

## A. The Apollo Allegations

The Indictment alleges that in 2003, at the direction of Mr. Adams, Apollo retained a financial services firm of which he was a principal to raise money for Apollo, and that the firm successfully completed that task and was paid a commission for its work. (¶ 10). Although the foregoing allegation appears in the part of the Indictment entitled "THE SCHEME TO DEFRAUD," there is no allegation that the initial raising of money from investors was fraudulent or otherwise unlawful.

---

[1] All citations to numbered paragraphs are to the Indictment.

The Indictment acknowledges that each Apollo company had a board of directors and that Apollo Employees A and B were members, but, implying that Mr. Adams deprived Apollo of his "honest services," alleges that they were "nominal members"—whatever that means—and that neither board "played an active role" in overseeing the companies' financial affairs, with such matters instead being "routinely entrusted to ADAMS." (¶ 12).

The Indictment goes on to allege that Mr. Adams took advantage of the trust the two directors reposed in him by creating bank accounts, depositing money intended for Apollo into those accounts, and paying Mr. Adams's (and his law partners') law firm. (¶¶ 13–14). The Indictment acknowledges that the firm "did perform services for Apollo," but—again making allegations of the kind common before *Skilling*—faults Mr. Adams for "unilaterally determin[ing] how much Apollo would pay" and signing most of the checks through which payment was made. *Id.*

The first allegations tied to a date within the 2006–2013 time period (when supposed unlawful activity occurred) concern RL Investment Holdings, LLC ("RL"). Between 2006 and 2008, Mr. Adams, "directly" and "indirectly" through an individual employed in the financial services industry (referred to in the Indictment as "J.Z.") and unspecified "others," allegedly engaged in transactions totaling about $2.4 million in which certain counter-parties wrote checks to RL in return for shares of Apollo Diamond. (¶¶ 17, 19). The Indictment alleges that "[i]n some instances,

ADAMS, directly and indirectly through J.Z. and others, lied to investors about the source of the shares that investors would be purchasing . . . ." (¶ 18).

The Indictment makes similar allegations about transactions in 2007 and 2009 in which investors made their checks payable to companies named DL Investments, LLC and ADR Investments, LLC, respectively. (¶¶ 23–26, 34–37). The Indictment acknowledges that a member of both Apollo Diamond's board of directors and Apollo Gemstone's board of directors was aware of the account in the name of ADR Investments. (¶ 35).

### B. The Scio Allegations

The remaining allegations in the part of the Indictment that precedes the allegations listing mail and wire communications concern the opening of bank accounts in 2007 (¶¶ 29–33) and the period "[b]eginning around mid-2008" (when the nationwide financial crisis was in full swing) (¶ 41). The Indictment alleges that by that point Apollo had "suffered severe financial problems" and that by late 2010 it was near bankruptcy. *Id.* On March 1, 2011, Mr. Adams and his law partner allegedly formed and became the shareholders of a new Nevada corporation known as Scio Diamond Technology Corporation ("Private Scio"). (¶ 43). Later that month, Mr. Adams allegedly informed Apollo shareholders that fundraising and financing efforts had been unsuccessful but that Apollo had entered into asset purchase agreements with Private Scio whereby Private Scio would acquire the assets of Apollo

Diamond for $2 million and the assets of Apollo Gemstone for $10,000.  (¶ 44).  The next allegation refers to a transaction in which Apollo shareholders were offered the option of selling their shares in Apollo—which "teetered on the edge of bankruptcy" (¶ 41)—for a penny a share and purchasing the same number of shares in Private Scio (¶ 45).

The Indictment faults Mr. Adams and his law partner for not disclosing to Apollo shareholders that they had founded Private Scio and were its sole shareholders and board members and "intentionally misle[ading] Apollo shareholders into believing that Private Scio was willing and able to pay the asset purchase price, when, in fact, Private Scio was not yet capitalized and did not have the money necessary to complete the asset purchase."  (¶ 46).  Mr. Adams is also faulted for requiring shareholders who accepted the offered exchange to release any potential claims against the Apollo companies and their officers, directors, advisors, and agents.  (¶ 47).  According to the Indictment, Apollo shareholders approved the proposed transaction with Private Scio at a shareholder meeting (¶ 48), and the exchange of shares then proceeded (¶ 50).

The Indictment concedes that Mr. Adams and his law partner in fact solicited investments in Private Scio in an effort to raise the $2,010,000 required, as promised, but alleges that the effort failed.  (¶ 51).  Thereafter, Mr. Adams allegedly arranged for Private Scio to be acquired by Krossbow Holding Corporation, which became a

publicly traded company, also later renamed Scio Diamond Technology Corporation ("Public Scio"). (¶ 52). The Indictment concedes that Apollo Diamond's sole director (Employee A) approved and signed the asset purchase agreement on behalf of Apollo Diamond, but it seeks to minimize that action by alleging that the board member signed "at the direction and upon the advice of ADAMS." (¶ 54). The Indictment goes on to allege that Mr. Adams "solicited, directly and indirectly, new investors in Public Scio, at a price of $0.70 per share" and criticizes him for purportedly "fail[ing] to disclose" to them that former Apollo shareholders had been promised the right to buy shares of Public Scio for a penny a share. (¶ 55). According to the Indictment, the $2 million that Public Scio needed to buy Apollo Diamond's assets was successfully raised and that purchase price was paid. (¶ 56). Mr. Adams allegedly received $800,000 of the $2 million and his law firm $550,000. *Id.* The purchase price for Apollo Gemstone's assets was allegedly raised to $100,000 and paid, with Mr. Adams and two other non-charged directors (Employees A and B) each receiving $33,000. (¶ 57). The exchange of shares by Apollo shareholders allegedly occurred from June 2012 through March 2013. (¶ 58).

The charging paragraphs of the Indictment list mailings and wire communications between June 2012 and August 2012, but those paragraphs do not provide additional information about the alleged scheme to defraud. (¶¶ 61, 63). Instead, each of the charging paragraphs is preceded by a paragraph that simply

incorporates paragraphs 1 through 59 of the Indictment in their entirety. (¶¶ 60, 62). The total amount involved in the mailings and wires that are charged is just over $4,000.

## ARGUMENT

**I.   A BILL OF PARTICULARS SHOULD BE GRANTED WHEN NECESSARY TO ENABLE THE DEFENSE TO PREPARE FOR TRIAL AND TO AVOID OR MINIMIZE THE DANGER OF SURPRISE AT TRIAL.**

"Bills of particulars have grown from very small and technical beginnings into most important instruments of justice." *United States v. Smith*, 16 F.R.D. 372, 375 (W.D. Mo. 1954). In keeping with that evolution, Federal Rule of Criminal Procedure 7(f) was amended in 1966 to eliminate "the requirement of a showing of cause." Fed. R. Crim. P. 7(f) advisory committee's note to 1966 amendment. The amendment was "designed to encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases." *Id.* Rule 7(f) now provides in pertinent part that "[t]he court may direct the government to file a bill of particulars." In accordance with the spirit of the 1966 amendment, defendants should "be given the benefit of the doubt in gray areas." *United States v. Thevis*, 474 F. Supp. 117, 124 (N.D. Ga. 1979), *aff'd*, 665 F.2d 616 (5th Cir. Unit B 1982); *accord United States v. Rogers*, 617 F. Supp. 1024, 1028 (D. Colo. 1985).

"The purpose of a bill of particulars is to inform the defendant of the nature of a charge with sufficient precision to enable him to prepare for trial and to avoid or

minimize the danger of surprise at trial." *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011). "In providing a bill of particulars, the government is not required to detail all of the evidence that it will submit at trial. However, a defendant is entitled to know what behavior is alleged to constitute the offense he is charged with." *United States v. Idriss*, No. CR. 03-372 (JRTFLN), 2004 WL 733977, at *4 (D. Minn. Mar. 1, 2004) (citation omitted). The government does not discharge its obligation to provide notice of the charge "merely by providing mountains of documents to defense counsel who [are] left unguided" as to which documents relate to the charged conduct. *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (per curiam); *accord United States v. Bazezew*, 783 F. Supp. 2d 160, 168 (D.D.C. 2011).

**II.    RECENT DECISIONS LIMITING THE SCOPE OF THE MAIL AND WIRE FRAUD STATUTES MAKE A BILL OF PARTICULARS ESPECIALLY IMPORTANT IN THIS CASE.**

A bill of particulars is especially necessary in this case because of recent decisions restricting the reach of the mail and wire fraud statutes.

**A.    Absent Bribes or Kickbacks, "Honest Services" Prosecutions Are Foreclosed.**

Between the 1970s and 1980s, the lower courts allowed "'an extraordinary expansion of mail and wire fraud statutes to permit federal prosecution for conduct that some had thought was subject only to state criminal and civil law.'" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 502 (1985) (Marshall, J., dissenting) (quoting

*United States v. Weiss*, 752 F.2d 777, 791 (2d Cir. 1985) (Newman, J., dissenting)). As a result, until the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), and again from the enactment of 18 U.S.C. § 1346 in 1988[2] until the decision in *Skilling v. United States*, 561 U.S. 358 (2010), corporate directors, officers, employees, and agents were often prosecuted for mail or wire fraud on the ground that they entered into schemes to deprive corporations or shareholders of the right to "honest services."[3]

In *Skilling*, however, the Supreme Court took a major step toward restoring the principle that "States possess primary authority for defining and enforcing the criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993). *Skilling*

---

[2] *McNally* rejected the "intangible rights" doctrine, but Section 1346 restored to the mail and wire fraud statutes "one of the 'intangible rights' that lower courts had protected under [those statutes] prior to *McNally*: 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000).

[3] *See, e.g.*, *United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997) (wire fraud charges against head of the Oklahoma City Municipal Bond Underwriting Department of Stifel, Nicolaus & Company for receiving compensation from both issuers and third-party financial institutions in connection with his underwriting of several municipal bond issues); *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980) (mail and wire fraud charges against salesman and trader of government bonds at securities firm for concealing from his employer material information about his trades); *United States v. Brennan*, 938 F. Supp. 1111 (E.D.N.Y. 1996) (mail fraud charges against former President, Chairman, and CEO of insurance underwriting company for failure to disclose conflict of interest), *rev'd*, 183 F.3d 139 (2d Cir. 1999); *see also United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942) ("The actual deception that is practised is the continued representation of the employee to the employer that he is honest and loyal to the employer's interests."), *quoted in Skilling*, 561 U.S. at 401.

dramatically curtailed the scope of the mail and wire fraud statutes by sharply limiting the meaning of the phrase "the intangible right of honest services" in Section 1346. The decision held that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Skilling*, 561 U.S. at 409.  The Supreme Court rejected the government's argument that it should "go further" by holding that Section 1346 also applies to "'undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty.'" *Id.* (quoting Brief for the United States at 43–44).

Applying this principle, the Court further held in *Skilling* that the former CEO of Enron had been improperly convicted of wire fraud for allegedly "defraud[ing] Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price," and "'profit[ing] from the fraudulent scheme . . . through the receipt of salary and bonuses, . . . and through the sale of approximately $200 million in Enron stock, which netted him $89 million.'" *Id.* at 413 (ellipses in original) (quoting Brief for the United States at 51).  In another case decided the same day as *Skilling*, the Supreme Court relied on *Skilling* in holding that the jury had erroneously been charged on "honest services" fraud in a mail fraud prosecution against corporate executives for paying themselves noncompetition fees (without any

documented approval by the corporation[4]) and failing to disclose their receipt of those fees.  *Black v. United States*, 561 U.S. 465, 474 (2010).

Because no bribes or kickbacks are alleged in this case, the government cannot rely, either expressly or in substance, on a contention that Mr. Adams violated Apollo's or investors' right to "honest services."  Especially in light of the Indictment's inclusions of allegations reminiscent of a pre-*Skilling* "honest services" prosecution (*e.g.*, ¶¶ 12–14), a bill of particulars is necessary to ensure that the government does not in fact predicate its case in whole or in part on such a contention.  Courts have required the government to provide extensive particulars in circumstances where an established legal doctrine limited the scope of potential liability for mail or wire fraud.  *See United States v. Pilnick*, 267 F. Supp. 791, 794, 801–02 (S.D.N.Y. 1967) (Weinfeld, J.) (ordering particulars in case involving charges of substantive mail and wire fraud offenses and conspiracy to commit mail and wire fraud, in case "arising out of the sale of undeveloped land in Florida to the public" where doctrine of *caveat emptor* was implicated).  The same should be required here.

### B.    The Mail and Wire Fraud Statutes Do Not Prohibit Mere Nondisclosure or Silence.

The Eighth Circuit also has limited the mail and wire fraud statutes in important respects.  Of paramount importance is the Eighth Circuit's decision in *United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012).

---

[4] *See United States v. Black*, 530 F.3d 596, 599 (7th Cir. 2008), *rev'd*, 561 U.S. 465.

*Steffen* grew out of the Supreme Court's decision in *Neder v. United States*, 527 U.S. 1 (1999). In *Neder*, the Justices for the first time embraced "the presumption that Congress intended to incorporate the common-law meaning of the term 'fraud' in the mail fraud, wire fraud, and bank fraud statutes." *Id.* at 23 n.7. The Court also stressed that "both at the time of the mail fraud statute's original enactment in 1872, and later when Congress enacted the wire fraud and bank fraud statutes, actionable 'fraud' had a well-settled meaning at common law." *Id.* at 22.

Relying on *Neder*, the Eighth Circuit held in *Steffen* that passive concealment—mere nondisclosure or silence—cannot support a mail or wire fraud charge. *See* 687 F.3d at 1115–16. The court also rejected the government's contention that the defendant had "implicitly represented" a fact that was untrue. *Id.* at 1116–17. The court proceeded to affirm the dismissal of the mail and wire fraud charges against the owner of two companies involved in the construction business. *Id.* at 1117.

Like *Skilling*, *Steffen* highlights the need for a bill of particulars in this case. In two places, the Indictment relies on an alleged "nondisclosure" or "concealment." (¶¶ 46, 55). Particulars are needed to guard against Mr. Adams being tried for passive concealment, which *Steffen* establishes is beyond the scope of the mail and wire fraud statutes.

### III. THE GOVERNMENT SHOULD BE REQUIRED TO PROVIDE THE REQUESTED PARTICULARS.

The defense's requests for particulars are appropriate, and the government should be required to provide those particulars, as demonstrated below.

#### A. The Alleged Pretenses, Representations, Promises, or Concealments.

The government should be required to identify the alleged false or fraudulent pretenses, representations or promises, or concealments, by means of which the scheme to defraud charged in the Indictment[5] was allegedly executed. A scheme to defraud for purposes of Sections 1341 and 1343 "must involve some sort of fraudulent misrepresentations or omissions." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991), *quoted with approval in United States v. Goodman*, 984 F.2d 235, 239 (8th Cir. 1993). The omission now must rise to the level of active concealment. *See Steffen*, 687 F.3d at 1115–16.

It is well accepted that the government bears the burden to identify the alleged fraudulent misrepresentations underlying its charges. In *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) (per curiam), the Second Circuit reversed RICO and mail fraud convictions because the government produced over 4,000 documents in discovery, but failed to specify which documents submitted to FEMA were allegedly

---

[5] For convenience, the defense refers in this memorandum to "the scheme to defraud" alleged in the Indictment. The defense expressly preserves, however, the right to contend that the government has improperly charged multiple schemes to defraud in each count of the Indictment.

falsified. *Id.* at 574–75. Here, the document production exceeds 500,000 documents or computer files, and some of the documents or files are themselves hundreds of pages long. The government should be required to identify which of these documents contain allegedly fraudulent misrepresentations, and which statements within the documents constitute such allegedly fraudulent misrepresentations.

District courts have repeatedly required as much from the government, recognizing the need for particulars concerning the falsehoods or omissions that are the basis of a mail or wire fraud charge. In *United States v. Patterson*, No. 16-10091-JTM-01, 2017 WL 1361727 (D. Kan. Apr. 13, 2017), the court ruled that a defendant charged with wire fraud was entitled to a bill of particulars identifying "the bates number of each fax that contains the material misrepresentations charged." *Id.* at *2. In *United States v. Sampson*, 448 F. Supp. 2d 692 (E.D. Va. 2006), the court required the government to file a bill of particulars identifying the specific dates of the conduct alleged in a mail fraud, the documents alleged to be fraudulent, and "what the false statements were within the documents." *Id.* at 696. In *United States v. McCoy*, 492 F. Supp. 540 (M.D. Fla. 1980), the court held that a defendant charged with mail fraud was "entitled to a bill of particulars setting forth each false and fraudulent pretense and representation described generally in the indictment." *Id.* at 545.[6]

---

[6] *See also, e.g.*, *United States v. Solnin*, 81 F. Supp. 3d 193, 198, 209 (E.D.N.Y. 2015) (where mail and wire fraud charges alleged defendant made false and fraudulent representations to "John Doe Distilleries," government was required to disclose "the identities of the John Doe victims, as well as the corresponding e-mails and/or items

14

Like the defendants in the foregoing cases, Mr. Adams is entitled to have the government specifically identify all allegedly false or fraudulent pretenses, representations, promises, or concealments affirmatively made by him.

### B.     The Bases for Alleging that the Nondisclosure Alleged in Paragraphs 46 and 55 Were Part of a Scheme To Defraud.

Particulars are also needed with respect to the following allegations in the Indictment of concealment or nondisclosure, in order to ascertain whether the allegations are consistent with *Steffen*'s holding that passive concealment cannot support a charge of mail or wire fraud:

> 46. ADAMS and M.M. concealed from Apollo shareholders that they themselves had founded Private Scio and that they alone were the sole shareholders and board members of Private Scio. Moreover, they intentionally misled Apollo shareholders into believing that Private Scio was willing and able to pay the asset purchase price, when, in fact, Private Scio was not yet capitalized and did not have the money necessary to complete the asset purchase.
>
> 55. To fund the purchase of assets from Apollo Diamond, ADAMS solicited, directly and indirectly, new investors in Public Scio, at a price of $0.70 per share. ADAMS failed to disclose to these new investors that former Apollo Diamond and Apollo Gemstone

---

underlying the charged counts"); *United States v. Trumpower*, 546 F. Supp. 2d 849, 852 (E.D. Cal. 2008) (where defendant was charged with money laundering, and funds at issue were allegedly derived from scheme involving mail and wire fraud, defendant was entitled to bill of particulars identifying, *inter alia*, "the particular false material representations"); *United States v. Caine*, 270 F. Supp. 801, 806 (S.D.N.Y. 1967) (requiring the government to identify "each pretense, representation and promise claimed to have been falsely fraudulent"); *Pilnick*, 267 F. Supp. at 801 (directing government, in case involving charges of substantive mail and wire fraud offenses and conspiracy to commit mail and wire fraud, to identify any false or fraudulent pretenses, representations, or promises not set forth in indictment).

shareholders had been promised the right to buy millions of shares of Public Scio at a penny a share.

The government should be required to identify any facts that are alleged to convert these alleged nondisclosures into active concealments. *See Steffen*, 687 F.3d at 1115–16.

### C. The Alleged "Indirect[]" Representations and Solicitations.

Specificity also should be required with respect to the allegation in paragraph 55 (quoted in Part III.B above) that Mr. Adams "indirectly" solicited new investors in Public Scio without disclosing certain information to them, and the allegation in paragraph 31 that he "indirectly" made representations about the use of monies received in connection with Apollo. In *Steffen*, the Eighth Circuit found wanting the government's contention that the defendant had "implicitly represented" a certain fact. 687 F.3d at 1116–17. Particulars are necessary to allow the defense to prepare to meet the government's allegations and to assist in the determination of whether they suffer from a defect similar to the defect in the government's implicit representation contention in *Steffen*.

### D. The "[O]thers" Through Whom Mr. Adams Alleged Made Representations.

The government should be required to identify as well the "others" through whom Mr. Adams allegedly made the representations alleged in paragraphs 17, 18, 24, 25, 36, and 37. As noted in Part III.A above, a "scheme to defraud" within the meaning of Sections 1341 and 1343 must involve fraudulent representations or active

16

concealment. With respect to those allegations in the Indictment that seek to impose liability on Mr. Adams for representations made by other persons, the defense needs to know who they were in order to prepare for trial.

### E. The Money or Property that Was the Alleged Object of the Scheme To Defraud.

The next request for particulars rests on the principle that, except where the right of "honest services" is implicated (an exception that does not apply here, see Part II.A, *supra*), "[t]he federal mail fraud statute is '*limited in scope to the protection of property rights*.'" *United States v. Wirtz*, 357 F. Supp. 2d 1164, 1167 (D. Minn. 2005) (emphasis added) (quoting *Cleveland v. United States*, 531 U.S. 12, 18 (2000)); *see Pasquantino v. United States*, 544 U.S. 349, 355 (2005). "[T]he deprivation must involve a wronging of the victim's property rights." *United States v. Ratcliff*, 488 F.3d 639, 645 n.8 (5th Cir. 2007). The Supreme Court was explicit in *Cleveland* that "§ 1341 requires the object of the fraud to be 'property' in the victim's hands." 531 U.S. at 26.[7] The same principle of course applies to the wire fraud statute. *See, e.g.*, *Pasquantino*, 544 U.S. at 355 n.2 ("[W]e have construed identical language in the wire and mail fraud statutes *in pari materia*."); *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in

---

[7] *See also Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 831 n.15 (M.D. La. 2002) ("To be guilty of mail fraud, the defrauder must have an intent to use deceit for the purpose of divesting another person of a property interest.").


relevant part, and accordingly we apply the same analysis to both sets of offenses here.").

To vindicate the principle established by *Cleveland*, to ensure that Mr. Adams is not held liable for violation of the right of "honest services" in circumstances where that right cannot be the basis of liability, and to allow the defense to prepare for trial, the government should be directed to identify all of the money or property that was the alleged object of the scheme to defraud alleged in the Indictment. *See United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (ordering government to provide particulars as to property allegedly obtained pursuant to scheme to defraud alleged in mail fraud counts); *see also United States v. Emor*, 785 F.3d 671, 680 n.4 (D.C. Cir. 2015) (stating in prosecution for mail and wire fraud that "it is difficult to conceive how the government could prove a violation of a statute intended to punish those who deprive others of their property, without identifying in some manner who those 'others' were").

### F. The Other Alleged Participants in the Scheme To Defraud.

Finally, the government should be required to identify the other alleged participants, if any, in the scheme to defraud alleged in the Indictment. *See, e.g.*, *United States v. Mariani*, 90 F. Supp. 2d 574, 592 (M.D. Pa. 2002) (holding that defendant was entitled to particulars identifying the "other participants in the alleged scheme to defraud"); *United States v. Chovanec*, 467 F. Supp. 41, 46 (S.D.N.Y. 1979) ("[T]he government is directed to furnish the names of those co-schemers known to

them and whom they will claim participated in the alleged scheme with defendant Friend."). Again, Mr. Adams is entitled to know this basic information in order to prepare his defense at trial.

## CONCLUSION

For the foregoing reasons, Mr. Adams respectfully requests that this Court direct the government to provide a bill of particulars responding in full to each request set forth in the accompanying motion.

Dated: September 27, 2017             Respectfully submitted,

    /s/ *James L. Volling*
James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com

Joseph G. Petrosinelli (DC Bar #434280)
Lance Wade (DC Bar #484845)
Sarah Lochner O'Connor (DC Bar #1012405)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
jpetrosinelli@wc.com
lwade@wc.com
soconnor@wc.com

Attorneys for Defendant Edward S. Adams