# EXHIBIT 1

JEK:blb
AO 106 (Rev. 04/10) Application for a Search Warrant                                                          2014R00312

# UNITED STATES DISTRICT COURT RECEIVED

for the
District of Minnesota

DEC 3 0 2015

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

Case No.  15-MJ - 942 (JSM)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Northern District of California, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

|     |                                                                                  |
| --- | -------------------------------------------------------------------------------- |
| X   | evidence of a crime;                                                             |
| X   | contraband, fruits of crime, or other items illegally possessed;                 |
| X   | property designed for use, intended for use, or used in committing a crime;      |
|     | a person to be arrested or a person who is unlawfully restrained. The search is related to a |

violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| Title 18, United States Code, Section(s) 1341 & 1343 | Mail Fraud and Wire Fraud |

The application is based on these facts: **See attached Affidavit.**

    X    Continued on the attached sheet.

_____
*Applicant's Signature*

Sworn to before me and signed in my presence.

Date:  11/25/15

Christie Kroells, Inspector
*Printed Name and Title*

_____
*Judge's Signature*

City and State:  Minneapolis, MN

Janie S. Mayeron, U.S. Magistrate Judge
*Printed Name and Title*

SCANNED

DEC 3 0 2015

U.S. DISTRICT COURT ST. PAUL

STATE OF MINNESOTA ) **FILED UNDER SEAL – PURSUANT TO ORDER**
                          ) ss.   AFFIDAVIT OF CHRISTIE KROELLS
COUNTY OF HENNEPIN )       15-MJ- 942 (JSM)

I, Postal Inspector Christine Kroells, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo! Inc., an e-mail provider headquartered at 701 First Avenue, Sunnyvale, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.    I am a Postal Inspector with the U.S. Postal Inspection Service, and have been since 2003. I am currently assigned to the Twin Cities Field Office in Minneapolis, Minnesota. I am authorized to conduct investigations on behalf of the United States Postal Inspection Service. My primary criminal investigative responsibilities include investigations which may involve violations of Title 18, United States Code, Section 1341, Mail Fraud. I have conducted and participated in numerous criminal investigations

of individuals involved in illegal activities for possible violations of the United States Code and related laws, including but not limited to mail and wire fraud in violation of Title 18, United States Code, 1341 and 1343, respectively. Your affiant's experience includes training in and investigation of mail fraud and wire fraud. Your affiant's investigative experience includes uncovering schemes where individuals obtain goods or monetary funds from victims as part of investment schemes through false pretenses and do not follow through with their obligations to the victims. In your affiant's experience, these individuals use these schemes to obtain money and property for their personal gain. In your affiant's experience evidence of these crimes can be found in email communications.

3.     This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1341 and 1343 have been committed by Edward S. Adams and Michael R. Monahan, including by concealing and failing to disclose material information to company shareholders prior to seeking the shareholders' approval of transactions which personally benefitted Adams and Monahan. There is also probable cause to believe that evidence of these violations is located in the following email accounts, further described in Attachment A:

    a.  edwardsadams@yahoo.com, used by Edward S. Adams;

2

b. jafman1@yahoo.com, used by Edward S. Adams; and

c. michaelrmonahan@yahoo.com, used by Michael R. Monahan;

and to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.     According to online records your affiant reviewed, Linares Management Associates registered with the state of Massachusetts on or about May 2, 1990, and on or about February 20, 2001, Linares Management Associates changed its name to Apollo Diamond, Inc. (ADI). According to these records, B.R.L. and M.V.L. were listed as President and as Treasurer and Secretary, respectively, from the inception of the company and through the name change. On or about May 23, 2006, ADI was voluntarily dissolved and on the same date ADI was re-registered with the state of Massachusetts listing B.R.L. again as President, and adding R.C.L. as Treasurer and Adams as Secretary. On or about April 2, 2004, Apollo Diamond Gemstone Corporation (ADGC), a subsidiary of ADI, was registered with the state of Delaware. Adams signed the Articles of Incorporation as the Incorporator for ADGC. Adams is R.C.L.'s son-in-law and B.R.L.'s brother-in-law.

7. Through documents your affiant has gathered during the course of this investigation, your affiant has learned that ADI started working to "develop and perfect" a chemical vapor deposition (CVD) technology that produces high-quality diamond crystals for use in the industrial and gemological industries. R.C.L. reportedly discovered this technology, which was used by ADI to develop a process to create large, single-crystal diamonds that could be grown in a controlled laboratory environment. ADGC was created to generate these synthetic diamonds and market them to various industries.

8. Between 2004 and 2011, Adams held various positions within both ADI and ADGC, including Secretary of ADI and Secretary, Executive Vice President, Chief Financial Officer, Director, and President of ADGC. Your affiant has reviewed records showing Adams in these roles. These records include multiple Form Ds for ADI filed with the SEC, including one dated October 25, 2006, and another dated November 13, 2007, in which Adams signs the forms as ADI's Secretary and is listed as an Executive Officer of ADI. Form Ds for ADGC, dated November 13, 2007, July 20, 2009, and July 20, 2010, that were signed by Adams either as ADGC's Secretary or ADGC's Chief Financial Officer list Adams as an Executive Officer, and, on one form, as a Director.

9. Between 2008 and 2010, Monahan held various positions within ADGC, including Vice President of Business Development, Executive Vice President for Corporate Development and Marketing, and General Counsel. Your affiant reviewed records showing Monahan in these roles, including multiple Form Ds filed with the SEC.

4

Two of these Form Ds filed for ADGC, which were dated July 20, 2009, and July 20, 2010, list Monahan as an Executive Officer of ADGC.

10. From at least 2008 through 2014, Adams and Monahan were partners in a Minneapolis-based law firm, Adams Monahan, LLP (AMLLP). Focus Capital Group, Inc. (Focus) is a Minneapolis-based investment banking firm that was co-founded by Adams and Monahan and incorporated with the state of Minnesota in 2005. Adams was Chief Executive Officer and Managing Director of Focus, and Monahan was the Senior Managing Director of Focus. ESA Consulting Services, LLC (ESA Consulting) is a Minneapolis-based company. According to the Minnesota Secretary of State, Adams is listed as the Manager of ESA Consulting.

11. Your affiant reviewed records regarding the formation of a privately-held company named Scio Diamond Technology Corporation, which was formed on or about March 1, 2011 in Nevada. For ease of reference and to avoid any potential confusion, this Affidavit will refer to this company formed on March 1, 2011 as "Private Scio" as distinguished from the publicly-traded company that adopted the same name in July 2011, as explained below in paragraph 21. Adams and Monahan are listed on the Articles of Incorporation as the sole officers and members of the Board of Directors for Private Scio. Specifically, Adams is listed as the Director, President, and Treasurer, and Monahan is listed as the Secretary. Both Adams and Monahan owned shares in Private Scio.

5

12.     Your affiant reviewed a proxy statement and the cover letter to that proxy statement sent to ADI shareholders and dated March 11, 2011, from R.C.L., in his capacity as ADI's Chairman asking for the shareholders' approval of the sale of ADI's assets to Private Scio.  The proxy statement solicited the proxies from shareholders to approve (1) the sale of all of ADI's assets for $2,000,000 to Private Scio and (2) a stock repurchase program whereby ADI would repurchase the shares of interested shareholders for $0.01 per share.  The proxy statement explained that the $2,000,000 proceeds from the sale would be used to satisfy ADI's outstanding debts and liabilities and to fund the stock repurchase program.  According to the cover letter, beginning in 2009, ADI "was forced to terminate many of its employees and later to reduce, and in some cases defer or even eliminate, compensation to its remaining employees."  The cover letter states that the ADI Board of Directors, in seeking to act in the best interest of the company, decided the sale of the company's assets was the best option in an effort to continue their mission, which was to manufacture and distribute synthetic diamonds.  Specifically, the cover letter states, "a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology."  The cover letter continues to explain that because of this decision, ADI has agreed to sell substantially all of its assets to Private Scio for approximately $2,000,000.  The cover letter further states that ADI's most significant creditors have agreed to accept reduced payments and that these creditor agreements are conditioned on the sale of the assets to Private Scio.  The cover letter does not disclose, however, that Adams' and

6

Monahan's law firm, AMLLP, was the single largest creditor of ADI at that time. In addition, the cover letter explained that under the stock repurchase program, ADI shareholders could sell back their shares at $0.01 per share, which the letter indicated could give rise to a tax advantage to the shareholders. According to the cover letter, any shareholders whose shares were repurchased by ADI would also be given the option to invest in Private Scio at a price of $0.01 per share in number of shares equal to the number of shares that they held in ADI. The cover letter indicated that there would be a Special Meeting of Stockholders and part of the agenda of the meeting would be to vote on the sale of ADI to Private Scio. A similar cover letter dated March 18, 2011, was sent to the ADGC shareholders. Neither of these cover letters disclosed Adams' or Monahan's roles in Private Scio, despite the fact that, according to the proxy statement, AMLLP was retained by ADI and ADGC to carry out the proxy solicitation. Nor did either of the proxy statements themselves disclose Adams' or Monahan's roles in Private Scio. The failure of both the proxy statement and the cover letter to disclose Adams' and Monahan's roles and ownership interests in Private Scio is a material omission the ADI shareholders should have been made aware of prior to their decision to vote on the asset sale to Private Scio and the stock-repurchase program. In addition, the failure of both the proxy statement and the cover letter to disclose that Adams, Monahan, and AMLLP acted as counsel for both ADI and Private Scio in connection with the transaction was a material omission the shareholders of both ADI and Private Scio should have been made aware of prior to their decisions to authorize the transaction.

13.     Your affiant reviewed an asset purchase agreement dated on or about March 11, 2011, which was executed between ADI and Private Scio whereby Private Scio agreed to purchase the assets of ADI for $2,000,000 in cash.  On or about March 18, 2011, a second asset purchase agreement was executed, this time between ADGC and Private Scio, whereby Private Scio agreed to purchase the assets of ADGC for $10,000 in cash.   Neither asset purchase agreement disclosed Adams's or Monahan's roles or ownership interests in Private Scio.  Although these asset purchase agreements are signed by R.C.L., your affiant has not seen any evidence of funds being provided from Private Scio to ADI or ADGC.  These asset purchase agreements also do not disclose Private Scio's inability to pay the purchase prices as of the date of the agreements and as of the date of the Special Meeting; they only state that Private Scio "(p)rior to closing . . . shall have procured funding to make the Cash Payment."   Your affiant believes the contingency of Private Scio's funding, and the fact that Private Scio did not currently have the funding, could have been a deciding factor for the shareholders in determining whether or not to vote for the sale of ADI's and ADGC's assets to Private Scio.  Your affiant found one bank account that appeared to initially start out as a Private Scio bank account.  The account was opened on or about July 13, 2011, by Adams, as an officer of Private Scio.  Adams is the sole signer on the account until C.N. (Chief Financial Officer for Public Scio) is added on or about April 25, 2012, shortly after which the account is closed.

14.     According to the transcript of a deposition of Adams conducted by the SEC on or about August 27, 2015, and reviewed by your affiant, Adams answered questions regarding the drafting of March 11, 2011 cover letter to the proxy statement from R.C.L. to the ADI shareholders. Adams stated that he thought his law firm, AMLLP, had some input on drafting the letter but he did not remember if AMLLP actually drafted the letter.

15.     In addition, the cover letter introduced the "new management" for Private Scio as J.D.L., Chief Executive Officer, and a letter of introduction from J.D.L. was included in the proxy statement materials sent to the shareholders. This introduction letter was dated on or about March 11, 2011, to ADI shareholders and March 18, 2011, to ADGC shareholders. Your affiant reviewed these letters and noticed that, again, Adams' and Monahan's roles and ownership interest in Private Scio were not disclosed.

16.     Your affiant also reviewed a recording of an interview of J.D.L. by members of the SEC in which J.D.L. stated, in reference to Private Scio, that he was "not involved in that original private company."

17.     Your affiant learned that on or about April 18, 2011, a special meeting was held in Boston, Massachusetts per the proxy statement and letter described above, where a majority of the shareholders for ADI and ADGC approved the asset purchase agreements between ADI, ADGC, and Private Scio.

18.     Your affiant learned that as of May 2011, which was before the stock-repurchase program had been completed, Adams and his wife owned 11 percent of

9

ADGC and Monahan owned 4 percent and Adams and his wife owned less than 2 percent of ADI and Monahan owned 0 percent.

19.    On or about May 1, 2011, Private Scio issued a private placement memorandum ("PPM") offering up to 7,200,000 shares of common stock at $0.70 per share to potential accredited investors, to terminate on September 30, 2011.  Your affiant reviewed this PPM and learned that Adams' and Monahan's roles in ADI and ADGC were not disclosed.  An amendment to this PPM, dated on or about August 1, 2011, again does not disclose Adams' and Monahan's roles in ADI and ADGC.  The amendment was signed by Adams.  The disclosure of Adams' and Monahan's roles in ADI and ADGC would be material information to prospective shareholders of Private Scio, in part because the prior companies involved both Adams and Monahan in the same business, manufacturing diamonds, and both prior companies failed.  This is a potential risk that is not outlined in the PPM.  According to bank records your affiant reviewed, over $700,000 was raised from investors as part of this offering through on or about August 1, 2011.

20.    On or about May 5, 2011, Adams sent an email to D.P. and K.M. and copied Monahan and P.R., who are all employees of Focus, regarding controlling Scio, "control which we can utilize to effectuate a favorable outcome."  (Considering the timing of this email, your affiant believes Adams is referring to Private Scio.)  Adams also states that without his and Monahan's roles in Scio, he fears he would only be an agent to the company and not in control of getting paid by the company.  Adams adds,

"there is no Scio opportunity--none--without us [Adams and Monahan]. This transaction was our idea, we have managed it, and we need to continue to manage it to a successful outcome." In a follow-up to a response from this email, Adams discusses his control of the Scio board and the invitations he has out to other individuals to join the Board. He also states that he and Monahan collectively only own 16 percent of the company which is 4,000,000 of the 25,000,000 shares, and after the offering that will be less. The email address Adams used for this email is jafman1@yahoo.com and the email address this was sent to for Monahan is michaelrmonahan@yahoo.com.

21.     According to online records reviewed by your affiant, an amendment was filed in Nevada effectively dated July 20, 2011, changing the name of a publicly-traded company named Krossbow Holdings Corporation, to Scio Diamond Technology Corporation. For ease of reference and to avoid any potential confusion, this Affidavit will refer to this publicly-traded company that adopted the name Scio Diamond Technology Corporation as "Public Scio.".

22.     Your affiant reviewed an asset purchase agreement between Public Scio and Private Scio (dated July 31, 2011, and found that Public Scio agreed to acquire substantially all of the assets of Private Scio, including those listed in a schedule attached to the asset purchase agreement. Your affiant reviewed the attached schedule and discovered that it listed one item, the name Scio Diamond Technology Corporation. According to the asset purchase agreement, the properties and rights of Private Scio were to be transferred to Public Scio for 13,000,000 shares of Public Scio's stock. However, it

11

appears from the asset purchase agreement and other records reviewed by your affiant that the 13,000,000 shares were not distributed to Private Scio but instead were distributed directly to Adams and his wife, Monahan and his wife, R.C.L., J.D.L., and other individuals.

23.     According to stock sale agreements and other records your affiant reviewed, Adams and his wife and Monahan and his wife each obtained a total of 5,390,000 Public Scio shares from the Scio Asset Purchase Agreement and from additional stock sales agreements in the beginning of August 2011.  As a result, both the Adamses and the Monahans each obtained more than a 27 percent ownership interest in Public Scio.   First, pursuant to Schedule 1.4 of the asset purchase agreement, the Adamses and the Monahans each received 4,100,000 shares of Public Scio.  Second, on or about August 1, 2011, every share of Public Scio's outstanding stock was sold for $0.06 and $0.08 a share to a small group, which included the Adamses, the Monahans, and others.  Adams and Monahan each received 290,000 shares of Public Scio in an August 1, 2011 stock sale agreement for $0.06 a share, and Adams and Monahan each received 1,000,000 shares for $0.08 a share in another August 1, 2011 stock sale agreement.  J.D.L. obtained a significant share of Public Scio shares as well, amounting to 2,290,000 shares, or over 11 percent of the company, putting Adams and Monahan, not J.D.L., the Chief Executive Officer, in control of Public Scio.  The sale of these Public Scio shares for $0.06 and $0.08 per share to Adams, Monahan, and select others occurred

12

while the Private Scio PPM, which offered Private Scio shares for $0.70 per share, was still active.

24.     On or about August 5, 2011, Public Scio publicly changed its name from Krossbow to Scio Diamond Technology Corporation (Public Scio). J.D.L. was appointed Chief Executive Officer of Public Scio, Adams was appointed Chairman of the Board, and Monahan was appointed to the Board.

25.     Your affiant reviewed an SEC Form 8-K filed online for Public Scio. According to this Form 8-K, dated August 11, 2011, the aforementioned Scio Asset Purchase Agreement was executed on August 5, 2011, and under the terms of the agreement, "the name 'Scio Diamond Technology Corporation' was purchased for 13,000,000 newly issued shares of common stock of the Company." The Form 8-K explained the change of control of Public Scio and also listed the new directors and officers of Public Scio, which included Adams and Monahan. The 8-K stated Adams' and Monahan's beneficial ownership interests of Public Scio included 5,390,000 shares each, which meant Adams and Monahan each beneficially owned over 27 percent of the company. According to the 8-K Adams and Monahan were appointed to Public Scio's Board of Directors as the Chairman and a member, respectively, on August 5, 2011. There was no disclosure in this 8-K of Adams's or Monahan's previous roles in ADI or ADGC. The 8-K also did not disclose Adams's relationship, as son-in-law and brother-in-law, to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC, respectively, or Adams's and Monahan's law firm, AMLLP's,

previous representation of ADI and ADGC, despite an included biography of Adams in the 8-K. A similar 8-K filed with the SEC, dated on or about August 17, 2011, also did not provide any of these aforementioned disclosures.

26.     According to another 8-K filed online by Public Scio with the SEC on or about August 31, 2011, Public Scio entered into an asset purchase agreement with ADI for $2,000,000.  Public Scio was supposed to pay ADI $1,000,000 in cash and provide a $1,000,000 promissory note "in consideration for ADI's Diamond Growing Machines and Intellectual Property."  The 8-K is signed by J.D.L., as Public Scio's Chief Executive Officer.  There is no disclosure of Monahan's previous roles in ADGC, Adams' previous roles in ADI or ADGC, or Adams' familial relation to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC.   Your affiant believes that these failures to disclose the extent of Adams' and Monahan's connections to the previous, failed companies were important to current and future shareholders of Public Scio to make informed decisions on purchasing or retaining their shares.  This asset purchase agreement also does not disclose the previous asset purchase agreements for Private Scio to purchase the assets of ADI and ADGC.

27.     Your affiant learned that on or about August 10, 2011, Public Scio paid $275,000 to AMLLP.  From on or about August 11, 2011, through January 14, 2013, Public Scio paid $1,725,000 to ADI.  Of this amount, $1,600,000 was paid between August 11, 2011, and December 30, 2011.  Subsequent to the payments from Public Scio to ADI, ADI disbursed two payments totaling $75,000 to ESA Consulting Services LLC

(an Adams company) in October 2011, an additional payment of $275,000 to AMLLP on November 18, 2011, and six payments totaling over $726,765.97 directly to Adams. On or about the same days as the August 10, 2011 payment of $275,000 from Public Scio to AMLLP and the November 11, 2011 payment of $275,000 from ADI to AMLLP, AMLLP made payments of $262,500 on August 10, 2011, and $225,000 on November 18, 2011, to the Monahans.

28.     Your affiant was able to find online archived copies of the www.sciodiamond.com website. The earliest available archived copy is from October 28, 2011. After clicking on "Our Company" and then "Officers and Directors", the website explained Adams is Chairman of the Board and lists Monahan under "Officers and Directors" of Public Scio, but there is no disclosure regarding Adams' or Monahan's previous roles with ADI and ADGC.

29.     In your affiant's review of records, she found a series of emails between Adams, Monahan, and C.N., the Chief Financial Officer for Public Scio. On or about March 26, 2012, an email was sent from C.N. to Adams, at his email address edwardsadams@yahoo.com,     Monahan,     at     his     email     address michaelrmonhan@yahoo.com, and copying J.D.L. regarding disclosures for documents in working with a potential large investor. C.N. writes about the common ownership of Scio, ADI, and ADGC and states, "We also need to disclose any executive officer or director relationships involving ADI and . . . ADGC. I don't know what you guys may be or may have been . . . . If you guys have resigned any relevant positions or board seats

15

please let me know what happened . . . ." C.N. adds, "We saw somewhere that [D.P.] was an officer of one of the companies, so if you have records on that, please provide." Adams responds to this email the same day and states, "Michael [Monahan] and I were neither ever. [D.P.] is nothing related to this in anyway."

30.     Your affiant discovered a memorandum dated on or about November 30, 2009, from ADI discussing the roles of Adams, Monahan, and D.P. to ADI. It appears to your affiant the memorandum was issued to deal with disclosures for Focus Capital Group (another of Adams' and Monahan's companies as described above). The memorandum states, in part, Adams, Monahan, and D.P. "are currently serving in various directorial and/or officer capacities, with Apollo Diamond, Inc. (including its various subsidiaries and affiliates, including Apollo Diamond Gemstone Corporation)." There is a signature page to the memorandum which contains Adams' and Monahan's signatures.

31.     Your affiant reviewed a Form 8-K filed with the SEC on or about June 8, 2012. The 8-K explains that on June 5, 2012, Public Scio agreed to purchase "substantially all of the assets of ADGC" for $100,000 pursuant to an asset purchase agreement. According to the 8-K, the assets purchased "consist primarily of cultured diamond gemstone –related know-how, inventory, and various intellectual property." This varies substantially in value from the original asset purchase agreement whereby Private Scio was going to purchase ADGC's assets for $10,000 just over one year prior to this.

32. Your affiant knows from her experience that non-disclosure of key individuals' roles in companies, such as the non-disclosure here of Adams' and Monahan's roles and ownership interests in Private Scio to ADI and ADGC shareholders prior to the special meeting of shareholders to approve the asset purchase agreement with Private Scio and the stock-repurchase program and of Adams' and Monahan's roles in ADI and ADGC to Private Scio's shareholders, can be material information to most current and prospective investors. In this case, Adams and Monahan maneuvered themselves into a position of control with Private Scio, did not disclose this position to ADI and ADGC shareholders prior to the shareholder vote on the sale of ADI and ADGC to Private Scio and the stock-repurchase program, and then put themselves in another position of control with Public Scio, partly by selling Private Scio's name to Public Scio and then by purchasing Public Scio shares at rates far lower than rates that were in effect only weeks later, in order to gain control of Public Scio. Then, they did not disclose their roles in ADI and ADGC to the Public Scio shareholders before Public Scio's purchase of ADI and ADGC and made attempts to actively conceal those roles in ADI and ADGC after the sale to Public Scio. Adams and Monahan were not only able to benefit financially, as described above, but also managed to maneuver themselves into a position of greater control and ownership in the new company, Public Scio. Specifically, Adams moved from an ownership position of 11 percent in ADGC and less than 2 percent in ADI to over 27 percent in Public Scio and Monahan moved from an ownership position of 4 percent in ADGC and 0 percent in ADI to over 27 percent in Public Scio.

17

33.     During your affiant's review of the transcript of the SEC's deposition of Adams on August 27, 2015, your affiant learned that, according to Adams, Adams mainly uses one email address, edwardsadams@yahoo.com.  According to the deposition transcript, as part of the subpoena request for records by the SEC, Adams searched his emails, including edwardsadams@yahoo.com, for key words related to his business dealings with Scio and produced those email records to the SEC.  Therefore, given that Adams was able to search for, find, and produce emails from the edwardsadams@yahoo.com account in response to the subpoena request it appears that Adams still retains emails that would be relevant to the investigation.

34.     Based on the above, your affiant believes that Adams has used the email addresses edwardsadams@yahoo.com and jafman1@yahoo.com in his business dealings related to the fraud scheme described in this affidavit and that Monahan has used the email address michaelrmonahan@yahoo.com in his business dealings related to the fraud scheme.

35.     A preservation letter was sent to Yahoo! Inc. on or about October 7, 2015 for edwardsadams@yahoo.com and on or about October 22, 2015 for jafman1@yahoo.com and michaelrmonahan@yahoo.com.  In general, an e-mail that is sent to a Yahoo! Inc. subscriber is stored in the subscriber's "mail box" on Yahoo! Inc. servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Yahoo! Inc. servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Yahoo! Inc.'s servers for

18

a certain period of time. Therefore, it is believed Yahoo! Inc. has maintained the records being sought pursuant to this warrant.

## BACKGROUND CONCERNING E-MAIL

36.     In my training and experience, I have learned that Yahoo! Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo! Inc. allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Yahoo! Inc. During the registration process, Yahoo! Inc. asks subscribers to provide basic personal information. Therefore, the computers of Yahoo! Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo! Inc. subscribers) and information concerning subscribers and their use of Yahoo! Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.     A Yahoo! Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo! Inc. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

19

38.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

39.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

20

40. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

41. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo! Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Further your Affiant sayeth not.

_____
Postal Inspector Christie Kroells
United States Postal Inspection Service

SUBSCRIBED and SWORN to before me this 25th day of November, 2015

_____
THE HONORABLE Janie S. Mayeron
United States Magistrate Judge
District of Minnesota

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

**ATTACHMENT B**

**Particular Things to be Seized**

## I.  Information to be disclosed by Yahoo! Inc. (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.  The types of service utilized;

d.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.  All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

a.  All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

> 1.  All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:
>
>> i.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

the business bank accounts and other financial accounts of the

above business entities.

ii. All bookkeeping ledgers, journals, reports, and other bookkeeping

records, and computer printouts thereof, which record, identify,

and itemize the dates, amounts, and nature and classification of all

income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public

Scio, to include all such documents, records, and communications

regarding the ADI/ADGC proxy statement from March 2011, the asset

purchase agreement between ADI/AGC and Private Scio, the stock-

repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or

prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any writing or oral conversation, including, but not limited to, telephone conversations,

conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)      Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)      Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)      Text messages

d)      Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)      Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)      Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

## SEARCH WARRANT ADDENDUM

1.  In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2.  If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g. computer, hard drive, mobile device, smartphone, cell phone,) or other data storage mechanism (e.g. information produced by an internet provider or social media provider). The person from whom the electronic storage device was seized or whose data was seized from another data storage mechanism may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3.  Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4.  The government shall establish a search methodology governing the review of seized data, information, documents or other records to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data, information, documents or other records seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

# EXHIBIT 2

JEK:blb

AO 93 (Rev. 12/09) Search and Seizure Warrant

2014R00312

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

*RECEIVED*

*MAR 1 1 2016*

*CLERK, U.S. DISTRICT COURT*
*ST PAUL, MINNESOTA*

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS THAT ARE ASSOCIATED WITH THE E-MAIL ADDRESSES: EDWARDSADAMS@YAHOO.COM, JAFMAN1@YAHOO.COM, AND MICHAELRMONAHAN@YAHOO.COM, THAT IS STORED AT PREMISES CONTROLLED BY YAHOO! INC.**

*Sealed by Order*

Case No.   15-MJ-942 (JSM)

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

>    **See Attachment A**

The person or property to be searched, described above, is believed to conceal:

>    See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     December 9, 2015
                                                                                           *(not to exceed 14 days)*

_ in the daytime 6:00 a.m. to 10 p.m.
X  at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Janie S. Mayeron.

Date and Time issued:   11/25/15  10:05 A.M.   *Janie S Mayeron*
                                                                                          *Judge's Signature*

City and State:  Minneapolis, MN                        Janie S. Mayeron, U.S. Magistrate Judge
                                                                                       *Printed Name and Title*

SCANNED

MAR 1 1 2016

U.S. DISTRICT COURT ST. PAUL

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.:<br>*2062433-MF* | Date and time warrant executed:<br>*11/25/15 @ 11:11 am* | Copy of warrant and inventory left with:<br>*NA* |

Inventory made in the presence of :

*NA*

Inventory of the property taken and name of any person(s) seized:

*NA*

\* Service made on subject of warrant via an outdated method of service.

---

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/10/16

Executing officer's signature

Printed name and title

Postal Inspector

Subscribed, sworn to, and returned before this date.

U.S. Judge or Magistrate Judge

Date

3/10/16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.      Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.      Information to be seized by the government

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.  All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

    i.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

the business bank accounts and other financial accounts of the
above business entities.

    ii. All bookkeeping ledgers, journals, reports, and other bookkeeping
records, and computer printouts thereof, which record, identify,
and itemize the dates, amounts, and nature and classification of all
income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public
Scio, to include all such documents, records, and communications
regarding the ADI/ADGC proxy statement from March 2011, the asset
purchase agreement between ADI/AGC and Private Scio, the stock-
repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or
prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing
items of evidence in whatever form (including written, printed, typed, recorded,
electronic, or graphic matter) and by whatever means they may have been created or
stored, including any electrical, electronic, computer, or magnetic form (such as any
information on an electronic or magnetic storage device, including floppy diskettes,
hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart
cards, memory calculators, pagers, personal digital assistants, as well as printouts or
readouts from any magnetic storage device); any handmade form (such as writing,
drawing, painting); any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any
means, whether by chance or design, and shall mean and be deemed to refer to any
writing or oral conversation, including, but not limited to, telephone conversations,

conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)     Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)     Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)     Text messages

d)     Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)     Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)     Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Yahoo! Inc., and my official title is _____. I am a custodian of records for Yahoo! Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo! Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.     such records were kept in the ordinary course of a regularly conducted business activity of Yahoo! Inc.; and

c.     such records were made by Yahoo! Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____

Date                                        Signature

## SEARCH WARRANT ADDENDUM

1.  In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2.  If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g. computer, hard drive, mobile device, smartphone, cell phone,) or other data storage mechanism (e.g. information produced by an internet provider or social media provider).  The person from whom the electronic storage device was seized or whose data was seized from another data storage mechanism may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3.  Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device.  Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4.  The government shall establish a search methodology governing the review of seized data, information, documents or other records to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team.   In the event that data, information, documents or other records seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

# EXHIBIT 3

JEK:blb

AO 106 (Rev. 04/10) Application for a Search Warrant



RECEIVED

2014R00312

# UNITED STATES DISTRICT COURT

FEB 03 2016

for the
District of Minnesota

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

Case No. 16mj 8(SER)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Northern District of California, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

| | |
|---|---|
| X | evidence of a crime; |
| X | contraband, fruits of crime, or other items illegally possessed; |
| X | property designed for use, intended for use, or used in committing a crime; |
| ___ | a person to be arrested or a person who is unlawfully restrained. The search is related to a |

violation of:

| <u>Code Section</u> | <u>Offense Description</u> |
|---|---|
| Title 18, United States Code, Section(s) 1341 & 1343 | Mail Fraud and Wire Fraud |

The application is based on these facts: **See attached Affidavit.**

____X____   Continued on the attached sheet.

_____
*Applicant's Signature*

Christie Kroells, Inspector
*Printed Name and Title*

Sworn to before me and signed in my presence.

Date: 7 Jan 2016

_____
*Judge's Signature*

Steven E. Rau, U.S. Magistrate Judge
*Printed Name and Title*

City and State: <u>St. Paul, MN</u>

SCANNED

FEB 0 3 2016

U.S. DISTRICT COURT ST. PAUL

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the

possession, custody, or control of the Provider, including any emails, records, files, logs,

or information that has been deleted but is still available to the Provider, or has been

preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and

October 22, 2015, the Provider is required to disclose the following information to the

government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or

preserved copies of e-mails sent to and from the account, draft e-mails, the source and

destination addresses associated with each e-mail, the date and time at which each e-mail

was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account,

to include full name, physical address, telephone numbers and other identifiers, records

of session times and durations, the date on which the account was created, the length of

service, the IP address used to register the account, log-in IP addresses associated with

session times and dates, account status, alternative e-mail addresses provided during

registration, methods of connecting, log files, and means and source of payment

(including any credit or bank account number);

c.      The types of service utilized;

d.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

a.    All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.    All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

i.    All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the
above business entities.

ii. All bookkeeping ledgers, journals, reports, and other bookkeeping
records, and computer printouts thereof, which record, identify,
and itemize the dates, amounts, and nature and classification of all
income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public
Scio, to include all such documents, records, and communications
regarding the ADI/ADGC proxy statement from March 2011, the asset
purchase agreement between ADI/AGC and Private Scio, the stock-
repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or
prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing
items of evidence in whatever form (including written, printed, typed, recorded,
electronic, or graphic matter) and by whatever means they may have been created or
stored, including any electrical, electronic, computer, or magnetic form (such as any
information on an electronic or magnetic storage device, including floppy diskettes,
hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart
cards, memory calculators, pagers, personal digital assistants, as well as printouts or
readouts from any magnetic storage device); any handmade form (such as writing,
drawing, painting); any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any
means, whether by chance or design, and shall mean and be deemed to refer to any

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)   Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)   Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)   Text messages

d)   Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)   Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)   Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

4

STATE OF MINNESOTA      )   **FILED UNDER SEAL – PURSUANT TO ORDER**
                        )   ss.    AFFIDAVIT OF CHRISTIE KROELLS
COUNTY OF HENNEPIN      )

I, Postal Inspector Christine Kroells, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo! Inc., an e-mail provider headquartered at 701 First Avenue, Sunnyvale, CA.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Postal Inspector with the U.S. Postal Inspection Service, and have been since 2003. I am currently assigned to the Twin Cities Field Office in Minneapolis, Minnesota.  I am authorized to conduct investigations on behalf of the United States Postal Inspection Service.  My primary criminal investigative responsibilities include investigations which may involve violations of Title 18, United States Code, Section 1341, Mail Fraud.  I have conducted and participated in numerous criminal investigations

of individuals involved in illegal activities for possible violations of the United States Code and related laws, including but not limited to mail and wire fraud in violation of Title 18, United States Code, 1341 and 1343, respectively. Your affiant's experience includes training in and investigation of mail fraud and wire fraud. Your affiant's investigative experience includes uncovering schemes where individuals obtain goods or monetary funds from victims as part of investment schemes through false pretenses and do not follow through with their obligations to the victims. In your affiant's experience, these individuals use these schemes to obtain money and property for their personal gain. In your affiant's experience evidence of these crimes can be found in email communications.

3.     This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1341 and 1343 have been committed by Edward S. Adams and Michael R. Monahan, including by concealing and failing to disclose material information to company shareholders prior to seeking the shareholders' approval of transactions which personally benefitted Adams and Monahan. There is also probable cause to believe that evidence of these violations is located in the following email accounts, further described in Attachment A:

      a.   edwardsadams@yahoo.com, used by Edward S. Adams;

2

    b.  jafman1@yahoo.com, used by Edward S. Adams; and

    c.  michaelrmonahan@yahoo.com, used by Michael R. Monahan;

and to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      According to online records your affiant reviewed, Linares Management Associates registered with the state of Massachusetts on or about May 2, 1990, and on or about February 20, 2001, Linares Management Associates changed its name to Apollo Diamond, Inc. (ADI). According to these records, B.R.L. and M.V.L. were listed as President and as Treasurer and Secretary, respectively, from the inception of the company and through the name change. On or about May 23, 2006, ADI was voluntarily dissolved and on the same date ADI was re-registered with the state of Massachusetts listing B.R.L. again as President, and adding R.C.L. as Treasurer and Adams as Secretary. On or about April 2, 2004, Apollo Diamond Gemstone Corporation (ADGC), a subsidiary of ADI, was registered with the state of Delaware. Adams signed the Articles of Incorporation as the Incorporator for ADGC. Adams is R.C.L.'s son-in-law and B.R.L.'s brother-in-law.

7.      Through documents your affiant has gathered during the course of this investigation, your affiant has learned that ADI started working to "develop and perfect" a chemical vapor deposition (CVD) technology that produces high-quality diamond crystals for use in the industrial and gemological industries. R.C.L. reportedly discovered this technology, which was used by ADI to develop a process to create large, single-crystal diamonds that could be grown in a controlled laboratory environment. ADGC was created to generate these synthetic diamonds and market them to various industries.

8.      Between 2004 and 2011, Adams held various positions within both ADI and ADGC, including Secretary of ADI and Secretary, Executive Vice President, Chief Financial Officer, Director, and President of ADGC. Your affiant has reviewed records showing Adams in these roles. These records include multiple Form Ds for ADI filed with the SEC, including one dated October 25, 2006, and another dated November 13, 2007,  in which Adams signs the forms as ADI's Secretary and is listed as an Executive Officer of ADI. Form Ds for ADGC, dated November 13, 2007, July 20, 2009, and July 20, 2010, that were signed by Adams either as ADGC's Secretary or ADGC's Chief Financial Officer list Adams as an Executive Officer, and, on one form, as a Director.

9.      Between 2008 and 2010, Monahan held various positions within ADGC, including Vice President of Business Development, Executive Vice President for Corporate Development and Marketing, and General Counsel. Your affiant reviewed records showing Monahan in these roles, including multiple Form Ds filed with the SEC.

Two of these Form Ds filed for ADGC, which were dated July 20, 2009, and July 20, 2010, list Monahan as an Executive Officer of ADGC.

10.     From at least 2008 through 2014, Adams and Monahan were partners in a Minneapolis-based law firm, Adams Monahan, LLP (AMLLP). Focus Capital Group, Inc. (Focus) is a Minneapolis-based investment banking firm that was co-founded by Adams and Monahan and incorporated with the state of Minnesota in 2005. Adams was Chief Executive Officer and Managing Director of Focus, and Monahan was the Senior Managing Director of Focus. ESA Consulting Services, LLC (ESA Consulting) is a Minneapolis-based company. According to the Minnesota Secretary of State, Adams is listed as the Manager of ESA Consulting.

11.     Your affiant reviewed records regarding the formation of a privately-held company named Scio Diamond Technology Corporation, which was formed on or about March 1, 2011 in Nevada. For ease of reference and to avoid any potential confusion, this Affidavit will refer to this company formed on March 1, 2011 as "Private Scio" as distinguished from the publicly-traded company that adopted the same name in July 2011, as explained below in paragraph 21. Adams and Monahan are listed on the Articles of Incorporation as the sole officers and members of the Board of Directors for Private Scio. Specifically, Adams is listed as the Director, President, and Treasurer, and Monahan is listed as the Secretary. Both Adams and Monahan owned shares in Private Scio.

5

12.    Your affiant reviewed a proxy statement and the cover letter to that proxy statement sent to ADI shareholders and dated March 11, 2011, from R.C.L., in his capacity as ADI's Chairman asking for the shareholders' approval of the sale of ADI's assets to Private Scio. The proxy statement solicited the proxies from shareholders to approve (1) the sale of all of ADI's assets for $2,000,000 to Private Scio and (2) a stock repurchase program whereby ADI would repurchase the shares of interested shareholders for $0.01 per share. The proxy statement explained that the $2,000,000 proceeds from the sale would be used to satisfy ADI's outstanding debts and liabilities and to fund the stock repurchase program. According to the cover letter, beginning in 2009, ADI "was forced to terminate many of its employees and later to reduce, and in some cases defer or even eliminate, compensation to its remaining employees." The cover letter states that the ADI Board of Directors, in seeking to act in the best interest of the company, decided the sale of the company's assets was the best option in an effort to continue their mission, which was to manufacture and distribute synthetic diamonds. Specifically, the cover letter states, "a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology." The cover letter continues to explain that because of this decision, ADI has agreed to sell substantially all of its assets to Private Scio for approximately $2,000,000. The cover letter further states that ADI's most significant creditors have agreed to accept reduced payments and that these creditor agreements are conditioned on the sale of the assets to Private Scio. The cover letter does not disclose, however, that Adams' and

6

Monahan's law firm, AMLLP, was the single largest creditor of ADI at that time. In addition, the cover letter explained that under the stock repurchase program, ADI shareholders could sell back their shares at $0.01 per share, which the letter indicated could give rise to a tax advantage to the shareholders. According to the cover letter, any shareholders whose shares were repurchased by ADI would also be given the option to invest in Private Scio at a price of $0.01 per share in number of shares equal to the number of shares that they held in ADI. The cover letter indicated that there would be a Special Meeting of Stockholders and part of the agenda of the meeting would be to vote on the sale of ADI to Private Scio. A similar cover letter dated March 18, 2011, was sent to the ADGC shareholders. Neither of these cover letters disclosed Adams' or Monahan's roles in Private Scio, despite the fact that, according to the proxy statement, AMLLP was retained by ADI and ADGC to carry out the proxy solicitation. Nor did either of the proxy statements themselves disclose Adams' or Monahan's roles in Private Scio. The failure of both the proxy statement and the cover letter to disclose Adams' and Monahan's roles and ownership interests in Private Scio is a material omission the ADI shareholders should have been made aware of prior to their decision to vote on the asset sale to Private Scio and the stock-repurchase program. In addition, the failure of both the proxy statement and the cover letter to disclose that Adams, Monahan, and AMLLP acted as counsel for both ADI and Private Scio in connection with the transaction was a material omission the shareholders of both ADI and Private Scio should have been made aware of prior to their decisions to authorize the transaction.

7

13.    Your affiant reviewed an asset purchase agreement dated on or about March 11, 2011, which was executed between ADI and Private Scio whereby Private Scio agreed to purchase the assets of ADI for $2,000,000 in cash. On or about March 18, 2011, a second asset purchase agreement was executed, this time between ADGC and Private Scio, whereby Private Scio agreed to purchase the assets of ADGC for $10,000 in cash.   Neither asset purchase agreement disclosed Adams's or Monahan's roles or ownership interests in Private Scio. Although these asset purchase agreements are signed by R.C.L., your affiant has not seen any evidence of funds being provided from Private Scio to ADI or ADGC.   These asset purchase agreements also do not disclose Private Scio's inability to pay the purchase prices as of the date of the agreements and as of the date of the Special Meeting; they only state that Private Scio "(p)rior to closing . . . shall have procured funding to make the Cash Payment."   Your affiant believes the contingency of Private Scio's funding, and the fact that Private Scio did not currently have the funding, could have been a deciding factor for the shareholders in determining whether or not to vote for the sale of ADI's and ADGC's assets to Private Scio. Your affiant found one bank account that appeared to initially start out as a Private Scio bank account. The account was opened on or about July 13, 2011, by Adams, as an officer of Private Scio. Adams is the sole signer on the account until C.N. (Chief Financial Officer for Public Scio) is added on or about April 25, 2012, shortly after which the account is closed.

8

14.    According to the transcript of a deposition of Adams conducted by the SEC on or about August 27, 2015, and reviewed by your affiant, Adams answered questions regarding the drafting of March 11, 2011 cover letter to the proxy statement from R.C.L. to the ADI shareholders.  Adams stated that he thought his law firm, AMLLP, had some input on drafting the letter but he did not remember if AMLLP actually drafted the letter.

15.    In addition, the cover letter introduced the "new management" for Private Scio as J.D.L., Chief Executive Officer, and a letter of introduction from J.D.L. was included in the proxy statement materials sent to the shareholders.  This introduction letter was dated on or about March 11, 2011, to ADI shareholders and March 18, 2011, to ADGC shareholders.  Your affiant reviewed these letters and noticed that, again, Adams' and Monahan's roles and ownership interest in Private Scio were not disclosed.

16.    Your affiant also reviewed a recording of an interview of J.D.L. by members of the SEC in which J.D.L. stated, in reference to Private Scio, that he was "not involved in that original private company."

17.    Your affiant learned that on or about April 18, 2011, a special meeting was held in Boston, Massachusetts per the proxy statement and letter described above, where a majority of the shareholders for ADI and ADGC approved the asset purchase agreements between ADI, ADGC, and Private Scio.

18.    Your affiant learned that as of May 2011, which was before the stock-repurchase program had been completed, Adams and his wife owned 11 percent of

9

ADGC and Monahan owned 4 percent and Adams and his wife owned less than 2 percent of ADI and Monahan owned 0 percent.

19.     On or about May 1, 2011, Private Scio issued a private placement memorandum ("PPM") offering up to 7,200,000 shares of common stock at $0.70 per share to potential accredited investors, to terminate on September 30, 2011. Your affiant reviewed this PPM and learned that Adams' and Monahan's roles in ADI and ADGC were not disclosed. An amendment to this PPM, dated on or about August 1, 2011, again does not disclose Adams' and Monahan's roles in ADI and ADGC. The amendment was signed by Adams. The disclosure of Adams' and Monahan's roles in ADI and ADGC would be material information to prospective shareholders of Private Scio, in part because the prior companies involved both Adams and Monahan in the same business, manufacturing diamonds, and both prior companies failed. This is a potential risk that is not outlined in the PPM. According to bank records your affiant reviewed, over $700,000 was raised from investors as part of this offering through on or about August 1, 2011.

20.     On or about May 5, 2011, Adams sent an email to D.P. and K.M. and copied Monahan and P.R., who are all employees of Focus, regarding controlling Scio, "control which we can utilize to effectuate a favorable outcome." (Considering the timing of this email, your affiant believes Adams is referring to Private Scio.) Adams also states that without his and Monahan's roles in Scio, he fears he would only be an agent to the company and not in control of getting paid by the company. Adams adds,

"there is no Scio opportunity--none--without us [Adams and Monahan]. This transaction was our idea, we have managed it, and we need to continue to manage it to a successful outcome." In a follow-up to a response from this email, Adams discusses his control of the Scio board and the invitations he has out to other individuals to join the Board. He also states that he and Monahan collectively only own 16 percent of the company which is 4,000,000 of the 25,000,000 shares, and after the offering that will be less. The email address Adams used for this email is jafman1@yahoo.com and the email address this was sent to for Monahan is michaelrmonahan@yahoo.com.

21.    According to online records reviewed by your affiant, an amendment was filed in Nevada effectively dated July 20, 2011, changing the name of a publicly-traded company named Krossbow Holdings Corporation, to Scio Diamond Technology Corporation. For ease of reference and to avoid any potential confusion, this Affidavit will refer to this publicly-traded company that adopted the name Scio Diamond Technology Corporation as "Public Scio.".

22.    Your affiant reviewed an asset purchase agreement between Public Scio and Private Scio (dated July 31, 2011, and found that Public Scio agreed to acquire substantially all of the assets of Private Scio, including those listed in a schedule attached to the asset purchase agreement. Your affiant reviewed the attached schedule and discovered that it listed one item, the name Scio Diamond Technology Corporation. According to the asset purchase agreement, the properties and rights of Private Scio were to be transferred to Public Scio for 13,000,000 shares of Public Scio's stock. However, it

11

appears from the asset purchase agreement and other records reviewed by your affiant that the 13,000,000 shares were not distributed to Private Scio but instead were distributed directly to Adams and his wife, Monahan and his wife, R.C.L, J.D.L., and other individuals.

23.    According to stock sale agreements and other records your affiant reviewed, Adams and his wife and Monahan and his wife each obtained a total of 5,390,000 Public Scio shares from the Scio Asset Purchase Agreement and from additional stock sales agreements in the beginning of August 2011. As a result, both the Adamses and the Monahans each obtained more than a 27 percent ownership interest in Public Scio.   First, pursuant to Schedule 1.4 of the asset purchase agreement, the Adamses and the Monahans each received 4,100,000 shares of Public Scio.  Second, on or about August 1, 2011, every share of Public Scio's outstanding stock was sold for $0.06 and $0.08 a share to a small group, which included the Adamses, the Monahans, and others.  Adams and Monahan each received 290,000 shares of Public Scio in an August 1, 2011 stock sale agreement for $0.06 a share, and Adams and Monahan each received 1,000,000 shares for $0.08 a share in another August 1, 2011 stock sale agreement.  J.D.L. obtained a significant share of Public Scio shares as well, amounting to 2,290,000 shares, or over 11 percent of the company, putting Adams and Monahan, not J.D.L., the Chief Executive Officer, in control of Public Scio.  The sale of these Public Scio shares for $0.06 and $0.08 per share to Adams, Monahan, and select others occurred

while the Private Scio PPM, which offered Private Scio shares for $0.70 per share, was still active.

24.     On or about August 5, 2011, Public Scio publicly changed its name from Krossbow to Scio Diamond Technology Corporation (Public Scio). J.D.L. was appointed Chief Executive Officer of Public Scio, Adams was appointed Chairman of the Board, and Monahan was appointed to the Board.

25.     Your affiant reviewed an SEC Form 8-K filed online for Public Scio. According to this Form 8-K, dated August 11, 2011, the aforementioned Scio Asset Purchase Agreement was executed on August 5, 2011, and under the terms of the agreement, "the name 'Scio Diamond Technology Corporation' was purchased for 13,000,000 newly issued shares of common stock of the Company." The Form 8-K explained the change of control of Public Scio and also listed the new directors and officers of Public Scio, which included Adams and Monahan. The 8-K stated Adams' and Monahan's beneficial ownership interests of Public Scio included 5,390,000 shares each, which meant Adams and Monahan each beneficially owned over 27 percent of the company. According to the 8-K Adams and Monahan were appointed to Public Scio's Board of Directors as the Chairman and a member, respectively, on August 5, 2011. There was no disclosure in this 8-K of Adams's or Monahan's previous roles in ADI or ADGC. The 8-K also did not disclose Adams's relationship, as son-in-law and brother-in-law, to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC, respectively, or Adams's and Monahan's law firm, AMLLP's,

previous representation of ADI and ADGC, despite an included biography of Adams in the 8-K. A similar 8-K filed with the SEC, dated on or about August 17, 2011, also did not provide any of these aforementioned disclosures.

26.     According to another 8-K filed online by Public Scio with the SEC on or about August 31, 2011, Public Scio entered into an asset purchase agreement with ADI for $2,000,000. Public Scio was supposed to pay ADI $1,000,000 in cash and provide a $1,000,000 promissory note "in consideration for ADI's Diamond Growing Machines and Intellectual Property." The 8-K is signed by J.D.L., as Public Scio's Chief Executive Officer. There is no disclosure of Monahan's previous roles in ADGC, Adams' previous roles in ADI or ADGC, or Adams' familial relation to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC. Your affiant believes that these failures to disclose the extent of Adams' and Monahan's connections to the previous, failed companies were important to current and future shareholders of Public Scio to make informed decisions on purchasing or retaining their shares. This asset purchase agreement also does not disclose the previous asset purchase agreements for Private Scio to purchase the assets of ADI and ADGC.

27.     Your affiant learned that on or about August 10, 2011, Public Scio paid $275,000 to AMLLP. From on or about August 11, 2011, through January 14, 2013, Public Scio paid $1,725,000 to ADI. Of this amount, $1,600,000 was paid between August 11, 2011, and December 30, 2011. Subsequent to the payments from Public Scio to ADI, ADI disbursed two payments totaling $75,000 to ESA Consulting Services LLC

(an Adams company) in October 2011, an additional payment of $275,000 to AMLLP on November 18, 2011, and six payments totaling over $726,765.97 directly to Adams. On or about the same days as the August 10, 2011 payment of $275,000 from Public Scio to AMLLP and the November 11, 2011 payment of $275,000 from ADI to AMLLP, AMLLP made payments of $262,500 on August 10, 2011, and $225,000 on November 18, 2011, to the Monahans.

28.     Your affiant was able to find online archived copies of the www.sciodiamond.com website. The earliest available archived copy is from October 28, 2011. After clicking on "Our Company" and then "Officers and Directors", the website explained Adams is Chairman of the Board and lists Monahan under "Officers and Directors" of Public Scio, but there is no disclosure regarding Adams' or Monahan's previous roles with ADI and ADGC.

29.     In your affiant's review of records, she found a series of emails between Adams, Monahan, and C.N., the Chief Financial Officer for Public Scio. On or about March 26, 2012, an email was sent from C.N. to Adams, at his email address edwardsadams@yahoo.com,        Monahan,        at        his        email        address michaelrmonhan@yahoo.com, and copying J.D.L. regarding disclosures for documents in working with a potential large investor. C.N. writes about the common ownership of Scio, ADI, and ADGC and states, "We also need to disclose any executive officer or director relationships involving ADI and . . . ADGC. I don't know what you guys may be or may have been . . . . If you guys have resigned any relevant positions or board seats

15

please let me know what happened . . . ." C.N. adds, "We saw somewhere that [D.P.] was an officer of one of the companies, so if you have records on that, please provide." Adams responds to this email the same day and states, "Michael [Monahan] and I were neither ever. [D.P.] is nothing related to this in anyway."

30.    Your affiant discovered a memorandum dated on or about November 30, 2009, from ADI discussing the roles of Adams, Monahan, and D.P. to ADI. It appears to your affiant the memorandum was issued to deal with disclosures for Focus Capital Group (another of Adams' and Monahan's companies as described above). The memorandum states, in part, Adams, Monahan, and D.P. "are currently serving in various directorial and/or officer capacities, with Apollo Diamond, Inc. (including its various subsidiaries and affiliates, including Apollo Diamond Gemstone Corporation)." There is a signature page to the memorandum which contains Adams' and Monahan's signatures.

31.    Your affiant reviewed a Form 8-K filed with the SEC on or about June 8, 2012. The 8-K explains that on June 5, 2012, Public Scio agreed to purchase "substantially all of the assets of ADGC" for $100,000 pursuant to an asset purchase agreement. According to the 8-K, the assets purchased "consist primarily of cultured diamond gemstone –related know-how, inventory, and various intellectual property." This varies substantially in value from the original asset purchase agreement whereby Private Scio was going to purchase ADGC's assets for $10,000 just over one year prior to this.

16

32.    Your affiant knows from her experience that non-disclosure of key individuals' roles in companies, such as the non-disclosure here of Adams' and Monahan's roles and ownership interests in Private Scio to ADI and ADGC shareholders prior to the special meeting of shareholders to approve the asset purchase agreement with Private Scio and the stock-repurchase program and of Adams' and Monahan's roles in ADI and ADGC to Private Scio's shareholders, can be material information to most current and prospective investors.    In this case, Adams and Monahan maneuvered themselves into a position of control with Private Scio, did not disclose this position to ADI and ADGC shareholders prior to the shareholder vote on the sale of ADI and ADGC to Private Scio and the stock-repurchase program, and then put themselves in another position of control with Public Scio, partly by selling Private Scio's name to Public Scio and then by purchasing Public Scio shares at rates far lower than rates that were in effect only weeks later, in order to gain control of Public Scio.    Then, they did not disclose their roles in ADI and ADGC to the Public Scio shareholders before Public Scio's purchase of ADI and ADGC and made attempts to actively conceal those roles in ADI and ADGC after the sale to Public Scio.    Adams and Monahan were not only able to benefit financially, as described above, but also managed to maneuver themselves into a position of greater control and ownership in the new company, Public Scio.    Specifically, Adams moved from an ownership position of 11 percent in ADGC and less than 2 percent in ADI to over 27 percent in Public Scio and Monahan moved from an ownership position of 4 percent in ADGC and 0 percent in ADI to over 27 percent in Public Scio.

17

33.     During your affiant's review of the transcript of the SEC's deposition of Adams on August 27, 2015, your affiant learned that, according to Adams, Adams mainly uses one email address, edwardsadams@yahoo.com.  According to the deposition transcript, as part of the subpoena request for records by the SEC, Adams searched his emails, including edwardsadams@yahoo.com, for key words related to his business dealings with Scio and produced those email records to the SEC.  Therefore, given that Adams was able to search for, find, and produce emails from the edwardsadams@yahoo.com account in response to the subpoena request it appears that Adams still retains emails that would be relevant to the investigation.

34.     Based on the above, your affiant believes that Adams has used the email addresses edwardsadams@yahoo.com and jafman1@yahoo.com in his business dealings related to the fraud scheme described in this affidavit and that Monahan has used the email address michaelrmonahan@yahoo.com in his business dealings related to the fraud scheme.

35.     A preservation letter was sent to Yahoo! Inc. on or about October 7, 2015 for edwardsadams@yahoo.com and on or about October 22, 2015 for jafman1@yahoo.com and michaelrmonahan@yahoo.com.  In general, an e-mail that is sent to a Yahoo! Inc. subscriber is stored in the subscriber's "mail box" on Yahoo! Inc. servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Yahoo! Inc. servers indefinitely.  Even if the subscriber deletes the e-mail, it may continue to be available on Yahoo! Inc.'s servers for

18

a certain period of time.  Therefore, it is believed Yahoo! Inc. has maintained the records being sought pursuant to this warrant.

## BACKGROUND CONCERNING E-MAIL

36.     In my training and experience, I have learned that Yahoo! Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo! Inc. allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account listed in Attachment A.   Subscribers obtain an account by registering with Yahoo! Inc.   During the registration process, Yahoo! Inc. asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo! Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo! Inc. subscribers) and information concerning subscribers and their use of Yahoo! Inc. services, such as account access information, e-mail transaction information, and account application information.   In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.     A Yahoo! Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo! Inc.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

19

38.    In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

39.    In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

40.    In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

41.    On November 25, 2015, U.S. Magistrate Judge Janie S. Mayeron signed a search warrant pertaining to the email addresses edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com.  That search warrant was based on the same allegations contained in this affidavit.  That same day, your affiant served that search warrant on Yahoo! Inc. via a fax number.  Your affiant understood this fax number to be the correct method for service of process on Yahoo! Inc. based on your affiant's previous successful service of process by this method and based on your affiant's consultation of a Yahoo! Inc. law enforcement manual.  After the search warrant was served and your affiant received confirmation that the fax had been successfully sent, a period of time passed with no response from Yahoo! Inc.  Accordingly, your affiant contacted Yahoo! Inc. and learned that although the fax number to which the search warrant had been sent formerly was the correct method for service of process, Yahoo! Inc. no longer accepted that method for service.  A representative of Yahoo! Inc. stated

21

they would not accept service of process for the November 25, 2015 search warrant because the date on which the warrant was to be executed, December 9, 2015, had passed. The Yahoo! Inc. representative explained that it was common for this error to occur and that Yahoo! Inc. required a new warrant to be issued and served on Yahoo! Inc. via their current, approved method, which is through email. Your affiant is therefore requesting a new warrant.

## CONCLUSION

42.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo! Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Further your Affiant sayeth not.

Postal Inspector Christie Kroells
United States Postal Inspection Service

SUBSCRIBED and SWORN to before me this 25th day of November, 2015 ~~7th day Jan 2016~~

THE HONORABLE STEVEN E. RAU
United States Magistrate Judge
District of Minnesota

22

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com,

jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises

controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First

Avenue, Sunnyvale, CA 94089.

## ATTACHMENT B

### Particular Things to be Seized

I.     **Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

a.     All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.     All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

i.     All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the
above business entities.

ii. All bookkeeping ledgers, journals, reports, and other bookkeeping
records, and computer printouts thereof, which record, identify,
and itemize the dates, amounts, and nature and classification of all
income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public
Scio, to include all such documents, records, and communications
regarding the ADI/ADGC proxy statement from March 2011, the asset
purchase agreement between ADI/AGC and Private Scio, the stock-
repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or
prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

### DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing
items of evidence in whatever form (including written, printed, typed, recorded,
electronic, or graphic matter) and by whatever means they may have been created or
stored, including any electrical, electronic, computer, or magnetic form (such as any
information on an electronic or magnetic storage device, including floppy diskettes,
hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart
cards, memory calculators, pagers, personal digital assistants, as well as printouts or
readouts from any magnetic storage device); any handmade form (such as writing,
drawing, painting); any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any
means, whether by chance or design, and shall mean and be deemed to refer to any

3

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)   Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)   Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)   Text messages

d)   Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)   Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)   Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

# EXHIBIT 4

JEK:blb
AO 93 (Rev. 12/09) Search and Seizure Warrant

2014R00312

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

**RECEIVED**

MAR 11 2016

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

In the Matter of the Search of:
**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

*Sealed by Order*

Case No.   16 mj 8(SER)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

> **See Attachment A**

The person or property to be searched, described above, is believed to conceal:

> **See Attachment B**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      January 21, 2016
                                                                                                        *(not to exceed 14 days)*

_  in the daytime 6:00 a.m. to 10 p.m.
X  at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Steven E. Rau

Date and Time issued:   *3:20 PM*
                                            *7 Jan 2016*                         *Steven E Rau*
                                                                                                    *Judge's Signature*

City and State:  St. Paul, MN
                                                        Steven E. Rau, U.S. Magistrate Judge
                                                                        *Printed Name and Title*

SCANNED
MAR 11 2016
U.S. DISTRICT COURT ST. PAUL

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.:<br>206 2433-MF | Date and time warrant executed:<br>1/8/16 @ 9:36am | Copy of warrant and inventory left with:<br>NA |
| Inventory made in the presence of :<br>NA | | |
| Inventory of the property taken and name of any person(s) seized: | | |

- *Flashdrive containing records for 3 email addresses: jafman1. edwardsadams, and michaelvmonahan.*

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/10/16

Subscribed, sworn to, and returned before this date.

_____
U.S. Judge or Magistrate Judge

Executing officer's signature

_____
Printed name and title

Postal Inspector
3/10/16
_____
Date

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with edwardsadams@yahoo.com,

jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises

controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First

Avenue, Sunnyvale, CA 94089.

## ATTACHMENT B

### Particular Things to be Seized

### I.   Information to be disclosed by Yahoo! Inc. (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    a.    The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

    b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.      Information to be seized by the government

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.  All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

    i.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the above business entities.

    ii.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/AGC and Private Scio, the stock-repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)   Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)   Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)   Text messages

d)   Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)   Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)   Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Yahoo! Inc., and my official title is _____. I am a custodian of records for Yahoo! Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo! Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

      b.     such records were kept in the ordinary course of a regularly conducted business activity of Yahoo! Inc.; and

      c.     such records were made by Yahoo! Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____
Date

_____
Signature

# EXHIBIT 5

# C-08010

# *ADAMS_EDWARD_20150827*

### *8/27/2015*

**Full-size Transcript**

**Prepared by:**

C-08010

Tuesday, September 15, 2015

1

1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In The Matter of:                    )

4                                        ) File No. C-08091-A

5   SCIO DIAMOND TECHNOLOGY CORPORATION )

6

7   WITNESS:  Edward Adams

8   PAGES:    1 through 307

9   PLACE:    Securities and Exchange Commission

10             175 West Jackson Boulevard

11             Chicago, Illinois

12   DATE:     Thursday, August 27, 2015

13

14        The above-entitled matter came on for hearing,

15   pursuant to notice, at 8:59 a.m.

16

17

18

19

20

21

22

23

24             Diversified Reporting Services, Inc.

25                    (202) 467-9200

2

1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         KEVIN A. WISNIEWSKI, ESQ.

5         JEFFREY A. SHANK, ESQ.

6         DANIEL J. HAYES, ESQ.

7         DONALD RYBA, CPA

8         Securities and Exchange Commission

9         Division of Enforcement

10        175 West Jackson Boulevard, Suite 900

11        Chicago, Illinois  60604

12        312-886-3807

13

14   On behalf of the Witness:

15        JOHN J. SIKORA, JR., ESQ.

16        Latham & Watkins, LLP

17        330 North Wabash Avenue, Suite 2800

18        Chicago, Illinois  60611

19        312-876-7700

20

21        JAMES L. KOPECKY, ESQ.

22        Kopecky Schumacher Bleakley & Rosenburg, P.C.

23        203 North Lasalle Street

24        Chicago, Illinois  60601

25        312-380-6552

1  Q Okay.  And how many of those folders did you find?

2  A Well, when I say a folder, you know, it would have

3 documents within the folder.

4  Q Okay.

5  A So I think there was only one Apollo folder,

6 maybe, and one Scio folder; something like that.  I tried to

7 keep the documents that were relevant in those.

8  Q Okay.  And what type of records were in that

9 Apollo folder?

10  A I suppose private placement documents, you know, a

11 shareholder list, perhaps.  I don't remember.

12  Q Okay.  How about that third bucket of e-mails?

13 Walk me through or explain to me what you did to search your

14 e-mails for responsive documents with response to Commission

15 Exhibit 27.

16  A I would look at the -- what I thought were the

17 terms that were most likely to be relevant in an e-mail, and

18 I would search using those terms.  At one point, I think I

19 even looked at all e-mail communications beginning in 2011,

20 just to make sure, you know, I wasn't missing something with

21 the search.  And I tried to produce those, of course.

22  Q How many e-mails are we talking about?  How many

23 actual e-mail addresses do you maintain?

24  A Four, five, six.  But I use one most typically,

25 which is the edwardsadams@yahoo.com.

1      Q    You searched all --

2      A    I did.

3      Q    Okay.  And you said you used certain terms in

4   response to what was in the subpoena.

5           Did you maintain a copy or a record of the terms

6   you used to search your e-mails?

7      A    I did not.

8      Q    Did you maintain in any of those e-mails a folder

9   for certain communications that related to Scio Diamond, to

10  Apollo Diamond or any other category that was responsive to

11  the subpoena?

12     A    Could you repeat that?

13     Q    Yeah.  Just to give you an example, so on my

14  records, right, I will have a case, right, and I will name a

15  case Scio, and I will take all my e-mails and I will store

16  it in that Scio folder.

17          I am just wondering if you did anything similar;

18  if you had some type of similar storage mechanism that you

19  used in your e-mails to kind of store and file those

20  e-mails.

21     A    I do, but I don't remember that it existed for

22  Apollo or Scio, as examples, you know.  I remember Baseball

23  2011, which my son was on a team, right; the e-mails there.

24  But I wasn't really diligent about necessarily doing that

25  for Apollo or Scio.

1    and then that would allow further commercialization of the

2    opportunity.  And there were discussions about the uses of

3    diamond in -- both in the industrial world, technology

4    world -- so, I guess, three prongs; technology, industrial,

5    gemstone.

6            So in 2000 -- and the dates are fuzzy because it's

7    a long time ago.  But in 2000 or 2001, I raised -- I was

8    affiliated with Equity Securities.  And I, along with some

9    other individuals at Equity, raised some money for Apollo.

10   Q    Okay.  And did you receive compensation from

11   Apollo Diamond -- did Equity Securities receive compensation

12   from Apollo Diamond for raising that money?

13   A    It did.

14   Q    So it was a broker-dealer?

15   A    It was.

16   Q    And did you talk to any investors -- reach out to

17   any investors about the opportunity to invest in Apollo

18   Diamond?

19   A    I did.

20   Q    And after performing those services for Equity

21   Securities, when did you actually become -- let me ask you

22   this:  Did you ever become an employee of Apollo Diamond?

23   A    So this is where we are going to need to talk

24   about definitions, because the "employee" definition, you

25   know, has different meanings, I think, depending on what

64

1    context.

2           I became general counsel for Apollo, and I think

3    that was in 2004 or so.

4     Q    So you were Apollo's general counsel?

5     A    For a period of time, yes.

6     Q    How about any other roles did you act on behalf of

7    the company?

8     A    We are talking about Apollo Diamond, not Gemstone?

9     Q    Apollo Diamond.

10    A    Okay.  So I believe later I became -- I think I

11   was general counsel, perhaps secretary, and executive vice

12   president, and then I think I later became briefly

13   president.  And I don't remember when, you know, the roles

14   changed and how.

15    Q    That's exactly what I was going to ask.

16           If you could just ball park, you know, to the

17   extent -- you said 2006 you became general counsel.  So --

18    A    No, 4.  2004.

19    Q    2004.  So were you secretary in 2004?

20    A    I don't remember.

21    Q    Okay.

22    A    I don't know if I was ever secretary or -- if I

23   was, it might have been for a brief -- I might have been

24   secretary for meetings, but not necessarily the corporate

25   secretary.  So in other words, I would take a note -- notes

1                    PROOFREADER'S CERTIFICATE

2

3    In the Matter of:   SCIO DIAMOND TECHNOLOGY

4                        CORPORATION

5    Witness:            Adam Edwards

6    File Number:        C-08091-A

7    Date:               August 27, 2015

8    Location:           Chicago, IL

9

10

11        This is to certify that I, Nicholas Wagner,

12   (the undersigned), do hereby swear and affirm

13   that the attached proceedings before the U.S.

14   Securities and Exchange Commission were held

15   according to the record and that this is the

16   original, complete, true and accurate transcript

17   that has been compared to the reporting or recording

18   accomplished at the hearing.

19

20

21

22   _____      _____

23   (Proofreader's Name)           (Date)

24

25

# C-08091

# *ADAMS_EDWARD_20151008*

### *10/8/2015 9:00 AM*

**Full-size Transcript**

**Prepared by:**

C-08091

Thursday, October 29, 2015

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    IN THE MATTER OF:                )

4                                     ) File No. C-08091-A

5    SCIO DIAMOND TECHNOLOGY          )

6    CORPORATION                      )

7

8    WITNESS:  Edward Adams

9    PAGES:    308 through 562

10   PLACE:    Securities and Exchange Commission

11             175 West Jackson Boulevard, Suite 900

12             Chicago, Illinois 60604

13   DATE:     Thursday, October 8, 2015

14

15       The above-entitled matter came on for hearing,

16   pursuant to notice at 9:00 a.m.

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25             (202) 467 9200

1        Q    You are talking about the page -- it is

2    not numbered.  On top of it it says "Sent from my

3    iPhone on May 5th of 2001 at 4:40 p.m. at Adams and

4    there is an e-mail address, jeffman1@yahoo.com?  Is

5    that the one that you are referring to?

6        A    Yes.

7        Q    Is that your e-mail address?

8        A    Yes.

9        Q    Jeffman1@yahoo.com?

10       A    It's an e-mail address, yes.

11       Q    Did you maintain that e-mail address on

12   May 5, 2011?

13       A    I presume.  Don't remember.

14       Q    And you're addressing -- in this e-mail

15   you are addressing -- is that Chris Mack, is that

16   who you're addressing?

17       A    Yes, I presume.

18       Q    And you refer to the paragraph Board

19   member consist of seven to nine members?

20       A    Yes.

21       Q    What Board is that?

22       A    Private Scio.  There was no public Scio at

23   this point.  It was -- is not anything other than --

24   I don't think we contemplated that.  So that's

25   private Scio.

1    what was owed up to 2010 and then what became owed

2    after 2011.

3              BY MR. SHANK

4        Q    You had made reference in one of your

5    answers that you paid out more than $300,000 on

6    behalf of Apollo Diamond.  Did I get that right?

7        A    Yes.

8        Q    What were those payments for?

9        A    For litigation that developed later.  I

10   mean that was one element, to settle a lawsuit that

11   Mack and Rapello brought.

12       Q    Now, were those personal litigation

13   expenses and settlements or litigation expenses on

14   behalf of Apollo?

15       A    They were named as a party, Apollo.  I

16   don't know how you would characterize them.  I think

17   you would characterize them as corporate and

18   personal obligations.

19             BY MR. WISNIEWSKI

20       Q    Did that lawsuit have to do with your

21   actions in connection as an executive or director of

22   Apollo?

23       A    A lawsuit involving Mack and Rapello?

24       Q    Yeah.

25       A    There's a context behind that.  So Mack

452

1    and Rapello, as you recall, are owners of -- they

2    were minority owners of Focus.  They -- my assistant

3    got a phone call.  You remember that we did not give

4    them those shares, right.  Remember that the shares

5    were reversed.  This is -- okay.  And there was a

6    dispute about that on their part.  Then what ended

7    up happening to precipitate the lawsuit was Focus

8    sued them.  And the reason Focus sued them is

9    because -- I remember this very distinctly because

10   it's so remarkable.

11          My assistant got a phone call from Bank of

12   America.  And Bank of America said, "Hey, we're just

13   confirming something about the Focus account in New

14   York City bank account."  And she came into my office

15   and said, "You know, we don't have a bank account in

16   New York City."  And I said, yeah, what are you

17   talking about?"  So we kind of followed it up.  And it

18   turned out that Mack and Rapello had basically in an

19   unauthorized manner opened a brokerage account, excuse

20   me, a bank account in the name of Focus and

21   represented that they were -- had the authority to do

22   that which was untrue.  And it deposited funds from a

23   client, investment banking client.  Not an individual.

24   It was a company, if I remember, or two companies into

25   that account that they controlled.  And that needless

453

```
 1    to say created a -- that was a variety of issues that

 2    resulted from that.  Ultimately, we ended up suing

 3    them because of that and some other things.

 4        Q    Who is "we"?

 5        A    "We" in this case, Focus, if I remember

 6    correctly.  And then maybe even Adams, me and

 7    Monahan, because we were partners and they had not

 8    contributed the capital like they were supposed to

 9    under the terms of the agreement that we had with

10    them.

11            And then FINRA got involved and we had to

12    provide all the documents about what these guys had

13    done.  You know, we talked to our compliance person

14    and said wow, that's really an unusual thing to have

15    done on their part.  And so I think they took the

16    position when they sued us that the best defense was a

17    good offense.  So I think that -- I mean I think it's

18    a fact that the lawsuit that they brought came after

19    the lawsuit we had brought.

20        Q    So the lawsuit they brought against you,

21    did it have to do with your role or your position at

22    Apollo Diamond?

23        A    So this is what I don't remember.  I mean

24    it was a long time ago, but I think that they sued,

25    because of my position outside or Apollo Diamond, I
```

1    don't know remember if they sued Apollo and Scio.  I

2    know they sued Lancia and myself and they may have

3    sued Apollo.  But I could be getting confused,

4    because there were people who later sued Apollo.

5    And I just don't remember who sued who on this.  So

6    I need to look at the Complaint to figure that out.

7         Q    But -- and again, I don't know if I'm

8    stating this wrong, but some of the money that you

9    paid out in addition to the $300,000 was part of

10   that lawsuit to settle that lawsuit?

11             MR. KOPECKY:  Money you paid out?

12             MR. WISNIEWSKI:  That you paid.

13             THE WITNESS:  Yes, so I paid their law firm.

14   We made a decision, meaning myself, and I talked to my

15   father in-law in length about this.  We made a decision

16   that spending money to defend the frivolous lawsuit

17   against these two individuals, frivolous in our

18   judgment, would cost a lot of money and would not serve

19   the Company's interest, meaning Scio or Apollo.

20             And Joe Lancia, remember he was the CEO of

21   course we know.  He was pretty -- he was very upset

22   about the fact that he had been served process.  At

23   the time I guess he -- he sort of indicated to me he

24   had never been served process before.  And later I

25   found out that was probably not an accurate statement

1   of the situation.  But he was very, "Oh, my God.  They

2   are serving me at my house", you know.  And I remember

3   making the decision, oh, my God.  I can't lose my CEO.

4   The CEO of the company because he's getting served by

5   these guys.  So that's why everything got settled.

6        Q    Did Apollo Diamond reimburse you for any

7   monies you paid out as a representative of that

8   settlement?

9        A    No.  There was an effort by Scio to do it

10  and it didn't happen.

11       Q    Getting back to Commission Exhibit 61, the

12  agreement dated January 2, 2012, you accepted

13  responsibility.  I'll go to skip to the Resolve

14  paragraph there.  It says, "Robert Linares --

15  directs the corporation, when able, to purchase all

16  of Adams equity participation for a sum of $300,000,

17  with an understanding that E. Adams shall release

18  the corporation from any and all liabilities owed to

19  him and shall be responsible for up to $300,000 of

20  the corporation's liability pursuant to the DCL."

21            Do you see that?

22       A    Yes.

23       Q    When were you actually paid this?  Were

24  you paid this?  Were you paid $300,000 by the

25  company under this agreement?

561

1              PROOFREADER'S CERTIFICATE

2

3    In the Matter of: SCIO DIAMOND TECHNOLOGY CORPORATION

4    Witness:          Edward S. Adams

5    File Number:      File No. C-08091

6    Date:             October 8, 2015

7    Location:         Chicago, Illinois

8

9

10        This is to certify that I, Nicholas Wagner,

11   (the undersigned), do hereby swear and affirm that the

12   attached proceedings before the U.S. Securities and

13   Exchange Commission were held according to the record

14   and that this is the original, complete, true, and

15   accurate transcript that has been compared to the

16   reporting or recording accomplished at the hearing.

17

18   _____        _____

19   (Proofreader's Name)              (Date)

20

21

22

23

24

25

# EXHIBIT 6

CLOSED,LC 1

# U.S. District Court
## District of South Carolina (Greenville)
## CIVIL DOCKET FOR CASE #: 6:13−cv−02660−GRA

McPheely et al v. Adams et al
Assigned to: Honorable G Ross Anderson, Jr
Cause: 28:1332 Diversity − Stockholders Suits

Date Filed: 09/27/2013
Date Terminated: 12/16/2013
Jury Demand: None
Nature of Suit: 160 Stockholders Suits
Jurisdiction: Diversity

**Plaintiff**

**Bernard M McPheely**
*Trustee for the Bernard M. McPheely*
*Revocable Trust Dated May 25, 2012*

represented by **H Sam Mabry , III**
Haynsworth Sinkler Boyd
PO Box 2048
Greenville, SC 29602
864−240−3200
Fax: 864−240−3300
Email: smabry@hsblawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Monroe Sprinkle , III**
Haynsworth Sinkler Boyd
PO Box 2048
Greenville, SC 29602
864−240−3212
Email: csprinkle@hsblawfirm.com
*ATTORNEY TO BE NOTICED*

**William Crum McKinney**
Haynsworth Sinkler Boyd
PO Box 2048
Greenville, SC 29602
864−240−3324
Email: wmckinney@hsblawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Thomas P Hartness**
*Trustee for the Thomas P Hartness*
*Revocable Trust Dated July 31 2010*

represented by **H Sam Mabry , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Monroe Sprinkle , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Crum McKinney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian McPheely**

represented by **H Sam Mabry , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Monroe Sprinkle , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Crum McKinney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Daisley**                represented by   **H Sam Mabry , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Monroe Sprinkle , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Crum McKinney**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Edward S Adams**              represented by   **Douglas Manning Muller**
Moore and Van Allen (Chas)
78 Wentworth Street
Charleston, SC 29401
843−579−7032
Fax: 843−579−8719
Email: dougmuller@mvalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Farrell**
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071−1560
213−485−1234
Fax: 213−891−8763
Email: james.farrell@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James H Moon**
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071−1560
213−485−1234
Fax: 213−891−8763
Email: james.moon@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John C Harabedian**
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071−1560
213−485−1234
Fax: 213−891−8763
Email: john.harabedian@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael R Monahan**                    represented by   **Douglas Manning Muller**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James J Farrell**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James H Moon**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John C Harabedian**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Robert Linares**                       represented by   **Douglas Manning Muller**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James J Farrell**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James H Moon**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John C Harabedian**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Theodorus Strous**                     represented by   **Douglas Manning Muller**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James J Farrell**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James H Moon**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John C Harabedian**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Adams Monahan LLP**                          represented by   **Douglas Manning Muller**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **James J Farrell**
                                                                (See above for address)
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **James H Moon**
                                                                (See above for address)
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **John C Harabedian**
                                                                (See above for address)
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

V.

**Interested Party**

**Scio Diamond Technology Corporation**        represented by   **Larry Lee Plumblee**
**Inc**                                                         Eppes and Plumblee
*a Nevada corporation*                                          PO Box 10066
                                                                Greenville, SC 29603
                                                                864−235−2600
                                                                Fax: 864−235−4600
                                                                Email: lplumblee@eppesandplumblee.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/27/2013 | 1 | NOTICE OF REMOVAL from Greenville County Court of Common Pleas, case number 2013−CP−23−04047. (Filing fee $ 400 receipt number 0420−4958797), filed by Adams Monahan LLP, Robert Linares, Edward S Adams, Michael R Monahan, Theodorus Strous. (Attachments: # 1 Exhibit 1−State Documents, # 2 Exhibit 2−Notice of Filing of Notice of Removal)(alew, ) (Entered: 09/27/2013) |
| 09/27/2013 | 3 | Local Rule 26.01 Answers to Interrogatories by Edward S Adams, Adams Monahan LLP, Robert Linares, Michael R Monahan, Theodorus Strous.(alew, ) (Entered: 09/27/2013) |
| 09/27/2013 | 4 | CERTIFICATE OF SERVICE by Edward S Adams, Adams Monahan LLP, Robert Linares, Michael R Monahan, Theodorus Strous re 1 Notice of Removal, 3 Local Rule 26.01 Answers to Interrogatories (alew, ) (Entered: 09/27/2013) |
| 09/27/2013 | 6 | CONSENT TO REMOVAL FROM STATE COURT by Scio Diamond Technology Corporation Inc. (alew, ) (Entered: 09/30/2013) |
| 09/27/2013 | 7 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by Scio Diamond Technology Corporation Inc.(alew, ) (Entered: 09/30/2013) |
| 09/27/2013 | 8 | Local Rule 26.01 Answers to Interrogatories by Scio Diamond Technology Corporation Inc.(alew, ) (Entered: 09/30/2013) |
| 09/27/2013 | 9 | CERTIFICATE OF SERVICE by Scio Diamond Technology Corporation Inc re 7 Disclosure Statement Pursuant to FRCP 7.1, 8 Local Rule 26.01 Answers to Interrogatories, 6 Consent to Removal from State Court (alew, ) (Entered: 09/30/2013) |
| 09/30/2013 | 5 | NOTICE TO COUNSEL − All future pleadings submitted for filing must contain the attorney's graphical signature instead of the s/typed name. This should be accomplished through the use of a graphical signature inserted on a created document |

# EXHIBIT 7

CLOSED,LC 1

# U.S. District Court
## District of South Carolina (Greenville)
## CIVIL DOCKET FOR CASE #: 6:13−cv−02813−BHH

Sennott v. Adams et al
Assigned to: Honorable Bruce Howe Hendricks
Cause: 28:1332 Diversity − Stockholders Suits

Date Filed: 10/15/2013
Date Terminated: 02/12/2015
Jury Demand: None
Nature of Suit: 160 Stockholders Suits
Jurisdiction: Diversity

**Plaintiff**

**Mark P Sennott**
*as Trustee of the Sennott Family*
*Charitable Trust*

represented by **Mason A Goldsmith**
Elmore Goldsmith
55 Beattie Place
Suite 1050
Greenville, SC 29601
864−255−9500
Fax: 864−255−9505
Email: mag@elmoregoldsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Edward S Adams**

represented by **Douglas Manning Muller**
Moore and Van Allen (Chas)
78 Wentworth Street
Charleston, SC 29401
843−579−7032
Fax: 843−579−8719
Email: dougmuller@mvalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Farrell**
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071−1560
213−485−1234
Fax: 213−891−8763
Email: james.farrell@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James H Moon**
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071−1560
213−485−1234
Fax: 213−891−8763
Email: james.moon@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John C Harabedian**
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071−1560
213−485−1234
Fax: 213−891−8763

Email: john.harabedian@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael R Monahan**                    represented by   **Douglas Manning Muller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Farrell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James H Moon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John C Harabedian**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adams Monahan LLP**                    represented by   **Douglas Manning Muller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Farrell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James H Moon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John C Harabedian**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Loblolly Inc**                          represented by   **Douglas Manning Muller**
*formerly known as*                                        (See above for address)
Scio Diamond Technology Corporation                        *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Farrell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James H Moon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John C Harabedian**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scio Diamond Technology Corporation**   represented by   **Douglas Manning Muller**
*formerly known as*                                        (See above for address)
Krossbow Holding Corporation                               *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **James J Farrell**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **James H Moon**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **John C Harabedian**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**John Does 1−10**

V.

**Interested Party**

**Apollo Diamond**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/15/2013 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0420−4986534.), filed by Mark P Sennott. Service due by 2/18/2014 (Attachments: # 1 Verification)(alew, ) (Entered: 10/16/2013) |
| 10/15/2013 | 3 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by Mark P Sennott.(alew, ) (Entered: 10/16/2013) |
| 10/15/2013 | 4 | NOTICE TO COUNSEL − All future pleadings submitted for filing must contain the attorney's graphical signature instead of the s/typed name. This should be accomplished through the use of a graphical signature inserted on a created document and not a signed signature on a printed document that is subsequently scanned. Pursuant to the Judicial Filing Preferences, All legal memoranda MUST be converted rather than scanned. Please refer to these preferences for all additional pleadings. (alew, ) (Entered: 10/16/2013) |
| 10/16/2013 | 5 | Summons Issued as to Edward S Adams, Adams Monahan LLP, Apollo Diamond, Loblolly Inc, Michael R Monahan, Scio Diamond Technology Corporation. (Attachments: # 1 Addendum)(alew, ) (Entered: 10/16/2013) |
| 10/17/2013 | 7 | Amended Summons Issued as to Loblolly Inc. (alew, ) (Entered: 10/17/2013) |
| 10/18/2013 | 9 | Local Rule 26.01 Answers to Interrogatories by Mark P Sennott. Refiled by clerk to correct event type.(alew, ) (Entered: 10/18/2013) |
| 11/18/2013 | 10 | WAIVER OF SERVICE by Adams Monahan LLP. Adams Monahan LLP waiver executed on 11/6/2013, answer due 1/6/2014. (Goldsmith, Mason) (Main Document 10 replaced on 11/18/2013) (alew, ). (Additional attachment(s) added on 11/18/2013: # 1 Waiver of Service of Summons−Adams Monahan, LLP) (alew, ). Modified on |

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kenneth Fink, | |
| Plaintiff, | |
| -against- | |
| Edward S. and Denise L. Adams, Michael R. and Julie C. Monahan, Adams Monahan LLP, Loblolly, Inc. (f/k/a Scio Diamond Technology Corporation), Scio Diamond Technology Corporation (f/k/a Krossbow Holding Corporation), and John Does 1-10, | Case No.: 12-cv-01899 (JRT-JSM) |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of September 2012, a true and correct copy of the following:

          1.)  Notice of Voluntary Dismissal without Prejudice; and

          2.)  Proposed Order

were served via U.S. Mail upon counsel for Defendants, James J. Farrell, Latham & Watkins, LLP, 355 South Grand Avenue, Los Angeles, CA 90071.

Date:  September 14, 2012         */s/ William E. Manske*
                                     William E. Manske

# EXHIBIT 9

CLOSED,CV

# U.S. District Court
## U.S. District of Minnesota (DMN)
## CIVIL DOCKET FOR CASE #: 0:12−cv−01115−DSD−JJK

Mack et al v. Adams et al
Assigned to: Senior Judge David S. Doty
Referred to: Magistrate Judge Jeffrey J. Keyes
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 05/07/2012
Date Terminated: 05/11/2012
Jury Demand: None
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

**Plaintiff**

**Kristoffer Mack**
*Derivatively on Behalf of Nominal*
*Defendant Loblolly, Inc. (f/k/a Scio*
*Diamond Technology Corporation)*

represented by **Annamarie A Daley**
Jones Day
90 S Seventh Street
Suite 4950
Minneapolis, MN 55402
612−217−8844
Fax: 844−345−3178
Email: adaley@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie M Seidl**
Barnes & Thornburg LLP
225 S Sixith Street
Suite 2800
INACTIVE
Minneapolis, MN 55402−4662
612−367−8773
Fax: 612−333−6798
Email: sseidl@btlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paul Rapello**
*Derivatively on Behalf of Nominal*
*Defendant Loblolly, Inc. (f/k/a Scio*
*Diamond Technology Corporation)*

represented by **Annamarie A Daley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie M Seidl**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Edward S. Adams**

represented by **Aaron R Hartman**
Monroe Moxness Berg PA
7760 France Avenue South
Ste 700
Minneapolis, MN 55435
952−885−5999
Fax: 952−885−5969
Email: ahartman@mmblawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Denise L. Adams**                              represented by   **Aaron R Hartman**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Defendant**

**Michael R. Monahan**                           represented by   **Aaron R Hartman**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Defendant**

**Julie C. Monahan**                             represented by   **Aaron R Hartman**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Defendant**

**Adams Monahan LLP**                            represented by   **Aaron R Hartman**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Defendant**

**Joseph Lancia**                                represented by   **Aaron R Hartman**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Defendant**

**Scio Diamond Technology Corporation**          represented by   **Aaron R Hartman**
*formerly known as*                                              (See above for address)
Krossbow Holding Corporation                                     *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Defendant**

**Loblolly, Inc.**
*formerly known as*
Scio Diamond Technology Corporation

| Date Filed | # | Docket Text |
|---|---|---|
| 05/07/2012 | 1 | COMPLAINT against Denise L. Adams, Edward S. Adams, Adams Monahan LLP, Joseph Lancia, Julie C. Monahan, Michael R. Monahan, Scio Diamond Technology Corporation, Loblolly, Inc. ( Filing fee $ 350 receipt number 4−64750.) assigned to Judge Susan Richard Nelson per Securities referred to Magistrate Judge Jeffrey J. Keyes. Filed by Kristoffer Mack and Paul Rapello. (Attachments: # 1 Exhibits A−G, # 2 Verification, # 3 Civil Cover Sheet) (MMP) Modified text on 5/8/2012 (MMP). (Entered: 05/08/2012) |
| 05/07/2012 |  | Summons Issued as to Denise L. Adams, Edward S. Adams, Adams Monahan LLP, Joseph Lancia, Julie C. Monahan, Michael R. Monahan, Scio Diamond Technology Corporation, Loblolly, Inc. (MMP) Modified text on 5/8/2012 (MMP). (Entered: 05/08/2012) |
| 05/09/2012 | 2 | ORDER OF RECUSAL AND DIRECTION TO THE CLERK OF COURT FOR REASSIGNMENT OF CASE. Judge Susan Richard Nelson recused. Case reassigned to Senior Judge David S. Doty for all further proceedings. **NOTE:** the new case number is **12cv1115 DSD/JJK**. Please use this case number for all subsequent |

# EXHIBIT 10



**U.S. Department of Justice**

United States Attorney
District of Minnesota

---

*600 United States Courthouse*      *Telephone: (612) 664-5600*
*300 South Fourth Street*                     *Fax: (612) 664-5787*
*Minneapolis, MN 55415*

May 16, 2017

James L. Volling
Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901

        Re:    *United States v. Edward S. Adams*
               Cr. 17-64 (DWF/KMM)

Dear Mr. Volling:

        Pursuant to our discovery obligations and our recent discussions, we are making documents available to you on the enclosed hard drive (which will also include the load files) provided to us by your office. For your convenience, the attached log details the material on the HD under the heading:

- Adams_Eclipse Docs.zip

        The Securities and Exchange Commission ("SEC") produced a database of documents to us related to its investigation. These documents remain in the same format that we received them from the SEC and are included on the hard drive under the heading:

- SEC

        Finally, as you are likely aware, we obtained emails from Mr. Adams' two Yahoo email accounts via search and seizure warrant. We are providing you with the data from the two accounts in the unfiltered format in which it was produced by Yahoo, which is on the hard drive under the heading:

- Yahoo email unfiltered

May 16, 2017
Page 2

As we discussed, we filtered those two email accounts in an effort to remove potentially privileged, as well as non-responsive, emails and documents.  Additionally, we obtained emails from the Yahoo email account for Michael Monahan, which we also filtered for privilege and relevance.  The aforementioned materials are copied onto the hard drive under the heading:

- Yahoo email filtered

Please feel free to call either one of us with any questions.

Sincerely,

GREGORY G. BROOKER
Acting United States Attorney

BY: DAVID M. MARIA
    JOHN E. KOKKINEN
Assistant U.S. Attorneys

Adams Records

5/16/2017

| Source | Beg Doc | End Doc |
| --- | --- | --- |
| Adams, Denise L. (Atty: Jon Hopeman) | 00000001 | 00000018 |
| Adams, Edward S. (Atty: Jon Hopeman) | 00000019 | 00002400 |
| Monahan, Michael R. (atty: Paul Dworak) | 00002401 | 00002588 |
| Bank of America NA | 00002589 | 00002609 |
| Barnstable County Registry Of Deeds (MA) | 00002610 | 00002643 |
| Burnett County Register Of Deeds (WI) | 00002644 | 00002705 |
| Commonwealth of Massachusetts Attn: Massachusetts Environmental Police Boat, Recreation Vehicle & Snowmobile Registration Bureau (MA) | 00002707 | 00002720 |
| Delta Airlines, Inc. | 00002721 | 00002739 |
| Empire Stock Transfer Inc. | 00002740 | 00002936 |
| Fidelity Investments/Fidelity Brokerage Services | 00002937 | 00005846 |
| First Eagle Funds | 00005847 | 00005896 |
| First National Bank | 00005897 | 00005931 |
| Hennepin County Recorder & Registrar of Titles | 00005932 | 0006183 |
| Parsons Commercial Group, Inc. | 00006184 | 00006430 |
| PEOPLESBANK | 00006431 | 00006446 |
| PeoplesBank | 00006447 | 00006451 |
| South State Bank | 00006452 | 00006917 |
| Venture Bank | 00006918 | 00008097 |
| Wells Fargo Financial Advisors, LLC | 00008098 | 00009638 |
| Scio Diamond Technology Corp. | 00009639 | 00011540 |
| Zipkin, Jill S. | 00011541 | 00013245 |

Adams Records

5/16/2017

| Source | Beg Doc | End Doc |
| --- | --- | --- |
| Abujawdeh, Dina | 00013246 | 00013247 |
| Adams, Edward S. (Atty: Jon Hopeman) | 00013248 | 00013581 |
| Adams, Edward S. (Atty: Jon Hopeman) | 00013582 | 00013840 |
| Altenbach, Susan | 00014010 | 00014343 |
| AMG Funds | 00014344 | 00014383 |
| Ariel Investment Trust | 00014384 | 00014437 |
| Bank of America | 00014438 | 00014454 |
| Bank of America | 00014455 | 00015765 |
| Bank of America | 00015766 | 00015774 |
| Berman, Lyle | 00015775 | 00016255 |
| Berwyn Funds | 00016256 | 00016263 |
| Bruce Fund c/o Huntington Asset Services, Inc. | 00016264 | 00016294 |
| Charles Schwab & Co. Inc. | 00016295 | 00019371 |
| Charles Schwab Bank | 00019372 | 00019372 |
| Clifton Larson Allen | 00019373 | 00027680 |
| Devenir Wealth Management | 00027681 | 00028060 |
| Engelkemier | 00028061 | 00028144 |
| Engkjer-Spitzley M. Faye | 00028145 | 00028609 |
| Fifth Third Bank | 00028610 | 00028617 |
| First National Bank | 00028618 | 00028987 |
| First National Bank | 00028988 | 00029276 |
| Gabelli Funds | 00029277 | 00029299 |
| Hennepin County Recorder & Registrar of Titles | 00029300 | 00029383 |
| Intralinks, Inc. | 00029422 | 00029422 |
| Johnson, Harry | 00029423 | 00030218 |
| Krochmal, Michael | 00030219 | 00030228 |
| Legg Mason Global Asset Management | 00030231 | 00030278 |
| Lister, Carol | 00030279 | 00030597 |
| Mack, Kris | 00030598 | 00030598 |

Adams Records                                                                                5/16/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Mass Mutual Financial Group | 00030599 | 00030599 |
| MBSC Securities Corporation c/o The Bank of New York Melon | 00030600 | 00030729 |
| McKoskey, William | 00030730 | 00031343 |
| Minnesota Dept. of Public Safety Driver & Vehicle Services | 00031344 | 00031370 |
| Mumm, Chris | 00031371 | 00031837 |
| Murry & Associates | 00031838 | 00034731 |
| Murry & Associates | 00034732 | 00034791 |
| Newport Coast Securities | 00034792 | 00035078 |
| Nymeo Federal Credit Union | 00035079 | 00035083 |
| PNC Bank | 00035085 | 00035085 |
| Quantronix, Inc. | 00035533 | 00035547 |
| Rapello, Paul | 00035548 | 00035622 |
| Rothman, Steve | 00035623 | 00035716 |
| Rydex Funds Services | 00035717 | 00035851 |
| Sankovsky, Robert | 00035852 | 00036099 |
| Schroeder, Brett | 00036100 | 00036413 |
| Security Mutual Life Insurance Company of New York | 00036422 | 00036751 |
| South State Bank (South Carolina Bank & Trust) | 00036752 | 00037974 |
| TCF Bank | 00038609 | 00038614 |
| TCF Bank | 00038619 | 00038641 |
| TCF Bank | 00038644 | 00038672 |
| TCF Bank | 00038754 | 00038754 |
| TIAA CREF Financial Services | 00038756 | 00038941 |
| Topographix | 00038942 | 0039163 |
| US Bank National Association | 00039164 | 00039251 |
| Vanguard Group, LLC | 00039252 | 00039357 |
| Vartughian, Ed | 00039358 | 00039411 |
| Venture Bank | 00039412 | 00039805 |

Adams Records

5/16/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Venture Bank | 00039806 | 00040450 |
| Venture Bank | 00040451 | 00040533 |
| Venture Bank | 00040534 | 00040829 |
| Westwood Funds | 00040830 | 00040856 |
| Winchester, Slade | 00040857 | 00040939 |
| Wisconsin Dept. of Natural Resources | 00040940 | 00040949 |
| Zipkin, Larry | 00040950 | 00041574 |
| Elan Financial | 00041575 | 00041973 |
| Elan Financial | 00042125 | 00042288 |
| Hey, Steven | 00042289 | 00042592 |
| Krochmal, Michael | 00042593 | 00042612 |
| Turturici, Jamie | 00042613 | 00042750 |
| American Express/Datamark, | 00042751 | 00042753 |
| Exterior Design Studio LTD | 00042754 | 00042766 |
| Fidelity Investments/Fidelity Workplace Services | 00042767 | 00042781 |
| Plekkenpol Builders Inc. | 00042782 | 00042928 |
| TransUnion | 00042929 | 00042940 |
| Empire Stock Transfer Inc. | 00042941 | 00045584 |
| Fidelity Investments/Fidelity Workplace Services | 00045585 | 00045609 |
| Wells Fargo Home Mortgage | 00045610 | 00045648 |
| Riedel, John | 00045649 | 00045667 |

Adams Records

5/16/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| American Express/Datamark, | 00045668 | 00045862 |
| American Express/Datamark, | 00045885 | 00045986 |
| American Express/Datamark, | 00046096 | 00046227 |
| American Express/Datamark, | 00046304 | 00046362 |
| American Express/Datamark, | 00046942 | 00047073 |
| MB Financial Bank, N.A. | 00047074 | 00047395 |
| Venture Bank | 00047396 | 00050250 |
| Wells Fargo Bank, N.A. | 00050251 | 00051714 |
| Fidelity Investments/Fidelity Workplace Services | 00051715 | 00051729 |
| TransUnion | 00051730 | 00051741 |
| Fidelity Investments/Fidelity Workplace Services | 00051744 | 00053832 |
| Hermes/Investment Management | 00053833 | 00053837 |
| Mass Mutual Financial Group | 00053844 | 00054099 |
| Santander Bank, NA (Sovereign Bank) | 00054110 | 00054938 |

# EXHIBIT 11

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 <David.Maria@usdoj.gov> |
| **Sent:** | Wednesday, August 23, 2017 6:09 PM |
| **To:** | Wade, Lance |
| **Cc:** | OConnor, Sarah; james.volling@FaegreBD.com; Petrosinelli, Joe; Kokkinen, John (USAMN) |
| **Subject:** | RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM) |

Lance,

As you have now identified those documents that you believe are privileged, we will establish a taint team (or individual) who will serve as your point of contact for these issues.  Once someone has been designated as the point person, I will have him or her contact you directly, and I anticipate that this will happen within the next week or two.  I will send you the name of the individual once I know it.

As to the remaining documents that are not in our review database, the government will retain those materials for authentication purposes, but I can assure that you nobody on the prosecution team has had, or will have, access to those documents.

Please call me if you would like to discuss further.  Otherwise, I will hopefully have a name for you by sometime next week.

Thanks,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Monday, August 21, 2017 12:49 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

David,

Our initial review of the potentially privileged materials is now complete.  I am happy to have a call to discuss the path going forward, but we are firmly of the view that the prosecution team should have no role in this process.  We should be interacting with the taint team – i.e., the one that made the privilege determinations in the first instance.  Moreover, as a practical matter, the process you outlined below is not feasible.  There are over a thousand privileged documents that need to be culled out of the database, and I don't believe that can await the document-by-document assessment you describe.  Nor do we believe such an assessment is either warranted or appropriate.

In addition, please return to Mr. Adams the documents you have filtered out and not permitted the prosecution team to review, or certify that those documents have been destroyed.  Those documents are not lawfully in the government's possession.

Please let me know when you are available for a call to discuss a path forward on the privilege materials.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Thursday, June 29, 2017 2:48 PM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance—

If you can identify for us the documents that you believe are privileged, we will have those documents segregated and will have someone outside of the prosecution team assigned to review them.  If there are, in fact, privileged documents that remain in the database, we will immediately take steps to determine why they were not removed during our filtering process.

As I indicated earlier, we do not intend to detail for you the methods that we utilized to filter the database, nor are we aware of any precedent that requires us to do so.  That being said, if there are specific categories of documents that you are seeing in the database that you believe are privileged, I am happy to discuss with you why we did or did not believe those documents to be privileged, or to explore how they were missed in the filtering process if they were, in fact, privileged.  Please call me if you care to discuss any of these issues.

Best regards,

David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Thursday, June 22, 2017 11:50 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

We are writing to follow-up on the privilege issues discussed below.  We have identified numerous privileged and/or work product protected documents in the database to which you say the prosecution team has access.  The privileged materials in that database appear to include documents directly related to the allegations in the indictment, as well as many privileged documents that are unrelated to the allegations in the indictment.  Given the large volume of documents and the numerous potential privileges implicated, it will take us some time to identify all of the privileged materials.  That task is made all the more difficult by the government's refusal to provide us with the search terms and protocol it used in its efforts to cull out privileged

material.  In any event, the government is now on notice that it is improperly accessing privileged information, and, accordingly, its review of the Yahoo email should cease immediately until our review is complete.

In addition, we reiterate our request that you disclose the search terms and protocol the government used in its effort to try to identify privileged information.  This information will expedite our efforts to identify privileged information in the prosecution team database.  We would also ask you to give us a contact for the attorney leading the taint team so that we can address privilege issues directly with that lawyer.

Sincerely,

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Tuesday, June 06, 2017 3:52 PM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

There will be a thumb drive in an envelope at will call here in Minneapolis.  I'll put Jim's name on it.

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Tuesday, June 06, 2017 2:48 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

We will pick up a disk when it is ready.  Thank you.

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Monday, June 05, 2017 10:56 AM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I checked on this with our lit support folks, and, apparently, they did not understand what our paralegal had requested.   On the hard drive that you received, they did not include the full set of data for the two Adams accounts (edwardsadams@yahoo.com and jafman1@yahoo.com) that we received from Yahoo.  We will burn those databases to a thumb drive or hard drive and get them to you.  I can either send by Fed Ex, or I can leave an envelope here at will call, and Jim can have someone from his office pick it up.  Let me know what you prefer.  The folder that was labeled as "unfiltered" on the drive that you received is the "Main Emails" folder that I described below, which is the database to which the investigation/prosecution team has access.  The folder that was labeled as "filtered" on the drive that you received is the "Adams taint" database that I described below, which includes materials that were extracted from the database in an effort to remove potentially privileged materials.

Again, the only database to which we have access is the folder that was labeled "Adams_Yahoo_Unfiltered" on the drive that you received.  If there are materials in this folder that you believe are privileged, please let us know, and we will address the issue immediately.

I apologize for any confusion.  Part of the problem is that I could not access and check the materials before we sent them out to ensure that they were labeled correctly, as I can only access one of the databases.

Please call me with additional questions, and let me know how you want to receive the materials for the two Yahoo accounts in the format that we received them from Yahoo.

Thanks,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, June 02, 2017 12:57 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

The hard drive we received from the government does contain folders for unfiltered and filtered email, as described in your prior correspondence.  The hard drive does not contain the subfolders you describe in your most recent email.  (See below screenshot of the hard drive you provided us.)  Thus, our questions remain the same.

--Lance Wade



**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Friday, June 02, 2017 12:00 PM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I did some checking, and it appears as though our lit support folks did not label the databases as I had instructed (as "unfiltered" and "filtered").

On the drive that you received, one of the Relativity folders had a sub-folder in it that contains all of the unfiltered emails from Adams' two Yahoo accounts, as we received them from Yahoo. The other Relativity folder contained three sub-folders, titled "Main Emails," "Adams Taint," and "SEC." The folder titled "Main Emails" should be what the letter referred to as the "filtered" email database. This is the database to which the investigation/prosecution team has access. It includes the filtered documents from both of Adams' email accounts, as well as the filtered documents from Monahan's email account. We do not have access to the "Adams Taint" folder. These were emails that were removed from the unfiltered database and do not reside in the "Main Emails" database to which we have access. I believe that

the concerns that you raise in no. 2, below, likely relate to documents in the "Adams Taint" folder.  The "SEC" folder is from the SEC's investigation and does not relate to the Yahoo emails.

If there are materials in the "Main emails" folder that you believe are privileged, please let us know, and we will address the issue immediately.

As to request no. 4, I believe that we produced to you the affidavits and warrants.  I also cannot access these "MJ" numbers on ECF, as I am not sure if they ever load the MJ file numbers to ECF.  My guess is that, if there are additional documents beyond what we produced, they consist of the sealing motions/orders, etc.  I will check our hard copy files and see what exists, and I'm happy to send you what I find.  Also, I believe that you should be able to get the complete files for each MJ number from the clerk's office.

Please give me a call if you have additional questions.


Regards,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, June 02, 2017 9:39 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

This follows up on prior correspondence regarding the seized email.

1.  The government's description of the databases set forth below and in other correspondence does not match what was produced in discovery.  We understand from your correspondence that there is one database (called "unfiltered") that contains all of the emails that were in the various Yahoo accounts, and one database ("filtered") that contains only the material to which the prosecution team has access.  Therefore, we assume that the "filtered" database is a subset of the "unfiltered" database.  Based on an initial review of the materials, that does not appear to be the case.  Rather, the "filtered" database has more documents than the "unfiltered" database.  Please clarify.

2.  Based on limited initial searches, it appears that there are hundreds, if not thousands, of privileged documents within the filtered database to which the government has access.  This is obviously very concerning, particularly since many of those documents appear to be communications between Mr. Adams and counsel who represented him in connection with government investigations of matters that are the subject of your indictment.  The government's accessing of these privileged documents, therefore, not only infringes on Mr. Adams' legal privileges and protections, but may also violate his Fifth and Sixth Amendment rights.  It will take us time to fully assess these issues.  We therefore renew our request that the government cease its review of Mr. Adams' email until this matter has been fully addressed.  Please confirm that the government will cease its review.

3.  Based on # 2 above, we reiterate our requests for information set forth below, which will help us address these issues more promptly.

4.  Please provide us with copies of all pleadings in matters 15-MJ-942 and 16-MJ-8.  You previously only provided us with selected pleadings from those matters.  It appears that those matters are no longer sealed, but we do not have access to those pleadings on Pacer.

Sincerely,

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Thursday, May 25, 2017 10:56 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

As I mentioned in my email below, the government does not intend to provide you with information regarding the process that was undertaken to filter the emails, nor are we aware of any authority that obligates us to do so.  That being said, if you can provide us with any such authority, we will review it and reconsider.

Again, if there are specific documents or categories of documents that you have seen in the filtered database that you believe we should not possess, please let us know.  There does not appear to be any basis to challenge our process unless and until you identify materials that are in the filtered database that you believe are inappropriately in our possession.

Please call me if you care to discuss further.  I am around all morning: (612) 664-5681.

Thanks,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Thursday, May 25, 2017 8:19 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

In our call on May 9, Assistant U.S. Attorney Maria advised me, Mr. Petrosinelli, and Mr. Volling that the government would review memoranda it had prepared and provide us with an explanation regarding how Mr. Adams' seized email was processed and filtered for review.  We understand from the email below that the government is now changing its position and refusing to engage in dialogue with us on these issues.  The government's refusal to provide further information prevents us from assessing whether (and, if so, the degree to which) it infringed on Mr. Adams' constitutional and legal privileges, and it will force us to burden the Court with litigation that might have been avoided through further discussion.

We reiterate our request that you cease review of Mr. Adams' email until we have had an opportunity to fully assess and litigate these issues (which may take time, given the voluminous emails, which are still in the process of loading).  And

7

we request that the government preserve all memoranda, documents, communications, and other evidence relating to the handling, processing, and reviewing of Mr. Adams' email.

Sincerely,


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Wednesday, May 24, 2017 2:14 PM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I have now reviewed your May 16, 2017 letter.  As an initial matter, when we spoke previously, I indicated that I would review materials and conduct research to determine what information, if any, I would share with you regarding the filtering and review process that we employed in connection with the search warrant executed on Mr. Adams' two Yahoo email addresses.  I did not, at that time, agree to provide you with an explanation of the process, though you did note that you would be interested in a description of the process.

Upon researching the issue, we are unaware of any authority that requires the disclosure by the government to the defense of such a description or explanation of the process.  We have turned over the search warrant and accompanying affidavit, and you are, obviously, free to challenge the propriety of the search in your pretrial motions.  Moreover, as I explained, we provided to you the unfiltered database, which contains all of the emails that were in the accounts, as well as the filtered version (i.e., the seized documents) that is the database to which the prosecution team has had access.  If there are specific documents within the filtered database that you believe are privileged, or should not be in the government's possession for some other reason, we can address those issues on a document-by-document basis.  To the extent that we agree that there are privileged documents that remain in the database, we will immediately have them removed.

In response to your additional requests, we also do not believe that we have an obligation to identify all individuals involved in the handling of the search warrant materials, nor will we "cease review" of the materials.

We are still available for a call, if you have questions or care to discuss this further.

Best regards,

David


David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street

Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Wednesday, May 24, 2017 12:53 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

What times work today for a call?

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Wednesday, May 24, 2017 11:46 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

No, this did not come through prior to now, but we have now received it.

Please call me if you would like to discuss the substance of the letter.

David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Wednesday, May 24, 2017 10:41 AM
**To:** Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Subject:** FW: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Gentlemen,

Our servers received a notice that this may not have gone through.  Please confirm receipt.  Thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**

725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Tuesday, May 16, 2017 4:56 PM
**To:** jkokkinen@usa.doj.gov; dmaria1@usa.doj.gov
**Cc:** james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; OConnor, Sarah <SOConnor@wc.com>
**Subject:** United States v. Adams (Case No. 17-cr-64-DWF-KMM)


Counsel:

Please see attached.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

# EXHIBIT 12

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

May 16, 2017

<u>Via Email</u>

John Kokkinen, Esq.
David Maria, Esq.
Assistant United States Attorneys
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

  Re: <u>United States v. Adams (Case No. 17-cr-64-DWF-KMM)</u>

Dear Counsel:

   This follows up on our conversation with Mr. Maria last week, during which we asked for information regarding the government's handling of Mr. Adams' seized email.  Mr. Maria agreed to review his notes and files and provide us with an explanation regarding how the email was processed, searched, and filtered.  We would appreciate a prompt explanation of these issues, including, in particular, a description of: (a) all steps the government took to comply with U.S. Attorneys' Manual Section 9-13.420; (b) the protocols used to identify evidence that was covered by the warrants; and (c) the protocols and search terms used to ensure that information protected by applicable legal privileges (including but not limited to spousal privilege, parent-child privilege, attorney-client privilege, and attorney work product) was not reviewed by the government.  Please also identify all government attorneys and agents who were involved in the handling of these materials.  In the meantime, we respectfully request that all government personnel cease review of Mr. Adams' email until we have had an opportunity to fully address and/or litigate this matter.

   To the extent that Mr. Adams has been harmed by the government's handling of his email, there is no sense in further exacerbating that harm now.  In that regard, be advised that

WILLIAMS & CONNOLLY LLP

John Kokkinen, Esq.
David Maria, Esq.
May 16, 2017
Page 2

we object to the use of any taint team process. *See, e.g., In re Grand Jury Subpoenas* 04-124-03 and 04-124-05, 454 F.3d 511 (6th Cir. 2006).

Sincerely,

Lance Wade

# EXHIBIT 13

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

August 31, 2017

<u>Via Email</u>

David Maria, Esq.
John Kokinen, Esq.
Assistant United States Attorneys
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

      Re:    <u>United States v. Adams, Case No. 17-CR-0064-DWF-KMM</u>

Dear Counsel:

      Based on the information available to us, we believe that in January 2016 the government unlawfully seized email and other data from Yahoo! Inc., pursuant to a sweeping and overly broad warrant.  Accordingly, we are planning to file a motion seeking, among other things, to suppress the seized material and its fruits.

      To date, the government has declined to comply with our repeated requests for additional information explaining the manner in which it sought and executed the Yahoo warrant.  In particular, the government has refused to explain the steps it took (if any) to ensure that investigators or members of the prosecution team did not review materials protected by the attorney-client privilege, the marital privilege, or the work product doctrine, or the measures it took to make certain that such persons reviewed only documents and data covered by Part II of Attachment B to the warrant.

      While we do not expect the government to share our view of the Fourth Amendment, we do think it would be beneficial to the judicial process if, when we file our motion, we are able to apprise the Court of what the government has done in executing the warrant, and if we can have sufficient information to narrow and focus the true issues in dispute.  Accordingly, we respectfully reiterate our request that the government provide the information previously requested.

      Sincerely,

      Lance Wade

# EXHIBIT 14

**From:** Bildtsen, Ann (USAMN) <Ann.Bildtsen@usdoj.gov>
**Sent:** Friday, September 15, 2017 9:53 AM
**To:** Wade, Lance; Maier, Gloria
**Subject:** RE: Adams

Good morning, Lance and Gloria.

I apologize that my afternoon got booked up with something else I can't move.   I will send some new possible dates and times.

Thank you.

Ann

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Thursday, September 14, 2017 4:30 PM
**To:** Bildtsen, Ann (USAMN) <ABildtsen@usa.doj.gov>; Maier, Gloria <GMaier@wc.com>
**Subject:** RE: Adams

Anne:

Could we do 4:30 eastern tomorrow?

Thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

**From:** Bildtsen, Ann (USAMN) [mailto:Ann.Bildtsen@usdoj.gov]
**Sent:** Wednesday, September 13, 2017 4:39 PM
**To:** Wade, Lance <LWade@wc.com>; Maier, Gloria <GMaier@wc.com>
**Subject:** RE: Adams

Lance and Gloria:

Do you have some time to discuss next steps tomorrow or Friday?  I am free tomorrow afternoon after 2:30 eastern and Friday afternoon after 3:30 eastern.   Thank you.

Ann

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, September 08, 2017 8:55 AM

**To:** Bildtsen, Ann (USAMN) <ABildtsen@usa.doj.gov>
**Cc:** Samie, Bahram (USAMN) <bsamie@usa.doj.gov>; Maier, Gloria <GMaier@wc.com>
**Subject:** RE: Adams

Ann:

Thank you for your call (and, Bahram, it is a pleasure meeting you). I very much appreciate the spirit and tone of your call and email – and the desire to try to find a path through this that is efficient and avoids needless litigation. I also appreciate that the government will cease accessing the database until we have had an opportunity to resolve these issues. We will give thought to the best way to proceed forward on these matters, and will connect with you again next week to have further discussions.

Given my upcoming trial schedule, my colleague Gloria Maier will undoubtedly be involved in this as well. I am copying her here, and will ask her to join future calls as well.

Have a great weekend.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Bildtsen, Ann (USAMN) [mailto:Ann.Bildtsen@usdoj.gov]
**Sent:** Friday, September 08, 2017 9:40 AM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** Samie, Bahram (USAMN) <Bahram.Samie@usdoj.gov>
**Subject:** Adams

Lance:

Thank you for your time on our call this morning. As discussed, I will be handling the independent review of the privilege and other issues you have raised with respect to the Yahoo search warrant. I will be joined by my colleague AUSA Bahram Samie, copied here. We will be in touch next week to further discuss the protocol. Thank you.

**Ann M. Bildtsen | Assistant United States Attorney**
**Deputy Civil Chief**
U.S. Attorney's Office | District of Minnesota
600 U.S. Courthouse | 300 South Fourth Street | Minneapolis, MN 55415
T: 612.664.5615 | F: 612.664.5788
ann.bildtsen@usdoj.gov

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.