## DECLARATION OF CHRISTIE KROELLS

Pursuant to Title 28, United States Code, Section 1746, I, Christie Kroells, Inspector with the U.S. Postal Inspection Service ("USPIS"), hereby declare under penalty of perjury as follows:

1.    I have been an Inspector with the USPIS since 2003.  I am assigned to investigate primarily criminal activity involving mail fraud and have been so assigned to handle such investigations in addition to other mail-related criminal cases for the entirety of my time with the USPIS.

2.    During my service as an Inspector, I have participated in numerous investigations involving allegations of mail fraud.  The majority of those investigations involved an investigative team comprised of investigators from various federal and/or state law enforcement agencies including and not limited to the USPIS, the Federal Bureau of Investigation (FBI), the Internal Revenue Service (IRS), and the Minnesota Department of Commerce, among others.

3.    My investigations and those of others with which I have been involved necessitate the use of investigative tools such as search warrants.  I have participated in the execution of approximately two to three search warrants per year since I have been a U.S. Postal Inspector.  When executing a search warrant, care is taken to avoid the review of materials that contain information protected by the attorney-client privilege.  Specifically, when I am searching pursuant to a search warrant and see indicia of potentially attorney-client-privileged information on a document, I stop reviewing that document and either set it aside (if the nature of the item allows for such setting aside) or otherwise memorialize

its location. I do this so I may call its existence to the attention of the taint/filter team for their review, if such a team exists, or to the attention of the prosecutor for purposes of establishing a taint/filter team to review the document. This practice would, of course, change in instances where law enforcement has obtained a waiver of the attorney-client privilege from the relevant client(s).

4.      This practice is consistent across the investigative teams with which I have been involved, whether I am the lead investigator on the case, another agent from my agency is the lead investigator, or an agent from another agency is the lead investigator. Proceeding cautiously is important to protect the privilege and to preserve and not taint the investigation and its agents by exposure to privileged information.

5.      In the instant investigation, regarding alleged fraud by Edward Adams, multiple law enforcement agencies joined in the investigative effort, including the USPIS, the FBI, and the IRS.

6.      In late 2015 and early 2016, the investigative team obtained search warrants for the personal email accounts of Mr. Adams, namely edwardsadams@yahoo.com and jafman1@yahoo.com, and a third, personal email account of one of Mr. Adams' law firm partners. While the investigative team knew of Mr. Adams' business "locations," we did not seek to search those locations, such as his law office or his law firm email accounts. I was the affiant for those search warrants and understood AUSA Kokkinen had engaged in a process related to attorney-involved searches before I went to the Magistrate Judge to seek signing of the search warrants. I do not know the precise nature of that process or its

requirements but I understand from my communications with AUSA Kokkinen that he complied with the requirements for seeking an attorney-related search warrant.

7.      On November 25, 2015, I presented to U.S. Magistrate Judge Janie Mayeron an application to search the contents of Mr. Adams' personal email account maintained by Yahoo! along with a proposed search warrant for the same.  I do not recall these materials then including the "Addendum for Computer Search Warrant."  There was a time when some Magistrate Judges would attach the Addendum for Computer Search Warrant to a search warrant even if the warrant was not for a device (i.e., a computer, cellular telephone or similar item) and was instead for content.  It is possible that Magistrate Judge Mayeron attached the addendum to the warrant when she reviewed the search warrant though I do not specifically recall that.  After reviewing the application, Magistrate Judge Mayeron authorized the search by signing the search warrant.  On November 25, 2015, I faxed that warrant to Yahoo!  By that time, Yahoo! had changed its standard practice of allowing service by fax and was no longer accepting service by fax.  It took several weeks for Yahoo! to communicate this to me.

8.      Given the lapse of time, Yahoo! requested a second search warrant for the same email content.  On January 7, 2016, I presented to U.S. Magistrate Judge Steven Rau a second application to search the contents of Mr. Adam's personal email account maintained by Yahoo! along with a proposed search warrant for the same.  These materials did not include the "Addendum for Computer Search Warrant" as the proposed warrant was not for a device but rather for content of an email account.  Magistrate Judge Rau did

not attach the addendum to this second search warrant and authorized the search by signing the search warrant. On January 8, 2016, I served a copy of the warrant on Yahoo! by email.

9.     Sometime before I began searching the flash drive, possibly even before I received the flash drive, I spoke with AUSA David Maria, and we discussed reviewing communications between Mr. Adams and the employees of the Apollo/Scio entities. I was told by AUSA Maria that I could review them, that it was a non-issue, and the company would be waiving the privilege, if any, in any event.

10.     Approximately two months later, on or about March 7, 2016, I received at the USPIS, a sealed envelope from Yahoo! Within the envelope was a flash drive. The same day, I logged the flash drive into evidence.

11.     Either on March 7, 2016, or within the next several days, I attempted to open the drive using a stand-alone computer in our office. My purpose in attempting to open the drive was to verify that I had received the content of each of the three email accounts for which the January search warrant had been served, to ascertain the volume of content within those email accounts, and to determine how to best conduct the search of that content. At first, I was unable to open the content contained on the drive and needed to download the application Mozilla. Once I was able to access the content, I determined that we had received each of the three email accounts, that the volume of email within those accounts was substantial, and that it would require significant time to search. I do not know on which day I contacted AUSA Maria to tell him that I received the drive, but my recollection is that it was before I started reviewing the drive.

12.     On March 15, 2016, I had additional time to look in more depth at the content of the drive, as I had previously been working on other aspects of the instant investigation as well as separate investigations. At this time in the investigation of Mr. Adams, we were preparing for interviews of several potential witnesses. As a result, my searching of the flash drive's content on March 15, 2016, and later on March 17, 2016, focused on using keywords and key dates that might relate to the interviews we would be conducting. As a result of my searching on the 15th and my limited searching on the 17th, I printed 22 emails from the flash drive and included those printouts with other materials I was using to prepare for our witness interviews. While I do not believe those 22 emails to contain attorney-client privilege information – indeed, I would have followed my standard practice if I had thought so – out of an abundance of caution, I have provided those 22 emails to the USAO's taint attorney for review, and as a result, I no longer have them. Those 22 printouts were the only items I had retained from my searching of the flash drive before it was uploaded to the Relativity database through the USAO. When searching on those two dates, I do not recall seeing any emails that gave me concern regarding the attorney-client privilege. Had I, I would have followed my standard practice, which was to stop reviewing the document, to memorialize its location, to contact the assigned AUSA to advise them of this for potential taint review, and to continue my review of other emails. I was not aware of any other procedures or requirements for this search beyond my normally cautious approach described above.

13.     When searching on March 15, 2016, and very briefly on March 17, 2016, I remember seeing material that at first glance did not appear relevant to the instant

investigation. This occurs in all searches regardless of the "location" involved because we are reviewing the materials to identify items responsive to the search warrant. Out of an abundance of caution, I contacted AUSA Maria to advise him of this.

14.     On March 17, 2016, I provided the flash drive to SA Khan. Within the next day or so, I learned from AUSA Maria that he and AUSA Kokkinen spoke and that we needed to engage in a heightened filter process. I understand SA Khan provided the flash drive to the USAO at some point for the mechanical filtering procedure I describe in more detail below.

15.     My understanding of the heightened filter process was based on my conversations with AUSA Maria and led me to believe that we would put into place a mechanical method to attempt to filter out information that was likely attorney-client privileged in nature and information that was not relevant. In developing this method, we (the agents) and AUSAs Maria and Kokkinen collaborated on the search terms to be used to mechanically filter the email content into two primary categories: (1) content we could search and (2) content we could not search until it passed a taint review. I understood that this mechanical filtering would be conducted through the United States Attorney's Office and staff who had expertise in handling electronic data.

16.     I also understood from conversations with AUSA Maria that this process of mechanically filtering might not extract everything that was attorney-client in nature and that, as a result, I would need to continue my standard cautious practice of stopping review and contacting the AUSA if I came across anything that appeared suggestive of an attorney-client relationship.

17.     On April 27, 2016, AUSA Maria emailed IRS SA Belich, me, and FBI SA

Khan to advise us that the filtering search terms had been run on the email database and

that it should be ready for review – minus the potentially privileged items (as determined

by the mechanical filtering by search terms) – "very soon."

18.     On May 4, 2016, AUSA Maria emailed IRS SA Belich, me and FBI SA Khan

to advise us that the email database was ready for review in the application Relativity.  In

that email, AUSA Maria further stated, in relevant part:

> the potentially privileged docs have been pulled and stored in a separate
> database, which should not show up on your Relativity screens.  That being
> said, if you identify other law firms or lawyers in your review of the database
> with whom any of our folks appear to have an attorney-client relationship,
> make sure to flag it, and we can run supplemental searches to segregate these
> documents.

19.     I understand that the search records related to this database show I first

reviewed documents within it on May 5, 2016.  I have no reason to disagree with that.

When I opened the database, I noted that the volume of filtered emails remained

substantial, such that a document-by-document review was impracticable.  Therefore, I

began my searching using keywords and dates of significance in our investigation.  During

my search, I did come across names of attorneys who were not targets or subjects of the

instant investigation.   When this occurred, I followed my standard practice, stopped

reviewing the email, memorialized the document's location, and contacted AUSA Maria.

20.     On May 16, 2016, I emailed AUSAs Maria and Kokkinen as well as IRS SA

Belich and FBI SA Khan to advise that I had come across additional attorney email

addresses likely relating to privileged information.  AUSA Maria replied by email to all of

us the same day, indicating that he had also come across the names of other attorneys and that those, in addition to the ones I had seen, would be added to the filtering search terms to be segregated out as potentially privileged information. I have no reason to doubt that this further mechanical filtering occurred. Again, I continued my review knowing that I might need to utilize my standard practice if I came across additional emails that appeared to be attorney-client in nature. I do not recall seeing any additional attorney-client privileged information, although if I had I would have followed my normal practice, not reading the document, memorializing its location and contacting the prosecutor.

21.     On November 2, 2016, I went into the database to search and noticed that it contained a substantially lesser number of emails than it had first contained. I contacted AUSA Maria to let him know of this. Sometime thereafter, the database appeared to have increased in size from the substantially lesser number of emails that I saw on November 2, 2016.

22.     I was not involved in the preparation of the database for disclosure to defense counsel or in the disclosure of that database to defense counsel.

23.     By August 21, 2017, I had been spending substantial time on other investigations to the exclusion of the investigation of Mr. Adams.   When a pocket of time opened in my schedule on August 21, 2017, I returned to the investigation of Mr. Adams and reviewed some additional emails in the database, again using date and keyword searching.  That was the last day on which I reviewed the database.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ Christie Kroells
CHRISTIE KROELLS

## DECLARATION OF JENNIFER KHAN

Pursuant to Title 28, United States Code, Section 1746, I, Jennifer Khan, Special Agent with the Federal Bureau of Investigation ("FBI"), hereby declare under penalty of perjury as follows:

1.      I have been a Special Agent with the FBI for 12 years.  I am assigned to investigate primarily white-collar crime and have been so assigned for the entirety of my time with the FBI.

2.      During my service as a Special Agent, I have participated in numerous investigations involving allegations of various types of fraud.  The majority of those investigations involved an investigative team comprised of investigators from various federal and/or state law enforcement agencies including and not limited to the Federal Bureau of Investigation (FBI), the United States Postal Inspection Service (USPIS), the Internal Revenue Service (IRS), the Minnesota Department of Commerce, and the Minnesota Bureau of Criminal Apprehension, among others.

3.      Our investigations involve the use of investigative tools such as search warrants.  I have participated in the execution of approximately 30 search warrants during my time as a Special Agent.  When executing a search warrant, we are cautious to avoid the review of materials that contain information protected by the attorney-client privilege. When I am searching, if I see something that is potentially covered by the attorney-client privilege, I stop reviewing it and set it aside or note where it is located.  Then, I bring it to the attention of either the taint/filter team for their review, if such a team exists, or the

Assistant U.S. Attorney(s) assigned to the case so we may establish such a taint/filter team to review the document(s) for attorney-client privileged material.

4.    This practice is consistent across the investigative teams with which I have been involved, whether I am the lead investigator on the case, another agent from my agency is the lead investigator, or an agent from another agency is the lead investigator. We are careful to preserve the integrity of the investigation – to avoid reviewing information that is covered by the attorney client privilege.

5.    In the instant investigation, into alleged fraud by Edward Adams, multiple law enforcement agencies participated in the investigation, including the FBI, the IRS, and the USPIS.

6.    In late 2015 and early 2016, the investigative team obtained search warrants for the personal email accounts of Mr. Adams.  I was not the affiant for those search warrants.  The investigative team knew of but did not seek to search business "locations" for Mr. Adams, such as his law office or his law firm email accounts.

7.    After Yahoo! responded to the search warrant by providing the email account contents on a flash drive, USPIS Inspector Christie Kroells provided to me the flash drive on March 14, 2016, which I understood to contain the contents of Mr. Adam's personal email account.   I maintained custody of the flash drive and delivered it to AUSA David Maria on March 17, 2016.

8.    As a team, we (the agents) and the AUSAs, and in particular AUSA Maria, put into place a process by which the email account contents would be mechanically filtered to remove from our review emails that were likely attorney-client privilege in

nature. This involved formulating search terms that could be run mechanically to filter the email contents. I understood that a member of the U.S. Attorney's Office staff, Dan Czapko, would spearhead that mechanical filtering, and that once it was complete, we would be given access to the filtered database and could begin reviewing the filtered content, but would not have access to the emails that were filtered out as a result of the mechanical filtering.

9.     For those materials that were filtered out of our review, I asked a fellow Special Agent who was not on the prosecution team, Kurt Buelke, to handle the filter review. We exchanged emails regarding this on March 18, 2016, and AUSAs Kokkinen and Maria also discussed identifying an AUSA to join Special Agent Buelke in that process. At 3:33 p.m. on March 18, 2016, AUSA Maria emailed me, SA Buelke, and AUSA Kokkinen indicating that the size of the email production would require the database to be housed off-site, and that they would run a list of search terms "to determine the universe of potentially privileged documents." If the search resulted in a manageable number of potentially privileged documents, SA Buelke would review that. If there were too many potentially privileged documents for SA Buelke to review, those documents would be further reduced in number by mechanical filtering using relevance terms.

10.    On April 27, 2016, AUSA Maria emailed SA Belich, me, and Inspector Kroells to advise us that the filtering search terms had been run on the email database and that it should be ready for review – minus the potentially privileged items (as determined by the mechanical filtering by search terms) – "very soon."

11.     On May 4, 2016, AUSA Maria emailed SA Belich, me, and Inspector Kroells to advise us that the email database was ready for review in the application Relativity.  In that email, AUSA Maria further stated, in relevant part:

> the potentially privileged docs have been pulled and stored in a separate database, which should not show up on your Relativity screens.  That being said, if you identify other law firms or lawyers in your review of the database with whom any of our folks appear to have an attorney-client relationship, make sure to flag it, and we can run supplemental searches to segregate these documents.

12.     I understood that there was a separate set of materials to which we did not have access and that were segregated out as a result of the mechanical filtering.  When I started reviewing the email contents, I started going document by document and realized quickly that there were far too many documents to search in that way.  As a result, I began searching by key terms and relevant dates.  I do not recall reviewing any material that appeared potentially attorney-client privileged in nature.  If I did, I would have followed the process identified above, specifically stopping my review of the document, noting the document's location, and calling it to the attention of the AUSA(s) for purposes of a later taint review, if desired.

13.     I understood from an email exchange on May 16, 2016, on which I was included, that Inspector Kroells and AUSA Maria had come across additional attorney names, that those names would be added to the list of filtering search terms, and that emails containing those terms would be added to the set of emails we could not review or access.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ Jennifer Khan
JENNIFER KHAN

## <u>DECLARATION OF BRANDON BELICH</u>

Pursuant to Title 28, United States Code, Section 1746, I, Brandon Belich, Deputy United States Marshal, hereby declare under penalty of perjury as follows:

1.      I have been a federal law enforcement officer for 15 years.  Since February 2017, I have served as a Deputy United States Marshal in Minnesota.  Immediately prior to that, I served as a Criminal Investigator with the Internal Revenue Service (IRS) for 14 years.

2.      While employed by the IRS, I participated in numerous investigations involving allegations of various types of fraud.  The majority of those investigations have involved an investigative team with investigators from various federal and/or state law enforcement agencies, including and not limited to IRS, the Federal Bureau of Investigation (FBI), the United States Postal Inspection Service (USPIS), U.S. Homeland Security Investigations, the Minnesota Department of Commerce, the Minnesota Bureau of Criminal Apprehension, and others.

3.      We use many different of kinds of investigative tools during our investigations, including search warrants.  During my time with the IRS, I participated in executing of approximately 50 search warrants.  When executing a search warrant, we are careful to avoid the review of materials that may contain information protected by the attorney-client privilege.  When I am involved in the actual execution of a search warrant, as soon as I see a document that contains potentially attorney-client privileged information, I stop reviewing it and set it aside or note its location, so I may notify the taint/filter team, if one exists, or the prosecutor for purposes of establishing a taint/filter team.

4.     This practice is consistent across the investigative teams with which I have been involved, whether I am the lead investigator on the case, another agent from my agency is the lead investigator, or an agent from another agency is the lead investigator. We search carefully because reviewing something that is protected by the attorney-client privilege could negatively affect the investigation.

5.     In the instant investigation, involving alleged fraud by Edward Adams, multiple law enforcement agencies joined in the investigative effort including the IRS, the FBI, and the USPIS.

6.     In late 2015 and early 2016, the investigative team obtained search warrants for three personal email accounts, including two used by Mr. Adams. I was not the affiant for those search warrants.

7.     The investigative team knew of but did not seek to search business "locations" for Mr. Adams, such as his law office or his law firm email accounts. At some point after Yahoo! responded to the search warrant by providing the email account contents, I learned through the AUSAs that they were going to set up a mechanical filtering system that would help filter out information that was likely to be attorney-client privileged in nature. I understood from the AUSAs that this was something that needed to be done to comply with some kind of a request made because the target of the investigation was an attorney.

8.     I understood from conversations with the AUSAs that this mechanical filtering system was going to be set up by a USAO staff member, who I recall to be Dan Czapko, and could eventually involve one or more agents on a taint team reviewing the

emails that had been filtered out. From those conversations, I also understood that the email account contents would not be available for review until after the mechanical filtering system had filtered out the information we could not review.

9.   On April 27, 2016, AUSA Maria emailed me, USPIS Inspector Christie Kroells and FBI Special Agent Jennifer Khan to advise us that the filtering search terms had been run on the email database and that it should be ready for review – minus the potentially privileged items (as determined by the mechanical filtering process) – "very soon."

10.   On May 4, 2016, AUSA Maria emailed me, Inspector Kroells, and SA Khan to advise us that the email database was ready for review in the application Relativity. In that email, AUSA Maria further stated, in relevant part:

> the potentially privileged docs have been pulled and stored in a separate database, which should not show up on your Relativity screens. That being said, if you identify other law firms or lawyers in your review of the database with whom any of our folks appear to have an attorney-client relationship, make sure to flag it, and we can run supplemental searches to segregate these documents.

11.   At the time, my duty station was in Duluth, Minnesota, which meant I would be accessing the database remotely for review. When I tried remotely accessing the database, it was cumbersome and extraordinarily slow, requiring three to five minutes to pull up a single email. As a result, I reviewed a very small number of documents using Relativity. As is typical, USPIS Inspector Kroells and FBI SA Khan shared with me emails they had discovered in their searching. I do not recall seeing any emails that contained potentially attorney-client privileged information. If I had, I would have followed the

process I described above, meaning I would have stopped reviewing the document, noted the document's location, and called it to the attention of the AUSA.

12.    I understood from an email between Inspector Kroells and AUSA Maria on May 16, 2016, on which I was copied, that they had come across additional attorney names, that the those names would be added to list of filtering search terms, and that this would result in the documents containing those additional search terms being placed within the set of emails we could not access.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ Brandon Belich
BRANDON BELICH

## DECLARATION OF MARK ZEITZ

Pursuant to Title 28, United States Code, Section 1746, I, Mark Zeitz, Supervisory Information Technology ("IT") Specialist for the U.S. Attorney's Office in the District of Minnesota ("USAO"), hereby declare under penalty of perjury as follows:

1.  I am employed as the Supervisory IT Specialist and, more specifically, serve as Litigation Support Supervisor for the USAO. I have been employed with the office for 11 years and have served as an Information Technology Specialist, an Automated Litigation Support ("ALS") Specialist, and most recently, in my supervisory capacity. I supervise three Automated Litigation Support Specialists ("ALSS") including Dan Czapko. My direct supervisor is the First Assistant U.S. Attorney Greg Brooker, who is now also the Acting U.S. Attorney.

2.  ALS staff assist Assistant U.S. Attorneys ("AUSAs") in the Civil and Criminal Divisions in a variety of ways. Most often, ALS staff receive, process and make accessible for review the data that law enforcement obtains in investigations where our office is involved. At an AUSA's request, ALS staff will assist the AUSA in determining how to search, segregate or otherwise organize the data for review by the prosecution team. Likewise, when requested by the AUSA, ALS staff will assist the AUSA to export the data for disclosure to defense counsel once the investigation has resulted in criminal charges. ALS staff also have technical expertise in trial presentation applications; audio, video and related transcription presentation applications; as well as PowerPoint, such that AUSAs sometimes seek ALS assistance in these areas.

3.     In the context of receiving, processing, organizing and later exporting data for disclosure in connection with investigations, ALS staff takes direction from the AUSA(s) assigned to the cases. That direction may come orally or by email from the AUSA.

4.     For those cases where the data set is of a small enough size, the data may be maintained on the USAO's servers in Minnesota and processed, organized and exported in-house. In cases where the data set is of too large a size, it is sent to the Department of Justice Litigation Technology Support Center ("LTSC") in Columbia, South Carolina, to be maintained on their servers. In such situations, the AUSA provides direction to the assigned ALS staff person in the USAO who then makes a Litigation Work Plan (LWP) memorializing the work we need the LTSC to do in terms of processing, organizing or exporting of the data. One of the LTSC staff members then implements the LWP on the data maintained for our office. When a LTSC staff member completes an LWP, the staff member sends a completion email. I have reviewed each of the eight work LWPs related to the investigation of Edward Adams. The following is a compilation of the information contained within those records, specifically the LWPs, unless otherwise specified.

### Litigation Work Plan 1 ("LWP1") – Processing the Email Data

5.     On March 18, 2016, ALSS Czapko transmitted to the LTSC by wide area network the 34-gigabyte contents of a flash drive related to Mr. Adams's case and requested that the data be processed and placed into a Relativity database project. The same day at 3:33 p.m., AUSA Maria emailed AUSA Kokkinen and FBI Special Agents

Jennifer Khan and Kurt Buelke regarding the running of a list of search terms against the Relativity database to "determine the universe of potentially privileged documents."

6.     Relativity is a web based document review tool that allows for the effective storage, organization and searching of large quantities of data.  During the investigation, this Office used various versions of Relativity including versions 7.5, 8.2, and 9.4.

7.     The LTSC completed this request on April 12, 2016, and granted the USAO's ALS team (including me, Dan Czapko and four other ALS team members) as well as AUSA David Maria, AUSA John Kokkinen and now Supervisory Paralegal Sara O'Reilly access to the project.  When originally constructed, the database contained 146,522 documents.

8.     The Relativity application maintains a history that specifies which individuals had access to the database and the various folders therein at particular times and also reflects which individuals viewed particular documents and when those documents were viewed.

9.     The Relativity history for the database reflects that the following USAO personnel or law enforcement agents were granted access to the database and on the dates specified; first viewed a document in the database on the date specified, if any; and last viewed a document on the date specified, if any:

| USAO Personnel Names | Database Access Granted On | Date First Database Document Viewed | Date Last Database Document Viewed |
|---|---|---|---|
| Dan Czapko | 4/12/2016 | 4/14/2016 | 9/11/2017 |
| David Maria | 4/12/2016 | 5/4/2016 | 4/4/2017 |
| John Kokkinen | 4/12/2016 | No viewings | No viewings |
| Jennifer Khan | 5/5/2016 | 5/5/2016 | 10/31/2016 |
| Christine Kroells | 5/5/2016 | 5/5/2016 | 8/21/2017 |
| Sara O'Reilly | 4/12/2016 | No viewings | No viewings |
| Coryn Petersen | 9/12/2016 | 9/13/2016 | 9/13/2016 |
| Brandon Belich | 5/3/2016 | 6/6/2016 | 7/13/2016 |
| Martin Harris | 4/8/2017 | No viewings | No viewings |

Coryn Petersen is a former USAO paralegal, and Martin Harris is a USAO paralegal.

10.     Inspector Kroells document view history indicates that she viewed four documents on August 21, 2017, and her next most recent viewing prior to that date occurred on May 16, 2017.

11.     Relativity records will indicate specific searches that were applied to the database materials if those searches are saved ("saved searches"). Saved searches may be modified, however, by subsequent alterations to the saved search conditions including and not limited to changes to the search terms, the fuzziness level, and stemming. Altering the fuzziness increases or decreases the rate of capture for terms similar to the identified search term(s). Each of the searches described hereafter was at some point a saved search but may have been modified.

12.     If specific documents are alleged to contain attorney-client privileged information, I could determine from the Relativity log history whether a member of the prosecution team ever accessed those documents, who accessed them and the dates and times of accessing, if any.

### Preliminary Searching

13.     On April 14, 2016, AUSA Maria emailed AUSA Kokkinen an "initial cut" of search terms to filter out "potentially privileged documents" in the Relativity database.

14.     On or before April 26, 2016, ALSS Czapko ran the proposed general and specific search terms against the email database.  On April 26, 2016, AUSA Maria emailed AUSA Kokkinen and explained he was advised that the general search terms proposed in his email of April 14, 2016, appeared too general, in that they "hit" on 70 to 80 percent of the documents, "due in large part to the standard disclaimers on many of the emails."  As a result, AUSA Maria emailed AUSA Kokkinen and AUSA Tim Rank explaining his proposal to use the more specific search terms, as further described below, to filter the database into three categories of materials: (1) for review, (2) for potential "taint" review, and (3) to be eliminated from review.

### Litigation Work Plan 2 ("LWP2") – First-Round Filtering
### (Potential Attorney-Client Privilege)

15.     On April 27, 2016, ALSS Czapko submitted LWP2 to the LTSC and requested filtering by specified search terms that would result in certain documents and their family being placed into secure folders that would be inaccessible to the prosecution team.  "Family" in this context, means the relationship between emails and attachments;

the emails are considered "parents" and the attachments are considered "children." These secure folders were identified as the "Taint Folder," which would be inaccessible to the agents and prosecutors handling Mr. Adams's case but accessible to Office's ALS team, and the "Not For Review Folder," which would be inaccessible to anyone in the USAO and only accessible to Relativity personnel at the LTSC.  Documents containing the following search terms, in the alternative, and the family of those documents were to be placed in the Taint Folder:

> adamsgrumbles
> adamsmonahan
> amllp
> zouvas

16.    Pursuant to LWP2, documents containing the following terms, in the alternative, and their family were to be placed in the Not For Review Folder:

> anthonyostlund
> dorsey
> fredlaw
> fredrickson
> K&L
> klgates
> kopecky
> ksblegal
> latham
> lw.com
> merchantgould
> sankovitz
> schwegman
> sikora
> slwip
> watkins
> wc.com

17.     On May 3, 2016, the LTSC completed this LWP2.  At this point, case-related law enforcement officers Brandon Belich, Jennifer Khan, and Christie Kroells were given access by the LTSC to the For Review Folder, which contained the remaining materials that had not been moved to the "Taint" or Not For Review Folders.

### Litigation Work Plans 3 and 4 – Second-Round Filtering
### (Additional Potential Attorney-Client Privilege)

18.     On May 16, 2016, Inspector Kroells exchanged emails with AUSA Maria wherein both noted that they had identified additional attorneys during their review of the filtered database.  This required additional filtering of the materials, as specified more fully below.

19.     On June 7 and 9, 2016, ALSS Czapko submitted LWP3 and LWP4 requesting the LTSC, first, remove from the "For Review" and Taint Folders any documents containing the following terms, in the alternative, and their family:

arnstein
@arnstein.com
felhaber
@felhaber.com
hopeman
amslaw
blandrichter
@blandrichter.com
tamburino
caplanlaw
@caplanlaw.com
brever

And, second, LWP3 and LWP4 requested that those removed materials be placed in the Not For Review Folder, specifically the folder accessible only by Relativity personnel at the LTSC.

20.     Preliminary searching of these terms by ALSS Czapko on or about June 7, 2016, indicated that approximately 1,000 documents including family would be eliminated from the database because of this search term filtering.   On June 9, 2016, the LTSC completed this LWP3.

21.     On June 9, 2016, ALSS Czapko submitted a LWP4 requesting the LTSC to remove from the Taint Folder any documents containing the search terms identified above for LWP3 (and their family) and to place those in the Not For Review Folder.   On June 10, 2016, the LTSC completed this LWP4.

### Litigation Work Plans 5, 6, 7 ("LWP5-7") – Third-Round Filtering
### (search term adamsmonahan)

22.     On October 17, 2016, AUSA Maria emailed ALSS Czapko and described seeing in the For Review Folder an email to an associate at Mr. Adams's law firm.   AUSA Maria identified the associate's email address as cmumm@adamsmonahan.com and asked why the first-round filtering (LWP2) – which included the search term adamsmonahan – would not have filtered these materials out of the For Review Folder and into the Not For Review Folder, as specified in LWP2 above.

23.     To try to address this, on October 19, 2016, ALSS Czapko submitted LWP5 requesting, first, that the LTSC remove from the For Review Folder any documents containing the following terms, in the alternative (and their family):

        privilege
        attorney
        lawyer
        advice
        counsel
        acp

"work product"
"law firm"
workproduct
"work-product"
adamsmonahan
adamsgrumbles
sankovitz
amllp
wc.com
merchantgould
zouvas
dorsey
K&L
klgates
schwegman
slwip
fredrikson
fredlaw
anthonyostlund
kopecky
ksblegal
latham
watkins
lw.com
sikora
arnstein
@arnstein.com
felhaber
@felhaber.com
hopeman
amslaw
blandrichter
@blandrichter.com
tamburino
caplanlaw
@caplanlaw.com
brever

and requesting, second, that the LTSC place those materials in the "Taint Review" folder.

On October 20, 2016, the LTSC completed this request, which resulted in the transfer of

just over 105,000 documents to the secure Taint Folder.  He did this out of an abundance

of caution to try to see if something was wrong in the filtering search as previously constructed. ALSS Czapko also increased the search's "fuzziness," meaning the search's ability to capture terms despite potential errors that could prevent recognition of the terms (i.e., misspellings, optical character recognition errors, and similar issues). This filtering did not alter the filtering that was completed by LWP2, LWP3 and LWP4.

24.     On November 2, 2016, ALSS Czapko submitted LWP6 to the LTSC and requested the rebuilding of the dictionary search index for the Relativity database and all of its folders. He did so because of the October 17, 2016, email from AUSA Maria, which caused him to question whether the dictionary search index was functioning correctly. The dictionary search index allows the ALS team to run preliminary searches to identify where specified search terms are located within the database, to identify how many times the search term appears in the database, to determine how many documents in the database contain the search term(s), and to increase or decrease the rate of capture for terms similar to the search terms. The LTSC completed LWP6 on November 3, 2016.

25.     On November 7, 2016, ALSS Czapko submitted LWP7 to the LTSC and requested that all of the materials moved to the Taint Folder by LWP5 – *except* those containing the search term adamsmonahan.com – be returned to the For Review Folder. ALSS Czapko did this because any emails from an adamsmonhan email address would remain in the Taint Folder, inaccessible to the prosecution team. The LTSC completed this request on November 7, 2016.

26.     I have reviewed LWP5 and 7 and noticed that this search process filtered out and then returned the exact same number of documents. Based on my review of the

Relativity database logs and metadata for the relevant emails, it appears that Mr. Mumm was using a Hotmail account rather than his "adamsmonahan" account, something neither AUSA Maria nor ALSS Czapko knew. To the extent Mr. Adams and Mr. Mumm exchanged emails using Mr. Mumm's Hotmail account, these searches could not have filtered those Hotmail emails out of the For Review Folder.

### Litigation Work Plan 8 ("LWP8") – Fourth-Round Filtering (Relevance)

27.     On February 28, 2017, AUSA Maria emailed ALSS Czapko requesting the running of a final set of terms, specified below, to identify and retain the relevant documents in the database.

28.     On April 4, 2017, ALSS Czapko requested by LWP8 that the LTSC, first, retain in the For Review Folder any documents containing the following terms, in the alternative, and their family:

Apollo
Diamond
ADI
ADGC
Gemstone
DL
RL
ADR
RBE
ESA
MRM
Scio
SDTC
Krossbow
Linares
Lancia
Zipkin
Nichols

LisaL
LMAInc
Mack
Rapello
Platt
Robb
Larson
McMahon
Bern
McPheely

And, second, ALSS Czapko requested that the LTSC place the remaining documents –
those without any of these terms – in a secure folder identified as "Not Adams Email
Database" and inaccessible by the prosecution team.

### Preparing the Potentially Privileged Materials for Disclosure

29.    On April 7, 2017, I requested that the LTSC give me access to move
documents and create folders in the email Relativity project.  Given the time lag associated
with the LWP queue, the LTSC granted me the requested access.  With such access, to
include access to all of the secure folders, I separated the emails by email account into three
folders: Adams, Jafman1 and Monahan.  These folders were intended to and did serve as
the basis for the discovery production of the emails contained in the secure Not For Review
Folder, Taint Folder and Not Adams Email Database Folder and ensured that only Mr.
Adams received the potentially privileged emails in his email accounts, that he would not
receive the potentially privileged emails in Mr. Monahan's email account, and vice versa.

30.    In the process of providing discovery to Mr. Adams's counsel, the original
production did not contain the unprocessed material provided by Yahoo!, meaning the

material before filtering.  Once that was discovered, I understand that Mr. Adams was provided complete, unprocessed materials specific to his two email accounts.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ Mark Zeitz
MARK ZEITZ

## DECLARATION OF DAVID M. MARIA

Pursuant to 28 U.S.C. Section 1746, I, David M. Maria, Assistant United States Attorney for the District of Minnesota, hereby declare under penalty of perjury as follows:

1.      I am an Assistant United States Attorney in the District of Minnesota, and have been so employed since January 11, 2016.   Prior to being hired by the U.S. Attorney's Office, I was a partner with the law firm of Shook, Hardy, and Bacon LLP, where I worked from April 2014 until December 2015.   Prior to that, I worked as a Trial Attorney with the Department of Justice's Criminal Division (Fraud Section) from 2010 until April 2014.   From 2001 through 2010, I worked as an associate at Arnold & Porter and then Latham & Watkins.   In both the private and public sector, I was involved in a number of large-scale investigations that included the collection and processing of substantial amounts of electronic data, the reviews of which often included creating processes to identify and segregate potentially privileged materials.

2.      As part of my duties as an AUSA in the District of Minnesota, I was assigned to the investigation of Edward S. Adams for possible investment fraud and other related crimes.

3.      On or about March 17, 2016, I received from FBI Special Agent Jennifer Khan a thumb drive containing Yahoo!'s production of records pursuant to the search warrant executed on January 8, 2016 for the email accounts edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com.   I did not review any of the records on the thumb drive.   Instead, I provided the thumb drive to Automated Litigation

Support ("ALS") staff at the U.S. Attorney's Office and asked that they load the electronic data into a searchable database.

4.      ALS staff worked with the Department of Justice's Litigation and Technology Support Center ("LTSC") in South Carolina to load the materials into a "Relativity" database, which would be housed on servers at the LTSC but could be accessed remotely.

5.      I next requested that ALS staff conduct a mechanical filtering process to segregate potentially privileged documents.  Specifically, I asked ALS staff to run two separate lists of search terms against the full set of electronic data: (a) a list of general terms; and (b) a list of terms related to lawyers and law firms with which we believed that Mr. Adams had some involvement, either personally, or during the time that he was associated with Apollo Diamond/ADGC/Scio.  I reviewed materials already collected as part of the investigation and consulted with members of the prosecution team to arrive at the lawyer/law firm specific terms.  This list of terms was designed to segregate and exclude any communications to or from entities which the government was aware had represented Mr. Adams in connection with a prior investigation by the Securities and Exchange Commission and other litigation, as well as any communications to or from Mr. Adams's law firm, Adams & Monahan.

6.     The lists of search terms were as follows, with the exclamation point character (!) intended to serve as a wild card root expander in the search process:

> General Terms
> privilege!
> attorney
> lawyer
> advice
> counsel
> acp
> "work product"
> "law firm"
>
> Lawyer/Law Firm Specific Terms
> adamsmonahan
> adamsgrumbles
> sankovitz
> amllp
> wc.com
> merchantgould
> zouvas
> dorsey
> "K&L"
> klgates
> schwegman
> slwip
> Fredrikson
> fredlaw
> anthonyostlund
> Kopecky
> ksblegal
> latham
> watkins
> lw.com
> Sikora

7.     After running the two lists of search terms, ALS staff informed me that the list of general terms was resulting in a disproportionately large number of hits, and ALS staff attributed this primarily to standard language and disclaimers that showed up on many

of the electronic mails.  The lawyer/law firm specific term list also generated a substantial number of hits, which I concluded likely captured the vast majority of potentially privileged materials.  For this reason, I determined that we would utilize the lawyer/law firm specific term list to filter out potentially privileged emails and attachments.

8.      The documents (including "family members," meaning documents that themselves did not contain the terms but were attached to, or a part of a string or chain with, a document or email that did contain one of the terms) that hit on the lawyer/law firm specific search terms were placed into secure folders which no one on the prosecution team could access.  This filtering process resulted in more than 32,000 documents being segregated into secure folders identified as the "Taint" and "Not For Review" folders.  To date, these secure folders remain segregated within the database at the LTSC and have never been reviewed in any manner by the prosecution team.  Initially, the government considered using a taint team to review the contents of the secure Taint Folder (materials containing the search terms "adamsgrumbles," "adamsmonahan," "amllp," and "zouvas") to determine if there were any non-privileged documents among them that could be turned over to the prosecution team, but, ultimately, the government determined that it would not undertake this task.  Accordingly, no members of the prosecution team have reviewed the secure Taint or Not For Review Folders.

9.      After filtering out the potentially privileged documents, the LTSC placed the remaining documents into a folder accessible to the prosecution team (identified as the "For Review Folder").  On May 4, 2016, before any member of the prosecution team accessed the For Review Folder, I instructed all members of the prosecution team that, if

they encountered any documents that appeared to have the names of lawyers or law firms that had not been on our initial list of search terms, they should cease reviewing the document and contact me.

10.    Through this process, we identified the following additional search terms, which we instructed the LTSC to run against the For Review Folder to filter out additional documents:

> arnstein (and @arnstein.com)
> felhaber (and @felhaber.com)
> hopeman
> amslaw
> blandrichter (and @blandrichter.com)
> tamburino
> caplanlaw (and @caplanlaw.com)
> brever

11.    This supplemental filtering process, which took place in June 2016, resulted in approximately 1,000 additional documents (including family members) being removed from the For Review Folder and added to the segregated secure folder. As with the other documents that were segregated and removed, these documents have not been available to, or reviewed by, any members of the prosecution team.

12.    In October 2016, I discovered that, for some reason, emails to/from an Adams Monahan associate attorney had not been picked up by the "adamsmonahan" search term. ALS staff could not provide an explanation for why the search term missed these documents. Nevertheless, I was advised that ALS staff addressed the issue by increasing the "fuzziness" of the search terms.

13.     To further limit the documents in the Government Review Database to materials that fell within the scope of the "Information to be seized by the government" as set forth in the search warrant, on April 4, 2017, I requested that ALS staff run the following list of search terms:

Apollo
Diamond
ADI
ADGC
Gemstone
DL
RL
ADR
RBE
ESA
MRM
Scio
SDTC
Krossbow
Linares
Lancia
Zipkin
Nichols
LisaL
LMAInc
Mack
Rapello
Platt
Robb
Larson
McMahon
Bern
McPheely

14. Any document that failed to contain at least one of these terms was removed from the For Review Folder. In other words, only the documents that hit on one or more of these search terms were retained in the For Review Folder, resulting in the set of documents/data that was "seized" pursuant to the search warrant that remains accessible by, and available to, the prosecution team.

15. In conducting my own searches with the For Review Folder, I used keyword searches to identify emails relevant to the case.

16. On August 21, 2017, I received an email from Adams's counsel Lance Wade, indicating that the defense had identified approximately one thousand emails in the For Review Folder which the defense claimed were privileged. I had previous communications with Mr. Wade in which I requested that, if the defense found emails they believed to be privileged during their review of the For Review Folder, they identify any such emails so they could be segregated from the For Review Folder and looked at by someone who was not part of the prosecution team. To date, Mr. Wade has not identified any documents which he contends contain privileged communications.

17. After receiving Mr. Wade's August 21, 2017 email, I responded by advising Mr. Wade that we would have a taint team who would act as his point of contact with respect to the approximately one thousand emails in the For Review Folder which the defense claimed were privileged. The US Attorney's Office designated AUSA Ann Bildtsen as the Taint AUSA, and it is my understanding that AUSA Bildtsen has had communications with Mr. Adams's counsel on this matter. Out of an abundance of caution, I directed members of the prosecution team to refrain from accessing the For Review

Folder, and it is my understanding from ALS Staff that no members of the prosecution team have accessed the For Review Folder since August 21, 2017.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ David M. Maria
DAVID M. MARIA