## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 17-cr-64-DWF-KMM |
| | ) | |
| v. | ) | **OPPOSITION TO MOTION** |
| | ) | **TO QUASH** |
| EDWARD S. ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |

The government's opposition to Mr. Adams's motion to suppress is premised on its purported reasonable execution of a search warrant and its "employ[ment of] the two-step process for electronic evidence set forth in Federal Rule of Criminal Procedure 41(e)(2)(B)." (DCD 49 at 3, *see also id.* at 1 (noting that the government would "be prepared to offer evidence regarding the reasonable execution of the warrant at an evidentiary hearing")). But the materials submitted by the government in support of the "reasonableness" of its execution of the warrant (DCD 52-1 & 67) make clear that during the investigation phase of this case—and prior to the return of the indictment—the government never actually took the second step. Instead, the government investigation team had unfettered access to the vast majority of the email it obtained under step one, and routinely accessed and searched all but a narrow (and under-inclusive) subset of privileged documents.

The only evidence the government produced suggesting that it actually took a second step to "seize" any documents under the warrant is contained in two paragraphs of

AUSA Maria's declaration.  (DCD 52-1 at 41-42 (Maria Decl. ¶¶ 13-14)).  In Paragraph

13, AUSA Maria states:

> To further limit the documents in the Government Review Database to materials that fell within the scope of the "Information to be seized by the government" as set forth in the search warrant, on April 4, 2017, I requested that ALS staff run the following list of search terms . . . .

(*Id.* ¶ 13 (identifying 28 search terms)).  In the next paragraph, AUSA Maria explains:

> Any document that failed to contain at least one of these terms was removed from the For Review Folder.  In other words, only the documents that hit on one or more of these search terms were retained in the For Review Folder, *resulting in the set of documents/data that was 'seized' pursuant to the search warrant* . . . .

(*Id.* ¶ 14 (emphasis added)).  These actions took place more than a year *after* the

government obtained the Yahoo! Materials, three weeks *after* the government presented

its case to a grand jury and obtained an indictment on March 22, 2017, and *just three

days before* it produced Rule 16 materials to the defense.  Aside from technical

employees who implemented his directive, AUSA Maria is the lone witness who can

speak to this purported "seizure"—no other member of the prosecution team discusses

seizure at all in their declarations.

It would not be unreasonable to infer from these facts that what has now been

characterized as a "seizure" by AUSA Maria—and AUSA Maria alone—was not actually

a seizure at all, but instead an effort to conceal prior failures to take the second step under

the warrant.  Indeed, the government has produced no contemporaneous documents that

describe AUSA Maria's actions as a seizure.  The only such evidence is AUSA Maria's

post hoc characterization of the actions as a "seizure," as set forth in a declaration

proffered by the government.  Having submitted sworn testimony from AUSA Maria in opposition to the motion to suppress, the government cannot now attempt to shield him from cross-examination.  Mr. Adams is entitled to test these assertions (and others), as they directly implicate his fundamental constitutional rights.

Indeed, a full airing of the facts relating to the government's conduct during the execution of the warrant is necessary—and long past due.  For more than eight months, AUSA Maria withheld evidence tending to show that the warrant in this case was unlawfully executed and that Mr. Adams's constitutional rights were violated.  AUSA Maria refused repeated requests from defense counsel for an explanation regarding what steps the government took to execute the warrant.  AUSA Maria refused to disclose the method by which the government filtered for responsive documents covered by the warrant.  And AUSA Maria refused to explain what steps were taken to ensure that important legal privileges involving Mr. Adams, his clients, his spouse, and others were not infringed upon.

But perhaps worse than AUSA Maria's silence were the few words he did offer regarding the seized documents.  Because in those words, AUSA Maria affirmatively deceived the defense, and led it to believe that the prosecution team that investigated the case and returned an indictment against Mr. Adams had access to only approximately 43,000 of the Yahoo! emails, when in fact it had sustained access (which AUSA Maria and others on the team repeatedly exploited) to nearly all of the seized documents— approximately 114,000 in total—prior to indictment.  The harm and burdens to Mr. Adams that resulted from AUSA Maria's misstatements, and delay of and burden on

these proceedings, are profound.  On the basis of AUSA Maria's statements, Mr. Adams

and his counsel spent hundreds of hours, and tens of thousands of dollars, picking

through what had been represented to be the prosecution team's review database—trying

to infer what the government had done, and trying to assess the propriety of the execution

of the warrant and the harm that has resulted to Mr. Adams.  It was not until new counsel

for the government got involved in this case that the truth began to emerge, and it was

soon revealed that the time and money Mr. Adams spent on those efforts was largely a

waste because he and his counsel had not been reviewing the database to which the

prosecution team had access pre-indictment.

It is reasonable and appropriate to consider AUSA Maria's acts of concealment

and affirmative misstatements when assessing the veracity of his proffered testimony, and

the only way to bring those fully before the Court is through cross-examination of his

untested declaration.  As the government well knows, lies and acts of concealment are

quintessential evidence of consciousness of guilt.  *See, e.g.*, *United States v. Eggleton*,

799 F.2d 378, 381 (8th Cir. 1986).  Conversely, if it is true, as the government suggests,

that AUSA Maria's communications were not "intentionally misleading," (DCD 66 at

23), it is well past time for him to come forward and explain why—and given the

centrality of those statements to this motion, it is necessary and appropriate for his

explanation to be subject to the crucible of adversarial litigation.  For the government to

cast this as a mere discovery dispute unworthy of a hearing (*see id.*) is demeaning of the

harm Mr. Adams has suffered as a result of the prosecution team's actions, and neglects

the serious constitutional implications of their conduct.

4

## BACKGROUND

Mr. Adams filed his Motion to Suppress on September 27, 2017.  (DCD 36 & 37).

At that time, the defense was under the impression that the prosecution team had not had

access to the emails that it had segregated from its review database.  *See* DCD 37 at 13.

The defense's understanding was that:

> The government isolated more than 79,000 such files into a separate database
> using methods the government has refused to disclose to Mr. Adams or his
> counsel. . . . The Assistant U.S. Attorneys prosecuting the case have
> represented that they have had no access to that isolated set of emails . . .
> Unidentified government personnel filtered out nearly two-thirds of the
> Yahoo!-produced files based on criteria that the government refuses to
> disclose to the defense.  It then passed along to the prosecution team the
> remaining approximately 29,000 files that it appears to have concluded were
> not subject to any privileges and were properly called for in the warrant.

*Id.*[1]  The defense was under this impression because it was what AUSA Maria had

repeatedly told the defense.  (*See* DCD 41-1 at 124, 131 (Emails from AUSA Maria to L.

Wade)).  On August 23, 2017, AUSA Maria assured undersigned counsel that "As to the

remaining documents that are not in our review database . . . . I can assure you that

nobody on the prosecution team has had, or will have, access to those documents."  (*Id.* at

124).  On May 24, 2017, he told the defense that "we provided to you the unfiltered

---

[1] The numbers of files identified in the Motion to Suppress reflect files from Mr.
Adams's two Yahoo! accounts, whereas the numbers of files identified in the
government's recent disclosures also include files from Michael Monahan's Yahoo!
account.  Thus, when the motion to suppress refers to "the 29,010 files provided to the
prosecution team," it is referring to the number of files from Mr. Adams's two Yahoo!
accounts that were in the government's review database when it was provided to Mr.
Adams in May 2017.  (*See* DCD 37 at 13).  That database included a total of
approximately 43,000 files because it also included approximately 14,000 files from Mr.
Monahan's Yahoo! account.  (*See* DCD 54 at 4-5).

database, which contains all of the emails that were in the accounts, as well as the filtered version (i.e., the seized documents) that is the database to which the prosecution team has had access." *Id.*  And on April 7, 2017, AUSA Maria told then-defense counsel that the government would "provide you with the data from the two accounts in the unfiltered format in which it was produced by Yahoo, as well as the database from which we have been working, which has been filtered in an effort to remove potentially privileged, as well as non-responsive, emails and documents."  (Ex. 1, Letter from AUSA Maria to R. Paulose).

However, as the government revealed for the first time in its November 30, 2017 disclosures, AUSA Maria's statement that "nobody on the prosecution has had . . . access to those documents" was false.  (DCD 41-1 at 124; *see* DCD 52 & 52-1).  Instead, the government had searched the drive with all 146,000 documents in March 2016, and it had access to a database containing between 113,000 and 114,000 documents from late April or early May 2016 through April 4, 2017, a mere three days before AUSA Maria first told defense counsel that the review database it produced was "the database from which we have been working."  (*See* DCD 54 at 1-5 (summarizing DCD 52, 52-1, and related government disclosures); Ex. 1).

In addition to the fact that the government's November 30 disclosures revealed that AUSA Maria's correspondence had misled the defense, those disclosures also revealed that AUSA Maria was a central figure in the execution of the warrant at issue. The centrality of his role caused the defense to identify him as a witness for the

evidentiary hearing.  (*See* DCD 54).[2]  The government's disclosures on November 30 and

additional disclosures since then have revealed:

- AUSA Maria was the sender or a recipient of every single email related to the execution of the warrant produced by the government, (*see* DCD 67 at 1-25), with the exception of technical emails between Dan Czapko, a litigation support specialist, and the DOJ's Litigation Technology Service Center about the implementation of requested actions in the DOJ's database (*see id.* at 26-129).  And AUSA Maria was the member of the prosecution team who requested all such actions from Dan Czapko.  (*See, e.g.*, *id.* at 57, 60, 76, 78, 90, 113).

- AUSA Maria appears to have been the key decision-maker related to the execution of the warrant, as he sent every email containing what appear to be the key decisions.  (*See, e.g.*, DCD 67 at 2, 4, 6, 13, 14, 16, 22).

- AUSA Maria authorized Inspector Kroells to search the complete, unfiltered contents of the Yahoo! flash drive in mid-March 2016.  (DCD 52-1 at 4-5 (Kroells Decl. ¶¶ 9-12) ("I was told by AUSA Maria that I could review them, that it was a non-issue")).  During these initial searches, Inspector Kroells saw "material that . . . did not appear relevant to the instant investigation," and she notified AUSA Maria of this.  (*Id.* at ¶ 13).

- On March 17, 2016, AUSA Maria told Inspector Kroells that the prosecution team "needed to engage in a heightened filter process."  (DCD 52-1 at 6 (Kroells Decl. ¶ 14)).

---

[2] The government confuses Mr. Adams's Responsive Notice of Intent to Call Witnesses with a motion setting forth a legal basis for our subpoena to AUSA Maria.  (*See* DCD 66 at 14-18).  Mr. Adams's notice identified his additional witnesses for the upcoming evidentiary hearing as required by Local Rule 12.1(c)(3)(b) and updated the Court on recent and still developing factual disclosures related to the execution of the warrant, in advance of a hearing that was, at the time of the filing, three days away.  (*See* DCD 54).  While the limited facts set forth in that notice actually provided an adequate basis to justify calling AUSA Maria, the notice was not—and did not purport to be—a memorandum of law.  Moreover, when the government objected to the identification of the prosecuting attorneys as witnesses, the defense reviewed its needs and decided not to identify AUSA Kokkinen in its notice in an attempt to respond to the government's concern.

- On March 17, 2016, AUSA Maria took custody of the Yahoo! flash drive—containing the complete contents of the Yahoo! email accounts—and had custody of it for over one year, until April 4, 2017.  (Ex. 2, Evidence Tag).

- On March 18, 2016, AUSA Maria emailed the other members of the prosecution team about the "logistics" of loading the documents into the database before the search could begin.  (DCD 67 at 2).

- On April 14, 2016, AUSA Maria proposed a list of search terms to AUSA Kokkinen designed to identify privileged documents within the Yahoo! accounts.  (DCD 67 at 4-5 ("Here is my initial cut at a list of search terms that could be used to filter the potentially privileged documents in the email database.")).  AUSA Maria's list of search terms did not include the name or law firm name of Mr. Adams's then criminal defense counsel, Jon Hopeman, with whom the government had recently met.  (*See id.* at 5).  None of the federal agents (Inspector Kroells, Agent Khan, or Agent Belich) are copied on this email.  (*See also* DCD 52-1 at 37 (Maria Decl. ¶ 5)).

- On April 26, 2016, AUSA Maria circulated the results of the application of his search terms to AUSA Timothy Rank and AUSA Kokkinen.  AUSA Maria wrote that the "general" privilege search terms, including "privilege!" and "attorney" "were hitting on 70-80% of the documents."  (DCD 67 at 6).  AUSA Maria stated that the list of "specific" privilege terms "also had a substantial amount of hits."  (*Id.*).  He concluded "I believe that we are okay just sticking with these terms and dispensing with the general terms."  (*Id.*; *see also* DCD 52-1 at 38-39 (Maria Decl. ¶ 7) ("I determined that we would utilize the lawyer/law firm specific term list")).  In his April 26 email, he also discussed a plan for using a taint team to review certain potentially privileged documents.  (DCD 67 at 6).

- The government did not use a taint team as part of its execution of the Yahoo! warrant, a fact that is only discussed in AUSA Maria's declaration.  (*See* DCD 52-1 at 39 (Maria Decl. ¶ 8) ("Initially, the government considered using a taint team . . . but, ultimately, the government determined that it would not undertake this task")).

- On May 2, 2016, AUSA Maria was the first member of the prosecution team to access the government's review database.[3]  (*See* Ex. 3 at 1).  AUSA Maria

---

[3] Three business days ago, on Friday, December 15, 2017, the government produced a 2,320-page spreadsheet reflecting the activity of the prosecution team, exclusive of litigation support personnel, in the database.  An excerpt of this spreadsheet is attached as

searched the documents in the database using "keyword searches."  (DCD 52-1 at 42 (Maria Decl. ¶ 15)).

- While seven members of the prosecution team were active in the database, more than 50% of the total prosecution team activity is attributable to AUSA Maria.  (*See* Ex. 4 (13,042 spreadsheet rows denote activity by AUSA Maria, out of 23,534 total entries)).  AUSA Maria viewed more documents in the database than any other member of the prosecution team.  (*See* Ex. 4 (7,442 spreadsheet rows denote the "View" action taken by AUSA Maria, compared to 5,008 such actions by all other members of the prosecution team)).  He also searched using the "document query" action more than any other member of the prosecution team (5129 spreadsheet rows denote the "Document Query" action by AUSA Maria, compared to 5144 such actions by all other members of the prosecution team combined).  (*See* Ex. 4).

- On May 16, 2016, Inspector Kroells notified the prosecution team that two email addresses, including that of Jon Hopeman's firm, "appear[ed] to contain privileged communications."  (DCD 67 at 13).  AUSA Maria acknowledged that he "also saw that Hopeman had done some work for [Mr. Adams] before," and also that "it looks like [Mr. Adams] had a guy working on his tax issues – Tom Brever," although AUSA Maria had not shared these observations with the prosecution team until after Inspector Kroells raised the issue.  (*Id.*).

- Three weeks later, on June 6, 2016, AUSA Maria made the request for litigation support to remove documents containing privilege search including "hopeman," and "brever."  (DCD 67 at 14).

- On June 28, 2016, AUSA Maria emailed counsel for Scio and obtained what purported to be a privilege waiver by *Scio* of *Apollo*'s attorney-client privilege.  No other member of the prosecution team was included in AUSA Maria's correspondence with counsel for Scio.  (DCD 67 at 22).

- On November 2 and 3, 2016, AUSA Maria and Inspector Kroells emailed about "organizing the emails by tagging important ones by players and topics." (Ex. 5, Email from D. Maria to K. Kroells).

- On February 28, 2017, AUSA Maria emailed litigation support specialist Czapko, without copying any of the other members of the prosecution team,

Exhibit 3.  The defense has used the automated functions in Excel to create a summary of the number of rows of activity associated with each member of the prosecution team, which is attached as Exhibit 4.

and requested that he run search terms to "cull this down to relevant documents." (DCD 67 at 16). The list of search terms includes a number of extremely broad terms, such as "Apollo," "Diamond," Mr. Adams's initials, "ESA," and his wife's maiden name and the last name of many members of her extended family, "Linares." (*Id.*). This request was not implemented until April 4, 2017, (*id.* at 115-129), and AUSA Maria's declaration states that he made this request on April 4, 2017. (DCD 52-1 (Maria Decl. ¶ 13)).

- AUSA Maria states that the April 4, 2017 filtering was "[t]o further limit the documents in the Government Review Database to materials that fell within the scope of the 'Information to be seized by the government' as set forth in the search warrant," and that the application of those search terms "result[ed] in the set of documents/data that was 'seized' pursuant to the search warrant." (DCD 52-1 (Maria Decl. ¶¶ 13-14)).

In short, AUSA Maria was personally and intimately involved in the execution of this warrant and the very matters that Mr. Adams contends render that warrant execution unconstitutional.

In the government's opposition to Mr. Adams's motion to suppress, it stated that it would "be prepared to offer evidence regarding the reasonable execution of the warrant at an evidentiary hearing." (DCD 49 at 1). It then provided a Notice of Intent to Call Witnesses stating that, "[W]ith respect to the manner in which the warrant was executed, the government intends to call some or all of the witnesses noticed below to supplement declarations filed by the government along with this notice." (DCD 52 at 2). The government submitted a declaration from AUSA Maria setting forth facts and assertions about the execution of the warrant, including the assertion that the seizure of evidence pursuant to the Yahoo! search warrant took place at his direction on April 4, 2017. (DCD 52-1 at 41-42 (Maria Decl. ¶¶ 13-14)).

Thereafter, Mr. Adams filed his Responsive Notice of Intent to Call Witnesses identifying AUSA Maria as a witness for the evidentiary hearing.  (DCD 54).  That same day, undersigned counsel for Mr. Adams obtained a subpoena for AUSA Maria's testimony, and provided a letter to the U.S. Attorney's Office alerting it that AUSA Maria would be called as a witness and providing it with information about the subject matter of AUSA Maria's testimony.  (DCD 66-2).

## ARGUMENT

Whether a defending or prosecuting attorney may be called to testify in a case he is trying is within the discretion of the district court.  *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991).  Obviously in the ordinary case requests for such testimony are disfavored, *id.*, but here—where AUSA Maria's testimony is central to the issue of the reasonableness of the search's execution, where Mr. Adams's constitutional rights are implicated, where the government chose to put AUSA Maria at the center of this issue, and where the testimony will be offered at a motion hearing, not before a jury—the circumstances justify compelling AUSA Maria to testify.

The Eighth Circuit long ago recognized that "an accused's right to call relevant witnesses and to present a complete defense may not be abrogated . . . for the purpose of protecting a United States Attorney from possible embarrassment while testifying, if he possesses information vital to the defense."  *Gajewski v. United States*, 321 F.2d 261, 268-69 (8th Cir. 1963).  A defendant must also show "his inability to present the same or similar facts from another source creates a compelling need for the testimony."  *Watson*, 952 F.2d at 986.  Because AUSA Maria's testimony is both vital to Mr. Adams's defense

and unavailable from any other source, the Court should deny the government's motion to quash.

### A.   AUSA Maria's Conduct Was Central to the Execution of the Warrant

The issue at the upcoming evidentiary hearing is whether the government executed the Yahoo! warrant in an unreasonable manner.  *See Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."); *see also* DCD 49 at 1 (noting that the government would "be prepared to offer evidence regarding the reasonable execution of the warrant at an evidentiary hearing").[4]  Because AUSA Maria's conduct was central to the execution of the warrant, only he can offer any testimony about critical aspects of the warrant's execution, including the purported "seizure" itself, the steps that were taken to protect Mr. Adams's privileged information, and his own extensive rummaging within the review database.  As a result, AUSA Maria's testimony is vital and there is a compelling need for his testimony.  *See Watson*, 952 F.2d at 986.

---

[4] *See also United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis, governs the method of execution of the warrant.") (citation omitted)); *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) ("When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant."); *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978) (Kennedy, J.) ("As interpreted and executed by the agents, this warrant became an instrument for conducting a general search."); *United States v. Metter*, 860 F. Supp. 2d 205, 212 (E.D.N.Y. 2012) (concluding that government's fifteen-month delay in reviewing electronic evidence to determine whether any of it fell outside the search warrant "constitutes an unreasonable seizure under the Fourth Amendment").

*The purported April 4, 2017 "seizure."*  Critically, no other witness can offer testimony about the actual purported "seizure" that took place as a result of the execution of the Yahoo! search warrant.  There can be no question that evidence about the purported seizure itself is vital to evaluating the reasonableness of the execution of a search warrant, as the Fourth Amendment protects against "unreasonable searches *and seizures*."  U.S. Const. amend. IV (emphasis added).  AUSA Maria states in his declaration that he took action on April 4, 2017 to request that litigation support staff "run [a] list of search terms," and that doing so "result[ed] in the set of documents/data that was 'seized' pursuant to the search warrant."  (DCD 52-1 at 41-42 (Maria Decl. ¶¶ 13-14)).  None of the law enforcement agents appear to have been involved in this action, as they are not copied on AUSA Maria's request to litigation support (*see* DCD 67 at 16), and this action is not mentioned in their declarations, (*see* DCD 52-1 at 1-21 (Declarations of Inspector Kroells, Agent Khan, and Agent Belich)).

While the government's position appears to be that Mark Zeitz, a Supervisory Information Technology Specialist, could testify about the April 4, 2017 action, (*see* DCD 66 at 17-18), there is no reason to believe that Mr. Zeitz could provide any testimony about *the reasonableness* of the relevance search terms selected by AUSA Maria, which were incredibly overbroad, including such terms as "Apollo," "Diamond," "ESA," and "Linares."  (*See* DCD 52-1 at 22, 32 (Zeitz Decl. ¶¶ 1, 27-28)).  Rather, Mr. Zeitz's declaration merely reflects what the search terms were, that the request was made by AUSA Maria, and the technical steps the litigation support department took to implement AUSA Maria's request.  (*See id.*).  No other witness can provide testimony

about whether the April 4, 2017 action can credibly be considered the "seizure" pursuant to the government's proposed step two of the execution of the Yahoo! warrant, particularly in light of the prosecution team's other extensive activity in the database in the thirteen months preceding that date.

Relatedly, no other witness can offer testimony about the multiple letters and emails written to defense counsel by AUSA Maria himself, or his refusal to provide information about the government's search of Mr. Adams's email for many months. While the government argues that this subject is not relevant to the manner in which the warrant was executed, (*see* DCD 66 at 23), to the contrary, these letters and emails, which misled the defense about the information to which the prosecution team had access and concealed the scope of the government's search, are evidence of AUSA's Maria consciousness that the execution of the warrant had not been reasonable, negating any argument of good faith. *See United States v. Rogers*, No. 1:09CR139, 2013 WL 435946, at *1, 5-7 (N.D. Miss. Feb. 4, 2013) (relying in part on police officers' "dissembling" at evidentiary hearing in declining to apply good faith exception to exclusionary rule); *see also Ashcraft v. State of Tenn.*, 327 U.S. 274, 278 (1946) ("Wilful concealment of material facts has always been considered as evidence of guilt."); *Eggleton*, 799 F.2d at 381 (evidence that defendant had used false information to "prevent his detection and apprehension . . . was admissible to show his consciousness of guilt"); *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.").

14

***The decisions related to privileged documents.***   Similarly, no other witness can

offer testimony about the decisions related to privileged documents within Mr. Adams's

email accounts that were made during the execution of the warrant.  From the

information disclosed to date by the government, it appears that AUSA Maria made these

decisions, and there is a compelling need for this testimony as it directly relates to the

reasonableness of the execution of the search.  *See Watson*, 952 F.2d at 986; *United*

*States v. Tillisy*, No. CR13-310, 2014 WL 6451248, at *1, 3 (W.D. Wash. Nov. 17, 2014)

(relying on testimony by taint team AUSA to assess reasonableness of search warrant

execution and, ultimately, suppress two documents);[5] *United States v. Hsia*, 81 F. Supp.

2d 7, 8, 11-14 (D.D.C. 2000) (recounting testimony by AUSA at two-day evidentiary

hearing on motion to dismiss indictment based on government's alleged use of privileged

information).  For example, no other witness can testify about why the government

decided that Inspector Kroells could search the complete contents of the Yahoo! flash

drive without any privilege filtering.  (*See* DCD 52-1 at 4-5 (Kroells Decl. ¶¶ 9-12) ("I

was told by AUSA Maria that I could review them, that it was a non-issue")).  That

decision appears to have been made by AUSA Maria, not Inspector Kroells.  The same is

true about AUSA Maria's decision, mere days later, that the prosecution team "needed to

engage in a heightened filter process."  (DCD 52-1 at 6 (Kroells Decl. ¶ 14)).

---

[5] Of course, in the present case, the government's decision to forego the regular taint
team procedure means the Court must rely on AUSA Maria's testimony rather than that
of a separate prosecutor.

Thereafter, it was AUSA Maria who prepared the list of privilege search terms to apply to the database.  (DCD 67 at 4-5).  As the law enforcement agents (Inspector Kroells, Agent Khan, and Agent Belich) were not included on that email, (*see id.*), there is no reason to believe that they would be able to provide testimony about why certain search terms were abandoned or not identified in the first place—including "privilege," "work product," "acp," and "Hopeman."  Similarly, no other witness will be able to offer testimony about whether the prosecution team took any steps to comply with the guidelines contained in United States Attorneys' Manual ("USAM") § 9-13.420 for the execution of "Searches of Premises of Subject Attorneys, including the decision not to use a taint team.  (*See* DCD 52-1 at 39 (Maria Decl. ¶ 8)).  And no other witness will be able to provide testimony about why AUSA Maria failed to promptly alert the other members of the prosecution team that communications between Mr. Adams and his attorneys Jon Hopeman and Tom Brever were confidential, or why he waited three weeks to remove additional privileged documents from the database once Inspector Kroells raised the issue.  (*See* DCD 67 at 13).  And no other witness will be able to provide testimony about the reasonableness of the purported privilege waiver that AUSA Maria obtained from counsel for *Scio* purporting to waive *Apollo*'s attorney-client privilege for separate legal entities.  (*See* DCD 67 at 13).

***AUSA Maria's extensive review of materials.***  AUSA Maria led the prosecution team in their efforts to review the Mr. Adams's Yahoo! emails, and AUSA Maria was the most active member of the prosecution team in the government's review database.  (*See supra* bullets pp. 7-10 (detailing AUSA Maria's many actions related to the Yahoo!

16

emails and citing, inter alia, DCD 67 at 1-25; DCD 52-1 at 36-43 (Maria Decl.); Ex. 3 & Ex. 4)). No other member of the prosecution team can provide testimony relevant to the reasonableness of AUSA Maria's own conduct in the review database. (*See id.*). The execution of search warrants is traditionally the province of law enforcement officers, not prosecuting attorneys. *Cf.* Fed. R. Crim. P. Rule 41(f) (referring repeatedly to "[t]he *officer* executing the warrant" (emphasis added)); *United States v. Leon*, 468 U.S. 897, 922-24 (1984) (discussing good faith of "officers [who] acted pursuant to a warrant"). But here, the government and AUSA Maria himself have elected to put AUSA Maria at the center of the execution of this warrant. It is, thus, only appropriate for him to provide testimony at the evidentiary hearing about the execution of the warrant. By "participat[ing] directly in . . . investigating his cases," AUSA Maria has "subject[ed] himself to the risk of being called as a witness." *Riboni v. Dist. Ct. in & for Tenth Judicial Dist.*, 586 P.2d 9, 11 (Colo. 1978) (en banc).

AUSA Maria had a unique role in the execution of this warrant as the decision-maker, as the lead reviewer, and as the only person who purportedly executed the "seizure" pursuant to the warrant. The other law enforcement witnesses cannot "present the same or similar facts" that AUSA Maria can, and as the facts in AUSA Maria's purview are vital to the assessment of the reasonableness of the search and seizure, this Court should deny the government's effort to block his testimony. *Watson*, 952 F.2d at 986.

**B.    The Protection of Mr. Adams's Constitutional Rights Requires AUSA Maria's Testimony.**

Here, where Mr. Adams's constitutional rights under the Fourth, Fifth and Sixth

Amendments are at issue, it is even more appropriate for the Court to exercise its

discretion to permit AUSA Maria's testimony. *See id.* "[A] suppression hearing is a

critical stage of the prosecution affecting substantial rights of an accused." *United States*

*v. Hodge*, 19 F.3d 51, 53 (D.C. Cir. 1994) (citations omitted) (holding district court erred

in limiting cross-examination of detective).[6]  The hearing is often the only opportunity a

defendant has to assert his Fourth Amendment rights. *See Stone v. Powell*, 428 U.S. 465,

490-95 (1976).  It is true that "the interests at stake in a suppression hearing are of a

lesser magnitude than those in the criminal trial itself." *United States v. Raddatz*, 447

U.S. 667, 679 (1980).  But the Sixth Amendment right to compulsory process still applies

at suppression hearings. *See United States v. Bowe*, 698 F.2d 560, 565 (2d Cir. 1983)

(citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)) ("There is no doubt that [a

defendant] ha[s] the right under the sixth amendment to subpoena [a witness] to testify on

his behalf at [a] suppression hearing.").[7]  So, too, does the Confrontation Clause, at least

to some extent. *See United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986) ("[T]he

---

[6] *Accord United States v. Hurse*, 477 F.2d 31, 33 (8th Cir. 1973) (recognizing that
"suppression hearing was a critical stage of the proceedings and that the defendant was
entitled to be personally present" (citations omitted)).

[7] *Accord United States v. Macklin*, 902 F.2d 1320, 1329 (8th Cir. 1990) (stating in the
context of a suppression hearing that Sixth Amendment right to compulsory process
would only have been violated by grant of government's motion to quash "upon a
showing that the testimony of the witness sought would be both material and favorable").

18

right of confrontation does not apply *to the same extent* at pretrial suppression hearings as it does at trial." (emphasis added)).  And of course, suppression hearings must comply with "the demands of due process."  *Raddatz*, 447 U.S. at 684.

Each of these rights is implicated here, where AUSA Maria's testimony is critical to determining whether the execution of the warrant was reasonable.  *See* U.S. Const. amend. IV; *Dalia*, 441 U.S. at 258.  The government recognizes the relevance of AUSA Maria's testimony and has already made him a witness through the submission of his declaration, while at the same time it seeks to avoid subjecting him to cross-examination. (*See* DCD 52 at 2 ("With respect to the manner in which the warrant was executed, the government intends to call some or all of the witnesses noticed below to supplement declarations filed by the government along with this Notice.")).  This approach is contrary to the very nature of our adversarial system and wholly inadequate under the circumstances.  First, it would be unfair to permit the government to rely on AUSA Maria's declaration while preventing Mr. Adams from testing AUSA Maria's assertions through cross-examination.  *See United States v. Nobles*, 422 U.S. 225, 239-40 (1975); *United States v. Daily*, 488 F.3d 796, 802 (8th Cir. 2007).

Second, when a defendant raises serious doubts about the government's evidence at a suppression hearing, hearsay is inappropriate.  The government is correct that "the trial court may accept hearsay evidence at a suppression hearing."  *Boyce*, 797 F.2d at 693.  But this is true only "if the court is satisfied that the statements were made and *that there is nothing to raise serious doubt about their truthfulness*."  *Id.* (emphasis added) (citing *United States v. Matlock*, 415 U.S. 164, 175-77 (1974)).  Here, the facts outlined

above raise serious doubts about the truthfulness of AUSA Maria's statements, rendering hearsay inappropriate.

Third, only through live testimony can the Court assess AUSA Maria's credibility. One of the primary purposes of evidentiary hearings is "to test the statements of witnesses in the crucible of cross-examination." *Rogers*, 2013 WL 435946, at *5; *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."). A Ninth Circuit case, *United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995), is instructive. In *Mejia*, a district judge took over an ongoing, multiday suppression hearing midstream. *See id.* at 313-14. The defendant sought a continuance to re-call two detectives who had already testified, but the judge refused, explaining he would review the transcripts of the detectives' direct and cross examinations. *Id.* Ultimately, he denied suppression, and the Ninth Circuit reversed. *Id.* at 314, 320. The court explained that "[l]ive testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice—matters that cannot be gleaned from a written transcript." *Id.* at 315. AUSA Maria's declaration would be inadequate because the Court could not use it to determine his credibility. *See also United States v. Wey*, 256 F. Supp. 3d 355, 378-79 (S.D.N.Y. 2017) (comparing credibility of two agents who provided testimony about the execution of the warrant and concluding that one agent, "with no particular professional stake in this matter," offered more credible testimony than thoroughly-prepared case agent).

### C.    The Government's Arguments to the Contrary Are Unpersuasive

Despite the government's protestations to the contrary, AUSAs do testify at pre-trial hearings in their own cases, especially when they have played an active role in the investigation.  *See, e.g.*, *United States v. Hare*, 49 F.3d 447, 451 (8th Cir. 1995) ("Hare sought to suppress statements made . . . when he met with the agents and the AUSA. . . .  The AUSA testified [about the context surrounding those statements] at the suppression hearing . . . ."); *United States v. Johnson*, 131 F. Supp. 2d 1088, 1103-08 (N.D. Iowa 2001) (concluding that AUSA "may testify at the pretrial evidentiary hearing regarding the admissibility of" a statement by a jailhouse informant); *Wey*, 256 F. Supp. 3d at 367, 369, 373-75, 399, 402, 405 (recounting extensive testimony by AUSA during suppression hearing examining overbroad email search); *United States v. Heine*, No. 3:15-cr-238, 2016 WL 5934421, at *1-2 (D. Or. Oct. 11, 2016) (recounting court's denial of motion to quash testimony by AUSA at suppression hearing); *see also Heine*, Gov't's Mot. to Quash Subpoena, ECF 400 (Aug. 19, 2016) (explaining that defendant sought AUSA's testimony about whether she improperly orchestrated parallel civil proceeding against defendant).  Such testimony is also common in state court.[8]

---

[8] *See, e.g.*, *State v. Claybrook*, 736 S.W.2d 95, 104 (Tenn. 1987) (District Attorney "testified at pre-trial hearing on the motions to suppress regarding conversations with the defendant at the jail on the day of his arrest"); *State v. Doran*, 731 P.2d 1344, 1347-49 (N.M. Ct. App. 1986) (allowing prosecutor who was also search warrant affiant to testify at suppression hearing); *Hamilton v. State*, 496 So. 2d 100, 107 (Ala. Crim. App. 1986) ("We find no error in permitting a prosecuting attorney who has testified at a suppression hearing to act as counsel at trial."); *People v. Cannon*, 323 N.E.2d 846, 851-52 (Ill. App. Ct. 1975) (explaining that "danger that a jury would believe a prosecutor to be more

By contrast, nearly every case the government cites in support of its argument—including the two Eighth Circuit cases—involved attempts by defense counsel to procure *trial* testimony by prosecutors.[9]  These cases are inapposite for that reason alone.  *United States v. Johnston*, 690 F.2d 638 (7th Cir. 1982) (en banc), another of the government's cases, explained the differences between a prosecutor's testimony before a judge and a jury:

> A judge, as compared with a jury, may be better able to take account of a witness-prosecutor's adversarial role in weighing the objectivity of his testimony.  A judge may also be less apt than a jury to confuse the roles of witness and prosecutor. . . .  [W]e would expect that a judge would not be swayed by the prominence or prestige of a government prosecutor in assessing the credibility of his testimony. . . .

*Id.* at 644.  In *Johnston*, the Seventh Circuit reversed a district court's decision applying a *per se* rule preventing a prosecutor from testifying at a suppression hearing, explaining that a "suppression hearing is a preliminary matter outside the presence of the jury" that

---

credible than an ordinary witness . . . did not exist . . . at the hearing on the suppression motion").

[9] *See United States v. Ziesman*, 409 F.3d 941, 950 (8th Cir. 2005) (sought AUSA's trial testimony); *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991) (same); *United States v. Wooten*, 377 F.3d 1134, 1143 (10th Cir. 2004) (same); *United States v. Atman*, 145 F.3d 1333, 1998 WL 211767, at *4 (10th Cir. 1998) (same); *United States v. Ashman*, 979 F.2d 469, 493-94 (7th Cir. 1992) (same); *United States v. Troutman*, 814 F.2d 1428, 1440 (10th Cir. 1987) (same); *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975) (same); *United States v. Beard*, 2016 WL 3964902, at *2 (W.D. Ky. July 18, 2016) (same); *United States v. Reid*, 2006 WL 1751789, at *5 (D.N.H. June 21, 2006) (same).

"is concerned with one of many matters a judge may have to determine before trial." *Id.*
at 645.[10]

The government's remaining cases are equally unpersuasive.  In two of them, the
defendant sought to preemptively disqualify an AUSA based on his or her theoretical
testimony.[11]  Mr. Adams does not currently seek disqualification.  In a third, the court
expressed its disapproval but found no prejudice where a government attorney both
conducted grand jury proceedings for the Department of Justice and testified before that
same grand jury.  *See United States v. Birdman*, 602 F.2d 547, 564 (3d Cir. 1979).  The
government's final and most applicable cases, *United States v. Jansen*, 2015 WL
1326150 (N.D. Ill. Mar. 13, 2015), and *United States v. Bailin*, 1990 WL 16435 (N.D. Ill.
Jan. 22, 1990), actually support Mr. Adams's position.

In *Jansen*, the district court refused to compel an AUSA's testimony at a post-
guilty plea hearing to withdraw that plea on grounds of prosecutorial misconduct, breach
of his plea agreement, and ineffective assistance of counsel.  2015 WL 1326150, at *1,
11.  The court rejected the defendant's reasons for calling the AUSA because in each case
the testimony sought was immaterial to withdrawal of the defendant's plea, based solely

---

[10] *Johnston* also suggested as an alternative to precluding the prosecutor's testimony,
while still insulating the trial judge from being influenced by that testimony, that "the
trial judge could have submitted the suppression motion to a magistrate to hear the
conflicting testimony and recommend a finding of fact."  690 F.2d at 645.  Of course, that
is already the situation in the present case.

[11] *See United States v. Kendricks*, 2017 WL 3877645, at *6-7 (M.D. Fla. Sept. 5, 2017);
*United States v. Bin Laden*, 91 F. Supp. 2d 600, 623-24 (S.D.N.Y. 2000).

on conclusory statements, or premature because the government had not yet put certain facts at issue. *Id.* at *2-11. Here, by contrast, AUSA Maria's conduct—the purported seizure—is the central focus of the suppression hearing. Nothing is more material. And far from the conclusory allegations in *Jansen*, Mr. Adams has set out the evidence of an unreasonable seizure in great detail, supported by considerable evidence. (*See supra* bullets pp. 7-10; Exs. 1-5).

In *Bailin*, the district court quashed subpoenas defendants served on two AUSAs who had participated in pre-indictment interviews of the defendants where the defendants made statements they sought to suppress. *See* 1990 WL 16435, at *1. The court explained that the FBI agents present in each interview could testify instead, as could the defendants themselves. *Id.* Thus, "*[u]nder the circumstances*, there [wa]s no apparent need for calling the [AUSAs] during the suppression hearing." *Id.* (emphasis added). The circumstances of the present case could not be more different. The *sole* witness to the warrant's purported execution on April 4, 2017 is AUSA Maria. He is also the only witness competent to testify about the plurality of searches that he alone conducted in the government's review database. And only AUSA Maria can testify to the meaning of his

24

own communications to Mr. Adams's counsel, which bear on his understanding of reasonableness and, thus, good faith.[12]

AUSA Maria's testimony is vital to Mr. Adams's defense at the suppression hearing. No other witness can provide similar testimony, so Mr. Adams's need is compelling. And the government itself submitted AUSA Maria's testimony in opposition to the suppression motion. The Court should therefore deny the government's motion to quash.

<u>**CONCLUSION**</u>

For the foregoing reasons, Mr. Adams respectfully requests that the Court deny the motion to quash.

---

[12] The DOJ's *Touhy* regulations are also no barrier to AUSA Maria's testimony. Mr. Adams has provided notice under the regulations, (DCD 66-2), and will supplement his notice to include the additional information about the subject of AUSA's Maria testimony set forth in this brief. The government is not asserting the application of these regulations as a basis to quash the subpoena. DCD 66 at 25. Invoking the *Touhy* regulations as a shield to prevent AUSA Maria from testifying, after submitting his declaration as evidence, would constitute an unfairly imbalanced access to discovery and would violate Mr. Adams's due process rights. *See United States v. Bahamonde*, 445 F.3d 1225, 1229 (9th Cir. 2006) (concluding that the application of *Touhy* regulation in criminal case was unconstitutional); *United States v. Larson*, No. 12-cr-00886, 2014 WL 5696204, at *5 (N.D. Cal. Nov. 4, 2014) (agreeing that "Touhy regulations do not apply with the same force in criminal proceedings as they do in civil cases"). The two unpublished cases cited by the government—one of which concluded that the AUSA's testimony was not relevant—are not authoritative. *See United States v. Vander Luitgaren*, 2008 WL 2610465, at *1-2 (M.D. Fla. June 30, 2008). If the Acting United States Attorney were to instruct AUSA Maria not to testify, all inferences should be drawn against AUSA Maria and the government. *Cf. Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1480 (8th Cir. 1987) (recognizing appropriateness of drawing adverse inference against civil litigant asserting Fifth Amendment privilege).

Dated:  December 20, 2017                 Respectfully submitted,


   /s/ *Lance Wade*        
Joseph G. Petrosinelli (DC Bar #434280)
Lance Wade (DC Bar #484845)
Sarah Lochner O'Connor (DC Bar #1012405)
Gloria Maier (DC Bar # 1012208)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
jpetrosinelli@wc.com
lwade@wc.com
soconnor@wc.com
gmaier@wc.com

James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com

Attorneys for Defendant Edward S. Adams