UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 17-64 (DWF/KMM) |
| | ) | |
| Plaintiff, | ) | **FIRST SUPERSEDING** |
| | ) | **INDICTMENT** |
| v. | ) | |
| | ) | 18 U.S.C. § 1341 |
| EDWARD S. ADAMS, | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 2 |
| Defendant. | ) | 26 U.S.C. § 7206(1) |

THE UNITED STATES GRAND JURY CHARGES THAT:

## OVERVIEW

1.     From at least in or about 2006 through at least in or about March 2013,
Defendant **EDWARD S. ADAMS** engaged in a scheme and artifice to defraud investors
in Apollo Diamond, Inc. ("Apollo Diamond") and Apollo Diamond Gemstone Corporation
("Apollo Gemstone") (collectively, "Apollo") by misrepresenting that the investors'
money would be used to fund those companies' operations.  Instead, **ADAMS** deposited
the investors' funds in accounts controlled by **ADAMS** and subsequently misappropriated
and embezzled millions of dollars for his personal use and benefit.  When these companies
were on the brink of insolvency, and in order to prevent his theft from being discovered,
**ADAMS** again duped the investors, convincing them to convert their shares of stock in
Apollo Diamond and Apollo Gemstone into shares of stock in a new company, Scio
Diamond Technology Corporation, which, unbeknownst to investors, **ADAMS** secretly
controlled.  This transaction further enriched **ADAMS**, even as it lulled investors into
believing that their previous investments retained value.

SCANNED
FEC 20 2017
U.S. DISTRICT COURT MPLS

2.      From in or around 2006 through in or around 2013, **ADAMS** stole over $4.38 million from Apollo Diamond and Apollo Gemstone investors by transferring investment funds from Apollo and Scio accounts that he controlled to his own personal accounts for his own use.  During this same time period, **ADAMS** also paid his own law firm over $2.54 million out of Apollo and Scio accounts that he controlled, even though his law firm had already been paid $1.59 million by Apollo out of the company's operating accounts.

### GENERAL ALLEGATIONS

At all times relevant to this indictment:

### Relevant Entities and Individuals

3.      Apollo Diamond and Apollo Diamond Gemstone Corporation were both Delaware corporations with their principal places of business in Massachusetts.  Apollo's core business was the creation of laboratory-grown diamonds and diamond materials. While Apollo Gemstone was purportedly a privately held subsidiary of Apollo Diamond, the leadership, operations, and capital of the two entities were commingled, and they effectively operated as a single corporate entity.

4.      Defendant **EDWARD S. ADAMS**, a resident of Minneapolis, Minnesota, was an attorney, licensed by the State of Minnesota, and a professor at the University of Minnesota School of Law.  **ADAMS** held various titles at Apollo Diamond and Apollo Gemstone, including, at various times, Chief Financial Officer, Secretary, Executive Vice President, and General Counsel of Apollo Diamond, and Chief Financial Officer, President, Executive Vice President, Secretary, and member of the Board of Directors of Apollo Gemstone.

5.    Adams Monahan LLP (formerly Adams, Monahan & Sankovitz) ("AMLLP") was a law firm, located in Minneapolis, Minnesota, of which **ADAMS** was one of the two named partners. The vast majority of AMLLP's revenue came from work that AMLLP purportedly performed for Apollo.

6.    Scio Diamond Technology Corporation ("Scio") was a publicly traded corporation that came into existence in 2011 as the result of a transaction that **ADAMS** designed and structured, purportedly to acquire the assets of Apollo.

7.    "Apollo Employee A" was the founder of Apollo Diamond, was a member of the Board of Directors of both Apollo Diamond and Apollo Gemstone, and, at various times, served as the Chairman, President, and Chief Executive Officer of Apollo Diamond and the Chairman and Chief Technology Officer of Apollo Gemstone. Apollo Employee A was also the father-in-law of **ADAMS**.

8.    "Apollo Employee B" had various roles at Apollo, including, at various times, as a member of the Board of Directors and Chief Executive Officer and President of Apollo Diamond, and Chief Executive Officer and President of Apollo Gemstone. Apollo Employee B was also the brother-in-law of **ADAMS**.

9.    J.Z. was an individual employed in the financial services industry who assisted Apollo in its fundraising efforts. J.Z. was responsible for raising millions of dollars of investment money for Apollo. Due to ongoing and substantial material misrepresentations and material omissions that **ADAMS** made to J.Z., as well as material omissions, **ADAMS** caused J.Z. unknowingly to convey false and misleading information to investors and potential investors in Apollo.

## THE SCHEME TO DEFRAUD

10.    In or around approximately 2003, at the direction of **ADAMS**, Apollo retained Equity Securities, Inc., a financial services firm located in Minneapolis, Minnesota, of which **ADAMS** was a Principal at the time, to provide investment banking services and to raise money for Apollo. Equity Securities was successful in raising over $25 million for Apollo, for which Equity Securities received a commission of approximately $3-4 million.

11.    Subsequent to these fundraising efforts, **ADAMS** became increasingly involved with Apollo, first as outside legal counsel to the company and later in various managerial positions with Apollo. Due to his familial relationship with Apollo Employee A and Apollo Employee B, and the trust placed in him by these individuals, **ADAMS** handled the ongoing fundraising efforts, with little or no oversight from Apollo Employee A, Apollo Employee B, or anyone else at Apollo.

12.    While Apollo Diamond and Apollo Gemstone each purported to have a Board of Directors, and Apollo Employee A and Apollo Employee B were nominal members of these Boards, neither Board played an active role in overseeing the financial affairs of Apollo Diamond and Apollo Gemstone, and decisions relating to financial matters were routinely entrusted to **ADAMS**.

13.    Taking advantage of the trust placed in him by Apollo Employee A and Apollo Employee B and the lack of oversight of his actions, as detailed below, **ADAMS** created multiple bank accounts that purported to be accounts related to, and for the benefit

4

of, Apollo Diamond and Apollo Gemstone, and thereafter deposited investment money intended for Apollo Diamond and Apollo Gemstone into these accounts.

14.    **ADAMS** then transferred millions of dollars of Apollo investment funds from these accounts into personal bank accounts controlled by **ADAMS** and the bank account for his law firm, AMLLP.   While AMLLP did perform services for Apollo, **ADAMS** unilaterally determined how much Apollo would pay AMLLP, **ADAMS** himself signed most of the checks for payments to AMLLP, and Apollo's books and records did not reflect most of the payments that **ADAMS** caused to be paid to AMLLP.

15.    Throughout the course of this fraud scheme, and as set forth below, **ADAMS** embezzled millions of dollars from Apollo and its investors for his own personal use and benefit.

### "RL Investment Holdings"

16.    In or around August 2006, **ADAMS** opened a bank account at Venture Bank in Golden Valley, Minnesota, in the name of RL Investment Holdings, LLC ("RL Investments").   **ADAMS** was the sole signatory on this account, and bank statements for this account were mailed to **ADAMS** at his law firm's business address.

17.    **ADAMS**, directly and indirectly through J.Z. and others, represented to investors that they could invest and purchase shares in Apollo Diamond by making checks payable to "RL Investments."   **ADAMS**, or other individuals at AMLLP acting at his direction, issued stock certificates representing shares in Apollo Diamond to investors who wrote checks to RL Investments.   **ADAMS**, directly or indirectly through J.Z. and others, represented that the investments would be used for Apollo Diamond's operations,

including working capital, funding additional diamond growing equipment, and research and development.

18.     In some instances, **ADAMS**, directly and indirectly through J.Z. and others, lied to investors about the source of the shares that investors would be purchasing, thereby concealing the fact that **ADAMS** was diverting much of this money to himself.

19.     From in or around August 2006 through in or around June 2008, relying on these representations, individuals or entities who believed that they were investing in Apollo Diamond wrote checks to RL Investments totaling approximately $2,400,000. **ADAMS** deposited these funds into the RL Investments account.

20.     Instead of transferring these funds to Apollo Diamond for use to further the company's operations, **ADAMS** surreptitiously diverted over $1.2 million of these investors' funds to other bank accounts controlled by **ADAMS** and then spent the money for his own use and enjoyment. **ADAMS** transferred an additional $101,500 to his law firm's bank account.

21.     **ADAMS** distributed the remainder of the Apollo Diamond investors' funds from the RL Investments account to various individuals as determined by **ADAMS**, including over $500,000 to L.Z., a friend and former business partner of **ADAMS**.

22.     **ADAMS** used none of the approximately $2.4 million that he deposited in the RL Investments account for Apollo's operations, in breach of his promise to the investors to use their funds for that exclusive purpose.

6

## "DL Investments"

23.    In or around February 2007, **ADAMS** opened a bank account at Venture Bank in Golden Valley, Minnesota, in the name of DL Investments, LLC ("DL Investments"). **ADAMS** was the sole signatory on this account, and bank statements for this account were mailed to **ADAMS'** home address in Minneapolis, Minnesota.

24.    **ADAMS**, directly and indirectly through J.Z. and others, represented to investors that they could invest and purchase shares in Apollo Diamond by making checks payable to "DL Investments." **ADAMS**, or other individuals at AMLLP acting at his direction, issued stock certificates representing shares in Apollo Diamond to investors who wrote checks to DL Investments. **ADAMS**, directly or indirectly through J.Z. and others, represented that the investments would be used for Apollo Diamond's operations, including working capital, funding additional diamond growing equipment, and research and development.

25.    In some instances, **ADAMS**, directly and indirectly through J.Z. and others, lied to investors about the source of the shares that investors would be purchasing, thereby concealing the fact that **ADAMS** was diverting much of this money to himself.

26.    From in or around March 2007 through in or around November 2007, relying on these representations, individuals or entities who believed that they were investing in Apollo Diamond wrote checks to DL Investments totaling approximately $1,720,000. **ADAMS** deposited these funds into the DL Investments account at Venture Bank.

27.    Instead of transferring these funds to Apollo Diamond for use to further the company's operations, **ADAMS** surreptitiously diverted over $857,000 of these investors'

funds to other bank accounts controlled by **ADAMS** and then spent the money for his own use and enjoyment. **ADAMS** transferred the remaining approximately $859,000 to his friend and former business partner L.Z.

28.   **ADAMS** used none of the approximately $1.72 million that he deposited in the DL Investments account for Apollo's operations, in breach of his promise to the investors to use their funds for that exclusive purpose.

## Apollo Diamond and Apollo Gemstone Accounts Opened and Controlled by Adams

29.   In or around 2007, **ADAMS** opened a bank account at Venture Bank in Golden Valley, Minnesota, in the name of Apollo Diamond, as well as two bank accounts in the name of Apollo Gemstone, one at Venture Bank and one at the First National Bank of Waseca. **ADAMS** was the sole signatory on these accounts. Bank statements for the Apollo Diamond account were mailed to **ADAMS'** home address in Minneapolis, Minnesota, and bank statements for the Apollo Gemstone accounts were mailed to his law firm's business address.

30.   Although these accounts bore the names "Apollo Diamond" and "Apollo Diamond Gemstone Corporation," the accounts were not authorized by Apollo Diamond, Apollo Gemstone, Apollo Employee A, or Apollo Employee B, and the activity in these accounts was solely directed by, and visible to, **ADAMS**.

31.   **ADAMS** solicited investments for Apollo Diamond and Apollo Gemstone and represented, directly and indirectly, that the investments would be used for the operations of Apollo Diamond and Apollo Gemstone, including working capital, funding additional diamond growing equipment, and research and development. **ADAMS**

deposited investors' funds intended for Apollo Diamond and Apollo Gemstone into the Apollo Diamond and Apollo Gemstone accounts at Venture Bank and First Bank of Waseca, and **ADAMS**, or other individuals at AMLLP acting at his direction, issued stock certificates in Apollo Diamond or Apollo Gemstone to the investors.

32. **ADAMS** diverted large portions of these investors' funds for his own personal use and benefit without the knowledge and consent of Apollo Diamond, Apollo Gemstone, Apollo Employee A, and Apollo Employee B, and without disclosing this material fact to investors in Apollo Diamond and Apollo Gemstone.

33. **ADAMS** transferred over $938,000 to personal bank accounts controlled by **ADAMS** and also transferred over $1,176,000 to the bank account for **ADAMS**' law firm, from which he received distributions.

### "ADR Investments"

34. In or around July 2009, **ADAMS** opened a bank account at Venture Bank in Golden Valley, Minnesota, in the name of ADR Investments, LLC ("ADR Investments"). **ADAMS** was the sole signatory on this account, and bank statements for this account were mailed to **ADAMS** at his law firm's business address in Minneapolis, Minnesota.

35. Unlike the RL Investments and DL Investments accounts, Apollo Employee A was aware of the existence of this account. **ADAMS** represented to Apollo Employee A that certain "warrants" owned by Apollo would be sold to fund this account and that the proceeds would be used to pay outstanding bills of Apollo.

36. **ADAMS**, directly and indirectly through J.Z. and others, represented to investors that they could invest and purchase shares in Apollo Diamond by making checks

payable to "ADR Investments." **ADAMS**, or other individuals at AMLLP acting at his direction, issued stock certificates representing shares in Apollo Diamond to investors who wrote checks to ADR Investments. **ADAMS**, directly or indirectly through J.Z. and others, represented that the investments would be used for Apollo Diamond's operations, including working capital, funding additional diamond growing equipment, and research and development

37.   In some instances, **ADAMS**, directly and indirectly through J.Z. and others, lied to investors about the source of the shares that investors would be purchasing, thereby concealing the fact that **ADAMS** was diverting much of this money to himself.

38.   From in or around July 2009 through in or around March 2010, individuals who believed that they were investing in Apollo Diamond wrote checks to ADR Investments totaling approximately $2,710,000. **ADAMS** deposited these funds in the ADR Investments account at Venture Bank.

39.   **ADAMS** misappropriated and embezzled over $427,000 of these investment funds for his own personal use and benefit, transferring these funds into his personal bank account. **ADAMS** also distributed over $125,000 to his law partner, M.M., and distributed $50,000 to L.Z. **ADAMS** failed to disclose to investors that their investment funds would be used for the personal use and benefit of **ADAMS** and others selected by **ADAMS**.

40.   Although **ADAMS** falsely represented to investors that their investments in Apollo Diamond made via ADR Investments would be used to fund Apollo Diamond and its operations, **ADAMS** continued diverting investors' funds to his personal account even when Apollo Diamond was in dire need of capital to maintain its core operations. For

example, in January 2010, L.L., an Apollo Diamond employee who handled various accounting responsibilities, requested access to $15,000 of these funds to meet Apollo's basic operations.  **ADAMS** falsely stated that no money was available.  On the same day, **ADAMS** transferred $100,000 from the ADR Investments account to his personal account at Wells Fargo.

### The Scio Diamond Technology Corp. Lulling Scheme

41.    Beginning around mid-2008, Apollo suffered severe financial problems and could not timely meet its financial obligations.  Apollo's problems were caused and compounded by **ADAMS'** embezzlement from Apollo, described above.  By late 2010, Apollo had become irretrievably insolvent and teetered on the brink of bankruptcy.

42.    Expecting that bankruptcy would trigger litigation by shareholders of Apollo Diamond and Apollo Gemstone, and fearful that such litigation would uncover **ADAMS'** embezzlement from Apollo, **ADAMS** devised a means of appeasing the shareholders, and extending and continuing the scheme, by allowing the shareholders to convert their now worthless investments in Apollo Diamond or Apollo Gemstone into investments in a new entity.

43.    Specifically, in March 2011, **ADAMS** and his law partner, M.M., created a privately held company called Scio Diamond Technology Corporation ("Private Scio"). **ADAMS** and M.M. incorporated Private Scio as a Nevada corporation on March 1, 2011. **ADAMS** and M.M. were the sole shareholders, issuing themselves each 2,000,000 shares of common stock of Private Scio.  **ADAMS** and M.M. also named themselves as the only two members of the board of directors of Private Scio.

44.    On March 11, 2011, **ADAMS** sent letters to Apollo Diamond and Apollo Gemstone shareholders, informing them that the companies' fundraising and financing efforts had been unsuccessful and that the companies' ability to continue as going concerns was in doubt. The letters notified the shareholders that Apollo Diamond and Apollo Gemstone had entered into asset purchase agreements with Private Scio, whereby Private Scio would acquire the assets of Apollo Diamond for $2,000,000 and the assets of Apollo Gemstone for $10,000.

45.    To induce Apollo Diamond and Apollo Gemstone shareholders to approve the transaction, **ADAMS** and M.M. structured the transaction so that Apollo Diamond and Apollo Gemstone shareholders would be permitted (1) to sell back all of their shares in Apollo Diamond and Apollo Gemstone for a penny, and (2) to purchase the same number of shares in Private Scio for a penny. In other words, the shareholders, without expending additional money, would receive the same number of shares in the new entity, Private Scio, that they had held in Apollo Diamond and Apollo Gemstone.

46.    **ADAMS** and M.M. concealed from Apollo shareholders that they themselves had founded Private Scio and that they alone were the sole shareholders and board members of Private Scio. Moreover, they intentionally misled Apollo shareholders into believing that Private Scio was willing and able to pay the asset purchase price, when, in fact, Private Scio was not yet capitalized and did not have the money necessary to complete the asset purchase.

47.    To insulate himself from potential litigation that would potentially uncover his embezzlement from Apollo, **ADAMS** required all Apollo shareholders who wanted to

participate in the share exchange and acquire shares in Private Scio to sign a covenant not

to sue, and to release any potential claims against Apollo Diamond, Apollo Gemstone, and

its officers, directors, advisors, and agents, including **ADAMS**.  If an Apollo Diamond or

Apollo Gemstone shareholder was not willing to sign the agreement containing this release,

the shareholder was not permitted to complete the share exchange and receive shares in

Private Scio.

48.    On or about April 18, 2011, at a shareholder meeting and by way of the

submission of proxies, shareholders of Apollo Diamond and Apollo Gemstone, in reliance

on **ADAMS'** misstatements and material omissions, approved the Private Scio transaction.

49.    **ADAMS'** intention to lull the Apollo investors and avoid, or at least delay,

shareholder litigation that he feared would uncover his past theft and embezzlement was

made clear by his own description of the Scio transaction in a September 2011 email to

Apollo Employee A:

> We were broke facing potential massive litigation from
> disgruntled shareholders and I pulled a rabbit out of the hat –
> for the last time by the way because if this does not work I am
> spending my valuable time on something else.

50.    Beginning in or around April 2011, the Apollo Diamond and Apollo

Gemstone shareholders sent their shares in Apollo Diamond or Apollo Gemstone to

AMLLP, along with the required Stock Repurchase Agreements through which investors

forfeited the right to sue Apollo and its officers, directors, advisors, and agents, including

**ADAMS**.  **ADAMS** sent those shareholders checks for a penny per share of the stock that

each investor previously held.  The process was not completed until in or around July 2012.

51.     From in or around April through in or around July 2011, **ADAMS** and M.M. solicited investments in Private Scio in an effort to raise the $2,010,000 that Private Scio promised to pay to complete the asset purchase.  Because **ADAMS** and M.M. could not raise enough money, **ADAMS** had to devise another way to lull the former Apollo Diamond and Apollo Gemstone investors, stave off inevitable litigation, and prevent the detection of his ongoing fraud scheme.

52.     Specifically, **ADAMS** arranged another transaction where Private Scio would be acquired by a publicly traded shell entity, called Krossbow Holding Corporation, and then would become a publicly traded company, also called Scio Diamond Technology Corporation ("Public Scio"), which **ADAMS** could then use to raise the money necessary to complete the Apollo asset purchase.  The transaction occurred on August 5, 2011, and was publicly announced on August 11, 2011.

53.     Beyond accomplishing his goal of lulling the former Apollo Diamond and Apollo Gemstone investors and preventing the detection of his earlier fraud, **ADAMS** saw another opportunity to personally profit from this transaction.  **ADAMS** structured the transaction so that he and M.M. received (including shares granted to their spouses) at no cost 4,100,000 shares each in Public Scio, and both also acquired another 1,000,000 shares at a substantially reduced price.  The former Apollo Diamond and Apollo Gemstone shareholders received nothing as a result of this transaction.

54.     On August 31, 2011, Public Scio, of which **ADAMS** now beneficially owned over 5 million shares, announced that it had agreed to acquire the assets of Apollo Diamond for the sum of $2,000,000.  The former Apollo Diamond shareholders had no opportunity

to approve or reject this transaction. Instead, at the direction and upon the advice of **ADAMS**, Apollo Employee A approved and signed the asset purchase agreement on behalf of Apollo Diamond.

55.     To fund the purchase of assets from Apollo Diamond, **ADAMS** solicited, directly and indirectly, new investors in Public Scio, at a price of $0.70 per share. **ADAMS** failed to disclose to these new investors that former Apollo Diamond and Apollo Gemstone shareholders had been promised the right to buy millions of shares of Public Scio at a penny a share.

56.     After raising enough money from new investments in Public Scio, **ADAMS,** through a series of transactions, caused Public Scio to pay the $2,000,000 purchase price for Apollo Diamond's assets, much of which he took for himself. **ADAMS** transferred over $800,000 into his personal accounts and transferred an additional $550,000 to the bank account for **ADAMS**'s law firm.

57.     As noted above, in April 2011, the former Apollo Gemstone shareholders had agreed to sell the assets of Apollo Gemstone for $10,000. In June 2012, however, **ADAMS** unilaterally increased the purchase price to $100,000, falsely representing to Public Scio's management that Apollo Gemstone's sole remaining shareholder, Apollo Employee A, had demanded an increase in the price. In or around January 2013, Public Scio paid $100,000 to Apollo Gemstone, which **ADAMS** deposited in the Apollo Gemstone account at Venture Bank that **ADAMS** controlled. Of this money, **ADAMS** distributed $33,000 to himself, and $33,000 each to Apollo Employee A and Apollo

Employee B.  In or around April 2013, **ADAMS** closed the Apollo Gemstone account at Venture Bank, transferring the remaining $1,271.75 to his personal account.

58.     While the lulling scheme implemented by **ADAMS** began in 2011 when Apollo Diamond and Apollo Gemstone shareholders began redeeming their Apollo Diamond and/or Apollo Gemstone shares for a penny a share, the process was not completed until these shareholders purchased shares in Public Scio at a penny a share by sending checks and signed subscription agreements and received stock certificates representing their shares owned in Public Scio.  This process took place from in or around June 2012 through in or around March 2013.

59.     By completing this transaction that **ADAMS** had designed and implemented, the former Apollo Diamond and Apollo Gemstone shareholders now held shares in a publicly traded, operating company, which appeared to them as a better option than retaining shares in entities that they were informed were on the verge of insolvency. **ADAMS**' plan succeeded, and he was able to avoid "potential massive litigation from disgruntled shareholders" and prevent investors from discovering that he had stolen millions of dollars of Apollo investors' money, all while lining his pockets with additional money from new investors in Public Scio.

## COUNTS 1-8
(Mail Fraud)

60.     The allegations set forth in paragraphs 1 through 59 of this Superseding

Indictment are realleged as if fully set forth herein.

61.     On or about the following dates, in the State and District of Minnesota and

elsewhere, the defendant,

### EDWARD S. ADAMS,

and others known and unknown to the grand jury, having devised and intending to devise

the scheme and artifice described above, caused to be sent, delivered, and moved by the

United States Postal Service and private and commercial interstate carrier various mailings,

items, and things for the purpose of executing and attempting to execute such scheme and

artifice:

| COUNT | APPROXIMATE DATE | MAILING DETAILS |
|-------|------------------|-----------------|
| 1 | 7/16/2012 | Mailing of subscription form and check by investor B.S. to purchase Public Scio shares |
| 2 | 8/31/2012 | Mailing from Public Scio to investor B.S. containing executed subscription agreement and Scio stock certificates |
| 3 | 7/30/2012 | Mailing of subscription forms and checks by investor C.L. to purchase Public Scio shares |
| 4 | 8/31/2012 | Mailing from Public Scio to investor C.L. containing executed subscription agreement and Scio stock certificate |

| 5 | 6/14/2012 | Mailing of subscription form and check by investor M.K. to purchase Public Scio shares |
| 6 | 8/31/2012 | Mailing from Public Scio to investor M.K. containing executed subscription agreement and Scio stock certificate |
| 7 | 8/1/2012 | Mailing of subscription forms and check by investor S.H. to purchase Public Scio shares |
| 8 | 8/31/2012 | Mailing from Public Scio to investor S.H. containing executed subscription agreement and Scio stock certificate |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 9-14
(Wire Fraud)

62.    The allegations set forth in paragraphs 1 through 59 of this Superseding Indictment are realleged as if fully set forth herein.

63.    On or about the following dates, in the State and District of Minnesota and elsewhere, the defendant,

## EDWARD S. ADAMS,

having devised and intending to devise the scheme and artifice described above, caused to be transmitted by means of wire communication in interstate commerce the following writings, signs, signals, pictures, and sounds for the purpose of executing and attempting to execute such scheme and artifice:

| COUNT | APPROXIMATE DATE | WIRE DETAILS |
|---|---|---|
| 9 | 6/22/2012 | Check from investor B.E. for $1,325 deposited in Public Scio account at South State Bank |

| 10 | 6/22/2012 | Check from investor M.K. for $320 deposited in Public Scio account at South State Bank |
|----|-----------|----------------------------------------------------------------------------------------|
| 11 | 7/24/2012 | Check from investor B.S. for $800 deposited in Public Scio account at South State Bank |
| 12 | 8/7/2012 | Check from investor C.L. for $275 deposited in Public Scio account at South State Bank |
| 13 | 8/8/2012 | Check from investor S.H. for $1,079.17 deposited in Public Scio account at South State Bank |
| 14 | 6/27/2012 | Check from investor R.S. for $325 deposited in Public Scio account at South State Bank |

All in violation of Title 18, United States Code, Section 1343 and 2.

### TAX FRAUD: 2008-2010

64.　As detailed above, during the course of his scheme to defraud, **ADAMS** diverted large portions of investors' funds to personal accounts controlled by **ADAMS** for his personal use and benefit.

65.　In filing his personal income tax returns with the Internal Revenue Service, **ADAMS** failed to disclose most of these funds on his tax returns and, accordingly, did not pay income tax on these amounts.

### COUNTS 15-17
(Making and Subscribing False Tax Returns)

66.　The allegations set forth in paragraphs 1 through 65 of this Superseding Indictment are alleged as if fully set forth herein.

19

67.     On or about the following dates, in the State and District of Minnesota and elsewhere, the defendant,

**EDWARD S. ADAMS,**

did willfully make and subscribe false tax returns for the years set forth on the chart below, which were verified by written declarations that they were made under the penalty of perjury, and which the defendant did not believe to be true and accurate as to every material matter:

| COUNT | TAX YEAR | APPROX. FILING DATE | FORM TYPE | NATURE OF FALSITY |
|---|---|---|---|---|
| 15 | 2008 | 12/29/2011 | 1040X | Defendant reported taxable income of $674,763, whereas his taxable income exceeded $674,763. |
| 16 | 2009 | 12/29/2011 | 1040X | Defendant reported taxable income of $581,795, whereas his taxable income exceeded $581,795. |
| 17 | 2010 | 12/29/2011 | 1040X | Defendant reported taxable income of $783,327, whereas his taxable income exceeded $783,327. |

All in violation of Title 26, United States Code, Section 7206(1).

**FORFEITURE ALLEGATIONS**

68.     Counts 1-14 of this Superseding Indictment are hereby realleged and incorporated as if fully set forth herein by reference, for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(3), and Title 28, United States Code, Section 2461(c).

<u>U.S. v. EDWARD S. ADAMS</u>                                        Criminal No. 17-64 (DWF/KMM)

69.     Upon conviction of the offenses alleged in Counts 1-14 of this Superseding Indictment, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(3) and Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c), all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses charged in Counts 1-14, respectively.

70.     If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____          _____
ACTING UNITED STATES ATTORNEY            FOREPERSON