1
                UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3
---------------------------------------------------------
                           )
  United States of America,    )  File No. 17-CR-64
4
                           )        (DWF/KMM)
         Plaintiff,         )
5
                           )
  vs.                    )  Minneapolis, Minnesota
6
                           )  January 9, 2018
  Edward S. Adams,          )  8:43 a.m.
7
                           )
         Defendant.         )
8
---------------------------------------------------------

9

10
               BEFORE THE HONORABLE
               KATHERINE M. MENENDEZ
11
    UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                **(MOTION HEARING)**

12
<u>APPEARANCES</u>
  For the Plaintiff:         UNITED STATES ATTORNEY'S OFFICE
13
                         David J. MacLaughlin, AUSA
                         Tracy Perzel, AUSA
14
                         David M. Maria, AUSA
                         Tim Rank, AUSA
15
                         John E. Kokkinen, AUSA
                         600 U.S. Courthouse
16
                         300 South Fourth Street
                         Minneapolis, MN 55415
17

  For the Defendant:         WILLIAMS & CONNOLLY LLP
18
                         Lance A. Wade, ESQ.
                         Gloria K. Maier, ESQ.
19
                         725 12th Street NW
                         Washington, DC 20005
20

  Court Reporter:            STACI A. HEICHERT,
21
                         RDR, CRR, CRC
                         1005 U.S. Courthouse
22
                         300 South Fourth Street
                         Minneapolis, Minnesota 55415
23

24
    Proceedings recorded by mechanical stenography;
  transcript produced by computer.
25

1        **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3              THE COURT:  Good morning, everyone.  Sorry to keep

4        you waiting.  I hear our desk collapsed.  Why don't we start

5        getting the appearance on the on the record again.  We're

6        here for a continuation of motion hearing in United States

7        versus Edward Adams; criminal No. 17-64.  Let's start with

8        the government.

9              MR. MACLAUGHLIN:  Your Honor, it's David

10       MacLaughlin for the United States, along with Assistant U.S.

11       Attorneys David Maria, Tracy Perzel, and Tim Rank.

12             THE COURT:  Okay.  Thank you.  Welcome.

13             MR. ADAMS:  Good morning, Your Honor.  Lance Wade

14       on behalf of Mr. Adams.  With me is my colleague, Gloria

15       Meier.  We have a little bit lighter team today.

16             THE COURT:  I was going to say, you've thinned the

17       bench today.

18             MR. WADE:  With all the binders we need a little

19       more room.  And Mr. Adams is present as well.  I'll just

20       note briefly we left on the bench a what I would describe as

21       a tentative exhibit list that we can work off of --

22             THE COURT:  Yes, thank you good.

23             MR. WADE:  -- today and a few thumb drives that

24       are exhibits that you'll see them referenced -- you'll see

25       them on the index.  We just wanted the Court to have those.

1   I did note yesterday that the Court uses an iPad, and if it

2   would be helpful, we could very easily take all of our

3   exhibits and submit a thumb drive that had all of our

4   exhibits in the case so you had an electronic copy of those,

5   if that would be helpful to the Court.  We don't have that

6   with us, but we could do that.

7          THE COURT:  I think that we're probably -- given

8   that you've already generated the 14 trees of binders, I'm

9   fine working with those.  I'm just trying to cut down on my

10  contribution with mixed success, so that won't be necessary.

11  But if we decide that would be, we'll get in touch and ask

12  for those exhibits electronically.

13         MR. WADE:  Thank you, Your Honor.

14         THE COURT:  Thank you.  And I should just note,

15  obviously we didn't expect today's testimony.  My schedule

16  can charitably be described as a mess before I put you all

17  on top of it, so we're going to have to be flexible.  We've

18  got petty offense calendar this morning, a brief detention

19  hearing at 11, two pretrials later this afternoon.  We're

20  just going to have to kind of work creatively to get all the

21  testimony in, so --

22         MR. WADE:  We're prepared to be flexible, Your

23  Honor.

24         THE COURT:  Okay.  Good.  Let's get going.

25         MR. MACLAUGHLIN:  At this time the United States

Khan - Direct

```
 1    calls Jennifer Khan.

 2              THE COURT:  Great.  Good morning.

 3              THE WITNESS:  Good morning.

 4         (The witness is sworn.)

 5              THE COURT:  Thank you.  Please be seated.  Please

 6    state your full name and spell your last name for the

 7    record.

 8              THE WITNESS:  Jennifer Khan, K-H-A-N.

 9              THE COURT:  You can proceed, Mr. MacLaughlin.

10              MR. MACLAUGHLIN:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12    BY MR. MACLAUGHLIN:

13    Q.  Ms. Khan, good morning.

14    A.  Good morning.

15    Q.  You are a special agent with the Federal Bureau of

16    Investigation, correct?

17    A.  That's correct.

18    Q.  And you're assigned to a white collar squad with that

19    agency, true?

20    A.  True.

21    Q.  How long have you been with the FBI?

22    A.  Just over 12 years.

23    Q.  And have you been doing white collar crime essentially

24    the whole time?

25    A.  I have.
```

1    Q.  And in the course of your experience as a federal agent,

2    have you participated in the execution of search warrants?

3    A.  I have.

4    Q.  Could you give the Court an estimate of how many and

5    sort of describe your general experience with search warrant

6    executions?

7    A.  I've been involved in probably around 30 search warrants

8    involved in just being a searcher at the search warrants,

9    helping out the case agent, various case agents with the

10   search.  I've also participated in the -- in putting

11   together the affidavit and swearing out the affidavits as a

12   case agent.

13   Q.  Okay.  So you've been the affiant in past cases?

14   A.  Yes.

15   Q.  And you've -- have you participated in premises warrants

16   where you actually go into a building and take stuff?

17   A.  That's correct.

18   Q.  And have you, in the past, participated in the search of

19   e-mails that are obtained from a third-party provider like

20   in this case?

21   A.  Yes.

22   Q.  I'd like to ask you, Special Agent Khan, about the

23   attorney-client privilege.  In the course of your training,

24   either when you were becoming an agent or during the period

25   of your employment with the FBI, have you received training

Khan - Direct

1    about the attorney-client privilege?

2    A.  Yes, I have.

3    Q.  And tell us about that training.

4    A.  In our training, we were told about attorney-client

5    privilege and if you came across documents that appeared to

6    contain attorney-client privilege that we were supposed to

7    set those aside, put them in a secure box or location so

8    that they could be reviewed at a later time by a taint team.

9    Q.  So in your training and in your experience, how do you

10   spot a document that you consider to be potentially

11   privileged such that you segregate it in the manner you just

12   described?

13   A.  Sure.  Sometimes it might be in a folder that clearly

14   says, you know, attorney so-and-so, so you can tell pretty

15   quickly if that's going to be attorney-client privilege.

16   Other times you will have to just figure it out by starting

17   a review of the documents and, as you start reviewing it,

18   you can pretty easily determine, oh, this looks like it's

19   privileged communication, I need to stop looking at it, set

20   it aside, and let the case agents know.

21   Q.  Okay.  Now, I'm going to ask you a question I didn't ask

22   yesterday, suggested to me by one of my colleagues.  Is your

23   job as an agent to make a legal determination about whether

24   a document is privileged or is it simply to just identify

25   documents as potentially privileged?

1    A.  Just to identify them as potentially privileged.

2    Q.  Okay.  And so if you see the word privileged on a

3    document, does that give you pause?

4    A.  It can.

5    Q.  Okay.  Tell us about that.

6    A.  If it clearly says attorney-client privilege, then you

7    know automatically that, you know, stop, put it away, and

8    let the case agents know that there's this possible taint

9    evidence.

10   Q.  Okay.  And what other indicia, that's a word that's been

11   thrown around here, what other indicia of privilege, of

12   privilege, do you spot or are vigilant for in reviewing the

13   results of an e-mail search warrant?

14   A.  I guess if I understand you correctly, when you're

15   looking through there, you might not know immediately if

16   it's attorney-client privilege, but sometimes you can tell

17   from an e-mail header that says such-and-such law firm, then

18   you might give pause, say this might be privileged

19   documentation.  Just because it says privileged, a lot of

20   times that's, you can see that in a fax cover sheet where

21   it's, you know, intended only for that person but it's not

22   attorney-client privilege.

23   Q.  And in this particular case, when you were going through

24   the e-mails, were you aware that Professor Adams had been

25   the subject of an SCC investigation?

1    A.  Yes, I was.

2    Q.  And did you know that the facts underlying that SCC

3    investigation were quite similar to the facts that give rise

4    to the indictment?

5    A.  Yes.

6    Q.  And were you aware that Professor Adams had been sued by

7    some of the investors in the Apollo entities who weren't

8    very happy?

9    A.  Yes, I was.

10   Q.  And did you know that he was represented by lawyers in

11   connection with those actions?

12   A.  Yes.

13   Q.  And, in fact, at the time you were reviewing the

14   e-mails, did you have in the back of your mind those

15   lawyers' names?

16   A.  I knew at least one of those names.

17   Q.  Okay.  So if I'm understanding your testimony correctly,

18   Special Agent Khan, your essential procedure, if you see

19   something that might be privileged, is to stop, segregate,

20   tag, and alert?

21   A.  Correct.

22   Q.  And who do you alert?

23   A.  I will alert the case agent and, in this case, I would

24   alert the AUSAs.

25   Q.  Now, in this case, we are here because your team sought

1    search warrants for two e-mails, correct?

2    A.  Correct.

3    Q.  Two e-mail accounts I should say?

4    A.  That's correct.

5    Q.  Okay.  What were those two accounts?

6    A.  Ed Adams' account and Mike Monahan.

7    Q.  Do you remember, as you sit there, the names of the two

8    e-mail accounts belonging to Mr. Adams?

9    A.  I do not.

10   Q.  Okay.  Regardless of what they were called, what kind of

11   accounts were they?  How -- what did you understand their

12   nature to be?

13   A.  That they were his personal e-mails.

14   Q.  Okay.  As a member of the prosecution team, were you

15   aware that there was also -- that there were also other

16   e-mail accounts controlled by Mr. Adams, including one at

17   his law firm Edwards Monahan LLC?

18   A.  I believe I knew that.

19   Q.  Okay.  Were you involved in the process of deciding

20   whether or not to seek a search warrant for that e-mail

21   account?

22   A.  I was not.

23   Q.  Now, I'd like to direct your attention briefly to do you

24   have a big thick binder up there that kind of looks like

25   this?

1    A.  Yes.

2    Q.  I'd like to direct your attention to Defense Exhibit 52,

3    and specifically I'd like to direct your attention to do you

4    see in the lower right-hand corner there are Bates numbers?

5    A.  Yes.

6    Q.  I'd like to direct your attention to DSM page 552.

7    A.  Okay.

8    Q.  There are three zeros that precede it which means

9    somebody's predicting there could be up to 999,000 documents

10   in this case, which is not good, but do you see question 10

11   there?

12   A.  I do.

13   Q.  At the bottom, sort of the bottom half of the page?

14   A.  Yes.

15   Q.  And do you see that there are a number of e-mails that

16   are listed in response to this question?  Do you see that?

17   A.  I do.

18   Q.  I'll just tell you other evidence in the case indicates

19   that this is an SCC questionnaire that Professor Adams

20   answered.  Do you -- will you accept that?

21   A.  Okay.

22   Q.  So there are a number of e-mails here, and there's an

23   indicator about whether they're personal --

24              THE COURT:  Yes.  Hit pause.

25              MR. WADE:  I don't think we have any foundation

```
 1        that the witness has seen this document, so I don't know

 2        that it's appropriate to ask questions about the document.

 3                    THE COURT:  Mr. MacLaughlin.

 4                    MR. MACLAUGHLIN:  It's in evidence.  It was used

 5        to examine witnesses yesterday.  And I'm not making any --

 6                    THE COURT:  Let's ask if she is aware of this

 7        document.  If she's not, then I can take it for its own

 8        weight or not weight, but it's not necessary for her

 9        testimony.

10        BY MR. MACLAUGHLIN:

11        Q.  Okay.  Have you ever seen this document?

12        A.  I have not.

13        Q.  Okay.  Were you aware in general, Special Agent Khan,

14        that Mr. Adams characterized the two e-mail accounts as sort

15        of mixed use accounts, partially personal, partially

16        business?

17        A.  I don't know that I was aware of that.

18        Q.  Okay.  Well, let's talk a little bit about what you did

19        know, okay?

20        A.  Okay.

21        Q.  About the nature of Mr. Adams' businesses, all right?

22        A.  Okay.

23        Q.  You knew he was a lawyer, of course?

24        A.  Yes.

25        Q.  And you knew he was, and still is, a law professor at
```

```
1    the University of Minnesota Law School?

2    A.  Correct.

3    Q.  All right.  But he had many other businesses, correct?

4    A.  Yes.

5    Q.  I don't know much about this case, but I've seen

6    reference to a yogurt business, so clearly he's a

7    businessman or entrepreneur to some extent.  Does that

8    square with your investigation?

9    A.  Correct.

10   Q.  He had a company called ESA Consulting?

11   A.  Yes.

12   Q.  What was that?

13   A.  He used that company when he did expert testimony is my

14   understanding.

15   Q.  Okay.  And, in fact, Professor Adams was an expert

16   witness in one of the cases that you and I worked, correct?

17   A.  Correct.

18   Q.  All right.  He had a company called the Focus Group?

19   A.  Yes.

20   Q.  Do you know what that was?

21   A.  I believe that was investments.

22   Q.  Investments?

23   A.  Right.

24   Q.  Okay.  And I saw reference somewhere, again, I'm a

25   neophyte to the facts of the case, but he had some kind of
```

1    investment banking business.  Is that true?

2    A.  I'm not sure on that.

3    Q.  Okay.  And, in addition to all of that, Mr. Adams,

4    Professor Adams, held a lot of nonlegal positions at Apollo

5    Diamond, correct?

6    A.  Correct.

7    Q.  Apollo Gemstone?

8    A.  Yes.

9    Q.  I've got the indictment here.  It says in the indictment

10   that Adams held various titles at Apollo Diamond and Apollo

11   Gemstone, including chief financial officer, secretary,

12   executive vice president, and general counsel of Apollo

13   Diamond and chief financial officer, president, and

14   executive vice president and secretary of Apollo Gemstone.

15   Is that all -- does that all square with what you know in

16   your investigation?

17   A.  Yes, it does.

18   Q.  Okay.  So the word business as it applies to Professor

19   Adams applies to a lot of stuff other than just being a

20   lawyer, correct?

21   A.  That's correct.

22   Q.  All right.  So Special Agent Khan, we've looked at the

23   chain of custody for the infamous flash drive.  It looks

24   like you received it on March 14th, 2016?

25   A.  That's correct.

Khan - Direct

```
 1    Q.  You received it from Inspector Kroells?

 2    A.  Correct.

 3    Q.  Do you remember why you took possession of it at that

 4    time?

 5    A.  As I recall, we were going to split up reviewing of the

 6    e-mails and so I was going to take that thumb drive to our

 7    CART team to produce copies of the thumb drive so that we

 8    could review it.

 9    Q.  And did you ever make it to the cart team with that

10    thumb drive?

11    A.  We did not.

12    Q.  Why not?

13    A.  It was decided that we needed to do a taint review or

14    filter out e-mails before we did that.

15    Q.  It occurs to me that we ought to back up and answer a

16    question that --

17    A.  Okay.

18    Q.  The word CART, after this many years in this job, is

19    meaningful to me, but what's the CART team?

20    A.  There they are like our computer team, specialized --

21    agents that are receive specialized training in computer

22    review.

23    Q.  Okay.  So you were going to take this thumb drive and

24    head out and have them process it?

25    A.  Correct.
```

1    Q.  Okay.  And that didn't happen?

2    A.  Right.

3    Q.  Why?

4    A.  Because we decided we needed to filter out the e-mails

5    first for possible taint, you know, attorney-client

6    privilege.

7    Q.  And tell us about how that decision was made, if you

8    know.

9    A.  As I recall, we got a call or an e-mail from David Maria

10   saying we should do this before we start reviewing the thumb

11   drive.

12   Q.  Okay.  And there's been a -- it was this phrase thrown

13   around heightened filter process.  Is that what you're

14   talking about now?

15   A.  Yes.

16   Q.  Okay.  And what did you understand that heightened

17   filter process to be filtering?

18   A.  Filtering, the keywords, certain keywords were going to

19   be put into the system so that e-mails containing those

20   keywords would be filtered out and put into a spot where we

21   would not have access to them because they could be

22   potentially taint evidence or attorney-client privilege.

23   Q.  Okay.  So I'm -- we've sort of got two things floating

24   around in the case.  We've got did we look at things that

25   are relevant to what's in the warrant and did we look at

1   privilege stuff.  This filter was relevant to which one of

2   those two things?

3   A.  To the privilege.

4   Q.  To the privilege.  Okay.  Now, were you involved at all

5   in the process of figuring out what filter terms to run?

6   A.  I think we discussed it.  I don't remember what list of

7   terms we came up with, but there were discussions

8   about -- about keywords that should be used.

9   Q.  Okay.  And did you ever see or look at the sort of the

10  final list of filter terms that were sent to our ALS people

11  to undertake this mechanical filtering?

12  A.  I don't recall seeing that.

13  Q.  All right.  In any event, did this mechanical filtering

14  process occur?

15  A.  Yes.

16  Q.  And at some point in time were you granted access, as a

17  member of the prosecution team, to the set of e-mails that

18  were leftover after those filtered documents were pulled

19  out?

20  A.  Yes.

21          MR. MACLAUGHLIN:  One moment, Your Honor.

22  BY MR. MACLAUGHLIN:

23  Q.  I would like to take a quick look at paragraph 9 of your

24  declaration that has been filed in this case as document No.

25  52-1.  And you wrote, For those materials that were filtered

1    out of our review, I asked a fellow special agent who is not

2    on the prosecution team, Kurt Beulke, to handle the filter

3    review.  Do you remember that?

4    A.  I do.

5    Q.  And a who is Kurt Beulke?

6    A.  Kurt Beulke is a special agent on my squad who was not

7    involved in this case at all.  He primarily works healthcare

8    fraud matters, and he was also relatively new to the office.

9    Q.  And was there also discussion, in addition to recruiting

10   a taint agent, also of recruiting a taint AUSA?

11   A.  Yes.

12   Q.  Tell us about that discussion.

13   A.  I don't remember exactly what the discussion was, but we

14   knew -- we had discussed having a taint agent and then also

15   an AUSA that could review those e-mails that had been

16   separated into the separate pod to see if they were

17   privileged.

18   Q.  Okay.  Say that again.  Say it louder.  I didn't quite

19   hear it.

20   A.  Okay.  We had a discussion about having an agent and

21   also an AUSA, that would be the taint team put together,

22   that would go in and review those e-mails that had been

23   separated out for possible privilege.

24            MR. MACLAUGHLIN:  Okay.  So may I approach the --

25            THE COURT:  You may.

```
1              MR. MACLAUGHLIN:  -- whiteboard?

2   BY MR. MACLAUGHLIN:

3   Q.  So this is a -- obviously a very aesthetically pleasing

4   tool here in the courtroom, right?

5   A.  It is.

6   Q.  Okay.  So on May 2nd of 2016, or thereabouts, it might

7   have been a day or two later, other evidence in the case

8   shows that this first filtering was done.  Does that sound

9   about right to you?

10  A.  That sounds about right.

11  Q.  Okay.  And so that day, other evidence shows that

12  113,361 e-mails were made available to you guys.  Does that

13  sound right?

14  A.  That sounds right.

15  Q.  And 33,161 documents were pulled out, right?

16  A.  Correct.

17  Q.  And so now these documents here, did you guys have any

18  access to those documents at all?

19  A.  No.

20  Q.  All right.  The taint team, had it been constituted, had

21  you followed through on the taint team, what would the taint

22  team have done, which of these two piles of e-mails would

23  they have looked at?

24  A.  The 33,161 e-mails.

25  Q.  Okay.  And so there were at least preliminary tiltings
```

1    toward going in to those filtered e-mails and figuring out

2    if anything in there was potentially not only useful but

3    usable?

4    A.  Correct.

5    Q.  Okay.  Was a taint AUSA ever selected to work with

6    Special Agent Beulke?

7    A.  I don't believe so.

8    Q.  Okay.  Let's look at some e-mails to kind of trace

9    through how this went, and I want to direct your attention

10   to Khan-1.

11   A.  Okay.

12   Q.  So you've got to get Khan-1 in front of you.  There was

13   a pile there yesterday.

14   A.  Oh, here we go.  Okay.

15   Q.  Have you got Khan-1?

16   A.  Yep.

17   Q.  Okay.  So I'm going to publish this actually.  We'll

18   start at page 2.  So at page 2, this appears, does it not,

19   to be an e-mail from you to John and David?

20   A.  Yes.

21   Q.  And John and David would be John Kokkinen and David

22   Maria?

23   A.  That's correct.

24   Q.  All right.  And you write, "SA Kurt Beulke from my squad

25   has kindly agreed to be part of the e-mail review team.

1    Please let him know when you're ready to start the process.

2    I've included him on this e-mail.  Thanks."  Do you remember

3    sending this?

4    A.  I do.

5    Q.  And why did you send this?

6    A.  To let them know that we had a taint agent available.

7    Q.  Okay.  Understandably, Kurt Beulke is sort of interested

8    in, all right, I've agreed to do it but is my life going to

9    end, right, how much time is this going to take?

10   A.  Right.

11   Q.  And so he wrote, "Hey, guys, any insight you could

12   provide on the potential time commitment and expectations of

13   the taint review prior to its commencement would be

14   appreciated as well."  Right?

15   A.  Correct.

16   Q.  Now, this exchange is occurring in the middle of March.

17   I think his e-mail is dated March 18th of 2016?

18   A.  Yes.

19   Q.  And so this e-mail is being written by Special Agent

20   Beulke during this filtering process, right, it's before the

21   actual disclosure and separation of the 33,000 from the

22   rest?

23   A.  Right.

24   Q.  All right.  David Maria responds, correct?

25   A.  Yes, he does.

1   Q.  He responds on March 18th and he writes, "We still have

2   to figure out a few logistics.  Because of the size of the

3   database, it is going to have to be housed in Relativity at

4   the LTSC instead of loaded into Eclipse here."  And the

5   Court already knows, Relativity is a database that is housed

6   in South Carolina, right?

7   A.  Right.

8   Q.  Okay.  Ultimately you were granted access to Relativity?

9   A.  I was.

10  Q.  And you can search in Relativity?

11  A.  Yes.

12  Q.  Okay.  He goes on, "My guess is that there will be

13  nothing available for us to review until the week after next

14  and possibly the week after that.  This sucks but we don't

15  have an alternative."  He goes on to answer Beuilke's

16  question, "Once it is" --

17            THE COURT:  Hang on just one second,

18  Mr. MacLaughlin.  Sir, can you grab him?

19            MR. MACLAUGHLIN:  Sure.

20            THE COURT:  Thank you.  Sorry to interrupt.  Hey,

21  just to let you know, so I've given the U.S. attorney who is

22  trying to manage the petty offenses permission to use those

23  two rooms, so I don't mind if it's a little more rowdy out

24  there than it usually is because otherwise they'd normally

25  be in here.  Just an FYI.

```
 1                  Thank you.  Sorry to interrupt.  Go ahead.

 2      BY MR. MACLAUGHLIN:

 3      Q.  So Mr. Maria goes on, "Once it is loaded in Relatively,

 4      we plan on running a list of search terms to determine the

 5      universe of potentially privileged documents."  That's the

 6      mechanical filtering process you testified about earlier?

 7      A.  That's correct.

 8      Q.  Okay.  If the search results in a manageable number of

 9      documents, that is in the universe that you will review."

10      You being who?

11      A.  Kurt.

12      Q.  Kurt.  "If there are too many hits, we will back up and

13      do a relevant search.  Short answer is that once we have a

14      database of documents for you to review, it should not be

15      too many documents."  Do you see that?

16      A.  I do.

17      Q.  Did it turn out to be the case, Special Agent Khan, that

18      the -- that the database containing the filtered documents

19      was a relatively manageable low numbered set like AUSA Maria

20      was anticipating?

21      A.  No, it was over 33,000 documents.

22      Q.  Okay.  Did a taint process ever happen in this case?

23      A.  No.

24      Q.  Were you involved in discussions about not doing the

25      taint process?  Or not?
```

1    A.  Not that I recall.  It just never happened and those

2    e-mails stayed in their little pod.

3    Q.  Okay.  So I'm going to walk over here again.  We have

4    this 33,161 that were pulled out.  You never had access to

5    them, right?

6    A.  Right.

7    Q.  And then later another 1,494 were pulled out?

8    A.  Yes.

9    Q.  Here's my question, at any point in time, did the

10   prosecution team ever even try to go in and look at any of

11   these or figure out which of them might actually be both

12   useful and usable?

13   A.  No.

14   Q.  Is it -- would it be a fair thing to say that you guys,

15   because of the size and number of filtered e-mails, you just

16   abandoned them?

17   A.  That's correct.

18   Q.  Okay.  Next question, it appears to me that the

19   prosecution team had access to the for review e-mails from

20   approximately May 4th of 2016 and that the seizure occurred

21   in approximately April of 2017, about 11 months.

22   A.  Correct.

23   Q.  Here's my question, was this the only matter you were

24   working on during that 11-month period of time?

25   A.  No.

1    Q.  Were you otherwise busy with other matters?

2    A.  Yes, I was very busy.

3    Q.  Okay.  You were working on, for example, what we call

4    the back cracker cases?

5    A.  Yes.

6    Q.  With AUSA Maria and Kokkinen?

7    A.  Yes.

8    Q.  And you had other things going on?

9    A.  Correct.

10   Q.  All right.  And in a case like this, would you

11   characterize this, on the spectrum of complexity, where

12   would you put this case?

13   A.  This is a fairly complex case.

14   Q.  In a complex case like this, are people like you,

15   special agents with the FBI, fungible?  I mean, can you just

16   pull somebody else in to do e-mail reviews?

17   A.  No.

18   Q.  Why?

19   A.  They don't know the case and they wouldn't know what's

20   really truly relevant to our case.

21   Q.  Okay.  I'm going to be very, very quick about the next

22   set of questions because the Court has already seen these

23   things, but just very quickly, I want to direct your

24   attention to Kroells-3.

25   A.  Okay.  All right.

1    Q.  Okay.  So, again, I'm going to be kind of quick here.

2    On April the 27th, did the team get an e-mail from David

3    Maria?

4    A.  Yes, we did.

5    Q.  And is the upshot of this that the production, what

6    you're going to be granted access to, will be available very

7    soon?

8    A.  Yes.

9    Q.  Flip the page to page 2 and look at the bottom.  On

10   May 4th of 2016, did your team get another e-mail from AUSA

11   Maria about the database actually being available?

12   A.  Yes.

13   Q.  Okay.  And in this e-mail, did he warn you that even

14   though a filter process had been undertaken to nonetheless

15   be on the lookout for other potentially privileged materials

16   in the 113,361 you were being granted access to?

17   A.  He did.

18   Q.  Okay.  And did you do that?

19   A.  Yes.

20   Q.  Okay.  And, in fact -- and, again, I don't think I need

21   to show you any more of these because we've seen them.  At

22   some point in time Inspector Kroells actually did find extra

23   stuff, right, that appeared to her to be potentially

24   privileged?

25   A.  Yes, she did.

1   Q.  And there was another filtering process to pull those

2   out?

3   A.  Correct.

4   Q.  Okay.  Now, in your examination of the e-mails in the

5   production that was made available to you on May 2nd or

6   May 4th of 2016, did you search by hand or did you use

7   mechanical search terms?

8   A.  As I recall, I started -- excuse me, started going

9   mechanically and realized that was going take far too long

10  so then I would just use keywords.

11  Q.  Okay.  You were searching obviously about 112,000

12  e-mails?

13  A.  Right.

14  Q.  All right.  That's a lot of e-mails?

15  A.  It is.

16  Q.  Okay.  What was the purpose of your searching?  What

17  were you trying to accomplish by running your mechanical

18  search term searches on the database that was disclosed to

19  you on May 4th?

20  A.  We were trying to look for elements of the fraud which

21  we had been granted through the search warrant.

22  Q.  Okay.  When you did that, did you maintain your

23  vigilance about attorney-client privilege -- potential

24  attorney-client privilege materials?

25  A.  Definitely.

1    Q.  The four-part protocol you testified about earlier, was

2    that in effect in your actions with that database at all

3    times?

4    A.  Yes.

5    Q.  So I'm going to ask you a question.  What -- there are a

6    lot of privileges floating around in this case.  Mr. Adams

7    is a lawyer, right?

8    A.  Yes.

9    Q.  Therefore he potentially had clients?

10   A.  Correct.

11   Q.  Those clients potentially had a privileged relationship

12   with Mr. Adams?

13   A.  Yes.

14   Q.  And you testified earlier that Mr. Adams himself was a

15   client?

16   A.  Yes.

17   Q.  With respect to the SCC matter?

18   A.  That's correct.

19   Q.  And the underlying civil suits?

20   A.  Right.

21   Q.  Whose privilege were you particularly concerned about

22   protecting in the course of going through these documents?

23   A.  Mr. Adams.

24   Q.  Okay.  Why?

25   A.  He was our subject and we knew about these civil

1    lawsuits going on.

2    Q.  In the course of reviewing the e-mails, did you see

3    communications between Mr. Adams and principals or employees

4    of Apollo Diamond?

5    A.  I believe I did.

6    Q.  All right.  And the same with Apollo Diamond Gemstone?

7    A.  Correct.

8    Q.  And private Scio?

9    A.  Yes.

10   Q.  Or Scio?  Scio?  Okay.  And the Linareses?

11   A.  Yes.

12   Q.  In the context of this case, who are those people and

13   entities?

14   A.  Some of them are investors, some of them are employees

15   involved in the company, some of them are owners of the

16   companies.

17   Q.  Okay.  Are they victims?

18   A.  Yes.

19   Q.  To the best of your knowledge, have any of those

20   entities or peoples asserted their own attorney-client

21   privilege with respect to this case?

22   A.  Not to the best of my knowledge, no.

23   Q.  So I'm going to direct your attention now to Khan-2.

24   A.  Okay.

25   Q.  Now, when you were doing your searches on Relativity,

1    did you know that Relativity sort of records all of your

2    searches and that later on it can be known what searches you

3    ran?  Did you know that at the time?

4    A.  I didn't.

5    Q.  Okay.  You understand now, though, that Khan-2 is a

6    summary of all of your searches that you actually undertook?

7    A.  Correct.

8    Q.  So let's just, I'm going to let Mr. Wade ask you

9    questions about this more than I will, but who is Ward, for

10   example?

11   A.  She was an employee who worked with Mr. Adams.

12   Q.  And was your search -- why did you search -- if you

13   remember, if you don't remember, that's fine, I'm just

14   trying to ask you questions about why you picked certain

15   search terms if you remember.  Why did you search for the

16   name Ward?

17   A.  We were preparing to interview her and we were aware of

18   the fact that she had some involvement in the bank accounts

19   for the different entities, Apollo Diamond, Apollo Gemstone

20   and so forth, so we were looking for any correspondence she

21   would have had regarding those.

22   Q.  Okay.  And I see that you also ran a search involving

23   her name for secrets.  Why secret?

24   A.  I don't recall, but it was possibly had to do with an

25   e-mail that I had been told about from either Inspector

1    Kroells or someone else on the team.

2    Q.  Is there somewhere in your case a secret account that

3    allegedly Professor Adams was trying not to have somebody

4    else know about?

5    A.  A lot of these accounts we had learned a lot of people

6    involved in Apollo companies did not know they -- of the

7    existence of these accounts.

8    Q.  Okay.  Theo Strous, who's that?

9    A.  He was on the board, and we were getting ready to do an

10   interview of him as well.

11   Q.  Okay.  I'm not going to beat a dead horse anymore, but

12   I've just got one general question.  Were these search terms

13   that you ran designed to take the whole universe of

14   documents in the for review database and figure out which

15   one of them fit within part two of attachment two to the

16   warrant?

17   A.  Yes.

18           MR. MACLAUGHLIN:  May I have a moment, Your Honor?

19           THE COURT:  Yes.

20       (Counsel conferred.)

21   BY MR. MACLAUGHLIN:

22   Q.  So a point of clarification, so on May 4th, 2016, you're

23   granted access to sort of the first set --

24           THE COURT:  Hit pause, please.  Yes, sir.

25           MR. WADE:  I -- I believe the correct date is

Khan - Direct

```
 1     May 4th but the board that counsel is pointing to says

 2     May 2nd.  I'm -- I -- maybe we can clarify that.

 3                THE COURT:  Yeah, why don't we do that, because

 4     this has been an oft utilized tool.

 5     BY MR. MACLAUGHLIN:

 6     Q.  Okay.  Do you remember of your own memory what the date

 7     was when you got access to that?

 8     A.  Not the exact date, no.

 9                THE COURT:  And is No. 2 supposed to be the date

10     of access or is it supposed to be the date that the culling

11     was done?

12                MR. MACLAUGHLIN:  The date of access.  Let me find

13     the right e-mail here.

14                THE COURT:  Do you have something to add?

15                MR. WADE:  I was just going to say, I don't think

16     the parties dispute that that's May 4th.  I just think

17     counsel put that up very early on and --

18                THE COURT:  And we haven't cleared it up.

19                MR. WADE:  -- maybe we could change that 2 to a 4

20     so we're all clear.

21                MR. MACLAUGHLIN:  Sure.  And I think Mr. Wade is

22     correct.

23     BY MR. MACLAUGHLIN:

24     Q.  So let's go back to Kroells-3.

25     A.  Okay.
```

Khan - Direct

1    Q.  And let's look at the second page of Kroells-3.  And

2    this is that e-mail from Mr. Maria that says you guys have

3    access, right?

4    A.  Correct.

5    Q.  All right.  So he writes, "The database is up and ready

6    for review in Relatively," and that's May 4th of 2016?

7    A.  Correct.

8             MR. MACLAUGHLIN:  Okay.  So Mr. Wade is correct.

9             THE COURT:  Why don't we change that.  And then

10   I'm going to take a picture of this, and I will send it to

11   everyone.

12        (Counsel conferred.)

13            THE COURT:  There's some disagreement about

14   whether the 4th is the right date?

15            MR. MACLAUGHLIN:  If I could hold fort for a

16   second.

17            THE COURT:  Sure.

18            MR. MACLAUGHLIN:  Just to let you know, I'm not

19   the witness obviously.  On May 2nd in some sense the

20   database was made available to our office.  The Court is

21   going to see when Mike Zeitz is on the stand that David

22   Maria did some sort of administerial things inside the

23   database on May 2nd.

24            THE COURT:  Okay.

25            MR. MACLAUGHLIN:  The team was granted access or

Khan - Direct

```
 1    was told it had access on the 4th.

 2              THE COURT:  Okay.

 3              MR. MACLAUGHLIN:  So, you know, this --

 4              THE COURT:  So the record will be the record, and

 5    I guess we're debating whether the handwritten document

 6    matters or not.

 7              MR. MACLAUGHLIN:  I think we're congealing on the

 8    head of a pin, really.

 9              MR. WADE:  No -- I didn't mean to cut you off,

10    counsel.  No objection.  But my objection was he was asking

11    about May 4th but pointing at the date May 2nd.

12              THE COURT:  May 2nd which is confusing.  Okay.

13    I'm going to take a quick second and take a picture of this

14    and then we can move on to the actual testimony which is

15    what really matters.  If I know how to open this tiny door.

16              THE CLERK:  Judge, I have one.  I took a picture

17    yesterday.

18              THE COURT:  Oh, never mind.  Thank you.  Okay.

19    BY MR. MACLAUGHLIN:

20    Q.  So I'm just here to clarify something which I think --

21    A.  Okay.

22    Q.  -- is fairly clear, but so on May 4th, I'm pointing at

23    the 2nd, but you guys got that e-mail from David Maria on

24    the 4th?

25    A.  That's correct.
```

Khan - Direct

1    Q.  So you guys knew on the 4th that you could go to

2    Relativity and, if the pistons were firing correctly with

3    that program, you ought to be able to look at these things?

4    A.  Yes.

5    Q.  All right.  So that's the day you got access or knew you

6    had access to 113,361 e-mails, correct?

7    A.  Correct.

8    Q.  At that point in time there were still some privileged

9    e-mails in that database that Special Agent -- that

10   Investigator Kroells spotted leter on?

11   A.  Yes.

12   Q.  So between May 4th of 2016 and June 7th of 2016, you

13   guys, in fact, did have access to these 1,494 e-mails that

14   were later pulled out and segregated?

15   A.  Correct.

16   Q.  Okay.  And, in fact, it was your review of them that

17   caused you concern and caused the second culling to occur

18   that pulled that 1,494 out?

19   A.  Correct, the team's review.

20          MR. WADE:  Objection.  I think that

21   mischaracterizes the evidence in the hearing, I believe.  I

22   believe there was testimony on this yesterday from Postal

23   Inspector Kroells that she raised the issue.

24          MR. MACLAUGHLIN:  Yes, isn't that what I -- I'm

25   sorry, maybe I misspoke.

1     BY MR. MACLAUGHLIN:

2     Q.  I -- to move things along I didn't show you the e-mail,

3     but you've seen the e-mail where Inspector Kroells says,

4     hey, I'm seeing some stuff in here that might be privileged,

5     there's @Arnstein.com and @Felhaber.com?

6     A.  Yes.

7     Q.  Do you remember that?

8     A.  I do.

9     Q.  And so that gave rise to concern that resulted in a

10    second cull that pulled out these 1,494 e-mails?

11               THE COURT:  Okay.  Let's limit her testimony to

12    what she actually has knowledge of rather than having her

13    restate what Agent Kroells did.  So if she had knowledge

14    that that's what led to that, that's fine.

15               MR. MACLAUGHLIN:  Okay.

16    BY MR. MACLAUGHLIN:

17    Q.  I'm really just getting at, there was concern expressed

18    that you had access to these 1,494 e-mails for a month?

19    A.  Yes.

20    Q.  Okay.

21               THE COURT:  Got it.  Thank you.

22               MR. MACLAUGHLIN:  Yep.

23    BY MR. MACLAUGHLIN:

24    Q.  So Kroells-2, let's go back to that very briefly, is

25    one, two, three -- Khan-2, Khan-2, not Kroells-2, Khan-2 is

```
1    one, two, three, four, five, six, seven pages long, right?

2    A.  That's correct.

3    Q.  But looking through it, it appears that you only did

4    one, two, three, four, or five searches?  Does that sound

5    right to you?

6         MR. WADE:  Objection.  I believe there's a lengthy

7    list of searches in the seventh page.

8         MR. MACLAUGHLIN:  The question is you did searches

9    on two days.

10   BY MR. MACLAUGHLIN:

11   Q.  You searched this database on two different days and

12   that's it.  Is that fair?  That's what this indicates.  I'm

13   asking if that squares with your recollection?

14   A.  That does.

15        MR. MACLAUGHLIN:  Okay.  Thank you, Judge.  I have

16   no more questions at this time.

17        THE COURT:  Okay.  And are we going to have

18   testimony about whether the repeated, just to use an

19   example, Theo and Strous being repeated two dozen times is

20   indicative of two dozen hits on a single search or whether

21   it is indicative of somewhat innately re-running the same

22   search?

23        MR. MACLAUGHLIN:  The answer to that is yes, we

24   are, Mark Zeitz is going to address that --

25        THE COURT:  Okay.  And I think that will answer
```

1     the question that you're raising about the lack of clarity

2     about whether these represent repeated searches or repeated

3     hits on the same search.  And I'm not sure that it matters

4     one way or the other, but we'll find out.  Go ahead.

5               MR. WADE:  And recognizing the Court's schedule,

6     should we just go ahead and get started?

7               THE COURT:  Yep.

8               MR. WADE:  Okay.

9               THE COURT:  Oh, you mean do I need to check on

10    what's going on?

11              MR. WADE:  Exactly.

12              THE COURT:  No, I think they're going to tell us

13    what's going on when they're ready for us.  So thanks for

14    checking though.

15                         **CROSS-EXAMINATION**

16    BY MR. WADE:

17    Q.  Good morning, Special Agent Khan.

18    A.  Good morning.

19    Q.  My name is Lance Wade.  I represent Mr. Adams.  We have

20    never met before, have we?

21    A.  We have not.

22    Q.  It's mice to meet you.

23    A.  Nice to meet you.

24    Q.  I'm just going to quickly start where counsel for the

25    government left off.

1                    MR. WADE:  If I could approach.

2                    THE COURT:  Please.

3        BY MR. WADE:

4        Q.  The approximately 1,500 documents that you had access to

5        between May 2nd and June 7th, do you know which attorneys

6        those documents related to?

7        A.  I do not.

8        Q.  Do you recall that one of the attorneys who was

9        identified in an e-mail that was sent by Postal Inspector

10       Kroells was Jon Hopeman at the then Felhaber -- excuse me,

11       then at the Felhaber law firm?

12       A.  I recall that from her e-mail, yes.

13       Q.  And that was the e-mail she sent in May to alert the

14       team to the fact that she had identified these materials?

15       A.  Yes.

16       Q.  And were you aware that Mr. Hopeman was representing

17       Mr. Adams in this investigation?

18       A.  Yes, I was.

19       Q.  And was another one of the law firms that was identified

20       in that same e-mail correspondence Mr. Brever?

21       A.  I don't know if I know that, that it was him.  I just

22       remembered seeing the e-mail address.

23       Q.  Okay.  Well, we'll come back to that document then and

24       in some more detail.  You talked about some of your

25       experience as a special agent and some of the searches that

1    you've done.  Do you recall that testimony?

2    A.  I do.

3    Q.  Have you ever been involved in -- how many e-mail

4    service provider searches have you been involved in?

5    A.  Not very many.  I don't remember the exact number, but

6    it's not very many.

7    Q.  Is it more than five?

8    A.  Probably not.

9    Q.  Is it fewer than two?

10   A.  It's -- I can't say for sure.

11   Q.  As you sit here today, can you remember any other cases

12   where you did an e-mail service provider search?

13   A.  I think there was at least one other case.  There could

14   be more, though.  It's 12 years is a long time to remember.

15   Q.  Have you done one recently?

16   A.  This is the most recent one.

17   Q.  Okay.  And have you ever been involved in an

18   investigation where the subject or target of the

19   investigation is an attorney?

20   A.  Yes.

21   Q.  And did you ever -- and in those prior experiences, were

22   you ever involved in seizing documents that belonged to that

23   attorney?

24   A.  Yes.

25   Q.  And was that a premises search or a electronic seizure?

 1    A.  That was a premise search.

 2    Q.  And so you went in and you got all the documents from a

 3    lawyer's office?

 4    A.  Yes.

 5    Q.  And did the investigation team then review those

 6    documents?

 7    A.  They did.  I was -- I was not the case agent on that

 8    matter.  I was just helping with the search and then they

 9    set -- they set up the review of these documents later.

10    Q.  Okay.  Do you know if those documents were sent over to

11    a taint team or whether the investigation team reviewed

12    those documents?

13    A.  As I recall, there was a taint team.

14    Q.  Okay.  And the documents were sent to the taint team for

15    filtering?

16    A.  Correct.

17    Q.  Were you involved in any other searches where an

18    attorney was targeted?

19    A.  I believe that was the only one besides this

20    investigation.

21    Q.  Were you involved in any other electronic -- or I'm

22    sorry, in the one other instance that you seem to recall or

23    a handful of instances of e-mail service provider searches,

24    do you remember approximately how many e-mails you received

25    in that search?

1    A.  I do not.

2    Q.  Could you please turn your attention to that big binder

3    there, document No. 33 which is Defense Exhibit 33.  Do you

4    have that in front of you, ma'am?

5    A.  I do.

6    Q.  And do you recognize that document?

7    A.  I do.

8    Q.  What is this document?  I'm sorry, I think we can accept

9    the foundation.  This document indicates that you accepted

10   custody on March 14th of 2016?

11   A.  That's correct.

12   Q.  And are you -- and when you enter a date as to when you

13   take custody of a -- of evidence, are you always careful to

14   make sure that date's accurate?

15   A.  Of course.

16   Q.  Do you have any reason to doubt that the March 14th,

17   2016, date is accurate?

18   A.  That is accurate.

19              MR. WADE:  Court's indulgence for one moment.

20              THE COURT:  Yes, of course.

21         (Counsel conferred.)

22              MR. WADE:  Your Honor, may I approach?

23              THE COURT:  Yes.

24              MR. WADE:  I'm going to hand you a file that we

25   should probably mark as an exhibit.  I'll call it the

1      Redweld, and we will add an exhibit tag to it after if the

2      government is okay with our doing so.

3                  MR. MACLAUGHLIN:  That's fine, Your Honor.

4      BY MR. WADE:

5      Q.  Which is appears to contain on the outside that chain of

6      custody tag.  Are you familiar with that Redweld?

7      A.  Yes, I am.

8      Q.  Are you the one who created that Redweld and put the

9      thumb drive in that file?

10     A.  I did not.

11     Q.  Do you know who did that?

12     A.  That was Inspector Kroells.

13     Q.  So when she handed it to you, it was already in that

14     drive?

15     A.  Correct.

16     Q.  Or I'm sorry, in that Redweld?

17     A.  Yes.

18     Q.  And what did you do with that Redweld after you received

19     it?

20     A.  I maintained that in the custody at my desk.

21     Q.  For how long?

22     A.  Three days.

23     Q.  And then what'd you do with it?

24     A.  Then I turned this evidence over to AUSA Maria.

25     Q.  And what does the chain of custody tag indicate as to

1    what happened with the document thereafter or with the

2    evidence thereafter?

3    A.  It went from myself to Mr. Maria and then it was

4    transferred over to Martin Harris who is also an employee at

5    the U.S. Attorney's Office.

6    Q.  Okay.  On what date did it go to AUSA Maria?

7    A.  On March 17th, 2016.

8    Q.  And how long was it in his possession?

9    A.  In Mr. Maria's possession, until April 4th of 2017.

10   Q.  And is it standard protocol for assistant United States

11   attorneys to maintain possession of evidence?

12   A.  That I don't know.  I know he had it in his possession

13   so that we could get it to the review team.

14   Q.  Isn't it ordinarily the role of the investigating agency

15   to maintain the custody of evidence that's obtained by

16   the -- by the bureau?

17   A.  Normally we do but we needed to get it to the computer

18   people so they could do the filtering process.

19   Q.  And typically if you -- if you do something like that,

20   if the evidence is needed, is the evidence then returned to

21   the investigating agency?

22   A.  It can be, yes.

23   Q.  But it wasn't in this case?

24   A.  It wasn't.  It was maintained at the United States

25   Attorney's Office.

1    Q.  You can set that aside, ma'am.

2            THE COURT:  Can I inquire whether the contents of

3    that Redweld are at issue or just using it as a

4    demonstrative to ask questions related to Exhibit 33?

5            MR. WADE:  I think the answers that she provided

6    clarified some ambiguity I had and so I didn't need to go in

7    any deeper into the --

8            THE COURT:  So I don't need to --

9            MR. WADE:  No.

10           THE COURT:  I don't need to maintain custody of

11   the Redweld with these exhibits, we can rest on Exhibit 33

12   and the cross?

13           MR. WADE:  Yeah, and I'm happy not submitting it

14   into evidence.  I'm happy taking it back and giving it to

15   the government if --

16           THE COURT:  Okay.  Good.  I wanted to make sure.

17           MR. WADE:  Why don't I approach and do that so it

18   doesn't get lost in the shuffle.

19           THE COURT:  Yeah, that's probably a good idea or

20   we'll all have to sign the chain of custody form.  Okay.

21   Thank you.

22           You can continue.

23   BY MR. WADE:

24   Q.  Ma'am, we talked a little bit earlier today about your

25   standard protocol for when you encounter privileged

1    documents and how you would discontinue the review of those

2    documents and inform counsel for the government that

3    potentially privileged documents existed?

4    A.  Yes.

5    Q.  Do you recall seeing any potentially privileged

6    documents in this case?

7    A.  I do not.

8    Q.  None whatsoever?

9    A.  No, I had a limited review of the e-mails, and I did not

10   see any privileged documents during that review.

11   Q.  Do you recall seeing any communications between

12   Mr. Adams and anyone at the Apollo companies?

13   A.  None that I personally found, but I believe some were

14   shown during interviews and those -- that's when I would

15   have been made aware of those.

16   Q.  Okay.  But in your searching of the Relativity database,

17   you don't recall seeing any of those e-mails?

18   A.  I had such a limited search of the database that I

19   don't -- I really, at this time, don't recall seeing any of

20   those.

21   Q.  Okay.  If you had seen those e-mails, would you have

22   felt free to review them?

23               THE COURT:  I --

24               MR. MACLAUGHLIN:  Objection.  Calls for a

25   hypothetical.

```
 1              THE COURT:  I think that's right.  I'm also
 2    intrigued by our return to privilege that your client can't
 3    raise.
 4              MR. WADE:  Respectfully, we believe our client can
 5    raise it, and that will be the subject of briefing.  We
 6    believe he does have standing to raise the Apollo
 7    privileges, and that will be the subject of motions before
 8    the Court.
 9              THE COURT:  Okay.
10              MR. WADE:  And, Your Honor, the applicability of
11    the privilege, as counsel for the government has noted out,
12    has of -- has noted this morning is not really the issue as
13    it relates to the reasonableness.  As it relates to the
14    reasonableness, if there's a belief that the material may be
15    privileged, it's how it was handled.
16              THE COURT:  As it's related to the reasonableness
17    of the privilege, but it still boils down to whether there
18    is a privilege that needs to be honored or not.  My
19    assessment of reasonableness will contemplate whether they
20    were -- okay.  And we have reasonableness as to relevance
21    versus reasonableness, I've used relevance loosely, as to
22    particularity and responding to the things in the warrant
23    versus reasonableness as to privilege.  It is your position
24    that their handling of documents that they believed not to
25    be privileged because they involved communications between
```

1    Mr. Adams and the companies that they believe they either

2    had a waiver for, he didn't have the standing to raise the

3    privilege, or weren't privileged because of an exception to

4    the privilege, their decisions on that basis undermine the

5    reasonableness of their execution of the search warrant?

6          MR. WADE:  Yes, Your Honor.  It is not an

7    investigating agency -- investigative team's job to

8    determine the applicability of a privilege.

9          THE COURT:  Let's hypothesize --

10         MR. WADE:  Privileges were being asserted -- I

11   didn't meet to cut Your Honor.

12         THE COURT:  So let's just hypothesize that the

13   ultimate finding is as, to pick a number out of a hat, 5,000

14   of these e-mails that you think there could have been

15   privileged, that I or another judge ultimately decides that

16   they're not privileged for whatever reason, whether the

17   privilege has been waived, whether it is not Mr. Adams'

18   privilege to assert in the first place, whether the

19   communications were in furtherance of a criminal scheme that

20   somehow viciates the privilege, whether they are not covered

21   by the privilege, let's say that they are not privileged,

22   they have made an on the ground assessment that you disagree

23   with that turns out to be right, how do I gauge the

24   reasonableness of the execution of this search warrant if

25   you haven't yet raised the privilege issue?  Do you

1      understand where I'm --

2                  MR. WADE:  I do, Your Honor.

3                  THE COURT:  -- in a pickle?

4                  MR. WADE:  I do, Your Honor.  And respectfully, I

5      think there are two different pickles which we're going to

6      have to eat in the course of this -- the litigation of this

7      case.  The issue as it relates to the reasonableness of the

8      execution of the warrant is if privileges exist and they're

9      being asserted, the government investigative team is

10     obligated to deal with that in a certain way, and there's a

11     level of reasonableness in terms of how they deal with

12     materials where there's a privilege assertion.  And they

13     could go to the Court and seek clarification as to the

14     applicability of the privilege.  They could obtain a legally

15     effective warrant.  There could be lit --

16                 THE COURT:  So it's your position --

17                 MR. WADE:  There could be litigation.

18                 THE COURT:  -- that communication from Mr. Adams'

19     counsel to the government articulating that they believe

20     that they have privilege with respect to the Apollo e-mails

21     was enough to render subsequent conduct unreasonable,

22     regardless of whether ultimately that privilege is found to

23     exist or not?

24                 MR. WADE:  Yes.

25                 THE COURT:  Okay.

```
 1              MR. WADE:  Yes.

 2              THE COURT:  Okay.  I'm not saying I agree with you

 3     but okay, I understand your argument.

 4              MR. WADE:  And I think the very existence of the

 5     taint protocol and the subject of the motion to compel and

 6     the DOJ policy on this informs that, that the investigative

 7     team doesn't get to just look at the documents and make its

 8     own legal judgment as to whether there's privilege.  In

 9     fact, if there's an assertion of a privilege under -- under

10     the ethics laws of the state of Minnesota, and I believe in

11     virtually every jurisdiction in the country, the -- you're

12     supposed to stop and you're supposed to not review privilege

13     that you reasonably believed to be privileged.

14              THE COURT:  But what if they, no disrespect

15     intended, but what if the government team believes that the

16     assertion of privilege is utterly without merit from go?

17              MR. WADE:  Then --

18              THE COURT:  Do they still have to engage in this

19     process before they engage in the review, that's your

20     position?

21              MR. WADE:  Without question.  It's not my

22     position; it's the policy of the United States Department of

23     Justice.

24              THE COURT:  And is it -- does it have bearing on

25     the Fourth Amendment reasonableness as opposed to --
```

1              MR. WADE:  Yeah.

2              THE COURT:  -- the privilege question?

3              MR. WADE:  Well, it does.  I will say there's very

4    little law on this because very rarely are search warrants

5    of this kind executed by an investigative team.  I haven't

6    looked specifically at this issue.  As I sit here, I'm not

7    aware any of case where an investigative team has ever

8    executed a warrant on a lawyer's files, ever.

9              THE COURT:  To put it conversely, I'm not aware of

10   any case where conduct with respect to privilege informs the

11   reasonableness of the execution of the search warrant.  It

12   informs the reasonableness of the admissibility of the

13   evidence, perhaps the taint of the prosecution team, but I

14   can't find any cases that stand for the idea that that

15   calculus gets imported into the reasonableness of the

16   execution of the Fourth Amendment.

17             MR. WADE:  I would -- Your Honor, it's virtually

18   unprecedented because it just doesn't -- it just doesn't

19   come up --

20             THE COURT:  Okay.

21             MR. WADE:  -- in practice and in the law, but, you

22   know, respectfully, the government can't seize documents

23   that are privileged, no matter what privilege it is.

24   There's no difference between whether they're subject or

25   target.  As Your Honor well knows based on your own

1    experience, subjects and targets are ebb and flow in cases

2    all the time.

3           THE COURT:  But as you well know, there's

4    countless times where there's an assertion of privilege

5    that's found not to carry water, right, and you're

6    suggesting that the assertion, the hint, the invocation of

7    the term privilege, not with respect to the communications

8    with Mr. Hopeman which cause me major concern, I'm talking

9    about with respect to the -- Mr. Adams' own communications

10   to his clients, let's imagine a scenario where hype -- and I

11   don't mean at all that this is what is happening, but just

12   to clean up the hypothetical, let's imagine a scenario where

13   a guy claims that his communications with his lawyer are

14   privileged and his lawyer is a well-known jailhouse lawyer

15   whose never been to law school and the person's new defense

16   counsel asserts with affidavits and everything else that

17   these communications are subject to the attorney-client

18   privilege, that the -- that the government should have hit

19   pause and gotten some clarification around that but everyone

20   knows that that claim of privilege doesn't hold water, in

21   your estimation, they should have done that nonetheless?

22   They're not allowed to do any gatekeeping based on their

23   knowledge of waiver, on their knowledge of other things that

24   render it not privileged?

25          MR. WADE:  The government has the right to

1    challenge that privilege assertion, and it always has the

2    right to challenge a privilege assertion, and in my

3    experience often does it, including during a grand jury

4    space, you can go to a grand jury judge and you can

5    challenge an assertion of the privilege, and that has

6    happened in cases that I've been involved in, and there are

7    many other cases, grand jury cases, where that happens, but

8    they can't make their own judgment as to whether or not

9    they --

10              THE COURT:  So in my example, even if it's

11   facially laughable, and I'm not suggesting that this is

12   facially laughable, they still can't do it?

13              MR. WADE:  If there's no lawyer, I suppose maybe.

14   If there -- but if they -- if they claim the person is a

15   lawyer and -- and they say that we had privileged

16   communications and they meet sort of the -- the basics,

17   like, privilege log level elements of asserting a privilege,

18   the government at that point doesn't get the ability to just

19   say, well, we don't agree with you so we're going to plow

20   forward.  In fact, the ethics laws prohibit it.

21              THE COURT:  But the part where you admit that

22   we're on the frontier is the importation of that thought,

23   which is interesting, into a Fourth Amendment reasonableness

24   interpretation.

25              MR. WADE:  In this case, because an investigative

1      team reviewed lawyer's files, yes, but in this case, the

2      warrant did not authorize them to seize privileged

3      documents.

4              THE COURT:  Okay.  We'll look more at this.  Let's

5      continue.  Thank you.

6              MR. WADE:  I forgot exactly where I was so I --

7              THE COURT:  The last thing I wrote down is that

8      she didn't see privileged documents during her review of the

9      Relatively database so she doesn't recall seeing

10     communications between Mr. Adams and employees of the Apollo

11     companies.

12     BY MR. WADE:

13     Q.  Is that correct?

14     A.  Correct.

15     Q.  Okay.  And if you had seen those communications, would

16     you have followed your standard practice?

17     A.  I probably would.

18     Q.  Okay.  The indicia that we talked about that would alert

19     you based on your training at the FBI to the fact that

20     something is privileged, if something said privileged on it,

21     would that be a general indicia that the document could be

22     subject to a claim of privilege?

23     A.  It could be.

24     Q.  And if it said work product on it, would that be indicia

25     that the document could be protected by a privilege?

1    A.  That could be as well.

2    Q.  If an attorney's name was on the document, could that be

3    indicia of the fact that the document is subject to a claim

4    of privilege?

5    A.  It could be but not always.

6    Q.  There are instances in -- if you immediately looked and

7    saw an attorney communicating with President Trump and you

8    had no reason to believe that attorney was representing

9    President Trump, that wouldn't be an example of an indicia

10   of privilege?

11   A.  Right.

12   Q.  But if there was -- if there were communications between

13   a lawyer and someone relating to events where you were

14   uncertain, that could be an indicia of privilege?

15   A.  It could be.

16   Q.  And in this case, you knew Mr. Adams was a lawyer,

17   right?

18   A.  Yes.

19   Q.  And that that was part of his business?

20   A.  Correct.

21   Q.  And that he used his -- we talked about his Yahoo e-mail

22   account and some questions were asked about that e-mail

23   account?

24   A.  Yes.

25   Q.  Do you recall that?  You described that as a personal

1   account?

2   A.   That was my understanding, yes.

3   Q.   Okay.  But he conducted business in that account,

4   correct?

5   A.   Possibly, yes.

6   Q.   Well, did you get a copy of the warrant in this case?

7   A.   Yes.

8   Q.   And did you get a copy of the warrant affidavit?

9   A.   Yes, I did.

10  Q.   Okay.  And you're aware that it sets forth that the

11  reason that you have probable cause to seize, in your view,

12  Mr. Adams' Yahoo e-mail is because he conducted business in

13  that account?

14  A.   He's got -- I mean, he's got his lawyer business, he's

15  got other business dealings too, so there could be both in

16  there.

17  Q.   All those business things could be in his account,

18  right?

19  A.   Correct.

20  Q.   And that's why you have the ability to -- that's why you

21  wanted the information, right?

22  A.   Right.

23  Q.   You weren't investigating his personal life, were you?

24  A.   No.

25  Q.   You weren't investigating, you know, intimate personal

1    aspects of his life?

2    A.  No.

3    Q.  You were investigating his business?

4    A.  Correct.

5    Q.  And part of his business was being a lawyer?

6    A.  Yes.

7    Q.  Including for the companies at issue in this case,

8    correct?

9    A.  Correct.

10   Q.  There were some testimony you offered about the use of

11   the taint team, and I think you were shown Khan-1, and

12   that's in front of you?

13   A.  Yes.

14   Q.  That's a thin document that's out of the big binder, so

15   let's use that, but I'll note for the record, that's also a

16   Defense Exhibit 13.  This e-mail is sent from Mr. Maria, at

17   the top of DX-13, is sent on March 18th of 2016, correct?

18   A.  Correct.

19   Q.  And if I may approach the board.  That's approximately a

20   month and a half before the documents had been filtered down

21   to remove the privileged materials, right?

22   A.  Correct.

23   Q.  In fact, March 18 was just a week or two after the

24   government, maybe 11 days I guess it is, after the

25   government obtained the Yahoo e-mails, correct?

1     A.  Yes.

2     Q.  And you were still developing the privilege terms during

3     this time period, correct?

4     A.  As I recall, yes.

5     Q.  They hadn't been applied yet?

6     A.  Right.

7     Q.  Okay.  Let's look at the second paragraph of this e-mail

8     which -- I'm sorry, the third paragraph of this e-mail,

9     starting with once.  Do you see that paragraph?

10    A.  Yes.

11    Q.  Okay.  And do you recall, the sum and substance of this

12    e-mail is essentially repeated in your declaration as well.

13    Do you recall that?

14    A.  Yes.

15    Q.  With respect to the taint team issue?

16    A.  Correct.

17    Q.  And this talks about how you were working on developing

18    a list of search terms to winnow out those materials,

19    correct?

20    A.  Correct.

21    Q.  And it says that if you run those search terms and

22    there's a -- there's a manageable number of documents, the

23    taint team would just go ahead and review them, correct?

24    A.  Correct.

25    Q.  But it said if you ran those search terms and there was

1    a big group of documents, you would have to pause, right?

2    A.  Yes.

3    Q.  And it says you would then back up and do a relevance

4    filtering over that group of documents to try to winnow in

5    on the materials that were covered by the investigation,

6    correct?

7    A.  Correct.

8    Q.  And by relevance terms, what you mean there are terms

9    that are designed to identify materials covered by the

10   warrant?

11            MR. MACLAUGHLIN:  Your Honor, object to the

12   questions asserting what you mean.  This is a document

13   written by AUSA Maria, not the witness.

14            THE COURT:  You can ask if she is aware of what

15   was intended by relevance terms.

16   BY MR. WADE:

17   Q.  What did you understand relevance terms to mean in

18   connection with Mr. Maria's discussion of employing a taint

19   team?

20   A.  That the relevant to our investigation and what falls in

21   the scope of the warrant.

22   Q.  Okay.  So if it was relevant to the investigation and

23   within the scope of the warrant, that the goal was to try to

24   find terms that would limit that big group of privilege

25   documents and pare it down to that subset of documents,

```
 1    right?

 2    A.  Right.

 3    Q.  Okay.  Were you ever shown the search terms that were

 4    used in this case?

 5    A.  Not that I recall.

 6    Q.  Could you go to DX-14?  Do you have that?

 7    A.  I do.

 8    Q.  This is an e-mail.  You didn't receive this e-mail,

 9    correct?

10    A.  I did not.

11    Q.  At least you're not on it?

12    A.  Right.

13    Q.  You don't recall anyone printing a copy of this and

14    handing it to you, do you?

15    A.  No.

16    Q.  Do you recall whether you had any meetings on or about

17    April 14th to discuss any list of privilege terms?

18    A.  There may have been some meetings.  I don't remember

19    when they were.

20    Q.  But you don't recall specifically reviewing a draft list

21    of terms?

22    A.  No.

23    Q.  Okay.  Let's -- let's go to the second page.  You see

24    that's a draft list of terms?

25    A.  I do.
```

Khan - Cross

1    Q.  You see that?  That was being proposed.  Do you know

2    whether this list of terms was ever run across the database?

3    A.  I don't know.

4    Q.  Okay.  This is the kind of list of potentially

5    privileged terms that AUSA Maria was talking about in the

6    third paragraph of DX-13, correct?

7    A.  I don't know.  I -- I can assume, but I don't know for

8    sure if he was referring to this list or another list.  I

9    just don't know.

10   Q.  Okay.  Do you know how many documents --

11              MR. WADE:  May I approach the --

12              THE COURT:  Yes, you may.

13              MR. WADE: -- board?

14   BY MR. WADE:

15   Q.  Counsel for the government has focussed a lot on this

16   33,161 e-mails, right, on the -- that were filtered out for

17   privilege, correct?

18   A.  Yes.

19   Q.  And then another 1,500 that were filtered out subsequent

20   to that, correct?

21   A.  Yes.

22   Q.  For a total of 37,000, according to counsel's math,

23   which I'm not going to take off my shoes here so we'll just

24   have to trust that, okay?

25   A.  Okay.

1    Q.  All right.  So there's no discussion between lines 1 and

2    lines 2 of this chalk of the number of terms that hit on the

3    initial list of potentially privileged search terms, is

4    there?

5    A.  No.

6    Q.  And you don't know that document -- that number, do you?

7    A.  I do not.

8    Q.  The list of search terms here, have you ever prepared a

9    list or been involved in a case where you've prepared search

10   terms?

11   A.  I have not.

12   Q.  Okay.  Do these seem like a -- does this seem like a

13   reasonable set of terms to you?

14           MR. MACLAUGHLIN:  Objection.  Calls for a legal

15   conclusion.

16           THE COURT:  And it doesn't sound like she's

17   involved in the preparation of these terms, so I'm not sure,

18   let's move on.

19           MR. WADE:  Okay.

20           THE COURT:  I should just say sustained, but I

21   talk too much.

22   BY MR. WADE:

23   Q.  Do you know, I may have asked this, I apologize if I

24   did, do you know whether relevance terms were ever applied

25   to an initial list of privilege terms to filter those down

```
 1      to the materials that were relevant and covered by the
 2      warrant?
 3      A.  I don't.
 4      Q.  Did this seem like a reasonable approach to you?
 5                MR. MACLAUGHLIN:  The same objection.
 6                THE COURT:  Sustained.
 7                MR. WADE:  She's on the e-mail and executing the
 8      warrant.
 9                THE COURT:  Did what seem like a reasonable
10      approach?  We're still talking about the document that she
11      didn't see?
12                MR. WADE:  No, no, no, I'm sorry, turning back to
13      Defense Exhibit 13.
14                THE COURT:  Okay.
15                MR. WADE:  If I, just to clarify, and I may still
16      get an objection.
17      BY MR. WADE:
18      Q.  The third paragraph there that's described, did that
19      seem like a reasonable approach to you?
20                THE COURT:  Overruled.  She may answer.
21                THE WITNESS:  To apply search terms, it did seem
22      reasonable, yes.
23      BY MR. WADE:
24      Q.  The general approach that's outlined by AUSA Maria, did
25      that seem reasonable to you?
```

```
 1    A.  Yes.

 2    Q.  A taint team was never used in this case, correct?

 3    A.  Correct.

 4    Q.  If I can turn your attention to Khan Exhibit 2.

 5    A.  Okay.

 6    Q.  This is the list of searches that database records

 7    suggest that you ran on the database?

 8    A.  Correct.

 9    Q.  And does that seem consistent with your recollection?

10    A.  It does.

11    Q.  And there's some ambiguity about the May dates and

12    access dates, but it appears that your searched the database

13    for the first time on May 5th of 2016, correct?

14    A.  That's what it says, yes.

15    Q.  And it appears that you searched the database for the

16    last time on October 31st, 2016, correct?

17    A.  Correct.

18    Q.  Do you know when you last accessed the database?

19    A.  It was a long time ago.  I don't know the exact date.

20    Q.  Have you accessed the database since April 7th of 2017?

21    A.  No.

22    Q.  And the e-mails that we -- or I'm sorry, the searches

23    that are reflected in Khan-2, there were various word

24    searches related to Sandy Ward, correct?

25    A.  Correct.
```

1    Q.  And were you preparing for an interview of Ms. Ward at

2    the time that you were doing these searches?

3    A.  Yes, we were.

4    Q.  Do you recall what date that interview occurred?

5    A.  I do not.

6    Q.  And Ms. Ward was an employee of Mr. Adams' law firm,

7    correct?

8    A.  I knew she was an employee of Mr. Adams.  I didn't -- I

9    don't know if I knew exactly what business or company she

10   worked for.

11   Q.  Did you participate in the interview of her?

12   A.  I did.

13   Q.  Did you ask her?

14   A.  I don't -- I don't recall.

15           MR. MACLAUGHLIN:  Object on relevance grounds.

16           THE COURT:  Overruled.

17           MR. WADE:  I'll be -- that's my last question on

18   that.

19   BY MR. WADE:

20   Q.  And when you -- just as an example here, it looks like

21   you started searching for Sandy Ward on May 5th, 2016, at

22   2:07 p.m., correct?

23   A.  Correct.

24   Q.  And there are searches for documents relating to

25   Ms. Ward at least through 3:19 p.m., correct?

1          MR. MACLAUGHLIN:  Your Honor, objection.  This

2    witness does not know the Relativity intricacies that gave

3    rise to this particular exhibit.  That's Mark Zeitz.

4          MR. WADE:  Okay.

5          THE COURT:  She can testify to what she thinks the

6    document reflects, with the understanding that the agent who

7    actually prepared the document probably knows better.  I'm

8    not sure we need her to read what the document says.

9          MR. WADE:  I was trying to get to a high level

10   summary but I was also just trying to give an example.

11   BY MR. WADE:

12   Q.  The database records here reflect approximately an hour

13   and 12 minutes, or thereabouts, of searching within the date

14   base.  Do you see that they reflect that?

15   A.  That's what the document shows, yes.

16   Q.  Okay.  And is that generally consistent with the

17   recollection of the amount of time you spent searching for

18   Sandy Ward documents in May?

19   A.  Possibly.

20   Q.  You don't --

21   A.  It was awhile -- it could be.

22   Q.  You don't believe you spent five days doing it?

23   A.  No.  No.

24   Q.  And when you -- as you were reviewing documents and

25   executing search warrants, would -- executing searches,

1    would documents pop up in response to those search terms?

2    A.  Sometimes, yeah, if it hit on a search term, they would

3    pop up.

4    Q.  And then would you go through and view the documents

5    that came up?

6    A.  Yes.

7    Q.  And if a document was not relevant, would you just click

8    to the next document?

9    A.  Yes.

10   Q.  And if it was relevant, what would you do?

11   A.  If I found it relevant, then I most likely would have

12   printed it out.

13   Q.  Okay.  And the documents that you found to be not

14   relevant, did you tag those documents?

15   A.  No.

16   Q.  Did you make a record of those documents?

17   A.  No, not that I recall.

18   Q.  Did you do anything to track which documents were not

19   relevant?

20   A.  No.

21   Q.  Did you do anything to remove documents that were not

22   relevant from the database?

23   A.  I would have no way of knowing how to do that so no.

24   Q.  Okay.  Did you have any discussions with anyone about

25   doing that?

Khan - Cross

1    A.  No.  I don't want to tamper, so to speak, you know, with

2    the evidence that we have there.  I wouldn't want to remove

3    or delete or destroy anything.  I would just move on.

4    Q.  I understand, ma'am, that you didn't want to delete

5    anything or do anything.  My question is, did you have any

6    discussions with anyone on the investigation team about how

7    to deal with irrelevant evidence?

8    A.  Not that I recall.

9    Q.  Did you receive any instructions about how to execute

10   the search warrant, apart from the privilege cautions that

11   you previously testified to?

12   A.  I don't recall any specific instructions, no.

13   Q.  Were you given any sort of protocol in terms of how you

14   should memorialize what you were doing or track what you

15   were doing?

16   A.  Not that I recall, no.

17   Q.  Did you keep a log of the various materials that you

18   reviewed?

19   A.  No.

20   Q.  Were you given any sort of specific allocation of

21   documents to review by the prosecutors in the case?

22   A.  As in a certain set of documents or?

23   Q.  Yeah.

24   A.  No, we were just looking for documents that were

25   relevant to our investigation and covered by the warrant.

1       That's what we were doing.

2       Q.   But you weren't allocated a certain amount to say you

3       cover this amount of documents, another investigator will

4       cover a different set of documents?

5       A.   At first we kind of discussed that strategy, you know,

6       when I was given the thumb drive but then when we did the

7       searches we didn't do that, no.

8       Q.   Okay.  So at first you discussed the idea that you just

9       split up the documents, go through, figure out what's

10      relevant and what's not relevant?

11      A.   I'm not sure what you mean.  I mean, I was going to

12      review, like, for instance, e-mails one through 50,000 or

13      whatever, you know, and Inspector Kroells would review the

14      next chunk.  That's initially what we had talked about

15      doing, but then we did do the keyword searches, and then

16      after that we just kind of all reviewed as a whole the

17      database to figure out what fit into our investigation and

18      what was relevant and figure out what was privileged and

19      not.

20      Q.   Okay.  So you initially -- let me see if I could just

21      summarize a couple of the key points there.  You initially

22      had discussions about breaking up different sectors of the

23      database among the various investigators in the case?

24      A.   Right.

25      Q.   But then you abandoned that?

1    A.  Yes.

2    Q.  And, instead, people were just given the ability to do

3    keyword searches throughout the entire database?

4    A.  Or search however they deemed best for their purposes,

5    yes.

6    Q.  There were no restrictions, in other words, put on what

7    you could and couldn't search for, apart from the privilege

8    issues you previously discussed?

9    A.  Right.  We just had to be cognizant of the privilege

10   issues of what we were searching, yep.

11   Q.  If you --

12              THE COURT:  Mr. Ward, can I interrupt for a

13   second?  How much longer do you think you have in this

14   cross?

15              MR. WADE:  I'm always terrible answering these

16   type questions, Your Honor, I will make that confession to

17   the Court.  Half an hour.

18              THE COURT:  We are going to take a break.  Is

19   right now okay?  I know I just abruptly interrupted a theme.

20              MR. WADE:  If I could ask maybe three or four more

21   questions, I think I could -- I could complete my

22   questioning with respect to Khan Exhibit 2.

23              THE COURT:  Great.  Thank you.

24              MR. WADE:  Okay.

25              THE COURT:  And at that point I think we're going

```
1     to take a break, everybody can take a break, a restroom

2     break, and we'll also handle the petty calendar.  We

3     probably won't reconvene until 10:30 once we break, so but

4     go ahead with your questions.

5               MR. WADE:  Is it okay if we leave everything at

6     counsel table?

7               THE COURT:  Absolutely.  Absolutely.  And I'll

8     make sure that we don't have people messing with your stuff.

9               MR. WADE:  Thank you, Your Honor.

10              THE COURT:  If you would clear the podium, though.

11              MR. WADE:  Absolutely, Your Honor.

12              THE COURT:  Thank you.

13    BY MR. WADE:

14    Q.  The -- if you turn a couple of pages deeper into Khan

15    Exhibit 2, which isn't paginated but I think it's about four

16    pages in, do you see at the bottom the reference is to Josh

17    Reilly?

18    A.  I do.

19    Q.  And did you search for Josh Reilly documents because you

20    were preparing for an interview of Mr. Reilly?

21    A.  Yes.

22    Q.  And are you aware that Josh Reilly worked with

23    Mr. Monahan?

24    A.  I believe he --

25    Q.  I'm sorry, Mr. Adams?
```

1    A.  Yes.

2    Q.  And Mr. Monahan?

3    A.  Yes.

4    Q.  And that, in fact, he worked at the Adams Monahan firm?

5    A.  Again, I don't know if I know exactly what entity he

6    worked for, but I knew he worked for Mr. Monahan and

7    Mr. Adams.

8    Q.  So you don't know whether he worked for the Adams

9    Monahan firm?

10   A.  I know he worked for Mr. Adams, I don't -- I don't

11   recall at this time if I knew if specifically for the law

12   firm or not.

13   Q.  And, again, the record will speak for itself with

14   respect to the amount of time, but at different points on

15   Halloween of 2016 you were reviewing for Josh Reilly

16   documents, correct?

17   A.  Correct.

18   Q.  Some in the morning and then again later in the

19   afternoon?

20   A.  Yes.

21   Q.  And as you reviewed -- as you searched for Josh Reilly

22   documents, again, I take it documents came up in response to

23   your searches?

24   A.  Correct.

25   Q.  And you -- you viewed those documents, correct?

```
1    A.  Some.  I don't know if I reviewed all of them, but I

2    would have reviewed documents that popped up.

3                MR. WADE:  I am done with Khan-2, Your Honor, and

4    I think this would be a good time for the break we

5    discussed.

6                THE COURT:  Great.  Anything we should talk about

7    before we part about logistics or anything?  Okay.

8                MR. MACLAUGHLIN:  No, Your Honor.

9                THE COURT:  We will go in to recess.  We'll

10   reconvene around 10:30 depending on how the petty offense

11   calendar does.

12        (Recess taken from 10:06 a.m. until 10:41 a.m.)

13               THE COURT:  Okay.  We are good to go.  Thank you.

14               MR. WADE:  Do you want to announce that we're back

15   on the record or do you --

16               THE COURT:  We're back on the record.

17               MR. WADE:  All right.  Thank you.

18               THE COURT:  I note everybody that is essential is

19   present so.  All right.  You can proceed.

20               MR. WADE:  Thank you, Your Honor.

21   BY MR. WADE:

22   Q.  Special Agent Khan, I have one additional

23   document -- one additional question with respect to Khan-2.

24   A.  Okay.

25   Q.  And the portion that relates to Josh Reilly.  Do you
```

1      recall your prior testimony on that?

2      A.  Yes.

3      Q.  Are you aware that the government had in its possession

4      billing records from the Adams Monahan law firm?

5      A.  I believe I did know that.

6      Q.  Did you look at any of those billing records?

7      A.  I did not.

8      Q.  Did anyone ever summarize any of the substance or

9      timekeepers who appeared on those billing records to you?

10     A.  To me, no.

11     Q.  Ma'am, do you know when you got a copy of the warrant

12     that was signed by Judge Rau in this case?

13     A.  It was shortly after it was signed.  I -- I don't

14     remember the exact date.

15     Q.  How did you receive that?

16     A.  From Inspector Kroells.

17     Q.  Did she hand you a copy or e-mail you a copy?

18     A.  I believe it was e-mailed.

19     Q.  When did you join this investigation?

20     A.  At the very beginning.  I think we initially opened this

21     case probably in late 2014.

22     Q.  And did there become a point in 2016 where you became

23     less active or involved in the case?

24     A.  Yes.

25     Q.  Why was that, just generally?

1    A.  I had a lot of operational matters going on in other

2    investigations that took me away from this case for a time.

3    Q.  And is there a point in time in which you can pinpoint

4    when you sort of disengaged from the case?

5    A.  Probably around we had executed a series of search

6    warrants in other non-related matters at the end of 2015, so

7    from about that time until sometime in 2016 I was busy with

8    those matters.

9    Q.  And how extensive would you say your involvement was in

10   2016, about how much -- do you have any estimate for how

11   much investigative time you spent on the case?

12   A.  I know I was involved in a lot of interviews.  I don't

13   know how much time that took up because we did do quite a

14   few interviews during that timeframe, but that was mostly my

15   involvement was in conducting interviews.

16   Q.  Okay.  And in preparing 302s relating to those

17   interviews?

18   A.  Right.

19   Q.  Okay.  And were you involved in interviews that occurred

20   in the March 7th, 2016, to May 5th, 2016, time period?

21   A.  It's possible.  I don't -- I don't recall.

22   Q.  Do you recall any specific witnesses who you interview

23   during that window?

24   A.  I don't.  I'd have to review my case file to know if I

25   interviewed people at that time or not.

1    Q.   Okay.  Do you recall when Chris Mumm was interviewed?

2    A.   I do not recall a date.  I don't believe I was involved

3    in that interview.

4    Q.   Do you recall when Sandy Ward was interviewed?

5    A.   I do not.  It would have been sometime after I ran these

6    key search -- keyword searches.

7    Q.   Do you recall when J.R. Maddox was interviewed?

8    A.   I do not.

9    Q.   Do you know whether Mr. Sankovitz was interviewed, James

10   Sankovitz I believe it is?

11   A.   I don't know for sure.  I know there was talk about it,

12   but I don't know if he was, and if he was, I was not

13   involved in that interview.

14   Q.   Was Mr. Monahan interviewed?

15   A.   He was at some point.

16   Q.   Do you recall approximately the date on which he was

17   interviewed?

18   A.   I don't, but I think that was later on in the

19   investigation.

20   Q.   Let me ask you about a few documents.  Do you recall

21   being advised that Mr. Adams or his counsel were asserting

22   privilege with respect to Apollo and Scio communications in

23   the SCC investigation?

24   A.   I don't think I was aware of that.

25   Q.   Do you recall whether learning that Mr. Hopeman was

1    asserting privilege with respect to Apollo and Scio

2    privilege matters in this investigation?

3    A.  I don't recall that.

4    Q.  Do you recall learning that Mr. Adams was asserting

5    privilege with respect to communications that he had with

6    Mr. Brever, his tax counsel?

7    A.  No, I was not aware of that.

8    Q.  Do you recall learning that Mr. Adams was asserting

9    privilege with respect to communications involving an

10   accounting firm who -- that was employed by Mr. Adams' tax

11   counsel?

12   A.  No, I was not aware of that.

13   Q.  That was the Murry LLC law firm?  Does that help refresh

14   your recollection?

15   A.  I'm -- I'm not familiar with that name, no.

16   Q.  Okay.  Let me show you a couple of documents quickly and

17   just see if it refreshes your recollection.

18   A.  Okay.

19   Q.  Okay?  Let's start with 49.

20               MR. WADE:  Court's indulgence for one moment.

21               THE COURT:  Yeah.

22   BY MR. WADE:

23   Q.  While I'm looking for a document, let me jump to a

24   different one.  Can I bring your attention to Defense

25   Exhibit 67 which is a document in which Mr. Brever is

1    asserting privilege on behalf of Murry & Associate, LLC,

2    documents.  Do you recall that there was a grand jury

3    subpoena that was issued to Murry & Associates?

4    A.  I was not aware of that.

5    Q.  Okay.  Does this document, DX-67, help your refresh your

6    recollection that privileges were being asserted with

7    respect to documents relating to Murry & Associates?

8    A.  No, I was --

9          THE COURT:  I don't think that her testimony was

10   that she had no recollection, it was that she was unaware,

11   so I'm not sure you need to --

12   BY MR. WADE:

13   Q.  Okay, Does it refresh your recollection as to whether

14   you were aware that privileges were being asserted with

15   respect to Murry, LLC documents?

16   A.  It does not.

17   Q.  Okay.  Do you recall any instances -- do you recall

18   having any discussions or communications with anyone about

19   Murry, LLC --

20   A.  No.

21   Q.  -- materials?  Let's turn to Defense Exhibit 65.  This

22   is a document from Mr. Hopeman to Mr. Maria attaching a

23   privilege log.  Does this document help reflect -- refresh

24   your recollection as to whether you were aware that

25   privileges were being asserted by Mr. Adams with respect --

1              THE COURT:  Mr. Wade, she didn't testify that she

2      doesn't remember.  She testified that she wasn't aware.

3              MR. WADE:  Right.  And --

4              THE COURT:  So as far as I know, refreshing

5      recollection is limited to a case where somebody has

6      indicated that they don't have a recollection.  I think the

7      testimony is she wasn't aware.  If you want to clarify that,

8      that's fine, but no number of things --

9              MR. WADE:  Okay.

10             THE COURT:  -- that maybe could have made her

11     aware but of which she wasn't aware --

12             MR. WADE:  Fair point.  I may not have appreciated

13     the nuance that you're focussed on in that question.

14             THE COURT:  I'm just trying to help us.  These are

15     totally in evidence, I get their import, if she didn't know

16     about them, if that's her testimony, let's move on.

17     BY MR. WADE:

18     Q.  Is it your testimony you're comfortable that you never

19     became aware of the fact that those privileges were being

20     asserted?

21     A.  Correct.

22     Q.  Okay.  Did you read Mr. Adams' SCC depositions?

23     A.  I only skimmed over it very briefly.

24     Q.  Okay.  Do you recall seeing an assertion of privilege

25     within those depositions?

1     A.  I do not.

2     Q.  This document relating to Mr. Hopeman, in March of 2016,

3     about a week after you got the Yahoo thumb drive, there was

4     a meeting with Mr. Hopeman and Mr. Petrosinelli from my law

5     firm, was there not?

6     A.  And the U.S. Attorney's Office?

7     Q.  Yes.

8     A.  I believe so.

9     Q.  You participated in a meeting with those two gentlemen,

10    correct?

11    A.  Correct, with others present as well.

12    Q.  And you were aware at that time that they were

13    representing Mr. Adams in the investigation?

14    A.  Yes.

15    Q.  Do you recall when you became aware that Mr. Hopeman or

16    Mr. Petrosinelli were representing Mr. Adams?

17    A.  I do not recall a date, no.

18    Q.  But at least by the date that you met with them?

19    A.  Right.

20    Q.  And perhaps a few days earlier in connection with the

21    scheduling of the meeting that was to occur?

22    A.  That would be accurate.

23            MR. WADE:  Your Honor, I apologize if you consider

24    this question --

25            THE COURT:  We'll find out.

```
 1              MR. WADE:  -- asked and answered, but I want to
 2    make sure the record is clear on one specific point.
 3    BY MR. WADE:
 4    Q.  Do you recall ever being advised by AUSA Maria that
 5    Murry, LLC, documents could not be reviewed by the
 6    investigation team?
 7              THE COURT:  I'll allow it.
 8              THE WITNESS:  No.
 9    BY MR. WADE:
10    Q.  I think you testified on direct that civil -- you were
11    aware that Mr. Adams had civil lawyers who are representing
12    him in various related litigations?
13    A.  I knew he had -- I don't know if they were civil
14    lawyers, but I knew he had lawyers representing him in these
15    civil matters, yes.
16    Q.  There were variety of civil lawsuits that related to
17    Apollo and Scio issues that you were aware of, correct?
18    A.  Correct.
19    Q.  And you're aware he had counsel?
20    A.  Correct.
21    Q.  Do you know who those lawyers were?
22    A.  I do not.
23    Q.  Did you go through any effort to search dockets or --
24    search dockets to identify who those lawyers were?
25    A.  I went in to PACER to review those civil filings, but I
```

```
 1    don't recall if I knew or -- I definitely don't remember,

 2    you know, who his civil attorneys would have been, and I

 3    didn't specifically make efforts to learn who they were.

 4    Q.  Okay.  And when you went in to PACER to look at

 5    the -- at the docket, in PACER, in a docket report,

 6    counsel's name comes up at the very top of the docket

 7    report, correct?

 8    A.  It's possible.  I don't remember.  It's possible.

 9    Q.  Okay.  Do you recall taking any note of the lawyers who

10    were representing him to make sure that you didn't review

11    those documents?

12    A.  No.

13    Q.  And as you sit here today, would you be able to -- can

14    you identify the names of any of the lawyers who represented

15    Mr. Adams in those civil cases?

16    A.  I cannot, no.

17    Q.  None, none of them?

18    A.  Just Mr. Hopeman.

19    Q.  You're not aware of any other lawyers who represented

20    him in the civil cases?

21    A.  No, I don't recall their names.

22    Q.  Do you know the name Aaron Hartman?

23    A.  No.

24    Q.  Have you ever heard that name?

25    A.  I have not.
```

1    Q.  You're aware that at some point during this

2    investigation the government sought permission from DOJ tax

3    to prepare a -- to pursue tax charges?

4    A.  Yes.

5    Q.  And were you involved in the preparation of the

6    materials that sought such approval?

7    A.  I was not.

8    Q.  Who was responsible for that?

9    A.  I don't know.  I would guess that the AUSAs who were

10   involved and probably the IRS agent.

11   Q.  Do you recall when that happened?

12   A.  I do not know.

13   Q.  Back to the government's grease board, line item 4

14   refers to some documents that were removed from the database

15   on April 7th, 2017?

16   A.  Yes.

17   Q.  Were you aware at the time that that had happened?

18   A.  I was not.

19   Q.  You had been disengaged from the case at that point?

20   A.  I wouldn't say disengaged, but I was not involved in

21   looking at e-mails to any extent.

22   Q.  And so were you -- did you have any role in the

23   development of search terms that were used to perform that

24   culling?

25   A.  I was not.

1   Q.  Did you have any meetings to discuss those search terms?

2   A.  I was not involved in any meetings, no.

3   Q.  In any way?

4   A.  Correct, from that step No. 4, no.

5   Q.  I'm sorry, just so I'm clear, you weren't involved in

6   any way, meaning you didn't have any meetings, discussions,

7   e-mails, conversations about the development of the search

8   terms?

9   A.  For step No. 4, no.

10  Q.  And by step No. 4, you mean the culling that happened in

11  April of 2017, correct?

12  A.  Correct.

13  Q.  If we could go to DX-24.

14          THE COURT:  And I should just note that we are

15  going to have a very brief criminal hearing, supposed to be

16  at 11 but I don't see any lawyers here yet, so we might just

17  have to abruptly stop.  We're going to have an in custody

18  defendant, so I'll ask counsel and Mr. Adams to leave their

19  table, but literally five minutes.  I think it's not even

20  worth leaving the courtroom for.

21          MR. WADE:  Very well, Your Honor.  We're happy to

22  go up until that point.

23          THE COURT:  Okay.  That seems best.

24          MR. WADE:  And I'm almost finished so.

25          THE COURT:  Okay.  Thank you.

1    BY MR. WADE:

2    Q.  Do you have Exhibit 24 in front of you?

3    A.  I do.

4    Q.  And this is -- this is an e-mail that you're not on,

5    correct?

6    A.  That's correct.

7    Q.  And I take it you were never printed -- this e-mail was

8    never printed and shared with you, correct?

9    A.  Correct.  I have never seen it before.

10   Q.  Okay.  And setting aside the e-mail, you never were

11   given a set of search terms that resembles this set for your

12   review and consideration, were you?

13   A.  No.

14   Q.  I'd like to go through some of the terms, okay?

15   A.  Okay.

16   Q.  And I'd like to focus on the period in May of 2016 at

17   the time that you obtained access --

18              THE COURT:  Hit pause.

19              MR. MACLAUGHLIN:  Yeah, so object, lack of

20   foundation.  The document is in, it speaks for itself, and

21   she's not seen it.

22              MR. WADE:  Okay.

23              THE COURT:  I think he's going to try to get her

24   knowledge about the significance of the individual terms

25   regardless of how they are so that I have a record about

```
1    them, no?
2                MR. WADE:  Yeah, it happens --
3                THE COURT:  Okay.  Overruled.
4                MR. WADE:  It happens to be they're in here so
5    it's just efficient to have the words in front of us, but
6    you don't have to look at the document.
7                THE COURT:  I assumed that's where you were going.
8    As long as we stay there, it's overruled.
9                MR. WADE:  Okay.
10   BY MR. WADE:
11   Q.  Okay.  So focussing on your time when you got access to
12   the Yahoo database, okay?
13   A.  Okay.
14   Q.  In May of 2016.  Do you believe that -- at that time did
15   you know what Apollo was?
16   A.  Yes.
17   Q.  At that time did you know what the significance of
18   diamond?
19   A.  Yes.
20   Q.  Okay.  That -- the technology at issue related to
21   diamond technology, correct?
22   A.  Correct.
23   Q.  At that time did you know what ADI was?
24   A.  Yes.
25   Q.  Okay.  What was it?
```

1    A.  Apollo Diamond, Inc.

2    Q.  At that time did you know what ADGC was?

3    A.  Yes.

4    Q.  And what does that stand for?

5    A.  That's for Apollo Diamond Gemstone.

6    Q.  And I take it then you know what the next word, the

7    significance of the next term, you knew that in April of

8    2016, the significance of gemstone?

9    A.  Yes.

10   Q.  And did you know what DL was?

11   A.  Yes.

12   Q.  And that's DL Investments?

13   A.  Correct.

14   Q.  And did you know what RL was in May of 2016?

15   A.  Yes.

16   Q.  That was RL Investments?

17   A.  Correct.

18   Q.  And did you know what ADR was in May of 2016?

19   A.  Yes.

20   Q.  That was ADR Investments?

21   A.  Correct.

22   Q.  And did you know what RBE was?

23   A.  I don't believe so.

24   Q.  Do you know what that is today?

25   A.  No.

1    Q.  Do you know what ESA was?

2    A.  Yes.

3    Q.  Those are Mr. Adams' initials, correct?

4    A.  Correct.

5    Q.  They also are -- he used his initials in a consulting

6    firm he had?

7    A.  I believe so, yes.

8    Q.  I believe you testified that was a legal expert

9    consulting firm?

10   A.  Right.

11   Q.  And you were aware of that in May of 2016?

12   A.  Yes.

13   Q.  And you were aware of MRM in May of 2016?

14   A.  Yes.

15   Q.  And those are Mr. Monahan's initials?

16   A.  That's correct.

17   Q.  And he had a -- some sort of entity that bore his

18   initials as well, correct?

19   A.  Correct.

20   Q.  You are aware in May of 2016 what Scio was?

21   A.  Yes.

22   Q.  You were aware of in 2016 what SDTC was?

23   A.  I don't recall that, no.

24   Q.  Are you familiar with the company name Scio Diamond

25   Technology Company?

1   A.  Okay, yep.

2   Q.  That's Scio, right?

3   A.  Right.

4   Q.  And you knew what Scio was at that time?

5   A.  Correct.

6   Q.  And Crossbow, you knew what that was at that time?

7   A.  Yes.

8   Q.  The Linareses, you knew who they were at that time

9   period?

10  A.  Yes, I did.

11  Q.  Okay.  I take it you don't know the entire Linares

12  family tree, right?

13  A.  Not the entire, no.

14  Q.  Okay.  But you were aware in May of 2016 that there were

15  several members of the Linares family who were involved in

16  the Apollo business?

17  A.  Yes.

18  Q.  Okay.  You were aware, Lancia, did you know what that

19  term, the -- who -- what that term was in May of 2016?

20  A.  I believe so, yes.

21  Q.  Okay.  And did you -- and what is Lance I can't?

22  A.  Joe Lancia was involved with Scio, I believe.

23  Q.  He was an executive in Scio?

24  A.  Yep.

25  Q.  And you knew that in May of 2016?

```
 1    A.  I believe so.

 2    Q.  And Zipkin, did you know that term in May of 2016?

 3    A.  I believe so.

 4    Q.  And what does that term refer to?

 5    A.  To Jill and Larry Zipkin.

 6    Q.  Okay.  You knew who those individuals were in May of

 7    2016?

 8    A.  I believe so.

 9    Q.  Okay.  And Nichols, do you know what that term refers

10    to?

11    A.  Charlie Nichols.

12    Q.  And who is Charlie Nichols?

13    A.  He was involved with I believe Scio as well.

14    Q.  Okay.  And you knew that in May of 2016?

15    A.  I believe so.

16    Q.  Lisa L.

17    A.  That is most likely Lisa Linares.

18    Q.  Okay.  And you knew Lisa Linares was one of the Linares

19    family members who was involved with this case as of -- you

20    knew that as of May of 2016, correct?

21    A.  I believe so, yep.

22    Q.  Mack, do you know -- were you -- oh, I'm sorry, I

23    skipped one.  MLA, Inc., do you know that is?

24    A.  I believe so.  That does sound familiar, yes.

25    Q.  Okay.  Was that -- was that a Linares entity that was
```

1    discussed in the affidavit?

2    A.  I believe so, yes.

3    Q.  Okay.  And you were aware of that in May of 2016?

4    A.  Yes.

5    Q.  Mack, what does that refer to?

6    A.  To Mack and Rapello.

7    Q.  And Rapello is the next name there?

8    A.  Yep.

9    Q.  Those two, what do those terms refer to?

10   A.  They were involved, let's see if I can test my memory

11   here, they were involved in the companies, I believe perhaps

12   some fund-raising.  It has been a long time since I've

13   thought of them, but I do recognize those names.

14   Q.  And you knew that in May of 2016?

15   A.  Yep.

16   Q.  And Platt, what does that refer to?

17   A.  I'll have to test my memory again, but that is a

18   familiar name as well.

19   Q.  It was a person who was involved with the Scio entities?

20   A.  To the best of my recollection.

21   Q.  And do you believe you probably knew that in -- when you

22   were more involved in the case in May --

23   A.  More than likely, yes.

24   Q.  -- of 2016?  The answer was more than likely?  We talked

25   over each other.  I just want to make sure for the benefit

1   of our court reporter.  Did you say that --

2   A.  More than likely.

3   Q.  -- more than likely you knew that?  Okay.  Robb, do you

4   know what that refers to?

5   A.  That's also familiar.  I don't, at this moment, recall

6   what that refers to, but it is familiar.

7   Q.  Okay.  And were -- you don't recall what that refers to?

8   A.  No.

9           MR. WADE:  The Court's indulgence for one second.

10      (The defendant conferred with his attorney.)

11  BY MR. WADE:

12  Q.  Would the fact that Mr. Robb, if I represented to you

13  that Mr. Robb was involved in the Scio and Crossbow

14  transactions, would that help refresh your recollection as

15  to who he was?

16  A.  That sounds familiar, but I can't say for sure.

17  Q.  Okay.  So that one you're not sure if you knew about in

18  May of 2016?

19  A.  Correct.

20  Q.  Okay.  Larson, do you know what Larson refers to?

21  A.  I do not.

22  Q.  Okay.  McMahon, do you know what McMahon refers to?

23  A.  That is familiar.  I'm -- again, at this time I don't

24  recall why.

25  Q.  Okay.  Bern, do you know Bern refers to?

1    A.  Bern McPheely, he was involved in Scio to some extent.

2    Q.  He was an executive at Scio?

3    A.  I believe so.

4    Q.  And you knew that in May of 2016?

5    A.  Probably.

6    Q.  And these few that you didn't recall, I believe it was

7    Robb, Larson, and McMahon, if they were involved with the

8    Scio transactions at the time you were working on the case,

9    were you pretty familiar -- in May of 2016, were you pretty

10   familiar with those transactions?

11   A.  I would have been, yeah, at that time.

12          MR. WADE:  The Court's indulgence for just a

13   second.

14       (Counsel conferred.)

15          MR. WADE:  We have no further questions at this

16   time, Your Honor.

17          THE COURT:  Thank you.  Mr. MacLaughlin.  It's not

18   until 11:30 so thank you.  You can continue.

19          MR. MACLAUGHLIN:  Thank you.  I don't actually

20   have very much, so this should be maybe five, ten minutes.

21                    **REDIRECT EXAMINATION**

22   BY MR. MACLAUGHLIN:

23   Q.  Greetings, Special Agent Khan.

24   A.  Hello.

25   Q.  All right.  Let's start with something that you got

Khan - Redirect

1    asked early in your cross.  At the U.S. Attorney's Office on

2    the sixth floor of this building, we have evidence rooms,

3    right?

4    A.  That's correct.

5    Q.  Have you ever heard of the Lake of the Woods room?

6    A.  Yes.

7    Q.  The Big Stone Task Force room?

8    A.  Yes.

9    Q.  The Ottertail room?

10   A.  Yes.

11   Q.  We have a lot of rooms down there where evidence is

12   stored, right?

13   A.  That's correct.

14   Q.  And, in fact, in your experience, when a trial is

15   upcoming, where are trial exhibits that are going to be

16   admitted, where are they actually stored?

17   A.  They're kept in the task force rooms.

18   Q.  Okay.  And assistant U.S. attorneys have access to those

19   rooms?

20   A.  They do.

21   Q.  There's no rule that says an agent has to be there when

22   an AUSA goes in there, right?

23   A.  Correct.

24   Q.  And, in fact, AUSAs routinely have evidence in their

25   offices.  Is that your experience?

1    A.  That is my experience.

2    Q.  Okay.  That's my first area of inquiry.  My second area

3    of inquiry, let's go back to this, since we just got done

4    with it, DX-24.

5    A.  Okay.

6    Q.  So there's a series of search terms here in this e-mail

7    dated February 28th, 2017, that you were just asked a bunch

8    of questions about, right?

9    A.  Correct.

10   Q.  And the thrust of Mr. Wade's questions was didn't you

11   already know this stuff in May of 2016.  Do you remember

12   that?

13   A.  I do.

14   Q.  I want to focus on something else.  Correct me if I'm

15   wrong, but what I heard in your testimony is that every one

16   of these terms is somehow rooted in this case.

17   A.  Correct.

18   Q.  Are there any of the search terms here that, given your

19   experience in the case, shouldn't be here, aren't properly

20   calculated to lead to relevant evidence?

21   A.  These all seem to be proper.

22   Q.  Okay.

23           MR. WADE:  Your Honor, I move to strike that.  I

24   just think it calls for the conclusion of the type that we

25   have talked about, and she didn't develop the term.

1          THE COURT:  Overruled because the horse is out of

2     the paddock or but I understand your objection.

3          MR. MACLAUGHLIN:  Okay.  Paddock.

4          THE COURT:  I was trying to come up with a folksy

5     term to explain it's too late but that's what I came up

6     with.

7          MR. WADE:  I think horse is out of the barn is an

8     acceptable.

9          THE COURT:  Out of the barn.  Strike the paddock.

10    BY MR. MACLAUGHLIN:

11    Q.  Final area of questioning and then I'm done.  I think

12    you testified on cross that it was not your practice in this

13    case to locate irrelevant materials and then flag them as

14    irrelevant.  Is that right?

15    A.  That's correct.

16    Q.  Okay.  You had very little involvement in this search

17    warrant but which I'll talk about last, I guess I've got one

18    more thing to ask you about, but in general, what was the

19    procedure?

20    A.  Once the sorting of the, you know, privileged documents

21    was --

22    Q.  Well, let me ask a better question.

23    A.  Okay.

24    Q.  I'm sorry to talk over you.

25          MR. WADE:  If we could just let the witness finish

1     the question --

2              THE COURT:  Yeah, let's let her finish the

3     question and then we can clarify if necessary.  Thank you.

4              MR. WADE:  Maybe it could be read back.

5              THE WITNESS:  Once that process was complete and

6     we were given access to these e-mails through Relativity and

7     we went into Relativity to look for e-mails that were

8     relevant to our search, bearing in mind that we still had to

9     pay attention for anything that could be deemed privileged.

10    BY MR. MACLAUGHLIN:

11    Q.  Okay.  So that actually was responsive my question, I'm

12    sorry to interrupt you.  So if I'm hearing you correctly,

13    the prosecution team's approach was to find relevant

14    documents?

15    A.  Yes.

16             MR. WADE:  Objection, Your Honor.  She can only

17    speak to her approach, I believe.

18             THE COURT:  Overruled.

19    BY MR. MACLAUGHLIN:

20    Q.  Not necessarily to just go to narrow the world down by

21    finding irrelevant documents and tagging them?

22    A.  Right.

23    Q.  As irrelevant?

24    A.  Correct.

25    Q.  Okay.  Finally, and maybe I missed the bleeding obvious

Khan - Redirect

1    before with respect to Khan-2, you went into the database on

2    May 5th of 2016?

3    A.  Correct.

4    Q.  You didn't go back into the database until October 31 of

5    2016?

6    A.  That's correct.

7    Q.  And those are the only two days that you went into that

8    database?

9    A.  That I can recall.

10            MR. MACLAUGHLIN:  Okay.  May I have a moment?

11        (Counsel conferred.)

12            MR. MACLAUGHLIN:  I've got nothing else, Your

13   Honor.

14            THE COURT:  Anything in redirect -- recross,

15   Mr. Wade?

16            MR. WADE:  Court's indulgence for one moment.

17            THE COURT:  You know, I have a couple of

18   questions.  Why don't I ask them, and then if they open the

19   door, I'll let everyone go again.

20                        **EXAMINATION**

21   BY THE COURT:

22   Q.  Are you aware of whether the e-mails that you accessed

23   during your searches, some of which may be printed?

24   A.  Yes.

25   Q.  Ended up in the 42,927 that were the subject of the

1    final culling?

2    A.  That I do not know.

3    Q.  Okay.  Was the entire investigation focussed on the

4    Yahoo -- or these e-mails between March and -- of 2016 and

5    April of 2017 or were there other aspects going on in the

6    investigation?

7    A.  We had a lot of different aspects in the investigation.

8    Q.  Like what?

9    A.  We had bank records that were being reviewed and

10   scheduled out, we had access to documents that the SCC had

11   turned over to us so we were going through those as well.  I

12   can't remember if we were doing interviews during that time

13   period, but that's something else that could potentially

14   have been going on during that timeframe, so we were looking

15   at a lot of different records and not just the e-mails.

16   Q.  Were you aware of whether there was a -- whether your

17   team had access to tax records that weren't through these

18   e-mails?

19   A.  That I don't know.

20           THE COURT:  Okay.  Those are my only questions.

21   Did you have either questions of your own or any questions

22   in response to the questions I raised?  Mr. Wade.

23           MR. WADE:  I have no further other questions, Your

24   Honor.

25           THE COURT:  I knew you could do it.  It looked

```
 1    like it was difficult.  But Mr. MacLaughlin, any further
 2    questions in response to my questions?
 3               MR. MACLAUGHLIN:  Yes.
 4               THE COURT:  Now that might cause Mr. Wade to
 5    reconsider his.
 6               MR. MACLAUGHLIN:  Well, that's fine.
 7               MR. WADE:  I'm trying, Your Honor.
 8                    FURTHER REDIRECT EXAMINATION
 9    BY MR. MACLAUGHLIN:
10    Q.  I fought to just sit there, but I didn't win the battle,
11    because now these questions are in the paddock.  So all
12    right, so this case is about a lot more than just these
13    e-mails, right?
14    A.  That's correct.
15    Q.  You've been the case agent on this case since the
16    beginning, that was your testimony on cross and on direct,
17    right?
18    A.  Correct.
19    Q.  During that entire period of time when you have been on
20    this case, you went into this database precisely twice?
21    A.  Right.
22    Q.  On two different days?
23    A.  Correct.
24    Q.  Okay.  Now, this case involves many grand jury
25    subpoenas, does it not?
```

 1    A.  It does.

 2    Q.  A lot of bank records?

 3    A.  Yes.

 4    Q.  Okay.  Can you give the judge a sense of the volume of

 5    bank records that this case encompass?

 6    A.  There's hundreds of subpoenas that we sent out for bank

 7    accounts.

 8    Q.  Okay.  We have many -- quite a few entities, right?

 9    A.  Yes.

10    Q.  Lots of bank accounts?

11    A.  Yes.

12    Q.  Okay.  Just on the face of the indictment there are a

13    lot of bank accounts, right?

14             THE COURT:  Go ahead and answer.

15             THE WITNESS:  Yes.

16             MR. WADE:  Your Honor, I know you opened the barn

17    door here.

18             THE COURT:  I did.

19             MR. WADE:  But I don't really see the relevance of

20    this whole line of questioning, unless we're going to expand

21    the scope of the hearing.  I'm going to have a hard time

22    limiting my inquiry --

23             THE COURT:  I think we can move on.  I had my own

24    curiosity that might or might not be relevant.  I'm not

25    going to explain it to you all because I'm concerned that

1    that's just going to lead to your uncallus curiosities as

2    well.  Mr. MacLaughlin, I think that we've all established

3    that this was a wide ranging and extensive investigation and

4    this was only one part of it.

5             MR. MACLAUGHLIN:  Okay.  Thank you.

6             THE COURT:  Okay.  Mr. Wade, in light of that,

7    anything else you need to ask?

8             MR. WADE:  No, Your Honor.  Thank you.

9             THE COURT:  Okay.  Thank you.  Thank you.  You can

10   step down.

11            Why don't we go ahead and not waste time and start

12   with our next witness, if we could, and we'll hit pause in

13   probably less than ten minutes for very briefly.

14            MS. PERZEL:  Your Honor, the United States calls

15   Mark Zeitz.

16            THE COURT:  Okay.

17         (The witness is sworn.)

18            THE COURT:  Please sit down and state your full

19   name and spell your last name for the record.

20            THE WITNESS:  It's Mark Allan Zeitz.  And my last

21   name is spelled Z-E-I-T-Z.

22            THE COURT:  All right.  Let's proceed.

23            MS. PERZEL:  Thank you, Your Honor.

24            ///

25            ///

1                          **DIRECT EXAMINATION**

2     BY MS. PERZEL:

3     Q.  Mr. Zeitz, you started in our office, the United States

4     Attorney's Office in Minnesota, back in April of 2006.  Is

5     that correct?

6     A.  That's correct.

7     Q.  You were originally in an IT capacity, information

8     technology?

9     A.  Yes.

10    Q.  And ultimately you moved into an automated litigation

11    support capacity, right?

12    A.  Yes.  When I started in IT, it was an IT and lit support

13    team together.

14    Q.  All right.  So in totality in our office you've been

15    involved in automated litigation support since 2006.  Is

16    that correct?

17    A.  That's correct.

18    Q.  And you've risen to the ranks of being a supervisor now

19    of the automated litigation support staff.  Is that correct?

20    A.  That's correct.

21    Q.  How many folks do you currently supervise?

22    A.  I supervise four different people.

23    Q.  Does that include Dan Czapko?

24    A.  It does.

25    Q.  Now, but before you were a supervisor there was sort of

Zeitz - Direct

```
1     a de facto supervisory arrangement.  Is that right?

2     A.  Yes.

3     Q.  Can you just briefly tell us about that?

4     A.  Oh, I was the most experienced person in the section so

5     I -- everyone would come to me with questions, I would, you

6     know, frequently hand out assignments, I would handle the

7     largest cases, I still do handle the largest and most

8     complex cases in the office.

9     Q.  All right.  So let's talk for a minute about ALS for

10    short, automated litigation support.  Can you tell us just

11    in general what that involves?

12    A.  So we are looking to make the documents accessible and

13    reviewable and then presentable in court.

14    Q.  I want to talk to you about whether or not your role

15    involves any kind of investigative activity?

16    A.  No, it does not.

17    Q.  Okay.  So you're not involved in the marshaling and

18    gathering and culling through of evidence for purposes of

19    making a case, say, for example against Mr. Adams?

20    A.  No.  We may assist investigators with techniques to use

21    the technology, but we're not involved in those kinds of

22    things.

23    Q.  At any point do you ever, in having access to items of

24    evidence, pull something out and say, prosecutor, AUSA,

25    here's something that's significant?
```

Zeitz - Direct

1    A.  No.

2    Q.  You're purely a technical person?

3    A.  Yes.

4    Q.  Is that true for the other members of the ALS staff?

5    A.  Yes.

6    Q.  Let's talk for a minute about your training and

7    experience.  You have a number of -- a combination, I should

8    say, of specialized and on on-the-job training in ALS.  Is

9    that correct?

10   A.  That is correct.

11   Q.  And you also have a degree in telecommunications,

12   multimedia, and applied computing?

13   A.  That is correct.

14   Q.  You, as I understand it, in addition to having the

15   specialized experience, conduct a lot of training on behalf

16   of the Department of Justice.  Is that right?

17   A.  That is correct.

18   Q.  And you do so nationally at the National Advocacy Center

19   in South Carolina?

20   A.  That is correct.  In March I'll be a trainer for the

21   first processing training that's coming up.

22   Q.  You've, from your experience on the job, developed

23   expertise in many aspects of ALS, I wouldn't say all,

24   perhaps, but many aspects.  Is that fair?

25   A.  It's ever changing so yes.

Zeitz - Direct

1    Q.  And that expertise has been recognized nationwide.  Is

2    that right?

3    A.  Yes.

4    Q.  As a result of that recognition, have you worked on

5    working groups related to how the department is going to

6    operate in terms of e-discovery at the national level?

7    A.  Yes.  I've worked on working groups to develop

8    templates.  You know, we have a lot of districts, 92

9    districts, where they're doing the same thing, so we're

10   trying to basically generate templates so that everybody's

11   kind of working off the same thing and not re-creating the

12   wheel.

13   Q.  And just so we're clear, that working group and the

14   development of templates was not related to taint review

15   process, correct?

16   A.  Oh, no.  No.

17   Q.  Okay.  And in context of further your expertise, you

18   were also involved in the government's procurement or the

19   department's procurement of a $5 million application for the

20   purpose of reviewing evidence, correct?

21   A.  Yes.  Yes, we procured Nuix which is processing software

22   where we process documents, e-mails, other different file

23   types to put into the review tool.

24   Q.  And that application was accepted by the Department at

25   your suggestion?

 1    A.  It was.

 2    Q.  Okay.  Let's turn to your case work.  You have been

 3    involved in thousands of cases on the ALS level.  Is that

 4    right?

 5    A.  I have.

 6    Q.  When we talk about being involved in cases, you don't

 7    soup to nuts handle a particular case, so say Tracy Perzel

 8    is a defendant, had a case, would you handle my case soup to

 9    nuts as the ALS person?

10    A.  No.

11    Q.  How does it work?

12    A.  We currently have an e-mail box, and it's an ALS e-mail

13    box that agents and other AUSAs, support staff can e-mail,

14    and then we will just kind of determine who has time to

15    handle the request, but anybody can handle requests from any

16    case.

17    Q.  Depending upon the case needs, is it true that you could

18    become involved as early as the investigative stage in terms

19    of helping process and put into reviewable form documents or

20    other materials or as late as trial when somebody's actually

21    looking to present material at trial?

22    A.  Yes, that is true.

23    Q.  In addition to that type of involvement in case work,

24    you also troubleshoot.  Is that fair?

25    A.  I do.

1    Q.  Agents, AUSAs come to you with questions if they didn't

2    get enough out of the training that they maybe got before?

3    A.  Yes.  Absolutely.

4    Q.  Okay.  And as we've said before, nothing to do with the

5    investigative function?

6    A.  Nothing at all.

7    Q.  Anything to do like a paralegal would?

8    A.  No.

9    Q.  Well, and let me ask the question, hold on.  You're

10   familiar with our paralegals in the office, right?

11   A.  Oh, yes.

12   Q.  And you're familiar with the fact that often their

13   involvement in cases involves reviewing evidence, maybe

14   going through boxes obtained pursuant to search warrants and

15   trying to identify whether there's something in there that

16   could be relevant to the case?

17   A.  Yes, reviewing and tagging.

18   Q.  Do you have anything to do with, other than from a

19   technical putting information in reviewable form, do you

20   have anything to do with marshaling that evidence in support

21   of a prosecution?

22   A.  No.

23   Q.  I want to talk to you about Relatively.  What is it?

24   A.  Relativity is a web-based document review tool which

25   means you have to access it using like Internet Explorer or

Zeitz - Direct

1    Google Chrome.  It allows us to review and search a
2    incredibly large amount of documents.  It is housed in
3    South Carolina, in Columbia, at the Litigation Technology
4    Service Center.  We do have in house document review tools,
5    but when they are -- when we come across cases that are too
6    large, then we need to send them down to South Carolina for
7    hosting.
8    Q.  All right.  So let's talk for a couple of minutes about
9    your use of Relativity.  You've used it for about the past
10   six years?
11   A.  Yes.
12   Q.  Is that right?
13   A.  Yes.
14   Q.  And is it fair to say that you've done so in
15   approximately 30 cases, that is, used Relatively?
16   A.  Yes.
17   Q.  All right.  You talked about data storage down in
18   South Carolina.  How does that affect our ability to effect
19   actions on that data once that data is down in
20   South Carolina?
21   A.  It's a slow process.  You know, we're -- we end up
22   becoming project managers to cases where we get a request
23   from the attorney and then we have to relay that request to
24   the LTSC and then they have to implement that request.
25   Q.  Now, at some point very late in this case, and I mean

1    late relative to when ultimately materials are disclosed,

2    you obtained some access to be able to do division into

3    folders of some of the materials?

4    A.  Yes.

5    Q.  Is that correct?

6    A.  Yes, that's correct.

7    Q.  Did you have that during the totality of the time that

8    things were going on here?

9    A.  No.

10   Q.  And as a result of that, were much of the directions and

11   actions that were taken on the database effected through

12   South Carolina, the LTSC?

13   A.  Yes, that is correct.

14   Q.  I want to talk for a minute about the functionality of

15   Relatively.  Could you tell us a little bit about that?

16   A.  Sure.  Is there a specific area of the functionality

17   you're looking to get in to?

18   Q.  What's the primary purpose of Relativity?

19   A.  Just document review.  You want to view images of the

20   documents, you can view the natives of the documents, you

21   can look at the extracted text, we can set up different

22   views so you can see different metadata, e-mail, to, from,

23   date sent, subject, that kind of material.

24   Q.  I want to talk for a minute about Dan Czapko.

25   A.  Sure.

1    Q.  Mr. Czapko moved to ALS in June of 2013.  Is that

2    correct?

3    A.  That is correct.

4    Q.  Would it be fair to say at that time he was a pretty

5    green ALS person?

6    A.  Yes.

7    Q.  All right.  You trained him and you continue to train

8    him?

9    A.  Yes.

10   Q.  Who does he come to for questions?

11   A.  He comes to me.

12   Q.  And how would you characterize whether or not Mr. Czapko

13   is still learning today?

14   A.  Oh, he is still learning today.

15   Q.  All right.  Prior to the Relatively project that was

16   created in connection with hosting Mr. Adams' e-mails, how

17   would you have described his expertise in Relativity?

18   A.  I'd say he had about an intermediate level knowledge.

19   There's kind of a base level knowledge for getting review

20   teams into Relatively.  They need to be able to do keyword

21   searches, they need to be able to tag documents, they're not

22   allowed to create tags themselves, they need to be able to

23   print documents, so you need to know how to explain those

24   basic functions to the case team.

25              THE COURT:  Okay.  We're going to hit pause right

1    now.  Sorry for the abrupt interruption.

2             MS. PERZEL:  That's all right.

3             THE COURT:  And you all are welcome to stay in the

4    courtroom or step outside.  It will probably take us a very

5    short amount of time.

6             (Recess taken from 11:27 a.m. until 11:40 a.m.)

7             THE COURT:  I am starting to get acutely anxious

8    about time, so if there is any way we can, I understand this

9    was the warm up, but focus less on his experience with

10   Relatively and get to what we need to know, and I might just

11   encourage everybody to try to really pare down to what we

12   need at this point.  Okay.  Let's roll.

13   BY MS. PERZEL:

14   Q.  Prior to the Relatively project being created, this

15   particular Relatively project, you were the one that was

16   working in Relativity for this case, correct?

17   A.  Yes.

18   Q.  You had done some Relatively project for the SCC?

19   A.  Yes, it was the SCC materials we received we put in a

20   different Relativity database.

21   Q.  And the reason for you not being involved in this

22   particular database is you were going on paternity leave,

23   correct?

24   A.  Yes.

25   Q.  All right.  And Mr. Czapko at that time, when you were

Zeitz - Direct

 1   out, still learning Relativity, fair to say?

 2   A.  Yes.  Yes, absolutely.

 3   Q.  All right.  Let's turn to the Edward Adams II database

 4   which is the Relativity database at issue here.  Is that

 5   right?

 6   A.  Yes.

 7   Q.  Are you familiar with it?

 8   A.  Yes, I am.

 9   Q.  And, in fact, have you reviewed various items in

10   preparation for your testimony today?

11   A.  I have.

12   Q.  Does that include e-mails that have been sent to and

13   from the prosecution team and Mr. Czapko?

14   A.  Yes.

15   Q.  As well as e-mails in that context that may include law

16   enforcement?

17   A.  Yes.

18   Q.  Does it also include the Relativity activity log?

19   A.  Yes, it does.

20   Q.  What is that?

21   A.  So Relativity keeps a very, very detailed history of all

22   actions that are occurring in the database, whether you're

23   viewing documents, whether you're doing keyword searching,

24   whether you're printing documents, anything of that nature

25   it tracks.

1    Q.  Was Mr. Czapko aware of that functionality?

2    A.  He was aware that it had some functionality.  I don't

3    think he was aware that the extent.

4    Q.  And Mr. Czapko communicated the functionality to the

5    team?

6    A.  No.

7    Q.  Okay.  So in addition to reviewing those items, have you

8    also reviewed the footprint of the database and the various

9    folders as the database was being reduced by filtering?

10   A.  Yes.

11   Q.  And I shouldn't say database, but as the items being

12   made available to the prosecution team were being reduced by

13   filtered?

14   A.  Yes, in Relativity you create a secure folder in which

15   the prosecution does not have access to it, that's why it's

16   so beneficial because we don't have to -- in our other

17   review tool we have to delete the documents out of the

18   review tool and then put it in a completely entirely

19   separate database.  There's a secure folder that they don't

20   even see.

21   Q.  And there can be more than one secure folder, correct?

22   A.  Absolutely.

23   Q.  All right.  You had also reviewed I think the

24   defendant's motion to quash Mr. Maria's subpoena, correct?

25   A.  Yes.

1   Q.  You also talked to Dan Czapko regarding his process in

2   this case, correct?

3   A.  Yes.

4   Q.  And then you consulted with some Relativity experts to

5   confirm your understanding of certain Relativity back end

6   code.  Is that correct?

7   A.  That is correct.

8   Q.  And did that include the vendor of Relativity?

9   A.  It did.

10  Q.  All right.  So let's turn your attention to when this

11  information comes into our office and is going to be put

12  into a Relativity database.

13  A.  Sure.

14  Q.  Occurring on or about March 17th, 2016, going forward.

15  How does that process work?

16  A.  So we review the material we get in and we do like an

17  assessment of the volume of data that we have to determine

18  whether it's going to go to Relativity or stay in our office

19  in our review tool, and then after that initial assessment

20  we inform the attorney what we're -- what our plan is going

21  to be based on file types and size, and then we send down a

22  work plan to the LTSC stating what we would like done with

23  these documents, you know, do we want de-duplication done,

24  do we want things -- how we want them foldered, that kind of

25  information, and then we -- after they accept our work plan,

Zeitz - Direct

1    then we transmit those documents down to them.

2    Q.  Okay.  So we're going to try to condense on the work

3    plan discussion as we go through the various events that

4    happened in this case.  Suffice it to say that there's a lot

5    of documents that flow back and forth to establish what it

6    is we as an office want done and what we're asking them in

7    the LTSC to effectuate?

8    A.  That is correct.

9    Q.  Okay.  So on or about March 18th, 2016, basically the

10   first actions were taken in connection with trying to

11   establish this database.  Is that correct?

12   A.  That is correct.

13   Q.  I want to show you, and you have at your desk Zeitz

14   Exhibit 3, I believe it is.  Or 2, excuse me.  I'm sorry, 2.

15   Do you see that?

16   A.  Yes.

17   Q.  Okay.  So for ease of understanding, is the first page

18   basically a confirmation by the LTSC that they've received

19   our request to do something with information?

20   A.  Yes.

21   Q.  And that's captioned in the subject Edward Adams LTSC

22   Spec Sheet Received?

23   A.  Yes.

24   Q.  And that's dated March 18th, 2016?

25   A.  Yes.

Zeitz - Direct

1    Q.  Is the second page an e-mail from the LTSC indicating to

2    Mr. Czapko that a work order has been opened and the data

3    should be shipped?

4    A.  That is correct.  It's from one of the coordinators at

5    the LTSC.

6    Q.  Okay.  And then on Monday, March 21st, 2016, page 3 of

7    this document, is that indicating by Dan Czapko in e-mail

8    that the information has been uploaded to a shared drive for

9    purposes of the LTSC then downloading it?

10   A.  That is correct.

11   Q.  Okay.  Let's talk for a minute about how Mr. Czapko

12   actually got access to the data to make it available to the

13   LTSC.  Are you familiar with that?

14   A.  Yes.

15   Q.  Tell us about that.

16   A.  So AUSA Maria came down with the thumb drive and then

17   Dan Czapko copied it to his machine and then from his

18   machine he zipped up the files and then uploaded it up to

19   that share so the LTSC could download it.

20   Q.  Now, this isn't our first rodeo with the respect to

21   handling of items of evidence like this, correct?

22   A.  That is correct.

23   Q.  Did the AUSA remain present while that item was being

24   downloaded?

25   A.  Yes.

Zeitz - Direct

```
 1    Q.  All right.  So Mr. Czapko never took custody of the

 2    physical thumb drive himself?

 3    A.  No.

 4    Q.  All right.  So let's turn then once -- what happens when

 5    once the items are uploaded into the database?

 6    A.  After uploaded to Relativity or uploaded to the LTSC?

 7    Q.  Uploaded to the LTSC, thank you.

 8    A.  Okay.  The LTSC, they then process the material.  They

 9    have a couple of different various tools, one of them being

10    Nuix, the other one being eCapture, to process the materials

11    and then load them up into Relativity for us.

12    Q.  And that's the Relativity database that we've all been

13    referring to here?

14    A.  Yes.

15    Q.  When that original Relativity database was created, it

16    contained 146,522 documents.  Is that correct?

17    A.  That is correct.

18    Q.  And, in fact, you've gone through and prepared a summary

19    chart that reflects the distillation of items that were

20    available to the prosecution team, correct?

21    A.  That is correct.

22    Q.  Okay.  We can talk about that in a minute.  And actually

23    I'll start with it.  It's Zeitz-3.

24    A.  Okay.

25    Q.  Do you have that present?
```

1    A.  I do.

2    Q.  Okay.  So my documents a little bit too wide for our

3    sheet here, but that's all right.  On the left-hand column

4    are we seeing what is commonly referred to as a litigation

5    work plan number?

6    A.  That is correct.

7    Q.  Each litigation work plan reflects an action that we've

8    asked the LTSC to take on our behalf.  Is that right?

9    A.  That's correct.

10   Q.  And in the second column, does that indicate the dates

11   those work plans would have been submitted to the LTSC?

12   A.  That's correct.

13   Q.  Third column, does it talk about the days that that

14   event, that request that we've asked the LTSC to complete,

15   has, in fact, been completed?

16   A.  That's correct.

17   Q.  Does the fourth column summarize what we've asked?

18   A.  Yes.

19   Q.  And then going further, fifth and sixth columns, do

20   those reflect the distillation of information available to

21   the prosecution team?

22   A.  That's correct.

23   Q.  So when Mr. MacLaughlin, you've been here the whole

24   time, I almost said testified, was questioning witnesses and

25   he finally got down to the number of 42,927?

1    A.  That is --

2    Q.  Does that comport with your calculus of the distillation

3    of this database?

4    A.  That is correct.

5    Q.  Okay.

6    A.  Although that 3,700 number is, that's -- his math is

7    wrong.

8    Q.  Fair point.

9    A.  It has been bothering me.

10   Q.  We'll get there.  All right.  So once the data is housed

11   in Relativity at the LTSC, Mr. Czapko takes some preliminary

12   searching action at the direction of David Maria.  Is that

13   right?

14   A.  That is correct.

15   Q.  I want to make one thing clear.  Do you guys take any

16   searching action without direction from the prosecution

17   team?

18   A.  No, we do not.

19   Q.  Okay.  So let's look at Zeitz-4.  Page 1, is that an

20   e-mail from David Maria to John Kokkinen discussing initial

21   cut of a list of search terms to filter out potentially

22   privileged information?

23   A.  That is correct.

24   Q.  Okay.  And there is an attachment, you've got it up

25   there, correct, that contains a list of search terms?

Zeitz - Direct

1    A.  Yes.

2    Q.  Page 2, they're both general and specific terms,

3    correct?

4    A.  Correct.

5    Q.  If you go to page 3 and you look at page 3, does it have

6    Mr. Maria asking what people think about this, if everyone's

7    good, and here's how we can go forward, this will be an

8    ongoing process to review potentially privileged

9    information?

10   A.  Yes.

11   Q.  Or to review for basically potentially privileged

12   information?

13   A.  Yep.

14   Q.  Okay.  At some point Mr. Czapko, April 25th, 2016,

15   looking at page 4 of the exhibit, did Mr. Czapko run these

16   terms that were being proposed by Mr. Maria as part of the

17   preliminary searching to see what hits might come up in the

18   documents in the database?

19   A.  He did.

20   Q.  And that was to identify the potential number of hits,

21   correct?

22   A.  That's correct.

23   Q.  If we were to go to page 5, is that the document we see?

24   A.  That is correct.

25   Q.  Okay.  And then flipping to page 6 of the same document,

1    April 26th, 2016, an e-mail from Mr. Maria to Mr. Rank and

2    Mr. Kokkinen talking about the Adams' privilege taint

3    review.  Is that right?

4    A.  That's correct.

5    Q.  Okay.  And so Mr. Maria was sharing this information

6    with his co-counsel as well as Mr. Rank, correct?

7    A.  That's correct.

8    Q.  And then as we go down to the bottom, there's a

9    discussion down here about a potential process that could be

10   undertaken depending upon the size of the data that, you

11   know, is uncovered, correct?

12   A.  That's correct.

13   Q.  Let me ask you one thing out of the gate.  Does anybody

14   ever review what is contained in -- well, first of all, does

15   anybody ever review what's originally pulled out of the

16   database in the first round searching, 33,161 documents?

17   A.  No.

18   Q.  Okay.  Well, and I should say that in the context of the

19   database because, of course, Ms. Kroells had access to it,

20   you're not aware of that, but you know in the context of the

21   database nobody reviewed 33,161 documents?

22   A.  That's correct.

23   Q.  All right.  Just want to pull through these, and we're

24   not going to go through these work requests for each action,

25   but I want to pull through them here.  On April 27th, 2016,

1     is this basically the cover sheet that Mr. Czapko got back

2     when he requested certain searching to be conducted on the

3     database?

4     A.  That is correct.  It's the approval form that we get

5     from the LTSC to approve the actions that we've given to

6     them.

7     Q.  They're basically saying this is we understand your

8     actions -- the actions you want us to take to be, is it okay

9     if we take these actions?

10    A.  That's correct.

11    Q.  Do you approve?  And if we were to fast forward a bit

12    into the actual action on the page 8 of this exhibit talks

13    about a certain set of items being removed to the taint

14    review folder, correct?

15    A.  That's correct.

16    Q.  Actually four search terms, and then another set of

17    items being removed to the not for review folder.  Do you

18    see that?

19    A.  Yep.

20    Q.  And those items start with Anthony Ostlund, correct?

21    A.  Yes.

22    Q.  So the taint review folder, that was a folder that was

23    to be unavailable to the prosecution team but nonetheless

24    accessible to our ALS team in the U.S. Attorney's Office in

25    the District of Minnesota?

1    A.  That is correct.

2    Q.  The not for review folder was a folder to be accessible

3    only to staff at the LTSC.  Is that correct?

4    A.  That is correct.

5              THE COURT:  Can I clarify the taint review was

6    available to the tech team in the U.S. Attorney's Office?

7              THE WITNESS:  Yes.

8              THE COURT:  Not to the prosecution team?

9              THE WITNESS:  Not to prosecution team.

10             THE COURT:  The not for review folder wasn't

11   available to Minnesota at all?

12             THE WITNESS:  Not available to Minnesota at all.

13   That was David Maria's direction.

14             THE COURT:  Okay.  Thank you.

15   BY MS. PERZEL:

16   Q.  And just in terms of controlling access to the database,

17   if you wanted someone to have access to a particular folder,

18   would that request have been made through South Carolina?

19   A.  Yes.

20   Q.  There's additional pages to this work request, correct?

21   A.  Yes.

22   Q.  And then, finally, as we go to page 11, Zeitz-4, is this

23   an e-mail from Dan Czapko to David Maria on May 3rd

24   responding to Mr. Maria's question, "Does that mean that all

25   potentially privileged docs have been removed from the main

1    database?"

2    A.  That is correct.

3    Q.  And Mr. Czapko says, "Yes.  You will only have access to

4    that material.  There is a taint review folder that you

5    won't see that we can give the review team access to."

6    A.  That's correct.

7    Q.  The review --

8    A.  Yes, if there was a taint team, then they could get

9    access to it.

10   Q.  Okay.  I want to talk to you in a moment, if we could,

11   about the distillation process and perhaps for a minute

12   specifically some of these general terms that Mr. Maria had

13   originally looked at, if you can, on page 2, Zeitz

14   Exhibit 4.  Do you see those general terms?

15   A.  You said page 2?

16   Q.  Yes.

17   A.  Oh, I'm sorry.

18   Q.  No, that's all right.

19   A.  I do see the general terms.

20   Q.  Okay.  Would that have been reasonable to exclude from

21   the totality of the database, those general terms?

22   A.  I do not believe so.

23   Q.  Why not?

24   A.  Because disclaimers that are typically on people's

25   e-mails.

Zeitz - Direct

1           MS. MAIER:  Objection, Your Honor, lacks

2     foundation.  He's testified that he does not make judgments

3     about the substance of cases, that he is the IT person.

4     This is calling for a legal judgment.

5           MS. PERZEL:  He's not talking about the substance

6     of cases; he's talking about what's in e-mails.

7           THE COURT:  Sure, can you repeat the question?

8           MS. PERZEL:  Sure.  I don't think.  But I'll try.

9     BY MS. PERZEL:

10    Q.  Would that have been a reasonable --

11          THE COURT:  Take another stab at the question and

12    then I'll see.

13    BY MS. PERZEL:

14    Q.  Would it have been reasonable to pull out of the

15    database materials based on the general search terms?

16          THE COURT:  Sustained.

17    BY MS. PERZEL:

18    Q.  Let's talk about e-mails in general, Mr. Zeitz.  You've

19    had over your career probably access to millions of pages of

20    e-mails.  Is that correct?

21    A.  More -- tens of millions.

22    Q.  So in your review of millions of pages of e-mails, what

23    do you typically see on many e-mails?

24    A.  Disclaimers.

25    Q.  And what are disclaimers?

Zeitz - Direct

1    A.  Disclaimers are in the signature block that are on every

2    single e-mail and, you know, they contain lots of different

3    terms.

4              THE COURT:  Hit pause.

5              MS. MAIER:  Yeah, I have the same objection here.

6    He's testified that as the IT person he is not in the habit

7    of reviewing the documents for the substance, he's handling

8    the back end, tech side of the --

9              THE COURT:  Overruled.  I'll allow him to note how

10   frequently in his review of bazillions of e-mails he sees

11   disclaimers.  That doesn't mean that they are or aren't

12   privileged.  And let your colleague object.

13             MS. MAIER:  We would ask to be able to offer

14   expert testimony on this issue if Your Honor is going to

15   consider this testimony.

16             THE COURT:  We'll borrow for another day or

17   postpone for another day whether that's necessary.  He can

18   testify based on his own experience how often he sees the

19   disclaimer.  That doesn't mean that he is testifying as to

20   its weight.

21             MS. MAIER:  Your Honor, here we're talking about

22   the testimony of what he saw in this case, and these

23   documents and not the testimony, his experience on other

24   cases and --

25             THE COURT:  I understand.  Overruled.  You can

Zeitz - Direct

 1    continue.

 2    BY MS. PERZEL:

 3    Q.  Okay.  So we talked about your review of millions of

 4    e-mails and the fact that they often contain disclaimers.

 5    You don't know how many disclaimers this body of e-mails

 6    contained, fair?

 7    A.  Absolutely not.

 8    Q.  Okay.  But in your experience with regard to

 9    disclaimers, are there a number of e-mails that contain

10    disclaimers?

11    A.  Yes.

12    Q.  And do those disclaimers often contain words like

13    privilege?

14    A.  That is correct.

15    Q.  And do they often contain words like advice?

16    A.  Yes.

17    Q.  And work product?

18    A.  Yes.

19    Q.  And are they often perhaps --

20              THE COURT:  Object.

21              MS. PERZEL:  I'll move on Your Honor.

22              THE COURT:  He can't testify.

23              MS. PERZEL:  Thank you.  All right.

24              THE COURT:  I can't raise an objection myself, but

25    I will sustain the --

1          MS. MAIER:  Objection, Your Honor.

2          THE COURT:  -- not-yet-out-of-her-mouth objection

3     that goes beyond the conversation we had.  Continue.

4          MS. PERZEL:  You did tell us you might object, so

5     I appreciate that.

6     BY MS. PERZEL:

7     Q.  So Mr. Zeitz, let's just move on.  The distillation that

8     occurs, round 1, as we call it, first round filtering for

9     potential attorney-client privilege information, those

10    specific search terms, Zeitz-3, that's a substraction of

11    33,161 documents.  Is that right?

12    A.  That's correct.

13    Q.  Okay.  The action that you can see Mr. Czapko taking in

14    connection with that first round filtering, doing some

15    general term searching, then doing some specific term

16    searching, is that typical based on your experience and

17    training?

18    A.  Yes, it is.

19    Q.  Was there anything unusual about the way this was

20    handled from your experience and training?

21    A.  No.

22    Q.  Okay.  So let's move ahead then.  I want to talk to you

23    about the first view of documents, because the defense

24    raised Mr. Maria's first view of documents in its motion

25    to -- I believe it was motion to quash the motion -- I don't

1    know what motion it was, but they raised it.

2    A.  Yes.

3    Q.  That, in fact, he was searching around through documents

4    before the action was completed on May 3rd, 2016?

5    A.  That's correct.

6    Q.  Is that correct?

7    A.  That's correct.

8    Q.  No, no, I'm asking, was he searching around in

9    documents?

10   A.  Oh.

11   Q.  Before the filtering round 1 was conducted?

12   A.  No, he was not.

13   Q.  How do you know that?

14   A.  From his activity log.

15   Q.  Okay.  Tell me about the activity log.  What is it?

16   A.  So in the activity log it has detailed records as to

17   what people were doing, whether they were viewing documents,

18   printing documents, or generating searches, and his activity

19   log does not have any of that until the 4th.

20   Q.  All right.  And I have shared with you what it looks

21   like to me as Defense Exhibit 64.  Is that correct?  You

22   don't have it up there.  But I showed this to you, right?

23   A.  Yes, you did.

24   Q.  So Defense Exhibit 64 at the top says Pivot Table of All

25   Activity Deliverable 2017, many other words.  Is this

1    basically a summary of the activity log?

2    A.   That is correct.

3    Q.   Okay.  So our numbers, do they square with this that

4    there were 23,534 activities within the database?

5    A.   I didn't check the grand total, but I did look at

6    queries and views.

7    Q.   You checked this number, right, and you checked that

8    number and you checked that number?

9    A.   Yes.

10   Q.   Okay.  And they were on?

11   A.   Yes.

12   Q.   Do you have any reason to assume that their numbers are

13   otherwise incorrect?

14   A.   No, I don't.

15   Q.   Okay.  So they are referring to a term called document

16   query.  Are you familiar with that term?

17   A.   I am familiar with that term.

18   Q.   Okay.  Tell me about it.

19   A.   So document query is the term that Relativity uses in

20   the history when an action is generated, and it could be as

21   simple as opening up the database because it's returning

22   records to the grid.  By default, the default view in

23   Relativity is a thousand records are returned to the grid.

24   So those thousand records, just opening the database, like

25   opening a Excel spreadsheet, is considered to be a document

Zeitz - Direct

1    query.

2    Q.  Okay.  So let's talk for just a minute, okay.  I want to

3    talk about Relativity for a second.  I mean, this logging is

4    super robust.  Is that a fair way to describe it?

5    A.  It is.  It's a little excessive.

6    Q.  Okay.  When you opened Relativity, you talked about

7    seeing a grid view, correct?

8    A.  Yes.

9    Q.  Like an Excel spreadsheet.  Is that correct?

10   A.  Yes.

11   Q.  There's a number of columns containing information

12   related to the various documents that are in the database,

13   correct?

14   A.  That's correct.  Metadata fields.

15   Q.  And what it returns initially is a thousand documents

16   right?

17   A.  That is correct.

18   Q.  And a thousand documents meaning in that little Excel

19   spreadsheet format?

20   A.  That is correct.

21   Q.  In order to access a document, do you have to click on

22   the number related to the document and then physically

23   access it?

24   A.  Yes, you have to click on the -- what is called is the

25   control number.

1    Q.  Okay.  Is that the only way to physically access a

2    document in Relativity by clicking on the control number?

3    A.  Yes, it is.

4    Q.  Okay.  Whether you're in a search or whether you're just

5    in the original grid view, correct?

6    A.  That is correct.

7    Q.  So let's talk about this.  When you're in the original

8    grid view and you want to do a search, you can click to do a

9    search, correct?

10   A.  There's a drop down member for keyword searching or

11   dictionary searching.

12   Q.  Okay.  And you type in what you're searching for,

13   correct?

14   A.  That is correct.

15   Q.  And when you then hit enter or return, Relativity

16   returns a sub grid view, correct?

17   A.  That is correct.

18   Q.  Same thing, still a grid?

19   A.  Mm-hmm.

20   Q.  Yes or no?

21   A.  That is correct.

22   Q.  I only say that --

23   A.  Sorry.

24   Q.  -- for the benefit of the court reporter.

25   A.  Sorry.

Zeitz - Direct

1    Q.  Because she won't know huh-uh from mm-hmm.

2    A.  Okay.

3    Q.  All right.  So returns a sub grid view?

4    A.  That is correct.

5    Q.  So even if I'm searching, I still have no visual access

6    to a document, correct?

7    A.  You still have not viewed a document, that is correct.

8    Q.  Okay.  And so, again, in that sub grid view, I need to

9    click, physically click on the document ID number in order

10   to get to a view of the document?

11   A.  That is correct.

12   Q.  Will that give me a view of all pages of the document or

13   just the first page?

14   A.  It just shows the first page and then you can scroll

15   through the pages.

16   Q.  If I have conducted a word search, it could give me page

17   3 of a document, correct, because that's the only page where

18   that word may come up?

19   A.  Well, Relativity is a document-based system so it's

20   going to give you the first page of the document.

21   Q.  Okay.

22   A.  That's one of the disadvantages of using Relativity.

23   Q.  Okay.  Once I do that search, however I do my search,

24   whether it's with a number in it or whether it's with words

25   in it, and I access a document by physically clicking on

1    that document ID number, how I do get to another document?

2    A.  You can either go back to the grid of your search

3    results and then click on another document ID number or up

4    at the top you can click a button to go to the next search

5    result, the next document search result.

6    Q.  Okay.  When you look at this Relativity activity log --

7    and, by the way, we should clarify, it is in Zeitz

8    Exhibit 1, correct?

9    A.  That's correct.

10   Q.  Every single entry logged by Relativity is in this DVD,

11   correct?

12   A.  Yes.

13   Q.  And is that for both Mr. Czapko in one file and for the

14   prosecution team in a separate file?

15   A.  That is correct.

16   Q.  Okay.  Those logs and the entries within the logs, I

17   should say the entries within the logs only, some of those

18   may be duplicative, right?

19   A.  Absolutely.

20   Q.  Relativity occasionally will create multiple entries

21   that are identical for the same action?

22   A.  It's identical when you first look at it.  It's, at the

23   same time, it's pulling two separate actions to create that

24   view that you see on the screen.  So for document query, you

25   see typically two actions.  When you log in to the project

Zeitz - Direct

```
 1    or when you do anything, you'll see two document query
 2    actions.
 3    Q.  You'll see two document query actions on the Relativity
 4    activity log?
 5    A.  That's correct.
 6    Q.  So by Mr. Maria, let's go specifically to May 2nd, 2016.
 7    A.  Sure.
 8    Q.  You have reviewed that day, correct, in the Relativity
 9    activity log?
10    A.  I have.
11    Q.  In fact, you've spent quite a bit of time examining that
12    particular day, correct?
13    A.  Yes, I have.
14              THE COURT:  Do I have a physical document of this?
15              MS. PERZEL:  You do.  It is Zeitz-6.
16              THE COURT:  Zeitz-6.  Thank you.
17              MS. PERZEL:  Oh, I'm sorry.  Are you talking about
18    what's on the screen, Your Honor, or are you talking about
19    what we're talking about now?
20              THE COURT:  Mr. Maria's log that he is about to
21    explain.
22              MS. PERZEL:  Zeitz-6.
23              THE COURT:  Okay.
24              THE WITNESS:  I'm sorry about the text size.
25              MS. PERZEL:  That's all right.
```

1              Do you need another copy, Your Honor?

2              THE COURT:  Oh, no, I've got it.  I've got it.

3    BY MS. PERZEL:

4    Q.  All right.  So let's just take a look at this.  I

5    realize we're in mildly microscopic view here.  Let's see if

6    we can zoom in a little bit.  And we'll run through the

7    columns briefly.  Why don't you just run through the names

8    of the columns left to right, column one through the end.

9    A.  Sure.  So there's the name column.  The name column

10   specifically for this stuff is referring to for almost all

11   these actions it's referring to the grid layout that David

12   Maria was seeing at the time.  The action is right there.

13   The document query, it's just a high level general term

14   about what action is going on.  The object time is --

15   Q.  Can you pause for one second?

16   A.  Oh, sure.

17   Q.  That action, document query, is that specifically from

18   Relativity?

19   A.  That is from Relatively.

20   Q.  Okay.  And if we were to look at Defense Exhibit 71, is

21   document query on page 3 of Defense Exhibit 71 which is the

22   Relatively administrative guide?

23   A.  Do I have that up --

24   Q.  You don't but I can show you the face sheet.

25   A.  Yes.  Yes.

Zeitz - Direct

```
 1                    MR. WADE:  The binder.

 2                    THE COURT:  It might be up there.  It's 71.

 3                    THE WITNESS:  Okay.  Thank you.

 4     BY MS. PERZEL:

 5     Q.  Do you want to focus on that for a minute?

 6     A.  Yes.

 7     Q.  Okay.  So what the administrator guide says is for a

 8     document query, a query was run on a list of documents or a

 9     document query was canceled.  So what you're saying is that

10     when Relativity originally is opened to a particular

11     project, Relativity is going out to the document storage and

12     saying give me the first thousand documents to display in

13     the grid view?

14     A.  That is correct.

15     Q.  Okay.  And is that considered a document query?

16     A.  That's considered a document query but it's not viewing

17     any documents.

18     Q.  Right.  But it's going to show up in the Relativity

19     activity log as a document query?

20     A.  Absolutely.

21     Q.  All right.  Please continue.

22     A.  So the next column is the username, so which user, in

23     this case, David Maria, the timestamp, so the date and time

24     this action was performed.  You'll notice on the first two

25     actions it's the same date and time.  It's running two
```

1    actions so it can show you that grid view, and you'll see

2    that consistently down the line.  The details are the

3    details of what has occurred in the action.  And then my

4    notes column of what was -- what action was occurring, and

5    then I added in these -- the notes and searches column I

6    added myself.  The searches column is flagging whether it

7    was a search or not.

8    Q.  Okay.  For any of these items on Zeitz-6, are there any

9    searches here?

10   A.  No.

11   Q.  Are there what we would truly consider a document view,

12   I have clicked on a document identification number and I'm

13   trying to see a document actually in the database?

14   A.  There are no document views.

15   Q.  Was that any type of the action that happened on

16   May 6th, 2016, involving David Maria?

17   A.  No.

18            MS. MAIER:  Objection.  Just to clarify, I believe

19   you said May 6th.

20            MS. PERZEL:  Excuse me.  Thank you.  I appreciate

21   that.

22            THE COURT:  May 2nd.

23   BY MS. PERZEL:

24   Q.  May 2nd.

25   A.  Yes.

1    Q.  All right.  So if we were to try to differentiate

2    between what is a true document query like in layman

3    language versus code language.

4    A.  Mm-hmm.

5    Q.  Is there anything on here that's actually David Maria

6    trying to search for documents in the database?

7    A.  No.  There are no keyword searches in here.

8    Q.  What would you see if there were keyword searches?

9    A.  You -- if there were keyword searches, there would be

10   the fields that you would be searching, so in Relativity

11   there's lots of different fields, to, from, date, sent, like

12   I've talked about, they can be added to this index to be

13   searched or not, and you would see those fields and you

14   would also see something called a properties keywords field

15   in there and then there would be some quotation mark, it

16   goes double quote, single quote, and then the keyword that

17   you're going to be searching and then the end with the

18   single quote, double quote.

19   Q.  Okay.  And that's not in any of this?

20   A.  That's not in here at all.

21   Q.  Okay.  But that's not what happened that day?

22   A.  That is correct.

23   Q.  Okay.  What if I just clicked on a document ID number,

24   what would you see?

25   A.  You would see a document view action in there.

1    Q.   Okay.  And, of course, you know that we've redacted out

2    document identification numbers, right?

3    A.   That is correct.

4    Q.   But does that at all affect May 2nd, 2016?

5    A.   No, we only redacted things that were in the name

6    column, and those actions come out looking very different in

7    here.

8    Q.   Okay.  So you surmised these things based upon your

9    experience in Relativity, correct?

10   A.   That is correct.

11   Q.   Did you verify what you understand all of this back end

12   code to mean with experts at the Litigation Technology

13   Center as well as the vendor of Relativity?

14   A.   I did.  I contacted James Walle who is the operations

15   manager at the Litigation Technology Service Center.  He can

16   give a more in-depth view to what these actions actually

17   mean because it refers to different artifact IDs which are

18   unique to this project, so it, you know, I gave this code as

19   well to kCura who is the vendor, I sent this to them in an

20   e-mail when I was on a call with them.  They couldn't tell

21   me about which specific folders because they don't have

22   access to our project but James Walle does because he's the

23   operations manager at the service center so he was able to

24   verify what I knew about what was occurring.

25   Q.   Did any of your discussions with them change what you

Zeitz - Direct

1    believed had happened here?

2    A.  No.

3    Q.  Okay.  Were they consistent with what you believed

4    happened?

5    A.  Yes.

6    Q.  And is your description of what occurred in these

7    various coded languages contained in the final column on the

8    spreadsheet?

9    A.  It's -- well, the second to last column.  It's the Zeitz

10   notes.

11   Q.  Oh, I'm sorry, yes.  There's one more.  All right.  So

12   if we were to look at the first note entry opening of

13   Relatively database, no searches executed, no documents

14   viewed.

15   A.  That's correct.

16   Q.  I'm not going to go through all of these because the

17   judge can read them, but there's no searching for documents

18   on this day and there's no viewing of documents on this day,

19   correct?

20   A.  That is correct.

21   Q.  And I'm referring to David Maria, correct?

22   A.  Yes.

23   Q.  But also no viewing by other members of the prosecution

24   team on that day, correct?

25   A.  That is correct.

1    Q.  Okay.  Or searching?

2    A.  Or searching.  I don't even believe they had access by

3    that time.

4    Q.  Okay.  All right.  So let's take a minute here.  Okay.

5    Let's talk about second round filtering if we can.  At some

6    point it's called to the attention of Mr. Maria that there

7    may be other names in the database that need to be filtered

8    out, correct?

9    A.  That is correct.

10   Q.  And are you familiar with that?

11   A.  I am.

12   Q.  All right.  And let me see if I've got it readily

13   available.  Looking at Zeitz-7.

14   A.  Yes.

15   Q.  Do you have that in front of you?

16   A.  I do.

17   Q.  Okay.  Let me just zoom out here.  Okay.  So e-mail

18   from, going to the bottom, David Maria about running some

19   additional terms for purposes of filtering the database,

20   correct?

21   A.  That is correct.

22   Q.  Okay.  Now, this e-mail or this information came to

23   Mr. Maria at some point I believe mid to late May 2016.  Do

24   you understand that?

25   A.  I do understand that.

1    Q.  Okay.  And this filtering occurs on or about June 7th,

2    there's a series of actions that are taken we can talk about

3    that, correct?

4    A.  Yes, that's correct.

5    Q.  Okay.  So this e-mail talks about the terms down at the

6    bottom that need to be filtered out, correct?

7    A.  That is correct.

8    Q.  And Mr. Maria is asking to have anything that hits

9    segregated from the database and put into the database that

10   will not be reviewed?

11   A.  That is correct.

12   Q.  Okay.  And at the top, second e-mail -- excuse me, not

13   the top.  Middle e-mail, does Mr. Czapko reply at about

14   10:19 on the same day, June 7th, 2016?

15   A.  He does.

16   Q.  Okay.  And he talks about then a request being made to

17   LTSC to filter this?

18   A.  Yes.

19   Q.  And then there's just a brief response by Mr. Maria.  Is

20   that correct?

21   A.  That is correct.

22   Q.  Did you understand that this action, based upon the

23   review of all of the information that we discussed, had in

24   fact been undertaken?

25   A.  Yes.

Zeitz - Direct

1    Q.  All right.  And if we were to look at the filtering of

2    the database, second round filtering, Zeitz-3, we're talking

3    about litigation work plan two here, correct?

4    A.  Excuse me.  We are talking about --

5    Q.  We're talking about litigation work plan three to four,

6    correct?

7    A.  Three to four, yes.

8    Q.  Okay.  That's completed, there are a couple of work

9    plans associated with that, but it's completed respectively

10   with regard to those multiple work plans June 9th and 10th,

11   2016, correct?

12   A.  That is correct.

13   Q.  And for the exact numbers, I believe Mr. MacLaughlin was

14   right on this, 1,494 documents were taken out of the

15   database?

16   A.  He was correct on that.

17   Q.  And I should say taken out of the folder available for

18   the review of the prosecution team?

19   A.  And I believe even for Minnesota from that e-mail but

20   yes.

21   Q.  Okay.  So let's move ahead.  I want to talk about third

22   round filtering.  At some point it comes to Mr. Maria's

23   attention based on his review of documents that there may,

24   nonetheless, be an Adams Monahan e-mail that has gotten

25   through the first round filtering, correct?

1    A.  That is correct.

2    Q.  Because that first round filtering contained a request

3    for Adams Monahan, that term, with no space in the middle,

4    to be removed from the database, correct?

5    A.  That is correct.

6    Q.  Documents containing that term?

7    A.  Yes, documents containing the term Adams Monahan.

8    Q.  Okay.  And you've dug around to try to reconstruct what

9    happened with this.  Is that right?

10   A.  I did.

11   Q.  Okay.  I want you to pause for just a second before you

12   launch into that and I want to show you what is Zeitz-8.

13   Does that appear to be an e-mail, starting at the bottom

14   down here, trail, including an e-mail from October 17, 2016,

15   9:52 a.m., Mr. Maria stating, "I've noticed a few e-mails

16   that went to an associate at Adams Monahan law firm.  The

17   e-mail had a cmumm@AdamsMonahan.com"?

18   A.  Yes.

19   Q.  And Mr. Maria is further in that e-mail asking for

20   Mr. Czapko to figure out why the search didn't capture that?

21   A.  That is correct.

22   Q.  Okay.  And Mr. Czapko is asking about timeline for doing

23   this and things like that, correct?

24   A.  That's correct.

25   Q.  All right.  So does Mr. Czapko dig in to try to figure

Zeitz - Direct

1    out what's going on here?

2    A.  He does.

3    Q.  Fair to say he's kind of concerned that something went

4    wrong with the search?

5    A.  He is.

6    Q.  Okay.  So what does he do?

7    A.  So he takes the general search terms that were looked at

8    previously to remove quite a few documents from the database

9    and he pulls all of those to the secure folder.  After he's

10   done with that, he contacts the LTS -- well, he has the LTSC

11   do that operation.  After that operation, he has the LTSC

12   rebuild the index in the case because he's concerned that

13   the index may not be functioning appropriately because it

14   did not strip out these documents.

15   Q.  When we're talking about a index, I apologize for

16   interrupting you, but it's sort of like the index in a court

17   reporter's transcript, correct?

18   A.  It is.  So basically when you're running these searches,

19   it wants to run them very quickly so it makes a list of all

20   of the different words that are in the case and all of the

21   different pages, documents that they're on so it can bring

22   you to that document very quickly.

23   Q.  Okay.  So they do that.  Is there anything else they do?

24   A.  They do that, and then Dan asks them to bring everything

25   back except for anything with the Adams Monahan e-mail

1     address.

2     Q.  Okay.  So by this point, when you say bring everything

3     back, we're searching that distilled folder, right?

4     A.  Mm-hmm.

5     Q.  We're searching the folder that contains now 113,000 I

6     believe it's, I look at my sheet to make sure, 1 -- excuse

7     me, 11,867 documents?

8     A.  Yes.

9     Q.  And so by bring back, that's the search, third round

10    filtering was conducted on that set of materials, correct?

11    A.  Yes, it was.

12    Q.  Okay.  So the effort to figure out if Adams Monahan was

13    still in there was being done on that set of materials, not

14    on the full 146,522?

15    A.  That is correct.

16    Q.  Okay.  Just so we're not thinking we're bringing back

17    stuff that we already took out?

18    A.  No, and that is actually on the third round filtering,

19    on Zeitz-3, there's 105,185 documents that go to the secure

20    folder and then he says bring the documents back but make

21    sure there's nothing that has that Adams Monahan e-mail

22    domain in it.

23    Q.  Now, that looks like kind of like a -- to me, it looks

24    like a screw up, right, because 105,000 documents go and

25    105,000 documents come back?

Zeitz - Direct

1    A.  That is correct.

2    Q.  Was Mr. Czapko aware that nothing containing Adams

3    Monahan, in addition to what had already been pulled out,

4    was otherwise pulled out?

5    A.  He was not aware of that.

6    Q.  Did you figure out why that was the case?

7    A.  I did.

8    Q.  Tell me about that.

9    A.  So I ended up looking at the history, as I've gotten

10   much more familiar with the history -- Relativity history in

11   this case, and I looked at documents that David Maria was

12   viewing right before he sent the e-mail about Chris Mumm,

13   and it ended up being that Chris Mumm used a Hotmail e-mail

14   address.  And David Maria, you know, he sends him this

15   e-mail, a very definite this is the cmumm@AdamsMonahan.com

16   e-mail address, but he would have no knowledge of that.

17   When he's viewing the document, we have to image the

18   document, and when documents get imaged, specifically

19   e-mails sometimes, just the display name shows up, so it

20   just says Chris Mumm, it doesn't say cmumm@AdamsMonahan.com,

21   so he's unaware that it's not -- David Maria is unaware that

22   it's not from that Adams Monahan e-mail address, that it's

23   from a Hotmail e-mail address.

24   Q.  When you looked at that e-mail, you were looking at the

25   to and from fields, correct?

1    A.  I was.

2    Q.  Okay.  You're not reviewing that e-mail for substance,

3    correct?

4    A.  No.

5    Q.  All right.  So going back, then, let's move along here,

6    would Mr. Czapko have had any reason at that time to believe

7    the reconstruction, his attempts at filtering in that third

8    round filtering failed to remedy the problem?

9    A.  No.

10   Q.  He wasn't aware of this 105,105 --

11   A.  He was not.  It ended up being over like a three-week

12   period of time.

13   Q.  I want to talk to you about the final round of

14   relevance -- or final round of filtering, basically what I

15   call fourth round filtering.  Do you see that on Zeitz-3?

16   A.  I do.

17   Q.  Okay.  So litigation work plan, litigation work plan 8,

18   it looks like submitted to the LTSC on April 4th, 2017,

19   correct?

20   A.  Yes.

21   Q.  All right.  So you've also taken a look at information

22   related to this filtering.  Is that right?

23   A.  I have.

24   Q.  Okay.  February 28th, 2017, does Mr. Maria ask for the

25   conducting of this filtering?

Zeitz - Direct

1    A.  He does.

2    Q.  All right.  And do you have an explanation as to why it

3    it's not requested of the LTSC until April 4th of 2017?

4    A.  I mean, we had a lot of different projects going on at

5    that time.  We had a trial that ended up getting moved up

6    one week which was something we had never -- we had never

7    encountered in our district, and it wasn't a very large

8    trial, but it had a significant amount of lit support need

9    that I was working on, Dan Czapko was working on, Brian, one

10   of our other lit support people, was working on, all at the

11   same time.  I was gone for a week at training at the LTSC

12   leadership development training, and I was also giving that

13   IRB proposal.  We also had over half of the lit support

14   staff was moving offices within that time period as well.

15   Q.  All right.  So not something specific to whether or not

16   we wanted to search Mr. Adams' database sufficiently but a

17   factor of what's going on in the office, fair?

18   A.  Yes.

19   Q.  Okay.  So does this relevance searching happen?

20   A.  It does.

21   Q.  And it relates to litigation work plan 8, correct?

22   A.  Yes.

23   Q.  Fourth round searching for relevance search terms, and

24   as I look at this, it says 68,940 documents get pulled out

25   at that time.  Is that correct?

Zeitz - Direct

1    A.  That's correct.

2    Q.  And if we were to walk through, there's a, for purposes

3    of efficiency, looking at Zeitz-9, is that some of the

4    documents that relate to the conducting of litigation work

5    plan No. 8?

6    A.  What were you looking at again?

7    Q.  Oh, excuse me, I'm sorry.  I don't know that I have the

8    right date here.  I think I have the wrong date.  No, I do.

9    I have the right date.  I'm looking at Zeitz-9.

10   A.  Okay.

11   Q.  Go ahead.

12   A.  So when you say some of the documents, what are you --

13   Q.  I'm just referring to are these -- there's a lot of

14   documents that go to this searching.  There's the -- there's

15   the original submission that happens to the LTSC, there's

16   the confirmation, there's the documents.  To the extent that

17   there's anything that goes back and forth, I guess I'm

18   saying this is not the only document that relates to the

19   litigation work plan?

20   A.  That is correct.

21   Q.  Okay.  So this is basically the approval request,

22   correct?

23   A.  Yes.

24   Q.  And we won't go through any more of that.  The action,

25   though, gets completed what looks like the same day by the

1      LTSC.  Is that right?

2      A.  That is correct.

3      Q.  Okay.  So let's talk for a few more minutes just about

4      some of the summary items that you prepared in connection

5      with your testimony today.  First of all, you looked at

6      views in the database, right, to kind of consolidate, this

7      is Zeitz-5, consolidate from that giant 23,000 and change

8      set of actions to a relatively usable form, what constitutes

9      when database access was granted, when people first viewed

10     something, when people last viewed something, and how many

11     unique document views they had, correct?

12     A.  That is all correct.

13     Q.  Is that all information that you obtained by examining

14     the Relatively activity log?

15     A.  It is.

16     Q.  Okay.  And so --

17     A.  And from the LTSC as well because they granted access to

18     people.

19     Q.  Okay.  So in terms of access grants, as identified here,

20     we won't go through them individually, we have the dates

21     that first documents were viewed, and I want to particularly

22     focus on Mr. Maria, what was the date he first viewed a

23     document?

24     A.  On the 4th, 5/4/2016.

25     Q.  And that would have been after the first round filtering

Zeitz - Direct

1      was completed?

2      A.   That is correct.

3      Q.   Okay.  And then we've got all the dates of the last

4      viewing of documents by prosecution team and Mr. Czapko,

5      correct?

6      A.   That is correct.

7      Q.   And then you did this column, unique document views.

8      How did you arrive at that?

9      A.   So I used Excel and basically formatted a -- I filtered

10     to just the document views that occurred in the database,

11     and then in the name column, I don't have an example here, I

12     guess it, in Zeitz-6 there's the name column which would

13     have the Bates number in there.  I ended up doing an

14     advanced filter which only gives unique entries which

15     basically will leave one copy of a duplicate and any other

16     unique entries in there to get to those numbers.

17     Q.   Okay.  So it looks like it winds up being just under

18     10,000, I believe the accurate total was 9,252, unique

19     document views, correct?

20     A.   Sure.

21     Q.   What's a unique document view?

22     A.   You know, if you viewed the document at any time.

23     Q.   Okay.  And when you're talking about a document, are we

24     saying -- say I have a ten-page document and I look at page

25     1 and page 3 and page 5, is that going to come up as one

Zeitz - Direct

1    unique document view or is that going to come up as three?

2    A.  That's going to be one unique document view.  And if you

3    viewed that document at a different time, that still would

4    be one unique document view.

5    Q.  So if I viewed it on three separate dates and I viewed

6    four separate pages of the same document, it's going to

7    reflect one document view?

8    A.  Yes.

9    Q.  Okay.  Just so we're clear on that, let's talk about --

10             THE COURT:  Can I, I'm sorry, if one of the people

11   on this list looked at a document on ten different days, it

12   just shows as a single document?

13             THE WITNESS:  That is correct.

14             THE COURT:  Regardless of what search got them to

15   that document?

16             THE WITNESS:  That is correct.

17             THE COURT:  Okay.

18   BY MS. PERZEL:

19   Q.  And we should be clear too that in the unique document

20   view column, it is culled to be by assistant -- or excuse

21   me, by individual.  You didn't try to draw out whether or

22   not Dan Czapko and David Maria viewed the same document and

23   then call that one, correct?

24   A.  That is correct.

25   Q.  Okay.  So to the extent Dan Czapko views unique numbers,

1    those are his numbers; to the extent that David Maria does,

2    those are his numbers, correct?

3    A.  That is correct.

4    Q.  So I want to go back, then, for just a minute to the

5    database searches.  I don't think you have these separately

6    up in front of you because I only have one copy, so I'm

7    going to shoot them on the screen for you.

8    A.  I have David Maria's but that's about it.

9    Q.  Okay.  Let's just take a second to do this.  The judge

10   raised a good question.  Is this that Brandon Belich is

11   searching Rothman five times or is this that Mr. Brandon

12   Belich has searched Rothman once?

13   A.  No, what is most likely occurring, and if you look at

14   the activity that happens in between on his excessively long

15   log, what you will see is document views occurring.  So he

16   searches a document, he goes to view some of the results

17   from the grid, and then when he goes back to the list of the

18   search results, it reruns the search each time.

19   Q.  Okay.  So this is an internal process within Relatively

20   that's saying, okay, now Mr. Belich is out of Rothman and

21   he's come back to the sub grid view and he's picking a new

22   document?

23   A.  That is correct.

24   Q.  From that same search?

25   A.  Yes.

1   Q.  Okay.  Now, there's times when we look at these logs

2   that you come back to the searches and so I'm just

3   hypothesizing here for just a minute because I know this

4   isn't what it says, but say I ran indicted, which Mr. Maria

5   does on May 4th, 2016, at 4:21 and 25 seconds, and then I

6   ran accused and then I ran indicted.  Based on what you

7   understand of the Relativity activity log, is that separate

8   searches of the term indicted?

9   A.  Those would be separate searches that would show up in

10  this activity log.

11  Q.  Okay.

12  A.  But when you see them repeatedly consecutively around

13  the same time and date, that is consistent with they just

14  ran one search and they were just going through their

15  results.

16  Q.  Let me ask you a question.  If I'm in Relatively and I

17  go to a meeting, I run a search before I go to my meeting,

18  it pops up in the grid view, I click on a document within

19  that -- excuse me, click -- pops up in the sub grid view for

20  the search, I click on the document and I get called away

21  from my desk or go to a meeting, that search is still there.

22  When I come back and I go back into that same search and now

23  I want to look at a new document, could that still be the

24  same search?

25  A.  It could still be on that search when you -- if you

1    walked away from your desk, as long as you -- as long as

2    Relativity didn't kick you out.

3    Q.  Okay.  But without going through the relatively log

4    ad nauseam, you couldn't say for sure one way or the other?

5    A.  Yes, I mean, it's more apparent when have you document

6    views that occurring in between these different searches,

7    that's where it becomes easy to identify.

8    Q.  Is Relatively able to tell you how long I spent within a

9    particular document?

10   A.  It is not.

11   Q.  Is it able to tell you what aspects of a particular

12   document I've taken a look at?

13   A.  Aspects like different parts?

14   Q.  Like if I scroll down in a screen to get to the bottom

15   of the document?

16   A.  No, it is not.  It is just one log per document.

17   Q.  If I click on a document and I see Jon Hopeman and I go

18   whoa, Jon Hopeman represents the defendant, and I look away

19   and I memorialize that and I close that document, can that

20   tell whether I've done that or not?

21   A.  It can tell that you went in the document and then you

22   went back to the grid view, that's it.

23   Q.  But in terms of the physical actions that I'm taking as

24   the user on the other side of the computer screen, it

25   doesn't know whether I'm sitting in that seat, whether my

1    eyes are looking at that screen, or whether I'm doing

2    something completely different?

3    A.  No.

4         THE COURT:  So I think we're going to stop now.

5    I'm mindful of our court reporter.  I think that we should

6    take a really expedited lunch break and reconvene at 1.  I

7    have a pre-trial at 1:30, a pre-trial at -- wait, let me

8    make sure I understand this.  I have a pre-trial at 1:30, a

9    telephone pre-trial at 2.  I think that those will both be

10   quite brief, so I think we could, if we've got the

11   inclination, squeeze in some testimony in between those, and

12   then we pretty much need to be done by 2:30.  How does that

13   look?

14        MS. PERZEL:  I'm almost done with --

15        THE COURT:  Are we going to be done by 2:30?

16        MS. PERZEL:  Mm-hmm.

17        THE COURT:  Okay.  So you're going to cross him.

18   How long do you think that's going to take?

19        MS. MAIER:  45 minutes.

20        MR. WADE:  We can see if we can try to pare it

21   down over the lunch.

22        THE COURT:  How about Mr. Czapko?

23        MS. MAIER:  We have only five to ten minutes for

24   Mr. Czapko.

25        THE COURT:  Good.  How about you guys for

1    Mr. Czapko?

2            MS. PERZEL:  I was going to do five to ten

3    minutes.

4            THE COURT:  Okay.  Well, I'm going to be

5    cautiously optimistic.  I have a hearing at 2:30, but if I

6    need to start that a little bit late, we can do that.  Let's

7    just take a quick lunch and do what we can.  I might move

8    one of those pretrials.  Okay.  Any objection to that plan?

9    Does anybody have needs that can't be met in a quick

10   half-hour lunch window?  I know that's brutal for Staci.

11           MR. WADE:  We will just go as quickly as we can to

12   actually grab food in the --

13           THE COURT:  That's fine.  And if you are not here

14   right at 1, don't worry, but let's just aim for it, all

15   right?  Okay.  Thank you.

16       (Lunch recess taken at 12:33 p.m.)

17                          *   *   *

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                       **IN OPEN COURT**

3         **(1:01 p.m.)**

4              THE COURT:  All right.  I remind you that you

5    remain under oath.  We are back on the record in the United

6    States versus Adams.  I see that we have all the essential

7    players here, so let's begin.

8              MS. PERZEL:  Thank you, Your Honor.

9                  **DIRECT EXAMINATION (Cont'd)**

10   BY MS. PERZEL:

11   Q.  Mr. Zeitz, when we're talking about the database

12   generally, that's the database that's got 146,522 documents

13   in it, correct?

14   A.  Correct.

15   Q.  And when we're talking about unique views, I want to

16   show you Zeitz-5 again, each of those totals, for example,

17   David Maria, 5,422, unique documents views, that's of the

18   146,522 documents in the database?

19   A.  Of the ones that he had access to.

20   Q.  Correct.  But I'm just saying the total documents that

21   are in the database, there's 146,522?

22   A.  That is correct.

23   Q.  Okay.  So David Maria, for example, by my math, that's

24   less than -- or about 3.7 percent of the total documents.

25   Do you have any reason to dispute that?

1    A.  No.

2    Q.  And is the same true in terms of unique document views

3    in that relates to total documents in the database, of all

4    of those documents, these are the documents that were

5    viewed?

6    A.  Yes.

7    Q.  I want to turn your attention for a minute to defense

8    Exhibit 64.  Do you see that?

9    A.  What's the number?

10   Q.  64.  It's up on the screen.

11   A.  Oh, yes.  Yes.

12   Q.  All right.  So looking at this document, and I ask you

13   to look at a couple of things on it, one of the horizontal

14   -- of the horizontal sets of information is view.  Do you

15   see that?

16   A.  Yes, I do.

17   Q.  And their number comes out at 12,450, correct?

18   A.  Yes, that's correct.

19   Q.  And you understand why that is probably, correct?

20   A.  Yes.  They can't do unique counts because they don't

21   have the document numbers to actually figure out what are

22   unique views and what aren't.

23   Q.  So we don't dispute that total?

24   A.  No.

25   Q.  Okay.  So turning then quickly, if I may, one more

Zeitz - Direct

1   question about the database, 146,522 total documents, that

2   translates into just under half a million pages, correct?

3   A.  Yeah, it was like 489,000 pages.

4   Q.  Okay.  So let's talk for a minute about Khan-2.  And I

5   want to make sure a couple of things are clear with regard

6   to all of these summaries of searches.  Khan-2, Belich-1,

7   Kroells-8, and Zeitz-10 --

8   A.  Okay.

9   Q.  -- all the various summaries of searches?

10  A.  Yes.

11  Q.  Did you prepare those?

12  A.  I did.

13  Q.  Okay.  And that was from the Relativity activity log?

14  A.  It was from the activity log, yes.

15  Q.  Okay.  So what I want to look at just very briefly in

16  Khan-2 is, again, very similar to Belich-1 wherein we see

17  the reported quote-unquote searching of a particular term,

18  in this instance, Ward, on what looks like a single day,

19  May 2nd -- excuse me, May 5th, 2016?

20  A.  Yes.

21  Q.  Okay.  You explained that in the context of Brandon

22  Belich's searching of the term Rothman, correct?

23  A.  That is correct.

24  Q.  Does this mean that Jennifer Khan has searched Ward this

25  many times as are contained in Khan-2?

1    A.  No.

2    Q.  Tell us, just very briefly, why you believe that to be

3    the case?

4    A.  I believe if you look at the full activity log you will

5    see document views in between these keyword searches where

6    she's going back to the subset grid view of just the Ward

7    results.

8    Q.  Okay.  So I might go just into the subset of the Ward

9    results and pick the document that's at place one in that

10   result and look at that and then come back to those sub grid

11   view, pick the document that's at place 4, look at that, and

12   then go back to the sub grid view again?

13   A.  That is correct.

14   Q.  And that continues over the course of time in this

15   activity log, correct?

16   A.  Yes.  And you don't see that in David Maria's log, he

17   may just be clicking, there's an option to just click

18   through the image views of your results to just go to the

19   next document instead of going back to the grid view so for

20   some people you might not see that activity.  This, you

21   know, for Jennifer, this looks to be the activity she was

22   doing where she's searching, she's viewing a document, then

23   she's going back to the sub grid view.

24   Q.  So just so we're clear, there are two options, once I

25   get to a document vis-à-vis a search, I can either return to

Zeitz - Direct

1   the grid -- return to the list which is a sub grid view

2   containing my search results in an Excel spreadsheet type

3   form, right?

4   A.  Yes.

5   Q.  Or I can click through in this additional way like you

6   were talking about and get to the next search result?

7   A.  Yes.  Next document, the image view of the next search

8   result.

9   Q.  To the extent that there's this repeated listing of the

10  same search terms, it appears, to you, based on the

11  Relativity activity log, that the person is going return to

12  search and then picking a new document, looking at that

13  document, and then return to search and picking another

14  document?

15  A.  That is correct.

16  Q.  Same search?

17  A.  Yes, same search.

18  Q.  Okay.  There's two other things I just want to clarify

19  that we see sometimes in the log.  There's some numbers in

20  the right-hand column of Kroells-8 that is the third from

21  the last page.  What does that appear to be to you?

22  A.  That's just a number search.  I mean, it's typical for

23  people to search for account numbers or check numbers or

24  things of that nature.

25  Q.  We just didn't maybe hit a line left on the spreadsheet?

Zeitz - Direct

1   A.  Yeah, it's just the way that Excel is formatting that

2   spreadsheet.

3   Q.  Okay.  And then there's a place on the last page where

4   it has a hashtag value exclamation point?

5   A.  So that means there was no results returned for the

6   search that I was trying to -- where I was trying to pull

7   from the details specifically just the keywords that were

8   coming out.

9   Q.  Okay.  So no value returned for the search?

10  A.  Yes.

11  Q.  There's no documents that satisfy the criteria?

12  A.  There's no keyword that came out of that.  And if you

13  look at the detail view, we could get more of a picture of

14  why that is not coming out.

15  Q.  Okay.  So just so that we're clear on that.  But here's

16  an important question, you have access to the full database

17  right now because of your tech role as well as the fact that

18  the LTSC has long ago granted you access to it?

19  A.  That is correct.

20  Q.  As we said at the beginning, you're not reviewing it for

21  content, you don't pull things out, that's not your job, but

22  the judge asked a good question earlier and she said she was

23  concerned in the context of another witness about Felhaber

24  documents?

25  A.  Mm-hmm.

1    Q.  If we wanted to, could you go back, search the 113,361

2    documents for Felhaber?

3    A.  Yes.

4    Q.  And pull out the Felhaber documents?

5    A.  Yes.

6    Q.  And could you pull out the ones that were specifically

7    viewed by members of the prosecution team?

8    A.  Yes.

9    Q.  Okay.  Could you do that even as to the whole database,

10   146,522 documents?

11   A.  Yes.

12   Q.  Because obviously we know Christy Kroells had access to

13   the thumb drive which contains all those documents?

14   A.  Yes.

15   Q.  Okay.  And you could specifically narrow it, at least in

16   the context of the database, as to those that were viewed?

17   A.  Yes.

18            MS. PERZEL:  I have no further questions.

19            THE COURT:  I have a tech question.  You can get

20   ready.  It's just to help me understand while you set up.

21   It's not so much a -- you talk about this grid view and

22   going, clicking on things.

23            THE WITNESS:  Mm-hmm.

24            THE COURT:  What do you see about the e-mail on

25   the grid view?  Do you see nothing more than a number, do

1    you see the to, the from, the metadata, the date, the first

2    line?  What do you see?

3            THE WITNESS:  So it depends on which grid view you

4    have enabled.  So in the first line of the name column that

5    is in the spreadsheet for David Maria, Zeitz-6, there's a

6    name in the name column.  It says the LTSC loading all

7    standard fields.  So that's the standard --

8            THE COURT:  Hang on one second.  I've got to find

9    my Zeitz-6.  Got it.  Okay.

10           THE WITNESS:  So these are the standard fields

11   that the LTSC has, which it's actually quite extensive that

12   list of fields, to, from, date, sent, I mean, it's got a lot

13   of information, and it -- when you put a lot of information

14   on the grid, it's like a lot of information in Excel, it

15   almost gets to -- it's too much, so we end up creating a

16   standard view for the case team, and we sometimes will

17   confer with them, sometimes we'll just put in e-mail fields,

18   to, from, date, sent, that kind of thing into a view that is

19   set for all the users of the prosecution team, so we set the

20   view for them by default.

21           THE COURT:  And that's the view that if they run a

22   search like Ward, their list of 64 documents that contain

23   the word Ward, what shows on the grid view you've decided in

24   advance?

25           THE WITNESS:  Yes.

1          THE COURT:  So what was the grid view in this

2     case?

3          THE WITNESS:  I mean, the all standard fields, I

4     can get that information to you, what fields were on that,

5     and then I can also get you their -- their grid view

6     information, but I don't have that.

7          THE COURT:  You don't know what it was, you don't

8     remember?

9          THE WITNESS:  No, there's a lots of fields.

10          THE COURT:  Do you remember what's common?

11          THE WITNESS:  To, from, date sent, sometimes page

12     count, cc, bcc, subject.  There was not a body of the e-mail

13     in this all standard field.  This one had so many fields

14     that you had to scroll over to the right to see all the

15     other fields because there so -- it was so voluminous.

16          THE COURT:  So like with a number, like let's say

17     that an agent wants to look at e-mails sent related to a

18     particular event that they know happened, they're seeing

19     enough to know who the e-mail is to and from and the date it

20     was sent and the number of pages, at a minimum, no matter

21     what else is set with --

22          THE WITNESS:  That is correct.

23          THE COURT:  Okay.  That's good enough to help me

24     understand.  Thank you.

25          THE WITNESS:  Yeah.

Zeitz - Cross

1      **CROSS-EXAMINATION**

2      BY MS. MAIER:

3      Q.  All right.  Good afternoon, Mr. Zeitz.

4      A.  Good afternoon.

5      Q.  I want to start with Zeitz Exhibit 5.

6      A.  Sure.

7      Q.  That hopefully you have in front of you?

8      A.  Yes.

9      Q.  So this is a summary chart that you've prepared?

10     A.  It is.

11     Q.  And it shows the dates that different members of the

12     prosecution team first viewed documents in the Relatively

13     database?

14     A.  That is correct.

15     Q.  And the dates that they last viewed documents in the

16     Relativity database?

17     A.  That is correct.

18     Q.  And so of these individuals listed, Mr. Czapko was the

19     first to view any documents in the database, correct?

20     A.  He was.

21     Q.  On what date did he first view documents?

22     A.  On 4/14.

23     Q.  Okay.  Of 2016?

24     A.  Of 2016.

25     Q.  And no other members of the prosecution team viewed any

Zeitz - Cross

1    document in this database in April of 2016?

2    A.  In April of 2016, no.

3    Q.  And so AUSA Maria, he did not view any documents in

4    April of 2016?

5    A.  No.

6    Q.  The first time he viewed any documents was May 4th of

7    2016?

8    A.  Yes.

9    Q.  And there were no other members of the U.S. Attorney's

10   staff, other attorneys, who viewed documents in this

11   database in April of 2016?

12   A.  No.

13   Q.  You testified about the number of unique document views

14   in the database?

15   A.  I did.

16   Q.  So it is 9,252?

17   A.  Yes.

18   Q.  And so it would be possible for your office to generate

19   an export of just those documents?

20   A.  Of just the unique -- of just the documents that were

21   viewed by the prosecution team?

22   Q.  Yes.

23   A.  Yes.

24   Q.  And this chart shows that Dan Czapko viewed -- or

25   Mr. Czapko viewed -- he himself viewed 38 unique documents?

Zeitz - Cross

1    A.  Yes.

2    Q.  And that was in the course of the entire time that he

3    had access to the database?

4    A.  That is correct.

5    Q.  So more than a year from April 2016 to September of

6    2017?

7    A.  Yes.

8    Q.  Turning to, let's see, you testified about an

9    April 26th, 2016, e-mail between AUSA Maria and AUSA

10   Kokkinen about the number of hits that different search

11   terms got in April of 2016?

12   A.  That's correct.

13   Q.  Do you recall that?  You yourself did not look at any

14   results of that search in April of 2016?

15   A.  I did not.

16   Q.  And let's see, so based -- so those search terms, and if

17   we -- let's see if I have the list here, Zeitz Exhibit 4, do

18   you have that in front of you?

19   A.  I -- yeah.  Yes.

20   Q.  So that, those search terms that were originally run in

21   April of 2016 included both what were in a category of

22   general terms?

23   A.  Yes.

24   Q.  And search terms that were in the category of terms

25   related to law firms used by Apollo, ADGC, and Adams, right?

Zeitz - Cross

1    A.  That's correct.

2    Q.  In your experience working in the database, do you know

3    how many -- how many hits in the database were for those

4    general search terms?

5    A.  I think that's referred to in one of the other e-mails.

6    I think it's actually in that Exhibit page 6.  It has the

7    different hit results for the different terms.

8    Q.  Okay.  And what is the number for those general search

9    terms in this document?

10   A.  Oh, it doesn't have the general ones.  It just has the

11   specific ones.  It -- it doesn't have a -- it just says it's

12   -- it's 70 to 80 percent.  It doesn't have the actual

13   breakdown.

14   Q.  Let's -- let's look at the exhibit that's marked

15   Zeitz-3.

16   A.  Sure.

17   Q.  Do you have that in front of you?

18   A.  I do.  I'm sorry.  I'm making a little bit of a mess of

19   these things so.

20   Q.  That is what happens.

21   A.  Yeah.

22   Q.  So that is another chart that you prepared in this case?

23   A.  It is.

24   Q.  And you testified that -- you testified about some

25   activity in October of 2016?

Zeitz - Cross

1    A.  Yes.

2    Q.  Related to an Adams Monahan search that Mr. Czapko

3    conducted?

4    A.  Yes.

5    Q.  And you said that at that time, out of an abundance of

6    caution, Mr. Czapko moved the documents that hit on the

7    general search term out of the for review folder and into

8    one of the secured folders?

9    A.  He did, so that number would be correct, 105,185.

10   Q.  And so that number corresponds to the number of

11   documents out of the 146,522, I think that's a 2?

12   A.  Yes, it is a 2.

13   Q.  And that's the number of documents that hit on the

14   general search terms and did not hit on any of the specific

15   search terms?

16   A.  You know, the -- there was a discussion about the

17   overlap between the two different terms in some of the

18   e-mails.  It was more of like what do we do if it hits on

19   one but not another.  So I'm not quite -- I mean, I guess

20   those had already been pulled, so yes, it would be, yes.

21   Q.  All right.  So at this time in April of 2016, 33,161 had

22   moved out because they hit on the original specific list of

23   search terms?

24   A.  That's correct.

25   Q.  And those are the terms that are on -- on Zeitz-4 at

Zeitz - Cross

1    page 2 under the list terms related to specific law firms?

2    A.  That's correct.

3    Q.  So that was 33,161 that had moved out of the database?

4    A.  Yes.

5    Q.  And then another list of specific law firm type terms in

6    June were also applied and those were moved out?

7    A.  That's correct.

8    Q.  And then above that number there was 105,185 documents

9    still in the database that included those general terms?

10   A.  That's correct.

11   Q.  And then those were moved out in that period of time in

12   October of 2016?

13   A.  That's correct.

14   Q.  And so if you add up all of those numbers, does that get

15   us to about, you know, pause to give you a moment to look at

16   the numbers and attempt the math, but about 139,000 total

17   documents?

18   A.  I -- I don't know.  I could take a look.

19   Q.  Okay.

20              THE COURT:  Can you tell me what he's adding?

21              MS. MAIER:  Yes.

22              THE COURT:  Can you refresh my understanding?

23              MS. MAIER:  So the three categories of privileged

24   terms that had been applied at any point in time, if we add

25   them up, what would the total number of documents that hit

Zeitz - Cross

1    on any of the privileged terms that were discussed in

2    connection with this case have been?

3              THE COURT:  And you're including the general

4    terms?

5              MS. MAIER:  Yes.

6              THE WITNESS:  So the 33,161, plus the 1,494, plus

7    the 105,185?

8    BY MR. WADE:

9    Q.  Correct.

10   A.  139,840.

11   Q.  139,840.

12   A.  Yep.

13   Q.  Out of the 146,522?

14   A.  That's correct.

15   Q.  And so now I want to talk about views, document views,

16   that took place in the database leading up to April 26,

17   2016?

18   A.  Okay.

19   Q.  Okay.  And so in the big binder I have a copy of the

20   e-mail about which search terms to use that discuss the

21   general search terms as DX-15, and I believe that was also a

22   Zeitz exhibit?

23   A.  Okay, yeah.

24   Q.  But DX-15?

25   A.  Yes.

Zeitz - Cross

1    Q.  So prior to the date of this e-mail, April 26, 2016, the

2    only person who had viewed any documents in that database

3    was Mr. Czapko?

4    A.  That is correct.

5    Q.  Okay.  And so if --

6    A.  Oh, or potentially a member of the LTSC.  They might do

7    a spot check to verify that things were loaded

8    appropriately.

9    Q.  Okay.

10   A.  We didn't pull any of the LTSC member records.

11   Q.  But no one else in Minnesota was in the database --

12   A.  No.

13   Q.  -- in that period of time?  And we would be able to look

14   at Mr. Czapko's Relativity log to determine how many views

15   he had during that period of time?

16   A.  Yes.

17   Q.  Right?  And so we've -- you prepared that document,

18   right?

19   A.  I did.

20   Q.  It is a large document.  I think you have probably

21   somewhere at your feet or around you a big binder?

22   A.  This thing.

23   Q.  That's called DX-86?

24   A.  All right.

25   Q.  A different big binder.

Zeitz - Cross

1    A.  It says this exhibit contains separate volume.  Okay.

2    Yep.  Okay.

3    Q.  So it's DX-86 on the front?

4    A.  It says 80.

5    Q.  Okay.

6    A.  Oh, that's a different one.

7    Q.  I don't think we're going to need that one.

8    A.  Okay.  Okay.

9    Q.  You got that, okay?

10   A.  86.

11   Q.  And if you look at the first page, do you see the title

12   is all activity deliverable in 2017?

13   A.  Yes.

14   Q.  Okay.  And this is the Relativity activity log that you

15   prepared for Mr. Czapko, right?

16   A.  It is.

17   Q.  And you can see that on the first page of the document

18   there is one document view, right?

19   A.  On the first page, yes, right, the second to last entry

20   which is highlighted in I don't remember what color it was,

21   either it was green or blue.

22   Q.  And so that was April 14th, the first day that he went

23   into the database?

24   A.  Yes.

25   Q.  And that was a document that was viewed, he didn't

Zeitz - Cross

```
1    even -- it was a document that was viewed before he ran any

2    search term searches?

3    A.  It was.

4    Q.  Right.  So if you can flip through these first pages,

5    I'm going to try to not take too much time with this big

6    document, but on page 5, do you see where he ran the search

7    term for the word privilege?

8    A.  Yes, I do.

9    Q.  And then after that you see the view at the bottom of

10   the page?

11   A.  I do, yep.

12   Q.  And you've explained that when you read these logs, you

13   can look at the views that came after a search term and

14   infer that he got the results of that search and then he

15   looked at a document, right?

16   A.  Yes.

17   Q.  And so that document view related to the search for the

18   word privilege?

19   A.  Mm-hmm.

20   Q.  And then if you flip through the next few pages, do you

21   see that there are seven document views between pages 5

22   through 13?

23   A.  I see one at the end of page 5 and I see more on -- yes,

24   two on ten, one on 11, two on 12, and then one on 13.

25   Q.  Okay.  And so that adds up to seven?
```

Zeitz - Cross

1    A.  Okay.

2    Q.  And so that was on April 14th, that activity?

3    A.  Yep.

4    Q.  Turning to April 15th on page 17.

5    A.  Okay.

6    Q.  Do you see the entry, it's the last entry on that page,

7    where he searches for this string of general search terms?

8    A.  Let me see here.  Yes, privilege, attorney or lawyer or

9    advice, counsel, yeah, ACP, yep.

10   Q.  Right.  And then after running that search, he views

11   three documents between pages 18 and 21?

12   A.  One, two, three, yes.

13   Q.  And then on page 22 you see that he creates a saved

14   search for potential privileged general terms?

15   A.  Yes.

16   Q.  All right.  So later that -- so those are three document

17   views that related to that general string of privileged

18   terms?

19   A.  Mm-hmm.

20   Q.  And those views, we -- looking at this spreadsheet, we

21   don't know if those are unique document views?

22   A.  We don't know.

23   Q.  So it's a maximum of three document views after running

24   those terms?

25   A.  Yes.

Zeitz - Cross

1    Q.  And for the seven views that we counted, that's a

2    maximum of seven documents?

3    A.  That's correct.

4    Q.  And so later that same day, which is April 15th, 2016,

5    starting at page 48 of this spreadsheet?

6    A.  What number?

7    Q.  48.

8    A.  48.

9    Q.  Are you on that page?

10   A.  Yes.

11   Q.  Do you see in the top row he ran a search for the

12   keyword work product?

13   A.  Yes.

14   Q.  And that's one of the terms that was on the general term

15   list?

16   A.  Yes.

17   Q.  And then there's a document view below that?

18   A.  Yes.

19   Q.  And then if you look at the pages that follow this one,

20   48, so from 48 to 56, do you see a series of searches for

21   terms on that list of general search terms?

22   A.  I do.

23   Q.  And document views?

24   A.  Yes.  What page was I ending on?

25   Q.  56.

1    A.  56.  Yep, searches and yes, and more document views,

2    yes.

3    Q.  And it's a total of five documents on those pages?

4    A.  Yes.

5    Q.  On pages 48, 52, 54, and 56?

6    A.  Mm-hmm.

7    Q.  So that's a maximum of five documents that were viewed

8    as a result of running those search terms that were on that

9    general term list?

10   A.  Sure.

11   Q.  So that's between the ten -- I'm sorry, the seven

12   documents that were viewed after the search for privilege?

13   A.  Mm-hmm.

14   Q.  The three documents that were searched later in the day

15   on April 15th and the five documents that were searched also

16   in the afternoon of April 15th, that's 15 documents that

17   related to those general terms?

18   A.  Yes.

19   Q.  And it's a maximum of 15 documents?

20   A.  Maximum, yes.

21   Q.  I want to turn to the filter -- okay.  So the June 7th

22   and 9th additional filtering that took place.

23   A.  Mm-hmm.

24   Q.  Do you recall your testimony on that subject?

25   A.  Yes.

Zeitz - Cross

1    Q.  And you testified that, let's see, that 1,494 documents

2    were excluded at that time?

3    A.  Yes.

4    Q.  I want to turn to AUSA Maria's activity log.

5    A.  Sure.

6    Q.  Okay.  So that --

7    A.  Which -- which one is that?

8    Q.  So that is DX-78.

9    A.  78?

10   Q.  Yes.

11   A.  Okay.  Which page?

12   Q.  We're going to turn to page 319.  And so this is an

13   extract, I will represent, of the all activity on final

14   prosecution team spreadsheet that you created.

15   A.  Yep.

16   Q.  And we filtered for the user AUSA Maria.

17   A.  Yep.

18   Q.  Okay.  319.  You testified that you reviewed the e-mail

19   correspondence surrounding the June 2016 filtering?

20   A.  I did.

21   Q.  And do you recall that it was on May 16th that the

22   members of the prosecution team e-mailed about the need to

23   add additional privilege terms?

24   A.  I don't know if I reviewed the prosecution team's

25   e-mails.  I just reviewed e-mails from AUSA Maria.

1   Q.  Okay.  So there is an AUSA Maria e-mail that is I

2   believe cited in your declaration where he responds to

3   agents -- agent referrals to identify the --

4   A.  Oh, yes, yes.

5   Q.  And so do you know -- so let's turn to that e-mail.  It

6   may have been within the Zeitz exhibits, but I have a copy

7   of it in the DX binder at tab 21.

8   A.  Okay.  21?

9   Q.  DX-21.

10  A.  That might be easier.

11  Q.  Sorry, you have two big binders in front of you right

12  now.

13  A.  I know, that's okay.  I'll manage it.  All right.

14  Q.  And so the first line of his e-mail is, "I also saw that

15  Hopeman had done some work for him before"?

16  A.  Mm-hmm.

17  Q.  Do you know when in the database AUSA Maria saw that?

18  A.  I don't know.

19  Q.  If we look at his activity log, we can tell when he was

20  in the database on this date, May 16th, and the dates prior

21  to that, correct?

22  A.  Yeah, so that would probably correspond, I mean, if he

23  sent the e-mail that day, then most likely before then,

24  right before then is when he viewed that material.

25  Q.  So let's look at on what's on page 319 of the big

1    spreadsheets.

2    A.  Sure.

3    Q.  DX-78.

4    A.  Oh, yeah.  Yep.

5    Q.  Do you see that the bottom line of that page of the

6    spreadsheet, which is line 4265?

7    A.  Yep.

8    Q.  It says action, view, object document?

9    A.  Yep.

10   Q.  David Maria, with date and timestamp of May 9th, 2016,

11   at 5:05:27 p.m.?

12   A.  Yes.

13   Q.  And then if you turn to the next page of the

14   spreadsheet, what is the timestamp on the next activity by

15   AUSA Maria in that database?

16   A.  5/2 of 2016.

17   Q.  Okay.  So he had no access in the database between those

18   two dates and times?

19   A.  Mm-hmm.

20   Q.  So when he sent his e-mail on May 16th, 2016, whatever

21   he saw in the database related to Mr. Hopeman, he had to

22   have seen it on or before May 9th?

23   A.  I mean, if he saw that information from the database

24   then yes.

25   Q.  And I want to turn now to the -- so it's not in this

1    spreadsheet in front of us, but we've discussed the October

2    and November additional filtering that took place that's

3    reflected in Zeitz Exhibit 3 where 105,000 documents were

4    moved?

5    A.  Yes.

6    Q.  And you've testified that to sort of figure out what

7    happened around that time you looked at AUSA Maria's records

8    of his searches for Chris Mumm?

9    A.  I did.  I looked for -- well, what I was looking at was

10   his view history that was directly before the Chris Mumm

11   e-mail, so he sends the Chris Mumm e-mail so I'm looking for

12   his view history directly before that.

13   Q.  And when he sent that e-mail about Chris Mumm, it may be

14   a Zeitz exhibit, but I have it in the DX binder in front of

15   us at DX-23.

16   A.  All right.

17   Q.  And he sent that e-mail to Mr. Czapko on October 17th,

18   2016, at 9:52 a.m., correct?

19   A.  Oh, I'm looking at 22, I'm sorry.  Yes.

20   Q.  And so you --

21   A.  17th, 2016, 9:52.

22   Q.  So you looked at his exhibit log for the entries --

23   A.  Document view log.

24   Q.  -- immediate prior to that time?

25   A.  Sorry.  Yeah, his document view log.

Zeitz - Cross

1    Q.  Okay.

2    A.  Yes.

3    Q.  And you saw that he was searching for and viewing

4    documents related to the search Mumm?

5    A.  I was specifically looking for his views, not his

6    searches.  I didn't really look at his searches.  I just

7    looked at his views.

8    Q.  Okay.  But you -- and you saw that he was viewing

9    documents related to Chris Mumm before that time?

10   A.  That's correct.

11   Q.  You saw that Mumm was one of the addressees, senders or

12   recipients, of the e-mails?

13   A.  Yes.

14   Q.  After AUSA Maria sent his e-mail to Mr. Czapko on this

15   date, October 17th, at 9:52, did he stop viewing documents

16   in the database related to Chris Mumm?

17   A.  Did David?  What was the question again?

18   Q.  Yes.  So after he sent the e-mail on October 17th, 2016,

19   did AUSA Maria stop viewing documents in the database

20   related to Chris Mumm?

21   A.  I didn't reference all Chris Mumm e-mails and check the

22   history of those e-mails.

23   Q.  Okay.

24   A.  They might have gotten filtered out by those general

25   terms, but I don't know for sure.

Zeitz - Cross

1    Q.  So one of the exhibits that the government had in front

2    of you was Zeitz Exhibit 10, correct?

3    A.  Yes.

4    Q.  And that is a summary of AUSA Maria's keyword searches

5    in the database?

6    A.  Mm-hmm.

7    Q.  And if you turn to, let's see, page 11, there are

8    numbers in the lower right-hand corner?

9    A.  Oh, yeah, yeah.  Oh, yeah, I see the Mumm ones.

10   Q.  You see -- and that there are a number of entries on

11   this that have Mumm as the search term, correct?

12   A.  That's correct.

13   Q.  And as you've testified, that doesn't mean that he

14   actually typed in Mumm that many times, but he ran that

15   search and he may have gone back to the search results

16   screen that was reloaded, correct?

17   A.  That is correct.

18   Q.  But so during that time period and we have -- there's a

19   time difference to take into account here?

20   A.  Yeah, eastern versus central.

21   Q.  Yes.  So we are, this -- the e-mail that was sent was at

22   9:52 a.m. central time, right?

23   A.  I believe so.  I mean, I haven't checked the -- I mean,

24   that's what we turned over, so I would believe that to be

25   correct.  E-mails can get imaged at different -- in a

Zeitz - Cross

1   different time zone, but I'm assuming that is accurate.

2   Q.  This e-mail was printed on AUSA's Maria with his header,

3   correct?

4   A.  Okay, then yes.

5   Q.  So it's fair to assume that's 9:52 central?

6   A.  That is correct.

7   Q.  And then this spreadsheet that was prepared in the

8   Relatively activity log is in eastern time, right?

9   A.  That is.

10  Q.  And so 9:52 central would be 10:52 eastern?

11  A.  9:52 central is 10:52 eastern, right?  Yes?

12          THE COURT:  Yes.  I'll take judicial notice of the

13  time zones.

14          THE WITNESS:  Time zones are difficult.

15          THE COURT:  I know.

16  BY MS. MAIER:

17  Q.  And then so do you see on this list of search terms that

18  we can begin with 10:53 a.m., there are additional

19  search -- search entries for the word Mumm, correct?

20  A.  Yes.

21  Q.  And then Mumm 17?

22  A.  Yes.

23  Q.  And then on the -- starting at the bottom of this page

24  there's a search term Mumm in conjunction with other search

25  terms, correct?

1    A.  That is correct.

2    Q.  Using the and?

3    A.  Yes.

4    Q.  In the search term.  So it's -- there are several at the

5    bottom of this page, and then if you turn to the next page,

6    do you see several additional Mumm search terms?

7    A.  I do.

8    Q.  Okay.  And that is on October 17th, 2016, from 10:53

9    until at least 11:37 a.m. eastern with Mumm, C. Mumm, and

10   Zipkin, correct?

11   A.  That's correct.

12   Q.  And if we look at his activity log, we can see the

13   document views that correspond to those searches that he was

14   running at that time?

15   A.  That's correct.

16   Q.  Correct?  And so if you look at this big log in front of

17   you, DX-78, and if you turn to page 1005, do you -- are you

18   on that page?

19   A.  I am.

20   Q.  Do you see at the bottom of the page the last two

21   entries, one of them is a document query for the search term

22   Mumm?

23   A.  Yes.

24   Q.  At 10:53 a.m. eastern?

25   A.  Yep.

Zeitz - Cross

1    Q.  And after that query there's a document view?

2    A.  Yes.

3    Q.  And then if you just flip through the next group of

4    pages, do you see numerous document views that follow the

5    Mumm search terms?

6    A.  I do.

7    Q.  And you're welcome to take your time to flip through,

8    but --

9    A.  How far would you like me to go?

10   Q.  From page --

11            THE COURT:  How about you just give him the answer

12   that you think it is and ask if he thinks that sounds

13   realistic in light of the --

14   BY MS. MAIER:

15   Q.  He viewed over 100 documents after that time?

16   A.  Yeah, that seems reasonable.  I mean, where is it

17   the -- is the there ending -- I do see a lot of document

18   views, yes.

19   Q.  Going at least through page 1,030 and then they continue

20   after that point?

21   A.  Yep, I still see document views, yep.

22   Q.  I want to turn now to the post April 4th activity in the

23   database, and so you have in front of you a list of dates,

24   the entry No. 4, 4/7/17?

25   A.  Yes.

1    Q.  The filtering took place.  That activity actually took

2    place on April 4th, 2017, correct?

3    A.  April 4th, yes, that is correct.  Yep, I have that in my

4    Zeitz-3.

5    Q.  And if you look at Zeitz-5, which was your summary of

6    when members of the prosecution team last viewed documents

7    in the database, the only two members of the prosecution

8    team who did so on or after April 4th of 2017, were AUSA

9    Maria and Inspector Kroells, correct?

10   A.  Kroells, yes, and Maria, yes.

11   Q.  And so on April 4th Mr. Czapko e-mailed AUSA Maria to

12   inform him that the Relativity filtering project was

13   complete, and I'm going to ask you the specific time of that

14   e-mail and so it would be helpful if you want to turn to

15   DX-12.

16   A.  Sure.

17   Q.  Which is a collection of e-mails related to Mr. Czapko.

18   A.  Mm-hmm.

19   Q.  If you turn to the last page of that document, so the

20   Bates number at the bottom is DSM229.

21   A.  Holy moly.  Yep.

22   Q.  You see that Mr. Czapko's e-mail says the Adams

23   Relatively project is ready, let me know if anything doesn't

24   look right?

25   A.  Yes.

1    Q.  And you see at the last line of this e-mail includes the

2    instructions for this bit of work in the database, and it

3    says make the items in the Adams e-mail database search

4    accessible for the team to search, put items not in the

5    search folder in the -- put items not in the search in

6    folder that team does not have access to, correct?

7    A.  That's correct.

8    Q.  And so that's moving the 68,940 documents?

9    A.  That is correct.

10   Q.  And that e-mail was sent at 4:03 p.m. central?

11   A.  It was.

12   Q.  And after that time AUSA -- we look at his log, he

13   logged on to Relativity for three minutes after that point.

14   Is that right?

15   A.  For David Maria?

16   Q.  Yes.

17   A.  So we're going to the end of his log?

18   Q.  Yeah, so we would find that information in his activity

19   log, right?

20   A.  Mm-hmm.

21   Q.  All right.  So if we go to his log to page 1339.

22   A.  1339?

23   Q.  Mm-hmm.

24   A.  Okay.

25   Q.  Do you see that the timestamp of this entry, date and

1    time, is April 4th of 2017 at 5:14:13 eastern?

2    A.  Yes.

3    Q.  And so that's 4:14:13 central?

4    A.  Yes.

5    Q.  And so that's after Mr. Czapko's e-mail?

6    A.  Yes.

7    Q.  And do you see that the entry prior to this one was

8    earlier that morning at 10:59 a.m.?

9    A.  Yes.

10   Q.  That was --

11   A.  10:59, yep.

12   Q.  -- before the move of the 68,000 documents was

13   completed?

14   A.  Yes.

15   Q.  And then from that point when Mr. AUSA Maria logged in

16   at 5:14:13 eastern to the end of his activity log, it's a

17   total of three minutes of activity in the database?

18   A.  Yes.

19   Q.  And those were his final three minutes in this database?

20   A.  Yes.

21   Q.  And during that time, he looked, he viewed two

22   documents?

23   A.  Mm-hmm.

24   Q.  And he converted eight documents?

25   A.  Yes.

Zeitz - Cross

```
 1              MS. MAIER:  The Court's indulgence.
 2    BY MS. MAIER:
 3    Q.  Mr. Zeitz, you've reviewed all of the work orders and
 4    plans that relate to all of the potentially privileged
 5    search terms that were run in this database?
 6    A.  That's correct.
 7    Q.  And we've looked at those list of search terms today.
 8    Do any of those work plans have the search term on them of
 9    Murry, M-U-R-R-Y?
10    A.  Not that I saw.
11    Q.  And so none of those work plans were to effect the
12    removal of documents that included the word Murry from the
13    database?
14    A.  No.  Do I need this binder open?
15    Q.  What was that?
16    A.  Do I still need this binder open?
17    Q.  No.
18    A.  Okay.
19    Q.  You can set that one aside for now.
20    A.  Thank you.
21              MS. MAIER:  Court's indulgence for just one
22    moment.
23              THE COURT:  Yeah.
24              MS. MAIER:  Thank you.
25          (Counsel conferred.)
```

Zeitz - Redirect

1              MS. MAIER:  All right.  I don't have any further

2      questions for this witness.

3              THE COURT:  Thank you.

4                      **REDIRECT EXAMINATION**

5      BY MS. PERZEL:

6      Q.  Mr. Zeitz, I have just a few questions to follow-up on.

7      A.  Sure.

8      Q.  You were talking originally, I believe it may have been

9      a question by the judge, about the grid view?

10     A.  Yes.

11     Q.  And what exactly a person could see upon opening the

12     grid view?

13     A.  Yes.

14     Q.  And there were some columns that the judge was asking

15     about and e-mails I think she was -- or I think you had said

16     you could see to or from on e-mails.  Is that always the

17     case depending upon the resolution on your screen or the

18     columns that you've selected?

19     A.  Yeah, typically they're alphabetical, so when I'm saying

20     you're scrolling, you know, to would be closer to the end,

21     so you might not see that by default until you've scrolled

22     over to the right on all of those fields.

23     Q.  Okay.  And having experienced Relatively a bit myself,

24     is it possible that you get to the point where you may not

25     be able to see to or from because they're so far to the

1    right and you've scrolled your arrow all the way over?

2    A.   That is true.  And in my experience, AUSAs aren't

3    really -- they don't really like the grid view, it's very

4    much a spreadsheet, and they want to view the image of the

5    document.

6    Q.   So even though to or from might be a column that's

7    actually selected, based upon the resolution of your screen,

8    you may not be able to get over far enough to the right on

9    the screen to actually see it?

10   A.   You could scroll over, but it would not be on there by

11   default.

12   Q.   Okay.  So I want to go back for a minute to some

13   questions that were asked of you.  When you have a question

14   about something going on that you're dealing with ALS wise,

15   who do you ask?

16   A.   I mean, I'll call the -- depending on the issue.  If

17   it's a technical issue with our applications, I'll call the

18   litigation technology helpdesk.  You know, in the various

19   committees that I've served on, I've worked with other

20   litigation support people in different districts, if it's a

21   technical issue.  If it's a legal issue, obviously the

22   AUSAs.

23   Q.   Are those the folks at the Litigation Technology Service

24   Center who have the most substantial expertise in Relativity

25   and in searching that you know of in the department?

Zeitz - Redirect

```
1    A.  Absolutely.

2    Q.  Okay.  And when Mr. Czapko, you were on paternity leave

3    or otherwise not available to Mr. Czapko, who would

4    Mr. Czapko turn to with questions --

5    A.  He would contact -- sorry.

6    Q.  -- on Relatively?

7    A.  Sorry.  He would contact the helpdesk, the litigation

8    technology help desk.

9          MS. PERZEL:  Okay.  I have no further questions.

10                        EXAMINATION

11   BY THE COURT:

12   Q.  I have a few questions.  So Zeitz-9.

13   A.  Yes.

14   Q.  This list of terms sets the universe for the 42,927?

15   A.  It does.

16   Q.  So there is nothing in the 42,927 that is not

17   the -- that does not have one of these terms in it?

18   A.  That is correct.

19   Q.  So if there are searches that were done prior to that

20   based on terms that aren't on this list, then documents were

21   viewed that might or might not be in the 42,927 depending on

22   whether they might also have this word in them?

23   A.  That is correct.

24   Q.  Do we know whether all of the documents viewed during

25   the phase where the team was accessing this to prepare,
```

1      first off, are in the 42,927?

2      A.  I can find out.

3      Q.  So we don't know, we don't --

4      A.  No, I don't have an exhibit or anything for that.

5      Q.  Okay.  Thank you.

6      A.  Yep.

7      Q.  Oh, I'm sorry, I had one other question.  What happened

8      to the 68,940 documents?

9      A.  The 68,948, which one is --

10     Q.  The ones that were kicked out by virtue of this set of

11     searches?

12     A.  They were moved to the secure folder so that the

13     prosecution team couldn't have access to them.  We need to

14     still need to have them for production so we have them in

15     the database, just the prosecution team can't get access to

16     them.

17     Q.  For production meaning to turn over to the defense?

18     A.  Turn over to defense.  And, you know, this is fairly

19     typical where the production -- people are rushing to get

20     the production, they are like got to find the relevant

21     documents, got to cull this down, can I do the production,

22     and then you don't hear anything until it's getting closer

23     to hearings, trials, things like that.

24     Q.  The production includes the 1465 whatever those numbers

25     are?

1    A.  It does not because it does not contain anything that

2    was a Monahan e-mail that was potentially privileged or in

3    that secure folder.  So nothing from -- so for the defendant

4    Adams, he only received Adams e-mails and jazzman1 e-mails.

5    Q.  Oh, I'm sorry.

6    A.  He did not receive anything Monahan that's in the secure

7    folder.

8    Q.  And that 146 that we've been talking for two days

9    includes Monahan documents?

10   A.  It does.

11        MS. PERZEL:  Let me ask -- can I ask a couple of

12   clarifying questions, Your Honor, if I might?

13        THE COURT:  Yeah, please.

14                   **REDIRECT EXAMINATION**

15   BY MS. PERZEL:

16   Q.  There are -- as I understand, Mr. Zeitz, there are a

17   series of e-mail accounts that are contained among that

18   146,522 documents?

19   A.  That's correct.

20   Q.  And one of the source e-mails -- or two of the source

21   e-mails belong to Mr. Adams?

22   A.  That's correct.

23   Q.  And one of the source e-mails belongs to Mr. Monahan.

24   Is that correct?

25   A.  That is correct.

1    Q.  Okay.  So as we're talking about this total, the judge

2    is exactly correct, there's e-mail boxes contained within

3    this total?

4    A.  There is.

5    Q.  And so when you're talking about trying to produce

6    these, there were a set of materials that were culled back

7    to things that could be privileged as to Mr. Monahan sourced

8    to Mr. Monahan's e-mail account?

9    A.  Yes.

10   Q.  And so you didn't want to disclose to Mr. Adams things

11   that were sourced to Mr. Monahan's e-mail account or you

12   were told not to do that and so that was set aside in terms

13   of the discovery to --

14   A.  That is correct.

15   Q.  -- Mr. Adams?

16           MS. PERZEL:  Just for purposes of clarifying, Your

17   Honor.

18           THE COURT:  Okay.  Do my questions raise any

19   questions for the defense team?

20           MS. MAIER:  No, they do not.

21           THE COURT:  Okay.  Do my questions raise any

22   questions besides your clarifying questions for the

23   government?

24           MS. PERZEL:  No, Your Honor.  Thank you.

25           THE COURT:  Thank you.  You can step down.

Czapko - Direct

 1                  THE WITNESS:  Thank you.

 2                  MS. PERZEL:  Your Honor, the United States calls

 3      Mr. Czapko.

 4                  THE COURT:  Okay.  I am going to take a brief

 5      recess to do the two -- the 1:30 hearing that I had.  You

 6      all can stay in here.  I'm going to do it in a conference

 7      room.  Staci can take a break, and we'll reconvene in

 8      15 minutes or less.

 9          (Recess taken from 1:52 p.m. until 2:08 p.m.)

10                  MS. PERZEL:  Your Honor, the United States calls

11      Dan Czapko.

12                  THE COURT:  Excellent.  With a silent C right?

13                  MS. PERZEL:  Yes.

14                  THE COURT:  I was not sure until I found his name.

15          (The witness is sworn.)

16                  THE COURT:  Thank you.  Please be seated and state

17      your full name, and spell your last name for the record.

18                  THE WITNESS:  Daniel Czapko, C-Z-A-P-K-O.

19                  THE COURT:  You can proceed.  Thank you.

20                        **DIRECT EXAMINATION**

21      BY MS. PERZEL:

22      Q.  Mr. Czapko, you are an automated litigation support

23      specialist within the United States Attorney's Office.  Is

24      that correct?

25      A.  Yes.

```
1    Q.  And you've held that position at varying levels since

2    mid 2013.  Is that right?

3    A.  Yes, correct.

4    Q.  Okay.  Your supervisor, is that Mike Zeitz?

5    A.  Yes, he is.

6    Q.  And prior to him officially being a supervisor, was he

7    sort of your de facto supervisor?

8    A.  Yes.

9    Q.  All right.  I'd like to turn your attention to the Adams

10   case, the case of Mr. Edward Adams that we are present on

11   today, and specifically direct your attention to the

12   database that you were involved in facilitating the creation

13   of that database being housed at the Litigation Technology

14   Service Center in Columbia, South Carolina -- or

15   South Carolina, I should say.  Are you familiar with that?

16   A.  Yes.

17   Q.  All right.  We've had a lot of discussions today about

18   litigation work plans and actions that were taken in the

19   database.  I'm not going to go through each of those, but is

20   it fair to say that to the extent that there was action

21   being taken in the database starting -- or action to create

22   the database within the database, starting on or about

23   March 18th, 2016, and continuing through on or about

24   April 4th, 2017, you would have been the ones initial -- one

25   initiating those actions by the LTSC?
```

1    A.  Yes.

2    Q.  All right.  In Mr. Zeitz' absence, because I realize he

3    was on paternity leave for part of the time, if you had

4    questions regarding the database or things that were, you

5    know, you just didn't understand or were questionable to

6    you, to whom would you reach out to in Mr. Zeitz' absence?

7    A.  For Relativity questions, it would have been the LTSC.

8    Q.  All right.  And in terms of actions you had took in this

9    case, were all those actions taken at the direction of AUSA

10   David Maria?

11   A.  Yes.

12   Q.  You didn't independently go to take any action in the

13   database without AUSA Maria's direction in that regard,

14   correct?

15   A.  No, I did not.

16   Q.  And in terms of your role on the case, do you do

17   anything with regard to investigations, you know, digging

18   through evidence to identify something that might be helpful

19   in terms of marshaling the prosecution against Mr. Adams?

20   A.  No, I don't.

21   Q.  My short question is, are you a member of the

22   prosecution team?

23   A.  No.

24        MS. PERZEL:  Okay.  I understand the defense has a

25   number of questions for you.  I'm not asking you any more

```
 1     questions at this time.  Thank you.
 2                THE COURT:  Wow.
 3                MS. MAIER:  Your Honor, we have no questions for
 4     this witness.
 5                THE COURT:  Okay.
 6                          EXAMINATION
 7     BY THE COURT:
 8     Q.  I have a question.
 9     A.  Yes.
10     Q.  Because I just can't resist.  I should have asked
11     Mr. Zeitz this, I think, but just to help me understand
12     Relativity, I've used similar systems for large document
13     cases in the past, can a member of the prosecution team
14     create a folder?
15     A.  It depends on their -- what level of access they have.
16     Q.  How about like the case agents, agents?
17     A.  I -- I don't believe so.
18     Q.  Can they create a flag?
19     A.  We generally create the flags for them, like a tag.  Is
20     that what you're asking.
21     Q.  Yeah.  So hypothetically, if I wanted to find all the
22     documents about cats and I wanted to put them in a folder
23     that said cats or I wanted to flag them as being about cats
24     and I'm on the prosecution team, I couldn't do that myself,
25     I would say hey, can you make me a flag or a folder about
```

Czapko - By the Court

```
1    cats?
2    A.  We do make the -- they generally give us a list of flags
3    or tags and we create those.  I know some people might have
4    a different level of access depending on their experience
5    with Relativity.
6    Q.  Okay.  So if you create the cat folder or the cat flag,
7    then the team can use it?
8    A.  Yes.
9    Q.  So if you make that category, then every time somebody
10   sees a document about cats, they could click something and
11   put it in that collection?
12   A.  Yes.
13            THE COURT:  Or flag it for them.  Okay.  I
14   probably made matters worse, but any questions as a result?
15            MS. MAIER:  No, Your Honor.
16            THE COURT:  Any questions as a result?
17            MS. PERZEL:  No, Your Honor.
18            THE COURT:  Thank you.  You were the most
19   efficient of all of our witnesses.
20            Any further witnesses from the government?
21            MS. PERZEL:  No, Your Honor.
22            THE COURT:  Any further witnesses for Mr. Adams?
23            MR. WADE:  Not at this time, Your Honor.
24            THE COURT:  Okay.  All right.  Let's talk about a
25   bunch of things.  I have a whole lot of questions that I
```

1     would like you to keep in mind in your briefing.  I

2     recognize it's a little unorthodox in that normally I would

3     like more of a dialogue around the things that I'm thinking

4     about, but we just don't have time for a dialogue because

5     I've got another hearing in 15 minutes and I also want to

6     leave time for schedule.

7              I'm not suggesting these are the right questions,

8     and I -- it is not an ignore them at your peril situation,

9     meaning if it turns out that these are the wrong questions,

10    you don't need to waste your precious words explaining to me

11    why they're the wrong questions.  You've already perceived

12    that I'm pretty in-depth familiar with the issues that are

13    going on and I will catch up, so don't feel like this

14    becomes the bible around which you have to organize your

15    briefing.  I don't -- I don't mean to abuse my power like

16    that.  I just want you to have the benefit of a bunch of

17    things that I'm curious about that might or might not be

18    appropriate focuses for your briefing.  I'm assuming we're

19    having post hearing briefing.

20             MR. WADE:  We -- we are, Your Honor, and maybe we

21    can talk about that in connection with the next motion.  We

22    were conferring with the government just prior to the last

23    witness about the scheduling in light of the fact that some

24    of the court reporters are very burdened and a bit back

25    logged and --

1                THE COURT:  Right.  Right.

2                MR. WADE:  -- trying to figure out what we could

3       do to not put too much pressure on the system but get you

4       information in a timely manner.

5                THE COURT:  Okay.

6                MR. WADE:  We're also talking about what the

7       technically correct method for submission of a brief on this

8       issue at this point is.  And recognizing that we had similar

9       dialogue on this yesterday and based on experience in other

10      cases and without having done the research on this in the

11      Eighth Circuit, you know, I think it may be our view, again,

12      like yesterday, the Bill of Particulars motion, that as a

13      technical matter, the motion to suppress should be -- should

14      be denied as moot without prejudice and that we should just

15      roll in the new motion to make clear that it relates

16      with -- relates to the indictment that Mr. Adams was

17      arraigned on yesterday.

18                THE COURT:  Okay.  Let's -- let's reserve those

19      thoughts for a moment.  You don't have to answer these right

20      now.  Is the defense suggesting that compliance with Rule 41

21      is not necessarily adequate to constitute compliance with

22      the Fourth Amendment, meaning the committee notes in the

23      rule about the two-step process?  In a -- in if those are

24      complied with, and I'm not saying whether they are or not,

25      is it the defense's position that that isn't coextensive

1     with the protections provided by the Fourth Amendment?

2              What is the status of the law in our circuit on a

3     requirement that a taint team be brought in and when and is

4     that a Fourth Amendment question, a Fifth Amendment

5     question, or a Sixth Amendment question?

6              I think I know the answer to this now, Mr. Wade,

7     it is my understanding that the government -- I'm sorry,

8     that Mr. Adams is raising the alleged omissions from the

9     affidavit not as a poorly developed Franks motion but going

10    to whether Leon applies.  If I'm wrong about that, somebody

11    needs to make that clear at some point.

12             What effect, if any, does the newly constituted

13    taint team have on all of this?

14             What effect, and we kind of got into this earlier

15    a little bit, Mr. Wade and I, do either violations of

16    privilege or an arguably cavalier attitude toward privilege

17    have on the Fourth Amendment reasonableness analysis?  I'm

18    not saying whether the attitude was cavalier, I'm saying

19    that's what the defense is suggesting.  Flip side, what does

20    the Fourth Amendment require about honoring privilege in the

21    execution of a search warrant?

22             One of my concerns in this case is I think there

23    are two very distinct issues that are being merged by

24    everyone, and I want to know if that's what the law

25    requires, permits, or prohibits.  So I recognize several of

1       these questions are kind of trying to get at that.

2               What's Mr. Adam's position if the seize first,

3       search second doesn't work?  Should that be Yahoo doing

4       relevance searches to reduce the responsive documents?

5       Should it be me?  Or should it be -- and I'm not talking

6       about privilege; I'm talking about relevance.  I recognize

7       I'm using relevance in a colloquial term.  I mean

8       responsiveness to the search warrant when I say relevance to

9       distinguish it from a conversation about privilege?  What

10      does the Fourth Amendment require who should be doing that

11      segregation to make sure that only responsive documents are

12      ultimately seized?  Is it the tech provider?  Is it the

13      Court?  Or is it the prosecution team in the eyes of the

14      defense?

15              What's the remedy?  What is the Eighth Circuit

16      case law support as the remedy for an unreasonably

17      executed -- I'm struggling for whether to use the word

18      search or seizure because I think that's part of our

19      question.  Is the seizure happening on April 7th?  Is the

20      seizure happening during the searches?  Is the seizure

21      happening when Yahoo turned it over?  Are the other items

22      searching within seized documents or trying to narrow down

23      the seizure?  I don't know.  But let's say what is the

24      remedy for what happened here with respect to the relevance

25      question, is it suppression?  Or is it suppression of

1    certain things that are beyond the scope, as in you can't

2    use things that might have been taken that were beyond the

3    scope?  Or is it suppression of all of the fruits of this

4    search warrant?

5            Same question as to the privilege issue, is the

6    remedy for disrespected privilege in a search, if there is,

7    and I'm not saying there is, is the remedy that those

8    documents cannot be used?  Is the remedy suppression of all

9    of the places those documents were obtained?  Or is the

10   remedy something related to the composition of the

11   government team?

12           I think you guys will touch this anyway, but I

13   guess the touchstone question is what does the Fourth

14   Amendment require for reasonableness in terms of executing a

15   search warrant like this on a large volume e-mail account?

16           What effect does the waiver of privilege, and I

17   recognize you don't necessarily agree that there has been

18   one, Mr. Wade, but what effect does a midcourse waiver of

19   privilege have on pre-waiver privilege violations?

20           What right does Mr. Adams have to raise privilege

21   that has been seemingly waived by valid counsel and that is

22   certainly not being raised by the clients, at least that I

23   have right now, I'm not talking, incidentally, to be quite

24   clear, about Mr. Adams' own privilege with his own counsel,

25   I'm talking about the Apollo Scio companies.

1          We fleshed this question out a little bit earlier

2     in my conversation with Mr. Wade, but is it required by

3     either the Fourth Amendment, or whatever amendment the

4     privilege arises from, Fifth and Sixth, I think, that any

5     indication of privilege, no matter how specious, has to

6     somehow take it out of counsel's hands?  Did -- -- to put it

7     another way, the fact that Mr. Adams now disagrees that

8     there was a waiver of privilege or that there isn't a

9     privilege, which is the government's position, render what

10    the government did short of a ruling on that inappropriate?

11    Does that make sense?

12              MR. MACLAUGHLIN:  Yes.

13              THE COURT:  Does that make sense to you, what I'm

14    mussing about there?  I'm not saying do you agree with it,

15    I'm saying do you understand my question?

16              MR. WADE:  Could you try it one more time, Your

17    Honor?

18              THE COURT:  Sure.

19              MR. WADE:  Because I'm not sure I understand that

20    one.

21              THE COURT:  I can't believe you didn't get that.

22              MR. WADE:  Yeah.

23              THE COURT:  The way I see this situation is that

24    we have a case where Mr. Adams believes he has privileged

25    communications with Apollo Scio and the Apollo entities and

1    their related things because he's counsel for them.  The

2    government believed that that was not a privilege that they

3    had to honor.  They based that belief on I don't know what

4    yet but I'm assuming at least in part on the waiver that is

5    general Exhibit 1 and also perhaps on their knowledge of the

6    case, on their belief that these communications were in

7    furtherance of criminal behavior, or on communications they

8    had with counsel, I don't know, but they believed there was

9    not a privilege.  You argue now that there was and continues

10   to be a privilege.  His lawyer alerted them to their belief

11   that there was a privilege.  They said we don't agree and

12   did not stop themselves from reviewing those things, did not

13   kick that up to a court or anybody else.  What's the legal

14   impact of that?  If they are now right that there was no

15   privilege, does that cleanse their earlier actions or are

16   they still vulnerable?  Flip side, if you are now right that

17   there is a privilege, is the remedy for that that they can't

18   use the privileged documents or that they can't use any of

19   the documents?

20         What impact does the pre-filtration searching by

21   Agent Kroells have on the analysis?  This is the searching

22   that was done that we don't have documentation of using

23   Mozilla in the days prior to the official kickoff of the

24   Relativity database.  And what's the impact of the fact that

25   we don't know what those look like?

1          This last one may not be where you're going, but

2     if Mr. Adams is considering raising an argument that because

3     a superseding indictment came out that contains allegations

4     beyond the allegations that were contained in the search

5     warrant affidavit and therefore that there was searching

6     that was done in this database that went beyond the things

7     contemplated in the search warrant, sort of a proof is in

8     the pudding argument, you bring a superseding indictment

9     that includes charges that aren't the charges that are

10    contemplated in the search warrant, if Mr. Adams is going to

11    explore that, and I'm not saying you are or you aren't, but

12    reading between the lines, how does plain view work in this

13    context?  I know that when we're rifling through an e-mail

14    database in a white collar case and see child pornography, I

15    think, and I might be wrong, that that is often followed up

16    by getting a second warrant to search for child pornography.

17    It is much different when these are heavily interrelated

18    financial crimes.  What's the practice, they all seem to be

19    related to fraud, how far afield do they have to get before

20    you need a different warrant?

21         These are questions that came to mind while I was

22    working on all this.  I normally would love to have a

23    fulsome argument about all of these with all of you, but I

24    just don't think we have time for that so I thought it at

25    least might be helpful to give the benefit of my questions.

1    But like I said, please don't feel like you have to answer

2    these, you might think she completely missed the point and

3    that's a total waste of paper and that is fine, just don't

4    address them, but I thought it might be useful to you to

5    know the things that I was wondering.

6              Let's talk about logistics.  I've been really

7    struggling with the idea that both sides seem to decide on

8    their own without consulting with the Court that there would

9    be two waves of pre-trial motions aside from the challenges

10   to the superseding indictment.  Usually the practice in our

11   district is that you bring all your motions at once and that

12   if a superseding indictment adds new charges of a new type

13   that bring in new issues, those and those alone are the

14   appropriate subject for the second wave of motions.

15             The sense that I am getting is that there's this

16   intermediate possible thoughts about motions related to

17   privilege that are in the offing and frankly have nothing to

18   do with the superseding indictment, per se, not with the

19   addition of those tax counts, and that everyone decided it

20   made sense to do this motion, and if this doesn't work from

21   Mr. Adams' perspective, and I don't mean that to denigrate

22   the value of what you're trying to achieve, but if there

23   isn't a suppression here, then we go back again and look at

24   the admissibility of all of these documents.  I might be

25   misunderstanding that.  If that is what's contemplated, that

1    is quite out of step with our practice.  But again, I have

2    not had a case like this.  So we need to talk about that.

3    So let's start with you.

4         MR. WADE:  Your Honor, on that issue specifically,

5    we are in very unique circumstances here and circumstances

6    that have been, through no fault of his own, incredibly

7    burdensome financially on Mr. Adams.  The -- you saw that

8    Mr. Hopeman asked that these materials just be reviewed,

9    that the documents would be reviewed -- would be reviewed, a

10   privilege log would be prepared, they had the materials

11   preserved.  If they had followed Mr. Hopeman's request, they

12   would have all the evidence they're entitled to and we

13   wouldn't have been here for the last two days, frankly, and

14   we probably would be on the eve of trial.  That's not what

15   happened.  And then for a period of months there was little

16   or no disclosure about what actually happened.  I know Your

17   Honor has talked about the sunshine that happened.

18        THE COURT:  I understand there was a sea change.

19        MR. WADE:  Yeah, it was dark.  It wasn't sunshine

20   for a long, long time.  And so we spent -- we were spending

21   dozens and dozens and dozens of hours trying to figure out

22   what all of this stuff was, while, at the same time,

23   relating to the motions to meet the motions deadline, which

24   we didn't seek to extend, while at the same time trying to

25   figure out the privilege issues but not having an

1     explanation from the government as to how they dealt with

2     the privilege issues which we asked for repeatedly so that

3     we could try to deal with this expeditiously.  Instead,

4     again, we were forced to sort of pick and shovel through the

5     database and figure that out, a database that's so

6     voluminous that the government has admitted here in this

7     these proceedings it can't review them.  So what we did, and

8     I apologize if this should have been brought to the Court

9     sooner, to the --

10                THE COURT:  I understand you guys called me like

11    four times in two weeks and were probably hesitant to do so

12    again or trying to figure out these issues, so I'm not --

13    it's just not our normal practice.

14                MR. WADE:  And there is a degree to which the

15    materials that -- the sea change sort of right in the middle

16    of the discussions because initially Your Honor -- the Court

17    will recall that the hearing date was set for November and

18    so when we were talking about all of this, it wasn't to

19    start this in January or February, it was to start this, you

20    know, in November still, right after the motions hearing,

21    and so that shifted.

22                I will tell you I think everyone proceeded in good

23    faith.  It seemed to make sense.  Because the substantial

24    cost Mr. Adams has already occurred as a result of the

25    government's conduct here, a lot of which was frankly wasted

1    effort because of the lack of disclosure, if he had to

2    redouble a lot of that effort to deal with the privilege

3    issues and the taint motion and spend what will be tens, if

4    not a hundred thousand dollars, dealing with that issue,

5    only to have all of that stuff -- all of the evidence

6    suppressed, just as a matter of economy, we didn't think it

7    made sense.  And we raised that with the government.  We

8    maybe should have brought that to the Court.  I'm not sure I

9    fully understood the local practice, you know, on this.

10   These are privilege issues but there are disputes and

11   they're not ripe for adjudication by the Court at this

12   point.

13              THE COURT:  Well, let me understand -- let me

14   understand that.  How does it work, like, let's put

15   aside -- let's imagine that I don't recommend suppression,

16   let's imagine that that is adopted by Judge Frank, let's

17   imagine that my holding is the search was executed in

18   comportment with the Fourth Amendment, more or less,

19   therefore it shouldn't be suppressed, and I don't get into

20   details around the remedy for the violation of privilege

21   because it's not yet before me, which it sounds like might

22   not yet be before me, then will you seek another effort to

23   suppress everything on privilege violations or will you

24   begin to be tactical about who's going to decide whether,

25   just to use shorthand, whether Government's Exhibit 1 about

1      the waiver is right or whether your view is right that all

2      these documents are privileged, who decides that?  Do I

3      decide that or Judge Frank?  I do, right?  That's pre-trial

4      motion?

5                  MR. WADE:  I think that --

6                  THE COURT:  In the first instance I recognize I

7      decide nothing but.

8                  MR. WADE:  You decide both everything and nothing,

9      I believe, Your Honor.

10                 THE COURT:  I believe my power is, yeah.  That

11     comes back to me.

12                 MR. WADE:  I think that comes to you, and that

13     comes to you based upon a ripened record which we can start

14     now to develop, and maybe we should have started this

15     November 30th when we realized -- when we realized that the

16     schedule was going to be delayed, but I will tell Your

17     Honor, as I think you know, we have been fully engaged on

18     this.  We have spent no time not -- virtually almost not a

19     minute on trial preparation.  We have been fully engaged on

20     the litigation of this motion and taxed, not just engaged,

21     but taxed, and so we haven't had the time to deal with that

22     just as a practical matter, let alone deal with this, let

23     alone prepare for trial.

24                 THE COURT:  Mr. MacLaughlin, share your thoughts

25     with me about this.  Oh, Mr. Maria.

1            MR. MARIA:  If I may, Your Honor.  It's an

2       interesting situation.  Obviously I've been sitting here,

3       but I think I know the facts of our side in terms of

4       scheduling, but can I start -- and I'll keep it to the

5       issues we're discussing as to not open the door to anything

6       else.  But there wasn't ever a meeting of the minds, Your

7       Honor, in terms of how this would be done.  And as you

8       mentioned yesterday morning, you know, the government's also

9       confused as to why there wasn't either briefing that

10      occurred at the same time on these issues.  This is the way

11      that the defense chose to bring this up and to phrase it

12      this way about process, etc., instead of bringing up

13      privilege issues, privilege documents, and that's why we're

14      here.  All we agreed to was an expert disclosure extension,

15      that was this week or something, because we filed ours, they

16      said they were consumed with that, and we said it may be

17      that the briefing that results from this results in a need

18      for extension and if that's the case, we're not going to

19      object because this has taken longer, but we didn't have any

20      meeting of the minds with them, we didn't agree to any trial

21      date extension, and we didn't agree to any other deadlines.

22      More importantly, we didn't agree to any other briefing

23      should be allowed that isn't unique to the new charges in

24      the new indictment.

25            THE COURT:  Do you think there's any chance that

1      counsel can agree to narrow the dispute about the privilege

2      documents?  I mean, for instance, you're not going to be

3      disputing any of Adam's communications with counsel as being

4      privileged?

5              MR. MARIA:  No, Your Honor.  And all along we

6      asked, whether it was through us or through the taint team,

7      once that was established, If there were flaws, if there

8      were errors, let us know and we'll probably agree to them or

9      we'll take it up.  A big issue is the communication with the

10     company, you know, we have our side of that, but as to his

11     things with our lawyers, whether it's in civil litigation,

12     SEC, or in preparation for this --

13             THE COURT:  So those are agreed on, I'm not saying

14     you've nailed down which those are.

15             MR. MARIA:  We would never object to those, Your

16     Honor, and we wanted to know all along if those had slipped

17     through in some way, shape, or form because we would have

18     immediately taken them out.

19             THE COURT:  Mr. Wade.

20             MR. WADE:  The answer to the question of whether

21     we can narrow this, I think the answer is yes.  I think

22     there are likely to be -- I think there are likely to be --

23     there are sort of a technical matter of needing to deal with

24     the removal of a lot of and various privileged documents

25     that is I'll call sort of the Heinz 57 of privilege that's

1   within there, and I don't think that the government is

2   likely to ultimately disagree with that.  I think that there

3   are -- there are two issues -- at least two issues, only one

4   of which is really coming to the floor recently, to -- both

5   of which are frankly coming to the floor.

6           So just in terms of talking about schedule, the

7   key issues that I think are going to before the Court on the

8   privilege issue which is the government's disregard for the

9   Apollo privileges and the government's disregard for the

10  Brever/Murry related privileges, those are going to be

11  before the Court.  We did not -- we learned about those on

12  November 30th or later.  We were, prior to that, we were

13  totally unaware of the government's position on that.  We

14  had no idea.  We asked.  But we were not given an

15  explanation with respect to the approaches they took on

16  privileges.  So I don't think we slept on our rights on

17  those.

18          On dealing with some of the nuts and bolts of

19  the -- of the -- the privilege documents -- the other

20  privilege documents, I don't know that we're going to need

21  to even move to suppress those, so this whole discussion,

22  you know, may be moot.

23          With regard to consultation about scheduling --

24          THE COURT:  Wait, wait, wait, I'm sorry.  I want

25  to understand the one thing you just said might not be on my

1    plate which is you think that with respect to Mr. Adams'

2    communications with his own counsel, that is going to be

3    agreed to and not litigated and we don't -- we're not going

4    to be talking about Felhaber, we're not going to be talking

5    about John Brink, we're not going to be talking about

6    counsel in the civil litigation or the SEC, those are all

7    you're going to flag if they've missed them, they're going

8    to agree not to introduce them, and those will not be before

9    me?

10            MR. WADE:  They won't be before you, except we may

11   have to assess whether or not the fact that they -- a remedy

12   with respect to some of the -- a couple of the violations

13   that have come to light very recently, so specifically,

14   like, the Hopeman related things, if we think there is a

15   remedy that goes beyond suppression, we've learned since

16   November 30th additional information about what happened

17   there.  Again, we did not know that before November 30th.

18   We did not know how they dealt with that material before the

19   motions deadline.  So I don't know how we could have

20   conceivably even dealt with -- the real substantive issues

21   that are likely to be before the Court, Hopeman, Apollo,

22   Brever/Murry, none -- none of -- we weren't --

23            THE COURT:  You don't mean --

24            MR. WADE:  -- aware of that.

25            THE COURT:  -- Apollo and Scio, you really mean

1    just Apollo, or do you mean all of the entities?

2              MR. WADE:  I mean the Apollo company specifically.

3    I don't mean the --

4              THE COURT:  Companies, is that a singular or

5    plural?

6              MR. WADE:  There are two different Apollo

7    companies.  Your Honor, just in ten seconds --

8              THE COURT:  Yes.

9              MR. WADE:  -- relating to the board down below.

10             THE COURT:  Yeah, that's fine.

11             MR. WADE:  This is an asset purchase and those

12   entities remain, the Apollo entities remain, they didn't

13   become a part of public Scio or private Scio.  They just

14   acquired some assets.  You have the asset purchase

15   agreements in your binders.  This is just a 30-second

16   preview of what's going to be before the Court.

17             THE COURT:  And I'm assuming that it's your

18   position that this waiver is inadequate, not binding,

19   invalid, doesn't cover the Apollo company, something like

20   that.

21             MR. WADE:  It would be like McDonald's waiving

22   Nike's privilege if it bought some assets from Nike.  It

23   can't do it.

24             THE COURT:  Okay.  How many of the e-mails at

25   issue deal with the things that you would believe are

1     implicated by the Apollo specific privilege?

2          MR. WADE:  I -- I don't have that number with me.

3     I'm sorry, Your Honor, I wasn't prepared to --

4          THE COURT:  Do you have any sense?

5          MR. WADE:  Thousands I would guess.

6          THE COURT:  Okay.  Is it true that they didn't

7     know which of these documents you had and hadn't accessed

8     until the new disclosure of information?

9          MR. MARIA:  I was going to answer one thing

10    Mr. Wade said that relates to that in saying he

11    didn't -- they didn't know what our privilege calls, what

12    our positions were because they asked.  They never asked.

13    They would never have a dialogue.  They demanded from the

14    beginning they needed our entire process, Your Honor, and

15    that's where we got to this impasse.  If you look at the

16    correspondence that you have, at all times my goal was to

17    have a dialogue in terms of we'll tell you what our

18    privilege calls are, what things you think --

19         THE COURT:  Mr. Maria, we can split hairs all you

20    want, but the fact of the matter is there was an immense

21    increase in the fulsomeness of the government's disclosures

22    after November 30th.

23         MR. MARIA:  Agreed, Your Honor.

24         THE COURT:  All of this that I understand happened

25    wasn't readily provided, whether you -- whether you think

1    they weren't asking the right questions, whether you didn't

2    like their tone.

3              MR. MARIA:  Agreed.

4              THE COURT:  It wasn't provided.

5              MR. MARIA:  Agreed, Your Honor.

6              THE COURT:  Okay.

7              MR. MARIA:  But it --

8              THE COURT:  So it does seem like you all, if one

9    of the questions is were they appropriate in self-helping

10   into a bifurcated motions proceeding which I am troubled by,

11   whether you guys get to complain about it or not.

12             MR. MARIA:  Your Honor, I don't believe that

13   it -- I mean, this was a decision that was made and

14   ultimately to give them everything we had, more than

15   probably has been given over in any case in terms of

16   process, internal communications, search terms.  That's not

17   obligated, in terms of what --

18             THE COURT:  But there's still things we don't

19   know.  Just to be frank, I don't know whether all of the

20   documents that this team has looked at are in the final

21   search pool.  I mean, you declared this seizure of 42,927

22   documents on April 7th, but I don't know if those bear any

23   relationship to the things that your team utilized to

24   prepare its investigation.

25             MR. MARIA:  Fair enough.

 1          THE COURT:  So -- and I don't mean to sound

 2     frustrated, but we both have a ton of information and still

 3     not because other than saying that that's what's seized and

 4     that's all you have access to now but nobody ever looks in

 5     it anymore because you already finished all your work with

 6     documents that I don't know -- I mean, I'm sure you'll start

 7     looking in it a lot getting ready for trial, but I don't

 8     know.  I don't know if you looked at documents that are

 9     beyond the seizure.

10          MR. MARIA:  No, and I think the seizure hadn't

11     occurred, and that's the point from a legal standpoint is

12     you have the opportunity -- we could have looked through,

13     from a legal standpoint, once we did our best efforts to

14     cull out the potentially privileged ones, it's like pulling

15     things from a building.  You can look through -- the case

16     law is clear, you can look through every single document and

17     then determine what should be part of the final seizure.

18          THE COURT:  Okay.  But --

19          MR. WADE:  Your Honor, I hate to cut off counsel,

20     and I would almost never do it, but there's been litigation

21     over whether we can hear this, okay, and whether it's from

22     there or whether it's from here, and I think Your Honor

23     said --

24          THE COURT:  Okay.

25          MR. WADE:  So I just prefer that we not open that

1    box.

2               THE COURT:  I find this frustrating because this

3    is part of the box.  You have raised a challenge to the

4    reasonableness of the execution of this search warrant.  My

5    question is this, I understand that you declared that the

6    law allows you to go through the boxes for a long time and

7    decide what's relevant and what's not relevant, right, and

8    in the boxes world you sort out the stuff that's relevant,

9    say we're going to keep this, and you recognize there's

10   going to be the occasional birthday card in there that

11   shouldn't be in there, it's not perfect, it's reasonable,

12   but all of the stuff related to the fifth grade play and the

13   personal conversations and everything else goes into the

14   other boxes, right, so then we have this box, this is what

15   we seized, those go back to the human, and this is what we

16   can search in.

17              Here it's my sense that you searched in all the

18   boxes, you would sometimes pull things from a box, use them

19   in interviewing witnesses, use them in preparing the

20   indictment, put them back in the boxes, and then at some

21   point you said we're only going take the green boxes but we

22   don't know whether the green boxes contained the things that

23   were used.  So although you say that that wasn't a seizure,

24   it's hard to imagine pulling a document out of a box and

25   using it in an investigation as not being a mini seizure,

1     right?

2          MR. MARIA:  I see your point.  I was

3     distinguishing between viewing and utilizing.  Obviously we

4     would have had the ability to view document in terms

5     of -- so say we had the resources to do a document by

6     document review to determine relevance, which my

7     understanding under the case law is that that's permissible,

8     we could have done that.  We couldn't have used nonrelevant

9     ones.

10         THE COURT:  Right.  To prepare your investigation.

11         MR. MARIA:  Right.  So if there are ones that we

12    use, and I think that's an exercise we're undertaking now to

13    determine were any ones that didn't end up in the final

14    database used in any witness interviews, and I know there's

15    been dialogue about that, agreed that that would be

16    something that would be akin to a mini seizure in advance.

17         THE COURT:  Wouldn't that inform the

18    reasonableness of the execution of the search warrant?

19         MR. MARIA:  If -- I mean, the overall process is

20    what it is in terms of how it was done and, you know, the

21    efforts that were made in terms of --

22         THE COURT:  Mr. Wade, why don't you grab a seat.

23         MR. MARIA:  And, again, Your Honor, I came up to

24    discuss scheduling at one point.  I wasn't trying to get

25    into --

1           THE COURT:  No.  And I'm not trying to do that

2      either.  But I can't help but feel like as much as I don't

3      want to say it that I can't necessarily decide these issues

4      because we don't have all of the information that -- and I'm

5      not, believe me, I'm not trying to look for issues that are

6      not here and I'm not trying to -- this is the second time,

7      Mr. Wade, that I feel like you all have kind of ridden rough

8      shod over our practice.  The first time was when I issued a

9      scheduling order a year ago and nobody from the defense team

10     engaged, though the deadlines were blown by, until after

11     that it had occurred.  And then we found out that

12     Ms. Pauluse was no longer counsel and new counsel were on

13     board, and I think I expressed my surprise at that point.  I

14     know I did to you, Mr. Maria.

15          There's a way we have of doing things here.  You

16     have an obligation to understand it, and it involves one

17     bite at the motion apple.  Flip side, they can't be held to

18     that one bite at the motion apple if you guys haven't given

19     them the information.  And I can't decide if what makes the

20     most sense in assessing this motion related to suppression

21     for the reasonableness of the execution of the search

22     warrant to have it -- we also have this bureaucratic problem

23     that a motion can't be out there for more than a certain

24     period of time, and I don't know how to navigate that, but

25     to hit pause, have a second round of briefing and evidence,

1      though I can't imagine a hearing that takes longer than the

2      one we've already had, to answer these questions once and

3      for all and then have a singular decision about it.

4      I -- that's what I'm trying to figure out.  Mr. MacLaughlin

5      is itching to say something.  Go ahead.

6                  MR. MACLAUGHLIN:  So I think part of the

7      difficulty that we're facing here and that the Court is

8      facing particularly is the hamstrung nature of the

9      situation.  We don't have the e-mails.  Now, it seems to me

10     that Mark Zeitz, when he was testifying, told the Court,

11     told all of us, that he has the ability to do a lot of

12     things.  I mean, we can figure out what the views were.

13     It -- I don't understand why --

14                 THE COURT:  Yeah, we're between a rock and a hard

15     place with respect to the e-mails question.

16                 MR. MACLAUGHLIN:  I mean, look, the government,

17     just for purposes of getting ready for this hearing, and the

18     defense said we don't have the documents so you can't use

19     them here.

20                 THE COURT:  No, that I -- I --

21                 MR. MACLAUGHLIN:  But that's a silly position to

22     be in.  I mean, we shouldn't --

23                 THE COURT:  Well, their position is that this

24     database is full of privileged information that allows you

25     to continue to --

1          MR. MACLAUGHLIN:  Right.  But to the extent that

2     there are e-mails --

3          THE COURT:  I'll hear from you in a minute,

4     Mr. Wade.  I promise.

5          MR. MACLAUGHLIN:  But to the extent that there are

6     e-mails that are not privileged, we ought to have them and

7     then that way we can answer these questions, we can answer

8     the question did the prosecution team view anything that

9     didn't end up in the 42,927?  I mean, we'll have a lot more

10    data about that.  But right now I think that the lacunas and

11    the information before the Court are due in part to the fact

12    that we don't know what those e-mails are.

13         THE COURT:  Okay.  I'd like to hear from Mr. Wade.

14    He's had about 14 things to say and --

15         MR. WADE:  And I know the Court's under pressure,

16    so it's -- it's a bit frustrating, because respectfully, the

17    idea that the Court is upset for the defense for the failure

18    to raise issues that relate to the information that we

19    received starting on November 30th when we have asked for

20    that information, current counsel, has asked for that

21    information from the very first call with the government,

22    and you can see the correspondence and assess it however you

23    want, but I think we can all agree that it was persistent

24    and repetitive in terms of our asking for the information.

25    So respectfully, we can't file motions that address

1     information we don't have.

2              THE COURT:  You did get this on the 30th though.

3              MR. WADE:  I will note --

4              THE COURT:  I mean, I agree with -- I agree with

5     everything you're saying and in -- and it is impossible to

6     litigate the legality of the search if you're not given

7     information about how the search was conducted, and that's a

8     burden that's on the government under the federal rules of

9     civil -- criminal procedure, no question, I agree with that.

10    I note that there's a distance between November 30th and

11    now.  But I also, in terms of talking to the court about

12    these issues so we could possibly figure out how to make

13    things move more efficiently, I don't have a ready solution.

14    And it is complicated by the fact that you have access to

15    all these e-mails, the government does not have access to

16    all these e-mails, which I understand why, and I'm not sure

17    what the solution is.  It cannot be that they never get

18    access to these e-mails in order to demonstrate the

19    reasonableness of their search, if the search, in fact, was

20    reasonableness.  It also cannot be that they get all the

21    e-mails in order to, you know, things that are known to be

22    privileged.  Maybe what needs to happen is there needs to be

23    an intermediate ruling on the issue of the Apollo privilege.

24    If that is the biggest issue related to privilege, and I

25    think it is, I think there's a subsidiary issue about

1    whether reckless disregard of privilege generally could

2    inform a reasonableness of execution of a search warrant

3    leading to suppression of the whole kit and caboodle, but

4    let's imagine that the frontier of law doesn't support that

5    and I'm not -- I haven't predecided.  If the Apollo

6    privilege issue can be worked out, then one way or the

7    other, then what?  Then the rest of the e-mails could be

8    turned back over to the government and they could

9    demonstrate the reasonableness of their search efforts?

10             MR. WADE:  Well, a couple of points on that, Your

11    Honor.  First of all, and I'd like to make this, I wanted to

12    make this point specifically after Mr. Zeitz' testified and

13    now I'll make it more generally.  Mr. Zeitz has great

14    technical capacity and he has the access to a set

15    information.  All of the information that he has access to

16    that in the documents specifically beyond the 42,927 he has

17    absolutely no business reviewing.

18             THE COURT:  Okay.

19             MR. WADE:  They have not been seized.  And we

20    demanded the return of everything that's not been seized.

21    And the only way in which that information was, frankly, we

22    should probably have it back, I think, under Rule 41(g).

23             THE COURT:  Although I guess if we're litigating

24    issues related to the reasonableness of how that was even

25    generated and there is information in there that

1      could -- you've kind of raised the issue that it was

2      generated in an unreasonable way so having it back right now

3      seems like it would hamstring their ability to defend

4      against that argument.

5             MR. WADE:  And we haven't raised that, Your Honor.

6      I'm just raising it because the idea that they can go in to

7      the side of -- frankly, the idea that they can just go into

8      those documents and do an analysis and look at the documents

9      to check whether Mr. Maria looked at the Mumm file, for

10     example, is a perfect demonstration of the fiction that is a

11     seizure in this case.  Okay?  The seizure happened on

12     March 7th.  I understand Rule 41, and you asked a question

13     about it and we'll brief it, but --

14            THE COURT:  Or don't.  I mean, I want to make

15     clear that if my questions are a waste of words, don't

16     answer them, but yeah, I hear what you're saying.

17            MR. WADE:  But it just demonstrates, they -- they

18     have everything, and they made a -- they drew a line, post

19     indictment, you know, on April 7th and that they're not

20     going to review -- they're going to label something their

21     seizure and they're not going to review it.  They don't have

22     the right to sort of redraw the line at this point to try to

23     save their otherwise unreasonableness conduct.

24            THE COURT:  Wait.  I'm sorry.  Which one do you

25     want back?  You want everything but the 42,927 back?

1          MR. WADE:  I think we probably need to just

2     preserve everything and keep it where it is so that we have

3     a forensic record.

4          THE COURT:  I do too.

5          MR. WADE:  But they don't --

6          THE COURT:  Hypothetically speaking for, what you

7     want is everything but the 42,927?

8          MR. WADE:  Well, I'm saying as a practical

9     -- they've said that's what they've seized.  They don't have

10    a right to --

11         THE COURT:  Keep all the rest.

12         MR. WADE:  -- certainly to look at anything else.

13         THE COURT:  Okay.  And we don't have any

14    indication that they have been looking at anything else

15    except to try to figure out what to do in response to your

16    motion, right?

17         MR. WADE:  Right.  And Mr. Zeitz was doing it in

18    good faith and he's not a member of the prosecution team and

19    I'm sure he didn't read the contents, I'm not -- this isn't

20    an attack, sometimes my arguments are viewed as attacks.

21         THE COURT:  Right, I understand.

22         MR. WADE:  This isn't an attack on Mr. Zeitz, I'm

23    just pointing out the matter that to the extent going

24    forward they're ready to litigate this motion, you know,

25    regardless of what side of the fence the person is on or

1    whether they're on the investigation team, they don't have

2    the right to go in to material that they haven't seized,

3    okay?  That's sort of point one.

4              But to the question, Your Honor, of how do

5    we -- this is a box, it's a pickle that we're in, and it's a

6    pickle that we're in because of the extraordinary amount of

7    work that's required to deal with all of this and just

8    practical limitations.  I mean, we disclosures on

9    November 30th.  I know we had a couple of, one or two

10   conferences with the Court.  As the Court knows, both sides

11   had lengthy vacations that were preplanned --

12             THE COURT:  No, I understand.

13             MR. WADE:  -- within that.  Notwithstanding that,

14   we cross-briefed two different motions.

15             THE COURT:  All of which I read.

16             MR. WADE:  And prepared for a two-day hearing.

17   And so I think Your Honor isn't meaning to suggest that we

18   haven't been diligent.

19             THE COURT:  No, it's more that I don't know where

20   to go from here.

21             MR. WADE:  Okay.  Let me --

22             THE COURT:  And I don't know, I don't -- I don't

23   know that it -- we can decide where to go from here right

24   now.  Here's kind of my instinct, but this comes from my new

25   practice in the civil arena which used to be completely

1    foreign to me and now is most of what I do, why don't you

2    guys try to work this out and make a plan, a plan that

3    addresses all of these complexities and a plan that

4    emphasizes disclosures and sunshine by the government,

5    because I think part of this problem, I'm not -- I'm not

6    characterizing or not characterizing what did or didn't

7    happen, but I have eyes, and I think a lot of this could

8    have been avoided if some of these disclosures had been made

9    sooner.  But whatever, maybe, maybe there was just an all or

10   nothing approach, I'm not opining one way or the other, but

11   let's not have that issue moving forward.  Let's open these

12   boxes, let's open these files, and let's not have lack of

13   information cause the Court's resources, which are spread

14   incredibly thin, not to whine, go to trying to work these

15   things out all the time for you.

16          So try to figure out a plan, a plan that -- that

17   considers timeframe for motions related to the superseding

18   indictment, which I frankly assume are going to be

19   circumscribed because there's not an enormous set of changes

20   between the pre-existing indictment and the first

21   superseding indictment other than adding the tax counts, I'm

22   not conversant with whether there are additional factual

23   changes that might bring up new issues, but assuming that

24   they're not, figure out what the timing is for that

25   litigation.  We have two now outstanding pieces of

1    litigation in front of me, the Fourth Amendment litigation,

2    the privilege litigation which hasn't been raised on its own

3    but is completely informing the Fourth Amendment motion

4    raised by the defense, and the Bill of Particulars request.

5    The Bill of Particulars request has been, I forget what we

6    did, denied as moot.

7         MR. WADE:  We denied that as moot and we're going

8    to refile one Bill of Particulars motion that relates to the

9    entire indictment.

10        THE COURT:  Make a plan for how we can do these

11   things that includes an approach to getting the government

12   access to what they need to access to, to answer these

13   questions if these questions need to be answered.  If they

14   don't need to be answered, they don't need to be answered

15   and -- but you can't really have it both ways.  We can't

16   have a universe in which they cannot defend themselves but I

17   have to answer the question.  I am not going to go through

18   the 146,000 documents.  I -- I've been asked before to go

19   through shocking amounts of stuff because people can't

20   figure out a way.  It's not that I don't want to spend the

21   time, I just, I can't.

22        MR. WADE:  And we're not asking --

23        THE COURT:  I can't be the answer.

24        MR. WADE:  Yeah.

25        THE COURT:  So figure out a plan.  If there are

1    discrete things that you can't agree on, let's bring those

2    to me to talk through.  I would accept, if Mr. Adams wants

3    to be present for all of those conversations, that's very

4    important to me, I would accept if you want to have those

5    conversations by phone.  If you can narrow down all the

6    areas in dispute and then bring three issues to me by phone,

7    Mr. Adams can participate by phone or if he's fine with,

8    since it's just scheduling, letting you do it, just give me

9    a waiver on the record.  Let's figure out our plan, and that

10   includes the plan for when this case can get to trial.  I'm

11   going to take your proposal, I'm going to talk to Judge

12   Frank about it, I'm going to look at it myself, and let's

13   see if we can get a roadmap for the next steps of the

14   litigation.  How does that sound?

15               MR. MACLAUGHLIN:  That sounds like a great idea.

16   We'll do it.

17               THE COURT:  How does that sound to you, Mr. Wade?

18               MR. WADE:  It sounds like a great idea and

19   consistent with --

20               THE COURT:  You just said that because he said

21   that.

22               MR. WADE:  -- what we had started to talk about

23   but just hadn't had the time to --

24               THE COURT:  I know, I recognize that.

25               MR. WADE:  -- pin it down.

1          THE COURT:  Let me just be clear, I'm kind of a

2     new judge so I tend to say things that I'm thinking and

3     probably shouldn't, but I'm not deciding that anybody has

4     messed anything up.  And I expressed frustration about what

5     I described as self-helping, but, frankly, you're right.

6     And I expressed frustration about what I described as a lack

7     of full disclosures, I'm going to stick to that one a little

8     more, but I admit I don't know about the candor of the -- or

9     the tenor of the conversations that happened in the months

10    before November 30th.  But we can all kind of hold hands and

11    move forward together to try to figure out an approach to

12    get these issues litigated so that Mr. Adams gets his

13    constitutional rights explored, rulings on those things, and

14    if it can -- assuming it continues to merits, which it will,

15    a decision on the ultimate question so that we can resolve

16    this for both sides.

17          MR. WADE:  Very good, Your Honor.

18          THE COURT:  So how soon do you all think you can

19    have a plan to me or bring to me the areas that you can say

20    we've agreed on these four things, these ten things, we

21    don't agree on these three things, what's your sense?

22          MR. WADE:  Your Honor, just based on quickly

23    conferring with counsel, we would suggest within a week we

24    can come to the Court.  And it would probably make sense we

25    can contact your chambers and find a time to do that in a

1   short telephonic conference and lay this out rather than

2   giving you more paper --

3           THE COURT:  Great.

4           MR. WADE:  -- and having it be static, maybe we

5   can have a more dynamic interaction to make sure it meets

6   your expectations.

7           THE COURT:  That would be great.  Although, if

8   possible -- so a week from today is Tuesday, January 16th.

9   I'd welcome an e-mail that says we think we've worked out a

10  plan, here's the rough strokes of it, here's the things we

11  don't agree on.  You don't need to flesh out all the ways

12  that your side is right.  I agree, let's talk about those on

13  the phone.  Just give me what will be an agenda for our

14  phone conversation.  So could that e-mail be a week from

15  today?

16          MR. WADE:  Yes, Your Honor.

17          THE COURT:  Okay.  And then I can tell you right

18  now that I can find time probably on Wednesday the 17th or

19  sometime between Wednesday and Friday I'll make time for us

20  to have a phone call.  Mr. Adams, I'll -- I'm sorry to speak

21  to you without your counsel.  Would you, at this point,

22  think that you would like to participate in that phone call

23  about scheduling?  Would you be comfortable not being

24  present?  What do you think?  Or do you want to consult with

25  counsel and he can let me know?  I didn't mean to --

1            MR. WADE:  Just the Court's indulgence for a

2      moment.

3            THE COURT:  Sure.

4        (The defendant conferred with his attorney.)

5            MR. WADE:  Your Honor, just formally for the

6      record, I will say that Mr. Adams would waive his right to

7      be present for any of those phone conversations but he may

8      choose to participate if he's available.

9            THE COURT:  Okay.

10            MR. WADE:  He just doesn't want to do anything

11      that might hold up the proceedings here so he doesn't want

12      to be an obstacle.

13            THE COURT:  Okay.  So Mr. Adams, you understand,

14      at least in my probably overbroad reading of your rights,

15      that you have a right to be present any time the lawyers are

16      talking to the judge about anything involving your case?

17            THE DEFENDANT:  Thank you, Your Honor.  I

18      appreciate that very much.

19            THE COURT:  And you're indicating that you'd be

20      comfortable with us having a phone conversation in about a

21      week related to scheduling in your absence if you're not

22      able to be there?

23            THE DEFENDANT:  I do, Your Honor.  Thank you.

24            THE COURT:  Okay.  All right.  That seems good

25      enough for me.  And you're welcome if you can be.  Okay.

1    What else?

2              MR. WADE:  Thank you for your patience, Your

3    Honor.  We appreciate it.  We know these are --

4              THE COURT:  Yeah, it's a fascinating set of

5    issues.

6              MR. WADE:  -- complicated issues, and you've been

7    very patient and accommodating with your schedule.  We

8    appreciate it.

9              THE COURT:  You're welcome.  Mr. MacLaughlin,

10   Mr. Maria, is there anything else we should talk about?  I

11   think we've successfully postponed making any decisions

12   about anything.  Before I let you finish the question I just

13   asked you, I assume that no matter what else is true we are

14   going to need a transcript of this hearing.  Is that right?

15             MR. MACLAUGHLIN:  I have no doubt about that.  Do

16   you?

17             THE COURT:  Okay.  And --

18             MR. WADE:  I love it when we come to agreement on

19   issues.

20             THE COURT:  And do we have a sense, given the

21   reality that more briefing is coming and given an eye toward

22   Mr. Adams' resources, the least expensive transcript and the

23   one that gives the court reporter the most time is the

24   30 days.  Sometimes it's done before the 30 days.  Are we

25   comfortable with that?

1    MR. MACLAUGHLIN:  I was actually going to address

2    that.  We're -- I think the time pressure that we perceive

3    ourselves to be under is illusory at this point, even though

4    the speedy trial --

5    THE COURT:  Well, I wrote down every word that was

6    said in the last two days, so if you would just like my

7    notes, that could kind of end around the --

8    MR. MACLAUGHLIN:  Well, I don't think we're, to

9    use an expression that I like to use, in a burning building

10   here because the superseding indictment is --

11   THE COURT:  Has restarted.  I'm not concerned

12   about that.

13   MR. MACLAUGHLIN:  It's going to reset the

14   deadlines.  I'm not saying that what we litigated here today

15   should be denied as moot, I'm not saying that.  I mean, we

16   litigated it and this is the litigation over it, but it

17   seems to me that 30 days for the transcript is probably

18   okay.  If it's --

19   THE COURT:  Mr. Wade probably doesn't usually wait

20   30 days for transcripts in his practice.

21   MR. WADE:  Your Honor must be a good poker play,

22   you've read --

23   THE COURT:  I'm a terrible poker play.

24   MR. WADE:  You've read me well.  We normally

25   don't, but let us confer --

1          THE COURT:  Okay.

2          MR. WADE:  Let us make that part of those

3     discussions.  I -- we -- one of the court reporters is

4     present and she certainly knows that we are going to be

5     wanting it, and we can maybe consult with the other court

6     reporter and get their rate schedule.

7          THE COURT:  Okay.  So the other thing I want you

8     to talk about during your meetings, if possible, is not just

9     timing, but I don't need a full agreement on everything that

10    is or isn't going to be briefed, but I do want to understand

11    kind of what is going to come in the next wave, whether

12    you're recommending that the record on the existing motion

13    is closed with respect to reasonableness or not, like see if

14    you can come to agreement on those questions.

15         MR. WADE:  Can I ask one question, just about

16    general preference and practice, because maybe -- we're in

17    unchartered waters here.  Maybe if we were in Lake Superior

18    we'd be in to Canada at this point, okay?

19         THE COURT:  Okay.

20         MR. WADE:  And I don't want to be violative of it

21    anymore than we already have been, and I apologize to the

22    extent we have been.  In conferring, would you prefer that

23    we tee up all of the motions in various legal issues for one

24    proceeding a motions hearing and that we set a schedule

25    that's tied to one motions hearing, which I know is the

1     standard practice here, or would you prefer that to the

2     extent we can start to make progress on some of these issues

3     we -- we're open to considering it that it be done more

4     piecemeal?  Do you -- or does the Court not have a --

5               THE COURT:  Our practice is overwhelmingly a

6     unitary single bite at the apple motion hearing, followed by

7     motions in limine narrowly tailored to trial issues.  The

8     kind of rolling motions thing doesn't happen here.  Given

9     that this case is a bit of a challenge, if the proposal is a

10    deviation from that practice, I would ask for it to be

11    narrowly circumscribed.  For instance, I can imagine an

12    idea, I'm not saying it should be because I'd love it not to

13    be, but I can imagine the idea that in order to address some

14    things, the privilege issue needs to get resolved, but talk

15    about it.  I am not going to say that I will refuse a

16    creative solution just because it's not all at once but I'm

17    also not going to say right now that we can piecemeal these

18    motions until the end times.

19              MR. WADE:  Okay.  And one last question or one

20    last issue to raise, just sort of understanding how the

21    Court thinks about this and the local practice and how that

22    lines up with some of the schedule and practices that are

23    being employed in this case so far, Jencks Act statements

24    have not been produced and were scheduled to be produced I

25    forget if it was ten days before trial or a month before

1    trial or some closer proximity to trial, before when they

2    were legally required under the statute but not open file at

3    the beginning of the case like we get in some other cases.

4    I would anticipate, not knowing what's in them, that there

5    could be suppression motions relating to those Jencks Act

6    statements, and I don't know how -- that's sort of one of

7    these issues like how could we file a motion relating to

8    information we received on November 30th on November 1st, I

9    can't file motions relating to the Jencks Act statements

10   until we have the Jencks Act statements, but just based upon

11   what we've heard in the hearing over the last two days and

12   privilege issues and that I think they're not only relevant

13   but I think they're probably -- those statements may need to

14   be part of the litigation in terms of what we're seeking

15   here.

16              THE COURT:  Okay.  So here's how this generally

17   works.  I wish that the government would turn over Jencks

18   Act earlier.  I've never understood why they don't.  And in

19   many of my cases, for instance, with Mr. MacLaughlin, they

20   do.  It serves countless purposes that are the goal of the

21   government, encouraging sometimes pleas, saving time,

22   focussing on the issues, as much as it helps the defense.  I

23   am unable by law to order them to do it any sooner than the

24   close of the direct examination at trial.  In our district,

25   the rules related to criminal procedure around motions have

1     been interpreted to require that they disclose things

2     necessary to the litigation of what we generally consider to

3     be pre-trial motions in the discovery process early enough

4     so that you can litigate them.  For instance, let's say it's

5     a 302 but it has to do with showing a photo spread, they

6     would disclose that because, in our practice, eyewitness

7     identification is the kind of thing that's the subject of a

8     pre-trial motion, even if it wouldn't otherwise be

9     disclosed.

10            Things related to privilege that pop up in Jencks

11    Act come -- disclosures on the eve of trial tend to be

12    handled as motions in limine.  Things that come up only upon

13    late disclosure that maybe should have been disclosed

14    earlier are generally not interpreted against the defense

15    because you didn't have the control.  I think that the U.S.

16    Attorney's Office has a variable practice, but I would be

17    surprised if they would choose a very tight interpretation

18    of their Jencks Act responsibilities in this case, but I'll

19    leave that to them to talk about.  Hopefully this is

20    something an agreement can be reached on.

21            MR. WADE:  Okay.  I --

22            THE COURT:  I fear, though, that they have seen

23    firsthand that the longer they wait to make disclosures,

24    the -- it doesn't necessarily serve their ends.  In this

25    litigation I think we've struggled with that.  They get to

1    decide that, though.  The law gives it to them, not to me

2    and not to you.

3              MR. WADE:  Understood.  And we'll confer with the

4    government.  I just wanted the record clear that I --

5              THE COURT:  Yeah.

6              MR. WADE:  -- anticipate there could be real

7    issues here.

8              THE COURT:  A motion to suppress that you didn't

9    know because Jencks wasn't shared you can't have been

10   expected to raise it.

11             MR. WADE:  Thank you, Your Honor.

12             THE COURT:  Okay.  Mr. MacLaughlin, anything -- I

13   had asked you to say things and then I interrupted you ten

14   times.

15             MR. MACLAUGHLIN:  I have nothing further.  I think

16   the next thing is we talk, we speak, and we try to make this

17   easier.

18             THE COURT:  Okay.  Mr. Maria, anything else?

19             MR. MARIA:  Nothing else.

20             THE COURT:  I know you've been silent but now not.

21             MR. MARIA:  No, we were talking about the

22   scheduling side and outside of the scope of this is the

23   reason I got up in the first place.  But no, nothing further

24   from our end.

25             THE COURT:  And who do we think is going to

1   comprise the team moving forward?  You still?  Okay.  All

2   right.

3           MR. MARIA:  Yes, Your Honor.

4           THE COURT:  All right.  Okay.  I think that that's

5   it.  Let's finally give our court reporter a break, and we

6   are in recess.  Take care of yourself, Mr. Adams.  And I

7   look forward to talking to you all next week.  But you all

8   don't need to rise because I'm just going to sit right here

9   and while you clean up I'll get ready for my next matter.

10          (Proceedings concluded at 3:11 p.m.)

11                          *   *   *

1              <u>I N D E X</u>

2    <u>GOVERNMENT WITNESSES</u>:                              <u>PAGE</u>

3        Jennifer Khan
              Direct Examination by Mr. MacLaughlin       4
4              Cross-Examination by Mr. Wade              37
              Redirect Examination by Mr MacLaughlin     92
5              Examination by the Court                   97
              Redirect Examination by Mr. MacLaughlin    99
6
         Mark Zeitz
7              Direct Examination by Ms. Perzel          102
              Cross-Examination by Ms. Maier             169
8              Redirect Examination by Ms. Perzel        195
              Examination by the Court                   197
9              Redirect Examination by Ms. Perzel        199

10       Dan Czapko
              Direct Examination by Ms. Perzel          201
11             Examination by the Court                   204

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **C E R T I F I C A T E**

2          I, Staci A. Heichert, certify that the foregoing is

3      a correct transcript from the record of proceedings in the

4      above-entitled matter.

5

6              Certified by:  *s/ Staci A. Heichert*

7                              Staci A. Heichert,
                               RDR, CRR, CRC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25