# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 17-cr-64-DWF-KMM |
| | ) | |
| v. | ) | **MEMORANDUM OF LAW IN** |
| | ) | **SUPPORT OF MOTION** |
| EDWARD S. ADAMS, | ) | **ASSERTING CERTAIN** |
| | ) | **PRIVILEGES IMPLICATED BY** |
| Defendant. | ) | **YAHOO! EMAIL SEIZURE** |
| | ) | |
| | ) | |

Mr. Adams, by and through his undersigned counsel and pursuant to the Court's

January 23 Scheduling Order (DCD 88), moves the Court for a ruling that Mr. Adams has

a valid basis to assert that two categories of documents seized by the United States

pursuant to the January 2016 Yahoo! warrant (*see* DCD 37) are protected by a privilege

from disclosure.

First, Mr. Adams seeks a ruling that communications he and other lawyers made

in the course of providing legal advice to Apollo Diamond, Inc. and Apollo Diamond

Gemstone Corporation (the "Apollo Companies") are protected by the Apollo

Companies' attorney-client privilege and/or the work product doctrine, neither of which

has been waived.  The government has argued that counsel for Scio Diamond Technology

Corporation ("Scio"), a company that in 2011 and 2012 purchased certain assets of the

Apollo Companies, "waived in June 2016 any assertion of attorney-client privilege that it

may hold for work performed by Adams, Monahan, or their law firm, Adams Monahan

LLC [*sic*]."  (DCD 49 at 23).  The government contends that this purported waiver by

Scio permitted its review of Mr. Adams' Yahoo! emails, including those containing confidential communications with the Apollo Companies dating back to at least 2007. But because Scio merely acquired assets from the Apollo Companies, it did not inherit the Apollo Companies' attorney-client privileges and thus did not have standing or authority to waive those privileges.  Indeed, as the government well knew, years after the Scio-Apollo asset purchase transactions both Robert Linares (the Apollo Companies' founder and main shareholder) and Mr. Adams continued to assert the companies' attorney-client privileges to prevent disclosure of privileged information to the government.

Second, Mr. Adams seeks a ruling that his own attorney-client privilege and the work product doctrine protect from disclosure certain of his communications with the tax attorneys he retained in 2014, and, in turn, with accountants (Murry & Associates LLC) engaged by his counsel pursuant to *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), to facilitate and inform counsel's legal guidance to Mr. Adams.

## **LEGAL STANDARD**

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (citation omitted).  "[C]onfidential communications between an attorney and his client are absolutely privileged from disclosure against the will of the client."  *Diversified Indus. v. Meredith*, 572 F.2d 596, 601 (8th Cir. 1977).  The attorney-client privilege applies "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made

2

in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor except the protection be waived." *Id.* at 602 (citation omitted).

"[I]t is universally accepted that the attorney-client privilege may be raised by the attorney." *Fisher v. United States*, 425 U.S. 391, 402 n.8 (1976). Indeed, "the attorney has the duty, upon any attempt to require him to testify or produce documents within the confidence, to make assertion of the privilege, not merely for the benefit of the client, but also as a matter of professional responsibility in preventing the policy of the law from being violated." *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956); *accord* Restatement (Third) of The Law Governing Lawyers § 86(1)(b) (Am. Law Inst. 2000) ("A lawyer . . . from whom a privileged communication is sought must invoke the privilege when doing so appears reasonably appropriate . . . ."). The attorney-client privilege "attaches to corporations as well as to individuals." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985); *see also Upjohn,* 449 U.S. at 390. One who asserts the privilege has the burden of establishing it. *See Diversified Indus., Inc.*, 572 F.2d at 609.

In addition to the attorney-client privilege, the work-product doctrine exists to "shelter[] the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). "The work product doctrine sharply limits the access of an opponent to materials 'prepared in anticipation of litigation or for trial." *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir. 1997) (quoting Fed. R. Civ. P. 26(b)(3)). There are

PUBLIC VERSION

two types of work product—ordinary and opinion. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). "Ordinary work product includes raw factual information." *Id.* "Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories." *Id.* Like the attorney-client privilege, the work-product doctrine applies in criminal cases, *see Nobles*, 422 U.S. at 238, and when "the client is a corporation," *In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840, 842 (8th Cir. 1973) (citation omitted). "Work product immunity may be asserted by either the client or the attorney." *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d at 924 n.15.

"[F]ederal courts follow the federal common law regarding privileges in federal criminal proceedings." *United States v. Espino*, 317 F.3d 788, 795 (8th Cir. 2003); *accord In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915 (8th Cir. 1997) (applying "federal common law of attorney-client privilege" in criminal investigation). "[T]here is no case authority for the proposition that the [attorney-client] privilege applies differently in criminal and civil cases." *Swindler & Berlin v. United States*, 524 U.S. 399, 408-09 (1998).

## I.     The Apollo Companies' Privileges Have Not Been Waived

Mr. Adams's role as legal counsel to the Apollo Companies does not appear to be in dispute. (*See* DCD 70 (First Superseding Indictment) at ¶ 4 (noting that Mr. Adams is an attorney whose roles included serving as General Counsel of Apollo Diamond)). Rather, the crux of the privilege dispute is whether Scio's purported waiver of the Apollo Companies' privileges in 2016 was valid and effective. (*See* DCD 49 at 23). The answer to that question is no. Scio's purported waiver of the Apollo Companies' privileges was

4

ineffective because the Apollo Companies and their owners did not transfer control of the companies to Scio—rather, the Apollo Companies simply sold certain assets.  As a result, Scio does not stand in the Apollo Companies' shoes, and did not (and does not) control its privileges.

### A.   Factual Background to Apollo Companies' Privileges

#### 1.   Mr. Adams is Legal Counsel to the Apollo Companies

Apollo Diamond, Inc. ("ADI"), and Apollo Diamond Gemstone Corporation ("ADGC") are Delaware corporations founded by Robert Linares.  *See* Ex. 1 at 1 (August 31, 2011 Asset Purchase Agreement between Apollo Diamond, Inc. and Scio) (previously identified as DX 55); Ex. 2 at 1 (May 31, 2012 Asset Purchase Agreement between Apollo Diamond Gemstone Corp. and Scio ) (previously identified as DX 56); Decl. of R. Linares (Jan. 31, 2018) ¶ 1.  As of January 2, 2012, Mr. Linares has been the sole remaining director of ADI.  *See* Ex. 3 (Jan. 2, 2012 Agreement between Apollo Diamond, Inc. and Edward S. Adams); Declaration of Robert Linares ("Linares Decl.") ¶ 3.

Mr. Adams and his law firm, Adams Monahan LLP, provided legal services to the Apollo Companies and oversaw the legal affairs of the companies since at least 2006.  Linares Decl. ¶ 2.  Mr. Adams has, at all times, been authorized to assert the attorney-client privileges of the Apollo Companies and the attorney work product protections associated with work he and his firm performed for the Apollo Companies.  Linares Decl. ¶ 2.  Mr. Adams's Yahoo! emails that were seized by the government pursuant to the January 7, 2016 warrant, which sought documents dating back to 2006, including confidential communications between Mr. Adams and representatives of the Apollo

5

Companies made for the purpose of providing or receiving legal advice, as well as documents prepared in anticipation of litigation.[1]

### 2. The ADI and ADGC Asset Purchase Agreements

On August 31, 2011, ADI and Scio entered into an Asset Purchase Agreement (the "ADI APA"), pursuant to which Scio acquired certain assets of ADI. *See* Ex. 1. The agreement did not transfer all assets of ADI to Scio; rather it only transferred certain "Purchased Assets" described in the ADI APA, including diamond growing equipment and all of ADI's patents. *Id.* § 2.1. The only "intangible assets" that were transferred by the ADI APA and not specifically enumerated in § 2.1 were those that "relate to or are used in the operation of the Purchased Assets or Business," the "Business" being "owning and developing proprietary technology relating to the production of laboratory-created diamond and diamond materials." *Id.* at 1 (Recital), § 2.1(h), § 2.1(g). The ADI APA identified assets that were excluded from agreement, and these "Excluded Assets"

---

[1] Yahoo! produced 146,522 documents. (DCD 52-1 at 24 (Zeitz Decl. ¶ 7)). Mr. Adams is in the process of preparing a privilege log corresponding to the approximately 9,000 documents produced by Yahoo! that the government viewed in its Relativity database, *see* Ex. 4 (chart produced by the government reflecting number of unique document views in Yahoo! database by prosecution team) (previously marked as GX Zeitz 5), and the Court has set a deadline of March 15, 2018 for this log (DCD 88 at 2). Although Mr. Adams has not yet completed this privilege log, for the purpose of this motion, Mr. Adams has identified a sample of documents from his Yahoo! emails that are confidential communications between Mr. Adams and his colleagues at Adams Monahan LLP and representatives of the Apollo Companies for the purpose of providing or receiving legal advice, or are documents prepared by Mr. Adams in anticipation of litigation on behalf of the Apollo Companies. Mr. Adams's log of these sample documents is attached as Ex. 5 and the documents listed in the log have been submitted under seal, *ex parte*, to the Court in connection with its consideration of this motion as Ex. 21.

PUBLIC VERSION

included ADI's contract rights and real property rights, as well as ADI's books and records that did not relate primarily to the "Purchased Assets or Business." *Id.* § 2.2. All such books and records "remain[ed] the property" of ADI. *Id.* ADI also retained all of its liabilities. *Id.* § 2.4(a). The "Retained Liabilities" included all of ADI's liabilities related to the Asset Purchase Agreement transaction documents, all liabilities related to the Excluded Assets, all liabilities related to "Pre-Closing Business" such as liabilities "from events occurring" or "conditions existing" prior to the ADI APA closing, and all liabilities related to "Legal Proceedings" arising out of events or occurrences prior to the closing. *Id.* §§ 2.4(a)(i)-(v).

In May 2012, ADGC and Scio entered into a similar Asset Purchase Agreement ("ADGC APA"). *See* Ex. 2. The terms of the ADGC APA were substantially similar to the ADI APA that had been entered into the prior year. The ADGC APA only transferred certain "Purchased Assets," including intellectual property, equipment, and inventory. *Id.* § 2.1. The ADGC APA did not transfer certain "Excluded Assets," which included contract rights and real property rights, as well as ADGC's books and records "that do not relate primarily to the Purchased Assets or Business," ADGC's "Business" being "manufacturing and marketing laboratory-created gemstone diamonds using the proprietary technology of its parent company, Apollo Diamond, Inc." *Id.* at 1 (Recitals) & § 2.2. Like ADI, ADGC also retained all of its liabilities, including all liabilities related to the Asset Purchase Agreement transaction documents, the "Excluded Assets," "Pre-Closing Business," and "Legal Proceedings" arising out of events or occurrences prior to the closing. *Id.* §§ 2.4(a)(i)-(v) & 1.2 (Definitions).

7

### 3.     Scio's Post-Asset Purchase Agreement Statements to SEC

In communications with the SEC nearly a year after the ADI APA, the Chief

Financial Officer of Scio, Charles Nichols, explained why Scio believed that the Asset

Purchase Agreement between ADI and Scio resulted in the "acquisition of assets rather

than the acquisition of a business."  Ex. 6 at 3 (April 13, 2012 letter from Scio to SEC).

Mr. Nichols stated:

> The Company completed its acquisition of certain assets from Apollo
> Diamond Inc. ("Apollo Diamond") on August 31, 2011. The assets included
> certain intellectual property, diamond growing machines, and related
> equipment. . . .   The major asset class included in property, plant and
> equipment is manufacturing equipment. . . .  The patent asset includes patents
> issued and patent applications, software and trademarks. . . . *The Company
> did not seek out Apollo Diamond or its business as a going concern and did
> not intend to succeed to Apollo Diamond's business. Rather, the Company
> was interested in acquiring Apollo Diamond's diamond growing machines
> and intellectual property as the first step in an overall plan to build a new
> business*. . . .

*Id.* at 3-5 (emphasis added).  The reasons that Scio cited for its confirmation that it did

not acquire the ADI business included:

- "There is no overlap whatsoever in the executive management team of the

  Company, on the one hand, and the executive management team that had been

  in place at Apollo Diamond. . ."

- "There is no overlap whatsoever in the board of directors of the Company, on

  the one hand, and the board of directors that had been in place at Apollo

  Diamond. . ."

- "The Company currently has 6 employees.  Only two of these employees had

  previously been employed by or worked with Apollo Diamond.  Apollo

8

Diamond had laid off one of these employees in 2009 and the other in 2010, so neither was currently employed by Apollo Diamond at the time of the acquisition."

- "There is absolutely no overlap in physical facilities between Apollo Diamond and the Company. The Company's headquarters and primary production facility is in Greenville, South Carolina. Apollo Diamond has never had any operations in South Carolina."

- "The Company does not use any trade names that were previously used by Apollo Diamond."

*Id.* at 5-6.

On numerous other occasions, Scio also made clear that it believed ADI remained a freestanding entity with independent finances and that ADI could be subject to legal liability.  For example:

- On May 22, 2012 Scio sent ADI a letter requesting that it confirm information about a note payable by Scio to ADI.  Ex. 7 at 1-2.  The letter was sent at the request of Scio's auditors, who were auditing Scio's financial statements.  *Id.* at 2.

- On November 6, 2012, Scio sent ADI and ADGC a letter "to address . . . a number of outstanding issues" including the purported failure of ADI to transfer "mosaic assets which were in the possession of the Apollo companies" and which "were understood to be part of the [asset] purchase . . . ."  Scio

9

reported that the "omission [of the mosaic assets] has caused considerable financial harm to Scio . . . ."  Ex. 8.

- Consistent with the terms of the Asset Purchase Agreement between ADI and Scio, which required a $1,000,000 cash payment in addition to a $1,000,000 promissory note, *see* Ex. 1 at § 2.3, on September 9 and November 18, 2011, Scio made two transfers of $500,000 each to ADI.  Ex. 9 (ADI bank statements).

### 4.   ADI and ADGC's Post-Asset Purchase Agreement Activity

On January 2, 2012, Robert Linares, in his capacity as the sole director of ADI, entered into an agreement with Mr. Adams related to the ongoing liabilities of ADI.  Ex. 3 (hereinafter "the January 2012 Agreement"); Ex. 10 at 283:2-284:14 (R. Linares authenticating this agreement during his SEC deposition); *see also* Linares Decl. ¶ 3. The January 2012 Agreement acknowledged that ADI, together with its subsidiaries and affiliates, "will continue to have potential ongoing issues relating to its asset sale and other potential legal, financial, and other issues," including potential liability to creditors. Ex. 3.

The January 2012 Agreement states that "for a period of five years E. Adams will serve as an advisor to Corporation and assist the Corporation with respect to issues— legal, business, and otherwise—that might arise during this five year period."  *Id.*  The January 2012 Agreement also "directs the Corporation (when able) to purchase all of E. Adams' Equity Participation for the sum of $300,000 with the understanding that E. Adams shall release the Corporation from any and all liabilities owed to him and shall be

10

responsible for up to $300,000 of the Corporation's liability pursuant to the DCL." *Id.*
This agreement empowered Mr. Adams "to manage the ongoing liabilities and legal
matters of the Apollo Companies." Linares Decl. ¶ 3. ADI faced—and continues to
face—its share of liability and legal issues, including lawsuits, potential tax liability, and
threats from Scio, creditors, and vendors. ADI was sued in August 2012 and October
2013, and it remained a party to litigation until February 2015. *See* Ex. 11 (Docket
Report in *Kenneth Fink v. Adams, et al.*, Civ. No. 12-1899 (D. Minn.)) (filed in August
2012); Ex. 12 (Docket Report in *Mark P. Sennott v. Adams, et al.*, Civ. No. 13-2813
(D.S.C.)) (filed in October 2013 and dismissed with prejudice after a settlement in
February 2015).

ADI has also continued to maintain a bank account since the ADI APA. Today,
the bank account has a balance of $5,305. Ex. 13 (December 29, 2017 Venture Bank
account statement for ADI account). Bank records obtained by the government pursuant
to a grand jury subpoena reflect the continued activity in this account between August 31,
2011 (the date of the ADI APA) and 2013. *See* Ex. 14. Checks were written from this
account after August 31, 2011 by Mr. Adams, consistent with his ongoing obligation to
assist the Apollo Companies with their ongoing liabilities pursuant to the January 2012
Agreement. *See* Ex. 15 (collection of checks).

### 5. Mr. Adams and Mr. Linares Have Asserted the Apollo Companies' Privileges

As the government was aware, Mr. Adams has repeatedly asserted that
communications and other documents in his possession relating to his legal work on

11

behalf of the Apollo Companies are protected by the attorney-client privilege and work product doctrine. *See* Ex. 16 (Mr. Adams's August 2015 privilege log in SEC matter, asserting the attorney-client privilege and work product protection for documents relating to Mr. Adams's legal work for ADI and ADGC) (previously identified as DX 62); Ex. 17 (Mr. Adams's May 2016 privilege log in response to grand jury subpoena, asserting the attorney-client privilege and work product protection for documents relating to Mr. Adams's legal work for ADI and ADGC) (previously identified as DX 65). When Mr. Adams was deposed by the SEC, he maintained the confidential nature of documents and communications relating to his legal work for the Apollo Companies. *See* Ex. 18 at 175:6-11 ("Should that be the advice that we give the company? And we talked about – when I say 'we,' I mean Bob and I and Michael and Bob and others who were attorneys that we – so I want to be a little careful because I don't want to break any privilege here."). And the SEC properly honored those assertions. *See id.* at 212:3 ("Q: I want to make sure I don't invade the privilege."); *id.* at 289:4-9 (A: . . . "This is where I think it might become a little more privileged. . ." Q: "Let's stay away from that."); *id.* at 330:8-13, 507:16-25).

Mr. Linares, as a director of the Apollo Companies, has not authorized the waiver of the Apollo Companies' attorney-client privileges or any attorney work product protection associated with work performed for them. Linares Decl. ¶ 4; *see also* Ex. 10 at 222:8-23 ("Mr. Linares, what I don't do is you tell me [*sic*] any conversations or information that you had with counsel. So if Ed Adams was serving in the role as your

12

counsel – the corporation's counsel, I don't want to hear about any conversations that you may have had with him in that respect.").

### 6.     June 2016 Letter from Counsel for Scio

The government has taken the position that, in June 2016, "counsel for Scio, the successor company to Apollo Diamond and Apollo Diamond Gemstone Corporation, waived in June 2016 any assertion of attorney-client privilege that it may hold for work performed by Adams, Monahan, or their law firm, Adams Monahan LLC [*sic*], in connection with the Apollo Diamond entities or in connection with the transactions by which the assets of Apollo Diamond entities were transitioned to or acquired by Scio entities."  (DCD 49 at 23).

The June 2016 email from Scio's counsel, David Young, states that pursuant to a conversation with Scio's Chief Executive Officer, Gerald McGuire:

> Scio will not assert any attorney-client privilege or seek compliance with any duty of confidentiality with regard to work or services performed by Ed Adams, Michael Monahan, the Adams Monahan law firm or the attorneys associated with the Adams Monahan law firm in connection with (1) the Apollo Diamond entities (e.g., Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation) and (2) the transactions by which the assets of the Apollo Diamonds [*sic*] entities were transitioned to or acquired by either of the Scio Diamond Technology Corporation entities (the original or the current).  The waiver of any attorney-client privilege does not include any work performed in connection with patent matters or matters relating to Scio's ongoing business."

Ex. 19 (previously identified as DX 32) (Email from D. Young to AUSA Maria).

### B.     The Apollo Companies Retained Control of Their Privileges

The Apollo Companies did not pass control of their corporations to new management—rather, they sold certain assets to a different corporation.  As a result, the

PUBLIC VERSION

right to control the Apollo Companies' privileges did not pass to Scio under the ADI and ADGC Asset Purchase Agreements.

"[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Weintraub*, 471 U.S. at 349. However, "[n]either *Weintraub* nor any other case . . . holds that the attorney-client privilege is an incident of the sale of a portion of tangible assets of a corporation and is transferred upon sale." *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 102-03 (S.D.N.Y. 1986); *see also Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663, 668 (N.Y. 1996) ("the mere transfer of assets with no attempt to continue the pre-existing operation generally does not transfer the attorney-client relationship"); *Hanson v. Loparex Inc.*, No. 09-CV-1070 (MJD/SRN), 2009 WL 10690093, at *4 (D. Minn. Sept. 8, 2009) (same) (quoting *Tekni-Plex, Inc.* with approval); *Postorivo v. AG Paintball Holdings, Inc.*, No. CIV.A. 2991-VCP, 2008 WL 343856, at *5 (Del. Ch. Feb. 7, 2008) ("When the successor merely purchases assets and does not attempt to continue the pre-existing operation, generally the attorney-client privilege does not transfer. By contrast, when the successor continues the operations of the predecessor company, the successor company stands in the shoes of prior management and holds the privilege with respect to communications regarding the company's operations." (citing *Tekni-Plex, Inc.*)); *Pilates, Inc. v. Georgetown Bodyworks Deep Muscle Massage Centers, Inc.*, 201 F.R.D. 261, 263-64 (D.D.C. 2000) (concluding that assignment of trademarks did not transfer control of the attorney-client privileges held by the former trademark owners with their counsel, as the new owner "obtained no control" of the selling corporation); *Zenith Elecs. Corp. v.*

14

*WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21911066, at *1-2 (N.D. Ill. Aug. 7, 2003) (concluding that purchaser in asset purchase transaction did not acquire the right to assert the seller's attorney-client privilege relating to communications that took place prior to asset purchase); *Federal Deposit Ins. Corp. v. Amundson*, 682 F. Supp. 981, 986-87 (D. Minn. 1988) (holding that purchaser of assets did not assume the role of former client to seller's counsel).

In *Sobol*, for example, the corporate buyer of contractual rights argued it was the "successor in interest" to the company from which it purchased them. 112 F.R.D. at 103. A third party sought to compel discovery of the seller's privileged communications, and the buyer claimed that it controlled the privilege because "the right to assert *(or waive)* the privilege passes with the transferred assets." *Id.* (emphasis added). The court rejected this argument as "factually flawed" and denied the buyer control over the privilege because the buyer "was not the successor-in-interest of [the seller] nor was it the 'new management' of the seller" as a result of the purchase. *Id.*

The same is true here. The transactional documents make clear that the Apollo Companies sold certain assets to Scio, but did not pass control of the Apollo Companies' operations to new management. The ADI and ADGC Asset Purchase Agreements itemized the assets that were being sold, and excluded certain assets as well as all liabilities. *See* Ex. 1 § 2.1 (describing "Purchased Assets); *id.* § 2.2 (describing "Excluded Assets"); *id.* § 2.4 (describing "Retained Liabilities); Ex. 2 at §§ 2.1, 2.2, & 2.4 (same). As many courts have held, the "mere transfer of some assets of one corporation to another" did not transfer the right to claim the Apollo Companies'

15

privileges. *Zenith Elecs. Corp.*, 2003 WL 21911066, at *1-2; *accord, e.g.*, *Sobol*, 112 F.R.D. at 103.

Scio's contemporaneous statements and conduct confirm what is apparent from the asset purchase agreements:

- In regulatory submissions to the SEC, Scio confirmed that had only acquired "certain assets" from ADI, and that it had not sought out Apollo Diamond's business "as a going concern and did not intend to succeed Apollo Diamond's business." Ex. 6 at 3-4.

- Rather, Scio told the SEC that the acquisition of ADI's equipment and intellectual property was "the first step in an overall plan to build a new business," and the new business had no overlap in executive management, no overlap in the board of directors, no overlap in physical facilities, no employees who transitioned without interruption, and did not use the same trade names as the Apollo Companies. *Id.* at 4-6.

- Scio sent Mr. Linares a letter complaining of "a number of outstanding issues" related to the transaction between the two companies, including the Apollo Companies' alleged failure to honor portions of the agreement, which had led to "considerable financial harm." Ex. 8.

- Scio sent ADI a letter requesting that ADI confirm information about a note payable by Scio to ADI. Ex. 7 at 1-2.

- Scio made payments to ADI. Ex. 9.

PUBLIC VERSION

Indeed, although the Apollo Companies were no longer actively conducting business in the way they did before the asset sales, they did continue to exist and operate after the Scio transactions. Mr. Linares and Mr. Adams continued to act on the companies' behalf and continued to manage their remaining assets and liabilities. *See* Ex. 3 (Jan. 2, 2012 Agreement). Payments were received. *See* Ex. 9 (payment from Scio). Payments were made, and checks were cut. *See* Ex. 14 (2011-2013 bank statements); Ex. 15 (checks). Assets remained in ADI's bank account. *See* Ex. 13 (December 2017 bank statement); Ex. 14 (2011-2013 bank statements). Scio did not continue the Apollo Companies' operations, did not "stand[] in the shoes of prior management," and thus did not receive control over the Apollo Companies' "privilege with respect to communications regarding the company's operations." *Postorivo*, 2008 WL 343856 at *5; *see also Sobol*, 112 F.R.D. at 102-03; *Pilates, Inc.*, 201 F.R.D. at 263-64.

### C.   The June 2016 Purported Waiver by Scio was Ineffective, and the Apollo Companies' Privileges Have Not Otherwise Been Waived.

The June 2016 email from Scio's counsel purporting to waive the Apollo Companies' privileges was ineffective because Scio did not obtain control of the Apollo Companies' privileges. *See Sobol*, 112 F.R.D. at 102-03; *Postorivo*, 2008 WL 343856 at *5; *Zenith Elecs. Corp.*, 2003 WL 21911066, at *1-2; *Pilates, Inc.*, 201 F.R.D. at 263-64. Scio thus did not have the right to waive the Apollo Companies' privileges relating to "work or services performed by Ed Adams . . . in connection with (1) the Apollo

PUBLIC VERSION

Diamond entities (e.g., Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation)" as it purported to do.  *See* Ex. 19.

Similarly, Scio did not have the right to waive the Apollo Companies' privileges "with regard to work or services performed by Ed Adams . . . in connection with . . . (2) the transactions by which the assets of the Apollo Diamonds [*sic*] entities were transitioned to or acquired by either of the Scio Diamond Technology Corporation entities."  *Id.*  As discussed above, Scio did not obtain control over the Apollo Companies' privileges.  And even in the context of a merger, or where the parties agree that a buyer stands in the shoes of the seller, the buyer still does not obtain control of the seller's attorney-client privileges with respect to the negotiation of the transaction itself, due to the adverse relationship of the parties.  *See Postorivo*, 2008 WL 3438566, at *1, 6; *Tekni-Plex, Inc.*, 674 N.E.2d at 671 (concluding that, even in the context of a merger, "to grant new Tekni-Plex control over the attorney-client privilege as to communications concerning the merger transaction would thwart, rather than promote, the purposes underlying the privilege").  Scio's email, therefore, is not an effective waiver of the Apollo Companies' legal privileges.  *See Sobol*, 112 F.R.D. at 102-03; *Zenith Elecs. Corp.*, 2003 WL 2191106 at *1-2; *Postorivo*, 2008 WL 343856, at *1; *Tekni-Plex, Inc.*, 89 N.Y.2d at 138, 674 N.E.2d at 671.

After the Scio-Apollo transactions, Scio ended up in an adversarial posture with Mr. Linares and Mr. Adams.  *See* Ex. 8 (Nov. 6, 2012 letter from Scio to R. Linares).  Such post-transaction ill will and finger pointing is not unusual in the business world, and is a natural extension of the adversarial nature of corporate transactions.  *See Postorivo*,

18

2008 WL 343856, at *1, 6; *Tekni-Plex, Inc.*, 674 N.E.2d at 671. But this adversarial posture does not give Scio the right to take one position that is fully consistent with the transactional documents where it is beneficial to do so, *see* Ex. 6 (Scio April 13, 2012 letter to SEC), and take a completely different position years later when it wishes to comply with a government waiver demand and exact some harm on its corporate adversaries, *see* Ex. 19.

Neither Mr. Robert Linares, the sole remaining director of ADI and ADGC, nor Mr. Adams, who was empowered to manage the companies' legal matters, have waived the Apollo Companies' attorney-client privilege or any work product protection associated with the legal work performed for them. *See* Linares Decl. ¶ 4; Ex. 10 (Linares SEC Dep.) at 222:8-23; Ex. 18 (Adams SEC Dep.) at 175:3-11, 212:3, 289:4-9, 330:8-13, 507:16-25; Ex. 16 (Adams SEC privilege log); Ex. 17 (Adams grand jury privilege log). Accordingly, these privileges remain in full force and effect.

## II.    Murry LLC's Confidential Communications and Workpapers Are Attorney-Client Privileged Pursuant to *United States v. Kovel* and Are Work Product

Mr. Adams has submitted to the Court for *in camera* review a collection of seven emails (and their attachments) that were seized by the government from Yahoo! and remain in its investigation team database. *See* Ex. 20 (Priv. Log of Adams Communications with Murry LLC); Ex. 22 (*In Camera* Submission of Documents in Priv. Log of Adams Communications with Murry LLC). These emails are collectively referred to in this Motion as "the Murry Emails." The Murry Emails reflect communications from Mr. Adams to accountants at the firm Murry & Associates, LLC

PUBLIC VERSION

("Murry LLC"), which was retained by Mr. Adams's tax attorney for the express purpose of informing and facilitating legal advice to Mr. Adams.  *See* Declaration of Thomas Brever, Esq. ("Brever Decl.") at ¶¶ 2, 3, 5, 6 & Ex. B.  The Murry Emails embody Mr. Adams's requests for the legal advice of his attorney, as assisted by the expertise of Murry LLC.  Under *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), and its progeny, these communications and their attachments are attorney-client privileged.  They are also protected work product that reflect Mr. Adams's counsel's and his counsel's agents' mental impressions and judgments as to the relevance and importance of particular information to the legal tax issues being evaluated.  And, of course, there has been no waiver by Mr. Adams of these privileges; his counsel have rigorously and consistently asserted them on his behalf.  Mr. Adams moves this Court to rule that the Murry Emails are attorney-client privileged and attorney work product.

### A.   The Attorney-Client Privilege and Work Product Protection Apply to Documents and Communications Arising From Engagements of Accountants to Facilitate an Attorney's Legal Counsel to a Client.

It is well established that in certain circumstances the communications and workpapers of accountants who are working with lawyers on behalf of the lawyer's client are protected from disclosure by the attorney-client privilege.  *See United States v. Kovel*, 296 F.2d 918, 921-22 (2d Cir. 1961).  More than fifty years ago, the Second Circuit recognized in *Kovel* that "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others" and that "the communications of the client [would often] necessarily [be] committed to [others] by the attorney or the client himself." *Id.* at 921.  *Kovel* reasoned that the privilege therefore

PUBLIC VERSION

must extend in certain circumstances to communications arising as part of work performed by the agents of attorneys. *Id.* In *Kovel*, Louis Kovel, an accountant employed by a law firm, was held in contempt for refusing to disclose communications with a firm client regarding a statement of the client's assets and liabilities and a "transaction underlying a bad debt reduction in [the client's] 1954 tax return." *Id.* at 919–20. On appeal, the Second Circuit vacated the judgment of contempt on the basis that the attorney-client privilege could apply to situations in which "the presence of an accountant [wa]s necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* at 922. The touchstone of the privilege was that the communications between client and accountant "be made in confidence for the purpose of obtaining legal advice from the lawyer." *Id.*

Courts within every Circuit have adopted *Kovel*'s key principles. *See United States v. Schwimmer*, 892 F.2d 237, 241 (2d Cir. 1989) ("Information provided to an accountant by a client at the behest of his attorney for the purposes of interpretation and analysis is privileged to the extent that it is imparted in connection with the legal representation."); *United States v. Cote*, 456 F.2d 142, 144-45 (8th Cir. 1972) (recognizing that the "attorney-client privilege attached to the information contained in the accountant's workpapers" where the "accountant's aid to the lawyer preceded the advice and was an integral part of it" (citing *Kovel*, 296 F.2d at 921-22)); *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000); *United States v. Bornstein*, 977 F.2d 112, 116-17 (4th Cir. 1992); *United States v. Judson*, 322 F.2d 460, 462-63 (9th Cir. 1963); *Great Lakes*

PUBLIC VERSION

*Transp. Holding, LLC v. Yellow Cap Serv. Corp. of Fla., Inc.*, No. 11-50655, 2011 WL

4710851, at *1-2 (E.D. Mich. Oct. 7, 2011); *Ferko v. Nat'l Ass'n for Stock Car Auto*

*Racing, Inc.*, 218 F.R.D. 125, 138–40 (E.D. Tex. 2003); *Aull v. Cavalcade Pension Plan*,

185 F.R.D. 618, 628-29 (D. Colo. 1998); *United States v. Mullen & Co.*, 776 F. Supp.

620, 621 (D. Mass. 1991); *see also F.T.C. v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir.

1980) (calling *Kovel*'s holding "correct and necessary to preserve the effectiveness of

counsel in our legal system"); *United States v. Alvarez*, 519 F.2d 1036, 1045-46 (3d Cir.

1975) (citing and applying *Kovel* to medical expert hired to assist attorney); *Coca-Cola*

*Co. v. Allianz Ins. Co.*, No. 1:01-cv-3125, 2004 WL 7308665, at *2-6 (N.D. Ga. Mar. 4,

2004) (citing and applying *Kovel* in context of an insurance broker).

Beyond communications, documents (such as workpapers) reflecting a *Kovel*

accountant's mental impressions are protected by the well-established rule that "the

[work product] doctrine [must] protect material prepared by agents for [an] attorney as

well as those prepared by the attorney himself." *Nobles*, 422 U.S. at 239; *see, e.g.*,

*United States v. Willis*, 565 F. Supp. 1186, 1220 n.63 (S.D. Iowa 1983) (applying work

product protection to documents prepared by an accountant functioning as the attorney's

agent); *Wells Fargo & Co. v. United States*, Nos. 10-57, 10-95, 2013 WL 2444639, at

*36 (D. Minn. June 4, 2013) (applying work product protection to tax accrual workpapers

"created by non-lawyers at [accounting firm]" because they were "closely tied to the

analysis of [bank's] attorneys").

22

### B.   The Murry Emails Were Exchanged as Part of Murry LLC's Retention by Mr. Adams's Counsel to Facilitate Legal Advice and Therefore Are Privileged.

The Murry Emails fit squarely within the *Kovel* framework.  In late September 2014, Mr. Adams retained Thomas Brever, Esq.—an experienced tax attorney of 39 years—to provide legal advice on complex tax issues, ██████████████████ ████████████████████████████████████████████████████████ [2] Brever Decl. ¶ 2.  After numerous communications with Mr. Adams, Mr. Brever decided it would be necessary to engage Murry & Associates LLC ("Murry LLC"), an accounting firm, to facilitate his understanding of tax-related information provided by Mr. Adams and to inform his legal guidance to Mr. Adams on those issues.  *Id.* ¶¶ 2, 3, 5.

Mr. Brever's engagement of Murry LLC meets all the touchstones of *Kovel* and other federal cases applying the attorney-client privilege to communications with accountants.  First, it was Mr. Brever, not Mr. Adams, who retained and instructed Murry LLC.  *Compare, e.g.*, *Schwimmer*, 892 F.2d at 241, 244 (finding communications privileged where attorneys retained accountant after they began representing the defendants in an investigation); *United States v. Schmidt*, 360 F. Supp. 339, 347, 350-51 (M.D. Pa. 1973) (same), *with, e.g.*, *United States v. Brown*, 478 F.2d 1038, 1040 (7th Cir.

---

[2] 

PUBLIC VERSION

1973) (finding no privilege where "the accounting firm was retained by the taxpayer and not the attorney, and the accountant's presence at the October meeting was requested by the taxpayer's assistant and not by the attorney").  The retention letter between Foster Brever Wehrly, PLLC (formerly Foster & Brever, PLLC) ("Foster Brever") and Murry LLC clearly delineated the nature of the engagement:  Murry LLC would serve as an "independent contractor" to Foster Brever and would "assist . . . in providing professional services."[3]  Brever Decl. ¶¶ 3, 6 & Ex B.

Second, the record makes clear that Mr. Brever, Mr. Adams, and Murry LLC all understood that Mr. Adams's communications to Murry LLC were being made in confidence for the purpose of obtaining legal advice from Mr. Brever.  Mr. Brever expressly authorized Murry LLC to communicate directly with Mr. Adams, and advised Mr. Adams that he could "speak with them candidly" since they had been retained "under the *Kovel* doctrine to render legal advice."  Brever Decl. ¶¶ 3, 4 & Ex. C; *accord, e.g.*,

---

[3] This is not a case in which a taxpayer has attempted after-the-fact to secure privilege protections for pure accounting work performed by his accountants by passing along accounting records to his attorney or by roping his attorney into his financial discussions with his accountants.  Thus, a large body of cases rejecting the application of the attorney-client privilege recognized in *Kovel* to such a factual scenario are entirely inapplicable here.  *See, e.g.*, *Cavallaro v. United States*, 284 F.3d 236, 247–48 (1st Cir. 2002) (finding no privilege where Ernst & Young hired by corporate client to provide financial advice); *Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188, (4th Cir. 1991) (no privilege for communications between client and accountant before attorney was involved); *United States v. Bouschor*, 316 F.2d 451 (8th Cir. 1963) (finding no privilege where attorney merely took possession of records from client's accountants' pre-existing files); *Summit Ltd. v. Levy*, 111 F.R.D. 40, 41-42 (S.D.N.Y. 1986) (finding no privilege where attorney merely consulted long-standing accountant to estate, because of accountant's familiarity with estate's affairs).

PUBLIC VERSION

*Schwimmer*, 892 F.2d at 241 (upholding the privilege where counsel informed his client to "speak freely with [the accountant] and that any conversations with the accountant would be protected by the attorney-client privilege").

Third, Mr. Brever retained Murry LLC to decipher tax-related information provided by Mr. Adams in order to facilitate more effective legal counsel. *See, e.g.*, *Kovel* at 921-22; *Cote*, 456 F.2d at 144; *Judson*, 322 F.2d at 463. The retention letter stated that Murry LLC would assist Foster Brever "in the matter of rendering legal advice and assistance in connection with the determination, reporting and payment of federal and state income and other taxes of [Mr. Adams]" and would "assist Foster & Brever, PLLC in providing professional services, possibly including research and development of positions on tax and other matters that may result in litigation." Brever Decl. ¶ 3 & Ex. B. This is exactly what happened in practice during the *Kovel* Engagement. Murry LLC conveyed its understanding of Mr. Adams's tax information and liability issues to Mr. Brever in frequent phone calls and emails throughout the engagement. Brever Decl. ¶ 7. Mr. Brever, in turn, used that information to render legal advice to Mr. Adams. *Id.* This exchange of (1) information from Mr. Adams to Murry LLC, then (2) analysis and interpretation from Murry LLC to Mr. Brever, and (3) ultimately legal advice from Mr. Brever to Mr. Adams—exactly the exchange endorsed in *Kovel*[4]—is apparent in the

---

[4] It is, of course, irrelevant that Mr. Brever was not present for or copied on every correspondence between Mr. Adams and Murry LLC. *Kovel* itself decries any such requirement for the privilege to apply. 296 F.2d at 922 ("[I]f the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may

PUBLIC VERSION

chronology of teleconferences and emails that took place during the *Kovel* Engagement.

*See* Table 1 (cataloging communications evidenced in the Murry Emails and Mr.

Brever's Declaration).

**Table 1**

| Date of Communication | Participants in Communication | | |
|---|---|---|---|
| | Edward S. Adams (Client) | Murry LLC (Accountants) | Thomas Brever (Attorney) |
| 10/28/2014 email | ESA | MLLC | |
| 10/29/2014 call | | MLLC | TB |
| 10/29/2014 call | ESA | | TB |
| 10/29/2014 emails | ESA | MLLC | |
| 10/30/2014 call | | MLLC | TB |
| 11/3/2014 call | | MLLC | TB |
| 11/4/2014 emails | ESA | MLLC | |
| 11/4/2014 call | | MLLC | TB |
| 11/4/2014 call | ESA | | TB |
| 11/6/2014 call | | MLLC | TB |
| 11/6/2014 call | ESA | | TB |
| 11/8/2014 email | ESA | MLLC | |
| 11/8/2014 email | ESA | MLLC | TB |
| 11/8/2014 call | ESA | | TB |
| 11/10/2014 emails | ESA | MLLC | |
| 11/10/2014 email | | MLLC | TB |
| 11/11/2014 call | | MLLC | TB |
| 11/11/2014 call | ESA | | TB |
| 11/12/2014 call | | MLLC | TB |
| 11/12/2014 call | ESA | | TB |
| 11/17/2014 call | | MLLC | TB |
| 11/18/2014 call | ESA | | TB |
| 11/19/2014 call | | MLLC | TB |
| 11/20/2014 call | ESA | | TB |

better give legal advice, communications by the client *reasonably related to that purpose* ought fall within the privilege; there can be no . . . virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant . . . ." (emphasis added)).

26

| 12/3/2014 call | ESA | | TB |
|---|---|---|---|
| 12/11/2014 call | ESA | | TB |
| 12/15/2014 call | ESA | | TB |
| 12/29/2014 call | ESA | | TB |

██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████   Brever Decl. ¶ 9.  The Eighth Circuit

has long recognized that the determination "whether . . . taxpayers should file an

amended return undoubtedly involve[s] legal considerations which mathematical

calculations alone would not provide" and therefore cannot be properly categorized as

"accounting advice."  *Cote*, 456 F.2d at 144.  Accordingly, where an accountant's "aid to

the lawyer preceded the advice" regarding whether to file an amended return and "was an

integral part of it," "the attorney-client privilege attached to the information contained in

the accountant's workpapers."  *Id.*

　　This is not a case where the sole purpose and contribution of the accountant was to

prepare the client's tax returns.  *E.g.*, *Cote*, 456 F.2d at 144 ("[I]f the advice to file the

returns was first given by [the attorney] and thereafter the accountant was employed

*simply to make the correct mechanical calculations*, the privilege would not apply."

(emphasis added)); *United States v. Gurtner*, 474 F.2d 297, 299 (9th Cir. 1973).

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████   *See* Brever Decl. ¶¶ 3, 5, 6.

27

Thus, both the function performed by Murry LLC (facilitating Mr. Brever's legal advice to Mr. Adams by interpreting and analyzing information provided by Mr. Adams) and the subject matter of the engagement ███████████████████ ████████████████████████████████████████████████ ██████████████████████ render the Murry Emails attorney-client privileged.

### C.   The Murry Emails Are Protected Work Product.

In addition to the attorney-client privilege, the Murry LLC Emails are protected by the work product doctrine.  As noted above, the work product doctrine "sharply limits the access of an opponent to materials prepared in anticipation of litigation or for trial."  *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d at 924 (citation omitted).  Courts in the Eighth Circuit protect anything from which an attorney's or his agent's mental impressions could be inferred.  *See, e.g.*, *In re Chrysler Motors Corp. Overnight Evaluation Prog. Litigation*, 860 F.2d 844, 846 (8th Cir. 1988) (applying work product protection to computer tape reflecting "counsel's selection of certain categories of information" such that it served as "a compendium of relevant evidence" (citation omitted)); *Willis*, 565 F. Supp. at 1186 (applying work product protection to photocopies of tax codes and tax law treatises, some of which had been annotated by the lawyer or his staff, because the court did not believe the IRS "[wa]s entitled to discover these notations and indications of emphasis").

Each of the Murry Emails reflects Murry LLC's "mental impressions, conclusions, opinions or legal theories," *Baker*, 209 F.3d at 1054, about ███████████████████ ██████████████████████████████████████████████

28

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████    The Murry Emails, which contain probing factual questions from Murry LLC, as well as documents provided by Mr. Adams specifically in response to apparent requests by Murry LLC, would reveal precisely these sorts of mental impressions and so are protected work product.

The Murry Emails also meet the work-product requirement of having been prepared in anticipation of litigation.  In the Eighth Circuit, work product must "fairly be said to have been prepared or obtained because of the prospect of litigation."  *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (citation omitted).  Here, as explained by Mr. Brever, the *Kovel* Engagement of Murry LLC was aimed in part at "research and development of positions on tax and other matters that may result in litigation."  Brever Decl. ¶ 3 & Ex. B.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████    *See supra* note 2.  The prospect of litigation motivated Mr. Brever to retain Murry LLC and, in turn, was the impetus for Murry LLC's communications with Mr. Adams.

###   D.    The Attorney-Client Privilege and Work Product Protections Applicable to Foster Brever and Murry LLC Have Not Been Waived

There is no question that neither Mr. Adams (nor Mr. Brever or Murry LLC) has waived attorney-client privilege or work product protections applicable to the Murry

PUBLIC VERSION

Emails.  The attorney-client privilege and work product protection can be waived by "voluntary disclosure" of protected materials, *e.g.*, *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998); *In re Chrysler Motors Corp. Overnight Evaluation Prog. Litig.*, 860 F.2d at 846–47, but quite to the contrary, Mr. Brever has asserted the privileges at every turn.

When Murry LLC received a Grand Jury subpoena for documents in 2016, Mr. Brever responded that the attorney-client privilege and work product protections extended to Murry LLC pursuant to the *Kovel* Engagement.   Brever Decl. ¶ 10 & Ex. E. In producing Murry LLC files to the government, Mr. Brever carefully distinguished non-privileged, non-work product materials from files and communications covered by the federal courts' *Kovel* jurisprudence.  *Id.* ¶¶ 10-14.  Mr. Brever provided a privilege log to AUSA Maria in conjunction with the Murry LLC productions, and directly informed Mr. Kokkinen of the foundation for privilege and work product claims as to Murry LLC documents.  *Id.* ¶¶ 10, 12.  Among the non-privileged, non-work product documents produced by Mr. Brever for Murry LLC were: "(1) tax returns and other records from Mr. Adams's accountants at CLA; (2) filed copies of Mr. Adams's amended returns; (3) non-privileged financial records; (4) records that were merely computational in nature, and therefore not privileged or work product protected under applicable case law; and (5) records relating to a separate engagement by which Mr. Adams retained Murry LLC to prepare his 2015 tax returns."  *Id.* ¶ 11.

Documents that were withheld by Mr. Brever on the basis of privilege and work product were confidential communications from Mr. Adams to Murry LLC (or among

30

Murry LLC personnel) responding to substantive questions from Murry LLC or providing information and attachments for the purpose of obtaining Mr. Brever's legal advice. *Id.* ¶ 10 & Ex. E. Thus, Mr. Brever drew a careful distinction between computational documents containing pure data, which were produced, and communicative documents that would reveal the interactions between Mr. Adams, Murry LLC, and Mr. Brever for purposes of obtaining legal advice, with were withheld on privilege and work product grounds.[5]

In late December 2016, Mr. Brever established with Mr. Kokkinen a plan to utilize *in camera* submission to resolve any disputes the government might have with Mr. Brever's assertions of the privilege. Brever Decl. ¶ 12. The government has never informed Mr. Brever, Mr. Adams, or the Court of any such dispute. The record here plainly precludes a finding of waiver.

We believe that the Court's *in camera* review of the Murry Emails will lead it to the same conclusions reached by Mr. Brever and Murry LLC: the Murry Emails contain communications from Mr. Adams to Murry LLC of information to be used in facilitating Mr. Brever's assessment of the pertinent tax issues and legal strategy and to be kept in strictest confidence, and, accordingly, they merited the utmost protection afforded by the attorney-client privilege under *Kovel* and the work product doctrine. To the extent this

---

[5] Based on this good faith (and correct) application of applicable case law, Mr. Brever asserted privilege over Murry LLC's copies of all of the Murry Emails, not knowing at the time that the government possessed duplicates of those documents among the Yahoo! emails in its investigation review database.

PUBLIC VERSION

Court requires additional explanation of specific documents among the Murry Emails, the defense stands ready to provide it in an *in camera* submission to the Court.

\*          \*          \*          \*          \*

With credit due to Mr. Brever and Murry LLC, this is the clearest and most principled invocation and application of the *Kovel* privilege that this Court will find in the case law. The *Kovel* privilege has been vigorously asserted and protected—and never waived. It should be validated and honored in this matter going forward.

## **CONCLUSION**

For the foregoing reasons, Mr. Adams respectfully requests that the Court grant his motion.

Dated:  February 5, 2018                           Respectfully submitted,

                                                  /s/ *Lance Wade*
                                                  Joseph G. Petrosinelli (DC Bar #434280)
                                                  Lance Wade (DC Bar #484845)
                                                  Sarah Lochner O'Connor (DC Bar #1012405)
                                                  Gloria Maier (DC Bar # 1012208)
                                                  WILLIAMS & CONNOLLY LLP
                                                  725 Twelfth Street, N.W.
                                                  Washington, DC  20005
                                                  Telephone:  (202) 434-5000
                                                  jpetrosinelli@wc.com
                                                  lwade@wc.com
                                                  soconnor@wc.com
                                                  gmaier@wc.com

PUBLIC VERSION

James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com

*Attorneys for Defendant Edward S. Adams*

PUBLIC VERSION