# EXHIBIT 10

# C-08091

# *LINARES_ROBERT_20151112*

*11/12/2015*

**Full-size Transcript**

**Prepared by:**

C-08091

Wednesday, November 25, 2015

1

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:       )
4                          ) File No. C-08901-A
5  SCIO DIAMOND TECHNOLOGY )
6  CORPORATION             )
7
8  WITNESS:  Robert Linares
9  PAGES:    1 through 293
10 PLACE:    Securities and Exchange Commission
11           Chicago Regional Office
12           175 West Jackson Boulevard, Suite 900
13           Chicago, Illinois 60604
14 DATE:     Thursday, November 12, 2015
15
16     The above-entitled matter came on for hearing,
17 pursuant to notice, at 9:05 a.m.
18
19
20
21
22
23
24           Diversified Reporting Services, Inc.
25                    (202) 467-9200

221

1  with Apollo Diamond Gemstone Corporation?
2       A    That's correct.  I signed that.
3       Q    Okay.  Mr. Linares, I am going to hand you a
4  document that was previously marked as Commission Exhibit
5  6. Commission Exhibit 6 is a three-page document Bates
6  numbered SEC Monahan 240 through 242.  That purports to
7  be a letter dated March 11, 2011, from Apollo Diamond,
8  Incorporated to the shareholders of Apollo --
9       A    I believe that I sent you a copy of this also,
10 right?
11      Q    -- Diamond shareholders.  Mr. Linares, is that
12 your signature on the last page of this exhibit?
13      A    Yes.
14      Q    Okay.  And you are familiar with the Commission
15 Exhibit 6?
16      A    Yes.
17      Q    Okay.  And is this the letter that was sent to
18 Apollo Diamond, Incorporated shareholders in connection
19 with the solicitation of proxies --
20      A    Yes.
21      Q    -- to vote on the Asset Purchase Agreement
22 between Apollo Diamond, Incorporated and Scio -- private
23 Scio?
24      A    Yes.
25      Q    Okay.  I speak slowly.  Sorry.

222

1    A    That's all right.

2    Q    I try to help out as much as I can.

3    A    And I have to learn not to pre-empt you.

4    Q    No, no.  Mr. Linares, who drafted this
5  document?

6    A    Okay.  Ed and I talked about -- I'll tell you
7  what typical --

8    Q    And let me stop you.  Jim, I just want to make
9  sure -- Mr. Linares, what I don't do is you tell me any
10 conversations or information that you had with counsel.
11 So if Ed Adams was serving in the role as your counsel --
12 the corporation's counsel, I don't want to hear about any
13 conversations that you may have had with him in that
14 respect.

15         If you're talking to him in a different
16 context, as an executive or as a consultant, I'm -- we
17 can talk about that, but I just want to make sure to
18 distinguish or delineate between the two.

19   A    Okay.  I think then under those set of ground
20 rules what I should say is that I will talk to you about
21 the mechanism by which this was created and not how each
22 line was --

23   Q    That sounds great.

24   A    -- created.  Okay.  So we have -- let's go
25 back, and we have the bones of an agreement with Joe

1   A   No.

2   Q   Just a few follow-up questions. Mr. Linares,
3  did Ed Adams -- following -- following the execution of
4  the Asset Purchase Agreement between Apollo Diamond,
5  Incorporated and public Scio and Apollo Diamond Gemstone
6  and public Scio, did Ed Adams ever provide you a
7  breakdown of how much money individuals, entities or
8  anyone else received as a result of the -- after
9  receiving the purchase price? Did he ever break down for
10 you who got what?

11  A   I don't recall any such break down.

12  Q   Okay. Did you ever discuss with him who got
13 what?

14  A   I don't recall doing that.

15  Q   Okay. Why was Ed in charge of distributing the
16 proceeds of the Asset Purchase Agreement?

17  A   Because he had the resources to do so. I did
18 not. He had resources. He had an office. He had people
19 working for him who could do that.

20  Q   So he was no longer an officer or executive of
21 the company?

22  A   I don't think.

23  Q   Okay. And he was no longer a director in the
24 company?

25  A   I'm not sure what we had him -- empowered him

283

1  with in order to do that.
2      Q    Okay.  And I'm not -- let me just hand you a
3  document that has been previously marked as Commission
4  Exhibit 61.
5           Commission Exhibit 61 is an agreement between
6  Apollo Diamond, Incorporated and Ed S. Adams dated
7  January 2, 2012.  Do you recognize this document?
8      A    Well, let me read it and see.  Okay.
9      Q    And what is this?
10     A    What's the question?
11     Q    Do you recognize this document?
12     A    Yes.
13     Q    What is it?
14     A    Well, it's two things.  One of which is that Ed
15  agrees to work for -- work for the company --
16     Q    Okay.
17     A    -- as it's getting wound down, and the
18  corporation agrees to pay Ed $300,000 and give up all of
19  its claims to unpaid -- it says here accrued --
20  liabilities, accrued salaries, I believe.
21     Q    Well, I think it says --
22     A    Let's see.
23     Q    -- millions of warrants and/or shares?
24     A    Yes.
25     Q    It was my understanding that the executives of

284

1  Apollo Diamond, Incorporated had foregone their right to
2  warrants and options --
3       A    Right.
4       Q    -- with connection of the Asset Purchase
5  Agreement?
6       A    Okay.
7       Q    So why is the company compensating Mr. Adams
8  for foregoing those here in this document?
9       A    Yeah. That's a good question. I don't
10 remember the sequence of events that led -- that led up
11 to this. I don't really --
12      Q    Okay. So did you execute this document on
13 July -- or January 2nd, 2012?
14      A    I signed it.
15      Q    Okay. So that's after a point in time that
16 those --
17      A    Yes.
18      Q    -- letters went out, the proxy solicitation
19 went out to Apollo Diamond shareholders; is that correct?
20      A    Yeah. We are into 2012 already.
21      Q    Okay. And what funds did Apollo Diamond,
22 Incorporated have to pay Mr. Adams $300,000?
23      A    Let me see. The only funds that there would be
24 in my recollection would be the funds from the asset
25 sale.

1     Q    Okay.  It was my understanding that all of
2  those funds were already earmarked?
3     A    I see where you're going with that.  I don't
4  know the answer.  I don't know the answer to that,
5  because certainly we wouldn't be able to exceed the $2
6  million.  So I don't -- I don't recall what our logic was
7  on this.
8          I am drawing a blank as to why we did this --
9     Q    Okay.
10    A    -- and what relationship this had to do with
11 the $2 million, but it couldn't exceed the $2 million
12 because it was -- you couldn't exceed it.  You couldn't
13 get money from where there wasn't, and it also had to
14 leave money in for the reserves.  So I don't -- I don't
15 recall.
16    Q    Okay.  And is this the agreement that gave Ed
17 the authority to make those payments or those
18 distributions on behalf of Apollo Diamond?
19    A    No, because this is before -- this is after the
20 closing --
21    Q    Okay.
22    A    -- with -- so he would start paying bills, and
23 I think that some of this may be there were bills that Ed
24 paid on behalf of the company, such as settling with the
25 State of Massachusetts, such as settling with the

286

1 landlord that he paid out of his pocket and were not part
2 of the -- the list of bills to be paid. That's my --
3 that's sort of my recollection of what was going on here.
4     So it wasn't, no, we're going to give you some
5 money. He had out-of-pocket expenses. They were big, it
6 could have been this high, that he took care of.
7   Q   Okay. And under this agreement Mr. Adams
8 assumed any responsibility for additional corporate debt
9 that Apollo Diamond may -- that may arise --
10   A   Right.
11   Q   -- with regard to Apollo Diamond?
12   A   Yes.
13   Q   And he --
14   A   That's the way that I read it.
15   Q   And he assumed that liability up to $300,000?
16   A   Right.
17   Q   Okay. And he was paid $300,000 in exchange for
18 that?
19   A   Correct.
20   Q   Okay.
21   A   But understand -- my understanding and my
22 remembrance of this, this is not in a vacuum. This is
23 for things that he has written checks for out of his own
24 personal checkbook, and they're not on the list.
25   Q   The $300,000?

287

1    A     The $300,000 is to take care of some of those
2    things as whether or not -- as an additional contingency
3    as it says here.  That's my recollection of the
4    conversation that went into creating this.
5    Q     Okay.  And that's sort of -- although it's
6    not -- that's not in the document, you think that's the
7    intent behind it?
8    A     Yeah.  That's what I recall as the intent.
9    Q     Okay.  Okay.  Now, I hand you an exhibit that
10   has been previously marked as Commission Exhibit 51.
11   Commission Exhibit 51 is a document that purports to be
12   an amendment to Asset Purchase Agreement by and between
13   Apollo Diamond, Incorporated, and Scio dated July 1,
14   2011.
15         Take your time to read it, and let me know when
16   you are done, Mr. Linares.
17   A     Okay.  Question?
18   Q     Okay.  Do you recognize this document?  And
19   what is it?
20   A     Well, this is -- in my remembrance of this it
21   is a way to get out of the agreement with Scio if Scio
22   doesn't execute what it is supposed to.
23   Q     It's a way for who to get out of the agreement?
24   A     For Apollo.
25   Q     Okay.