# EXHIBIT 18

# C-08010

# *ADAMS_EDWARD_20150827*

*8/27/2015*

**Full-size Transcript**

**Prepared by:**

C-08010

Tuesday, September 15, 2015

```
                                                                    1
 1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3   In The Matter of:              )
 4                                  ) File No. C-08091-A
 5   SCIO DIAMOND TECHNOLOGY CORPORATION )
 6
 7   WITNESS:  Edward Adams
 8   PAGES:    1 through 307
 9   PLACE:    Securities and Exchange Commission
10             175 West Jackson Boulevard
11             Chicago, Illinois
12   DATE:     Thursday, August 27, 2015
13
14        The above-entitled matter came on for hearing,
15   pursuant to notice, at 8:59 a.m.
16
17
18
19
20
21
22
23
24           Diversified Reporting Services, Inc.
25                    (202) 467-9200
```

1   Q   Okay. Why don't you explain to me or walk me
2   through the events leading up to the March 2011 asset
3   purchase agreements between Apollo Diamond, Apollo Gemstone,
4   and Scio Diamond Corporation.
5   A   When you say walk you through the events --
6   Q   What was the state of Apollo Diamond and Apollo
7   Gemstone at this point?
8   A   My father-in-law had been very ill beginning in
9   2010. He had an issue with his liver, which miraculously he
10  survived. And the company, we had -- when I say "we," all
11  of us that were a part of Apollo and Adams Monohan, because
12  we were working so closely with the company, had spent a
13  huge amount of effort trying to bring this Howard University
14  transaction to fruition. We were also working on some other
15  things.
16          I think at one point in 2010 we talked extensively
17  to Tiffany. That could have been earlier, but I think it
18  was still ongoing in 2010; Tiffany, the jeweler. We had
19  talked to somebody who had a public company with $30 million
20  in cash. I don't remember if that was middle of 2010 or
21  late. And we had had ongoing conversations, because we
22  believed we got the technology -- the company believed it
23  had the technology to the point where it was commercially
24  viable, and it just needed an infusion of cash to build out
25  the manufacturing facility and scale it up, which was the

 1  whole, sort of, premise beginning in 2001 for what the
 2  company was seeking to do.
 3          But my father-in-law was ill.  My brother-in-law,
 4  I think, resigned in 2010 because he had gone a long time
 5  without being paid and was frustrated with that situation.
 6  And I think he was just -- I can't speak for him, but I
 7  think he was tired of dealing with it from that perspective,
 8  especially when Howard cratered.
 9          So in -- through a period of time, January,
10  February, even -- I think it was January, February, we
11  talked about options for the company.  We talked to Deutsche
12  Bank.  We tried to -- we had a Deutsche Bank person -- a
13  former Deutsche Bank person who had specialized in selling
14  middle market -- specialized in middle market mergers and
15  acquisitions; so middle-sized companies.  He was out
16  actively trying to sell the assets or the company, Apollo
17  and Apollo Diamond Gemstone.
18          Michael and I were talking to a variety of large
19  players about a potential investment in the company, and/or
20  a sale of the company's technology or assets.  And we were,
21  frankly, getting nowhere.  You know, there was -- I mean,
22  you may remember -- I guess it depends on your view.  But
23  2011 was, I think, still a pretty depressed market state,
24  and so I think companies were still very leery about doing
25  anything.  And we weren't -- we weren't really getting any

1   significant traction.  We had a lot of conversations, but we
2   weren't getting any traction.
3           So now we started talking about ideas, you know,
4   and wanting to do -- we didn't want -- I mean, one option we
5   explored was bankruptcy.  You know, should we just bankrupt
6   the company?  Should the company file bankruptcy?  Should
7   that be the advice that we give the company?  And we talked
8   about -- when I say "we," I mean Bob and I and Michael and
9   Bob and others who were attorneys that we -- so I want to be
10  a little careful because I don't want to break any privilege
11  here.
12          But we had engaged Paul Hastings, and they had
13  been engaged over a period of time.  They were involved in
14  some of these discussions and attorneys there.  And we
15  talked about, you know, the strategy for what the company --
16  what would bankruptcy mean.  And the general view was that
17  bankruptcy would -- it could open the company up to someone
18  buying the assets, and the shareholders getting very little,
19  and -- particularly when you considered that there were law
20  firms that were owed a significant amount of money like
21  ours.  There were people like us that were secured
22  creditors, meaning Bob, Bryant and myself.  And so that
23  didn't seem appealing because that would have wiped out the
24  shareholders.
25      Q   So other than the secured creditors and your law

211

1          MR. SHANK:  Yes.
2          THE WITNESS:  I don't know what other people at
3  private Scio knew, so I can't really testify to that.  I'm
4  sorry.
5          MR. SHANK:  What -- never mind.  Go ahead.
6          MR. KOPECKY:  I am still late to this game.  But
7  this is private Scio's.  They didn't raise any money -- you
8  didn't raise any money with this?
9          THE WITNESS:  No.  Well, I don't know.
10         MR. KOPECKY:  "You" being private Scio didn't.
11         THE WITNESS:  Yeah, I mean, we changed the
12 document or it got changed, because later this other
13 attorney came in -- I won't go there.
14         BY MR. WISNIEWSKI:
15    Q   When was this document changed?  You said this
16 document was changed -- or this was taken out.  When was
17 this taken out?
18    A   I think in 2011 or '12.  I don't really remember.
19    Q   This bullet point was removed in 2010?
20    A   No, not 2010.  I think you said 2010.  I'm sorry
21 if you didn't.  I think it was in 2012, I think.  I think it
22 was altered, the way this was worded, because other
23 attorneys were engaged, and they had a different
24 perspective.
25    Q   So in --

1                MR. SIKORA:  Can you let him finish?

2           BY MR. WISNIEWSKI:

3      Q    I want to make sure I don't invade the privilege.

4           So this bullet point was taken out of this PPM

5      sometime in 2012?

6      A    No.  Let me be clear, okay.  The PPM was

7      restructured and changed, my recollection, in 2012, because

8      what ended up happening was public -- so can I use that

9      phrase?

10     Q    Sure.

11     A    Public Scio now had new securities and counsel,

12     period, and they made alterations to it.  And I wasn't -- I

13     had nothing to do with those documents anymore, other than

14     looking at them.  And I was merely the chairman of public

15     Scio.

16     Q    Okay.  But Exhibit 13, as it's written here, this

17     was distributed to individuals and potential investors,

18     correct?

19     A    I don't remember if this exact document was or

20     there were addendums to it that were included along with

21     this document.  I don't remember because -- I am trying to

22     think, did I send it to anyone.  I don't remember that I --

23     I might have sent it to people that were interested, but I

24     don't remember if it was this document or another one that

25     included addendums or --

1   MR. WISNIEWSKI:  Off the record at 5:24.
2              (Whereupon, a recess was had.)
3   MR. WISNIEWSKI:  Back on the record at 5:25.
4   Read back my last question.
5              (Whereupon, the record was read by the
6                  reporter.)
7   MR. SHANK:  You started to answer about your
8   communications with Mr. Zouvas.
9   MR. WISNIEWSKI:  You said Luke Zouvas said, I do
10  these all the time.  And that's when you were cut off.
11  MR. SHANK:  You said "two-step transaction," and
12  that's when we stopped.
13  THE WITNESS:  Okay.  Thank you.
14  MR. SHANK:  What was the two-step transaction?
15  THE WITNESS:  So the two-step -- I think what he
16  was referring to -- I never heard of this -- was you would
17  become -- you would become a director, an owner, a
18  controlling owner of Crossbow, and then Crossbow would
19  acquire the assets of private Scio.  So that's the two
20  steps.  You have to become an owner, a controlling owner of
21  it, and then you can direct it to acquire the assets of
22  Apollo and Gemstone.  I think that's what he meant.
23  MR. HAYES:  How were you going to become a
24  controlling owner of Crossbow?
25  THE WITNESS:  By buying shares from someone who

                                                                289

1    was a shareholder of Crossbow, if I remember correctly.

2              BY MR. WISNIEWSKI:

3         Q    And did you do that?

4         A    Yeah, Mr. Zouvas -- so then what ended up

5    happening was, you know, he started doing all the

6    documentation to do that.  This is where I think it might

7    become a little more privileged.  And I think it is

8    privileged, probably.

9         Q    Let's stay away from that.

10             So did you purchase shares from somebody at

11   Crossbow?

12        A    Yes.

13        Q    Who was that?

14        A    I don't remember.

15        Q    How many shares did you purchase?

16        A    I think it was around 1,700,000 or 1,900,000.  I

17   don't remember the exact number.

18        Q    Okay.

19             MR. HAYES:  That was sufficient to give you

20   control over Crossbow?

21             THE WITNESS:  That's what he represented.

22             MR. HAYES:  Okay.  How much did you pay for those

23   shares?

24             THE WITNESS:  I don't remember.  200 some

25   thousand, I think.

# C-08091

# *ADAMS_EDWARD_20151008*

*10/8/2015 9:00 AM*

**Full-size Transcript**

**Prepared by:**

C-08091

Thursday, October 29, 2015

308

1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3   IN THE MATTER OF:              )
4                                  ) File No. C-08091-A
5   SCIO DIAMOND TECHNOLOGY        )
6   CORPORATION                    )
7
8   WITNESS:   Edward Adams
9   PAGES:     308 through 562
10  PLACE:     Securities and Exchange Commission
11             175 West Jackson Boulevard, Suite 900
12             Chicago, Illinois 60604
13  DATE:      Thursday, October 8, 2015
14
15       The above-entitled matter came on for hearing,
16  pursuant to notice at 9:00 a.m.
17
18
19
20
21
22
23
24            Diversified Reporting Services, Inc.
25                    (202) 467 9200

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

1   out who practically decided how the allocation should
2   go.
3           MR. KOPECKY:  Can I also interpose an
4   objection, because the exhibit was covered at the last
5   testimony and he provided additional reasons to make it
6   inaccurate.  I object to this actually constituting the
7   stock ledger.  He testified at the prior testimony as
8   to reasons why it is not accurate.  Three additional
9   people who had shares.
10          BY MR. SHANK
11      Q   My basic question was obviously the
12  Board -- you testified the Board ultimately approved
13  and decided who got what shares?
14      A   Right.
15      Q   And I was asking who was part of the
16  decision making to figure out how to allocate the
17  shares for the Board's ultimate approval?
18      A   I mean the backdrop -- I believe it was
19  ultimately those three individuals and then it was
20  with consultation from Bob Linares, because we were
21  trying to figure out -- look, the objective here was
22  to figure out a way to get the shareholders more
23  shares than they had in the fully diluted basis in
24  Apollo and Apollo Diamond Gemstone, which we did.
25  You know, someone has to form an entity.  I would

329

1    have been thrilled if someone else was going to do
2    all this work for free and do all the -- but nobody
3    volunteered.  There were no hands that went up.
4    When I tried to ask other people, a lot of people --
5    I remember one discussion the guy said "Just forget
6    it.  It doesn't always work out.  Not every deal
7    works out.  Just leave it."  Maybe that was good
8    advice, but I kept on it.
9              I thought, no, there is a way, that this is
10   a way for people.  And ultimately it came down to us
11   enlisting the help -- I mean I can't run a business
12   like Lancia can.  That was his -- that was what he had
13   done.  He had brung some other businesses here.  I
14   never met the man in my life until probably January of
15   2011.  And he was referred to me by one of the people
16   at Focus Capital.  And as a result of that, I want to
17   say Mike met him and Bob Linares met him and we were
18   impressed with him.  This guy at Focus spoke very
19   highly about him.
20             He had sold a business that Lancia
21   was the CEO of for a lot of money and it had been a
22   successful business.  And so we kind of -- we said to
23   Joe, you know, we have an idea here which would allow
24   the shareholders to get a tax loss according to Paul
25   Hastings.  And we'll allow the company to kind of

330

1  reboot and it will be less dilutive than if we just
2  keep going the way we are where there is millions of
3  warrants out and there's preferred shares and there's
4  debt.
5         So -- and I remember one of things Paul
6  Hastings, an attorney at Paul Hastings, and I'm
7  never going to say his name.
8         MR. SHANK:  Hang on.  You might be getting
9  into privileged materials.  So please don't testify
10 about what the attorneys at Paul Hastings are advising
11 you on.
12        THE WITNESS:  Okay.  I'm sorry.  Thank you.
13        MR. SIKORA:  We accept your objection.
14        BY MR. WISNIEWSKI
15    Q   Who is Christopher Mum?
16    A   An associate of the law firm of Adams
17 Monahan.
18    Q   And he was issued looks like 125,000
19 shares restricted in consideration of future
20 services?
21    A   I mean I have to look at the Board
22 minutes, but that seems right here based on what
23 you've said here.
24        MR. WISNIEWSKI:  I'm marking this exhibit,
25 Commission Exhibit 54.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

1        A    Of Apollo Diamond Inc., yes.

2        Q    So why at that time in August of 2012, '11

3   or shortly thereafter did Apollo Diamond Inc.

4   shareholders not get warrants?

5        A    I think what happened is a letter -- an

6   indication of interest letter was sent out to verify

7   that people were -- that the blue sky stuff was

8   correctly done.  That they wanted to invest

9   potentially in public Scio.  That they expressed

10  interest in investing or that they would express

11  interest.  I think we ran FINCEN and OFAC maybe

12  against some of the names that -- I don't remember

13  if it was about all of the names.  Just to make sure

14  there wasn't a problem with someone.  And then,

15  yeah, and that is kind of -- I remember it being,

16  okay.  Then there was discussion about well, is the

17  appropriate point to do it when we complete the

18  transaction with Apollo Diamond Gemstone.  And I

19  think that is when other counsel weighed in and

20  said --

21       Q    Wait.

22            MR. SIKORA:  So you are sneaking in there.

23  You got to remember if you are talking about -- that is

24  what is privilege and that is what you have to stay

25  away from.  Thank you by the way, SEC, for catching

508

1    these things as well.
2            BY MR. SHANK
3        Q   Who was involved in those initial
4    discussions about waiting until the Asset Purchase
5    Agreement with Apollo Diamond Gemstone was executed?
6        A   It would have been Lancia.  So me -- I
7    think -- and I don't remember when that was
8    discussed.  I know there is communication between my
9    associates and Zouvas on this issue.
10       Q   Did you have any opinions as of the fall
11   of 2011 whether those warrants should be issued to
12   Apollo Diamond, Inc. shareholders?
13       A   I think I had an opinion that we needed to
14   do -- I think it was in the PPM.  And I had an
15   opinion that we should ask Zouvas about what's the
16   appropriate -- when do we disclose this or do this.
17       Q   As of the fall of 2011, to your knowledge,
18   had there been any public disclosure of those
19   warrants rights to public Scio shareholders?
20           MR. KOPECKY:  I think you throw in the word
21   "rights" brings us back to -- I believe he testified
22   there were no rights.  I'm getting thrown on that.
23           THE WITNESS:  2012.  I know that Lancia sent
24   out a letter, I think, in September of 2011, maybe.
25           BY MR. SHANK