```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA

-----------------------------------------------------------
                            )  COURT FILE
UNITED STATES of AMERICA,    )  NO. 17-CR-64 (DWF/KMM)
                            )
            Plaintiff,       )
                            )
        vs.                  )
                            )  Courtroom 8 East
EDWARD S. ADAMS,             )  Monday, January 8, 2018
                            )  Minneapolis, Minnesota
            Defendant.       )  9:00 A.M.
                            )
-----------------------------------------------------------
```

### PRETRIAL MOTIONS, EVIDENTIARY HEARING, ARRAIGNMENT


BEFORE THE HONORABLE KATHERINE M. MENENDEZ
UNITED STATES MAGISTRATE JUDGE


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415
612.664.5108

**A P P E A R A N C E S:**


For the Government:     **OFFICE OF THE U.S. ATTORNEY**
                        By:  DAVID J. MacLAUGHLIN
                             JOHN E. KOKKINEN
                             DAVID M. MARIA
                             TRACY L. PERZEL
                             TIMOTHY C. RANK
                             Assistant U.S. Attorneys
                        600 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415



For the Defendant:      **WILLIAMS & CONNOLLY, LLP**
                        By:  LANCE A. WADE, ESQUIRE
                             GLORIA K. MAIER, ESQUIRE
                             JOSEPH G. PETROSINELLI, ESQUIRE
                        725 12th Street, NW
                        Washington, D.C.  20005



                        **FAEGRE BAKER DANIELS, LLP**
                        By:  DEBORAH A. ELLINGBOE, ESQUIRE
                        2200 Wells Fargo Center
                        90 South Seventh Street
                        Minneapolis, Minnesota  55402-3901




                    *      *      *      *

1          (9:00 a.m.)

2                         **P R O C E E D I N G S**

3                         **IN OPEN COURT**

4          (Defendant present)

5                THE COURT:  Thank you.  Please be seated.

6                All right.  Welcome, everybody.  We are here for a

7     pretrial motion hearing in United States vs. Adams.

8                We are on the record and why don't we go ahead and

9     get notices of appearances for everyone, beginning with the

10    Government, please.

11               MR. MacLAUGHLIN:  Your Honor, thank you.

12               So at counsel table with me is the actual

13    prosecution team in this case:  Assistant U.S. Attorneys

14    David Maria and John Kokkinen.

15               For purposes of this hearing, because they've been

16    in trial and because of the subpoena issue, there are three

17    other lawyers here:  myself, David MacLaughlin, Assistant

18    U.S. Attorney Tracy Perzel, and Assistant U.S. Attorney Tim

19    Rank.

20               THE COURT:  Okay.  And who's going to be helming

21    the boat, you?

22               MR. MacLAUGHLIN:  I guess I'm helming the boat,

23    yeah.

24               THE COURT:  Okay.  Great.  Welcome.

25               MR. MacLAUGHLIN:  Thank you.

1    MR. WADE:  Good morning, Your Honor.  Lance Wade

2    from the Williams & Connolly law firm on behalf of Mr. Ed

3    Adams, who is present this morning.  With me at counsel

4    table is my colleague Gloria Maier, my colleague Joseph

5    Petrosinelli, and Deborah Ellingboe of the Faegre law firm.

6    I will be taking the lead in the hearing this

7    morning, although Ms. Maier will also be taking some

8    witnesses.

9    THE COURT:  Okay.  Excellent.  Thank you and

10   welcome, welcome to everybody.

11   How are you holding up, Mr. Adams?

12   THE DEFENDANT:  I'm fine, thank you, Your Honor.

13   THE COURT:  Good.  Welcome.

14   THE DEFENDANT:  Thank you.

15   THE COURT:  Okay.  So the way I plan to proceed is

16   to hear brief -- in light of the very substantial briefing

17   that I've received -- argument from both sets of counsel

18   related to the motion to quash and the motion to compel.

19   I'll then issue a brief ruling on those two

20   matters to be followed by a more fulsome order.  But I'll be

21   issuing the ruling from the bench, just to let you know,

22   because it obviously has bearing on the next steps in the

23   hearing.

24   And then we'll move right into the hearing on the

25   motion to suppress.  I am assuming that all of the

1   anticipated testimony today relates only to the motion to

2   suppress and not to the motion for bill of particulars, is

3   that correct?

4           MR. MacLAUGHLIN:  That's correct, Your Honor.

5           THE COURT:  Okay.  And correct from your

6   perspective as well.

7           MR. WADE:  That's correct, Your Honor.  And in

8   fact, we've conferred with the Government about the motions

9   in light of the superseding indictment, and I'll remind the

10  Court that I think we have to deal with an arraignment this

11  morning --

12          THE COURT:  Yes, sir.

13          MR. WADE:  -- as well.  I think as a technical

14  matter at least the bill of particulars is moot and --

15  because of the superseding indictment, and so it would be

16  our intention after consulting with the Government of not

17  proceeding with bill of particulars at this point, because

18  we think there will be additional motions against the

19  superseding indictment and that it makes sense to consider

20  the bill of particulars in connection with those motions.

21          THE COURT:  Okay.  Why?

22          MR. WADE:  The bill of particulars -- first of

23  all, Your Honor, I anticipate that there will be new motions

24  against the indictment that will affect the indictment in

25  its entirety, so it's possible that the Court will never

1  even actually ever have to consider the bill of particulars

2  because it may choose to dismiss some or all counts of the

3  indictment.

4      THE COURT:  So there will be a motion to dismiss

5  brought as to new counts in the indictment that also would

6  affect existing counts in the indictment?

7      MR. WADE:  Yes, Your Honor.  There will be a

8  motion that I believe will relate to all counts of the

9  indictment relating to the fact that the Government has

10  accessed privileged materials in this case and that those

11  privileged materials have tainted the indictment.

12      I think that they're also going to be -- we

13  anticipate -- of course, we just got the superseding

14  indictment a couple days before the holiday, but we

15  anticipate that there will also be motions that are targeted

16  specifically to the tax counts, a number of them, and we

17  anticipate that there will be a bill of particulars that are

18  specific to the tax counts and that it's intertwined with

19  the particulars on the other counts as well.

20      THE COURT:  So you're withdrawing the bill of

21  particulars motion for now, but with the intention of

22  bringing it as to the entire new superseding indictment.

23      MR. WADE:  Correct, and the particulars we'll seek

24  will relate to the tax counts, the new counts and the old

25  counts, and it will be intertwined, so we thought it made

1    sense to do that at one time.

2         I'll also note for the Court, I think as a

3    technical matter we're not withdrawing this motion.  I think

4    as a technical matter this motion is moot as a result of the

5    superseding indictment because the indictment for which we

6    sought particulars no longer exists.

7         THE COURT:  Well, I'm not sure if it's moot if you

8    think it suffers from the same infirmities that its

9    predecessor suffered from as to the counts that are not new.

10   I mean, it's not your position that the superseding

11   indictment has assuaged your concerns about particularity.

12        MR. WADE:  Not at all, Your Honor.  If anything --

13        THE COURT:  So I'm not quite certain --

14        MR. WADE:  -- it's heightened them.

15        THE COURT:  -- why I wouldn't address the motion

16   as to the fraud counts, or as to the counts that exist, and

17   then you can seek a new motion for a bill of particulars as

18   to the new counts.  The fraud counts have not changed in a

19   way that materially affects the bill of particulars argument

20   that you've already raised, correct?

21        MR. WADE:  The new counts directly relate to the

22   old counts, and the conduct that is at issue in the new

23   counts and the particulars that are required are intertwined

24   with the particulars that are required for the old counts,

25   and I think that they inform the analysis as to what

1    particulars should be ordered as a whole.  That's I believe

2    as a technical legal matter.

3           As a practical matter, Your Honor, given

4    everything that was on the docket with the Court and that

5    fact that we had so much to deal with today, we conferred

6    with the Government about what to do on this and we together

7    came forward and decided to recommend to the Court that we

8    table that and deal with it separately to be most efficient

9    so that we can deal with everything at one time.

10          In making these representations to the Court and

11   without putting the cart before the horse, I think also in

12   conferring with the Government, we're mindful of the fact

13   that for a variety of reasons in this case we think that a

14   new schedule is going to be required.

15          We have not had the opportunity because of

16   different counsel's vacation and being out of town to confer

17   about a new schedule, but I think all the parties agree that

18   as a practical matter in light of the significance of the

19   motion that's before the Court on the suppression issues and

20   other privilege motions and taint motions that are likely to

21   follow if the motion to suppress is not granted, that we all

22   need to be realistic about the time frame that we're

23   operating under here and are going to need to jointly

24   confer, try to come up with a new schedule and propose that

25   to the Court.

1            We do that with great hesitation, Your Honor.

2     It's -- the delays that have resulted in these proceedings

3     are through no fault of Mr. Adams.  They are as a result of

4     delayed disclosures by the Government or litigation

5     schedule, frankly, trial schedules of other counsel in the

6     case and the need to delay briefing.

7            But just as an example, Your Honor, we were

8     supposed to have this motions hearing two months ago and

9     obviously we didn't have it then and a lot has ensued that

10    has fully occupied counsel in the meantime, none of which

11    relates to preparing for trial.

12           So I think we're in agreement with the Government

13    on the fact that a new schedule is likely needed both for

14    those reasons and in light of the superseding indictment,

15    which involves new charges that we have to deal with, new

16    motions, a new expert, at least one that we'll have to

17    identify and retain.  And so our plan was to confer with the

18    Government after this hearing and then come up with a

19    proposed schedule to proffer to the Court.

20           THE COURT:  Have you had any conversations with

21    Judge Frank's chambers about the necessity for a new

22    schedule?

23           MR. WADE:  Again, we have not at this time, Your

24    Honor.  It was our intention.  It's my understanding

25    Mr. Maria was on vacation last week and he's been the lead

1       lawyer in the case.

2                THE COURT:  Okay.

3                MR. WADE:  Mr. Kokkinen and I conferred regarding

4       scheduling issues and we wanted to have the opportunity once

5       Mr. Maria was back in town to then get our heads together

6       and propose something, and I think our expectation would be

7       we would try to do that, you know, propose a schedule that

8       affects matters before Your Honor and matters before Judge

9       Frank at the same time.

10               MR. KOKKINEN:  That's correct, Your Honor.  We

11      spoke on Friday, I believe it was, and Mr. Wade brought up

12      the issue of wanting to work on coming up with an agreement

13      about a new trial date.  I said that the Government was not

14      opposed to the idea of that given our agreement, I suppose,

15      that as a result of today's hearing there's likely going to

16      be post-hearing briefing, there's likely going to be appeals

17      to the District Court, there's likely going to be additional

18      motions by the defense with regard to the superseding

19      indictment.

20               And so I think we are in agreement that a new

21      trial date will need to be requested from Judge Frank.

22      Again, that conversation was just on Friday, so we haven't

23      reached out to Judge Frank yet to -- and we haven't had any

24      discussions about specific timing yet, so I don't know what

25      defense counsel has in mind.  We're open to the idea of

1    moving things.  It may just be a matter of how far out they

2    get moved that would be the issue that we'll have to

3    negotiate with defense counsel.

4              THE COURT:  Okay.  I'll leave it to you whether

5    you would like to withdraw the motion for a bill of

6    particulars to be refiled later or whether you would like me

7    to deny it as moot.  One or the other has to happen.  I

8    can't just have a motion languishing that makes the heads in

9    the Clerk's Office explode.  So we have to choose one path

10   or the other.  Either I have to address it by denying it or

11   you have to withdraw it.

12             MR. WADE:  Understandably, Your Honor.  I think in

13   light of that we would request that you deny it as moot

14   without prejudice to refile it against the superseding

15   indictment.

16             THE COURT:  Okay.  Let me also note that the

17   superseding indictment adds additional things, but doesn't

18   radically alter this landscape.  And I think that there's

19   going to be some conservative appetite for adjusting the

20   schedule, and I would encourage that we don't design a

21   schedule that requires the full exploration of this round of

22   pretrial motions, including time for reports and

23   recommendation, objections to the District Court,

24   post-hearing briefing before it all gets started and then

25   commencing the next wave of pretrial motions.

1           There are additional counts in this case, but to

2    the extent that you have indictment -- indictment-wide

3    motions, it sounds like they build upon issues that are

4    already before the Court.  And so just to signal to the

5    parties, we need to keep this case moving.  It's already

6    been around for a long time.  I understand it's a complex

7    and significant case with enormous stakes for Mr. Adams, but

8    I'm not looking to have full exploration of the first round

9    of motions followed by beginning a clock related to the

10   second.

11           MR. WADE:  We understand, Your Honor, and we agree

12   and we'll be mindful of that in conferring with the

13   Government on the schedule.

14           THE COURT:  Thank you.

15           MR. WADE:  I will note that I believe that the

16   motions that will be brought before the Court with respect

17   to the superseding indictment are likely to actually be more

18   significant and complex than the motions that are already

19   before the Court.  We want to be respectful of the Court and

20   the burdens that are imposed on the Court in dealing with a

21   series of complex motions and recognizing that there's

22   likely to be extensive briefing on these issues required,

23   but we will do our best to find a schedule that moves all of

24   this forward as expeditiously as possible.  I assure you

25   that is Mr. Adams' desire and certainly in his interest to

1    do in this case.

2              THE COURT:  Okay.  Thank you.

3              Anything you want to add from the Government's

4    perspective with respect to any of that?

5              MR. MacLAUGHLIN:  Not on any of that.  Thank you,

6    Judge.

7              THE COURT:  Okay.  I'm going to order -- and I'll

8    just briefly mention in the written order -- denial without

9    prejudice as moot of the motion for bill of particulars.  We

10   will explore that more fully if and when it comes before us

11   in response to the superseding indictment.

12             Let's proceed with argument with respect to both

13   the motion to compel and the motion to quash.  And let me

14   just note that I've read everything everybody has filed and

15   I think we can keep this part of the conversation quite

16   brief.

17             With that invitation, Mr. MacLaughlin.

18             MR. MacLAUGHLIN:  Thank you, Your Honor.

19             We did say a lot in our papers.  Mr. Genrich did a

20   very thorough job of briefing this.

21             I would simply note on the motion to quash, Your

22   Honor, that it is really unusual for an Assistant U.S.

23   Attorney to receive a subpoena.  I've been in the office 20

24   years.  I've never heard of it happening in our office.

25             In this case there is sunshine all over the place.

1      We handed out our search terms, every search term that every

2      member of the prosecution team undertook in this database

3      called Relativity has been turned over.  That is so far

4      above market that -- I mean, we have told them how we

5      executed this warrant.  There are four or five declarations.

6      There are primary contemporaneous e-mail communications that

7      have been disclosed.  As we repeatedly said in our papers,

8      the Court has everything it needs.  The test in the case law

9      is whether Mr. Maria's testimony is needed and not satisfied

10     from other sources.  I think neither one of those parts of

11     the conjunctive test are met, and so we stand by our motion

12     to quash.

13             THE COURT:  Okay.  Why don't you talk about the

14     motion to compel while you're here.

15             MR. MacLAUGHLIN:  Yes, Your Honor.

16             As you know, we made an *ex parte* filing with the

17     Court some time ago in which we provided the Court with

18     essentially documents that reflect our compliance with the

19     United States Attorneys' Manual and our conversations with

20     the Criminal Division of the Department of Justice,

21     primarily in the form of what's called the PSEU, the Policy

22     and Statutory Enforcement Unit.  The Court has those things.

23             I think the Court upon reviewing them was probably

24     struck by how "work product-y" and "internal memorandum-y"

25     they are.  I'm sorry to the court reporter for saying these

1    things, but these are truly in the nature of internal

2    Government communications.  I think there's plenty of

3    evidence the Court has that we in fact complied with the

4    requirement that we talk to our brethren in Washington, D.C.

5           It seems to me that what we lawyers said to each

6    other prior to getting this warrant is not relevant to the

7    overbreadth of the warrant, the alleged overbreadth of the

8    warrant, or how we executed it after we got done talking to

9    each other.

10          So for all of those reasons, as well as the ones

11   stated in our brief, Your Honor, we resist their motion to

12   compel what they call hearing documents.

13          THE COURT:  Thank you.

14          All right.  Mr. Wade.

15          MR. WADE:  Very briefly, Your Honor.

16          I agree with Mr. MacLaughlin that seeking

17   testimony from an Assistant United States Attorney is

18   unusual.  This is an unusual case.  Mr. Maria was the most

19   active person in searching within the Yahoo e-mail.  He

20   directed the search, he set out parameters for what could be

21   searched, and we should be entitled to gather the objective

22   evidence that relates to what he did.

23          THE COURT:  How come the extensive database

24   documentation about the searches that were conducted aren't

25   adequate to that end?

1    MR. WADE:  Because there's a lot of information

2    that Mr. Maria has not provided that is relevant to this

3    inquiry.

4    THE COURT:  Do you have information about the

5    searches that were done?

6    MR. WADE:  We have information about queries that

7    were run within the database.

8    THE COURT:  And do you have information about the

9    documents that were in the database at the time that the

10    queries were run?

11    MR. WADE:  We know which universe was in the body

12    that was being searched at the time the queries were run,

13    right?

14    MR. WADE:  Constructively we do, Your Honor.  I

15    would suggest that it would take tens of thousands of

16    dollars of forensic work to pull the documents that were

17    pulled out of the database on April 4th, 2017 based on the

18    search terms the Government executed back into the database

19    to identify what the universe of materials that the

20    Government was accessing.

21    But fundamentally, Your Honor, the question really

22    before the Court, I think, and why Mr. Maria's testimony is

23    most relevant -- I think it's relevant for a variety of

24    reasons that's set forth in our briefing, and I'm not going

25    to go through each and every tick and tie, in fact, that we

1    identified.

2            We didn't hold a lot back.  We've obviously

3    developed some additional thinking and identified some

4    additional relevant facts as we prepared for the hearing,

5    but we were pretty robust, as the Court knows, in terms of

6    identifying the involvement of Mr. Maria, the extensive

7    involvement of him, and his conduct.  What we don't know is

8    what he did in terms of directing the team on what they

9    could search, what --

10           THE COURT:  But we know what they did search,

11   right?  I mean, we know the searches that were done.

12   Regardless of whether those were done at Mr. Maria's

13   instruction or on the *sua sponte* instincts of an agent, we

14   know the searches that were done, right?

15           MR. WADE:  We know the queries that were done and

16   we know that documents were viewed.

17           THE COURT:  And we know which documents were

18   viewed.

19           MR. WADE:  We do not, Your Honor.

20           THE COURT:  We know which documents were available

21   for review?

22           MR. WADE:  It is knowable what documents were

23   viewed.  The Government provided voluminous spreadsheets

24   that will be before the Court later this morning and this

25   afternoon that show what searches were done, that show that

1    documents were viewed in response to searches.  They have

2    the ability to identify specifically which documents were

3    viewed by number.  We requested that and the Government

4    refused to provide that information, so we don't have that.

5    We don't know what was viewed.

6         But fundamentally, if you back up -- and I don't

7    want to segue into some quasi-argument on the motion --

8    there is, without Mr. Maria's declaration, which the

9    Government says that -- in a footnote to its reply that it

10   does not need to offer in this case.  Without that there is

11   no evidence that a quote-unquote seizure took place in this

12   case.  They are characterizing running of search terms --

13        THE COURT:  What about the e-mails that talk about

14   the seizure?  Why don't those establish that a seizure was

15   done.

16        MR. WADE:  I'm not aware of which e-mails the

17   Court refers to that talk about a seizure.  There are no

18   e-mails that I'm aware of prior to or around the time that

19   the seizure occurred that characterize that as a seizure.

20        THE COURT:  Okay.

21        MR. WADE:  The only characterization of that as a

22   seizure is Mr. Maria's declaration.  It's the only evidence

23   that I'm aware of -- and there's a lot of evidence in this

24   case, Your Honor, so if I'm missing something, I'm happy to

25   have counsel for the Government identify it, but it's the

1    only evidence that I'm aware of that reflects that that was

2    a seizure.  Everything else that happened in the database

3    was not done in pursuance -- in connection with the seizure.

4    There's no evidence that ties all --

5              THE COURT:  What if you never called that a

6    seizure?

7              MR. WADE:  I'm sorry?

8              THE COURT:  What's the legal significance of the

9    declaration at the moment of the seizure?  I mean, let's say

10   they never had that declaration of what is or isn't a

11   seizure but instead had proceeded as they did, sorting the

12   documents, removing -- you know, doing extensive searches

13   with respect to terms that might indicate privilege,

14   segregating those documents, not looking at those documents,

15   having the intention to call a team down the road if they

16   wanted to look in those documents, doing relevant searches

17   and relevant searches within the documents, but never had

18   this aha moment of declaring it a seizure?  Would that

19   change the analysis?

20             MR. WADE:  I think it would.  I don't think the

21   analysis changes a lot with the characterization of it as a

22   seizure *post hoc*.  I think the real evidence of the seizure

23   is that the seizure took place when they loaded the

24   documents into the database, removed the privileged terms in

25   an underinclusive way and then gave unfettered access to the

1    investigation team.  The best evidence in this case of a

2    seizure occurring is that, which is exceptionally overbroad.

3    It was essentially a general warrant at that point.

4              THE COURT:  So why is his declaration relevant

5    about the moment of what you describe as a pretextual

6    seizure?

7              MR. WADE:  Well, to the extent that the Court

8    might consider that as a seizure, as the seizure, we're

9    entitled to explore the circumstances surrounding the

10   seizure.

11             THE COURT:  But you know the circumstances

12   surrounding the seizure.  You know when they claim it

13   occurred, right?  I mean, it doesn't matter if he said that

14   in his affidavit or not.  The Government has taken the

15   position that that constitutes the seizure.  They could take

16   that position in a memorandum.  That's their legal position,

17   right?

18             MR. WADE:  If they're taking that position as a

19   matter of legal argument that that is when the seizure

20   occurred, I guess as a technical matter -- and we're not to

21   consider Mr. Maria's declaration, I guess certainly they can

22   make that legal argument in the same way we as lawyers can

23   make any legal argument.  But they have actually -- to

24   support the reasonableness of the execution of the warrant,

25   they have taken the position as a factual matter in the

1      declaration that that is when the seizure occurred.

2      Mr. Maria is the only one based on the documents that are

3      before us that we're aware of that identified the search

4      terms.

5                  THE COURT:  But we know the search terms he

6      identified.

7                  MR. WADE:  But we don't know the process by which

8      he identified the search terms.  We don't know whether --

9                  THE COURT:  I mean, I guess what I'm trying to get

10     at is, one thing that I learned to the detriment of my

11     clients for 20 years is that the subjective intention of

12     Government officers, whether they're U.S. Attorneys or

13     law-enforcement officers, is irrelevant, even when -- you

14     know, as a former public defender, you new darn well that

15     there was a certain motivation going on.  That's irrelevant.

16     What's relevant is whether it complies with the expectations

17     of the law objectively, and here we have an absolute flood

18     of information about the searches that were done, the

19     methods that were used, the mechanisms that were in place.

20     Whether Mr. Maria's subjective belief about why he was using

21     those is available through other sources or not, it's not

22     relevant to my calculus.

23                  MR. WADE:  Respectfully, it is, Your Honor,

24     because there are additional objective facts that need to

25     be -- that we have the right, we believe, to explore in

1    connection with our motion to suppress.

2              THE COURT:  Like what?

3              MR. WADE:  All of the searches that you have just

4    identified in terms of everything that happened in advance

5    of April 4th, 2007 at this point, based on the record before

6    the Court, are in no way tied to the conduct of Mr. Maria in

7    developing search terms and identifying --

8              THE COURT:  But why does how he got to the search

9    terms matter?  I can look at the search terms, decide

10   whether they constitute a reasonable compliance with the

11   warrant, reasonable protection of privilege.  Why does his

12   thinking in choosing term A, rejecting term B, matter to

13   that analysis?  In the same way -- let me give you a

14   more --

15             MR. WADE:  Sure.

16             THE COURT:  -- you know, mundane 1980s analogy,

17   right?

18             We have a more traditional search of boxes in

19   somebody's office, and the -- they take the unusual step of

20   somehow recording everything that they looked at, but why

21   they chose to look in the boxes in the left-hand cupboard

22   but not the boxes in the right-hand cupboard doesn't change

23   the analysis of whether looking at the boxes in the

24   left-hand cupboard was reasonable.

25             I feel like what you are saying is you'd like to

1    know why Mr. Maria chose certain search terms or why he

2    chose certain protocols with respect to how to approach the

3    search, but his "why" doesn't have any bearing on my

4    assessment of the objective reasonableness of what he did.

5              MR. WADE:  No.  What we'd like to know, Your

6    Honor, is the process that he went through in developing

7    those search terms --

8              THE COURT:  Why?

9              MR. WADE:  -- whether that was connected to the

10   warrant, how it was connected to warrant in his view at that

11   time, and whether he consulted with any of the other members

12   of the prosecution team in connection with the development

13   of those search terms.

14             THE COURT:  Let's say that they consulted

15   fulsomely, wrung their hands exhaustively and believed

16   themselves to be doing everything right, but that I look at

17   the warrant compared with the searches that were done and

18   find that it's wrong.  Their belief in its correctness

19   doesn't change anything.  *Leon*'s not applicable in this

20   context.  It doesn't bail them out, right?  Whether you

21   might find in other circuits that *Leon* applies in this

22   context or not, they are eschewing any reliance on *Leon*.

23             So if I found that they did all of the mental work

24   that you describe wanting to know about, that they thought

25   we were doing the right thing, but that they were actually

1    doing the entirely wrong thing, that's an objective

2    assessment that would lead to suppression.  Why is the

3    reverse not true?

4              MR. WADE:  Well, first, Your Honor, with respect

5    to *Leon*, to the extent they don't rely on *Leon*, we have

6    alleged that the warrant in this case lacks particularity,

7    and we think the warrant both in its entirety and --

8              THE COURT:  Well, I think they're not necessarily

9    repudiating a reliance on *Leon* with respect to the warrant

10   itself.  And I'll allow Mr. MacLaughlin to correct me if

11   I've misapprehended the extent to which they're relying on

12   *Leon*, but I understood them not to be relying on *Leon* with

13   respect to the execution of the search warrant, saying that

14   Mr. Maria's subjective intentions are irrelevant to that.

15             MR. WADE:  Two issues, Your Honor.

16             One is, it's not just the reasonableness of the

17   execution of the warrant.  We would submit to the Court --

18   now, of course, our briefing on this, Your Honor, occurred

19   before the disclosures of November 30th, and so that's part

20   of the reason why we've conferred and we need additional

21   briefing after this hearing to basically address the issues

22   that are before the Court now.  Because respectfully,

23   there's a degree to which the Court is untethered outside

24   its -- I'm sure its own work, it's untethered by briefing to

25   arguments that relate to the execution of the search warrant

1   because we didn't know how the execution -- how the warrant

2   was executed because it wasn't disclosed to the defense.  So

3   there's a degree to which additional briefing is going to be

4   required.

5          THE COURT:  Absolutely.

6          MR. WADE:  And if we want to come back after that

7   briefing and have another hearing, maybe we can consider it

8   then.

9          But some of the issues that we had anticipated

10  being before the Court in that hearing are not just the

11  reasonableness of the execution of the warrant, but we think

12  the conduct of the Government in this case amounted to a

13  flagrant disregard for the limitations imposed by the

14  warrant.  And I believe, Your Honor, there is a circuit

15  split as to whether the subjective intention of the

16  executing officers is relevant to the analysis of flagrant

17  disregard.  I believe, Your Honor -- and if I'm misstating

18  this, I -- we will clarify it for the Court -- I believe the

19  Eighth Circuit has not taken a position on that.  And so --

20         THE COURT:  Well, if I had to predict based on the

21  Eighth Circuit's relentless set of holdings that the

22  subjective belief of an officer is irrelevant, I would

23  predict that's not going to come down on your side, but I

24  might be just hypothesizing at this point.

25         MR. WADE:  Your Honor certainly has more

1    experience litigating Fourth Amendment issues in the Eighth

2    Circuit than I do.

3              THE COURT:  It's an uphill battle, I can tell you,

4    with respect to this issue, not with respect to all issues.

5    But with respect to the relevance and the subjective intent

6    of law enforcement, it seems to be -- but I look forward to

7    briefing on that.  I don't think we need to -- I intended to

8    allow you post-hearing briefing no matter what, because I

9    think this record is going to be very interesting with

10   respect to your motion to suppress, but it's particularly

11   more necessary in light of your explanation that so much of

12   what has emerged since late November has really changed your

13   understanding of the landscape with the way the search was

14   executed and the way the warrant was applied, so I am

15   absolutely going to permit post-hearing briefing.

16             MR. WADE:  And maybe briefly, Your Honor, I think

17   in a moment Mr. MacLaughlin wants to lay out a few things

18   about the hearing generally after we get past these

19   threshold issues.  We'll give some additional -- some

20   preliminary thinking on that that we expect to be more fully

21   briefed just so the Court has a little bit greater sense of

22   where we're going.

23             To the extent that you want to hold a ruling on

24   the suppression -- or the motion to quash the subpoena until

25   that time, or hold that memorandum -- or hold that motion

1    open until after you have a more robust record, we wouldn't

2    object to that.  We can go -- we're prepared to try to go

3    forward.  Not knowing how this was going to go and having a

4    lot of evidence, we prepared to try to be flexible and we

5    might labor a little bit in front of the Court in light of

6    the uncertainty as to who the witnesses were going to be.

7          But we do think at its core, the Government's

8    conduct in this case, the objective facts -- the Court keeps

9    coming back to subjective interpretation and I think that's

10   an argument that's been proffered by the Government.  And I

11   understand why they want to label our inquiry as purely

12   exploring Mr. Maria's state of mind, but our exploration of

13   the objective facts of what Mr. Maria did in connection with

14   the execution of the warrant we believe is relevant.  He

15   accessed more -- he has more database activity in this

16   Relativity database that's at issue in the case than any

17   other officer, and we believe that we're entitled to explore

18   his objective conduct in connection with that.

19         This is sort of a rare circumstance, frankly, in

20   which a federal prosecutor is even involved in the execution

21   of a search other than maybe overseeing the execution of a

22   search.  That's why we're in these unusual circumstances,

23   because the person who is involved directly in the execution

24   of the search is an Assistant United States Attorney as

25   opposed to an FBI agent, or a postal inspector, or an IRS

1   agent.  And I think it's clear that if it was a postal

2   inspector, or an IRS agent, or an FBI agent, that we'd be

3   entitled to examine those witnesses and it shouldn't matter

4   that the person happens to be a federal prosecutor.  That's

5   who the Government chose to execute the warrant.  We're

6   entitled to explore those facts.

7            THE COURT:  Okay.

8            MR. WADE:  Briefly on the motion to compel, Your

9   Honor.

10           THE COURT:  Thank you.

11           MR. WADE:  What is before the Court -- the

12  Government has submitted documents pursuant to Rule 16

13  evidently while we were still conferring and before we moved

14  to compel.  I assume that's because the Government believes

15  there may be some discovery obligation that it has with

16  respect to those documents and it is appropriately taking

17  prophylactic steps to make sure that it doesn't run afoul of

18  its discovery obligations, and we appreciate that.

19           To the extent that there is any question as to

20  whether the material that is in that case constitutes **Brady**,

21  it should be disclosed to the defense.  We should not parse

22  that line in this case.

23           THE COURT:  What's your best case to support the

24  idea that **Brady** applies to something that frames the

25  execution of a search warrant as opposed to substantive

1    evidence at trial?  What's your best case?  Because the

2    Government kind of flirts with the idea that **Brady** doesn't

3    apply to the preliminary stages of motions to suppress, not

4    my favorite argument.

5              MR. WADE:  To be fair, Your Honor, the case law

6    that we had is cited in our papers and I don't have anything

7    to add beyond that.  I think that in this case what we're

8    talking about directly relates to the admissibility of core

9    evidence that will determine whether or not Mr. Adams is

10   innocent or not.

11             THE COURT:  Okay.

12             MR. WADE:  And he has a fundamental right under

13   the Fourth Amendment and the Sixth Amendment to have access

14   to those materials, and of course the Fifth Amendment

15   pursuant to **Brady**.

16             The law is in the Eighth Circuit -- to be fair and

17   to be candid with the Court, the law as to whether or not

18   **Brady** applies in this context is not clear in the Eighth

19   Circuit.  There is some case law that suggests -- outside of

20   the Eighth Circuit that suggests that it does apply.

21             I will note it's been the practice of the

22   Government in this case to not parse fine lines.  I believe

23   it's the published policy of the United States Attorney's

24   Office for the District of Minnesota to err on the side of

25   disclosure.

1            THE COURT:  I think it's hard to argue they

2      haven't erred on the side of pretty fulsome disclosure in

3      this case.  I mean, I see a lot more disclosure around this

4      search than I have seen ever around the execution of a

5      warrant and how it was done.  So I'm not sure that their

6      effort to withhold a very circumscribed set of information

7      on the basis of work product undermines their commitment to

8      full disclosure in this case as evidenced by your -- lots of

9      notebooks and myriad declarations and the all-day hearing

10     that we're about to undertake.

11            MR. WADE:  In fact, Your Honor, there was a sea

12     change November 30th, 2016 with respect to that and we're

13     appreciative that we were now able to get these issues

14     before the Court.

15            THE COURT:  2017.

16            MR. WADE:  2017.  I apologize, Your Honor.

17            THE COURT:  There's two November sea changes?  I

18     can't imagine.

19            MR. WADE:  We're now in  2018.  I always get

20     confused for a few months until I get my sea legs.  There

21     was a sea change in that regard and we appreciate it, but

22     the materials that I think are before the Court are

23     relevant.  The Department of Justice has a standard that

24     they employ when they search for attorney's files.  Whether

25     or not --

1          THE COURT:  Adherence to that standard doesn't

2     give rise to Mr. Adams having any particular cause of

3     action.  It still goes back to me assessing the objective

4     reasonableness of the execution of the warrant.

5          MR. WADE:  Exactly, Your Honor.  We are not

6     contending -- in fact, we specifically noted in our brief

7     and don't dispute the case law cited by the Government with

8     respect to this not conferring a substantive right on

9     Mr. Adams.  What it does do is set a standard that informs

10    the reasonableness of the execution of the warrant.

11          As we're going to discuss in a moment, Your Honor,

12    this is an unprecedented case because you have a prosecution

13    team executing a warrant on the files of a lawyer.  It's

14    unprecedented.

15          THE COURT:  Well, that's not unprecedented, right?

16    I mean, prosecution teams often execute search warrants on

17    the files of lawyers when lawyers are accused of criminal

18    conduct.

19          MR. WADE:  They do, Your Honor, but the policy

20    that is at issue in this motion directly informs what they

21    do in that respect.  And the policy -- I have either the

22    pleasure or the burden of having experienced this policy and

23    seen this policy employed in many other cases through my

24    career.  And the way that that is employed in connection

25    with the conduct of a search is to err on the side of taking

1    all attorney files and giving them to a taint team, not

2    having the prosecution team parse and make the distinctions

3    about what may be privileged and what may not be privileged.

4              To use Your Honor's 1980s --

5              THE COURT:  Analogy?

6              MR. WADE:  -- analogy, if we were to walk into the

7    offices of U.S. Bank to seize materials covered by the

8    warrant and some of those materials were within a lawyer's

9    files, there would be special labeling that would be put on

10   those boxes and those materials would not go to the

11   prosecution team.  They would go to a taint team and the

12   taint team would do the filtering of those materials --

13   typically they deal with defense counsel -- to get privilege

14   terms and to make sure that no privileges are violated.  If

15   necessary, they might litigate before the court the

16   application of the privilege between the taint team and the

17   defense lawyers.  But the idea that a prosecution team

18   itself does that filtering is unprecedented and

19   unreasonable, and the adherence to the policy with respect

20   to that is directly relevant to this case.

21             THE COURT:  Okay.  Thank you very much.

22             Mr. MacLaughlin, I've got just a couple questions.

23   I know you're eager to say something.

24             I'd like your response to the idea about the fact

25   that only Mr. Maria's declaration provides information

1    related to when the seizure occurred.

2             MR. MacLAUGHLIN:  That's not true.  There is in

3    fact an e-mail from Mr. Maria dated February 28th of 2017 in

4    which Mr. Maria asks our automated litigation support people

5    to do the final relevance cull, and that's going to be

6    admitted today when Mr. Zeitz is on the stand.

7             THE COURT:  Has that e-mail been provided to

8    opposing counsel?

9             MR. MacLAUGHLIN:  Yes.

10            THE COURT:  Okay.  Tell me about the relevance of

11   the compliance or noncompliance with the U.S. Attorney

12   practice and policy, the idea that this is unprecedented in

13   Mr. Wade's experience.

14            MR. MacLAUGHLIN:  Well, it's not unprecedented in

15   any way.  All the time lawyers get involved in reviewing the

16   raw pull from an e-mail provider of the results of a search

17   warrant.  That's not just the province of agents these days.

18   We all get involved in doing that.

19            THE COURT:  So we're kind of conflating two

20   different ideas.  One is the relevance limitations that are

21   the subject of the particularity complaint and the other is

22   privilege issues that are the subject of the concerns about

23   privilege.

24            MR. MacLAUGHLIN:  I don't know that we're

25   conflating them.  We've been trying very hard not to.  We've

1    got a Fourth Amendment world that we're going to be talking

2    about today and we have a privilege world that we're going

3    to be talking about today.  Where and how those two worlds

4    meet is a little bit unclear under the case law.

5            What is clear is that the touchstone for Fourth

6    Amendment purposes is reasonableness.  Whether we were

7    solicitous of the privilege -- and we were -- fits into that

8    reasonableness analysis, I don't know the answer to that.  I

9    have not seen a case that says in the court's analysis of

10   whether the Government executed a warrant reasonably the

11   court can take into account whether the Government rode

12   roughshod over the privilege.  Frankly, that might just be a

13   separate problem, not related to the Fourth Amendment, but

14   right now I'm not sure it matters, because we're going to

15   talk about all of that today.

16           THE COURT:  Okay.  Thank you.  You can be seated,

17   sir.

18           MR. MacLAUGHLIN:  I do have just two things to

19   add.

20           THE COURT:  Okay.

21           MR. MacLAUGHLIN:  Number one, I want the Court to

22   know that Williams & Connolly has all of the e-mails in this

23   case and they have them in various databases, and so if they

24   took a search term that Mr. Maria ran and ran it through

25   that database, I see no reason why they shouldn't be able

1    rather easily to find out what e-mails that particular

2    search pulled up.

3              Number two, I want the Court to know that the

4    prosecution team does not have those e-mails.  We gave them

5    up in August of this year.  We decided if you guys think

6    there are all these privileged materials in there, we are

7    going to dispossess the prosecution team of them, and that's

8    when Ann Bildtsen of our office became the taint lawyer.  We

9    have no access to those e-mails.

10             THE COURT:  And these are the segregated e-mails

11   that are the subject of the anticipated taint team.

12             MR. MacLAUGHLIN:  We have access to none of them

13   at this point.

14             THE COURT:  You have access to no e-mails.

15             MR. MacLAUGHLIN:  Zero, none.  We looked away in

16   order to, you know, create a better record here and make

17   sure that we went forward in a clean manner so that we could

18   litigate this thing in a clean way.

19             Point number --

20             THE COURT:  Is it your intention not to access the

21   e-mails in preparation for trial or just not to have them

22   right now?

23             MR. MacLAUGHLIN:  Just not to have them right now

24   while we're litigating over this, so we have no access to

25   those e-mails.

1          Now Mr. Wade used the verb that I don't think

2      accurately reflects the spirit with which we have been

3      communicating with each other.  He said we have refused, the

4      Government has refused to tell them which documents were

5      viewed as a result of these searches.  We declined to do

6      that and let me tell you why.  We said --

7          THE COURT:  I'm not sure there's a big difference

8      between refusing and declining.

9          MR. MacLAUGHLIN:  Well, Your Honor, it was a

10     respectful conversation back and forth.  We didn't just say,

11     "No, forget it.  We're not going to show those to you."  We

12     said, "Look, we don't have the e-mails.  We'll give you the

13     Bates numbers of the documents that these searches kicked

14     out if you will tell us what documents they were.  We'll

15     give you the Bates numbers, but you have to give us the

16     e-mails."  They declined to give us the e-mails.  They said,

17     "We don't want you to see any of that stuff."  And so we

18     said, "Well, we don't want to give you the Bates numbers if

19     you're not going to tell us what they refer to."

20         THE COURT:  But you wouldn't need that if you

21     hadn't deprived yourself of access to this stuff, right?

22         MR. MacLAUGHLIN:  Correct.

23         THE COURT:  I'm just trying to understand why you

24     would need them to tell you what the e-mails are, because

25     you have temporarily sequestered all of these, and so the

 1    only way you could get -- you could also know what they were

 2    knowing is if they told you.

 3            MR. MacLAUGHLIN:  Exactly.  And so we've taken the

 4    position with them, Your Honor, that:  You ought to share

 5    the e-mails with us unless they are actually privileged.  We

 6    don't claim any entitlement to look at anything that's

 7    actually privileged, but we're certainly not going to give

 8    you the Bates numbers.  We're going to decline to do that in

 9    light of your decision to decline not to tell us what

10    e-mails they refer to.

11            One other point.  Mr. Maria is here.  He'll be

12    here after the hearing, he's an officer of the court, and

13    like in any other case, he'll be here to answer questions

14    that the Court might have.  And if Mr. Wade has questions

15    that he thinks the Court ought to ask Mr. Maria, that

16    communication can happen.  That's relevant to the motion to

17    quash.

18            THE COURT:  Thank you.

19            You're popping up to say something.

20            MR. WADE:  Very briefly, Your Honor, with respect

21    to access to the e-mails.

22            First of all, the communications with

23    Mr. MacLaughlin have been nothing but cordial, and so to the

24    extent my choice of verbs suggested otherwise, I would like

25    the record to be modified and clarified and supplemented.

 1          The Government -- because the database that they

 2     have, the current database, is in our view full of

 3     privileged information and irrelevant information, but the

 4     particular concern is privileged information, because

 5     Mr. Adams has an obligation as a practicing lawyer to take

 6     steps to protect privileges, because those issues are going

 7     to need to be litigated, and I anticipate, unfortunately,

 8     months of litigation relating to the privileged materials

 9     and the application of privileges, the applicability of

10     privileges.  This is going to be a burdensome and

11     time-consuming process.

12          Because of that and because our motion was

13     directed at suppression of all the e-mails, we made the

14     decision back in October when we thought this was going to

15     be before the Court shortly in November, that we should just

16     wait to get a ruling from the Court on the motion so that we

17     don't spend all that time and effort and energy litigating

18     and doing the pick-and-shovel work through the database to

19     deal with all the vast privilege invasions if everything's

20     going to be suppressed.

21          Now, if we knew that this was going to -- that all

22     these additional disclosures were going to come out and that

23     this was going to take several additional months, maybe we

24     would have started on that process.  And part of --

25     earlier -- and part of what we can do going forward with the

1    schedule we talked about with Your Honor is try to build in

2    some simultaneous activity recognizing resource limitations

3    of the defense and our need for sleep and rest occasionally,

4    but we made the judgment not to do that.  As a result, we

5    also agreed in our cordial conversations with Government

6    that we would not offer specific e-mails in this hearing

7    that are within the database, because it wouldn't be fair.

8             THE COURT:  Because you're recognizing that you

9    you get to access it right now and they do not.

10            MR. WADE:  Right.

11            THE COURT:  Okay.

12            MR. WADE:  And so the record's clear, the reason

13   that no specific e-mails are going to be offered; for

14   example, e-mails that are beyond the scope of the warrant

15   that are within the seized database, or documents that the

16   prosecution team previously had access to for a long time

17   but then culled out at the last minute, the reason none of

18   that's going to be offered is because we have an agreement

19   with the Government that we would not offer those materials.

20            If the Court comes to the view that it thinks that

21   that is necessary in how -- in a determination of this case

22   in terms of we have to go document by document to identify

23   each and every document that's beyond the scope of the

24   warrant -- and there are a lot of them, tens of thousands --

25   we'll have to deal with that and figure out how to present

1     that to the Court in a way that doesn't require the Court to

2     take the rest of its year dealing with it.

3               THE COURT:  We can cross that bridge.  I mean,

4     what I understand you to be saying is that you have filed

5     only part of the motions that you intended to file on the

6     schedule that was set because you are seeking a complete

7     suppression order, but if you don't succeed in getting that,

8     you intend to file a second wave of motions seeking

9     item-by-item suppression both for privilege and for

10    exceeding the scope.

11              MR. WADE:  I think -- respectfully, Your Honor, I

12    think that -- I didn't view it as a -- that as a

13    supplemental motion, because our view is everything should

14    be suppressed.

15              THE COURT:  Right.  But you could have -- I mean,

16    I -- I think I'm borrowing worry and we need to move on, but

17    I'm troubled by the idea that there are different approaches

18    that you could take to suppression, that you could have said

19    the remedy for this excessive execution of the warrant --

20    your position is that the remedy is that everything should

21    be suppressed.  But if you fail at that, you're going to try

22    again and say, okay, maybe that's not the remedy, but the

23    remedy is that an overbroad execution of a warrant should

24    have individual suppression and then endeavor to demonstrate

25    that.

1              Is that your planned next move?

2              MR. WADE:  Well, Your Honor, frankly, we were

3    prepared -- I may even have some documents in my

4    briefcase -- to offer evidence of specific e-mails that are

5    beyond the scope of the warrant that are within the

6    prosecution team's database.

7              It didn't -- we didn't know what the Government

8    had done to execute the warrant until November 30th, and

9    then we've all been shooing a galloping horse since then to

10   get this before the Court.  We didn't -- we're not doing

11   that because the Government objected to our doing that.

12   They objected to our offering specific e-mails and so we

13   agreed not to.

14             But I think given the magnitude of the invasions

15   in this case, the idea that the burden would be on Mr. Adams

16   to go document by document through tens of thousands of

17   documents and identify each and every document that's beyond

18   the scope I think shouldn't be required.  The Government had

19   an obligation to exercise the search warrant in a way that

20   is reasonable and it didn't do that.  Their failure to meet

21   their burden shouldn't flip the burden in this case onto

22   Mr. Adams given the magnitude of the evidence that we're

23   talking about here.

24             THE COURT:  Okay.  Thank you very much.

25             I am going to for now grant the motion to quash

1    and deny Mr. Adams' team's effort to have Mr. Maria testify

2    in this matter.

3            The reason is that Mr. Adams has not met either

4    prong of the test that governs this question specifically,

5    the vitality to the question before the Court and the

6    uniqueness of Mr. Maria as a source.

7            The thing that I do think Mr. Maria might be able

8    to uniquely provide is his very own private, subjective

9    reasoning for doing what he did which doesn't play into my

10   calculus.

11           My careful review of the declaration submitted, as

12   well as the substantial information that I've already

13   received, suggests that there's an unusual amount of

14   sunshine and transparency around how this search was

15   executed that is going to enable me to make a good decision

16   about whether it was executed properly or not.  I'm going to

17   hear about that all day.

18           So it is a unique and unusual circumstance.  I

19   would not call it completely unprecedented.  I don't think I

20   share Mr. MacLaughlin's memory that it has not been done in

21   the two decades that I've been here, but it is certainly

22   extremely rare and the showing has not been made in this

23   case.

24           I am also not going to require the document to be

25   produced that is the subject to the motion to compel.  It is

1    very clearly work product and subject to nondisclosure.  For

2    that reason I'm not going to find that **Brady** doesn't apply

3    in the context of pretrial stages, because I find that if it

4    is true to be troubling.  And I don't need to rely on that

5    in this case, because I can certainly say that, again, the

6    analysis that I have to make is about the execution of the

7    search warrant and whether it's objectively reasonable.  We

8    get to put that to the test in part by comparing what was

9    done with the U.S. Attorneys' Practice Manual.  And while

10   that might not give rise to an individualized cause of

11   action by itself, it will certainly inform the

12   reasonableness of the execution, but we don't need to have

13   private discussions about compliance with that in order to

14   assess the objective reasonableness.

15           So let me say, however, that both of those are

16   not -- I'm not inviting more briefing unless there's

17   something real unique that occurs.  I've got a truly

18   extraordinary amount of briefing and the promise for an

19   enormous yet to come to address these issues.

20           But I am going to keep this in mind all day, and

21   if the development of the record suggests either that

22   Mr. Maria's testimony is necessary or that the document at

23   issue needs to be disclosed, I'm reserving my right to

24   change my mind, but for now that is the ruling as to both

25   motions and I'll be capturing it in a relatively brief order

1    sometime after the hearing.

2              With that said, let's talk next steps.

3              MR. MacLAUGHLIN:  Your Honor, it is my suggestion

4    that I talk for a few minutes about the hearing we're about

5    to have, about its scope, about what we sort of intend to

6    show the Court, put things in perspective, to get Mr. Wade

7    to respond if he sees things differently, and then to get

8    going with the witnesses.  Is that all right?

9              THE COURT:  That sounds great.

10             MR. MacLAUGHLIN:  Okay.

11             So it seems to me, Your Honor, that you -- I can

12   tell from what you've already said that you are very clear

13   on what the purpose of this hearing is.  I've just put on

14   the screen the Attachment B to the warrant that Judge Rau

15   issued.  I don't know if the Court --

16             THE COURT:  I've got it.

17             MR. MacLAUGHLIN:  -- can see that.

18             So the membrane here from having nothing to having

19   the database from Yahoo is covered by the general briefing

20   in the case.  That's not what we're talking about here

21   today.

22             What we are talking about today is --

23             THE COURT:  And just to be clear, is Attachment B

24   that you're putting on the screen the same as Government

25   Exhibit Kroells 9?

```
 1              MR. MacLAUGHLIN:  Yes, it is, exactly.
 2              THE COURT:  Thank you.
 3              MR. MacLAUGHLIN:  So what we're talking about
 4    today -- and I flipped over to page 2, Your Honor -- is this
 5    (indicating) membrane here.  The question is did we get from
 6    here to here in a reasonable manner.  That's what we're
 7    going to be talking about today, how did we get to part two
 8    of Attachment B.
 9              I want to flip to the end and say that there's
10    another line here, and there's a couple things that happened
11    after we get to part two after we do the search, and one is
12    production (indicating).  My writing is awful, but that's --
13    it's supposed to say "production."  We're not talking today
14    about production.
15              The Court saw in the attachments that there were
16    errors made in production.  We misdescribed some of the
17    stuff we were turning over, there was back-and-forth and
18    some confusion.  Production is quite aside from our
19    execution of the warrant and we're not talking about that
20    today.
21              Finally, there's the other issue that we're not
22    addressing today, which is taint.  I think that Mr. Wade
23    when he says we're going to have more litigation later is
24    going to be really litigating about whether the prosecution
25    team was tainted.  Since we don't even have the e-mails,
```

1      we're not going to get to that today.  So the narrow topic

2      today is the journey that the Government took to go from

3      part one of Attachment B to part two of Attachment B.

4                May I approach the white board?

5                THE COURT:  Yes.

6                MR. MacLAUGHLIN:  So let me put this a little bit

7      differently.  And I want to have this up here for the

8      witnesses and my handwriting is bad, but the basic facts are

9      that on March 7th (indicating) of '16, we received 146,522

10     e-mails from Yahoo, and they were on a thumb drive as the

11     Court is aware.

12               Then on May 2nd of 2016, a mechanical filtering

13     process was completed by what we call the LTSC, the

14     Litigation Technical Support Center down in South Carolina.

15     What they did is, they took this 146,522.  They applied

16     search terms designed to cull out privileged material.  That

17     resulted in the removal of 33,161 documents, with the result

18     that the prosecution team was granted access to 113,361

19     documents.

20               So effectively, Your Honor, this is the day,

21     May 2nd of 2016, that the prosecution team was granted

22     access for the first time generally in the Relativity

23     database to search around in the for-review e-mails.

24               The evidence here is going to show that the

25     mindset of the team was nonetheless to be vigilant about

1    privileged materials.  This filtering process was known not

2    to be perfect.  In fact, the Court is going to see an e-mail

3    from AUSA Maria to the team saying:  Look, we've done this

4    filtering process, might not be perfect, be on the lookout.

5         And indeed, more were spotted, with the result

6    that on June 7th of 2016, there was another cull starting

7    with the 113,361.  They pulled out another 1,494, and the

8    result of that was now the team had access to 111,867

9    documents.  So as time went on, this is what the prosecution

10   team was searching (indicating) through.

11        On April 7th of last year, the final relevance

12   cull was completed pursuant to a request in an e-mail by

13   AUSA Maria dated February 28th.  And here what we had was

14   111,867, less the relevance cull pull, which was 68,940, and

15   that left 42,927.

16        So as of today, those are the e-mails that are in

17   our for-review database.  This (indicating) number is 29

18   percent of the raw take.

19        And there's going to be other evidence, Your

20   Honor, that the total number of actual unique document views

21   in this case is 9,252 document views.  Mark Zeitz is going

22   to testify about that.

23        What that means, Your Honor, is that of this

24   146,522 documents, only that number, that number of

25   documents (indicating), were viewed by the prosecution team.

1          So the issue in this case is whether our journey

2     from that number to this (indicating) number was reasonable.

3          THE COURT:  Okay.

4          MR. MacLAUGHLIN:  That's what we're talking about

5     today.  Not about production, not about taint, simply about

6     the journey from the 146 down to the 42.

7          So, for Fourth Amendment purposes, Your Honor, the

8     touchstone is reasonableness.  And as I mentioned earlier,

9     there are issues about privilege here.  We're going to talk

10    about those two.  They are in the mix somewhere.

11         The evidence at this hearing is going to show that

12    the --

13         THE COURT:  I'm not actually looking for opening

14    argument if that's what you're segueing into.

15         MR. MacLAUGHLIN:  Just to kind of -- I'd like to

16    hit the highlights of the law.  I'll be very short then.

17         THE COURT:  Okay.

18         MR. MacLAUGHLIN:  You're going to see that we

19    executed this warrant carefully.  You're going to see that

20    we executed it reasonably.  You're going to see that we

21    executed it diligently.  You're going to see that we were

22    solicitous about the nature of Section 2 of Attachment B,

23    and that we were solicitous about the privilege.  All of

24    that I think is going to come through in the testimony.

25         So let me say a word about reasonableness.  There

1     is an old case -- you mentioned the two-cabinet example from

2     1980.  In 1976 the Supreme Court decided **Andreson vs.**

3     **Maryland**, and in that case the court noted that in any

4     search warrant involving a lot of pieces of paper, the

5     Government at least cursorily -- and I say that because

6     that's the phrase that comes from that case that reappears

7     in subsequent case law -- the Government at least cursorily

8     can look at every single piece of paper available to look at

9     in order to determine what's within the scope of the

10    warrant.  And there's no law anywhere that suggests that the

11    prosecution team itself can't do that, and there's no Fourth

12    Amendment jurisprudence that requires *ex ante* restrictions

13    on how that process is done.  The touchstone is one of good

14    faith and reasonableness -- not good faith, reasonableness.

15    Any argument that that's been somehow turned on its head by

16    the advent of the electronic age and just not true.

17          Rule 41 itself contemplates explicitly that in the

18    context of e-mail search warrants there's going to be a

19    two-step process.  The Government has to get the stuff first

20    and then it has to figure out within it what's relevant.

21    And the notes, the committee notes, note themselves:

22          "A substantial amount of time can be involved in

23    the forensic imaging and review of information.  This is due

24    to the sheer size of the storage capacity of media,

25    difficulties created by encryption" and so forth.  "The rule

1    does not prevent a judge from imposing a deadline for the

2    return of the storage media ...."

3            However, the committee decided not to impose a

4    time frame because of the varying levels of complexity

5    presented to the Government in making the journey from part

6    one to part two of a search warrant like this.

7            Here particularly, Your Honor -- I've never dealt

8    with a client.  I know your background is as a defense

9    lawyer.  I've never dealt with a client.  I can't imagine

10   what that would be like.

11           I want the Court to know that we don't do search

12   warrants because we already know everything about the case.

13   We do search warrants because we want to know more about the

14   case.  And there's a tremendous learning curve involved in

15   executing a warrant, in a case like this particularly.

16           This Government team jumped in, it started looking

17   at stuff, and there was a learning curve, an arc of the case

18   that happens in every complex case.  It takes time to figure

19   out as a Government team which of 146,000 e-mails are

20   relevant.  That process in this case was accomplished in

21   just under a year, which is pretty fast.

22           I'll point out too and the Court is going to hear

23   that the people involved in this case were busy, had other

24   demands, and in a complex case like this the agents are far

25   from fungible.

1              I want to make another point, that the touchstone

2      being reasonableness means the touchstone is not perfection.

3      Williams & Connolly says -- and I guess I don't have any

4      reason to dispute because I don't have the e-mails -- that

5      there are a lot of irrelevant e-mails remaining in the

6      42,927.  I don't know if that's true or not, but the fact

7      that we didn't succeed in pulling everything out that isn't

8      relevant in no way even hints at suppression here.  In fact,

9      if they would cooperate with us and tell us which ones -- we

10     don't have time to look at e-mails about Mrs. Adams' 50th

11     birthday, for example.  We don't want to look at that stuff.

12     We want to look at the stuff that's relevant to our case.

13     It's reasonableness, not perfection.

14              Now, on privilege, just a few words here.  Much

15     has been said about Mr. Adams being a lawyer.  He is a

16     lawyer.  He was a partner at Adams Monahan.  He's a fairly

17     prominent lawyer too.  He was in fact general counsel from

18     time to time to some of these victim companies.  And

19     obviously we have no interest and had no interest in

20     intruding on the relationship he had with his own clients.

21              And so therefore -- and I want to make this very

22     clear -- as the witnesses will testify, he had an e-mail

23     account at Adams Monahan which we decided not to search.  It

24     wasn't that we thought there wouldn't be anything in there,

25     as Adams Monahan represented the victims.  It's just that we

1     didn't want to get into a morass of his relationship with

2     his own clients.

3               Now, as we go through today -- and I know the

4     Court knows this is getting a little long, but the privilege

5     we cared about the most in going through these e-mails was

6     Mr. Adams' privilege with his lawyers.  We surely didn't

7     want to intrude on his clients' privilege, but we really

8     didn't want to intrude on his privilege with his lawyers.

9     And we were aware that there had been an SEC investigation.

10    We knew he was represented in connection with that

11    investigation.  We knew that the same underlying facts that

12    gave rise to the indictment were at issue there, being sued

13    by some angry investors.  We knew all that and we knew he

14    had lawyers.  The real push by the prosecution team, if

15    there was a main focus, was not to look at those e-mails.

16              Okay.  Now, this is important, Your Honor.  I want

17    to make this -- this is a point I want to make very clear.

18              The victims of this case are Apollo, Apollo

19    Gemstone, Private Scio, and the people that invested in

20    those companies.  They came up with some kind of chemical

21    vapor deposition way of making diamonds, which sounds pretty

22    cool to me, and the gravamen of the indictment is he got

23    money to put into those companies and then didn't put the

24    money into the companies.

25              So there are a lot of communications in this case

1    between Mr. Adams and the people at those companies,

2    principally a couple of people, three or four people, the

3    Linares, who I think are his in-laws.  Those are the

4    privileged communications.  They're communications with

5    victims, okay?  It seems to me that Mr. Adams is trying to

6    hide behind his law license.

7              THE COURT:  We're not there yet.  We're not asked

8    here to discuss whether individual communications with

9    particular humans are or aren't privileged.

10             MR. MacLAUGHLIN:  I think that is part of what's

11   going to happen, that there is an argument that we should

12   not have looked at -- and thus unreasonably executed the

13   warrant -- communications that he had with employees of

14   Private Scio and employees of Apollo.  I think that is going

15   to be in the air today, and I want to make clear for the

16   Court that that in our view is a completely different matter

17   from Mr. Adams talking to his own lawyers.

18             Moreover, I don't understand how he has any

19   standing to assert the attorney-client privilege of those

20   entities.  As we know, the attorney-client privilege, it's

21   one person alone, the client.  Lawyers assert it all the

22   time, but they do it vicariously on behalf of their client.

23             So there's that.  I think we've covered a lot of

24   the rest of it.

25             Your Honor, we do intend to offer some exhibits.

1    I put them up there in front of you.

2              THE COURT:  How many witnesses are you going to

3    call, Mr. MacLaughlin?

4              MR. MacLAUGHLIN:  We're hoping to call three

5    witnesses.  There's some question about whether two more

6    will be needed.  It's our view that Brandon Belich -- and so

7    far on the privilege he really ought not be called, and the

8    Court has solved the David Maria issues, so at most four

9    witnesses.

10             So we've talked about ground rules.  One of those

11   is that if they have e-mails we don't, we've agreed not to

12   use them.  I think it may arise in the course of the hearing

13   that if he wants to offer some for the Court's

14   consideration, we object to that unless they're shown to us.

15   If they're not privileged, it seems to me we ought see them.

16             With respect to the exhibits we'll be offering,

17   we've talked about exhibits at the hearing and we agree that

18   the Court certainly is entitled to and should consult with

19   anything that's been filed on ECF.

20             The order of proof today will be Christine

21   Kroells, and then Jennifer Khan, and then if Brandon Belich

22   isn't called, Mark Zeitz.  That's how we want to go forward.

23   These gentlemen are here to answer questions as officers of

24   the court.

25             THE COURT:  I am not going ask Mr. Maria any

1    questions that are going to be relevant to my decisionmaking

2    today having decided that he couldn't testify.  I don't want

3    to get into a position of allowing the Government to be able

4    to make proffers about things and not allowing the

5    opportunity for cross-examination.  So at least my initial

6    instinct is not to ask Mr. Maria any questions.  I don't

7    want to have a quasi-witness scenario where the defendant

8    doesn't get to respond.  We can revisit that if I've been

9    improvident, but that's my intention.

10            Mr. Wade, can I hear from you a little bit?  Any

11    objection to the *en masse* admission of all of the proffered

12    Government exhibits?

13            MR. WADE:  I don't, Your Honor.  The rules of

14    evidence I don't think apply in an evidentiary hearing such

15    as this.

16            THE COURT:  I just find it's more efficient rather

17    than going through foundational questions that we probably

18    don't need simply to have you agree there's no objection.

19    It seems much more efficient to say all of the proposed

20    Government exhibits are admitted right now if you have no

21    objection.

22            MR. WADE:  I agree and would ask for the same

23    courtesy from the Government.  To the extent that the

24    Government doesn't like some of our exhibits, they're

25    obviously welcome to make whatever argument they want to

1    make about them or they be stricken.  As you can see, we

2    have a mountain of information we're hoping to leave with

3    the Court rather than carry home to Washington.

4              THE COURT:  Binders of exhibits that I don't have

5    yet.

6              MR. WADE:  We have not offered those up, but we

7    can do that, Your Honor.  It's voluminous.  We can either do

8    it as the witnesses come up -- we essentially have

9    sequentially -- one core binder of sequentially numbered

10   documents which with the Court's permission I'll offer.

11             THE COURT:  Thank you.  I'm not going to decide on

12   their admission yet.  I assume you've provided them to

13   opposing counsel.

14             MR. MacLAUGHLIN:  Yes.

15             MR. WADE:  We gave a copy to opposing counsel this

16   morning.  We intend to put a book up on the stand.

17             THE COURT:  And have the witness talk about them.

18             MR. WADE:  There are then some additional binders

19   that relate to specific witnesses that are actually exhibits

20   that are reflected in -- they're so voluminous we didn't

21   include, where one binder is one exhibit, that is, for

22   example, the database activity of Postal Inspector Kroells.

23   So we have that all in a binder available in case she has

24   any questions about what we did on a particular day.

25             THE COURT:  Are there any binders that you intend

1     to introduce today that have not been provided to the

2     Government?

3                  MR. WADE:  We certainly -- the Government has the

4     information -- I think the short answer is no, Your Honor.

5     There are binders that we haven't technically handed over to

6     the Government, but this is information that's extracted out

7     of documents they gave to us, so the filtered spreadsheets,

8     for example, and we are intending and have already given

9     some of those to the Government.  As soon as they want them,

10    they can --

11                 THE COURT:  Why don't we do that right now.

12                 MR. WADE:  Sure.

13                 THE COURT:  Thank you.

14         (Documents provided to Government counsel)

15                 MR. WADE:  And for the record, Your Honor, I'm

16    offering up three exhibits that are in three different

17    binders, Defense Exhibits 78, 80 and 86.  These are in

18    addition to the shorter compilation that's already before

19    the Court.

20                 THE COURT:  Okay.  Do you have a list of the

21    exhibits?

22                 MR. WADE:  I believe we have a copy that we can

23    provide to the Court.

24                 THE COURT:  Okay.

25                 MR. WADE:  And certainly --

1              THE COURT:  In general, just in our future

2    practice -- and I know we've been under the gun, but it's

3    really helpful if you can provide the exhibits at all in

4    advance.  And also if you can get us an exhibit list that we

5    can provide to the court reporter to work from.  If I don't

6    get it until after the hearing, that's fine, but it helps us

7    create a more fulsome record than me trying to figure out

8    what to call each of these exhibits.

9              MR. WADE:  Absolutely, Your Honor.  And we'll

10   prepare that list and either offer it up at a break or after

11   the hearing.

12             THE COURT:  And e-mail it to opposing counsel as

13   well.

14             So it's my intention, Mr. MacLaughlin -- go ahead

15   and walk around --

16             MR. WADE:  If I may approach again.

17             THE COURT:  Please.

18             Mr. MacLaughlin, do you have any objection to the

19   admission for the purpose of this hearing only of the

20   binders?

21             MR. MacLAUGHLIN:  No.  I obviously haven't had a

22   chance to look through them carefully, but I have a high

23   degree of confidence that they have their origin with our

24   disclosures and that we know what they are and have seen

25   them and --

1          THE COURT:  It seems like they're overwhelmingly

2     Bates stamped.

3          Okay.  So I'm going to admit all exhibits from

4     both sides.

5          Come on up if you need to.  Just stand up here.

6     I'm just not that formal.

7          We don't need to do foundational questions except

8     as necessary to convince me that's worth attention, but you

9     don't need to do the:  "And what is this?  Is it kept in the

10    normal course of business?"  Let's circumvent all of that

11    unless it's necessary to the consideration of the exhibit.

12         MR. WADE:  Very good, Your Honor.

13         THE COURT:  Does that make sense?

14         MR. MacLAUGHLIN:  Yes.  So Mr. Zeitz will be on

15    the stand later.  I have been provided by my colleague with

16    a number of exhibits related to his testimony, and they are

17    Zeitz 1 through Zeitz -- a number of Zeitz ones here.

18         THE COURT:  Okay.  Let's make sure to get copies

19    to opposing counsel.

20         MR. MacLAUGHLIN:  Zeitz 1 through 10, and then we

21    also have a general -- the waiver e-mail, this General 1.

22         MR. WADE:  We have been provided copies, Your

23    Honor.

24         THE COURT:  Okay.  Great.

25         MR. MacLAUGHLIN:  So we'd offer these as well.

```
1              THE COURT:  I'll admit all of those.  I'd also
2      seek from the Government an exhibit list --
3              MR. MacLAUGHLIN:  Yes, Your Honor.
4              THE COURT:  -- and provide it to opposing counsel
5      as well.
6              MR. WADE:  And just for the record and for the
7      benefit of all the parties as we go through the hearing this
8      morning, our documents are tabbed according to the exhibit
9      number and they're stamped, but in addition to that, in the
10     case of all but the three big binders --
11             THE COURT:  The fat ones?  Yes.
12             MR. WADE:  We have Bates labeled in the lower
13     right-hand corner "DSM" for "Defense Suppression Motion" so
14     that --
15             THE COURT:  Okay.  These are the not the
16     Government's Bates stamps.
17             MR. WADE:  No, the DSM -- that's why I wanted to
18     make the record clear, Your Honor.  The DSM are Defense
19     Suppression Motion Bates stamps.  We added them, just in
20     experience in proceedings like this, sometimes it's hard to
21     refer to a page number --
22             THE COURT:  Okay.
23             MR. WADE:  And we though it would be helpful to
24     have a page number to make the record clear.
25             THE COURT:  Thank you.
```

```
 1              MR. MacLAUGHLIN:  And, Your Honor, if I may

 2     approach, I've got Zeitz 1 through 10 and also General 1.

 3     It's called General 1 because it's just sort of a

 4     free-floating exhibit.

 5              THE COURT:  That's fine.

 6              All right.  We are going to take a three-minute

 7     recess.  Everybody can rearrange themselves or make a quick

 8     restroom run and then we'll start with testimony.  It's my

 9     hope that we take a pretty brief lunch break.  I know that

10     everybody's going to be -- it's going to be a long day.  But

11     please let me know if anybody needs a break at a time that I

12     didn't anticipate.  I'm perfectly happy to make that happen.

13              MR. KOKKINEN:  Briefly, Your Honor.

14              THE COURT:  Yes.

15              MR. KOKKINEN:  Mr. Maria and I have another case

16     that has a motions hearing in front of Judge Noel at 1:30

17     today, so I plan on not returning back to the courtroom, to

18     this courtroom, at about 12:30 so I can go prepare for and

19     handle that hearing in front of Judge Noel, and upon its

20     conclusion, if we're still going, I'll come back in.

21              THE COURT:  I predict we might be, so -- okay.

22     We'll take a really brief recess and then we'll get started.

23              Thank you.

24         (Recess taken at 10:25 a.m.)

25
```

```
1            (10:35 a.m.)

2                          IN OPEN COURT

3            THE COURT:  All right.  Let's get going.  I needed

4      some coffee.  You guys can do the same after lunch, please.

5            All right.  Let's go.

6            MR. MacLAUGHLIN:  We're operating on adrenaline.

7            THE COURT:  Yeah, I can tell.  It's going to fade

8      soon, though.

9            MR. MacLAUGHLIN:  Yes, I know.  We're going to get

10     jittery.

11           The United States calls Christine Kroells.

12           THE COURT:  I've been know to accidentally make a

13     defense objection or two, so I'll try to rein that in to

14     make sure --

15           MR. WADE:  We have no objection to your doing so,

16     Your Honor.

17        (Laughter)

18           **CHRISTINE KROELLS, GOVERNMENT'S WITNESS, SWORN**

19           THE COURT:  Thank you.

20           Please be seated and please state your full name

21     and spell your last name for the record.

22           THE WITNESS:  Christine Kroells, K-R-O-E-L-L-S.

23           THE COURT:  All right.  You can proceed,

24     Mr. MacLaughlin.

25           MR. MacLAUGHLIN:  Thank you, Your Honor.
```

1                        **DIRECT EXAMINATION**

2     BY MR. MacLAUGHLIN:

3     Q.  Ms. Kroells, good morning.

4     A.  Good morning.

5     Q.  What do you do for a living and how long have you been

6     doing it?

7     A.  I'm a United States Postal Inspector and I have been so

8     for about 14 years.

9     Q.  And what kind of cases do you work as a postal

10    inspector?

11    A.  Mostly mail fraud investigations involving investment

12    fraud schemes and the like.

13    Q.  And may I call you Inspector Kroells as we go through

14    the hearing?

15    A.  Yes.

16    Q.  I want to start, Inspector Kroells, by asking you, in

17    your 14 years of experience, have you been from time to time

18    the affiant on search warrants?

19    A.  Yes, I have.

20    Q.  I don't mean to pin you down.  How many times do you

21    think you have written an affidavit and gone and seen a

22    judge to swear it out?

23    A.  Oh, I don't know.  I've helped out on numerous search

24    warrants, I guess.  Maybe two to three of those a year, but

25    I don't know how many I've actually been the affiant on.

1    Q.   Okay.  Now, Judge Menendez has been at the receiving end

2    of being visited by agents, but just very briefly, can you

3    describe the process by which you draft a warrant affidavit

4    and work with the United States Attorney's Office in

5    completing that process?

6    A.   So usually the way I do it is, I start out by writing an

7    affidavit, putting as many facts as I think are relevant to

8    the investigation and to probable cause for the search

9    warrant into this affidavit, and then I send it to the AUSA

10   who I'm working with and then I work with that person to

11   refine it.

12   Q.   Okay.  It's fair then to say that in every case in

13   Federal Court where you present an affidavit, the United

14   States Attorney's Office has helped you draft it and has

15   reviewed it.

16   A.   Yes, that's true.

17   Q.   And to the extent, Inspector Kroells, that something

18   needs to be attached to that warrant or that something else

19   needs to go along with that warrant, how do you get help in

20   that regard?

21   A.   The AUSA helps me with that.

22   Q.   I'd like to now shift away from being the affiant for a

23   second to actually executing warrants, okay?

24   A.   Okay.

25   Q.   Have you been involved in executing premises search

1    warrants?

2    A.  I have.

3    Q.  And order of magnitude, again, not holding your feet to

4    the fire.

5    A.  Again, like I said, probably two to three a year that

6    I've either had or helped with, give or take.

7    Q.  Okay.  Have you ever been involved in a premises search

8    warrant where one of the things that you actually grabbed

9    was a computer?

10   A.  Yes, I have.

11   Q.  And when that happens, when a computer is actually

12   grabbed -- well, sometimes they're imaged on-site, right?

13   A.  Yes, they are.

14   Q.  When they can't be imaged on-site, what happens?

15   A.  When they can't be imaged on-site, we take the actual

16   device and try to get it imaged and then either get it back

17   to the person or whatever we're supposed to be doing with

18   it.

19   Q.  But the bottom line is, when you go into somebody's

20   house and take a computer back to your office, that person

21   is dispossessed of that computer, correct?

22   A.  That's correct.

23   Q.  They can't use it because it's gone.

24   A.  That's correct.

25   Q.  I want to talk to you a little bit now about e-mail

1    search warrants.

2         How many times have you been involved in preparing

3    and serving on an e-mail provider like Yahoo! an e-mail

4    search warrant account?

5    A.  I don't know how many times.  Several.

6    Q.  Okay.  You've got experience in that field.

7    A.  I have, yes.

8    Q.  And in your experience -- all my questions today are

9    going to be in your experience -- when you execute a warrant

10   and get e-mails from a third-party provider like Yahoo! or

11   Hotmail or whoever, does that dispossess the person of those

12   e-mails?

13   A.  No, it does not.

14   Q.  In fact, do you sometimes seek in connection with

15   obtaining a warrant a nondisclosure order so they don't even

16   really know that the e-mails have been pulled?

17   A.  Yes, a lot of times we get a sealing order.

18   Q.  Okay.  I want to talk to you now, Inspector Kroells,

19   about your training and experience in reviewing documents,

20   whether from an e-mail search warrant or a physical premises

21   warrant.  When you've got lots and lots of documents and you

22   think some of them might be privileged, tell the Court what

23   you do to shield yourself from exposure to privileged

24   materials.

25   A.  Well, I try to be careful in my searching, and if I do

1    find potentially privileged documents, I stop reviewing it

2    and let my AUSA know.  So this is, you know, I've been

3    finding a lot of volume of potentially privileged or not a

4    lot so they can tell me how I should proceed after that.

5    Q.  Inspector Kroells, may I ask you to take that microphone

6    and just pull it a little closer to you?  I'm probably the

7    hardest of hearing in the courtroom, but it would help me,

8    anyway.

9         How do you identify what you call a potentially

10   privileged document?  What are the signs of that?  What are

11   its characteristics that cause you concern?

12   A.  Well, as we're beginning a case and learning about the

13   case, we start to learn who is represented by attorneys and

14   the names of those attorneys and that's what we're looking

15   out for.

16   Q.  Okay.  Now, in this case you've been working on the case

17   involving Prof. Adams, correct?

18   A.  Yes, I have.

19   Q.  And in working on this case and in interacting with the

20   prosecution team and in particular when you were executing

21   this warrant, were you aware that there was a prior SEC

22   investigation of Mr. Adams?

23   A.  I was aware of that.

24   Q.  And were you aware that the facts underlying that

25   investigation were the same facts or similar facts to the

1      ones that gave rise to the indictment here?

2      A.  Yes.

3      Q.  And similarly, were you aware that Mr. Adams had been --

4      that Prof. Adams had been sued by some number of angry

5      investors related to this case?

6      A.  Yes.

7      Q.  And there again, were you aware that he was represented

8      by lawyers in connection with those matters?

9      A.  Yes.

10     Q.  As you went through the stuff in this case, did you have

11     in your mind, were you vigilant to avoid reviewing such

12     documents?

13     A.  Yes, I was.

14     Q.  Put more meat on that bone.  Tell us how, what you did,

15     what you avoided and how you avoided it.

16     A.  So generally what I do when I'm looking at e-mails is, I

17     do kind of a cursory glance at the e-mail, see if anything

18     pops out at me, any names that I know of, potential

19     attorneys representing, for example, Mr. Adams in this case.

20     If I see those names, then I confirm in the e-mail headings

21     that that person is on that e-mail and the people on that

22     e-mail and then report that back to my AUSA, saying either

23     in this case those need to be pulled out of the Relativity

24     project or we need to do something to make sure that we're

25     not viewing those items.

1   Q.  Okay.  So if I'm hearing you correctly, it sounds like

2   you do a number of things.  You see something that might be

3   privileged.  Number one, you stop looking at it.

4   A.  Correct.

5   Q.  Number two, you flag it and segregate it.

6   A.  Correct.

7   Q.  Number three, you write down or memorialize why you

8   think it might be privileged.

9   A.  Correct.

10  Q.  And four, you communicate the fact that you've seen this

11  document to the AUSA in charge of the case.

12  A.  Correct.

13  Q.  Is that essentially correct?

14  A.  Yes.

15  Q.  Okay.  I want to talk to you a little bit about the

16  concept of a taint team, okay?

17  A.  Okay.

18  Q.  In this particular case, no taint team was employed,

19  correct?

20  A.  Not until much, much later.

21  Q.  Not until August of this year.

22  A.  Correct.

23  Q.  Okay.

24          MR. MacLAUGHLIN:  May I walk over to the white

25  board, Your Honor?

1          THE COURT:  Of course.

2     Q.  So I want to ask you a question, Inspector Kroells, and

3     the best way I know how to ask it is to write it on this

4     board, and I've lost my -- here it is.

5          So you understand you're the one that got a thumb

6     drive with all of those -- this raw take, right, 146,522

7     e-mails, correct?

8     A.  Okay.  I did receive a thumb drive.  I don't remember

9     how many e-mails exactly were on it at the time.

10    Q.  Okay.  Well, I'm endeavoring to be accurate and precise.

11    If I'm not, I'm not.

12          And you knew that there was a mechanical pull out

13    of those 146 to try to segregate out privileged e-mails,

14    right?

15    A.  Yes.

16    Q.  What do you know about the search terms that were used,

17    if anything, to accomplish that pull?

18    A.  I believe we provided --

19          THE COURT:  I'm sorry.  Just to make the record

20    clear for the purpose of our eventual briefing, we are

21    talking about the May 2nd pull, the pull that's indicated as

22    number two on the handwritten timeline, correct?

23          MR. MacLAUGHLIN:  That's right, Your Honor, and

24    I'll try to be more Tim-Willette-conscious as I go through.

25          THE COURT:  Thank you.

1    BY MR. MacLAUGHLIN:

2    Q.  So let me ask it again.  On March 7th of 2016, you

3    received a thumb drive Yahoo!, exclamation point, right?

4    A.  Yes.

5    Q.  And that was Yahoo!'s response to the warrant that had

6    been signed by Judge Rau.

7    A.  Yes.

8    Q.  And on May 2nd of 2016, there was a mechanical filtering

9    process undertaken to try to pull privileged e-mails out of

10   that large body of e-mails; does that sound right to you?

11   A.  I was aware that that was happening.  I don't know the

12   exact date that it occurred.

13   Q.  Okay.  And were you involved in helping the team

14   formulate the terms that went into the search that resulted

15   in that pull?

16   A.  Yes.  I worked with the AUSAs and other agents to

17   determine what potential words were potentially privileged

18   or could help us flag potentially privileged e-mails.

19   Q.  Please give Judge Menendez an idea of how that process

20   worked.

21   A.  We just discussed the attorneys that we were aware of

22   that represented Mr. Adams and provided that information to

23   the AUSA.

24   Q.  So, for example, did you provide the names to the AUSA

25   of lawyers that you thought represented Mr. Adams in the SEC

1   case?

2   A.  Correct.

3   Q.  And did you provide to the extent you knew them the

4   names of lawyer who represented Mr. Adams in the underlying

5   civil cases?

6   A.  To the extent that I knew them.  I don't remember who

7   was representing him in each particular matter.

8   Q.  Okay.  I'm going to draw a blue line -- a blue circle,

9   that is, around the number 33,161, which is the number of

10  e-mails that were segregated on May 2nd, correct?

11  A.  I don't remember the exact number, but I know that there

12  was a number of them that were segregated.

13  Q.  If you trust me on the number, does that sound right?

14  A.  Yes.

15  Q.  Okay.

16          THE COURT:  Hit pause for one moment.

17  Mr. MacLaughlin --

18          MR. WADE:  Your Honor, for the record, we don't

19  have an objection to these general numbers, so to keep the

20  proceedings moving.

21          THE COURT:  To the extent they may not remember

22  the precise -- all of the columns, you're not concerned

23  about it.

24          MR. WADE:  We're not concerned about the specific

25  numbers that are on the board with respect to the different

1    phases of searching.

2                 THE COURT:   Thank you.  I appreciate that

3    clarification.

4    BY MR. MacLAUGHLIN:

5    Q.   Inspector Kroells, then on the 7th of June of 2016 there

6    was another cull, correct?

7    A.   I don't remember specific dates, but I know that there

8    were culls of pulling privileged information.

9    Q.   Okay.  We're going to look this in a few minutes, but

10   you saw in this (indicating) set of -- in the 113,361, you

11   spotted some things that you were concerned were privileged,

12   right?

13   A.   Yes, I did.

14   Q.   Did you follow your procedure:  stop, flag, segregate

15   and report?

16   A.   Yes, I did.

17   Q.   And when you reported that, who did you report it to?

18   A.   AUSA Maria.

19   Q.   And did AUSA Maria in response have our automated

20   litigation support people undertake another search?

21   A.   That was what his communication was to me that he was

22   going to do.

23   Q.   So if I told you that another 1,494 e-mails came out on

24   June 7th of 2016, would that roughly comport with your

25   recollection of events?

1    A.  It would.

2    Q.  All right.  So at this point in time -- and I'm no good

3    at adding and I'm certainly no calligrapher -- but there's

4    roughly, you know, 37,000 now e-mails pulled out of the

5    database, right?

6    A.  Yes.

7    Q.  You didn't have any access to those, did you?

8    A.  Those 37,000, no.

9    Q.  And that remains true to today.

10   A.  Correct.

11   Q.  Okay.  Here's my question.  Here's why I came up to the

12   white board:

13            I'm pointing an arrow at that 37,000.  If there

14   had been a taint team, if the taint team procedure had been

15   followed through on by the prosecution team, what would the

16   taint team have looked at?

17   A.  I believe they would have looked at --

18            MR. WADE:  Objection, Your Honor.

19            THE COURT:  Basis, please?

20            MR. WADE:  I don't see the basis.  I don't think

21   we've established that the witness can answer that question.

22            THE COURT:  Lay some foundation as to her

23   knowledge about what her understanding of the plan for the

24   taint team would have been.

25            MR. MacLAUGHLIN:  Sure.

1    BY MR. MacLAUGHLIN:

2    Q.  So at this point in time after -- at the June 7, 2016,

3    after that second pull, if you accept my math, you guys had

4    access to 111,867 documents, right?

5    A.  Right.

6    Q.  The prosecution team could go onto Relativity and

7    conduct Boolean searches to see what was in there.

8    A.  Correct.

9    Q.  Okay.  Was a taint team supposed to be involved in that

10   process?

11   A.  We had talked about putting together a taint team.

12   Q.  If the taint team -- so there's this 37,000 e-mails out

13   here, right --

14   A.  Right.

15   Q.  -- that you guys don't have access to.

16   A.  Right.

17   Q.  If there had been a taint team, what would they have

18   been assigned to look at?

19             MR. WADE:  Objection.  Lacks foundation.

20             THE COURT:  For awareness of what -- let me just

21   ask you this:  How did you come to learn about the plans

22   for the taint team?

23             THE WITNESS:  I believe there was some

24   communication between agents and AUSAs that we had talked

25   about maybe putting together a taint team, and there was

1    outreach from the AUSAs to the agents trying to find

2    potential other agents who weren't involved in the case that

3    could be on the taint team.

4              THE COURT:  Were you aware of what the plan was

5    for how the taint team would work with the prosecution team

6    or work with the evidence?

7              THE WITNESS:  In general I'm aware of how it

8    works.

9              THE COURT:  Okay.  You can proceed,

10   Mr. MacLaughlin.

11             MR. MacLAUGHLIN:  Okay.

12   BY MR. MacLAUGHLIN:

13   Q.  Let me do this.  I think this might help solidify this.

14             I am going to show you what's been labeled -- I

15   wasn't planning to show you this, but this is actually

16   Khan 1.

17             Before I ask any questions about this, who is Curt

18   Bohlke?

19   A.  I don't know if I know that name, Curt Bohlke.

20   Q.  An FBI agent who was going to be the taint agent on the

21   team?

22   A.  Oh, okay.  Yeah, I know there was an FBI agent that was

23   potentially going to be a taint team member, but I don't

24   remember the name.

25   Q.  Okay.  So you're working this case with Jen Khan of the

1    FBI?

2    A.  I am.

3    Q.  And for a period of time with Brandon Belich of the IRS.

4    A.  Correct.

5    Q.  And Curt Bohlke is, am I correct about this, a colleague

6    of Special Agent Khan's?

7    A.  I don't know.  I know that there was an FBI agent that

8    was going to be on the team.  I don't remember his name.

9    I'm sorry.

10   Q.  Okay.  So there was for awhile talk of a taint team

11   looking at some stuff, right?

12   A.  Right.

13   Q.  And what does a taint team do?

14   A.  My understanding of a taint team in general is that it

15   is generally comprised of both AUSAs and agents, sometimes

16   one or the other, and they look through the potentially

17   privileged documents that have been flagged and pulled from

18   the actual prosecutorial team, the agents and prosecutors on

19   the actual case.

20   Q.  Okay.  So getting back now to the white board, this

21   113,361, you guys had access to that, right?

22   A.  Yes.

23   Q.  To the extent that you found stuff in there that you

24   thought was privileged, what did you do?

25   A.  If I thought it was privileged, I made note of it and

1    talked to the AUSA and probably the other agents about it.

2    Q.  And in that event it would be shifted over to this

3    folder containing the 37,000.

4    A.  Correct.

5    Q.  So with all of that in mind, was a taint team ever

6    brought on board to look at these 37,000 documents?

7    A.  Not that I'm aware of.

8    Q.  Why?

9            MR. WADE:  Objection.

10           THE COURT:  Foundation?

11           MR. WADE:  Foundation.

12           THE COURT:  Sustained.

13   Q.  Okay.  Did you guys as a prosecution team talk about

14   whether it was worth the time to take a dive into these

15   37,000 documents to see if in fact they were privileged?

16   A.  I don't remember if we actually talked about it.  I know

17   I had an opinion as to whether we needed to look at --

18   Q.  What was your opinion?

19   A.  My opinion was that we didn't need to.  We were finding

20   other e-mails that were specifically relevant to the search

21   warrant and to the fraud scheme and we didn't need to waste

22   other people's time to look at all of those other e-mails.

23   Q.  Okay.  So to your knowledge, was any effort ever made by

24   any member of the prosecution team to get into that database

25   containing the 37,000 documents and try to figure out if any

1    of them were not privileged?

2    A.  Not that I'm aware of.  I know we --

3    Q.  These 37,000 were thrown back into the pond, correct?

4    A.  Not a pond that we were looking at, but --

5    Q.  Right.  They were permanently locked away at the LTSC,

6    correct?

7    A.  Locked away somewhere, yes.

8    Q.  And somehow or other the Government came to the

9    conclusion that we're content to have those and we don't

10   need to dive into (indicating) these.

11   A.  That's correct.

12   Q.  I'm pointing at 113,361 and the 37,000.

13           Now, let's talk about part one of Attachment B to

14   the warrant for a second.

15           In your experience when you have a search warrant

16   and it's asking for things from an e-mail provider that

17   relate to a particular case, a particular fraud scheme, a

18   particular defendant, a particular time frame, is it the

19   responsibility of that e-mail provider to figure out what

20   fits into that description?

21   A.  No.

22   Q.  Have you ever called Yahoo! or Hotmail to say, "Here's

23   what we need.  We need e-mails from 2009 to 2012 relating to

24   Mr. Adams, these entities, these time frames"?

25   A.  No, that's not their responsibility.

1   Q.  Okay.  In your experience, whose responsibility is it to

2   get from that 146,522 to some lesser number that's within

3   the scope of the warrant?

4   A.  The Government's team, the agents and the AUSAs.

5   Q.  In your own words, if you could, tell us what your goal

6   was in searching this database between May 2nd of 2016 when

7   you really were granted access to it and April of 2017 when

8   the final relevance cull was done.

9   A.  My goal was to specifically find e-mails that were

10  relevant to the fraud scheme pursuant to the search warrant.

11  Q.  In the process of doing that, did you have in the back

12  of your mind attachment two to part B -- part two to

13  Attachment B of the warrant?

14  A.  Yes.

15  Q.  Can you see that?

16  A.  I can.

17  Q.  I don't think we need to get into too much detail here,

18  but this is part two of Attachment B to the warrant,

19  correct?

20  A.  Yes.

21  Q.  And it gets into detail, but the first paragraph says

22  that you are entitled to seize all information described

23  above Section 1 that constitutes fruits, contraband,

24  evidence and instrumentalities of violations of Title 18,

25  United States Code, Sections 1341 and 1343, involving

1    Edward S. Adams and Michael R. Monahan occurring after

2    October 25 of 2016, correct?

3    A.  October 25th of 2006, yes.

4    Q.  2006.  I'm sorry.  So my overarching question is:

5            Is whatever you did within this database between

6    May 2nd of 2016 and April of 2017 calculated to find things

7    that fit into that general category?

8    A.  Yes.

9    Q.  So could you have done it manually?  That is to say, if

10   you had chosen to, in your experience, because you have

11   decided personally to go through every single e-mail, that

12   wasn't privileged anyway, to see what was relevant and what

13   wasn't?

14   A.  I guess.  That's not my general practice because there's

15   usually so many to go through.

16   Q.  Okay.  So here there's 140,000-plus, right?

17   A.  Yes.

18   Q.  What did you decide to do in order to try to make this

19   journey from part one to part two of Attachment B?

20   A.  Tried to use search terms that would be relevant to

21   finding actual evidence of the fraud scheme.

22   Q.  Now, you tend to work on, at least now in your career,

23   on pretty complex cases, right?

24   A.  Yes.

25   Q.  When you first get, you know, in this case the

1    146,000 e-mails from Yahoo!, do you know right away what

2    search terms to use to pull out relevant stuff?

3    A.  No, I don't.  At that time I'm still learning about the

4    case and what's relevant and what's not.

5    Q.  Okay.  There's a learning curve, correct?

6    A.  Yes, there is.

7    Q.  And how does looking inside the database that you get

8    here from Yahoo! in this case inform you about how to go

9    forward to narrow down that warrant to just what's relevant?

10   A.  Well, we don't know what we're going to get.  We don't

11   know if everything is going to be relevant or if there's

12   going to be nothing relevant, so looking through it helps me

13   learn who are the players involved and what is relevant and

14   what's not.

15   Q.  And in this case you're working with Jen Khan of the

16   FBI?

17   A.  Yes, I am.

18   Q.  You're working with IRS, Brandon Belich, later Marcus

19   Wayne?

20   A.  Yes.

21   Q.  You're working with AUSA Maria?

22   A.  Yes.

23   Q.  You're working with AUSA Kokkinen.

24   A.  Yes.

25   Q.  For a time you were working with AUSA Kim Svendsen,

1    right?

2    A.  Yes.

3    Q.  Okay.  Is it fair to say that there -- in a complex like

4    this there's an arc of learning that takes a significant

5    period of time?

6    A.  Definitely.

7    Q.  Now, I want to ask you some questions -- again, these

8    are in your experience.  In your experience, do judges tell

9    you how you're going to do this, what steps you're going to

10   take or what search terms you're going to use to get from

11   part one to part two of this warrant?

12   A.  No, not in my experience.

13   Q.  Did Judge Rau in this case tell you, "Here's what I want

14   you to do.  I want you to use these search terms and here's

15   how much time I want you to take," anything like that?

16   A.  No.

17   Q.  So what's the goal?  When we get down to this last

18   number here, this 42,927 document number that's at the end

19   of the road, tell Judge Menendez what your goal is with

20   respect to the nature of those 42,927 e-mails.

21   A.  Well, we're hoping that those are narrowed down and

22   specifically relevant to the fraud scheme that we're

23   investigating.  We're hoping to narrow everything down to

24   specifically relevant documents that are involved in the

25   fraud scheme.

1    Q.   Now, I've got a question for you.  In a case like this

2    involving, you know, six figures' worth of e-mails, has that

3    process ever been perfect?

4    A.   Probably not.

5    Q.   I mean, from time to time you run into documents that

6    are not relevant, correct?

7    A.   Oh, for sure.  Yeah, that happens.

8    Q.   And do you have any interest in those?

9    A.   No, I don't.

10   Q.   I mean, for example, I guess we have apparently in that

11   database e-mails about a surprise birthday party for the

12   defendant's wife.  I mean, do you have any interest in that?

13   A.   No.  There are so many e-mails and I'm really trying to

14   get through everything fairly quickly and I'm only

15   interested in the e-mails that are specifically related to

16   the fraud scheme.  I'm not wanting to really waste my time

17   on reading anything else.

18   Q.   Okay.  I want to talk to you a little bit about your

19   workload now.  I think we've established that you got access

20   to this database about May 2nd of 2016 and the seizure

21   occurred -- well, Mr. Wade thinks it occurred on April 4th.

22   I put April 7th, of 2017.  I'm not sure what's right, but

23   about a year, correct --

24   A.   Okay.

25   Q.   -- that you had access to this?

1    A.  Yes.

2    Q.  Did you have other demands during that period of time,

3    or was this the only case you were working on?

4    A.  No, I definitely had other cases that I was working on.

5    Q.  For example, what did you do during October of 2016, the

6    entire month?

7    A.  The entire month I was -- it was spent on a completely

8    separate trial, and the summer prior to that was spent on

9    getting ready for that mostly.

10   Q.  Okay.  So you worked with me, not to inject myself into

11   this, the entire summer to get ready for Reichel trial,

12   right?

13   A.  Yes.

14   Q.  And we were in Judge Wright's courtroom the entire month

15   of October, right?

16   A.  Yes, we were.

17   Q.  And are those the only two matters you have going on?

18   A.  No, there are others as well.

19   Q.  Okay.  Other things nipping at your heels?

20   A.  Yes, definitely.

21   Q.  And similarly -- I can ask Jen Khan this and I will ask

22   her, but she's busy too, right?

23   A.  Yes.

24   Q.  Let's talk about this case then.  When did you get

25   involved in investigating this case?

1    A.  I believe it was towards the end of 2014.

2    Q.  All right.  And I think it's worth a few minutes -- I

3    know the Court has read the indictment.  I know that because

4    she knows that the superseding indictment isn't real

5    different from the original one.

6           But for purposes of our discussion, can you give

7    us a two-minute executive summary of what this case is

8    about?

9    A.  Sure.  So my understanding is that Mr. Adams'

10   father-in-law, Robert Linares, invented a way to create

11   man-made diamonds and that Mr. Adams was involved in getting

12   investors to put money into the companies, the Apollo

13   companies, that created and marketed these diamonds.  And

14   our investigation was into Mr. Adams' taking of the money

15   from the investors that was supposed to be used for the

16   companies and then transitioning that into the Scio

17   companies, continuing to position himself into a better

18   position.

19   Q.  Okay.  So we have a series of companies, really.  We

20   have Apollo Diamond?

21   A.  Yes.

22   Q.  And Apollo Diamond and its intellectuals, or its

23   principals, had developed something called chemical vapor

24   deposition, which is a way of making diamonds.

25   A.  Yes.

1    Q.   Sounds kind of cool, right?

2    A.   Yes.

3    Q.   And then there's another company called Apollo Diamond

4    Gemstone?

5    A.   Yes.

6    Q.   And ultimately all of the assets of those two companies

7    were sold to a company called Private Scio?

8    A.   That was the intent initially was to sell it to Private

9    Scio, yes.

10   Q.   And then somehow that became a public company.

11   A.   Then there was a separate company that became public,

12   Scio, yes.

13   Q.   And so the thrust of the indictment is -- if it's true.

14   I'm not saying it's true, but the allegation is that

15   Mr. Adams, Prof. Adams, raised money and then didn't put the

16   money into these companies.

17   A.   Correct, took most of the money for himself, others, or

18   his law firm.

19   Q.   So Apollo Diamond, Apollo Gemstone, and Private Scio,

20   these are all essentially victims of this crime, right?

21   A.   Yes.

22   Q.   And Mr. Adams had various positions at that these

23   companies?

24   A.   He did.

25   Q.   Some of them were legal and some of them were not legal.

1   A.  Yes.

2   Q.  And his law firm Adams Monahan, LLC represented these

3   companies from time to time, correct?

4   A.  His law firm represented them, correct.

5   Q.  So you knew that he was a lawyer.

6   A.  Yes.

7   Q.  You knew that these companies existed and that they were

8   victims of the case.

9   A.  Yes.

10  Q.  You knew that he or his law firm represented the

11  companies.

12  A.  Yes.

13  Q.  And you also knew about the SEC case and the underlying

14  civil suits, right?

15  A.  Yes.

16  Q.  Did you figure as well that since he was a lawyer and

17  had a law firm that he had other clients out there

18  somewhere?

19  A.  Yes.

20  Q.  All right.  I want to focus your attention on late 2015.

21  A.  Okay.

22  Q.  You're firmly ensconced as a member of the prosecution

23  team at that point in time, correct?

24  A.  Yes.

25  Q.  And around that time, November-December of 2015, you

1    guys began to think about getting search warrants of a

2    couple of e-mail accounts that you knew that Mr. Adams

3    controlled, true?

4    A.  Yes.

5    Q.  What were those two accounts?

6    A.  The two accounts that belonged to Mr. Adams were

7    edwardsadams@yahoo.com, and josten1@yahoo.com.

8    Q.  And what kind of e-mail accounts were they, in the sense

9    of where they private, or were they associated with

10   University of Minnesota, or Adams Monahan, or anything else?

11   A.  No, they appeared to be personal accounts.

12   Q.  Okay.  Was the prosecution team aware that Mr. Adams had

13   an e-mail account associated with his law firm Adams

14   Monahan, LLC?

15   A.  Yes, we were aware of that.

16   Q.  And why didn't you get a search warrant for that account

17   as well?

18   A.  My understanding, we didn't want to look into all of the

19   potentially privileged communications that would have been

20   in that e-mail.

21            MR. WADE:  Objection.  There's no foundation for

22   that answer.

23            THE WITNESS:  I agree.  The answer is stricken

24   unless you'd like to lay some foundation.

25            MR. MacLAUGHLIN:  Sure.

1  BY MR. MacLAUGHLIN:

2  Q.  So you were a member of the prosecution team, right?

3  A.  I was.

4  Q.  And in fact you turned out to be the affiant on the

5  search warrant for the personal e-mail accounts.

6  A.  Yes.

7  Q.  All right.  Was there discussion among the prosecution

8  team about the need or the helpfulness of getting search

9  warrants to grab those two accounts?

10           THE COURT:  Hold on, please.

11           MR. WADE:  Just to be clear, discussion that she

12  was involved in, I would not object to that question, but

13  otherwise I object for lack of foundation.

14           THE COURT:  I think that's probably inaccurate.

15  The admonition is, is she involved in the discussion.

16           MR. MacLAUGHLIN:  Sure.

17  BY MR. MacLAUGHLIN:

18  Q.  So Inspector Kroells, you've heard the objection and

19  you've heard the judge's view, so let's talk about what you

20  actually participated in personally or saw in e-mails maybe.

21           And let me get into it like this.  How was it

22  decided, if you remember, that you were going to be the

23  affiant?

24  A.  I don't remember specifically, but I know I was the one

25  who had the time at that time to put the effort into writing

1    it.

2    Q.  In your discussions with the prosecution team about

3    getting warrants for these two e-mails, did you guys talk

4    about or acknowledge the existence of an e-mail account that

5    he had at his law firm?

6    A.  Yes, we did.

7    Q.  And did you talk about whether you were going to go and

8    get an e-mail for that account?

9    A.  Yes, we talked about that.

10   Q.  Tell us about those discussions that you participated

11   in.

12   A.  We just talked about that we knew that there was these

13   other e-mail addresses out there and that we didn't want to

14   delve into that at this point because there was so much

15   potentially privileged communications in those e-mail

16   addresses that we thought we'd better be a little safer and

17   stay with the personal e-mail accounts.

18   Q.  Okay.  In having those discussions, you were aware that

19   Adams Monahan had acted from time to time as a lawyer,

20   represented the Apollo and Scio entities, right?

21   A.  Yes.

22   Q.  So I take it it wasn't that you stayed away from that

23   account because you thought it didn't have anything relevant

24   in it.

25   A.  Correct.

1    Q.  Okay.  So let's talk a little bit now about your work as

2    the affiant in this case.

3              You testified earlier that generally you worked

4    with the United States Attorney's Office in putting together

5    an affidavit, correct?

6    A.  Yes.

7    Q.  And so in late 2015, who did you work with at our office

8    to draft, review and finalize the search warrant affidavit?

9    A.  Initially I was going to be working with Kim Svendsen

10   from the U.S. Attorney's Office, but that changed to AUSA

11   Kokkinen and I worked mostly with him to draft and write the

12   affidavit.

13   Q.  Okay.  So Mr. Kokkinen reviewed your work?

14   A.  Yes, he did.

15   Q.  Mr. Kokkinen, did he provide you with ancillary or

16   additional documents he thought was necessary to bring to

17   the judge in getting the warrants?

18   A.  I don't remember that.

19   Q.  So you wrote in your declaration -- and I'm going to

20   quote this and then ask you about this.  In your declaration

21   you say in working on putting this affidavit together, you

22   understood that Mr. Kokkinen "had engaged in a process

23   related to attorney-involved searches before I went to the

24   magistrate judge to seek signing of the warrants."

25             Do you know anything about that process?

1    A.  I know that he did that process.  I don't know what was

2    all involved in that process, no.

3    Q.  I now want to take you to November the 25th of 2015.

4    You actually swore this affidavit out twice, correct?

5    A.  I did.

6    Q.  And the first time you did that was on November

7    the 25th, 2015 before the now-retired Magistrate Judge

8    Mayeron, correct?

9    A.  Yes.

10   Q.  And that particular warrant ended up having attached to

11   it a document called "Search Warrant Addendum," correct?

12   A.  Yes.

13   Q.  My first question is:  Were you even aware that it was

14   there at the time?

15   A.  At the time I received an e-mail from AUSA Kokkinen and

16   it did not have that addendum attached to the documents that

17   were going to be presented to the judge.

18   Q.  Okay.  Let's -- I'm asking you a slightly different

19   question.

20   A.  Okay.

21   Q.  I'll ask you that one next.

22   A.  Okay.

23   Q.  Did you have an awareness -- when you walked out of

24   Judge Mayeron's office and she'd signed it, did you have an

25   awareness that that document was even attached to the

1    materials relating to the warrant?

2    A.  I don't remember specifically, but I think -- I think

3    this was the circumstance where she added that prior to me

4    walking out of her office.  I know there was a time when

5    that happened and I think it was this warrant.

6    Q.  All right.  So is your answer you don't remember if you

7    were aware of it as you walked out of her office, or you

8    just don't recall, or --

9           MR. WADE:  Objection.  Asked and answered.

10          THE COURT:  Let's clarify the answer.

11   A.  So I don't remember specifically, but I think that this

12   was the instance where the judge added that document to the

13   warrant.  I know that there was a time when that happened

14   and I think that was this warrant.

15   Q.  Now, since you swore out your declaration, I asked you

16   to go back and look at your e-mails to try to figure out if

17   our office had provided you with that document, correct?

18   A.  Right.

19   Q.  And in doing what I asked you to do, you went back and

20   looked at e-mails that you received from Mr. Kokkinen just

21   ahead of your signing this warrant.

22   A.  I did.

23   Q.  What did you find?

24   A.  I found the sealing order and related documents and then

25   the affidavit and related documents, but I did not find that

1    search warrant addendum.

2    Q.  All right.  So based on your search, do you think AUSA

3    Kokkinen or the U.S. Attorney's Office in any way provided

4    you with that search warrant addendum?

5    A.  I think they did not.

6    Q.  Okay.  So now I want to talk to you a little bit about

7    what we talked about earlier, the difference between a

8    premises warrant and an e-mail warrant.  And if I'm

9    recalling correctly, you said when you grab a computer out

10   of somebody's house, you dispossess them of it, when you do

11   an e-mail search warrant you don't, correct?

12   A.  Correct.

13   Q.  So I'm going to show you Kroells 1.  If you could take a

14   look at Kroells 1 for a second.

15   A.  I have --

16   Q.  Did I not properly collate your pile?

17   A.  There's Belich 1 in front of mine, but --

18   Q.  You'll find Kroells 1 a few pages in.

19   A.  I have it, yes.

20   Q.  And you and I met last week to get ready for this

21   hearing?

22   A.  We did.

23   Q.  And I showed you a document which is actually our

24   standard search warrant addendum that we attach to premises

25   warrants where we think we're going to get a computer.

1    A.  Yes.

2    Q.  Do you remember that?

3    A.  I do.

4    Q.  So I want to focus in -- let's start with paragraph 2.

5    Paragraph 2 says:

6          "If electronically stored data, information,

7    documents, or other records have been identified and seized

8    by the Government, the Government may retain the electronic

9    storage device.

10          First question:  When you go get e-mails from an

11   e-mail provider, do they actually take their storage device

12   and detach it from their system and send it to you?

13   A.  No, my understanding is that we get copies of what is in

14   that account.

15   Q.  Is there anything to return to the e-mail provider when

16   you get an e-mail search warrant take?

17   A.  No.

18   Q.  Okay.  Let's go on.  It next says:

19          "The person from whom the electronic storage

20   device was seized may request that the Government provide

21   him or her with electronic copies of the data, information,

22   documents, or other records by making a written request to

23   the United States Attorney's Office, identifying with

24   specificity the data, information, documents, or other

25   records sought to be copied."

1      Here's my question:  In your experience, does that

2   concept have any application at all to an e-mail search

3   warrant?

4   A.  No, it doesn't.

5   Q.  Is there anything after you execute an e-mail search

6   warrant to be returned to the person whose account was

7   searched?

8   A.  No, and in fact, a lot of times that person doesn't even

9   know that that account has been searched.

10   Q.  I want to go down now to paragraph 3.  Inspector

11   Kroells, can you read that on there?  Can you read the

12   document?

13   A.  Yes.

14          MR. MacLAUGHLIN:  Judge, can you read it?

15          THE COURT:  Yes.

16   Q.  Okay.  I've circled something in paragraph 3.  It says:

17          "Nothing in this warrant shall limit or prevent

18   the owner of the electronic storage device, files, software,

19   hardware, data, information, documents, or other records

20   from filing a motion with the Court pursuant to Rule 41(g)

21   for the return of the property or making a request directly

22   to the Government for the return of the property."

23          Does that concept have any application whatsoever

24   in the context of an e-mail search warrant?

25   A.  No, it does not.

1              MR. WADE:  Objection.  Lacks foundation.

2              THE COURT:  I agree.  I don't think her opinion as

3      to the applicability of either of these paragraphs to

4      electronically provided data is particularly relevant.

5              MR. MacLAUGHLIN:  Okay.

6      BY MR. MacLAUGHLIN:

7      Q.  Well, let me ask you this, then.  Looking at the top,

8      there's a paragraph there that says:

9              "In conducting the search authorized by this

10     warrant, the Government shall make reasonable efforts to

11     utilize search methodology that avoids searching files,

12     documents, or other electronically stored information which

13     is not identified in the warrant."

14             Was that done in this case?

15     A.  Yes, to my knowledge.

16     Q.  And in paragraph 4 it says:

17             "In the event the data seized" -- "In the event

18     that data seized pursuant to this warrant is identified by

19     the Government as possibly containing attorney-client

20     privileged communications, a process will be undertaken" --

21     here it talks about a taint team -- "to screen off the

22     prosecution team from those materials."

23             Did that happen in this case?

24     A.  We were screened off from those materials and discussed

25     putting together a taint team, yes.

1    Q.  Okay.  And in this case you guys never (indicating)

2    tried to delve into those 37,000 documents.

3    A.  No.

4    Q.  Moving on now to Kroells 2, is this the search warrant

5    addendum that was attached to the first version of the

6    warrant that you executed in front of Judge Mayeron?

7    A.  It looks like it, yes.

8    Q.  And is it essentially the same thing that we just looked

9    at which is standard operating procedure in a premises

10   warrant?

11   A.  Yes.

12   Q.  Okay.  And Mr. Kokkinen did not send this to you.

13   A.  No.

14   Q.  So Inspector Kroells, this first warrant that you swore

15   out in front of Magistrate Mayeron, to make a long story

16   short, you sent it to Yahoo!.  Somehow the service was no

17   good because their rules had changed, and so you had to go

18   get a second warrant; is that all fair?

19   A.  That is correct.

20   Q.  You swore out this same warrant, essentially, in front

21   of Judge Rau on January the 7th of 2016?

22   A.  Correct.

23   Q.  When you went to see Judge Rau, did you in some way

24   deliberately withhold or conceal from him this addendum?

25   A.  Definitely no, I did not.

1   Q.  In your mind, when you went and saw Judge Rau on

2   January 7th, were you essentially re-presenting the same

3   thing to him that you had previously presented to Magistrate

4   Mayeron?

5   A.  Essentially, yes.

6   Q.  On January 8th, the next day, did you serve it on

7   Yahoo!?

8   A.  I did.

9   Q.  All right.  Let's go forward to March 7th of 2016.  On

10  that day you did receive a flash drive from Yahoo!, correct?

11  A.  Yes, I did.

12  Q.  And that was the flash drive that contained documents

13  that were responsive to this warrant.

14  A.  Yes.

15  Q.  Specifically, the documents within the ambit of part one

16  of Attachment B.

17  A.  Yes.

18  Q.  Tell us what you did initially with that thumb drive.

19  A.  I logged it into evidence and attempted to access it.

20  Q.  And was your initial attempt to access it successful?

21  A.  I don't remember.  I know that I had with problems with

22  one time using the Mozilla application and trying to get it

23  loaded onto our standalone computer so that I could access

24  the e-mails in the flash drive.  I don't know remember if it

25  was this specific flash drive or not.

1    Q.  So you did sort of an initial access of it right away?

2    A.  At some point, yes, when I was able to get into it.

3    Q.  What was the purpose of that initial access?  The first

4    time you opened it, what was the reason you opened it?

5    A.  To determine the volume of what I had received and that

6    what I had received was what was being asked for.

7    Q.  And what did you discover?

8    A.  That we received e-mails pursuant to the three e-mail

9    addresses and that there were quite a few e-mails in all

10   three of those accounts.

11   Q.  I want to direct your attention now to the week or so

12   after you got that drive, the week or so after March 7th of

13   2016.

14   A.  Okay.

15   Q.  Did you access the drive again?

16   A.  Yes.

17   Q.  And prior to receiving the drive, had you communicated

18   with the prosecution team about the possibility of accessing

19   it when you got it?

20   A.  Yes.

21   Q.  And why did you talk to the prosecution team about

22   looking inside the thumb drive when you got it?

23   A.  Just being cautious, making sure that we were able to

24   look at what we received.

25   Q.  Okay.  What specifically did you search?  What were you

1    looking for when you accessed the thumb drive in the week or
2    so after you got it?
3    A.  I was looking for evidence related to the fraud scheme
4    and getting ready for any potential interviews that we were
5    going to be conducting.
6    Q.  Did you talk to AUSA Maria about going in and looking at
7    the thumb drive?
8    A.  I did.
9    Q.  Tell us about what conversation.
10   A.  So I know that we spoke in general about looking at the
11   thumb drive and whether I would be able to look at the
12   e-mails.  And then also, I specifically remember talking to
13   him about being able to read e-mails between Mr. Adams,
14   Mr. Monahan, and employees of the Apollo and Scio companies.
15   Q.  Okay.  So I want to ask you a couple of general
16   questions about that and then some specific questions about
17   that, okay?
18   A.  Okay.
19   Q.  In going into the thumb drive in the week or so after
20   you got it, did you employ your vigilance in avoiding
21   attorney-client privilege documents?
22   A.  Yes, I did.
23   Q.  Did you particular employ that diligence in avoiding
24   looking at or exposing yourself to Mr. Adams' communications
25   with lawyers who represented him in the SEC matter?

1    A.  Correct.  We were -- or I was specifically concerned

2    about avoiding any of the e-mails that could be potentially

3    privileged between Mr. Adams and any attorneys that

4    represented him.

5    Q.  Including in the SEC matter?

6    A.  Including in the SEC matter.

7    Q.  And the related civil matters.

8    A.  Correct.

9    Q.  If it's not exactly the same as your answer was before,

10   tell the judge what you did in accessing that flash drive to

11   avoid looking at those documents.

12   A.  I don't remember specifically within that week or so

13   that I had the flash drive before turning it over to

14   SA Khan, but I know that I would have followed my common

15   procedure, which is being careful not to review any

16   potentially privileged documents, and if I did actually see

17   something, I would write down the name of the attorney

18   involved and let the AUSA know, for example, I'm seeing a

19   lot of potentially privileged information or I'm seeing a

20   little bit of potentially privileged information so that the

21   AUSA would have that information and be able to let me know

22   how to proceed from there.

23   Q.  In your first foray into the thumb drive that week when

24   you had it, did you see any privileged stuff?

25   A.  I don't remember specifically.  It's likely that I did.

1    Q.   Okay.  And if you did?

2    A.   I would have used those methods.  I would have not

3    reviewed it and then relayed the information to the AUSA of

4    what I was finding and the names of the attorneys.

5    Q.   Do you remember in fact doing that?  Did you give AUSA

6    Maria -- you know, "I'm running into some stuff and here are

7    the names of the lawyers"?

8    A.   I know I did throughout this process.  It was such a

9    short period of time prior to turning the drive over to

10   SA Khan.  I don't remember if that happened before.  It was

11   likely that it did, but I don't remember --

12   Q.   It was likely that what?

13   A.   That I did.

14   Q.   That you did.  And in fact, a very short time later AUSA

15   Maria decided to undertake a heightened filter procedure for

16   that very thumb drive, correct?

17   A.   It was my understanding, yes, that that was going to

18   happen.

19   Q.   Let me ask you a specific question and you averted to it

20   a few minutes ago.

21          In your declaration you say that you had

22   communications -- that you talked to David Maria about

23   whether you could look at communications between Mr. Adams

24   and employees of Apollo/Scio entities.  Do you remember

25   that?

1    A.  Yes.

2    Q.  Tell us about that conversation with Mr. Maria.

3    A.  I think I was just being cautious and making sure that

4    we could look at those e-mails.  Our main concern,

5    obviously, was protecting the attorney-client privilege

6    between Mr. Adams and attorneys that represented him, but I

7    was also aware that Mr. Adams himself was an attorney and I

8    wanted to make sure that we could look at communications

9    between him and the companies' employees.

10   Q.  Okay.  Now, these companies were mainly in the persons

11   of people with the last name of Linares, correct?

12   A.  Correct.

13   Q.  There's Robert Linares and Bryant Linares?

14   A.  Yes.

15   Q.  And they were the people who were actually working at

16   the Apollo entities.

17   A.  Yes.

18   Q.  And so you wanted to know to the extent Mr. Adams is

19   communicating with these guys, can I look at it?

20   A.  Correct.

21   Q.  Characterize them.  What were they?

22   A.  They were victims in the case.

23   Q.  They were victims.  And what did Mr. Maria tell you

24   about whether you could look at Mr. Adams' communications

25   with the victims in this case?

1    A.  He said that yes, I can, and that --

2            THE COURT:  Pause, please.

3            You can politely say, "Objection" and stop things.

4    You're so quiet.

5            MR. WADE:  I object to this line of questioning

6    and the characterization of victims.  This is early in the

7    investigation.

8            THE COURT:  Overruled.

9            MR. WADE:  And I don't see the relevance to

10   whether or not they were victims to the privilege analysis.

11           THE COURT:  Overruled.  Obviously your belief that

12   these people are or aren't victims doesn't control whether

13   they were victims.  That's our long-term question in this

14   case.

15           You can proceed, Mr. MacLaughlin.

16           MR. MacLAUGHLIN:  Okay.  Thank you.

17   BY MR. MacLAUGHLIN:

18   Q.  And what did Mr. Maria say when you said, "Can I talk to

19   the Linareses?  Can I look at Mr. Adams' communications with

20   the Linareses?"  What did he say?

21   A.  He said that I could and that in any case we would be

22   receiving I think it was a privilege waiver from the

23   company, but it didn't really matter.  We could look at them

24   anyway.

25   Q.  Okay.  And do you know whether that waiver ultimately

1    occurred?

2    A.  It did.

3    Q.  Okay.

4            MR. MacLAUGHLIN:  And, Your Honor, I would refer

5    the Court to General Exhibit 1, which is the actual waiver,

6    I think, of the privilege by these entities.

7            THE COURT:  Thank you.

8    Q.  So during the course of your review during that one

9    week, did you see e-mails that struck you as relevant to the

10   case and interesting enough to print out for future use?

11   A.  I did.

12   Q.  And did you print out some e-mails?

13   A.  I did.

14   Q.  How many e-mails did you print out?

15   A.  About 22 e-mails.

16   Q.  And do you have those e-mails today?

17   A.  No, I do not.

18   Q.  Are those e-mails now in the possession of the defense?

19   A.  I don't know.  My understanding is that I turned them

20   over to AUSA Ann Bildtsen.

21   Q.  And Ann Bildtsen is now the leader of the recently

22   constituted taint team.

23   A.  Correct.

24   Q.  I just want to put a final nail in this.  In that

25   one-week period when --

1        THE COURT:  Can I clarify, Mr. MacLaughlin, one

2   question?

3        You said that you printed out 22 e-mails during

4   this week before you turned over the thumb drive?

5        THE WITNESS:  (Nods head).

6        THE COURT:  And the paper copies of those e-mails

7   exist to this day?

8        THE WITNESS: Yes.  Those -- sorry.

9        THE COURT:  No, go ahead.

10       THE WITNESS:  Those paper copies is what I turned

11   over to AUSA Bildtsen.

12       THE COURT:  Got it.  Thank you.

13       Sorry for the interruption.

14       MR. MacLAUGHLIN:  No, no problem.

15   BY MR. MacLAUGHLIN:

16   Q.  So just to put a final nail in this, during the entire

17   week or whatever it was when you were looking at the thumb

18   drive, did you have your procedure in play of stop, flag,

19   segregate, and alert AUSA Maria if you saw anything that

20   looked privileged to you?

21   A.  Yes.  That's my common procedure.

22   Q.  Okay.  I want to go forward a little bit now.

23       There's some confusion in the documentation about

24   whether you gave that thumb drive to Special Agent Khan, but

25   you did give it to Special Agent Khan at some point, right?

1   A.  I did.

2   Q.  There's some indications it was on March 17th, other

3   documents suggest it was March 14th, but in that couple-day

4   range you gave it to her, right?

5   A.  I did, mm-hm.

6   Q.  And you understood, correct, that Special Agent Khan

7   turned it over to AUSA Maria?

8   A.  Yes.

9   Q.  Now, when AUSA Maria got the thumb drive, did you start

10  to hear from AUSA Maria that his view was that we had to

11  engage in a heightened filter process with respect to that

12  thumb drive?

13  A.  Yes.  My understanding was that was the reason why

14  Special Agent Khan turned that flash drive over to AUSA

15  Maria.

16  Q.  And what kind of a filtering process did you

17  understand -- from AUSA Maria's conversations with you, what

18  kind of a filtering process did you understand you were

19  contemplating?

20  A.  That we were trying to filter out the potentially

21  privileged information.

22  Q.  I guess I'm asking how.  By hand, mechanically?  How was

23  that going to happen?

24  A.  I didn't really completely understand the process, but

25  some type of electronic digital process that the U.S.

1    Attorney's Office would employ.

2    Q.  And I think you testified earlier that in fact as a

3    member of the prosecution team, you were involved in helping

4    the prosecution team come up with a list of terms designed

5    to cull out privileged stuff, right?

6    A.  Yes.

7    Q.  And was your contribution to that process in part

8    informed by what you had seen in the week you were looking

9    at the thumb drive?

10   A.  I'm sure it was, yes.

11   Q.  So, what is Relativity other than something I can't

12   stand?  What is Relativity?

13   A.  Relativity is, I guess, a database that we use to review

14   evidence.  It's specifically helpful in reviewing e-mail

15   evidence.

16   Q.  And in this case was Relativity the medium used to house

17   these e-mails?

18   A.  Yes, it was.

19   Q.  And was Relativity the electronic format in which these

20   segregated documents I've been referring to, the 37,000 up

21   there, were pulled out and stored?

22   A.  So my understanding is we were able to view the ones

23   that were not pulled out, the ones that were not potentially

24   privileged.  I don't know where the 37,000 were stored.

25   Q.  Okay.  And if I told you that it looks like you guys --

1   by "you guys" I mean the prostitution team -- got access to

2   the 113,361 on May 2nd of 2016, does that sound about right

3   to you?

4   A.  I think it was a couple days later that we were informed

5   of it, but yes, around that time.

6   Q.  Okay.  And as this process was happening, as the

7   mechanical filtering process was occurring, while they were

8   doing their thing down at the LTSC, was David Maria

9   communicating with you guys about what was going on?

10  A.  Yes, he was.

11  Q.  I'd like to direct your attention to Kroells 3.

12  A.  Okay.

13  Q.  On April 27th of 2016, did Mr. Maria send out an e-mail

14  to Brandon Belich, yourself, and Jennifer Khan?

15  A.  He did.

16  Q.  And Brandon Belich was the IRS agent working on this

17  case at the time?

18  A.  At the time, yes.

19  Q.  And Jennifer Khan is the FBI agent, right?

20  A.  Yes.

21  Q.  And it's called "Scio Update."  Mr. Maria says:

22          "We have run search terms on the e-mail database

23  to try to segregate potentially privileged documents."

24          Is it that what you understood was going on, that

25  the documents were getting pulled out that might be

1    privileged?

2    A.  Yes.

3    Q.  "We are still trying to refine the database that

4    contains potentially privileged docs, but the good news is

5    that the larger database should be available for our review

6    very soon.  Does everyone have access to Relativity?"

7         Do you see that?

8    A.  I do.

9    Q.  So did AUSA Maria send this to you right before you guys

10   actually got access to the Relativity database he's

11   referring to here in the e-mail?

12   A.  Yes, he did.

13   Q.  Now, there's a chain -- page 2 of Kroells 3 contains

14   other e-mails that are a little bit later.  I want to direct

15   your attention to the bottom of page 2 of Kroells 3.

16        Do you see there that there's an e-mail from

17   May 4th of 2016 from Mr. Maria to apparently the prosecution

18   team?

19   A.  I do see that, yes.

20   Q.  And so obviously it's dated May 4th.  You appear to be

21   correct that it wasn't May 2nd, right?

22   A.  Right.

23   Q.  Before we even look at this, okay, I want to ask you

24   about the mindset of the prosecution team when you were

25   about to receive the Relativity e-mails, and I'm going to

1    give you an either/or.

2    A.  Okay.

3    Q.  Was the mindset -- and speak for yourself.  I mean, if

4    you don't know what other people were thinking, that's fine.

5         But in talking among yourselves, was your mindset

6    that:  Great.  We're getting a bunch of stuff from the LTSC.

7    It's been screened for privilege.  We have nothing to worry

8    about.  We can go through them with impunity.

9         That's choice one.

10         Or choice two, was your mindset and were your

11    discussions:  It's coming back, we've done our best to

12    filter them, but it may not be a perfect process, so we're

13    going to keep our eyes open and continue to be vigilant for

14    attorney-client stuff.

15         Choice one or choice two?

16         MR. WADE:  Object to the form about what was your

17    mindset.

18         THE COURT:  Okay.  I'd also note that I'm not sure

19    how relative mindset is as subjective intent isn't part of

20    our calculus as opposed to actions.

21         MR. MacLAUGHLIN:  I'm really -- may I address that

22    with the witness?

23         THE COURT:  Certainly.

24    BY MR. MacLAUGHLIN:

25    Q.  So I'm asking you about --

1        THE COURT:  So the first objection was as to

2   leading.  Let's focus in on letting her articulate her own

3   view of her mindset.

4        My additional concern is, I don't want to go too

5   far down the road of subjective intent which neither damns

6   nor saves nor saves the process that was ultimately

7   undertaken.

8        MR. MacLAUGHLIN:  Okay.  I understand.  I'm just

9   trying to really not get the mindset so much as the

10  prosecution team was working to avoid seeing stuff it

11  shouldn't see.  That seems like it goes to reasonableness,

12  but I certainly understand your ruling.

13       THE COURT:  I think -- I'm sorry.  To the extent I

14  have complicated what was a very reasonable leading

15  objection by adding my own overlay, my concern is actions

16  taken demonstrate reasonableness; intentions, underlying

17  actions taken are exactly why I have determined that AUSA

18  Maria can't testify.

19       MR. MacLAUGHLIN:  Understood.  What's good for the

20  goose is good --

21       THE COURT:  Exactly.

22       MR. MacLAUGHLIN:  Goose/gander.  Okay.

23       THE COURT:  Continue, please.

24       MR. MacLAUGHLIN:  All right.

25

1    BY MR. MacLAUGHLIN:

2    Q.  When the stuff came back from the LTSC and you got

3    access to it on May 4th of 2016, were you still vigilant for

4    additional things that might be attorney-client privileged

5    in that take?

6    A.  Yes, definitely.

7    Q.  Okay.  Why?  How?

8    A.  It was my understanding that that filtering process may

9    not have completely pulled out all of the potentially

10   privileged documents, and we needed to continue to keep our

11   regular practice in place of making sure that if we see

12   something we think might be privileged, to stop reviewing it

13   and let the AUSAs know.

14   Q.  I'd like to direct your attention now to Kroells 3, page

15   2, bottom of the page.  Is this an e-mail from Mr. Maria to

16   you dated May 4th?

17   A.  Yes, it is.

18   Q.  And he writes:

19        All:  Also, the e-mail database is up and ready

20   for review in Relativity.  It is the Adams II database.  Per

21   our searches, the potentially privileged docs have been

22   pulled and stored in a separate database which should not

23   show up in your Relativity screens.

24        First question:  Was that true?  Did the

25   screened-out documents not appear on your Relativity

1    screens?

2    A.  Correct, that's my understanding.

3    Q.  That being said, if you identify other law firms or

4    lawyers in your review of the database with whom any of our

5    folks appear to have an attorney-client relationship, make

6    sure to flag it and we can run supplemental searches to

7    segregate these documents.

8           My question is:  Did you do that?  When you went

9    into the 113,361, did you employ that, that process of

10   keeping your eyes open?

11   A.  Yes, I did.

12   Q.  Did you in fact, Inspector Kroells, when you were going

13   through those 113,361 e-mails, find other things that you

14   thought really were privileged and shouldn't be in there?

15   A.  I did.

16   Q.  And did you communicate that to your AUSA?

17   A.  I did.

18   Q.  I'd like to direct your attention to Kroells 5.

19          On May 16th of 2016, did you send an e-mail to

20   Mr. Maria and Mr. Kokkinen outlining some of your concerns

21   about things you were seeing amongst the 113,361 e-mails?

22   A.  I did.

23   Q.  And I'm just going to read this.

24          In going through the e-mails, I've come across the

25   following e-mail addresses that appear to contain privileged

1    communications, @arnstein.com and @felhaber.com.

2         Do you see that?

3    A.  I do.

4    Q.  Why did you think that these were of concern, these

5    particular things you were noticing?

6    A.  Because they must have been related to attorneys that I

7    knew were representing Mr. Adams at the time?  I don't

8    remember Arnstein at this point in time, but I do remember

9    Felhaber was Jon Hopeman, who was Mr. Adams' criminal

10   attorney.

11   Q.  Okay.  And you sent this to David Maria, correct?

12   A.  Yes.

13   Q.  Flipping over to page 2, AUSA Maria responded 24 minutes

14   later, correct?

15   A.  Yes.

16   Q.  And he wrote:

17        I also saw that Hopeman had done some work for him

18   before, so we need to add Hopeman, as well as the @felhaber

19   that you note below?

20        Correct?

21   A.  Yes.

22   Q.  And he goes on to also say that he's noticed that Tom

23   Brever has done some work for Mr. Adams, right?

24   A.  Yes.

25   Q.  And so did this lead to another cull that among other

1    things pulled out the names of those lawyers?

2    A.  Yes.

3    Q.  And was that the cull reflected in line item 3 there on

4    the board where another 1,494 e-mails came out of the

5    database?

6    A.  That would make sense, yes.

7    Q.  All right.  Now I'd like to ask you a few questions

8    about the searches that you in fact undertook, not a lot,

9    but some, in order to determine whether they were reasonable

10   in light of the search warrant, all right?  So I'd like to

11   show you and have you look at Kroells 7.

12            Now, Kroells 7 is an e-mail -- essentially an

13   e-mail from you to David Maria, correct?

14   A.  Yes, it is.

15   Q.  And it's dated November the 3rd of 2016.

16   A.  Yes.

17   Q.  And on that day, you and I and Joe Thompson, we were

18   waiting for a verdict in the Reichel case, right?

19   A.  Yes, we were.

20   Q.  So suddenly you had a chunk of time to pay attention to

21   this.

22   A.  Yes, I did.

23   Q.  What were you thinking about that resulted in the

24   population of this e-mail?

25   A.  Trying to organize our case and trying to get all of the

1    relevant e-mails together for the fraud scheme case.

2    Q.  And to that end, Inspector Kroells, were you thinking

3    about potential flags that you could use to mark particular

4    e-mails in the Yahoo! take?

5    A.  Yes.

6    Q.  I'd like you to direct your attention to the second page

7    of Kroells 7.

8            So I don't want to ask you about all of these.  We

9    know who Ed Adams is.  Who's Mike Monahan and why did you

10   think he deserved a flag?

11   A.  Mike Monahan was Mr. Adams' law partner and also worked

12   a lot on the Apollo transactions.  We believed he was

13   involved in the fraud scheme.

14   Q.  Okay.  Who's Theo Strauss?

15   A.  I believe he was a board member one of the Apollo

16   companies and then later served at least on a special

17   litigation committee for Scio, so we believed he might have

18   communications or information about the fraud scheme as

19   well.

20   Q.  All right.  Just bombing around a little bit, who's

21   Sandy Ward?

22   A.  Sandy Ward was an assistant of Mr. Adams.  I know that

23   she had some communications with Mr. Adams about some secret

24   bank accounts that were of particular interest in the fraud

25   scheme.

1    Q.  How about -- what's Crossbow?

2    A.  Crossbow is the original name of the public company that

3    was used to turn into Public Scio, which ended up purchasing

4    the assets of the Apollo companies.

5    Q.  So these flags that you're proposing here, are they all

6    flags designed, in your mind, to organize stuff in this

7    Yahoo! database by relevance, by particular categories of

8    relevance to the investigation you were conducting?

9    A.  Yes.

10   Q.  I'd like to talk to you for a few minutes about some of

11   the searches you in fact undertook, and I want to direct you

12   to Kroells 8.

13        Inspector Kroells, you understand that as it turns

14   out, the searches that you did on Relativity were captured

15   by that program, right?

16   A.  Yes.

17   Q.  I want to ask you, did you know that your searches were

18   captured by Relativity when you were doing these searches?

19   A.  No, I didn't.

20   Q.  Okay.  So again, I'm going to tread very lightly here.

21   I think Mr. Wade will probably have more questions than I,

22   but let's just -- Sandy and Ward.  You searched for Sandy

23   and Ward, Sandy Ward, right?

24   A.  Yes.

25   Q.  Who's Sandy Ward?

1    A.  Sandy Ward is the assistant to Mr. Adams that I spoke of

2    who had communications about the secret bank accounts.

3    Q.  Okay.  What secret bank account?

4    A.  So in the process of the fraud scheme, my understanding

5    is Mr. Adams opened up bank accounts that money from

6    investors was put into.  Some of those bank accounts were

7    not -- the Linares family was not aware of those bank

8    accounts, and a lot of the money that came out of them went

9    directly to Mr. Adams, his partner, or his law firm, other

10   people involved.

11   Q.  Okay.  And so that secret bank account is relevant to

12   your case, is that true?

13   A.  Yes.

14   Q.  And is it fair to say then that you constructed the

15   Sandy Ward search to lead you to documents that were within

16   part two of Attachment B to the warrant?

17   A.  Definitely, yes.

18   Q.  Now, there's some funny ones in here.  Like, if we go to

19   page 2, it looks like you searched for the word "crap."

20   A.  Yes, I did.

21   Q.  Okay.  Why did you search for the word "crap"?

22   A.  In my experience when fraud schemes are going downhill,

23   things are starting to unravel, people will start getting

24   cryptic in their e-mails, but they also start using foul

25   language or getting upset, and those were the e-mails that I

1    was looking for relevant to this scheme.

2    Q.  So the word "crap" you thought might lead to documents

3    within the ambit of part two of Attachment B.

4    A.  Yes.

5    Q.  Let's go to the bottom of page 4.  They're not numbered,

6    unfortunately, but let's go there anyway.  You have a

7    search:  "Monahan" and "Maddox" and the "f" word.

8    A.  Yes.

9    Q.  Tell us about that search.

10   A.  Again, my understanding when fraud schemes are going

11   downhill, people use foul language.  Mr. Monahan and

12   Mr. Maddox were both attorneys at Mr. Adams' firm that were

13   working on the Apollo and Scio transactions.  I thought they

14   had directly relevant information regarding the scheme.

15   Q.  I'm just going to ask you this question and then I'm

16   going to let Mr. Wade cross-examine you on it.

17          Is your testimony that all of the searches that

18   are reflected here in Kroells 8 were designed to lead you to

19   relevant evidence within the ambit of part two of Attachment

20   B of the warrant?

21   A.  Yes, that was what I was trying to do.

22   Q.  Okay.  Now, finally, I want to get into an area that

23   isn't entirely germane to why we're here, but you have been

24   attacked, correct, as having misled Judge Rau?

25   A.  Yes.

1          MR. MacLAUGHLIN:  Your Honor, just one moment.

2       (Pause)

3   Q.  So I'm going to read something into the record to

4   prepare to ask you some questions, okay?

5   A.  Okay.

6   Q.  And I'm looking at ECF No. 37, and ECF No. 37 is

7   Prof. Adams' memorandum in support of defendant's motion to

8   suppress.

9          THE COURT:  Okay.  Hang on just one second.

10          MR. WADE:  If we could just have the Court's

11   indulgence, I don't think that's marked as an exhibit.  I

12   have the pleading, I can find it, but I wasn't prepared

13   to --

14          THE COURT:  Yes, that would be great.  I'm just

15   looking to see if I can pull it up on my iPad.

16          37?

17          MR. MacLAUGHLIN:  37, ECF 37.

18          THE COURT:  I've got it.  Take time to make sure

19   you've got it.  What page are you referring to,

20   Mr. MacLaughlin?

21          MR. MacLAUGHLIN:  I'm referring to page 32.

22   There's sort of a summary in here of the things that

23   Prof. Adams alleges that Inspector Kroells did not tell

24   Judge Rau that she should have told Judge Rau.

25          THE COURT:  Okay.  I don't need you to read this

1    into the record, but you can certainly flag for us what you

2    think is important here.

3                 MR. MacLAUGHLIN:  Sure.

4    BY MR. MacLAUGHLIN:

5    Q.  You understand, Inspector Kroells, that you've been

6    accused of sort of misleading or not being fully -- of

7    lacking some candor with Judge Rau, correct?

8    A.  Correct.

9    Q.  There's not been a *Franks* motion and I don't think

10   there's a facial challenge to the warrant, but is among

11   other things -- so, Prof. Adams said that you did not tell

12   Judge Rau that EdAdams@yahoo.com was his main e-mail

13   account.  Do you remember that accusation?

14   A.  I do.

15   Q.  I'd like to direct your attention to paragraph 33 of

16   Kroells 9, which is your affidavit?

17                 MR. WADE:  I'm sorry.  Which specific reference in

18   document 37, DCD document 37?  What page and what line?

19                 MR. MacLAUGHLIN:  So I was trying to stay away

20   from it, so --

21                 THE COURT:  No, no, that's okay.  If it's

22   important to be specific, just tell us where the allegation

23   is that this is not -- that there was a representation that

24   this was not made?

25                 MR. MacLAUGHLIN:  Okay.  At page 32 there's a full

1    paragraph starting with the word "Here."

2             THE COURT:  Got it.

3             MR. MacLAUGHLIN:  Second sentence:  The inspector

4    did not inform Magistrate Judge Rau that Mr. Adams was

5    represented by counsel in a parallel SEC investigation that

6    had been underway since the preceding year, or that he had

7    been represented by counsel in related private civil suits.

8             Correct?

9    A.  Yes.

10   Q.  My first question is:  Do you understand at all in your

11   training that you're required to tell a judge what other

12   legal proceedings are affecting a defendant whom you propose

13   to search?

14   A.  No, it's not my --

15            MR. WADE:  Objection.  Relevance.

16            THE COURT:  Overruled.

17   A.  No, it's not my understanding that I need to state that.

18   Q.  And in fact, you referred to the SEC investigation in

19   your affidavit, didn't you?

20   A.  I did.

21   Q.  I'd like to direct your attention to paragraph 14 of

22   Kroells 9, and in the first phrase of that paragraph you

23   wrote -- and this is what you presented to Judge Rau,

24   correct?

25   A.  Yes, it is.

1    Q.  According to the transcript of a deposition of Adams

2    conducted by the SEC on or about August 27, 2015, Mr. Adams

3    answered certain questions.

4            Do you see that?

5    A.  I do see that.

6    Q.  So certainly you weren't hiding from Judge Rau that

7    there was an SEC investigation that somehow led to

8    Prof. Adams being deposed, correct?

9    A.  Correct.

10   Q.  In any event, did you have any obligation to disclose

11   that other people other than the United States were thinking

12   the same things we were in our investigation?

13   A.  No, I don't think I did.

14   Q.  Let's go on.  The next accusation here is that you did

15   not -- that you did not tell Judge Rau that the Ed Adams

16   e-mail address was one of his primary e-mail addresses that

17   he used.  Do you see that?

18   A.  I do understand that was an accusation, yes.

19   Q.  Is that true?

20   A.  That's not true.

21   Q.  Let's look at paragraph 33 and let's go to the top of

22   the page.  You wrote:

23           During your affiant's review of the transcript of

24   the SEC's deposition of Adams, your affiant learned that,

25   according to Adams, Adams mainly uses one e-mail address,

1    EdwardSAdams@yahoo.com.

2              Correct?

3    A.  Yes.

4    Q.  In fact, you did tell Magistrate Judge Rau that this was

5    his main e-mail account.

6    A.  I did.

7    Q.  And that was an important part of your probable cause

8    because you're seeking to search that very e-mail account,

9    correct?

10   A.  That's correct.

11   Q.  He further accuses you of telling Magistrate Rau that

12   Mr. Adams held certain nonlegal positions with Apollo

13   Diamond, but that you essentially concealed that he was a

14   lawyer as well for Apollo Diamond.

15             Do you remember that accusation?

16   A.  I do.

17             MR. WADE:  Objection.  Can we focus on the

18   specific language in the motion?

19             MR. MacLAUGHLIN:  Sure.

20             THE COURT:  The specific language is "failed to

21   disclose the fact that he had been general counsel of Apollo

22   Diamond for most of the period in the investigation."

23             MR. MacLAUGHLIN:  That's exactly right.

24   BY MR. MacLAUGHLIN:

25   A.  Do you remember that?

1    A.  I remember that accusation, yes.

2    Q.  Is that accusation true?

3    A.  I didn't specifically say general counsel in my

4    affidavit, but I did state that Mr. Adams, Mr. Monahan and

5    their law firm represented the companies over the time

6    period, and I did specifically say that Mr. Adams -- or

7    excuse me -- that Mr. Monahan was general counsel.

8    Q.  Okay.  So let's look at a few provisions of your

9    affidavit and let's go first to paragraph 10 at page 5.

10   A.  Okay.

11   Q.  So the first clause, the first sentence of that:

12             From at least 2008 through 2014, Adams and Monahan

13   were partners in a Minneapolis-based law firm,

14   Adams Monahan, LLP.

15             Correct?

16   A.  Yes.

17   Q.  So you're telling Judge Rau here this guy Adams is a

18   lawyer, correct?

19   A.  Yes.

20   Q.  Now let's look at paragraph 12, and let's look at the

21   last sentence of paragraph 12 at page 7.  Do you see the

22   sentence that begins "In addition"?

23   A.  I do.

24   Q.  You wrote:

25             In addition, the failure of both the proxy

1    statement and the cover letter to disclose that Adams,

2    Monahan, and AM,LLP -- that's Adams Monahan, LLP, correct?

3    A.   Yes.

4    Q.   Acted as counsel for both ADI -- what's ADI?

5    A.   Apollo Diamond.

6    Q.   And Private Scio in connection with the transaction was

7    material omission.

8         Do you see that?

9    A.   I do.

10   Q.   So you clearly did tell Magistrate Rau that Prof. Adams

11   is a lawyer, right?

12   A.   Yes.

13   Q.   That he was a partner in a law firm, Adams Monahan?

14   A.   Yes.

15   Q.   That that law firm, Adams Monahan, represented Apollo

16   Gemstone?

17   A.   Yes.

18   Q.   Well, Apollo Diamond?

19   A.   The companies, yes.

20   Q.   And Scio?

21   A.   Yes.

22   Q.   And that Adams himself, if I'm reading this, also

23   represented from time to time these companies.

24   A.   Yes.

25   Q.   It wasn't a secret from Judge Rau that that was the

1    state of affairs.

2    A.  No, it wasn't.

3              MR. MacLAUGHLIN:  Your Honor, may I have a moment?

4              THE COURT:  Yes.

5         (Pause)

6              MR. MacLAUGHLIN:  That's all I have for right now.

7              THE COURT:  All right.  Why don't we go ahead and

8    get started with cross-examination.  I know we won't get

9    done in the next couple minutes.

10             MR. WADE:  Does Your Honor want -- there's a need

11   for a bathroom break on the defense side, but if you only

12   plan to go until noon --

13             THE COURT:  Oh, absolutely.  Why don't we just --

14   how do people feel about stopping now and let's talk about

15   how long people need for lunch.  I know that locals can go

16   quickly, but I know you guys are not hometown -- and

17   incidentally, I should let you know we will lock the

18   courtroom, you can leave your stuff spread out, and we'll

19   also unlock either of the conference rooms if you need

20   access to phones or a place to have private conversations.

21             MR. WADE:  Your Honor, for the record, since my

22   mother would object, I was born and raised and went to

23   college here in Minnesota, so --

24        (Laughter)

25             THE COURT:  I just meant you don't have an office

1    right downstairs where you can eat lunch.

2              MR. WADE:  That is true, Your Honor.

3              THE COURT:  What if we break now and how long do

4    we need?

5              (Defense counsel confer)

6              THE COURT:  Come back at a quarter till 1:00, a

7    hair under an hour?  Is that going to work all around?  Does

8    that make sense for -- and let me get a sense of timing.

9              Does everybody believe we will be able to conclude

10   the testimony today?

11             MR. MacLAUGHLIN:  From our perspective, yes.

12             THE COURT:  Yeah, but you guys always discount all

13   the --

14        (Laughter)

15             THE COURT:  So let me start with them.

16             MR. WADE:  I think it's going to be tight, Your

17   Honor.  We'll see.  Obviously we'll try to over the lunch

18   hour, the short lunch hour, eat and streamline things and

19   refocus.  We weren't sure who the witnesses were going to

20   be, so there's some stuff that we need to shuffle, but we'll

21   certainly endeavor to do that.

22             THE COURT:  We can talk about what happens if

23   we're not able to reach that goal if we get there.

24             Anything we need to do before I send us out for

25   lunch?

1          MR. MacLAUGHLIN:  No, Your Honor.

2          MR. WADE:  If I could make just one ministerial

3   point.  I think there was a document that questions were

4   being asked about specific to handwriting that Counsel had

5   on the screen.  I would just ask that that be marked.

6          THE COURT:  I noted that as well.  It's actually

7   on the copied exhibit for me as well.

8          MR. WADE:  We may be referring to a different --

9          THE COURT:  It's Exhibit 9 where you've helpfully

10   underlined the things you were going to ask her.

11          MR. MacLAUGHLIN:  I thought I was going to get

12   away with that, but -- so we can give the Court --

13          THE COURT:  I don't think it's a -- if everybody's

14   okay with it, I can obviously decide for myself whether it

15   deserves the asterisks and circle next to it or not.

16          MR. WADE:  I trust the Court to give it

17   appropriate weight.

18          The only question I would ask is, I think

19   Kroells 1, there was some specific underlying that actually

20   related to questions that were being asked.  And I hate to

21   do this to Counsel, but I just ask that we --

22          MR. MacLAUGHLIN:  Kroells 1?

23          THE COURT:  The Kroells 1 that I have, I have the

24   one that --

25          MR. MacLAUGHLIN:  This is clean.

1        THE COURT:  The evidence is clean.

2        MR. MacLAUGHLIN:  Yes, that's a clean one.

3        MR. WADE:  Kroells 1, which is reflected on the

4   ELMO right now, was what was projected for the witness and

5   questions about the handwriting and the circles were asked

6   on the record, and I'd just ask -- maybe we can make a copy

7   over lunch?

8        THE COURT:  That's fine, so we can know what the

9   questions referred to.  That's a good idea.

10        MR. WADE:  And maybe we could mark it as Kroells

11   1-A if the Court doesn't object to that.

12        THE COURT:  If you don't mind --

13        MR. MacLAUGHLIN:  No, that's fine.

14        THE COURT:  -- finding time to do that over lunch.

15   That way we'll know what the answers were referring to.

16        MR. WADE:  Thank you.

17        THE COURT:  Okay.  With that we are in recess and

18   I will see everyone at a quarter till 1:00 if we can make it

19   happen.

20        (Lunch recess taken at 11:55 a.m.)

21                    *     *     *     *

22        (12:46 p.m.)

23                    IN OPEN COURT

24        THE COURT:  Thank you.  Please be seated.

25        All right.  We are going back on the record and

1    Inspector Kroells is still on the stand.

2              And I'd remind you you remain under oath.

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  And you can proceed.

5              MR. WADE:  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7    BY MR. WADE:

8    Q.  Good afternoon, Ms. Kroells.

9    A.  Good afternoon.

10   Q.  You're a postal inspector with the United States Postal

11   Inspector Service?

12   A.  Yes, I am.

13   Q.  And you were the lead investigating agent in this case?

14   A.  I was one of the investigating agents on the case, yes.

15   Q.  Were you the lead agent?

16   A.  I don't know that we specifically get into that kind of

17   terminology.  I was one of the agents who had time to work

18   on the case, and that varies depending on all of our

19   schedules.

20   Q.  Did you do more investigative work in the case

21   ultimately than any of the other agents?

22   A.  I guess I don't know what everybody else did.  I know

23   all of us worked hard on the case.

24   Q.  You started working the case, I believe you testified,

25   in 2014?

1    A.  I did.

2    Q.  And were you working on the case actively on and off up

3    until now?

4    A.  On and off, yes.

5    Q.  Are you a lawyer, ma'am?

6    A.  I am.

7    Q.  So you've received training on how to apply the

8    attorney-client privilege?

9    A.  A long time ago, yes.

10   Q.  When did you graduate from law school?

11   A.  Oh, boy.  2002, I think?

12   Q.  2002?  That's 15 years ago or so?

13   A.  Or so, yes.

14   Q.  Did you ever practice as a lawyer?

15   A.  I never did.

16   Q.  Have you ever received any training since law school on

17   how to apply the attorney-client privilege?

18   A.  I believe I received some basic training in the

19   Inspection Service Academy and then also through the U.S.

20   Attorney's Office when they offer it.

21   Q.  Are there specific courses the U.S. Attorney's Office

22   offers with respect to the application of the

23   attorney-client privilege?

24   A.  I don't think specific courses, but sometimes they offer

25   some kind of courses and it's some way related to

1    attorney-client privilege.

2    Q.  What is the attorney-client privilege?

3    A.  My understanding it's the privileged communications

4    between the attorney and their client.

5    Q.  Have you received --

6           MR. MacLAUGHLIN:  May I suggest that you slide the

7    microphone a little bit closer?

8           THE WITNESS:  (Complies).

9           THE COURT:  Thank you.  Go ahead.

10   BY MR. WADE:

11   Q.  Have you received training on how to apply any other

12   legal privileges?

13   A.  What do you mean specifically?

14   Q.  Have you received training on how to apply the work

15   product doctrine?

16   A.  I know of it.  I don't know anything specific to it, I

17   don't think.

18   Q.  What is the work product doctrine?

19   A.  I understand that there are certain work product

20   materials that are not discoverable.

21   Q.  What are those materials?

22   A.  I don't know specifically.  I don't know how to word it.

23   Q.  Do you know generally?

24   A.  No.

25   Q.  Are you aware of the spousal communication privilege?

1    A.  I'm aware there is one.

2    Q.  What is that privilege?

3    A.  I'm not sure as to specifics, but just generally there

4    is some kind of privilege between a husband and a wife and

5    their communications.

6    Q.  Are you aware of a common interest or a joint defense

7    privilege?

8    A.  I don't know what that is.

9    Q.  You offered testimony about some of your experience with

10   regard to search warrants.  Do you recall that?

11   A.  I do.

12   Q.  Have you ever been involved with seeking a search

13   warrant in a case -- in an instance in which the documents

14   you were seeking belonged to a lawyer?

15   A.  The best way I can answer that question is saying that

16   this was the first case I had in which the main defendant

17   was an attorney.  Does that answer your question?

18   Q.  I think so.  Mr. Adams, of course, wasn't a defendant at

19   the time you applied for the warrant.

20   A.  Right, but he was the subject of the investigation.

21   Q.  He was subject of the investigation and he was an

22   attorney.

23   A.  Correct.

24   Q.  And was this the first time you sought a warrant for

25   evidence that related to an attorney specifically?

1   A.  I want to say yes, but I'm not sure.

2   Q.  You can't recall any other instances --

3   A.  I don't recall as I sit here, no.

4   Q.  You talked a little bit about your experience with taint

5   teams.  Do you recall that testimony?

6   A.  I do.

7   Q.  Do you have any experience dealing with taint teams in

8   the context of a taint team's work on documents that belong

9   to a lawyer?

10  A.  I have never been a member of a taint team, so I don't

11  think I have that experience.

12  Q.  Have you had any cases in which you've used the taint

13  team on documents that belong to a lawyer?

14  A.  I have been on a case where a taint team reviewed a

15  document between a lawyer and the defendant in that case,

16  but I don't believe that that defendant was an attorney.

17  Q.  And in your declaration you wrote that:

18          When executing a search warrant, care is taken to

19  avoid the review of materials that contain information

20  protected by the attorney-client privilege.

21          Right?

22  A.  Yes.

23  Q.  And is it your testimony that you took such care in this

24  case?

25  A.  Yes, it is.

1  Q.  Then in the next sentence of your declaration -- which

2  you're welcome to look at it, it's Exhibit 1 -- you say that

3  when you're searching pursuant to a search warrant and you

4  see indicia of potentially attorney-client client privilege

5  information on a document, you stop reviewing the document

6  and either set it aside or otherwise memorialize its

7  location.  Do you recall the declaration?

8  A.  I do recall the declaration.

9  Q.  And you offered testimony that was similar to that this

10 morning.

11 A.  Yes.

12 Q.  You refer to this as your standard cautious practice?

13 A.  Yes, it is.

14 Q.  Okay.  Let me ask you a few questions about that.

15      What are the indicia of potentially privileged

16 information to which you refer?

17 A.  To me, that is when I'm just briefly looking at the

18 communication initially, whether I see any names that refer

19 me back to names of attorneys that represent the person, the

20 defendant at the time or the subject of the investigation.

21 Q.  So is a name of an attorney an indicia that a document

22 may be privileged?

23 A.  Yes.  That's the main one that I look for.

24 Q.  Okay.  The name of an attorney is the main indicia that

25 a document may be privileged.

1    A.  Correct.

2    Q.  And it's not your job to assess whether there actually

3    is a privilege, correct?

4    A.  I don't think so, no.

5    Q.  Well, if you see an indicia of a privilege, you don't

6    stop, think back to your time in law school and make a

7    judgment as to whether the privilege actually applies to

8    that document, do you?

9    A.  No.  If I see a name of an attorney that I know

10   represents the subject of the investigation, then I stop

11   reviewing unless I have seen other names of people on that

12   e-mail.  I know that there's an exception to that if a third

13   party is involved in the communication.

14   Q.  Okay.  You just testified that if the attorney

15   represents the subject of the investigation, right?

16   A.  Yes.

17   Q.  Okay.  Are those the only instances in which an attorney

18   is an indicia of attorney-client privilege?

19   A.  No.  There's also when an attorney represents the

20   subject of an investigation, but not in that specific

21   investigation.

22   Q.  Isn't the presence of an attorney's name on a document,

23   regardless of the status of anyone within the investigation,

24   indicia of the fact that that document may be a privileged

25   communication?

1    A.  It could be, yeah.

2    Q.  Okay.  And if the word "privilege" appears on a

3    document, is that an indicia that the document may be

4    attorney-client privilege?

5    A.  It's not one where I would immediately stop reviewing

6    the document.  I am cautious, because in my experience

7    people put "Privileged" on documents that are not privileged

8    just to avoid detection.

9    Q.  Okay.  So let me make sure your testimony is clear here.

10         If you see the word "Privilege" on a document, you

11   do not stop reviewing that document.

12   A.  Not necessarily.

13   Q.  In this case when you reviewed documents, if you saw the

14   word "Privilege" on a document, you did not necessarily stop

15   and review that document.

16   A.  I don't recall seeing that.  I may have.  I don't

17   remember.

18   Q.  Are you aware that the word "privilege" hit on tens of

19   thousands of documents in this case?

20   A.  I am not aware.

21   Q.  You're not aware of that?

22   A.  I don't know.

23   Q.  But it's your testimony you didn't see the word

24   "privilege" ever on a document?

25   A.  No, my testimony is that I don't recall specifically.

1   It probably was on documents I reviewed, but I don't

2   specifically recall those documents.

3   Q.  Okay.  And so we're clear, that word, "privilege," is

4   not an indicia that the document may be privileged.

5   A.  It could be, but in this case when I'm reviewing

6   documents, I know that people who are subjects of

7   investigations put "Privilege," the word "privilege" on

8   documents that aren't necessarily privileged, so I do not

9   immediately stop just because I see the word "Privileged."

10  Q.  Okay.  So what do you do?

11  A.  I look into the names on the -- on the e-mail to see if

12  it's attorneys that relate to the subject of the

13  investigation that represent the subject in some way in that

14  investigation or another.

15  Q.  So your search for attorneys is limited to whether or

16  not to your knowledge that attorney represents the subject

17  of the investigation?

18  A.  Right, either in the instant criminal investigation or

19  other investigations.

20  Q.  So if there's an attorney -- well, what about in this

21  case when there's an attorney who's on the documents?

22  A.  What do you mean, what about in this case if there's an

23  attorney on the documents?

24  Q.  All of the e-mail you received from Yahoo! either

25  belonged to Mr. Adams, who's an attorney, or Mr. Monahan,

1     who's an attorney, correct?

2     A.  Yes.

3     Q.  And you're aware that they provided legal services to

4     Apollo.

5     A.  Yes.

6     Q.  You're aware they provided legal services to Scio.

7     A.  Yes.

8     Q.  You're aware they provided legal services to other

9     companies.

10    A.  I believe they did, yes.

11    Q.  Okay.  And so if you saw the word "Privilege" and one of

12    their names appeared in the document, is it your testimony,

13    ma'am, that you did not stop reviewing the document?

14    A.  That's correct, because this is what we're investigating

15    is Mr. Adams' and Mr. Monahan's activity.  They are

16    attorneys, but it was my understanding that I could review

17    communications with them -- between them and other people in

18    this case if it had to do with the fraud scheme.

19    Q.  Okay.  And we'll talk about that in more detail, but I

20    want to make sure the record's clear on this.

21          You would review documents that you believed were

22    privileged if the privilege belonged to Apollo and the

23    communication involved Mr. Monahan or Mr. Adams.

24    A.  I guess that's true, because I was told that I could

25    review those documents.

1    Q.  And that seemed reasonable to you?

2    A.  Yes.

3    Q.  Okay.  And the same is true -- would the same be true

4    for documents unrelated to Apollo or Scio?

5    A.  So you're talking about other companies that Mr. Adams

6    may represent that are unrelated?

7    Q.  Yes.

8    A.  I would try not to review any of those, yes.

9    Q.  Did you see any of those documents when you reviewed the

10   material?

11   A.  Did I see other documents where Mr. Adams was

12   representing other companies?  I probably did, yes.  Did I

13   stop reviewing?  Yes.

14   Q.  Did you follow your standard cautious practice?

15   A.  I tried to, yes, definitely.

16   Q.  And did you communicate in those instances to Mr. Maria

17   which documents you saw?

18   A.  I don't know that I would be specific as to the specific

19   documents.  I would say this attorney's name who I know

20   represents Mr. Adams or Mr. Monahan, his communications are

21   still in the project.

22   Q.  And were those documents removed from the database?

23   A.  My understanding is that they would be.

24   Q.  Okay.  So if you communicated to Mr. Maria that there

25   were documents that were privileged and unrelated to the

1    Scio or Apollo investigation, you communicated that to

2    Mr. Maria and it was your expectation that he would remove

3    those from the database.

4    A.  Not necessarily that he would remove them, but someone

5    would remove them.

6    Q.  AUSA Maria would ensure that those materials were

7    removed, it was his responsibility.

8    A.  I don't know whose ultimate responsibility it was, but I

9    was -- it was my responsibility to tell AUSA Maria, and then

10   he needed to go on and do what he needed to do.  I don't

11   know exactly what his responsibility is.

12   Q.  Okay.  And your standard cautious practice, just so

13   we're clear, because I believe you testified you always

14   applied your standard cautious practice, right?

15   A.  Mm-hm, yes.

16   Q.  Except you didn't apply your standard cautious practice

17   if the potentially privileged communications related to

18   Apollo or Scio, correct?

19   A.  Because I was told that I could review those

20   communications.

21   Q.  So the answer is yes?

22   A.  The answer is I reviewed what I was told I could if it

23   fell within the -- can you repeat your question?

24   Q.  Happily.  You did not follow your standard cautious

25   practice and stop reviewing documents and notify AUSA Maria

1    if the documents you were reviewing related to Apollo or

2    Scio.

3    A.  We're kind of splitting hairs, I think.  I mean, my

4    standard cautious practice is in not reviewing

5    attorney-client privilege documents when they're not related

6    to the case.  Those were related to the case and I could

7    review those is my understanding, so of course I was allowed

8    to review those.  I was still being cautious as to other

9    documents.

10   Q.  You could review privileged communications if they

11   related to the case.

12   A.  Not necessarily.  That's a little general.  If they

13   related to the fraud scheme.  I did not want to review any

14   kind of documents that Mr. Adams or Mr. Monahan had with

15   attorneys that represented them specifically.

16   Q.  But you could review privileged communications if they

17   related to the underlying facts that were being investigated

18   in the case.

19   A.  It was my understanding, yes.

20   Q.  And that's because you were specifically authorized to

21   do that by AUSA Maria.

22   A.  Yes, I think so.

23   Q.  Back to your indicia.  If the word "attorney" appears in

24   the document, would you employ your standard cautious

25   practices?

1    A.  Would I immediately stop reviewing?

2    Q.  Yes.

3    A.  I wouldn't immediately stop reviewing, but I would be

4    cautious as to why reviewed within the document to see if I

5    thought it might be attorney-client privilege as far as

6    Mr. Adams being represented by specific attorneys

7    themselves.

8    Q.  If the word "lawyer" appeared, would you employ your

9    standard cautious practice?

10   A.  Same answer.  I would be cautious, but I wouldn't

11   immediately stop reviewing.  I would look a little bit more,

12   but be cautious as to what I was reviewing within the

13   document to see if it was related to the fraud scheme or if

14   it might potentially be attorney-client privilege between

15   Mr. Adams and any attorneys that represented him.

16   Q.  And with regard to those documents, you would only cease

17   review if it was unrelated to the underlying facts that were

18   subject to the investigation.

19   A.  And if it wasn't -- I wouldn't review anything related

20   to any attorneys that represented Mr. Adams.

21   Q.  Is a signature block of a lawyer appearing on a document

22   an indication that the document was protected by the

23   privilege?

24   A.  It can be, yes.

25   Q.  And would you employ your standard cautious practice if

1     you saw such a document?

2     A.  It depends on the name of the attorney.  I mean, if it

3     was Mr. Adams' or Mr. Monahan's attorney block at the

4     bottom, I was told that I could review those documents if it

5     wasn't attorney-client privilege, meaning attorneys

6     representing Mr. Adams or Mr. Monahan.  So not necessarily

7     is the answer to your question.

8     Q.  I'm sorry for cutting you of.  I thought you were

9     complete.

10              MR. WADE:  Your Honor, may I approach the board?

11              THE COURT:  You may.

12    Q.  I want to point you to a couple of the dates that are up

13    on this board.

14              MR. WADE:  Which might I suggest to the Court we

15    take a picture of and mark it as an exhibit in the case.

16              THE COURT:  Already planning on it.

17    BY MR. WADE:

18    Q.  With respect to number 1 up here, March 7, 2016, I'll

19    ask you some detailed questions about that later, but that's

20    approximately the date on which you received the Yahoo!

21    e-mail?

22    A.  Yes, it is, the flash drive.

23    Q.  And this May date, whether it's May 2nd or May 4th,

24    that's approximately the date on which you gained access to

25    the database?

1    A.  The Relativity project, yes.

2    Q.  That was after some sort of privilege culling had

3    occurred?

4    A.  That was my understanding, yes.

5    Q.  Okay.  And between the March date and the May date, you

6    employed your standard cautious practice as you've justified

7    described in your testimony?

8    A.  I only reviewed documents until I turned over the flash

9    drive is my memory.  There was a point in -- I believe it

10   was in March, most likely, when AUSA Maria asked us to stop

11   any kind of review while they got together the culling

12   process and put together the Relativity project, so I wasn't

13   reviewing all of that time between March and May.

14   Q.  I wasn't meaning to suggest you were, ma'am, but you did

15   testify this morning that you reviewed some documents in

16   this time period, correct?

17   A.  Yes.

18   Q.  And my only question is:  You employed your standard

19   cautious practices just described with respect to whatever

20   documents you reviewed during that time period, correct?

21   A.  Yes, yes.

22   Q.  And then you employed your standard cautious practice

23   from May going forward until now.

24   A.  Yes.

25   Q.  Let me ask you a couple questions about the warrant and

1    your efforts to seek the warrant, okay?

2           There was no exigency in obtaining this warrant,

3    was there?

4    A.  You mean was there any hurry to get it done?

5    Q.  Yes.

6    A.  Not my understanding.  We had a preservation letter in

7    place at Yahoo!

8    Q.  You had been preserving evidence at Yahoo! since October

9    of 2015.

10   A.  I believe both preservation letters went out in

11   approximately that time frame, yes.

12   Q.  So there was no rush that necessitated you to hurry and

13   get -- pull together an affidavit to submit to the Court to

14   make sure that evidence was not destroyed.

15   A.  No, I don't believe we were in any kind of real rush.

16   Q.  And prior to the time period that you applied for the

17   warrant, you were aware that there had been an SEC

18   investigation ongoing?

19   A.  Yes.

20   Q.  And the SEC had in fact granted an access request that

21   was made by the Minnesota U.S. Attorney's Office, correct?

22   A.  I'm sorry.  Repeat that question.

23   Q.  Yes.  The SEC had granted an access request that was

24   made by the Minnesota U.S. Attorney's Office to allow the

25   U.S. Attorney's Office to obtain the SEC investigation

1    materials, correct?

2    A.  I know that the SEC had shared materials with us.  I

3    don't know the process by which they did that.

4    Q.  But you had access to those investigation materials.

5    A.  Some of them, yes.  I don't how much we -- if we

6    received all they had or just they provided some of it to

7    us.  I don't know.

8    Q.  You had access to the SEC depositions?

9    A.  Yes, I did.

10   Q.  And you in fact had reviewed Mr. Adams' deposition?

11   A.  I did.

12   Q.  And you were aware of the various legal roles that he

13   played with respect to Apollo.

14   A.  I was aware that he had represented Apollo companies in

15   some manner, yes.

16   Q.  You're aware that there's testimony in the SEC

17   transcript in which Mr. Adams indicates that he was general

18   counsel of Apollo?

19   A.  I do recall that testimony, yes.

20   Q.  And in Mr. Adams' SEC testimony, he disclosed that the

21   Yahoo! e-mail address was his primary e-mail address, did he

22   not?

23   A.  Yes, he did.

24   Q.  And you testified this morning that this was his

25   personal e-mail address, right?

1    A.  Yes.

2    Q.  But in fact, this was his business and personal e-mail

3    address, wasn't it?

4    A.  I don't know.  I know he said in his deposition that it

5    was his primary and I put that information into the

6    affidavit by saying that it was his main e-mail account.  I

7    don't know how he differentiates between work and personal,

8    but my understanding of a Yahoo! account is that it's a

9    personal account.

10   Q.  If you can turn to Defense Exhibit 52.

11            Are you familiar with this document, ma'am?

12   A.  I may have seen this.  It might be an SEC document.

13   Q.  This was a document that was marked as an exhibit to the

14   deposition of Mr. Adams in the SEC case.

15   A.  Okay.

16   Q.  And you reviewed those exhibits, correct?

17   A.  You know, I don't remember if I reviewed all of those

18   exhibits or the timing of when I reviewed them, but I think

19   I remember seeing this one.

20   Q.  In your search warrant application you cited several of

21   the exhibits to the SEC deposition, correct?

22   A.  I don't remember if they were exhibits to the SEC

23   investigation or other -- if we received them other ways.

24   Q.  And you don't recall as you sit here today whether you

25   reviewed this one?

1    A.  I don't know if I reviewed this one prior to writing the

2    affidavit.  It does look familiar to me that I may have

3    reviewed it at some point.

4    Q.  Okay.  If you go to page 2 of the letter Bates marked

5    552 on the bottom.

6    A.  Okay.

7    Q.  Do you see question 10?

8    A.  Yes.

9    Q.  And do you see the first e-mail that Mr. Adams

10   identifies in this questionnaire?

11   A.  Yes.

12   Q.  What is the first e-mail that Mr. Adams identifies in

13   this questionnaire?

14   A.  EdwardSAdams@yahoo.com.

15   Q.  And did Mr. Adams indicate whether this e-mail address

16   was a business e-mail address, a personal e-mail address, or

17   both?

18   A.  I didn't get a chance to read the whole question, but

19   after the e-mail address it says "Both."

20   Q.  I'm done with that document.

21        Could you go to Defense Exhibit 34, please.

22   A.  Okay.

23   Q.  And if you could turn to page 18 of Defense Exhibit 34,

24   which is marked with the Bates number 299.

25   A.  Okay.

1    Q.  And could you read for the record paragraph 34, please.

2    A.  Paragraph 34 states:

3            Based on the above, your affiant believes that

4    Adams has used the e-mail addresses EdwardSAdams@yahoo.com

5    and josten1@yahoo.com and has business dealings related to

6    fraud scheme described in this affidavit and that Monahan

7    has used the e-mail address MichaelRMonahan@yahoo.com and

8    has business dealings related to the fraud scheme.

9    Q.  And you wrote that paragraph?

10   A.  I did.

11   Q.  And so you knew this wasn't just his personal e-mail

12   address, right?

13   A.  Well, I knew that he had communications regarding the

14   Apollo companies and the Scio companies.

15   Q.  You knew that he used this e-mail address in his

16   business dealings, correct?

17   A.  Yes.

18   Q.  And his business dealings included providing legal

19   services to Apollo.

20   A.  Yes.

21   Q.  And providing legal services to other clients.

22   A.  I was aware that he was an attorney and that he provided

23   legal services to other clients.

24   Q.  You were aware that Mr. Adams had produced e-mails from

25   his Yahoo! accounts to the SEC, correct?

1    A.  Yes.

2    Q.  You had seen those documents.

3    A.  I had seen some e-mails.  I can't remember if I saw them

4    through the SEC production to us or other methods.

5    Q.  And you're welcome to look through your affidavit, but

6    you reference at least two of those documents in your

7    affidavit.  Do you recall that?

8    A.  I recall that I reference SEC documents in the

9    affidavit.  I don't recall specifically which ones, but I

10   can review it if you'd like me to.

11   Q.  The fact that you recall that you reference specific

12   Yahoo! e-mails is sufficient.  Thank you.

13           And those Yahoo! e-mails related to business

14   dealings of Mr. Adams, correct?

15   A.  The Yahoo! e-mails that I reference in my affidavit?

16   Q.  Yeah.

17   A.  Can you point to which ones you're talking about so I

18   know specifically?

19   Q.  The Yahoo! e-mails generally are referred to frequently

20   throughout the affidavit.

21   A.  Okay.  So you're talking general, not specific now?

22   Q.  Well, let me ask this, Inspector Kroells:

23           Isn't the basis for you to be able to obtain the

24   Yahoo! e-mail account the fact that it included extensive

25   communications relating to business?

1    A.  Yes.

2    Q.  You weren't targeting Mr. Adams' personal life in your

3    investigation, were you?

4    A.  No, I was looking for his dealings with the specific

5    Apollo companies and Scio.

6    Q.  And you believed you had probable cause to seize those

7    documents, correct?

8    A.  Yes.

9    Q.  Because they were business documents.

10   A.  Yes.

11   Q.  You testified about the Adams Monahan e-mail address.

12   Do you recall that?

13   A.  I guess I don't remember the actual e-mail address.

14   Adams Monahan, is that the one for the law firm?  I know

15   that he had one for the law firm.  I don't remember the

16   actual e-mail address.

17   Q.  You don't remember what it was?

18   A.  I don't remember what it was.  I know that there was

19   one.

20   Q.  How did you know that there was one?

21   A.  I don't specifically remember.  I just know that there

22   was -- we had conversations about any kind of e-mail

23   addresses held by the law firm and Mr. Adams and Mr. Monahan

24   at the law firm and that we weren't going to try to seek

25   those.

1    Q.  And you were not going to try to seek those.

2    A.  At that point, no.

3    Q.  And during your investigation, do you have any evidence

4    that suggests that Mr. Adams actively used his Adams Monahan

5    e-mail address?

6    A.  I don't know.  I wasn't looking at that.

7    Q.  Does that mean you did not have any evidence?

8    A.  It wasn't something I was paying attention to, so I

9    don't know if we have evidence regarding that or not.

10   Q.  Are you aware of any evidence suggesting that Mr. Adams

11   actively used his Adams Monahan e-mail address?

12              THE COURT:  Can we focus on time frame?

13   Q.  At the time you're applying for the search warrant.

14   A.  I guess I don't remember.

15   Q.  Were you aware of any such evidence at the time period

16   that you were having discussions with the investigation team

17   about whether to seek that evidence?

18   A.  Do I remember having evidence regarding that e-mail

19   address?

20   Q.  Yes.

21   A.  I don't remember.

22   Q.  Do you recall at any time period during your whole

23   investigation seeing a single document from the Adams

24   Monahan e-mail address?

25   A.  I don't remember.

1    Q.  And do you recall seeing any evidence that Mr. Adams

2    actively used the Adams Monahan e-mail address, ever?

3    A.  I don't remember.  I wasn't focused on that.

4    Q.  So you don't recall seeing such evidence, I take it.

5    A.  I don't remember if I did or I didn't.  I wasn't focused

6    on that.

7    Q.  We talked -- you testified earlier about some of the

8    representations in your warrant.  Do you recall that?

9    A.  Yes.

10   Q.  And your perception that you felt attacked by the

11   defense?

12   A.  It seemed like it, yes.

13   Q.  I apologize that you feel that way.  It wasn't our

14   intent.  We're all doing our job, you understand that.

15   A.  As am I.

16   Q.  As a factual matter, you did not disclose to the Court

17   in seeking the application -- in seeking the warrant that

18   Mr. Adams was the general counsel of Apollo companies,

19   correct?

20   A.  I did not state that specifically in my affidavit, no.

21   Q.  And as an objectively factual matter, you did not

22   include in the second warrant the addendum to the first

23   warrant that included minimization protocols, correct?

24   A.  I did not include it and I did not think it was my place

25   to include it.

1           MR. WADE:  Move to strike the second half of the

2    question (sic).

3           THE COURT:  Overruled.

4    Q.  Let's look at that for a second.  If you can bring up --

5    in fact, I will put on the ELMO Kroells 1-A.  This was a

6    Government exhibit.

7    A.  Okay.

8           (Counsel confer)

9           THE COURT:  Okay.  Let me be clear about the

10   origins of 1-A.  Was that originally on 9?

11          MR. MacLAUGHLIN:  Your Honor, that was originally

12   Kroells Exhibit 1, and it is the standard United States

13   Attorney's addendum to a premises unit where we think we're

14   going to grab a computer.

15          THE COURT:  I understand, but the one you wrote on

16   was 1.

17          MR. MacLAUGHLIN:  Was 1, and then over the lunch

18   hour I labeled it 1-A.

19          THE COURT:  Okay.  And can I get a copy of the

20   1-A?  Do I already --

21          MR. MacLAUGHLIN:  I put it on your --

22          THE COURT:  I'm sure it's here.  Okay.  I got it.

23          Okay.  Thank you.  Sorry for the interruption.  Go

24   ahead.

25

1    BY MR. WADE:

2    Q.   And so this is a copy of a standard document that was

3    used by the U.S. Attorney's Office or is used by the U.S.

4    Attorney's Office.  Are you aware of that?

5    A.   That's my understanding, yes.

6    Q.   And you had a discussion with counsel for the Government

7    about this addendum.

8    A.   Yes.

9    Q.   And as you went through with him, this addendum has to

10   do with premises searching, it doesn't have anything to do

11   with Yahoo! e-mail searching or searching of e-mails

12   obtained by Yahoo! -- by e-mail service providers.

13   A.   I don't know if it doesn't have anything to do with it,

14   but my understanding is it's specifically for premises

15   warrants.

16   Q.   And you're of the view that this is basically the same

17   document as what was attached to the warrant?

18   A.   Yes.

19   Q.   Let me leave up on the screen 1-A.

20              MR. WADE:  And at risk of really confusing the

21   record, Your Honor, I'm going to put up Kroells Exhibit 2

22   that has red underlining on it.  Can you see that?

23              THE COURT:  Mm-hm.

24              MR. WADE:  Can you read the red underlined

25   portion?

1          THE COURT:  Mm-hm.

2     BY MR. WADE:

3     Q.  Please read it for the record.

4     A.  "Or other data storage mechanism, e.g., information

5     produced by Internet provider or social media provider."

6     Q.  Doesn't that specifically contemplate e-mail provided by

7     an Internet provider?

8     A.  That's what it says, but my understanding is this was

9     for premises warrants for actual devices taken during a

10    premises warrant.

11    Q.  Well, that's what Kroells 1 relates to, but Kroells 1

12    and Kroells 2 are not the same document, are they?

13    A.  Oh, I see what you're saying.  There's an added little

14    bit to it.

15    Q.  Right.  The language that you just read was not in

16    Kroells 1, which is a standard protocol from the U.S.

17    Attorney's Office, correct?

18    A.  Right.

19    Q.  But it is in Kroells 2, correct?

20    A.  I see that, yes.

21    Q.  And Kroells 2 is the addendum that was attached to the

22    warrant, correct?

23    A.  The original warrant with Judge Mayeron, yes.

24    Q.  And as a purely objective factual matter, you did not

25    inform Judge Rau that the warrant that you were seeking was

1    different from the warrant that you had obtained from the

2    prior magistrate.

3    A.  Are you saying specific to the search warrant addendum

4    being different?

5    Q.  Yes.

6    A.  I didn't even realize that that little part of there was

7    in there until you read it to me today.  And I wasn't

8    specifically trying to mislead Judge Rau or anything like

9    that, or keep information from him regarding the previous

10   search warrant.  I was trying to be as forthcoming as

11   possible.

12   Q.  I'm not asking about your subjective intent.  I take it

13   as offered.  My question is just simply:

14          You didn't inform Judge Rau that the warrant you

15   were seeking was different from the prior warrant, correct?

16   A.  I did not inform Judge Rau that the search warrant

17   addendum was added to the search warrant, no.

18   Q.  Let me ask you about a couple individuals.

19          You know who Mr. Adams is, correct?

20   A.  I do.

21   Q.  And you knew he was a lawyer at the time you applied for

22   the warrant?

23   A.  I did.

24   Q.  And at the time you executed the warrant?

25   A.  I did.

1    Q.  Michael Monahan, you knew he was a lawyer at the time

2    you applied for the warrant?

3    A.  I did.

4    Q.  And at the time you executed the warrant.

5    A.  I did.

6    Q.  J.R. Maddox, you knew he was a lawyer at the time you

7    applied for the warrant?

8    A.  I did.

9    Q.  And at the time you executed the warrant.

10   A.  I did.

11   Q.  Chris Mumm, you knew he was a lawyer?

12   A.  Yes.

13   Q.  At the time you applied for the warrant?

14                THE COURT:  What is that last name, please?

15                MR. WADE:  Mumm, M-U-M-M, Your Honor.

16                THE COURT:  Thank you.

17   Q.  You knew Mr. Mumm was a lawyer both at the time you

18   applied for the warrant and at the time you executed the

19   warrant, correct?

20   A.  Yes.

21   Q.  James Sankovitz, S-A-N-K-O-V-I-T-Z, you knew he was a

22   lawyer at the time that you applied for the warrant and at

23   the time you executed the warrant, correct?

24   A.  Yes.

25   Q.  And you knew that Sandy Ward was an employee of

1    Mr. Adams' law firm, correct?

2    A.  I knew that she was an assistant to Mr. Adams.  I don't

3    know specifically what entity employed her, if it was the

4    law firm or what.

5    Q.  Did you interview Ms. Adams in this case?

6    A.  Ms. Ward I did.

7    Q.  I'm sorry?

8    A.  Are you asking if I interviewed Ms. Ward?

9    Q.  I'm sorry, yes.  Did you interview Sandy Ward in this

10   case?

11   A.  I did.

12   Q.  And did you ask her who she was employed by?

13   A.  I'm sure I did.  I don't remember the answer to that

14   question.  I know she said that she was an assistant to

15   Mr. Adams.

16   Q.  And do you know if she worked from his law offices?

17   A.  I don't remember that.

18   Q.  And you knew that Josh Riley worked for Mr. Adams' law

19   firm?

20   A.  I'm trying to remember if he worked for the law firm or

21   for Focus.

22   Q.  Do you know?

23   A.  I don't remember at this point.

24   Q.  Did you interview him?

25   A.  I did.

1   Q.  And did you ask him who he worked for?

2   A.  I'm sure I did.  I don't recall the answer specifically.

3   Q.  Your discussions with -- let me strike that and shift

4   just in time period a little bit here.  I'm going to talk to

5   you about the time that you obtained the documents from

6   Yahoo! in March of 2016, okay?

7   A.  Okay.

8   Q.  And around that time, AUSA Maria told you that you could

9   review the files when you received them, correct?

10  A.  Yes.

11  Q.  And you specifically asked him whether you could review

12  communications between Mr. Adams and members of the Linares

13  family, correct?

14  A.  Yes.

15  Q.  And you specifically asked him about that because you

16  were concerned that those documents may be privileged,

17  correct?

18  A.  I think it was more of a concern of being cautious and

19  not that I necessarily thought that they might be privileged

20  and that I couldn't review them.  I just wanted to make sure

21  that I could and I was being cautious.

22  Q.  You wanted to be cautious about what?

23  A.  About protecting any kind of attorney-client privilege

24  that I am not supposed to review.

25  Q.  Okay.  So you asked him because the concern that you had

1    or the caution that was going off in your mind related to

2    whether -- the fact that the documents might be privileged,

3    correct?

4    A.  I just wanted -- yes, I wanted to make sure that they

5    weren't -- that I could review them.

6    Q.  And he told you that you could.

7    A.  Yes.

8    Q.  And he told you that you could review the privileged

9    communications with the Apollo and Scio employees as well.

10   A.  I think it was kind of a general question, but yes, that

11   I could review those documents.

12   Q.  That was in March of 2016?

13   A.  I don't specifically remember when we had that

14   conversation.  It would have been either prior to receiving

15   the flash drive or the day that I informed him that I

16   received it or something like that.  It was probably

17   ongoing communications about what we could review once we

18   received the flash drive.

19   Q.  Okay.  And so counsel for the Government has suggested

20   that that date is March 7th, 2016, right?

21   A.  The day I received the flash drive, yes.

22   Q.  So it was in that time frame within a few days or a week

23   that you believe you had this conversation with Mr. Maria?

24   A.  The specific conversation regarding the Linares family?

25   Q.  And the privileged -- and the privileged communications

1   relating to Apollo and Scio.

2   A.  I don't remember specifically when I had it.  I don't

3   remember if it was in March or if it was prior to that.

4   Q.  But it wouldn't have been later than when you started

5   accessing those documents.

6   A.  I don't know.  I don't remember.

7   Q.  You spoke about this in your declaration, correct?

8   A.  Mm-hm.

9   Q.  Do you want to take a look at that?

10  A.  I think it was around that time frame, or it was

11  possible that I saw something in the e-mails and I wanted to

12  make sure that I could review them, but it was --

13  specifically to the Linares family, I think it was around

14  that time frame.

15  Q.  Okay.  If you go to Exhibit 1, Defense Exhibit 1,

16  paragraph 9, take a moment and review that to yourself.

17  A.  (Witness complies).

18  Q.  Does that refresh your recollection as to the general

19  time period when you had these communications about

20  privilege with AUSA Maria?

21  A.  Yes.

22  Q.  When did you have those communications?

23  A.  Around the time frame before I received the flash drive.

24  Q.  And that was March of 2016.

25  A.  That I received the flash drive.

1    Q.  Do you know whether the company had actually waived

2    attorney-client privileges at -- strike that.

3            Do you know whether anyone had waived any

4    attorney-client privileges at the time that you had that

5    conversation?

6    A.  I guess that's kind of a general question.  I don't know

7    how to answer that.

8    Q.  Let me try it a different way.

9            Do you know whether Apollo had waived its

10   attorney-client privileges at the time that you had that

11   communication with AUSA Maria?

12   A.  I don't believe that they had, but I'm not sure.

13   Q.  Do you know whether AUSA -- I'm sorry -- do you know

14   whether Scio had waived its attorney-client privileges at

15   the time you had that conversation with AUSA Maria?

16   A.  I don't remember.  I don't know.

17   Q.  Was there any reason that caused you to believe that

18   they had waived their privileges?

19   A.  I don't remember.

20   Q.  Do you know whether either of those companies ever

21   waived their privileges?

22   A.  I believe they did.

23   Q.  Respectfully, I'm not focused on your belief.  Do you

24   know whether they did or not?

25   A.  I don't recall specifically receiving any kind of letter

1    or anything stating that they did, but it was my

2    understanding that at least one or both of those companies

3    did waive.  I don't know specifically when.

4    Q.  What is the basis for your understanding?  How did you

5    learn that?

6    A.  It would have been communications that I had with the

7    AUSAs.

8    Q.  Were those in writing?

9    A.  I don't remember.

10   Q.  Do you recall having any written communications with

11   AUSAs about privilege waivers?

12   A.  I may have.  I don't remember.

13   Q.  Were you asked to review your e-mails in connection with

14   these proceedings?

15   A.  Yes.

16   Q.  And did you review those e-mails?

17   A.  I did.

18   Q.  And in reviewing those e-mails, did you see any

19   communications between yourself and the prosecution team

20   regarding privilege waivers?

21   A.  Sitting here today, I don't remember.  I did review my

22   e-mails, but I don't remember if there was anything in

23   there.

24   Q.  You did that last month?

25   A.  It would have been probably the end of December, yeah.

1    Q.  You certainly -- as you sit here today, you can't point

2    to any document in which you were informed of that in

3    writing.

4    A.  No, I can't.

5    Q.  Okay.  Do you have any more evidence of when you learned

6    of when the privilege was waived?  Do you have any other

7    further recollection on that?

8    A.  I remember something about in the summer of '16 there

9    was some kind of waiver, but I don't know -- I don't

10   remember specifically what company that related to.

11   Q.  Okay.  Who has knowledge about the waiver and the scope

12   of the waiver and the timing of the waivers?

13   A.  I don't know.

14        (Pause)

15        THE COURT:  She said, "I don't know."

16   Q.  Other than that one instance in 2016, the summer of

17   2016, are you aware of any -- learning of any privilege

18   waivers that had occurred?

19   A.  As I sit here today, I don't recall any.

20   Q.  But you knew in March of 2016 that no privilege waivers

21   had yet occurred, correct?

22        MR. MacLAUGHLIN:  Your Honor, asked and answered

23   at this point.

24        THE COURT:  I think that also mischaracterizes the

25   testimony.

1    Q.  Do you recall offering testimony earlier today about

2    waivers on direct examination?

3    A.  I don't remember.  I know that we talked about waivers,

4    yes.

5    Q.  And you talked about this conversation that you had with

6    AUSA Maria, correct?

7    A.  You're talking about related to the Linares family?

8    Q.  And whether --

9    A.  -- and just in general?

10   Q.  I think we would make --

11   A.  I'm sorry.

12   Q.  -- job a lot easier if we avoid talking over each other.

13   I'll do my best, okay?

14   A.  Go ahead.  I'm trying.

15   Q.  Do you recall having a conversation about whether you

16   could look at privileged documents with AUSA Maria in

17   testimony that you offered on direct examination on that?

18   A.  Yes.

19   Q.  And didn't you testify on direct examination that AUSA

20   Maria told you it was his expectation that there would be

21   waivers?

22   A.  Yes.

23   Q.  And so there hadn't been waivers at the time that you

24   had that conversation, correct?

25   A.  My understanding specific to the Apollo companies, there

1     hadn't been waivers at that point.

2     Q.  Have you had any other case in which you were

3     specifically authorized by a prosecutor that you could --

4     that you could look at privileged documents before there was

5     a waiver of privilege?

6                MR. MacLAUGHLIN:  Objection.  Relevance.

7                THE COURT:  Overruled.

8     A.  I guess I don't know how to answer that question.  I'm

9     sure there are exceptions and I was allowed to look at

10    potentially privileged communications or documents, but

11    because of who the communications were between I was allowed

12    to look at them, meaning because they were between subjects

13    of an investigation, for example.

14    Q.  The conversation that you had with AUSA Maria about your

15    ability to look at privileged documents without a waiver

16    being in place, do you recall that?

17    A.  Yes.

18    Q.  Did you have any conversation with a prosecutor on a

19    prior occasion that was similar to that?

20                MR. MacLAUGHLIN:  Objection.  Relevance.

21                THE COURT:  Overruled.

22    A.  I guess I'm not sure what you're asking for.  I mean, I

23    thought I just answered it.  I have had communications with

24    AUSAs in other investigations regarding communications or

25    documents that I could look at because of who is in the

1    documents.  Even though there might typically be some kind

2    of privilege, I was allowed to look at them even though

3    there wasn't a waiver.

4             THE COURT:  And that will be the answer.

5    Q.  Between March 15th and March 17th you conducted searches

6    using keywords and dates on the materials on the thumb

7    drive, correct?

8    A.  I'm sorry.  What dates did you say?

9    Q.  March 15th and March 17th of 2016.

10   A.  Yes, I looked -- or I guess I conducted searches.

11   Q.  This was being done to prepare for witness interviews

12   that you were going to be conducting?

13   A.  Yes.

14   Q.  Which witness interviews were you preparing for?

15            MR. MacLAUGHLIN:  Objection.  Relevance and beyond

16   the scope.

17            THE COURT:  Overruled.  It's directly raised by

18   the issues in the motion.

19   A.  I was preparing to interview a number of people, all of

20   which who had potential information regarding the fraud

21   scheme.  I don't know that I could list every single one of

22   them sitting here today, but it would be people involved in

23   the Apollo companies, people involved in the Scio companies

24   and the transaction that occurred between the two, Apollo

25   and Scio, and investors.

1    Q.  So in those two days where you reviewed the contents of

2    the thumb drives before it was turned over?

3    A.  Yes.

4    Q.  You prepared for all of those interviews?

5    A.  No.  I mean, I probably had specific searches, but I

6    mean, I'm always looking for other documents related to

7    other interviews as well.  Just because I'm looking, say,

8    for documents related to one interview doesn't mean that if

9    I come across a document related to a potential other

10   interview that I'm going to completely ignore that document

11   if it's related to the fraud scheme.  I'm still going to

12   pull it.

13   Q.  Ma'am, can you look at Defense Exhibit 1 --

14   A.  Okay.

15   Q.  -- paragraph 12, please.

16   A.  Okay.

17   Q.  Do you have paragraph 12 in front of you?

18   A.  Yes, and I understand what you're saying.  I was

19   preparing for interviews and using keywords related to those

20   interviews, but I was also not going to just ignore other

21   documents that I saw in there.

22   Q.  Okay.  But were you preparing for specific interviews,

23   ma'am?

24   A.  I don't remember specifically what interviews.  I know

25   that we were going to be doing interviews of the Linareses.

1    I know that we were going to be interviews of -- I think Pat

2    Doering was one, Terrence Howard was one.  I don't remember

3    all of them that I was preparing for at that specific time.

4    Q.  Do you remember any of the ones that you were preparing

5    for at that specific time?

6    A.  I just named a couple.

7    Q.  You were preparing for those at that specific time?

8    A.  Terrence Howard and Pat Doering, I believe.

9    Q.  Were you preparing for a Sandy Ward interview at that

10   specific time?

11   A.  Yes, I was.

12   Q.  And did you do searches that were focused on preparing

13   for the Sandy Ward interview?

14   A.  I may have.  I don't remember my specific searches.

15   Q.  Were you preparing for a Chris Mumm interview at the

16   time -- this time in March of 2016?

17   A.  I remember preparing for that interview.  I don't know

18   if it was specifically during that time frame.

19   Q.  And as you sit here today, you don't recall any other

20   interviews that you were specifically preparing for in those

21   two days in which you accessed documents on the thumb drive.

22   A.  It would help -- I don't remember.  I don't remember

23   without reviewing documents.

24            MR. WADE:  Your Honor, for the record, we had

25   asked for a log of just the dates of the interviews and the

1    witnesses to address this very purpose and the Government

2    declined to provide that.

3              THE COURT:  Do you have 302s of those witness

4    interviews?

5              MR. WADE:  We don't have them.  They have not been

6    produced.

7              THE COURT:  Thank you.

8              MR. WADE:  I'd renew my request that we just get a

9    log.  I understand if the Government doesn't want to

10   disclose its Jencks statements until a later date.  We've

11   had some collegial discussions with counsel on that, but I

12   think for purposes of this hearing, knowing what interviews

13   were occurring during the time period that they were

14   executing the warrant is directly relevant.

15             THE COURT:  We'll return to this after we're done

16   with the witness testimony.  Thank you.

17   BY MR. WADE:

18   Q.  Do you know about how long you searched on March 15th?

19   A.  No, I do not.

20   Q.  Do you know about how long you searched on March 16th?

21   A.  I think the date -- the dates on the e-mails that I

22   printed out was the 15th and the 17th, not the 16th.

23   Q.  Okay.  So when you printed the e-mails, they had dates

24   on the footer?

25   A.  Yes.

1    Q.  And that was March 15th to March 17th?

2    A.  Yes.

3    Q.  Do you know what search terms you used during those

4    searches?

5    A.  I do not.

6    Q.  Do you have any record of that at all?

7    A.  No, not that I'm aware of.

8    Q.  Do you know what date restrictions you used during that

9    period?

10   A.  No.  It would have been after the October 25th, 2006,

11   but other than that I don't know.

12   Q.  You reviewed documents that came up in response to your

13   search terms?

14   A.  Yes.

15   Q.  Do you know how many documents you reviewed?

16   A.  No.

17   Q.  Do you know which documents you reviewed?

18   A.  I know which documents I printed, so I must have

19   reviewed those, obviously.  Other than that, I don't.

20   Q.  You know you reviewed at least 22 documents.

21   A.  Right.

22   Q.  Those were the ones you printed.

23   A.  Right.

24          THE COURT:  Can you remind me -- sorry to

25   interrupt, Mr. Wade.  Can you remind me, those 22 e-mails

1      are not in my evidence, correct?

2                MR. WADE:  They're not, Your Honor.

3                THE COURT:  These are part of the whole

4      sequestering of the entire universe of documents until we

5      get this decided.

6                MR. WADE:  That's correct, Your Honor.  And we had

7      agreed not to mark those documents or use those documents in

8      connection with this hearing.  We had a little bit of a

9      disagreement of counsel.  It's our view that we should just

10     submit a sealed exhibit to Your Honor with those documents

11     just so we have in the record what those 22 documents are.

12     We got them from the taint team.  We're going to adhere by

13     our restrictions and not ask questions that go --

14               THE COURT:  Let's put a pin in that conversation

15     until later.  I'm now accruing a list of the things I want

16     to ask you later.  Sorry to interrupt.

17               MR. WADE:  Sure.

18     BY MR. WADE:

19     Q.  Did you print all of the documents that you looked at?

20     A.  I don't think I did.  I don't know.

21     Q.  Did you use any of the documents that you printed in any

22     witness interviews?

23     A.  I looked back at that.  I don't know that I actually

24     showed any witnesses any of those 22 e-mails.

25     Q.  When you said you looked back at that, what did you do?

1    A.  I looked back at my memorandums of interviews to see if

2    I had actually shown witnesses that I thought I had been

3    preparing for at the time.

4         For example, I think I had possibly been preparing

5    for Terrence Howard's interview at the time.  I looked back

6    to see if we had shown him any e-mails by reading the

7    memorandum or 302, and I did not see that we had shown him

8    any e-mails.  It was a phone conversation.

9    Q.  Did you share any of those 22 e-mails with any other

10   members of the prosecution team?

11   A.  I don't know.

12   Q.  Where did you maintain those documents?

13   A.  In a folder in my office, or multiple folders in my

14   office.

15   Q.  Are there other documents that you printed out during

16   your searches that exist within folders in your documents?

17   A.  Yes, there are other documents that I've printed out

18   during this investigation that are within those folders.

19   Q.  Did you print all of the documents that you looked at in

20   those two days?

21   A.  I think I answered that already.  I don't remember.  I

22   doubt that I printed everything I actually saw.

23   Q.  In fact, you saw some documents when you were doing

24   those searches that were outside the scope of the warrant,

25   correct?

1    A.  I remember generally that I had seen something related

2    to other cases that Mr. Adams had and I avoided those.

3    Q.  They were outside the scope of the warrant, right?

4    A.  Right.

5    Q.  And you were sufficiently concerned or cautious that you

6    actually raised the fact that there were documents that were

7    outside the scope of the warrant on the thumb drive with

8    AUSA Maria, correct?

9    A.  I believe we had those conversations, yes.

10   Q.  Can you go to DX 1 at paragraph 13, the --

11   A.  Yes, and that's what I just said.  I believe we had

12   those conversations.

13   Q.  You said you believed you had those conversations.  You

14   did in fact have that conversation with Mr. Maria, correct?

15   A.  Yes, I think we did.

16   Q.  And seeing this was sufficiently significant that you

17   thought you should share that fact with the lead prosecutor

18   in the case?

19   A.  Yes.

20   Q.  Did you do anything to flag or otherwise document which

21   of the documents that were outside the scope of the warrant

22   that you reviewed?

23   A.  I don't remember at that time.  I don't know that that

24   program has that ability.  I probably would have written

25   myself a note potentially.  I don't remember this

1    specifically, but I can tell you my general practice.  I

2    probably would have written a note to myself saying this is

3    some kind of business that appears to be not related to the

4    Apollo or Scio companies.

5    Q.  On a document-by-document basis?

6    A.  I don't know if I understand your question.

7    Q.  Your standard practice of taking notes if you identify

8    something that's not relevant.  If you see a document that's

9    not relevant, do you create a log of documents that are not

10   relevant or not covered by the warrant?

11   A.  Either a mental note or written down on a Post-it note

12   so that I can communicate that I have found potentially

13   irrelevant information to AUSA Maria in this case.

14   Q.  Okay.  And so if you found potentially irrelevant

15   information within the documents that you were searching,

16   you -- every time you would tell AUSA Maria about it?

17   A.  I would keep a running mental note or something on a

18   Post-it note.

19   Q.  How many times did you do that in this case?

20   A.  I don't remember.

21   Q.  Do you have any documentation of logs of materials that

22   were not covered by the warrant?

23   A.  That was nothing that I kept, so no.

24   Q.  Did you take any efforts to ensure that those documents

25   that were not covered by the warrant were excluded from the

1    materials that were within the database?

2    A.  I don't remember specifically.  I mean, I know that we

3    had talked about taking irrelevant information out of the

4    database.  I don't know if or when that specifically

5    happened.  I know -- as I said before, I mean, we're all

6    learning at the beginning of this as to what is irrelevant

7    and what is relevant, so lot of it is to just mentally

8    knowing myself that this might not be related to the Apollo

9    or Scio companies and the fraud scheme.

10   Q.  So you would mentally note that, but my question is:  Do

11   you have any system for keeping track of the materials that

12   you looked at that were not relevant?

13   A.  Of specific documents that I looked at that were not

14   relevant?  No.

15   Q.  Did you have any tags in your database for not relevant

16   or outside the scope?

17   A.  Not when I was looking at the e-mails prior to the

18   Relativity database.

19   Q.  Okay.  Did you have tags after you created the

20   Relativity database that said "not relevant," "outside the

21   scope"?

22   A.  Not that I remember, no.

23   Q.  Okay.  You never had any tags that indicated that the

24   document was not covered by the warrant.

25   A.  None that I used.

1    Q.  Are you aware of anyone else on the investigation team

2    using such tags?

3    A.  I don't know.

4    Q.  You mentioned that there was a program that you used to

5    look at these documents just a second ago.

6    A.  Yes.

7    Q.  What was the program?

8    A.  So when I received the flash drive on March 7th, I was

9    required to download Mozilla, I think it was, to actually

10   review the records within the flash drive.

11   Q.  Okay.  Did you copy the thumb drive or the contents of

12   the thumb drive when you received it?

13   A.  Did I make a copy of the entire flash drive when I

14   received it?

15   Q.  Or any parts of the flash drive.

16   A.  I did not make a copy of the flash drive, no.

17   Q.  You accessed the flash drive, but you didn't copy its

18   contents anywhere.

19   A.  I don't know how that works, how -- I don't know how the

20   review of the e-mails work within the Mozilla program, so I

21   don't know if it does something with it in there.  I'm

22   sorry.  I'm not an IT person.  But I did not physically make

23   a copy of the flash drive.

24   Q.  Do you still have the Mozilla program on your computer?

25   A.  I don't know.  It's not my computer.  It's a standalone

1    computer within our office.

2    Q.  Did the Mozilla program remain on the computer after you

3    turned the thumb drive over?

4    A.  I don't know.

5    Q.  Were the documents still available -- are they still

6    available on the Mozilla program on that computer?

7    A.  I don't know.  I have not looked at them.

8    Q.  Can you go to DX 33.

9    A.  Okay.

10   Q.  This is a chain of custody tag, correct?

11   A.  Yes.

12   Q.  And am I correct that this -- you're familiar with this

13   document.

14   A.  I am.

15   Q.  I take it -- this can be an important document in an

16   investigation, correct?

17   A.  It can be, yes.

18   Q.  And I take it you take special care to make sure that

19   the information that you put out is accurate?

20   A.  Yes.

21   Q.  This indicates that you handed off the thumb drive to

22   Special Agent Khan of the Federal Bureau of Investigation on

23   March 14th, 2016, correct?

24   A.  That's what this says, yes.

25   Q.  Okay.  But you testified that the documents that you

1    printed you printed on March 15th and March 17th, correct?

2    A.  Because that was the date on the bottom of those e-mails

3    that I printed.  I don't know why there's a discrepancy as

4    to dates.

5    Q.  Well, is it possible there's a discrepancy because you

6    searched the documents after you handed over the thumb drive

7    to Special Agent Khan?

8    A.  I don't know.  All I know is I stopped reviewing any

9    kind of documents on Mozilla after AUSA Maria told me that

10   there was going to be a heightened filter process.  I don't

11   know why there's a discrepancy as to dates.  I don't

12   remember.

13   Q.  Doesn't it appear that there was a copy of the contents

14   of the thumb drive that was maintained in your office?

15   A.  It's a possibility, or the dates on those e-mails that

16   were printed out was wrong.  I don't know.  I was going by

17   the dates on the e-mails as to when I reviewed them.  I

18   didn't have specific recollection other than that the date

19   on the e-mails says the -- the e-mails I printed said the

20   15th and the 17th, so that's when I assumed I printed them

21   out on those two dates.

22   Q.  Do you have any reason to believe the date on the Postal

23   Inspection Service's computer is wrong?  Does that come up?

24   A.  I don't know.  I have no idea.

25   Q.  You talked about the heightened filtering process that

1    you went through or that AUSA Maria told you you needed to

2    perform on the contents of the thumb drive, correct?

3    A.  Right.

4    Q.  And you had learned of this from AUSA Maria?

5    A.  Yes.

6    Q.  And you understood that he had had a conversation with

7    AUSA Kokkinen about this.

8    A.  Some kind of conversation, yes.  I wasn't privy to the

9    exact specifics of that conversation.

10   Q.  And this heightened filtering process was designed to

11   separate out content that the investigation team could not

12   access and search, correct?

13   A.  Right.

14   Q.  And this was designed to filter out the potentially

15   privileged documents?

16   A.  Right.

17   Q.  And it was designed to filter out documents that were

18   not relevant, correct?

19   A.  I know that we discussed that.  I don't know if the

20   specific culling at that point at that point in time was

21   designed to take out the potentially irrelevant documents.

22   I don't know when that happened specifically, at this time

23   or later, or if it happened --

24           MR. MacLAUGHLIN:  Which date are you talking about

25   now?  What date are you inquiring about?  I missed it.

1          MR. WADE:  I was just talking about the heightened

2     filtering process.

3          MR. MacLAUGHLIN:  Okay.

4     BY MR. WADE:

5     Q.  Can you look at paragraph 15 of your declaration at

6     Defense Exhibit 1?

7     A.  Yes.  And I know I said that we discussed filtering

8     potentially irrelevant and potentially privileged, but I

9     don't know -- I didn't have anything to do with the

10    filtering process, so I don't know if the irrelevant

11    filtering took place or when.

12    Q.  Well, let's look at paragraph 15, okay?

13    A.  Okay.

14    Q.  Do you have it in front of you, ma'am?

15    A.  Yes.

16    Q.  In there you say that based on the conversations with

17    AUSA Maria, that you learned that you needed to do

18    heightened filtering to remove information that was not

19    relevant, correct?

20    A.  That we had that conversation, yes.

21    Q.  Do you know whether that was ever done?

22    A.  That's what I just said.  I don't know if the relevancy

23    filter actually occurred or when.  I don't know.

24    Q.  Were you ever asked to develop a set of relevance terms?

25    A.  I don't remember.

1    Q.  When you searched through your documents in connection

2    with the preparation for this hearing, did you come across

3    any documents that indicated that you had started to prepare

4    relevance terms for use on the database?

5    A.  Yes.  So sometime in November, I believe it was, of '16

6    we were starting to create tags for relevant documents

7    within the Relativity database.  Is that what you're asking?

8    Q.  No.  Those are tags, correct?

9    A.  Yes.

10   Q.  Not search terms, correct?

11   A.  Well, they can be both, but I'm just trying to answer

12   your question as correctly as possible.

13   Q.  Okay.  Did you ever create any search terms that were

14   specifically designed to filter out documents that were not

15   relevant?

16   A.  I don't remember.

17   Q.  When you searched through your documents, did you come

18   up with any materials that suggest that you did do such

19   work?

20   A.  Not that I remember.

21   Q.  You talked about your collaboration on the search terms

22   relating to the potentially privileged documents.  Do you

23   recall that testimony?

24   A.  Yes.

25   Q.  Did you prepare drafts of potentially privileged search

1    terms?

2    A.  Did I actually write something out and maintain it?  Not

3    that I remember.

4    Q.  Did you send any e-mails to anyone that included the

5    terms that you thought should be included in potentially

6    privileged searches?

7    A.  Other than the e-mail that I discussed in my direct

8    examination where I had found some potentially privileged

9    documents related to Felhaber and Arnstein, I don't

10   remember.

11   Q.  You don't recall anything other than that one document.

12   A.  Right.

13   Q.  But you did add some names that you thought should be

14   included to the terms orally, is that right?

15   A.  I remember having conversations with AUSA Maria about

16   potentially privileged names that we needed to use in the

17   filtering process.

18   Q.  Okay.  Do you recall which names you suggested be added?

19   A.  No.

20   Q.  Did you recall -- did you suggest any general search

21   terms that should be used to identify potentially privileged

22   documents?

23   A.  I don't recall.

24   Q.  Did you suggest that the name of Mr. Adams' then

25   criminal defense counsel be included in the materials?

1    A.  I don't remember.  I don't recall the name.  Are you

2    talking about Mr. Hopeman?

3    Q.  Yeah.  Prior to your e-mail when you were initially

4    developing the terms, did anyone suggest that the current

5    criminal defense lawyer should be included within the search

6    terms?

7    A.  I don't recall.  As I said, I don't remember

8    specifically what names we discussed.

9    Q.  Around this time, you had had a meeting with

10   Mr. Hopeman, correct?

11   A.  Yes.

12   Q.  And Mr. Petrosinelli, my law partner, participated in

13   that meeting, correct?

14   A.  Yes.

15   Q.  Did you suggest that Mr. Hopeman's name or

16   Mr. Petrosinelli -- that was in March --

17          MR. WADE:  I'm sorry, Your Honor.  Strike that.

18   Q.  That was in March of 2016?

19   A.  The meeting with Mr. Hopeman and Mr. Petrosinelli?  Yes.

20   Q.  Okay.  And did you suggest that either of their names be

21   added to the search terms?

22   A.  I don't remember specifically.

23   Q.  Who was the ultimate -- who's the person who ultimately

24   decided which terms should be used?

25   A.  I don't know.  I provided the information that I had for

1    suggestions as to what search terms should be used to AUSA

2    Maria.

3    Q.  Could you please turn to Defense Exhibit 14.  And you're

4    not on the e-mail, but could you turn to the second page.

5    A.  Okay.

6    Q.  Do you see this as a set of potential search terms?

7    A.  I see --

8    Q.  Did you ever review this document?

9    A.  I don't remember it.

10   Q.  Did you ever give specific input on this document?

11   A.  I'm sorry.  I don't remember this document.  I may have

12   reviewed it or not.  I don't remember.

13   Q.  Do you recall ever reviewing any other drafts like it?

14   A.  I don't remember.

15   Q.  And Mr. Maria prepared this?

16   A.  I don't know.

17   Q.  If you go back to the prior page, Mr. Maria circulated

18   this.

19   A.  Yeah, but I don't know if he prepared it or not.

20   Q.  Fair enough.  Have you done privileged searches in

21   databases previously?

22   A.  Am I trying to look for privileged documents in

23   databases?  No, I'm trying to avoid them.  I don't

24   understand your question.

25   Q.  It probably wasn't a very good one.  Have you ever tried

1    to come up with a list of privileged search terms?

2    A.  In other cases?

3    Q.  Yes.

4    A.  I don't remember right now.

5    Q.  Okay.  Did these terms seem reasonable to you?

6    A.  Do these terms right here today seem reasonable?

7    Q.  Yes.

8    A.  Well, as I told you before, just because there's the

9    word "privileged" or "attorney" or "lawyer" on a document

10   doesn't mean that there is an actual privilege in the

11   document, so I don't know that it's reasonable or not, but

12   if that's what the AUSAs came up with, then that's what they

13   came up with.  I don't remember this document at all.

14   Q.  Do you know that those general terms weren't included?

15   A.  Excuse me?

16   Q.  Have you been told that these search terms were never

17   used, the general terms?

18   A.  I don't know.

19   Q.  You don't know?

20   A.  I don't know.

21   Q.  You got access to the Relativity database on May 5th,

22   2016; does that sound right?

23   A.  Around that time frame.

24   Q.  And you had understood that the privilege terms had been

25   applied at that point?

1    A.  The terms had been applied to filter out potentially

2    privileged documents, yes.

3    Q.  And you went about conducting searches in the database?

4    A.  Yes.

5    Q.  And you reviewed documents that came up in response to

6    the searches?

7    A.  Yes.

8    Q.  And were some those documents outside the scope of the

9    warrant?

10   A.  Potentially.  I don't remember specifics, but there may

11   have been.

12   Q.  You viewed thousands of documents, correct?

13   A.  I don't remember how many, but I reviewed a lot, yes.

14   Q.  Okay.  And is it fair to say that a significant number

15   of those documents were outside the scope of the warrant?

16   A.  I don't remember.  You got to understand I'm reviewing,

17   like you said, a lot of documents and I'm going through them

18   very, very fast as to whether I can see something that might

19   be relevant to the case, and if it's relevant to the case,

20   then I pull it, whether I tag it or print it or somehow keep

21   it for the investigation.

22   Q.  And if it's not relevant to the case, you just move to

23   the next document?

24   A.  Yes, unless it's potentially privileged, and then I

25   provide that information to AUSA Maria.  And previous, I

1    also was letting him know that there was potentially

2    irrelevant documents in there and what those were.

3    Q.  After you got access to the database on May 5th, 2016,

4    did you inform AUSA Maria whenever you saw documents that

5    weren't relevant?

6    A.  I'm trying to remember.  I don't remember at this point.

7    Q.  But as you search for the documents, if one of your

8    searches pops up a series of documents, you would click

9    through the documents, is that right?

10   A.  Yes.

11   Q.  And if you saw a document that was relevant, you might

12   tag it or print it.

13   A.  Right.

14   Q.  And if it wasn't relevant, you'd just move to the next

15   document.

16   A.  Right.

17   Q.  You didn't have a tag or any way to record that the

18   document wasn't relevant, correct?

19   A.  There wasn't a tag that I used in the program, no.

20   Q.  Okay.  And then after you did one set of searches, if

21   you then went back in to do more searches that were related,

22   you might hit on some of those same relevant documents,

23   correct?

24   A.  I don't know.  It's possible.

25   Q.  Or other members of the investigation team might hit on

1    them as well.

2    A.  I don't know.

3    Q.  Did the work that you did in the database to I think you

4    said sort of enhance your understanding of the case, was

5    that similar to the kind of work that you do in a database

6    of documents that was produced pursuant to a grand jury

7    subpoena?

8    A.  What do you mean?  I don't understand the question.

9    Q.  I take it you've had cases where counsel for companies

10   have produced documents in response to a subpoena in a

11   database?

12   A.  I have had cases where counsel produces documents

13   pursuant to a grand jury subpoena, yes.

14   Q.  And if there's a substantial volume of documents in

15   those instances, you just go about doing keyword searches to

16   try to find the relevant ones, right?

17   A.  If it's a database.

18   Q.  Or if it's not a database, if counsel produces a lot of

19   e-mail in response to a grand jury subpoena, would you load

20   it into a database sometimes?

21   A.  I wouldn't specifically.  I would talk to the U.S.

22   Attorney's Office and decide how they wanted to go about

23   reviewing any kind of voluminous database.

24   Q.  Okay.  In your investigative work --

25              MR. MacLAUGHLIN:  May I object on relevance

1    grounds about what she would do with grand jury documents

2    which aren't involved here at all?

3          MR. WADE:  Goes to reasonableness, Your Honor, if

4    I could have a little leeway here.

5          THE COURT:  I think I know where you're going.

6    Sustained.  How she would handle grand jury documents isn't

7    relevant to whether her handling of these documents was

8    reasonable.

9          MR. WADE:  Well, let me try one more question and

10   if it draws an objection and it's sustained, then I'll move

11   on, if that's okay.

12         THE COURT:  Okay.

13   BY MR. WADE:

14   Q.  Was the way that you treated the Yahoo! e-mail database

15   any different from the way that you treated any other

16   database that you received during an investigation?

17   A.  It's kind of a loaded question.  I mean, I would say

18   that there probably are differences.  I mean, there's a lot

19   of different types of evidence that I receive and I guess

20   I'm always careful as to whether or not I'm reviewing

21   potentially attorney-client privilege that I'm not supposed

22   to review.  So in that way I'm always careful, but I guess I

23   don't really understand your question.

24   Q.  Well, as a general matter, in the database that's at

25   issue in this case, you search for documents, correct?

1    A.  Yes.

2    Q.  Based on witness interviews you were preparing for?

3    A.  Yes.

4    Q.  And based on meetings you were going to have to discuss

5    the facts?

6    A.  Probably.

7    Q.  And if you learned about information in one interview,

8    you might go and do some follow-up searching in the

9    database, is that right?

10   A.  That's probably true, yes.

11   Q.  And you'd use the knowledge that you acquired to then

12   maybe do some additional searching thereafter, correct?

13   A.  Yes.

14   Q.  It would just kind of build on itself, correct?

15   A.  It's a continuous learning curve, yes.

16   Q.  In other words, you treated this database the way that

17   you treated any database of e-mails that you used during an

18   investigation.

19   A.  I don't know that that's true.

20             THE COURT:  Okay.  Let's move on.

21   Q.  If you could go to DX 20.

22             This is a -- this is an e-mail that you sent to

23   AUSA Maria following your standard practice, correct?

24   A.  Yes.

25   Q.  And this was in mid-May, not long after you got access

1    to the database.

2    A.   Correct.

3    Q.   You pretty promptly raised this concern with AUSA Maria.

4    A.   Yes.

5    Q.   In fact, you at this point -- I'm sure you don't have

6    this memorized, but you had only accessed the database on

7    four days, on May 5th, May 10th, May 11th and May 12th.

8    Does that seem roughly consistent with your recollection?

9    A.   If that's what the documents say, then that's probably

10   accurate.

11   Q.   Okay.  And within those four days, you identified

12   potentially privileged documents relating to these two

13   e-mail addresses, correct?

14   A.   Yes.

15   Q.   And one of them related to Mr. Adams' then criminal

16   defense counsel.

17   A.   Yes, but that doesn't mean that we hadn't flagged that

18   before.  Just because I'm seeing it in this database doesn't

19   mean that we hadn't flagged that before.

20   Q.   So that may have been excluded previously.

21   A.   It's possible it was and then I was still seeing it or

22   some other form of the e-mail address.

23   Q.   If it was excluded before, why do you think you would

24   see it at this time?

25   A.   I have no idea.

1    Q.  Okay.  Do you have reason to believe it was previously

2    excluded?

3    A.  It would make sense.

4    Q.  You would expect that documents of criminal defense

5    counsel would be excluded from the database, correct?

6    A.  Right.

7    Q.  And you also raised one other e-mail extension that you

8    thought might contain privileged information, the Arnstein

9    e-mail extension?

10   A.  Yes.

11   Q.  And you asked questions about whether you could look at

12   particular Scio documents, correct?

13   A.  Yes.

14   Q.  If you go to DX 21, AUSA Maria responded 24 minutes

15   after you sent that e-mail, correct?

16   A.  Yes.

17   Q.  And he told you that he had noticed the Hopeman

18   documents as well, right?

19   A.  Yes.

20   Q.  And he told you that there were also documents that

21   related to Mr. Adams' tax counsel, correct?

22   A.  Yes.

23   Q.  That was Tom Brever at Foster Brever?

24   A.  Yes.

25   Q.  And prior to May 16th, had Mr. Maria alerted you to the

1   existence of these Hopeman and Brever communications?

2   A.  I don't know.  I know that he did on this date.  I don't

3   know if he did previously.

4   Q.  Do you infer from the way he wrote this e-mail that this

5   was the first you were learning of this?

6   A.  That there were additional Hopeman and Felhaber and

7   Brever documents still within the database?

8   Q.  Yes.

9   A.  It looks like it.

10  Q.  It looks like this is the first time you're learning of

11  that, right?

12  A.  Yes.

13  Q.  You don't recall a conversation from AUSA Maria alerting

14  you to that prior to May 16th, do you?

15  A.  I don't recall.

16  Q.  And do you know when AUSA Maria had last accessed the

17  database at this point?

18  A.  No.

19  Q.  Okay.  The Foster Brever documents, these related to a

20  guy working on Mr. Adams' tax issues, correct?

21  A.  Okay.  I don't recall.  I mean it says that in here, but

22  sure, yes.

23  Q.  Okay.  And tax offenses had become part of the

24  investigation of Mr. Adams during this time period, correct?

25  A.  I don't know specifically when they became a part of the

1    investigation, but yes, IRS was added to the case and tax

2    charges were looked at.

3    Q.  In fact, criminal investigator Brandon Belich is on this

4    e-mail, correct?

5    A.  Yes, Special Agent Belich is on the e-mail.

6    Q.  Now Deputy Marshal Belich, I understand?

7    A.  Yes.

8    Q.  And does his presence on the documents and the fact that

9    he was added to the case suggest that at least as of this

10   time, the tax issues were part of the investigation?

11   A.  Yes.

12   Q.  And there was searching that was done for documents that

13   related to the tax offenses, correct?

14   A.  I'm sure there were, yes.

15   Q.  Well, in fact, you did some of those searches, didn't

16   you?

17   A.  I think I pulled some documents related to the Murry --

18   I think he was a CPA.

19   Q.  I'll come back to Mr. -- Mr. Murry -- I'll come back to

20   Mr. Murry.

21           And as you were doing your general searching

22   within the database, if you saw documents that related to

23   tax offenses, would you pass them along to Agent Belich?

24   A.  Possibly.  I don't remember, but yeah, it's possible

25   that I did.

1    Q.  But the purpose of having him on the team was for his

2    tax expertise.

3    A.  Yes.

4    Q.  And in fact, at one point during the investigation AUSA

5    Maria asked you to create a tag in the Relativity database

6    relating to Adams' tax issues, correct?

7    A.  I vaguely recall -- I think we had that as one of the

8    potential tags that we were discussing adding to the

9    Relativity project.

10   Q.  Well, why don't we look at Defense Exhibit 60.

11   A.  Okay.  Yes, I see it.

12   Q.  And just so the record's clear, there is an e-mail to

13   you on November 3rd -- I'm sorry -- on November 3rd, 2016 at

14   7:53 a.m. in which Mr. Maria asks you to add an Adams tax

15   tag to the Relativity database containing the Yahoo!

16   e-mails, correct?

17   A.  He doesn't ask me to add it.  He says that it should be

18   added maybe.

19   Q.  It should be added to the list of tags, correct?

20   A.  Correct.

21   Q.  And was it?

22   A.  I don't know.

23   Q.  Well, there were tags added to the database, correct?

24   A.  Yes.  I don't remember if that specific one was on there

25   as I sit here today.

1    Q.  Did you follow up on his request?

2    A.  To have these tags added --

3    Q.  Yes.

4    A.  -- to ask somebody?  I don't remember.  I would think

5    that I would have, but I don't remember.

6    Q.  Well, you say in the e-mail above that:

7           Thanks.  And I can e-mail Cory and ask who would

8    add the tags.

9           Correct?

10   A.  Right.

11   Q.  And the tags that you're talking about are the ones that

12   were identified by you and the additions of Mr. Maria,

13   correct?

14   A.  Right.

15   Q.  And did you e-mail Cory to have the tags added?

16   A.  I don't remember.  I would think that I would have, but

17   I don't remember specifically --

18   Q.  Ultimately the tags were added, right?

19   A.  -- so I would guess that I did.

20   Q.  Going back to DX 21, in total there were five or maybe

21   six different groups of potentially privileged documents

22   that are identified in this e-mail, correct?

23   A.  So you're talking about Arnstein being one, Felhaber

24   being one, like that?

25   Q.  Yes.

1    A.  And Brever being one, so there's three.  Potentially the

2    Nelson Mullens information.  That's four.

3    Q.  Okay.  So four --

4    A.  Around four.

5    Q.  Four categories.  And also the Caplan Law?  Do you see

6    that in there?

7    A.  Oh, right, mm-hm, in the middle.

8    Q.  So that's five?

9    A.  Looks like it potentially, yes.

10   Q.  Okay.  So five categories of additional documents were

11   identified, including Mr. Adams' then criminal defense

12   counsel and his tax counsel.

13   A.  As potentially privileged.

14   Q.  And this is on May 16th, 2016.

15   A.  Yes.

16   Q.  Did you immediately stop reviewing documents in the

17   database?

18   A.  No, but if I came across those, I did not look at them.

19   Q.  Do you know why it took nearly three weeks to have those

20   sensitive privileged documents removed from the database?

21   A.  I do not.

22   Q.  Because just so the record's clear, those documents

23   weren't removed according to the Government's chart until

24   June 7th, 2016, correct?

25   A.  According to the chart, that's correct.

1   Q.  And according to the chart, at that time 1500 additional

2   privileged documents were removed, correct?

3   A.  Approximately, yes.

4   Q.  Presumably relating to these terms, correct?

5   A.  I don't know, but yes.

6   Q.  You don't know because you didn't do the work, but the

7   timing matches up on that?

8   A.  I guess.  I don't know.

9   Q.  You prepared your affidavit in November of 2015,

10  correct?

11  A.  Around that time period and prior.

12  Q.  And between then and April of 2017, your knowledge about

13  the case increased substantially, correct?

14  A.  I would say so, yes.

15  Q.  Indeed, the focus of the Government's investigation

16  changed after you prepared the warrant application, correct?

17  A.  Yes, it did.

18  Q.  The Government shifted away from a theory that was

19  focused on fraud in connection with the Scio/Apollo

20  transactions into a theory that was focused on Mr. Adams'

21  alleged embezzlement or misappropriations of funds from

22  Apollo or its investors, correct?

23  A.  I would say it's focusing on both at that point, later.

24  We were focusing on both.

25  Q.  Right, but the embezzlement fraud, if you will, or

1    crime, that became the focus of the investigation after you

2    prepared your affidavit, correct?

3    A.  That was added to it, yes.

4    Q.  That was added to what?

5    A.  To the investigation as a focus.

6    Q.  Right.  That became a new issue after you submitted your

7    warrant affidavit.

8    A.  Another issue to look at, yes.

9    Q.  And the Government, as we talked about, also began

10   investigating potential tax charges against Mr. Adams at

11   some point after you prepared the warrant application,

12   correct?

13   A.  I don't know if it was after or before.  I know I was

14   working with Special Agent Belich during the time I was

15   writing the affidavit.

16   Q.  And do you know when Special Agent Belich was put on the

17   case?

18   A.  Specifically, no.

19   Q.  And as the Government's focus and theories on different

20   schemes and crimes changed, you continued to access

21   documents in the Yahoo! database, correct?

22   A.  I continued to access documents within the Relativity

23   database.

24   Q.  And you continued to search for documents that related

25   to your evolving theory of the case.

1    A.  Yes.

2    Q.  And let's go to DX 10 at 92.

3           So Defense Exhibit 10, Bates labeled 92 in the

4    bottom right-hand corner, and I call your attention to

5    paragraph 4.  There it says:

6           There is probable cause to believe that Mr. Adams

7    had committed mail and wire fraud by concealing and failing

8    to disclose material information to company shareholders

9    prior to seeking shareholders' approval of transactions

10   which personally benefited him and Monahan.

11          Correct?

12   A.  Yes.

13   Q.  And in the pages that follow you lay out that alleged

14   scheme to defraud the shareholders in connection with the

15   transactions that occurred between Scio and Apollo.

16   A.  Correct.

17   Q.  And the core of the scheme outlined in your affidavit,

18   which you should feel free to reference, involves the

19   failures by Mr. Adams and Monahan to disclose to

20   shareholders either various information relating to the

21   transactions or information regarding their involvement with

22   those two companies, correct?

23   A.  Yes, it does discuss that.

24          THE COURT:  Okay.  We're going to take a break.

25          MR. WADE:  And we would just ask that while the

1    witness is on examination that she not confer with counsel.

2              THE COURT:  That seems like a standard operating

3    procedure.

4              MR. WADE:  Okay.

5              THE COURT:  Thank you.

6              You can step down.  We're going to take a

7    ten-minute recess.

8         (Recess taken at 2:35 p.m.)

9                          *      *      *      *

10        (2:50 p.m.)

11                        IN OPEN COURT

12             THE COURT:  Please be seated.  We're back and

13   ready to go.  Everyone necessary is here.

14             All right.  Let's go.

15             MR. WADE:  Thank you, Your Honor.

16   BY MR. WADE:

17   Q.  Inspector Kroells, I think we were looking at Defense

18   Exhibit 10 when we left off and we were talking about the

19   Scio/Apollo transactions.  Do you recall that?

20   A.  Yes.

21   Q.  And those transactions as set forth in your affidavit

22   occurred in 2011 and then into 2012, correct?

23   A.  The transition from the Apollo companies to the Scio

24   companies, yes.

25   Q.  And that was the primary focus of your affidavit was on

1    those events in 2011 and '12.

2    A.  Yes.

3    Q.  And in your affidavit you didn't mention or discuss

4    Mr. Adams' alleged embezzlement or theft of the kind set

5    forth in the indictment in this case, correct?

6    A.  You know, I don't remember if the numbers that we came

7    up with as far as the money going to Mr. Adams included that

8    at the time or not.

9    Q.  Okay.  Feel free to take a look -- I'll represent to you

10    that I've read the affidavit and I have seen no reference to

11    embezzlement or taking of monies anywhere in the affidavit,

12    but I want to make sure our record's clear.  So please take

13    your time and review the affidavit and let us know if there

14    are any places in your affidavit where you mention or

15    discuss Mr. Adams' alleged embezzlement or theft of the kind

16    set forth in the indictment in this case.

17    A.  Right.  I don't think I specifically talked about

18    embezzlement or theft, but I did discuss, I believe, the

19    money going to Mr. Adams, Mr. Monahan, and AMLLP.

20    Q.  To which statements are you referring now?  Could you

21    point me to the statements?

22    A.  I'm looking for it.  I'm trying to remember if that

23    information was put in here.

24         MR. MacLAUGHLIN:  Your Honor, no facial challenge

25    having been made, I question the relevance of this line of

1    questioning.

2              MR. WADE:  We made a facial --

3              THE COURT:  Hopefully we're almost done with this

4    line of inquiry.

5              MR. WADE:  We have made a facial challenge, Your

6    Honor.

7              THE COURT:  To the four corners -- is that what

8    you're referring to, Mr. MacLaughlin?

9              MR. MacLAUGHLIN:  I don't understand there to be a

10   challenge to whether there's sufficient probable cause.

11   There's an allegation that the warrant itself was broad.

12   The witness is now being asked what she did or didn't say in

13   establishment of probable cause.

14             MR. WADE:  May we approach?

15             THE COURT:  Sure.

16             I don't need a record for this.  Thank you.  I'll

17   let you know.

18             (Discussion at the bench off the record)

19                       IN OPEN COURT

20             THE COURT:  All right.  I'm going to overrule any

21   objection to this line of questioning at this time without

22   deciding on the merits of the argument that the defense is

23   trying to support, but it's at least appropriate for

24   inquiry.

25             Go ahead.

1            MR. WADE:  Was there a question pending?  Would it

2     be possible to have it read back?  I apologize.

3            (Pause - court reporter begins reviewing notes).

4            THE COURT:  Could you just throw it out there

5     again?  Is that okay?

6            MR. WADE:  Sure.

7            THE COURT:  Let's just get back on track.  Thank

8     you.

9     BY MR. WADE:

10    Q.  Ma'am, I think when we left off the questioning, you

11    were looking to determine whether your affidavit included

12    any language relating to the embezzlement scheme that's set

13    forth in the indictment in this matter.  Did you locate any

14    such language?

15    A.  And I couldn't recall exactly the parameters of the

16    dates as we were focusing to in the affidavit as far as the

17    funds going to Mr. Adams, Mr. Monahan, and AMLLP.  I found

18    it on pages 14 and 15 of the affidavit.  Paragraph 27

19    discusses -- and it looks like we kept those date parameters

20    between 2011 and 2013 as far as the funds going to

21    Mr. Adams, Mr. Monahan, and AMLLP.

22    Q.  And this relates to payments of money from Scio that

23    were made to Mr. Adams or his law firm or his law partner,

24    correct?

25    A.  It looks like there's also payments from ADI to the law

1    firm.

2    Q.  In connection with the transaction between Scio and

3    Apollo?

4    A.  I think it's duplicative I think is what we're saying in

5    the affidavit, that there were two payments to the law firm,

6    one from Apollo and one from Scio.

7    Q.  Right, arguably both for work relating to that

8    transaction, correct?

9    A.  I don't know if it was specific for work relating to

10   that specific transaction, but for work that they did for

11   Apollo and/or Scio.

12   Q.  Okay.  Let's look -- if you can turn to DX 69, which is

13   the first superseding indictment.

14   A.  Yes.

15   Q.  If you look at the first page, paragraph 1 of DX 69, it

16   alleges a scheme to defraud Apollo shareholders by

17   misrepresenting that investors' money that would be used to

18   fund company operations was actually going to Mr. Adams,

19   correct?

20   A.  Yes.

21   Q.  You didn't discuss at all in your warrant affidavit that

22   scheme, correct?

23   A.  I don't see that as a separate scheme.

24            THE COURT:  Mr. Wade, can I encourage in the

25   interest of time, if what you're doing is comparing what's

1    in the superseding indictment with what's in the warrant

2    application, that I can do that also and maybe we could

3    focus on if there's any other things that this witness has

4    knowledge of related to the discrepancy between those two

5    documents.  I'll anticipate that you would do a searching

6    exploration of the gaps between the two documents and look

7    for some hints of that in your briefing, but I think in the

8    interest of time, could we move to what she alone can

9    provide?  Does that make sense?

10             MR. WADE:  Sure.

11             THE COURT:  Okay.

12             MR. WADE:  Your Honor, it was my intention to ask

13   the postal inspector a series of questions that relate to

14   searches that were done with respect to specific entities

15   and dates that are identified in the indictment, but are

16   nowhere mentioned in the affidavit.  It's a totally

17   different scheme.

18             I was similarly intending to ask questions that

19   show that a series of tags were created related to those

20   topics.  I think that's probably apparent from the documents

21   and I would be willing to skip over that if the Court is

22   willing to accept a summary of that in post-hearing

23   briefing.

24             THE COURT:  And Mr. MacLaughlin, what's the

25   Government's position as to allowing me to draw the lines

1    between the searches done, the -- you know, I guess here's a

2    concern with cutting you off on this:

3              Does this witness have unique knowledge about

4    whether the searches done pertain to things that were

5    anticipated in the warrant, as well as things that were

6    ultimately in the indictment, and I don't want to foreclose

7    either you the opportunity to demonstrate that or the

8    Government the opportunity to point out that there's overlap

9    between those searches and the search warrant.

10             So I don't think I should probably end run that

11   line of questions.  I just don't know that I need the

12   questions comparing the affidavit to the indictment.

13             Does that make sense.

14             MR. WADE:  Fair point, Your Honor.  Let me try

15   to --

16             THE COURT:  It is 3:00 o'clock and we are still on

17   our first witness.

18             MR. WADE:  I am -- counsel is mindful of that.

19             THE COURT:  Okay.

20   BY MR. WADE:

21   Q.  Postal Inspector Kroells, did you search for documents

22   relating to Jill Zipkin?

23   A.  I did.

24   Q.  Did you review numerous documents relating to Jill

25   Zipkin?

1    A.  I did.

2    Q.  Did you search for documents relating to Mr. Adams' sale

3    of warrants?

4    A.  I did.

5    Q.  And did you review numerous documents relating to

6    Mr. Adams' sale of warrants?

7    A.   I don't remember specifically what I found, but I was

8    looking for records about that, yes.

9              THE COURT:  Sale of what?  Could you --

10             MR. WADE:  Warrants.

11             THE COURT:  Search warrants?

12             MR. WADE:  Stock warrants.

13             THE COURT:  Okay.

14             MR. WADE:  Sorry.

15             THE COURT:  That's okay.  I just wanted --

16             MR. WADE:  It's not the warrant that we've been

17   spending most of our time on this morning, Your Honor.

18   BY MR. WADE:

19   Q.  Did you search for documents relating to DL Investments?

20   A.  I did.

21   Q.  And did you review numerous documents relating to

22   DL Investments?

23   A.  I did.

24   Q.  Did you search for documents relating to RL Investments?

25   A.  I did.

1    Q.  And did you review numerous documents relating to

2    RL Investments?

3    A.  I don't remember how many, but I'm sure I reviewed some,

4    yes.

5    Q.  And did you review documents relating to

6    ADR Investments?

7    A.  I did search for that, yes.

8    Q.  And did you review documents relating to ADR

9    Investments?

10   A.  I most likely did find some, yes.

11   Q.  And we talked about tags that you worked to have created

12   or at least were involved in trying to create tags.  You

13   recall that testimony?

14   A.  Yes.

15   Q.  And feel free to look at the DX 60.  That's where that

16   e-mail is.

17   A.  Okay.

18   Q.  Do you recall that there was a tag created for Julie

19   Zipkin?

20   A.  Jill Zipkin?  Yes.

21   Q.  I'm sorry.  Jill Zipkin.  And Larry Zipkin?

22   A.  Yes.

23   Q.  And there is a tag for the sale of stock in warrants?

24   A.  Yes.

25   Q.  There's a tag for ADR Investments?

1    A.  Yes.

2    Q.  There's a tag for RL Investments.

3    A.  Yes.

4    Q.  There's a tag for DL Investments.

5    A.  Yes.

6    Q.  And we discussed there's a tag for taxes.

7    A.  That was, yes, another one.

8    Q.  Added by AUSA Maria.

9    A.  Maria.

10   Q.  And there were searches for Murry, correct?

11   A.  Yes.

12   Q.  And who is Mr. Murry?

13   A.  He's a CPA.

14   Q.  So these searches related to potential tax charges

15   against Mr. Adams?

16   A.  I would guess so, yes.

17   Q.  And did you know that communications with Mr. Murry were

18   privileged because Mr. Murry was retained by Mr. Adams' tax

19   counsel?

20   A.  I know that Mr. Adams' tax counsel produced e-mails that

21   they believed were not privileged and it was after that that

22   I did the search on Murry.  I'm guessing -- I don't recall,

23   but I'm guessing that those searches in the Relativity

24   database that I did for Murry was to duplicate the e-mails

25   that the tax -- or the attorney for the tax person produced.

1    Q.  Well, Mr. Murry was served with a grand jury subpoena in

2    this case, correct?

3    A.  Yes.

4    Q.  And that subpoena was referred to Mr. Brever, correct?

5    A.  I believe so, yes.

6              MR. MacLAUGHLIN:  Your Honor, I object on

7    relevance grounds to this line of questioning.

8              THE COURT:  What's the relevance for this line of

9    questioning?

10             MR. WADE:  This directly relates to looking at --

11             THE COURT:  Privileged documents?

12             MR. WADE:  And tax documents.

13             THE COURT:  Overruled.

14   BY MR. WADE:

15   Q.  If you could go to DX 67.

16   A.  Okay.

17   Q.  Have you ever seen this letter, ma'am?

18   A.  I think this is the one I'm talking about.  I know I've

19   seen a letter like this.

20   Q.  And in this letter Mr. Brever informs Mr. Murry that

21   Murry & Associates were hired under a Kovel arrangement by

22   his firm.  Do you see that?

23   A.  I see that.

24   Q.  And it says that's for the purposes of assisting and

25   rendering legal advice, correct?

1    A.  I see that.

2    Q.  And he then notes in the letter that many of those

3    communications with the Murry firm are privileged, correct?

4    A.  Yes.

5    Q.  And he in fact attaches a privilege log asserting

6    privilege to the documents, correct?

7    A.  It looks like it, yes.

8    Q.  Okay.  Were you informed in December of 2016 by

9    Mr. Maria that the Murry documents were privileged?

10   A.  I don't remember.  I think -- I don't remember what

11   document I reviewed, but I know that I have a document -- or

12   I've seen a document that was from I believe Mr. Brever or

13   an associate of his.

14             THE COURT:  Pause for a moment.

15             MR. MacLAUGHLIN:  May we approach and have a side

16   bar about this Murry issue?

17             THE COURT:  Yes.  Do we need to be on the record?

18             MR. MacLAUGHLIN:  I think it wouldn't hurt.

19                         **AT SIDE BAR**

20                  *      *      *      *

21             (REPORTER'S NOTE:  Side bar audio system not fully

22   engaged.  The following is the reporter's best attempt at a

23   distance of 10 feet away)

24                  *      *      *      *

25             THE COURT:  Let me ask a question.  Whom are we

1    protecting this conversation from, the witness?

2              MR. MacLAUGHLIN:  (Inaudible) on this issue.

3              THE COURT:  Do you want to move towards the

4    microphone?

5              MR. MacLAUGHLIN:  Sure.  I'd like one of the other

6    lawyers to speak to it.

7              THE COURT:  Oh.  Okay.

8              MR. MacLAUGHLIN:  That's all.

9              MR. RANK:  Your Honor, I think this is (inaudible)

10   legal issue (inaudible) ask questions and presuming that the

11   communications with Mr. Murry are privileged.  Every one of

12   Mr. Wade's questions are in fact -- they're privileged

13   communications (inaudible) presumption of the communications

14   (inaudible) Mr. Murry as a CPA were actually privileged.

15   There's legal argument as to what -- they're not privileged

16   communications.  Assuming that they're going to brief that

17   and raise the issue (inaudible) and the searches are

18   actually done, and the fact of the searches that were done

19   with respect to Mr. Murry are out there, they're laid out in

20   what we provided to the defense, and so the issue of whether

21   there was privileged communications is a legal issue.

22              THE COURT:  So at the time that she was doing the

23   searches she was receiving counsel from the Government about

24   the collective belief that these were privileged.  Do we

25   need to ask her about these, or is that just part of the

1    record?

2             MR. WADE:  I think it's for the record, Your

3    Honor.  If he doesn't have anything to add as to why the

4    search was conducted, you know, maybe we don't need to ask

5    questions, but --

6             THE COURT:  Well, let's not do quite as much

7    foundation and get right to if she has (inaudible).

8             MR. WADE:  But the fact of the matter is, just so

9    Your Honor knows where this is going, whether it's

10   privileged or not -- and I'm not meaning to -- I understand

11   you reserve your rights to assert that it's not.  I don't

12   fully understand what that argument might be.  But the fact

13   of the matter is that she was specifically advised --

14   Mr. Murry was specifically advised that these documents were

15   privileged.  They relate directly to the indictment, all

16   counts of the indictment.

17            THE COURT:  This isn't her testimony.  We don't

18   need her view.  I'm trying to get us back to the things she

19   (inaudible) so we can --

20            MR. WADE:  Well, she reviewed the documents after

21   the Government was informed of the privilege.

22            THE COURT:  Okay.  So let's establish that and

23   then move on as to -- whether Counsel is correct that it's

24   privileged or not, we'll worry about that another day.

25

```
1                        IN OPEN COURT

2              THE COURT:  Okay.  Back on the full record.

3              We're going to focus these questions on the areas

4    related to Mr. Murry specific to this witness's knowledge

5    and understand that other relevant considerations might come

6    up in briefing.

7    BY MR. WADE:

8    Q.  Postal Inspector Kroells, did you search for Murry

9    documents after December 1st, 2016?

10   A.  I did.

11   Q.  Did you review Murry documents after December 1st, 2016?

12   A.  I don't know what you mean by review, but I think what

13   happened was I specifically was pulling the documents that

14   we were told were not privileged.  I was looking for an

15   alternative source.  I was probably asked to look for an

16   alternative source for the e-mails that we were being told

17   by Mr. Brever were not privileged communications.

18   Q.  What was an alternative source?

19   A.  Meaning the Relativity database.

20   Q.  Didn't you have the documents already if they were not

21   privileged?

22   A.  Yes, so I think they were produced by Mr. Brever, but in

23   my experience as an agent, sometimes it's nice to have

24   alternate sources for the documents as well.  So I think

25   probably what happened -- because I would never purposely
```

1    pull documents that I was told were attorney-client

2    privilege.  What I'm understanding probably happened was I

3    was told to replicate the e-mails that we were told were not

4    privileged and to pull them from the Relativity database.

5    Q.  Do you believe you were instructed to do that?

6    A.  I don't know.  That's my guess as to what happened,

7    because I wouldn't have actually pulled documents related to

8    attorney-client privilege after being told that it was.

9    Q.  Do you know whether any steps were taken to exclude

10   Murry documents from the Yahoo! database on or about

11   December of 2016?

12   A.  I do not know.

13   Q.  When you searched for the Murry documents after

14   December 1st, 2016 within the Yahoo! database, documents

15   came up in response to your search, correct?

16   A.  Yes.

17   Q.  Were you aware that additional filtering was done in

18   April of 2017 as noted on the board by the Government?

19   A.  I don't know that.  I've been told that recently, but I

20   didn't know that at the time, I don't think.

21   Q.  Did you have any role in that filtering?

22   A.  I don't remember.

23   Q.  Have you searched your documents for that time period?

24   A.  I don't remember if I specifically looked at that time

25   period.

1    Q.  Do you recall finding any documents that indicate that

2    you were involved in any filtering in April of 2017?

3    A.  Not that I remember.

4    Q.  Did you have any conversations with AUSA Maria about the

5    development of search terms in 2017?

6    A.  I don't remember.

7    Q.  Did you have any conversations with anyone else about

8    the creation of relevant search terms in 2017?

9    A.  I don't remember.

10   Q.  Well, if you could look at DX 24.  And if you can just

11   focus -- have you seen this document before?

12   A.  I don't know that I have.  I'm not on the e-mail header.

13   Q.  Okay.  Do you believe that you were ever shown this list

14   of search terms here?

15   A.  If it's the search terms that are -- or the tags that

16   are in Relativity, then I would have seen it, but I don't

17   know.

18   Q.  Well, there's indeed some overlap with the tags, right?

19   Correct?

20   A.  It looks like there was, yes.

21   Q.  But you don't recall ever being shown these search

22   terms, do you?

23   A.  I guess I don't understand what you're saying.  I mean,

24   these are all very common search terms related to this case.

25   Q.  Do you recall ever being shown a draft list of search

1    terms of this kind that was designed for relevance

2    filtering?

3    A.  I don't recall.

4    Q.  If you look -- ESA, do you know what that term refers

5    to?

6    A.  ESA Consulting.  It's a company of Mr. Monahan's.

7    Q.  Do you know what the letters E-S-A stand for?

8    A.  I'm assuming Edward S. Adams, but I don't know that for

9    certain.

10   Q.  Those are Mr. Adams' initials, correct?

11   A.  Correct.

12   Q.  Okay.  Was every Yahoo! e-mail that contained his

13   initials within the scope of the warrant?

14   A.  I wouldn't think so.

15   Q.  You see MRM?

16   A.  I do.

17   Q.  Okay.  Whose initials are those?

18   A.  Those are Mr. Monahan's initials.

19   Q.  Okay.  Was every Yahoo! e-mail with Mr. Monahan's

20   initials within the scope of the warrant?

21   A.  Not every one, probably not.

22   Q.  Do you see the word "diamond"?

23   A.  Yes.

24   Q.  Was every Yahoo! e-mail that contained the word

25   "diamond" within the scope of the warrant?

1    A.  I don't know.  It's possible that there were some that

2    were not, but I don't know.

3    Q.  You see the terms "Lisa L"?

4    A.  Yes.

5    Q.  That was Lisa Linares?

6    A.  I'm assuming.  I don't -- I've never seen this document

7    before that I remember.

8    Q.  No, but do you know "Lisa L" is Lisa Linares based on

9    your work in this case?

10   A.  There is a Lisa Linares.

11   Q.  Would every Lisa Linares communication -- that was

12   Mr. Adams' sister-in-law, correct?

13   A.  Yes.

14   Q.  Would every communication with Lisa Linares be within

15   the scope of the warrant?

16          MR. MacLAUGHLIN:  Your Honor, object to this line

17   of questioning.  It's in evidence, but she hasn't seen the

18   documents and these arguments can be made without

19   reference --

20          THE COURT:  I also note this calls for a legal

21   conclusion.  It's up to me, I think, whether the documents

22   that are listed are within the scope of the warrant, right?

23          MR. WADE:  I'm sorry?

24          THE COURT:  It's up to me whether the documents

25   are within the scope or not, right?  It's not up to this

1    agent.  I understand why you're asking her who these people

2    are, because I have no idea, but the conclusion about

3    whether, for instance, every time you see ESA is within or

4    not within the scope of the warrant isn't up to her, right?

5              MR. WADE:  Sure, but ultimately any search that's

6    done is not necessarily up to her, but whether --

7              THE COURT:  No.  I mean, you're kind of verging

8    into the question I have to answer, which is whether the

9    ultimate pool is beyond the scope of the warrant or not.  So

10   I appreciate the line of questions that helps me understand,

11   for instance, what Zipkin means, but I don't need her to

12   opine whether that was beyond the scope of the warrant.

13             MR. WADE:  Fair enough, Your Honor.  We'll move

14   forward.

15   BY MR. WADE:

16   Q.  One more specific term, Linares.  That's the family name

17   of Mr. Monahan's in-laws?

18   A.  Yes.

19   Q.  And some Linareses were involved in the family business?

20   A.  Yes, they were.

21   Q.  And some Linareses were not, right?

22   A.  I do not know how many people are in that family, so I

23   don't know.

24   Q.  But you don't have any reason to believe that every

25   member of the Linares family was involved in the business,

1     do you?

2     A.  I don't know.

3     Q.  And I may have misspoke.  It's Mr. Adams' in-laws, not

4     Mr. Monahan's in-laws.

5     A.  Oh.  I missed that too.

6     Q.  But it's Mr. Adams' in-laws, correct?

7     A.  Correct.

8     Q.  After you obtained the warrant in this case, what

9     instructions did you give to the investigation team

10    regarding what they could search for within the database?

11    A.  I don't know that I gave any instructions.  We had the

12    search warrant and that's what we used.

13    Q.  How did you use that?

14    A.  To help us determine what we could search for.

15    Q.  How did you specifically employ the search warrant?

16    A.  I used it in determining what I could search for.

17    Q.  Would you look at the search warrant before you

18    performed every search?

19    A.  No.

20    Q.  When did you look at the search warrant?

21    A.  I looked at it obviously when I wrote it, when I swore

22    it out and potentially after if I needed to refresh my

23    memory, but I was trying to stay within the scope of the

24    search warrant when I did all of my searches.

25    Q.  Was that search warrant circulated to every other member

1      of the investigation team?

2      A.  I don't know.

3      Q.  Did you do that?  Did you circulate it?

4      A.  I don't know.  I don't remember.

5      Q.  Were you given instructions by other members of the

6      prosecution team regarding what you could search for within

7      the Yahoo! e-mails?

8      A.  Well, we've kind of already touched on that.  I mean, I

9      had a conversation with AUSA Maria about some of the

10     information that I could look at and some of the information

11     that we couldn't look at, obviously, the attorney-client

12     between Mr. Adams and his attorneys.  Is that what you're

13     asking?  I don't understand, I guess.

14     Q.  That's a fair clarification.  I apologize.

15            Other than what we've already discussed, were you

16     given any other specific instructions of what you were able

17     to search for and not search for?

18     A.  I may have been.  I don't recall.

19     Q.  Were you given any sort of memorandum or search plan

20     that outlined what was appropriate to search for?

21     A.  I don't recall that.

22     Q.  Was there any search briefing that occurred?

23     A.  I don't recall that either.

24     Q.  Were the documents within the database specifically

25     allocated out to different members of the investigation team

1    to cover a different portion of the documents?

2    A.   I'm not sure if I understand.

3    Q.   Well, was there a plan to complete the review of the

4    Yahoo! e-mails?

5    A.   After it was in the Relativity database?

6    Q.   Yes.

7    A.   I know we had discussed at one point a plan, but I don't

8    know that that actually happened.

9    Q.   Okay.  So you didn't have a specific quota of a certain

10   number of documents that you needed to review to do your

11   portion of the searching.

12   A.   No.  I think it was whoever had time and had access to

13   the database was doing the searching.

14   Q.   And they were doing keyword searching.

15   A.   Yes.

16   Q.   There wasn't a universe of material that you wanted to

17   make sure you got through the material.

18   A.   I don't believe so, no.

19   Q.   Different groupings of documents were not assigned out

20   to different members of the investigation team for review.

21   A.   Not that I recall.

22   Q.   Was progress of how much review had happened within the

23   database tracked in any way, how many documents had been

24   reviewed?

25   A.   I have no idea.

1    Q.  Do you know when the review of the Yahoo! e-mails was

2    complete?

3    A.  I don't know.  What do you mean, complete?

4    Q.  When did the investigation team complete its review of

5    the Yahoo! e-mails?

6    A.  I don't know.  I don't understand the question,

7    complete.  I mean, we were told at a certain point we

8    couldn't review the database anymore.  I don't know at that

9    point if it was complete.

10   Q.  You were told you couldn't review it for privilege

11   concerns, correct?

12   A.  Right.

13   Q.  But were you ever informed that the investigation team's

14   review of the database was complete?

15   A.  I was never informed of that, no.

16   Q.  All of the Yahoo! documents are still in the possession,

17   custody and control of the Government, correct?

18   A.  I'm assuming so, yes.

19   Q.  Can you go to DX 58, please.

20   A.  Okay.

21   Q.  This is a letter from Mr. Adams' then defense counsel

22   Mr. Hopeman to then United States Attorney Andrew Luger

23   after learning of the Yahoo! seizure, objecting to the

24   seizure and asking for the opportunity to have the documents

25   back and review them for privilege.

1        Were you made aware of this request?

2   A.  I don't recall this letter.

3   Q.  If you go to 59.  This is August 2016.  This is

4   Mr. Maria's response declining the request from Mr. Adams'

5   counsel.  Were you aware that Mr. Adams' request to review

6   the documents for privilege was declined?

7   A.  I'm not aware of that, but I recall today.

8   Q.  Have you reviewed the documents since April 7th of 2017?

9   A.  I'm trying to remember when my last access was.  I think

10  it was in August of -- let me look here -- August of 2017.

11  So yes, I have.

12  Q.  And it looks like you've reviewed the documents on three

13  different occasions:  on April 27th, 2017; May 16th, 2017;

14  and August 21st, 2017?

15  A.  Yes, that looks to be correct.

16  Q.  And do you know for about how long you reviewed the

17  documents on those different days?

18  A.  I don't.

19  Q.  Do you have an estimate?  Are we talking under an hour?

20  A.  I don't know.

21          MR. WADE:  If I could have a moment, Your Honor.

22          THE COURT:  Of course.

23      (Defense counsel confer)

24          MR. WADE:  We have no further questions at this

25  time, Your Honor.

1      THE COURT:  Mr. MacLaughlin.

2      MR. MacLAUGHLIN:  Yes.

3                    **REDIRECT EXAMINATION**

4   BY MR. MacLAUGHLIN:

5   Q.  Inspector Kroells, it seems like it's been quite some

6   time since I've spoken to you.

7   A.  Yes, sir.

8   Q.  All right.  So a lot of stuff was just asked of you.

9   I'm not going to touch on all of it by any means.

10      I want to start out at the beginning of the

11   cross-examination.

12   A.  Okay.

13   Q.  There are certainly documents that you come across in

14   searching through something like an e-mail database that say

15   "Privileged" on them, correct?

16   A.  Yes.

17   Q.  And in fact, certain e-mail accounts automatically

18   generate something that says "Privileged"; is that your

19   experience?

20   A.  Yes, it is.

21   Q.  Does the fact that a document says "Privileged" on it

22   always mean that it's really privileged within the meaning

23   of the actual common-law privilege?

24   A.  No, not in my experience.

25   Q.  And is that why when you see "Privileged," you don't

1   necessarily just stop in your tracks.  You actually think a

2   little bit about what you're looking at.

3   A.  Correct.

4   Q.  Okay.  Mr. Wade kind of had a mantra during the first

5   part of his cross.  He kept talking about your standard

6   cautious practice, standard cautious practice.  I want to

7   ask you some questions about that.

8          With respect to the e-mails, particularly the 22

9   e-mails that you printed out in March of 2016, you testified

10  on direct that you did employ your usual vigilance for

11  privileged materials when you printed those out, correct?

12  A.  Yes.

13  Q.  Now, I just want to really put a nail in this.

14         I think I heard you say something on

15  cross-examination like you looked at all privileged

16  documents as long as they had something to do with the

17  fraud, and he was leading and so that's what happens.

18  A.  Okay.

19  Q.  I want to ask you some open-ended questions about that.

20  A.  Okay.

21  Q.  So, for example, if you saw an e-mail between Mr. Adams

22  and one of his lawyers where it looked like it might contain

23  a discussion of the fraud or how to meet the allegations,

24  would you look at that document?

25  A.  Definitely not.

1    Q.  All right.  Your conversations with AUSA Maria about

2    what you could look at when you talked to him about the

3    thumb drive, I think there was some confusion about when

4    that was, but in any event, it was before you actually

5    looked at the thumb drive, right?

6    A.  Yes.

7    Q.  And your concern, correct, was with whether you could

8    look at communications with Apollo, right?

9    A.  Yes.

10   Q.  And employees of Apollo.

11   A.  Yes, that was a specific concern.

12   Q.  And employees of Apollo Gemstone.

13   A.  Yes.

14   Q.  And employees of Private Scio.

15   A.  Yes.

16   Q.  In short, the people -- the Linareses, the people who

17   were at the receiving end of this case, correct?

18   A.  Yes.

19   Q.  And what was his advice?

20   A.  That I could.

21   Q.  Okay.  Now, again, these are words that came from good

22   cross-examination, but I want to front them here.  He said:

23   So you got permission to look at these privileged documents.

24   AUSA Maria said yes, they're privileged, but you could look

25   at them.  Is that what he told you?

```
 1    A.  No.

 2    Q.  He just said -- what was his advice?

 3    A.  That I could look at them.

 4    Q.  That you could look at them.  Okay.

 5            I think you testified on cross that you don't have

 6    a whole lot of knowledge about the waiver in this case, is

 7    that right?

 8    A.  That's correct.

 9    Q.  But you do have a lot of knowledge, do you not, about

10    what happened in the case?

11    A.  Yes.

12    Q.  Okay.

13            MR. MacLAUGHLIN:  Can I get General 1?

14            Your Honor, may I approach the white board again?

15            THE COURT:  Yes.

16    Q.  So I just want to lay out the relationship -- and I'm

17    not the right guy to be doing this.  The right guy to be

18    doing this is sitting over (indicating) here.  But we have

19    Apollo Gemstone, right, AGI, right?

20    A.  Okay.

21    Q.  And that was a company that had investors, true?

22    A.  Yes.

23    Q.  And this is the company that had this apparently cool

24    technology to make diamonds.

25    A.  I think Apollo Diamond is actually the one that had the
```

1    technology and Gemstone was the one that was selling it or

2    marketing it.

3    Q.   Okay.  So there's ADI and AGI, right?

4    A.   Right.

5    Q.   And these two companies went broke, correct?

6    A.   Yes.

7    Q.   I want to ask you a question.  As of the time you went

8    and saw Magistrate Rau, what was the status of these

9    companies?

10   A.   They were out of business.

11   Q.   They were dead letters, correct?

12              THE COURT:  Pause for a moment.

13              MR. WADE:  Your Honor, I think this is going to

14   the kind of legal conclusion that the Government had

15   specifically asked that we not inquire about, and so --

16              THE COURT:  Which legal conclusion is that?

17              MR. WADE:  Maybe counsel for the Government can

18   proffer it to the Court, but I assume he's trying to ask

19   questions about the privilege issue.

20              THE COURT:  So as long as he doesn't ask her her

21   opinion about the facts that he's about to elicit from her

22   that I don't know lead to a vitiation of privilege, I'll

23   allow it.  That's the line I tried to draw with you, was get

24   what facts were necessary to establish -- so that I can

25   determine whether the privilege exists.  If he asks her if

1    this business has gone under, he can do that.  If they

2    received specific information as to the significance of

3    that, they can do that.  I won't encourage asking about does

4    that mean there is no privilege.

5              MR. WADE:  But she's already testified she doesn't

6    know about the waiver, and so we're asking questions about

7    something that she's already offered testimony on, and this

8    is relating to the propriety of the waiver, which is a legal

9    issue that'll be before the Court.  The question -- it

10   doesn't relate to her execution of the warrant since she

11   didn't even know that there was waiver.

12             THE COURT:  Okay.  I will overrule your objection,

13   because I think this line of questions goes to facts that

14   will enable me to determine whether privilege was violated,

15   but I won't give latitude to getting into surmise about the

16   long-term impact on privilege.

17             MR. MacLAUGHLIN:  Very good.

18   BY MR. MacLAUGHLIN:

19   Q.  Let me ask a question that I just heard from the bench.

20             At the time you went to visit Magistrate Rau, had

21   these two companies gone under?

22   A.  Yes.

23   Q.  Did they even have any assets left?

24   A.  No.

25   Q.  Okay.  In 2011 -- again, I'm not a calligrapher -- there

1    was another company called Private Scio that was created,

2    right?

3    A.  Yes.

4    Q.  And that company was created by Mr. Adams right out in

5    the state of Nevada?

6    A.  Mr. Adams and Mr. Monahan, yes.

7    Q.  Okay.  And these companies at some point had assets even

8    though they had failed, essentially, correct?

9    A.  Yes.

10   Q.  And is it correct then that substantially all of the

11   assets of these two companies in 2011 were sold to Private

12   Scio?

13   A.  That was the intent it looked like.  They were trying to

14   sell their assets to Private Scio, but Private Scio wasn't

15   able to raise enough money to pay for that, so that was when

16   Public Scio was created to actually buy all the assets.

17   Q.  Okay.  I don't know how in detail we need to get, but

18   the assets certainly left these companies and they were

19   dead.

20   A.  Yes.

21   Q.  They went over here to Scio, Scio -- Private/Public

22   Scio.  They're over here, right?

23   A.  Yes.

24   Q.  And did this ENLT, these two entities, have any ongoing

25   business concerns or value after that asset sale?

1      A.  No, not to my understanding.

2             THE COURT:  Hang on one second.

3             MR. WADE:  Objection.  Lacks foundation.  And

4      again, this all goes to the determination of whether a

5      privilege remains.  It doesn't have anything to do with her

6      execution of the search warrant.  These are facts --

7             THE COURT:  Overruled.  I need to understand the

8      factual backdrop in order to decide whether it's relevant.

9      We're here one time.  I gave you guys hours.  Let him

10     explore this topic briefly so that I can have the record.

11     And I might decide consistent with your suggestion that it

12     is not relevant to my determination of the reasonableness of

13     the execution of the warrant, but I might not, and I'd

14     rather do it while we've got her on the stand.

15            MR. WADE:  Fair enough, Your Honor.  I would just

16     say there's a lot of evidence that's to the contrary of

17     what's being talked about, and if we end up litigating this

18     issue, the other side should come in as well.  I'm not

19     trying to litigate that right now, but a lot of the

20     statements that are being made are not factually accurate.

21            THE COURT:  Okay.  Thank you.

22            Mr. MacLaughlin, let's keep it short.

23     BY MR. MacLAUGHLIN:

24     Q.  Do you -- this is a yes or no.  Do you or do you not

25     know anything about the June 2016 waiver of the privilege by

1   this entity (indicating) here?

2   A.  I know that there was a waiver in June 2016, or summer

3   of 2016.

4   Q.  Let's nut it right there.

5           So Mr. Wade asked you quite a few questions about

6   the nature of EdAdams@yahoo.com and whether it was a

7   business account or whether it was a private account,

8   correct?

9   A.  Yes.

10  Q.  And you have testified and I think you said in your

11  declaration that it was essentially, as far as you knew, a

12  private e-mail account, right?

13  A.  Right.

14  Q.  You say right in your affidavit that he did business out

15  of that account, didn't you?

16  A.  Yes.

17  Q.  Okay.  Now, Mr. Adams, according to your investigation,

18  is a lawyer, correct?

19  A.  Yes.

20  Q.  He's also other things, isn't he?

21  A.  Yes.

22  Q.  He's got other firms?

23  A.  Yes.

24  Q.  In fact, toward the end of your examination, Mr. Wade

25  was asking you things about, like, ESA.  Isn't ESA actually

1     a consulting company of his?

2     A.  Yes.

3     Q.  And doesn't he have a business involving, what, yogurt

4     or --

5     A.  Yes.  I can't remember the name, Yogurt Lab or something

6     like that.

7     Q.  And he's got an investment banking business?

8     A.  He did, yes.

9     Q.  Okay.  And as the defense has pointed out in its

10    pleadings, a lot of what Mr. Adams did even with respect to

11    these companies wasn't lawyer work, it was functioning as an

12    officer of the company.

13    A.  Correct.

14    Q.  You didn't hide any of that from Judge Rau.

15    A.  No.

16    Q.  Now, he also asked you questions about asserted

17    inactivity in the Ed Adams, Adams Monahan account, the

18    e-mail account associated with the law firm.

19    A.  Yes.

20    Q.  Did you have access to the SEC documents to which our

21    office was granted access?

22    A.  Yes.

23    Q.  And in looking at those documents, did you notice

24    whether or not there was activity in that account?

25    A.  I don't remember specifically.  I know that we had --

1    that we were aware of that account.

2    Q.  You were aware of that account.

3    A.  Yes.

4    Q.  Okay.  One way or the other -- and it doesn't matter if

5    you know, but I want to know if you know -- do you know if

6    in fact that was a dormant account or if there may have been

7    activity in that account?

8    A.  It was my understanding that it was an active account.

9    Q.  Okay.  And your decision to stay away from it was based

10   on what again?

11   A.  Because we thought there would be too much privileged

12   communications in that specific e-mail account and we were

13   trying to be cautious and stay away from as much privileged

14   communications as we could.

15   Q.  Would it surprise you if I told you that during your

16   cross-examination, Mr. Rank looked and saw all kinds of

17   activity in that account in the SEC production?  Would that

18   surprise you?

19   A.  It would not surprise me.

20   Q.  The red underlining on Kroells 2, do you still have that

21   up there?

22          MR. MacLAUGHLIN:  Do you have the red underlined

23   version of Kroells 2?

24          MR. WADE:  And what's good for the goose is good

25   for the gander.  If you'd like to mark that copy as an

1    exhibit for the record, I have no objection.

2             MR. MacLAUGHLIN:  All right.

3             THE COURT:  I'm not sure if we need it or not.

4    Let me take a look at it again.  Thank you.

5             MR. MacLAUGHLIN:  I like the application of the

6    goose-and-gander law.

7    BY MR. MacLAUGHLIN:

8    Q.  Showing you the underlined portion there of Kroells 2,

9    which might become --

10            THE COURT:  I would like -- it doesn't have to

11   happen right now, but I would like this to be marked so I

12   don't lose --

13            MR. WADE:  We should just mark it and hand it up.

14   No problem, Your Honor.

15            THE COURT:  Thank you.

16   BY MR. MacLAUGHLIN:

17   Q.  Showing you Kroells 2 and what will become 2-A, I guess,

18   if I do what I did with Kroells 1, you remember that that's

19   language that's different from our standard premises warrant

20   -- search warrant addendum, correct?

21   A.  Yes.

22   Q.  Based on the totality of your interactions with AUSA

23   Kokkinen, your review of this thing, your recent search of

24   your e-mails that you got from Kokkinen, where do you think

25   that language came from?

1    A.  This actual language in this actual document?

2    Q.  Yes.

3    A.  I think it came from the -- or the actual document

4    itself?

5    Q.  Where did this extra language come from?  Who added it?

6    A.  I would say probably the judge added it --

7              MR. WADE:  Objection.  Lacks foundation.

8    A.  -- because the first one without that language was from

9    the U.S. Attorney's Office.

10             THE COURT:  Okay.  Let's lay some foundation for

11   whether she knows who added it.

12             MR. MacLAUGHLIN:  Okay.

13   BY MR. MacLAUGHLIN:

14   Q.  So you've seen Kroells 1.

15   A.  I have.

16   Q.  And Kroells 1 is our general search warrant addendum

17   that we attach to premises warrants.

18   A.  Right.

19   Q.  And you indeed do have experience with that because

20   you've executed premises warrants before.

21   A.  Yes.

22   Q.  And I think the judge kind of wanted us to stay away

23   from this, but this particular language fits that situation

24   where you're taking something away from somebody and they

25   don't have it anymore, right?

1    A.  Yes.

2    Q.  Okay.  Did you look in your e-mails from

3    Mr. Kokkinen -- let me back up and ask this:

4         Did Mr. Kokkinen send you a final package to bring

5    to Magistrate Judge Mayeron?

6    A.  He did.

7    Q.  And did you review that final package preparatory to

8    your testimony here?

9    A.  I did.

10   Q.  Did you specifically check it for this addendum?

11   A.  I did.

12   Q.  And was it in there?

13   A.  No.

14   Q.  When you walked out of Magistrate Mayeron's office after

15   you signed the warrant, did you -- was this part of what you

16   had in your hand?

17   A.  Yes.

18   Q.  And is this language in red nowhere to be found in

19   Kroells 1?

20   A.  Correct.

21   Q.  I mean, I'm kind of making an argument, I guess, but

22   based on all of that, where did this language come from?

23        MR. WADE:  Objection.  Lacks foundation.  She

24   doesn't know.

25        THE COURT:  She knows where it didn't come from,

1    which is the U.S. Attorney's Office.  The record is clear

2    that she didn't -- or as clear as we can get -- that it

3    wasn't provided by the Government and wasn't in the packet

4    taken to the judge, but it was in the package that was

5    brought out of the judge's chambers, right?

6             Okay.  I don't need her to answer that question.

7             MR. MacLAUGHLIN:  Okay.  Very good.

8    BY MR. MacLAUGHLIN:

9    Q.  Now, there were a series of questions asked of you on

10   cross about you knew Mr. Adams was a lawyer, right?

11   A.  Yes.

12   Q.  You knew Mr. Monahan was a lawyer.

13   A.  Yes.

14   Q.  Apparently Mr. Maddox is a lawyer.

15   A.  Yes.

16   Q.  Mr. Mumm is a lawyer.

17   A.  Yes.

18   Q.  There's a Sankowitz.  He's a lawyer.

19   A.  Yes.

20   Q.  And these lawyers apparently employ assistants, people

21   like Sandy Ward and Josh Riley, right?

22   A.  Yes.

23   Q.  Okay.  In your experience, are you allowed to

24   investigate lawyers when they themselves commit crimes?

25   A.  Yes.

1    Q.  Is there anything about one's holding of a bar ticket

2    that prevents you from conducting searches to find out what

3    lawyers are saying to themselves or to other people to

4    commit a crime?

5    A.  No.

6    Q.  I want to talk about the 22 e-mails.

7    A.  Okay.

8    Q.  Mr. Wade properly asked you if you remembered what the

9    search terms that you used were to generate those e-mails,

10   right?

11   A.  Yes.

12   Q.  And unfortunately, you know, we have all kinds of search

13   terms in the case that we've provided, but they're all from

14   Relativity.

15   A.  Yes.

16   Q.  And you did the searching of the thumb drive before the

17   documents were loaded into Relativity.

18   A.  Yes.

19   Q.  Okay.  So let me ask you not what the search terms that

20   you used were, but were the search terms you used, as far as

21   you can recollect and in your experience, the same kind of

22   search terms that we see that you used when you got the

23   database back in Relativity?

24   A.  They would have been similar, yes.

25   Q.  Do you remember anything unusual outside of your normal

1    searching protocols that are reflected in all of the data

2    we've turned over that were different in your searching for

3    these 22?

4    A.  No.

5    Q.  Now, he asked you and I think you've acknowledged that

6    on the thumb drive you saw documents that were outside of

7    the scope of the warrant.

8    A.  Yes.

9    Q.  Now, a good deal of Mr. Wade's cross-examination of you

10   dealt with the fact -- and I think it is a fact -- that you

11   weren't actively seeking to screen out irrelevant documents,

12   right?

13   A.  Right.

14   Q.  Okay.  It's like the MPIRG negative check-off, right?

15   Instead of approaching this project by we want to identify

16   what's not relevant and pull it out -- and I think this has

17   been answered during this hearing many times, but let's

18   answer it again -- what was your approach?

19   A.  My approach was to try to find documents that were

20   relevant and pull those out.

21   Q.  Okay.  So there's two ways to skin a cat and one of them

22   is more efficient than the other, right?

23   A.  Right.

24   Q.  Okay.  So Mr. Wade asked you at the end, in March,

25   April of 2017, we've seen the e-mail from Mr. Maria where

1    there's the final relevance terms that he lays out, right?

2    A.  Yes.

3    Q.  It's that February 28th letter --

4    A.  Okay.

5    Q.  -- okay?  And Mr. Wade asked you on cross were you

6    involved in putting those terms together, and I think you

7    answered the question no.

8    A.  I don't remember.

9    Q.  Okay.  You don't remember.  Okay.  Fair enough, but I

10   want to ask you this question:

11           That was the *coup de gras*, right?  That final

12   relevant search was the result of the collective work of

13   your prosecution team that had been going on since May 4th

14   of 2016, right?

15   A.  The concept of it --

16           MR. WADE:  Objection.  Lacks foundation.  She's

17   testified essentially she had no involvement in that search,

18   in the preparation of that search.

19           THE COURT:  The testimony is that she doesn't

20   remember how it came to be.  I'm not going to let us go

21   further down as to what might have been.

22   Q.  Okay.  But I want to be specific about what you do and

23   don't remember, because this is important.

24           My understanding of your testimony on cross is

25   that you don't specifically remember on February 28th of

1    2016, when David Maria put that letter together saying

2    search for these documents, you don't remember being

3    involved in that.

4    A.  That's correct.

5             MR. WADE:  I'd object to the form of these

6    questions in light of how it's recharacterizing the

7    testimony that was offered on cross.

8             THE COURT:  Overruled so far.

9    Q.  Okay.  Here's my question, though:

10            Even if you weren't involved in putting that

11   letter together --

12   A.  Right.

13   Q.  Even if you weren't involved in the actual formal

14   process of putting pen to paper to get it to our ALS people,

15   in general, you were involved in searching this database,

16   right?

17   A.  Yes.

18   Q.  When you found things that were relevant, did you bring

19   them to the attention of the prosecution team?

20   A.  Of course.

21   Q.  And did you bring them to Mr. Maria's attention?

22   A.  Yes, I did.

23   Q.  Did you bring them to Special Agent Khan's attention?

24   A.  Yes.

25   Q.  Belich's attention?

1     A.  Yes.

2     Q.  So there is a group of people learning together here,

3     right?

4     A.  Right.

5     Q.  And at the end of the day, even if you weren't involved

6     in it, that letter, that e-mail that David Maria sent for

7     the final relevant violence culling, does that not represent

8     the collective wisdom of the group based on your --

9                 THE COURT:  Sustained.

10                MR. MacLAUGHLIN:  What?

11                THE COURT:  You can stop at that question.

12    Everything else was fine.  Now asking her to opine what it

13    must have been goes beyond her knowledge.

14                MR. MacLAUGHLIN:  Okay.

15                THE COURT:  You can make that argument based on

16    the record you've developed.  It's the

17    asking-one-question-too-many problem.

18                MR. MacLAUGHLIN:  Okay.  Right.

19    BY MR. MacLAUGHLIN:

20    Q.  A lot of input went into that letter from the

21    prosecution team.

22                MR. WADE:  Objection.

23                THE COURT:  Let's move on.  I think the record is

24    pretty developed on this point.

25                MR. MacLAUGHLIN:  Okay.

1    BY MR. MacLAUGHLIN:

2    Q.  Now, during your cross-examination, Mr. Wade mentioned

3    that he wants a log of the e-mails that were shown to

4    witnesses.  Do you remember that?

5    A.  I do.

6    Q.  And I don't remember what you know about this or not,

7    but are you aware that the e-mails that were shown to

8    witnesses, that we've agreed to turn those over and we've

9    already turned some of them over?

10   A.  I don't know.

11   Q.  Okay.  I'll stay away from that then.

12          MR. WADE:  Your Honor, just to be clear, I was

13   asking -- what we talked about was a log of the interviews

14   that were occurred --

15          THE COURT:  So that you can infer the searches

16   that might have been done.

17          MR. WADE:  Yes.

18          MR. MacLAUGHLIN:  I think that's outside her area

19   of knowledge.  We can address that separately.

20          THE COURT:  Okay.

21   BY MR. MacLAUGHLIN:

22   Q.  Straight up:  After you gave the thumb drive to Special

23   Agent Khan, did you do any more searching on this thumb

24   drive?

25   A.  As soon as AUSA Maria told us that there needed to be a

1   heightened filtered process, no, I did not do any more

2   searching.

3   Q.  Okay.  Let's talk a little bit about Mr. Hopeman and

4   this Arnstein firm that were the subject matters of your

5   e-mail about, hey, I'm seeing extra stuff, okay?

6   A.  Okay.

7   Q.  You swore this thing out on January 8th of 2016 in front

8   of Magistrate Judge Rau.

9   A.  January 7th, I believe.

10  Q.  January 7th of 2016.  Okay.  So were you expecting any

11  e-mails to be produced by Yahoo! after that date?

12  A.  No.

13  Q.  Okay.  And it was brought out on cross, I think

14  accurately, that you as part of the prosecution team met

15  with Mr. Hopeman in March of 2016?

16  A.  That's correct.

17  Q.  Did you have any reason to know or to believe that he

18  had been involved in representing Mr. Adams during the

19  period of time when Yahoo! was required to cough up these

20  e-mails?

21  A.  At that time, no.

22  Q.  Same question with respect to Mr. Petrosinelli.

23  A.  I don't know.  I don't know when -- was he the SEC

24  attorney for Mr. Adams?

25  Q.  Yeah.

1    A.  If it was, then I don't know when that started.

2    Q.  All right.  Now, there was a line of questions that

3    Mr. Wade asked you about the focus of your affidavit

4    compared to what ended up in the indictment, and I think for

5    the most part the judge is going to look at that as a matter

6    of law, okay?

7    A.  Okay.

8    Q.  But I want to ask you the question:

9          So the main focus of your affidavit, or one of the

10   main focuses of your affidavit was the transaction when the

11   assets were sold to Private Scio, correct?

12   A.  Correct.

13   Q.  But your affidavit talks at length, does it not, about

14   Apollo?  I mean, it talks at least some about Apollo

15   Diamond?

16   A.  It does.

17          MR. WADE:  Your Honor --

18          THE COURT:  I'm going to apply the

19   goose-and-gander rule here.  I can read the differences

20   between the affidavit and the indictment.  If there are

21   things that are in one or the other that factually I don't

22   understand, those would be perfect for this line of

23   questioning, but the comparing of side by side is something

24   I'm going to do.

25   Q.  Let me focus on that then.

1          So in a fraud case, including the fraud case that

2     you described in your affidavit --

3     A.  Yes.

4     Q.  -- is one of the elements you have to prove and

5     investigate an attempt to defraud?

6     A.  Yes.

7     Q.  And so if mistakes were made accidentally, innocently,

8     that's not a violation of 1341 or 1343, correct?

9     A.  That's my understanding.

10    Q.  And so your affidavit says that this --

11          MR. WADE:  Your Honor, goose/gander.  This doesn't

12    relate to facts.  He's asking about elements in an offense.

13          THE COURT:  Sustained.

14    Q.  Okay.  Did it turn out in your investigation, though,

15    that what happened with Apollo Diamond, what happened with

16    Apollo Gemstone, provided context for and motivation for

17    what you described in your affidavit with respect to Private

18    Scio?

19    A.  Most definitely.  It was all related.

20    Q.  Okay.  Moreover, in your -- in the attachment that we've

21    been looking at -- and I'm going to direct your attention to

22    DX 8, page 78 and 79, Magistrate Rau authorized you to go

23    all the way back to 2006 in looking for evidence, correct?

24    A.  That's correct.

25    Q.  And notwithstanding the fact that the Private Scio

1   transaction happened in 2011.

2   A.  Correct.

3   Q.  And in support of that, you provided him with

4   information about things that had been going on for years

5   with all of these entities.

6   A.  Correct.

7   Q.  And so my question is:

8          In executing this warrant, did you look for

9   anything other than evidence of mail and wire fraud

10  occurring on or after October 25th, 2016 and involving

11  Mr. Adams?

12  A.  No, I did not.

13  Q.  One other question about that document.

14         Did you ask for and did Mr. -- and did Judge Rau

15  provide you with permission -- and I'm going back now to

16  page 88.  Did he authorize you to grab tax records of ADI,

17  ADGC, Private Scio, Public Scio, and an entity called Focus?

18  A.  Page 78, and yes.

19  Q.  So even though you didn't talk about a Title 26 offense

20  in your affidavit, the -- Section 2 of Part B authorized you

21  to grab tax records and financial documents showing income

22  of these entities for the fiscal years it was in existence.

23  A.  Yes.

24         MR. WADE:  Your Honor, I'd move to strike that

25  last answer.  To the extent that she's offering the opinion

1    as to whether something's covered by the warrant, I think at

2    side bar we came to the view that that's not appropriate.

3                THE COURT:  I'm going to overrule that, because

4    it's my understanding the testimony she gave, that she was

5    saying what the warrant stated, which is sort of

6    unnecessary, but not an opinion as to whether it is covered

7    or not.

8                MR. WADE:  So she just read a portion of the

9    warrant?

10               THE COURT:  That's the way I understand.

11               MR. WADE:  No objection to her reading the

12   warrant, Your Honor.

13               MR. MacLAUGHLIN:  I have nothing else.

14               THE COURT:  Thank you.

15               Recross?

16               MR. WADE:  Your Honor, I will be very brief.

17               For the Court's benefit, I won't ask the

18   witness -- I won't delve into a sublitigation of the lower

19   half of the grease board.

20               I will just note for the Court's attention that

21   the asset purchase agreements, not the merger agreements, of

22   the relevant entities are marked at DX 55 and DX 56, and so

23   those are before the Court.

24

25

1              **RECROSS-EXAMINATION**

2     BY MR. WADE:

3     Q.  Inspector Kroells, you were aware that Mr. Adams and

4     counsel for Mr. Adams were asserting privileges on behalf of

5     Apollo and Scio entities in the spring of 2016, correct?

6     A.  I don't recall whether I was aware of that or not.

7     Q.  Could you turn to DX 65.  This is a letter from

8     Mr. Hopeman, correct?

9     A.  It appears to be, yes.

10    Q.  And it attaches a privilege log, correct?

11    A.  It looks like it.

12    Q.  And the privilege log asserts privileges on behalf of

13    the Apollo companies and on behalf of the Scio companies,

14    correct?

15    A.  I don't know.  I don't understand what this all means,

16    the privilege log and all that.

17    Q.  When you look at Bates label DSM 743, do you see the

18    name Apollo Diamond?

19              THE COURT:  Pause, please.  Yes.

20              MR. MacLAUGHLIN:  May I just briefly voir dire the

21    witness?  Three questions?

22              THE COURT:  Why don't -- no.

23              MR. MacLAUGHLIN:  Okay.

24              THE COURT:  Why don't you ask her if she's aware

25    of the information contained in this letter, because if

1    she's not, I'm not going to have her read it out loud.

2              MR. WADE:  Fair point.

3    BY MR. WADE:

4    Q.  Were you advised in May of 2016 by AUSA Maria that

5    privileges were being asserted on behalf of Apollo?

6    A.  I don't recall.

7    Q.  We talked about your knowledge of the SEC files as well.

8    Do you recall that?

9    A.  Yes.

10   Q.  Okay.  Could you go to DX 62.  This is a letter -- I'll

11   just represent -- do you recall whether you saw this letter?

12   A.  I don't recall this letter.

13   Q.  Okay.  Do you recall learning or being told that counsel

14   for Mr. Adams was asserting legal privileges on behalf of

15   Apollo and Scio companies in 2015?

16   A.  I don't recall that, no.

17   Q.  Okay.  Did you read Mr. Adams' SEC testimony?  I believe

18   you testified that you did, correct?

19   A.  I did.  If it's in there, I don't remember reading that

20   part.

21   Q.  Are you aware that there were several instances within

22   that testimony in which Mr. Adams didn't answer questions

23   because they called for privileged information relating to

24   Apollo and Scio companies?

25   A.  I don't remember.

1    Q.  You don't remember reading that?

2    A.  I'm not saying it's not there.  I just don't remember as

3    I sit here today.  There was two depositions and they're

4    quite lengthy.

5            MR. WADE:  I have no further questions, Your

6    Honor.

7            THE COURT:  Thank you.  I have a couple questions.

8                    **E X A M I N A T I O N**

9    BY THE COURT:

10   Q.  In your review of documents throughout this time, did

11   you see use of ESA not referring to the business?

12   A.  Not referring to what business?

13   Q.  So -- I'm sorry.  It's my understanding that ESA is a

14   consulting company.

15   A.  Yes.

16   Q.  And the initials are also, we believe, Mr. Adams'

17   initials.

18   A.  Yes.

19   Q.  Did you see ESA used as personal initials in personal

20   correspondence and as a way of signing off on things or

21   otherwise referring to himself, not the business?

22   A.  I don't remember that.  I don't remember if I did or I

23   didn't.

24   Q.  How about MSM?

25   A.  MRM, Mr. Monahan's initials?

1    Q.  I'm sorry.  Yes.

2    A.  I don't remember if I saw him signing off using those

3    initials in e-mails or not.

4    Q.  Is MRM a business?

5    A.  MRM Consulting is a business.  Both companies received

6    funds from the Apollo/Scio companies.

7    Q.  You indicate that you encountered -- this is way back

8    when, so I apologize, but that you encountered documents

9    that were potentially outside the scope of the warrant.  You

10   would pull the documents if they were relevant, but if they

11   weren't relevant, you would move on and you would note them

12   so that you could tell them to the AUSA about maybe not

13   being relevant.  Is that generally right in your careful

14   practice?

15   A.  So if there's something outside of the warrant, I was

16   not interested in that.  I was trying to find documents

17   within the scope of the warrant.  And if it's something that

18   I think is relevant to the warrant and to the fraud scheme,

19   that I would pull out.  Does that answer your question?

20   Q.  I thought that you testified that you would provide

21   information to the prosecutor -- and this is not with

22   respect to privilege, but relevance -- for documents that

23   you thought might not be relevant.

24   A.  I remember having a conversation regarding the fact that

25   I was seeing potentially irrelevant e-mails within the

1    e-mail database.  I don't remember specifics.  I think that

2    I kind of wrote myself a list to try to stay away from those

3    companies when I was reviewing e-mails.

4    Q.  And this was exactly my question.  Do you believe that

5    the list, if you remember, which you probably don't, was

6    based on document number or just categories, like broad

7    strokes?

8    A.  Just broad strokes.

9    Q.  You're unaware of what records may or may not have been

10   kept by the Mozilla application on the computer.

11   A.  Correct.  After AUSA Maria told me to stop reviewing any

12   e-mails, I didn't even look in that computer again, or in

13   that application.

14   Q.  After the final cull was made and the documents were

15   reduced to 42,000-something, you accessed the database only

16   three more times?

17   A.  It looks like that, yes.

18   Q.  So most of your review of this database was done prior

19   to the cull.

20   A.  Yes.

21   Q.  Are you aware of when Mr. Hopeman began representing

22   Mr. Adams?

23   A.  I'm trying to think.

24   Q.  If not, that's okay.

25   A.  I don't remember a specific date.

1    Q.  Do you remember whether you understood that Mr. Hopeman

2    represented Mr. Adams during the time frame covered by the

3    warrant?

4    A.  You know, I don't know that he did because I don't know

5    that Mr. Adams would have been aware of the criminal

6    investigation at that time.

7    Q.  Okay.

8              THE COURT:  Those are my questions.

9              I'll start with you, Mr. Wade.  Any questions

10   you'd like to ask created by my opening of doors?

11             MR. WADE:  No, Your Honor.

12             THE COURT:  Okay.  Mr. MacLaughlin?

13             MR. MacLAUGHLIN:  No, Your Honor.

14             THE COURT:  Okay.  Can I call it?  We are at an

15   end.  You may step down.  Thank you.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  It is ten after 4:00.  Let's think

18   about next steps.  I think we have three more witnesses.

19             Do we need a break, Tim?

20        (Discussion off the record between the Court and the

21   court reporter)

22             THE COURT:  Okay.  We're going to go off the

23   record.

24        (Recess taken at 4:10 p.m.)

25                   *     *     *     *

```
 1        (4:17 p.m.)

 2                        IN OPEN COURT

 3      (Defendant present at podium with counsel)

 4          THE COURT:   All right.   We are back on the record

 5      for the continuation of our motion hearing, but before we

 6      move further with testimony, we are going to do the

 7      arraignment for Mr. Adams on the superseding indictment.

 8          Mr. Adams, a superseding indictment has been

 9      returned against you by the grand jury.   Have you received a

10      copy of that indictment?

11          THE DEFENDANT:   I have.

12          THE COURT:   Would you like me to read it out loud

13      to you, or do you waive the reading of the indictment?

14          THE DEFENDANT:   I waive the reading of the

15      indictment.

16          THE COURT:   Okay.   And how do you plead to the

17      charges against you in the superseding indictment?

18          THE DEFENDANT:   Not guilty.

19          THE COURT:   Not guilty pleas will be entered on

20      your behalf as to all of the allegations in the superseding

21      indictment.   I do not yet have a schedule for next steps.

22      Usually an arraignment triggers some new deadlines related

23      to the filing of motions.   I think that that's one of the

24      things we're going to discuss tomorrow at the conclusion of

25      testimony is what would be an appropriate next-step
```

```
 1    schedule, so you'll get those dates once we nail those down.

 2              Mr. MacLaughlin, anything further with respect to

 3    the arraignment?

 4              MR. MacLAUGHLIN:  No, Your Honor.  Thank you.

 5              THE COURT:  Anything in your estimation, sir, on

 6    behalf of Mr. Adams?

 7              MR. WADE:  No, Your Honor.  Thank you.

 8              THE COURT:  Okay.  Thank you, sir.  You can be

 9    seated.

10              All right.  On that note, I think we're going to

11    take witnesses slightly out of order so we can accommodate a

12    travel schedule.  If the Government could call its next

13    witness, please.

14              MR. MacLAUGHLIN:  At this time the United States

15    calls Brandon Belich.

16              THE COURT:  Come on up, sir.

17        BRANDON BELICH, GOVERNMENT'S WITNESS, SWORN

18              THE COURT:  Thank you.  You can be seated.

19              Please state your full name and spell your last

20    name for the record, sir.

21              THE WITNESS:  Brandon Belich, B-E-L-I-C-H.

22              THE COURT:  You can proceed, Mr. MacLaughlin.

23              Are you ready over there?  Okay.

24              Go ahead, Mr. MacLaughlin.

25              MR. MacLAUGHLIN:  Thank you.
```

1              **DIRECT EXAMINATION**

2     BY MR. MacLAUGHLIN:

3     Q.  So we're going to try to get through this quickly.

4              Mr. Belich, you are presently a Deputy United

5     States Marshal, correct?

6     A.  That's correct.

7     Q.  But for a period of time you were a Special Agent with

8     the Internal Revenue Service Criminal Investigation

9     Division.

10    A.  Correct.

11    Q.  What years did you have that job?

12    A.  From 2003 through February of 2017.

13    Q.  So 13-plus years.

14    A.  Yes, sir.

15    Q.  And your last duty station was up in Duluth, Minnesota,

16    correct?

17    A.  Correct.

18    Q.  All right.  In the course of your 13-plus years as a

19    Special Agent with the IRS, did you have experience

20    executing search warrants?

21    A.  Yes, I did.

22    Q.  Have you executed premises warrants?

23    A.  Yes.

24    Q.  And have you executed or been involved in the execution

25    of e-mail search warrants?

1    A.  Yes, I have.

2    Q.  At some point were you brought into this case?

3    A.  Yes, I was.

4    Q.  And when were you brought in?

5    A.  I believe it was in the summer of 2014.

6    Q.  And why were you brought in?

7    A.  I was called by the U.S. Attorney's Office to assist

8    with the investigation.

9    Q.  Okay.  Generally, you were investigating matters under

10   Title 26, correct?

11   A.  Correct, as well as Title 18 violations as well.

12   Q.  Okay.  So let's just put a little emphasis on that.

13           Your agency has jurisdiction to investigate money

14   laundering, correct?

15   A.  Correct.

16   Q.  So that would be Section 1956, concealment and promotion

17   money laundering?

18   A.  Yes.

19   Q.  1957, engaging in monetary transactions in criminally

20   derived property?

21   A.  Correct.

22   Q.  All right.  And so is it usual or unusual for you to get

23   involved in a fraud case?

24   A.  Very common.

25   Q.  Okay.  Now, in this particular case, at the end of 2015

1    or in early 2016, a search warrant was obtained by your

2    prosecution team for two e-mails of Mr. Adams', is that

3    correct?

4    A.  That's correct.

5    Q.  My first question is:  What was the nature of those

6    accounts?  What kind of e-mail accounts were they?

7    A.  They were personal e-mail accounts.

8    Q.  Were you aware as a member of the prosecution team that

9    there was also an e-mail account that Mr. Adams had in

10   connection with his law firm, a firm called Adams Monahan,

11   LLC?

12   A.  Yes.

13   Q.  Were you involved in discussions or a witness to

14   discussions about why you didn't go and do a search warrant

15   for that Adams Monahan, LLC e-mail account?

16   A.  I don't recall specific discussions as to why we did or

17   didn't -- you know, or why we didn't include the law firm

18   e-mail accounts, but I'm sure I would have been possibly

19   present at some meetings in which we discussed that.

20   Q.  You don't remember what was said about that topic.

21   A.  I don't specifically recall that, no.

22   Q.  Okay.  Now, when you were trained as a Special Agent,

23   you do that at a place called FLETC, right?

24   A.  Correct.

25   Q.  And that stands for Federal Law Enforcement Training

1    Center, and it's in Georgia.

2    A.  Correct.

3    Q.  There or elsewhere, did you get any training, or from

4    our office, for that matter, about how to spot

5    attorney-client privilege communications?

6    A.  Yes.

7    Q.  Tell us about that training.

8    A.  Received training at the Federal Law Enforcement

9    Training Center, and, yeah, they educate us as to what the

10   attorney-client privilege is and to know that -- what to

11   watch for as far as communications, correspondence that may

12   be with attorneys.

13   Q.  Okay.  So how do you spot -- in your experience as an

14   agent, how do you spot documents that might be privileged?

15   A.  Quite often it would be just looking at the letterhead

16   of a letter or of an envelope.  You know, usually law firms

17   are unique in the way they're titled.

18   Q.  And if you see something, for example, an e-mail that

19   was seized pursuant to warrant, if you see something that

20   you think might be privileged, tell the Court what your

21   procedure is.

22   A.  I would immediately stop reviewing it, set it aside and

23   notify -- if a taint team has been identified, I would

24   notify the member of the taint team or notify the

25   prosecutor, the AUSA assigned to the case, and immediately

1    stop -- you know, cease reviewing it or cease looking at it.

2    Q.  Now, in this particular case, did you ever have

3    possession of the thumb drive?  We've been talking a lot

4    about a thumb drive that came in on March 7th of 2016.  You

5    didn't have access to that, right?

6    A.  No, I did not.

7    Q.  Did you ever touch it?

8    A.  Not that I know of.

9    Q.  Okay.  So is it fair to say then that the first time you

10   had access to anything that came in from Yahoo! was in May

11   of 2016 when for the first time that database was made

12   available to the prosecution team?

13   A.  That would have been the earliest date, and at that

14   point I don't think I had my remote access available, so it

15   would have been -- I'm not exactly sure if it would have

16   been a month or so after that when I was finally able to

17   access it.

18   Q.  Okay.  Now, the e-mails were loaded into a program

19   called Relativity, correct?

20   A.  Correct.

21   Q.  You were up in Duluth?

22   A.  Correct.

23   Q.  How did that program function for you up there?

24   A.  The connection issues that I had were very poor, so I

25   wasn't able to review.  I think when I tried to pull up an

1    e-mail, it actually took like three to five minutes just for

2    an e-mail to pop up on the screen.  And so if I were to try

3    and click down and look through an inbox, it would take five

4    minutes for each one to open up.

5           THE COURT:  That would be maddening.

6           THE WITNESS:  Mm-hm, it would.

7    Q.  And the maddening quality of it is reflected in

8    Belich 1, and I'm hoping it's in front of you, but it might

9    not be.  Do you have a document up there called Belich 1?

10          MR. MacLAUGHLIN:  And if not, may I approach?

11   A.  I do.

12   Q.  You do.  Okay.  So when you were doing -- when you

13   accessed Relativity, did you know that whatever you did in

14   Relativity was logged and could be recalled later what you

15   did?

16   A.  Yes.

17   Q.  So it looks like you only searched for one thing and

18   that's "Rothman."  Is that the only search you conducted in

19   this database?

20   A.  That I can recall, yes.

21   Q.  Okay.  And who's Rothman?  What is Rothman?

22   A.  There were two investors with the last name Rothman.  I

23   can't recall if they were brothers or cousins.  And I

24   interviewed both of them I think in approximately July of

25   2016.  So I'm sure in connection with me interviewing the

1    witnesses I conducted a search looking for what e-mails

2    might have involved them.

3    Q.  Okay.  Now, we've been doing a lot of talking about the

4    warrant in this case and the attachment to the warrant.  Did

5    you look at the search warrant when it was issued?

6    A.  Yes.

7    Q.  Okay.  And you knew it had an attachment to it,

8    Attachment B?

9    A.  Yes.

10   Q.  And did you read Attachment B before you started looking

11   around in this e-mail database?

12   A.  Yes, I would have reviewed that.

13   Q.  Was this search for Rothman intended to identify

14   documents that were within the scope of Section 2 of

15   Attachment B to the warrant?

16   A.  Yes.

17   Q.  All right.  Now, when you first got involved in the

18   case -- give me the date again.  When did you sign up for

19   the case, if "signing up" is the right term?

20   A.  I believe it was in the -- maybe August or September of

21   2014, I believe.

22   Q.  So that's long before the search warrant was even

23   executed.

24   A.  Yes.

25   Q.  What did you understand -- I'm going to approach this

1    board over here.

2              MR. MacLAUGHLIN:  If that's okay, Your Honor?

3              THE COURT:  Yes, of course.

4    Q.  So the thumb drive comes in on March 7th and you don't

5    touch the thumb drive, right?

6    A.  Correct.

7    Q.  You get access to it in early May of 2016.

8    A.  Either then or later.

9    Q.  What was your understanding about what was going during

10   the period of time between when that thumb drive came in and

11   when you were granted access to it?

12   A.  The U.S. Attorney's Office set up a process of doing a

13   mechanical filtering to search for correspondence, any

14   potential correspondence with law firms, anything that may

15   be potentially privileged, so I think we set it up with some

16   of the law firms I think that we were aware of that were

17   involved in other civil actions with Mr. Adams.  So it was

18   to identify any of that correspondence and remove it from

19   what we would have.

20   Q.  Okay.  So I'm inferring from that answer that you and

21   the prosecution team were aware of other matters related to

22   facts that give rise to the indictment.

23   A.  That's correct.

24   Q.  Were you aware of the SEC investigation?

25   A.  Yes.

1    Q.  And some other lawsuits brought by angry investors.

2    A.  Yes.

3    Q.  I'd like to -- do you have Kroells 3 up there?  Did she

4    leave her exhibits?

5    A.  Yes, I do.

6    Q.  So let's just quickly glance at Kroells 3.  This is an

7    e-mail from David Maria dated April 27th of 2016 and you're

8    on it, correct?

9    A.  That's correct.

10   Q.  And this is just before the database was made available

11   in early May of 2016.

12   A.  That's correct.

13   Q.  And David Maria writes:

14          We have run search terms on the e-mail database to

15   segregate potentially privileged documents and we're still

16   working on that.  Does everybody have access to Relativity?

17          What did this e-mail tell you?

18   A.  That they ran the mechanical filtering process that I

19   was describing in an attempt to segregate potentially

20   privileged documents.

21   Q.  Okay.  Now, was the mind -- was your -- forget about

22   mindset.  We're going to skip mindset.

23          The discussions between members of the prosecution

24   team, was that discussion that we ran the filter terms so we

25   got nothing to worry about?

1    A.  No, absolutely not.  We would still proceed with your

2    normal amount of caution on making sure if you do come

3    across anything that looks like it may be potentially

4    attorney-client privilege, that you would take the normal

5    precautions in setting that aside and notifying the

6    prosecutor.

7    Q.  Let me show you the second page then of Kroells 3, and

8    at the bottom there's an e-mail:  "To All."

9            Do you see that?

10   A.  Yes.

11   Q.  Were you one of the members of the "all"?  Did you get

12   this e-mail?

13   A.  Yes, I did.

14   Q.  And here he says:  The e-mail database is up and ready

15   for review in Relativity.

16           That's the database we've been talking about?

17   A.  Yes.

18   Q.  Per our searches, the potentially privileged docs have

19   been pulled and stored in a separate database which should

20   not show up on your Relativity screens.

21           Was that your understanding?

22   A.  That's correct.

23   Q.  And he says:

24           That being said, if you identify other law firms

25   or lawyers in your review of the database with whom any of

1    our folks appear to have an attorney-client relationship,

2    make sure to flag them.

3             My question is:  As you went forward, did you

4    follow this advice?

5    A.  Yes, absolutely.

6    Q.  Even though you did very minimal searching.

7    A.  Correct.

8    Q.  And were you aware, Dep. Marshal Belich, that in fact

9    Christi Kroells, Christine Kroells, did spot some additional

10   attorney-client communications that weren't picked up by the

11   filtering process?

12   A.  Yes.

13   Q.  And just directing your attention to Kroells 5, is this

14   her e-mail -- you're on it -- to David Maria explaining that

15   there appear to be additional privileged hits in the

16   database?

17   A.  Yes, that's correct.

18   Q.  Okay.  And "Felhaber" is one of the additional search

19   terms proposed here, correct?

20   A.  Yes.

21   Q.  Do you happen to remember when Jon Hopeman came on board

22   in this case?

23   A.  I do.

24   Q.  When was that?  Do you know when he came on board?

25   A.  I don't know.

1    Q.  Now, as a result of your not having any good access to

2    the Relativity database, you have reported in your

3    declaration that you actually received some of the

4    underlying Yahoo! e-mails from other members of the

5    prosecution team, right?

6    A.  Correct.  There was two case agents that were working in

7    the metro that had more access.

8    Q.  And in the last week or so, I've asked you to take a

9    good hard look and figure out what e-mails those were.

10   A.  Correct.

11   Q.  And did you do that?

12   A.  Yes.

13   Q.  And who were they actually from?

14   A.  I received e-mails from both Christi Kroells, as well as

15   from David Maria.

16   Q.  And did you package up those e-mails and send them to

17   the leader of the taint team, Ann Bildtsen?

18   A.  Yes, I did.

19   Q.  Did you do that electronically and by snail mail?

20   A.  Yes.

21              MR. MacLAUGHLIN:  May I have a moment, Your Honor?

22              THE COURT:  Yes.

23              (Government counsel confer)

24              MR. MacLAUGHLIN:  I do have some additional

25   questions.

1    BY MR. MacLAUGHLIN:

2    Q.  So when you first got involved in this case in 2014, I

3    want to direct your attention back to your first

4    involvement.

5            What were you going to develop in the case?  What

6    was your initial role in terms of developing charges?

7    A.  As far as what types of charges we were focused on?

8    Q.  Yes.

9    A.  As the IRS agent, I guess my charge that I would have

10   been bringing to the table would have been a money

11   laundering charge.  At that point that was the focus.  We

12   were focused on the fraud aspect of the case.

13   Q.  Okay.

14   A.  Usually when we do get involved in cases like that,

15   we're still aware of the potential for tax charges.  If we

16   see that evidence supports that, then we would pursue that

17   down the road.

18   Q.  But in this particular case when you got involved

19   initially, it was to develop money laundering charges

20   arising out of the fraud, is that fair?

21   A.  Correct, yes.

22   Q.  And as I understand it, quite a bit of time went by when

23   you were working on solely on Title 18 offenses here, is

24   that true?

25   A.  That's true.

1    Q.  Do you remember, do you have a time frame for when this

2    matter became a tax matter or when the prosecution team

3    decided to look at tax charges?

4    A.  It was submitted to DOJ Tax in the fall of 2016.

5    Q.  Okay.  So let's talk just a little bit about that,

6    because Judge Menendez might know about this and might not.

7            Whereas, the United States Attorney's Office can

8    initiate an investigation under Title 18 on its own

9    authority, is that true of tax offenses?

10   A.  No.  You need approval -- from my understanding, you

11   need approval from DOJ Tax.

12   Q.  Okay.  So DOJ Tax in Washington, D.C., exercises very

13   careful control over when and under what circumstances we

14   can investigate or charge Title 26 offenses, correct?

15   A.  Correct.

16   Q.  In this particular case, you said that DOJ weighed in

17   and granted permission to conduct a grand jury tax

18   investigation in the fall of 2016, is that correct?

19   A.  That's correct.

20   Q.  My colleague Mr. Rank has given me a note that says that

21   that permission -- that the grand jury request to DOJ --

22   which would have come from our office, correct?

23   A.  Correct.

24   Q.  You write a letter and we sign and send it out

25   essentially is what happens, right?

```
1    A.  Correct.

2    Q.  That letter went out there on November 8th of 2016,

3    correct?

4    A.  Correct.

5            THE COURT:  Just pause.

6            MS. MAIER:  Your Honor, he's testifying now about

7    documents that have not been provided to defense counsel in

8    connection with this hearing.

9            THE COURT:  True?

10           MR. MacLAUGHLIN:  I think that is true, yes.

11           THE COURT:  Okay.  Then let's leave behind this

12   territory of testimony.

13           MR. MacLAUGHLIN:  Okay.

14   BY MR. MacLAUGHLIN:

15   Q.  Suffice it to say that it wasn't until the fall of 2016

16   that we even got permission to go forward with the tax case.

17   A.  Correct.

18           MR. MacLAUGHLIN:  May I have another moment, Your

19   Honor?

20           THE COURT:  Yes.

21      (Government counsel confer)

22           MR. MacLAUGHLIN:  I have nothing further.

23           THE COURT:  Thank you.

24      (Counsel confer)

25           THE COURT:  All right.  Go ahead.
```

1          **CROSS-EXAMINATION**

2    BY MS. MAIER:

3    Q.  Good afternoon, Dep. Marshal Belich.  My name is Gloria

4    Maier.  I'm one of the attorneys representing Mr. Adams here

5    today.

6              So you're currently a Deputy United States

7    Marshal, correct?

8    A.  Correct.

9    Q.  In 2016 you were a Special Agent with the IRS?

10   A.  That's correct.

11   Q.  The Internal Revenue Service?

12   A.  Yes.

13   Q.  And you were added to this case because of your

14   expertise in the areas under the jurisdiction of the IRS.

15   A.  Correct.

16   Q.  And according to the IRS Internal Revenue Manual, the

17   IRS' criminal investigation mission is to investigate

18   potential criminal violations of the IRC, the Internal

19   Revenue Code, correct?

20   A.  And, as I recall, related federal financial crimes

21   involved in Title 18 as well.

22   Q.  And you mentioned money laundering.

23   A.  Correct.

24   Q.  And so that's 18 U.S.C. 1956 and 18 U.S.C. 1957.

25   A.  Correct.

1    Q.  Your agency's jurisdiction does not typically include

2    mail and wire fraud under 18 U.S.C. 1341 and 1343.

3    A.  My understanding is that usually that would fall as one

4    of the specified unlawful activities for what supports

5    the -- or not supports, but that is involved in the money

6    laundering activity, so quite often was involved with

7    investigating the SUA as well as the money laundering

8    activity as well.

9    Q.  And so you testified that -- so if we can actually turn

10   to the Internal Revenue Manual which I have -- do you have a

11   big binder up in front of you?

12   A.  I do.

13   Q.  That says Defense Exhibits DX?

14   A.  Yes.

15   Q.  All right.  So does this look to you like a printout

16   from the IRM?

17   A.  Which number?

18   Q.  Oh, I'm sorry.  DX 87.

19   A.  Yes, it does appear to be.

20   Q.  And so if you turn to page 5 of that document, do you

21   see the description of money laundering strategy?

22   A.  I do.

23   Q.  And if you read that paragraph, that paragraph refers to

24   enforcement of the Bank Secrecy Act and related federal

25   money laundering statutes in support of the DOJ and Treasury

1   National Money Laundering Strategy, correct?

2   A.  Yes.

3   Q.  This document doesn't refer to mail or wire fraud.

4   A.  Not specifically by name, no, it does not.

5   Q.  And I want to now turn to your activity as a part of

6   this case team.

7   A.  Okay.

8   Q.  You accessed the Relativity database, you testified,

9   between May and July of 2016 --

10  A.  Yes.

11  Q.  -- is that right?  Was this your first time having

12  involvement in the search of an attorney's files where the

13  attorney was the subject of the investigation?

14  A.  I'm sorry.  Of an attorney's files.

15  Q.  Yes.  So in this case you understand that the defendant,

16  Mr. Ed Adams, is an attorney?

17  A.  Yes.

18  Q.  And he is the subject of the investigation?

19  A.  Correct.

20  Q.  Is this your first time being involved in an

21  investigation where the subject of the investigation was a

22  lawyer and you were searching that lawyer's files?

23  A.  This would be my first time as a case agent.  I believe

24  I've been involved with search warrants, so I would have

25  searched records involving attorneys, potentially, just as

1    an assisting agent.

2    Q.  Okay.  But this was the first time that you recall where

3    you were a case agent assigned to such a case?

4    A.  That's correct.

5    Q.  And you testified on direct that if you saw something

6    that was potentially privileged, you would set it aside?

7    A.  Yes.

8    Q.  What specific indicia were you looking for to determine

9    whether you should set something aside?

10   A.  I guess the first clue would be, you know, who it was to

11   or from, so whether it would be, like I said, letterhead.

12   But in this instance with an e-mail, I would look at the

13   e-mail address that it was -- you know, who the e-mail

14   correspondence would have been to or from, just to see if it

15   looked like it was a law firm e-mail address.

16   Q.  So you were looking to see whether or not the document

17   was to or from a lawyer?

18   A.  That would be a good clue.  I mean, among other things.

19   If I do see anything -- depending on what I'm reviewing.  I

20   mean, if I'm looking up an e-mail that I believe is with an

21   investor, but it turns out there's an attorney name on

22   there, then I would probably set that aside as well.  So I

23   mean, if there's just anything that would lead me to believe

24   that might be correspondence with an attorney.

25   Q.  Okay.  So an attorney name would be something that would

1   be indicia of privilege.

2   A.  Right, an attorney name.  And I wouldn't limit it to

3   just that, but just anything that would lead me to believe

4   that that might be correspondence with an attorney.

5   Q.  And what about if a document said "Privileged" on it?

6   A.  Absolutely.

7   Q.  And what if a document said "Work Product" on it?

8   A.  That would definitely be something that -- yeah, it

9   would be a clue to at least set it aside and could

10  potentially be privileged.

11  Q.  When you conducted searches in the database -- I mean,

12  you testified earlier that you searched for the word

13  "Rothman."  What instructions were you given about how to

14  conduct your searches in the database?

15  A.  I don't specifically recall instructions as to how to

16  search, but I guess rather than just browsing through

17  looking for anything, I was wanting to target it towards

18  something that I knew, you know, was more relevant to what I

19  was looking into at the time, such as a specific investor.

20  Q.  And were you searching to prepare to speak to those

21  investors?

22  A.  Either -- I don't recall if it was before or after the

23  interview, so it could have either been to prepare to speak

24  with them, or if I spoke with them and they indicated there

25  was e-mails with Mr. Adams, I could have been looking it up

1    after the fact.  I don't recall in this instance if it was

2    before or after.

3    Q.  So the purpose of your searching was in connection with

4    speaking to witnesses and witness interviews.

5    A.  Correct.

6    Q.  Were you given any instructions on the search terms that

7    you could use in your search?

8    A.  I don't specifically recall receiving instructions.  It

9    doesn't mean I didn't -- you know, there wasn't some

10   discussion about that, but I guess I figured that I would

11   just be more targeted towards what I'm looking towards, but

12   I don't specifically recall if there were instructions given

13   as to that.

14   Q.  Were you free to choose your own search terms?

15   A.  I was free to, yes.  I had that on my own laptop and so

16   I could type in what I was willing to type.

17   Q.  Were you given any restrictions on the search terms that

18   you could use?

19   A.  Not that I'm aware of other than I would know not to

20   search something that would indicate that it might be

21   potentially privileged.

22   Q.  In this case was there a search briefing of any kind?

23   A.  There were meetings throughout the process in which we

24   were determining the mechanical filtering system and I guess

25   what we would include in that mechanical filtering.  And

1    then at that point we had discussed even once we were able

2    to access it that, you know, we still needed to proceed with

3    caution because it wasn't a perfect system and we still

4    needed to make sure that we weren't going to be reviewing

5    privileged information, so there were multiple meetings in

6    which we discussed that.

7    Q.  And so those meetings were focused on the mechanical

8    filtering of potentially privileged documents.

9    A.  As well as once we were able to review what was -- the

10   remainder of what was left.  After the mechanical filter

11   segregated, you know, the e-mails that it removed, we also

12   discussed on how to proceed beyond that point.

13   Q.  But were you given any instructions during those

14   meetings on how to proceed with your searches in the

15   database?

16   A.  I would say generally.  I would assume that we did, but

17   I don't think it was so much of an instruction:  This is how

18   you will search as to it was discussed that be cognizant of

19   what you're searching, you know.

20   Q.  But you don't recall any specific instructions on how to

21   conduct your search.

22   A.  I don't recall any specific instructions, no.

23   Q.  When did you receive the warrant that related to the

24   Yahoo! e-mails?

25   A.  I assisted -- let's see.  Postal Inspector Kroells was

1    the affiant and I was assisting her a little bit in drafting

2    the affidavit.  I just had some discussions with her at that

3    point and I believe that would have been in November,

4    October of '15, I'm guessing.  So it would have been

5    sometime beyond that in March that it would have been -- you

6    know, the search would have been submitted -- or the warrant

7    would have been submitted to Yahoo!  I wasn't involved in

8    even serving the warrant, so I'm not exactly sure on when

9    that would have been finalized.

10   Q.  So you conducted limited searches in the database,

11   correct?

12   A.  Correct.

13   Q.  But other members of the prosecution shared documents

14   with you outside the database that they had discovered in

15   their searches of the Yahoo! e-mail.

16   A.  Correct.

17   Q.  And you testified that Inspector Kroells sent you

18   documents?

19   A.  Yes.

20   Q.  And AUSA Maria sent you documents?

21   A.  Correct.

22   Q.  Your declaration noted that Special Agent Khan sent you

23   documents.  Did she or did she not send you documents?

24   A.  She did not.  When I prepared that, I didn't have access

25   to my e-mail from IRS at that point and I was going off of

1   recollection.

2       And I guess the way I was thinking at the time,

3   collectively the two agents, the two case agents that were

4   in the Cities had access to it and I knew that they reviewed

5   it and shared e-mails with me.  As I went through looked at

6   it, "they" was just Christi and then David Maria.

7       So I didn't receive any -- based on the review

8   last week of my inbox from IRS, that I didn't receive any

9   e-mails from Jennifer.

10  Q.  And did you have conversations with Inspector Kroells

11  about documents that she provided you?

12  A.  I don't recall specifically, but I would imagine that we

13  probably did discuss them.

14  Q.  And what about with AUSA Maria?  Did you have

15  conversations with AUSA Maria about the documents that he

16  provided you?

17  A.  I'm sure we probably did.

18  Q.  Now, we were talking about the mission of the IRS.  And

19  so the Internal Revenue Code is Title 26, correct?

20  A.  Correct.

21  Q.  And so part of your job as an IRS criminal investigator

22  was to investigate potential criminal violations under

23  Title 26?

24  A.  Correct.

25  Q.  And it involves investigations of violations of 26

1    U.S.C. 7206(1), which is willfully making false statements

2    on a tax return, is that right?

3    A.  Correct.

4    Q.  Now, Dep. Marshal Belich, I'm going to ask you some

5    general questions about the Yahoo! e-mails that were shared

6    with you by the other members of the prosecution team.  I

7    want to be clear that I'm not asking you about the specific

8    contents of those documents.  Do you understand that?

9    A.  Yes.

10   Q.  Some of Mr. Adams' Yahoo! e-mails that the other members

11   of the prosecution team shared with you related to

12   Mr. Adams' personal tax returns, correct?

13           THE COURT:  I don't understand how that question

14   isn't dealing with the content of the e-mail.

15           MS. MAIER:  It's the subject of the e-mails.  It's

16   not underlying what was in those documents.

17           THE COURT:  But this is the information that the

18   Government doesn't have access to right now, correct?

19           MS. MAIER:  It is.

20           THE COURT:  Okay.  We can move on.

21           MS. MAIER:  Your Honor, would you permit questions

22   about the senders and recipients of those documents, the

23   type of information that would typically appear on a

24   privilege log.

25           THE COURT:  I feel like this is a little bit

1    difficult, because it's asking him about something that he

2    knows and you know, but they don't know, right?

3              Am I right about that?

4              MR. MacLAUGHLIN:  That is right, Your Honor.

5              THE COURT:  And I thought part of the reason that

6    everyone was okay with them not knowing it was that we

7    weren't going to go there today.

8              MS. MAIER:  This relates to his recollection of

9    the general types of documents related to sort of the

10   ongoing execution of the search that were being viewed and

11   were being provided.  It's similar to the search terms.  We

12   don't have search terms for these documents because he did

13   not search for them.

14             THE COURT:  Okay.  Ask a question and I'll let you

15   know.

16   BY MS. MAIER:

17   Q.  Do you recall if any of the e-mails that you were

18   provided were either sent or received by Murry & Associates?

19             THE COURT:  I'll allow it.

20             MR. MacLAUGHLIN:  Okay.

21   A.  I'm sorry.  Can you repeat the question?

22   Q.  Do you recall if any of the e-mails that were provided

23   to you from Mr. Adams' Yahoo! e-mail database by the other

24   members of the prosecution team were sent or received from

25   or by Murry & Associates?

1    A.  I don't recall any of those e-mails from -- I don't

2    recall any of the e-mails that you're speaking of involved

3    with the Yahoo! warrant.

4    Q.  You don't recall one way or the other sitting here

5    today.

6    A.  I don't recall.

7    Q.  Is it your understanding that documents relating to the

8    subject of Mr. Adams' personal tax returns were authorized

9    to be searched for or seized by the Yahoo! search warrant?

10   A.  I guess I would review the --

11   Q.  So the affidavit is behind -- I'm sorry -- the warrant

12   is behind tab 11 of the big binder?

13          MR. MacLAUGHLIN:  It strikes me as calling for a

14   legal conclusion.

15          THE COURT:  Are you asking him whether the warrant

16   says that or whether he believes it means that?

17          MS. MAIER:  Well, whether the warrant says it --

18          THE COURT:  I can read the warrant.

19   BY MS. MAIER:

20   Q.  You were involved in preparing the affidavit related to

21   the search warrant in this case?

22   A.  Limited.  I assisted Inspector Kroells.

23   Q.  And the subject of probable cause addressed in the

24   affidavit does not describe tax fraud.

25   A.  I don't believe it did.

1    Q.  Now, if you could turn to the document that is marked in

2    the big binder with the tab 64.

3            Dep. Marshal Belich, do you have that in front of

4    you?

5    A.  Yes, I do.

6    Q.  And do you see the column of this spreadsheet that has

7    your name at the top?

8    A.  Yes.

9    Q.  And I will represent that this is a pivot table that was

10   created from a large spreadsheet of data that was produced

11   by the Government of the activity in the Relativity

12   database, and so this summarizes the different actions in

13   the database taken by the different members of the

14   prosecution team.

15           THE COURT:  Can you explain what a pivot table is?

16           MS. MAIER:  Yes.  So within Excel when you have a

17   large spreadsheet of data, there's an automatic function

18   sort of like a sum function within Excel where you can

19   generate by identifying variables which -- you know, telling

20   Excel to create a chart, and it creates a summary chart of

21   the database.

22           THE COURT:  That's called a pivot table.

23           MS. MAIER:  Yes.

24           THE COURT:  Thank you.

25

1    BY MS. MAIER:

2    Q.  Do you see the column that has the number 21 at the top

3    of it?

4    A.  Yes.

5    Q.  And it's 21 document queries?

6    A.  Yes.

7    Q.  And so does this reflect that when you were active in

8    the database, you performed 21 queries in the data?

9            MR. MacLAUGHLIN:  Objection.  Lack of foundation.

10   This is not something this witness knows anything about.

11           THE COURT:  Sustained.  You can ask him if he

12   thinks this sounds right.

13   Q.  Recalling your time in the database between May and

14   July of 2016, you did run some searches in that database,

15   correct?

16   A.  Yes.

17   Q.  And you viewed documents while you were active in the

18   database.

19   A.  Yes.

20   Q.  And do you recall using the export function of

21   Relativity at one point to export a document out of

22   Relativity?

23   A.  I don't specifically recall it, but I don't -- I guess I

24   wouldn't be surprised that I did it.

25   Q.  And do you know that Relativity has a tagging function?

1    A.  Yes, I think I did know that.

2    Q.  When you were in the database, you did not tag any

3    documents that you were looking at.

4            THE COURT:  Answer --

5    A.  I'm sorry.  I don't recall tagging anything.

6    Q.  You don't recall tagging anything?

7    A.  No.

8    Q.  Do you recall tagging any -- therefore, since you don't

9    recall tagging anything, you don't recall tagging anything

10   as relevant, do you?

11   A.  No.

12   Q.  And you don't recall tagging anything as irrelevant, do

13   you?

14   A.  No.

15   Q.  You did not tag any documents to identify them as

16   documents to be seized.

17   A.  No.

18   Q.  Did you seize any documents in connection with the

19   Yahoo! warrant?

20   A.  No, not that I know of.

21   Q.  So you did some searching in those documents, but you

22   did not seize any documents.

23   A.  I guess I -- I know I viewed a few of the e-mails, you

24   know, relating to that one witness, I guess.  I don't recall

25   if I would have saved those e-mails or if I just viewed

1   them.  I don't recall anything being relevant in those

2   e-mails, so I don't recall saving them, printing them,

3   anything like that.  So no, as far as I'm aware, I didn't

4   seize them.

5   Q.  And you didn't seize any other documents in this

6   database.

7   A.  No.

8           MS. MAIER:  Could I have one minute?

9           THE COURT:  Yes.

10      (Defense counsel confer)

11  BY MS. MAIER:

12  Q.  On the subject of the documents that were shared with

13  you, do you recall as a general subject matter that those

14  documents related to Mr. Adams' personal tax returns?

15          MR. MacLAUGHLIN:  Objection.  We haven't seen

16  those.

17          THE COURT:  I'm going to overrule or -- you can't

18  ask it.

19          MS. MAIER:  May I have one more moment and I may

20  be done.

21      (Pause)

22          MS. MAIER:  I have no further questions for this

23  witness.

24          MR. MacLAUGHLIN:  No redirect.

25          THE COURT:  Okay.  I have a couple questions for

1    you.

2              THE WITNESS:  Yes, ma'am.

3                    **E X A M I N A T I O N**

4    BY THE COURT:

5    Q.  During your time as an IRS agent, were you ever involved

6    on a team during an investigation that didn't lead to tax

7    charges?

8    A.  Yes.

9    Q.  Were you ever involved in a case that didn't even lead

10   to this referral process that we've heard a little bit

11   about?

12   A.  Yes.

13   Q.  Do you ever get asked to be on a case because of your

14   knowledge of tax documents that might go to other charges,

15   or are you usually asked to be on a case because you're

16   laying the groundwork for tax charges?

17   A.  I'd say neither.  A lot of times we're asked to assist

18   in the investigation, I guess, just for our expertise.

19   There's a lot that we can -- "we" meaning the IRS agents --

20   can bring to an investigation aside from just tax.

21              There is -- you're involved -- if there does

22   become a tax charge, but even if it's just -- whether it be

23   a drug charge or a fraud case, there's a lot that an IRS

24   agent can bring to a case or an investigation just from a

25   financial investigative standpoint.

1    Q.  The interviews that you did, Rothman, were those yours

2    because they were tax in nature, or because they were up

3    north, or some other reason altogether?

4    A.  Neither.  We had a large number of investors in this

5    case that we wanted to reach out to and interview and we

6    just literally split them up.  And as I recall, throughout

7    the country -- I don't -- I believe one of the Rothmans

8    might have been in Ohio.  So I mean, there were a lot of

9    just telephone interviews, so I just literally grabbed a

10   handful of them.

11              THE COURT:  Any questions raised by my questions?

12              MS. MAIER:  Just one, Your Honor.

13              THE COURT:  Certainly.

14                   **FURTHER CROSS-EXAMINATION**

15   BY MS. MAIER:

16   Q.  Did any other members of the prosecution team request

17   guidance from you based on your tax expertise?

18   A.  I'm sorry.  Can you ask that again or rephrase it?

19   Q.  Did any other members of the prosecution team request

20   guidance from you on tax issues based on your tax expertise?

21   A.  No.  I would say if there's any tax issues, they might

22   have not asked me for guidance, but asked me as to how we

23   would pursue potential tax charges.

24   Q.  And did you have conversations like that in this case?

25   A.  As to whether or not we would pursue tax charges?

1    Q.  Yes.

2    A.  Yes.

3            MR. MacLAUGHLIN:  Could we have a time frame,

4    please?

5    Q.  During March of 2016 to April of 2017, did you have such

6    conversations?

7    A.  Not that I recall.

8            MS. MAIER:  Okay.

9            THE COURT:  Thank you.  Anything raised by my

10   questions?

11           MR. MacLAUGHLIN:  Yes, actually, indeed.

12                    **REDIRECT EXAMINATION**

13   BY MR. MacLAUGHLIN:

14   Q.  So, Former Special Agent Belich, 1956 and 1957 are

15   both -- especially 1956 -- is a very complex statute,

16   correct?

17   A.  Correct.

18   Q.  And that is a statute that deals with complex monetary

19   transactions in criminally derived property.

20   A.  Correct.

21   Q.  And that is an area of law enforcement that is specially

22   delegated to the IRS, right?

23   A.  Correct.

24   Q.  And in fact, you guys, you IRS agents, you Special

25   Agents, you receive a lot of training about how to analyze

1     bank accounts, follow money, make it understandable to a

2     jury, right?

3     A.   That's correct.

4     Q.   And so you are routinely brought into financial cases to

5     do money laundering, right?

6     A.   Correct.

7     Q.   Some of those also result in tax charges, but many

8     don't, right?

9     A.   That's correct.

10    Q.   And so when you're brought in to work up a 1956 or 1957

11    charge, you need a specified unlawful activity, right?

12    A.   Correct.

13    Q.   It's the specified unlawful activity that throws up

14    proceeds that's the beginning of a money laundering case,

15    right?

16    A.   That's correct.

17    Q.   And in effect then, when you're brought in to do a 1956

18    or a 1957 count in a fraud case, you're joining in the fraud

19    investigation, right?

20    A.   That's correct.

21    Q.   And that's why you were looking up Rothman when you were

22    doing the one search you did, true?

23    A.   Correct.

24    Q.   And you guys bring expertise and putting together charts

25    and sorting the wheat from the chaff and showing that this

1    money isn't really doing what it looks like it's doing in a

2    concealment case, right, like 1956, conceal or disguise the

3    nature, location, source, ownership or control of the

4    proceeds of specified unlawful activity.

5    A.   Correct.

6    Q.   So a big part of what you guys do is Title 18, sometimes

7    with no involvement at all with Title 26 offenses.

8    A.   That's correct.

9              MR. MacLAUGHLIN:  Nothing further.

10             MS. MAIER:  Couple questions.

11             THE COURT:  I assumed so.

12                       **RECROSS-EXAMINATION**

13   BY MS. MAIER:

14   Q.   Dep. Marshal Belich, did you have any involvement in the

15   preparation of the tax charges in this case?

16   A.   Yes.

17   Q.   And what involvement was that?

18   A.   Once the -- well, I think I would have written the

19   request to expand -- it's a Title 26 expansion, I guess,

20   it's referred to.  I don't know what the -- it's to expand

21   the grand jury investigation to include a Title 26 charge.

22             So I believe I would have written that request, as

23   well as I was involved in interviewing the return preparers,

24   a couple sources of income, and I began writing up a

25   prosecution report, Special Agent's Report is what it's

1    called, and I was in the process of writing that when I

2    accepted a job with the Marshals.

3    Q.  And so what period of time were you working on those

4    efforts?

5    A.  From I believe it was November was when the approval

6    went through for the Title 26 grand jury, and then it was

7    in November of 2016 -- 2017.  No, no.  I'm sorry.

8                THE COURT:  That was just two months ago.

9    A.  November of 2016 through February of 2017, so about

10   three months.

11   Q.  Okay.  November of 2016 through February of 2017.

12   A.  Correct.

13   Q.  And that was during the period of time that searches

14   were being conducted in the Yahoo! database.

15   A.  I don't know if they were or not.  I don't think I was

16   at that point.  I'd long given up on being able to search

17   that by that point.

18   Q.  But you were a member of the prosecution team during

19   that time period.

20   A.  I was, but I don't know if anyone was still searching

21   the e-mails at that point.  I was -- and actually, if it was

22   in November when it was approved, prior to that, prior to

23   submitting the request for grand jury expansion, I would

24   have reviewed the tax returns obtained through the *ex parte*

25   order prior to that search, so I would have been probably

1      working on that -- you know, reviewing the tax returns for a

2      month or so prior to submitting the expansion request.

3      Q.  And you continued to have communications and

4      conversations with other members of the prosecution team

5      related to the development of the tax charges.

6      A.  Less so there at that point.  I think one of the agents

7      might have been busy on another case.  I was pretty much

8      digging into getting the tax case moving to try and catch up

9      to where we were in the fraud case.

10     Q.  But you weren't doing that totally on your own, were

11     you?

12     A.  Largely, yes.  We also had a revenue agent assigned to

13     the case and she assisted me on some of it and then I had

14     communications with the AUSA as well, I think during that

15     time period I may not have had as much communication with

16     the other agents.

17     Q.  But you had communications with AUSA Maria about that

18     during that period of time --

19     A.  Yes.  About developing the tax investigation?

20     Q.  Yes.

21     A.  Yes.

22     Q.  When were the e-mails from the database shared with you

23     by AUSA Maria and Agent Kroells?

24             THE COURT:  If you recall.

25     A.  I think the first one would have been in May or June of

1    '16.  It was shortly after it was available.  They could

2    have all been within that month or they could have been

3    spread out.  I just remember that the first one was shortly

4    after.  They might have all been in like May or June, but

5    there might have been a few after that.  I don't recall.

6              MS. MAIER:  One moment.

7         (Pause)

8              MR. WADE:  Your Honor, there's -- with respect to

9    this witness, I don't think we have any more testimony, but

10   there's sort of a technical matter on -- given the scope of

11   the examination just put forward by the Government, it's not

12   clear, I think, whether full Jencks Act statements for this

13   witness were disclosed.  That's my sense from conferring

14   with counsel in between as we were shifting the podium.

15             And so I assume counsel will go and look to see if

16   there are any Jencks Act statements, and if there's no

17   objection to recalling the witness to the extent that those

18   Jencks Act statements are relevant to this proceeding, you

19   know, we just want to make clear for the record that we

20   believe in light of some of the testimony regarding the

21   submission of the tax charges to DOJ Tax and the like, that

22   there may well be -- that was not a part of this before and

23   there may well be Jencks Act statements relating to that

24   that need to be produced.

25             So I don't know if there are or there aren't, but

1      we want to preserve our rights on that.

2                THE COURT:  Mr. MacLaughlin?

3                MR. MacLAUGHLIN:  We'll take a look.  I doubt if

4      there are any.  When we expand a grand jury case to include

5      tax charges, the IRS agent helps us write a letter, but we

6      sign it, they're our words, and we send that out to DOJ Tax.

7      I don't think that the early drafts of the SAR, the Special

8      Agent's Report, are Jencks here.  That's about the

9      underlying tax case, not about how this warrant was

10     executed.

11               So we'll take a look is the bottom line.

12               MR. WADE:  I would respectfully request that the

13     underlying documents to the extent they relate to what was

14     just testified to are Jencks if they're statements of the

15     witness.

16               THE COURT:  Let's pick one lawyer.  Actually --

17               MR. WADE:  I think we're done with testimony.  We

18     just wanted to make the record.

19               THE COURT:  So the question is whether the letters

20     sent to Main Justice are Jencks as to this witness

21     because -- not because they have anything to do with the

22     execution of the search warrant, but because it's a

23     statement that he made relevant to this entire case ever?

24               MR. WADE:  No, they're relevant to his acquisition

25     of knowledge during the period in which the warrant was

1    being executed and documents were being shared with him.

2              And to the extent, for example, if he incorporated

3    information he received from the Yahoo! materials into a

4    memo that he submitted to the Government that he wrote,

5    that's his statement, that would be Jencks.

6              THE COURT:  And you know he has not testified

7    either way as to whether he did or didn't do that, nobody

8    asked him that question.

9              MR. WADE:  Well, he did testify that he prepared a

10   bunch of documents.  I don't know --

11             THE COURT:  Nobody asked him whether it was based

12   on Yahoo!, any of the information -- right?  That's not --

13   nobody asked that.

14             MR. WADE:  That's a fair point, Your Honor.  I

15   mean, we can certainly pose the question to the witness

16   or --

17             THE COURT:  I think we're done.  I'll let the

18   Government look into what the documents are rather than

19   talking theoretically about whether they exist or not.  You

20   have definitely raised a flag on the issue so that we can

21   keep it in light.

22             MR. WADE:  That's all I intended to do, Your

23   Honor.

24             THE COURT:  Okay.  Thank you.

25             I think we're done.  I think we've gotten through

 1    the rounds of -- you were last and you were done.

 2              MS. MAIER:  Yes, I had no further questions.

 3              THE COURT:  Oh, okay.  Thank you.

 4              All right.  You may step down.  Thank you.  Safe

 5    travels.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  And we are done with testimony.  Let's

 8    take a minute to talk about what tomorrow looks like.

 9              I've got a court reporter I think starting at

10    8:30, is that right, Abby?

11              THE CLERK:  As far as I can tell.  Brian just

12    asked that.  It's 9:00 a.m.

13              THE COURT:  Oh.  We'll see.  Let's try to get here

14    and get ready to go, but I'll let you know if I can.

15              Mr. MacLaughlin, I think you auto-populate in my

16    e-mail, so if I e-mail you this evening about clarification

17    on that, will you please e-mail opposing counsel and let

18    them know whether we're going to start at 8:30 or 9:00?

19              MR. MacLAUGHLIN:  I certainly will.

20              THE COURT:  Okay.  So tomorrow we have?

21              MR. MacLAUGHLIN:  Tomorrow we'll start with

22    Jennifer Khan.

23              THE COURT:  Okay.

24              MR. MacLAUGHLIN:  I anticipate that her testimony

25    on direct will be much shorter than Inspector Kroells and a

1     bit longer than Mr. Belich's, because she was a little bit

2     more involved in investigating the case.

3          After that we propose to put on Mark Zeitz.

4          THE COURT:  Okay.

5          MR. MacLAUGHLIN:  Then the issue is going to be

6     whether we call Dan Czapko, who is the ALS guy that was

7     hands-on.  We believe that everything ALS did will be

8     covered by Mark Zeitz's testimony.  They may want to call

9     him.

10          THE COURT:  And you plan to have him available.

11          MR. MacLAUGHLIN:  We're going to have him

12    available.  We may actually object to him being called, you

13    know, as cumulative, whatever the Court chooses to do with

14    that if --

15          THE COURT:  But you're not going to quibble about

16    whose subpoena he's here on.  He'll be here so that if the

17    defense wants to call him and I allow it --

18          MR. MacLAUGHLIN:  He will be here.  Yes, he will

19    absolutely be here.

20          THE COURT:  Okay.  And then we're going to talk

21    after that about -- I want the parties to spend some time --

22    with all your spare time between now and when I see you

23    again -- thinking about schedule and about limitations on

24    the extent of briefing and about whether we can narrow the

25    topics to be addressed at all or not in the post-hearing

1  briefing, so be thinking about that.

2          MR. MacLAUGHLIN:  Very good.

3          THE COURT:  Anything else we need to handle right

4  now?

5          MR. MacLAUGHLIN:  Not from the United States.

6          MR. WADE:  No, Your Honor.

7          THE COURT:  Are you sure?

8          MR. WADE:  I'm sure.  I have logistical questions

9  that I can inquire with your deputy about after we're off

10  the record.

11          THE COURT:  Okay.  Well, I don't mind you

12  inquiring.  I'm completely informal.

13          MR. WADE:  I'm just wondering the extent to which

14  we can leave materials in the courtroom and --

15          THE COURT:  You can totally leave materials in the

16  courtroom.  We will lock -- is that right, sir, we can lock

17  the courtroom and protect their stuff?

18          COURT SECURITY OFFICER:  Yes, Your Honor.

19          THE COURT:  Okay.  And I promise not to rifle

20  through any of your belongings.

21          MR. WADE:  Your Honor's welcome to review any of

22  the binders --

23      (Laughter)

24          THE COURT:  Okay.  Yes, feel free to leave

25  whatever you need to make things more comfortable.

311

1              And any other logistical questions?

2              MR. WADE:  No, Your Honor.

3              MR. MacLAUGHLIN:  None.

4              THE COURT:  Okay.  Great.  We're in recess.  Have

5    a good night, everybody.

6          (Proceedings concluded for the day at 5:15 p.m.)

7                      *      *      *      *

# I N D E X

**W I T N E S S E S:**                                              **PAGE**

**CHRISTINE KROELLS**

        Direct Examination by Mr. MacLaughlin          63
        Cross-Examination by Mr. Wade                  134
        Redirect Examination by Mr. MacLaughlin        233
        Recross-Examination by Mr. Wade                259
        Examination by the Court                       261

**( EDWARD S. ADAMS )**

        Arraignment                                    265

**BRANDON BELICH**

        Direct Examination by Mr. MacLaughlin          267
        Cross-Examination by Ms. Maier                 282
        Examination by the Court                       298
        Further Cross-Examination by Ms. Maier         299
        Redirect Examination by Mr. MacLaughlin        300
        Recross-Examination by Ms. Maier               302

* * * * *

# E X H I B I T S

        **NUMBER**                    **FOR ID   IN EVIDENCE**

        Government ( ALL )                   59

        Defendant ( ALL )                   59

C E R T I F I C A T E


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415-2247
612.664.5108