UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-00064 (DWF/KMM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S RESPONSE TO** |
| | ) | **DEFENDANT'S MOTION** |
| v. | ) | **ASSERTING CERTAIN** |
| | ) | **PRIVILEGES** |
| EDWARD S. ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Gregory G. Brooker, United States Attorney for the District of Minnesota, and David M. Maria and John Kokkinen, Assistant United States Attorneys, respectfully submits this response to the Motion of Defendant Edward S. Mr. Adams Asserting Certain Privileges Implicated by Yahoo! Email Seizure [Docket No. 89 (Motion), Docket No. 90 (Memorandum, hereinafter "Def. Mem.")]. For the reasons set forth herein, the Court should find that no valid privilege exists over either category of documents for which Mr. Adams is attempting to assert a privilege.

The first category comprises documents as to which Mr. Adams asserts that Apollo Diamond, Inc. or Apollo Diamond Gemstone Corporation (collectively, "Apollo") holds the attorney-client privilege. However, after entering into the Asset Purchase Agreement ("APA") (Def. Mem. Exh. 1) with Scio Diamond Technology Corporation, dated August 31, 2011, Apollo was effectively dead, having transferred control, operations, and its assets to a new corporate entity. While Mr. Adams kept two bank accounts open to complete

portions of the transaction, pay off various liabilities, and funnel hundreds of thousands dollars to his personal accounts, Apollo had no building, no operations, and no ongoing corporate governance.  Moreover, although the Asset Purchase Agreement contained a section titled "Excluded Assets," which provided that Apollo retained certain specific, enumerated assets, it makes no mention of any privileges to be retained by Apollo. Accordingly, there is no basis for Apollo, a defunct company, or anyone on Apollo's behalf to assert a privilege.  Yet, Mr. Adams – who admittedly resigned from all positions with Apollo in early-2011 – now seeks to assert privileges once held by the company whose investors he defrauded.  Even if Apollo somehow retained the right to assert a privilege, in no circumstance should Mr. Adams be permitted to assert that privilege to shield evidence of his criminal conduct.

The second category of documents over which Mr. Adams asserts a privilege relates to communications with a tax attorney, Thomas Brever, and an accounting firm, Murry & Associates ("Murry"), which was purportedly retained by Brever in a "*Kovel*" arrangement. Because Mr. Adams hired Brever (and Brever hired Murry) for the sole purpose of preparing and filing Mr. Adams's amended tax returns, communications among these individuals and entities retain no privilege, as (1) the communications were not privileged to begin with, because they do not relate to legal advice, or (2) any privilege was waived, because the communications were for the purpose of disclosing the information in amended tax returns filed with the federal government.  In fact, although the government retained only the communications between Mr. Adams and Murry and filtered out any communications to which Brever was a party, controlling case law makes clear that the

communications with Brever also are not privileged and can be reviewed by the government.

For the foregoing reasons, and for the additional reasons set forth herein, the government respectfully requests that the Court find that no privilege attaches to emails and related documents and correspondence in Mr. Adams's Yahoo! email accounts relating to (1) communications between or among Mr. Adams and anyone at Apollo, and (2) communications between or among Mr. Adams, Brever, and Murry.

## I.  MR. ADAMS CANNOT ASSERT ANY PRIVILEGE OVER APOLLO'S COMMUNICATIONS WITH MR. ADAMS OR HIS LAW FIRM.

### a.  Background – The Scio/Apollo Transaction.

As detailed in the superseding indictment [Docket No. 70, at ¶¶ 41-54], faced with potential bankruptcy and inevitable shareholder litigation, Mr. Adams and his law partner, Michael Monahan, devised a transaction whereby Scio Diamond Technology Corporation ("Private Scio"), a privately held company that Mr. Adams and Monahan created and owned, would acquire the assets of Apollo Diamond for $2 million and the assets of Apollo Diamond Gemstone for $10,000.  Mr. Adams promised the Apollo shareholders the right to purchase the same number of shares in Private Scio that they held in Apollo at no additional cost and further promised a tax advantage from the loss sustained on their Apollo investments.  As of February 28, 2011, Mr. Adams had resigned from all positions with

Apollo.[1]  (Mr. Adams Oct. 29, 2015 SEC Transcript (Def. Hearing Exh. 51[2]) at 404:14.)

As of that time, Mr. Adams was no longer involved in making decisions on behalf of

Apollo.  (Adams Sept. 15, 2015 SEC Transcript (Def. Hearing Exh. 50) at 241:20-22.)

The transaction was structured in such a manner that Scio would acquire

substantially all of the assets of Apollo, without acquiring its liabilities, and where Scio

would continue the company's ongoing operations.  This is clear from the letter that

Apollo's CEO, Robert Linares, sent out to Apollo shareholders, describing and proposing

the transaction:

- "Given our recent history and the current economic environment, our board

    of directors has determined that a sale of the Company's assets and,

    correspondingly, new management offers the best chance to successfully

    lead future initiatives to monetize our proprietary technology."  (Exhibit 1,

    March 11, 2011 Letter from R. Linares to Apollo Shareholder, at 2.)

- "[T]he Company has entered into an Asset Purchase Agreement with Scio

    Diamond Technology Corporation ('SDTC') – a company formed for the

    purpose of this transaction and to capitalize on the technology developed by

---

[1] During the period in which Apollo was in existence, Mr. Adams and his law firm, Adams Monahan, performed various legal services for Apollo, and Mr. Adams, for a time, served as General Counsel of Apollo.  As Mr. Adams, himself, explained though, "the general counsel role really morphed into more of an executive role at the company versus a legal role . . . because I was doing more corporate type of executive work versus legal work." (Mr. Adams SEC Transcript (Def. Hearing Exh. 50) at 87:22-88:3.)
[2] Citations to "Def. Hearing Exh." refer to the binder of exhibits provided by Mr. Adams at the January hearing on the motion to suppress.

Apollo – whereby Apollo has agreed to sell substantially all of our assets for approximately $2,000,000 to SDTC." (*Id.*)

- "We are hopeful that under the new management of SDTC . . . the opportunity will be sufficiently recapitalized in order to achieve the commercial success we continue to believe can be attained.  Several key Company employees, including myself, are committed to assisting in this task at the direction of SDTC's management." (*Id.* at 2-3.)

In the Asset Purchase Agreement that the Apollo investors approved by way of proxy, the Agreement provided that "Seller desires to sell to Purchaser, and Purchaser desires to acquire from Seller, all or substantially all of the property, assets, rights, and privileges of Seller related to, used in, or otherwise associated with the operation of the Business on the terms and subject to the conditions set forth in the Agreement."[3]  (Exhibit 2, Apollo Proxy Statement.)  In mid-April 2011, at a shareholder meeting and by way of submission of proxies, the Apollo shareholders (and Apollo Diamond Gemstone shareholders) approved the Private Scio transaction and asset purchase.

Mr. Adams and Private Scio were unable to raise the money necessary to complete the asset purchase, but the former Apollo investors had already approved the transaction and agreed to tender their Apollo shares, so Mr. Adams needed to find another way to consummate the asset purchase.  Mr. Adams entered into an agreement with several

---

[3] As noted below, while this language was changed in the APA dated August 31, 2011, this was, nevertheless, the language in the asset purchase agreement presented to, and approved by, the Apollo Diamond shareholders.

individuals who owned a publicly traded shell company called Krossbow Holding Corp., whereby Krossbow, by way of reverse merger, would acquire the assets of Private Scio, which consisted of nothing more than the name "Scio Diamond Technology Corporation" and the right to acquire the assets of Apollo.  In exchange, Mr. Adams, as one of the majority shareholders of Private Scio, received (beneficially with his wife) over 5,000,000 shares in the public company now known as Scio Diamond Technology Corp. ("Public Scio").  Public Scio and Apollo executed the APA on August 31, 2011.  The transaction was purportedly approved by Apollo's board of directors at a meeting on August 27, 2011.[4]

As a housekeeping matter, in May 2012, Public Scio also entered into an APA with Apollo Diamond Gemstone that was substantially similar to the Scio/Apollo APA.  As Mr. Adams explained, the diamond inventory of the two companies had been "lumped together" and "jumbled" (*id.* at 515:9-12, 517:11-15), and the May 2012 transaction was merely a necessity before Scio could issue shares to the former Apollo and Apollo Diamond Gemstone shareholders.  The purchase price, which former Apollo Diamond Gemstone shareholders had approved at $10,000, was increased to $100,000.  Scio paid this amount to Mr. Adams, which Mr. Adams deposited in the Apollo Diamond Gemstone

---

[4] As alleged in the superseding indictment, the Scio transaction was part of Adams's lulling scheme to prevent the detection of Adam's embezzlement.  When the APA was signed on August 31, 2011, the Apollo board consisted only of Robert Linares, and the "board meeting" included only Mr. Linares and Mr. Adams, as Mr. Linares's "legal advisor" and "Secretary of the Meeting."  (Adams SEC Transcript (Def. Hearing Exh. 51) at 404:2-407:20.)  The former Apollo shareholders were not involved in the decision.  At the time of the transaction, Mr. Adams was the Chairman of the Board of Scio (*id.* at 389:14-24), yet he was also purportedly providing legal counsel to Robert Linares and Apollo.  In other words, Mr. Adams designed, structured, and was involved on both sides of the Scio/Apollo APA.

account that he controlled at Venture Bank.  Mr. Adams promptly transferred $33,000 to his Wells Fargo account and distributed $33,000 each to his father-in-law and brother-in-law.  The former Apollo Diamond Gemstone shareholders received none of this money.

### b.   The APA Transferred Apollo's Assets and Control of the Business to Scio.

The parties are in agreement that, as set forth in Mr. Adams's brief, "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well."   (Def. Mem. at 14 (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985).)  Similarly, the parties are in agreement that "the mere transfer of assets with no attempt to continue the pre-existing operation generally does not transfer the attorney-client relationship." (Def. Mem. at 14 (quoting *Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663, 668 (N.Y. 1996).)  The only disagreement relates to the substance of the Scio/Apollo transaction.

As described in the communications to Apollo shareholders set forth above, the Apollo shareholders approved a transaction whereby Apollo would sell "substantially all" of its assets to a new company that was established solely for the purpose of the transaction, and where "new management" would "lead future initiatives to monetize our proprietary technology."  (*See supra* at 4-5.)  The APA that was executed in August 2011 (when Mr. Adams was the Chairman of the Board of Scio but was also advising Robert Linares as the sole board member of Apollo) incorporated different language from the asset purchase agreement initially proposed to Apollo shareholders but nevertheless provided that Scio would acquire:

> all of Seller's right, title, and interest in and to certain of the property, assets, rights, and privileges of Seller related to, used in, or associated with the operation of the Business, including personal property, tangible or intangible property, wherever located, whether accrued, contingent or otherwise, other than the Excluded Assets…

(APA Section 2.1 (p. 9).)

Nowhere in the APA is there any indication that Apollo would retain any attorney-client privilege or work product protection.  The Excluded Assets, which are all that Scio *did not* acquire per the terms of the APA included only six categories of assets: (1) Transaction Rights; (2) Contracts; (3) Books and Records, (4) Third Party Property; (5) Claims and Warranties, and (6) Leased Real Property.  (*Id.* Section 2.2 (p. 11).)  These Excluded Assets make no mention of any privileges to be retained by Apollo.  In contrast though, all "Other Assets" not specifically enumerated as "Excluded Assets" were conveyed to the Buyer:

> *Other Assets*.  To the extent not otherwise enumerated in this <u>Section 2.1</u>, and at the discretion of Buyer, all other tangible assets, rights, privileges, benefits, Claims, and interests of Seller, whether real, personal or mixed wherever located, that relate to, used in or held for use in the operation of the Purchased Assets or Business.

(*Id.* Section 2.1(j) (p. 10.))

As explained to the shareholders, the purpose of the transaction was to allow the "Business" of Apollo to continue as a new entity, Scio, while shedding the liabilities, which would remain with Apollo, and allowing Apollo shareholders to become Scio shareholders.  As Mr. Adams himself described his goal when structuring the transaction: "I was trying to facilitate a transaction that allowed the shareholders to have a second bite at their apple.

8

That's what my goal was here." (Adams SEC Transcript (Def. Hearing Exh. 50), at 245:21-23.)  In short, when the transaction was completed, Apollo's operations continued on as Scio, with the same operations, the same shareholders (at least, initially), and with Mr. Adams now calling the shots at Scio.  That is how all individuals involved in, and familiar with, the transaction viewed it, at least until the recent assertions made in Mr. Adams's current Memorandum.

Michael Monahan, who structured the transaction with Mr. Adams, and who, like Mr. Adams, owned millions of shares in Public Scio, testified that the transaction was intended for the same shareholders to continue to own the same business in a new company, run by different management:

- "I believe most, if not all shareholders, understood they were going to own the same assets in a different capital structure, different company…" (Exhibit 3, Monahan SEC Trans., at 139:23-25.)

- "What the Apollo shareholders were most excited about, what mattered to them is that the opportunity would live on, they would have a chance to own a part of the company that was going to exploit the technology, the diamond technology, and that they were going to own it in a company that was capitalized and had a myopic focus on manufacturing versus kind of research and development that Apollo had done a lot over the years.

  And that ability to own the assets in a new entity at no cost to them and in an entity that was free of debt or any other liabilities, had a new management team and a new focus was what they were really looking for." (*Id.* at 169:2-13.)

- "So a shareholder from Apollo who owned X percent in Apollo in a $45 million capital structure owned certain assets in an entity with substantial liabilities and no cash and control in the hands of a few people and an illiquid stock in a privately held company.  That same person who exercised his or her right to purchase the shares in Public Scio had an increased ownership percentage **in an entity that owned the same assets with no debt, cash in the bank and liquidity**." (*Id.* at 256:11-18 (emphasis added).)

9

In fact, prior to Mr. Adams's current efforts to shroud these communications in privilege, even Mr. Adams and the legal team that represented him in connection with the investigation by the U.S. Securities and Exchange Commission described the APA as one where Scio acquire <u>all</u> of the assets of Apollo.  In a presentation that Mr. Adams's then-counsel, Latham & Watkins LLP, gave to the SEC in December 2014, Mr. Adams's counsel described Public Scio as follows:

- "'Public Scio' (Krossbow Holding Corp.)
  - Public company purchased in 2011 to acquire Apollo & Gemstone assets
  - Public Scio now owns **all assets of former Apollo & Gemstone entities**."

(Exhibit 4, Latham & Watkins "Presentation to the SEC Staff, In the Matter of Scio Diamond Technology Corp." at p. 7 (emphasis added).)

The statements of those directly involved in the Scio/Apollo transaction, including Mr. Adams's own lawyers, conclusively demonstrate that the Scio/Apollo transaction effectively transferred all of Apollo's assets and operations to Scio, so that Scio could continue Apollo's business under a different name, with all of Apollo's shareholders becoming Scio shareholders, and with Mr. Adams effectively controlling Public Scio as its Chairman of the Board of Directors and as its largest shareholder (along with his law partner).[5]

---

[5] Mr. Adams cites several statements from an April 2012 SEC comment letter (Def. Mem. at 8-9; Def. Mem. Exh. 6), signed by Scio's then-CFO, Charles Nichols.  Nichols, however, was not employed at Scio when the Scio/Apollo transaction occurred, and he had no involvement in the transaction.

Concomitantly, Apollo ceased all business operations after the APA.  Contrary to Mr. Adams's assertion that the Apollo Companies "did continue to operate and exist after the Scio transactions," Robert Linares testified to the SEC as follows:

> Q:    When did the company cease to exist, Apollo Diamond?
> A:    Well, cease to exist in practical terms when we concluded the sale of the assets to Scio.

(Exhibit 5, Robert Linares SEC Trans., at 13:7-10.)  And although Mr. Adams points out that, per the APA, Apollo retained its "books and records" (Def. Mem. at 7), that actually did not occur, because Apollo – having ceased operations and ceased paying many of its liabilities – had been locked out of its former building by its landlord:

> Q:    So once the landlord prevented you from entering the building --
> A:    Right.
> Q:    -- you no longer had access to any corporate files?
> A:    That's correct.
> Q:    You never saw the corporate files again?
> A:    That's correct.

(Exhibit 5, R. Linares SEC Trans., at 21:19-22:1.)  And, when asked who might have been responsible for taking possession of those materials, Mr. Linares, again, clarified that Scio would take possession because the APA was intended to convey all of Apollo's assets:

> It would be [Scio CEO] Joe Lancia, because Joe Lancia was the executive at Scio that we signed the deal with, and he was responsible for everything.  It was his – he was the one person who was going to take possession of the records, of the equipment, of the processes, the sales records, all of the inventory.  That all was bequeathed to him in the agreement that we sold.

11

(*Id.* at 22:5-11.)  Finally, Mr. Linares confirmed that, other than some information relating to Apollo's outstanding debts, he and Apollo did not retain <u>any</u> records for the purpose of winding down Apollo's business:

> Q:    It was your understanding that under the Asset Purchase Agreement between Apollo Diamond and Scio Diamond Technology in 2011 that Scio Diamond had the right to obtain Apollo Diamond's corporate records?
> A:    That's correct.
> Q:    Do you know if they, in fact, did maintain those?
> A:    I don't know.  I have no idea.
> Q:    Did you maintain or keep with you any of Apollo records following the Asset Purchase Agreement that would allow you to wind down Apollo's business?
> A:    No.  What we considered – there were only a few things that were important, one of which was the debts of the company, and that was the main thing, the debts of the company.

(*Id.* at 38:5-19.)

To support his assertion that all of Apollo's assets and operations did not transfer to Scio, Mr. Adams also argues that Apollo had "activity" after the APA.  He points to purported "liability and legal issues, including lawsuits, potential tax liability, and threats from Scio, creditors, and vendors." (Def. Mem. at 11.)  Additionally, he points to an Apollo bank account at Venture Bank that currently maintains a balance of $5,305.  Ironically, this is one of the very accounts that Mr. Adams covertly opened in Apollo's name in 2007, for which he was the sole signatory, and through which he committed a portion of the fraud detailed in the superseding indictment.  (Indictment, ¶¶ 29-33.)  Mr. Adams notes that, subsequent to the signing of the APA, "[p]ayments were received" in this account, "[p]ayments were made, and checks were cut," and [a]ssets remained in ADI's bank

account." (Def. Mem. at 17.)  Mr. Adams misleadingly only provides the summary bank account statements for that account as exhibits and does not include copies of checks or details of monetary transfers.  Had he done so, it would be apparent that the vast majority of the "payments made" and "checks cut" were going to Mr. Adams.  Specifically, Mr. Adams wrote the following checks and/or transferred the following funds during the period subsequent to the APA:

- $275,000 to Adams Monahan LLP on Nov. 18, 2011;
- $335,000 to Adams's personal Wells Fargo account on Sept. 13, 2011;
- $350,000 to Adams's personal Wells Fargo account on Jan. 10, 2012;
- $5,000 to Adams's personal Wells Fargo account on March 1, 2012;
- $10,000 to Adams's personal Wells Fargo account on June 8, 2012;
- $25,000 to Adams's personal Wells Fargo account on Feb. 11, 2012; and
- $1,765.97 to Adams's personal Wells Fargo account on Apr. 4, 2013 (which took the account balance to zero).

In short, Mr. Adams transferred over $1,000,000 to himself or his law firm during this period when he argues that he was managing the liabilities of Apollo.[6]

Mr. Adams also argues that an agreement dated January 2, 2012, between Mr. Adams and Robert Linares (Def. Mem. Exh. 3) demonstrates the ongoing existence and operation of Apollo and somehow conveys to Mr. Adams the right to assert privileges on behalf of Apollo.  (*e.g.*, Def. Mem. at 17.)  As detailed above, Apollo no longer existed,

---

[6] In fact, in addition to controlling the Apollo account, Mr. Adams also controlled Scio's bank account, both before and after the execution of the APA.  As Scio's CEO Joe Lancia testified, Mr. Adams "insisted" that Mr. Adams "was going to be the only signature on that account."  (Exhibit 6, Lancia SEC Trans., at 270:9-17.)  From July 2011 through May 2012 (when Scio established a bank account in South Carolina), Mr. Adams transferred over $383,000 from this account to his law firm and transferred an additional $60,264.74 to his personal account at Wells Fargo.

and there were no operations, as everything but the "debts of the company" had been transferred to Scio.  This agreement appears to be nothing more than a way to provide a paper trail for some of the money that he paid himself out of the Apollo account that he controlled after Apollo ceased to exist.  Even on its face, it fails to convey the right to assert any privileges.  Finally, even if it were somehow construed to convey such a right to Mr. Adams, by its very terms, that right would have expired on January 2, 2017, five years after it was executed.

As is clear from the statements of the three individuals involved in the structuring and execution of the APA – Mr. Adams, Monahan, and Robert Linares – the APA resulted in Scio owning "all assets of former Apollo and Gemstone entities" (Exhibit 4, at p. 7), structured so that Scio owned "the same assets in a different capital structure" but "with no debt, cash in the bank and liquidity."  (Exhibit 3, Monahan SEC Trans., at 139:23-25, 256:11-18.)  Moreover, other than serving as little more than a personal piggy bank for Mr. Adams, Apollo "cease[d] to exist in practical terms when [it] concluded the sale of assets to Scio."  (Exhibit 5, R. Linares SEC Trans., at 13:7-10.)

c.      **Any Privilege that Remains is Held by Scio.**

As noted above, "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Weintraub*, 471 U.S. at 349.  "Displaced managers," such as Linares,[7] or Mr. Adams as his

---

[7] As is clear from the Affidavit of Robert Linares submitted with Mr. Adams' memorandum, Linares is not attempting to assert any privilege on behalf of himself or Apollo – only noting that he never waived any privilege.  Only Mr. Adams, who resigned any role that he had with Apollo in early 2011, is attempting to assert a privilege.

purported agent pursuant to the January 2012 agreement, "may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties." *Id.*

Here, as set forth in detail above, the APA resulted in the transfer of all of Apollo's assets to Scio – "a new entity . . . that was free of debt or any other liabilities, had a new management team and a new focus." (Exhibit 3, Monahan SEC Trans., at 169:2-13.) In such instances, courts have consistently held that any privileges also transfer to the successor company. *See*, *e.g.*, *Tekni-Plex*, 674 N.E.2d at 134 ("As a practical matter, then, old Tekni-Plex did not die. To the contrary, the business operations of old Tekni-Plex continued under the new managers. Consequently, control of the attorney-client privilege . . . passed to the management of new Tekni-Plex.") (internal citations omitted); *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004) ("If the practical consequences of the transaction result in the transfer of the control of the business and the continuation of the business under new management, the authority to assert or waive the attorney client privilege will follow as well."); *American Intern. Spec. Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 407 (N.D. Ill. 2007) ("New FTL purchased substantially all of Old FTL's business operations and continues to operate Old FTL's business. Therefore, because the practical consequences of the Asset Purchase Agreement resulted in the transfer of control of Old FTL's business and the continuation of that business under new

---

Moreover, the government met with and interviewed Mr. Linares with Mr. Linares's counsel present. Mr. Linares freely discussed issues relating to Apollo and his communications with Mr. Adams and at no time did he or his counsel assert any privilege with regard to any such communications.

management, the authority to assert or waive the attorney client privilege transferred to New FTL.").

The *American Intern. Spec. Lines* case engages in a thorough analysis of this issue and contrasts those instances when courts have found the privilege was conveyed to the successor entity with those instances when the privilege was not deemed conveyed. In general, courts have found the privilege to convey when "most, if not all, of a corporation's assets" are sold to a successor corporation. *See id.* at 406. In contrast, the *American Intern. Spec. Lines* court provides multiple examples where the privileges did not transfer, citing cases where only certain enumerated assets were transferred, including items such as leases, trademarks, and goodwill. *See id.*

In the present case, it is abundantly clear that the sole business operations of Apollo transferred to Scio as a result of the APA, and any argument to the contrary is belied by the statements of all involved in the transaction, as well as the express language of the APA. In every such instance in which a court has addressed such a transaction, as the transaction has been described by Monahan, Robert Linares, and Mr. Adams's own lawyers, the court has held that the privileges passed to the successor company. Accordingly, any attorney-client privilege once held by Apollo are now held by Scio.

### d.   <u>Scio Has Waived its Privileges Regarding Communications with Mr. Adams and His Law Firm.</u>

Although not relevant to the current analysis, for subsequent issues to be addressed by the Court, it is noteworthy that Scio has waived any privileges regarding communications between or among Apollo and Mr. Adams or anyone at his law firm, as

evidenced in the June 2016 email from Scio's counsel.  (Def. Hearing Exh. 28.)  Because, as demonstrated above, any of Apollo's privileges passed to Scio, contrary to Mr. Adams's assertions, this is a valid waiver of Scio's privileges.  Moreover, although this email was sent in June 2016, as set forth in the attached Declaration of David Young (Exhibit 7), Scio's counsel conveyed to the government in February or March 2017 that Scio did not intend to assert any attorney-client privilege with respect to any legal advice that Mr. Adams or his law firm may have provided to Apollo.  In any event, under no circumstance would this be Mr. Adams's privilege to assert.

Accordingly, from February or March 2016 forward, the government was entitled to review any communications between or among employees at Apollo and Mr. Adams or anyone at his law firm, as any privilege[8] that Apollo may have once held regarding those communications was transferred to, and then waived by, Scio.  The Court should reject any effort by Mr. Adams to assert a privilege – one that he, personally, never held (and one that Robert Linares is not even attempting to assert) – for the sole purpose of shrouding his own criminal conduct in secrecy.

---

[8] Mr. Adams also asserts that there also exists work product protection, but he does not appear to argue in his memorandum that he, as the lawyer, can assert the work product doctrine to prevent disclosure against the wishes of the client.  Accordingly, as any work product protection also transferred to Scio, only Scio can assert that the doctrine protects such materials for disclosure (and Scio has waived any such protections).  Moreover, as Mr. Adams cites in his memorandum, the work product doctrine "sharply limits the access of an opponent to materials 'prepared in anticipation of litigation or for trial.'"  (Def. Mem. At 3 (quoting *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir. 1997).)  Mr. Adams has not pointed to any anticipated litigation or trial for which he counseled or assisted Scio.

## II.    THE BREVER AND MURRY TAX PREPARATION COMMUNICATIONS ARE NOT PRIVILEGED.

Mr. Adams also asserts that certain communications that he had with Murry, an accounting firm, are privileged because Murry was hired by an attorney, Thomas Brever, pursuant to a *Kovel* arrangement.  Because Mr. Adams hired Brever and Murry to assist him with the filing of amended tax returns, and not to provide legal advice or tax planning advice (which could potentially be privileged), the communications among Mr. Adams, Brever, and Murry relating to the filing of his amended tax returns are not privileged, regardless of the type of arrangement under which Mr. Adams and Brever attempted to cloak the arrangement.

As discussed on the status conference call among the parties on January 19, 2018, the government is at a distinct disadvantage in responding to Mr. Adams's memorandum on this issue, as Mr. Adams has submitted the documents that it claims are privileged *ex parte*.  Nevertheless, the government will endeavor herein to explain why the Murry and Brever documents are not privileged based on its understanding of the situation and the admittedly non-privileged documents that have been produced by Brever.[9]  Additionally, while Mr. Adams appears to have submitted seven Murry communications for the Court's review, it is critical that the Court have <u>all</u> relevant emails and attachments, including the communications between Mr. Adams and Brever, in order to assess the nature of the relationship among these parties and whether their communications do, in fact, relate to the

---

[9] As explained below, Brever produced documents to the government in response to a subpoena and withheld other documents (including communications with Murry) on the assertion of the attorney-client privilege and attorney work product doctrine.

provision of legal advice.  At a minimum, Mr. Adams should be required to provide <u>all</u> such documents to the Court and to certify that he has done so.  As discussed on the conference call, if the Court wishes the government to weigh in on specific documents, those documents could be provided to the government's filter team.

As background, the Murry documents in question relate specifically to the substantive allegations in the superseding indictment.  As of 2014, Mr. Adams had not declared the money that he embezzled from the various Venture Bank accounts that he controlled (*see* Superseding Indictment, ¶¶ 16-40) as income on his tax returns.  Only after being served with a subpoena by the SEC in 2014 did he attempt to remedy the earlier false tax returns that he had filed.  This led to his relationship with Brever and Murry, which appears to have begun in October 2014.  The Murry documents in question were initially discovered by the government in Mr. Adams's Yahoo! emails based on a search of the keyword "warrants," which is how Mr. Adams attempted retroactively to justify his embezzlement of the money from Apollo investors.  As explained below, it appears that Mr. Adams hired Brever and Murry in late-October 2014 for the primary purpose of preparing and filing his amended tax returns and that this tax preparation process was largely, if not entirely, completed by mid-November 2014.  It also appears that Brever's involvement was intended by Mr. Adams as nothing more than an effort to cloak these materials in privilege under the *Kovel* line of cases.  Yet, no privilege protects these materials.

### a.    Tax Return Preparation Does Not Involve Legal Advice.

Courts have routinely held that "preparation of tax returns, while it may require some knowledge of the law, is primarily an accounting service." *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (citing *United States v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981)); *United States v. Gurtner*, 474 F.2d 297, 299 (9th Cir. 1973); *Canaday v. United States*, 354 F.2d 849, 857 (8th Cir. 1966)); *see also Ellis v. United States*, No. 3:14-MC-00521-CWR-LRA, 2015 WL 7289497, at \*5 (S.D. Miss. Nov. 16, 2015) ("[T]he preparation of tax returns does not constitute legal advice within the applicability of the privilege.").   This stands true whether the preparation of the tax returns is done by an accountant at a lawyer's direction, or if the preparation is done by a tax lawyer directly. *See Davis*, 636 F.2d at 1043-44 (highlighting the absence of an accountant-client privilege and noting that "[i]t would make little sense to permit a taxpayer to invoke a privilege merely because he hires an attorney to perform the same task.").   As *Kovel* itself makes clear, the key requirement "is that the communication be made in confidence for the purpose of obtaining legal advice" and that "[i]f what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists."  *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

There also exists a fundamental difference between tax planning, which may require legal advice, and tax return preparation.  Tax planning can entail "advising a client on how best to structure contemplated financial transactions, decisions, or occurrences from a tax consequences standpoint."  *United States v. Willis*, 565 F. Supp. 1186, 1190 (S.D. Iowa 1983).  Contrasting tax return preparation, the *Willis* court explained:

> Income tax preparation, on the other hand, involves closed tax periods and entails evaluating the consequences of previously-consummated transactions and occurrences; compiling the information pertinent to those transactions and events; categorizing, classifying, and otherwise organizing the information in a way which corresponds with the classifications and categories appearing on tax return forms; selecting among the various available tax forms; electing the most advantageous tax filing status; computing the final figures to be included on the taxpayer's return on the basis of raw information available; completing the tax return; and other after-the fact services ultimately aimed at satisfying the disclosure requirements for the tax period in question.

*Id.* at 1191.

In *United States v. Schussel*, the First Circuit held that communications relating to tax return preparation – even if the returns are not ultimately filed – are not privileged because the information is communicated "with the intent that the information be turned over to the IRS." *United States v. Schussel*, 291 Fed. Appx. 336, 347 (1st Cir. 2008). In *Schussel*, amended tax returns were prepared for a defendant who was being audited by the IRS, but, based on advice from his lawyer – who had been retained by the defendant specifically because the lawyer had experience in criminal tax matters – the defendant decided not to file the returns. Regardless of the fact that the defendant presumably made this decision based on the advice of counsel, the court held that, because the defendant communicated the information with the intent that it be disclosed to the IRS, there was no expectation of confidentiality and, therefore, the information was not privileged. *Id*. at 347.

The Eighth Circuit examined this issue in detail in *United States v. Cote*, 456 F.2d 142 (8th Cir. 1972), and (in contrast what the *Schussel* court later held), found that there

existed some instances where the decision to file amended returns could involve legal considerations to which a privilege would attach.  In *Cote*, the court analyzed when the communications with the lawyer occurred, when the decision to file amended returns was made, and when the accountant was involved.  There, the court found that the lawyer's advice to file the amended returns was formulated after reviewing the work done by the accountant, and the accountant's work, accordingly, assisted the lawyer in providing legal advice.  *See id.* at 144.  The court went on to explain:

> We would agree that if the advice to file the returns was first given by [the lawyer] and thereafter the accountant was employed simply to make the correct mechanical calculations, the privilege would not apply.

*Id.*

Here, based on the Brever declaration and the documents that Brever produced to the government that Brever determined were not privileged,[10] it is evident that the Murry documents fall in the category described by *Cote* where no privilege applies.  Mr. Adams retained Brever on September 24, 2014.  (Brever Dec. ¶ 2.)  Brever retained Murry on October 28, 2014.  (*Id* ¶ 3.)  As demonstrated by the communications between Mr. Adams and Murry, Mr. Adams and Brever retained Murry for the exclusive purpose of preparing and filing Mr. Adams's amended tax returns.  On October 27, 2014, the day before Murry

---

[10] Brever produced documents in response to a grand jury subpoena served on Murry.  The documents attached hereto as exhibits and referenced in this section were produced by Brever and are documents that Brever represented "are covered neither under attorney-client nor work product privileges."  (Brever Dec. 20, 2016 Letter to D. Maria and J. Kokkinen.)

was purportedly formally retained by Brever, Patrick Murry explained in an email to Brever:

> We would be happy to prepare any amended returns that are required. If we can get all of the necessary information (the original returns and the information on the omitted income) we can get right on preparing the returns.

(Exhibit 8, October 27, 2014 email chain (bottom of p.1).) In response, Brever instructed Murry to contact Mr. Adams directly, and Patrick Murry emailed Mr. Adams and asked, "Would you be available tomorrow afternoon for [sic] phone call to discuss the amended returns that you need prepared?" (*Id.* (top of p.1.) Little more than two weeks later, Brever emailed Mr. Adams, letting him know that Murry had finished preparing the amended returns:

> Pat has prepared the amended returns based on the documents and information provided. They can be signed by you and your wife. I have sent a disclosure statement to Pat for comment. This can be added to the returns for filing.

(Exhibit 9, November 12, 2014 email from Brever to Mr. Adams and P. Murry.)

These emails demonstrate that (1) the decision had already been made to file amended returns at the time Murry was retained, and (2) Murry was retained for the exclusive purpose of preparing the amended returns. In *Cote*, the Eighth Circuit specifically noted that the communications with the accountant in such a situation are not privileged, and the Court should hold that Mr. Adams's communications with Murry are, likewise, not privileged.[11]

---

[11] Mr. Adams also appears to be asserting a "*Kovel* Accountant Work Product" protection over several documents. (Def. Mem. Exh. 20.) Courts have routinely held that the

As demonstrated by the cases cited above, the communications with Brever[12] may also be not privileged, to the extent that he was merely involved or counseling with respect to the preparation of amended tax returns.  Instead of submitting for the Court's review the email communications with Brever that have been withheld as privileged, Mr. Adams submitted a recent declaration whereby Brever describes the nature of his engagement by Mr. Adams and the type(s) of legal advice that he provided.  (The government was not privy to this information, as it was redacted in the filed version.)  The government submits that the Brever declaration should be disregarded, as the best evidence of the timing and nature of the relationship – which is critical to the inquiry under *Cote* – is the set of contemporaneous emails between Mr. Adams and Brever.  These emails will shed light on the specific purpose for which Mr. Adams retained Brever and should <u>all</u> be provided to the Court.  Moreover, because a party cannot assert a blanket privilege over a group of documents and must allege and establish its specificity as to each document, *see United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982); *In re Milk Products Antitrust Litig.*, 84 F. Supp. 2d 1016, 1028 (D. Minn. 1997), the Court will ultimately have to review

---

preparation of tax returns, by lawyers or by accountants at the direction of lawyers, do not constitute work product because they are not prepared in anticipation of litigation.  *See United States v. El Paso Co.*, 682 F.2d 530, 542-43 (5th Cir. 1982); *Davis*, 636 F.2d at 1040; *United States v. Bell*, No. C94-20342 RMW, 1994 WL 665295, at *4 (N.D. Cal. Nov. 9, 1994) ("[A] party's analysis of contingent tax liabilities, while involving the 'weighing of legal arguments, predicting the stance of the IRS, and forecasting [the client's] position in court,' was not prepared in anticipation of a dispute with the IRS over its tax return.").

[12] As explained in the government's briefing in response to Mr. Adams's motion to suppress, the government segregated any communications that included Brever's name and the prosecution team has not reviewed, or had access to, those communications.

those documents to determine if each document withheld by Mr. Adams or Brever is, in fact, privileged.  For these reasons, the Court should require Mr. Adams to submit all relevant communications with Brever and Murry to the Court and should further require Mr. Adams to certify that the seven Murry documents submitted for the Court's review constitute all of the Murry materials withheld on privilege grounds.

### b.   Any Privilege that May Have Existed Has Been Waived.

As set forth above, based on the information available to the government, Mr. Adams's communications with Brever and Murry relating to the filing of Mr. Adams's amended tax returns are not privileged because the communications did not constitute legal advice.  To the extent that the Court determines otherwise, controlling case law dictates that any privilege that may have existed with regard to these communications has been waived.  Because Mr. Adams filed amended tax returns as a result of his interactions with Brever and Murry, these disclosures to the government "effectively waived the privilege not only to the transmitted data but also as to the details underlying that information." *Cote*, 456 F.2d at 145.

In *Cote*, where the court found that a privilege existed (because, in contrast to the fact pattern here, the lawyer had utilized the work done by the accountant to make the determination that the client should file amended returns), the court ultimately determined that the privilege had been waived:

> Notwithstanding our recognition that the attorney-client privilege attached to the information contained in the accountant's workpapers under the circumstances existing here, we find that by filing the amended returns the taxpayers communicated, at least in part, the substance of that

> information to the government, and they must now disclose the
> detail underlying the reported data.

*Id.* at 144.  The court went on to note that, "[i]n tax cases waiver is often not even an issue

since the privilege is said not to attach to information which the taxpayer intends his

attorney to report in the contents of a tax return."  *Id.* at 145 n.3 (citing multiple cases).

Other circuits addressing the issue have held the same, many of them citing *Cote* with

approval.  *See*, *e.g.*, *In re Grand Jury Proceedings*, 727 F.2d 1352, 1357 (4th Cir. 1984);

*United States v. Lawless*, 709 F.2d 485, 488 (7th Cir. 1983).

Accordingly, to the extent that any privilege may have initially attached to

communications among Mr. Adams, Brever, and Murry that related to the filing of his

amended tax returns, Mr. Adams has "waived the privilege not only to the transmitted data

but also as to the details underlying that information."  *Cote,* 456 F.2d at 145.  The Court

should, therefore, order that the government is entitled to review any such communications

in Yahoo! email database and should further order Murry and Brever to comply with the

grand jury subpoena issued to Murry and produce all such communications previously

withheld as privileged.

## CONCLUSION

For the foregoing reasons, the Court should issue an Order finding that (1) no

privilege exists regarding communications between Mr. Adams (or anyone at his law firm)

and anyone at Apollo, as any privilege that may have existed has been effectively waived

by Scio, and (2) communications among Mr. Adams, Brever, and Murry are not privileged,

either because they did not constitute legal advice or because any privilege that may have

attached has been waived.

Dated: February 20, 2018

                                    Respectfully submitted,

                                    GREGORY G. BROOKER
                                    United States Attorney

                                    /s/ David M. Maria

BY:    DAVID M. MARIA
           JOHN E. KOKKINEN
           Assistant U.S. Attorneys