## APOLLO DIAMOND, INC.

## PROXY STATEMENT
### FOR
### 2011 SPECIAL MEETING OF STOCKHOLDERS

This proxy statement contains information relating to the solicitation of proxies by the board of directors of Apollo Diamond, Inc. ("**ADI**" or the "**Company**") to be voted upon at the special meeting of stockholders to be held on April 18, 2011 at 9:00 a.m. local time at Embassy Suites Boston at Logan Airport, 207 Porter Street, Boston, Massachusetts 02128.

### Summary

*This summary highlights information included elsewhere in this proxy statement. This summary may not contain all of the information you should consider before voting on the proposals presented in this proxy statement. You should read the entire proxy statement carefully, including the annexes attached hereto. For your convenience, we have included cross references to direct you to a more complete description of the topics described in this summary. In this proxy statement, "we", "us" and "our" refer to ADI and its consolidated subsidiaries, unless the context otherwise requires.*

Apollo Diamond, Inc. seeks approval from its stockholders to enter into a series of transactions through which the Company would initially sell substantially all of its assets to Scio Diamond Technology Corporation ("SDTC") for approximately $2.0 million (the "Asset Sale") and subsequently repurchase all of the outstanding shares of its single series common stock (the "Stock"). The proceeds from the Asset Sale would be utilized to satisfy the Company's outstanding debts and liabilities as well as to repurchase the Company's outstanding stock at a value of $.01 per share (the stated par value of the Company's capital stock). Every ADI stockholder consenting to the stock repurchase transaction (the "Stock Repurchase") will enter into an agreement with the Company to sell the stockholder's Stock to the Company at a value of $.01 per share. In connection with the Asset Sale, ADI has negotiated an option for ADI stockholders to purchase shares of SDTC common stock under a separate subscription agreement with SDTC (the "SDTC Subscription Agreement"). Each ADI stockholder who satisfies the requirements set forth in the SDTC Subscription Agreement and who has their/its SDTC Subscription Agreement accepted by SDTC will be permitted to purchase a number of shares of SDTC's common stock equal to the stockholder's current ADI Stock ownership. The SDTC common stock will be offered at an initial purchase price of $.01 per share.

**GOVERNMENT
EXHIBIT
2
17-CR-64 (DWF/KMM)**



**COMMISSION
EXHIBIT
7
8-4-15 TS**

Apollo Diamond Gemstone Corporation ("ADGC"), a subsidiary of ADI will concurrently seek approval from its stockholders to enter into an asset sale with SDTC through which it would also sell substantially all of its assets to SDTC for approximately $10,000. ADGC will also seek consent from its stockholders to repurchase all of its currently outstanding capital stock at a value of $.01 per share. Each ADGC stockholder consenting to the repurchase will also be permitted to purchase an equal number of shares of SDTC common stock on terms equal to those provided to ADI stockholders.

As a result of these transactions, if approved and consented to, SDTC will own substantially all of the assets of ADI and ADGC. You will also own shares in SDTC which actually exceed, on a fully-diluted percentage basis, your existing share ownership in ADI. In other words, as a result of this transaction, your ownership in SDTC will on a fully-diluted percentage share ownership basis exceed that of your existing percentage share ownership in ADI.

The following is a table of the current capital structures of ADI and ADGC as well as the proposed capital structure of SDTC, assuming all ADI and ADGC stockholders consent to the respective repurchases of stock and subscribe for SDTC common stock:

| Entity | Outstanding Shares | Outstanding Warrants and Options | Fully-Diluted Shares | Shares Eligible for Repurchase |
|---|---|---|---|---|
| ADI | 21,702,619 | 23,500,000 | 45,202,619 | 21,702,619 |
| ADGC | 25,480,447 | 18,519,000 | 43,999,447 | 985,447 |
| **Totals:** | | | | **22,688,066** |

| | Outstanding Shares | Presently Issued or Reserved for Issuance Warrants and Options | Fully-Diluted Shares |
|---|---|---|---|
| SDTC | 25,218,099 | 4,250,000 | 29,468,099 |

The following is a comparison of fully-diluted ownership interests based on an assumed ownership of 100,000 shares:

| | Fully-Diluted Interest |
|---|---|
| ADI | 0.22% |
| SDTC | 0.34% |

2

SEC-MONAHAN-000222

*Reasons for the Asset Sale and Stock Repurchase*

Through substantial research and development, the Company has developed a proprietary process to manufacture diamond materials in a controlled laboratory environment. To date, however, the Company has achieved only nominal success in commercializing its proprietary technology and has been unable to secure financing necessary to properly move into a viable commercialization phase of operations. Moreover, the Company is unable to fund further operations without additional outside capital. As a result, and as previously disclosed in shareholder letters, since 2008 the Company has faced significant liquidity challenges which have adversely affected our business, financial condition, results of operations and prospects and, more recently, also called into doubt our ability to continue as a going concern. Our board of directors' decision to enter into the Sale Agreement (as defined below) was the result of a purposeful decision-making process that included a careful evaluation of ADI's strategic alternatives, including its prospects of continuing as a stand-alone company. Recent efforts to recapitalize and/or sell the Company through the assistance of various parties, including our financial advisor, Deutsche Bank AG, have proven ineffective. Given our recent history and the current economic environment, our board of directors and the current senior management, including our founder, chief executive officer and chairman, Dr. Robert C. Linares, believe that management experienced in manufacturing and commercialization of technology is necessary to recapitalize the Company and lead the initiative to monetize our proprietary technology. Also, Dr. Linares, who is now seventy-five years old, has recently experienced difficulties related to his health. Resultantly, Dr. Linares feels he is no longer able to provide a full-time commitment to the day-to-day operations and commercialization phase of the business, which will be required to monetize our proprietary technology. The Asset Sale would provide a new corporation with an opportunity to organize under new management and a capital structure likely more conducive to realizing the capital necessary to commercialize the proprietary technology. Finally, and very significantly, as a result of the Asset Sale and the Stock Repurchase, ADI stockholders would likely have an opportunity to realize the **dual benefits** of a capital loss on their respective investments in the Company and an opportunity, if they choose, to invest the entire amount they receive in connection with the repurchase of their shares from ADI in a new entity seeking to commercialize ADI's proprietary technology. If approved, each stockholder would have a per share basis of $.01 in SDTC common stock.

*The Asset Sale*

We have agreed to sell substantially all of our assets to SDTC for approximately $2.0 million in cash pursuant to the Asset Purchase Agreement dated of even date herewith (the "Sale Agreement"), between SDTC and ADI. Under the terms of the Sale Agreement, SDTC will acquire substantially all of the assets of ADI for $2.0 million in cash. A copy of the Sale Agreement is attached hereto as Appendix A. The entire proceeds from the Sale Agreement will be applied toward existing liabilities of ADI, including transaction costs associated with the

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000223

Asset Sale and the Stock Repurchase. We would have no significant operating assets following the Asset Sale.

*Use of Proceeds*

The proceeds from the Asset Sale would be used to pay off ADI's debts and liabilities, including certain lease payments, professional service fees and transaction costs associated with the proposed Asset Sale as well as the Stock Repurchase.

*Conditions to the Asset Sale*

Completion of the Asset Sale requires the approval of a majority of our stockholders as well as the satisfaction or waiver of the customary conditions set forth in the Sale Agreement.

*The Stock Repurchase*

Under the terms of the stock repurchase agreement between the Company and each stockholder (each a "Stock Repurchase Agreement"), ADI will agree to repurchase all of the shares of Stock owned by its stockholders at a price of $.01 per share. The Company will utilize a portion of the proceeds from the Asset Sale to repurchase the Stock. To enable each ADI stockholder to preserve his, her or its pro-rata ownership in SDTC, and to actually increase their pro-rata percentage ownership on a fully-diluted basis, each stockholder, who qualifies as an accredited investor and whose subscription is accepted in the sole and unilateral discretion of SDTC, will be permitted to purchase shares of SDTC common stock at $.01 per share through the SDTC Subscription Agreement. For example, an ADI stockholder who owns 10,000 shares of Stock will be offered $100 by the Company for such stockholder's Stock. In turn, the stockholder will have an opportunity to purchase 10,000 shares of SDTC common stock for $100 ($.01 per share). A copy of the proposed Stock Repurchase Agreement is attached hereto as Appendix B.

*SDTC*

Assuming each of the ADI stockholders enters into a Stock Repurchase Agreement with ADI and ultimately purchases shares of SDTC common stock, the initial capital structure of SDTC will consist of approximately 25,218,099 shares of common stock and 4,250,000 warrants and/or options exercisable at various prices. The outstanding common stock of SDTC will consist of 21,702,619 common shares issuable to ADI stockholders who enter into the Stock Purchase Agreement. In addition, it will include 985,447 common shares issuable to ADGC stockholders who enter into a similar stock purchase agreement with ADGC. Some of the warrants will be allocated to SDTC's chief executive officer, Joseph D. Lancia, and will vest according to the attainment of specific benchmarks relating to the commercialization of the Company's technology. Mr. Lancia's biography is included with his letter of introduction and has been

4

provided to you by way of this mailing. Other warrants and/or options in SDTC will be allocated to parties in connection with their anticipated contributions to the enterprise.

## QUESTIONS AND ANSWERS

The following is a list of specific questions you, as a stockholder of ADI, may have regarding the Asset Sale, the Stock Repurchase and the special meeting. We have also provided brief answers to such questions. We urge you to carefully read this entire proxy statement, the appendices to this proxy statement and the documents referred to or incorporated by reference in this proxy statement because the information in this section does not provide all of the information that may be important to you as a stockholder of ADI with respect to the authorization of the Asset Sale or the consent to the Stock Repurchase.

## THE SPECIAL MEETING

Q. **When and where will the special meeting of stockholders take place?**

A. The special meeting of stockholders will be held on April 18, 2011 at 9:00 a.m. local time at Embassy Suites Boston at Logan Airport, 207 Porter Street, Boston, Massachusetts 02128.

Q. **What is the purpose of the special meeting?**

A. At the special meeting, you will be asked to vote upon: (1) a proposal to authorize the Asset Sale; (2) a proposal to approve the Stock Repurchase; (3) a proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies for one or more proposal(s) in the event that there are not sufficient votes and/or at the time of the special meeting or any adjournment or postponement thereof to approve one or more of the foregoing proposals; and (4) such other matters as may properly come before the special meeting or any postponements or adjournments thereof.

Q. **Is the approval of the Asset Sale or the Stock Repurchase proposal dependent on the approval of the other proposal?**

A. No. The Asset Sale proposal and the Stock Repurchase proposal are independent proposals. A vote for or against one proposal does not count as a vote for or against the other proposal. However, our board of directors believes that the Asset Sale proposal and the Stock Repurchase proposal are integral parts of an overall plan to restructure the opportunity to utilize our proprietary diamond technology and that such proposals represent the best strategic alternatives for maximizing immediate and future stockholder value.

Q. **What is the record date for the special meeting?**

A. Holders of our common stock as of the close of business on March 11, 2011, the record date for the special meeting, are entitled to notice of, and to vote at, the special meeting or any postponements or adjournments of the special meeting.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN               SEC-MONAHAN-000225

Q. **What vote is required to approve the matters to be voted upon at the special meeting?**

A. The authorization of the Asset Sale requires the affirmative vote of the holders of a majority of the outstanding shares of our common stock.

Consent to the Stock Repurchase proposal is an independent election of each stockholder and does not require any majority vote of the outstanding shares of our common stock.

The proposal to adjourn the special meeting requires the affirmative vote of the holders of a majority of the shares of common stock that are present in person or represented by proxy at the special meeting and entitled to vote thereon.

Q. **What are the effects of not voting or abstaining?**

A. If you do not vote by virtue of not being present in person or by proxy at the special meeting, it will have the effect of a vote AGAINST the Asset Sale and Stock Repurchase proposals but will have no effect on the adjournment proposal. If you are present at the special meeting in person or by proxy but abstain from voting, it will have the effect of a vote AGAINST the Asset Sale, Stock Repurchase and adjournment proposals.

Q. **What does it mean if I received more than one proxy card?**

A. If your shares are registered differently or in more than one account, you will receive more than one proxy card. Sign and return all proxy cards to ensure that all of your shares are voted.

## PROPOSAL NUMBER 1: ASSET SALE

Q. **Why did ADI enter into the Sale Agreement?**

A. We entered into the Sale Agreement for several reasons. As previously disclosed, significant recent liquidity challenges have adversely affected our business, financial condition, results of operations and prospects and, more recently, also called into doubt our ability to continue as a going concern. Our board of directors' decision to enter into the Sale Agreement was the result of a purposeful decision-making process that evaluated ADI's various strategic alternatives, including its prospects of acquiring outside funding and continuing as a stand-alone company following a market test process with the assistance of our financial advisor. This transaction structure allows us to preserve a potential upside opportunity for our stockholders while concurrently providing stockholders with a mechanism to solidify and realize a capital loss.

Q. **What will happen if the Asset Sale is authorized by our stockholders?**

A. If the Asset Sale is authorized by the requisite stockholder vote and if the conditions and/or obligations of ADI and SDTC are satisfied or waived, we will sell substantially all of our assets to SDTC for cash. We would utilize proceeds from the Asset Sale primarily to retire

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000226

our outstanding liabilities. We would also use a portion of the proceeds for the Stock Repurchase. We would have no significant operating assets following the Asset Sale.

Q. **What will happen if the Asset Sale is not authorized?**

A. Pursuant to the terms of the Sale Agreement, if we fail to obtain stockholder approval of the Asset Sale, the Asset Sale will not occur.

In the event the Asset Sale is not completed for any reason, we will need to obtain financing or raise capital in order to continue as a going concern. We were unsuccessful in our attempts from 2008 to date to obtain sufficient financing, and we cannot assure you that any financing or capital would be available to us on acceptable terms, if at all.

Due to our current liquidity challenges, we may be forced to seek bankruptcy or other similar protection if the Asset Sale is not authorized by our stockholders and we are unable to obtain financing.

Q. **What is the purchase price to be received by ADI?**

A. The consideration to be received by ADI in the Asset Sale is approximately $2.0 million in cash.

Q. **How was the purchase price determined?**

A. The cash consideration payable to ADI reflects the approximate amount of consideration necessary to satisfy our known liabilities, as presently negotiated.

Q. **How would the proceeds from the Asset Sale be used?**

A. The proceeds from the Asset Sale would be used to pay off certain of ADI's debts and liabilities, including certain lease payments, transaction costs associated with the Asset Sale, professional service and other vendor bills. A portion of the proceeds will also be allocated to the Stock Repurchase.

Q. **What does the board of directors recommend regarding the Asset Sale?**

A. Our board of directors has determined that the terms and conditions of the Sale Agreement and the transactions contemplated thereby, including the Asset Sale, are fair, suitable and in the best interests of ADI and its stockholders. This determination was made by a unanimous vote of all of the members of our board of directors. Our board of directors recommends that you vote **FOR** the authorization of the Asset Sale.

Q. **Do I have appraisal rights in connection with the Asset Sale?**

A. Under Delaware law, appraisal rights are not provided to stockholders in connection with the transactions contemplated by the Sale Agreement.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000227

Q. **Are there any risks to the Asset Sale?**

A. Yes. You should carefully read the section entitled "Risk Factors" appearing later in this document.

Q. **What are the tax consequences of the Asset Sale to U.S. stockholders?**

A. The Asset Sale will not likely create a taxable event for our U.S. stockholders. We do not anticipate that any proceeds from the Asset Sale will be distributed or paid to our stockholders. WE URGE EACH STOCKHOLDER TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR(S) REGARDING POTENTIAL TAX CONSEQUENCES OF THE ASSET SALE.

Q. **What are the tax consequences of the Stock Repurchase to U.S. stockholders?**

A. The Stock Repurchase will likely solidify a capital loss situation for stockholders. In order to properly realize a capital loss, stockholders wishing to invest in SDTC are advised to wait at least thirty one (31) days before investing in SDTC in order to avoid a possible negation of the capital loss under the "wash rule" which may or may not apply to these circumstances. SDTC has agreed to permit the Company's stockholders forty-five (45) days from the receipt of funds from ADI pursuant to such stockholder's Stock Repurchase Agreement to complete the contemplated investment in SDTC. WE URGE EACH STOCKHOLDER TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR(S) REGARDING TAX CONSEQUENCES OF THE STOCK REPURCHASE PLAN. STDC reserves the right to reject a subscription for shares for any reason or no reason in its sole and unilateral discretion, including, but not limited to, country of residence, verification of accredited status, timeliness of subscription agreement tendered, etc.

## PROPOSAL NUMBER 2: THE STOCK REPURCHASE

Q. **What does the Stock Repurchase entail?**

A. The Stock Repurchase provides for the stockholder to sell all of his, her or its Stock to the Company for a price of $.01 per share (the stated par value of the Company's capital stock). For example, an ADI stockholder who owns 10,000 shares of Stock will be offered $100 by the Company for such stockholder's Stock.

Q. **What will happen if the Stock Repurchase is approved?**

A. Approval of the Stock Repurchase is an independent decision for each of the Company's stockholders. If a stockholder consents to the Stock Repurchase, the stockholder will enter into a Stock Repurchase Agreement with the Company and will receive $.01 per share for all of his, her or its ADI Stock. It is expected that the stockholder will also be provided with an opportunity to purchase a number of shares of SDTC common stock equal to one hundred percent (100%) of his, her or its ADI Stock at a value of $.01 per share, so long as the

8

purchase of SDTC common stock occurs within forty-five (45) days of the receipt of funds from ADI pursuant to such stockholder's Stock Repurchase Agreement and he, she, or it qualifies as an accredited investor whose subscription for shares in SDTC is accepted by SDTC. For example, an ADI stockholder who owns 10,000 shares of Stock will be offered $100 by the Company for such stockholder's Stock. In turn, the stockholder will likely be permitted, under a separate subscription agreement with SDTC, to purchase 10,000 shares of SDTC common stock for $100 ($.01 per share). STDC reserves the right to reject a subscription for shares for any reason or no reason in its sole and unilateral discretion, including, but not limited to, country of residence, verification of accredited status, timeliness of subscription agreement tendered, etc.

Q. **Can ADI estimate the distributions that the stockholders would receive in a liquidation of the Company's assets?**

A. No. As stated previously, attempts to recapitalize and/or sell the Company have proven unsuccessful. It is the opinion of our board of directors and senior management that a liquidation of assets would not result in cash sufficient to return an appreciable amount to our stockholders after the Company's debts and liabilities are satisfied. In a liquidation, stockholder's claims are considered only after the claims of secured and unsecured creditors are fully satisfied. Moreover, any opportunity to realize a benefit from the commercial exploitation of our proprietary technology would likely vanish. Our board of directors firmly believes that with proper financing, our proprietary technology can be commercially developed successfully under new management.

Q. **What will happen if the Asset Sale is authorized by our stockholders but our stockholders do not consent to the Stock Repurchase?**

A. Pursuant to the terms of the Sale Agreement, if a substantial majority of our stockholders do not approve the Stock Repurchase, we would likely have to consider a liquidation of our assets and a subsequent dissolution of the Company either via an adjournment of the special meeting or at a separate special meeting of stockholders called for the purpose of seeking approval of the dissolution. Alternatively, due to our current liquidity challenges, we may be forced to seek bankruptcy or other similar protection if the Asset Sale is not completed and we are unable to obtain sufficient financing.

If SDTC opts to proceed with the Asset Sale without the consent of the majority of our stockholders to the Stock Repurchase, the Company may still elect to complete the Asset Sale. In that case, we will have transferred substantially all of our operating assets to SDTC and will have no operations and, therefore, no opportunities to generate significant revenue going forward.

Q. **Will the stockholders receive any payment from dissolution or bankruptcy if the Asset Sale is completed?**

A. Assuming the Asset Sale is completed, ADI would first satisfy its existing debts and liabilities. It is unlikely that a substantial amount of money would remain for distribution to

9

stockholders in either a dissolution or bankruptcy outcome.  Moreover, the possibility of further obligations may require the Company to establish a contingency reserve, which could delay any distributions to stockholders until the claims are resolved.  Distributions also could be delayed if the board of directors determines that it is in the best interests of the Company and our stockholders to effectuate the dissolution in accordance with the procedures set forth in Sections 280 and 281(a) of the General Corporation Law of the State of Delaware ("DGCL") as opposed to those prescribed by Section 281(b) of the DGCL.  The procedures of Sections 280 and 281(a) of the DGCL would require that any distribution be subject to prior completion of proceedings in the Delaware Court of Chancery.  The Plan of Dissolution provides for the dissolution to be effected pursuant to Sections 280 and 281(a) of the DGCL, but allows ADI to elect to effect the dissolution pursuant to Section 281(b) of the DGCL.

Q.  **Do I have appraisal rights in connection with dissolution?**

A.  Under Delaware law, appraisal rights are not provided to stockholders in connection with the dissolution.

Q.  **Are there any risks to the dissolution?**

A.  Yes. You should carefully read the section entitled "Risk Factors" appearing later in this document.

## PROPOSAL NUMBER 3: ADJOURNMENT

Q.  **What is the effect of voting to approve the proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies?**

A.  If you vote in favor of the proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies, you will be voting to permit the special meeting to be adjourned in order to solicit additional votes in favor of the Asset Sale, the Stock Repurchase or both. In the event that the Asset Sale has not received the requisite stockholder approval, it is likely that ADI would seek to adjourn the special meeting to solicit additional proxies in favor of either the Asset Sale or the Stock Repurchase proposals. In the event that the Asset Sale has received the requisite stockholder approval, but the Stock Repurchase has not received the consent of a substantial majority of our stockholders and SDTC opts not to proceed with the Asset Sale, it is likely that ADI would seek to adjourn the special meeting to solicit additional consent with respect to the Stock Repurchase while closing the polls on the proposal on the Asset Sale.  Voting in favor of the adjournment proposal would allow ADI to take such actions. However, in the event that the requisite stockholder vote in favor of the Asset Sale has been obtained but a substantial majority of the stockholders do not consent to the Stock Repurchase and SDTC nevertheless opts to proceed with the Asset Sale, it is likely that ADI would seek to close the polls and register the authorization of the Asset Sale in order to allow such transaction to close.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000230

## PURPOSE OF SPECIAL MEETING

At the special meeting, our stockholders will consider and vote upon:

(1) A proposal to authorize the sale of substantially all of our assets to SDTC (the "Asset Sale") pursuant to the Asset Purchase Agreement dated March 11, 2011 (the "Sale Agreement");

(2) A proposal to consent to the stock repurchase of one hundred percent (100%) of the stockholder's ADI common stock by the Company for $.01 per share (the "Stock Repurchase");

(3) A proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies for one or more proposal(s) in the event that there are not sufficient votes at the time of the special meeting or any adjournment or postponement thereof to approve one or more of the foregoing proposals; and

(4) Such other matters as may properly come before the special meeting or any postponements or adjournments thereof.

The costs of preparing, assembling and mailing this proxy statement and the enclosed materials and all clerical and other expenses of solicitation will be paid by ADI. In addition to the solicitation of proxies by use of the mails, directors, officers, employees and/or designated representatives of ADI may solicit proxies by telephone, telecopier or personal interview. ADI will also request brokerage houses and other custodians, nominees and fiduciaries to forward soliciting material to the beneficial owners of common stock held of record by such custodians.

**These transactions have not been approved or disapproved by the Securities and Exchange Commission (the "SEC"), and the SEC has not passed upon the fairness or merits of these transactions nor upon the accuracy or adequacy of the information contained in this proxy statement. Any representation to the contrary is unlawful.**

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

THIS PROXY STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS THAT HAVE BEEN MADE PURSUANT TO PROVISIONS OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. FORWARD-LOOKING STATEMENTS REPRESENT ADI'S EXPECTATIONS OR BELIEFS CONCERNING FUTURE EVENTS, INCLUDING ANY STATEMENTS REGARDING: THE RECEIPT AND USE OF THE CASH CONSIDERATION TO BE RECEIVED BY ADI UNDER THE SALE AGREEMENT AND CASH USED IN OPERATIONS, FINANCING AND/OR INVESTING ACTIVITIES FOR ADI'S FUTURE LIQUIDITY AND CAPITAL RESOURCE NEEDS OR EXPECTED DISTRIBUTIONS TO STOCKHOLDERS. WITHOUT LIMITING THE FOREGOING, THE WORDS "LIKELY," "BELIEVES," "INTENDS," "PROJECTS," "PLANS," "EXPECTS," "ANTICIPATES," AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ACTUAL EVENTS OR RESULTS MAY DIFFER MATERIALLY FROM THESE PROJECTIONS. INFORMATION REGARDING THE RISKS, UNCERTAINTIES AND OTHER FACTORS THAT COULD CAUSE ACTUAL RESULTS

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000231

TO DIFFER FROM THE RESULTS IN THESE FORWARD-LOOKING STATEMENTS ARE DISCUSSED UNDER THE SECTION "RISK FACTORS" IN THIS PROXY STATEMENT. PLEASE CAREFULLY CONSIDER THESE FACTORS AS WELL AS OTHER INFORMATION CONTAINED HEREIN. THE FORWARD-LOOKING STATEMENTS INCLUDED IN THIS PROXY STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS PROXY STATEMENT. WE DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR SUPPLEMENT ANY FORWARD-LOOKING STATEMENTS TO REFLECT SUBSEQUENT EVENTS OR CIRCUMSTANCES, EXCEPT AS REQUIRED BY LAW.

[RISK FACTORS BEGIN ON THE NEXT PAGE]

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000232

## RISK FACTORS

There are a number of factors that our stockholders should consider when deciding whether to vote to approve the proposals contained in this proxy statement.

### *We cannot be sure when or if the Asset Sale will be completed.*

The consummation of the Asset Sale is subject to the satisfaction or waiver of various conditions, including the authorization of the Asset Sale by our stockholders. We cannot guarantee that we will be able to satisfy the closing conditions set forth in the Sale Agreement. If we are unable to satisfy the closing conditions, SDTC will not be obligated to complete the Asset Sale.

If the Asset Sale is not completed, our board of directors, in discharging its fiduciary obligations to our stockholders, will evaluate other alternatives that may be less favorable to our stockholders than the Asset Sale, and we expect that we will need to obtain financing or raise capital in order to continue as a going concern. We were unsuccessful in our attempts to obtain sufficient financing since 2008, and we cannot assure you that any financing or capital would be available to us on acceptable terms, if at all.

### *We cannot predict the timing, amount or nature of any distributions to stockholders.*

In the event of dissolution, our board of directors is currently unable to predict the timing, amount or nature of, or the record dates for, distributions, if any, to our stockholders. The primary reasons for this uncertainty stem from the procedures established under Delaware law for the dissolution of a Delaware corporation. Delaware law permits creditors and other claimants to assert claims against us, and it could take an unspecified amount of time to resolve these claims. Also, under Delaware law, before a dissolved corporation may make any distributions to its stockholders, it must pay or make reasonable provisions to pay all of its claims and obligations, including all contingent, conditional or un-matured claims known to the corporation.

### *Any estimates of the amounts available for distribution to our stockholders during any dissolution would be based on a number of assumptions, including our administrative and professional expenses incurred during any dissolution.*

Our estimate of the maximum amount available for distribution also takes into account certain administrative and professional expenses we would expect to incur in resolving our business affairs during dissolution, if necessary. The amount of these expenses could be affected by negotiations to resolve any outstanding contractual arrangements as well as the regulatory and legal requirements to dissolve ADI.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000233

*Any estimates of the amount available for distribution in any dissolution assume that ADI will not incur any taxes as a result of the Asset Sale. However, there can be no assurances that ADI will not incur taxes as a result of the Asset Sale, in particular given the uncertainties regarding our ability to offset gains realized in the Asset Sale against our net operating loss.*

In the event of dissolution, estimates of the amounts available for distribution would assume that ADI will not incur any taxes as a result of the Asset Sale. However, there can be no assurances that ADI will not incur taxes as a result of the Asset Sale, in particular given the uncertainties regarding our ability to offset gains realized in the Asset Sale against our net operating loss.

### Our directors and executive officers may have interests in the Asset Sale other than, or in addition to, the interests of our stockholders generally.

Members of our board of directors and certain of our executive officers may have interests in the Asset Sale that are different from, or are in addition to, the interests of our stockholders generally. Our board of directors is aware of these interests and has considered them, among other matters, in approving the Sale Agreement.

### Our stockholders could authorize the Asset Sale, but not consent to the Stock Repurchase.

If a substantial majority of our stockholders do not consent to the Stock Repurchase we will likely still complete the Asset Sale if it is authorized by our stockholders and if the other conditions to closing are satisfied or waived. In such case, we will have transferred substantially all of our operating assets to SDTC and will have no operations and, therefore, no remaining opportunities to generate significant revenue. We would likely continue to ask the stockholders to consent to the Stock Repurchase, either via an adjournment of the special meeting for the sole purpose of soliciting consent to the Stock Repurchase (while closing the polls and registering the authorization of the Asset Sale prior to adjournment) or at a separate special meeting of stockholders called for the purpose of seeking consent to the Stock Repurchase. In any event, with no assets with which to generate revenue, we would use the cash received from the Asset Sale to pay outstanding debts and liabilities instead of making distributions to our stockholders. We would have no material business or operations after the Asset Sale and will likely not have finances sufficient to maintain our corporate existence. These factors would severely limit the alternatives available to us. Our board of directors would have to evaluate our alternatives, including the possibility of bankruptcy and/or dissolving the Company.

### Our stockholders could vote against the Asset Sale.

If the Asset Sale is not authorized by our stockholders or if the Asset Sale is not consummated, then our board of directors, in accordance with its fiduciary obligations to our stockholders, may take such actions as it deems advisable and in the best interests of our stockholders to dispose of ADI's assets in a manner designed to maximize stockholder value. In either case, these other alternatives may be less favorable to our stockholders than the Asset Sale.

In the event the Asset Sale is not completed for any reason, we expect that we will need to obtain financing or raise capital in order to continue as a going concern. We have been largely

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000234

unsuccessful in our attempts to obtain significant financing since 2008 and we cannot assure you that any financing or capital would be available to us on acceptable terms, if at all. A significant capital raise could also risk impairing the tax benefit attributed in part to our net operating losses.

Due to our current liquidity challenges, we may be forced to seek bankruptcy or other similar protection if the Asset Sale is not completed and we are unable to obtain financing.

*Our stockholders may be liable to our creditors for part or the entire amount received from us in our liquidating distributions if reserves are inadequate.*

If dissolution becomes necessary and is implemented, it is unlikely that sufficient funds would be available to establish a contingency reserve designed to satisfy any additional claims and obligations that may arise. Moreover, any contingency reserve may not be adequate to cover all of our claims and obligations. Under the DGCL, if we fail to create an adequate contingency reserve for payment of our claims and obligations during the three-year period after we file a certificate of dissolution with the Delaware Secretary of State, each stockholder could be held liable for payment to our creditors of the lesser of (i) such stockholder's pro rata share of amounts owed to creditors in excess of the contingency reserve, and (ii) the amounts previously received by such stockholder in dissolution from us and from any liquidating trust or trusts. Accordingly, in such event, a stockholder could be required to return part or all of the distributions previously made to such stockholder, if any, and a stockholder could receive nothing from us under a plan of dissolution.

*ADI would confront urgent and significant liquidity challenges in the event the Asset Sale is not consummated.*

During the last few years, ADI has faced liquidity challenges and has been operating under substantial cash restrictions. In 2009, the Company was required to layoff a number of employees and instituted reduced salaries and/or eliminated salaries for our remaining personnel and senior management. In recent months, the Company has been unable to pay salaries to any personnel. In addition, over the past several years the Company has accrued significant payables to professional services providers, various vendors and other suppliers. The Company has been unable to raise funds sufficient to commercialize its proprietary technology. In the event the Asset Sale is not authorized and stockholders do not consent to the Stock Repurchase, it is likely that any other outcome will be a less favorable for the Company and its stockholders.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000235

## THE SPECIAL MEETING

**Time, Date and Place**

The special meeting will be held on April 18, 2011 at 9:00 a.m. local time at Embassy Suites Boston at Logan Airport, 207 Porter Street, Boston, Massachusetts 02128.

**Proposals**

At the special meeting, holders of shares of our common stock as of the record date will consider and vote upon:

- A proposal to authorize the Asset Sale pursuant to the Sale Agreement;

- A proposal to consent to the Stock Repurchase;

- A proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies for one or more proposal(s) in the event that there are not sufficient votes at the time of the special meeting or any adjournment or postponement thereof to approve one or more of the foregoing proposals; and

- Such other matters as may properly come before the special meeting or any postponements or adjournments thereof.

Descriptions of the Asset Sale and Stock Repurchase are included in this proxy statement. Copies of the Asset Purchase Agreement and the Stock Repurchase Agreement are attached as Appendix A and Appendix B, respectively, hereto.

**Required Vote**

*Proposal No. 1: Asset Sale*

The authorization of the Asset Sale requires the affirmative vote of the holders of a majority of the outstanding shares of our common stock. You may vote FOR, AGAINST or ABSTAIN. Failures to vote and abstentions will have the same effect as a vote AGAINST the authorization of the Asset Sale.

*Proposal No. 2: The Stock Repurchase*

The vote to approve the Stock Repurchase is an independent decision to be considered by each stockholder.  Depending on the number of YES votes received, the outcome of the vote on the Stock Repurchase may or may not influence the Asset Sale, if otherwise approved.  You may vote FOR, AGAINST or ABSTAIN.  Failures to vote and abstentions will have the same effect as a vote AGAINST the Stock Repurchase.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000236

*Proposal No. 3: Adjournment*

The proposal to adjourn the special meeting if necessary or appropriate requires the affirmative vote of the holders of a majority of the outstanding shares of common stock that are present in person or represented by proxy at the special meeting and entitled to vote thereon. You may vote FOR, AGAINST or ABSTAIN. Abstentions will have the same effect as a vote AGAINST the proposal to adjourn the special meeting. Broker non-votes, if any, and failures to attend the special meeting in person or by proxy and vote will have no effect on the proposal to adjourn the special meeting.

**Record Date**

Holders of our common stock as of the close of business on March 11, 2011, the record date for the special meeting, are entitled to notice of, and to vote at, the special meeting or any postponements or adjournments of the special meeting. According to the Company's records, on the record date there were 19,584,319 shares of common stock and 105,915 shares of Series A Preferred Stock outstanding and entitled to vote at the special meeting or any postponements or adjournments of the special meeting. No other shares of capital stock were outstanding on the record date.

**Ownership of Directors and Executive Officers**

As of the record date, our directors and executive officers held 60.53% in the aggregate of the voting stock entitled to vote at the special meeting.

**Quorum and Voting**

The presence at the special meeting, either in person or by proxy, of persons holding a majority of the issued and outstanding shares of our common stock entitled to vote at the special meeting is necessary to constitute a quorum for the transaction of business at the special meeting.

Shares of our common stock represented at the special meeting in person or by proxy, but as to which stockholders have abstained from voting, will be treated as present at the special meeting for purposes of determining the presence or absence of a quorum for the transaction of all business.

If a quorum is not represented at the special meeting, the holders of a majority of the shares of common stock present in person or by proxy and entitled to vote at the special meeting will have power to adjourn the special meeting to another time, or to another time and place, without notice other than announcement of the adjournment at the meeting, and there may be successive adjournments for like cause and in like manner until a quorum is present. At such adjourned meeting at which a quorum is present, any business may be transacted that may have been transacted at the special meeting as originally notified.

17

**Proxies; Revocation of Proxies**

If you are unable to attend the special meeting, we urge you to submit your proxy by completing and returning the enclosed proxy card. If your shares of common stock are held in "street name" (i.e., through a bank, broker or other nominee), you will receive instructions from your broker, bank or other nominee that you must follow in order to have your shares voted. If you elect to vote in person at the special meeting and your shares are held by a broker, bank or other nominee, you must bring to the special meeting a legal proxy from the broker, bank or other nominee authorizing you to vote your shares of common stock.

Unless contrary instructions are indicated on the proxy card, all shares of stock represented by valid proxies will be voted FOR the Asset Sale, FOR the Stock Repurchase and FOR the adjournment proposal, if any, and will be voted at the discretion of the persons named as proxies in respect of such other business as may properly be brought before the special meeting. As of the date of this proxy statement, the board of directors knows of no other business that will be presented for consideration at the special meeting other than the Asset Sale proposal, the Stock Repurchase proposal and the adjournment proposal.

You may revoke your proxy and change your vote at any time before the polls close at the special meeting by:

- Giving written, dated notice to the Chairman of ADI stating that you would like to revoke your proxy;

- Signing and returning to the Chairman in a timely manner another proxy card with a later date;

- If you are a stockholder of record or have a legal proxy from the stockholder of record, attending the special meeting in person and voting; or

- If your shares are held in "street name," following the instructions of your bank, broker or other nominee with respect to the revocation of proxies.

NOTICE: Simply attending the special meeting will not constitute a revocation of your proxy. Absent proof of receipt, any written notice that is mailed via regular mail will not be deemed to have been received by the Chairman until five business days have elapsed since the date of postmark.

**Adjournments and Postponements**

The special meeting may be adjourned for any purpose deemed necessary or appropriate in the sole discretion of our board of directors and affirmed by a vote of the holders of a majority of the outstanding shares of common stock that are present in person or represented by proxy at the special meeting and entitled to vote thereon, including for the purpose of soliciting additional proxies if there are insufficient votes to authorize the Asset Sale or consent to the Stock Repurchase. The board of directors may also, without limitation, propose to adjourn the special

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000238

meeting for the sole purpose of soliciting additional votes as to one proposal while closing the polls and registering the approval of the other proposal. Any adjournment may be made without notice (if the adjournment is not for more than thirty days and a new record date is not fixed for the adjourned meeting), other than by an announcement made at the special meeting of the time, date and place of the adjourned meeting. Any adjournment will allow our stockholders who have already sent in their proxies to revoke them at any time prior to their use at the special meeting, as adjourned.

At any time prior to convening the special meeting, our board of directors may postpone the special meeting for any reason without the approval of our stockholders. If postponed, ADI will provide notice of the new meeting date as required by law. Our board of directors may postpone the special meeting for the purpose of soliciting additional proxies to constitute a quorum or sufficient votes for authorization of the Asset Sale and/or the approval of the Stock Repurchase. Similar to adjournments, any postponement of the special meeting for the purpose of soliciting additional proxies will allow stockholders who have already sent in their proxies to revoke them at any time prior to their use.

### Solicitation of Proxies

This proxy solicitation is being made and paid for by ADI on behalf of its board of directors. In addition, we have retained Adams Monahan, LLP to assist in the solicitation. We will pay Adams Monahan, LLP reasonable hourly fees, plus reasonable out-of-pocket expenses, for their assistance relating to the solicitation of proxies. Our directors, officers and employees may also solicit proxies by personal interview, mail, e-mail, telephone, facsimile or other means of communication. These persons will not be paid any additional compensation for their efforts. We will also request brokers and other fiduciaries to forward proxy solicitation material to the beneficial owners of shares of common stock that the brokers and fiduciaries hold of record. In addition, we will indemnify Adams Monahan, LLP against any losses arising out of that firm's proxy soliciting services on our behalf.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000239

APPENDIX A

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this *"Agreement"*) dated as of March 11, 2011, is by and among APOLLO DIAMOND, INC., a Delaware corporation (*"ADI"*) and SCIO DIAMOND TECHNOLOGY CORPORATION, a Nevada corporation (*"SCIO"*).   ADI may be referred to in this Agreement as the **"Seller"** and SCIO may be referred to in this Agreement the **"Purchaser."** Seller and Purchaser may be referred to in this Agreement collectively as the **"Parties"** and individually as a **"Party."**

**RECITALS**

**WHEREAS**, Seller is engaged in the business of owning and developing proprietary technology relating to the production of laboratory-created diamond and diamond materials (the **"Business"**);

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to acquire from Seller, all or substantially all of the property, assets, rights, and privileges of Seller related to, used in, or otherwise associated with the operation of the Business on the terms and subject to the conditions set forth in this Agreement;

**NOW THEREFORE**, in consideration of the premises and mutual agreements, benefits, representations, warranties, and covenants of the Parties contained herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound subject to the terms and conditions hereof, the Parties each agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**1.1 Definitions and Interpretation.** Unless otherwise expressly provided to the contrary in this Agreement (a) capitalized terms used herein shall have the meanings set forth in Section 1.2, unless the context otherwise requires and (b) this Agreement shall be interpreted in accordance with the provisions set forth in Section 1.3.

**1.2 Definitions.** Subject to Section 1.3 below, the following terms shall have the following definitions when used in the Agreement:

*"ADI"* has the meaning set forth in the Preamble.

*"Affiliate"* means a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person. As used in this definition, *"control"* means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Purchaser, on the one hand, and Seller, on the other hand, will not be deemed to be Affiliates of each other.

*"Agreement"* has the meaning set forth in the Preamble.

*"Assigned Intangible Assets"* has the meaning set forth in Section 2.1(l).

*"Books and Records"* means the books, files, records, information, and data (including all Tax Returns and related workpapers and electronic data to the extent transferable)

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

relating to the Purchased Assets and Business that are in the possession of Seller, including data regarding all accounts receivable and accounts payable in such form as reasonably requested by Purchaser so that such data can be transferred to Purchaser's accounting system from Seller's accounting system.

*"Business"* has the meaning set forth in the Recitals above.

*"Business Day"* means any day other than a Saturday, Sunday, or other day on which commercial banks in Minneapolis, Minnesota are authorized or required by Law to close.

*"Cash Payment"* has the meaning set forth in Section 2.3.

*"Claim"* means any demand, claim, cause of action, suit, demand, judgment, complaint, notice of noncompliance or violation, or other assertion of Liability.

*"Closing"* has the meaning set forth in Section 3.1.

*"Closing Date"* has the meaning set forth in Section 3.1.

*"Code"* means the Internal Revenue Code of 1986, as amended.

*"Computer Software"* has the meaning set forth in Section 2.1(b)(ii).

*"Consent"* means any necessary ratification by, notification requirement to, filing or registration with, or consent, waiver, approval, permit, or other authorization from, a Governmental Authority or other third party.

*"Contemplated Transactions"* means all of the transactions contemplated by this Agreement, including: (a) the sale of the Purchased Assets to Purchaser; (b) the execution and delivery of the Transaction Documents; and (c) the performance by the Parties of their respective covenants and obligations under this Agreement.

*"Contract"* means any contract, agreement, lease, license, instrument, commitment, or other obligation or arrangement (whether written or oral), and any liability, cost, or expense of whatever kind or nature relating to the foregoing, that is binding on a Person or any part of its property under applicable Law.

*"Damages"* means any and all damages, losses, liabilities, payments, obligations, penalties, fines, assessments, charges, costs, Taxes, disbursements or expenses (including interest, awards, judgments, settlements, costs of redemption, fees, reasonable disbursements and expenses of attorneys, accountants and other professional advisors and of expert witnesses and costs of investigation and preparation of any kind or nature whatsoever) and court costs.

*"Employee Benefit Plan"* means any (a) employee welfare benefit plans or employee pension benefit plans as defined in sections 3(1) and 3(2) of ERISA, including plans that provide retirement income or results in deferrals of income by employees for periods extending to their terminations of employment or beyond, and plans that provides medical, surgical or hospital care benefits or benefits in the event of sickness, accident, disability, death or unemployment and (b) other employee benefit agreements or arrangements that are not ERISA plans, including any deferred compensation plans, incentive plans, bonus plans or arrangements, stock option plans, stock purchase plans, stock award plans, golden parachute agreements, severance pay plans, dependent care plans, cafeteria plans,

2

employee assistance programs, scholarship programs, retention incentive agreements, noncompetition agreements, vacation policies and, or other similar plans, agreement or arrangements that (i) are maintained by or required to be contributed to Seller or any Affiliates thereof or with respect to which Seller may have any Liability, (ii) have been approved by Seller or any Affiliates thereof but are not yet effective for the benefit of Seller Employees or their beneficiaries, or (iii) that were previously maintained by Seller or any Affiliates thereof and with respect to which Seller or any Affiliates thereof may have any Liability, contingent or otherwise.

*"Environmental, Health and Safety Laws"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976, the Occupational Safety and Health Act of 1970, each as amended, together with all other laws, rules and regulations of federal, state, local and foreign governments (and all agencies thereof) and other requirements having the force or effect of law relating to or imposing liability or standards of conduct concerning pollution or protection of the environment, public health and safety, or employee health and safety, and all judgments, orders and decrees of federal, state, local and foreign governments (and all agencies thereof) having the force and effect of law issued or promulgated thereunder, and all related common law theories.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

*"Excluded Assets"* has the meaning set forth in Section 2.2.

*"Governmental Authority"* means the United States and any foreign, state, county, city, or other political subdivision and any department, commission, ministry, board, bureau, agency, commission, officer, official, court, tribunal, arbitrator, board or bureau or other instrumentality thereof or any quasi-governmental or private body exercising any regulatory, administrative, taxing, importing, exporting, or other governmental or quasi-governmental function and any self-regulatory organization, such as a securities exchange.

*"Governmental Order"* means any Order, directive, writ, judgment, injunction, decree, stipulation, determination, or award by or with any Governmental Authority.

*"Intangible Personal Property"* means proprietary rights, business names, business logos, slogans, processes, Intellectual Property, franchises, licenses, technology, computer software, source codes, operating rights, plans and specifications, third party guaranties and warranties, rights with respect to telephone and facsimile numbers and email addresses or listings, SAP server code, data and content, and all other intangible rights and property, and any work product, knowledge, creative works, and other proprietary data related thereto.

*"Intellectual Property"* means all copyrights, patents, trademarks, trade names, service marks, mask works, domain names, email addresses, uniform resource locator addresses, trade dress, logos, slogans, symbols, corporate names, rights of publicity and privacy, inventions, design rights, drawings, trade secrets, customer and supplier lists, pricing and marketing plans, policies and strategies, methods of operation, royalties, secret processes, formulae, rights in know-how and all applications, registrations, renewals and other rights

3

relating to the foregoing (whether or not any registration or filing has been made with respect thereto) used primarily in connection with the Business, including the Computer Software, Trademark Intellectual Property and the Website Intellectual Property.

*"Interim Period"* means the period of time from the date of this Agreement until the earlier of the Closing or the Termination Date.

*"Knowledge" "Know" "Knowing"* means in the case of Seller, the actual knowledge of the Seller Employees or the Seller's representatives or agents after reasonable inquiry, but without independent investigation and, in the case of Purchaser, the actual knowledge of the Purchaser's employees, representatives or agents after reasonable inquiry, but without independent investigation.

*"Law"* means all applicable local, state, federal, tribal, and foreign laws (whether statutory or common) and rules, regulations, rules, tariffs and regulatory authorizations, codes (including the Code), and ordinances promulgated thereunder, as well as case law, judgments, orders, consent orders, or decrees.

*"Lease"* means any lease or sublease, including any amendments thereto, of any Purchased Asset.

*"Leased Real Property"* has the meaning set forth in Section 2.2(f).

*"Liabilities"* means any and all expenses, debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, or determined or determinable, including those arising under any Law or Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking.

*"Lien"* means any charge against or interest in property to secure payment of a debt or performance of an obligation such as a Claim, debt, mortgage, indenture, hypothecation, encumbrance, Liability, lien, right of redemption, security interest, mechanic's or materialman's lien, judgment lien, assessment, special assessment, title defect, restriction, reservation, reversion, Contract, or right or interest of any third party, whether absolute or contingent, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

*"Material Adverse Effect"* with respect to any Person means any change, event, development, circumstance or effect (each, an *"Effect"*) that, individually or taken together with all other related Effects, is, or would be reasonably expected to be, materially adverse (i) to the condition (financial or otherwise), assets, liabilities (taken together), business or results of operations of such Person and its subsidiaries, taken as a whole, but excluding the Effect (A) resulting from general economic conditions that does not disproportionately affect such Person in any material respect, (B) affecting companies in the industry in which it conducts its business generally, provided that such Effect does not disproportionately affect such Person in any material respect, or (C) resulting from the announcement or performance of this Agreement or the transactions contemplated hereby or (ii) on the ability of such Person to perform its obligations under this Agreement and the Transaction Documents or to consummate the Contemplated Transactions.

*"Notice Period"* has the meaning set forth in Section 6.4(d).

4

"*Offer of Employment*" has the meaning set forth in <u>Section 7.1</u>.

"*Order*" means any order, ruling, decision, verdict, decree, charge, award (including arbitration awards), judgment, injunction, directive or other similar determination or finding by, before, or under the supervision of any Governmental Authority, or any arbitrator, board of arbitration, or similar entity including any regulatory or administrative Proceeding.

"*Ordinary Course of Business*" means, with respect to any Person, the ordinary course of business of such Person consistent with past custom and practice (including with respect to quantity and frequency).

"*Organizational Documents*" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles or certificate of formation, certificates of designation, regulations, operating or company agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"*Other Equipment*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Party*" or "*Parties*" has the meaning as set forth in the Preamble.

"*Permits*" means all licenses, permits, concessions, franchises, certificates, consents, exemptions, approvals, variances, registrations, or authorizations of any Governmental Authority, necessary or desirable in connection with, related to, or associated with the Purchased Assets or the conduct of the Business.

"*Person*" means any individual, firm, association, incorporated or unincorporated organization, partnership, business, trust, estate, joint stock company, joint venture, club, syndicate, company, corporation, Governmental Authority, or other legal entity.

"*Proceeding*" means any action, suit, hearing, investigation, audit, examination, arbitration, litigation, review or other proceeding, at law or in equity, before any Governmental Authority, including any regulatory or administrative proceeding.

"*Prohibited Transactions*" has the meaning set forth in <u>Section 6.4(a)</u>.

"*Purchase Consideration Allocation*" has the meaning set forth in <u>Section 8.1</u>.

"*Purchased Assets*" has the meaning set forth in <u>Section 2.1</u>.

"*Purchaser*" has the meaning set forth in the Preamble.

"*Purchaser's Reimbursable Expenses*" means, with respect to Purchaser, the reasonable and documented out-of-pocket fees and expenses incurred by Purchaser, prior to the termination of this Agreement, in connection with the Contemplated Transactions and the preparation, negotiation, prosecution, and performance of this Agreement, including all reasonable fees and expenses of counsel, investment banking firms, financial advisors, accountants, and consultants to Purchaser in connection therewith.

"*Real Property Rights*" all easements, servitudes, rights-of-way, privileges, licenses, and appurtenances related or pertaining to the Leased Real Property, including all right, title and interest, if any, in and to (a) any land in the bed of any street, road or avenue open

5

or proposed in front of or adjoining the Leased Real Property; (b) any rights-of-way, rights of ingress or egress or other interests in, on, or to, any land, highway, street, road, or avenue, open or proposed, in, on, or across, in front of, abutting or adjoining the Leased Real Property, and any awards made, or to be made in lieu thereof, and in and to any unpaid awards for damage thereto by reason of a change of grade of any such highway, street, road, or avenue; (c) any easement across, adjacent or appurtenant to the Leased Real Property, existing or abandoned; (d) all sewage treatment capacity and water capacity and other utility capacity to serve the Leased Real Property and Improvements; (e) all oil, gas, and other minerals in, on or under, and that may be produced from the Leased Real Property; (f) all water in, under or that may be produced from the Leased Real Property, and all wells, water rights, permits and historical water usage pertaining to or associated with the Leased Real Property; (g) any land adjacent or contiguous to, or part of the Leased Real Property, whether those lands are owned or claimed by deed, limitations or otherwise, and whether or not they are located inside or outside the description given herein, or whether or not they are held under fence by Seller or whether or not they are located on any survey; and (h) any reversionary rights attributable to the Leased Real Property.

*"Retained Books and Records"* has the meaning set forth in Section 2.2(c).

*"Retained Liabilities"* has the meaning set forth in Section 2.4(a).

*"SCIO"* has the meaning set forth in the Preamble.

*"Seller"* has the meanings set forth in the Preamble.

*"Seller Employees"* mean all existing or former employees of Seller or any of its Affiliates..

*"Seller's Reimbursable Expenses"* means, with respect to Seller, the reasonable and documented out-of-pocket fees and expenses incurred by Seller, prior to the termination of this Agreement, in connection with the Contemplated Transactions and the preparation, negotiation, prosecution, and performance of this Agreement, including all reasonable fees and expenses of counsel, investment banking firms, financial advisors, accountants, and consultants to Seller in connection therewith.

*"Straddle Period"* has the meaning set forth in Section 8.2.

*"Superior Proposal"* means any bona fide written proposal or offer with respect to a Competing Transaction made by a third party (A) to acquire, directly or indirectly, the Business for consideration consisting of cash, other consideration, and the assumption of substantially all liabilities required to be assumed by Purchaser under this Agreement, and (B) that is otherwise on terms that the Board of Directors of ADI determines in its reasonable good faith judgment (after consultation with its financial advisor and outside counsel), taking into account, among other things, all legal, financial and other aspects of the proposal or offer (1) if consummated, would result in a transaction that is more favorable, from a financial point of view, to the Seller' stakeholders than the Contemplated Transactions and (2) is reasonably capable of being promptly consummated including with respect to receipt of all required regulatory approvals.

*"Tangible Personal Property"* means furniture, fixtures, furnishings, racks, cabinets, hardware, tools, machinery, instruments, measuring and other devices, appliances,

6

supplies, communications devices and systems, computers, servers, and other computer equipment, hardware and systems, electrical equipment and systems, construction, repair, and maintenance equipment, materials, spare parts, and any other items of tangible personal property.

*"Tax"* means any federal, state, local or foreign income tax, *ad valorem* tax, excise tax, sales tax, use tax, value added tax, alternative or add-on minimum tax, franchise tax, real or personal property tax, transfer tax, gross receipts tax, escheat or unclaimed property tax, or other tax, assessment, duty, fee, levy or other governmental charge of any kind whatsoever, together with and including any and all interest, fines, penalties, assessments and additions to tax resulting from, relating to, or incurred in connection with any such tax or any contest or dispute thereof.

*"Tax Returns"* means all returns, declarations, reports, statements and other documents required to be filed in respect of Taxes.

*"Termination Date"* has the meaning set forth in Section 11.1(b).

*"Termination Fee"* means $3,000,000.

*"Trademark Intellectual Property"* has the meaning set forth in Section 2.1(b)(iii).

*"Trademarks"* has the meaning set forth in Section 2.1(b)(iii).

*"Transferred Books and Records"* has the meaning set forth in Section 2.1(m).

*"Transaction Documents"* means the agreements listed in Sections 3.3 and 3.4 and any other agreements or documents executed in connection with or as required under this Agreement.

*"Transferred Employee"* has the meaning set forth in Section 7.2.

*"Website"* has the meaning set forth in Section 2.1(b)(iv).

*"Website Intellectual Property"* has the meaning set forth in Section 2.1(b)(iv).

*"Underlying Technology"* means any and all technical information, software, specifications, drawings, records, shared drive and other computer files, work product, works of authorship, or other creative works or ideas knowledge, know-how, trade-secrets, invention disclosures, or other data including works subject to copyright protection and mask works associated with Seller' website or operation thereof, including related e-mail.

**1.3 Interpretations.** Unless expressly provided for elsewhere in this Agreement, this Agreement shall be interpreted in accordance with the following provisions:

All references herein to Articles, Sections, Exhibits and Schedules are to Articles and Sections of and Exhibits and Schedules attached to and forming part of this Agreement, unless the contrary is specifically stated;

(a) The headings of the Articles, Sections and subsections of this Agreement and the headings contained in the Exhibits and Schedules hereto are inserted for convenience of reference only and shall not in any way define or affect the meaning, construction, or scope of any of the provisions hereof or thereof;

7

(b) A defined term has its defined meaning throughout this Agreement and each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined;

(c) In the event of any conflict between the main body of this Agreement and the Exhibits and Schedules hereto, the provisions of the main body of this Agreement shall prevail;

(d) Except where specifically stated otherwise, any reference to any statute, regulation, rule, or agreement shall be a reference to the same as amended, supplemented or re-enacted from time to time;

(e) Whenever the words "include," "including," or "includes" appear in this Agreement, they shall be read as if followed by the words "without limitation" or words having similar import;

(f) Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa;

(g) A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, from time to time, except to the extent prohibited by this Agreement or that other agreement or document;

(h) A reference to any party to this Agreement or another agreement or document includes the party's permitted successors and assigns;

(i) A reference to a writing includes a facsimile transmission of it and any means of reproducing of its words in a tangible and permanently visible form;

(j) A reference to a statute, regulation or law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated there under;

(k) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(l) Unless otherwise specified, all references to a specific time of day in this Agreement shall be based upon Central Standard Time or Central Daylight Savings Time, as applicable on the date in question;

(m) References to "$" or to "dollars" shall mean the lawful currency of the United States of America;

(n) No action shall be required of the Parties except on a Business Day and in the event an action is required on a day which is not a Business Day, such action shall be required to be performed on the next succeeding day which is a Business Day;

(o) All references to "day" or "days" shall mean calendar days unless specified as a "Business Day;"

(p) Time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the time period commences and

8

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000181

including the day on which the time period ends and by extending the period to the next Business Day following if the last day of the time period is not a Business Day.

## ARTICLE II
## PURCHASE AND SALE

**2.1 Purchase and Sale of Purchased Assets.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, free and clear of any interest in such property as provided by 11 U.S.C. §363(f), all of Seller's right, title, and interest in and to all of the property, assets, rights, and privileges of Seller related to, used in, held for use in, or otherwise associated with the operation of the Business, whether real, personal, or mixed, tangible or intangible, of every kind and description and wherever located, whether accrued, contingent or otherwise, other than the Excluded Assets (collectively, the *"Purchased Assets"*), including the following:

(a) *Diamond Growers and Related Equipment.* Subject to Section 2.2, the diamond growers listed on Schedule 2.1(a), and related diamond growing equipment, including but not necessarily limited to lasers, polishers, finishers, big saws, power generators, recirculation systems, clean rooms, UPS, automated test equipment, PL, FTIR, AV-VIS, microscopes, X-rays machines and all other related and miscellaneous equipment relating the Business (collectively the *"Transferred Diamond Growing Equipment"*);

(b) *Intellectual Property.* The Intellectual Property constituting:

(i) All issued patents and patent applications of Seller whether pending, in force or abandoned as well as any and all patent related documents including invention disclosures and descriptions, draft patent applications whether filed or not filed, as well as rights to any of Seller's patent prosecution attorneys' files;

(ii) Seller's software programs, tools, kits, and any content or related documentation or third party or open source code embedded therein, either locally stored on Seller's computers or remotely accessed by Seller, that is owned or made available to Seller and is used in, held for use in, or is necessary for the operation of the Purchased Assets or Business or otherwise, and any upgrades, updates, releases, fixes, enhancements, or modifications thereto, and all written materials and specifications applicable thereto (collectively, the *"Computer Software"*);

(iii) The name "Apollo Diamond" and the mark "Apollo" and any other registered or unregistered trademarks, trade names, service marks, domain names, and email addresses, used or held for use in the Business (collectively, the *"Trademarks"*), and any and all goodwill associated with the Business embodied in the Trademarks, and any and all rights of Seller with respect to the Trademarks (collectively, the *"Trademark Intellectual Property"*);

(iv) Seller's internet website located at *www.apollodiamond.com* and any derivations thereof (collectively, the *"Website"*) and all intellectual property rights that may exist or arise in connection with the Website, including all Underlying Technology (collectively, the *"Website Intellectual Property"*); and

9

(v)     Uniform resource locator addresses, trade dress, logos, slogans, symbols and corporate names.

(c) *Other Equipment*. All furniture, equipment, computers, computer equipment, machinery, tools, hand tools, spare parts, test equipment, supplies, inventory, office supplies, telephones, and all other tangible personal property of every kind and description insofar as any of the foregoing relates to the operation of the Purchased Assets or Business (the "*Other Equipment*"), including the Equipment listed in Schedule 2.1(c).

(d) *Inventory.* All goods, items, parts, pieces or materials of every kind necessary in the operation of the Business or produced by or in coordination with the Business, whether diamond, metal or any other substance, wherever located and whether currently in the possession of the Seller or any third party..

(e) *Contracts*. All of the interests, rights, Claims, and benefits arising or accruing to Seller under any Contracts to which a Seller is a party or has or may acquire a benefit and that relate to the Purchased Assets or Business, including the Contracts listed in Schedule 2.1(e), to the extent Seller's interest in any such Contract is assignable, but subject to the rights of Purchaser not to assume specified Contracts as contemplated by Section 2.2(b) (after taking into account all of the foregoing, the "*Assigned Contracts*");

(f) *Additional Tangible Assets*. All other Tangible Personal Property of every kind used in the operation of the Purchased Assets or Business, together with any rights appurtenant thereto, including any express or implied warranty by the manufacturer, vendor, or lessor of any such Tangible Personal Property;

(g) *Accounts and Notes Receivable*. All trade accounts receivable, notes receivable, and other rights of Seller to payment from customers and other third parties and other amounts due from customers and other third parties or that become due, including all assets constituting working capital, that relate to or arise from the operation of the Purchased Assets or Business;

(h) *Insurance Benefits*. All insurance benefits arising from or related to the Purchased Assets and Business;

(i) *Cash*. All cash and cash equivalents, securities, money on deposit with banks, certificates of deposit, and short-term investments (if any) of Seller;

(j) *Prepaid Deposits and Expenses*. Any deposits and prepaid expenses (paid to or by Seller), Claims for refunds, and rights of set off related to the Purchased Assets or Business;

(k) *Claims and Warranties*. Any and all Claims, warranties, reimbursements, and indemnities against third parties relating or attributable to the Business, the Purchased Assets, or the Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or non-contingent;

(l) *Intangible Assets*. Any and all customer and supplier relationships, and other Intangible Personal Property of every kind (in addition to the Computer Software, Trademark Intellectual Property and Website Intellectual Property, and uniform resource locator addresses, trade dress, logos, slogans, symbols and corporate names that constitute

10

Intellectual Property) that relate to or are used in the operation of the Purchased Assets or Business, together with all rights appurtenant thereto (the "***Assigned Intangible Assets***");

(m) *Books and Records*. Original copies of the Assigned Intangible Assets and photocopies of the other Books and Records (collectively, the "***Transferred Books and Records***");

(n) *Goodwill*. Any goodwill and going concern value related to the Business; and

(o) *Other Assets*. To the extent not otherwise enumerated in this Section 2.1, all other tangible or intangible assets, rights, privileges, benefits, Claims, and interests of Seller, whether real, personal or mixed, of every kind and description and wherever located, that relate to, used in or held for use in the operation of the Purchased Assets or Business.

**2.2  Excluded Assets.** Notwithstanding anything to the contrary in Section 2.1 or elsewhere in this Agreement or other Transaction Documents, the Purchased Assets shall not include, and Purchaser will not acquire any interest in or purchase the following assets which shall remain the property of the applicable Seller (collectively, the "***Excluded Assets***"):

(a) *Transaction Rights*. All rights of Seller under this Agreement and the other Transaction Documents, and all cash and non-cash consideration payable or deliverable to, or on behalf of, Seller by Purchaser pursuant hereto and thereto;

(b) *Contracts*. Any and all of the interests, rights, Claims, and benefits arising or accruing to or against Seller;

(c) *Books and Records*. The original copies of all of the Books and Records, other than the original copies of the Assigned Intangible Assets (which shall be provided to Purchaser pursuant to Section 2.1(l) and of which Seller may retain photocopies), and any Books and Records of Seller (i) that are not permitted to be transferred to Purchaser under applicable Law, (ii) that constitute charters, bylaws, limited liability company agreements, minute books, stock transfer records, and other records related to the corporate governance of Seller, and (iii) all other books and records of Seller that do not relate primarily to the Purchased Assets or Business (collectively, the "***Retained Books and Records***");

(d) *Third Party Property*. Any improvements, equipment, inventory and any other tangible personal property located at the Leased Real Property as of the Closing Date that are not owned by or leased to Seller;

(e) *Claims and Warranties*. Any and all Claims, warranties, reimbursements, and indemnities of Seller, whether choate or inchoate, known or unknown, contingent or non-contingent with respect to the matters set forth in Schedule 2.2(e); and

(f) *Leased Real Property*. All leasehold interests in any real property (the "***Leased Real Property***"), together with all Real Property Rights related thereto.

**2.3  Consideration.** Subject to the other terms of this Agreement, the consideration for the Purchased Assets shall consist of cash in an amount of $2,000,000 as stipulated between the Parties (the "***Cash Payment***").

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000184

**2.4 Retained Liabilities.**

(a) Seller shall retain and be solely liable for and hereby expressly agrees to retain any and all of its Liabilities (collectively, the *"Retained Liabilities"*), regardless of whether any such Retained Liability is disclosed herein or in any Schedule hereto, whether known or unknown, absolute or contingent, liquidated or unliquidated, whether due or to become due, and whether Claims with respect thereto are asserted before or after the Closing Date. Notwithstanding the preceding sentence, Retained Liabilities shall include the following:

(i) *Transaction Liabilities.* Any and all Liabilities of Seller under the Transaction Documents;

(ii) *Excluded Assets.* Any and all Liabilities of Seller with respect to the Excluded Assets;

(iii) *Purchased Assets and Pre-Closing Business.* All Taxes, Claims and Liabilities arising out of Seller' ownership, operation, use, or maintenance of the Purchased Assets or Business, as well as any matters arising from events occurring, conditions existing, or costs accruing prior to the Closing;

(iv) *Taxes.* Any and all Liabilities of Seller for Taxes that relate to (A) the ownership, operation, use, or maintenance of the Purchased Assets or Business prior to the Closing Date, or (B) any sales, use, transfer, or other similar Taxes imposed as a result of the consummation of the Contemplated Transactions or performance of the Transaction Documents;

(v) *Legal Proceedings.* Any and all Liabilities of Seller that relate to any Proceeding involving the Purchased Assets or Business, including warranty, personal injury, breach of contract, failure to perform, infringement, noncompliance with Law, and tort Claims, that is (a) pending or threatened as of the Closing, or (b) commenced after the Closing but that arises out of or relate to any event, omission, or occurrence happening as of or prior to the Closing;

(vi) *Environmental Liabilities.* Any and all Liabilities of Seller with respect to any violation of Law including those arising from (a) the release, threatened release, presence, treatment, storage, disposal (including disposal at off site locations), handling, transportation or arrangement for transportation of hazardous substances prior to the Closing, (b) any failure of Seller to comply in any respect with Environmental, Health, and Safety Laws prior to the Closing, and (c) any facts, events, or circumstances in existence prior to the Closing that give rise to Liabilities pursuant to Environmental, Health, and Safety Laws;

(vii) *Employee Benefit Plans.* Any and all Liabilities of Seller, fiduciaries or ERISA Affiliate under any Employee Benefit Plan maintained or contributed to by Seller, fiduciary or any ERISA Affiliate or with respect to which Seller, its fiduciary or ERISA Affiliate has any Liability, whether prior to, on, or after the Closing, including any (a) failure to comply with all applicable Laws, (b) liability with respect to audits, inquiries, Proceedings, or Claims with any Governmental Authority with respect to any Employee Benefit Plan, (c) participation in any "multiemployer" plan (within the meaning of Section 3(37) of ERISA, whether or not governed by the provisions of ERISA) or withdrawal liability with

12

SEC-MONAHAN-000185

respect to any multiemployer plan, (d) required employer contributions with respect to the Employee Benefit Plans, (e) accumulated funding deficiency, (f) Lien under ERISA or Section 412 of the Code, or (g) the termination of, or intent to terminate, any Plan;

(viii) *Employees*. Any and all Liabilities of any nature of Seller or any fiduciary or ERISA Affiliate to Seller Employees, including Liabilities with respect to (a) any Contract, plan or policy, (b) wages, withholdings, overtime pay, minimum wage, employment Tax, vacation, sick pay, bonuses, severance pay, retirement, or other compensation, (c) benefits under Employee Benefit Plans, (d) the Worker Adjustment and Retraining Notification Act (WARN) of August 4, 1988 or equivalent state or local statutory or regulatory requirements, (e) any collective bargaining agreement or obligation or requirement under the National Labor Relations Act, (f) reporting, filing, hiring or other employment obligations with the Office of Federal Contract Compliance Programs, (g) all immigration related obligations, including all requirements of the Immigration Reform and Control Act of 1986, (h) any governmental or administrative proceeding for the enforcement of labor and employment laws and regulations, and (i) all other employment and employment related federal, state and local statutes, regulations, administrative requirements, common laws, and public policies;

(ix) *Intercompany Liabilities*. Any and all Liabilities of Seller for intercompany advances, charges, or accounts payable of any kind or nature; and

(x) *Broker Fees*. Any and all fees, commissions, and other compensation due and owing to any broker, finder, or agent retained by Seller.

### 2.5 Casualty Losses.

(a) Purchaser shall accept the Purchased Assets "as is" without warranty as to their condition and operation as of the date of this Agreement. However, if between the date of this Agreement and the Closing, there is an actual casualty loss to any Purchased Assets in which the cost to recover, salvage, and repair such Purchased Asset(s) to the state of condition and repair existing for such Purchased Asset(s) as of the date of this Agreement (collectively, the *"Purchased Assets Repair Costs"*) exceeds the casualty loss value ascribed to such Purchased Asset(s) (the *"Casualty Loss Amount"*), or any such loss by seizure, forced sale or other involuntary transfer then, if so directed by Purchaser in its sole discretion, the subject Purchased Asset(s) shall be deemed an Excluded Asset and shall not be sold to Purchaser hereunder, and the Cash Payment shall be reduced by an amount equal to the loss value ascribed to such Purchased Asset(s) as mutually determined by Seller and Purchaser; *provided, however*, that such determination shall be made by the Parties at least three Business Days prior to Closing, otherwise the Purchase Asset(s) shall be classified as Excluded Assets.

(b) The provisions of this Section 2.5 shall be applied with respect to all casualty losses or damage suffered by any Purchased Assets and, notwithstanding any other provision of this Agreement, the Parties shall be required to proceed with the Closing, subject to the other terms and conditions for the Closing, *provided*, further that in no event shall any casualty loss or damage to which this Section 2.5 applies constitute a breach of any other provision of this Agreement by Seller or be aggregated with any other actions, omissions, or failures of Seller in the determination of any breach of this Agreement by Seller, and for

13

SEC-MONAHAN-000186

the avoidance of doubt no such casualty loss or damage shall in any way be considered in the determination of a termination of this Agreement under Section 11.1.

### ARTICLE III
### CLOSING

**3.1 Closing.** Provided that this Agreement shall not have been earlier terminated pursuant to Section 11.1, and further provided that all of the conditions set forth in Sections 10.1 and 10.2 to the obligations of the Parties to consummate the Contemplated Transactions (other than conditions with respect to actions each Party will take at the Closing itself) shall have been satisfied or waived, the closing of the Contemplated Transactions (the "*Closing*") shall take place at such place and time as the Parties shall mutually agree, but shall occur on May 31, 2011 or any extension thereof as mutually agreed by the Parties, but in no case later than June 30, 2011 (the "*Closing Date*").

**3.2 Risk of Loss.** The risk of damage, destruction, or other casualty loss to or of the Purchased Assets shall remain with Seller from and after the execution of this Agreement until 11:59 p.m. on Closing Date, at which time Seller shall place Purchaser in possession of the Purchased Assets. From and after the Closing, all risk of damage, destruction, or other casualty loss to or of the Purchased Assets shall be borne solely by Purchaser and to the fullest extent permitted by Law, Purchaser agrees to indemnify, defend and hold Seller and their respective officers, directors, equity owners, and agents harmless from against any and all Claims and pay any and all Damages (including for personal injury, property damage or loss, and third party suits) attributable to the Purchased Assets and arising from events first occurring or conditions first existing from and after the Closing.

**3.3 Deliveries of Seller.** At the Closing, Seller will deliver (or cause to be delivered) to Purchaser each of the following items:

(a) *Master Bills of Sale*. One or more Master Bills of Sale, each substantially in the form of Exhibit 3.3(a), duly executed by the Seller and dated as of the Closing Date;

(b) *Assignments and Assumptions of Intangible Assets*. One or more Assignments and Assumptions of Intangible Assets, each substantially in the form of Exhibit 3.3(b), duly executed by the Seller and dated as of the Closing Date;

(c) *Officer's Certificates*. A certificate from Seller duly executed by an authorized officer thereof certifying as to the fulfillment of each condition specified in Sections 10.1(a) and 10.1(b) and dated as of the Closing Date;

(d) *Corporate Authorizations*. Copies of the resolutions of Seller, certified by the Secretary or Assistant Secretary thereof as being correct and complete and then in full force and effect, authorizing the execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the Contemplated Transactions;

(e) *Mutual Release*. In consideration for payment of the Cash Payment, Seller shall deliver a mutual release by Seller in favor of Purchaser and by Purchaser in favor of Seller on terms mutually acceptable to the Parties; and

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000187

(f) *Miscellaneous.* Any and all other documents, instruments, or agreements contemplated by this Agreement or as are necessary or appropriate or reasonably requested by Purchaser to fully consummate the Contemplated Transactions, in each case in form and substance reasonably satisfactory to Purchaser, duly executed, and dated as of the Closing Date.

**3.4 Deliveries of Purchaser.** At the Closing, Purchaser will deliver (or cause to be delivered) to Seller each of the following items:

(a) *Cash Payment.* The Cash Payment, against delivery of the items specified in <u>Section 3.3</u> and in accordance with <u>Section 2.3</u>;

(b) *Officer's Certificates.* A certificate of Purchaser duly executed by an authorized officer thereof certifying as to the fulfillment of each condition specified in <u>Sections 10.2(a)</u> and <u>10.2(b)</u> and dated as of the Closing Date;

(c) *Corporate Authorizations.* Copies of the resolutions of Purchaser, certified by the Secretary or Assistant Secretary thereof as being correct and complete and then in full force and effect, authorizing the execution of this Agreement and the Transaction Documents; and

(d) *Miscellaneous.* Any and all other documents, instruments, or agreements contemplated by this Agreement or as are necessary or appropriate or reasonably requested by Seller to fully consummate the Contemplated Transactions, in each case in form and substance reasonably satisfactory to Seller, duly executed, and dated as of the Closing Date.

## ARTICLE IV
## <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

As a material inducement to Purchaser to enter into this Agreement and consummate the Contemplated Transactions, Seller represents and warrants to the Purchaser that the statements contained in this <u>Article IV</u> are correct and complete as of the date of this Agreement, and will be correct and complete as of the Closing (unless any such representation or warranty speaks to an earlier date, in which case the statements contained in such representation or warranty will be correct and complete as of such date) as though made then and as though the Closing were substituted for the date of this Agreement throughout this <u>Article IV</u>:

**4.1 Organization.**

(a) Apollo Diamond, Inc. is a corporation, duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

(b) Seller is duly qualified or licensed to conduct its business as a foreign entity and is in good standing under the Laws of each jurisdiction where such qualification or license is required, except where the failure to be so qualified as would not, individually or in the aggregate, have a Material Adverse Effect.

15

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000188

**4.2 Power and Authority.**

(a) Seller has the requisite corporate power and authority necessary to own, lease, or operates its properties and assets and carries on its business as presently conducted.

(b) Seller has the requisite corporate power and authority to execute and deliver this Agreement, the Transaction Documents and the other documents contemplated hereby, to perform its obligations hereunder and thereunder, and to consummate the Contemplated Transactions.

**4.3 Authorization.** Seller has taken all corporate actions necessary to authorize the execution and delivery of this Agreement, the Transaction Documents and the other documents contemplated hereby to which such Seller is a party, the performance of such Seller's obligations hereunder and thereunder, and the consummation of the Contemplated Transactions. This Agreement, the Transaction Documents, and the other documents contemplated hereby has been duly authorized, approved, executed, and delivered by Seller. This Agreement constitutes and, as of the Closing, the Transaction Documents and the other documents required to be executed and delivered by Seller at the Closing will each constitute, a valid and legally binding obligation of Seller and, assuming the due authorization, execution, and delivery thereof by the other parties hereto and thereto, enforceable against Seller in accordance with its terms and conditions.

**4.4 Noncontravention.** Neither the execution and delivery by Seller of this Agreement, the Transaction Documents or any other documents contemplated hereby, nor the performance by Seller of its obligations hereunder or thereunder, nor the consummation by Seller of the Contemplated Transactions, will (a) violate any provision of the Organizational Documents of Seller, (b) violate any Permit, Law, Order, or other restriction of any Governmental Authority to which Seller or any of the Purchased Assets is subject or bound, (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel or require any notice under, or result in the creation of any Lien upon any of the Purchased Assets under any Contract to which Seller is a party or by which Seller or any of the Purchased Assets is subject or bound, or (d) require Seller to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority or other third party, in each case in clauses (b), (c), and (d) except as would not, individually or in the aggregate, have a Material Adverse Effect.

**4.5 Assets.** Seller owns good and marketable title, free and clear of all Liens other than Permitted Encumbrances, to all of the Purchased Assets. Immediately after the Closing, Purchaser shall have good and marketable title to all of the Purchased Assets, free and clear of all Liens. The Purchased Assets have been maintained in accordance with past practice, are in sufficient operating condition and repair (subject to normal wear and tear) suitable for the purposes for which they are presently or were most recently used in the Business.

**4.6 Absence of Undisclosed Liabilities.** Seller does not have, and as of the Closing, will not have, any obligation or Liability (in any case, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated or due or to become due), other than those Liabilities specifically enumerated by Seller. Seller hereby agrees to utilize the Cash Payment to retire such enumerated Liabilities.

16

**4.7 Legal Compliance.** The Business is in material compliance with all Laws applicable to the Business or any of the Purchased Assets. Except as set forth on Schedule 4.7, no Proceeding or Claim has been received by Seller or filed, commenced or, to the Knowledge of Seller, threatened against Seller, in each case with respect to the Business and the Purchased Assets, alleging a violation of or liability or potential responsibility under any law.

**4.8 Litigation; Proceedings.** Except as set forth on Schedule 4.8, there are no material Proceedings or Claims pending or, to Seller's Knowledge, threatened against or affecting Seller and relating to the Business or the Purchased Assets, or to which the Purchased Assets may be bound or affected, at Law or in equity, or before or by any Governmental Authority; Seller is not subject to any Order with respect to the Business or the Purchased Assets.

**4.9 Environmental Matters.** Seller has not handled or disposed of any substance, arranged for the disposal of any substance, exposed any employee or other individual to any substance or condition, or owned or operated the Business or any property or facility (and no such property or facility is contaminated with such substance) so as to give rise to any Liability or corrective or remedial obligation under any Environmental, Health and Safety Laws as would have a Material Adverse Effect. Seller and its predecessors are and have been in compliance with and have complied with all Environmental, Health and Safety Laws, and no Proceeding or Claim has been filed or commenced against Seller alleging any failure to so comply, in each case as would have a Material Adverse Effect. Seller has not, either expressly or by operation of law, assumed or undertaken any Liability of any other Person under any Environmental, Health and Safety Laws.

**4.10 Tax Matters.** (a) Seller has timely filed (or joined in the filing of) all Tax Returns required by applicable Law to be filed by Seller (taking into account any extensions of time within which to file); (b) all such Tax Returns were true, correct and complete in all respects; all Taxes owing by Seller (whether or not shown on any Tax Return) have been paid; (c) there is no Proceeding or Claim concerning any Seller Taxes either claimed or raised by any Tax authority in writing; (d) no written Claim has been made by any Tax authority in a jurisdiction where Seller does not currently file a Tax Return that it is or may be subject to any Tax by such jurisdiction, nor has any such assertion been threatened or proposed in writing; (e) Seller does not have any outstanding request for any extension of time within which to pay Taxes or file any Tax Returns; (f) there are no outstanding waivers or extensions of any applicable statute of limitations for the assessment or collection of any Taxes; (g) Seller is not a "foreign person" within the meaning of Section 1445 of the Code; (h) Seller is not a party to, or bound by, any Tax allocation, Tax indemnity, Tax sharing, or similar agreement or arrangement that imposes or could impose liability on Seller for the Taxes of another Person (other than any other Seller); (i) Seller does not have any material liability for the Taxes of another Person, consolidated group or combined group under Treasury Regulation Section 1.1502-6 or any similar provision of applicable Law, including as a transferee or successor, (j) Seller has withheld and paid all material Taxes required to be withheld by Seller in connection with any amounts paid or owing to any employee, creditor, independent contractor or other third party; and (k) no material liens for Taxes exist with respect to Seller' assets.

17

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

**4.11 Absence of Certain Developments.**  Prior to the date hereof:

(a) Seller has not sold, leased, transferred or assigned any of their assets, tangible or intangible, other than in the Ordinary Course of Business;

(b) Seller has not entered into any Contract outside the Ordinary Course of Business, except for Contracts entered into in connection with Seller' strategic sale or restructuring process (excluding contingent sales agreements);

(c) Seller has not accelerated, terminated, modified or canceled any material Contract to which any Seller is a party or by which any Seller is bound and, to Seller' the Knowledge, no party intends to take any such action;

(d) Seller has not suffered or imposed any Lien (other than any Permitted Encumbrances) upon any of its assets, tangible or intangible;

(e) Seller has not canceled, compromised, waived, or released any right or Claim outside the Ordinary Course of Business;

(f) Seller has not experienced any material damage, destruction, or loss (whether or not covered by insurance) to their properties or the Purchased Assets;

(g) To Seller's Knowledge, there has not been any other occurrence, event, incident, action, failure to act or transaction outside the Ordinary Course of Business involving the Business or the Purchased Assets; and

(h) Seller has not committed to do any of the foregoing.

**4.12   Contracts.** Seller is not a party to any Contract or other agreement affecting the Purchased Assets or their use in the Business.

**4.13   Customers and Suppliers.**  No material supplier of Seller has indicated that it shall stop, or materially decrease the rate of, supplying, products to Seller for the Business.

**4.14   Accounts Receivable.**  Seller has no accounts receivable as of the date hereof.

**4.15   Broker Fees.** Seller is solely liable for any and all fees, commissions, or other compensations to any broker, finder, or agent retained by any Seller, if any, with respect to the Contemplated Transactions.

**4.16   No Preferential Purchase Rights** There are no preferential purchase rights, options or other similar rights in any Person, not a party to this Agreement, to purchase or acquire any interest in the Purchased Assets, in whole or in part.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

As a material inducement to Seller to enter into this Agreement and to consummate the Contemplated Transactions, Purchaser represents and warrants to Seller that the statements contained in this <u>Article V</u> are correct and complete as of the date of this Agreement, and will be correct and complete as of the Closing Date (unless any such representation or warranty speaks to an earlier date in which case, the statements contained in such representation or warranty will be correct and complete as of such date)

18

as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article V:

**5.1 Organization.**

(a) Scio Diamond Technology Corporation is a corporation duly incorporated, validly existing, and in good standing under the Laws of the State of Nevada.

(b) Purchaser is duly qualified or licensed to conduct its business as a foreign entity and is in good standing under the Laws of each jurisdiction where such qualification or license is required, except where the failure to be so qualified would not individually or in the aggregate have a material adverse effect on the ability of Purchaser to perform their obligations under this Agreement or the Transaction Documents or to consummate the Contemplated Transactions.

**5.2 Power and Authority.**

(a) Purchaser has the requisite corporate power and authority necessary to own, lease, or operate its properties and assets and carry on its business as presently conducted.

(b) Purchaser has the requisite corporate power and authority to execute and deliver this Agreement, the Transaction Documents and the other documents contemplated hereby, to perform its obligations hereunder and thereunder, and to consummate the Contemplated Transactions.

**5.3 Authorization.** Purchaser has taken all corporate actions necessary to authorize the execution and delivery of this Agreement, the Transaction Documents and the other documents contemplated hereby, the performance of Purchaser's obligations hereunder and thereunder, and the consummation of the Contemplated Transactions. This Agreement, the Transaction Documents and the other documents contemplated hereby have been duly authorized, approved, executed, and delivered by such Purchaser.   This Agreement constitutes and, as of the Closing, the Transaction Documents and other documents required to be executed and delivered by Purchaser at the Closing will each constitute, a valid and legally binding obligation of Purchaser and, assuming the due authorization, execution, and delivery thereof by the other parties hereto and thereto, enforceable against such Purchaser in accordance with its terms and conditions.

**5.4 Noncontravention.** Neither the execution and delivery by Purchaser of this Agreement, the Transaction Documents or any other documents contemplated hereby, nor the performance by Purchaser of its obligations hereunder or thereunder, nor the consummation by Purchaser of the Contemplated Transactions, will (a) violate any provision of the Organizational Documents of Purchaser or any Law, Order, or other restriction of any Governmental Authority to which Purchaser or its assets are subject or bound, (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material Contract or material Lien to which any Purchaser is a party or by which Purchaser or its assets is subject or bound, in each case in all of the clauses above except as would not, individually or in the aggregate, materially adversely affect the ability of Purchaser to consummate the Contemplated Transactions or perform its obligations under this Agreement.

19

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000192

**5.5 Consents.**  No Consent of any Governmental Authority is required by Purchaser in connection with the execution, delivery, and performance of this Agreement by Purchaser and the consummation of the Contemplated Transactions by Purchaser.

**5.6 Financing.**  Subject to the conditions set forth in Article X, Purchaser will have at the Closing sufficient funds to timely and fully pay the Cash Payment (in accordance with Section 2.3) and consummate the Contemplated Transactions in accordance with the terms hereof.

**5.7 Litigation.**  As of the date of this Agreement, there is no Claim, Proceeding or Order pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party relating to this Agreement or the Contemplated Transactions that would have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the Transaction Documents or to consummate the Contemplated Transactions.

**5.8 No Material Adverse Change.**  There has not been:

(a) any amendment to the Organizational Documents of Purchaser; or

(b) any event outside the Ordinary Course of Business that has had or would reasonably be expected to have a Material Adverse Effect on Purchaser.

**5.9 Broker Fees.**  Purchaser is solely liable for any and all Liability to pay any fees, commissions, or other compensations to any broker, finder, or agent retained by any Purchaser with respect to the Contemplated Transactions.

**5.10 "AS IS, WHERE IS."**  It is understood that Purchaser take the Purchased Assets "as is, where is." Except as specifically set forth in this Agreement or the Transaction Documents, Purchaser explicitly acknowledges that Seller makes no representations or warranties, express or implied, with respect to the Purchased Assets or the Business. Purchaser acknowledges that it has conducted its own due diligence and has made such investigations as it has deemed appropriate and such other inquiries as it has deemed necessary or desirable to satisfy itself as to the condition, operations, and prospects of the Purchased Assets and the Business.

### ARTICLE VI
### PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the Interim Period:

**6.1 General.** Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law or otherwise to consummate, make effective, and comply with all of the terms of this Agreement and the Contemplated Transactions, including (a) providing all information and making all filings necessary in connection herewith and therewith, and (b) satisfying, but not waiving, the conditions precedent set forth in Article X.

**6.2 Notices and Consents.** As promptly as practicable following the date hereof, each Party will give any notices to, make any filings with, and use all commercially reasonable efforts to obtain the Consents of third parties and Governmental Authorities required to

20

consummate, make effective, and comply with all of the terms of this Agreement and the Contemplated Transactions, and will use all commercially reasonable efforts to agree jointly on a method to overcome any objections by any third party or Governmental Authority to this Agreement or the Contemplated Transactions. Subject to applicable Law, the Parties shall cooperate with each other in exchanging information and assistance in connection with obtaining any Consents of third parties and Governmental Authorities and shall promptly provide to the other Parties or their representatives copies of all filings made with any third party or Governmental Authority with respect to this Agreement or the Contemplated Transactions.

**6.3 Preservation of Purchased Assets and Business.** Seller shall use commercially reasonable efforts to (a) preserve Seller' current Business and the Purchased Assets substantially intact, including Seller's present customer and supplier relationships, and (b) maintain the Purchased Assets in good working order and condition, normal wear excepted. Without limiting the generality of the foregoing, from the date hereof through the Closing Date, Seller shall not, without the prior written consent of Purchaser, take any of the following actions:

(i) Take any action or omit to take any action, the taking or omission of which, could reasonably be expected to have a Material Adverse Effect or to Seller' Knowledge violate in any material respect this Agreement;

(ii) Enter into any Contract that would restrict or impair in any material way the conduct of the Business or the Purchased Assets;

(iii) Sell, transfer or otherwise dispose of or cause a Lien to exist on the Purchased Assets; or

(iv) Authorize or enter into an agreement to do any of the foregoing.

**6.4 No Shop.**

(a) During the Interim Period, Seller, or any agent or advisor to Seller, or any Affiliate of Seller shall not, directly or indirectly, through any officer, director, employee, agent, professional, advisor, other representative or otherwise, (1) solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer from any third party (other than Purchaser or any Affiliate of Purchaser) relating to any acquisition, divestiture, business combination, or reorganization or similar transaction involving any portion of the Business or the Purchased Assets, whether structured as a financing or refinancing or otherwise (a **"*Competing Transaction*"**), (2) enter into discussions or negotiations regarding a Competing Transaction, (3) furnish any information with respect to, enter into any agreement or understanding with respect to, otherwise assist or participate in, or facilitate in any other manner any Competing Transaction (including executing any confidentiality agreement with any other third party with respect to a Competing Transaction), or (4) waive any rights under any existing standstill or waiver agreements (any actions described in clauses (1) through (4) are **"*Prohibited Transactions*"**).

(b) Notwithstanding the foregoing provisions, in the event Seller receives an unsolicited bona fide offer or proposal for a Competing Transaction prior to the Closing and Seller's Board of Directors concludes in good faith (after consultation with its outside financial and

21

legal advisors) that such offer or proposal constitutes or is reasonably likely to result in a Superior Proposal, then, Seller may, and may permit their subsidiaries and representatives to, take any Prohibited Transaction described in sub-clauses (2) or (3) of clause (a) above (other than enter into any agreement); *provided* that (x) prior to providing any nonpublic information permitted to be provided pursuant to this sentence, Seller shall have entered into a confidentiality agreement with such third party on customary terms and which in any event is no less favorable to Seller than the confidentiality agreement entered into with Purchaser in connection with the Contemplated Transactions, and (y) concurrently with providing such information, Seller shall also furnish to Purchaser a copy of any confidential data or information being furnished to any third party pursuant to this Section to the extent not previously furnished to Purchaser.

(c) Seller shall promptly (within 24 hours) advise Purchaser orally and in writing following receipt of (1) any offer or proposal for a Competing Transaction or indication by any Person that it is considering making an offer or proposal relating to a Competing Transaction, (2) any request for nonpublic information relating to Seller or access to the properties, books or records of Seller, other than requests in the Ordinary Course of Business and unrelated to an offer or proposal relating to a Competing Transaction, or (3) any inquiry or request for discussions or negotiations regarding an offer or proposal relating to a Competing Transaction. Seller shall promptly (within 24 hours) provide Purchaser with a copy (if in writing) and summary of the related material terms of any such offer or proposal or request (including the identity of the Person making or considering such offer or proposal or making such request and shall keep Purchaser apprised of any material developments and discussions on a reasonably current basis (and in any event within 24 hours).

(d) Notwithstanding anything herein to the contrary, prior to entering into an agreement in connection with any Competing Transaction, (1) Seller shall provide prior written notice to Purchaser, at least 48 hours in advance (the "***Notice Period***"), of its intention to take such action with respect to such Competing Transaction, specifying the material terms and conditions of any such Competing Transaction (including the identity of the party proposing to effect such Competing Transaction) and furnishing to Purchaser a copy of the relevant proposed transaction agreements with the party proposing to effect such Competing Transaction and other material documents and (2) during the Notice Period, and in any event prior to taking such action, Seller shall negotiate, and shall cause its financial and legal advisors to negotiate, with Purchaser in good faith (to the extent Purchaser desires to negotiate) to make such adjustments in the terms and conditions of this Agreement so that such proposal or offer for a Competing Transaction ceases to constitute a Superior Proposal.

(e) At any time prior to the Closing, Seller may terminate this Agreement and concurrently with such termination, upon payment to Purchaser of the Termination Fee and Purchaser's Reimbursable Expenses, enter into a definitive agreement with respect to a Superior Proposal if the Board of Directors of Seller determines in good faith, after consultation with Seller's outside legal counsel, that in light of such Superior Proposal such action is required in order for Seller's Board of Directors to comply with its fiduciary obligations under applicable Law, provided that Seller has otherwise strictly complied with

22

SEC-MONAHAN-000195

all of their obligations in this Section 6.4.  Such agreement to pay the Termination Fee and Purchaser's Reimbursable Expenses is, in part, based on Seller recognizing Purchaser's expenditure of time, energy, and resources in connection with this Agreement. The payment of the Termination Fee and Expense Reimbursement shall be governed by the provisions of this Agreement. Except as may be negotiated as part of a Superior Proposal, under no circumstances will a break-up fee, expense reimbursement or other similar bid protections be provided by Seller to any potential bidder or bidders for any portion of the Business or the Purchased Assets, other than Purchaser.

**6.5 Public Announcement.** Seller and Purchaser shall consult with and provide each other the opportunity to review and comment upon any press release or other public statement, if any, prior to the issuance of such press release or other public statement relating to this Agreement or the Contemplated Transactions, and shall coordinate the timing of any such press release or other public statement.

**6.6 Notices of Certain Events.** Seller shall promptly notify Purchaser of:

(a) Any written communication or written notice from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b) Any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

(c) Any Material Adverse Effect on the Purchased Assets.

## ARTICLE VII
## EMPLOYEE MATTERS

**7.1 Offers of Employment.** Purchaser or any Affiliate of Purchaser shall be entitled, but not obligated, to make offers of employment to such of the Seller Employees as Purchaser or such Affiliate of Purchaser shall determine and on such terms as Purchaser or such Affiliate determines (each, an *"Offer of Employment"*). In connection therewith, Seller shall permit Purchaser and their representatives and Affiliates to have access, at reasonable times and upon reasonable notice, to all Seller Employees for conducting interviews and evaluations to assess whether Purchaser or any Affiliates thereof desires to extend Offers of Employment to any of the Seller Employees.

**7.2 Terms of Employment and Transition.** In the event Purchaser or any Affiliate thereof extends an Offer of Employment to a Seller Employee, and such Seller Employee accepts employment with Purchaser or such Affiliate (each, a *"Transferred Employee"*), employment of such Transferred Employee by Purchaser or such Affiliate shall be on the terms of the Offer of Employment applicable to each such Transferred Employee, if any.

**7.3 Employee Benefits.**

(a) Seller shall be Liable for the payment of all wages, compensation, and other remuneration due as of the Closing Date to each Seller Employee, and Seller shall be Liable for all payments or contributions required to be made to any Employee Benefit Plans of Seller.

23

  SEC-MONAHAN-000196

(b) Effective as of Closing and thereafter, Purchaser (or an Affiliate thereof) shall provide, or cause to be provided, under Purchaser's plans or otherwise, continuation health coverage with respect to Seller Employees; provided, however, that Seller (or an Affiliate thereof) shall, at their sole expense, be solely responsible for providing any and all notices and/or elections required by COBRA, and by Seller' agreements, policies, plans or practices.

**7.4 Miscellaneous.** Notwithstanding any provision to the contrary in this Agreement, nothing expressed or implied in this Agreement shall confer upon any Seller Employee (including any Transferred Employee) any rights or remedies of any nature or kind whatsoever, including any right to employment or continued employment for any specified period by Purchaser or any Affiliate thereof, or restrict in any way the right of Purchaser or any such Affiliate to terminate employment of any Transferred Employee.

**ARTICLE VIII**
**TAX MATTERS**

**8.1 Purchase Consideration Allocation.** Seller and Purchaser shall negotiate in good faith prior to the Closing to agree upon an allocation of the Cash Payment among the Purchased Assets (the *"Purchase Consideration Allocation"*). In the event the Parties are unable to finalize the Purchase Consideration Allocation prior to the Closing then the Parties shall attempt to finalize the Purchase Consideration Allocation within sixty (60) days after the Closing Date, *provided*, *however*, the Parties shall not be obligated to reach an agreement. If an agreement is reached, the Parties shall treat and report (and, if necessary, to cause each of their respective Affiliates to so treat and report) the sale and purchase of the Purchased Assets for all federal, state and local Tax purposes in a manner consistent with the agreed Purchase Consideration Allocation and shall not take any position on their respective Tax Returns that is inconsistent with such Purchase Consideration Allocation. Without limiting the generality of the preceding sentence, the Purchase Consideration Allocation will be reflected in Form 8594 that will be filed by Seller and Purchaser in accordance with Section 1060 of the Code and in any other filings under the Code. The Parties recognize that the Purchase Consideration Allocation shall not include Purchaser's acquisition expenses and that Purchaser will allocate such expenses appropriately.

**8.2 Tax Allocation.** For any ad valorem or similar property Taxes where the applicable Tax period begins before the Closing Date and ends after the Closing Date (the "*Straddle Period*"), such Taxes shall be allocated between the pre-Closing and post-Closing portion of the Straddle Period as described herein. The amount of such Taxes for the Straddle Period allocated to the portion of the period ending on the Closing Date shall be the total of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days from the beginning of such Straddle Period to and including the Closing Date and the denominator of which is the total number of days in the entire Straddle Period. The balance of such taxes shall be allocated to the portion of the Straddle Period beginning after the Closing Date.

24

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000197

## ARTICLE IX
## POST-CLOSING COVENANTS

The Parties agree as follows with respect to the period following the Closing Date:

**9.1 Books and Records.** At the Closing, or such subsequent date as the Parties may mutually agree, Seller shall deliver, or cause to be delivered, to Purchaser the Transferred Books and Records, provided that such delivery shall not include any Retained Books and Records and shall be at Seller' sole cost and expense.

**9.2 Computer Software.** Seller agree to use commercially reasonable efforts to provide Purchaser with a sublicense with respect to any Computer Software (in accordance with the terms of any primary license relating thereto) reasonably requested by Purchaser as being necessary in the operation of the Purchased Assets, or in the alternative to provide reasonable access to Purchaser to such information relating to the Purchased Assets that is embodied in such Computer Software.

**9.3 Monies Collected.** To the extent any payments of trade accounts receivable, credit card receipts or other monies that are for the account of Seller are received by any Purchaser, such Purchaser shall, within three (3) Business Days of receipt thereof, advance to Seller the amount of any such payments together with any documentation received by such Purchaser in connection therewith. To the extent any payments of trade accounts receivable, credit card receipts, or other monies that are for the account of Purchaser are received by a Seller, such Seller shall, within three (3) Business Days of receipt thereof, advance to Purchaser the amount of any such payments together with any documentation received by such Seller in connection therewith.

**9.4 Survivability.** The representations and warranties and pre-Closing covenants and obligations of Seller and of Purchaser in Article IV, Article V and Article VI of this Agreement shall not survive the Closing.

## ARTICLE X
## CONDITIONS TO CLOSING

**10.1 Conditions Precedent to Obligation of Purchaser.** The obligations of Purchaser to consummate the Contemplated Transactions and take any other action required to be taken by Purchaser at the Closing or thereafter are subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Purchaser in whole or in part:

(a) *Accuracy of Representations and Warranties.* The representations and warranties of Seller set forth in this Agreement shall have been and be true and correct in all respects (it being understood that, for purposes of determining the accuracy of such representations and warranties, all materiality qualifications contained in such representations and warranties shall be disregarded) as of the date hereof and as of the Closing Date, as though made on and as of the Closing Date (except to the extent representations and warranties speak as of a specified date, which representation and warranties shall have been true and correct as of such date), except for failures that would not, individually or in the aggregate, have a material adverse effect on the Purchased Assets, Business, or the ability of Seller, in

25

each case taken as a whole, to perform their obligations under this Agreement or consummate the Contemplated Transactions.

(b) *Compliance with Obligations.* Seller must have performed and complied with all of its covenants and obligations required by this Agreement to be performed or complied with at or prior to the Closing in all material respects.

(c) *No Legal Proceedings.* There shall be no Claim, Proceeding, or Order pending against Seller (excluding such by or at the direction of Purchaser or any Affiliates thereof) or against any Purchaser (excluding such by or at the direction of Seller or any Affiliates thereof) by or before any Governmental Authority that would reasonably be expected to have the effect of or seek to challenge, restrain, prohibit, invalidate, interfere with, or collect Damages arising out of, the Contemplated Transactions.

(d) *Consents.* Seller's stockholders shall approve this Agreement and the Contemplated Transactions pursuant to Seller's corporate governance and organizational documents requirements.

(e) *Financing of Purchaser.* Prior to Closing, Purchaser shall have procured funding to make the Cash Payment set forth in Section 2.3 that is necessary in connection with the consummation of the Contemplated Transactions.

(f) *Closing Deliveries.* Purchaser shall have delivered, or caused to be delivered, at the Closing each item described in Section 3.3.

**10.2 Conditions Precedent to Obligations of Seller.** The obligation of Seller to consummate the Contemplated Transactions and take any other action required to be taken by Seller at the Closing or thereafter is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived by Seller in whole or in part:

(a) *Accuracy of Representations and Warranties.* The representations and warranties of Purchaser set forth in this Agreement shall have been and be true and correct in all respects (it being understood that, for purposes of determining the accuracy of such representations and warranties, all materiality qualifications contained in such representations and warranties shall be disregarded) as of the date hereof and as of the Closing Date, as though made on and as of the Closing Date (except to the extent representations and warranties that speak as of a specified date, such representation and warranties shall have been true and correct as of such date), except for failures that would not, individually or in the aggregate, have a material adverse effect on the ability of Purchaser to perform their respective obligations under this Agreement or consummate the Contemplated Transactions.

(b) *Compliance with Obligations.* Purchaser must have performed and complied with all of their respective covenants and obligations required by this Agreement to be performed or complied with at or prior to the Closing in all material respects.

(c) *No Legal Proceedings.* There shall be no Claim, Proceeding, or Order pending against any Purchaser (excluding such by or at the direction of Seller) by or before any Governmental Authority that may have the effect of or seek to challenge, restrain, prohibit, invalidate, interfere with, or collect Damages arising out of, the Contemplated Transactions.

26

SEC-MONAHAN-000199

(d) *Closing Deliveries.* Purchaser shall have delivered, or caused to be delivered, at the Closing each item described in Section 3.4.

## ARTICLE XI
## TERMINATION

**11.1 Termination of Agreement.** The Parties may terminate this Agreement as provided below:

(a) *Mutual Consent.* Purchaser and Seller may terminate this Agreement as to all Parties by mutual written consent at any time prior to the Closing by written instrument authorized by the respective Boards of Directors of Seller and Purchaser.

(b) *By Purchaser.* Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing in the event that Seller has breached any representation, warranty, or covenant contained in this Agreement to such an extent that the conditions set forth in Sections 10.1 shall not have been satisfied, or cannot be satisfied by June 30, 2011 (the ***"Termination Date"***); *provided*, that Purchaser shall have provided written notification to Seller of such breach and the breach shall have continued without cure for a period of ten (10) days after delivery of the notice of such breach. At its sole and absolute discretion, Purchaser has the right to waive termination or agree to extend any deadlines under this Section 11.1(b).

(c) *By Seller.* Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing in the event that Purchaser has breached any representation, warranty, or covenant contained in this Agreement to such an extent that the conditions set forth in Sections 10.2 shall not have been satisfied, or cannot be satisfied by the Termination Date; *provided*, that Seller shall have provided written notification to Purchaser of such breach and the breach shall have continued without cure for a period of ten (10) days after delivery of the notice of breach.

(d) *By Either Party.* Seller or Purchaser may terminate this Agreement by giving written notice to the other Party if (i) any court of competent jurisdiction or any other Governmental Authority in a suit instituted by a third party or a Governmental Authority shall have issued an Order or shall have taken any other action prior to the Termination Date permanently enjoining, restraining, or otherwise prohibiting the Contemplated Transactions or a material portion thereof, (ii) the Closing has not occurred by the Termination Date, *provided*, that the Party electing to terminate shall not have caused such failure to close.

**11.2 Effect of Termination.**

(a) If either Party terminates this Agreement pursuant to Section 11.1, all rights and obligations of the Parties under this Agreement shall terminate; *provided*, that the rights and obligations of the Parties under this Section 11.2 (Effect of Termination), any provisions regarding the interpretation or enforcement of this Agreement, and Article XII (Miscellaneous) will survive any such termination.

(b) Notwithstanding any other provision of this Agreement, in no event shall Seller or be entitled to recover any out-of-pocket Damages caused by any breach by Purchaser of this Agreement.

27

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                                        SEC-MONAHAN-000200

## ARTICLE XII
## MISCELLANEOUS

**12.1 Waiver.** Any term or provision of this Agreement may be waived in writing at any time by the Party which is entitled to the benefits thereof. The failure of either Party at any time or times to require performance of any provision hereof shall in no manner affect such Party's right at a later time to enforce the same. No waiver by any Party of a condition or of the breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, covenant, representation, or warranty of this Agreement.

**12.2 Notices.** All notices, requests, demands, Claims, Consents, or other communications required or authorized hereunder shall be in writing and shall be deemed to have been duly given by the applicable Party if personally delivered, sent by facsimile with receipt acknowledged, sent by a recognized commercial overnight delivery service which guarantees next Business Day delivery, sent by U.S. registered or certified mail return receipt requested and postage prepaid, or otherwise actually received by the other Party at the address of the intended recipient set forth below:

If to Seller:        Apollo Diamond, Inc.

P.O. Box 670
Framingham, MA 01704
Attention: Robert C. Linares
Chairman
Fax: 508-429-2925

If to          Scio Diamond Technology
Purchaser:     Corporation

[*Redacted*]

All such notices and communications shall be deemed to have been received if personally delivered, at the time delivered by hand; if mailed, three (3) Business Days after being deposited in the mail; if faxed, upon confirmation of receipt if the confirmation is between 9:00 a.m. and 5:00 p.m. local time of the recipient on a Business Day, otherwise on the first Business Day following confirmation of receipt; and, if sent by overnight air courier, on the next Business Day after timely delivery to the courier.

Either Party may change the address to which notices, requests, Claims, Consents, and other communications hereunder are to be delivered by giving the other Party prior written notice thereof in the manner herein set forth in this Section 12.2.

**12.3 Further Assurances.** Each of the Parties hereby agrees that after Closing it will execute and deliver such additional documents and will use commercially reasonable efforts to take or cause to be taken such further action as may be necessary or desirable, or

28

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000201

as the other Party may reasonably request, to close and make effective the Contemplated Transactions. After the Closing, each Party, at the request of the other Party, and without additional consideration, shall execute and deliver, from time to time, such additional documents of conveyance and transfer as may be necessary to accomplish the orderly transfer of the Purchased Assets and Business to Purchaser in the manner contemplated in this Agreement.

**12.4 Expenses.** Except as otherwise expressly provided in this Agreement, each of the Parties shall pay all costs and expenses incurred or to be incurred by it and its advisors and representatives in connection with any negotiations respecting this Agreement and Contemplated Transactions, including preparation of documents, obtaining any necessary regulatory approvals, and the consummation of the other transactions contemplated hereby.

**12.5 Successors and Assigns.** This Agreement, and all rights and powers granted hereby, will bind and inure to the benefit of the Parties and their respective successors and permitted assigns.

**12.6 Third Party Beneficiaries.** This Agreement and any agreement contained, expressed, or implied herein, shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**12.7 Time of the Essence.** Time is of the essence in the performance of all covenants and obligations under this Agreement.

**12.8 Assignment.** Neither this Agreement nor any Party's rights, interests, or liabilities hereunder may be assigned, transferred, conveyed, or pledged by operation of law or otherwise; *provided,* that Purchaser may transfer and assign prior to the Closing all or any portion of its rights and liabilities pursuant to this Agreement to an Affiliate thereof but Purchaser shall not be relieved of their obligations hereunder as a result of such assignment.

**12.9 Governing Law; Venue.** THIS AGREEMENT, THE TRANSACTION DOCUMENTS, AND THE LEGAL RELATIONS BETWEEN THE PARTIES WITH RESPECT TO THIS AGREEMENT, SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MINNESOTA WITHOUT REGARD TO RULES CONCERNING CONFLICTS OF LAWS. Purchaser and Seller agree that the Courts of the State of Minnesota shall have exclusive jurisdiction over all disputes and other matters relating to (a) the interpretation and enforcement of this Agreement or any ancillary document executed pursuant hereto, and (b) the Purchased Assets, and Seller expressly consents to and agrees not to contest such exclusive jurisdiction. The Parties waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the bringing of any such Claim or Proceeding in such jurisdiction.

**12.10 Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000202

**12.11 Entire Agreement; Amendment.** This Agreement (including any documents referred to in this Agreement) constitutes the entire agreement between the Parties with respect to the Contemplated Transactions and supersedes any prior understandings, negotiations, statements, discussions, correspondence, offers, agreements, or representations by the Parties, written or oral, relating in any way to the subject matter of this Agreement and the Contemplated Transactions. No modification, amendment, or supplement of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. Without limiting the generality of the preceding sentence, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement will be binding unless hereafter made in writing and signed by the Party to be bound, and no modification will be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement, except as otherwise specifically agreed to by the Parties in writing.

**12.12 Counterparts.** This Agreement may be executed by Purchaser and Seller in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument. A facsimile transmission of a signed copy of this Agreement shall be effective as a valid and binding agreement between the Parties for all purposes.

**12.13 Certain Limitations.** NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT (OR ANY OTHER AGREEMENT RELATED HERETO) TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY BE LIABLE (OR ENTITLED TO RECOVER) UNDER, OR IN RESPECT OF, THIS AGREEMENT FOR EXEMPLARY, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES.

[Signature Page Follows]

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000203

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first above written.

**APOLLO DIAMOND, INC.**

By:   Robert C. Linares
Its:   Chairman


**SCIO DIAMOND TECHNOLOGY CORPORATION**


By:   Joseph D. Lancia
Its:   Chief Executive Officer

31

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000204

SCHEDULE 2.1(a)

DIAMOND GROWERS AND RELATED EQUIPMENT:

[*Redacted—Confidential*]

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN                    SEC-MONAHAN-000205

SCHEDULE 2.1(c)

OTHER EQUIPMENT:

[*Redacted—Confidential*]

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SCHEDULE 2.1(e)

CONTRACTS:

[*Redacted—Confidential*]

                     SEC-MONAHAN-000207

SELLER CLAIMS AND WARRANTIES:

[*Redacted—Confidential*]

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SCHEDULE 4.7

PROCEEDING OR CLAIM RECEIVED BY SELLER:

[*Redacted—Confidential*]

SCHEDULE 4.8

PROCEEDINGS OR CLAIMS BEFORE A GOVERNMENTAL AGENCY:

[*Redacted—Confidential*]

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN
SEC-MONAHAN-000210

SCHEDULE 3.3(a)

MASTER BILL OF SALE

THIS MASTER BILL OF SALE AREEMENT (the "Bill of Sale") is made this ___ day of _____, 2011, by and between **APOLLO DIAMOND, INC.,** a corporation duly organized under the laws of the State of Delaware ("Seller"), and **SCIO DIAMOND TECHNOLOGY CORPORATION**, a corporation duly organized under the laws of the State of Delaware ("Purchaser"). Seller and Purchaser may be referred to in this Bill of Sale collectively as the "Parties" and individually and a "Party." Capitalized terms used herein without definition shall have the meaning ascribed thereto in that certain Asset Purchase Agreement (defined below).

WITNESSETH

WHEREAS, Seller and Purchaser are parties to that certain Asset Purchase Agreement dated as of March 11, 2011 (the "Asset Purchase Agreement"), pursuant to which, among other things, Seller agreed to sell and transfer, and Purchaser agreed to purchase and accept, substantially all of the assets of Seller; and

WHEREAS, it is a condition to the Closing of the Asset Purchase Agreement that Seller enters into this Bill of Sale to sell to Purchaser the Transferred Assets (defined below).

NOW THEREFORE, in consideration of the payment by Purchaser of the Cash Payment and in further consideration of the mutual covenants and agreements contained in the Asset Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby covenant and agree as follows:

1.      **Transferred Assets**. For value received, the receipt and sufficiency of which is hereby acknowledged, effective as of _____ ___, 2011, Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser, which hereby accepts, all its right, title and interest and benefit in and to [*Redacted—Confidential*] (collectively, the "Transferred Assets"):

TO HAVE AND TO HOLD, all and singular, for its own use forever, the Transferred Assets hereby sold, assigned, transferred, conveyed and delivered, or intended so to be, unto Purchaser, its successors and assigns forever.

1.      **Excluded Assets**. For the avoidance of doubt, Seller shall not be deemed to have sold pursuant to this Bill of Sale any asset other than the Transferred Assets.

2.      **Assumption of Liabilities**. Purchaser hereby undertakes, assumes and agrees to perform, pay and discharge when due all liabilities and obligations accruing and required to be performed on or after the date hereof under any contracts related to the Transferred Assets.

3.      **Relationship with the Asset Purchase Agreement**. This Bill of Sale is intended to evidence the consummation of the transactions contemplated by the Asset Purchase Agreement. This Bill of Sale is made without representation or warranty except as provided in and by the Asset Purchase Agreement. This Bill of Sale is in all respects subject to the provisions of the Asset Purchase Agreement and is not intended to supersede, limit or qualify any provision of the Asset Purchase Agreement, except that the Schedules attached hereto (if

SCHEDULE 3.3(a)

any), shall take precedence over the schedules attached to the Asset Purchase Agreement for purposes of this Bill of Sale.

    4.    **Further Assurances**. Each Party hereby agrees on demand to make, execute, acknowledge and deliver any and all further documents and instruments, and to do and cause to be done all such further acts, reasonably requested by the other Party to evidence and/or in any manner to perfect the transfer and assignment to Purchaser of the Transferred Assets contemplated hereby. Subject to any contrary provisions of the Asset Purchase Agreement, Purchaser is hereby granted the irrevocable right and authority to collect for its own account all accounts and notes receivable and other items included in the Transferred Assets and to endorse with the name of Seller any checks received solely on account of any such accounts and notes receivable or such other items.

    5.    **Successors**. This Bill of Sale shall inure to the benefit of and is binding upon the respective successors and assigns of Seller and Purchaser.

    6.    **Risk of Loss**. The risk of loss, injury, destruction or damage to any of the Assets by fire or other casualty or occurrence shall remain with Seller until, and transfer to Purchaser.

    7.    **Taxes and Fees**. Seller agrees to indemnify and hold harmless Purchaser with respect to any taxes, fees, commissions or other charges becoming due as a result of this Bill of Sale, except any sales or use tax on the transfer of the Transferred Assets to Purchaser or Purchaser's subsequent use of the Transferred Assets, which sales and use taxes are the responsibility of the Purchaser.

    8.    **GOVERNING LAW**. THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF MINNESOTA, WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS.

    9.    **Modification**. This Bill of Sale shall not be modified or amended except by an instrument in writing signed by authorized representatives of the Parties.

    10.    **Time**. Time is of the essence related to this Bill of Sale.

    11.    **Entire Bill of Sale**. Purchaser and Seller warrant that the terms and conditions of this Bill of Sale were fully read and understood and that they constitute the entire Bill of Sale between the Parties.

    12.    **Unenforceability**. If any one or more provisions of this Bill of Sale shall be found to be illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

    13.    **Confidentiality**. The entire contents of this Bill of Sale shall remain confidential between all Parties named in this Bill of Sale, except as required by law.

SCHEDULE 3.3(a)

14.   **Counterparts**.  This Bill of Sale may be executed by facsimile transmission by the Parties in counterparts.  Following such transmission, the parties agree that executed originals will be forwarded by mail or by courier to the respective parties.

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed by their authorized representatives and effective as of the date first written above.

**APOLLO DIAMOND, INC.**

By: _____

Name: Robert Linares

Title: Chief Executive Officer

**SCIO DIAMOND TECHNOLOGY CORPORATION**

By: _____

Name: Joseph D. Lancia

Title: Chief Executive Officer

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SCHEDULE 3.3(b)

ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AREEMENT (the "Assignment") is made this ___ day of _____, 2011, by and between **APOLLO DIAMOND, INC.**, a corporation duly organized under the laws of the State of Delaware ("Assignor"), and **SCIO DIAMOND TECHNOLOGY CORPORATION**, a corporation duly organized under the laws of the State of Delaware ("Assignee"). Assignor and Assignee may be referred to in this Assignment collectively as the "Parties" and individually and a "Party." Capitalized terms used herein without definition shall have the meaning ascribed thereto in that certain Asset Purchase Agreement (defined below).

WITNESSETH

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of March 11, 2011 (the "Asset Purchase Agreement"), pursuant to which, among other things, Assignor agreed to assign, and Assignee agreed to assume, substantially all of the intangible assets and intellectual property of Assignor; and

WHEREAS, it is a condition to the Closing of the Asset Purchase Agreement that the Assignor enters into this Assignment to assign to Assignee the Assigned Assets (defined below).

NOW THEREFORE, through mutual negotiation and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby covenant and agree as follows:

15.    **Assignment**. Assignor hereby assigns all of its rights, obligations, interests and liabilities in the [*Intangible Asset(s)*] to the Assignee (the "Assigned Assets") pursuant to the terms of the Asset Purchase Agreement and this Assignment. As of the date of this Assignment, Assignor shall have no further rights, obligations, interests or liabilities of any kind whatsoever related to the Assigned Assets.

16.    **Assumption**. For and in consideration of the assignments hereunder, Assignee hereby assumes all of Assignor's rights, obligations, interest and liabilities related to the Assigned Assets to the same extent as though Assignee had been the original owner of the Assigned Assets.

17.    **Fees**. Any registration for the change of the registered owner of the Assigned Assets shall be undertaken by Assignor and Assignor shall bear the registration fees, or other applicable fees, incurred hereby.

18.    **Ownership**. Assignor represents and warrants that Assignor has the exclusive ownership of the Assigned Assets and no rights or equity of any third-party is prejudiced due to the using of the Assigned Assets. There is no litigation or any other disputes arising from or relating to the Assigned Assets.

19.    **Indemnification**. Assignor shall indemnify and hold harmless Assignee and its affiliates, officers, directors, shareholders, employees, partners, agents and representatives from

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SCHEDULE 3.3(b)

and against any and all loss, liability, damage or expenses which may be incurred by Assignee related to the Assigned Assets or due to any claims of a third-party in connection with the Assigned Assets.

20. **Dispute Resolution**. This Assignment shall be governed by the laws of the State of Minnesota. Any dispute or controversy arising from this Assignment shall be subject to Section 12.9 of the Asset Purchase Agreement.

21. **Entire Assignment**. This Assignment contains the entire understanding among the Parties with respect to the matters covered herein and supersedes and cancels any prior understanding with respect to the matter covered herein.

22. **No Changes**. No changes, alternations or modifications hereto shall be effective unless made in writing and signed by all of the Parties.

23. **Severability**. Any provision of this Assignment which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without affecting in any way the remaining provisions hereof or rendering any other provision of this Assignment invalid or unenforceable.

24. **Confidentiality**. The entire contents of this Assignment shall remain confidential between all Parties named in this Assignment, except as required by law.

25. **Counterparts**. This Assignment may be executed by facsimile transmission by the Parties in counterparts. Following such transmission, the parties agree that executed originals will be forwarded by mail or by courier to the respective parties.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed by their authorized representatives and effective as of the date first written above.


**APOLLO DIAMOND, INC.**


By: _____
Name: Robert Linares
Title: Chief Executive Officer


**SCIO DIAMOND TECHNOLOGY CORPORATION**


By: _____
Name: Joseph D. Lancia
Title: Chief Executive Officer

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

\* \* \* \* \*

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

APPENDIX B

## STOCK REPURCHASE AGREEMENT

This Stock Repurchase Agreement (the "Agreement") is made as of _____, 2011 by and among APOLLO DIAMOND, INC., a Delaware corporation (the "Company"), and _____ ("Seller").

### RECITALS

**WHEREAS,** Seller currently holds an aggregate _____ shares of the Company's single series common stock, par value $0.01 per share (the "Stock);

**WHEREAS**, the Company agrees, upon the terms and conditions set forth herein, to repurchase all of the shares of Stock currently owned by Seller;

**WHEREAS**, the Company and Seller desire that the Company repurchase from Seller all of shares of Stock in the Company beneficially owned by Seller (the "Repurchase Shares") upon the terms and conditions and for the consideration set forth herein (the "Repurchase"); and

**WHEREAS**, the Company and Seller desire to enter into the covenants and agreements set forth below.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein set forth and each act done and to be done pursuant hereto, the parties hereto, intending to be legally bound, do hereby represent, warrant, covenant and agree as follows:

1. **THE REPURCHASE.**

   a. Repurchase of the Shares. Subject to the terms and conditions set forth in this Agreement, the Company agrees to repurchase from Seller, and Seller agrees to sell, assign and transfer all of Repurchase Shares to the Company at a repurchase price of $.01 per share (the "Repurchase Amount").

   b. The Closing. The Repurchase shall be deemed complete upon: (1) the Seller first tendering this fully-executed Agreement, together with Seller's Company Stock certificate(s) representing the Repurchase Shares, duly endorsed in favor of the Company; and (2) the Company subsequently tendering a check of immediately available good funds, payable to Seller for the Repurchase Amount; *provided, however*, that the Repurchase Amount shall be tendered to Seller within five (5) business days of the Company's receipt of the items set forth in (1) above and the execution of this Agreement by both the Company and Seller. The completion of the matters set forth in this Section 1 (b) shall be deemed the "Closing" and the date of the Closing shall be deemed the "Closing Date."

   c. Repurchase Shares. Effective as of the Closing Date, the Repurchase Shares shall be canceled and no longer issued and outstanding. Prior to the Closing Date, Seller shall, except as otherwise set forth herein, have all rights, powers and privileges as a holder of Stock.

2. **EFFECTIVENESS AND TERMINATION.**

   a. Effectiveness. This Agreement shall be effective upon execution and delivery thereof by the Company and Seller of those items set forth in Section 1 (b) hereof; i.e., the Closing Date.

b. <u>Termination</u>. If the Closing has not occurred by May 31, 2011 (the "Termination Date"), without any breach of this Agreement by either party hereto, the Company and Seller shall negotiate in good faith appropriate amendments or other arrangements in regards to this Agreement and the matters contemplated hereby, including potentially an extension of the Termination Date; *provided, however*, that if the Company and Seller do not reach binding agreement on such amendments or arrangements or otherwise agree to extend the Termination Date on or before June 30, 2011, then this Agreement shall terminate and cease to be effective in its entirety, without any liability by either party to the other solely as a result of such termination.

## 3. REPRESENTATIONS AND WARRANTIES.

a. <u>Seller Representations and Warranties</u>. Seller hereby represents and warrants to the Company as follows as of the Closing Date:

    i. <u>Organization; Authority</u>. Seller has the requisite power and authority to enter into and to consummate the transactions contemplated in this Agreement and otherwise to carry out Seller's obligations hereunder. This Agreement has been duly executed and delivered by Seller, and constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms.

    ii. <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the consummation by Seller of the transactions contemplated hereby will not conflict with, or constitute a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any material agreement, indenture or instrument to which Seller is a party, or result in a violation of any law, rule, regulation, order, judgment or decree applicable to Seller or by which any property or asset of Seller is bound or affected.

    iii. <u>Ownership of Repurchase Shares</u>. Seller is the sole beneficial owner of the Repurchase Shares, free and clear of any and all liens, claims and encumbrances of any kind.

    iv. <u>Investor Status</u>. At the time Seller was offered by the Company the opportunity to tender and sell the Repurchase Shares, it was, and at the date hereof it is, an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act. Seller is not a broker-dealer.

    v. <u>Brokers and Finders</u>. Seller has no knowledge of any person who will be entitled to or make a claim for payment of any finder fee or other compensation as a result of the consummation of the transactions contemplated by this Agreement.

b. <u>Company Representations and Warranties</u>. The Company hereby makes the following representations and warranties to Seller as of the Closing Date:

    i. <u>Organization and Qualification</u>. The Company is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with the requisite power and authority to enter into and to consummate the transactions contemplated in this Agreement and otherwise to carry out its obligations hereunder. This Agreement has been duly executed by the Company, and constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms.

2

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

ii.      <u>No Conflicts</u>. Except with respect to any consent or approval described in Section 4(a) below, the execution, delivery and performance of this Agreement and the consummation by the Company of the transactions contemplated hereby will not, (1) result in a violation of the Company's Certificate of Incorporation or Bylaws, (2) conflict with, or constitute a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any material agreement, indenture or instrument to which the Company is a party, or result in a violation of any law, rule, regulation, order, judgment or decree (including United States federal and state securities laws and regulations and rules or regulations of any self-regulatory organizations to which either the Company or its securities are subject) applicable to the Company or by which any property or asset of the Company is bound or affected, or (3) require any consent or authorization of the Company's stockholders other than Seller.

iii.     <u>Brokers and Finders</u>. The Company has no knowledge of any person who will be entitled to or make a claim for payment of any finder fee or other compensation as a result of the consummation of the transactions contemplated by this Agreement.

## 4.   OTHER COVENANTS AND AGREEMENTS.

a.     <u>Seller's Consent</u>. To the extent the completion of the transactions contemplated in this Agreement or any other action contemplated in this Agreement requires the approval or consent of Seller under the Company's Certificate of Incorporation, the Company's Bylaws, the Delaware General Corporation Law (the "*DGCL*") or otherwise, Seller hereby consents to and approves all transactions and actions contemplated in this Agreement and, if necessary, agrees to vote all shares of the Company's equity securities held by Seller to approve or consent to such transactions and actions.

b.     <u>Termination of Agreements</u>. Effective upon the Closing, the Company and Seller hereby agree that as between the Company and Seller, all verbal, written, express or implied, agreements, contracts, covenants and understandings that have been entered into by them or otherwise exist between them as of or prior to the Closing Date (excluding this Agreement).

c.     <u>No Disparagement</u>. Seller agrees not to disparage or defame the Company, its products, services, business operations, litigation, practices and strategy, stockholders, directors, executive officers, employees, management or agents.

d.     <u>Covenant Not to Sue</u>. Each party on behalf of itself and each of its respective partners, officers, directors, advisors, consultants, attorneys and representatives hereby agrees that they will not make, assert, or maintain any claim, demand, action, suit, or proceeding against the other party prior to the earlier of the Closing or the termination of this Agreement pursuant to Section 2(b) hereof, except for material breaches of this Agreement.

e.     <u>Mutual Release</u>.

i.     <u>By Seller</u>. Seller individually and/or on behalf of his individual retirement account, as applicable, as well as for his heirs, successors and assigns (the "Seller Releasing Party") hereby covenants not to sue and releases and forever discharges the Company, its officers, directors, partners, employees, affiliates, advisors and agents (the "Company Released Parties") from any and all actions or causes of action, suits, debts, claims, complaints, contracts (expressed or

3

SEC-MONAHAN-000245

implied), controversies, indemnifications, agreements, promises, damages, judgments, and demands whatsoever, known or unknown, in law or equity, Seller ever had, now has, or shall or may in the future have against the Company Released Parties. Seller Releasing Party irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against the Company Released Parties, or instigating, encouraging, soliciting, facilitating or assisting claims by, or acquiring any claims from, any other person or entity or serving as an attorney or legal representative for anyone relating to any claims against the Company Released Parties.

ii.     By the Company. The Company, as well as its successors and assigns hereby covenants not to sue and releases and forever discharges the Seller, its officers, directors, partners, employees, affiliates, advisors and agents (the "Seller Released Parties") from any and all actions or causes of action, suits, debts, claims, complaints, contracts (expressed or implied), controversies, indemnifications, agreements, promises, damages, judgments, and demands whatsoever, known or unknown, in law or equity, the Company ever had, now has, or shall or may in the future have against the Seller Released Parties. The Company, as well as it successors and assigns irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against the Seller Released Parties, or instigating, encouraging, soliciting, facilitating or assisting claims by, or acquiring any claims from, any other person or entity against the Seller Released Parties.

## 5. MISCELLANEOUS.

a.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in the State of Delaware.

b.     Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other parties hereto. This Agreement, once executed by a party, may be delivered to the other parties hereto by regular mail, overnight delivery or by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

c.     Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement or the validity or enforceability of this Agreement in any other jurisdiction.

d.     Entire Agreement; Amendments. This Agreement contains the entire understanding of Seller, the Company, their respective affiliates and persons acting on their behalf with respect to the matters covered herein and supersedes all prior agreements and understandings, oral or written, with respect to such matters. There are no restrictions, promises, warranties or undertakings relating to such matters, other than those set forth or referred to herein. No provision of this Agreement may be waived other than by an instrument in writing signed by the party to be charged with enforcement, and no provision of this Agreement may be amended other than by an instrument in writing signed by the Company and Seller.

4

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000246

e.  Notices.  Any notices required or permitted to be given under the terms of this Agreement shall be in writing and sent by certified or registered mail (return receipt requested) or delivered personally, by nationally recognized overnight carrier or by confirmed facsimile transmission, and shall be effective five days after being placed in the mail, if mailed, or upon receipt or refusal of receipt, if delivered personally or by nationally recognized overnight carrier or confirmed facsimile transmission, in each case addressed to a party as provided herein.  The initial addresses for such communications shall be as follows, and each party shall provide notice to the other parties of any change in such party's address:

    i.      If to the Company:

> Apollo Diamond, Inc.
> P.O. Box 670
> Framingham, Massachusetts 01704-0670
> Facsimile: (508) 429-2925
> Attention:  Robert C. Linares

    ii.     If to Seller, to such address as the Company has on record for Seller or such address as Seller shall provide to the Company pursuant to this Section 5(e) hereof.

f.  Headings.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

g.  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  Except as provided herein, neither the Company nor Seller shall assign this Agreement or any rights or obligations hereunder.

h.  No Third-Party Beneficiaries.  This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person or entity.

i.  Fees and Expenses.  Each of the Company and Seller shall pay its own fees and all other associated expenses incurred by such party in connection with the negotiation, execution, delivery and performance of this Agreement.

j.  Attorney's Fees.  If either party to this Agreement shall bring any action, suit, counterclaim, appeal, arbitration, or mediation for any relief against the other, declaratory or otherwise, to enforce the terms hereof or to declare rights hereunder, the losing party shall pay to the prevailing party's reasonable attorney's fees and costs incurred in bringing and prosecuting such action and/or enforcing any judgment, order, ruling or award.

**[Signature Page Follows]**

5

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the day and year first above written.

**APOLLO DIAMOND, INC.**

By: _____

Name: _____

Title: _____

**SELLER**

By: _____

Name: _____

Title: _____

Address: _____

_____

Telephone Number: _____

6

CONFIDENTIAL TREATMENT REQUESTED BY MONAHAN

SEC-MONAHAN-000248