## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 17-cr-64-DWF-KMM |
| | ) | |
| v. | ) | **REPLY IN SUPPORT OF MOTION** |
| | ) | **ASSERTING CERTAIN** |
| EDWARD S. ADAMS, | ) | **PRIVILEGES IMPLICATED BY** |
| | ) | **YAHOO! EMAIL SEIZURE** |
| Defendant. | ) | |
| | ) | |
| | ) | |

The government's response brief makes no effort to address many of the facts Mr. Adams established to support the privileges at issue, and ignores the bedrock principle of law that Mr. Adams should be presumed innocent.  As to the Brever/Murry communications, the government also distorts case law and disregards controlling Eighth Circuit precedent establishing the *Kovel* privilege.  The government's response is contrary to both law and fact, and the Court should grant Mr. Adams's motion.

I.   **The Asset Transactions Did Not Transfer Control of the Apollo Companies' Legal Privileges to Scio, Thus Scio's Purported Waiver Was Ineffective**

The government does not contest any of the governing legal principles set forth in Mr. Adams's motion, and concedes that "[t]he only disagreement relates to the substance of the Scio/Apollo transaction."  Resp. 7.  The facts surrounding the asset purchase transactions—including the Asset Purchase Agreements themselves—demonstrate that the Apollo Companies only transferred certain assets to Scio, and Scio did not continue the Apollo Companies' pre-existing business operations.  As a result, these transactions

PUBLIC VERSION

did not transfer to Scio control over the Apollo Companies' legal privileges.  *See Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663, 668 (N.Y. 1996).

### A.    Facts That Are Not In Dispute

The government does not dispute a number of the facts Mr. Adams identified.

First, the government agrees that "Mr. Adams and his law firm, Adams Monahan, performed various legal services for Apollo, and Mr. Adams, for a time, served as General Counsel of Apollo."  Resp. 4 n.1.[1]

Second, the government does not dispute that the August 31, 2011 Asset Purchase Agreement between ADI and Scio ("ADI APA") and the May 31, 2012 Asset Purchase Agreement between ADGC and Scio ("ADGC APA") are the final agreements that governed the asset purchase transactions.  Mot. Exs. 1 & 2; *see* Resp. 6.  The government also agrees that the APAs stated that the buyer would obtain "'all of Seller's right, title, and interest in and to **certain** of the property, assets, rights, and privileges of Seller,'" and that the APAs specifically excluded six categories of assets.  Resp. 8 (quoting Mot. Ex. 1

---

[1] The government selectively paraphrases Mr. Adams's SEC deposition transcript regarding his roles at the Apollo Companies to omit his testimony about his ongoing provision of legal services.  For example the government states that "As of February 28, 2011, Mr. Adams had resigned from all positions with Apollo," and that "[a]s of that time, Mr. Adams was no longer involved in making decisions on behalf of Apollo."  Resp. 3-4 (citing Mr. Adams's SEC deposition 241:20-22 and 404:14).  Those same passages from Mr. Adams's deposition state that, at the time of the proxy, Mr. Adams "would have been involved in providing legal guidance," and "[i]f I were providing services, it was as an attorney."  Ex. 23 (Adams Dep.) 241:20-25, 404:16-22.

PUBLIC VERSION

§§ 2.1 & 2.2) (emphasis added)).[2]  The government also acknowledges that the Apollo

Companies retained their "debts," *see* Resp. 9, 12, and it does not dispute that the APAs

specifically state that the Apollo Companies retained all of their liabilities, *see* Mot. 7;

Mot. Exs. 1 & 2 § 2.4.

Third, the government does not dispute that, after the ADI APA, Mr. Adams made

dozens of payments from ADI's allegedly "covert[]" Venture Bank account, including,

among others, $210,000 to Merchant & Gould, $50,000 to Schwegman, Lundberg &

Woessner PA, $32,395.94 to Topographix, and thousands of dollars to several members

of the Linares family (including Robert Linares, Bryant Linares, and Martha Linares).

*See* Resp. 12-13; Mot. Exs. 14-15.

Fourth, the government does not dispute that, after the ADI APA, Robert Linares,

in his capacity as the sole remaining director of ADI, entered into an agreement with Mr.

Adams whereby Mr. Adams would, for an additional five years, continue to assist the

companies with legal and other issues, particularly those relating to liabilities and issues

arising from the asset sale.  Linares Dec. ¶ 3 & Ex. 1; *see* Resp. 13-14 (acknowledging

that ADI still possessed the "'debts of the company'").  While the government argues that

---

[2] The government also points the Court to a draft version of the ADI APA as of April
2011 describing the APA as conveying "all or substantially all" of ADI's assets.  *See*
Resp. 5 & Ex. 2.  But the draft agreement is not controlling, as the final ADI APA
includes an integration clause stating that it is the "entire agreement . . . and supersedes
any prior understandings," Mot. Ex. 1 § 12.11.  And to the extent that the government is
taking issue with the fact that the language of the ADI APA changed between April and
August 2011, *see* Resp. 5-6 nn.3-4, the government points to no law requiring all
shareholders to approve the final APA, and counsel for the defense is aware of none.

PUBLIC VERSION

the January 2012 Agreement "on its face . . . fails to convey the right to assert any privileges," Resp. 14, this misses the point:  Attorneys are, as a matter of law, authorized to assert legal privileges on behalf of their clients, Mot. 3-4; *Fisher v. United States*, 425 U.S. 391, 402 n.8 (1976); *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956), and Mr. Linares has submitted a declaration confirming under penalty of perjury that Mr. Adams was "at all times authorized to assert the attorney-client privileges of the Apollo Companies."  Linares Dec. ¶ 2.

Fifth, the government does not dispute that neither Mr. Adams nor Mr. Linares have waived the Apollo Companies' privileges.  *See* Mot. 11-13; Linares Dec. ¶ 4 ("I have never authorized the waiver of the Apollo Companies' attorney-client privileges or any attorney work product protection associated with work performed for them.").  The government observes that Mr. Linares's declaration does not itself assert any privilege, Resp. 14 n.7, but as noted above, Mr. Linares confirmed Mr. Adams's authority to do so, Linares Dec. ¶ 2.  And despite noting that it interviewed Mr. Linares and that during that time he did not assert any privileges, Resp. 14 n.7,[3] the government does not dispute Mr. Linares's declaration that he has not authorized a waiver of the companies' privileges.

---

[3] The language the government used—"Mr. Linares freely discussed issues relating to Apollo and his communications with Mr. Adams and at no time did he or his counsel assert any privilege with regard to any such communications"—is artfully stated. Counsel for Mr. Adams does not know whether the government's interview of Mr. Linares actually sought information related to legal advice that was protected by the Apollo Companies' privileges.  After receiving the government's response, undersigned counsel requested the 302 of Mr. Linares's interview, which would allow Mr. Adams to make this assessment, but the government refused Mr. Adams's request.

4

Sixth, the government essentially ignores the evidence Mr. Adams presented about Scio's post-transaction conduct.  Mr. Adams submitted a letter from Scio to the SEC, dated less than a year after the ADI APA, in which Scio's CFO, Charles Nichols, provided answers to the SEC's questions about Scio's 10-K and 10-Q.  Mot. Ex. 6 at 1. Regarding Scio's 10-Q, the SEC commented "[w]e note your disclosure that on August 31, 2011, you completed a purchase of certain assets from Apollo Diamond for $2 million," and asked "please tell us why you believe this was an acquisition of assets rather than an acquisition of a business."  *Id.* at 3.[4]  Scio provided a three-page response explaining that it did not acquire the ADI business because "there has been no continuity of Apollo's operations after the acquisition."  *Id.* at 4-6.  The government also ignores the additional post-transaction correspondence between Scio and the Apollo Companies demonstrating that Scio treated ADI as a separate entity with independent finances that could be subject to legal liability.  Mot. Exs. 7 & 8.

**B.      Scio Does Not Control the Apollo Companies' Legal Privileges, and the Government's Response Does Not Demonstrate Otherwise**

Based on the above undisputed facts, under the applicable legal standard—even according to the cases cited by the government—Scio is not and was not empowered to waive the Apollo Companies' attorney-client privileges and work product protections.

---

[4] The SEC's use of the phrase "certain assets" matches Scio's Form 10-Q that it was discussing, which states that "On August 31, 2011, the Company completed a purchase of certain assets from Apollo Diamond Inc."  Ex. 24 at 13 (Dec. 31, 2011 Scio Form 10-Q).

PUBLIC VERSION

The government's response leans heavily on a regurgitation of the allegations in the indictment, without citing to any evidence. But such recitations of unsubstantiated allegations are not evidence, and should be disregarded. *See, e.g.*, Resp. 2 ("Mr. Adams . . . now seeks to assert privileges once held by the company whose investors he defrauded"); *id.* 6 n.4 ("As alleged in the superseding indictment, the Scio transaction was part of Adams's lulling scheme to prevent the detection of Adam's [sic] embezzlement"); *id.* 12 ("this is one of the very accounts that Mr. Adams covertly opened . . . through which he committed a portion of the fraud detailed in the superseding indictment").[5] "[T]he presumption of innocence lies at the foundation of our criminal

---

[5] As in prior proceedings, the government makes caustic, largely irrelevant, allegations impugning Mr. Adams with scant, if any, citation to evidence in support. Many of these allegations are simply erroneous, and Mr. Adams will make these errors plain at trial, should that remain necessary. While Mr. Adams believes that these allegations are not relevant to whether the Apollo Companies retained control over their attorney-client privileges, he wishes to make clear that the Court should be particularly cautious about relying on any of these unsupported allegations—should it be even remotely inclined to do so. Two examples make the need for caution plain.

First, the government suggests that Mr. Adams had a conflict of interest in connection with the ADI APA. *See* Resp. 6 n.4. In making this allegation, the government ignores the fact that the Apollo Companies expressly waived potential conflicts of interest arising out of the involvement of the partners of Adams Monahan LLP in the creation of Scio—and this conflict waiver is discussed in the same Latham & Watkins LLP presentation that the government referenced and excerpted as its Exhibit 4. *See* Ex. 25 (Excerpt of Latham & Watkins LLP Presentation discussing conflict waivers).

Second, the government identifies without citation certain payments that Mr. Adams or his law firm purportedly received, and suggests that they were improper. *See* Resp. 7, 13. With respect to a $33,000 payment purportedly received by Mr. Adams, the government criticizes that "the **former** Apollo Diamond Gemstone shareholders received none of this money." Resp. 7 (emphasis added). But (1) as the government concedes, this group of people were no longer shareholders, and were therefore entitled to nothing,

6

PUBLIC VERSION

law." *Nelson v. Colorado*, 137 S. Ct. 1249, 1256 (2017) (internal quotation marks

omitted).  Because Mr. Adams is presently entitled to that presumption, the allegations of

the indictment are not assumed to be true for purposes of this motion (in fact, at this stage

they are presumed to be untrue), and they have no bearing on whether the Apollo

Companies retained control over their attorney-client privileges after the asset purchase

transactions.

The case law is squarely in Mr. Adams's favor.  Even according to all of the cases

cited by the government, "control of the entity possessing the privileges must also pass

for the privileges to pass." *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D.

401, 406 (N.D. Ill. 2007) (citation omitted); *see also Commodity Futures Trading

Comm'n v. Weintraub,* 471 U.S. 343, 349 (1985).  In *American International Specialty

Lines Insurance*, the court held that two entities seeking to control certain legal privileges

of a predecessor entity could not do so because they "simply do not control Old FTL's

business," and had actually "concede[d] that they are entities that have no connection to

the business operations of the pre-bankruptcy Old FTL." *Id.* at 407 (concluding that a

third entity that did continue to operate Old FTL's business controlled the privilege).  In

contrast, in *Soverain Software LLC v. Gap, Inc.*, the court relied on a declaration from the

buying entity's president and facts demonstrating the continuity of corporate personnel to

---

and (2) even if they were, it is a fundamental precept of corporate law that a corporation's
creditors (like Mr. Adams) have preference over its shareholders. *See* 15A William M.
Fletcher, Fletcher Cyclopedia of the Law of Corporations § 7417 (2018) ("the only
interest a shareholder has in the property of a corporation is the interest in any surplus
over and above what is required to pay its depositors and creditors").

conclude that the buying entity "not only acquired certain assets but also has continued to operate the [seller's] business," and as a result could control the seller's attorney-client privileges. 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004). Finally, in *Tekni-Plex*, which was in the context of a merger (where one company subsumes the other), the court concluded that the attorney-client privilege with respect to communications concerning the old Tekni-Plex's operations passed to the management of new Tekni-Plex because "following the merger, the business of old Tekni–Plex remained unchanged, with the same products, clients, suppliers and non-managerial personnel." *Tekni-Plex, Inc.*, 674 N.E.2d at 669.[6]

The evidence submitted by the government—excerpts from depositions, the March 2011 letter from Mr. Linares, the draft and final asset purchase agreements, and Latham & Watkins LLP's presentation to the SEC—does not demonstrate that control over the Apollo Companies and their operations passed to Scio as a result of the asset purchase transactions. *See* Resp. 4-12 & Exs. 1-6. For example, Mr. Monahan's testimony that

---

[6] Despite relying on *Tekni-Plex*, the government ignores that the *Tekni-Plex* court concluded that, even where a successor entity does obtain control over the original entity (which it did not here), the successor still does not obtain control over the original company's attorney-client privilege as it relates to the negotiation of the transaction itself. *See* 674 N.E.2d at 671 (explaining that "[u]nder the Merger Agreement, moreover, the rights of old Tekni–Plex with regard to disputes arising from the merger transaction remain independent from—and, indeed, adverse to—the rights of the buyer"); *see also Postorivo v. AG Paintball Holdings, Inc.*, 2008 WL 343856, at *1, 6 (Del. Ch. Feb. 7, 2008) (unpublished). Thus, under no circumstances did Scio obtain the right to waive the Apollo Companies' attorney-client privilege over confidential communications relating to the asset purchase transactions that remained in Mr. Adams's email repository.

PUBLIC VERSION

the Apollo shareholders would "'own the same assets in a . . . different company,'" and

that the different company would have "'a myopic focus on manufacturing versus kind of

research and development that Apollo had done a lot over the years,'" and that the new

entity would "'own[] the same assets with no debt, cash in the bank, and liquidity,'"

Resp. 9 (quoting Resp. Ex. 3), does not demonstrate that Scio assumed control of the

Apollo Companies' business operations.[7]  The government's evidence instead is

consistent with the facts Mr. Adams has established, showing that the Apollo Companies'

most valuable technology assets were shipped to a different state so that a new entity

(under new management, with new employees, in a new facility, under a new board, and

with many new additional shareholders) could try to monetize the technology—while the

old entity retained all liabilities and certain assets and continued limited operations in

order to manage those remaining assets and liabilities.

The government makes the conclusory assertion that "Apollo's operations

continued on as Scio, with the same operations," Resp. 9-10, but blatantly ignores Scio's

---

[7] The same is true for the other statements cited in the government's response.  This includes Mr. Adams's statement that he was "'trying to facilitate a transaction that allowed the shareholders to have a second bite at their apple.'"  Resp. 8.  It also includes Latham & Watkins LLP's statement in a PowerPoint presentation to the SEC that described Public Scio as "now own[ing] all assets of former Apollo & Gemstone entities."  Resp. 10 & Ex. 4.  This statement was a very simplified summary of the asset purchase agreements that were themselves Commission Exhibits in the SEC investigation.  *See* Mot. Exs. 1 & 2.  Similarly, Mr. Linares's statement in March 2011 that the anticipated transaction would result in "a sale of the Company's assets and, correspondingly, new management" by a new company, does not show that Scio took over control of the business operations of the Apollo Companies.  *See* Resp. 4 & Ex. 1.

PUBLIC VERSION

contemporaneous statements to the contrary, *see* Mot. Ex. 6.[8]  In Scio's 2012 official

correspondence with the SEC, Scio had a duty to be honest.  *See generally* 18 U.S.C.

§ 1001.[9]  In its 2012 letter, Scio stated that "we were in fact simply buying tangible assets

that remained in a warehouse and intellectual property related to Apollo Diamond's

diamond growing machines," that "**there has been no continuity of Apollo's operations**

**after the acquisition**," that Scio "did not seek out Apollo Diamond or its business as a

going concern and did not intend to succeed to Apollo Diamond's business," and that the

acquisition was "the first step in an overall plan to build a new business."  Mot. Ex. 6 at 4

(emphasis added).  Scio explained that there was no continuity in revenue-producing

activity between the companies, no continuity in the companies' senior management, no

continuity in the board of directors, no continuity in current employees, no continuity in

---

[8] The government's only response to this letter is the unsubstantiated assertion that its
author, Scio CFO Charles Nichols, "was not employed at Scio when the Scio/Apollo
transaction occurred, and he had no involvement in the transaction." Resp. 10 n.5.  It is
irrelevant whether Mr. Nichols was employed by Scio at the time of the ADI APA—he
spoke on behalf of the company in making statements to the SEC.  Moreover, the
substantially similar ADGC APA was finalized in May 2012, the month after Mr.
Nichols wrote his April 2012 letter to the SEC.  Mot. Exs. 2 & 6.  Ultimately, Mr.
Nichols was responsible for responding to the SEC's questions about the practical
consequences of the ADI asset purchase transaction mere months after that transaction
took place—something he was perfectly positioned to do.

[9] Any dishonesty by Scio or its officers could lead to significant criminal liability.  *See,
e.g.*, 3d Super. Indict., *United States v. Crook, et al.*, No. 04-CR-2605, DCD 742 ¶ 52.jjj
(S.D. Cal. Apr. 25, 2007) (charging defendants with conspiracy to commit securities
fraud based in part on their "caus[ing their company] to send a letter to the SEC
containing false and misleading statements").

PUBLIC VERSION

customer or vendor contracts, no continuity in geographic location, and no continuity in

the trade names used.  *Id.* at 4-6.

Here, as in *American International Specialty Lines Insurance*, where the court

concluded that entities that "concede[d] that they . . . have no connection to the business

operations" of the original entity could not control that entity's legal privileges, Scio has

also conceded that it did not continue the Apollo Companies' business operations.  240

F.R.D. at 407.  Although the government obtained a declaration from David Young as

counsel for Scio, Resp. Ex. 7, Mr. Young's declaration fails to address the lack of

continuity of operations between the Apollo Companies and Scio, and does not address or

dispute Scio's 2012 statement to the SEC that "there has been no continuity of Apollo's

operations after the acquisition," Mot. Ex. 6 at 4.  Having conceded a lack of connection

with the Apollo Companies' business operations, Scio does not control their legal

privileges.  *See Am. Int'l Specialty Lines Ins. Co.*, 240 F.R.D. at 407.

Similarly, neither of the factors that led the *Soverain Software* court to conclude

that there was operational continuity are present here—no Scio officer has submitted a

declaration describing any continuity of operations, and there is no evidence of continuity

between the Apollo Companies' and Scio's personnel.  *See* 340 F. Supp. 2d at 763.  In

sharp contrast, the facts demonstrate precisely the opposite:  in 2012, a Scio officer

explained that there was no continuity of operations and no overlap in personnel.  Mot.

Ex. 6 at 5-6.  Because control of the Apollo entities did not pass to Scio as a result of the

asset purchase transactions, neither did the control of the Apollo Companies' attorney-

PUBLIC VERSION

client privilege.  *See Am. Int'l Specialty Lines Ins. Co.*, 240 F.R.D. at 406-07; *see also Weintraub,* 471 U.S. at 349.

The terms of the asset purchase agreements also demonstrate that the "practical consequences" of the transactions were only to transfer certain assets to Scio, and not to effectuate the continuation by Scio of the Apollo Companies' pre-existing operations. *Tekni-Plex, Inc.*, 674 N.E.2d at 668.  There is no dispute that the asset purchase agreements excluded all of Apollo's liabilities, as well as several categories of assets. Mot. Exs. 1 & 2; Resp. 8.

The Apollo Companies' "Retained Liabilities" included all of their liabilities related to the Asset Purchase Agreement transaction documents, all liabilities related to the Excluded Assets, all liabilities related to "Pre-Closing Business" such as liabilities "from events occurring" or "conditions existing" prior to the asset purchase agreement closing, and all liabilities related to "Legal Proceedings" arising out of events or occurrences prior to the closing.  Mot. Exs. 1 & 2 § 2.4.  "Proceedings," in turn, includes any investigation, any litigation, or any other proceeding before a Governmental Authority.  Mot. Ex. 1 § 1.2.  Thus, the Apollo Companies' obligations arising out of or relating to the shareholder lawsuits, the SEC investigation, and the current criminal investigation fall squarely within the liabilities that they retained.

The Excluded Assets included the Apollo Companies' books and records, Mot. Exs. 1 & 2 § 2.2, and while the government argues that some of the corporate files were left behind by the Apollo Companies in a leased former building and that Mr. Linares testified that it was his understanding that Scio had the right to obtain the Apollo

PUBLIC VERSION

Companies' records, Resp. 11-12, the records presently at issue are not ones that were left behind in leased space, nor were they transferred to Scio.  The records at issue are ones that have been retained at all times in confidence by the Apollo Companies' attorneys, and those acting on their behalf.

The government seems to argue that that the terms of the ADI APA do not state that the company would retain its attorney-client privilege or work product protection, and that "privileges" were included in the category of "Other Assets" that were conveyed to Scio.  Resp. 8.  This argument must fail for two reasons.  First, the very cases the government cites hold that the control of the company is what governs, rather than any contractual agreement to transfer the attorney-client privilege.  *See Am. Int'l Specialty Lines Ins. Co.*, 240 F.R.D. at 407 (concluding that two entities did not obtain control of predecessor's privileges despite agreement that "purportedly 'vest[ed]' the attorney-client privilege in [them] with respect to documents and communications transferred to them"); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21911066, at *1 (N.D. Ill. Aug. 7, 2003) (unpublished) ("The court disagrees that the attorney-client privilege is a corporate asset that can be sold.").

Second, even assuming that the word "privileges" in the Other Assets section of the ADI APA refers to the attorney-client privilege and work product doctrine, the transfer of "Other Assets" was limited by the terms of that section to other assets "that relate to, [are] used in or held for use in the operation of the Purchased Assets or Business."  Mot. Ex. 1 § 2.1(j).  The Purchased Assets were limited to those enumerated in Section 2.1—namely, intellectual property and diamond growing equipment—and the

PUBLIC VERSION

"Business" was defined as the business of "owning and developing proprietary technology relating to the production of laboratory-created diamond and diamond materials." Mot. Ex. 1 at Recitals. (These Other Assets could have included the documents in the facility to which Mr. Linares referred.) Even assuming that this "Other Assets" provision operated to transfer to Scio control over ADI's attorney-client privilege as it relates to the intellectual property assets (which, as a matter of law, it did not, *see supra*), Scio's purported privilege waiver explicitly did not apply to communications related to its intellectual property. *See* Mot. Ex. 19 ("The waiver of any attorney-client privilege does not include any work performed in connection with patent matters.").

The government also asserts that the Apollo Companies were "defunct" and "effectively dead," Resp. 1-2, and quotes Mr. Linares as stating that ADI "cease[d] to exist in practical terms when we concluded the sale of the assets to Scio," Resp. 11. Mr. Adams agrees that "the Apollo Companies were no longer actively conducting business in the way they did before the asset sales." Mot. 17. But the Apollo Companies did continue to exist and operate in a more limited fashion, largely for the purpose of managing their remaining assets and liabilities, as is typical in asset purchase transactions. The January 2012 agreement between Mr. Linares and Mr. Adams,[10] the

---

[10] The government argues that, even if the January 2012 Agreement "were somehow construed to convey [the right to assert any privileges] to Mr. Adams, by its very terms, that right would have expired on January 2, 2017, five years after it was executed." Resp. 14. The government again misses the point, as the agreement, in part, engaged Mr. Adams to serve as a legal adviser to the Apollo Companies during that five year period, and even assuming that Mr. Adams's engagement as a legal adviser ended on January 2, 2017, Mr. Adams would still have the obligation and authority to assert the privilege on

PUBLIC VERSION

payments made and received after the asset purchase agreements, the lawsuits naming the Apollo Companies as defendants, and the subsequent correspondence between the Apollo Companies and Scio are evidence of the Apollo Companies' continued, limited operation—evidence the government's response almost completely ignores. Mot. Exs. 3, 7-15. As the Apollo Companies continued to exist after the asset purchase transactions, and as Mr. Adams continued to serve as their legal adviser after that time, it would be illogical to conclude that Scio somehow obtained the right to waive the Apollo Companies' attorney-client privileges over communications that they had with their legal adviser after the transactions closed.

Mr. Adams is, thus, entitled to assert the attorney-client privilege and attorney work product protection for documents relating to legal advice sought by or provided to the Apollo Companies, and for legal work product prepared in anticipation of litigation. *See Diversified Indus. v. Meredith*, 572 F.2d 596, 601 (8th Cir. 1977); *United States v. Nobles*, 422 U.S. 225, 238 (1975). Scio's purported waiver of the Apollo Companies' privileges was ineffective because the Apollo Companies and their owners did not transfer control of the Apollo Companies to Scio.

---

behalf of a former client: the underlying privileges remain, and have not been waived. *See In re Grand Jury Subpoena Duces Tecum*, 391 F. Supp. 1029, 1032-33 (S.D.N.Y. 1975) (concluding that former counsel had an independent obligation to assert the attorney-client privilege on behalf of a former client as to documents that remained in former counsel's possession).

PUBLIC VERSION

## II.     Foster Brever Wehrly and Murry LLC Provided Legal Advice and Services to Mr. Adams—Not Mere Tax Preparation Services—and Thus Their Records and Communications Are Privileged and Work Product.

The government's argument against the applicability of *Kovel* to Murry LLC's records and communications is contrary to both fact and law and should be rejected.  The government's response does not contest (nor could it) the meaning of *Kovel*.  Nor does the response confront the facts cited in Mr. Adams's motion that align Mr. Brever's retention of and collaboration with Murry LLC squarely within the four corners of *Kovel*. *See* Mot. 23-27.  The parties appear to agree that where a communication is made to an accountant serving as an agent for an attorney, "for the purpose of obtaining legal advice" from the attorney, that communication is privileged.  Resp. 20 (citing *Kovel*, 296 F.2d at 922).  The parties likewise agree that the attorney-client privilege does not apply where an attorney or accountant is doing nothing more than mechanically preparing tax returns at the request of a taxpayer.  The government thus resorts to an over-simplified and ill-supported two-pronged argument: (1) that Mr. Adams engaged Mr. Brever and Murry LLC merely to amend his tax returns, and (2) that even if an attorney-client privilege did attach to the engagement, it was waived in its entirety when Mr. Adams filed amended returns for 2008, 2009, and 2010.  Both arguments are without merit.

### A.     Contemporaneous Documents and Mr. Brever's Declaration Establish that Foster Brever Wehrly and Murry LLC Were Engaged to Perform and Inform Legal Tax Work, Not Merely to Amend Tax Returns

The government spends the majority of its response attempting to shoehorn Mr. Adams's engagement of Foster Brever Wehrly (and Mr. Brever's engagement of Murry LLC) into a common and simple fact pattern in which the attorney-client privilege does

16

not apply: the retention of an attorney or accountant *solely to prepare tax returns*. *E.g.*, Resp. 2 ("sole purpose of preparing and filing Mr. Adams's amended tax returns"), 22 ("exclusive purpose"). In order to do so, it ignores inconvenient facts and case law that place the work of Mr. Brever and Murry LLC squarely within the circumstance in which federal law recognizes the application of the attorney-client privilege to tax counsel and accountants serving tax counsel. Mot. 23-28. For the first time, the government now contends not only that Murry LLC's accounting work was not in service of legal advice pursuant to *Kovel*, but also that even *Mr. Brever's* work for Mr. Adams was not legal in nature. The government's position strains credulity and would require the Court to "disregard[]" Mr. Brever's declaration (as the government specifically urges, without basis, Resp. 24), as well as contemporaneous engagement letters, billing records, and correspondence between Mr. Adams, Mr. Brever and Murry LLC.

In effect, the government is now improperly attempting to convert its response into a motion to compel production of additional records from Murry LLC and a *sua sponte* subpoena for Mr. Brever's own files. Resp. 25, 26. Its arguments in these respects are neither timely nor procedurally proper. Despite discussing with Mr. Brever a mechanism for challenging certain of his privilege assertions over Murry LLC files, the government never took any such action—during the grand jury proceedings, or otherwise. *See* Brever Dec. ¶ 12.[11] Moreover, the government has never subpoenaed Mr.

---

[11] The government cannot now litigate a never-filed motion to compel compliance with a subpoena issued by a grand jury that has since expired. *See, e.g.*, *In re Grand Jury Proceedings*, 744 F.3d 211, 217-18 (1st Cir. 2014) (vacating contempt order entered for

PUBLIC VERSION

Brever's files, presumably in recognition of the attorney-client privilege.  As a result, the

complete documentation surrounding Mr. Brever's engagement has never been collected

or produced.  Nevertheless, to assist the Court's consideration of these matters, Mr.

Brever has attached various of his files (including his complete billing records) to his

declarations.  *See* Brever Dec.; Supp. Brever Dec.  To the extent that Mr. Adams's

communications with Mr. Brever exist in his Yahoo! email accounts, those

communications with Mr. Brever were removed from the prosecution team's database

and were not among the documents that the government purports to have "seized."  *See*

Maria Dec. ¶¶ 14, 16 (DCD 52-1 at 40-42) (stating that documents including the search

term "brever" were filtered out of the "For Review" folder of the government's database,

and that only the documents that remained in the "For Review" folder at the end of the

government's process were "seized"); *see also* Ex. 26 (May 16, 2016 email from AUSA

Maria stating: "it looks like he had a guy working on his tax issues – Tom Brever").

Indeed, the validity of the privilege between Mr. Brever and Mr. Adams cannot

reasonably be in dispute.[12]  Mr. Brever has declared (under penalty of perjury) that he

---

failure to comply with subpoena where "the subpoenaing grand jury was dead to begin
with" because "[i]t had expired even before the government moved to compel compliance
with its subpoena").  Nor can it seek a new subpoena at this late juncture.  *See* 4 Wayne
R. LaFave, et. al, *Criminal Procedure* § 8.8(f) (4th ed. 2015) ("[B]oth state and federal
courts hold that it is an abuse of the grand jury process to use grand jury subpoenas for
the sole or dominating purpose of preparing an already pending indictment for trial."
(internal quotation marks omitted)).

[12] The government's failure now to recognize the attorney-client privilege as applied to
*Mr. Brever* constitutes an about-face from the position it has taken in front of this Court,
and on which Mr. Adams has relied in formulating his legal arguments and this motion.

was engaged to represent Mr. Adams "in connection with legal issues on tax and related

matters," including 

Brever Dec. ¶ 2.  While the

government suggests Mr. Brever's retention was merely a sham attempt to "cloak" the

preparation of Mr. Adams's amended tax returns—which the government claims was a

foregone conclusion—in the attorney-client privilege, the contemporaneous documentary

evidence accords with Mr. Brever's declaration.[13]  Between late September 2014,

---

The government previously informed this Court and the defense that it would not be
challenging the privilege of Mr. Adams's communications with his own counsel.  *See*
Jan. 9, 2018 Hr'g. Tr. 219:25-220:18 ("The Court: Do you think there's any chance that
counsel can agree to narrow the dispute about the privilege documents?  I mean, for
instance, you're not going to be disputing any of Adam's communications with counsel
as being privileged?  Mr. Maria:  No, Your Honor. . . We would never object to those,
Your Honor, and we wanted to know all along if those had slipped through in some way,
shape, or form because we would have immediately taken them out.").  After the January
8 and 9 hearing, the government did not raise the issue of the application of the attorney-
client privilege to Mr. Adams's communications with Mr. Brever in the post-hearing
meet-and-confer process, in the joint January 16, 2018 email to the Court, or in the
subsequent January 19, 2018 telephonic hearing.

As the government now appears to have changed its positions with respect to Mr.
Brever, Mr. Adams is producing as Exhibits 27 and 28, a supplemental privilege log and
*in camera* submission of the five emails (and their attachments) reflecting
correspondence between Mr. Adams and Mr. Brever that the government viewed before
excluding them from its "For Review" folder ("the Brever Emails").  For the reasons
discussed herein, Mr. Adams is asserting the attorney-client privilege over these
communications, and the privileged nature of these emails likely will be relevant to the
litigation of the government's violations of Mr. Adams's constitutional rights.

[13] The government's complaints regarding its lack of access to the documents over which
privilege and work product claims have been asserted, Resp. 18-19, deserve little weight.
*In camera* review of purportedly privileged and work product documents is the typical
approach for adjudication of privilege disputes.  *See, e.g.*, *In re Berkley & Co., Inc.*, 629
F.2d 548, 553 n.9 (8th Cir. 1980) ("This court has endorsed in camera review of allegedly

19

██████████████████████████████ and late October 2014, when Mr. Brever retained

Murry LLC, Mr. Brever (a) participated in at least 10 calls with Mr. Adams, (b)

████████████████████████████ (c) received from Mr. Adams █████

████████ a draft legal memo ████████████████████ and (d) in all, performed

nearly 10 hours of work in Mr. Adams's case on 14 different days.  Brever Dec. ¶ 2;

Supp. Brever Dec. ¶ 5 & Ex. H; Ex. 28, Tab 8 (email from Mr. Adams to Mr. Brever and

attorney Jon Hopeman, Esq., ████████████████████████████████

███████ which was viewed by the government before it was removed from the "For

Review" database); Ex. 29 (emails from Mr. Adams ████████████████████

███████████████████████████████ to Messrs. Brever and Hopeman, which

were not viewed by the government before they were removed from the "For Review"

database).  To be perfectly clear, ████████████████████████████

████████████████████████████████████████████████████

██████████████████ Supp. Brever Dec. ¶ 2.  Mr. Brever's notes of his first meeting

with Mr. Adams reflect ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

---

privileged materials for purposes of determining a claim of privilege . . . ."); *In re Grand Jury Proceedings Involving Berkley & Co., Inc.*, 466 F. Supp. 863, 868 (D. Minn. 1979), aff'd as modified, 629 F.2d 548 ("[T]he most judicious way to determine application of the privilege is through an in camera inspection by this court.").  What is atypical here is that this briefing is occurring *after* the government has searched for and reviewed the privileged documents at issue.

PUBLIC VERSION

███████████████████████████████████████████████████

███████████████████████████████████████ *See* Supp. Brever Dec. ¶ 2

& Ex. G. ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶¶ 2-3, 5.

The government contends that the best evidence of the purpose of Mr. Brever's and Murry LLC's work is: (a) an email from Patrick Murry of Murry LLC on October 27, 2014, at the outset of the *Kovel* engagement (and a month after Mr. Brever was retained), in which Mr. Murry expressed Murry LLC's willingness to "prepare any amended returns that are required" and to "get right on preparing the returns" after receiving "all of the necessary information," Resp. 23 & Ex. 8, and (b) an email from Mr. Brever on November 12, 2014 informing Mr. Adams that Murry LLC had "prepared the amended returns based on the documents and information provided," *id.* & Ex. 9.  The government claims these emails show that by the time Murry LLC was retained "the decision had already been made to file amended returns" and that Murry LLC was hired exclusively to prepare those amended returns. *Id.* 23.

These emails are not at all in conflict with █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ and that he retained Murry LLC to assist

21

and advise him.  Nor are these emails inconsistent with the application of the attorney-client privilege.  *See, e.g.*, *United States v. Cote*, 456 F.2d 142, 144 (8th Cir. 1972) ("Here the taxpayers did not consult [their lawyer] for accounting advice.  His decision as to *whether the taxpayers should file an amended return undoubtedly involved legal considerations . . . .*" (emphasis added)).  To begin with, Mr. Murry's October 27 email itself recognizes uncertainty as to whether and which amended returns might ultimately be filed, offering to prepare "*any* amended returns" after receiving and analyzing further information.  *See* Resp. 23 & Ex. 8.  Second, how long it took Murry LLC to prepare initial draft amended returns is inconsequential.  What is far more telling regarding the nature of Murry LLC's engagement is what occurred (a) *after* Murry LLC was engaged and (b) *after* Murry LLC completed draft amended returns.

Contrary to the government's characterizations, this is not a case in which "the advice to file the returns was first given by [Mr. Brever] and thereafter the accountant was employed simply to make the correct mechanical calculations," *Cote*, 456 F.2d at 144; *accord United States v. Gurtner*, 474 F.2d 297, 298 (9th Cir. 1973).  The parties agree the attorney-client privilege would not apply to an accountant's work in that scenario.  But Mr. Brever did not conclusively determine that Mr. Adams should file amended tax returns, advise him to find an accountant to do so, and thereby end his advice on the tax matters at issue.  Rather, the record here is replete with evidence of Mr. Brever's ongoing involvement and *legal* advice regarding ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

22

████████████████████████████████████████████████ During that

time, Mr. Brever also had numerous telephone calls and exchanged emails regularly with

Mr. Adams and Murry LLC, as detailed in Table 1 of Mr. Adams's motion.  Mot. 26-27;

Brever Dec. ¶¶ 7-8; Supp. Brever Dec. Ex. H.  He performed legal services for Mr.

Adams on at least nine different days between the time he retained Murry LLC to assist

him and the time the government claims Murry LLC's work was "largely, if not entirely,

completed."  Supp. Brever Dec. Ex. H; *see* Resp. 19.

       Nor did Mr. Brever's and Murry LLC's work conclude once various amended

returns were drafted by mid-November 2014 (or at any time shortly thereafter).  Between

mid-November 2014 and late January 2015 (when select amended returns were filed

███████████████████████████), Mr. Adams, Murry LLC, and Mr. Brever

exchanged at least 17 phone calls and emails, ███████████████████████

██████████████████████████████████████████

██████   Mot. 26-27 tbl.1; Brever Dec. ¶¶ 7-8.  Mr. Brever worked on Mr. Adams's case

on 17 separate days during that time.  Supp. Brever Dec. Ex. H.  Even more importantly,

████████████████████████████████████████████████████

████████████████████████████████████████████

██████   *Id.*  Moreover, Mr. Brever's work for Mr. Adams continued *after* amended returns

were filed.  He performed legal service for Mr. Adams on 24 separate days—which

included 11 phone calls with Mr. Adams ██████████████████—after the filing

of Mr. Adams's amended returns and before Murry LLC received the government's

grand jury subpoena.  Supp. Brever Dec. ¶ 5 & Ex. H.

PUBLIC VERSION

Contrary to the government's suggestions, the Court already has received

privileged communications demonstrating the subject matter on which Mr. Brever's legal

counsel ████████████████████████████ was provided.  Mr. Brever has attested that

he was retained to advise Mr. Adams regarding ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ Supp. Brever Dec. ¶ 2, █████████████████

████████████████████████████████████████████████████████████

████████████████████████ Brever Dec. ¶ 2.  The documentary record here reflects just

that.  For example, ████████████████████████████████████████

███████████ Tab 1 of Exhibit 22 to the motion to █████████████████

███████ Supp. Brever Dec. ¶ 4. ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ *See, e.g.*, Mot. Ex. 22 Tabs 1-4; *accord* Supp.

Brever Dec. ¶ 4. ████████████████████████████████████████████

████████████████████████████ Mot. Ex. 22 Tab 3.  Similarly, the record is

clear that ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ *Id.* Tabs 2-5. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

24

████████████████ *Id.* Tabs 4, 5. █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Supp. Brever Dec. ¶ 3.

The government is simply wrong when it claims that Mr. Brever provided no legal services and that he and Murry LLC were engaged merely to prepare tax returns, which it says were a foregone conclusion before Murry LLC was ever retained. Resp. 22-23. For that reason, much of the case law it cites is distinguishable and inapplicable. In several of those cases, it was uncontested that the attorneys or accountants at issue were performing pure accounting services in preparing tax returns, or worse, merely as "scrivener[s]" simply "*filling out . . .* tax returns." *Canaday v. United States*, 354 F.2d 849, 857 & n.7 (8th Cir. 1966) (emphasis added); *see United States v. Lawless*, 709 F.2d 485, 486-87 (7th Cir. 1983) (attorney was specifically "retained by the co-executors of the estate to prepare the federal estate tax return" of a deceased woman and conceded that the information at issue was "transmitted to him, as the attorney preparing the tax return"); *cf. Gurtner*, 474 F.2d at 298-99 (finding that the defendant did not even demonstrate that the accountant was "acting as a consultant for his attorney"). In *Canaday*, the absence of legal advice was so patent that the attorney himself did not see fit to assert the attorney-client privilege. *See* 354 F.2d at 857 & n.7 (noting that the attorney "voluntarily released the papers" and testified as a government witness).

The record here, in contrast, comports with the Eighth Circuit's application of the *Kovel* doctrine, "recogni[zing] that the attorney-client privilege attached to the information contained in [an] accountant's workpapers" where an attorney's "decision as

25

to whether the taxpayers should file an amended return undoubtedly involved legal considerations which mathematical calculations alone would not provide" and where it was "clear that the accountant's aid to the lawyer preceded the advice and was an integral part of it."[14]   *Cote*, 456 F.2d at 144; *cf. United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982) (noting the potentially privileged nature of a lawyer's "analysis of the soft spots in a tax return and his judgments on the outcome of litigation on it").  In *Cote*, only "by *filing* the amended returns [did] the taxpayers communicate[]" the information in the accountant's workpapers to the IRS and thereby waive the privilege that had arisen.  456 F.2d at 144-45 (emphasis added).

There can be no question that Mr. Brever—a lawyer, not an accountant—was engaged to provide *legal* counsel and services on tax-related matters, not to prepare amended tax returns or merely shield from discovery an accountant's work doing so. Indeed, Mr. Adams has not claimed privilege (nor did Mr. Brever in producing Murry LLC's files) over *accounting workpapers*, *i.e.*, technical accounting and arithmetic

---

[14] The government's only legal authority suggesting that legal counsel's work ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ may not be covered by attorney-client privilege is an unpublished, non-precedential decision.  Resp. 21 (citing *United States v. Schussel*, 291 F. App'x 336 (1st Cir. 2008)).  Of course, there is no factual or legal basis for this Court to disregard the Eighth Circuit's controlling decision in *Cote*, in favor of *Schussel*.  Nor can *Schussel* be stretched—as the government proposes—to stand for the complete inapplicability of attorney-client privilege to all "communications relating" *in any way* "to tax return preparation."  Resp. 21.  Such a rule would read *Kovel*, *Cote*, and a host of case law from every circuit out of existence.  *See* Mot. 20-22 (collecting cases).  Moreover, the *Schussel* court's ruling rested significantly on its finding that the taxpayer had sent the documents in question to his attorney specifically "with the intent that the information be turned over to the IRS," 291 F. App'x at 347, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *see* Supp. Brever Dec. ¶¶ 2, 4, 7.

PUBLIC VERSION

memos used to justify and calculate the tax positions and amounts presented in tax returns.  Rather, Exhibit 20 to Mr. Adams's motion and Exhibit 27 to this reply assert the attorney-client and work product privileges only over communications with tax counsel and *Kovel* accountants for the distinctly *legal* purposes described by Mr. Brever.  *See* Brever Dec. ¶¶ 2, 5; Supp. Brever Dec. ¶¶ 2-3.  Overall, the documentary and testimonial evidence reflects ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  Accordingly, and for the reasons set out in Mr. Adams's motion, the Murry Emails and the Brever Emails are privileged and work product.[15]

### B.   The Content of the Murry Emails Was Not Disclosed in Mr. Adams's Amended Tax Returns, so the Attorney-Client Privilege and Work Product Protections Were Not Waived.

The government asserts that Mr. Adams waived the attorney-client privilege as to *all* of his "communications with Brever and Murry *relating to* the filing of [his] amended

---

[15] The government's argument against the application of the work product doctrine is likewise based on its contention that Mr. Brever and Murry LLC merely prepared returns, *see* Resp. 23-24 n.11, and fails for that same reason, *see* Brever Dec. ¶ 3; Supp. Brever Dec. ¶ 2 & Ex. G; Mot. 23 n.2, 28-29.  The cases the government cites for its argument that there is no work product in this context are inapposite.  *See El Paso Co.*, 682 F.2d at 539 (finding "[b]usiness imperatives," were the impetus for the creation of the documents); *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) (calling tax workpapers the only documents "colorably prepared in anticipation of . . . litigation" but finding "no evidence that [the tax attorney] had reason to expect future trouble with the IRS"); *United States v. Bell*, No. C94-20342, 1994 WL 665295, at *4 (N.D. Cal. Nov. 9, 1994) (unpublished) ("[T]he analysis was performed for financial reporting purposes, to anticipate the *financial impact* of potential litigation."  (emphasis added)).

PUBLIC VERSION

tax returns" when amended returns for 2008, 2009, and 2010 were filed "as a result of his interactions" with them.[16]  Resp. 25 (emphasis added).  The government's position, it appears, is that if a taxpayer ultimately files an amended return, every communication with either counsel or a *Kovel* accountant who participated *in any way* in the decision to file that return loses its privileged character.  That is not the law.

Mr. Adams agrees that the attorney-client privilege does not apply to data and information provided to the government in filed tax returns; such a disclosure waives any attorney-client privilege that might otherwise apply.  In the *Kovel* context, however, the Eighth Circuit and numerous other federal courts recognize a crucial distinction between the tax return's contents and "detail underlying the reported data" on the one hand, and "detail of *unpublished* expressions which are not part of the data revealed on the tax returns" on the other.  *See Cote*, 456 F.2d at 144, 145 n.4 (8th Cir. 1972) (referring any "dispute hereafter as to whether particular workpapers contain detail of *unpublished* expressions which are not part of the the data revealed on the tax returns . . . to the district court for an in camera ruling" on the applicability of the attorney-client privilege); *accord, e.g.*, *United States v. Jeremiah*, No. 75-480, 1975 WL 794, at *3-4 (D. Or. Sep. 30, 1975) (unpublished) (citing *Cote* for the importance of an *in camera* inspection to "ensure that confidential communications not disclosed in the return are afforded the protection of the privilege" and applying the privilege to "professional conversations"

---

[16] The government does not argue that filing an amended return could waive privilege as to communications unrelated to the topic of filing amended returns.

28

between attorney and client "regarding tax matters," among other categories of documents). In *Cote*, an accountant who prepared several taxpayers' tax returns "testified that the information on his workpapers was later *transcribed* onto the amended returns which were filed by the taxpayers with the government." 456 F.2d at 145 (emphasis added). The Eighth Circuit held that "[t]his disclosure effectively waived the privilege not only to the transmitted data but also as to the details underlying *that* information." *Id.* (emphasis added). But the Eighth Circuit went on to refer disputes regarding the application of the attorney-client privilege to documents containing "*unpublished* expressions" not among the "data revealed on the tax returns" for *in camera* review and decision by the district court, clearly recognizing that the privilege can apply to such documents.

The distinction the Eighth Circuit recognized in *Cote* has been employed by numerous courts. In *United States v. Schlegel*, a district court in this Circuit rejected the government's request for testimony from a defendant's attorney about communications surrounding the preparation of the defendant's tax return. 313 F. Supp. 177, 178 (D. Neb. 1970). The *Schlegel* court concluded that "aside from the information incorporated in the income tax return which was sent to the government, the oral conversations between the defendant and his attorney regarding preparation of the return" were privileged. *Id.* at 179-80. Moreover, "any written materials prepared by the defendant solely for the purpose of delivery to his attorney for the preparation of his return [were] within the privilege." *Id.* at 180. A contrary ruling would undermine the attorney-client privilege's purpose of encouraging full and frank communication between attorneys and

PUBLIC VERSION

their clients.  *Id.* at 179.  Indeed, the Eighth Circuit in *Cote* warned against applying its own waiver-by-filing rule "[t]oo broad[ly]," which "might tend to destroy the salutary purposes of the" attorney-client privilege.  *See* 456 F.2d at 145 n.4 (citing *Schlegel*, 313 F. Supp. 177).  The *Schlegel* rule has been widely adopted.  *See, e.g.*, *United States v. Willis*, 565 F. Supp. 1186, 1193 (S.D. Iowa 1983); *Muncy v. City of Dallas*, No. 3:99-CV-2960, 2001 WL 1795591, at *3 (N.D. Tex. Nov. 13, 2001) (unpublished); *Schenet v. Anderson*, 678 F. Supp. 1280, 1283 (E.D. Mich. 1988).

*Schlegel*'s reasoning applies to Mr. Adams's emails[17] with Mr. Brever and Murry LLC.  Mr. Adams communicated extensively with his attorney and attorney-retained accountants ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████[18]  Supp. Brever Dec. ¶ 2; *see also* Mot. 26-27 tbl.1

---

[17] Up to this point, the government has sought only *documentary* evidence regarding Mr. Adams's communications with Mr. Brever and Murry LLC, but under its view of the law *see, e.g.*, Resp. 25, nothing would prevent it from requiring Mr. Brever and Murry LLC accountants to testify about all of their discussions with Mr. Adams.  As this motion and reply demonstrate, compelling their testimony on anything more than the data and underlying computations reflected in Mr. Adams's filed tax returns would trample long-recognized attorney-client privilege principles.

[18] The government cites cases that are clearly distinguishable in this respect and therefore should not govern the analysis of the privilege here.  In *Lawless*, for example, the Seventh Circuit's rejection of the privilege was founded on the undisputed fact that the attorney had been retained specifically to prepare tax returns, such that the information at issue was indisputably "transmitted for the purpose of preparation of a tax return."  *See* 709 F.2d at 486-88.  The attorney did not even contend—let alone demonstrate—that there was any other purpose for which the taxpayer could have communicated information to him.  *Id.*; *accord In re Grand Jury Proceedings*, 727 F.2d 1352 (4th Cir. 1984) (holding that the privilege did not apply where it was undisputed that the

(cataloging 18 calls and emails between Mr. Adams and either or both of Mr. Brever and

Mr. Murry). ████████████████████████████████████

████████████████████████████████████████████████

████████ Supp. Brever Dec. ¶ 2. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ *See id.* ¶ 4 ████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ *See id.* ¶ 4; *accord Schlegel*, 313 F. Supp. at 179

(holding that the most "realistic rule" governing how to discern what information

provided to tax counsel was *intended* to be conveyed onward to the government was,

"[i]n short, whatever is finally sent to the government is what matches the client's

intent"). For the reasons articulated in *Cote* and *Schlegel*, the government's view of

waiver should not prevail.

   None of the communications over which Mr. Adams now claims (and Mr. Brever

previously asserted) the attorney-client privilege and work product protections constitute

the type of accountant workpapers containing mathematical "detail underlying" the

---

information at issue was provided to counsel for the express purpose of preparing a
prospectus to be disclosed to potential investors).

PUBLIC VERSION

amended tax returns filed by Mr. Adams that were at issue in *Cote*.  All Murry LLC

documents falling into that category have already been produced by Mr. Brever.  Supp.

Brever Dec. ¶ 4; Brever Dec. ¶¶ 11-14; Ex. 22.  As Mr. Brever reiterates in his

supplemental declaration:

> [I]n December 2016 I produced to the government all documents I
> believed not to be covered by the attorney-client privilege or work product
> protections, including those set forth in *United States v. Kovel*.  As an
> attorney who advises clients primarily in tax law and white-collar criminal
> matters, I am familiar with case law holding that the attorney-client privilege
> may be waived as to data and information ultimately included in filed tax
> returns provided to the IRS, as well as computational records underlying the
> figures reported in tax returns.  As referenced in my prior declaration, I
> appreciated and incorporated that legal principle into my determinations as
> to which Murry LLC files were produced and which were withheld on
> privilege and work product grounds. . . .
>             . . . [I]n several instances, I produced standalone copies of certain
> files which I believed contain data and information that was included in Mr.
> Adams's filed amended tax returns for years 2008, 2009, and 2010, ███
> ████████████████████████████████████████████████ in my view,
> constitute requests for legal advice from Mr. Adams regarding ████
> ████████████████████████████████████████████████████
> ████████████████████████████████████████████████████
> ██████████████

Supp. Brever Dec. ¶¶ 6-7.  Mr. Adams draws the same line with respect to Yahoo! emails

he exchanged with Mr. Brever and Murry LLC.  The communications logged in Exhibit

20 to Mr. Adams's motion and Exhibit 27 to this reply, if viewed by the government,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

PUBLIC VERSION

█████████████████████   These are not merely "detail underlying the reported data"—of the kind typically found in accountants' workpaper spreadsheets—that eventually was included in Mr. Adams's amended tax returns █████████████ ████████████████ instead, they are communications from client to counsel (or counsel's agent) that contain the type of "*unpublished* expressions" of information to counsel that the Eighth Circuit and many other courts have recognized retain their attorney-client privilege protection.  *See Cote*, 456 F.2d at 144-45.

The government's newfound desire to invalidate the *entirety* of the attorney-client privilege and work product protections across all of Mr. Adams's dealings with Foster Brever Wehrly and Murry LLC appears to signal a recognition of the consequences that could flow from the government's intentional invasion of Mr. Adams's privileged and work product protected materials through targeted searches for and subsequent review of privileged documents, which the government concedes "relate specifically to the substantive allegations in the superseding indictment."  Resp. 19.  The consequences of these violations of Mr. Adams's Fourth, Fifth, and Sixth Amendment rights should be left for another day, pursuant to the sequential briefing ordered by the Court.  *See* DCD 88.  But the government's belated attempts to pierce those plainly applicable privileges here should not be countenanced.

## CONCLUSION

Mr. Adams respectfully requests that the Court grant his motion.

PUBLIC VERSION

Dated:  February 26, 2018     Respectfully submitted,


                 /s/ *Lance Wade*

                Joseph G. Petrosinelli (DC Bar #434280)
                Lance Wade (DC Bar #484845)
                Sarah Lochner O'Connor (DC Bar #1012405)
                Gloria Maier (DC Bar # 1012208)
                WILLIAMS & CONNOLLY LLP
                725 Twelfth Street, N.W.
                Washington, DC  20005
                Telephone:  (202) 434-5000
                jpetrosinelli@wc.com
                lwade@wc.com
                soconnor@wc.com
                gmaier@wc.com

                James L. Volling (#113128)
                Deborah A. Ellingboe (#26216X)
                FAEGRE BAKER DANIELS LLP
                2200 Wells Fargo Center
                90 South Seventh Street
                Minneapolis, MN  55420
                Telephone:  (612) 766-7000
                Facsimile:  (612) 766-1600
                james.volling@faegrebd.com
                debbie.ellingboe@faegrebd.com


                *Attorneys for Defendant Edward S. Adams*

PUBLIC VERSION