# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Edward S. Adams,<br><br>Defendant. | Case No. 0: 17-CR-00064-DWF-KMM<br><br>**REPORT AND RECOMMENDATION AND ORDER** |

David M. Genrich, David J. MacLaughlin, David M. Maria, John E. Kokkinen, Assistant United States Attorneys, counsel for the government

Deborah A. Ellingboe, James L. Volling, Faegre Baker Daniels LLP; Gloria K. Maier, Joseph G. Petrosinelli, Lance A. Wade, Sarah L. O'Connor, Williams & Connolly LLP, counsel for defendant

Now before the Court is Edward S. Adams's Motion Asserting Certain Privileges Implicated by Yahoo! Email Seizure. ECF No. 89. Mr. Adams asserts that "two categories of documents seized by the United States pursuant to the January 2016 Yahoo! Warrant are protected by a privilege from disclosure." Mem. in Supp. at 1, ECF No. 90. The government's position is that neither category of documents is protected by attorney-client or work-product privilege. For the reasons set forth below, the Court recommends that the Motion be granted in part and denied in part.

## THE DOCUMENTS AT ISSUE

On January 7, 2016, the government obtained a search warrant to search the contents of three email accounts held by Yahoo![1] The government and Mr. Adams

---

[1] The validity of that search warrant and the reasonableness of its execution are the subject of a separate pending Motion to Suppress. Mot. to Suppress, ECF No. 36. The Court determined that resolving issues of privilege prior to addressing the alleged

generally agree that Mr. Adams's emails include communications protected by the attorney-client or work-product privileges, but they disagree about whether two specific categories of emails are covered by those protections or not.

### The Apollo Emails

The first category of emails in dispute comprises communications between Mr. Adams and others made "in the course of providing legal advice to Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation." *Id.* Apollo Diamond, Inc. is a Delaware corporation founded by Robert Linares. *Id.* at 5. Apollo Diamond, Inc. "is engaged in the business of owning and developing proprietary technology relating to the production of laboratory-created diamond and diamond materials." Def. Ex. 1 at 1 ("ADI APA"), ECF No. 91-1. Apollo Diamond Gemstone Corporation is also a Delaware corporation founded by Robert Linares. Mem. in Supp. at 5. Apollo Diamond Gemstone Corporation was previously "engaged in the business of manufacturing and marketing laboratory-created gemstone diamonds . . . using the proprietary technology of its parent company, Apollo Diamond, Inc. . . . and technology, trade secrets, patents and inventory developed by" Apollo Diamond Gemstone Corporation. Def. Ex. 2 at 1 ("ADGC APA"), ECF No. 91-2. Mr. Adams and his law firm provided legal services to Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation (collectively "Apollo")[2] "since at least 2006." Mem. in Supp. at 5.

In 2011 and 2012, Apollo entered into asset purchase agreements ("APAs") with a Nevada corporation, Scio Diamond Technology Corporation ("Scio"). *See generally* ADI APA; ADGC APA. The agreements contemplated transfer of "certain of the property, assets, rights, and privileges of [ADI] related to, used in, or otherwise associated with the assets on the terms and subject to the conditions set forth in this [APA]" and "certain of the property, inventory, and assets, rights, and privileges of [ADGC] related to, used in, or otherwise associated with the previous operation of

---

Fourth Amendment violation raised by that Motion is most efficient course. *See* Jan. 23, 2018 Ord., ECF No. 88.

[2] The Court recognizes that Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation were separate entities. But for the purposes of the discussion in this Report and Recommendation, the two are referred to collectively as "Apollo" wherever no distinction is necessary for the analysis.

[ADGC] on the terms and subject to the conditions set forth in this [APA]." ADI APA at 1; ADGC APA at 1.  Each agreement purported to exclude certain tangible and intangible items and each provided for a Scio entity's purchase of Apollo's intellectual property, diamond growing equipment, and inventory.  Mem. in Supp. at 6-7.  In explaining the arrangement to the Securities and Exchange Commission ("SEC"), Mr. Adams's law partner testified that the Apollo shareholders were most excited about owning a part of a company that would exploit the existing diamond technology "in a company that was capitalized and had a myopic focus on manufacturing versus [the] kind of research and development that Apollo had done a lot of over the years."  Gov't Ex. 3 at 4, ECF No. 109-3.

The government characterizes the Apollo-Scio transactions very differently. The superseding indictment alleges that Mr. Adams had "embezzled millions of dollars for his personal use and benefit" from Apollo.  Superseding Indictment at 1, ECF No. 70.  It further asserts that Mr. Adams then orchestrated the sale of Apollo to Scio "in order to prevent his theft from being discovered" and as a means of "extending and continuing the scheme."  *Id.* at 1, 11.  As part of the investigation underlying the indictment, the government obtained thousands of emails, including the communications now at issue between Mr. Adams and Apollo corporate managers.  Mem. in Supp. at 5-6.  The government also obtained a purported waiver of Apollo's attorney-client privilege from counsel for Scio.  *See* Young Decl., Gov't Ex. 7, ECF No. 109-7.  Specifically, counsel for Scio emailed Assistant United States Attorney David Maria on June 28, 2016, indicating that he had spoken with Scio's CEO and that:

> Scio will not assert any attorney-client privilege or seek compliance with any duty of confidentiality with regard to work or services performed by Ed Adams, Michael Monahan, the Adams Monahan law firm or the attorneys associated with the Adams Monahan law firm in connection with (1) the Apollo Diamond entities (e.g. Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation) and (2) the transactions by which the assets of the Apollo Diamonds entities were transitioned to or acquired by either of the Scio Diamond Technology Corporation entities (the original or the current).

Def. Ex. 19, ECF No. 91-19. This email memorialized a conversation from February or March 2016 communicating the same waiver. *See* Young Decl. The critical issue related to the status of the Apollo documents is whether the attorney-client privilege was Scio's to waive or whether only Apollo, though now defunct, retained the authority to waive the privilege.

**The Murry Emails**

The second category of documents the privilege of which is in dispute includes communications between Mr. Adams and an accountant engaged by his tax attorneys. Mem. in Supp. at 2. Mr. Adams hired Thomas Brever, a tax attorney, in September 2014 to assist with tax liabilities and related issues. Brever Decl. at ¶ 2, ECF No. 93. Shortly thereafter, Mr. Brever hired Murry & Associates, LLC, an accounting firm, to assist him in providing legal advice regarding Mr. Adams's taxes. *Id.* at 2. When the government obtained the emails from Yahoo!, it also obtained communications between Mr. Adams, his tax attorney, and the Murry & Associates accountants. *See* Mem. in Supp. at 2. Therefore, the second issue for the Court's consideration is whether those communications are protected by the attorney-client privilege.

## ANALYSIS

As described, the categories of documents at issue implicate two different aspects of attorney-client privilege. The Court recommends that Mr. Adams's motion be denied as to the first issue because Mr. Adams is unable to establish that a privilege remains as to the communications between himself and the Apollo entities. However, the Court concludes that Mr. Adams has established that the communications between himself, his tax attorney, and Murry & Associates are protected by privilege.[3]

---

[3] If the Court finds that either category of documents is, broadly speaking, covered by privilege, the parties have reserved for another day questions of which specific documents are privileged and whether the "crime-fraud exception" or any other exception undermines that privilege as to certain documents. *See* Jan. 23, 2018 Ord. at 3 (contemplating future briefing as to "any motions that arise from the privilege-related findings of the Court").

## I. Basic Principles of the Attorney-Client Privilege

"The attorney-client privilege is the oldest of privileges for confidential communications known to the common law." *Upjohn Co. v. U.S.*, 499 U.S. 383, 389, 101 S. Ct. 677, 682 (1981). It promotes "full and frank communication between attorneys and their clients" and "broader public interests in the observance of law and administration of justice." *Id.* When reviewing a claim of privilege, this Court follows federal common law and is not "bound by a mechanistic approach for applying the privilege in criminal cases." *United States v. Espino*, 317 F.3d 788, 795 (8th Cir 2003); *see also* Fed. R. Evid. 501 (stating that common law generally governs a claim of privilege). The party who asserts the protection of privilege "has the burden of establishing the right to invoke its protection." *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985). Attorney-client privilege arises where the parties to a given confidential communication are an attorney and her client, the attorney was engaged for the purpose of obtaining legal advice, and the privilege has been claimed and not waived. *Diversified Indus. Inc. v. Meredith*, 572 F.2d 596, 601-602 (8th Cir. 1977).

## II. The Apollo Documents

### A. The Successor Test

The Court must determine whether the sale of Apollo's assets gave Scio the authority to assert or waive Apollo's attorney-client privilege. Ordinarily, a mere transfer of assets does not pass the privilege to the acquiring corporation except where: (1) the sale also transferred control of the business; and (2) the acquiring corporation's management continues the selling corporation's business. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the privilege passes as well."); *Hanson v. Loparex Inc.*, No. 09-cv-1070 (MJD/SRN), 2009 WL 10690093, at *2, *4 (D. Minn. Sept. 8, 2009) (considering whether the acquiring corporation's business operations "are essentially the same" as the selling company and whether the transaction involved the "mere transfer of assets" rather than an "attempt to continue the pre-existing operation"); *Mackenzie-Childs LLC v. Mackenzie-Childs*, 262 F.R.D. 241, 248 (W.D.N.Y. 2009) ("Where one corporation merely sells its assets to another, however, the privilege does not pass to the acquiring corporation unless (1) the asset transfer was also accompanied by a transfer of control of the business and (2) management of the acquiring corporation continues the business of

the selling corporation."). But "a transfer of the [attorney-client] relationship can occur in situations involving the sale of less than all the organization's assets." *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1002 (N.D. Ill. 2008).

Courts look to the "practical consequences" of an asset sale rather than formalities of the transaction to determine whether the authority to assert or waive the attorney-client privilege transferred to the acquiring corporation. *Am. Intern. Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 403 (N.D. Ill. 2007); *Coffin v. Bowater Inc.*, No. 03-cv-227-P-C, 2005 WL 5885367, at *2 (D. Me. May 13, 2005); *Soverain Software LLC v. The Gap, Inc.*, 340 F. Supp. 2d 760, 762 (E.D. Tex. 2004). In *Soverain*, for example, although the transfer occurred through a purchase agreement that covered some but not all of the business's assets, the acquiring corporation obtained the authority to assert and waive the sellers' corporate privilege where the buyer purchased a particular software business, sold the acquired software as its principal business, retained the patents for the software, serviced customers who used the software, and took steps to update a new version of the software. 340 F. Supp. 2d at 763-64.

### B. Application to the Apollo-Scio Transactions

Against this legal backdrop, it becomes clear that Scio's waiver of the attorney-client privilege as to the Apollo documents was valid. The details of and context surrounding the asset sale and the contemporaneous and subsequent statements of the parties involved in the transactions all demonstrate that the practical consequence of the purchase was a transfer of corporate control from Apollo to Scio adequate to transfer both the privilege and the right to waive it.

#### 1. The Asset Sale

The language of the APAs themselves specifies that Scio acquired all of Apollo's intellectual property rights, website, equipment, machinery, and inventory, as well as numerous other tangible and intangible assets. ADI APA at 10-11; ADGC APA at 6-7. This constitutes essentially every asset which would be needed for the continuation of Apollo's business. Each APA also includes a clause that suggests transfer of the business. Both the ADI APA and the ADGC APA contain clauses requiring "preservation of purchased assets and business" by Apollo prior to closing. ADI APA at 21-22; ADGC APA at 16-17. Such clauses would serve little purpose if

Scio had only been interested in the assets themselves and not in continuing the business operations of Apollo.

There is no evidence before the Court that Apollo continued operating in any meaningful way. For instance, Mr. Adams, who bears the burden of establishing the application of privilege in this matter, has offered no proof that Apollo sold any products after the Scio transaction, continued to pay any employees (perhaps other than Mr. Adams), honored contracts to provide diamonds or related materials to any customers, or otherwise carried on as a viable business enterprise. Indeed, it is difficult to see how Apollo, a company that had developed and attempted to monetize diamond-making technology, could continue in business having sold all of its intellectual property to another company. The practical consequence of the so-called asset acquisition was for Scio to "continue the pre-existing operation." *Hanson*, 2009 WL 10690093, at *4. Scio, like *Soverain*, "not only acquired certain assets but also has continued to operate the . . . business." 340 F. Supp. 2d at 763.

Mr. Adams points to several facts which he says indicate that the right to assert attorney-client privilege did not pass to Scio, but his arguments are unpersuasive when viewed against the practical realities of the Apollo-Scio transactions. First Mr. Adams suggests that control did not pass to Scio because the APAs provide that Apollo retained certain "Excluded Assets." Mem. in Supp. at 15-17; *see also* ADI APA at 12; ADGC APA at 7. But this argument improperly elevates the formalities of the transactions as described in the APAs over the functional realities that surrounded the sale. Mr. Adams has not shown that anything in the list of assets retained by Apollo was necessary or even useful to any continuation of Apollo's business operations. Moreover, Mr. Adams has not provided any support for the actual existence of many of the assets excluded from the sale. For instance, Apollo retained "any and all of the interests, rights, Claims, and benefits arising or accruing to or against seller" with regard to contracts, though there is no evidence that any remaining contracts existed separate from the liabilities elsewhere reserved. *See* ADI APA at 12; ADGC APA at 7. Indeed, as explored below, according to Scio's SEC filings, by the time of the sale, Apollo had functionally ceased operations for more than a year before the sale. *See* Def. Ex. 6 at 5, ECF No. 91-6 ("In 2010, Apollo Diamond essentially ceased all revenue related activity, and laid off all but one of its employees (who was retained primarily for the purpose of liquidating the company's remaining inventory."). Similarly, Apollo retained "[a]ll leasehold interests in any real property," but no such

continuing interest in property has been identified beyond a property from which Apollo may have actually been evicted due to nonpayment. *See* ADI APA at 12; ADGC APA at 7; Def. Ex. 6 at 5. While there is no mechanical test for determining the retention or transfer of the attorney-client privilege, the practical realities of the Apollo-Scio sale certainly cut against Mr. Adams's assertion that the transactions did not result in transfer of the business.

Mr. Adams correctly notes that "[t]here is no dispute that the asset purchase agreements excluded all of Apollo's liabilities." Reply at 12, ECF No. 110. But retention of liabilities is not sufficient to defeat the transfer of corporate control and resultant passing of the privilege to Scio. In *Soverain*, one party argued that the acquiring company "could not be a successor for privilege purposes" because it had not acquired the selling companies' liabilities. 340 F. Supp. 2d at 764. The Court disagreed, finding that "[t]he desire of the purchaser of a bankrupt's assets to not acquire the bankrupt's liabilities should not lead, by that fact, to the waiver of all privileges attendant to the assets." *Id.*; *see also Ramada Franchise Sys. v. Hotel of Gainesville Assocs.*, 988 F.Supp. 1460, 1463-64 (N.D. GA 1997) (finding transfer of attorney-client privilege without discussion of liabilities of bankrupt company); *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, No. 3:11-CV-3237-D, 2012 WL 3453696, at *4 (N.D. Tex. Aug. 14, 2012) (finding that attorney-client privilege passed despite acquisition of very few liabilities). This Court agrees with *Soverain*, and concludes that Apollo's retention of liabilities does not undermine the conclusion that Scio is a successor for privilege purposes. Indeed, the record before the Court suggests that other than Apollo's liabilities, and a bank account which was primarily used to make payments to Mr. Adams and the Linares family, there was nothing left to Apollo after the sale to Scio.

### 2. The Statements of Involved Parties

In addition to the practical realities of the Apollo-Scio transactions, statements made by the individuals and businesses involved in the transactions further support the conclusion that they effectively constituted the sale of a business that transferred control of the privilege as well. Communications with stockholders describing the transactions do the same.

Mr. Adams, his law firm colleague Mr. Monahan, Mr. Adams's attorneys, and Mr. Linares all made statements which support this Court's conclusion. For example,

in testimony to the SEC, Mr. Adams described the transactions as "allow[ing] the company to kind of reboot," suggesting continuation of the business. Def. Ex. 18 at 15, ECF No. 91-18. When Mr. Monahan testified to the SEC, he said that most shareholders "understood they were going to own the same assets in a different capital structure." Gov't Ex. 3 at 2. He further testified that the shareholders were most excited that "the opportunity would live on," that "they would have a chance to own a part of a company that was going to exploit the technology." *Id.* at 4. Mr. Monahan noted that the opportunity the shareholders had with Apollo "was dead but now it has life" with Scio. *Id.* Similarly, in their presentation to the SEC, Mr. Adams's attorneys wrote that "Scio now owns all assets of former Apollo & Gemstone entities." Gov't Ex. 4 at 2, ECF No. 109-4. Critically, Mr. Linares told the SEC that Apollo "cease[d] to exist in practical terms when [they] concluded the sale of assets to Scio," and that the CEO of Scio "was responsible for everything" and would "take possession of the records, of the equipment, of the processes, the sales records, all of the inventory." Gov't Ex. 5 at 2, 4, ECF No. 109-5. Individually, these statements suggest that the acquisition was truly a transfer of the business. Taken together, they all but affirm that conclusion.

Similarly, Apollo's communications with shareholders in the form of a stockholder letter and the proxy statement proposing the transaction essentially characterize the asset sale as a sale of the business. The March 2011 stockholder letter refers to a determination that "a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology." Gov't Ex. 1 at 2, ECF No. 109-1. The proxy statement that accompanied that letter includes further characterizations of the sale of the business. For example, the statement repeatedly refers to the sale of substantially all of the assets. Gov't Ex. 2 at 1, 2, 3, 6, 9, 11, 14, ECF No. 109-2. It also indicates that Apollo would have no significant operating assets following the asset sale. *Id.* at 4, 7, 9, 14. And the proxy statement refers to Apollo reaching the decision to sell after considering "its prospects of continuing as a stand-alone company," and notes that while it had not succeeded at monetizing or commercializing their technology, it believed new management will. *Id.* at 3. These remarks in the stockholder letter and proxy statement support the conclusion that Apollo was selling its assets to Scio so that Scio would assume the same business operations, but more successfully.

Mr. Adams relies heavily on the fact that Scio itself characterized the transaction as an asset purchase rather than a purchase of a business in some of its communications to the SEC. Mem. in Supp. at 8-10. But Scio explained its reasoning for that characterization: the SEC apparently considers an acquisition to be of a business only if the nature of revenue-producing activity remains the same after the acquisition and if that activity continues. Def. Ex. 6 at 5. Because, per Scio's understanding, Apollo "had not had any substantive revenue-producing activity since early 2009, more than a full two years" prior to the acquisition and was "essentially a defunct entity," Scio did not believe the transaction constituted acquisition of a viable business under the SEC's standards. *Id.* By this logic, purchase of all of a bankrupt business's assets would not constitute a business acquisition. While that conclusion may be true for certain SEC considerations, it is certainly not true for an assessment of who controls the attorney-client privilege. *See, e.g., Am. Intern. Specialty Lines Ins. Co.*, 240 F.R.D. at 407 (finding an acquiring company "acquired the right to assert or waive the attorney-client privilege after bankruptcy" of the selling company).

Indeed, in SEC filings made in December 2011, Scio explained that it had "abandoned its original business plan and restructured its business to focus on man-made diamond technology development and commercialization." Def. Ex. 24 at 10, ECF No. 111-2. Scio's new mission essentially comprises the stated missions of ADI and ADGC, which were engaged in owning and developing man-made diamond technology and manufacturing and marketing the resulting diamonds. Def. Ex. 1 at 1; Def. Ex. 2 at 1. Apollo's serious lack of profitability has no bearing on Scio's ability to acquire and continue Apollo's business.[4]

In sum, the words of Mr. Adams himself, Mr. Monahan, Mr. Adams's attorneys, Mr. Linares, and communications with shareholders all confirm what an examination of the practical realities of the Apollo-Scio transactions already suggested:

---

[4] Mr. Adams also highlights Scio's mention of new management with no overlap between managers at Apollo and at Scio in support of his privilege claim, arguing that the non-continuity of management supports his argument that the privilege did not pass to Scio. Mem. in Supp. at 8, 16; Reply at 10. However, the presence of new management is not determinative of whether attorney-clietn privilege has passed to the new company. "New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors." *Weintraub*, 471 U.S. at 349, 105 S. Ct. at 1991.

Scio is, for all intents and purposes, a successor to Apollo. Therefore Scio held the power to both assert and waive Apollo's attorney-client privilege.

### C.     *Tekni-Plex, Inc.* **and a Limit to the Successor Privilege Doctrine**

Mr. Adams argues that even if the attorney-client privilege passed to Scio in part, Apollo retained the privilege with regard to negotiations surrounding the asset purchase transactions themselves. Mem. in Supp. at 18. He bases this assertion on a New York Court of Appeals case, *Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663 (N.Y. Ct. App. 1996). *Id.* Unfortunately for Mr. Adams, the *Tekni-Plex* decision has no bearing on the instant case. In *Tekni-Plex*, "the agreement between the parties . . . contemplated that, in any dispute arising from the merger transaction, the rights of the acquired corporation . . . relating to the transaction would remain independent from and adverse to the rights of [the acquiring corporation]." 674 N.E.2d at 672. The court there held that the new company could not assert the privilege for communications regarding the merger transaction itself, but did so "[i]n light of the facts of this particular transaction and the structure of the underlying agreement." *Id.* In marked contrast, Mr. Adams has not identified any language in either APA similar in any way to the very specific language in *Tekni-Plex.* The Court finds the reasoning of the New York Court of Appeals inapplicable here.[5]

### D.     **Conclusion**

Based on the foregoing, it is clear to the Court that the practical consequence of the APAs here was the acquisition of Apollo by Scio. Scio assumed control of the business and continued Apollo's business operations. Though the APAs did not explicitly transfer all of Apollo's assets to Scio, Apollo clearly passed control to Scio. As a result, Apollo's attorney-client privilege also passed to Scio.[6]  Therefore, the

---

[5] Mr. Adams periodically invokes the work-product doctrine with respect to his work for Apollo. *See* Mem. in Supp. at 1, 5, 19; Reply at 4, 5, 15. But the work-product doctrine relates specifically to work prepared in anticipation of litigation. *See United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170 (1975) (discussing the work-product doctrine as applying to materials prepared "in anticipation of litigation"). Mr. Adams has not alleged any facts nor offered argument to support a conclusion that any of his work for Apollo was done in anticipation of litigation.

[6] Mr. Adams contends in his reply that Scio's waiver "explicitly did not apply to communications related to its intellectual property." Reply at 14. He bases this

-11-

waiver of privilege relied upon by the government was a valid waiver and its collection and review of the Apollo documents did not constitute an unlawful encroachment on the protections of attorney-client privilege.

### III.   The Tax Communications

Mr. Adams also asserts attorney-client privilege as to his communications with his tax attorney, Thomas Brever, and with accountants at Murry LLC.  Mem. in Supp. at 19-32.  Communications between a client and an accountant may be protected under attorney-client privilege.  For the privilege to apply, the communications must "be made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

Whether communications with an accountant are subject to the privilege is a very fact specific inquiry, dependent on the services provided and the manner in which they were sought.  For instance, "[i]f what is sought is not legal advice but only accounting service, . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Id.*  And in the tax context, this analysis is even more searching.  If counsel initially advises a client to file returns and then retains an accountant "simply to make the correct mechanical calculations, the privilege would not apply." *United States v. Cote*, 456 F.2d 142, 144 (8th Cir 1972).

Two decisions shed light on the nuanced distinctions between consultations with accountants that are protected by privilege and those that are not.  In *Cote*, counsel's "decision as to whether the taxpayers should file an amended return undoubtedly involved legal considerations which mathematical calculations alone would not provide.  It is clear that the accountant's aid to the lawyer preceded the advice and was an integral part of it." *Id.*  "A more definitive test is whether the accountant's services are a necessary aid to the rendering of effective legal services to the client." *Id.*  The *Cote* court also considered whether the privilege is waived by

---

argument on the last sentence of the email from Scio's counsel memorializing the waiver: "The waiver of any attorney-client privilege does not include any work performed in connection with patent matters or matters relating to Scio's ongoing business.  *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977)." Def. Ex. 19.  The government does not appear to contest this particular issue.  However, there is no suggestion that most of the emails which the government seeks to use in its prosecution of Mr. Adams relate to patent matters.

filing of amended returns with the Internal Revenue Service, concluding that information included in the returns and "details underlying that information" are no longer protected by the privilege. *Id.* at 144-45.

The conclusions of *Cote* are supported by *United States v. Lawless*, in which the Seventh Circuit noted that if a client relays information only for use on a tax return, "such a transmission destroys any expectation of confidentiality which might have otherwise existed." 709 F.2d 485, 487 (7th Cir. 1983). The *Lawless* court concluded that basic tax preparation is an accounting service rather than a legal one, and an attorney preparing taxes is not acting "in his capacity as a professional legal adviser at the time the information was transferred." *Id.* at 487-88. As a result, such communications are not entitled to attorney-client privilege protection. *Id.*

Against this legal backdrop, the Court must assess the communications between Mr. Adams, Mr. Brever, and Murry & Associates accountants. The government asserts that Mr. Adams's communications with Mr. Brever and the Murry LLC accountants were solely for the purpose of filing amended tax returns. Mem. in Opp. at 20-25. Mr. Adams, arguing that his emails fall on the legal-advice side of the line explored above, provided samples of the communications to which he argues the privilege applies. Def. Ex. 22 Pt. 1, ECF No. 95; Def. Ex. 22 Pt 2, ECF No. 96. He further provided declarations and exhibits from Mr. Brever to support his assertions. Brever Decl., ECF No. 93 (sealed version at ECF No. 97); 2d Brever Decl., ECF No. 112 (sealed version at ECF No. 114).

On the record before the Court, Mr. Adams has established the privileged nature of the communications at issue. The declarations and their related exhibits demonstrate that Mr. Adams retained counsel before any decision was made to file amended tax returns and that counsel provided advice outside the narrow, accounting-service scope of preparing and filing amended returns. Indeed, Murry & Associates was retained to "assist [Mr. Brever] in providing professional services, possibly including research and development of positions on tax and other matters that may result in litigation." Brever Decl. at ¶ 2. The arrangement was premised on *United States v. Kovel*, which extends attorney-client privilege to accountants and other non-lawyer employees where the underlying communication was "made in confidence for the purpose of obtaining legal advice from the lawyer." 296 F.2d at 922; *see* Brever Decl. at ¶ 3. On these facts, the Court concludes that the communications between Mr. Adams, Mr. Brever, and Murry & Associates accountants were made in

confidence and for the purpose of obtaining legal advice.[7]  Mr. Adams has clearly continually invoked the protection of these privileges, as has Mr. Brever in responding to subpoenas, and the government does not contest that it has been raised.  Brever Decl., ¶¶ 10-14; 2d Brever Decl., ¶ 6.

The government argues that, even if some privilege applies, it has been waived with respect to communications made only for the purposes of tax return preparation.  Mem. in Opp. at 25-26.  Indeed, the Court agrees that attorney-client privilege does not apply to Mr. Adams's communications with Mr. Brever and Murry LLC accountants that were made only for the purpose of using the contained information on tax returns.  Mr. Brever's declarations indicate that he previously provided all such non-privileged materials to the government.  Brever Decl., ¶¶ 10-11, 13-14; 2d Brever Decl., ¶¶ 6-7.  But that waiver certainly does not apply to all communications between Mr. Adams, Mr. Brever, and Murry LLC's accountants.[8]  In the interest of clarity, the Court orders that Mr. Adams be required to proceed with the creation of privilege logs as to those documents which he alleges remain privileged in light of this Court's analysis and that documents that are not protected as discussed above continue to be provided as requested.

---

[7] Although the government has not specifically challenged the privileged status of Mr. Adams's communications directly with Mr. Brever, its memorandum on the privilege issue suggests that it believes that even these direct attorney-client communications are not protected by privilege.  For the same reasons the Court finds Mr. Adams's emails with Murry & Associates to be protected by attorney-client privilege, his emails with Mr. Brever certainly are.

[8] Mr. Adams also argues that these emails are protected by the work-product doctrine.  Mem. in Supp. at 28-29.  Because the communications are already protected by the attorney-client privilege, the Court need not reach this issue.  But the Court is skeptical that the communications would satisfy the anticipation-of-litigation prong of the work-product doctrine.  *See Nobles*, 422 U.S. at 238, 95 S.Ct. at 2170 (discussing the work-product doctrine as applying to materials prepared "in anticipation of litigation").  Mr. Adams argues that the communications were in anticipation of litigation, but the redacted reason provided does not seem to this Court to be more than speculative.  *See Diversified Indus., Inc.*, 572 F.2d at 604 ("[T]he work product rule does not come into play merely because there is a remote prospect of future litigation.").

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** the Defendant's Motion Asserting Certain Privileges Implicated by Yahoo! Email Seizure (**ECF No. 89**) be **GRANTED in part** and **DENIED in part**.

## ORDER

The Court orders the parties to proceed with creation of privilege logs and the litigation of any remaining issues related to the privileged status of specific documents as necessary. The parties are instructed to note the expedited objection schedule included in the Notice below and ordered in this Court's January 23, 2018 Order (ECF No. 88).

Date: March 12, 2018                                         *s/ Katherine Menendez*
                                                                          Katherine Menendez
                                                                          United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation "*unless the court sets a different deadline.*" (Emphasis added). The Court has previously ordered that objections shall be filed on or before March 19, 2018 and that responses to those objections shall be filed on or before March 26, 2018. All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the

earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.