# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17-cr-64-DWF-KMM |
| | ) | |
| EDWARD S. ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT, OR IN THE ALTERNATIVE FOR DISQUALIFICATION, FOR PRIVILEGE VIOLATIONS

WILLIAMS & CONNOLLY LLP
Joseph G. Petrosinelli (DC Bar #434280)
Lance Wade (DC Bar #484845)
Gloria Maier (DC Bar # 1012208)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
jpetrosinelli@wc.com
lwade@wc.com
gmaier@wc.com

FAEGRE BAKER DANIELS LLP
James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com

*Attorneys for Defendant Edward S. Adams*

PUBLIC VERSION

## TABLE OF CONTENTS

I.    BACKGROUND ................................................................................ 4

  A.    Summary of Relevant Facts from Suppression Motion. .............................. 4

  B.    The Prosecution Team Improperly Reviewed and Used Mr. Adams's
        Attorney-Client Privileged Documents ...................................................... 6

        1.    Privileged Communications with Latham & Watkins, SEC
              Investigation Counsel.................................................................... 7

        2.    Privileged Communications with Mr. Hopeman, Initial
              Criminal Defense Counsel ............................................................ 11

        3.    Privileged Communications with Mr. Brever, Tax Counsel........... 12

        4.    Privileged Communications with Murry LLC, *Kovel*
              Accountant ................................................................................. 13

        5.    Privileged Communications with Mr. Hartman .............................. 17

II.   ARGUMENT ................................................................................... 18

  A.    The Indictment Should Be Dismissed. ....................................................... 19

        1.    The Government's Conduct Violated Mr. Adams's Sixth
              Amendment Constitutional Rights.................................................. 19

        2.    The Government's Conduct Violated Mr. Adams's Fifth
              Amendment Constitutional Rights.................................................. 25

        3.    The Court Should Exercise Its Supervisory Power to Dismiss
              the Charges .................................................................................. 26

        4.    At a Minimum, the Tax Charges Require Dismissal ...................... 27

  B.    Alternatively, The Current Prosecution Team Should Be
        Disqualified .......................................................................................... 27

        1.    The Privileged Material in Mr. Adams's Emails Supports
              Disqualification ............................................................................ 29

        2.    The Government's Steps to Prevent and Mitigate Exposure to
              Privileged Documents Were Insufficient ........................................ 31

        3.    Privileged and Confidential Information Was Actually
              Disclosed ..................................................................................... 37

        4.    The Prosecution Team Demonstrated Improper Intent.................... 39

        5.    Additional Considerations Support Disqualification ...................... 41

III.  CONCLUSION ................................................................................. 42

PUBLIC VERSION

Defendant Edward Adams moves the Court to dismiss the First Superseding Indictment, with prejudice, based on the government's repeated, knowing, and improper review of his attorney-client privileged communications, which it obtained via a Yahoo! search warrant, including communications with his then-criminal defense counsel in this very matter.  If the Indictment is not dismissed, the Court at a minimum should disqualify the current prosecution team from further participation in the case.

The government's violations of Mr. Adams's privileges were repeated and egregious.  They were no accident.  And they have severely prejudiced his defense of the charges in the Indictment.  Among other things:

- AUSA David Maria, on just his second day of searching Mr. Adams's emails, reviewed a memo from Mr. Adams to Jon Hopeman, who AUSA Maria knew to be Mr. Adams's defense counsel in the very investigation at issue.  The memo bore the header "ATTORNEY-CLIENT PRIVILEGED COMMUNICATION."  He inexcusably did nothing to remove the memo from the government's review database, and as a result Postal Inspector Christine Kroells, the lead agent in the investigation, also reviewed the memo several days later—accessing it four times.  The memo includes, *inter alia*, information from Mr. Adams about potential government witnesses in this case, including facts that could be used to cross-examine them.

- AUSA Maria and other members of the prosecution team also reviewed several communications Mr. Adams sent to Thomas Brever, a tax attorney he had retained to advise him on tax issues, and Patrick Murry of Murry & Associates, LLC

1

("Murry LLC"), an accountant Mr. Brever had engaged under a *Kovel* arrangement.  One of the documents was a spreadsheet titled "ESA Tax Questions" and contained the header "Attorney-Client Privileged Communication for Tom Brever and Pat Murry." Notwithstanding that clear language, AUSA Maria reviewed the spreadsheet *six times* over a 30-day period.

- AUSA Maria not only reviewed Brever and/or Murry LLC communications on multiple occasions—he viewed one spreadsheet Mr. Adams sent to Mr. Murry *thirteen* times over five months, printed it, and sent it to an IRS Criminal Agent—but *after* he was expressly told that Mr. Brever had retained Mr. Murry in a privileged *Kovel* engagement, he immediately ran additional searches with the terms "murryllc" and "murry."

- AUSA Maria reviewed several draft memos that Mr. Adams prepared for Latham & Watkins LLP, which had represented Mr. Adams in the underlying SEC investigation relating to Apollo and Scio, of which Mr. Adams was a subject.  On his very first day of searching the email database, AUSA Maria reviewed one such draft memo, which was four pages long; although it did not expressly reference Latham, it bore the headers "**ATTORNEY-CLIENT PRIVILEGE**" and "**ATTORNEY WORK PRODUCT**."  This memo contains information about the issues at the heart of this case, and indeed AUSA Maria clearly found it interesting:  ignoring the boldface privilege headers, he viewed the memo *seven times* on his first day of searching and an additional *four times* on four other days.  He (and Inspector Kroells) also continued to review, on multiple occasions, other drafts of privileged communications Mr. Adams sent to Latham.

2

• Inspector Kroells reviewed more than *twenty* different documents reflecting communications between Mr. Adams and Aaron Hartman of the Anthony Ostlund firm, who the government knew had represented Mr. Adams in prior civil litigation where the claims substantially overlapped with the government's allegations in the Indictment. Kroells reviewed the first of these privileged documents in May 2016, shortly after receiving access to the government's Relativity database, but did nothing to remove them from the database or even alert the prosecution team that they existed.

These are only the highlights.  The invasion of Mr. Adams's attorney-client privileges, by experienced lawyers and agents who knew better, was staggering.  Perhaps most importantly, the communications at issue directly relate to the allegations of the Indictment—how Mr. Adams views the underlying facts, what information he has about witnesses the government might call at trial, his analysis of his tax returns, and a host of his other mental impressions about Apollo, Scio, and their shareholders that he shared with his attorneys.  It was information and cogent analysis, written by a sophisticated client (an attorney), meant only for his lawyers, so that they could defend him.  It is information the government had (and has) no right to know.

At the suppression hearing, the government and its witnesses sought to leave the impression that although members of the prosecution team accessed privileged materials, they did so only inadvertently and fleetingly.  The documents—including the Relativity database access log whose production the government resisted—tell a different story.  All of this, of course, may have been avoided if the government agents in charge of this investigation had created a taint team to review the Yahoo! emails, which is the standard

3

Department of Justice practice. But for reasons known only to them, they failed to do so, and that failure plainly created temptations that were too difficult to resist.

As discussed below, the government's conduct warrants dismissal of the Indictment; at a minimum, it requires disqualification of the current prosecution team.

## I.   BACKGROUND

### A.   Summary of Relevant Facts from Suppression Motion.

The factual background set forth in Mr. Adams's Post-Hearing Brief in Support of his Motion to Suppress, filed contemporaneously herewith, applies to this motion as well. Rather than simply repeat it, Mr. Adams incorporates it herein by reference. For purposes of this motion, the key points from that factual background are:

- Mr. Adams was, at all material times, a practicing attorney and a partner at the Adams Monahan LLP law firm. As a practicing attorney, Mr. Adams provided legal services to dozens of clients, including established companies and entities.

- By the time the government obtained Mr. Adams's Yahoo! emails in March 2016, Mr. Adams had been (and/or was still being) represented by a number of attorneys for various purposes, all relating to the same Apollo/Scio transactions the government was investigating. By March 2016, the government was aware of several of these attorneys, including Jon Hopeman of Felhaber Larson; Latham & Watkins LLP; and Anthony Ostlund Baer & Louwagie, P.A.

- The government considered establishing a taint team at the outset of its review of Mr. Adams's emails, but decided not to do so.

- On March 15 and 17, 2016, Inspector Kroells, with permission from AUSA

4

Maria, conducted searches of the entire Yahoo! email database before any steps had been taken to remove privileged documents. She concedes "[i]t's likely" that she encountered privileged documents during her initial search, but because she failed to make a record of what documents she accessed, there is no way to tell how many privileged documents she reviewed, how many times she reviewed them, or for how long.

- On or about April 14, 2016, AUSA Maria proposed a list of search terms to "filter the potentially privileged documents in the email database." The list, when run, hit on 139,840 out of the 146,522 documents—suggesting, of course, that a large volume of privileged materials may exist in the database. Rather than exclude these documents from review, AUSA Maria abandoned his initial list and proposed to instead exclude only documents that hit on a narrower list of terms. That narrower list hit on only 33,161 documents, and that (much) smaller subset was excluded from further review.

- Members of the prosecution team began viewing documents and running keyword searches in the database on May 4, 2016, and almost immediately it was apparent that the database still contained privileged materials. For example, on May 4 and 5, 2016, AUSA Maria saw privileged communications between Mr. Adams and both Mr. Hopeman and Mr. Brever. He inexplicably waited more than a month to request that such documents be filtered from the database.

- On July 8, 2016, Mr. Hopeman, who had recently learned of the Yahoo! search warrant, advised the government that Mr. Adams's Yahoo! emails contained privileged communications. He proposed that the government return the Yahoo! data to him and offered to conduct a privilege review. AUSA Maria responded with a curt

5

refusal.  AUSA Maria mentioned nothing about the events of the prior two months, including that he and others on the prosecution team already had viewed communications between Mr. Hopeman and Mr. Adams.

- On three occasions after the Indictment was returned and the government produced the Yahoo! emails to Mr. Adams, AUSA Maria inaccurately represented to Mr. Adams's counsel the scope of the email that the prosecution team had accessed and searched.  *See, e.g.*, DX 34[1] (April 7, 2017 AUSA Maria letter describing the 42,927 purportedly "seized" documents as "the database with which we have been working").  Contrary to AUSA Maria's statements, the government had "been working" with *all* of the emails produced by Yahoo!—not just the 42,927 purportedly "seized" documents.

## B.   The Prosecution Team Improperly Reviewed and Used Mr. Adams's Attorney-Client Privileged Documents

Of the documents that were viewed by the prosecution team during its review of the Yahoo! emails in the Relativity database, Mr. Adams is asserting his personal attorney-client privilege or the attorney work product protection over more than 100 documents.[2]  In particular, the prosecution team's review of documents in the following categories was particularly egregious, as these documents reflect Mr. Adams's detailed communications with his counsel on the very subjects at issue here.

---

[1] "DX" refers to exhibits Mr. Adams submitted during the evidentiary hearing.  "GX" refers to exhibits submitted by the government during the hearing.  These exhibits have been re-submitted to the Court contemporaneously herewith.

[2] *See* Ex. 1 (privilege log of documents viewed and "seized" by government); Ex. 2 (privilege log of documents viewed by government but not "seized").

6

### 1. Privileged Communications with Latham & Watkins, SEC Investigation Counsel

In April 2016, the government used "latham," "lw.com," and "Sikora" as search terms to filter communications between Mr. Adams and his attorneys at Latham. But the Relativity review database still contained draft memoranda, messages, and analyses prepared by Mr. Adams to share with Latham in connection with the SEC investigation.[3] All of these documents are privileged, and the records produced by the government reveal that members of the prosecution team ***repeatedly*** reviewed them.

On the ***first day*** AUSA Maria conducted searches in the database, he reviewed a draft memo that Mr. Adams prepared for Latham in connection with the SEC investigation. The memo bore the following legends at the top of the page, clearly indicating its privileged nature: "**ATTORNEY-CLIENT PRIVILEGE**" and "**ATTORNEY WORK PRODUCT**." *In camera* Ex. A (Doc IDs 00210651 & -52) (emphasis original). The draft memo is four pages long, and it contains Mr. Adams's thoughts about the 2011–12 Apollo/Scio transactions that are the subjects of the alleged "lulling" scheme described in the Indictment, and other related matters. Specifically, ██

████████████████████████████████████████████████████████

██████████████████████████████████████

---

[3] The SEC investigation related to the same Apollo/Scio transactions and other events that are core features of the Indictment. *See* Ex. 3 (SEC subpoena to Mr. Adams, seeking documents relating to, *inter alia*, (1) monies paid and owed by Apollo to Mr. Adams; (2) fees paid and owed by Apollo to Mr. Adams's law firm; (3) Mr. Adams's ownership interest in Apollo; (4) warrants issued by Apollo; and (5) disclosures to shareholders and other communications about the Apollo/Scio transactions).

PUBLIC VERSION



The draft version of the memo that AUSA Maria viewed is one that Mr. Adams sent to

himself on June 18, 2014.  The next day, on June 19, Mr. Adams sent a completed

8

version of this sensitive memo to Latham. *In camera* Ex. B (Doc IDs 00211199 & -200).[4]

Later, on September 25, 2014—after the government began issuing grand jury subpoenas

in this matter—Mr. Adams sent an updated version of the memo to his then-criminal

defense counsel, Mr. Hopeman. *See in camera* Ex. C (Doc IDs 00220087 & -88).

Not surprisingly, AUSA Maria found this document to be a valuable source of

information. He first viewed the draft memorandum on May 4, 2016 at 2:58 p.m.

Ignoring the large "privilege" legends, he then viewed it ***an additional six times that day***

between 3:00 p.m. and 4:47 p.m. Ex. 4 at 1. He also viewed it ***four more times, on four***

***other days***: on June 6, 2016, August 30, 2016, September 16, 2016, and September 23,

2016. *Id.*

Similarly, on September 6, 2016, AUSA Maria ***viewed twelve versions*** of a draft

email from Mr. Adams to his attorneys at Latham, dated September 10, 2015, shortly

after Mr. Adams's SEC deposition. *In camera* Ex. D;[5] Ex. 4 at 2. Mr. Adams sent this

email to Latham that same day, *see in camera* Ex. E (Doc IDs 00125494 & -95), for the

purpose of obtaining legal advice.[6] The email relates to Mr. Adams's SEC deposition

---

[4] Mr. Adams also sent an earlier version of the memo to Latham on June 7, 2014. *See in camera* Ex. F (Doc IDs 00203981 & -82).

[5] This *in camera* exhibit includes: Doc IDs 00253676, 00253677, 00253678, 00253679, 00253680, 00253681, 00253682, 00253683, 00253684, 00253685, 00253686, 00253687.

[6] The final version transmitted to Latham was excluded from the prosecution team's review database because it bore the names of the Latham lawyers. *See in camera* Ex. E (Doc IDs 00125494 & -95). However, multiple versions of the draft message—including the full text of the message—remained in the review database because those documents did not include recipient information.

9

and the 2011–12 Apollo/Scio transactions, and the matters discussed are highly relevant to this case. ███████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████

       As a third example, Kroells also reviewed a confidential analysis that Mr. Adams prepared for the purpose of obtaining legal advice from Latham and Mr. Hopeman. *In camera* Ex. G (Doc IDs 00252458 & -59). The analysis relates, in general, to the 2011–12 Apollo/Scio transactions and issues central to this case. ███████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████ Mr. Adams had first emailed this analysis to Latham and Mr. Hopeman on October 16, 2014. *See in camera* Ex. H (Doc IDs 00223423 & -24). Mr. Adams emailed himself this analysis on September 1, 2015, and then two days later he revised it and sent it to Latham. *See in camera* Ex. I (Doc IDs 00252841 & -42). Kroells ***viewed the analysis three times*** on May 17, 2016, and printed,

10

at least, the cover email transmitting the analysis.  Ex. 4 at 3.[7]

> **2.    Privileged Communications with Mr. Hopeman, Initial Criminal Defense Counsel**

On May 5, 2016, AUSA Maria's second day reviewing emails, he reviewed a

September 23, 2014 privileged memo that Mr. Adams sent to Mr. Hopeman—who he

knew was Mr. Adams's counsel in this very investigation—and Mr. Brever.  *In camera*

Ex. J (Doc IDs 00219514 & -15).  This memo, which bears the legend "ATTORNEY-

CLIENT PRIVILEGED COMMUNICATION," was made for the purpose of seeking

legal advice on matters generally relating to Scio, and related to the criminal investigation

that resulted in the Indictment.  ███████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████

After viewing this document, AUSA Maria apparently did nothing to alert other

members of the prosecution team who were using the database that such a plainly

privileged communication had escaped AUSA Maria's narrowed list of search terms.  As

a result, six days later, Kroells reviewed the same privileged memorandum.  Ex. 4 at 4.

The Relativity log reflects that Kroells ***viewed it four times*** during a ten minute period

and also viewed the email transmitting it to Mr. Brever and Mr. Hopeman.  *Id.*  Kroells

---

[7] Printing the native version an Excel spreadsheet such as this document would not be recorded on the Relativity activity log.  *See* Decl. of Mark Lyon ¶¶ 5–6.

PUBLIC VERSION

apparently didn't do anything for five days thereafter, at which time she contacted other members of the government team to warn them that privileged communications remained in the database.  DX 1, Kroells Decl. ¶ 20; DX 21.  AUSA Maria acknowledged that was true, presumably based on his earlier review of the same memorandum.  *Id.*  But again, the prosecution team did nothing to remedy the situation for three more weeks.  *See* DX 22; DX 4, Zeitz Decl. ¶ 20.

As discussed above, members of the prosecution team also viewed a draft memorandum and an analysis of the Apollo/Scio transactions, each of which Mr. Adams sent to Mr. Hopeman.  *In camera* Ex. A (Doc IDs 00210651 & -52) (draft memorandum); *in camera* Ex. C (Doc ID 00220087) (updated version of memorandum that was sent to Mr. Hopeman on Sept. 25, 2014); *in camera* Ex. G (Doc IDs 00252458 & -59) (analysis); *in camera* Ex. H (Doc IDs 00223423 & -24) (transmittal of analysis to Mr. Hopeman).

### 3.   Privileged Communications with Mr. Brever, Tax Counsel

On May 4, 2016, AUSA Maria viewed a privileged email that Mr. Adams sent on October 29, 2014 to Mr. Brever and to the accountants at Murry LLC that Mr. Brever had retained under *Kovel*.  *In camera* Ex. K (Doc IDs 00224301 & -02); Ex. 4 at 5.  The email supplied information in an Excel spreadsheet titled "ESA Tax Questions," and it was clear to anyone who viewed it that it was conveyed to seek legal advice from Mr. Brever:  the spreadsheet header stated, "Attorney-Client Privileged Communication for Tom Brever and Pat Murry."  *In camera* Ex. K (Doc IDs 00224301 & -02).  The contents of the spreadsheet go to the heart of the government's case against Mr. Adams. ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

PUBLIC VERSION

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  AUSA Maria viewed the privileged "ESA

Tax Questions" spreadsheet *four times* on May 4, 2016, between 3:49 p.m. and 4:48 p.m.

Ex. 4 at 5.  He viewed it *again* on May 9, 2016, and *for a sixth time* on June 6, 2016.

Members of the prosecution team viewed three other privileged communications

between Mr. Adams and Mr. Brever.  *See in camera* Ex. L (Doc IDs 00221001, -02, -03).

███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████  All three of these documents were

viewed by AUSA Maria on May 4, 2016, and Kroells viewed one of them on May 12,

2016.  Ex. 4 at 6.

### 4.    Privileged Communications with Murry LLC, *Kovel* Accountant

Beyond the spreadsheet described above, the prosecution team searched for,

viewed, and used several more privileged communications between Mr. Adams and

Murry LLC in connection with its investigation and development of tax charges against

Mr. Adams.  AUSA Maria in particular repeatedly viewed a number of communications

between Mr. Adams and Murry LLC that are privileged.[8]  On September 7, 2016 and

December 6, 2016, he deliberately searched for documents referencing "murryllc" or

"murry."  DX 79 at 9, 17.  The December 6, 2016 search was just days *after* AUSA

Maria was informed by Mr. Brever of the privileged *Kovel* arrangement between him and

Murry LLC for the purpose of representing Mr. Adams.  *See* DX 67; ECF 93-5.  And

AUSA Maria viewed or "converted" additional privileged communications between Mr.

Adams and Murry LLC on January 23, 2017.  *In camera* Ex. M (Doc ID 00224366); Ex.

N (Doc ID 00224368); Ex. O (Doc ID 00224409); Ex. P (Doc ID 00224497); Ex. 4 at 7,

8, 9, 10.  Kroells also searched for "murry" on April 27, 2017.  DX 81 at 10.

AUSA Maria repeatedly used the fruits of these searches.  On September 7, 2016,

he sent IRS Criminal Investigator Brandon Belich three privileged communications

(described below) between Mr. Adams and Murry LLC.  *See* Ex. 5, Bildtsen Feb. 2, 2018

email (without attachments); *in camera* Ex. Q (email with document referenced therein of

documents that AUSA Maria provided to Belich).  Notably, Belich testified that in the

"fall of 2016," the case against Mr. Adams "became a tax matter," and that he was

involved in the preparation of the tax charges between the fall of 2016 and February

2017.  Jan. 8 Hr'g Tr. at 280:1–4, 302:14–303:12.  The U.S. Attorney's Office requested

approval from the DOJ Tax Division to proceed with tax charges on November 8, 2016.

---

[8] The documents discussed in this section were previously submitted to the Court in connection with Mr. Adams's Motion Asserting Certain Privileges.  *See* ECF 89, 90, & 91–20 (Murry privilege log).

PUBLIC VERSION

*Id.* at 280:5–281:4.[9]

**First,** AUSA Maria sent Belich an October 28, 2014 email from Mr. Adams to Murry LLC attaching a spreadsheet titled "ESA Tax Summary for P. Murry."  *See in camera* Ex. R (Doc IDs 00224269 & -70).  The information in this spreadsheet was conveyed to seek legal advice from Mr. Brever, and ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████  AUSA Maria viewed the privileged attachment *six times* on May 4, 2016, and then *seven more times* between May 5, 2016, and October 6, 2016.  Ex. 4 at 11.  Kroells viewed these documents *three times* on April 27, 2017.  *Id.*  Although the Relativity log does not reflect when AUSA Maria printed the spreadsheet,[10] he

---

[9] The government claims that Belich "was not the agent who submitted the [IRS Special Agent Report ("SAR")] to DOJ Tax."  Ex. 6, AUSA Maria Feb. 22, 2018 email at 5 (Jan. 30 message).  The government states that "Agent Belich left well before the completion of the SAR," and takes the position that, even if the SAR discusses Yahoo!-derived evidence, the government is not required to produce it under *Brady*.  *Id.* at 2–3.  In any event, if the SAR contains no privileged information the government gleaned from its searches and reviews, the government should produce the document to Mr. Adams and the Court and demonstrate as much.

[10] As noted above, printing the native version an Excel spreadsheet such as this document would not be recorded on the Relativity activity log.  *See* discussion *supra* note 7; Decl. of Mark Lyon ¶¶ 5–6.

transmitted a printed copy of it to Belich on September 7, 2016.  *See* Ex. 5; *in camera* Ex.

Q.  AUSA Maria has shown an ongoing familiarity with it, as on February 27, 2018, in

connection with litigating this motion, he noted that the "spreadsheet was multiple

pages."  Ex. 7, Feb. 27, 2018 email from AUSA Maria to L. Wade.

 **Second,** AUSA Maria sent Belich an October 29, 2014 email from Mr. Adams to

Murry LLC that supplied information for the purpose of seeking legal advice from Mr.

Brever, and ███████████████████████████████████████████

███████████████████████████████████████████████████████  *In*

*camera* Ex. M (Doc ID 00224366).  AUSA Maria viewed this email *six times* between

May 4, 2016, when he printed it, and January 23, 2017, when he "converted" it.  Ex. 4 at

7.  AUSA Maria sent a printed copy of this document to Belich on September 7, 2016.

*See* Ex. 5; *in camera* Ex. Q.

 **Third,** AUSA Maria sent Belich another October 29, 2014 email from Mr. Adams

to Murry LLC that supplied information for the purpose of seeking legal advice from Mr.

Brever.  Ex. N (Doc ID 00224368). ███████████████████████████

███████████████████████████████████████████████████

███████████  AUSA Maria viewed, printed, and sent this document to Belich on

September 7, 2016.  *See* Ex. 5; *in camera* Ex. Q (Bildtsen Feb. 2, 2018 email).

 AUSA Maria also viewed additional privileged communications between Mr.

Adams and Murry LLC.  *See, e.g.*, *in camera* Exs. P (Doc ID 00224497), S (Doc ID

00224725), and T (Doc ID 00224879); Ex. 4 at 10, 12, 13.

 All of these privileged communications address issues central to the tax charges

PUBLIC VERSION

against Mr. Adams, and indeed the government's review and use of them appears to have generated those charges.

### 5.  Privileged Communications with Mr. Hartman

Although the government identified "anthonyostlund" as one of its search terms, this term was inadequate to filter out Mr. Adams's communications with Aaron Hartman of the Anthony Ostlund firm.  Mr. Hartman was Mr. Adams's civil counsel in litigation with Mr. Adams's disgruntled former business partners Kristoffer Mack and Paul Rapello,[11] and also provided counsel relating to other potential Apollo/Scio shareholder litigation.  *See* Ex. 1 (privilege log).  The issues in the civil litigation overlap with the government's allegations in the Indictment.  *See* Ex. 8 (Compl., *Mack and Rapello v. Adams, et. al.*).  Mack and Rapello alleged, *inter alia*, that "Adams has spent the past decade attempting to work numerous deals through Apollo Diamond for his own personal profit," and "Adams and [Michael] Monahan concocted and implemented a scheme to defraud shareholders" by "transferr[ing] Apollo Diamond assets to [Scio]."  *Id.* ¶¶ 2–3.

Members of the prosecution team viewed over twenty communications with Mr. Hartman relating to the civil litigation, including emails discussing litigation strategy.  *See, e.g.*, Ex. U.[12]  Kroells viewed several of these documents in May 2016, but she

---

[11] Mack and Rapello provided information to the government during its criminal investigation.  *See* Exs. 9, 10 (Emails from Mack and Rapello to Kroells).  "Mack" and "Rapello" were also search terms the government used to seize documents.  DX 24.

[12] This *in camera* exhibit includes:  Doc IDs 00447095, 00447097, 00447099, 00048044, 00048045, 00447124, 00447125, 00447126, 00447128, 00447130, 00447156, 00447157, 00447160, 00447169, 00447172, 00447172, 00051832, 00051833, 00051841.

PUBLIC VERSION

apparently never followed her supposedly "cautious" practice of alerting the prosecution

that communications between Mr. Adams and Mr. Hartman appeared in the database.

Ex. 4 at 14–15. 

On May 31, 2016, for example, Kroells viewed Doc ID

00051841, *see* Ex. U, after having searched for "ed" AND "settlement" AND "lawsuit."

Ex. 4 at 14–15.  Shortly thereafter she searched for a word contained in this document

("bribe") to retrieve it for a second view—reflecting that she did, indeed, read the

document.  *Id.*

## II.    ARGUMENT

The attorney-client privilege exists "to encourage full and frank communication

between attorneys and their clients and thereby promote broader public interests in the

observance of law and administration of justice."  *Upjohn Co. v. United States*, 449 U.S.

383, 389 (1981).  "It is perhaps, the most sacred of all legally recognized privileges, and

its preservation is essential to the just and orderly operation of our legal system."  *North*

*Dakota v. United States*, 64 F. Supp. 3d 1314, 1330 (D.N.D. 2014) (internal quotation

marks omitted).  It is a given that any of Mr. Adams's privileged communications in the

government's possession must be suppressed.  *See, e.g.*, *United States v. Alexander*, 736

F. Supp. 968, 997 (D. Minn. 1990); *United States v. Kriens*, 270 F.3d 597, 603 (8th Cir.

18

2001).  But in light of the government's conduct and the breadth of its intrusion into Mr.

Adams's highly relevant privileged communications, the Indictment should be dismissed.

At a minimum, the current prosecution team, which has been tainted by exposure to these

privileged communications, should be disqualified.

## A.    The Indictment Should Be Dismissed.

The Indictment against Mr. Adams should be dismissed because the prosecution

team's actions violated his rights under the Fifth and Sixth Amendments.  Independent of

any constitutional violations, the Court should dismiss the Indictment under its

supervisory authority, as a sanction for the government's knowing intrusion into Mr.

Adams's privileged communications.  While all charges merit dismissal, the tax charges

merit dismissal for the additional reason that the government apparently used Mr.

Adams's privileged communications to generate those charges.

### 1.    The Government's Conduct Violated Mr. Adams's Sixth Amendment Constitutional Rights

The prosecution team's access to and use of Mr. Adams's privileged

communications violated Mr. Adams's Sixth Amendment right to counsel.  "To establish

a sixth amendment violation, a criminal defendant must show two things:  first, that the

government knowingly intruded into the attorney-client relationship; and second, that the

intrusion demonstrably prejudiced the defendant, or created a substantial threat of

prejudice."  *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) (citations omitted).

It is beyond dispute that the prosecution team "knowingly intruded" into Mr. Adams's

relationship with multiple lawyers, including his counsel in this very investigation, Mr.

19

Hopeman, as well as Mr. Brever, attorneys at Latham & Watkins, and Mr. Hartman.

With the possible exception of Mr. Brever, prior to obtaining the Yahoo! emails the

government knew that all of these attorneys represented Mr. Adams in this and directly

related matters, but the government repeatedly reviewed Mr. Adams's privileged

communications with them.  Those communications included documents that bore clear

"attorney-client privilege" headers, yet AUSA Maria and Inspector Kroells in particular

simply ignored those flashing red lights and plowed forward in repeatedly reviewing

privileged materials.

   This government intrusion obviously prejudiced Mr. Adams.  First, the Eighth

Circuit recognizes that "gross misconduct on the part of the government" can give rise to

a presumption of prejudice.  *See United States v. Davis*, 646 F.2d 1298, 1303 n.8 (8th Cir.

1981).  Gross misconduct is akin to a lack of good faith in accessing attorney-client

privileged materials.  *Singer*, 785 F.2d at 234 n.6.  There can be no serious argument that

the prosecution team believed in good faith that it was permitted to look at the documents

described above—including a draft memorandum bearing "Attorney-Client Privilege"

and "Attorney Work Product" legends, a spreadsheet sent to tax counsel bearing the

legend "Attorney-Client Privileged Communication for Tom Brever and Pat Murry," and

communications between Mr. Adams and Murry LLC over which Mr. Brever claimed

privilege—without involving the Court or even employing a taint team.  *See State v.*

*Robinson*, 2018 WL 2085066, at *14–17 (Del. Super. Ct. May 1, 2018) (dismissing

indictment in murder case for Sixth Amendment violation after prosecution intentionally

reviewed attorney-client privileged documents without involving the court or using a

20

taint team); *see also Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995) (holding

that "[b]ecause . . . a prosecutor's intentional intrusion into the attorney-client

relationship constitutes a direct interference with the Sixth Amendment rights of [the]

defendant . . . absent a countervailing state interest, such an intrusion must constitute a

*per se* violation of the Sixth Amendment").

Second, even if no presumption applies, there was actual prejudice.  A defendant

proves prejudice by "demonstrat[ing] that the information . . . acquired by the

[government] officials was used by the [government] in some way."  *Clark v. Wood*, 823

F.2d 1241, 1249 (8th Cir. 1987).  Indeed, the prejudice here is apparent and severe.  The

government made extensive use of privileged communications in building its case against

Mr. Adams.  On the first two days of his searches, AUSA Maria came across and

***repeatedly viewed*** a veritable trove of privileged information, sent by Mr. Adams to his

counsel (including Mr. Hopeman), that relates to issues at the heart of the case.  The

government unlawfully entered the inner sanctum of Mr. Adams's defense—learning

how he would explain and address certain critical allegations that later appeared in the

Indictment, ████████████████████████████████████████████████

████████████████████████████████████████████████ how he

would confront witnesses against him, and, critically, how he himself would testify at

trial if he chose to do so.

The documents reviewed by the prosecution team provide Mr. Adams's

confidential thoughts to his counsel about all aspects of the Indictment:

21

| Indictment | Privileged Information Reviewed |
|---|---|



PUBLIC VERSION



After reviewing these privileged documents, the government was able to investigate its case—gather evidence, interview witnesses, frame an indictment—to try to specifically meet what it knew Mr. Adams's defense to be.  That is why AUSA Maria and Inspector Kroells accessed these documents so many times—because the documents contained information that assisted them in developing charges and anticipating Mr. Adams's defenses to such charges.  It is undisputed that AUSA Maria printed and transmitted some of these documents to IRS Agent Belich for use in developing tax

PUBLIC VERSION

charges.  This use of Mr. Adams's privileged communications was prejudicial and

requires dismissal.

Third, the specific communications the prosecution team accessed create actual

and material prejudice going forward.  These privileged communications relate to Mr.

Adams's trial defenses, his own testimony, how he would confront important trial

witnesses, and other analysis that could be used to refute the government's theories of

fraud.  The communications to Latham, for example—the draft memorandum, the draft

email, and the analysis—all ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████  Similarly, the information contained

on the spreadsheets that Mr. Adams sent to Mr. Brever and Murry LLC ███████

████████████████████████████████████████████████

██████████████████████████████████████

These revelations of defense strategy are irremediable and require dismissal.

*Contra United States v. Crow Dog*, 532 F.2d 1182, 1197–98 (8th Cir. 1976) (declining to

dismiss indictment where "[t]here [wa]s no evidence" that government informant in

defense camp "was present during the discussion of any defense strategy relevant to

appellant Crow Dog's trial nor is there any indication that he passed on any such

information to the FBI"); *see also United States v. Levy*, 577 F.2d 200, 207–08 (3d Cir.

1978) (citing *Crow Dog*, 532 F.2d at 1197–98) (ordering indictment dismissed after

revelation of defense trial strategy to government because it was uncertain how that

knowledge "might benefit the government in its further investigation of the case, in the

subtle process of pretrial discussion with potential witnesses" and "in the dynamics of trial itself").

### 2. The Government's Conduct Violated Mr. Adams's Fifth Amendment Constitutional Rights

Separate from the Sixth Amendment violation, the government conduct outlined above was so outrageous that Fifth Amendment due process requires dismissal of the Indictment because Mr. Adams will be deprived of a fair trial. *See United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir. 1990) (en banc) ("We recognize due process bars the government from invoking judicial process to obtain a conviction when the investigatory conduct of law enforcement agents is outrageous."), *rev'd on other grounds by Jacobson v. United States*, 503 U.S. 540 (1992). To merit dismissal, "the government's behavior must shock the conscience of the court." *Id.* Applying this standard, courts have dismissed charges for intentional intrusions on attorney-client privilege. *See United States v. Sabri*, 973 F. Supp. 134, 139, 146–47 (W.D.N.Y. 1996) (dismissing part of indictment where government intruded on "attorney-client relationship to investigate and obtain evidence against [the client] for use in a criminal prosecution"); *see also United States v. Voigt*, 89 F.3d 1050, 1066 (3d Cir. 1996) (explaining "claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client privilege will be cognizable where the defendant can point to actual and substantial prejudice"). Likewise, here, the prosecution team's intentional, repeated viewing of multiple unambiguously privileged documents going to the heart of a criminal investigation is shocking behavior. So too is intentionally searching for and

25

using documents over which the government knew privilege had been asserted (the Murry LLC communications) to develop new charges. The government should not be allowed to cavalierly disregard Mr. Adams's privileges without any consequences for its actions. The conduct here is so pervasive and central to Mr. Adams's exercise of his fundamental trial rights that a fair trial is essentially foreclosed. Dismissal on Fifth Amendment grounds is therefore warranted.

### 3. The Court Should Exercise Its Supervisory Power to Dismiss the Charges

Even if there were no constitutional violations, the Court should dismiss the Indictment under its supervisory powers. Courts are empowered to and do dismiss indictments based upon evidence derived from a breach of attorney-client privilege, especially when the government bears responsibility for the breach. *See, e.g.*, *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1421 (D. Md. 1986); *see also Gray v. Bell*, 712 F.2d 490, 504 (D.C. Cir. 1983). The government may not use privileged communications in building its cases, as "[i]t would be improper to prosecute a defendant on the basis of facts wholly or partially acquired by the prosecutor from the accused's private attorney." *Kriens*, 270 F.3d at 603. Indeed, it is "obvious that no governmental entity should intentionally review privileged material without the express approval of the court." *United States v. Pedersen*, No. 3:12-cr-00431-HA, 2014 WL 3871197, at *29 (D. Or. Aug. 6, 2014). The prosecution team's actions ran afoul of these simple commands, which justifies dismissal of the Indictment.

26

### 4.      At a Minimum, the Tax Charges Require Dismissal

It bears emphasizing that the prejudice against Mr. Adams is particularly severe

when it comes to the tax charges, as the chronology reveals that the government used Mr.

Adams's privileged tax communications to develop the tax charges against him.  The

case did not become a "tax matter" until *after* AUSA Maria and Kroells began searching

in the Yahoo! database and reviewed Mr. Adams's privileged communications with Mr.

Brever and Murry LLC—tax charges were not contemplated in the Yahoo! warrant.  *See*

DX 10; DX 11; Jan. 8 Hr'g Tr. at 280:1–4, 302:14 – 303:12.  But it became a tax matter

in the "fall of 2016"—which is precisely when AUSA Maria sent IRS Agent Belich three

privileged communications between Mr. Adams and Murry LLC.  And thereafter, Belich

was involved in preparing tax charges against Mr. Adams.  *See* Jan. 8 Hr'g Tr. at 280:1–

4, 302:14 – 303:12.  This use of Mr. Adams's confidential communications with his tax

counsel and *Kovel* accountant to develop tax charges against him is irreconcilable with

Mr. Adams's constitutional rights, and requires dismissal of these charges.

### B.      Alternatively, The Current Prosecution Team Should Be Disqualified

In the alternative, the Court should disqualify the current prosecution team.  "The

district court is charged with the responsibility of supervising the members of its bar."

*United States v. Agosto*, 675 F.2d 965, 969 (8th Cir. 1982), *abrogated on other grounds*

*by Flanagan v. United States*, 465 U.S. 259, 263 n.2 (1984).  This responsibility includes

attorney disqualification, *Jenkins ex rel. Agyei v. Missouri*, 931 F.2d 470, 484 (8th Cir.

PUBLIC VERSION

1991), and extends to criminal cases, *see Agosto*, 675 F.2d at 968–70, 973.[13]

"Disqualification is appropriate where an attorney's conduct threatens to work a

continuing taint on the litigation and trial." *Arnold v. Cargill Inc.*, No. 01-2086, 2004

WL 2203410, at *5 (D. Minn. Sept. 24, 2004) (Frank, J.). "[A] party has an interest in a

trial free from even the *risk* that confidential information has been unfairly used against

it." *Id.* (internal quotation marks omitted).

In a recent case, this Court identified and applied four factors it uses in deciding a

motion to disqualify:  (1) the "degree of exposure . . . to privileged information," (2) any

"steps . . . taken to prevent disclosure of confidential information or to mitigate the

impact of such disclosure," (3) "whether any privileged or confidential information has

actually been disclosed," and (4) any "improper intent."  *Shields v. Gen. Mills Inc.*, No.

16-cv-00954, 2017 WL 6520685, at *2–3 (D. Minn. Dec. 1, 2017), report and

recommendation adopted by 2017 WL 6542035 (D. Minn. Dec. 20, 2017).  The Court

derived these factors from cases where an attorney was tainted via a third party; here, the

conduct is more egregious, because the prosecution team was tainted via its direct access

to over 100,000 of Mr. Adams's emails.  It is clear from the Relativity records and other

disclosures that AUSA Maria, Inspector Kroells, and Agent Belich were directly exposed

to Mr. Adams's privileged communications, and it is likely that other members of the

current prosecution team have also been tainted—either directly by printed materials or

---

[13] *See also United States v. Horn*, 811 F. Supp. 739, 750 (D.N.H. 1992) (disqualifying
prosecutor who reviewed defense work product because "the integrity of the process has
been tampered with"), *reversed in other part* 29 F.3d 754, 758–59 (1st Cir. 1994).

PUBLIC VERSION

indirectly by the exposure of the lead prosecutor and lead investigator to these privileged materials.[14]  Weighing the applicable factors—and keeping in mind that "any doubt must be resolved in favor of disqualification"—the Court should disqualify the current prosecution team.  *Arnold*, 2004 WL 2203410 at *5 (internal quotation marks omitted).

In addition to the factors identified in *Shields*, the Eighth Circuit directs courts ruling on disqualification to consider the rules for attorney conduct,[15] "the court's duty to maintain public confidence in the legal profession and its duty to insure the integrity of the judicial proceeding."  *Agosto*, 675 F.2d at 969.  These considerations also support disqualification.

### 1. The Privileged Material in Mr. Adams's Emails Supports Disqualification

First, the presence and type of privileged information in Mr. Adams's emails supports disqualification.  In *Shields* and the cases it cited, the potential source of privileged information was an employee of the then-defendant company.  *See* 2017 WL

---

[14] To the extent the government contends that other members of the prosecution team have not been tainted by the government's access to Mr. Adams's privileged communications, Mr. Adams requests a *Kastigar*-like hearing to determine whether any remaining members of the current prosecution were tainted as well.  *See Kastigar v. United States*, 406 U.S. 441 (1972); *In re Grand Jury Subpoenas*, 454 F.3d 511, 517 (6th Cir. 2006) ("[T]he leaking of privileged materials to investigators would raise the spectre of *Kastigar*-like evidentiary hearings . . . .").

[15] At the time of *Agosto*, this Court had adopted the ABA Code of Professional Responsibility, which the Eighth Circuit applied on appeal.  *See* 675 F.2d at 969 n.2.  This Court has since adopted the Minnesota Rules of Professional Conduct.  *See* LR 83.6(a).  Under the Minnesota Rules of Professional Conduct, nonlawyers whose conduct is ordered or ratified by a lawyer are subject to the same ethical restrictions as lawyers.  *See State v. Miller*, 600 N.W.2d 457, 464 (Minn. 1999) (applying Rules of Professional Conduct to actions of detective working with county attorney's office).

29

6520685, at *3–4 (citing cases).  In order to determine whether the attorneys working

with these employees should be disqualified, the courts in these cases had to determine

whether the employees had been exposed to privileged information, and if so, what kind.

*See id.*; *Gifford v. Target Corp.*, 723 F. Supp. 2d 1110, 1119 (D. Minn. 2010).

Here, Mr. Adams's emails contained privileged information on issues at the heart

of this case.  When Inspector Kroells accessed and searched the complete set of Yahoo!

emails in March 2016, that database still contained the 34,655 documents that were,

thereafter, excluded in the two rounds of privilege filtering—including nearly 4,000

documents containing the Latham search terms.  *See* GX Zeitz 3; Maier Decl. ¶ 10.  The

Latham-related documents contain discussions with and information from Mr. Adams

relating to the Apollo/Scio transactions and other events that are core features of the

Indictment.  It is no answer for the government to speculate that Inspector Kroells did not

review Latham (or other privileged) materials during this initial time period; we do not

know what she reviewed only because she decided not make a record of it.  Even after the

privilege filtering was complete, it was woefully inadequate, and the database contained

many privileged documents reflecting Mr. Adams's confidential communications with

his lawyers—documents that were then repeatedly viewed and used by the prosecution

team.  *See* Exs. 1, 2 (privilege logs); Ex. 4 (Relativity log excerpt).

Many of these documents go to the heart of the charges against Mr. Adams and his

defenses against those charges.  *See* chart *supra* p. 22.  Thus, unlike a case in which a

witness had marginal access to privileged information, *see Shields*, 2017 WL 6520685, at

*4, the email accounts here contained extensive amounts of privileged "information and

30

documents relevant to the underlying litigation," *see id.*

### 2. The Government's Steps to Prevent and Mitigate Exposure to Privileged Documents Were Insufficient

Although the prosecution team (belatedly) ran search terms to filter out some privileged materials, these steps were plainly insufficient. Courts considering disqualification motions look favorably on preventative measures that are *effective* to protect against disclosure (or mitigate the effects of accidental exposure). *See id.* (praising "numerous steps [taken] to prevent any disclosure of privileged information" and distinguishing cases in which "measures . . . were not only less than those taken here, but in some instances demonstrably inadequate to prevent known disclosure"). That is not what occurred here. *See Mitchell v. Metro Life Ins. Co.*, No. 01 Civ. 2112, 2002 WL 441194, at *10 (S.D.N.Y. Mar. 21, 2002) (disqualifying law firm for failure to take sufficient preemptive action when faced with known risk of conflict).

First, the prosecution team employed measures that were inadequate for reviewing any lawyer's emails, much less those of a lawyer who had retained his own counsel. *Prima facie* evidence of this is that the Department of Justice's own guidelines require U.S. Attorneys' Offices to use, at the least, a separate "taint team" to review documents seized from a lawyer. *See* U.S. Dep't of Justice, *U.S. Attorneys' Manual* 9-13.420 (directing that in searches targeting attorneys, "a 'privilege team' should be designated" in order "to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy"). The same goes for reviewing electronic files believed to contain a client's communications with his own

31

lawyer.  *See* U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 110–11, Ch. 2, Pt. F.2.b (3d ed. 2009)[16] (requiring pre-filtering of potentially-privileged computer files by the court, a special master, or a taint team); *see also, e.g.*, DX 8 at DSM-000082 (addendum to first warrant in this case requiring government to establish a methodology to prevent inadvertent exposure to privileged material and use a taint team "[i]n the event that data . . . seized pursuant to this warrant are identified by the government as possibly containing privileged communications"); *In re Ingram*, 915 F. Supp. 2d 761, 763–64 (E.D. La. 2012) (seeking Court permission to have a taint team review emails seized pursuant to a search warrant to filter out privileged communications with the defendant's lawyer).

Although Mr. Adams believes that even taint teams violate constitutional rights, *see* Order Adopting R&R, *United States v. Heppner et al.*, No. 05-cr-00094, at 4 n.1, ECF 79 (D. Minn. Nov. 23, 2005) (Tunheim, J.) (Suppression Br. Ex. 22); *see also* Suppression Br. n.32, they are certainly better than privilege review by the investigators themselves.  Indeed, if employing a taint team is "not unlike assigning the fox to guard the henhouse," *Heppner*, ECF 79 at 4 n.1 (quoting ECF 71 at 11 n.3 (Noel, M.J.)), then allowing a prosecution team to conduct its own privilege review is akin to placing the fox inside that henhouse and asking it to be careful.  Such taint teams are common.  *See, e.g.*, Gov't Opp. to Mot. for T.R.O., *Michael D. Cohen v. United States*, No. 18-mj-03161, ECF 1, at 7–8 (S.D.N.Y. Apr. 13, 2018) (describing the use of taint teams as "common

---

[16] Available at:  https://www.justice.gov/criminal-ccips/ccips-documents-and-reports.

PUBLIC VERSION

practice"). They are well-known in the District of Minnesota, which even makes provision for them in a court-produced filing guide. *See* U.S. Dist. Court for the Dist. of Minn., *Elec. Case Filing Procedures Guide: Crim. Cases* 8 (Apr. 2018). Yet here, even though the prosecution team knew it was wading into a morass of privilege, it decided to forego this common practice, to the detriment of Mr. Adams and his privileged information.

The prosecution team's unsupervised efforts at filtering, not surprisingly, fell woefully short. AUSA Maria's initial proposed search terms, which included sensible words like "privilege," revealed that the vast majority of the emails hit on the terms—a clear signal that the emails were rife with privileged documents. But instead of immediately notifying Mr. Adams's counsel, or at least convening a taint team, AUSA Maria decided simply to jettison his initial search terms and come up with a much narrower list. When he did so, he and the prosecution team knew that Mr. Adams was a practicing attorney with clients and that he was represented by counsel in the criminal investigation of him, as well as a series of lawsuits relating to the same events that gave rise to the investigation. Jan. 8 Hr'g Tr. at 88:2–19 (Kroells testifying she knew of Mr. Adams's clients and about SEC case and civil suits); DX 48 (March 9, 2016 email arranging meeting between Mr. Hopeman and prosecution team). AUSA Maria also knew that Mr. Adams had used his Yahoo! email account to communicate with lawyers about the government's investigation. *See* DX 15 (email from AUSA Maria referring to filtering out "firms that have assisted in defending Adams and Monahan in connection with the SEC action (*and our investigation*)" (emphasis added)). Nonetheless, the

33

prosecution team relied on two facially inadequate measures to protect privilege:  (1) "mechanical filtering" of the lawyer names and email addresses that members of the prosecution team were aware of (based, in some part, on Kroells's unfettered access to the unfiltered data), and (2) *the prosecution team itself* keeping track of any other lawyers, firms, or privileged documents that showed up during its review so those documents could potentially be filtered out.  DX 4, Zeitz Decl. ¶¶ 15–21 (Zeitz describing filtering process); Ex. 1, Kroells Decl. ¶ 19 (Kroells describing her review process); Jan. 8 Hr'g Tr. at 115:8–13 (same). This approach was doomed to, and did, fail.

Second, even if the government's "mechanical filtering" and "be on the lookout" measures could have been effective in some theoretical world, the prosecution team knew they were not effective when it encountered privileged emails in the database *on the first day of its review*.  On May 4, AUSA Maria viewed *both* the draft memorandum to Latham *and* the "ESA Tax Questions" spreadsheet to Mr. Brever and Mr. Murry.  *See in camera* Exs. A, K; Ex. 4 at 1, 5.  *Both* documents bore legends identifying the documents as privileged and confidential—which they are.  Standard privilege search terms such as "privilege," "attorney-client privilege," or "attorney work product" would have caught these documents.  The next day, AUSA Maria reviewed a memorandum written by Mr. Adams to two of his lawyers, Mr. Hopeman and Mr. Brever.  *In camera* Ex. J; Ex. 4 at 4. Despite the clearly-privileged nature of this memorandum, AUSA Maria said nothing to the other members of the team, and as a result, six days later Inspector Kroells viewed it as well.  Ex. 4 at 4.  In fact, the Relativity log reflects that she viewed it four separate times during a ten-minute period, as well as viewing the email transmitting it to Mr.

34

Brever and Mr. Hopeman.  *Id.*  She, too, did nothing for five days.  *See* DX 1, Kroells Decl. ¶ 20; DX 21.  It took AUSA Maria three more weeks to finally filter the names of these lawyers—including Mr. Hopeman, who was Mr. Adams's counsel in the very investigation at hand—out of the review database.  DX 22; DX 4, Zeitz Decl. ¶ 20. Inspector Kroells, for her part, ***never*** alerted other members of the prosecution team to the presence in the database of many communications between Mr. Adams and Mr. Hartman, and such privileged communications were ***never*** filtered out.  These facts demonstrate that the prosecution team was well aware of the inadequacy of its measures, yet it continued using its flawed methods for over a year.

Third, as we now know, the government's measures failed to prevent it from reviewing large amounts of privileged information.  It suffices to say that the government reviewed and used dozens of privileged documents, involving matters at the heart of all aspects of the Indictment, some of them as many as thirteen times.  *See* Exs. 1, 2 (privilege logs); Ex. 4 (Relativity log excerpt).

Fourth, the government did not mitigate the harm caused by its failure to protect privilege.  Neither AUSA Maria nor Inspector Kroells acted with any urgency, or in some cases even acted at all, in letting their colleagues know about potentially privileged material they had discovered, or in having that material removed from the database. Instead, they kept reviewing (and re-reviewing) privileged documents.  Despite encountering more than thirty privileged communications with Mr. Hartman, for example, the prosecution team *never* filtered out emails to him.  The government retained many privileged documents in its database for more than a year.  Not until September

35

2017, when counsel for Mr. Adams informed the government about his anticipated motion to suppress, did the government finally institute a taint team.[17]  By that time, it was far too late; the damage had been done.  The government's failure to mitigate the harm caused by its ineffective preventative measures demands disqualification.

*Gifford*, a case in which a law firm was disqualified from suing a company after it received privileged information from the company's employee, is illuminating.  *See* 723 F. Supp. 2d at 1115–16, 1119–20.  After the employee contacted the firm, the firm took steps to protect the defendant's privilege, including segregating potentially-privileged documents lawyers saw during a "perfunctory" review of documents provided by the employee.  *Id.*  Despite their precautions, firm attorneys were exposed to privileged information during conversations with the employee and during the document review.  *Id.* at 1119.  The firm waited "more than a month" to return the privileged documents to the defendant after discovering them.  *Id.*  This Court (Judge Montgomery) disqualified the law firm because the circumstances of the case—a high-level employee with significant exposure to privileged information—"should have waved an immediate cautionary flag" for the firm but it nonetheless reviewed privileged information.  *See id.* at 1119–20. "Instead of ceasing its review, immediately informing [the defendant] it was in possession of the privileged documents, and returning the [privileged] documents, the [law] firm held some of the documents for more than a month . . . ."  *Id.* at 1119  The

---

[17] The current taint team's only function has been to gather and transmit documents to counsel for Mr. Adams in connection with the suppression litigation.

PUBLIC VERSION

court acknowledged the firm's preventative measures but explained that the employee's "privileged document production should have alerted the [firm's] attorneys that" those measures had failed. *Id.* at 1120.

Here, like in *Gifford*, the prosecution team was on notice that it was likely to encounter privileged information. The team took some modest measures to filter out that information, but like the firm in *Gifford*, they were inadequate. The prosecution team knew this, yet it did not change course. And even after it encountered privileged documents, the prosecution team did not attempt to mitigate the harm by contacting Mr. Adams or the Court (or even establishing a taint team). Instead, it retained the documents. Thus, as in *Gifford*, the prosecution team's preventative measures cannot overcome the "pivotal question" of whether it actually accessed privileged material—it did. *See id.* at 1117 (internal quotation marks omitted).

### 3.    Privileged and Confidential Information Was Actually Disclosed

Most importantly, Mr. Adams's privileged information was disclosed to—and was actually used by—the government. The prosecution team ultimately viewed more than 100 documents over which Mr. Adams is asserting the attorney-client privilege. *See* Exs. 1, 2 (privilege logs); Ex. 4. Dozens of these emails go directly to the heart of this case, touching on Mr. Adams's possible defenses, trial strategies, and how he would confront important witnesses. *See* chart *supra* p. 22. Among other things, the government viewed three different privileged draft communications with Latham relating to the 2011–12 Apollo/Scio transactions, a privileged memo to Mr. Brever and Mr. Hopeman about Scio, a privileged spreadsheet about "tax questions" for Mr. Brever and Murry LLC, seven

more privileged communications with Murry LLC, and more than twenty communications with Mr. Hartman about litigation with disgruntled former business partners who communicated with Inspector Kroells during the investigation.

Far from a quick peek at the documents, which the government suggested at the suppression hearing is what had occurred, the Relativity logs (whose production the government resisted) indicate that the government's review was extensive. *See* discussion *supra* pp. 6–18 (surveying repeated views of privileged communications to Latham, Mr. Hopeman, Mr. Brever, Murry LLC, and Mr. Hartman). Inspector Kroells ran searches using keywords from certain privileged communications between Mr. Adams and Mr. Hartman—demonstrating that she read the documents. And the government appears to have relied on privileged documents in securing permission to lodge tax charges against Mr. Adams.

Courts disqualify counsel based merely on a high *likelihood* that privileged information was disclosed. *See, e.g.*, *Arnold*, 2004 WL 2203410 at *13 (disqualifying counsel where court was "not convince[d]" that defendant's "confidential and privileged information was not disclosed"). Here, disclosure is a certainty, and it requires disqualification. *Accord Gifford*, 723 F. Supp. 2d at 1119 (disqualifying firm where "[client] disclosed at least two attorney-client communications that the [law] firm reviewed and evaluated"); *see also Richards v. Jain*, 168 F. Supp. 2d 1195, 1209 (W.D. Wash. 2001) (disqualifying law firm that reviewed privileged emails among the 100,000 emails turned over to it because "[t]he disclosure of privileged information cannot be undone").

38

### 4.      The Prosecution Team Demonstrated Improper Intent

Finally, the prosecution team acted in bad faith, or at least with reckless disregard for the danger of accessing privileged materials.  In evaluating an attorney's intent with regard to privileged materials, courts look not only to the actions leading up to a breach of privilege but also what counsel did once the breach occurred.  *See, e.g.*, *Gifford*, 723 F. Supp. 2d at 1119 (explaining that "[i]nstead of ceasing its review, immediately informing [defendant] it was in possession of the privileged documents, and returning the documents, the [law] firm held some of the documents for more than a month"); *Arnold*, 2004 WL 2203410, at *10 (explaining that "upon discovering that there were documents marked privileged or confidential," the "prudent response" by a law firm "would have been to return the documents" but instead the firm conducted its own privilege review).

Here, the government's bad faith is demonstrated in a number of ways.  First, AUSA Maria ignored explicit warnings he received from Mr. Hopeman and Mr. Brever about the privileged nature of many of the emails the government had obtained.  He offered only a curt (non-)response to Mr. Hopeman's letter, and his response to Mr. Brever's letter is perhaps most telling:  upon being informed that Mr. Brever had retained Murry LLC under *Kovel*, AUSA Maria actually searched for (and later viewed) documents referencing "murry" and "murryllc," so that he could view more privileged information.  Even if one assumes that AUSA Maria thought the government could someday argue that the Murry LLC communications did not fall under *Kovel* protection—a position the Court has now rejected—the good faith response would have been to raise the issue with Mr. Adams, the Court, or a taint team, not to immediately

39

search for *more* Murry LLC documents.

Second, the prosecution team's bad faith is demonstrated by what it did and failed to do after repeatedly encountering privileged documents in its review database.  Like the attorneys in *Gifford* and *Arnold*, the prosecution team continued its review.  At the very least, by reviewing emails itself after receiving these warnings and encountering privileged materials, the prosecution team "recklessly disregarded the risks associated with playing fast and loose with the rules protecting against the disclosure of privileged and confidential material."  *Arnold*, 2004 WL 2203410, at *10.

Third, in the months leading up to Mr. Adams's motion to suppress, AUSA Maria misstated to defense counsel the government's access to privileged documents, presumably assuming the actual facts would never see the light of day.  On three occasions, he stated that the government had only accessed the 42,000 purportedly "seized" documents—thus suggesting that the government had never accessed the remaining roughly 100,000 documents.  In reality, Inspector Kroells had access to the entire database when she searched the thumb drive in March 2016, and the prosecution team had access for nearly a year to over 100,000 of the Yahoo! documents, access that it repeatedly used.[18]

The prosecution team, in short, did not make a few innocent mistakes regarding Mr. Adams's privileged communications and then work to correct any errors.  *Contra*

---

[18] The government also resisted producing the "unredacted Relativity log" showing the specific privileged documents that were viewed, when, by whom, and the frequency of views.  *See* ECF No. 127.

PUBLIC VERSION

*Shields*, 2017 WL 6520685, at *6 (rejecting improper intent where law firm "established an ethical wall" at the first sign of trouble).  At best, it recklessly disregarded the great risk of viewing privileged communications and tainting its investigation as it trundled through a decade's worth of Mr. Adams's emails.  At worst, it intentionally sought out communications it knew were privileged, or at least as to which Mr. Adams and his attorneys had asserted privilege.  The prosecution team's actions here bespeak improper intent and mandate disqualification.

### 5.  Additional Considerations Support Disqualification

The Eighth Circuit directs courts ruling on disqualification to consider "the [rules for attorney conduct], the court's duty to maintain public confidence in the legal profession and its duty to insure the integrity of the judicial proceeding."  *Agosto*, 675 F.2d at 969.  All three considerations support disqualification.  First, the Minnesota Rules of Professional Conduct are clear that "[i]n representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [a third party]."  *Gifford*, 723 F. Supp. 2d 1110 (quoting Minn. R. Prof. Conduct 4.4).  This rule prohibits "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."  Minn. R. Prof. Conduct 4.4 cmt.1.  The government's actions here flouted this rule.

Second, maintaining confidence in the legal system requires disqualification.  "By conducting the privilege review and retaining [Mr. Adams's] privileged documents, the [government] 'risked creating the appearance of impropriety' and now 'asks this Court, [Mr. Adams], and the public to ignore the appearance of impropriety and simply trust that

41

upon conducting its own privilege review . . . [it] did not substantively review the documents.'" *Gifford*, 723 F. Supp. 2d at 1119 (quoting *Arnold*, 2004 WL 2203410, at *10). Absent dismissal of the Indictment, the only way to avoid the appearance of impropriety—and more importantly the fruits of actual impropriety—is to disqualify the prosecution team.

Third, the Court's duty to maintain the integrity of the judicial proceeding requires disqualification. "[T]he purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself," and "[i]n order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government." *Levy*, 577 F.2d at 200, 209; *accord Duffy v. United States (In re Grand Jury Proceedings)*, 473 F.2d 840, 843 (8th Cir. 1973). If the Indictment is not dismissed, then to ensure the integrity of any trial in this case, the prosecution team must be disqualified.

## III.   CONCLUSION

Mr. Adams respectfully requests that the Court dismiss the Indictment. In the alternative, Mr. Adams requests that the Court disqualify the prosecution team.

PUBLIC VERSION

Dated:  June 1, 2018                    Respectfully submitted,


                                          /s/ *Lance Wade*

                                        Joseph G. Petrosinelli (DC Bar #434280)
                                        Lance Wade (DC Bar #484845)
                                        Gloria Maier (DC Bar #1012208)
                                        WILLIAMS & CONNOLLY LLP
                                        725 Twelfth Street, N.W.
                                        Washington, DC  20005
                                        Telephone:  (202) 434-5000
                                        jpetrosinelli@wc.com
                                        lwade@wc.com
                                        gmaier@wc.com

                                        James L. Volling (#113128)
                                        Deborah A. Ellingboe (#26216X)
                                        FAEGRE BAKER DANIELS LLP
                                        2200 Wells Fargo Center
                                        90 South Seventh Street
                                        Minneapolis, MN  55420
                                        Telephone:  (612) 766-7000
                                        Facsimile:  (612) 766-1600
                                        james.volling@faegrebd.com
                                        debbie.ellingboe@faegrebd.com


                                        *Attorneys for Defendant Edward S. Adams*

PUBLIC VERSION