## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17-cr-64-DWF-KMM |
| | ) | |
| EDWARD S. ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### DEFENDANT'S POST-HEARING BRIEF
### IN SUPPORT OF MOTION TO SUPPRESS

WILLIAMS & CONNOLLY LLP
Joseph G. Petrosinelli (DC Bar #434280)
Lance Wade (DC Bar #484845)
Gloria Maier (DC Bar # 1012208)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
jpetrosinelli@wc.com
lwade@wc.com
gmaier@wc.com

FAEGRE BAKER DANIELS LLP
James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com

*Attorneys for Defendant Edward S. Adams*

## TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................................... 4
  A.   The Indictment Allegations ............................................................................. 4
  B.   The Yahoo! Search Warrant and Application ................................................. 6
  C.   The Government's Purported "Search" and "Seizure" ................................... 8
      1.   March 2016:  Kroells's Preliminary Searches and Use .................... 8
      2.   May 2016 to August 2017:  The Government's Searches and
           Use ................................................................................................. 11
      3.   April 2017:  Post-Indictment Relevance Cull and "Seizure" .......... 18
      4.   The April 4, 2017 "Seized" Documents .......................................... 20
      5.   April 2017 to August 2017: Post-"Seizure" Misstatements ............ 22
  D.   The Government's Disregard of Privilege Issues ......................................... 22
      1.   Mr. Adams's Attorney-Client Relationships ................................... 22
      2.   Initial Privilege Filtering ................................................................ 24
      3.   Second-Round Privilege Filtering ................................................... 25
      4.   Mr. Adams's Notification of Privilege Issues ................................. 27
      5.   Mr. Brever's Notification of Privilege Issues Regarding
           Murry ............................................................................................. 29
II.  ARGUMENT ........................................................................................................ 29
  A.   The Yahoo! Warrant Violated the Fourth Amendment ............................... 30
      1.   The Yahoo! Warrant Lacked Particularity ...................................... 30
      2.   The Yahoo! Warrant Was Overbroad .............................................. 32
  B.   The Government's "Execution" of the Warrant Violated the Fourth
       Amendment and Recklessly Disregarded Rule 41. ...................................... 33
      1.   The Government Searched For Emails Outside the Warrant .......... 35
      2.   The Government Made Unauthorized Use of Documents ............... 38
      3.   The Government Reviewed Emails More Than Was
           Necessary to Execute the Warrant. ................................................. 41
      4.   The Government's Ostensible "Seizure" Was Based on
           Search Terms and "Relevance" Rather Than the Terms of the
           Warrant. .......................................................................................... 43
      5.   The Government Disregarded Privilege ........................................... 45
  C.   The Government Over-seized Emails and Displayed a Flagrant
       Disregard for the Scope of the Warrant. ...................................................... 53
III. SUPPRESSION REMEDIES ................................................................................ 54
  A.   Complete Suppression Is the Appropriate Remedy. .................................... 56
  B.   In the Alternative, the Court Should Suppress Emails That Were
       Never Reviewed or Fall Outside the Warrant. ............................................. 57
IV.  CONCLUSION ..................................................................................................... 60

Defendant Edward Adams renews his motion for total suppression of his seized emails, *see* ECF 36, based on the government's violation of the Fourth Amendment in drafting and executing the Yahoo! warrant, its reckless disregard for Rule 41's requirements, and its gross over-seizure of emails beyond the warrant's scope.

Federal Rule of Criminal Procedure 41(e)(2)(B), which authorized the warrant at issue, grants the government vast power, at the outer limit of the Fourth Amendment, to seize and then search electronic information in a two-step process. In the second step, the government must review that data "consistent with the warrant," to determine which materials are within the scope of the warrant, and which are not. The power granted by Rule 41(e)(2)(B) is unique in many respects, and is largely unchecked. Unlike physical searches, the search does not take place in public, under observation.

The way the government handled Mr. Adams's Yahoo! email here violated the Fourth Amendment and Rule 41 in nearly every respect. The Yahoo! warrant was, effectively, a general warrant. The government never faithfully executed the second step. Rather, the government's activity in the email database was an unfettered fishing expedition for evidence of wrongdoing by Mr. Adams—whether or not that wrongdoing was within the scope of the warrant. Among other things:

- There was no pre-search plan or briefing to guide the search through Mr. Adams's emails. Team members could search however they deemed best for their purposes, and there were practically no restrictions put on what they could or could not search for.

- The investigation "evolved" to cover crimes and theories—including alleged embezzlement and tax fraud—totally unrelated to the alleged crime Inspector Kroells

1

described in order to obtain the warrant.  The government searched the Yahoo!
documents for evidence relating to the new theories, and never obtained a new warrant.

- The prosecution team freely used documents from the Yahoo! database during the
course of the year, and it never bothered to devise any system to identify and track
whether documents were within the scope of the warrant or not.  As a result, the team
returned to documents that were outside the scope of the warrant again and again.

- Although the government had access to Mr. Adams's Yahoo emails for the limited
purpose, under Rule 41(e)(2)(B), of determining what was within the scope of the
warrant in order to execute the warrant, members of the prosecution team universally
admitted that they searched for and used Yahoo! emails in connection with witness
interviews.  Members of the prosecution team showed witnesses *at least* 24 Yahoo!
documents, prior to any "seizure"—and many of these documents discuss topics outside
the warrant's scope.  Members of the prosecution team also used pre-"seizure" Yahoo!
documents to develop tax charges against Mr. Adams.

- After having used the Yahoo! emails for more than a year and having never
attempted to segregate documents covered by the warrant from those that were not, the
prosecution team applied a list of broad, basic search terms that were in no way limited to
the terms of the warrant—including Mr. Adams's initials and his wife's maiden name
(Linares).  The government then purported to "seize" the more than 40,000 emails that
contained those terms.  It did so in a rushed and slapdash manner, with no regard for
whether the team had used the documents over the course of the year—and thus
purportedly did not "seize" documents it had been using during the investigation,

2

including several used to develop new tax charges against Mr. Adams. This supposed "seizure" activity took place just before Rule 16 materials were due to be produced to the defense, when, were it not for this last-minute culling, the government's failure to take the second step under Rule 41 would have become apparent to the defense.

- Of the over 40,000 documents purportedly seized, the prosecution team never viewed over 87% of them. Prosecution team members spent no more than three minutes assessing the results of the "seizure" search terms prior to producing the materials to the defense. And based on Mr. Adams's document-by-document review of the subset of documents known to have been viewed by the government, nearly half fall outside the scope of the warrant or its probable cause.

- The prosecution team also trampled on the attorney-client privilege. It knew Mr. Adams was a practicing attorney with clients and that Mr. Adams communicated with his own counsel about the investigation from his Yahoo! email account. But Inspector Kroells initially rummaged through the Yahoo! data with no precautions whatsoever to prevent taint, and no records to show what documents she viewed; thereafter, the prosecution team's only step to protect privilege was to use search terms to filter out *some* of Mr. Adams's communications with *some* of his lawyers. The inadequacy of these procedures was plain on day one, when the team began to encounter obviously privileged communications in its review database. Even so, the government never used a taint team, contacted the Court, or did anything else to successfully minimize taint. Instead, it pressed ahead.

These actions—and more—require blanket suppression of the Yahoo! emails. The

importance of the Court's ruling on this motion cannot be overstated:  it will set the benchmark by which future searches pursuant to Rule 41(e)(2)(B) are measured.  There is no case from any court in the country endorsing the way the government conducted itself here, using the fruits of the *first* step of a Rule 41 warrant—a decade of Mr. Adams's emails—like a litigation database.  A line must be drawn to require the government to take the *second* step in a meaningful way.  If that second step is skipped, then the warrant is simply a general warrant, and outcry against general warrants is the very reason the Fourth Amendment exists.

## I.    BACKGROUND

Mr. Adams incorporates by reference the facts set out in his suppression brief, ECF 37 at 4-16, and his Motion to Dismiss the Superseding Indictment, or in the Alternative for Disqualification, for Privilege Violations filed herewith.

### A.    The Indictment Allegations

Mr. Adams was indicted on March 22, 2017.  *See* ECF 1.  A superseding indictment was issued on December 20, 2017.  *See* ECF 70.  The superseding indictment charges Mr. Adams with violations of 18 U.S.C. §§ 1341 and 1343, in connection with an alleged embezzlement scheme relating to 2006 to 2009 investments in Apollo and an alleged "lulling" scheme relating to the 2011 and 2012 Apollo/Scio asset purchase agreements.  It also charges Mr. Adams with violations of 26 U.S.C. § 7206(1) for allegedly willfully failing to disclose certain income on his tax returns.

The embezzlement scheme described in the indictment alleges Mr. Adams opened and controlled five bank accounts and "represented to investors that they could invest and

purchase shares in Apollo Diamond by making checks payable" to the accounts.  Indict. ¶ 17.  The accounts were named "RL Investment Holdings," "DL Investments," and "ADR Investments," as well as two accounts in the Apollo companies' names, and were with Venture Bank and the First National Bank of Waseca.  *See id.* ¶¶ 13–40.  Investors were solicited between 2006 and 2009 "directly and indirectly," including by "J.Z.," an "individual employed in the financial services industry who assisted Apollo in its fundraising efforts" and "rais[ed] millions of dollars of investment money for Apollo." *Id.* ¶¶ 9, 17.  Mr. Adams "directly or indirectly . . . represented that the investments would be used for Apollo Diamond's operations," but "[i]nstead . . . Adams surreptitiously diverted" the funds to the bank accounts "for his own use and enjoyment." *Id.* ¶¶ 17, 20.  The indictment notes that the funds related to the sale of "certain 'warrants'"[1] in Apollo.  *See id.* ¶ 35.

The indictment also alleges a "lulling" scheme relating to the 2011 and 2012 asset purchase agreements through which Scio purchased certain Apollo assets.  *See id.* ¶¶ 41–59.  The gist of this supposed scheme is that Mr. Adams failed to inform Apollo investors of his role in creating Scio, *id.* ¶ 46, that the asset purchase transactions served to insulate Mr. Adams "from potential litigation that would potentially uncover his embezzlement," *id.* ¶ 47, and that Mr. Adams personally profited from the transaction, *id.* ¶ 56.

The tax fraud scheme described in the indictment is one in which Mr. Adams

---

[1] "A warrant is defined as an option to purchase shares of corporate stock at a fixed price."  *Merrimac Assocs., Inc. v. Daig Corp.*, 799 F.2d 1251, 1253 (8th Cir. 1986).

allegedly willfully filed false tax returns.  *Id.* ¶¶ 64–67.  The indictment alleges that in tax

returns filed in 2011 for the 2008, 2009, and 2010 tax years, Mr. Adams's actual taxable

income exceeded the amount he reported because Mr. Adams willfully failed to disclose

"investors' funds" that he had "diverted . . . to personal accounts" that he controlled.  *Id.*

### B.    The Yahoo! Search Warrant and Application

On January 7, 2016, Postal Inspector Kroells applied for the search warrant at

issue.  DX 10.[2]  She sought to seize emails from three addresses: edwardsadams

@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com.  *Id.*  The first

was Mr. Adams's primary account, and the second was one he sometimes used.  *See* E.

Adams SEC Dep. Tr. (DX 50, at 12:24–25; DX 51, at 370:18–24).

In thirty numbered paragraphs, Kroells set forth the alleged probable cause for the

warrant based on "the fraud scheme described in this affidavit."  DX 10 ¶ 34; *id.* ¶¶ 6–35.

The "fraud scheme described" related only to the 2011 and 2012 Apollo/Scio asset

purchase transactions:

> Adams and Monahan maneuvered themselves into a position
> of control with Private Scio, and did not disclose this position
> to ADI and ADGC shareholders prior to the shareholder vote
> . . . .  Adams and Monahan were not only able to benefit
> financially . . . but also managed to maneuver themselves into
> a position of greater control and ownership in the new
> company, Public Scio.

*Id.* ¶ 32; *see also id.* ¶ 4 (stating "there is probable cause to believe that" mail and wire

---

[2] "DX" refers to exhibits Mr. Adams submitted during the evidentiary hearing.  "GX" refers to exhibits submitted by the government during the hearing.  These exhibits have been re-submitted to the Court contemporaneously herewith.

fraud "have been committed by Edward S. Adams . . . including by concealing and

failing to disclose material information to company shareholders prior to seeking the

shareholders' approval of transactions which personally benefitted Adams").

Kroells did not attempt to establish probable cause relating to tax fraud,

embezzlement, Apollo bank accounts, or to the sale of Apollo warrants. *See id.*; *see also*

Jan. 8 Hr'g Tr.4[3] at 207:2–23 (Kroells agreeing core of scheme outlined "involves the

failures by Mr. Adams . . . to disclose to shareholders either various information relating

to the transactions or information regarding their involvement with those two

companies."); *id.* at 209:3–19 ("I don't think I specifically talked about embezzlement or

theft").  She also did not describe any facts from the 2006 to 2009 time period. *See id.* at

211:10–21 (noting that her affidavit "kept those date parameters between 2011 and 2013

as far as the funds going to Mr. Adams . . . and AMLLP").

The government obtained the warrant on January 7, 2016.  DX 11.  Attachment B

to the warrant required Yahoo! to turn over for each account "[t]he contents of all e-mails

associated with the account, including stored or preserved copies of e-mails sent to and

from the account, [and] draft e-mails . . . ." *Id.* at 24.  The government could then seize,

pursuant to the second step of the warrant, "All information . . . that constitutes fruits,

contraband, evidence and instrumentalities of violations of 18 United States Code,

Sections 1341 and 1343, those violations involving Edward S. Adams . . . and occurring

after October 25, 2006." *Id.* at 25–26.  The warrant added that this information

---

[3] The January 8 and 9 transcripts are on the docket at ECF 106 and 87, respectively.

"includ[ed] . . . 1. All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA[4] during and for the calendar, fiscal, and federal tax year 2010 to present;" "2. All documents, records, and communications related to Private Scio, Public Scio;" and "3. All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio." *Id.* Like the warrant application, the warrant itself makes no mention of embezzlement, the sale of Apollo warrants, or fraud on Mr. Adams's personal tax returns.

### C.     The Government's Purported "Search" and "Seizure"

### 1.     March 2016: Kroells's Preliminary Searches and Use

Around March 7, 2016, the government received 146,522 documents from Yahoo! on a flash drive. DX 1, Kroells Decl. ¶ 10; DX 4, Zeitz Decl. ¶ 7. Kroells logged the flash drive into evidence on March 7, 2016. Jan. 8 Hr'g Tr. at 100:19; DX 33. The government knew Mr. Adams was a practicing lawyer and that he was under investigation by the SEC about the same subjects addressed in the warrant. Jan. 8 Hr'g Tr. at 88:2–19; *id.* at 67:19–68:2. Upon receipt of the flash drive, the government considered using a "taint team" to search the emails and ensure that the prosecution team did not gain access to privileged communications, but it decided not to do so. *See* DX 5,

---

[4] The warrant application described ESA Consulting Services, LLC as a Minneapolis-based company of which Mr. Adams was the manager, and which allegedly received Apollo funds. DX 10 ¶¶ 10, 27. "ESA" was not used in the warrant application to refer to Mr. Adams himself.

Maria Decl. ¶ 8; Jan. 9 Hr'g Tr. at 22:22–23:2.

On March 15 and 17, 2016,[5] Kroells searched all 146,522 documents on the flash

drive, using the "Mozilla" application on a computer in the office.  *See* DX 1, Kroells

Decl. ¶¶ 9, 12; Jan. 8 Hr'g Tr. at 100:20–25.  Kroells conducted these searches with

AUSA Maria's permission, before any steps were taken to remove privileged documents.

*See* DX 1, Kroells Decl. ¶¶ 9, 12.  According to Kroells, her searches "focused on using

keywords and key dates that might relate to the interviews we would be conducting," as

the prosecution team "prepar[ed] for interviews of several potential witnesses."  *Id.* ¶ 12;

*see also* Jan. 8 Hr'g Tr. at 102:3–5 ("I was looking for evidence relating to the fraud

scheme and getting ready for any potential interviews that we were going to be

conducting.").

As a result of the March 15 and 17 searching, Kroells states that she "printed 22

emails from the flash drive and included those printouts with other materials I was using

to prepare for our witness interviews."  DX 1, ¶ 12; Maier Decl. ¶ 4.  Eleven of these 22

documents are not among the documents the government purported to "seize" on April 4,

2017.  *See* Maier Decl. ¶ 4; DX 5, Maria Decl. ¶ 14.  Most of these documents are outside

the scope of the warrant.  *See* Maier Supp. Decl. ¶ 9 & Ex. 8.

On March 15, 2016, Kroells sent Brandon Belich, then an IRS Criminal

Investigator, at least two documents.  *See* Ex. 4, Bildtsen Feb. 2, 2018 email.  One of

---

[5] Although Kroells believes that she ran searches on March 15 and 17, Khan took custody
of the flash drive on March 14.  DX 33; Jan. 8 Hr'g Tr. at 184:21–185:21.  Kroells
concedes the possibility that a copy of the thumb drive was stored on the computer.  *Id*.

these documents is an email that apparently attached Mr. Adams's 2006 personal tax returns.[6]  *See* Ex. 6.  This email was, curiously, not included in the 22 documents that Kroells admitted to printing, *see* Maier Decl. ¶ 4–5, suggesting that Kroells printed (or downloaded and saved) an unknown number of additional documents.  This email also was not among the documents that the government purports to have "seized."  *See id.* ¶ 5.

The 146,522 emails contained on the flash drive that Kroells searched included Mr. Adams's communications not only with his counsel in the SEC investigation (Latham & Watkins LLP), tax counsel (Mr. Thomas Brever), *Kovel* accountant (Murry & Associates, LLC ("Murry LLC")), and counsel in related civil suits (including Mr. Aaron Hartman), but also the lawyer representing him in the very investigation at issue, Mr. Jon Hopeman.  *See infra* Part I.D.  Kroells conceded "[i]t's likely" she encountered privileged documents, and that the search terms later selected by the government to filter out privileged documents were informed by what she had seen during her early searches.  Jan. 8 Hr'g Tr. at 103:1–104:13; 110:2–10.  Kroells created no record of what she searched for or viewed.  *Id.* at 176:18–177:23.

During Kroells's unfettered search of Mr. Adams's unfiltered email, she recalls "seeing material that at first glance did not appear relevant to the instant investigation," and she "contacted AUSA Maria to advise him of this."  DX 1, ¶ 13.  After Kroells completed her searching, she learned that the prosecution team determined that it "needed to engage in a heightened filter process," including "a mechanical method to attempt to

---

[6] Presumably Kroells attached the tax returns to this otherwise-blank cover email.

filter out information . . . that was not relevant." *Id.* ¶¶ 14–15.

### 2.   May 2016 to August 2017:  The Government's Searches and Use

The government then created a database using the "Relativity" software program in order to review the Yahoo! email data.[7]  After the privilege filtering described below was conducted, *see infra* Part I.D., AUSA Maria began running searches and viewing documents in the database on May 4, 2016, and Kroells began doing the same on May 5. DX 4, Zeitz Decl. ¶ 9; DX 79; DX 81.  AUSA Maria and Kroells did most of the searching and reviewing in the database, but Belich and FBI Agent Jennifer Khan also conducted searches and viewed documents.  *See* DX 64.

There is no evidence that the prosecution team prepared a search plan or had a search briefing prior to beginning to search in the Relativity database.  *See* Jan. 8 Hr'g Tr. at 229:19–23 (Kroells testifying that she does not recall any search plan or search briefing); Jan. 9 Hr'g Tr. at 67:9–16 (Khan testimony (same)); *see also* Jan. 8 Hr'g Tr. at 286:11–19, 287:6–21 (Belich testifying that he did not recall receiving any instructions as to how to search in the database, or on what search terms to use).

The prosecution team also did not have a system to keep track of documents that members of the team looked at but determined were "not relevant" or were "not covered by the warrant."  Jan. 8 Hr'g Tr. at 182:10–183:3 (Kroells testifying she did not use any tags for irrelevant or outside the scope documents); *see also* Jan. 9 Hr'g Tr. at 66:13–20

---

[7] AUSA Maria had custody of the flash drive containing the complete Yahoo! data from March 17, 2016 to April 4, 2017.  *See* DX 33.

(Khan (same)); Jan. 8 Hr'g Tr. at 183:1–3 (Kroells unaware of anyone doing so). As a result, documents outside the scope of the warrant were repeatedly viewed by members of the prosecution team. Exs. 7–9 (excerpts from Relativity log reflecting documents outside the scope of the warrant that were viewed three or more times by members of the prosecution team).[8]

All three investigative agents testified that they searched in the Relativity database in order to prepare for witness interviews. Jan. 8 Hr'g Tr. at 196:24–197:15 (Kroells testifying that some of her searches were "[b]ased on witness interviews [she was] preparing for"); *id.* at 272:17–273:3, 287:3–5 (Belich's searches for "Rothman" was to prepare for witness interviews); Jan. 9 Hr'g. Tr. at 29:8–30:10, 70:19–21 (Khan testifying that searches for Sandy Ward, Theo Strouss, and Josh Reilly were to prepare for their witness interviews). Based on the timing of the activity in the database, all of Belich and Khan's searches for the purpose of witness interviews were prior to the alleged "seizure" (and the same is true for most, if not all, of Kroells's activity). *See* DX 88.

Kroells agreed that "the focus of the Government's investigation changed after [she] prepared the warrant application." Jan. 8 Hr'g Tr. at 205:15–207:1. Its initial theory was "fraud in connection with the Scio/Apollo transactions," but after submitting the warrant application the government "added" a theory of "alleged embezzlement or misappropriations of funds from Apollo or its investors." *Id.* And the government began

---

[8] *See also* Maier Supp. Decl. & Exs. 1–7 (documents viewed by the government in several categories that were outside the scope of the warrant); *infra* Part I.C.4.

investigating potential tax charges against Mr. Adams. *See id.* "[A]s the Government's focus and theories on different schemes and crimes changed," Kroells agreed that she "continued to access documents within the Relativity database," and "continued to search for documents that related to [the] evolving theory of the case." *Id.* This process was "a continuous learning curve," and Kroells used information learned in witness interviews, and from database searches, to "do some additional searching thereafter." *Id.* at 196:24–197:15. When Kroells found documents that she believed to be "relevant," she brought them to the attention of the other members of the prosecution team. *Id.* at 251:18–252:4.

Some of the searches Kroells ran relating to the alleged embezzlement scheme (involving bank accounts, Jill Zipkin, and the sale of stock warrants) included:

| | | | |
|---|---|---|---|
| 5/5/2016 3:05:26 PM | "sandy" AND "ward" AND "secret" | 5/12/2016 4:54:35 PM | "rl investment" |
| 5/5/2016 3:08:43 PM | "sandy" AND "ward" AND "apollo" AND "bank" AND "account" | 5/31/2016 11:11:27 AM | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" |
| 5/11/2016 3:34:12 PM | "sale" AND "warrants" | | |
| 5/11/2016 3:35:40 PM | "sale" AND "warrants" AND "jill" | 11/2/2016 1:57:45 PM | "ADR" |
| 5/12/2016 3:44:08 PM | "jill" AND "zipkin" AND "ed" | 11/2/2016 | "RL" |
| 5/12/2016 4:54:29 PM | "dl investment" | 5/16/2017 9:07:48 AM | "sell" AND "warrants" AND "apollo" |

DX 81; *see also* Jan. 8 Hr'g Tr. at 201:12–18; 215:19–216:10. These searches started on Kroells's *first* day in the database.

Kroells also ran searches relating to the tax offenses that ultimately were charged. *See* Jan. 8 Hr'g Tr. at 201:12–18. For example, she searched for "Murry," who she

understood to be a CPA working with Messrs. Brever and Adams.  *See id.* at 201:12–18, 217:10–218:5; DX 81 at 10.  Other searches appear entirely unrelated to the alleged embezzlement scheme, Scio lack of disclosure scheme, or tax fraud.  *See, e.g.*, DX 81, at 2, 3, 6 (searching for "crap," "bribe," "lie," and "shenanigans").

Like Kroells, AUSA Maria did not limit his searches to terms related to the alleged Scio lack of disclosure scheme.  His first searches, on the *first* day that he accessed the database, were for terms relating to the alleged embezzlement scheme that was never mentioned in the warrant application or warrant.  *See* DX 79.  Those initial searches on May 4, 2016 included "zipkin," "warrants," "authorized the sale of warrants," "sold warrants," "rl investments," "dl investments," "adr investments," and "adr."  *Id.*  Over the following eleven months, AUSA Maria also ran dozens of additional searches for terms relating to the alleged embezzlement and alleged tax fraud, including:

| | | | | |
|---|---|---|---|---|
| 5/9/2016 3:58:13 PM | >Jill< | | 8/30/2016 2:40:12 PM | "dl investments" |
| 5/9/2016 5:02:22 PM | "RL" AND "warrant" | | 8/30/2016 2:41:10 PM | "adr investments" |
| 5/9/2016 5:03:56 PM | "RL" AND "venture" | | 8/30/2016 3:57:32 PM | "embezzle" |
| 5/9/2016 5:04:24 PM | "RL Investments" | | 8/30/2016 3:58:44 PM | "stole" |
| 5/9/2016 5:05:15 PM | "DL" AND "warrant" | | 9/7/2016 1:01:07 PM | "murryllc" |
| 5/25/2016 11:02:54 AM | "maddox" AND "warrants" | | 9/19/2016 9:58:52 AM | "sale of warrants" |
| 5/25/2016 12:15:38 PM | "zipkin" AND "warrants" | | 9/19/2016 10:03:56 AM | "jill" |
| 6/27/2016 2:47:46 PM | >authorized W/8 warrants< | | 9/23/2016 9:43:57 AM | "adr" |
| 8/30/2016 2:39:19 PM | "rl investments" | | 10/17/2016 11:20:07 AM | "mumm" AND "rl" |

| | | | | |
|---|---|---|---|---|
| 10/17/2016 11:20:41 AM | "mumm" AND "dl" | | 12/6/2016 11:25:33 AM | "murry"[9] |
| 10/17/2016 11:21:20 AM | "mumm" AND "adr" | | 12/6/2016 11:26:55 AM | "murryllc" |
| 10/17/2016 11:21:58 AM | "mumm" AND "warrants" | | 1/10/2017 11:07:51 AM | "rl investments" |
| 10/20/2016 9:36:28 AM | "sale of warrants" | | 1/23/2017 10:20:20 AM | "adr" |
| 10/20/2016 9:36:36 AM | "warrant sale" | | 4/4/2017 5:16:54 PM | "dl investments" |
| 10/20/2016 9:37:10 AM | "sell warrants" | | 4/4/2017 5:17:10 PM | "rl investments" |

DX 79; *see also* Jan. 8 Hr'g Tr. at 201:12–18.  AUSA Maria also ran searches for terms

that are unrelated to any of the schemes described in the warrant and its application, or

even in the indictment—including for his own name.  *See* DX 79 (searches for, e.g.,

"jail," "indicted," "accused," "moron," "criminal," "asshole," "fbi," "jackass," "prison,"

"angry," "shit," "department of justice," "maria," "grand jury," "bogus," "lying").

Khan testified that members of the prosecution team could "search however they

deemed best for their purposes," and she agreed that "[t]here were no restrictions . . . put

on what [they] could or couldn't search for, apart from [certain] privilege issues."  Jan. 9

Hr'g. Tr. at 69:2–10.  So for example, her searches for "secret" related to her

understanding that there were "secret" bank accounts—accounts associated with the

alleged embezzlement fraud.  *Id.* at 29:8–30:10.

Belich testified that his initial role in the case involved "develop[ing] money

---

[9] Notably, this search (and the following ones) for Murry LLC communications took place just days after Mr. Brever's letter explaining that Murry LLC was "hired under a Kovel arrangement" arrived at the U.S. Attorney's Office.  DX 67; ECF 93-5.

laundering charges."[10]  Jan. 8 Hr'g Tr. at 279:18–21.  However, he agreed that in "fall of 2016," the case against Mr. Adams "became a tax matter." *Id.* at 280:1–4.  On November 8, 2016, the U.S. Attorney's Office requested approval from the DOJ Tax Division to proceed with tax charges. *Id.* at 280:5–281:4.  Belich was involved in the preparation of the tax charges between the fall of 2016 and February 2017. *Id.* at 302:14–303:12.[11]

In connection with "developing the tax investigation," Belich communicated with AUSA Maria, *id.* 304:17–21, and both Kroells and AUSA Maria sent him documents from the Yahoo! database, *id.* 289:17–21.  In addition to the documents Kroells sent him on March 15, 2016, *see supra* p. 10, AUSA Maria sent him documents five times between May 5, 2016, and January 20, 2017, *see* Ex. 4.  At the evidentiary hearing, Belich did not recall whether any of the documents sent to him by other members of the team from the Yahoo! database were sent or received from Murry LLC (Mr. Adams's *Kovel* accountants).  Jan. 8 Hr'g Tr. at 292:17–293:6.  Documents produced by the government, however, confirm that on September 7, 2016, AUSA Maria sent Belich privileged communications between Mr. Adams and Murry LLC from the Yahoo!

---

[10] Documents relating to money laundering are not within the scope of the warrant. *See* DX 11.

[11] The government represents that Belich "was not the agent who submitted the [IRS Special Agent Report ("SAR")] to DOJ Tax." Ex. 11, AUSA Maria Feb. 22, 2018 email at 5–6 (Jan. 30 message).  The government represents that "Belich left well before the completion of the SAR," and asserts that, even if the SAR discusses Yahoo!-derived evidence, the government is not required to produce it under *Brady* or *Jencks*. *Id.* at 2–3.

database.  *See* Ex. 4, Bildtsen Feb. 2, 2018 email; *in camera* Ex. Q;[12] Ex. 12.[13]  On

September 7, 2016, AUSA Maria also sent Belich a Yahoo! email that attached Mr.

Adams's amended tax returns that were filed in 2011 and are the subject of the

superseding indictment's tax fraud charges.  *See* Ex. 4, Bildtsen Feb. 2, 2018 email; Ex.

13 (email that AUSA Maria forwarded to Belich, omitting attachments).[14]  This email

and its attachments were not among the Yahoo! documents purportedly "seized" by the

government in April 2017.  Maier Decl. ¶ 6.[15]

The government showed witnesses *at least* 24 of the Yahoo! emails during the

investigation.  *See* Ex. 14 (Jan. 5, 2018 AUSA Bildtsen emails transmitting 24 emails and

noting that these are ones it could "definitively identify from the interview reports and

attachments as originating from the yahoo accounts"); Ex. 11, AUSA Maria Feb. 22,

2018 email at 3 ("we cannot represent that this [is] a comprehensive list of all documents

that were shown to witnesses").  Many of these documents are outside the scope of the

---

[12] This is AUSA Bildtsen's Feb. 2, 2018 email with the attachment of documents sent
from AUSA Maria to Belich, including privileged communications between Mr. Adams
and Murry LLC at pages 14-24.  This document has been submitted *in camera* in
connection with Mr. Adams's Motion to Dismiss the Superseding Indictment, or in the
Alternative for Disqualification, for Privilege Violations.

[13] These three emails were among those submitted to the Court in connection with Mr.
Adams's Motion Asserting Certain Privileges.  *See* ECF 89, 90, 91-20 (Murry LLC log).

[14] This event was not disclosed by the government until after the evidentiary hearing.

[15] The attachments to this email are also not recorded in the Relativity log as having been
viewed by the prosecution team, Maier Decl. ¶ 7, likely because AUSA Maria viewed
and forwarded this email to Belich while using Relativity's native viewer mode, *see id.*;
Ex. 13; Decl. of Mark Lyon ¶¶ 5–6.

warrant because they relate to the alleged embezzlement scheme, sale of Apollo warrants, alleged tax fraud scheme, or unrelated Apollo business.  *See* Maier Supp. Decl. ¶ 10 & Ex. 9.

On November 2, 2016, Kroells proposed a list of tags to create in the database so that "important" documents could be tagged "by players and topic."  DX 60.  Kroells's suggested topics included topics not mentioned in the warrant or application, such as "Sale of Stock/Warrants," "ADR Investments," "RL Investments," and "DL Investments."  *Id.*  Similarly, AUSA Maria suggested that a tag be added for "Adams Taxes."  *Id.*; Jan. 8 Hr'g Tr. at 216:11–217:9.  Thereafter, beginning on November 17, 2016, Kroells "Update[d]" the "Issues" field for 183 documents.  Ex. 15, (Relativity log excerpt).  The prosecution team did not use these tags to enact the "seizure," and as a result, 7 of the documents for which Kroells updated the "issues" tag were not among the documents that the government purports to have "seized" on April 4.  Maier Decl. ¶ 8.

Kroells printed documents during the course of her Relativity searches for reasons including preparing for witness interviews, and she has kept some of these documents in folders in her office to this day.  *See* Jan. 8 Hr'g Tr. at 178:19–179:18.  The government did not track which documents were printed for use throughout the year to ensure that all such documents were among those "seized," and as a result the government printed and presumably used at least twelve documents that it did not "seize."  Ex. 16 (Relativity log filtered for "Print"); Maier Decl. ¶ 9.

### 3.     April 2017:  Post-Indictment Relevance Cull and "Seizure"

On February 28, 2017, AUSA Maria requested that a list of search terms be

applied to the database.  DX 24.  The search terms were:  "Apollo, Diamond, ADI,

ADGC, Gemstone, DL, RL, ADR, RBE, ESA, MRM, Scio, SDTC, Krossbow, Linares,

Lancia, Zipkin, Nichols, LisaL, LMAInc, Mack, Rapello, Platt, Robb, Larson, McMahon,

Bern, McPheely."  *Id.*  On April 4, 2017, two weeks after the March 22 indictment was

returned against Mr. Adams, and only days before Rule 16 materials would need to be

produced to the defense, *see* ECF 9 (setting April 7 disclosure deadline), the government

applied these search terms to the database.  *See* GX Zeitz 3.  More than forty thousand

documents (42,927) contained these search terms.  *See id.*  These are the documents that

the government purports to have "seized" pursuant to the Yahoo! warrant.  DX 5, Maria

Decl. ¶ 14.  The documents that did not include these search terms were excluded from

the review database and moved to a secure folder to which the prosecution team no

longer had access.  Jan. 9 Hr'g Tr. at 198:10–16.

Neither Kroells nor Khan recalls having any involvement in the April 2017

relevance filtering or in creating the list of terms that AUSA Maria used.  Jan. 8 Hr'g Tr.

at 223:17–224:9; Jan. 9 Hr'g Tr. at 82:22–25; *see also* Jan. 8 Hr'g Tr. at 295:13–297

(Belich does not believe he "seized" any documents in the database).  Kroells does not

know when the government's review was "complete," and was never informed that the

investigation team's review of the database was complete.  Jan. 8 Hr'g Tr. at 231:1–15.

The April 2017 search terms were not closely tied to the warrant, and they did not

reflect a greater understanding of the case based on the year-long search.  Kroells

described the search terms that were applied in April 2017 as "very common search terms

related to this case."  *Id.* at 224:21–24.  Similarly, Khan testified that in May 2016, when

she first got access to the Yahoo database, she knew or probably knew the significance of all but three of the search terms (and for those, she did not recall whether she knew of their significance in May 2016). Jan. 9 Hr'g Tr. at 85:11–92:11.

AUSA Maria accessed the review database shortly after the relevance filtering took place on April 4, 2017, but has not accessed it since. DX 4, Zeitz Decl. ¶ 9. AUSA Maria spent a total of three minutes in the database after the relevance filtering took place, presumably to assess the results of the "seizure" search terms, and those were his final three minutes in the database. Jan. 9 Hr'g Tr. at 193:15–20. The only member of the prosecution team to access the database after the purported "seizure" occurred was Kroells, who accessed the database on a total of three days after April 4, 2017. DX 88.

### 4. The April 4, 2017 "Seized" Documents

Of the 42,927 purportedly "seized" documents, the prosecution team viewed only 5,485—less than 13%—during its year-long review. *See* Maier Decl. ¶ 3. Of the 5,485 documents viewed and "seized," 3,877 came from one of Mr. Adams's two Yahoo! accounts, and 1,608 came from Mr. Monahan's account. *Id.* Of the 3,877 documents viewed and "seized" from Mr. Adams's accounts, Mr. Adams is not asserting any claim of privilege over 3,350. Of these 3,350 documents:

- 115 relate to Mr. Adams's personal matters, and are entirely unrelated to the issues described in either the superseding indictment or the warrant application. *See* Maier Supp. Decl. Ex. 1 (list of these documents by Relativity Doc ID) & Ex. 2.[16]

---

[16] Mr. Adams does not include the additional documents that fall into these categories over which Mr. Adams is asserting a legal privilege, so that all documents appended to the Maier Supplemental Declaration may be accessed by the government. In light of the

- 635 relate to Mr. Adams's business interests other than Apollo and Scio, and are also entirely unrelated to the issues described in either the superseding indictment or in the warrant application. *See* Maier Supp. Decl. Ex. 1 (list) & Ex. 3.

- 556 relate to Apollo or Scio matters entirely unrelated to the issues described in either the superseding indictment or the warrant application. *See* Maier Supp. Decl. Ex. 1 (list) & Ex. 4.

- 249 relate to the sale of Apollo warrants and/or the allegedly secret bank accounts. *See* Maier Supp. Decl. Ex. 1 (list) & Ex. 5.

- 25 relate to Mr. Adams's personal tax returns or personal finances. *See* Maier Supp. Decl. Ex. 1 (list) & Ex. 6.

- An additional 14 documents appear to be outside the scope of the warrant for other reasons. *See* Maier Supp. Decl. Ex. 1 (list) & Ex. 7.

Thus, according to our count, more than 1,300 out of the 3,350 non-privileged Yahoo! emails that were viewed and "seized" by the government, or nearly 40%, have nothing to do with the alleged schemes set forth in the indictment. On top of that, nearly 300 more have nothing to do with the more narrow warrant and warrant application. The 37,502 emails that the government never looked at but purported to "seize" also include tens of thousands of documents that fall into the categories described above.[17]

---

Court's rulings, *see* ECF 117 & 139, Mr. Adams has included documents over which he had asserted a privilege on behalf of Apollo.

[17] Mr. Adams has not had the resources to categorize all 37,502 documents that were "seized" but never viewed by the government to specifically identify if they fall within the scope of the warrant—a task the government, with its far greater resources, failed to accomplish in over a year. The burden and cost on Mr. Adams to perform the work he has in connection with this motion have been extraordinary.

### 5.    April 2017 to August 2017: Post-"Seizure" Misstatements

On three occasions after the government produced the Yahoo! emails to Mr. Adams, AUSA Maria inaccurately represented to Mr. Adams the scope of the email that the government had accessed and searched.  *See* DX 34 (April 7, 2017 AUSA Maria letter describing the 42,927 purportedly "seized" documents as "the database from which we have been working"); DX 37 (May 24, 2017 AUSA Maria email describing the "seized" documents as "the database to which the prosecution team has had access"); DX 40 (Aug. 23, 2017 AUSA Maria email stating "As to the remaining documents that are not in our review database . . . I can assure you that nobody on the prosecution team has had, or will have, access to those documents.").

It is now clear that, contrary to AUSA Maria's statements, the prosecution team had access to *all* the data produced by Yahoo!—not just the 42,927 "seized" documents. Kroells had access to the entire Yahoo! database in March 2016, and the prosecution team had access to over 100,000 documents during its year-long search.  GX Zeitz 3.  It wasn't until Mr. Adams filed his suppression motion and other members of the U.S. Attorney's Office became involved that Mr. Adams received any meaningful information about how the government had searched Mr. Adams's emails.

### D.    The Government's Disregard of Privilege Issues

### 1.    Mr. Adams's Attorney-Client Relationships

Mr. Adams was, at all material times, a practicing attorney and a partner at the Adams Monahan LLP law firm.  *See* Indict. ¶¶ 4–5.  As a practicing attorney, Mr. Adams also provided legal services to dozens of clients, in addition to Apollo, including

established companies and entities.  *See* DX 58.

Prior to the present case, Mr. Adams was the subject of an SEC investigation, *In re Scio Diamond Technology Corporation* (C-08091), concerning the 2011-2012 asset purchase transactions between Apollo and Scio that were the subjects of the Yahoo! warrant.  Mr. Adams was represented in the SEC investigation by James Farrell and John J. Sikora, Jr. of Latham & Watkins LLP ("Latham") and James L. Kopecky of Kopecky Schumacher Bleakley & Rosenburg, P.C.  *See* DX 43, Wade Decl. ¶ 6.

After the U.S. Attorney's Office opened a criminal investigation of Mr. Adams, he was represented in that investigation by Jon M. Hopeman of Felhaber Larson.[18]  *Id.* ¶ 9. The government was aware by at least mid-February 2016 that Mr. Adams was obtaining counsel to represent him in the criminal investigation, and was introduced to Mr. Hopeman by early March 2016—before any Yahoo! email was reviewed.  *Id.*; *see also* DX 48 (March 9, 2016 email arranging meeting between Mr. Hopeman and government).

In September 2014, Mr. Adams retained Thomas Brever as his tax attorney in connection with his personal tax liabilities and related issues.  *See* ECF 117 at 4.  Mr. Brever engaged Murry LLC, an accounting firm, to assist him in providing legal advice regarding Mr. Adams's taxes under *Kovel*.  *Id.*  The Court has concluded that "Mr. Adams has established that the communications between himself, his tax attorney, and Murry & Associates are protected by privilege."  *Id.*; *see also* ECF 139 (adopting R&R).

---

[18] Latham also consulted with Mr. Adams and other counsel on criminal matters, once those issues arose.

Mr. Adams also was represented by counsel in four civil suits relating to Apollo

that were brought by disgruntled shareholders of Apollo and/or Scio in 2012 and 2013.

DX 43, Wade Decl. ¶ 10.  Mr. Adams was represented in three civil suits by Latham, and

in the fourth by Aaron Hartman of Anthony Ostlund Baer & Louwagie P.A.  *Id.*

### 2.      Initial Privilege Filtering

Despite Kroells's understanding that relevance filtering would take place early on,

no such filtering took place until the very end of the process.  As to privilege, the

government inexplicably decided not to use a "taint team" to ensure that the prosecution

team would not review any of Mr. Adams's privileged communications.  Instead, the

prosecution team itself applied search terms, which excluded only a small subset of

privileged documents from the review database.  On or about April 14, 2016, AUSA

Maria proposed a list of search terms to "filter the potentially privileged documents in the

email database."[19]  DX 4, Zeitz Decl. ¶ 13; GX Zeitz 4.  AUSA Maria commented, "If

everyone is good with this approach, we should be able to open up for review the

database with the documents that did not hit on the search terms."  GX Zeitz 4 at 3.

AUSA Maria's search terms hit on 139,840 of 146,522 documents, *see* Jan. 9 Hr'g

Tr. at 172:2–175:14, indicating that the database was rife with privileged documents.

Rather than exclude these documents, AUSA Maria abandoned the "general" privilege

---

[19] These terms were: privilege!, attorney, lawyer, advice, counsel, acp, "work product,"
"law firm," adamsmonahan, adamsgrumbles, sankovitz, amllp, wc.com, merchantgould,
zouvas, Dorsey, "K&L," klgates, schwegman, slwip, Fredrikson, fredlaw,
anthonyostlund, Kopecky, ksblegal, latham, Watkins, lw.com, Sikora.  GX Zeitz 4.

terms he proposed (privilege!, attorney, lawyer, advice, counsel, acp, "work product," and "law firm"), and excluded instead only documents that hit on the list of law firm and attorney names (the "specific" terms).  GX Zeitz 4 at 6.  The government applied the specific terms and excluded 33,161 documents from its review, after which 113,361 documents remained in the review database.[20]  GX Zeitz 3.  Around this time, on April 26, AUSA John Kokkinen asked AUSA Maria if the team had "come up with a list of relevance search terms yet?"  DX 27.  As described above, that did not take place until almost a year later.

### 3.    Second-Round Privilege Filtering

Members of the prosecution team began viewing documents and running keyword searches in the database on May 4, 2016.  *See* DX 4, Zeitz Decl. ¶ 9; DX 79 (AUSA Maria keyword searches).  On that first day, AUSA Maria viewed a copy of a highly-relevant privileged draft memorandum that Mr. Adams had prepared to send to his attorneys at Latham in connection with the SEC investigation.  Ex. 17.  The memo included large "**ATTORNEY-CLIENT PRIVILEGE**" and "**ATTORNEY WORK PRODUCT**" legends on the first page.[21]  Despite these legends, AUSA Maria viewed

---

[20] The "specific" search terms were purportedly meant to capture "firms that performed legal work for Apollo/Scio," or "firms that have assisted in defending Adams and Monahan in connection with the SEC action (and our investigation)."  GX Zeitz 4 at 6.  The government's original plan was to have a "taint team" review the documents that hit on adamsmonahan, adamsgrumbles, amllp, and zouvas, *id.*, but that review never took place.

[21] This document and all others described in this section have been submitted for *in camera* review in connection with Mr. Adams's Motion to Dismiss the Superseding Indictment, or in the Alternative for Disqualification, for Privilege Violations, filed

this document an additional six times on May 4, 2016 between 3:00 p.m. and 4:47 p.m. *Id.*  This document would have been filtered from the database had AUSA Maria not jettisoned the "general" search terms that he originally created.

The following day, on May 5, 2016, AUSA Maria viewed another highly-relevant privileged memo that Mr. Adams had sent to both Mr. Hopeman—who AUSA Maria knew was Mr. Adams's counsel in this very investigation—and Mr. Brever.  Ex. 18; *in camera* Ex. J.  The memo was also labeled "ATTORNEY-CLIENT PRIVILEGED COMMUNICATION."  Thereafter, it took eleven days for a different member of the prosecution team, Kroells, to alert other members of the team that the government had omitted certain lawyers from its privilege list.  DX 1, Kroells Decl. ¶ 20; DX 21 (noting that the "@felhaber.com" address "appear[ed] to contain privileged communications"); DX 20.  AUSA Maria responded:  "I also saw that Hopeman had done some work for him before, so we need to add Hopeman. . . . Additionally, it looks like he had a guy working on his tax issues – Tom Brever.  We will add Brever as well as @fosterbrever.com."  DX 21.

Despite this discussion on May 16, 2016, AUSA Maria did not request that any documents be excluded for another three weeks, until June 6.  DX 22; DX 4, Zeitz Decl.

---

contemporaneously herewith, and are described in greater detail in that brief.  This draft Latham memo is *in camera* Ex. A.

¶ 20.  After applying certain additional search terms,[22] 1,494 documents were excluded from the review database, and 111,867 remained in that database.  GX Zeitz 3.

Although the government identified "anthonyostlund" as one of its search terms in April 2016, this lone search term was inadequate to filter from the database Mr. Adams's communications with Mr. Hartman of Anthony Ostlund Baer & Louwagie P.A.  As a result, members of the prosecution team reviewed more than 20 privileged communications involving Mr. Hartman.  Ex. 19; *in camera* Ex. U.

And even though "latham" was one of the search terms used to filter privileged communications from the database in April 2016, as noted above that search term did not filter out some draft communications to Latham.  In addition to the draft memorandum discussed above, a draft email that Mr. Adams ultimately sent to Latham shortly after his SEC deposition remained in the government's review database.  AUSA Maria found this email especially informative:  he reviewed 12 versions of it on September 6, 2016.  Ex. 20; *in camera* Ex. D.  And another draft analysis, relevant to this case, that Mr. Adams prepared for Latham also remained in the review database and was reviewed by Kroells. Ex. 21; *in camera* Ex. G.

### 4.    Mr. Adams's Notification of Privilege Issues

On the heels of all of this review of Mr. Adams's privileged information, on July 8, 2016 Mr. Adams's then-criminal defense counsel, Mr. Hopeman, wrote to the U.S.

---

[22] AUSA Maria requested that documents that hit on the following terms be excluded: arnstein, @arnstein.com, felhaber, @felhaber.com, hopeman, amslaw, blandrichter, @blandrichter.com, tamburino, caplanlaw, @caplanlaw.com, brever.  DX 22.

Attorney's Office about the Yahoo! warrant, which Mr. Adams had recently learned

about from Yahoo!.  Mr. Hopeman informed the government that "Mr. Adams and his

law firm represented and performed legal work on behalf of a variety of parties and

clients during the period of time covered by the warrant to Yahoo!."  DX 58.  He also

notified the government that "the ESI contains information and communications

protected by the attorney-client privilege and work product doctrines that should not have

been sought or reviewed by your office," because "Mr. Adams retained and worked with

counsel himself on a variety of matters" and those communications were contained in the

Yahoo! data.  Finally, Mr. Hopeman noted that "the ESI is believed to contain

information that was outside the scope of the warrant."  *Id*.  Mr. Hopeman, who at that

time had no idea the government already had been reviewing Mr. Adams's privileged

communications, proposed that the government return the Yahoo! data to him and offered

to "internally review all of the ESI for attorney-client and work product privileges,

prepare a privilege log, and then provide you with both the privilege log and all of the

non-privileged ESI within the scope of the warrant."  *Id.*

On August 15, 2016, AUSA Maria provided a curt response to Mr. Hopeman,

saying only that the government "understand[s] [its] obligations and [is] taking

appropriate steps to comply with the U.S. Attorneys' Manual and to protect any

applicable privileges."  DX 59.  He mentioned nothing about the events of the prior

months, including that he and others on his team already had viewed communications

between Mr. Hopeman and Mr. Adams.

### 5.     Mr. Brever's Notification of Privilege Issues Regarding Murry

On November 4, 2016, the government issued a grand jury subpoena to Murry

LLC.  On December 1, 2016, Mr. Brever responded by letter to AUSA Maria.  He

explained that Murry LLC was "hired under a Kovel arrangement by our firm for the

purpose of assisting in rendering legal advice."  DX 67.  Mr. Brever produced certain

Murry LLC documents that were "not subject to claim of privilege," and a "privilege log

for materials that sets forth the identification of materials and the claims of privilege for

such materials."  *Id.*  Mr. Brever agreed with the government to resolve any disputes over

the application of the *Kovel* privilege to particular documents through an *in camera*

submission of disputed documents to the court, if necessary, but this process was never

used, as Mr. Brever was never informed of any disputes regarding the application of

privileges to particular documents described in his privilege log.  ECF 93 (Brever Decl.)

at ¶ 12.

Five days after Mr. Brever's letter, on December 6, AUSA Maria ran searches in

the Yahoo! database for "murry" and "murryllc."  DX 79.  Thereafter, in January 2017,

he viewed or "converted" four privileged communications between Mr. Adams and Mr.

Murry.  Ex. 22.  On April 27, 2017, Kroells searched for "Murry" and viewed a

privileged document.  DX 81 at 10; Ex. 22.

## II.     ARGUMENT

The searches and seizures in this case trampled on Mr. Adams's constitutional

rights from start to finish.  First, the Yahoo! warrant violated the Fourth Amendment

because it lacked particularity and was overbroad.  Second, that warrant was executed in

a way that violated the Fourth Amendment, as well as Rule 41.  Third, the government

seized tens of thousands of documents outside the scope of the warrant.  Each of these

reasons provides an independent basis for the Court to suppress the entire contents of Mr.

Adams's Yahoo! email accounts.  Considered together, that outcome is required.

**A.    The Yahoo! Warrant Violated the Fourth Amendment**

Even before the government's slipshod execution of the Yahoo! warrant, the

warrant itself lacked particularity and was overbroad.  Each defect requires suppression.

**1.    The Yahoo! Warrant Lacked Particularity**

The Fourth Amendment requires all warrants to "particularly describ[e] the place

to be searched, and . . . things to be seized."  U.S. Const. amend. IV.  This "particularity"

requirement prevents "a general, exploratory rummaging in a person's belongings" and

"the seizure of one thing under a warrant describing another."  *In re Grand Jury*

*Proceedings*, 716 F.2d 493, 497 (8th Cir. 1983).  "As to what is to be taken, nothing is

left to the discretion of the officer executing the warrant."  *Id.*; *see also United States v.*

*Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (explaining that "the particularity requirement

assumes even greater importance" in digital searches).

The list of "things to be seized" in the Yahoo! warrant lacked particularity because

it was too broad to stop "general, exploratory rummaging" in Mr. Adams's emails.  (That

is, in fact, what happened.)  The warrant authorized the seizure of ten years of Mr.

Adams's emails that were "fruits, contraband, evidence and instrumentalities of"

violations of" the mail and wire fraud statutes, "involving Edward S. Adams" "occurring

after October 25, 2006." DX 11.[23]  The email accounts belonged to Mr. Adams, so every email "involv[ed]" him.  And every email was a "writing[]" that was "transmitted by means of wire" "in interstate . . . commerce," 18 U.S.C. § 1343, as the emails were housed in California while Mr. Adams lived in Minnesota.  Shorn of meaningless language, the warrant thus authorized the seizure of all emails that were evidence of "[a] scheme or artifice to defraud," *id.* § 1343, "occurring after October 25, 2006." DX 11.

A warrant authorizing a general search of records for evidence of fraud occurring over a nearly ten-year period lacks particularity on its face.  Eighth Circuit precedent on this point is clear:  "In the absence of any clearly demonstrated necessity, [a] seven-year period covered by [a] search warrant" that at best sought records containing "any information pertaining to the generic crime of interstate fraud" was "excessive and unreasonable" and therefore lacked particularity.  *In re Grand Jury*, 716 F.2d at 497–99.

The warrant's reference to the mail and wire fraud statutes cannot save it.  *See Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987) (holding "general tax evasion statutes" "too broad in scope to provide any real limitation on [a] warrant"); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980) (cited by *Rickert*, same for mail fraud statute); *United States v. Maxwell*, 920 F.2d 1028, 1033 n.5 (D.C. Cir. 1990) (citing *Rickert*, same for wire fraud statute).  Thus, the warrant's lack of particularity requires suppression.

---

[23] The government has argued that the warrant authorized it to seize all information falling within this broad category.  *See* ECF No. 49 at 8 (quoting this part of the warrant).

## 2.   The Yahoo! Warrant Was Overbroad

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  The Court must determine whether "probable cause supported the issuance of [the] warrant to seize [the] items" identified. *United States v. Timley*, 443 F.3d 615, 622 n.5 (8th Cir. 2006).  To do so, the Court must "measur[e] the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued." *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982); *accord Rickert*, 813 F.2d at 909.  "[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based."  2 Wayne R. LaFave, *Search & Seizure* § 4.6(a), at 767 (5th ed. 2012) (collecting cases).

Kroells's affidavit did not provide probable cause for the broad warrant that was issued.  (Much less the roving search that took place.)  Rather, it only provided probable cause to seize evidence of the alleged fraud scheme related to the 2011–2012 asset purchase transactions.  *See* DX 10, at ¶ 32 (summing up the scheme).  According to the affidavit, this scheme and the alleged misrepresentations about it took place between 2011 and 2012.  *See id.* ¶ 12 (identifying first alleged misrepresentation in March 11, 2011 proxy statement); *id.* ¶ 29 (identifying last alleged misrepresentation in March 26, 2012 email).  So although the affidavit may have supported probable cause to investigate the asset purchase agreements and misrepresentations about them, it could not provide probable cause to search for documents of all fraud over the nearly 10 year period included in the warrant.  *See In re Grand Jury*, 716 F.2d at 498–99 (holding even if

warrant affidavit established probable cause to believe target "defrauded the two surety companies he represented in several transactions," warrant was overbroad because it "was not limited at all in its scope"). That the government might have *suspected* Mr. Adams of involvement in another scheme did not free it from the requirement of *establishing* probable cause to support its search. *See id.* at 499 (stating that no case supports the proposition "that where complex criminal activity is suspected, the scope of a search warrant is not limited by probable cause"). The overbreadth of the Yahoo! warrant requires suppression.

### B. The Government's "Execution" of the Warrant Violated the Fourth Amendment and Recklessly Disregarded Rule 41.

Even if some portions of the warrant were sufficiently particular and not overbroad, the government's "execution" the warrant demands suppression. The sole reason the government had access to Mr. Adams's emails under Rule 41 was to "review" them "consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B). Recognizing this, the government has claimed that its year's-worth of activity between receiving Mr. Adams's emails in March 2016 and deeming its final list of search terms to be its "seizure" in April 2017 was the execution of the warrant. The record establishes that this is untrue. During the time it supposedly was executing the warrant, the prosecution team instead searched for, scrutinized, and repeatedly viewed emails outside the scope of the warrant, used them at witness interviews, and used them to develop tax charges unrelated to the probable cause for the warrant. All of these actions are incompatible with the limited

purpose for which the government had access to the emails.[24]

Moreover, when the government claims it finally "seized" nearly 43,000 emails, it did so using broad search terms and without actually reviewing most of the emails. Thus, the government never came close to completing its sole authorized task—reviewing Mr. Adams's emails to determine which ones fell within the scope of the warrant. Instead, once the government received Mr. Adams's emails, it used them as a litigation database. Such conduct might be normal during civil discovery or after receiving documents pursuant to a subpoena, but it is not a permissible way to execute a search warrant.

Two separate doctrines each require suppression. First, the way "a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness." *See Hummel-Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994). The "dangers inherent in executing a warrant authorizing a search and seizure of a person's papers," mean "judicial officials, must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976).

Second, a violation of Rule 41 can require suppression. The Eighth Circuit

---

[24] A "search" occurs when the government violates a subjective expectation of privacy society recognizes as reasonable. *Kyllo v. United States*, 533 U.S. 27, 31–33 (2001); *see also United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (email protected by Fourth Amendment). A "seizure" occurs when there is meaningful interference with an individual's possessory interest in property. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Tangible and intangible property alike can be seized. *See Berger v. New York*, 388 U.S. 41, 59–60 (1967) (conversations seized by electronic eavesdropping). In email search cases, "there is actually a seizure, then a search, then another seizure." *United States v. Taylor*, 764 F. Supp. 2d 230, 234 n.22 (D. Me. 2011).

"appl[ies] the exclusionary rule to violations of Rule 41" where "reckless disregard of proper procedure is evident." *United States v. Turner*, 781 F.3d 374, 386–87 (8th Cir. 2015); *see generally* Ex. 2, Order, *United States v. Vision Sys. Grp., Inc.*, No. 4:09-cr-00004-RP-CFB, at 33–41 (S.D. Iowa Mar. 24, 2010), ECF 116 ("*Vision Systems* Order") (suppressing evidence and collecting cases applying Rule 41 reckless disregard standard).

Here, the government's manner of "executing" the warrant was both unreasonable under the Fourth Amendment and in reckless disregard of Rule 41.  The government (1) searched for documents outside the warrant's scope; (2) used documents it had not seized or could not permissibly seize; (3) reviewed individual documents more than necessary to execute the warrant; and (4) seized items based on relevance terms rather than the warrant itself.  Additionally, (5) the government's disregard for privilege was unreasonable.[25]

### 1.    The Government Searched For Emails Outside the Warrant

First, the government's searches demonstrate that it never attempted to confine itself to documents falling within the scope of the warrant.  Although the government has some leeway in executing warrants, "the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion." *Wilson v. Layne*, 526 U.S. 603, 611 (1999).  "Officials executing a search warrant must ensure that the search is conducted in a way that minimizes unwarranted intrusions into

---

[25] The government's disregard for privilege goes solely to the search's reasonableness and does not factor into the Rule 41 analysis.

an individual's privacy."  *United States v. Dallman*, No. 13-03081-01-CR-S-MDH, 2016

WL 6123250, at *3 (W.D. Mo. Oct. 12, 2016) (internal quotation marks omitted).  Far

from minimizing intrusions into privacy (or attempting to comply with Rule 41), the

government here sought out items without regard to the terms of the warrant.

From the start of their access to the database, AUSA Maria, Kroells, and Khan

repeatedly ran searches designed to find documents relating to the alleged 2006–2009

embezzlement scheme, not discussed at all in the warrant, including for terms like "RL,"

"DL," "ADR," "secret," and "sale of warrants."  *See* DX 79, DX 81, DX 83.  AUSA

Maria began running these searches on the first day he had access to the database.  DX

79.  AUSA Maria and Kroells also ran searches designed to find Mr. Adams's personal

tax returns and privileged communications with his *Kovel* accountant.  *See* DX 79, DX 81

(searches for "murryllc" and "murry").  And members of the prosecution team conducted

fishing expeditions by searching for general terms untethered to the warrant, like "crap,"

"bribe," "lie," "jail," "indicted," "accused," "moron," "criminal," "asshole," "fbi,"

"jackass," "prison," "angry," "shit," "department of justice," "maria," "grand jury,"

"bogus," and "lying."  DX 79; DX 81.

Consistent with these actions, testimony at the evidentiary hearing established that

the government did not feel bound by the warrant's terms.  There is no evidence of a

search plan or briefing.  *See generally* discussion *supra* pp. 11–18.  Khan testified that

those executing the warrant could "search however they deemed best for their purposes,"

and agreed "[t]here were *no restrictions* . . . put on *what* [they] could or couldn't search

for, apart from [certain] privilege issues."  Jan. 9 Hr'g Tr. at 69:2–10 (emphasis added).

*Dallman* is instructive.  There, a warrant authorized the government to search a computer for residency and travel documents relating to identity theft and failure to register as a sex offender.  2016 WL 6123250, at *1–2.  The government did not seek permission to search for child pornography.  *Id.*  An officer executing the warrant used a program that automatically searched for child pornography.  *See id.* at *2.  The judge suppressed a video found as a result, concluding "the search exceeded the scope of the warrant from the beginning."  *Id.* at *4.  The officer knew the program "would search for items that were outside the parameters of the warrant," so the court could not conclude that he "conducted the search in such a way that minimized unwarranted intrusions into [the] Defendant's privacy."  *Id.*  The court rejected the argument that the search was permissible because the government could have reviewed every file on the computer, because that is not what happened.  "Instead, [the officer] used a program he knew would search for images of child pornography despite the fact that the warrant did not permit him to do so."  *Id.*  Here, regardless of what the government could have done to execute the warrant, what it did—fish for documents to develop charges and theories outside the warrant—was both unreasonable and in violation of Rule 41.

Moreover, it was unreasonable for the government to continue searching under the authority of the Yahoo! warrant as its investigation "evolved" to encompass areas beyond the probable cause supporting that warrant.  This is especially true when the government began investigating alleged crimes falling under new statutes entirely.  *See* Jan. 8 Hr'g Tr. at 280:1–4 (in "fall of 2016," the case against Mr. Adams "became a tax matter").  The reasonable thing to do would have been to seek a new warrant, as officers frequently

do when their focus changes.  *See, e.g.*, *United States v. Suing*, 712 F.3d 1209, 1211–12

(8th Cir. 2013) (approving actions of officer who, after encountering child pornography

during a computer search for evidence of drug crimes, "did not interrupt the drug search

and act without judicial authority by continuing a child pornography search without first

obtaining a new search warrant").  Instead of taking this reasonable step, the government

treated Mr. Adams's emails as a litigation database to be searched for whatever it wanted.

### 2.    The Government Made Unauthorized Use of Documents

Second, the government's use of emails either before it ostensibly seized them, or

without ever ostensibly seizing them, shows that the government accessed Mr. Adams's

emails not for the sole purpose of executing the warrant.  "[W]hen executing a search

warrant, an officer is limited to conduct that is reasonably necessary to effectuate the

warrant's purpose."  *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997); *accord*

*Ginter v. Stallcup*, 869 F.2d 384, 388 (8th Cir. 1989) (per curiam) (holding actions "in the

execution of a search . . . warrant must be necessary to effectively execute that warrant").

"The 'when' and 'how' of otherwise legitimate law enforcement actions may always

render such actions unreasonable."  *Hummel-Jones*, 25 F.3d at 650.

Once again, there is no evidence that the prosecution team prepared a search plan

or had a search briefing prior to beginning to use the Relativity database about how the

investigative team could or could not use Yahoo! emails during the course of the year-

long "review" period.  *See* Jan. 8 Hr'g Tr. at 229:19–23 (Kroells); Jan. 9 Hr'g Tr. at

67:9–16 (Khan); *see also* Jan. 8 Hr'g Tr. at 286:11–19, 287:6–21 (Belich).

The members of the prosecution team who testified uniformly confirmed that they

were conducting searches in the database for the purpose of preparing for witness

interviews.  *See* Jan. 8 Hr'g Tr. at 196:24–197:15 (Kroells); *id.* at 272:17–273:3; 287:3–5

(Belich); Jan. 9 Hr'g. Tr. at 29:8–30:10, 70:19–21 (Khan).  Many of the Yahoo! emails

admittedly used with witnesses were not within the scope of the warrant, *see* Ex. 14, and

the government is unable to confirm that its records as to which Yahoo! emails were used

with witnesses are comprehensive, *see id.*; Ex. 11.

Members of the prosecution team (Kroells and AUSA Maria) also sent Belich

documents from the Yahoo! database that included Mr. Adams's personal tax returns and

privileged communications with his *Kovel* accountant about his personal tax situation.

*See* Exs. 4, 6, 12, 13.  After receiving such documents in March and September 2016,

Belich began to prepare a tax case against Mr. Adams in the fall of 2016, although tax

charges were not originally contemplated by the warrant.  *See* Jan. 8 Hr'g Tr. at 280:1–4.

Some of the Yahoo! tax documents that were identified and sent to Belich are also ones

that the government purports not to have "seized," *see* Exs. 6, 13; Maier Decl. ¶¶ 5–6—

its use of these documents, and in this highly consequential manner, was revealed only as

a result of Mr. Adams's litigation of this motion.

Counsel for Mr. Adams have found no other case where this has occurred.  For

much of American history, *using* documents with witnesses or to prepare charges without

first *seizing* them would have been physically impossible.  It remains legally impossible.

A Seventh Circuit case, *LeClair v. Hart*, 800 F.2d 692 (7th Cir. 1986), explains why.  In

*LeClair*, government agents searched a house for evidence of fish and game law

violations pursuant to a warrant.  *See id.* at 693.  Suspecting the residents of tax crimes,

IRS agents joined in the search team.  *See id.*  During the search, those IRS agents

dictated the contents of financial records into a tape recorder and took handwritten notes

about others.  *See id.*  On appeal in a subsequent *Bivens* action, the Seventh Circuit held

that the IRS agents seized the information, which was outside the scope of the warrant,

because "[t]he right to exclude others is generally one of the most essential sticks in the

bundle of rights that are commonly characterized as property."  *Id.* at 696 (quoting

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984)); *accord United States v.*

*Jefferson*, 571 F. Supp. 2d 696, 704 (E.D. Va. 2008) (Fourth Amendment "search and

seizure" occurred where government took photographs and notes on contents of

documents).  If taking note of the information contained in documents is a seizure, then

*using* that information or the documents themselves to question witnesses or develop tax

charges must also be a seizure.

  In contrast to the government's robust use of Mr. Adams's emails for other

purposes, it made no effort to do what it was actually supposed to: execute the warrant.

The prosecution team had no system to keep track of which of the Yahoo! emails were

covered by the warrant, and which ones were not.[26]  Jan. 8 Hr'g Tr. at 182:10–183:3; Jan.

8 Hr'g Tr. at 216:11–217:9.  The government would never reasonably be able to execute

a warrant without implementing some system.  (As will be explained below, applying

---

[26] Kroells and Maria actually discussed the use of tags in November 2016, but Kroells
only ended up tagging 183 documents.  DX 60; Jan. 9 Hr'g Tr. at 66:13–20; Ex. 15; *see
also generally* discussion *supra* p. 18.  Seven of those tagged documents were never
purportedly "seized" by the government.  *See* Maier Decl. ¶ 8.

broad "relevance terms" is not enough.)  The government's failure to do the one thing the warrant authorized while continuously using Mr. Adams's emails for unauthorized purposes demonstrates the unreasonableness of the government's execution of the warrant and its reckless disregard for the requirements of Rule 41.

### 3.    The Government Reviewed Emails More Than Was Necessary to Execute the Warrant.

Third, the government's execution of the warrant was unreasonable because it reviewed emails more than was necessary.  Again, the government had access to Mr. Adams's emails in order to assess whether each one fell within the warrant's scope.  Even if the government could review every email, Rule 41 and the Fourth Amendment required that review to be as "brief" or "cursory" as reasonably necessary.[27]  *See Andresen*, 427 U.S. at 482 n.11 (allowing that "innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized"); *United States v. Heldt*, 668 F.2d 1238, 1267 (D.C. Cir. 1981) (permitting "a brief perusal of documents" and stating that "the perusal must cease at the point at which the warrant's inapplicability to each document is clear"); *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (quoting *Andresen*).

Here, the government's review of documents for the purpose of executing the

---

[27] The government agrees with this proposition.  *See* Jan. 8 Hr'g Tr. 49:2–10 (explaining "the [Supreme C]ourt noted that in any search warrant involving a lot of pieces of paper, the Government *at least cursorily* - - and I say that because that's the phrase that comes from that case. . . can look at every single piece of paper available to look at in order to determine what's within the scope of the warrant."  (emphasis added)).

warrant was anything but "cursory."  The government unreasonably executed the warrant because it viewed many documents repeatedly as its theory of the case "evolved."  *See* Jan. 8 Hr'g Tr. at 196:24–197:15, 205:15–207:1 (Kroells describing her "continuous learning curve" and the "evolving" theory of the case); Exs. 7, 8, 9.  As the government had no system to track which documents were outside the scope of the warrant, there was nothing to prevent the prosecution team from revisiting such documents throughout the year—and in fact it did so.  *See* Jan. 8 Hr'g Tr. at 182:10–183:3 (Kroells testimony); *see also* Jan. 9 Hr'g Tr. at 66:13–20 (Khan testimony); Exs. 7, 8, 9.  This repeated inspection of documents exceeded what the government was authorized to do in executing the warrant and was, therefore, unreasonable.  *See United States v. Issacs*, 708 F.2d 1365, 1370 (9th Cir. 1983) ("We do not mean to suggest that agents entitled to examine a book or similar item may minutely scrutinize its contents . . . .").

The court in *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), flatly rejected the government's ability to review documents multiple times in this context:

> Perhaps most plainly problematic on this score are Agent Miller's 2015 searches which, as noted, covered all documents in the FBI databases, including those materials already sorted out as impertinent two years earlier. Clearly . . . additional physical searches in 2013 or 2015 of hard-copy documents judged irrelevant and left behind during [an earlier] search would have been presumptively impermissible—new search terms or not—in the absence of a fresh warrant.  Indeed, the proper analogy to help appreciate the nature of the agents' conduct here is not the Government seizing, for example, a hard-copy notebook deemed responsive to a warrant, retaining it, and later returning to that notebook for follow-up searches as its investigation developed.  Instead, Agent Miller's searches are akin to the Government seizing some hard-copy notebooks while leaving others it deemed unresponsive behind, and then returning to the premises two years later to seize the left-behind notebooks based on investigative developments but without seeking a new warrant.

*Id.* at 406–07 (citation omitted); *accord Jefferson*, 571 F. Supp. 2d at 704 (holding that if

initial examination "discloses neither that the document is within the scope of the

warrant, nor that there is probable cause to seize it under the plain view doctrine," agents

may only return to the document after seeking a warrant to do so).  Just as in *Wey*, the

government here seeks to collapse the distinction between its possession of Mr. Adams's

emails solely for the purpose of executing the warrant and its possession of an object that

it has already lawfully seized under the warrant, which is subject to reexamination.

In sum, the limited purpose for which the government had access to Mr. Adams's

emails did not permit it to conduct the sort of searching, repeated review of those emails

that it did.  In addition to violating Rule 41, this conduct was manifestly unreasonable.

*See United States v. Penn*, 647 F.2d 876, 882 n.7 (9th Cir. 1980) (en banc) ("A warranted

search is unreasonable if it exceeds in scope or intensity the terms of the warrant.").

### 4.    The Government's Ostensible "Seizure" Was Based on Search Terms and "Relevance" Rather Than the Terms of the Warrant.

Fourth, throughout its "execution" of the warrant and subsequent litigation, the

government has misunderstood what it needed to do under Rule 41.  In its briefing and at

the hearing, the government referred to "relevance," that is, relevance to its investigation

or case.  *See, e.g.*, ECF 77 at 5 (justifying actions during yearlong search as necessary "to

make informed decisions about relevance"); ECF 52-1 at 42 (AUSA Maria stating

searches aimed at "identify[ing] emails relevant to the case"); Jan. 8 Hr'g Tr. at 47:11–12

(referring to "the final relevance cull"); *id.* at 118:25–1 (Kroells explaining her task as

"trying to get all of the relevant e-mails together for the fraud scheme case"); Jan 9 Hr'g

Tr. at 68:14–19 (Khan explaining prosecution team "just kind of reviews as a whole the database to figure out what fit into our investigation what was relevant"). Relevance applies in civil discovery, where parties must produce all relevant matter. *See* Fed. R. Civ. P. 26(b)(1). Relevance also applies to grand jury subpoenas, which can be quashed when irrelevant to the general subject of the grand jury's investigation. *See United States v. R. Enters.*, 498 U.S. 292, 301 (1991). But relevance does not apply to the identification of which items fall within the scope of a warrant—rather, the terms of the warrant govern. *See United States v. Sedaghaty*, 728 F.3d 885, 913 (9th Cir. 2013) ("Relevance, of course, is not the standard; the language of the warrant controls.").

This misunderstanding infects the final list of "relevance terms" that the government has dubbed its "seizure" under the warrant. If the government seriously contends that every non-privileged email in Mr. Adams's accounts containing the final list of search terms—that is, the words "Apollo," "Diamond," "Gemstone," "Scio," "Krossbow," "Linares," "Lancia," "Zipkin," "Nichols," "LisaL," "Mack," "Rapello," "Platt," "Robb," "Larson," "McMahon," "Bern," or "McPheely" or the letters "ADI," "ADGC," "DL," "RL," "ADR," "RBE," "ESA," "MRM," "SDTC," or "LMAInc,"— actually falls within the scope the warrant, then the government as much as admits that the warrant has no limit and therefore lacks particularity (and is overbroad). Indeed, nearly half of the documents that the government viewed, and then ostensibly seized, have nothing to do with this case—not to mention this warrant. *See* Maier Supp. Decl. & Exs. 1–7; *supra* Part I.C.4.

If, by contrast, the government concedes that only about half of the emails

containing its relevance terms even arguably fall within the scope of the warrant—which

Mr. Adams has confirmed—then the government has *never* fulfilled its responsibility to

execute the warrant.  Having failed to do the one thing it was supposed to do under Rule

41, the government's conduct in purportedly "executing" the warrant was unreasonable.

*See United States v. Debbi*, 244 F. Supp. 2d 235, 237–38 (S.D.N.Y. 2003) ("[E]ven after

the instant motion was brought, no meaningful attempt was made to separate from what

was actually seized the only items that the warrant permitted to be seized . . . .  It is thus

evident that the Government chose to blatantly disregard the very limitations that saved

the warrant from overbreadth, and that the Government continues to do so.").

### 5.    The Government Disregarded Privilege

Finally, the government "executed" the warrant unreasonably by disregarding

privilege, which it admits it had no right to do.  *See* Jan. 8 Hr'g Tr. at 37:5–7.  The Eighth

Circuit has made clear that "an attorney's obligation to safeguard the privilege of his files

and papers, from any attempted invasion of such protected confidences as they contain,

entitles him to set up . . . the violation of privilege . . . as an element of unreasonable

search and seizure."  *Schwimmer v. United States*, 232 F.2d 855, 866 (8th Cir. 1956).[28]

There are two distinct privilege issues in this case because Mr. Adams was both a

---

[28] *See also* Eric D. McArthur, *The Search and Seizure of Privileged Attorney-Client Communications*, 72 U. Chi. L. Rev. 729, 746–47 (2005) ("[T]he Fourth Amendment's protection of privileged communications extends not only to purposeful and knowing searches but also to situations in which agents have reason to believe that a search will expose them to privileged communications.  In such situations, the Fourth Amendment's mandate of reasonableness requires that agents take measures to minimize their exposure to privilege material.").

practicing attorney and was himself represented by counsel.

Although searching a law office is not *per se* unreasonable, *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 959 (3d Cir. 1984), courts agree that "[i]n cases involving the search of a law office, the manner in which the search is conducted is subject to a heightened degree of scrutiny and special care to avoid unnecessary intrusion on attorney-client communications." *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1039 (D. Nev. 2006) (collecting cases); *accord Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1025–26 (2d Cir. 1980) ("[A] law office search should be executed with special care to avoid unnecessary intrusion on attorney-client communications."). The government searched Mr. Adams's email accounts rather than his office, but "[t]he government well knew, prior to the search, that the [accounts] contained privileged communications." *Klitzman*, 744 F.2d at 961. In fact, more than 95% of the documents in the database contained the general and specific privilege search terms that AUSA Maria originally proposed, which indicated that the database was flooded with privileged documents. *See* Jan. 9 Hr'g Tr. at 172:2–175:14.

Three cases are instructive as to how the government can approach the search of an attorney's records. In *Klitzman*, postal inspectors who suspected an attorney of mail fraud secured warrants for his law office and seized two thousand files. *See* 744 F.2d at 957. The Third Circuit upheld a preliminary injunction ordering the files returned because postal inspectors "took not one step to minimize the extent of the search or to prevent the invasion of the clients' privacy guaranteed by the attorney-client privilege." *See id.* at 961–62. In *National City Trading*, by contrast, a search warrant authorized the

seizure of business records intermixed with legal ones, and the prosecutor issued a memo and held a pre-search meeting explaining that agents should take special care executing the warrant. *See* 635 F.2d at 1023. The agents waited until the attorney whose files were being searched was present, did not examine closed files, and sealed without inspection a file identified as legal by the attorney. *See id.* at 1026. The Second Circuit held the search reasonable, although it suggested it would suppress any privileged documents accidentally seized. *See id.* Third, in a recent, high-profile search and seizure of an attorney's files, "the USAO-SDNY and FBI . . . established rigorous protocols . . . to ensure that the attorney-client privilege is respected," including having warrants executed by "filter agents who are not part of the investigative team and [who] have been walled off from" the prosecution team. *Michael D. Cohen v. United States*, No. 18-mj-03161, ECF 1, at 2, 4 (S.D.N.Y. Apr. 13, 2018) (attached as Ex. 3).

These measures in *Cohen* were required by the United States Attorneys' Manual. *See* U.S. Dep't of Justice, *United States Attorneys' Manual* § 9-13.420 (2012) ("Searches of Premises of Subject Attorneys"); DX 44 (containing this policy).[29] The Manual states "prosecutors are expected to take the least intrusive approach consistent with vigorous and effective law enforcement," *id.*, such as (for example) taking Mr. Hopeman up on his offer to review the emails for privilege. The Manual explains that if a search is necessary, "the possibility that, during such a search, the government may encounter

---

[29] Internal procedures do not create rights, but they do inform the reasonableness of a government agent's actions. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (citing ATF guidelines in holding reliance on non-particular warrant objectively unreasonable).

material protected by a legitimate claim of privilege" makes it "important that close control be exercised over this type of search." *Id.* To that end, "[p]rocedures should be designed to ensure that privileged materials are not improperly viewed, seized, or retained during the course of the search. *Id.* "[I]n all cases a prosecutor must employ adequate precautions to ensure that the materials are reviewed for privilege claims . . . ." *Id.* When executing the search warrant, "to protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, a 'privilege team' should be designated." *Id.* "Privilege team lawyers should be available . . . to advise the agents during the course of the search . . . ." *Id.*[30]

As the cases and Manual demonstrate, the government's conduct here was patently unreasonable. The government never used a taint team to wall off the search and review of the Yahoo! documents from the AUSAs and investigative agents assigned to the prosecution team, as is required by the Manual and is the standard practice in U.S. Attorneys' Offices across the country. There was no "close control" over the search here. And the government never established procedures to protect the disclosure of confidential communications between Mr. Adams and his clients—even after being alerted by Mr. Hopeman that "Mr. Adams and his law firm represented and performed legal work on

---

[30] The government refused to respond to Mr. Adams's requests for information about its compliance with Department of Justice policies. *See* ECF Nos. 68, 100. *Contra Cohen*, No. 18-mj-03161, ECF 1, at 4 (describing consultation with DOJ Office of Enforcement Operations, including developing pre-search instructions for separate filter team). Given how the warrant was "executed," the government cannot have complied.

behalf of a variety of parties and clients during the period of time covered by the warrant

to Yahoo!," DX 58, and even after AUSA Maria responded that the government

"understand[s] [its] obligations and [is] taking appropriate steps to comply with the U.S.

Attorneys' Manual and to protect any applicable privileges."  DX 59.

The other—even graver—privilege issue involves Mr. Adams's communications

with his own attorneys.  The search and seizure of communications protected by the

attorney-client privilege are so rare that the issue is little litigated.  Courts agree that

when executing a warrant for emails, the government must take steps to avoid reviewing

privileged communications.  *See, e.g.*, *Preventive Med. Assocs., Inc. v. Commonwealth*,

992 N.E.2d 257, 268 (Mass. 2013) (concluding that to be reasonable, search of indicted

defendant's emails "must include reasonable steps designed to prevent a breach of the

attorney-client privilege.").[31]  And the government usually does so, which is why these

cases are rare.  In *United States v. Taylor*, 764 F. Supp. 2d 230 (D. Me. 2011), for

example, the court found reasonable an email search that encountered privileged

communications where (1) an agent began by viewing only email header information, (2)

upon noticing potentially privileged material he stopped and contacted the prosecutor, (3)

---

[31] In *Preventive Medicine*, the Massachusetts Supreme Judicial Court based its holding on the Fourth Amendment and Massachusetts Article 14 without distinguishing between them.  *See* 992 N.E.2d at 267–68.  Article 14 served as the Fourth Amendment's model, and Massachusetts courts apply the same reasonableness standard under both provisions. *See Commonwealth v. Garner*, No. 35026-27, 1997 WL 339122, at *12 (Mass. Super. Ct. June 10, 1997); *see also Commonwealth v. Morales*, 968 N.E.2d 403, 410 (Mass. 2012).

the prosecutor filed a motion proposing a filter team,[32] and (4) the defendant suggested

no alternative, *id.* at 232–33.  In finding this search reasonable, the court emphasized the

government's quick resort to the court once it encountered attorney-client

communications.  *See id.*

In contrast to *Taylor*, here, the review of the Yahoo! documents was conducted by

the prosecution team itself, and even after repeatedly encountering privileged documents,

the team never stopped its review or implemented a taint team.  *Contra United States v.*

*Musto*, No. 3:16cr90, 2017 WL 1078179, at *2–5 (Agent who viewed privileged book

while executing warrant "immediately transferred . . . to the filter team").  Although the

government used search terms (without consultation with Mr. Adams's counsel) to filter

out some privileged documents, this process was woefully inadequate.  First, Kroells

knowingly was permitted to search the database prior to the application of the privilege

filter terms.  Second, those terms were incomplete, resulting in the review of core

privileged communications.  Third, even after members of the prosecution team

---

[32] Mr. Adams shares the skepticism of judges of this Court that taint teams protect Sixth
Amendment rights.  *See, e.g.*, Ex. 1, Order Adopting R&R, *United States v. Heppner et
al.*, No. 05-cr-00094, at 4 n.1 (D. Minn. Nov. 23, 2005), ECF 79 (Tunheim, J.) (sharing
"the Magistrate Judge's skepticism . . . that the use of a 'taint reviewer' was adequate to
protect defendants' . . . rights." (quoting ECF 71, at 11 n.3 (Noel, M.J.) (employing taint
team is "not unlike assigning the fox to guard the henhouse"))).  Although some circuits
have acknowledged the existence of taint teams, counsel to Mr. Adams is unaware of any
case in which a circuit court has endorsed their use.  Still, the government's use of a taint
team from the beginning of this case would have been more reasonable than relying on
"mechanical filtering."  The approach recently adopted in *Cohen*—the appointment of a
neutral special master who deals confidentially with the privilege holders—is among the
approaches best designed to appropriately respect and avoid government intrusion on the
privilege.  *See Cohen*, No. 18-mj-03161, ECF 30 (S.D.N.Y. Apr. 27, 2018).

encountered privileged communications—including memoranda bearing obvious "privilege" legends—they did not immediately improve their filtering.  (As a result, other members of the prosecution team were exposed to privileged communications and additional privileged communications were viewed.)  Fourth, the failure to use a taint team caused Mr. Adams's correspondence with Latham, about matters at the heart of this case, to remain in the review database and be reviewed by AUSA Maria.  And last, even after being alerted by Mr. Adams's tax attorney of the privileged nature of some communications between Mr. Adams and Murry LLC, AUSA Maria intentionally searched again for communications of that kind.  This cavalier disregard for Mr. Adams's attorney-client privilege was an element of the government's overall unreasonable search and seizure.  *See Schwimmer*, 232 F.2d at 866.

*     *     *

Taken individually, each of the transgressions outlined above would merit suppression.  Together, they require it.  Rule 41 requires suppression where "reckless disregard of proper procedure is evident."  *Turner*, 781 F.3d at 386–87 (internal quotation marks omitted).  In *Vision Systems*, a court within the Eighth Circuit reviewed the law surrounding reckless disregard and ultimately concluded that when the government failed to execute a two-step warrant within the 60-day period specified in the warrant, it recklessly disregarded proper procedure.  *See* Ex. 2, *Vision Systems* Order at 35–41.  The court explained that the failure was reckless because the case agent was "ignoran[t] about the Warrant's temporal restrictions" despite being the lead government investigator who "should have been keenly aware of the Warrant's requirements."  *Id.* at 38.  Likewise,

each member of the prosecution team should have known that search warrants impose requirements, that a "two-step process" requires that the government complete the second step, and that there are differences between reviewing the fruits of a subpoena and executing a warrant. The government's complete failure to complete the second step showed reckless disregard for proper procedure and requires suppression.

More broadly, every facet of the government's execution of the warrant was unreasonable. The Fourth Amendment's "test of reasonableness . . . is not capable of precise definition or mechanical application," and "[i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Here, that balance overwhelmingly favors suppression because there was no pressing need for the government to conduct a search of documents already in its possession the way it did, *see Wey*, 256 F. Supp. 3d at 400 (finding no exigency in conducting second step of two-step electronic search), and each aspect of that search violated Mr. Adams's rights, *see, e.g.*, *Cronin v. Peterson*, 288 F. Supp. 3d 970, 990 (D. Neb. 2018) (calling it "not objectively reasonable to execute [a] search warrant[] without seeing [it] or knowing what was to be seized under [it]"); *Cook v. Gibbons*, No. 404CV00073, 2005 WL 2260689, at *4 (E.D. Ark. Sept. 12, 2005) ("A search conducted pursuant to a lawfully issued warrant becomes unreasonable and therefore unconstitutional if the police officers executing the search overstep the self-contained limits of the warrant."). The government's unreasonable "execution" of the Yahoo! warrant violated the Fourth Amendment, so suppression is required.

### C.     The Government Over-seized Emails and Displayed a Flagrant Disregard for the Scope of the Warrant.

The government's massive over-seizure of emails outside the scope of the warrant provides a separate and independent basis for suppression.  The government's "flagrant disregard for the limitations of [the] search warrant . . . ma[d]e [the] otherwise valid search an impermissible general search," which "require[s] the suppression or return of all evidence seized during the search."  *Marvin v. United States*, 732 F.2d 669, 674–75 (8th Cir. 1984).  The conduct and testimony summarized above demonstrate that for more than a year, the government investigative team searched and seized documents at will without regard for the warrant.

An examination of the documents the government claims to have seized demonstrates the government's flagrant disregard for the terms of the warrant.  As explained above, nearly half of the non-privileged documents the government viewed and purportedly seized from Mr. Adams's Yahoo! accounts are beyond the scope of what is authorized by the warrant and its probable cause.  *See supra* Part I.C.4; Maier Supp. Decl. & Exs. 1–7.  Of those, 249 discuss the sale of Apollo warrants and/or the allegedly secret bank accounts, and 25 discuss Mr. Adams's personal tax returns, *see id.*, and the government used additional documents about Mr. Adams's taxes from the Yahoo! database that they never even purported to seize, Exs. 6, 13.  The remaining 1,306 do not even fall within the scope of the *indictment*, much less the far-narrower *warrant*.[33]

---

[33] The government's flagrant disregard for the limits of the warrant merits blanket suppression.  Mr. Adams acknowledges that *United States v. Decker*, 956 F.2d 773 (8th Cir. 1992), held that flagrant disregard applies only to the places searched and not to

## III.   SUPPRESSION REMEDIES

There is only one remedy for the sort of widespread Fourth Amendment violations that occurred in this case:  suppression of unlawfully seized evidence and its fruits.  *See United States v. Barraza-Maldonado*, 732 F.3d 865, 867 (8th Cir. 2013) ("A violation of the Fourth Amendment usually triggers exclusion of evidence obtained by way of the violation from a subsequent criminal prosecution.").  This is an appropriate case for the Court to apply the exclusionary rule because doing so would result in appreciable deterrence, the benefits of which would outweigh the costs of exclusion.  *See United States v. Hamilton*, 591 F.3d 1017, 1027–28 (8th Cir. 2010) (citing *Herring v. United States*, 555 U.S. 135, 143 (2009)) (laying out these factors for exclusion).

Exclusion here would result in appreciable deterrence.  The government's "conduct transgressed some bright-line rules of the Fourth Amendment." *United States v. Hulscher*, No. 4:16-CR-40070-01, 2017 WL 1294452, at *15 (D.S.D. Feb. 10, 2017) (suppressing evidence after follow-on search of cell phone for evidence of a new crime), *R&R adopted in pertinent part by* 2017 WL 657436 (D.S.D. Feb. 17, 2017).  One of these

---

over-seizures.  *Id.* at 779.  It is not clear how this standard would apply under a two-step warrant.  In any event, this holding, which put the Eighth Circuit at odds with other circuits, was a misapplication of Supreme Court precedent.  It makes little sense because the flagrant disregard doctrine exists to combat over-seizures.  Mr. Adams therefore requests that the Court find flagrant disregard here so that, should it be necessary, he can litigate the issue on appeal.  And, as Mr. Adams will explain below, he requests that the Court suppress all documents beyond the scope of the warrant, which *Decker* requires. *See id.* ("[*A*]*s long as the unlawfully seized items are suppressed*, there is certainly no requirement that lawfully seized evidence be suppressed as well." (emphasis added)).

rules is that "[s]earches pursuant to a search warrant are limited to the scope of the search and the things described with particularity in the search warrant." *Id.* at *15. Another bright line rule is that probable cause must "support[] the issuance of a warrant to seize" the items listed in that warrant. *Timley*, 443 F.3d at 622 n.5. A third is that warrants must particularize the items to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 563 (2004); *accord Wey*, 256 F. Supp. 3d at 398–99. "A reasonable, ordinary law enforcement agent . . . would know" and follow these rules, so the government's "conduct here [wa]s sufficiently deliberate so that exclusion will have a meaningful and substantial deterrent effect." *Hulscher*, 2017 WL 1294452, at *15.

The benefits of deterring this misconduct outweigh the costs of suppression. The Court must apply the exclusionary rule to prevent government agents from executing future electronic search warrants in the way this one was executed. But the converse is not true. The facts of this case are so unique—the conduct so egregious—that it is unlikely to result in evidence being suppressed in other cases. Mr. Adams is also not one of the "possibly dangerous defendants" going free as a result of suppression. *See Herring*, 555 U.S. at 141. He is innocent, but even if he were not, he is accused of financial crimes. *See United States v. Ganias*, 755 F.3d 125, 141 (2d Cir. 2014) ("Even assuming [defendant] committed tax evasion—a serious matter—this case does not involve drugs, guns, or contraband."), *overturned on other grounds en banc* 824 F.3d 199 (2d Cir. 2016). The balance between deterrence and societal costs favors deterrence.

The government must be deterred from acting in complete derogation of the Fourth Amendment, as it did here. First, the government's warrant to search ten years of

email for generic fraud lacked particularity.  Second, that warrant was overbroad where it

authorized the seizure of evidence beyond Mr. Adams's alleged 2011–12 Apollo/Scio

asset purchase transaction scheme.  Third, the warrant's "execution" was so unreasonable

that it is unrecognizable as an execution at all.  This Fourth Amendment hat-trick, along

with the violation of Rule 41 and massive over-seizure, demands the most severe remedy.

## A.    Complete Suppression Is the Appropriate Remedy.

The simplest solution, amply justified, is to suppress all of Mr. Adams's emails

and the fruits of their seizure.  Three different transgressions independently warrant

blanket suppression.  First, total suppression is the remedy when a warrant is completely

lacking in particularity.  *See United States v. Timley*, 443 F.3d 615 at 622; *accord Wey*,

256 F. Supp. 3d at 409–11 (applying blanket suppression to evidence seized under non-

particularized warrant).  The Yahoo! warrant, which purported to authorize a search of

ten years' worth of Mr. Adams's emails for evidence of generic fraud, is such a warrant.

Second, when a warrant is executed in an unreasonable manner under the Fourth

Amendment, the Eighth Circuit mandates suppression of all evidence obtained via that

warrant.  *See United States v. Marts*, 986 F.2d 1216, 1219 (8th Cir. 1993) (explaining that

knock and announce violation rendered search objectively unreasonable under the Fourth

Amendment and required suppression of all evidence seized).  Here, instead of actually

executing the warrant, the government (1) sought documents outside the warrant's scope,

(2) used documents for other purposes, (3) reviewed documents more thoroughly than

allowed, (4) relied on search terms and "relevance" instead of the warrant's own terms,

and (5) disregarded privilege.  All of these actions were unreasonable and together they

require blanket suppression.

Third, a reckless disregard of proper procedure under Rule 41 requires blanket suppression. *See United States v. Horton*, 863 F.3d 1041, 1052 (8th Cir. 2017) (declining to apply the exclusionary rule to a technical Rule 41 violation, in part because doing so would require suppression of all evidence obtained pursuant to warrant); *accord Vision Systems* Order at 40–41 (Ex. 2) (suppressing all evidence obtained from execution of warrant in manner that recklessly disregarded Rule 41).[34] Here, Rule 41 and the warrant required the government to actually complete the second step of the two-step process.  It never did.  Instead, the government engaged in the conduct outlined above.  This conduct recklessly disregarded proper procedure under Rule 41, so suppression is appropriate.

### B.      In the Alternative, the Court Should Suppress Emails That Were Never Reviewed or Fall Outside the Warrant.

Blanket suppression is the appropriate (and far simpler) remedy, but even failing that, thousands of Mr. Adams's emails should be suppressed.  First, the Court should suppress the documents the government *never* viewed during its yearlong sojourn through Mr. Adams's emails.  The government has now lost its chance.  Two cases support suppression of seized but un-reviewed emails.  First, in *Metter*, the court held "that the government's more than fifteen-month delay in reviewing the seized electronic evidence . . . constitute[d] an unreasonable seizure under the Fourth Amendment."  860 F. Supp. 2d at 212.  The court explained that although there was no established upper

---

[34] Again, blanket suppression should be appropriate on the independent ground that the government flagrantly disregarded the warrant's terms in its seizures.  *See supra* note 33.

limit to when the government could review documents under the two-step process, "the

Fourth Amendment requires the government to complete its review, *i.e.*, execute the

warrant, within a 'reasonable' period of time." *Id.* at 215.  So the court suppressed all the

evidence.  *Id.* at 216.  In recent briefing, the government attempted to distinguish *Metter*

because there the government failed to begin its execution of the warrant for an extended

period.  *See* Gov't Letter Br., ECF 127 at 3.  But so did the government here.  Certainly it

searched through and used Mr. Adams's emails for a variety of purposes from the get-go,

but the absence of any system to identify documents as outside the scope of the warrant

and the fact that it has never reviewed over 85% of the emails it purportedly seized

demonstrate that it, too, never really began executing the warrant.

 *Debbi* also supports suppression of the un-reviewed emails.  244 F. Supp. 2d at

236–37.  In *Debbi*, the government seized seven boxes of items from the defendant's

home for off-site review in a fraud case.  *Id*.  Those boxes contained many personal

documents.  *See id.* at 237.  The government there made "virtually no attempt" to

segregate evidence of the defendant's alleged fraud from other documents at the time of

the seizure and even months later, "no meaningful attempt was made to separate from

what was actually seized the only items that the warrant permitted to be seized."  *Id.* at

237–38.  In a passage that applies with equal measure to this case, the court lamented:

> For all its protestations of good faith, the Government felt free to invade
> Debbi's home, seize his records without meaningful limitation and restraint,
> pick over them for months thereafter without determining which were
> actually evidence of the alleged crimes, and even now refrain from returning
> what it was never entitled to seize.

*Id.* at 238.  In addition to ordering suppression of all documents seized that were not

evidence of the crimes alleged, the court ordered that "all items seized from the Debbi home that the Government has not by this date determined are evidence of the alleged [crimes] are hereby suppressed . . . ." *Id.* The Court should order the same relief here.

Second, documents falling outside the warrant's probable cause should be suppressed. As established above, the Yahoo! warrant is facially overbroad because it purports to authorize the seizure of items which Inspector Kroells's affidavit did not establish probable cause to seize. The Court must "measur[e] the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued." *Christine*, 687 F.2d at 753. Here, Kroells's affidavit established probable cause only of the alleged fraud scheme relating to the 2011-12 Apollo/Scio asset purchase transactions, so only documents comprising that alleged scheme could be seized under the warrant. Specifically, of the 3,350 viewed, non-privileged documents, 1,594 plainly fall outside the scope of probable cause established by Kroells's affidavit. *See* Maier Supp. Decl. & Exs. 1–7. These documents should be suppressed.

Third, documents falling outside the terms of the warrant should be suppressed. The government disregarded even the non-particular and overbroad terms of the warrant during its yearlong "execution" process and final application of search terms. It therefore seized many emails that fall outside the terms of the warrant. The remedy for the seizure of such items is suppression. *See Decker*, 956 F.2d at 779. The 635 "Entirely Unrelated" and 25 "Personal Tax" documents inarguably fall outside the scope of the warrant and must be suppressed. The 556 "Unrelated Apollo or Scio" and 249 "Warrants or Bank

Accounts" documents also fall outside any legitimate interpretation of the warrant.

Accordingly, these documents should be suppressed.

## IV.   CONCLUSION

For the reasons stated, the Court should suppress all Yahoo! emails obtained via

the warrant at issue.


Dated:  June 1, 2018                          Respectfully submitted,


                                         ___/s/ *Lance Wade*_____

                                         Joseph G. Petrosinelli (DC Bar #434280)
                                         Lance Wade (DC Bar #484845)
                                         Gloria Maier (DC Bar #1012208)
                                         WILLIAMS & CONNOLLY LLP
                                         725 Twelfth Street, N.W.
                                         Washington, DC  20005
                                         Telephone:  (202) 434-5000
                                         jpetrosinelli@wc.com
                                         lwade@wc.com
                                         gmaier@wc.com

                                         James L. Volling (#113128)
                                         Deborah A. Ellingboe (#26216X)
                                         FAEGRE BAKER DANIELS LLP
                                         2200 Wells Fargo Center
                                         90 South Seventh Street
                                         Minneapolis, MN  55420
                                         Telephone:  (612) 766-7000
                                         Facsimile:  (612) 766-1600
                                         james.volling@faegrebd.com
                                         debbie.ellingboe@faegrebd.com


                                         *Attorneys for Defendant Edward S. Adams*