United States v. Edward S. Adams
Evidentiary Hearing - Motion to Suppress (DCD 36)
January 8, 2018
Crim. No. 17-64 (DWF/KMM)

### Index of Defense Exhibits (DX)

| EXHIBIT | DESCRIPTION |
| --- | --- |
| DX 01 | Declaration of Christie Kroells |
| DX 02 | Declaration of Jennifer Khan |
| DX 03 | Declaration of Brandon Belich |
| DX 04 | Declaration of Mark Zeitz |
| DX 05 | Declaration of David M. Maria |
| DX 06 | Docket for Case No. 15-mj-00942-JSM-1 (First Warrant ) |
| DX 07 | Nov. 25, 2015 First Warrant Application |
| DX 08 | Nov. 25, 2015 First Warrant and Return |
| DX 09 | Docket for Case No.  16-mj-00008-SER-1 (Second Warrant) |
| DX 10 | Jan. 7, 2016 Second Warrant Application |
| DX 11 | Jan. 7, 2016 Second Warrant and Return |
| DX 12 | DOJ Automated Litigation Support Emails |
| DX 13 | 2016.03.18 Email from Maria to Beulke, Kokkinen, cc Khan re Apollo/Scio emails |
| DX 14 | 2016.04.14 Email from Maria to Kokkinen re: ADAMS - Search Terms for Privilege Filter |
| DX 15 | 2016.04.26 Email from Maria to Rank, Kokkinen re: Adams Privilege/Taint Review |
| DX 16 | 2016.04.27 Email from Maria to Belich, Kroells, Khan, cc Kokkinen re: Scio update |
| DX 17 | 2016.04.27 Email from Maria to McConville, cc Czapko re: Relativity database |
| DX 18 | 2016.05.05 Email from Maria to Kroells, cc Belich, Khan, Kokkinen re: Update |
| DX 19 | 2016.05.05 Email from Maria to Czapko, cc Khan, Kroells, Belich re: Relativity database |
| DX 20 | 2016.05.16 Email from Kroells to Maria, Kokkinen, cc Khan, Belich re: Scio Emails - Privileged |

| DX 21 | 2016.05.16 Email from Maria to Kroells, Kokkinen, cc Khan, Belich re: Scio emails |
| DX 22 | 2016.06.07 Email from Maria to Czapko re: Relativity database |
| DX 23 | 2016.10.17 Email from Maria to Czapko re: Adams database |
| DX 24 | 2017.02.28 Email from Maria to Czapko re: Adams database |
| DX 25 | 2016.03.18 Email from Beulke to Kokkinen, cc Khan re: Apollo/Scio emails |
| DX 26 | 2016.04.14 Email from Kokkinen to Maria re: ADAMS - Search Terms for Privilege Filter |
| DX 27 | 2016.04.26 Email from Maria to Kokkinen re: Adams Privilege/Taint Review |
| DX 28 | 2016.06.28 Email from Maria to Kokkinen FW: Follow-Up |
| DX 29 | 2016.07.08 206p Email from Zeitz to Maria, cc Khan, Serres, Kokkinen Re: Edward Adams case |
| DX 30 | 2016.07.08 234p Email from Zeitz to Khan, cc Seres Re: Edward Adams case |
| DX 31 | June 14, 2014 SEC Access Request |
| DX 32 | June 28, 2016 Email from Maria to Young Re: Follow-up |
| DX 33 | Chain of Custody |
| DX 34 | 2017.04.07 Maria letter to Paulose |
| DX 35 | 2017.05.16 Email from Wade to Kokkinen, Maria attaching letter |
| DX 36 | 2017.05.16 Letter from Brooker to Volling enclosing Production Hard Drive |
| DX 37 | 2017.06.02 Email from Kokkinen to Maria, Wade |
| DX 38 | 2017.06.08 Email from Maria to Wade, cc O'Connor, Volling, Petrosinelli, Kokkinen |
| DX 39 | 2017.06.29 Email from Maria to Wade, cc O'Connor, Volling, Petrosinelli, Kokkinen |
| DX 40 | 2017.08.23 Email Correspondence from Maria to Wade, cc O'Connor, Volling, Petrosinelli, Kokkinen |
| DX 41 | 2017.08.31 Letter from Wade to Maria, Kokkinen |
| DX 42 | 2017.09.03 Email from Maria to Wade, Kokkinen, cc Petrosinelli, Volling, O'Connor |
| DX 43 | 2017.09.27 Defendant's Motion to Suppress - Wade Declaration [DCD 38] |
| DX 44 | US Attorneys' Manual Policy on Searches of Attorney Premises |
| DX 45 | MN Rules of Professional Conduct Rule 3.8 |

| DX 46 | Minnesota LR-83-6 adopting rules professional conduct |
| DX 47 | 2016.03.03 – Grand Jury and Document Subpoena to Adams |
| DX 48 | 2016.03.09 Email from Kokkinen and Hopeman |
| DX 49 | 2016.04.11 Letter from Hopeman to Maria re: Edward Adams Production |
| DX 50 | 2015.08.27 Adams, Edward – SEC Deposition Testimony |
| DX 51 | 2015.10.08 Adams, Edward - SEC Deposition Testimony [Vol II] |
| DX 52 | SEC Deposition Exhibit 29 |
| DX 53 | SEC Deposition Exhibit 56 |
| DX 54 | SEC Deposition Exhibit 69 |
| DX 55 | 2011.08.31 ADI-Public Scio Asset Purchase Agreement |
| DX 56 | 2012.05.31 ADGC Asset Purchase Agreement |
| DX 57 | INTENTIONALLY OMITTED |
| DX 58 | 2016.07.08 Letter from Hopeman to Luger re Privileged ESI |
| DX 59 | 2016.08.15 Letter from Lugar to Hopeman |
| DX 60 | 2016.11.03 Email from Maria and Kroells re: Adams Relativity emails |
| DX 61 | 2017.09.07 Email from Maria to Bildsten re: Adams |
| DX 62 | 2015.08.20 - Adams SEC production privilege log |
| DX 63 | 2017.12.28 - Supplemental Maria Declaration [Doc ID 79] |
| DX 64 | Adams Opposition to Motion to Quash - Ex 4 (pivot table) |
| DX 65 | 2016.05.09 Hopeman Letter to Maria |
| DX 66 | Grand Jury Subpoena - Murry & Associates |
| DX 67 | 2016.12.01 Brever Letter to Maria re: Murry & Associates subpoena |
| DX 68 | 2016.12.20 Brever Letter to Maria re: Murry & Associates subpoena |
| DX 69 | 2017.12.21 First Superseding Indictment [Doc ID 70] |
| DX 70 | 2017.12.15 Email from Maclaughlin to Wade re Relativity Data |
| DX 71 | Excerpt - Relativity - Admin Guide - 9.4 - Description of Audited Actions |
| DX 72 | Minnesota Discovery Policy for Prosecutors |
| DX 73 | USAM 3-13.000 - Property Management |
| DX 74 | Thumb Drive containing Relativity activity logs disclosed by government (Prosecution team, Czapko, Zeitz) |

| DX 75 | Thumb Drive containing Maria Excerpts (electronic version of DX-78) |
| DX 76 | Thumb Drive containing Kroells Excerpts (electronic version of DX-80) |
| DX 77 | Thumb Drive containing Czapko Excerpts (electronic version of DX-86) |
| DX 78 | Excerpt of prosecution team Relativity activity log: AUSA Maria [see separate binder] |
| DX 79 | Extract of keyword searches: AUSA Maria |
| DX 80 | Excerpt of prosecution team Relativity activity log: Inspector Kroells [see separate binder] |
| DX 81 | Extract of keyword searches: Inspector Kroells |
| DX 82 | Excerpt of prosecution team Relativity activity log: Agent Khan |
| DX 83 | Extract of keyword searches: Agent Khan |
| DX 84 | Excerpt of prosecution team Relativity activity log: Agent Belich |
| DX 85 | Extract of keyword searches: Agent Belich |
| DX 86 | Relativity activity log: Czapko |
| DX 87 | IRS Mission and Authority (excerpt from Internal Revenue Manual) |
| DX 88 | Summary of Dates of Database Activity of Prosecution Team Members |
| DX 89 | Spedific Search Terms (003) (Czapko) |
| DX 90 | Search Warrant Addendum with red underlining (Inspector Kroells examination) |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

### DECLARATION OF CHRISTIE KROELLS

Pursuant to Title 28, United States Code, Section 1746, I, Christie Kroells, Inspector with the U.S. Postal Inspection Service ("USPIS"), hereby declare under penalty of perjury as follows:

1.    I have been an Inspector with the USPIS since 2003. I am assigned to investigate primarily criminal activity involving mail fraud and have been so assigned to handle such investigations in addition to other mail-related criminal cases for the entirety of my time with the USPIS.

2.    During my service as an Inspector, I have participated in numerous investigations involving allegations of mail fraud. The majority of those investigations involved an investigative team comprised of investigators from various federal and/or state law enforcement agencies including and not limited to the USPIS, the Federal Bureau of Investigation (FBI), the Internal Revenue Service (IRS), and the Minnesota Department of Commerce, among others.

3.    My investigations and those of others with which I have been involved necessitate the use of investigative tools such as search warrants. I have participated in the execution of approximately two to three search warrants per year since I have been a U.S. Postal Inspector. When executing a search warrant, care is taken to avoid the review of materials that contain information protected by the attorney-client privilege. Specifically, when I am searching pursuant to a search warrant and see indicia of potentially attorney-client-privileged information on a document, I stop reviewing that document and either set it aside (if the nature of the item allows for such setting aside) or otherwise memorialize



its location. I do this so I may call its existence to the attention of the taint/filter team for their review, if such a team exists, or to the attention of the prosecutor for purposes of establishing a taint/filter team to review the document. This practice would, of course, change in instances where law enforcement has obtained a waiver of the attorney-client privilege from the relevant client(s).

4.     This practice is consistent across the investigative teams with which I have been involved, whether I am the lead investigator on the case, another agent from my agency is the lead investigator, or an agent from another agency is the lead investigator. Proceeding cautiously is important to protect the privilege and to preserve and not taint the investigation and its agents by exposure to privileged information.

5.     In the instant investigation, regarding alleged fraud by Edward Adams, multiple law enforcement agencies joined in the investigative effort, including the USPIS, the FBI, and the IRS.

6.     In late 2015 and early 2016, the investigative team obtained search warrants for the personal email accounts of Mr. Adams, namely edwardsadams@yahoo.com and jafman1@yahoo.com, and a third, personal email account of one of Mr. Adams' law firm partners. While the investigative team knew of Mr. Adams' business "locations," we did not seek to search those locations, such as his law office or his law firm email accounts. I was the affiant for those search warrants and understood AUSA Kokkinen had engaged in a process related to attorney-involved searches before I went to the Magistrate Judge to seek signing of the search warrants. I do not know the precise nature of that process or its

requirements but I understand from my communications with AUSA Kokkinen that he complied with the requirements for seeking an attorney-related search warrant.

7.     On November 25, 2015, I presented to U.S. Magistrate Judge Janie Mayeron an application to search the contents of Mr. Adams' personal email account maintained by Yahoo! along with a proposed search warrant for the same.  I do not recall these materials then including the "Addendum for Computer Search Warrant."  There was a time when some Magistrate Judges would attach the Addendum for Computer Search Warrant to a search warrant even if the warrant was not for a device (i.e., a computer, cellular telephone or similar item) and was instead for content.  It is possible that Magistrate Judge Mayeron attached the addendum to the warrant when she reviewed the search warrant though I do not specifically recall that.  After reviewing the application, Magistrate Judge Mayeron authorized the search by signing the search warrant.  On November 25, 2015, I faxed that warrant to Yahoo!  By that time, Yahoo! had changed its standard practice of allowing service by fax and was no longer accepting service by fax.  It took several weeks for Yahoo! to communicate this to me.

8.     Given the lapse of time, Yahoo! requested a second search warrant for the same email content.  On January 7, 2016, I presented to U.S. Magistrate Judge Steven Rau a second application to search the contents of Mr. Adam's personal email account maintained by Yahoo! along with a proposed search warrant for the same.  These materials did not include the "Addendum for Computer Search Warrant" as the proposed warrant was not for a device but rather for content of an email account.  Magistrate Judge Rau did

DSM-000003

not attach the addendum to this second search warrant and authorized the search by signing the search warrant. On January 8, 2016, I served a copy of the warrant on Yahoo! by email.

9.     Sometime before I began searching the flash drive, possibly even before I received the flash drive, I spoke with AUSA David Maria, and we discussed reviewing communications between Mr. Adams and the employees of the Apollo/Scio entities. I was told by AUSA Maria that I could review them, that it was a non-issue, and the company would be waiving the privilege, if any, in any event.

10.     Approximately two months later, on or about March 7, 2016, I received at the USPIS, a sealed envelope from Yahoo!  Within the envelope was a flash drive. The same day, I logged the flash drive into evidence.

11.     Either on March 7, 2016, or within the next several days, I attempted to open the drive using a stand-alone computer in our office. My purpose in attempting to open the drive was to verify that I had received the content of each of the three email accounts for which the January search warrant had been served, to ascertain the volume of content within those email accounts, and to determine how to best conduct the search of that content. At first, I was unable to open the content contained on the drive and needed to download the application Mozilla. Once I was able to access the content, I determined that we had received each of the three email accounts, that the volume of email within those accounts was substantial, and that it would require significant time to search. I do not know on which day I contacted AUSA Maria to tell him that I received the drive, but my recollection is that it was before I started reviewing the drive.

12.     On March 15, 2016, I had additional time to look in more depth at the content of the drive, as I had previously been working on other aspects of the instant investigation as well as separate investigations.  At this time in the investigation of Mr. Adams, we were preparing for interviews of several potential witnesses.  As a result, my searching of the flash drive's content on March 15, 2016, and later on March 17, 2016, focused on using keywords and key dates that might relate to the interviews we would be conducting.  As a result of my searching on the 15th and my limited searching on the 17th, I printed 22 emails from the flash drive and included those printouts with other materials I was using to prepare for our witness interviews.  While I do not believe those 22 emails to contain attorney-client privilege information – indeed, I would have followed my standard practice if I had thought so – out of an abundance of caution, I have provided those 22 emails to the USAO's taint attorney for review, and as a result, I no longer have them.  Those 22 printouts were the only items I had retained from my searching of the flash drive before it was uploaded to the Relativity database through the USAO.  When searching on those two dates, I do not recall seeing any emails that gave me concern regarding the attorney-client privilege.  Had I, I would have followed my standard practice, which was to stop reviewing the document, to memorialize its location, to contact the assigned AUSA to advise them of this for potential taint review, and to continue my review of other emails.  I was not aware of any other procedures or requirements for this search beyond my normally cautious approach described above.

13.     When searching on March 15, 2016, and very briefly on March 17, 2016, I remember seeing material that at first glance did not appear relevant to the instant

investigation. This occurs in all searches regardless of the "location" involved because we are reviewing the materials to identify items responsive to the search warrant. Out of an abundance of caution, I contacted AUSA Maria to advise him of this.

14.     On March 17, 2016, I provided the flash drive to SA Khan. Within the next day or so, I learned from AUSA Maria that he and AUSA Kokkinen spoke and that we needed to engage in a heightened filter process. I understand SA Khan provided the flash drive to the USAO at some point for the mechanical filtering procedure I describe in more detail below.

15.     My understanding of the heightened filter process was based on my conversations with AUSA Maria and led me to believe that we would put into place a mechanical method to attempt to filter out information that was likely attorney-client privileged in nature and information that was not relevant. In developing this method, we (the agents) and AUSAs Maria and Kokkinen collaborated on the search terms to be used to mechanically filter the email content into two primary categories: (1) content we could search and (2) content we could not search until it passed a taint review. I understood that this mechanical filtering would be conducted through the United States Attorney's Office and staff who had expertise in handling electronic data.

16.     I also understood from conversations with AUSA Maria that this process of mechanically filtering might not extract everything that was attorney-client in nature and that, as a result, I would need to continue my standard cautious practice of stopping review and contacting the AUSA if I came across anything that appeared suggestive of an attorney-client relationship.

17.     On April 27, 2016, AUSA Maria emailed IRS SA Belich, me, and FBI SA Khan to advise us that the filtering search terms had been run on the email database and that it should be ready for review – minus the potentially privileged items (as determined by the mechanical filtering by search terms) – "very soon."

18.     On May 4, 2016, AUSA Maria emailed IRS SA Belich, me and FBI SA Khan to advise us that the email database was ready for review in the application Relativity.  In that email, AUSA Maria further stated, in relevant part:

> the potentially privileged docs have been pulled and stored in a separate database, which should not show up on your Relativity screens.  That being said, if you identify other law firms or lawyers in your review of the database with whom any of our folks appear to have an attorney-client relationship, make sure to flag it, and we can run supplemental searches to segregate these documents.

19.     I understand that the search records related to this database show I first reviewed documents within it on May 5, 2016.  I have no reason to disagree with that. When I opened the database, I noted that the volume of filtered emails remained substantial, such that a document-by-document review was impracticable.  Therefore, I began my searching using keywords and dates of significance in our investigation.  During my search, I did come across names of attorneys who were not targets or subjects of the instant investigation.  When this occurred, I followed my standard practice, stopped reviewing the email, memorialized the document's location, and contacted AUSA Maria.

20.     On May 16, 2016, I emailed AUSAs Maria and Kokkinen as well as IRS SA Belich and FBI SA Khan to advise that I had come across additional attorney email addresses likely relating to privileged information.  AUSA Maria replied by email to all of

DSM-000007

us the same day, indicating that he had also come across the names of other attorneys and that those, in addition to the ones I had seen, would be added to the filtering search terms to be segregated out as potentially privileged information. I have no reason to doubt that this further mechanical filtering occurred. Again, I continued my review knowing that I might need to utilize my standard practice if I came across additional emails that appeared to be attorney-client in nature. I do not recall seeing any additional attorney-client privileged information, although if I had I would have followed my normal practice, not reading the document, memorializing its location and contacting the prosecutor.

21.     On November 2, 2016, I went into the database to search and noticed that it contained a substantially lesser number of emails than it had first contained. I contacted AUSA Maria to let him know of this. Sometime thereafter, the database appeared to have increased in size from the substantially lesser number of emails that I saw on November 2, 2016.

22.     I was not involved in the preparation of the database for disclosure to defense counsel or in the disclosure of that database to defense counsel.

23.   By August 21, 2017, I had been spending substantial time on other investigations to the exclusion of the investigation of Mr. Adams.   When a pocket of time opened in my schedule on August 21, 2017, I returned to the investigation of Mr. Adams and reviewed some additional emails in the database, again using date and keyword searching.   That was the last day on which I reviewed the database.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ Christie Kroells_____
CHRISTIE KROELLS

DSM-000009

DSM-000010

## DECLARATION OF MARK ZEITZ

Pursuant to Title 28, United States Code, Section 1746, I, Mark Zeitz, Supervisory Information Technology ("IT") Specialist for the U.S. Attorney's Office in the District of Minnesota ("USAO"), hereby declare under penalty of perjury as follows:

1.    I am employed as the Supervisory IT Specialist and, more specifically, serve as Litigation Support Supervisor for the USAO. I have been employed with the office for 11 years and have served as an Information Technology Specialist, an Automated Litigation Support ("ALS") Specialist, and most recently, in my supervisory capacity. I supervise three Automated Litigation Support Specialists ("ALSS") including Dan Czapko. My direct supervisor is the First Assistant U.S. Attorney Greg Brooker, who is now also the Acting U.S. Attorney.

2.    ALS staff assist Assistant U.S. Attorneys ("AUSAs") in the Civil and Criminal Divisions in a variety of ways. Most often, ALS staff receive, process and make accessible for review the data that law enforcement obtains in investigations where our office is involved. At an AUSA's request, ALS staff will assist the AUSA in determining how to search, segregate or otherwise organize the data for review by the prosecution team. Likewise, when requested by the AUSA, ALS staff will assist the AUSA to export the data for disclosure to defense counsel once the investigation has resulted in criminal charges. ALS staff also have technical expertise in trial presentation applications; audio, video and related transcription presentation applications; as well PowerPoint, such that AUSAs sometimes seek ALS assistance in these areas.



EXHIBIT
DX-04

DSM-000022

3.      In the context of receiving, processing, organizing and later exporting data for disclosure in connection with investigations, ALS staff takes direction from the AUSA(s) assigned to the cases.  That direction may come orally or by email from the AUSA.

4.      For those cases where the data set is of a small enough size, the data may be maintained on the USAO's servers in Minnesota and processed, organized and exported in-house.  In cases where the data set is of too large a size, it is sent to the Department of Justice Litigation Technology Support Center ("LTSC") in Columbia, South Carolina, to be maintained on their servers.  In such situations, the AUSA provides direction to the assigned ALS staff person in the USAO who then makes a Litigation Work Plan (LWP) memorializing the work we need the LTSC to do in terms of processing, organizing or exporting of the data.  One of the LTSC staff members then implements the LWP on the data maintained for our office.  When a LTSC staff member completes an LWP, the staff member sends a completion email.  I have reviewed each of the eight work LWPs related to the investigation of Edward Adams. The following is a compilation of the information contained within those records, specifically the LWPs, unless otherwise specified.

### Litigation Work Plan 1 ("LWP1") – Processing the Email Data

5.      On March 18, 2016, ALSS Czapko transmitted to the LTSC by wide area network the 34-gigabyte contents of a flash drive related to Mr. Adams's case and requested that the data be processed and placed into a Relativity database project.  The same day at 3:33 p.m., AUSA Maria emailed AUSA Kokkinen and FBI Special Agents

DSM-000023

Jennifer Khan and Kurt Buelke regarding the running of a list of search terms against the Relativity database to "determine the universe of potentially privileged documents."

6. Relativity is a web based document review tool that allows for the effective storage, organization and searching of large quantities of data. During the investigation, this Office used various versions of Relativity including versions 7.5, 8.2, and 9.4.

7. The LTSC completed this request on April 12, 2016, and granted the USAO's ALS team (including me, Dan Czapko and four other ALS team members) as well as AUSA David Maria, AUSA John Kokkinen and now Supervisory Paralegal Sara O'Reilly access to the project. When originally constructed, the database contained 146,522 documents.

8. The Relativity application maintains a history that specifies which individuals had access to the database and the various folders therein at particular times and also reflects which individuals viewed particular documents and when those documents were viewed.

9.     The Relativity history for the database reflects that the following USAO personnel or law enforcement agents were granted access to the database and on the dates specified; first viewed a document in the database on the date specified, if any; and last viewed a document on the date specified, if any:

| USAO Personnel Names | Database Access Granted On | Date First Database Document Viewed | Date Last Database Document Viewed |
|---|---|---|---|
| Dan Czapko | 4/12/2016 | 4/14/2016 | 9/11/2017 |
| David Maria | 4/12/2016 | 5/4/2016 | 4/4/2017 |
| John Kokkinen | 4/12/2016 | No viewings | No viewings |
| Jennifer Khan | 5/5/2016 | 5/5/2016 | 10/31/2016 |
| Christine Kroells | 5/5/2016 | 5/5/2016 | 8/21/2017 |
| Sara O'Reilly | 4/12/2016 | No viewings | No viewings |
| Coryn Petersen | 9/12/2016 | 9/13/2016 | 9/13/2016 |
| Brandon Belich | 5/3/2016 | 6/6/2016 | 7/13/2016 |
| Martin Harris | 4/8/2017 | No viewings | No viewings |

Coryn Petersen is a former USAO paralegal, and Martin Harris is a USAO paralegal.

10.     Inspector Kroells document view history indicates that she viewed four documents on August 21, 2017, and her next most recent viewing prior to that date occurred on May 16, 2017.

11.     Relativity records will indicate specific searches that were applied to the database materials if those searches are saved ("saved searches"). Saved searches may be modified, however, by subsequent alterations to the saved search conditions including and not limited to changes to the search terms, the fuzziness level, and stemming. Altering the fuzziness increases or decreases the rate of capture for terms similar to the identified search term(s). Each of the searches described hereafter was at some point a saved search but may have been modified.

DSM-000025

12.     If specific documents are alleged to contain attorney-client privileged information, I could determine from the Relativity log history whether a member of the prosecution team ever accessed those documents, who accessed them and the dates and times of accessing, if any.

### Preliminary Searching

13.     On April 14, 2016, AUSA Maria emailed AUSA Kokkinen an "initial cut" of search terms to filter out "potentially privileged documents" in the Relativity database.

14.     On or before April 26, 2016, ALSS Czapko ran the proposed general and specific search terms against the email database.  On April 26, 2016, AUSA Maria emailed AUSA Kokkinen and explained he was advised that the general search terms proposed in his email of April 14, 2016, appeared too general, in that they "hit" on 70 to 80 percent of the documents, "due in large part to the standard disclaimers on many of the emails."  As a result, AUSA Maria emailed AUSA Kokkinen and AUSA Tim Rank explaining his proposal to use the more specific search terms, as further described below, to filter the database into three categories of materials: (1) for review, (2) for potential "taint" review, and (3) to be eliminated from review.

### Litigation Work Plan 2 ("LWP2") – First-Round Filtering
### (Potential Attorney-Client Privilege)

15.     On April 27, 2016, ALSS Czapko submitted LWP2 to the LTSC and requested filtering by specified search terms that would result in certain documents and their family being placed into secure folders that would be inaccessible to the prosecution team.  "Family" in this context, means the relationship between emails and attachments;

the emails are considered "parents" and the attachments are considered "children." These secure folders were identified as the "Taint Folder," which would be inaccessible to the agents and prosecutors handling Mr. Adams's case but accessible to Office's ALS team, and the "Not For Review Folder," which would be inaccessible to anyone in the USAO and only accessible to Relativity personnel at the LTSC. Documents containing the following search terms, in the alternative, and the family of those documents were to be placed in the Taint Folder:

> adamsgrumbles
> adamsmonahan
> amllp
> zouvas

16.    Pursuant to LWP2, documents containing the following terms, in the alternative, and their family were to be placed in the Not For Review Folder:

> anthonyostlund
> dorsey
> fredlaw
> fredrickson
> K&L
> klgates
> kopecky
> ksblegal
> latham
> lw.com
> merchantgould
> sankovitz
> schwegman
> sikora
> slwip
> watkins
> wc.com

DSM-000027

17.    On May 3, 2016, the LTSC completed this LWP2.  At this point, case-related law enforcement officers Brandon Belich, Jennifer Khan, and Christie Kroells were given access by the LTSC to the For Review Folder, which contained the remaining materials that had not been moved to the "Taint" or Not For Review Folders.

### Litigation Work Plans 3 and 4 – Second-Round Filtering
### (Additional Potential Attorney-Client Privilege)

18.    On May 16, 2016, Inspector Kroells exchanged emails with AUSA Maria wherein both noted that they had identified additional attorneys during their review of the filtered database.  This required additional filtering of the materials, as specified more fully below.

19.    On June 7 and 9, 2016, ALSS Czapko submitted LWP3 and LWP4 requesting the LTSC, first, remove from the "For Review" and Taint Folders any documents containing the following terms, in the alternative, and their family:

arnstein
@arnstein.com
felhaber
@felhaber.com
hopeman
amslaw
blandrichter
@blandrichter.com
tamburino
caplanlaw
@caplanlaw.com
brever

And, second, LWP3 and LWP4 requested that those removed materials be placed in the Not For Review Folder, specifically the folder accessible only by Relativity personnel at the LTSC.

20. Preliminary searching of these terms by ALSS Czapko on or about June 7, 2016, indicated that approximately 1,000 documents including family would be eliminated from the database because of this search term filtering. On June 9, 2016, the LTSC completed this LWP3.

21. On June 9, 2016, ALSS Czapko submitted a LWP4 requesting the LTSC to remove from the Taint Folder any documents containing the search terms identified above for LWP3 (and their family) and to place those in the Not For Review Folder. On June 10, 2016, the LTSC completed this LWP4.

### Litigation Work Plans 5, 6, 7 ("LWP5-7") – Third-Round Filtering (search term adamsmonahan)

22. On October 17, 2016, AUSA Maria emailed ALSS Czapko and described seeing in the For Review Folder an email to an associate at Mr. Adams's law firm. AUSA Maria identified the associate's email address as cmumm@adamsmonahan.com and asked why the first-round filtering (LWP2) – which included the search term adamsmonahan – would not have filtered these materials out of the For Review Folder and into the Not For Review Folder, as specified in LWP2 above.

23. To try to address this, on October 19, 2016, ALSS Czapko submitted LWP5 requesting, first, that the LTSC remove from the For Review Folder any documents containing the following terms, in the alternative (and their family):

    privilege
    attorney
    lawyer
    advice
    counsel
    acp

"work product"
"law firm"
workproduct
"work-product"
adamsmonahan
adamsgrumbles
sankovitz
amllp
wc.com
merchantgould
zouvas
dorsey
K&L
klgates
schwegman
slwip
fredrikson
fredlaw
anthonyostlund
kopecky
ksblegal
latham
watkins
lw.com
sikora
arnstein
@arnstein.com
felhaber
@felhaber.com
hopeman
amslaw
blandrichter
@blandrichter.com
tamburino
caplanlaw
@caplanlaw.com
brever

and requesting, second, that the LTSC place those materials in the "Taint Review" folder.
On October 20, 2016, the LTSC completed this request, which resulted in the transfer of
just over 105,000 documents to the secure Taint Folder. He did this out of an abundance

of caution to try to see if something was wrong in the filtering search as previously constructed. ALSS Czapko also increased the search's "fuzziness," meaning the search's ability to capture terms despite potential errors that could prevent recognition of the terms (i.e., misspellings, optical character recognition errors, and similar issues). This filtering did not alter the filtering that was completed by LWP2, LWP3 and LWP4.

24.     On November 2, 2016, ALSS Czapko submitted LWP6 to the LTSC and requested the rebuilding of the dictionary search index for the Relativity database and all of its folders. He did so because of the October 17, 2016, email from AUSA Maria, which caused him to question whether the dictionary search index was functioning correctly. The dictionary search index allows the ALS team to run preliminary searches to identify where specified search terms are located within the database, to identify how many times the search term appears in the database, to determine how many documents in the database contain the search term(s), and to increase or decrease the rate of capture for terms similar to the search terms. The LTSC completed LWP6 on November 3, 2016.

25.     On November 7, 2016, ALSS Czapko submitted LWP7 to the LTSC and requested that all of the materials moved to the Taint Folder by LWP5 – *except* those containing the search term adamsmonahan.com – be returned to the For Review Folder. ALSS Czapko did this because any emails from an adamsmonhan email address would remain in the Taint Folder, inaccessible to the prosecution team. The LTSC completed this request on November 7, 2016.

26.     I have reviewed LWP5 and 7 and noticed that this search process filtered out and then returned the exact same number of documents. Based on my review of the

Relativity database logs and metadata for the relevant emails, it appears that Mr. Mumm was using a Hotmail account rather than his "adamsmonahan" account, something neither AUSA Maria nor ALSS Czapko knew.   To the extent Mr. Adams and Mr. Mumm exchanged emails using Mr. Mumm's Hotmail account, these searches could not have filtered those Hotmail emails out of the For Review Folder.

### Litigation Work Plan 8 ("LWP8") – Fourth-Round Filtering (Relevance)

27.   On February 28, 2017, AUSA Maria emailed ALSS Czapko requesting the running of a final set of terms, specified below, to identify and retain the relevant documents in the database.

28.   On April 4, 2017, ALSS Czapko requested by LWP8 that the LTSC, first, retain in the For Review Folder any documents containing the following terms, in the alternative, and their family:

    Apollo
    Diamond
    ADI
    ADGC
    Gemstone
    DL
    RL
    ADR
    RBE
    ESA
    MRM
    Scio
    SDTC
    Krossbow
    Linares
    Lancia
    Zipkin
    Nichols

> LisaL
> LMAInc
> Mack
> Rapello
> Platt
> Robb
> Larson
> McMahon
> Bern
> McPheely

And, second, ALSS Czapko requested that the LTSC place the remaining documents – those without any of these terms – in a secure folder identified as "Not Adams Email Database" and inaccessible by the prosecution team.

### Preparing the Potentially Privileged Materials for Disclosure

29.     On April 7, 2017, I requested that the LTSC give me access to move documents and create folders in the email Relativity project.  Given the time lag associated with the LWP queue, the LTSC granted me the requested access.  With such access, to include access to all of the secure folders, I separated the emails by email account into three folders: Adams, Jafman1 and Monahan.  These folders were intended to and did serve as the basis for the discovery production of the emails contained in the secure Not For Review Folder, Taint Folder and Not Adams Email Database Folder and ensured that only Mr. Adams received the potentially privileged emails in his email accounts, that he would not receive the potentially privileged emails in Mr. Monahan's email account, and vice versa.

30.     In the process of providing discovery to Mr. Adams's counsel, the original production did not contain the unprocessed material provided by Yahoo!, meaning the

material before filtering.  Once that was discovered, I understand that Mr. Adams was provided complete, unprocessed materials specific to his two email accounts.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ Mark Zeitz
MARK ZEITZ

DSM-000034

DSM-000035

## DECLARATION OF DAVID M. MARIA

Pursuant to 28 U.S.C. Section 1746, I, David M. Maria, Assistant United States Attorney for the District of Minnesota, hereby declare under penalty of perjury as follows:

1.    I am an Assistant United States Attorney in the District of Minnesota, and have been so employed since January 11, 2016.  Prior to being hired by the U.S. Attorney's Office, I was a partner with the law firm of Shook, Hardy, and Bacon LLP, where I worked from April 2014 until December 2015.  Prior to that, I worked as a Trial Attorney with the Department of Justice's Criminal Division (Fraud Section) from 2010 until April 2014.  From 2001 through 2010, I worked as an associate at Arnold & Porter and then Latham & Watkins.  In both the private and public sector, I was involved in a number of large-scale investigations that included the collection and processing of substantial amounts of electronic data, the reviews of which often included creating processes to identify and segregate potentially privileged materials.

2.    As part of my duties as an AUSA in the District of Minnesota, I was assigned to the investigation of Edward S. Adams for possible investment fraud and other related crimes.

3.    On or about March 17, 2016, I received from FBI Special Agent Jennifer Khan a thumb drive containing Yahoo!'s production of records pursuant to the search warrant executed on January 8, 2016 for the email accounts edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com.  I did not review any of the records on the thumb drive.  Instead, I provided the thumb drive to Automated Litigation



DSM-000036

Support ("ALS") staff at the U.S. Attorney's Office and asked that they load the electronic data into a searchable database.

4.      ALS staff worked with the Department of Justice's Litigation and Technology Support Center ("LTSC") in South Carolina to load the materials into a "Relativity" database, which would be housed on servers at the LTSC but could be accessed remotely.

5.      I next requested that ALS staff conduct a mechanical filtering process to segregate potentially privileged documents.  Specifically, I asked ALS staff to run two separate lists of search terms against the full set of electronic data: (a) a list of general terms; and (b) a list of terms related to lawyers and law firms with which we believed that Mr. Adams had some involvement, either personally, or during the time that he was associated with Apollo Diamond/ADGC/Scio.  I reviewed materials already collected as part of the investigation and consulted with members of the prosecution team to arrive at the lawyer/law firm specific terms.  This list of terms was designed to segregate and exclude any communications to or from entities which the government was aware had represented Mr. Adams in connection with a prior investigation by the Securities and Exchange Commission and other litigation, as well as any communications to or from Mr. Adams's law firm, Adams & Monahan.

6.     The lists of search terms were as follows, with the exclamation point character (!) intended to serve as a wild card root expander in the search process:

General Terms
privilege!
attorney
lawyer
advice
counsel
acp
"work product"
"law firm"

Lawyer/Law Firm Specific Terms
adamsmonahan
adamsgrumbles
sankovitz
amllp
wc.com
merchantgould
zouvas
dorsey
"K&L"
klgates
schwegman
slwip
Fredrikson
fredlaw
anthonyostlund
Kopecky
ksblegal
latham
watkins
lw.com
Sikora

7.     After running the two lists of search terms, ALS staff informed me that the list of general terms was resulting in a disproportionately large number of hits, and ALS staff attributed this primarily to standard language and disclaimers that showed up on many

of the electronic mails. The lawyer/law firm specific term list also generated a substantial number of hits, which I concluded likely captured the vast majority of potentially privileged materials. For this reason, I determined that we would utilize the lawyer/law firm specific term list to filter out potentially privileged emails and attachments.

8.      The documents (including "family members," meaning documents that themselves did not contain the terms but were attached to, or a part of a string or chain with, a document or email that did contain one of the terms) that hit on the lawyer/law firm specific search terms were placed into secure folders which no one on the prosecution team could access. This filtering process resulted in more than 32,000 documents being segregated into secure folders identified as the "Taint" and "Not For Review" folders. To date, these secure folders remain segregated within the database at the LTSC and have never been reviewed in any manner by the prosecution team. Initially, the government considered using a taint team to review the contents of the secure Taint Folder (materials containing the search terms "adamsgrumbles," "adamsmonahan," "amllp," and "zouvas") to determine if there were any non-privileged documents among them that could be turned over to the prosecution team, but, ultimately, the government determined that it would not undertake this task. Accordingly, no members of the prosecution team have reviewed the secure Taint or Not For Review Folders.

9.      After filtering out the potentially privileged documents, the LTSC placed the remaining documents into a folder accessible to the prosecution team (identified as the "For Review Folder"). On May 4, 2016, before any member of the prosecution team accessed the For Review Folder, I instructed all members of the prosecution team that, if

they encountered any documents that appeared to have the names of lawyers or law firms that had not been on our initial list of search terms, they should cease reviewing the document and contact me.

10.    Through this process, we identified the following additional search terms, which we instructed the LTSC to run against the For Review Folder to filter out additional documents:

> arnstein (and @arnstein.com)
> felhaber (and @felhaber.com)
> hopeman
> amslaw
> blandrichter (and @blandrichter.com)
> tamburino
> caplanlaw (and @caplanlaw.com)
> brever

11.    This supplemental filtering process, which took place in June 2016, resulted in approximately 1,000 additional documents (including family members) being removed from the For Review Folder and added to the segregated secure folder.  As with the other documents that were segregated and removed, these documents have not been available to, or reviewed by, any members of the prosecution team.

12.    In October 2016, I discovered that, for some reason, emails to/from an Adams Monahan associate attorney had not been picked up by the "adamsmonahan" search term.  ALS staff could not provide an explanation for why the search term missed these documents.  Nevertheless, I was advised that ALS staff addressed the issue by increasing the "fuzziness" of the search terms.

DSM-000040

13.   To further limit the documents in the Government Review Database to materials that fell within the scope of the "Information to be seized by the government" as set forth in the search warrant, on April 4, 2017, I requested that ALS staff run the following list of search terms:

Apollo
Diamond
ADI
ADGC
Gemstone
DL
RL
ADR
RBE
ESA
MRM
Scio
SDTC
Krossbow
Linares
Lancia
Zipkin
Nichols
LisaL
LMAInc
Mack
Rapello
Platt
Robb
Larson
McMahon
Bern
McPheely

DSM-000041

14.    Any document that failed to contain at least one of these terms was removed from the For Review Folder.  In other words, only the documents that hit on one or more of these search terms were retained in the For Review Folder, resulting in the set of documents/data that was "seized" pursuant to the search warrant that remains accessible by, and available to, the prosecution team.

15.    In conducting my own searches with the For Review Folder, I used keyword searches to identify emails relevant to the case.

16.    On August 21, 2017, I received an email from Adams's counsel Lance Wade, indicating that the defense had identified approximately one thousand emails in the For Review Folder which the defense claimed were privileged.  I had previous communications with Mr. Wade in which I requested that, if the defense found emails they believed to be privileged during their review of the For Review Folder, they identify any such emails so they could be segregated from the For Review Folder and looked at by someone who was not part of the prosecution team.  To date, Mr. Wade has not identified any documents which he contends contain privileged communications.

17.    After receiving Mr. Wade's August 21, 2017 email, I responded by advising Mr. Wade that we would have a taint team who would act as his point of contact with respect to the approximately one thousand emails in the For Review Folder which the defense claimed were privileged.   The US Attorney's Office designated AUSA Ann Bildtsen as the Taint AUSA, and it is my understanding that AUSA Bildtsen has had communications with Mr. Adams's counsel on this matter. Out of an abundance of caution, I directed members of the prosecution team to refrain from accessing the For Review

Folder, and it is my understanding from ALS Staff that no members of the prosecution team have accessed the For Review Folder since August 21, 2017.

The foregoing is true and correct to the best of my knowledge and recollection.

Executed this 30th day of November, 2017.

s/ David M. Maria
DAVID M. MARIA

DSM-000043

JEK:blb
AO 93 (Rev. 12/09) Search and Seizure Warrant

2014R00312

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

*RECEIVED*

*MAR 1 1 2016*

*CLERK, U.S. DISTRICT COURT*
*ST. PAUL, MINNESOTA*

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

*Sealed by Order*

Case No.   15-MJ-942 (JSM)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the Northern District of California:

**See Attachment A**

The person or property to be searched, described above, is believed to conceal:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before      December 9, 2015
*(not to exceed 14 days)*

_ in the daytime 6:00 a.m. to 10 p.m.

X  at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from
whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Janie
S. Mayeron.

Date and Time issued:   11/25/15  10:05 A.M.      *Janie S. Mayeron*
                                                  *Judge's Signature*

City and State:  Minneapolis, MN                 Janie S. Mayeron, U.S. Magistrate Judge
                                                  *Printed Name and Title*

**EXHIBIT
DX-08**

SCANNED

MAR 1 1 2016

U.S. DISTRICT COURT ST. PAUL

DSM-000074

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>2062433-MF | Date and time warrant executed:<br>11/25/15 @ 11:11 am | Copy of warrant and inventory left with:<br>NA |
| Inventory made in the presence of :<br>NA | | |
| Inventory of the property taken and name of any person(s) seized:<br>NA | | |

\* Service made on subject of warrant via an outdated method of service.

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/10/16

*Executing officer's signature*

Printed name and title

Subscribed, sworn to, and returned before this date.

Postal Inspector

U.S. Judge or Magistrate Judge      3/10/16
     Date

DSM-000075

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

DSM-000076

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All records or other information stored at any time by an individual using

the account, including address books, contact and buddy lists, calendar data, pictures, and

files;

e.    All records pertaining to communications between the Provider and any

person regarding the account, including contacts with support services and records of

actions taken.

## II.    Information to be seized by the government

a.    All information described above in Section I that constitutes fruits,

contraband, evidence and instrumentalities of violations of 18 United States Code,

Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R.

Monahan and occurring after October 25, 2006, including, for each account or identifier

listed on Attachment A, information pertaining to the following matters:

    1. All documents, records, and communications related to financial,

       bookkeeping, transactional, and tax records reporting the business and

       financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and

       ESA during and for the calendar, fiscal, and federal tax years 2010 to

       present; to include, but not limited to:

          i. All bookkeeping ledgers, journals, reports, and other bookkeeping

             records, and computer printouts thereof, which itemize and record

             the dates, amounts, purpose, and expense category and

             classification of all financial transactions conducted in and through

DSM-000078

the business bank accounts and other financial accounts of the above business entities.

   ii. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/AGC and Private Scio, the stock-repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any writing or oral conversation, including, but not limited to, telephone conversations,

conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)    Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)    Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)    Text messages

d)    Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)    Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)    Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury

under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the

information contained in this declaration is true and correct. I am employed by Yahoo!

Inc., and my official title is _____. I am a custodian of

records for Yahoo! Inc. I state that each of the records attached hereto is the original

record or a true duplicate of the original record in the custody of Yahoo! Inc., and that I

am the custodian of the attached records consisting of _____

(pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted

business activity of Yahoo! Inc.; and

    c.    such records were made by Yahoo! Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the

Federal Rules of Evidence.

_____    _____

Date                     Signature

## SEARCH WARRANT ADDENDUM

1.  In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2.  If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g. computer, hard drive, mobile device, smartphone, cell phone,) or other data storage mechanism (e.g. information produced by an internet provider or social media provider). The person from whom the electronic storage device was seized or whose data was seized from another data storage mechanism may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3.  Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4.  The government shall establish a search methodology governing the review of seized data, information, documents or other records to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data, information, documents or other records seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

DSM-000082

JEK:blb
AO 106 (Rev. 04/10) Application for a Search Warrant

RECEIVED 2014R00312

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

FEB 03 2016

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

Case No. 16mj 8(SER)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Northern District of California, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

| | |
|---|---|
| X | evidence of a crime; |
| X | contraband, fruits of crime, or other items illegally possessed; |
| X | property designed for use, intended for use, or used in committing a crime; |
| | a person to be arrested or a person who is unlawfully restrained. The search is related to a |

violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section(s) 1341 & 1343 | Mail Fraud and Wire Fraud |

The application is based on these facts: **See attached Affidavit.**

X    Continued on the attached sheet.

_____
Applicant's Signature

Sworn to before me and signed in my presence.

Date: 7 Jan 2016

Christie Kroells, Inspector
Printed Name and Title

_____
Judge's Signature

City and State:  St. Paul, MN

Steven E. Rau, U.S. Magistrate Judge
Printed Name and Title

SCANNED
FEB 03 2016
U.S. DISTRICT COURT ST. PAUL

EXHIBIT
DX-10

DSM-000085

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

## ATTACHMENT B

### Particular Things to be Seized

I.   **Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.   The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.   Information to be seized by the government

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.   All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

i.   All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the
above business entities.

ii.  All bookkeeping ledgers, journals, reports, and other bookkeeping
records, and computer printouts thereof, which record, identify,
and itemize the dates, amounts, and nature and classification of all
income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public
Scio, to include all such documents, records, and communications
regarding the ADI/ADGC proxy statement from March 2011, the asset
purchase agreement between ADI/AGC and Private Scio, the stock-
repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or
prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

### DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing
items of evidence in whatever form (including written, printed, typed, recorded,
electronic, or graphic matter) and by whatever means they may have been created or
stored, including any electrical, electronic, computer, or magnetic form (such as any
information on an electronic or magnetic storage device, including floppy diskettes,
hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart
cards, memory calculators, pagers, personal digital assistants, as well as printouts or
readouts from any magnetic storage device); any handmade form (such as writing,
drawing, painting); any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any
means, whether by chance or design, and shall mean and be deemed to refer to any

3

DSM-000089

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)   Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)   Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)   Text messages

d)   Header information: distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)   Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)   Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

4

DSM-000090

16 m 8 (SEE)

STATE OF MINNESOTA   )   **FILED UNDER SEAL – PURSUANT TO ORDER**
                     )   ss.   AFFIDAVIT OF CHRISTIE KROELLS
COUNTY OF HENNEPIN   )

I, Postal Inspector Christine Kroells, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo! Inc., an e-mail provider headquartered at 701 First Avenue, Sunnyvale, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     I am a Postal Inspector with the U.S. Postal Inspection Service, and have been since 2003. I am currently assigned to the Twin Cities Field Office in Minneapolis, Minnesota.  I am authorized to conduct investigations on behalf of the United States Postal Inspection Service.  My primary criminal investigative responsibilities include investigations which may involve violations of Title 18, United States Code, Section 1341, Mail Fraud.  I have conducted and participated in numerous criminal investigations

of individuals involved in illegal activities for possible violations of the United States Code and related laws, including but not limited to mail and wire fraud in violation of Title 18, United States Code, 1341 and 1343, respectively.  Your affiant's experience includes training in and investigation of mail fraud and wire fraud.  Your affiant's investigative experience includes uncovering schemes where individuals obtain goods or monetary funds from victims as part of investment schemes through false pretenses and do not follow through with their obligations to the victims.  In your affiant's experience, these individuals use these schemes to obtain money and property for their personal gain. In your affiant's experience evidence of these crimes can be found in email communications.

3.     This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1341 and 1343 have been committed by Edward S. Adams and Michael R. Monahan, including by concealing and failing to disclose material information to company shareholders prior to seeking the shareholders' approval of transactions which personally benefitted Adams and Monahan.  There is also probable cause to believe that evidence of these violations is located in the following email accounts, further described in Attachment A:

a.  edwardsadams@yahoo.com, used by Edward S. Adams;

2

b. jafman1@yahoo.com, used by Edward S. Adams; and

c. michaelrmonahan@yahoo.com, used by Michael R. Monahan;

and to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.     According to online records your affiant reviewed, Linares Management Associates registered with the state of Massachusetts on or about May 2, 1990, and on or about February 20, 2001, Linares Management Associates changed its name to Apollo Diamond, Inc. (ADI).  According to these records, B.R.L. and M.V.L. were listed as President and as Treasurer and Secretary, respectively, from the inception of the company and through the name change. On or about May 23, 2006, ADI was voluntarily dissolved and on the same date ADI was re-registered with the state of Massachusetts listing B.R.L. again as President, and adding R.C.L. as Treasurer and Adams as Secretary.  On or about April 2, 2004, Apollo Diamond Gemstone Corporation (ADGC), a subsidiary of ADI, was registered with the state of Delaware.  Adams signed the Articles of Incorporation as the Incorporator for ADGC.  Adams is R.C.L.'s son-in-law and B.R.L.'s brother-in-law.

3

DSM-000093

7.    Through documents your affiant has gathered during the course of this investigation, your affiant has learned that ADI started working to "develop and perfect" a chemical vapor deposition (CVD) technology that produces high-quality diamond crystals for use in the industrial and gemological industries. R.C.L. reportedly discovered this technology, which was used by ADI to develop a process to create large, single-crystal diamonds that could be grown in a controlled laboratory environment. ADGC was created to generate these synthetic diamonds and market them to various industries.

8.    Between 2004 and 2011, Adams held various positions within both ADI and ADGC, including Secretary of ADI and Secretary, Executive Vice President, Chief Financial Officer, Director, and President of ADGC. Your affiant has reviewed records showing Adams in these roles. These records include multiple Form Ds for ADI filed with the SEC, including one dated October 25, 2006, and another dated November 13, 2007, in which Adams signs the forms as ADI's Secretary and is listed as an Executive Officer of ADI. Form Ds for ADGC, dated November 13, 2007, July 20, 2009, and July 20, 2010, that were signed by Adams either as ADGC's Secretary or ADGC's Chief Financial Officer list Adams as an Executive Officer, and, on one form, as a Director.

9.    Between 2008 and 2010, Monahan held various positions within ADGC, including Vice President of Business Development, Executive Vice President for Corporate Development and Marketing, and General Counsel. Your affiant reviewed records showing Monahan in these roles, including multiple Form Ds filed with the SEC.

4

DSM-000094

Two of these Form Ds filed for ADGC, which were dated July 20, 2009, and July 20, 2010, list Monahan as an Executive Officer of ADGC.

10.     From at least 2008 through 2014, Adams and Monahan were partners in a Minneapolis-based law firm, Adams Monahan, LLP (AMLLP).  Focus Capital Group, Inc. (Focus) is a Minneapolis-based investment banking firm that was co-founded by Adams and Monahan and incorporated with the state of Minnesota in 2005.  Adams was Chief Executive Officer and Managing Director of Focus, and Monahan was the Senior Managing Director of Focus.  ESA Consulting Services, LLC (ESA Consulting) is a Minneapolis-based company.  According to the Minnesota Secretary of State, Adams is listed as the Manager of ESA Consulting.

11.     Your affiant reviewed records regarding the formation of a privately-held company named Scio Diamond Technology Corporation, which was formed on or about March 1, 2011 in Nevada.  For ease of reference and to avoid any potential confusion, this Affidavit will refer to this company formed on March 1, 2011 as "Private Scio" as distinguished from the publicly-traded company that adopted the same name in July 2011, as explained below in paragraph 21.  Adams and Monahan are listed on the Articles of Incorporation as the sole officers and members of the Board of Directors for Private Scio.  Specifically, Adams is listed as the Director, President, and Treasurer, and Monahan is listed as the Secretary.  Both Adams and Monahan owned shares in Private Scio.

5

DSM-000095

12.    Your affiant reviewed a proxy statement and the cover letter to that proxy statement sent to ADI shareholders and dated March 11, 2011, from R.C.L., in his capacity as ADI's Chairman asking for the shareholders' approval of the sale of ADI's assets to Private Scio.  The proxy statement solicited the proxies from shareholders to approve (1) the sale of all of ADI's assets for $2,000,000 to Private Scio and (2) a stock repurchase program whereby ADI would repurchase the shares of interested shareholders for $0.01 per share.  The proxy statement explained that the $2,000,000 proceeds from the sale would be used to satisfy ADI's outstanding debts and liabilities and to fund the stock repurchase program.  According to the cover letter, beginning in 2009, ADI "was forced to terminate many of its employees and later to reduce, and in some cases defer or even eliminate, compensation to its remaining employees."  The cover letter states that the ADI Board of Directors, in seeking to act in the best interest of the company, decided the sale of the company's assets was the best option in an effort to continue their mission, which was to manufacture and distribute synthetic diamonds.  Specifically, the cover letter states, "a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology."  The cover letter continues to explain that because of this decision, ADI has agreed to sell substantially all of its assets to Private Scio for approximately $2,000,000.  The cover letter further states that ADI's most significant creditors have agreed to accept reduced payments and that these creditor agreements are conditioned on the sale of the assets to Private Scio.  The cover letter does not disclose, however, that Adams' and

6

DSM-000096

Monahan's law firm, AMLLP, was the single largest creditor of ADI at that time. In addition, the cover letter explained that under the stock repurchase program, ADI shareholders could sell back their shares at $0.01 per share, which the letter indicated could give rise to a tax advantage to the shareholders. According to the cover letter, any shareholders whose shares were repurchased by ADI would also be given the option to invest in Private Scio at a price of $0.01 per share in number of shares equal to the number of shares that they held in ADI. The cover letter indicated that there would be a Special Meeting of Stockholders and part of the agenda of the meeting would be to vote on the sale of ADI to Private Scio. A similar cover letter dated March 18, 2011, was sent to the ADGC shareholders. Neither of these cover letters disclosed Adams' or Monahan's roles in Private Scio, despite the fact that, according to the proxy statement, AMLLP was retained by ADI and ADGC to carry out the proxy solicitation. Nor did either of the proxy statements themselves disclose Adams' or Monahan's roles in Private Scio. The failure of both the proxy statement and the cover letter to disclose Adams' and Monahan's roles and ownership interests in Private Scio is a material omission the ADI shareholders should have been made aware of prior to their decision to vote on the asset sale to Private Scio and the stock-repurchase program. In addition, the failure of both the proxy statement and the cover letter to disclose that Adams, Monahan, and AMLLP acted as counsel for both ADI and Private Scio in connection with the transaction was a material omission the shareholders of both ADI and Private Scio should have been made aware of prior to their decisions to authorize the transaction.

7

13.    Your affiant reviewed an asset purchase agreement dated on or about March 11, 2011, which was executed between ADI and Private Scio whereby Private Scio agreed to purchase the assets of ADI for $2,000,000 in cash.  On or about March 18, 2011, a second asset purchase agreement was executed, this time between ADGC and Private Scio, whereby Private Scio agreed to purchase the assets of ADGC for $10,000 in cash.   Neither asset purchase agreement disclosed Adams's or Monahan's roles or ownership interests in Private Scio.  Although these asset purchase agreements are signed by R.C.L., your affiant has not seen any evidence of funds being provided from Private Scio to ADI or ADGC.  These asset purchase agreements also do not disclose Private Scio's inability to pay the purchase prices as of the date of the agreements and as of the date of the Special Meeting; they only state that Private Scio "(p)rior to closing . . . shall have procured funding to make the Cash Payment."   Your affiant believes the contingency of Private Scio's funding, and the fact that Private Scio did not currently have the funding, could have been a deciding factor for the shareholders in determining whether or not to vote for the sale of ADI's and ADGC's assets to Private Scio.  Your affiant found one bank account that appeared to initially start out as a Private Scio bank account.  The account was opened on or about July 13, 2011, by Adams, as an officer of Private Scio.  Adams is the sole signer on the account until C.N. (Chief Financial Officer for Public Scio) is added on or about April 25, 2012, shortly after which the account is closed.

8

14.     According to the transcript of a deposition of Adams conducted by the SEC on or about August 27, 2015, and reviewed by your affiant, Adams answered questions regarding the drafting of March 11, 2011 cover letter to the proxy statement from R.C.L. to the ADI shareholders.  Adams stated that he thought his law firm, AMLLP, had some input on drafting the letter but he did not remember if AMLLP actually drafted the letter.

15.     In addition, the cover letter introduced the "new management" for Private Scio as J.D.L., Chief Executive Officer, and a letter of introduction from J.D.L. was included in the proxy statement materials sent to the shareholders.  This introduction letter was dated on or about March 11, 2011, to ADI shareholders and March 18, 2011, to ADGC shareholders.  Your affiant reviewed these letters and noticed that, again, Adams' and Monahan's roles and ownership interest in Private Scio were not disclosed.

16.     Your affiant also reviewed a recording of an interview of J.D.L. by members of the SEC in which J.D.L. stated, in reference to Private Scio, that he was "not involved in that original private company."

17.     Your affiant learned that on or about April 18, 2011, a special meeting was held in Boston, Massachusetts per the proxy statement and letter described above, where a majority of the shareholders for ADI and ADGC approved the asset purchase agreements between ADI, ADGC, and Private Scio.

18.     Your affiant learned that as of May 2011, which was before the stock-repurchase program had been completed, Adams and his wife owned 11 percent of

9

ADGC and Monahan owned 4 percent and Adams and his wife owned less than 2 percent of ADI and Monahan owned 0 percent.

19.     On or about May 1, 2011, Private Scio issued a private placement memorandum ("PPM") offering up to 7,200,000 shares of common stock at $0.70 per share to potential accredited investors, to terminate on September 30, 2011.  Your affiant reviewed this PPM and learned that Adams' and Monahan's roles in ADI and ADGC were not disclosed.  An amendment to this PPM, dated on or about August 1, 2011, again does not disclose Adams' and Monahan's roles in ADI and ADGC.  The amendment was signed by Adams.  The disclosure of Adams' and Monahan's roles in ADI and ADGC would be material information to prospective shareholders of Private Scio, in part because the prior companies involved both Adams and Monahan in the same business, manufacturing diamonds, and both prior companies failed.  This is a potential risk that is not outlined in the PPM.  According to bank records your affiant reviewed, over $700,000 was raised from investors as part of this offering through on or about August 1, 2011.

20.     On or about May 5, 2011, Adams sent an email to D.P. and K.M. and copied Monahan and P.R., who are all employees of Focus, regarding controlling Scio, "control which we can utilize to effectuate a favorable outcome."  (Considering the timing of this email, your affiant believes Adams is referring to Private Scio.)  Adams also states that without his and Monahan's roles in Scio, he fears he would only be an agent to the company and not in control of getting paid by the company.  Adams adds,

10

"there is no Scio opportunity--none--without us [Adams and Monahan]. This transaction was our idea, we have managed it, and we need to continue to manage it to a successful outcome." In a follow-up to a response from this email, Adams discusses his control of the Scio board and the invitations he has out to other individuals to join the Board. He also states that he and Monahan collectively only own 16 percent of the company which is 4,000,000 of the 25,000,000 shares, and after the offering that will be less. The email address Adams used for this email is jafman1@yahoo.com and the email address this was sent to for Monahan is michaelrmonahan@yahoo.com.

21.    According to online records reviewed by your affiant, an amendment was filed in Nevada effectively dated July 20, 2011, changing the name of a publicly-traded company named Krossbow Holdings Corporation, to Scio Diamond Technology Corporation. For ease of reference and to avoid any potential confusion, this Affidavit will refer to this publicly-traded company that adopted the name Scio Diamond Technology Corporation as "Public Scio.".

22.    Your affiant reviewed an asset purchase agreement between Public Scio and Private Scio (dated July 31, 2011, and found that Public Scio agreed to acquire substantially all of the assets of Private Scio, including those listed in a schedule attached to the asset purchase agreement. Your affiant reviewed the attached schedule and discovered that it listed one item, the name Scio Diamond Technology Corporation. According to the asset purchase agreement, the properties and rights of Private Scio were to be transferred to Public Scio for 13,000,000 shares of Public Scio's stock. However, it

11

DSM-000101

appears from the asset purchase agreement and other records reviewed by your affiant that the 13,000,000 shares were not distributed to Private Scio but instead were distributed directly to Adams and his wife, Monahan and his wife, R.C.L, J.D.L., and other individuals.

23.     According to stock sale agreements and other records your affiant reviewed, Adams and his wife and Monahan and his wife each obtained a total of 5,390,000 Public Scio shares from the Scio Asset Purchase Agreement and from additional stock sales agreements in the beginning of August 2011.  As a result, both the Adamses and the Monahans each obtained more than a 27 percent ownership interest in Public Scio.  First, pursuant to Schedule 1.4 of the asset purchase agreement, the Adamses and the Monahans each received 4,100,000 shares of Public Scio.  Second, on or about August 1, 2011, every share of Public Scio's outstanding stock was sold for $0.06 and $0.08 a share to a small group, which included the Adamses, the Monahans, and others.  Adams and Monahan each received 290,000 shares of Public Scio in an August 1, 2011 stock sale agreement for $0.06 a share, and Adams and Monahan each received 1,000,000 shares for $0.08 a share in another August 1, 2011 stock sale agreement.  J.D.L. obtained a significant share of Public Scio shares as well, amounting to 2,290,000 shares, or over 11 percent of the company, putting Adams and Monahan, not J.D.L., the Chief Executive Officer, in control of Public Scio.  The sale of these Public Scio shares for $0.06 and $0.08 per share to Adams, Monahan, and select others occurred

12

DSM-000102

while the Private Scio PPM, which offered Private Scio shares for $0.70 per share, was still active.

24.     On or about August 5, 2011, Public Scio publicly changed its name from Krossbow to Scio Diamond Technology Corporation (Public Scio). J.D.L. was appointed Chief Executive Officer of Public Scio, Adams was appointed Chairman of the Board, and Monahan was appointed to the Board.

25.     Your affiant reviewed an SEC Form 8-K filed online for Public Scio. According to this Form 8-K, dated August 11, 2011, the aforementioned Scio Asset Purchase Agreement was executed on August 5, 2011, and under the terms of the agreement, "the name 'Scio Diamond Technology Corporation' was purchased for 13,000,000 newly issued shares of common stock of the Company." The Form 8-K explained the change of control of Public Scio and also listed the new directors and officers of Public Scio, which included Adams and Monahan. The 8-K stated Adams' and Monahan's beneficial ownership interests of Public Scio included 5,390,000 shares each, which meant Adams and Monahan each beneficially owned over 27 percent of the company. According to the 8-K Adams and Monahan were appointed to Public Scio's Board of Directors as the Chairman and a member, respectively, on August 5, 2011. There was no disclosure in this 8-K of Adams's or Monahan's previous roles in ADI or ADGC. The 8-K also did not disclose Adams's relationship, as son-in-law and brother-in-law, to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC, respectively, or Adams's and Monahan's law firm, AMLLP's,

13

previous representation of ADI and ADGC, despite an included biography of Adams in the 8-K. A similar 8-K filed with the SEC, dated on or about August 17, 2011, also did not provide any of these aforementioned disclosures.

26.    According to another 8-K filed online by Public Scio with the SEC on or about August 31, 2011, Public Scio entered into an asset purchase agreement with ADI for $2,000,000. Public Scio was supposed to pay ADI $1,000,000 in cash and provide a $1,000,000 promissory note "in consideration for ADI's Diamond Growing Machines and Intellectual Property." The 8-K is signed by J.D.L., as Public Scio's Chief Executive Officer. There is no disclosure of Monahan's previous roles in ADGC, Adams' previous roles in ADI or ADGC, or Adams' familial relation to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC.  Your affiant believes that these failures to disclose the extent of Adams' and Monahan's connections to the previous, failed companies were important to current and future shareholders of Public Scio to make informed decisions on purchasing or retaining their shares. This asset purchase agreement also does not disclose the previous asset purchase agreements for Private Scio to purchase the assets of ADI and ADGC.

27.    Your affiant learned that on or about August 10, 2011, Public Scio paid $275,000 to AMLLP. From on or about August 11, 2011, through January 14, 2013, Public Scio paid $1,725,000 to ADI. Of this amount, $1,600,000 was paid between August 11, 2011, and December 30, 2011. Subsequent to the payments from Public Scio to ADI, ADI disbursed two payments totaling $75,000 to ESA Consulting Services LLC

14

(an Adams company) in October 2011, an additional payment of $275,000 to AMLLP on November 18, 2011, and six payments totaling over $726,765.97 directly to Adams. On or about the same days as the August 10, 2011 payment of $275,000 from Public Scio to AMLLP and the November 11, 2011 payment of $275,000 from ADI to AMLLP, AMLLP made payments of $262,500 on August 10, 2011, and $225,000 on November 18, 2011, to the Monahans.

28.    Your affiant was able to find online archived copies of the www.sciodiamond.com website. The earliest available archived copy is from October 28, 2011. After clicking on "Our Company" and then "Officers and Directors", the website explained Adams is Chairman of the Board and lists Monahan under "Officers and Directors" of Public Scio, but there is no disclosure regarding Adams' or Monahan's previous roles with ADI and ADGC.

29.    In your affiant's review of records, she found a series of emails between Adams, Monahan, and C.N., the Chief Financial Officer for Public Scio. On or about March 26, 2012, an email was sent from C.N. to Adams, at his email address edwardsadams@yahoo.com,             Monahan,             at             his             email             address michaelrmonhan@yahoo.com, and copying J.D.L. regarding disclosures for documents in working with a potential large investor. C.N. writes about the common ownership of Scio, ADI, and ADGC and states, "We also need to disclose any executive officer or director relationships involving ADI and . . . ADGC. I don't know what you guys may be or may have been . . . . If you guys have resigned any relevant positions or board seats

15

please let me know what happened . . . ." C.N. adds, "We saw somewhere that [D.P.] was an officer of one of the companies, so if you have records on that, please provide." Adams responds to this email the same day and states, "Michael [Monahan] and I were neither ever. [D.P.] is nothing related to this in anyway."

30.   Your affiant discovered a memorandum dated on or about November 30, 2009, from ADI discussing the roles of Adams, Monahan, and D.P. to ADI. It appears to your affiant the memorandum was issued to deal with disclosures for Focus Capital Group (another of Adams' and Monahan's companies as described above). The memorandum states, in part, Adams, Monahan, and D.P. "are currently serving in various directorial and/or officer capacities, with Apollo Diamond, Inc. (including its various subsidiaries and affiliates, including Apollo Diamond Gemstone Corporation)." There is a signature page to the memorandum which contains Adams' and Monahan's signatures.

31.   Your affiant reviewed a Form 8-K filed with the SEC on or about June 8, 2012. The 8-K explains that on June 5, 2012, Public Scio agreed to purchase "substantially all of the assets of ADGC" for $100,000 pursuant to an asset purchase agreement. According to the 8-K, the assets purchased "consist primarily of cultured diamond gemstone –related know-how, inventory, and various intellectual property." This varies substantially in value from the original asset purchase agreement whereby Private Scio was going to purchase ADGC's assets for $10,000 just over one year prior to this.

16

32.    Your affiant knows from her experience that non-disclosure of key individuals' roles in companies, such as the non-disclosure here of Adams' and Monahan's roles and ownership interests in Private Scio to ADI and ADGC shareholders prior to the special meeting of shareholders to approve the asset purchase agreement with Private Scio and the stock-repurchase program and of Adams' and Monahan's roles in ADI and ADGC to Private Scio's shareholders, can be material information to most current and prospective investors.   In this case, Adams and Monahan maneuvered themselves into a position of control with Private Scio, did not disclose this position to ADI and ADGC shareholders prior to the shareholder vote on the sale of ADI and ADGC to Private Scio and the stock-repurchase program, and then put themselves in another position of control with Public Scio, partly by selling Private Scio's name to Public Scio and then by purchasing Public Scio shares at rates far lower than rates that were in effect only weeks later, in order to gain control of Public Scio.  Then, they did not disclose their roles in ADI and ADGC to the Public Scio shareholders before Public Scio's purchase of ADI and ADGC and made attempts to actively conceal those roles in ADI and ADGC after the sale to Public Scio.   Adams and Monahan were not only able to benefit financially, as described above, but also managed to maneuver themselves into a position of greater control and ownership in the new company, Public Scio.  Specifically, Adams moved from an ownership position of 11 percent in ADGC and less than 2 percent in ADI to over 27 percent in Public Scio and Monahan moved from an ownership position of 4 percent in ADGC and 0 percent in ADI to over 27 percent in Public Scio.

17

33.     During your affiant's review of the transcript of the SEC's deposition of Adams on August 27, 2015, your affiant learned that, according to Adams, Adams mainly uses one email address, edwardsadams@yahoo.com.  According to the deposition transcript, as part of the subpoena request for records by the SEC, Adams searched his emails, including edwardsadams@yahoo.com, for key words related to his business dealings with Scio and produced those email records to the SEC.  Therefore, given that Adams was able to search for, find, and produce emails from the edwardsadams@yahoo.com account in response to the subpoena request it appears that Adams still retains emails that would be relevant to the investigation.

34.     Based on the above, your affiant believes that Adams has used the email addresses edwardsadams@yahoo.com and jafman1@yahoo.com in his business dealings related to the fraud scheme described in this affidavit and that Monahan has used the email address michaelrmonahan@yahoo.com in his business dealings related to the fraud scheme.

35.     A preservation letter was sent to Yahoo! Inc. on or about October 7, 2015 for edwardsadams@yahoo.com and on or about October 22, 2015 for jafman1@yahoo.com and michaelrmonahan@yahoo.com.  In general, an e-mail that is sent to a Yahoo! Inc. subscriber is stored in the subscriber's "mail box" on Yahoo! Inc. servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Yahoo! Inc. servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Yahoo! Inc.'s servers for

18

a certain period of time. Therefore, it is believed Yahoo! Inc. has maintained the records being sought pursuant to this warrant.

### BACKGROUND CONCERNING E-MAIL

36.     In my training and experience, I have learned that Yahoo! Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo! Inc. allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account listed in Attachment A.   Subscribers obtain an account by registering with Yahoo! Inc.   During the registration process, Yahoo! Inc. asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo! Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo! Inc. subscribers) and information concerning subscribers and their use of Yahoo! Inc. services, such as account access information, e-mail transaction information, and account application information.   In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.     A Yahoo! Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo! Inc. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

19

38.   In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

39.   In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

20

DSM-000110

40.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

41.     On November 25, 2015, U.S. Magistrate Judge Janie S. Mayeron signed a search warrant pertaining to the email addresses edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com.  That search warrant was based on the same allegations contained in this affidavit.  That same day, your affiant served that search warrant on Yahoo! Inc. via a fax number.  Your affiant understood this fax number to be the correct method for service of process on Yahoo! Inc. based on your affiant's previous successful service of process by this method and based on your affiant's consultation of a Yahoo! Inc. law enforcement manual.  After the search warrant was served and your affiant received confirmation that the fax had been successfully sent, a period of time passed with no response from Yahoo! Inc.  Accordingly, your affiant contacted Yahoo! Inc. and learned that although the fax number to which the search warrant had been sent formerly was the correct method for service of process, Yahoo! Inc. no longer accepted that method for service.  A representative of Yahoo! Inc. stated

21

they would not accept service of process for the November 25, 2015 search warrant because the date on which the warrant was to be executed, December 9, 2015, had passed. The Yahoo! Inc. representative explained that it was common for this error to occur and that Yahoo! Inc. required a new warrant to be issued and served on Yahoo! Inc. via their current, approved method, which is through email. Your affiant is therefore requesting a new warrant.

## CONCLUSION

42.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo! Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Further your Affiant sayeth not.

Postal Inspector Christie Kroells
United States Postal Inspection Service

SUBSCRIBED and SWORN to before me this 25th day of November, 2015   7th day Jan 2016

THE HONORABLE STEVEN E. RAU
United States Magistrate Judge
District of Minnesota

22

DSM-000112

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

DSM-000113

## ATTACHMENT B

### Particular Things to be Seized

I.      **Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1. All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

   i. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the above business entities.

   ii. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/AGC and Private Scio, the stock-repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

### DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any

3

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)    Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)    Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)    Text messages

d)    Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)    Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)    Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

DSM-000117

JEK:blb
AO 93 (Rev. 12/09) Search and Seizure Warrant

2014R00312

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

RECEIVED

MAR 1 1 2016

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

In the Matter of the Search of:
**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

*Sealed by Order*

Case No.  16 mj 8(SER)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

**See Attachment A**

The person or property to be searched, described above, is believed to conceal:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before       January 21, 2016
*(not to exceed 14 days)*

_  in the daytime 6:00 a.m. to 10 p.m.
X  at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Steven E. Rau

3:20 PM

Date and Time issued:  7 Jan 2016

*Judge's Signature*

City and State:   St. Paul, MN

Steven E. Rau, U.S. Magistrate Judge
*Printed Name and Title*

**EXHIBIT
DX-11**

SCANNED
MAR 1 1 2016
U.S. DISTRICT COURT ST. PAUL

DSM-000118

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>2062433-MF | Date and time warrant executed:<br>1/8/16 @ 9:36am | Copy of warrant and inventory left with:<br>NA |
| Inventory made in the presence of :<br>NA | | |
| Inventory of the property taken and name of any person(s) seized: | | |

- Flashdrive containing records for 3 email addresses: jafman1. edwardsadams, and michaelrmonahan.

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/10/16

Executing officer's signature

_Printed name and title_

Subscribed, sworn to, and returned before this date.

Postal Inspector

_U.S. Judge or Magistrate Judge_     3/10/16

Date

DSM-000119

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

a.     All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.     All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

i.     All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the
above business entities.

ii. All bookkeeping ledgers, journals, reports, and other bookkeeping
records, and computer printouts thereof, which record, identify,
and itemize the dates, amounts, and nature and classification of all
income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public
Scio, to include all such documents, records, and communications
regarding the ADI/ADGC proxy statement from March 2011, the asset
purchase agreement between ADI/AGC and Private Scio, the stock-
repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or
prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing
items of evidence in whatever form (including written, printed, typed, recorded,
electronic, or graphic matter) and by whatever means they may have been created or
stored, including any electrical, electronic, computer, or magnetic form (such as any
information on an electronic or magnetic storage device, including floppy diskettes,
hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart
cards, memory calculators, pagers, personal digital assistants, as well as printouts or
readouts from any magnetic storage device); any handmade form (such as writing,
drawing, painting); any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any
means, whether by chance or design, and shall mean and be deemed to refer to any

DSM-000123

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)     Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)     Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)     Text messages

d)     Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)     Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)     Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

DSM-000124

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Yahoo! Inc., and my official title is _____. I am a custodian of records for Yahoo! Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo! Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Yahoo! Inc.; and

c.      such records were made by Yahoo! Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____          _____
Date                                               Signature

## Maria, David (USAMN) 1

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 |
| **Sent:** | Friday, March 18, 2016 3:33 PM |
| **To:** | Beulke, Kurt  (MP) (FBI); Kokkinen, John (USAMN) |
| **Cc:** | Khan, Jennifer L. (MP) (FBI) |
| **Subject:** | RE: Apollo/Scio emails |

We still have to figure out a few logistics.

Because of the size of the database, it is going to have to be housed in Relativity at the LTSC instead of loaded into Eclipse here.  Unfortunately, that can be a lengthy process.  My guess is that there will be nothing available for us to review until the week after next, and possibly the week after that.  This sucks, but we don't have an alternative.

Once it is loaded in Relativity, we plan on running a list of search terms to determine the universe of potentially privileged documents.  If the search results in a manageable number of documents, that is the universe that you will review.  If there are too many hits, we will back up and first do a relevance search and follow that with the same privilege search, which will result in smaller universe.

Short answer is that, once we have a database of documents for you to review, it should not be too many documents.  For planning purposes, I'm guessing that you won't have anything to review for at least 2-3 weeks.  We'll keep you updated along the way as to timing, but I don't think that you need to set aside too much time.

John – you disagree with any of this?

**From:** Beulke, Kurt (MP) (FBI) [mailto:Kurt.Beulke@ic.fbi.gov]
**Sent:** Friday, March 18, 2016 3:13 PM
**To:** Kokkinen, John (USAMN); Maria, David (USAMN) 1
**Cc:** Khan, Jennifer L. (MP) (FBI)
**Subject:** RE: Apollo/Scio emails

Hey guys,

Any insight you could provide on the potential time commitment and expectations of the taint review prior to its commencement would be appreciated as well. I'm mostly curious for planning/scheduling purposes.

Have a great weekend.

Thanks,
Kurt

-----------------------------------------------------------------
**Kurt Beulke | FBI Special Agent | Minneapolis Office**
Phone: 763.569.8362 | Email: kurt.beulke@ic.fbi.gov

**From:** Khan, Jennifer L. (MP) (FBI)
**Sent:** Friday, March 18, 2016 2:37 PM
**To:** Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>; Maria, David (USAMN) 1 <David.Maria@usdoj.gov>

1



DSM-000230

**Cc:** cakroells@uspis.gov; Belich, Brandon (USASPC) <Brandon.Belich@usdoj.gov>; Beulke, Kurt (MP) (FBI)
<Kurt.Beulke@ic.fbi.gov>
**Subject:** Apollo/Scio emails

John and David,

SA Kurt Beulke from my squad has kindly agreed to be part of the email review team.  Please let him know when you're
ready to start the process.  I've included him on this email.  Thanks!


SA Jennifer L Khan
Minneapolis FBI-St Paul RA
C-2 Squad
651-228-4249-desk

DSM-000231

## Maria, David (USAMN) 1

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 |
| **Sent:** | Tuesday, April 26, 2016 2:15 PM |
| **To:** | Rank, Timothy (USAMN); Kokkinen, John (USAMN) |
| **Subject:** | Adams Privilege/Taint Review |

Dan ran the search terms, and the "general" search terms ("privilege!," "attorney," etc.) were hitting on 70-80% of the documents, due in large part to standard disclaimers that appeared on many/most of the emails.

The more specific terms also had a substantial amount of hits. The specific terms used and the number of each are set forth below:

| TERM | Doc Hits |
|---|---|
| adamsgrumbles | 1,495 |
| adamsmonahan | 8,003 |
| amllp | 1,733 |
| anthonyostlund | 15 |
| dorsey | 2,438 |
| fredlaw | 89 |
| fredrikson | 633 |
| K&L | 174 |
| klgates | 34 |
| kopecky | 306 |
| ksblegal | 328 |
| latham | 3,968 |
| lw.com | 3,134 |
| merchantgould | 94 |
| sankovitz | 1,299 |
| schwegman | 1,531 |
| sikora | 736 |
| slwip | 1,394 |
| watkins | 3,604 |
| wc.com | 96 |
| zouvas | 1,006 |
| **Total** | **32,110** |

Because our specific search term list was comprehensive, I believe that we are okay just sticking with these terms and dispensing with the general terms. My suggestion would be to segregate/eliminate from our review all of the documents that hit on all of the specific search terms except for "adamsmonahan," "adamsgrumbles," "amllp," and "zouvas," as they were all firms that performed legal work for Apollo/Scio, or are firms that have assisted in defending Adams and Monahan in connection with the SEC action (and our investigation). We would then have the taint team review these approx. 12,000 documents for privilege, releasing to us those that are determined not to be privileged. If we think that 12,00 docs are too many for the taint team to review, we can come up with "relevance search terms" to cull this down to a more manageable number.

EXHIBIT

DX-15

DSM-000234

Thoughts on this? If everyone is good with this approach, we should be able to open up for review the database with the documents that did not hit on these search terms.

Obviously, this will be an ongoing process to identify potentially relevant documents, and, if we see additional firms or lawyers show up in the emails, we can run searches to segregate these documents.

DSM-000235

**Maria, David (USAMN) 1**

| | |
|---|---|
| **From:** | Kroells, Christine A <CAKroells@uspis.gov> |
| **Sent:** | Monday, May 16, 2016 12:06 PM |
| **To:** | Maria, David (USAMN) 1; Kokkinen, John (USAMN) |
| **Cc:** | Khan, Jennifer L. (MP) (FBI); Belich Brandon J |
| **Subject:** | Scio Emails - Privileged |

In going through the emails, I've come across the following email addresses that appear to contain privileged communications:
@arnstein.com
@felhaber.com

Also, are we allowed to look at the communications Adams et al had with Bland-Richter regarding the Scio v. Nelson Mullins lawsuit?

Christie Kroells
Postal Inspector | U.S. Postal Inspection Service | Twin Cities Field Office
7360 Bush Lake Rd., Ste. 100, Minneapolis, MN 55439
Office: 612-884-7877
https://postalinspectors.uspis.gov/



EXHIBIT
DX-20

1

DSM-000240

**From:**          Maria, David (USAMN) 1 </O=USA/OU=EXCHANGE ADMINISTRATIVE GROUP
                   (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A63F46EF56FF4831A47CE93C0A5F3011-
                   MARIA, DAVID (USAMN)>
**Sent:**          Monday, May 16, 2016 12:30 PM
**To:**            Kroells, Christine A; Kokkinen, John (USAMN)
**Cc:**            Khan, Jennifer L. (MP) (FBI); Belich Brandon J
**Subject:**       RE: Scio Emails - Privileged

I also saw that Hopeman had done some work for him before, so we need to add Hopeman, as well as the "@felhaber"
that you note below.

Additionally, it looks like he had a guy working on his tax issues – Tom Brever.  We will add Brever as well as
@fosterbrever.com.  He also had a civil litigation matter with Tamburino from Caplinlaw.  He may have been opposing
counsel, but it is not relevant for our purposes, so we will add those also.

We need to do a little research on our end, as well as have a conversation with Scio's current counsel, to figure out some
of the issues like he Bland-Richter one.  I'm assuming that we will be able to review those materials though, as they
already turned over the Nelson Mullins report, etc.

---

**From:** Kroells, Christine A [mailto:CAKroells@uspis.gov]
**Sent:** Monday, May 16, 2016 12:06 PM
**To:** Maria, David (USAMN) 1; Kokkinen, John (USAMN)
**Cc:** Khan, Jennifer L. (MP) (FBI); Belich Brandon J
**Subject:** Scio Emails - Privileged

In going through the emails, I've come across the following email addresses that appear to contain privileged
communications:
@arnstein.com
@felhaber.com

Also, are we allowed to look at the communications Adams et al had with Bland-Richter regarding the Scio v. Nelson
Mullins lawsuit?

Christie Kroells
Postal Inspector | U.S. Postal Inspection Service | Twin Cities Field Office
7360 Bush Lake Rd., Ste. 100, Minneapolis, MN 55439
Office: 612-884-7877
https://postalinspectors.uspis.gov/

1



**Maria, David (USAMN) 1**

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 |
| **Sent:** | Tuesday, June 07, 2016 10:23 AM |
| **To:** | Czapko, Daniel (USAMN) |
| **Subject:** | RE: Adams Relativity Database |

Great – thanks.

**From:** Czapko, Daniel (USAMN)
**Sent:** Tuesday, June 07, 2016 10:19 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Subject:** RE: Adams Relativity Database

David,

A search of these terms came up with 1,000 documents (this is including family, so attachments, etc. were included). I have sent the request to the LTSC for these documents to be placed in a folder that can only be accessed by the LTSC. I will let you know when this has been completed.

Thanks,
Dan

**From:** Maria, David (USAMN) 1
**Sent:** Monday, June 06, 2016 10:09 AM
**To:** Czapko, Daniel (USAMN)
**Subject:** Adams Relativity Database

Dan,

Can we run a search on the Relativity database for Adams (the one that they created at the LTSC with the Yahoo emails) for the following terms and then have any documents that hit segregated from the database and put into the database that will not be reviewed:

arnstein (and @arnstein.com)
felhaber (and @felhaber.com)
hopeman
amslaw
blandrichter (and @blandrichter.com)
tamburino
caplanlaw (and @caplanlaw.com)
brever

Please let me know if you have any questions.

Thanks,
David



EXHIBIT
**DX-22**

1

**Maria, David (USAMN) 1**

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 |
| **Sent:** | Tuesday, February 28, 2017 10:54 AM |
| **To:** | Czapko, Daniel (USAMN) |
| **Subject:** | Adams Database |

Dan,

We need to run one more set of search terms on the "Adams II" email database in Relativity. This should be the final set. These are our search terms to cull this down to relevant documents. Unlike the searches that we ran for potentially privileged documents, the docs that hit on these search terms should remain in the database, and those that don't should be excluded. Once you have run them, let me know, and I will do some spot checking based on certain documents that I have already pulled.

Here are the terms:

Apollo
Diamond
ADI
ADGC
Gemstone
DL
RL
ADR
RBE
ESA
MRM
Scio
SDTC
Krossbow
Linares
Lancia
Zipkin
Nichols
LisaL
LMAInc
Mack
Rapello
Platt
Robb
Larson
McMahon
Bern
McPheely

Let me know if you have any questions.

EXHIBIT
DX-24

1

DSM-000244

Thanks,
David

David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787

DSM-000245

RE: Adams Privilege/Taint Review
**From:** Maria, David (USAMN) 1
**To:**   Kokkinen, John (USAMN); Rank, Timothy (USAMN)
**Date:** Tue, Apr 26, 2016 3:30 PM ET

No.

---

**From:** Kokkinen, John (USAMN)
**Sent:** Tuesday, April 26, 2016 2:30 PM
**To:** Maria, David (USAMN) 1, Rank, Timothy (USAMN)
**Subject:** RE: Adams Privilege/Taint Review

Have we come up with a list of relevance search terms yet?

---

**From:** Maria, David (USAMN) 1
**Sent:** Tuesday, April 26, 2016 2:15 PM
**To:** Rank, Timothy (USAMN), Kokkinen, John (USAMN)
**Subject:** Adams Privilege/Taint Review

Dan ran the search terms, and the ?general? search terms (?privilege!,? ?attorney,? etc.) were hitting on 70-80% of the documents, due in large part to standard disclaimers that appeared on many/most of the emails.

The more specific terms also had a substantial amount of hits.  The specific terms used and the number of each are set forth below:

| TERM | Doc Hits |
|------|------|
| adamsgrumbles | 1,495 |
| adamsmonahan | 8,003 |
| amllp | 1,733 |
| anthonyostlund | 15 |
| dorsey | 2,438 |
| fredlaw | 89 |
| fredrikson | 633 |
| K&L | 174 |
| klgates | 34 |
| kopecky | 306 |
| ksblegal | 328 |
| latham | 3,968 |
| lw.com | 3,134 |
| merchantgould | 94 |
| sankovitz | 1,299 |
| schwegman | 1,531 |
| sikora | 736 |
| slwip | 1,394 |
| watkins | 3,604 |
| wc.com | 96 |
| zouvas | 1,006 |
| Total | 32,110 |



EXHIBIT
**DX-27**

Because our specific search term list was comprehensive, I believe that we are okay just sticking with these terms and dispensing with the general terms. My suggestion would be to segregate/eliminate from our review all of the documents that hit on all of the specific search terms except for ?adamsmonahan,? ? adamsgrumbles,? ?amllp,? and ?zouvas,? as they were all firms that performed legal work for Apollo/Scio, or are firms that have assisted in defending Adams and Monahan in connection with the SEC action (and our investigation).  We would then have the taint team review these approx. 12,000 documents for privilege, releasing to us those that are determined not to be privileged.  If we think that 12,00 docs are too many for the taint team to review, we can come up with ?relevance search terms? to cull this down to a more manageable number.

Thoughts on this?  If everyone is good with this approach, we should be able to open up for review the database with the documents that did not hit on these search terms.

DSM-000248

Obviously, this will be an ongoing process to identify potentially relevant documents, and, if we see additional firms or lawyers show up in the emails, we can run searches to segregate these documents.

DSM-000249

EXHIBIT
DX-33

DSM-000259

2014 K00512

ADAMS, EDWARD

**Property/Evidence Tag/Label**

A013070&b

Case No. 2062433-MF

Exhibit No.

Recovered By (Printed Name & Signature)
Christa Knoells / Christa A. Knoells

Date Recovered 3/7/16

Recovered From (Name / Location)
Yahoo Inc.

Description Black SanDisk Flashdrive with
Contents of search warrant for
email addresses; jdrmail.edward.adams,
mike.ellingson224@yahoo.com.

**CHAIN OF CUSTODY**

| Rec'd | (Printed Name / Signature / Date) |
|---|---|
| Rec'd | Jennifer Peterson 3-14-16 |
| Rec'd ADAMS | 3/17/16 |
| Rec'd | Monte Huff 4/4/17 |
| Rec'd BLODGETT | 4/14/17 |
| Rec'd ADAMS | Monte Huff 11/14/17 |
| Rec'd | |
| Rec'd | |
| Rec'd | |

PS Form **715**, June 2003

| | |
|---|---|
| **From:** | Harris, Martin 3 (USAMN) <mharris3@usa.doj.gov> |
| **Sent:** | Friday, April 07, 2017 4:15 PM |
| **To:** | rachel.paulose@dlapiper.com; joanne.stone@dlapiper.com |
| **Cc:** | Maria, David (USAMN) 1; Kokkinen, John (USAMN) |
| **Subject:** | US vs. Adams |
| **Attachments:** | 16-mj-8(SER) _SW Return - 3.31.16.pdf; Signed and Filed Application for SW.PDF; 15-mj-942 (JSM) _ SW Return 3.31.16.pdf; 2017_04_07_ letter to Defense re Discovery.pdf |

Counsel,

Please see the attached letter. We are also attaching the Yahoo Search Warrant Application, Affidavit, and return.

Martin P. Harris | Financial Analyst

Special Prosecutions Unit | Saint Paul

U.S. Attorney's Office l District of Minnesota

404 Federal Building l 316 North Robert Street l St. Paul, MN 55101

T: 651.848.1969 l F: 651.848.1943 l C: 612.388.3391

martin.harris@usdoj.gov<mailto:martin.harris@usdoj.gov>



1



**U.S. Department of Justice**

United States Attorney
District of Minnesota

| | |
|---|---|
| 600 United States Courthouse | Telephone: (612) 664-5600 |
| 300 South Fourth Street | Fax: (612) 664-5787 |
| Minneapolis, MN 55415 | |

April 7, 2017

Rachel Paulose
DLA Piper LLP
80 South Eighth Street, Suite 2800
Minneapolis, MN 55402-2103

      Re:   *United States v. Edward S. Adams*
             Cr. 17-64 (DWF/KMM)

Dear Ms. Paulose:

     Pursuant to our discovery obligations, we will be making documents available to you early next week via USAfx (which will also include the load files). Those materials are in the final stages of being prepared for production. For your convenience, the attached log details the material that will be made available next week.

     The following documents are not available in electronic format but are available for review in our office:

- Berwyn Fund Prospectus/Annual Reports
- Santander Bank Scio records

     Additionally, the SEC produced a database of documents to us related to its investigation. We believe that Mr. Adams may already have these documents or have been provided access to them by the SEC, but we can provide you with a copy of this database upon request. We also have transcripts of the testimony of several witnesses who appeared before the SEC (including Mr. Adams), as well as numbered exhibits from the testimony. If Mr. Adams has not yet received these materials, we will provide them to you upon request.

     Finally, as you are likely aware, we obtained emails from Mr. Adams' two Yahoo email accounts via search and seizure warrant. We will provide you with the data from the two accounts in the unfiltered format in which it was produced by Yahoo, as well as the database with which we have been working, which has been filtered in an effort to remove potentially privileged, as well as non-responsive, emails and documents. We are

April 7, 2017
Page 2

now processing that database for production, and, upon completion of the processing, we will provide it to you.  If you would like a copy of the three databases discussed above (the SEC database, the unfiltered Yahoo materials, and the filtered email database), you will need to provide a 200GB hard drive onto which we can copy these materials.  We will contact you when the processing has been completed and the materials have been copied onto the hard drive.

Please feel free to call either one of us with any questions.

Sincerely,

GREGORY G. BROOKER
Acting United States Attorney

BY: DAVID M. MARIA
JOHN E. KOKKINEN
Assistant U.S. Attorneys

Adams Records                                     4/7/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Abujawdeh, Dina | 00013246 | 00013247 |
| Adams, Denise L. (Atty: Jon Hopeman) | 00000001 | 00000018 |
| Adams, Edward S. (Atty: Jon Hopeman) | 00000019 | 00002400 |
| Adams, Edward S. (Atty: Jon Hopeman) | 00013248 | 00013581 |
| Adams, Edward S. (Atty: Jon Hopeman) | 00013582 | 00013840 |
| Altenbach, Susan | 00014010 | 00014343 |
| American Express/Datamark, | 00042751 | 00042753 |
| American Express/Datamark, | 00045668 | 00045862 |
| American Express/Datamark, | 00045885 | 00045986 |
| American Express/Datamark, | 00046096 | 00046227 |
| American Express/Datamark, | 00046304 | 00046362 |
| American Express/Datamark, | 00046942 | 00047073 |
| AMG Funds | 00014344 | 00014383 |
| Ariel Investment Trust | 00014384 | 00014437 |
| Bank of America | 00014438 | 00014454 |
| Bank of America | 0001445 | 00015765 |
| Bank of America | 00015766 | 00015774 |
| Bank of America NA | 00002589 | 00002609 |
| Barnstable County Registry Of Deeds (MA) | 00002610 | 00002643 |
| Berman, Lyle | 00015775 | 00016255 |
| Berwyn Funds | 00016256 | 00016263 |
| Berwyn Funds | | |
| Bruce Fund c/o Huntington Asset Services, Inc. | 00016270 | 00016294 |
| Burnett County Register Of Deeds (WI) | 00002644 | 00002706 |

DSM-000263

Adams Records                                                                  4/7/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Charles Schwab & Co. Inc. | 00016295 | 00019371 |
| Charles Schwab Bank | 00019372 | 00019372 |
| Clifton Larson Allen | 00019373 | 00027680 |
| Commonwealth of Massachusetts Attn: Massachusetts Environmental Police Boat, Recreation Vehicle & Snowmobile Registration Bureau (MA) | 00002707 | 00002720 |
| Delta Airlines, Inc. | 00002721 | 00002739 |
| Devenir Wealth Management | 00027681 | 00028060 |
| Elan Financial | 00041575 | 00041973 |
| Elan Financial | 00042125 | 00042288 |
| EMAIL | 00000001 | 00489258 |
| Empire Stock Transfer Inc. | 00042941 | 00045584 |
| Empire Stock Transfer Inc. | 00051715 | 00051741 |
| Empire Stock Transfer Inc. | 00002740 | 00002936 |
| Engelkemier | 00028061 | 00028609 |
| Engkjer-Spitzley M. Faye | 00028145 | 00028609 |
| Exterior Design Studio LTD | 00042754 | 00042766 |
| Fidelity Investments/Fidelity Brokerage Services | 00002937 | 00004400 |
| Fidelity Investments/Fidelity Workplace Services | 00042767 | 00042781 |
| Fidelity Investments/Fidelity Workplace Services | 00045585 | 00045609 |
| Fifth Third Bank | 00028610 | 00028617 |
| First Eagle Funds | 00005847 | 00005896 |
| First National Bank | 00028618 | 00028987 |
| First National Bank | 00028988 | 00029276 |
| First National Bank | 00005897 | 00005931 |
| Gabelli Funds | 00029277 | 00029299 |

DSM-000264

Adams Records                                                4/7/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Hennepin County Recorder & Registrar of Titles | 00005932 | 00006099 |
| Hennepin County Recorder & Registrar of Titles | 00029300 | 00029383 |
| Hey, Steven | 00042289 | 00042592 |
| Intralinks, Inc. | 00029422 | 00029422 |
| Johnson, Harry | 00029423 | 00030218 |
| Krochmal, Michael | 00030219 | 00030228 |
| Krochmal, Michael | 00042593 | 00042612 |
| Legg Mason Global Asset Management | 00030231 | 00030276 |
| Lister, Carol | 00030279 | 00030597 |
| Mack, Kris | 00030598 | 00030598 |
| Mass Mutual Financial Group | 00030599 | 00030599 |
| MB Financial Bank, N.A. | 00047074 | 00047395 |
| MBSC Securities Corporation c/o The Bank of New York Melon | 00030600 | 00030729 |
| McKoskey, William | 00030730 | 00031343 |
| Minnesota Dept. of Public Safety Driver & Vehicle Services | 00031344 | 00031370 |
| Monahan, Michael R. (atty: Paul Dworak) | 00002401 | 00002588 |
| Mumm, Chris | 00031371 | 00031837 |
| Murry & Associates | 00031838 | 00034791 |
| Murry & Associates | 00034732 | 00034791 |
| Newport Coast Securities | 00034792 | 00035078 |
| Nymeo Federal Credit Union | 00035079 | 00035083 |
| Parsons Commercial Group, Inc. | 00006184 | 00006430 |
| PeoplesBank | 00006447 | 00006451 |
| PEOPLESBANK | 00006431 | 00006446 |
| Plekkenpol Builders Inc. | 00042782 | 00042928 |
| Quantronix, Inc. | 00035533 | 00035547 |
| Rapello, Paul | 00035548 | 00035622 |
| Riedel, John | 00045649 | 00045667 |
| Rothman, Steve | 00035623 | 00035716 |
| Rydex Fund Services, LLC/Guggenheim Investments | | |

Adams Records                                                4/7/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Rydex Funds Services | 00035717 | 00035851 |
| Sankovsky, Robert | 00035852 | 00036099 |
| Santander Bank, NA | | |
| Santander Bank, NA | | |
| Santander Bank, NA | | |
| Schroeder, Brett | 00036100 | 00036413 |
| Scio Diamond Technology Corp. | 00009639 | 00011540 |
| Scio Diamond Technology Corp. | | |
| SEC | SEC-USAO-000000001 | SEC-USAO-000021388 |
| SEC | SEC-ADAMS-000001 | SEC-ADAMS-032745 |
| SEC | EST_00000001 | EST_00017016 |
| SEC | SEC-MONAHAN-000001 | SEC-MONAHAN-002678 |
| Security Mutual Life Insurance Company of New York | 00036422 | 00036751 |
| South State Bank | 00006452 | 00006917 |
| South State Bank (South Carolina Bank & Trust) | 00036752 | 00037974 |
| TIAA CREF Financial Services | 00038756 | |
| TIAA CREF Financial Services | | 00038941 |
| Topographix | 00038942 | 0039163 |
| TransUnion | 00042929 | 00042940 |
| Turturici, Jamie | 00042613 | 00042750 |
| US Bank National Association | 00039164 | 00039251 |
| Vanguard Group, LLC | 00039252 | 00039357 |
| Vartughian, Ed | 00039358 | 00039411 |
| Venture Bank | 00039412 | 00039805 |
| Venture Bank | 00039806 | 00040450 |

Adams Records                                    4/7/2017

| Source | Beg Doc | End Doc |
|---|---|---|
| Venture Bank | 00040451 | 00040533 |
| Venture Bank | 00040534 | 00040829 |
| Venture Bank | 00006918 | 00008097 |
| Venture Bank | 00047396 | 00050250 |
| Wells Fargo Bank, N.A. | 00050251 | 00051714 |
| Wells Fargo Financial Advisors, LLC | 00008098 | 00009638 |
| Wells Fargo Home Mortgage | 00045610 | 00045648 |
| Westwood Funds | 00040830 | 00040856 |
| Winchester, Slade | 0040857 | 00040939 |
| Wisconsin Dept. of Natural Resources | 00040940 | 00040949 |
| Zipkin, Jill S. | 00011541 | 00013245 |
| Zipkin, Larry | 0040950 | 00041574 |

JEK:blb
AO 93 (Rev. 12/09) Search and Seizure Warrant                                              2014R00312

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

RECEIVED

MAR 1 1 2016

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

*Sealed by Order*

Case No.  16 mj 8(SER)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

> See Attachment A

The person or property to be searched, described above, is believed to conceal:

> See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      January 21, 2016
                                                                        *(not to exceed 14 days)*

_ in the daytime 6:00 a.m. to 10 p.m.

X  at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Steven E. Rau.

Date and Time issued: 3:20 PM 7 Jan 2016

_____
*Judge's Signature*

City and State:  St. Paul, MN                    Steven E. Rau, U.S. Magistrate Judge
                                                          *Printed Name and Title*

SCANNED

MAR 1 1 2016

U.S. DISTRICT COURT ST. PAUL

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.:<br>206 2433 - MF | Date and time warrant executed:<br>1/8/16 @ 9:36am | Copy of warrant and inventory left with:<br>NA |
| Inventory made in the presence of :<br>NA | | |
| Inventory of the property taken and name of any person(s) seized:<br>- Flushdrive containing records for 3 email addresses: jafman1, edwardsadams, and michaelvmonahan. | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: 3/10/16

_____
Executing officer's signature

Subscribed, sworn to, and returned before this date.

_____          Postal Inspector
U.S. Judge or Magistrate Judge              Printed name and title

                                            3/10/16
                                            Date

DSM-000269

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government**

a.     All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.   All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

     i.   All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the above business entities.

ii. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/AGC and Private Scio, the stock-repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any

3

DSM-000273

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)     Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)     Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)     Text messages

d)     Header information:   distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)     Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)     Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury

under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the

information contained in this declaration is true and correct.  I am employed by Yahoo!

Inc., and my official title is _____.  I am a custodian of

records for Yahoo! Inc.  I state that each of the records attached hereto is the original

record or a true duplicate of the original record in the custody of Yahoo! Inc., and that I

am the custodian of the attached records consisting of _____

(pages/CDs/kilobytes). I further state that:

      a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

      b.      such records were kept in the ordinary course of a regularly conducted

business activity of Yahoo! Inc.; and

      c.      such records were made by Yahoo! Inc. as a regular practice.

      I further state that this certification is intended to satisfy Rule 902(11) of the

Federal Rules of Evidence.

_____    _____

Date                   Signature

DSM-000275

JEK:blb
AO 106 (Rev. 04/10) Application for a Search Warrant



RECEIVED
2014R00312
FEB 03 2016
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

# UNITED STATES DISTRICT COURT
### for the
### District of Minnesota

In the Matter of the Search of:

**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

Case No.  16mj 8(SER)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

    See Attachment A

located in the Northern District of California, there is now concealed:

    See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    __X__    evidence of a crime;

    __X__    contraband, fruits of crime, or other items illegally possessed;

    __X__    property designed for use, intended for use, or used in committing a crime;

    _____    a person to be arrested or a person who is unlawfully restrained. The search is related to a

violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section(s) 1341 & 1343 | Mail Fraud and Wire Fraud |

The application is based on these facts:  **See attached Affidavit.**

    __X__    Continued on the attached sheet.

Sworn to before me and signed in my presence.

Date:  7 Jan 2016

                                       *Applicant's Signature*

                      Christie Kroells, Inspector
                                 *Printed Name and Title*

                                     *Judge's Signature*

City and State:  St. Paul, MN

                      Steven E. Rau, U.S. Magistrate Judge
                                   *Printed Name and Title*

SCANNED
FEB 0 3 2016
U.S. DISTRICT COURT ST. PAUL

DSM-000276

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

DSM-000277

**ATTACHMENT B**

**Particular Things to be Seized**

I.     **Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.      Information to be seized by the government

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1. All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

   i.   All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the above business entities.

ii.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities

2.  All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/AGC and Private Scio, the stock-repurchase program, and the private offering.

3.  All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any

3

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)   Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)   Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)   Text messages

d)   Header information:  distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)   Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)   Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

4

DSM-000281

16 my8(SOB)

STATE OF MINNESOTA   )   **FILED UNDER SEAL – PURSUANT TO ORDER**
                           )   ss.   AFFIDAVIT OF CHRISTIE KROELLS
COUNTY OF HENNEPIN   )

      I, Postal Inspector Christine Kroells, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

    1.     I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Yahoo! Inc., an e-mail provider headquartered at 701 First Avenue, Sunnyvale, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

    2.     I am a Postal Inspector with the U.S. Postal Inspection Service, and have been since 2003. I am currently assigned to the Twin Cities Field Office in Minneapolis, Minnesota. I am authorized to conduct investigations on behalf of the United States Postal Inspection Service. My primary criminal investigative responsibilities include investigations which may involve violations of Title 18, United States Code, Section 1341, Mail Fraud. I have conducted and participated in numerous criminal investigations

of individuals involved in illegal activities for possible violations of the United States Code and related laws, including but not limited to mail and wire fraud in violation of Title 18, United States Code, 1341 and 1343, respectively.  Your affiant's experience includes training in and investigation of mail fraud and wire fraud.  Your affiant's investigative experience includes uncovering schemes where individuals obtain goods or monetary funds from victims as part of investment schemes through false pretenses and do not follow through with their obligations to the victims.  In your affiant's experience, these individuals use these schemes to obtain money and property for their personal gain. In your affiant's experience evidence of these crimes can be found in email communications.

3.      This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1341 and 1343 have been committed by Edward S. Adams and Michael R. Monahan, including by concealing and failing to disclose material information to company shareholders prior to seeking the shareholders' approval of transactions which personally benefitted Adams and Monahan.  There is also probable cause to believe that evidence of these violations is located in the following email accounts, further described in Attachment A:

a.   edwardsadams@yahoo.com, used by Edward S. Adams;

2

b. jafman1@yahoo.com, used by Edward S. Adams; and

c. michaelrmonahan@yahoo.com, used by Michael R. Monahan;

and to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.     According to online records your affiant reviewed, Linares Management Associates registered with the state of Massachusetts on or about May 2, 1990, and on or about February 20, 2001, Linares Management Associates changed its name to Apollo Diamond, Inc. (ADI). According to these records, B.R.L. and M.V.L. were listed as President and as Treasurer and Secretary, respectively, from the inception of the company and through the name change. On or about May 23, 2006, ADI was voluntarily dissolved and on the same date ADI was re-registered with the state of Massachusetts listing B.R.L. again as President, and adding R.C.L. as Treasurer and Adams as Secretary. On or about April 2, 2004, Apollo Diamond Gemstone Corporation (ADGC), a subsidiary of ADI, was registered with the state of Delaware. Adams signed the Articles of Incorporation as the Incorporator for ADGC. Adams is R.C.L.'s son-in-law and B.R.L.'s brother-in-law.

3

DSM-000284

7.      Through documents your affiant has gathered during the course of this investigation, your affiant has learned that ADI started working to "develop and perfect" a chemical vapor deposition (CVD) technology that produces high-quality diamond crystals for use in the industrial and gemological industries.  R.C.L. reportedly discovered this technology, which was used by ADI to develop a process to create large, single-crystal diamonds that could be grown in a controlled laboratory environment.  ADGC was created to generate these synthetic diamonds and market them to various industries.

8.      Between 2004 and 2011, Adams held various positions within both ADI and ADGC, including Secretary of ADI and Secretary, Executive Vice President, Chief Financial Officer, Director, and President of ADGC.  Your affiant has reviewed records showing Adams in these roles.  These records include multiple Form Ds for ADI filed with the SEC, including one dated October 25, 2006, and another dated November 13, 2007,  in which Adams signs the forms as ADI's Secretary and is listed as an Executive Officer of ADI. Form Ds for ADGC, dated November 13, 2007, July 20, 2009, and July 20, 2010, that were signed by Adams either as ADGC's Secretary or ADGC's Chief Financial Officer list Adams as an Executive Officer, and, on one form, as a Director.

9.      Between 2008 and 2010, Monahan held various positions within ADGC, including Vice President of Business Development, Executive Vice President for Corporate Development and Marketing, and General Counsel.  Your affiant reviewed records showing Monahan in these roles, including multiple Form Ds filed with the SEC.

4

DSM-000285

Two of these Form Ds filed for ADGC, which were dated July 20, 2009, and July 20, 2010, list Monahan as an Executive Officer of ADGC.

10.     From at least 2008 through 2014, Adams and Monahan were partners in a Minneapolis-based law firm, Adams Monahan, LLP (AMLLP).  Focus Capital Group, Inc. (Focus) is a Minneapolis-based investment banking firm that was co-founded by Adams and Monahan and incorporated with the state of Minnesota in 2005.  Adams was Chief Executive Officer and Managing Director of Focus, and Monahan was the Senior Managing Director of Focus.  ESA Consulting Services, LLC (ESA Consulting) is a Minneapolis-based company.  According to the Minnesota Secretary of State, Adams is listed as the Manager of ESA Consulting.

11.     Your affiant reviewed records regarding the formation of a privately-held company named Scio Diamond Technology Corporation, which was formed on or about March 1, 2011 in Nevada.  For ease of reference and to avoid any potential confusion, this Affidavit will refer to this company formed on March 1, 2011 as "Private Scio" as distinguished from the publicly-traded company that adopted the same name in July 2011, as explained below in paragraph 21.  Adams and Monahan are listed on the Articles of Incorporation as the sole officers and members of the Board of Directors for Private Scio.  Specifically, Adams is listed as the Director, President, and Treasurer, and Monahan is listed as the Secretary.  Both Adams and Monahan owned shares in Private Scio.

5

DSM-000286

12.     Your affiant reviewed a proxy statement and the cover letter to that proxy statement sent to ADI shareholders and dated March 11, 2011, from R.C.L., in his capacity as ADI's Chairman asking for the shareholders' approval of the sale of ADI's assets to Private Scio.  The proxy statement solicited the proxies from shareholders to approve (1) the sale of all of ADI's assets for $2,000,000 to Private Scio and (2) a stock repurchase program whereby ADI would repurchase the shares of interested shareholders for $0.01 per share.  The proxy statement explained that the $2,000,000 proceeds from the sale would be used to satisfy ADI's outstanding debts and liabilities and to fund the stock repurchase program.  According to the cover letter, beginning in 2009, ADI "was forced to terminate many of its employees and later to reduce, and in some cases defer or even eliminate, compensation to its remaining employees."  The cover letter states that the ADI Board of Directors, in seeking to act in the best interest of the company, decided the sale of the company's assets was the best option in an effort to continue their mission, which was to manufacture and distribute synthetic diamonds.  Specifically, the cover letter states, "a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology."  The cover letter continues to explain that because of this decision, ADI has agreed to sell substantially all of its assets to Private Scio for approximately $2,000,000. The cover letter further states that ADI's most significant creditors have agreed to accept reduced payments and that these creditor agreements are conditioned on the sale of the assets to Private Scio.  The cover letter does not disclose, however, that Adams' and

6

Monahan's law firm, AMLLP, was the single largest creditor of ADI at that time.  In addition, the cover letter explained that under the stock repurchase program, ADI shareholders could sell back their shares at $0.01 per share, which the letter indicated could give rise to a tax advantage to the shareholders.  According to the cover letter, any shareholders whose shares were repurchased by ADI would also be given the option to invest in Private Scio at a price of $0.01 per share in number of shares equal to the number of shares that they held in ADI. The cover letter indicated that there would be a Special Meeting of Stockholders and part of the agenda of the meeting would be to vote on the sale of ADI to Private Scio.  A similar cover letter dated March 18, 2011, was sent to the ADGC shareholders.   Neither of these cover letters disclosed Adams' or Monahan's roles in Private Scio, despite the fact that, according to the proxy statement, AMLLP was retained by ADI and ADGC to carry out the proxy solicitation.  Nor did either of the proxy statements themselves disclose Adams' or Monahan's roles in Private Scio.  The failure of both the proxy statement and the cover letter to disclose Adams' and Monahan's roles and ownership interests in Private Scio is a material omission the ADI shareholders should have been made aware of prior to their decision to vote on the asset sale to Private Scio and the stock-repurchase program.  In addition, the failure of both the proxy statement and the cover letter to disclose that Adams, Monahan, and AMLLP acted as counsel for both ADI and Private Scio in connection with the transaction was a material omission the shareholders of both ADI and Private Scio should have been made aware of prior to their decisions to authorize the transaction.

7

13.    Your affiant reviewed an asset purchase agreement dated on or about March 11, 2011, which was executed between ADI and Private Scio whereby Private Scio agreed to purchase the assets of ADI for $2,000,000 in cash.  On or about March 18, 2011, a second asset purchase agreement was executed, this time between ADGC and Private Scio, whereby Private Scio agreed to purchase the assets of ADGC for $10,000 in cash.   Neither asset purchase agreement disclosed Adams's or Monahan's roles or ownership interests in Private Scio.  Although these asset purchase agreements are signed by R.C.L., your affiant has not seen any evidence of funds being provided from Private Scio to ADI or ADGC.  These asset purchase agreements also do not disclose Private Scio's inability to pay the purchase prices as of the date of the agreements and as of the date of the Special Meeting; they only state that Private Scio "(p)rior to closing . . . shall have procured funding to make the Cash Payment."   Your affiant believes the contingency of Private Scio's funding, and the fact that Private Scio did not currently have the funding, could have been a deciding factor for the shareholders in determining whether or not to vote for the sale of ADI's and ADGC's assets to Private Scio.  Your affiant found one bank account that appeared to initially start out as a Private Scio bank account.  The account was opened on or about July 13, 2011, by Adams, as an officer of Private Scio.  Adams is the sole signer on the account until C.N. (Chief Financial Officer for Public Scio) is added on or about April 25, 2012, shortly after which the account is closed.

8

14.     According to the transcript of a deposition of Adams conducted by the SEC on or about August 27, 2015, and reviewed by your affiant, Adams answered questions regarding the drafting of March 11, 2011 cover letter to the proxy statement from R.C.L. to the ADI shareholders.  Adams stated that he thought his law firm, AMLLP, had some input on drafting the letter but he did not remember if AMLLP actually drafted the letter.

15.     In addition, the cover letter introduced the "new management" for Private Scio as J.D.L., Chief Executive Officer, and a letter of introduction from J.D.L. was included in the proxy statement materials sent to the shareholders.  This introduction letter was dated on or about March 11, 2011, to ADI shareholders and March 18, 2011, to ADGC shareholders.  Your affiant reviewed these letters and noticed that, again, Adams' and Monahan's roles and ownership interest in Private Scio were not disclosed.

16.     Your affiant also reviewed a recording of an interview of J.D.L. by members of the SEC in which J.D.L. stated, in reference to Private Scio, that he was "not involved in that original private company."

17.     Your affiant learned that on or about April 18, 2011, a special meeting was held in Boston, Massachusetts per the proxy statement and letter described above, where a majority of the shareholders for ADI and ADGC approved the asset purchase agreements between ADI, ADGC, and Private Scio.

18.     Your affiant learned that as of May 2011, which was before the stock-repurchase program had been completed, Adams and his wife owned 11 percent of

9

ADGC and Monahan owned 4 percent and Adams and his wife owned less than 2 percent of ADI and Monahan owned 0 percent.

19.    On or about May 1, 2011, Private Scio issued a private placement memorandum ("PPM") offering up to 7,200,000 shares of common stock at $0.70 per share to potential accredited investors, to terminate on September 30, 2011. Your affiant reviewed this PPM and learned that Adams' and Monahan's roles in ADI and ADGC were not disclosed. An amendment to this PPM, dated on or about August 1, 2011, again does not disclose Adams' and Monahan's roles in ADI and ADGC. The amendment was signed by Adams. The disclosure of Adams' and Monahan's roles in ADI and ADGC would be material information to prospective shareholders of Private Scio, in part because the prior companies involved both Adams and Monahan in the same business, manufacturing diamonds, and both prior companies failed. This is a potential risk that is not outlined in the PPM. According to bank records your affiant reviewed, over $700,000 was raised from investors as part of this offering through on or about August 1, 2011.

20.    On or about May 5, 2011, Adams sent an email to D.P. and K.M. and copied Monahan and P.R., who are all employees of Focus, regarding controlling Scio, "control which we can utilize to effectuate a favorable outcome." (Considering the timing of this email, your affiant believes Adams is referring to Private Scio.) Adams also states that without his and Monahan's roles in Scio, he fears he would only be an agent to the company and not in control of getting paid by the company. Adams adds,

10

"there is no Scio opportunity--none--without us [Adams and Monahan].  This transaction was our idea, we have managed it, and we need to continue to manage it to a successful outcome."  In a follow-up to a response from this email, Adams discusses his control of the Scio board and the invitations he has out to other individuals to join the Board.  He also states that he and Monahan collectively only own 16 percent of the company which is 4,000,000 of the 25,000,000 shares, and after the offering that will be less.  The email address Adams used for this email is jafman1@yahoo.com and the email address this was sent to for Monahan is michaelrmonahan@yahoo.com.

21.    According to online records reviewed by your affiant, an amendment was filed in Nevada effectively dated July 20, 2011, changing the name of a publicly-traded company named Krossbow Holdings Corporation, to Scio Diamond Technology Corporation.  For ease of reference and to avoid any potential confusion, this Affidavit will refer to this publicly-traded company that adopted the name Scio Diamond Technology Corporation as "Public Scio.".

22.    Your affiant reviewed an asset purchase agreement between Public Scio and Private Scio (dated July 31, 2011, and found that Public Scio agreed to acquire substantially all of the assets of Private Scio, including those listed in a schedule attached to the asset purchase agreement.  Your affiant reviewed the attached schedule and discovered that it listed one item, the name Scio Diamond Technology Corporation.  According to the asset purchase agreement, the properties and rights of Private Scio were to be transferred to Public Scio for 13,000,000 shares of Public Scio's stock.  However, it

11

DSM-000292

appears from the asset purchase agreement and other records reviewed by your affiant that the 13,000,000 shares were not distributed to Private Scio but instead were distributed directly to Adams and his wife, Monahan and his wife, R.C.L, J.D.L., and other individuals.

23.    According to stock sale agreements and other records your affiant reviewed, Adams and his wife and Monahan and his wife each obtained a total of 5,390,000 Public Scio shares from the Scio Asset Purchase Agreement and from additional stock sales agreements in the beginning of August 2011. As a result, both the Adamses and the Monahans each obtained more than a 27 percent ownership interest in Public Scio.   First, pursuant to Schedule 1.4 of the asset purchase agreement, the Adamses and the Monahans each received 4,100,000 shares of Public Scio.  Second, on or about August 1, 2011, every share of Public Scio's outstanding stock was sold for $0.06 and $0.08 a share to a small group, which included the Adamses, the Monahans, and others.  Adams and Monahan each received 290,000 shares of Public Scio in an August 1, 2011 stock sale agreement for $0.06 a share, and Adams and Monahan each received 1,000,000 shares for $0.08 a share in another August 1, 2011 stock sale agreement. J.D.L. obtained a significant share of Public Scio shares as well, amounting to 2,290,000 shares, or over 11 percent of the company, putting Adams and Monahan, not J.D.L., the Chief Executive Officer, in control of Public Scio.  The sale of these Public Scio shares for $0.06 and $0.08 per share to Adams, Monahan, and select others occurred

12

while the Private Scio PPM, which offered Private Scio shares for $0.70 per share, was still active.

24.    On or about August 5, 2011, Public Scio publicly changed its name from Krossbow to Scio Diamond Technology Corporation (Public Scio).  J.D.L. was appointed Chief Executive Officer of Public Scio, Adams was appointed Chairman of the Board, and Monahan was appointed to the Board.

25.    Your affiant reviewed an SEC Form 8-K filed online for Public Scio. According to this Form 8-K, dated August 11, 2011, the aforementioned Scio Asset Purchase Agreement was executed on August 5, 2011, and under the terms of the agreement, "the name 'Scio Diamond Technology Corporation' was purchased for 13,000,000 newly issued shares of common stock of the Company."  The Form 8-K explained the change of control of Public Scio and also listed the new directors and officers of Public Scio, which included Adams and Monahan.  The 8-K stated Adams' and Monahan's beneficial ownership interests of Public Scio included 5,390,000 shares each, which meant Adams and Monahan each beneficially owned over 27 percent of the company.  According to the 8-K Adams and Monahan were appointed to Public Scio's Board of Directors as the Chairman and a member, respectively, on August 5, 2011. There was no disclosure in this 8-K of Adams's or Monahan's previous roles in ADI or ADGC.  The 8-K also did not disclose Adams's relationship, as son-in-law and brother-in-law, to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC, respectively, or Adams's and Monahan's law firm, AMLLP's,

13

previous representation of ADI and ADGC, despite an included biography of Adams in the 8-K. A similar 8-K filed with the SEC, dated on or about August 17, 2011, also did not provide any of these aforementioned disclosures.

26.     According to another 8-K filed online by Public Scio with the SEC on or about August 31, 2011, Public Scio entered into an asset purchase agreement with ADI for $2,000,000. Public Scio was supposed to pay ADI $1,000,000 in cash and provide a $1,000,000 promissory note "in consideration for ADI's Diamond Growing Machines and Intellectual Property." The 8-K is signed by J.D.L., as Public Scio's Chief Executive Officer. There is no disclosure of Monahan's previous roles in ADGC, Adams' previous roles in ADI or ADGC, or Adams' familial relation to the Chairman of the Boards of ADI and ADGC and to an executive officer of both ADI and ADGC. Your affiant believes that these failures to disclose the extent of Adams' and Monahan's connections to the previous, failed companies were important to current and future shareholders of Public Scio to make informed decisions on purchasing or retaining their shares. This asset purchase agreement also does not disclose the previous asset purchase agreements for Private Scio to purchase the assets of ADI and ADGC.

27.     Your affiant learned that on or about August 10, 2011, Public Scio paid $275,000 to AMLLP. From on or about August 11, 2011, through January 14, 2013, Public Scio paid $1,725,000 to ADI. Of this amount, $1,600,000 was paid between August 11, 2011, and December 30, 2011. Subsequent to the payments from Public Scio to ADI, ADI disbursed two payments totaling $75,000 to ESA Consulting Services LLC

14

(an Adams company) in October 2011, an additional payment of $275,000 to AMLLP on November 18, 2011, and six payments totaling over $726,765.97 directly to Adams. On or about the same days as the August 10, 2011 payment of $275,000 from Public Scio to AMLLP and the November 11, 2011 payment of $275,000 from ADI to AMLLP, AMLLP made payments of $262,500 on August 10, 2011, and $225,000 on November 18, 2011, to the Monahans.

28.    Your affiant was able to find online archived copies of the www.sciodiamond.com website. The earliest available archived copy is from October 28, 2011. After clicking on "Our Company" and then "Officers and Directors", the website explained Adams is Chairman of the Board and lists Monahan under "Officers and Directors" of Public Scio, but there is no disclosure regarding Adams' or Monahan's previous roles with ADI and ADGC.

29.    In your affiant's review of records, she found a series of emails between Adams, Monahan, and C.N., the Chief Financial Officer for Public Scio. On or about March 26, 2012, an email was sent from C.N. to Adams, at his email address edwardsadams@yahoo.com,        Monahan,        at        his        email        address michaelrmonhan@yahoo.com, and copying J.D.L. regarding disclosures for documents in working with a potential large investor. C.N. writes about the common ownership of Scio, ADI, and ADGC and states, "We also need to disclose any executive officer or director relationships involving ADI and . . . ADGC. I don't know what you guys may be or may have been . . . . If you guys have resigned any relevant positions or board seats

15

please let me know what happened . . . ." C.N. adds, "We saw somewhere that [D.P.] was an officer of one of the companies, so if you have records on that, please provide." Adams responds to this email the same day and states, "Michael [Monahan] and I were neither ever. [D.P.] is nothing related to this in anyway."

30.     Your affiant discovered a memorandum dated on or about November 30, 2009, from ADI discussing the roles of Adams, Monahan, and D.P. to ADI. It appears to your affiant the memorandum was issued to deal with disclosures for Focus Capital Group (another of Adams' and Monahan's companies as described above). The memorandum states, in part, Adams, Monahan, and D.P. "are currently serving in various directorial and/or officer capacities, with Apollo Diamond, Inc. (including its various subsidiaries and affiliates, including Apollo Diamond Gemstone Corporation)." There is a signature page to the memorandum which contains Adams' and Monahan's signatures.

31.     Your affiant reviewed a Form 8-K filed with the SEC on or about June 8, 2012. The 8-K explains that on June 5, 2012, Public Scio agreed to purchase "substantially all of the assets of ADGC" for $100,000 pursuant to an asset purchase agreement. According to the 8-K, the assets purchased "consist primarily of cultured diamond gemstone –related know-how, inventory, and various intellectual property." This varies substantially in value from the original asset purchase agreement whereby Private Scio was going to purchase ADGC's assets for $10,000 just over one year prior to this.

16

32.     Your affiant knows from her experience that non-disclosure of key individuals' roles in companies, such as the non-disclosure here of Adams' and Monahan's roles and ownership interests in Private Scio to ADI and ADGC shareholders prior to the special meeting of shareholders to approve the asset purchase agreement with Private Scio and the stock-repurchase program and of Adams' and Monahan's roles in ADI and ADGC to Private Scio's shareholders, can be material information to most current and prospective investors.   In this case, Adams and Monahan maneuvered themselves into a position of control with Private Scio, did not disclose this position to ADI and ADGC shareholders prior to the shareholder vote on the sale of ADI and ADGC to Private Scio and the stock-repurchase program, and then put themselves in another position of control with Public Scio, partly by selling Private Scio's name to Public Scio and then by purchasing Public Scio shares at rates far lower than rates that were in effect only weeks later, in order to gain control of Public Scio.   Then, they did not disclose their roles in ADI and ADGC to the Public Scio shareholders before Public Scio's purchase of ADI and ADGC and made attempts to actively conceal those roles in ADI and ADGC after the sale to Public Scio.   Adams and Monahan were not only able to benefit financially, as described above, but also managed to maneuver themselves into a position of greater control and ownership in the new company, Public Scio.   Specifically, Adams moved from an ownership position of 11 percent in ADGC and less than 2 percent in ADI to over 27 percent in Public Scio and Monahan moved from an ownership position of 4 percent in ADGC and 0 percent in ADI to over 27 percent in Public Scio.

17

33.     During your affiant's review of the transcript of the SEC's deposition of Adams on August 27, 2015, your affiant learned that, according to Adams, Adams mainly uses one email address, edwardsadams@yahoo.com.  According to the deposition transcript, as part of the subpoena request for records by the SEC, Adams searched his emails, including edwardsadams@yahoo.com, for key words related to his business dealings with Scio and produced those email records to the SEC.  Therefore, given that Adams was able to search for, find, and produce emails from the edwardsadams@yahoo.com account in response to the subpoena request it appears that Adams still retains emails that would be relevant to the investigation.

34.     Based on the above, your affiant believes that Adams has used the email addresses edwardsadams@yahoo.com and jafman1@yahoo.com in his business dealings related to the fraud scheme described in this affidavit and that Monahan has used the email address michaelrmonahan@yahoo.com in his business dealings related to the fraud scheme.

35.     A preservation letter was sent to Yahoo! Inc. on or about October 7, 2015 for edwardsadams@yahoo.com and on or about October 22, 2015 for jafman1@yahoo.com and michaelrmonahan@yahoo.com.  In general, an e-mail that is sent to a Yahoo! Inc. subscriber is stored in the subscriber's "mail box" on Yahoo! Inc. servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Yahoo! Inc. servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Yahoo! Inc.'s servers for

18

a certain period of time.  Therefore, it is believed Yahoo! Inc. has maintained the records being sought pursuant to this warrant.

## BACKGROUND CONCERNING E-MAIL

36.    In my training and experience, I have learned that Yahoo! Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo! Inc. allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account listed in Attachment A.  Subscribers obtain an account by registering with Yahoo! Inc.  During the registration process, Yahoo! Inc. asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo! Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo! Inc. subscribers) and information concerning subscribers and their use of Yahoo! Inc. services, such as account access information, e-mail transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.    A Yahoo! Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo! Inc.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

19

DSM-000300

38.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

39.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

20

DSM-000301

40.    In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

41.    On November 25, 2015, U.S. Magistrate Judge Janie S. Mayeron signed a search warrant pertaining to the email addresses edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com.   That search warrant was based on the same allegations contained in this affidavit.  That same day, your affiant served that search warrant on Yahoo! Inc. via a fax number.  Your affiant understood this fax number to be the correct method for service of process on Yahoo! Inc. based on your affiant's previous successful service of process by this method and based on your affiant's consultation of a Yahoo! Inc. law enforcement manual.  After the search warrant was served and your affiant received confirmation that the fax had been successfully sent, a period of time passed with no response from Yahoo! Inc.  Accordingly, your affiant contacted Yahoo! Inc. and learned that although the fax number to which the search warrant had been sent formerly was the correct method for service of process, Yahoo! Inc. no longer accepted that method for service.  A representative of Yahoo! Inc. stated

21

they would not accept service of process for the November 25, 2015 search warrant because the date on which the warrant was to be executed, December 9, 2015, had passed. The Yahoo! Inc. representative explained that it was common for this error to occur and that Yahoo! Inc. required a new warrant to be issued and served on Yahoo! Inc. via their current, approved method, which is through email. Your affiant is therefore requesting a new warrant.

### CONCLUSION

42. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo! Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Further your Affiant sayeth not.

Postal Inspector Christie Kroells
United States Postal Inspection Service

SUBSCRIBED and SWORN to before me this 25th day of November, 2015    7th day Jan 2016

THE HONORABLE STEVEN E. RAU
United States Magistrate Judge
District of Minnesota

22

DSM-000303

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

DSM-000304

## ATTACHMENT B

### Particular Things to be Seized

I.       **Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.       The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.       All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.       The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.      Information to be seized by the government

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1. All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

    i. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

2

the business bank accounts and other financial accounts of the

above business entities.

ii. All bookkeeping ledgers, journals, reports, and other bookkeeping

records, and computer printouts thereof, which record, identify,

and itemize the dates, amounts, and nature and classification of all

income and expenses of the above business entities

2. All documents, records, and communications related to Private Scio, Public

Scio, to include all such documents, records, and communications

regarding the ADI/ADGC proxy statement from March 2011, the asset

purchase agreement between ADI/AGC and Private Scio, the stock-

repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or

prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any

3

writing or oral conversation, including, but not limited to, telephone conversations, conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)    Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)    Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)    Text messages

d)    Header information:  distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)    Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)    Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

4

DSM-000308

JEK:blb
AO 93 (Rev. 12/09) Search and Seizure Warrant                                                    2014R00312

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

*RECEIVED*

*MAR 11 2016*

*CLERK, U.S. DISTRICT COURT*
*ST. PAUL, MINNESOTA*

In the Matter of the Search of:
**INFORMATION STORED IN THE SERVERS
THAT ARE ASSOCIATED WITH THE E-
MAIL ADDRESSES:
EDWARDSADAMS@YAHOO.COM,
JAFMAN1@YAHOO.COM, AND
MICHAELRMONAHAN@YAHOO.COM,
THAT IS STORED AT PREMISES
CONTROLLED BY YAHOO! INC.**

*Sealed by Order*

Case No.   15-MJ-942 (JSM)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the Northern District of California:

See Attachment A

The person or property to be searched, described above, is believed to conceal:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before      December 9, 2015
                                                                  *(not to exceed 14 days)*

_ in the daytime 6:00 a.m. to 10 p.m.

X at any time in the day or night as I find reasonable cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from
whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Janie
S. Mayeron.

Date and Time issued:   11/25/15 10:05 A.M.        *Janie S Mayeron*
                                                   *Judge's Signature*

City and State:  Minneapolis, MN                    Janie S. Mayeron, U.S. Magistrate Judge
                                                    *Printed Name and Title*

SCANNED

MAR 1 1 2016

U.S. DISTRICT COURT ST. PAUL

DSM-000309

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: <br> 2062433-MF | Date and time warrant executed: <br> 11/25/15 @ 11.11 am | Copy of warrant and inventory left with: <br> NA |
| Inventory made in the presence of : <br> NA | | |
| Inventory of the property taken and name of any person(s) seized: | | |

NA

*Service made on subject of warrant via an outdated method of service.

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/10/16

Executing officer's signature

Printed name and title

Postal Inspector

3/10/16
Date

Subscribed, sworn to, and returned before this date.

U.S. Judge or Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with edwardsadams@yahoo.com, jafman1@yahoo.com, and michaelrmonahan@yahoo.com that is stored at premises controlled by Yahoo! Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, CA 94089.

DSM-000311

## ATTACHMENT B

### Particular Things to be Seized

I.     **Information to be disclosed by Yahoo! Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on October 7 and October 22, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II.     **Information to be seized by the government**

a.      All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341 and 1343, those violations involving Edward S. Adams and Michael R. Monahan and occurring after October 25, 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.  All documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

i.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through

the business bank accounts and other financial accounts of the above business entities.

    ii.  All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities

2.  All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/AGC and Private Scio, the stock-repurchase program, and the private offering.

3.  All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

## DEFINITIONS

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form (including written, printed, typed, recorded, electronic, or graphic matter) and by whatever means they may have been created or stored, including any electrical, electronic, computer, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

The term "communication" means the transmittal or exchange of information by any means, whether by chance or design, and shall mean and be deemed to refer to any writing or oral conversation, including, but not limited to, telephone conversations,

conversations in meetings, letters, memoranda, notes, telegraphic and telex communications, by face-to-face encounter, by regular mail or courier, by telephone, or by other means of electronic communication, whether transmitted in interstate or intrastate commerce. "Communication" includes, but is not limited to:

a)    Email (a/k/a electronic mail or e-mail): an electronic means for communicating information under specified conditions, generally in the form of text messages, through systems that will send, store, process and receive information and in which messages are held in storage until the addressee accesses them.

b)    Instant Messages (a/k/a IM): a form of electronic communication involving immediate communication between two or more online users; stored IM communications are messages that are purposely stored on a client computer.

c)    Text messages

d)    Header information:  distribution information associated with email such as Sender, Recipient, Subject, Date and Time, cc: (carbon copy), bcc: (blind carbon copy).

e)    Parent email, parent items, and child files: parent email refers to the content and substance of an electronic communication, including header information; parent items refers to the content and substance of items such as calendars, tasks, notes, etc.; child files refers to files attached to parent files or parent items.

f)    Social Media means electronic communication by and between correspondents connected together using media such as blogs (e.g., Twitter), content communities (e.g., YouTube), or social networks (e.g., Facebook).

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury

under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the

information contained in this declaration is true and correct.  I am employed by Yahoo!

Inc., and my official title is _____.  I am a custodian of

records for Yahoo! Inc.  I state that each of the records attached hereto is the original

record or a true duplicate of the original record in the custody of Yahoo! Inc., and that I

am the custodian of the attached records consisting of _____

(pages/CDs/kilobytes). I further state that:

     a.    all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

     b.    such records were kept in the ordinary course of a regularly conducted

business activity of Yahoo! Inc.; and

     c.    such records were made by Yahoo! Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the

Federal Rules of Evidence.

_____    _____

Date                     Signature

DSM-000316

SEARCH WARRANT ADDENDUM

1.  In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2.  If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g. computer, hard drive, mobile device, smartphone, cell phone,) or other data storage mechanism (e.g. information produced by an internet provider or social media provider).  The person from whom the electronic storage device was seized or whose data was seized from another data storage mechanism may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3.  Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device.  Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4.  The government shall establish a search methodology governing the review of seized data, information, documents or other records to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team.   In the event that data, information, documents or other records seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

**Wade, Lance**

| | |
|---|---|
| **From:** | Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov> |
| **Sent:** | Friday, June 02, 2017 12:50 PM |
| **To:** | Maria, David (USAMN) 1; Wade, Lance |
| **Cc:** | OConnor, Sarah; james.volling@FaegreBD.com; Petrosinelli, Joe |
| **Subject:** | RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM) |
| **Attachments:** | 10116021930.pdf |

Looking back at my email to Joe on 5/3/17, which attached an email I had sent to Rachel Paulose on 4/7/17, you have the application/affidavit and the return for 16-mj-8, and the return for 15-mj-942. I'm attaching the application/affidavit for 15-mj-942.

Regards,
John

---

**From:** Maria, David (USAMN) 1
**Sent:** Friday, June 02, 2017 11:00 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I did some checking, and it appears as though our lit support folks did not label the databases as I had instructed (as "unfiltered" and "filtered").

On the drive that you received, one of the Relativity folders had a sub-folder in it that contains all of the unfiltered emails from Adams' two Yahoo accounts, as we received them from Yahoo. The other Relativity folder contained three sub-folders, titled "Main Emails," "Adams Taint," and "SEC." The folder titled "Main Emails" should be what the letter referred to as the "filtered" email database. This is the database to which the investigation/prosecution team has access. It includes the filtered documents from both of Adams' email accounts, as well as the filtered documents from Monahan's email account. We do not have access to the "Adams Taint" folder. These were emails that were removed from the unfiltered database and do not reside in the "Main Emails" database to which we have access. I believe that the concerns that you raise in no. 2, below, likely relate to documents in the "Adams Taint" folder. The "SEC" folder is from the SEC's investigation and does not relate to the Yahoo emails.

If there are materials in the "Main emails" folder that you believe are privileged, please let us know, and we will address the issue immediately.

As to request no. 4, I believe that we produced to you the affidavits and warrants. I also cannot access these "MJ" numbers on ECF, as I am not sure if they ever load the MJ file numbers to ECF. My guess is that, if there are additional documents beyond what we produced, they consist of the sealing motions/orders, etc. I will check our hard copy files and see what exists, and I'm happy to send you what I find. Also, I believe that you should be able to get the complete files for each MJ number from the clerk's office.

Please give me a call if you have additional questions.



EXHIBIT
DX-37

1

DSM-000328

Regards,
David

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, June 02, 2017 9:39 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>;
Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

This follows up on prior correspondence regarding the seized email.

1.  The government's description of the databases set forth below and in other correspondence does not match what
was produced in discovery.  We understand from your correspondence that there is one database (called "unfiltered")
that contains all of the emails that were in the various Yahoo accounts, and one database ("filtered") that contains only
the material to which the prosecution team has access.  Therefore, we assume that the "filtered" database is a subset of
the "unfiltered" database.  Based on an initial review of the materials, that does not appear to be the case.  Rather, the
"filtered" database has more documents than the "unfiltered" database.  Please clarify.

2.  Based on limited initial searches, it appears that there are hundreds, if not thousands, of privileged documents within
the filtered database to which the government has access.  This is obviously very concerning, particularly since many of
those documents appear to be communications between Mr. Adams and counsel who represented him in connection
with government investigations of matters that are the subject of your indictment.  The government's accessing of these
privileged documents, therefore, not only infringes on Mr. Adams' legal privileges and protections, but may also violate
his Fifth and Sixth Amendment rights.  It will take us time to fully assess these issues.  We therefore renew our request
that the government cease its review of Mr. Adams' email until this matter has been fully addressed.  Please confirm
that the government will cease its review.

3.  Based on # 2 above, we reiterate our requests for information set forth below, which will help us address these issues
more promptly.

4.  Please provide us with copies of all pleadings in matters 15-MJ-942 and 16-MJ-8.  You previously only provided us
with selected pleadings from those matters.  It appears that those matters are no longer sealed, but we do not have
access to those pleadings on Pacer.

Sincerely,

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Thursday, May 25, 2017 10:56 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>

DSM-000329

Cc: OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

As I mentioned in my email below, the government does not intend to provide you with information regarding the process that was undertaken to filter the emails, nor are we aware of any authority that obligates us to do so. That being said, if you can provide us with any such authority, we will review it and reconsider.

Again, if there are specific documents or categories of documents that you have seen in the filtered database that you believe we should not possess, please let us know. There does not appear to be any basis to challenge our process unless and until you identify materials that are in the filtered database that you believe are inappropriately in our possession.

Please call me if you care to discuss further. I am around all morning: (612) 664-5681.

Thanks,
David

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Thursday, May 25, 2017 8:19 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

In our call on May 9, Assistant U.S. Attorney Maria advised me, Mr. Petrosinelli, and Mr. Volling that the government would review memoranda it had prepared and provide us with an explanation regarding how Mr. Adams' seized email was processed and filtered for review. We understand from the email below that the government is now changing its position and refusing to engage in dialogue with us on these issues. The government's refusal to provide further information prevents us from assessing whether (and, if so, the degree to which) it infringed on Mr. Adams' constitutional and legal privileges, and it will force us to burden the Court with litigation that might have been avoided through further discussion.

We reiterate our request that you cease review of Mr. Adams' email until we have had an opportunity to fully assess and litigate these issues (which may take time, given the voluminous emails, which are still in the process of loading). And we request that the government preserve all memoranda, documents, communications, and other evidence relating to the handling, processing, and reviewing of Mr. Adams' email.

Sincerely,

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

3

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Wednesday, May 24, 2017 2:14 PM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I have now reviewed your May 16, 2017 letter.  As an initial matter, when we spoke previously, I indicated that I would review materials and conduct research to determine what information, if any, I would share with you regarding the filtering and review process that we employed in connection with the search warrant executed on Mr. Adams' two Yahoo email addresses.  I did not, at that time, agree to provide you with an explanation of the process, though you did note that you would be interested in a description of the process.

Upon researching the issue, we are unaware of any authority that requires the disclosure by the government to the defense of such a description or explanation of the process.  We have turned over the search warrant and accompanying affidavit, and you are, obviously, free to challenge the propriety of the search in your pretrial motions.  Moreover, as I explained, we provided to you the unfiltered database, which contains all of the emails that were in the accounts, as well as the filtered version (i.e., the seized documents) that is the database to which the prosecution team has had access.  If there are specific documents within the filtered database that you believe are privileged, or should not be in the government's possession for some other reason, we can address those issues on a document-by-document basis.  To the extent that we agree that there are privileged documents that remain in the database, we will immediately have them removed.

In response to your additional requests, we also do not believe that we have an obligation to identify all individuals involved in the handling of the search warrant materials, nor will we "cease review" of the materials.

We are still available for a call, if you have questions or care to discuss this further.

Best regards,

David


David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787


**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Wednesday, May 24, 2017 12:53 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

What times work today for a call?

DSM-000331

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Wednesday, May 24, 2017 11:46 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

No, this did not come through prior to now, but we have now received it.

Please call me if you would like to discuss the substance of the letter.


David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787


---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Wednesday, May 24, 2017 10:41 AM
**To:** Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Subject:** FW: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Gentlemen,

Our servers received a notice that this may not have gone through.  Please confirm receipt.  Thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Tuesday, May 16, 2017 4:56 PM
**To:** jkokkinen@usa.doj.gov; dmaria1@usa.doj.gov
**Cc:** james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; OConnor, Sarah <SOConnor@wc.com>
**Subject:** United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

Please see attached.

DSM-000332

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

DSM-000333

**From:** Maria, David (USAMN) 1 <David.Maria@usdoj.gov>
**Sent:** Wednesday, August 23, 2017 6:09 PM
**To:** Wade, Lance
**Cc:** OConnor, Sarah; james.volling@FaegreBD.com; Petrosinelli, Joe; Kokkinen, John (USAMN)
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

As you have now identified those documents that you believe are privileged, we will establish a taint team (or individual) who will serve as your point of contact for these issues.  Once someone has been designated as the point person, I will have him or her contact you directly, and I anticipate that this will happen within the next week or two.  I will send you the name of the individual once I know it.

As to the remaining documents that are not in our review database, the government will retain those materials for authentication purposes, but I can assure that you nobody on the prosecution team has had, or will have, access to those documents.

Please call me if you would like to discuss further.  Otherwise, I will hopefully have a name for you by sometime next week.

Thanks,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Monday, August 21, 2017 12:49 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

David,

Our initial review of the potentially privileged materials is now complete.  I am happy to have a call to discuss the path going forward, but we are firmly of the view that the prosecution team should have no role in this process.  We should be interacting with the taint team – i.e., the one that made the privilege determinations in the first instance.  Moreover, as a practical matter, the process you outlined below is not feasible.  There are over a thousand privileged documents that need to be culled out of the database, and I don't believe that can await the document-by-document assessment you describe.  Nor do we believe such an assessment is either warranted or appropriate.

In addition, please return to Mr. Adams the documents you have filtered out and not permitted the prosecution team to review, or certify that those documents have been destroyed.  Those documents are not lawfully in the government's possession.

Please let me know when you are available for a call to discuss a path forward on the privilege materials.



DSM-000354

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Thursday, June 29, 2017 2:48 PM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance—

If you can identify for us the documents that you believe are privileged, we will have those documents segregated and will have someone outside of the prosecution team assigned to review them.  If there are, in fact, privileged documents that remain in the database, we will immediately take steps to determine why they were not removed during our filtering process.

As I indicated earlier, we do not intend to detail for you the methods that we utilized to filter the database, nor are we aware of any precedent that requires us to do so.  That being said, if there are specific categories of documents that you are seeing in the database that you believe are privileged, I am happy to discuss with you why we did or did not believe those documents to be privileged, or to explore how they were missed in the filtering process if they were, in fact, privileged.  Please call me if you care to discuss any of these issues.

Best regards,

David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Thursday, June 22, 2017 11:50 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

We are writing to follow-up on the privilege issues discussed below.  We have identified numerous privileged and/or work product protected documents in the database to which you say the prosecution team has access.  The privileged materials in that database appear to include documents directly related to the allegations in the indictment, as well as many privileged documents that are unrelated to the allegations in the indictment.  Given the large volume of documents and the numerous potential privileges implicated, it will take us some time to identify all of the privileged materials.  That task is made all the more difficult by the government's refusal to provide us with the search terms and protocol it used in its efforts to cull out privileged

DSM-000355

material.  In any event, the government is now on notice that it is improperly accessing privileged information, and, accordingly, its review of the Yahoo email should cease immediately until our review is complete.

In addition, we reiterate our request that you disclose the search terms and protocol the government used in its effort to try to identify privileged information.  This information will expedite our efforts to identify privileged information in the prosecution team database.  We would also ask you to give us a contact for the attorney leading the taint team so that we can address privilege issues directly with that lawyer.

Sincerely,


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Tuesday, June 06, 2017 3:52 PM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

There will be a thumb drive in an envelope at will call here in Minneapolis.  I'll put Jim's name on it.

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Tuesday, June 06, 2017 2:48 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

We will pick up a disk when it is ready.  Thank you.


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Monday, June 05, 2017 10:56 AM
**To:** Wade, Lance <LWade@wc.com>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

DSM-000356

I checked on this with our lit support folks, and, apparently, they did not understand what our paralegal had requested.   On the hard drive that you received, they did not include the full set of data for the two Adams accounts (edwardsadams@yahoo.com and jafman1@yahoo.com) that we received from Yahoo.  We will burn those databases to a thumb drive or hard drive and get them to you.  I can either send by Fed Ex, or I can leave an envelope here at will call, and Jim can have someone from his office pick it up.  Let me know what you prefer.  The folder that was labeled as "unfiltered" on the drive that you received is the "Main Emails" folder that I described below, which is the database to which the investigation/prosecution team has access.  The folder that was labeled as "filtered" on the drive that you received is the "Adams taint" database that I described below, which includes materials that were extracted from the database in an effort to remove potentially privileged materials.

Again, the only database to which we have access is the folder that was labeled "Adams_Yahoo_Unfiltered" on the drive that you received.  If there are materials in this folder that you believe are privileged, please let us know, and we will address the issue immediately.

I apologize for any confusion.  Part of the problem is that I could not access and check the materials before we sent them out to ensure that they were labeled correctly, as I can only access one of the databases.

Please call me with additional questions, and let me know how you want to receive the materials for the two Yahoo accounts in the format that we received them from Yahoo.

Thanks,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, June 02, 2017 12:57 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

The hard drive we received from the government does contain folders for unfiltered and filtered email, as described in your prior correspondence.  The hard drive does not contain the subfolders you describe in your most recent email.  (See below screenshot of the hard drive you provided us.)  Thus, our questions remain the same.

--Lance Wade

DSM-000357



**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Friday, June 02, 2017 12:00 PM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I did some checking, and it appears as though our lit support folks did not label the databases as I had instructed (as "unfiltered" and "filtered").

On the drive that you received, one of the Relativity folders had a sub-folder in it that contains all of the unfiltered emails from Adams' two Yahoo accounts, as we received them from Yahoo. The other Relativity folder contained three sub-folders, titled "Main Emails," "Adams Taint," and "SEC." The folder titled "Main Emails" should be what the letter referred to as the "filtered" email database. This is the database to which the investigation/prosecution team has access. It includes the filtered documents from both of Adams' email accounts, as well as the filtered documents from Monahan's email account. We do not have access to the "Adams Taint" folder. These were emails that were removed from the unfiltered database and do not reside in the "Main Emails" database to which we have access. I believe that

DSM-000358

the concerns that you raise in no. 2, below, likely relate to documents in the "Adams Taint" folder.  The "SEC" folder is from the SEC's investigation and does not relate to the Yahoo emails.

If there are materials in the "Main emails" folder that you believe are privileged, please let us know, and we will address the issue immediately.

As to request no. 4, I believe that we produced to you the affidavits and warrants.  I also cannot access these "MJ" numbers on ECF, as I am not sure if they ever load the MJ file numbers to ECF.  My guess is that, if there are additional documents beyond what we produced, they consist of the sealing motions/orders, etc.  I will check our hard copy files and see what exists, and I'm happy to send you what I find.  Also, I believe that you should be able to get the complete files for each MJ number from the clerk's office.

Please give me a call if you have additional questions.


Regards,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, June 02, 2017 9:39 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

This follows up on prior correspondence regarding the seized email.

1.  The government's description of the databases set forth below and in other correspondence does not match what was produced in discovery.  We understand from your correspondence that there is one database (called "unfiltered") that contains all of the emails that were in the various Yahoo accounts, and one database ("filtered") that contains only the material to which the prosecution team has access.  Therefore, we assume that the "filtered" database is a subset of the "unfiltered" database.  Based on an initial review of the materials, that does not appear to be the case.  Rather, the "filtered" database has more documents than the "unfiltered" database.  Please clarify.

2.  Based on limited initial searches, it appears that there are hundreds, if not thousands, of privileged documents within the filtered database to which the government has access.  This is obviously very concerning, particularly since many of those documents appear to be communications between Mr. Adams and counsel who represented him in connection with government investigations of matters that are the subject of your indictment.  The government's accessing of these privileged documents, therefore, not only infringes on Mr. Adams' legal privileges and protections, but may also violate his Fifth and Sixth Amendment rights.  It will take us time to fully assess these issues.  We therefore renew our request that the government cease its review of Mr. Adams' email until this matter has been fully addressed.  Please confirm that the government will cease its review.

3.  Based on # 2 above, we reiterate our requests for information set forth below, which will help us address these issues more promptly.

4.  Please provide us with copies of all pleadings in matters 15-MJ-942 and 16-MJ-8.  You previously only provided us with selected pleadings from those matters.  It appears that those matters are no longer sealed, but we do not have access to those pleadings on Pacer.

DSM-000359

Sincerely,

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Thursday, May 25, 2017 10:56 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

As I mentioned in my email below, the government does not intend to provide you with information regarding the process that was undertaken to filter the emails, nor are we aware of any authority that obligates us to do so.  That being said, if you can provide us with any such authority, we will review it and reconsider.

Again, if there are specific documents or categories of documents that you have seen in the filtered database that you believe we should not possess, please let us know.  There does not appear to be any basis to challenge our process unless and until you identify materials that are in the filtered database that you believe are inappropriately in our possession.

Please call me if you care to discuss further.  I am around all morning: (612) 664-5681.

Thanks,
David

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Thursday, May 25, 2017 8:19 AM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>; james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>;
Wade, Lance <LWade@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

In our call on May 9, Assistant U.S. Attorney Maria advised me, Mr. Petrosinelli, and Mr. Volling that the government would review memoranda it had prepared and provide us with an explanation regarding how Mr. Adams' seized email was processed and filtered for review.  We understand from the email below that the government is now changing its position and refusing to engage in dialogue with us on these issues.  The government's refusal to provide further information prevents us from assessing whether (and, if so, the degree to which) it infringed on Mr. Adams' constitutional and legal privileges, and it will force us to burden the Court with litigation that might have been avoided through further discussion.

We reiterate our request that you cease review of Mr. Adams' email until we have had an opportunity to fully assess and litigate these issues (which may take time, given the voluminous emails, which are still in the process of loading).  And

7

DSM-000360

we request that the government preserve all memoranda, documents, communications, and other evidence relating to the handling, processing, and reviewing of Mr. Adams' email.

Sincerely,


**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Wednesday, May 24, 2017 2:14 PM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Lance,

I have now reviewed your May 16, 2017 letter. As an initial matter, when we spoke previously, I indicated that I would review materials and conduct research to determine what information, if any, I would share with you regarding the filtering and review process that we employed in connection with the search warrant executed on Mr. Adams' two Yahoo email addresses. I did not, at that time, agree to provide you with an explanation of the process, though you did note that you would be interested in a description of the process.

Upon researching the issue, we are unaware of any authority that requires the disclosure by the government to the defense of such a description or explanation of the process. We have turned over the search warrant and accompanying affidavit, and you are, obviously, free to challenge the propriety of the search in your pretrial motions. Moreover, as I explained, we provided to you the unfiltered database, which contains all of the emails that were in the accounts, as well as the filtered version (i.e., the seized documents) that is the database to which the prosecution team has had access. If there are specific documents within the filtered database that you believe are privileged, or should not be in the government's possession for some other reason, we can address those issues on a document-by-document basis. To the extent that we agree that there are privileged documents that remain in the database, we will immediately have them removed.

In response to your additional requests, we also do not believe that we have an obligation to identify all individuals involved in the handling of the search warrant materials, nor will we "cease review" of the materials.

We are still available for a call, if you have questions or care to discuss this further.

Best regards,

David


David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street

DSM-000361

Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Wednesday, May 24, 2017 12:53 PM
**To:** Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>; Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>
**Cc:** OConnor, Sarah <SOConnor@wc.com>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

What times work today for a call?

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
**Sent:** Wednesday, May 24, 2017 11:46 AM
**To:** Wade, Lance <LWade@wc.com>; Kokkinen, John (USAMN) <John.Kokkinen@usdoj.gov>
**Subject:** RE: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

No, this did not come through prior to now, but we have now received it.

Please call me if you would like to discuss the substance of the letter.


David M. Maria
Assistant United States Attorney
District of Minnesota, Criminal Division
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
V: 612.664.5681 | F: 612.664.5787

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Wednesday, May 24, 2017 10:41 AM
**To:** Kokkinen, John (USAMN) <jkokkinen@usa.doj.gov>; Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
**Subject:** FW: United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Gentlemen,

Our servers received a notice that this may not have gone through.  Please confirm receipt.  Thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**

9

DSM-000362

725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Tuesday, May 16, 2017 4:56 PM
**To:** jkokkinen@usa.doj.gov; dmaria1@usa.doj.gov
**Cc:** james.volling@FaegreBD.com; Petrosinelli, Joe <JPetrosinelli@wc.com>; OConnor, Sarah <SOConnor@wc.com>
**Subject:** United States v. Adams (Case No. 17-cr-64-DWF-KMM)

Counsel:

Please see attached.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com | www.wc.com/lwade

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

DSM-000363

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 17-cr-64-DWF-KMM |
| | ) | |
| v. | ) | **DECLARATION OF LANCE** |
| | ) | **A. WADE IN SUPPORT OF** |
| EDWARD S. ADAMS, | ) | **DEFENDANT'S MOTION TO** |
| | ) | **SUPPRESS** |
| Defendant. | ) | |
| | ) | |

Pursuant to 28 U.S.C. § 1746, I, Lance A. Wade, counsel for Defendant Edward S. Adams, under penalty of perjury hereby state:

1.      The government, as part of its criminal investigation, first applied for a search warrant directed to Yahoo!, Inc. on November 25, 2015. *See* Exhibit 1, which is a true and accurate copy of the government's November 25, 2015 warrant application.

2.      The November 25, 2015 warrant was not executed, because the method of service used by the government was outdated. *See* Exhibit 2, which is a true and accurate copy of the returned November 25, 2015 warrant.

3.      The government applied for a second search warrant directed to Yahoo!, Inc. on January 7, 2016. *See* Exhibit 3, which is a true and accurate copy of the government's January 7, 2016 warrant application.

4.      The January 7, 2016 warrant was executed on January 8, 2016. *See* Exhibit 4, which is a true and accurate copy of the returned January 7, 2016 warrant.

5.      Prior to the government's first application for a search warrant directed to Yahoo!, Inc. in November 2015, Mr. Adams had become the subject of an SEC



**EXHIBIT**
**DX-43**

DSM-000366

investigation, *In re Scio Diamond Technology Corporation* (C-08091), that concerned the acquisition of the assets of Apollo Diamond, Inc. ("Apollo Diamond") and the exchange of shares in Apollo Diamond for shares in the acquiring company.

6.      Mr. Adams was represented in the SEC investigation by attorneys James Farrell and John J. Sikora, Jr. of Latham & Watkins LLP ("Latham") and attorney James L. Kopecky of the Chicago law firm of Kopecky Schumacher Bleakley & Rosenburg, P.C.  *See* Ex. 5 at 2.  Exhibit 5 is a true and accurate copy of excerpts of the Transcript of the Deposition of Edwards S. Adams, *In re Scio Diamond Technology Corporation* (C-08091) (Aug. 27, 2015 & Oct. 8, 2015).

7.      Mr. Adams was deposed at length by SEC attorneys on August 27, 2015 and October 8, 2015.  *See* Ex. 5.  In the course of the deposition, Mr. Adams testified that he was Apollo Diamond's General Counsel.  *Id.* at 63-64.  In connection with the criminal investigation, the government obtained the transcripts of those depositions.  *See* Ex. 1, Kroells Affidavit at ¶¶ 14, 33.

8.      In February of this year, the SEC notified Mr. Adams that it had decided not to pursue an enforcement action against him in connection with its investigation.

9.      After the United States Attorney's Office for the District of Minnesota ("USAO") opened a criminal investigation of Mr. Adams, he was represented in that investigation by Jon M. Hopeman, then of Felhaber Larson.  The USAO was aware by at least mid-February 2016 that Mr. Adams was obtaining counsel to represent him in the USAO's investigation, and was introduced to Mr. Hopeman specifically by early March 2016.

2

DSM-000367

10.     Mr. Adams was represented by counsel in four civil suits relating to the Apollo companies that were brought by disgruntled shareholders of Apollo Diamond, Private Scio, and Public Scio in 2012 and 2013.  In *McPheely v. Adams, et al. and Scio Diamond Technology Corporation, Inc.*, Case No. 6:13-cv-02660-GRA and *Sennott v. Adams, et al. and Apollo Diamond, Inc., Case No. 6:13-cv-02813-GRA*, Mr. Adams was represented by attorneys from Latham and an attorney at the Charleston, South Carolina law firm of Moore & Van Allen PLLC.  *See* Ex. 6, which is a true and accurate copy of an excerpt of the docket in the *McPheely* litigation; Ex. 7, which is a true and accurate copy of an excerpt of the docket in the *Sennott* litigation.

11.     In *Fink v. Adams, et al.*, Case No. 12-cv-01899 (JRT/JSM), Mr. Adams was represented by attorneys from Latham.  *See* Ex. 8, which is a true and accurate copy of a Certificate of Service filed in the *Fink* litigation, identifying counsel for Mr. Adams.

12.     In *Mack v. Adams, et al. and Loblolly, Inc. (f/k/a Scio Diamond Technology Corporation*, Court File No. 12-cv-1115 (DSD/JJK), Mr. Adams was represented by Aaron R. Hartman of Monroe Moxness Berg P.A.  *See* Ex. 9, which is a true and accurate copy of an excerpt of the docket in the *Mack* litigation.  The *Mack* suit was the subject of questioning by the SEC when it deposed Mr. Adams in 2015.  *See* Ex. 5 at 451–55.

13.     At his deposition before the SEC, Mr. Adams testified that the email address that he had mainly used was edwardsadams@yahoo.com.  *See* Ex. 5 at 12.  He also explained that he sometimes used the email address jafman1@yahoo.com, including for matters relating to the Apollo companies.  *See* Ex. 5 at 368 (note that the email address is mistranscribed as "jeffman1@yahoo.com").

3

DSM-000368

14.     After the government served the second warrant on Yahoo!, the company provided it with a flashdrive containing information associated with the three email addresses.  *See* Ex. 4 at 2.

15.     On May 16, 2017, the government produced to the defense, pursuant to its Rule 16 obligations, a hard drive containing ESI that had been produced to it by Yahoo! from the three email accounts that were the subject of the government's warrant.  *See* Ex. 10, which is a true and accurate copy of the government's May 16, 2017 production letter.

16.     In May 2017, when the government provided defense counsel with the emails produced by Yahoo!, the government purported to provide two databases.  One database (which the government called "Yahoo email unfiltered") supposedly contained all of the emails produced by Yahoo!, and the other (which the government called "Yahoo email filtered") supposedly contained "potentially privileged, as well as non-responsive, emails and documents" from the Yahoo! production.  *See* Ex. 10.

17.     The government's account of what the two databases contained was inaccurate.  This became apparent when defense counsel reviewed the ESI on the hard drive produced by the government, and defense counsel immediately informed the government of the discrepancy.  *See* Ex. 11 at 6, which is a true and accurate copy of email correspondence between counsel for the defense and the government, from May 16, 2017 to August 23, 2017.

18.     On June 5, 2017, the government responded by conceding that its earlier statements about the hard drive had been erroneous:

4

> I checked on this with our lit support folks, and, apparently, they did not understand what our paralegal had requested. On the hard drive that you received, they did not include the full set of data for the two Adams accounts (edwardsadams@yahoo.com and jafman1@yahoo.com) that we received from Yahoo.

Ex. 11 at 3-4. The government stated that it would separately supply the complete data received from Yahoo!. The government stated that the prosecution team had been given access to "the folder that was labeled 'Adams_Yahoo_Unfiltered' on the drive that [the defense] received." *Id.* at 4.

19.      On or about June 6, 2017, the government produced to defense counsel an additional thumb drive containing Yahoo! emails. As described by the government in its June 5, 2017 correspondence, the Yahoo! emails were divided into two categories: "Main Emails," previously described as "unfiltered," and "Adams taint," previously described as "filtered." Counsel for the government stated that the prosecution team "has access" to the "Main Emails"/"unfiltered" database, whereas the "Adams taint"/"filtered" database includes "materials that were extracted from the database in an effort to remove potentially privileged materials." Ex. 11 at 3-4. Counsel for the government did not disclose the methods that were used to divide the Yahoo! emails into the two databases. *Id.*

20.      In total, Yahoo! disclosed 108,291 emails or draft emails from Mr. Adams's accounts: more than 70,000 associated with edwardsadams@yahoo.com and nearly 38,000 associated with jafman1@yahoo.com, for a total of more than 400,000 pages of ESI. Yahoo! also disclosed emails from Mr. Monahan's Yahoo! account. The emails date back to October 2006.

DSM-000370

21.     The Yahoo! production includes privileged communications between Mr. Adams and his counsel in the same criminal investigation in which the warrant was obtained.  The Yahoo! production also contains privileged communications with Mr. Adams's attorneys in the SEC investigation and prior civil suits regarding the same subject matters at issue in the criminal investigation.

22.     Based on defense counsel's review of the two databases produced by the government to date, more than 79,000 files are in the "Adams taint"/"filtered" database, whereas more than 29,000 files are in the "Main Emails"/"unfiltered" database to which the government has access.  Thus the vast majority of the emails obtained from Yahoo!— more than 70%—were identified by the government as being potentially privileged or irrelevant to the subjects listed in the warrant.

23.     Based on searches and reviews conducted by the defense to date, it appears that at least 5,000, and potentially as many as 10,500, of the emails in the "Main Emails"/"unfiltered" database to which the government has access are privileged. Hundreds of other emails in the "Main Emails"/"unfiltered" database are wholly unrelated to the subjects identified in the warrant.

24.     Over 900 emails in the "Main Emails"/"unfiltered" folder appear to implicate Mr. Adams's personal attorney-client privilege with his own counsel.  This includes emails from July 2012 (many of which are marked "PRIVILEGED ATTORNEY CLIENT COMMUNICATION") among Mr. Adams, Mr. Monahan, and Aaron Hartman, an attorney then at Anthony, Ostlund, Baer & Louwagie P.A., about

6

DSM-000371

then-pending litigation with shareholders of Apollo, Private Scio, and Public Scio in which Mr. Hartman represented Mr. Adams and Mr. Monahan.

25.     Over 1,600 other emails in the "Main Emails"/"unfiltered" folder appear to involve Mr. Adams's communications with his own clients, regarding either his legal work for them or matters in which he had been retained as a consultant or expert witness.

26.     More than 300 emails in the "Main Emails"/"unfiltered" folder implicate the spousal privilege Mr. Adams shares with his wife, Denise.  Dozens of the private spousal communications now in the prosecution team's possession relate to Apollo business.

27.     Also among the emails in the "Main Emails"/"unfiltered" folder are more than 200 emails entirely unrelated to the subjects of the Indictment, including, for example: more than one hundred emails about the planning of a surprise 50th birthday party for Mr. Adams's wife (including drafts of a poem Mr. Adams wrote to her for that occasion); more than sixty emails relating to a yogurt business owned by Mr. Adams; emails about ski trips taken by Mr. Adams; travel itineraries for family vacations; emails concerning a potential personal investment by Mr. Adams in a Chicago hotel; and emails relating to evaluations of coaches of children's sports teams.

28.     Over 5,600 emails in the "Main Emails"/"unfiltered" category to which the prosecution team was given access contain the terms "privilege" or "privileged."  Adding other common terms used to safeguard privileged materials (set out in more detail below), and properly factoring in the attachments to those communications, brings the total number to over 11,000 documents.

DSM-000372

29.     Over 6,800 emails in the "Main Emails"/"unfiltered" category that was accessible to the prosecution team contain references to "attorney," "lawyer," or "counsel."

30.     "Williams & Connolly" and the names of Mr. Adams's Williams & Connolly counsel, including Joe Petrosinelli, appear in several documents in the "Main Emails"/"unfiltered" category, even though the government was aware of Mr. Petrosinelli's representation of Mr. Adams no later than early March 2016.

31.     The "Main Emails"/"unfiltered" folder available to the prosecution team contains 60 additional emails referring to Latham, Mr. Farrell, or Mr. Sikora—Mr. Adams' counsel in the parallel SEC investigation that concluded in February 2017.

32.     Since all Yahoo! emails were produced in June 2017, the government has rejected repeated requests by the defense to identify the measures it took to identify privileged communications and those not related to the subjects set forth in the warrant. *See* Ex. 12, which is a true and accurate copy of a letter from myself to the government, dated May 16, 2017; Ex. 13, which is a true and accurate copy of a letter from myself to the government, dated August 31, 2017; Ex. 11 at 2, 7, 8 (containing government's responses to requests, including that "we do not intend to detail for you the methods that we utilized to filter the database").

33.     On September 8, 2017, the government agreed to suspend the prosecution team's access to the "Main Emails"/"unfiltered" category. *See* Ex. 14, which is a true and accurate copy of email correspondence between counsel for the defense and the government, from Sept. 8, 2017 to Sept. 15, 2017.

DSM-000373

34.    By then, the prosecution team had had access to the Yahoo! emails in the "Main emails"/"unfiltered" category for twenty months, since the execution of the warrant on January 8, 2016.  *See* Ex. 4.

35.    Shortly before the government agreed to suspend the prosecution team's access to the folder, it also offered to establish a "taint team" for privilege review.  *See* Ex. 11 at 1; Ex.14.

36.    Undersigned counsel has spoken to a representative of the proposed taint team, but the parties have not yet entered into any agreement regarding a taint team review, which may be inadequate under the circumstances existing in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 th day of September, 2017.

Lance A. Wade

9

DSM-000374





U.S. Attorneys » Resources » U.S. Attorneys' Manual » Title 9: Criminal

# 9-13.000 - Obtaining Evidence

| | |
|---|---|
| 9-13.100 | Out of Court Identification Procedures |
| 9-13.200 | Communications with Represented Persons |
| 9-13.300 | Polygraphs——Department Policy |
| 9-13.400 | Obtaining Information From, or Records of, Members of the News Media; and Questioning, Arresting, or Charging Members of the News Media |
| 9-13.410 | Guidelines for Issuing Grand Jury or Trial Subpoena to Attorneys for Information Relating to the Representation of Clients |
| 9-13.420 | Searches of Premises of Subject Attorneys |
| 9-13.500 | International Legal Assistance |
| 9-13.510 | Obtaining Evidence Abroad——General Considerations |
| 9-13.512 | Intended Use of the Evidence |
| 9-13.514 | Time Required |
| 9-13.516 | Cost of Obtaining Evidence |
| 9-13.520 | Methods of Obtaining Evidence from Abroad |
| 9-13.525 | Subpoenas |
| 9-13.526 | Forfeiture of Assets Located in Foreign Countries |
| 9-13.530 | Special Considerations——Translations |
| 9-13.534 | Foreign Travel by Prosecutors |
| 9-13.535 | Depositions |
| 9-13.540 | Assisting Foreign Prosecutors |
| 9-13.600 | Use of Hypnosis |
| 9-13.800 | Access to and Disclosure of Financial Records |
| 9-13.900 | Access to and Disclosures of Tax Returns in a Non-tax Criminal Case |

## 9-13.100 - Out of Court Identification Procedures

See the Criminal Resource Manual at 238 et seq. for a discussion of the law on lineups and showups, photographic lineups, fingerprinting, handwriting, voice exemplars and voice prints and other physical evidence issues.

[updated July 1998]

## 9-13.200 - Communications with Represented Persons

EXHIBIT
DX-44

DSM-000375

    b. Information or materials provided by a client to an attorney for the purpose of disclosure to third parties, including information or materials provided for disclosure in bankruptcy proceedings, tax filings, immigration proceedings, or similar matters and transactions.

    c. Publicly filed documents not reasonably available from other sources.

    d. Testimony or materials necessary to respond to a claim of ineffective assistance of counsel, including, but not limited to, petitions filed pursuant to 28 U.S.C. § 2255 and D.C. Code § 23-110.

    e. Testimony or materials necessary to probe the viability of, or respond to, a formal, written claim or assertion by a civil litigant or a criminal defendant that he or she reasonably relied on the advice of counsel in engaging in the conduct at issue in the specific matter in which the information is sought.This exception does not apply to subpoenas intended to probe the possibility or viability of an advice-of-counsel defense that has not formally been claimed or asserted by a civil litigant or criminal defendant.

    f. Testimony or materials within the scope of an explicit and unchallenged waiver, or other express form of consent by the attorney's client to disclosure of the subject information.

    g. Information or materials produced or created in discovery, including deposition testimony, if such information or materials are not subject to a protective order.

    h. Testimony or materials that the court presiding over the underlying proceeding has ordered a party to produce or provide.

E. **Submitting the Request**. Requests for authorization should be submitted to the Policy and Statutory Enforcement Unit (PSEU), Office of Enforcement Operations, Criminal Division. When documents are sought in addition to the testimony of the attorney witness, a draft of the subpoena duces tecum, listing the documents sought, must accompany the submission.

F. **No Rights Created by Guidelines**. These guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitations on otherwise lawful investigative or litigative prerogatives of the Department of Justice.

G. **Questions.**  Questions regarding the applicability of the authorization requirement or any of its exceptions should be directed to the Policy and Statutory Enforcement Unit, Office of Enforcement Operations at 202-305-4023 or pseu@usdoj.gov.

[updated March 2016] [cited in USAM 9-11.255; USAM 9-13.420]

## 9-13.420 - Searches of Premises of Subject Attorneys

NOTE: For purposes of this policy only, "subject" includes an attorney who is a "suspect, subject or target," or an attorney who is related by blood or marriage to a suspect, or who is believed to be in possession of contraband or the fruits or instrumentalities of a crime. This policy also applies to searches of business organizations where such searches involve materials in the possession of individuals serving in the capacity of legal advisor to the organization. Search warrants for "documentary materials" held by an attorney who is a "disinterested third party" (that is, any attorney who is not a subject) are governed by 28 C.F.R. 59.4 and USAM 9-19.221 *et seq. See also* 42 U.S.C. Section 2000aa-11(a)(3).

There are occasions when effective law enforcement may require the issuance of a search warrant for the premises of an attorney who is a subject of an investigation, and who also is or may be engaged in the practice of law on behalf of clients. Because of the potential effects of this type of search on legitimate attorney-client relationships and because of the possibility that, during such a search, the government may encounter material protected by a legitimate claim of privilege, it is important that close control be exercised over this type of search. Therefore, the following guidelines should be followed with respect to such searches:

    A. **Alternatives to Search Warrants.** In order to avoid impinging on valid attorney-client relationships, prosecutors are expected to take the least intrusive approach consistent with vigorous and effective law enforcement when evidence is sought from an attorney actively engaged in the practice of law. Consideration should be given to

DSM-000376

obtaining information from other sources or through the use of a subpoena, unless such efforts could compromise the criminal investigation or prosecution, or could result in the obstruction or destruction of evidence, or would otherwise be ineffective.

> NOTE: Prior approval must be obtained from the Assistant Attorney General for the Criminal Division to issue a subpoena to an attorney relating to the representation of a client. See USAM 9-13.410.

B. **Authorization by United States Attorney or Assistant Attorney General.** No application for such a search warrant may be made to a court without the express approval of the United States Attorney or pertinent Assistant Attorney General. Ordinarily, authorization of an application for such a search warrant is appropriate when there is a strong need for the information or material and less intrusive means have been considered and rejected.

C. **Prior Consultation.** In addition to obtaining approval from the United States Attorney or the pertinent Assistant Attorney General, and before seeking judicial authorization for the search warrant, the federal prosecutor must consult with the Criminal Division.

> NOTE: Attorneys are encouraged to consult with the Criminal Division as early as possible regarding a possible search of an attorney's office. Telephone No. (202) 305-4023; Fax No. (202) 305-0562.

To facilitate the consultation, the prosecutor should submit the attached form (see Criminal Resource Manual at 265) containing relevant information about the proposed search along with a draft copy of the proposed search warrant, affidavit in support thereof, and any special instructions to the searching agents regarding search procedures and procedures to be followed to ensure that the prosecution team is not "tainted" by any privileged material inadvertently seized during the search. This information should be submitted to the Criminal Division through the Office of Enforcement Operations. This procedure does not preclude any United States Attorney or Assistant Attorney General from discussing the matter personally with the Assistant Attorney General of the Criminal Division.

If exigent circumstances prevent such prior consultation, the Criminal Division should be notified of the search as promptly as possible. In all cases, the Criminal Division should be provided as promptly as possible with a copy of the judicially authorized search warrant, search warrant affidavit, and any special instructions to the searching agents.

The Criminal Division is committed to ensuring that consultation regarding attorney search warrant requests will not delay investigations. Timely processing will be assisted if the Criminal Division is provided as much information about the search as early as possible. The Criminal Division should also be informed of any deadlines.

D. **Safeguarding Procedures and Contents of the Affidavit.** Procedures should be designed to ensure that privileged materials are not improperly viewed, seized or retained during the course of the search. While the procedures to be followed should be tailored to the facts of each case and the requirements and judicial preferences and precedents of each district, in all cases a prosecutor must employ adequate precautions to ensure that the materials are reviewed for privilege claims and that any privileged documents are returned to the attorney from whom they were seized.

E. **Conducting the Search.** The search warrant should be drawn as specifically as possible, consistent with the requirements of the investigation, to minimize the need to search and review privileged material to which no exception applies.

While every effort should be made to avoid viewing privileged material, the search may require limited review of arguably privileged material to ascertain whether the material is covered by the warrant. Therefore, to protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, a "privilege team" should be designated, consisting of agents and lawyers not involved in the underlying investigation.

Instructions should be given and thoroughly discussed with the privilege team prior to the search. The instructions should set forth procedures designed to minimize the intrusion into privileged material, and should ensure that the privilege team does not disclose any information to the investigation/prosecution team unless and until so instructed by the attorney in charge of the privilege team. Privilege team lawyers should be available either on or off-site, to advise the agents during the course of the search, but should not participate in the search itself.

The affidavit in support of the search warrant may attach any written instructions or, at a minimum, should generally state the government's intention to employ procedures designed to ensure that attorney-client privileges are not

DSM-000377

violated.

If it is anticipated that computers will be searched or seized, prosecutors are expected to follow the procedures set forth in the current edition of *Searching and Seizing Computers*, published by CCIPS.

F. **Review Procedures.** The following review procedures should be discussed prior to approval of any warrant, consistent with the practice in your district, the circumstances of the investigation and the volume of materials seized.

- Who will conduct the review, i.e., a privilege team, a judicial officer, or a special master.
- Whether all documents will be submitted to a judicial officer or special master or only those which a privilege team has determined to be arguably privileged or arguably subject to an exception to the privilege.
- Whether copies of all seized materials will be provided to the subject attorney (or a legal representative) in order that: a) disruption of the law firm's operation is minimized; and b) the subject is afforded an opportunity to participate in the process of submitting disputed documents to the court by raising specific claims of privilege. To the extent possible, providing copies of seized records is encouraged, where such disclosure will not impede or obstruct the investigation.
- Whether appropriate arrangements have been made for storage and handling of electronic evidence and procedures developed for searching computer data (i.e., procedures which recognize the universal nature of computer seizure and are designed to avoid review of materials implicating the privilege of innocent clients).

These guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitations on otherwise lawful investigative or litigative prerogatives of the Department of Justice.

See the Criminal Resource Manual at 265, for an attorney office search warrant form.

[updated October 2012] [cited in Criminal Resource Manual 265]

# 9-13.500 - International Legal Assistance

The Criminal Division's Office of International Affairs (514-0000) must be consulted before contacting any foreign or State Department official in matters relating to extradition of a fugitive or the obtaining of evidence in a criminal investigation or prosecution.

Any proposed contact with persons, other than United States investigative agents, in a foreign country for the purpose of obtaining the extradition of a fugitive or evidence should first be discussed with the Office of International Affairs, Criminal Division.

Before attempting to do any act outside the United States relating to a criminal investigation or prosecution, including contacting a witness by telephone or mail, prior approval must be obtained from the Office of International Affairs.

See the Criminal Resource Manual at 266, for additional background regarding the Office of International Affairs.

[cited in USAM 9-11.140]

# 9-13.510 - Obtaining Evidence Abroad—General Considerations

Because virtually every nation enacts laws to protect its sovereignty and can react adversely to American law enforcement efforts to gather evidence within its borders as a violation of that sovereignty, contact the Office of International Affairs initially to evaluate methods for securing assistance from abroad and to select an appropriate one. See the Criminal Resource Manual at 267 et seq.

# 9-13.512 - Intended Use of the Evidence

When a country grants assistance for a particular purpose, contact the Office of International Affairs (OIA) before using it for a different purpose. OIA will determine whether it can be used for a different purpose without the express permission of the country that provided it and, if not, for guidance in securing such permission. See the Criminal Resource Manual at 269.

DSM-000378

| | |
|---|---|
| **From:** | Jon M. Hopeman |
| **To:** | Edward Adams (adams006@umn.edu); Petrosinelli, Joe |
| **Subject:** | FW: Edward Adams |
| **Date:** | Wednesday, March 09, 2016 11:56:26 AM |
| **Attachments:** | 2014R00312-0073 - Edward Adams.pdf |

## Redacted - Attorney-Client Privilege

-----Original Message-----
From: Kokkinen, John (USAMN) [mailto:John.Kokkinen@usdoj.gov]
Sent: Wednesday, March 09, 2016 10:12 AM
To: Jon M. Hopeman
Cc: Maria, David (USAMN) 1
Subject: RE: Edward Adams

Jon,

Let's go with March 17 at 2:00 p.m.  We prefer that this meeting be with only those individuals representing Adams.  I assume that Mr. Petrosinelli is in some way assisting in the representation of Adams.  We will of course be willing to meet with Andy, we just insist on doing so separately.

Also, I know that you and David spoke about the fact that we would be requesting documents through a subpoena to Adams.  David told me that you had indicated that you would accept service.  Attached is the subpoena.

Thanks,
John


-----Original Message-----
From: Jon M. Hopeman [mailto:JHopeman@Felhaber.com]
Sent: Tuesday, March 08, 2016 3:34 PM
To: Kokkinen, John (USAMN)
Subject: RE: Edward Adams

John  March 17 p.m. works for me.  I want to bring Andy Birrell who represents Monahan if that is OK with you.  Also I will be bringing Joe Petrosinelli with me. Mr. Adams and Mr. Monahan will not be coming.   Let me know the time.  JMH


Jon M. Hopeman

**EXHIBIT**
**DX-48**

Attorney

220 South 6th Street, Suite 2200, Minneapolis, MN 55402
Direct: 612.373.8416 | Main: 612.339.6321 | Fax: 612.338.0535 jhopeman@felhaber.com http://www.felhaber.com

Confidentiality Notice:  This is a confidential communication notice from a law firm to the intended recipient.  If you have received it by mistake, please delete it and notify the sender.  Thank you.

-----Original Message-----
From: Kokkinen, John (USAMN) [mailto:John.Kokkinen@usdoj.gov]
Sent: Thursday, March 03, 2016 6:44 AM
To: Jon M. Hopeman
Cc: Maria, David (USAMN) 1
Subject: Edward Adams

Jon,

We would be available to meet with you on the 17th or the 18th.  Please let us know if either of those dates work and if you have a time preference.

Thanks,
John

DSM-000398

**C-08010**

*ADAMS_EDWARD_20150827*

*8/27/2015*

Full-size Transcript

Prepared by:

C-08010

Tuesday, September 15, 2015

---

2

1   APPEARANCES:
2
3   On behalf of the Securities and Exchange Commission:
4       KEVIN A. WISNIEWSKI, ESQ.
5       JEFFREY A. SHANK, ESQ.
6       DANIEL J. HAYES, ESQ.
7       DONALD RYBA, CPA
8       Securities and Exchange Commission
9       Division of Enforcement
10      175 West Jackson Boulevard, Suite 900
11      Chicago, Illinois  60604
12      312-886-3807
13
14   On behalf of the Witness:
15      JOHN J. SIKORA, JR., ESQ.
16      Latham & Watkins, LLP
17      330 North Wabash Avenue, Suite 2800
18      Chicago, Illinois  60611
19      312-876-7700
20
21      JAMES L. KOPECKY, ESQ.
22      Kopecky Schumacher Bleakley & Rosenburg, P.C.
23      203 North Lasalle Street
24      Chicago, Illinois  60601
25      312-380-6552

[8/27/2015]  ADAMS_EDWARD_20150827

---

1

1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3   In The Matter of:                    )
4                                        ) File No. C-08091-A
5   SCIO DIAMOND TECHNOLOGY CORPORATION )
6
7   WITNESS:  Edward Adams
8   PAGES:    1 through 307
9   PLACE:    Securities and Exchange Commission
10            175 West Jackson Boulevard
11            Chicago, Illinois
12   DATE:    Thursday, August 27, 2015
13
14       The above-entitled matter came on for hearing,
15   pursuant to notice, at 8:59 a.m.
16
17
18
19
20
21
22
23
24           Diversified Reporting Services, Inc.
25               (202) 467-9200

[8/27/2015]  ADAMS_EDWARD_20150827

---

3

1                    C O N T E N T S
2
3   WITNESS:                             EXAMINATION
4   Edward Adams                             5
5
6   EXHIBITS:      DESCRIPTION:             IDENTIFIED:
7   26   Subpoena issued on June 18, 2015       7
8   27   Subpoena dated May 16, 2014            7
9   28   Subpoena dated April 23, 2015          8
10   29   Background Questionnaire              20
11   30   University of Minnesota Law School Bio  22
12   31   U4 Employment History                43
13   32   Disclosure/Occurrence Composite      49
14   33   Apollo Diamond, Inc. Form Ds         65
15   34   1/2/09 Invoice from Adams Monohan, LLP  93
16   35   1/4/10 Invoice from Adams Monohan, LLP  98
17   36   1/3/11 Invoice from Adams Monohan, LLP  101
18   37   Summary of hours devoted to Apollo in 2011  104
19   38   Demand Promissory Note from RBE to Apollo  112
20   39   General ledger.xls                   120
21   40   Agreement between Apollo Diamond, Inc.  128
22        And Edward S. Adams
23   41   $400,000 Promissory Note             132
24   42   Account Statements from Venture Bank  142
25   43   Venture Bank Temporary Wire Agreements  144

[8/27/2015]  ADAMS_EDWARD_20150827

**EXHIBIT**
**DX-50**

4

C O N T E N T S (CONT.)

EXHIBITS:        DESCRIPTION:                    IDENTIFIED:

44    Venture Bank document                145
45    Apollo Diamond Term Sheet            157
46    Account Statements for Account 15792 161
46A   Articles of Incorporation for        181
      Scio Diamond Corporation
47    Scio Diamond Technology Corporation  182
      Initial stock ledger as of 4/1/11
48    Obligations of Apollo entities       259
49    Stock Repurchase Agreements          274
50    6/30/11 Check from Apollo Diamond    275
51    Amendment to the asset purchase agreement  283
52    Cio Form 8KA                         293

[8/27/2015] ADAMS_EDWARD_20150827

---

6

1      Prior to the opening of the record, you were
2  provided a copy of the formal order of investigation in this
3  matter and a supplemental order designating additional
4  officers.  It will be made available for you or for your
5  examination during the course of this proceeding.
6      Mr. Adams, have you had an opportunity to review
7  the formal order?
8      A   I have.
9      Q   And prior to the opening of the record, you were
10  provided with a copy of the Commission's Supplemental
11  Information Form.  A copy of that notice has been previously
12  marked as Commission Exhibit Number 1.  Mr. Adams, have you had
13  an opportunity to review Commission Exhibit Number 1?
14      A   I have.
15      Q   Okay.  Do you have any questions concerning the
16  notice?
17      A   I don't.
18      Q   Mr. Adams, are you represented today by counsel?
19      A   I am.
20      MR. WISNIEWSKI:  Will Counsel please identify
21  themselves.
22      MR. KOPECKY:  Jim Kopecky, Kopecky Schumacher &
23  Bleakley.  The reporter has my card and information,
24  Ms. O'Brien.
25      MR. SIKORA:  John Sikora with Latham & Watkins.  I

[8/27/2015] ADAMS_EDWARD_20150827

---

5

P R O C E E D I N G S

1      MR. WISNIEWSKI:  We will go on the record.  It is
2  August 27, 2015 at 8:59 a.m.
3
4      Mr. Adams, if I could have you raise your right
5  hand.
6  Whereupon,
7                    EDWARD ADAMS,
8  was called as a witness and, having been first duly sworn,
9  was examined and testified as follows:
10                    EXAMINATION
11  BY MR. WISNIEWSKI:
12      Q   Please state your full name, and spell your name
13  for the record.
14      A   Edward Scott Adams.  E-d-w-a-r-d, S-c-o-t-t,
15  A-d-a-m-s.
16      Q   Mr. Adams, my name is Kevin Wisniewski.  This is
17  Jeff Shank, Dan Hayes, and Don Ryba.  We are officers of the
18  Commission for the purposes of this proceeding.  This is the
19  investigation by the United States Securities and Exchange
20  Commission in the matter of Scio Diamond Technology
21  Corporation, C-08091, to determine whether there have been
22  violations of certain provisions of the Federal Securities
23  Laws; however, the facts developed in this investigation
24  might constitute violations of other Federal or State or
25  criminal laws.

[8/27/2015] ADAMS_EDWARD_20150827

---

7

1  will give the reporter my card as well.  Thank you.
2      MR. WISNIEWSKI:  Mr. Kopecky, you are representing
3  Mr. Adams today as his counsel?
4      MR. KOPECKY:  Yes.
5      MR. WISNIEWSKI:  And Mr. Sikora, you are
6  representing Mr. Adams today as counsel?
7      MR. SIKORA:  Yes.
8      BY MR. WISNIEWSKI:
9      Q   Mr. Adams, this is a copy of a subpoena that was
10  issued on June 18, 2015, and it is being marked as
11  Commission Exhibit 26.
12      (SEC Exhibit No. 26 was marked for
13          identification.)
14      BY MR. WISNIEWSKI:
15      Q   Mr. Adams, is this a copy of the subpoena pursuant
16  to which you are appearing here today?
17      A   I believe it is.
18      Q   Mr. Adams:  Don't worry, I have more copies
19  of the other ones.
20      BY MR. WISNIEWSKI:
21      Q   Mr. Adams, this is a copy of a subpoena dated
22  May 16, 2014, which I will mark as Commission Exhibit
23  Number 27.
24      (SEC Exhibit No. 27 was marked for
25          identification.)

[8/27/2015] ADAMS_EDWARD_20150827

8

```
1         BY MR. WISNIEWSKI:
2         Q    And I will also hand you a copy of a subpoena
3    dated April 23, 2015, which is marked as Commission
4    Exhibit 28.
5              (SEC Exhibit No. 28 was marked for
6                   identification.)
7         BY MR. WISNIEWSKI:
8         Q    Let me know when you have had an opportunity to
9    review Commission Exhibit 27 and 28.
10        A    Okay.  I have had a chance to review them.
11        Q    All right.  Mr. Adams, these subpoenas call for
12   the production of certain documents.  Have you tendered to
13   the staff all the documents called for by the subpoena?
14        A    I believe I have.
15        Q    Okay.  And why don't we start -- I guess we can
16   start with the -- Exhibit 27, Commission Exhibit 27.
17             And please describe the search that was conducted
18   for the subpoenaed documents, and state who conducted that
19   search.
20        A    I went through hard copies of documents that I had
21   at my home office as well as in my law firm, as well as my
22   computer files, my -- on my computer.  And I attempted to
23   identify, and did, I think, identify the responsive
24   documents, which I then provided to my counsel.
25        Q    Okay.  So you mentioned -- you did a search of
```

[8/27/2015] ADAMS_EDWARD_20150827

10

```
1         A    Yeah, I looked on my hard drives and also in my
2    e-mail accounts that I used, and searched -- some of them
3    had folders where it would be identified as Apollo Diamond
4    or Scio.  And so I looked through those folders, and then I
5    also looked through other documents to make sure they
6    weren't in some other folder.  And I attempted to identify
7    everything, which I think I reasonably did, that was
8    pertinent.
9         Q    Okay.  And as far as -- you said hard drives.
10   What hard drives are you referring to?
11        A    My home computer, laptop.
12        Q    Okay.  Other than your home computer laptop, do
13   you maintain any other type of hard drives anywhere else?
14        A    No.
15        Q    Okay.  How about your law firm?  Do you have a
16   separate computer that's at your law firm?
17        A    No, I aren't at the present.  No.
18        Q    Okay.  Did you at some time prior to the present?
19        A    Prior to, probably, 2013, I did.
20        Q    Okay.  And what did you do -- so it was a laptop
21   prior to 2013 or desktop; some type of computer?
22        A    You mean at the law firm?
23        Q    Yes.
24        A    Yes, desktop.
25        Q    And what did you do with the desktop?
```

[8/27/2015] ADAMS_EDWARD_20150827

9

```
1    your hard copy files.  Is that at your home?
2         A    Right, and at my office.
3         Q    Okay.  And your office, you are referring to
4    your --
5         A    Law firm.
6         Q    -- law firm office?
7              Are there any other offices you maintain?
8         A    My law school office.  I also looked there.
9         Q    Any other -- besides the law firm and your law
10   school office, any other office that you maintain?
11        A    No.
12        Q    Okay.  And did you keep or maintain files that
13   were designated for Scio Diamond or Apollo Diamond?
14             Kind of walk me through how you stored stuff, as
15   far as your hard copy records go.
16        A    My law firm did do that and I did personally do
17   that.  I mean, my files personally were more, I guess, mixed
18   up with other stuff.  The law firm stuff was more organized, if
19   you will, and so I picked the files out and sent several
20   bankers boxes to Latham.
21        Q    Okay.  And as far as the electronic documents go,
22   what did you do to search for electronic records?
23             And when I say "electronic records," e-mails, Word
24   documents, Excel files, and such.
25
```

[8/27/2015] ADAMS_EDWARD_20150827

11

```
1         A    I think I still have it.
2         Q    Okay.  And did you search that desktop for any
3    responsive records?
4         A    I searched a Dropbox that had all of that
5    information on it.
6         Q    Okay.  So you transferred everything in that --
7         A    My assistant did a couple years ago.
8         Q    Your assistant transferred everything from your
9    desktop into a Dropbox, which you searched for responsive
10   documents?
11        A    I did.
12        Q    And did you -- the laptop that you searched at
13   home, do you use that for your law firm -- your law practice
14   as well?
15        A    Not usually.  It's really more -- I guess I do
16   sometimes, but it's more a personal laptop.
17             And how about your -- you mentioned at the
18   school as well, the University of Minnesota.  Did you search
19   any records -- electronic records?
20        A    Right.  I looked to make sure there was nothing
21   that was pertinent there as well.
22        Q    Okay.  And you said you maintained on some of
23   these -- for electronic files, you maintained folders that
24   were labeled Apollo Diamond or Scio.  Is that right?
25        A    Yes.
```

[8/27/2015] ADAMS_EDWARD_20150827

12

1    Q.   Okay.  And how many of those folders did you find?

2    A.   Well, when I say a folder, you know, it would have

3 documents within the folder.

4    Q.   Okay.

5    A.   So I think there was only one Apollo folder,

6 maybe, and one Scio folder; something like that.  I tried to

7 keep the documents that were relevant in those.

8    Q.   Okay.  And what type of records were in that

9 Apollo folder?

10    A.   I suppose private placement documents, you know, a

11 shareholder list, perhaps.  I don't remember.

12    Q.   Okay.  How about that third bucket of e-mails?

13 Walk me through or explain to me what you did to search your

14 e-mails for responsive documents with response to Commission

15 Exhibit 27.

16    A.   I would look at the -- what I thought were the

17 terms that were most likely to be relevant in an e-mail, and

18 I would search using those terms.  At one point, I think I

19 even looked at all e-mail communications beginning in 2011,

20 just to make sure, you know, I wasn't missing something with

21 the search.  And I tried to produce those, of course.

22    Q.   How many e-mails are we talking about?  How many

23 actual e-mail addresses do you maintain?

24    A.   Four, five, six.  But I use one most typically,

25 which is the edwardsadamsqyahoo.com.

[8/27/2015] ADAMS_EDWARD_20150827

---

13

1    Q.   You searched all --

2    A.   I did.

3    Q.   Okay.  And you said you used certain terms in

4 response to what was in the subpoena.

5    Did you maintain a copy or a record of the terms

6 you used to search your e-mails?

7    A.   I did not.

8    Q.   Did you maintain in any of those e-mails a folder

9 for certain communications that related to Scio Diamond, to

10 Apollo Diamond or any other category that was responsive to

11 the subpoena?

12    A.   Could you repeat that?

13    Q.   Yeah.  Just to give you an example, so on my

14 records, right, I will have a case, right, and I will name a

15 case Scio, and I will take all my e-mails and I will store

16 it in that Scio folder.

17    I am just wondering if you did anything similar;

18 if you had some type of similar storage mechanism that you

19 used in your e-mails to kind of store and file those

20 e-mails.

21    A.   I do, but I don't remember that it existed for

22 Apollo or Scio, as examples, you know.  I remember Baseball

23 2011, which my son was on a team, right; the e-mails there.

24 But I wasn't really diligent about necessarily doing that

25 for Apollo or Scio.

[8/27/2015] ADAMS_EDWARD_20150827

---

14

1    Q.   Okay.  So in none of those five or six e-mail

2 accounts that you maintain -- there weren't any folders set

3 up for Scio or Apollo?

4    A.   I don't remember that there were.

5    Q.   Okay.  All right.  How about Exhibit 28; have you

6 tendered to the staff all documents called for by

7 Exhibit 28?

8    A.   I believe I have.  I provided them to my

9 attorney -- attorneys.

10    Q.   And similar to Exhibit 27, can you explain or

11 describe the search that was conducted for the subpoenaed

12 documents and state who conducted that search?

13    A.   Again, I went through hard copies of documents I

14 had in my possession at home or -- I think by this point

15 they were all at my home because I moved them from the law

16 firm.  And I did the same thing that I described earlier

17 with respect to my computer drives.

18    Q.   Okay.  So a similar approach you searched your

19 hard copy files; is that correct?

20    A.   Yes.

21    Q.   So any documents stored electronically -- we will

22 call that bucket, kind of, Word documents, Excel files,

23 things like that -- you searched for those records?

24    A.   I searched those.

25    Q.   And you searched your e-mails for e-mail

[8/27/2015] ADAMS_EDWARD_20150827

---

15

1 communications?

2    A.   Right.

3    Q.   Any other buckets of documents or information that

4 you searched for that may not be covered in those

5 categories?

6    A.   I don't think so.

7    Q.   Okay.  And as far as your e-mail searches with

8 regards to Exhibit 28, did you use a similar kind of search

9 term method to look for responsive documents?

10    A.   Yes.

11    Q.   Okay.  And did you maintain a list or a record of

12 the terms that you used to search those records?

13    A.   I did not.

14    Q.   Those e-mails, I'm sorry.

15    A.   I did not.

16    Q.   Okay.  Exhibit 28 requests records relating to

17 Apollo Diamond, Incorporated and Apollo Diamond Gemstone

18 Corporation; is that correct?

19    A.   Yes.

20    Q.   Okay.  And those businesses are no longer in

21 business; is that right?

22    A.   Right.

23    Q.   Okay.  Do you know who maintains the corporate

24 records of those two entities?

25    A.   I do not.

[8/27/2015] ADAMS_EDWARD_20150827

16

1   Q   Do you?

2   A   I do not.

3   Q   Okay.  Are you aware of -- at anytime, did you

4   maintain the corporate records of Apollo Diamond,

5   Incorporated?

6   A   No.

7   Q   Okay.  How about Apollo Diamond Gemstone

8   Corporation?

9   A   Can you clarify what corporate records are?

10  Q   Sure.  So let me ask you, what's your

11  understanding of that, when I use the word "corporate

12  records"?  I mean --

13  A   Everything from payables, receivables, checks,

14  payable ledgers, org chart, you know, production manuals,

15  how to produce diamond, reports about research regarding the

16  technology, private placement memos.

17  Q   I will stop you.  But I kind of agree with that

18  definition.  So just a general everyday -- everyday

19  documents of the -- you know, how the organization operates,

20  right?  Like you said, some financial information, the --

21  manufacturing documents, payables, and things like that.  I

22  agree with that definition as corporate records.

23      So with that definition, did you maintain -- did

24  you ever maintain the corporate records of Apollo Diamond,

25  Incorporated?

---

17

1   A   No.

2   Q   Okay.  How about Apollo Diamond Gemstone Corp?

3   A   No.

4   Q   Do you know who did?

5   A   I presume -- it was never a question that I asked

6   anyone.  It's a presumption.  And my presumption would be

7   the company in Massachusetts.

8   Q   Okay.  So to the extent this subpoena, Exhibit 28,

9   requests documents relating to Apollo Diamond, Incorporated

10  and Apollo Diamond Gemstone Corp, the documents that you

11  produced in response to the subpoena were just whatever

12  documents you had in your possession in your personal files?

13  A   Correct.

14  Q   Okay.  Mr. Adams, have you withheld any documents

15  called for by either of these subpoenas based on a claim of

16  privilege?

17  A   I don't know.  I gave the documents to my counsel.

18  I don't know if they did a privilege log or not.

19  Q   Okay.  So your counsel may have withheld some

20  based on a claim of privilege, but you are just not aware?

21  A   Yeah, I am not.

22  Q   Okay.  Were any documents called for by the

23  subpoena produced -- I'm sorry -- not produced for any

24  reason other than privilege?

25  A   Not that I know of.

---

18

1   Q   Okay.  Do you know whether any of the documents

2   responsive to the subpoenas but were not provided that were

3   in your possession at some time or that were lost, destroyed

4   or otherwise disposed of?

5   A   Could you repeat that?

6   Q   Yes.  Bad question.

7       Were any documents -- are you aware of any

8   documents that were not produced because they were

9   destroyed, lost or stolen?

10  A   That were in my possession, no.

11  Q   Okay.  Do you know if the corporate records of

12  Apollo Diamond, Incorporated or Apollo Diamond Gemstone Corp

13  were ever destroyed?

14  A   I don't know what happened to the records.

15  Q   Okay.  So just a few more basic background

16  questions here.

17      At the beginning of the testimony, you know, you

18  swore the oath.  Do you understand the oath?

19  A   I believe I do.

20  Q   Okay.  Is there anything that prevents you today

21  from giving full, complete and truthful answers to my

22  questions?

23  A   I don't believe so.

24  Q   Okay.  If you don't understand a question that I

25  ask you, will you let me know that?

---

19

1   A   Sure.

2   Q   You have already done it.

3       If you don't know the answer to one of my

4   questions, will you let me know that?

5   A   Absolutely.

6   Q   Okay.  If you don't have any knowledge about a

7   particular question or a subject matter, will you let me

8   know that?

9   A   I will try.

10  Q   Okay.  If we take a break or go off the record for

11  any reason, I am just going to ask you every time we go back

12  on the record whether or not we had any discussions during

13  the break, just to give you kind of a heads-up that I am

14  going to do that.

15  A   Okay.

16  Q   Okay?

17  A   I understand.

18  Q   And a few other ground rules.  The documents that

19  you see or that will be given to you today need to be

20  returned to me at the end of the day.  You or your counsel

21  cannot take those documents with you at the end of the

22  testimony, okay.

23      If you need a break, let me know.  We kind of

24  control the record; when we go on and off the record.  So

25  just let me know if you need to take a break.  We will try

DSM-000405

20

1   to take periodic breaks as we go along.
2      A   Okay.
3      Q   But if for any reason, just let me know.
4        You have done a pretty good job so far, but as far
5   as responding to my questions, I will ask that you wait
6   until I am done asking the question before you respond.  I
7   have a knack of talking slowly sometimes, and I will try to
8   get my question out in time, but I will just ask, just for
9   the court reporter's sake, to wait until I am done asking
10  the question.
11      And then finally, you know, as far as giving a
12  verbal response to my questions, no head nods.  Because
13  everything is being recorded here, head nods and things like
14  that, we are going to ask you to make an affirmative or some
15  type of verbal response to my questions.
16      Do you understand that?
17     A   I understand.
18     MR. WISNIEWSKI:  Okay.  All right.  So what, I
19  guess, I will mark as Exhibit 29 -- Commission Exhibit 29 is
20  the background questionnaire that Mr. Adams provided to the
21  Commission last night.  It's dated August 25, 2015.
22        (SEC Exhibit No. 29 was marked for
23        identification.)
24     BY MR. WISNIEWSKI:
25     Q   Mr. Adams, this is a document that is Bates

[8/27/2015] ADAMS_EDWARD_20150827

---

22

1     Q   Okay.  Go ahead.  So you are a professor at the
2  University of Minnesota Law?
3     A   I am.
4     Q   Okay.  And you are a tenured professor?
5     A   I am.
6     Q   What is your annual compensation from the
7  University of Minnesota?
8     A   I believe it's -- I just got a letter recently.  I
9  think my salary is $165,000.
10     Q   And is that an increase or just kind of an annual
11  affirmation of what your salary will be for that -- for this
12  year?
13     A   It's been fairly level because of law school
14  enrollments recently.
15     Q   Okay.
16     A   It was actually static from last year.
17     Q   Okay.
18     A   Didn't go up from last year.
19     Q   Okay.  So last five years, around the 165,000.
20  Any drastic jumps there?
21     A   I don't believe so.
22     Q   Okay.  All right.  I am going to hand you what I
23  will mark as Exhibit 30.
24        (SEC Exhibit No. 30 was marked for
25        identification.)

[8/27/2015] ADAMS_EDWARD_20150827

---

21

1   labeled SECBG_Adams_1 through 12.
2      Do you recognize this document?
3     A   I do.
4     Q   What is this document?
5     A   A background questionnaire that I provided to you.
6     Q   And is this your handwriting on the document?
7     A   It is.
8     Q   Did you complete this document?
9     A   I did.
10     Q   Okay.  Why don't you walk me through, kind of,
11  your employment history, starting with your current
12  employer, your position there, and kind of walking back.
13     A   I am a professor of law at the University of
14  Minnesota Law School.
15     Q   Okay.  And I see you are referencing -- are you
16  referencing the Exhibit 29 here, as far as the question that
17  requests your employment history?
18     A   Yes.
19     Q   Okay.  Is this a good place to start from, you
20  think, as far as walking current to backwards, as far as
21  your employment history?
22     A   Yes.
23     Q   Okay.  Why don't we go ahead and do that.
24      So you are on Page 10 there?
25     A   I am on Page 10.

[8/27/2015] ADAMS_EDWARD_20150827

---

23

1     BY MR. WISNIEWSKI:
2     Q   Mr. Adams, Exhibit 30 is a printout -- or purports
3  to be a printout from the University of Minnesota Law School
4  Web page.  Looks to be your bio.
5      Do you recognize Exhibit 30?
6     A   Yes.
7     Q   Okay.  And this bio kind of provides a general
8  overview of your background, the courses you teach, and some
9  of your publications; is that correct?
10     A   Yes.
11     Q   And does this bio accurately reflect your
12  experience and your work history or some of your positions
13  over the year?
14     A   I believe it does.
15     Q   Okay.  If we go down to the Publications section
16  there, we have one, two, three -- almost four pages -- or
17  three pages of publications.  And I won't go through, you
18  know, most of these.  But, you know, is there a general area
19  of practice that you specialize or that you publish articles
20  on, would you say?
21     A   Bankruptcy and corporate law.
22     Q   Okay.
23     A   Bankruptcy, corporate, commercial law.
24     Q   Okay.  And commercial law, would that -- I mean,
25  some of the articles that I see here involve corporate

[8/27/2015] ADAMS_EDWARD_20150827

24

1  governance.  Is that correct; corporate governance issues?
2      A    Some of them do.
3      Q    Okay.  How about Federal Securities laws?
4      A    I think I have written some on that.  Usually I am
5  using more empirical analysis, if you will.
6      Q    What do you mean by that?
7      A    Like, I wrote an article for the Penn Law Review
8  on arbitrage pricing theory --
9      Q    Okay.
10     A    -- which is more of an economics concept than it
11  is a legal one.
12     Q    Okay.  And these articles that you authored, kind
13  of explain to me how you gathered, you know, kind of the
14  background or the expertise to draft these articles.  Was it
15  just from your experience and research and practice?
16     A    I would say it was mostly research.
17     Q    Okay.
18     A    You are trying as an academic to add something to
19  the discussion, to the best of your ability.
20     Q    Okay.
21     A    And that usually means taking a different
22  perspective or critiquing an existing perspective that's
23  more accepted.
24     Q    Okay.  If we skip down on Exhibit 29 to the next
25  employer you have there, Adams Grumbles, LLP, what is that?

[8/27/2015] ADAMS_EDWARD_20150827

25

1      A    It's a law firm.
2      Q    Okay.  And are you a -- what's your membership or
3  ownership interest in Adams Grumbles, LLP?
4      A    I believe it 50 percent.
5      Q    Okay.  So you own 50 percent of the law firm or
6  the equity in the law firm?
7      A    Correct.
8      Q    And who owns the other 50 percent?
9      A    Ernest Grumbles.
10     Q    Okay.  And how long has Adams Grumbles, LLP been
11  in existence?
12     A    I think it was January 2013.
13     Q    Okay.  And was Adams Grumbles known as something
14  else prior to January 2013?
15     A    Mr. Grumbles was a non-equity partner in Adams
16  Monohan.
17     Q    Okay.
18     A    So -- and I could be wrong with these dates
19  because I don't remember if it's '13 or '14.  But -- Monohan
20  either left the end of '12 or the end of '13, and then
21  Grumbles and I became partners.
22     Q    Okay.  So is Adams Grumbles, LLP, is it a separate
23  or different entity than Adams Monohan, LLP?
24     A    You know, I don't think we created a separate
25  entity.  I think we just did a document where Ernest

[8/27/2015] ADAMS_EDWARD_20150827

26

1  purchased Michael's stake.
2      Q    Okay.
3      A    But I don't remember how we documented it.
4      Q    Okay.  But essentially it was a -- let me know if
5  this is wrong.  But Adams Monohan was the precursor to Adams
6  Grumbles; kind of the same law firm, just under a different
7  name?  Is that correct?
8      A    I think that's a largely accurate description.
9      Q    Okay.  Adams Monohan.  What was your ownership
10  interest in Adams Monohan?
11     A    For most of the time, I think when it was Adams
12  Monohan, 50 percent.
13     Q    Okay.  And you said most of the time.  Was there a
14  point that it wasn't 50 percent?
15     A    We had another partner at one point where -- and I
16  think at that point it was 33 percent.
17     Q    Okay.  Why don't you walk me through the timeline.
18  When was Adams Monohan established?
19     A    I believe it would have been 2004 or 2005.
20     Q    Okay.
21     A    I don't recall exactly.
22     Q    And so in or around 2004 or 2005, was the law firm
23  known as Adams Monohan?
24     A    Adams Monohan & Sankovitz.
25     Q    Okay.  So that's when there was another --

[8/27/2015] ADAMS_EDWARD_20150827

27

1      A    Individual.
2      Q    And that was when there was a 33 percent -- or you
3  think there was a 33 percent interest, or your interest in
4  the law firm was 33 percent?
5      A    I think.  You know, I don't remember the
6  documentation.
7      Q    Okay.  Then at some point, your interest in the
8  law firm went to 50 percent?
9      A    Correct.
10     Q    Okay.  And when was that, approximately?
11     A    I think it was 2007 or 8.
12     Q    Okay.  So 2007 or 8, it was known as Adams
13  Monohan, LLP?
14     A    Right.
15     Q    And then up to January 2013, when the name changed
16  to Adams Grumbles, LLP?
17     A    Yes.  It's either January 2013 or it could be
18  January 2014.  I don't really remember.
19     Q    Okay.  But from 2004 or 2005, you had a 50 percent
20  interest in either Adams Monohan, LLP or Adams Grumbles,
21  LLP?
22     A    If I heard you, I think I -- I think that's -- no.
23  Can -- I'm sorry.  Maybe I misunderstood the
24  question.
25     Q    Since 2004 or 5, up through the present, you had a

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000407

28

1  50 percent ownership interest in the law firm, whether it
2  was named Adams Monohan, LLP or Adams Grumbles?
3      A.   No.  When it was Adams -- so beginning -- when it
4  was formed in, I think it was, 2004 or 5, it was Adams
5  Monohan, Sankovitz.  At that point, I am pretty certain I
6  did not have 50 percent.
7      Q.   Okay.
8      A.   I think it was 33 percent.  But, you know, I would
9  have to go back and look at the documents because --
10     Q.   Maybe I misstated the dates.  But when did Adams
11 Monohan -- so when did that third partner no longer -- was
12 no longer affiliated with the law firm?
13     A.   I think he departed in either '07 or '08.
14     Q.   Okay.
15     A.   I don't know.  It could have been '09.  I mean, I
16 really don't remember.
17     Q.   Okay.
18     A.   And at that point, because there would have only
19 been two partners -- and I don't believe anyone else owned
20 equity -- it would have been 50 percent.
21     Q.   Okay.  So it was formed in '04, '05.  What type of
22 work did the law firm do?  What type of law firm was it?
23     A.   Corporate, bankruptcy, intellectual property.
24     Q.   Those are the three main -- so corporate,
25 bankruptcy, and intellectual property?

---

29

1      A.   I think those are the three.
2      Q.   When you say "corporate," what do you mean by
3  that?
4      A.   Formation of corporations, formation of
5  partnerships, securities work.  I think that's pretty
6  complete.
7      Q.   Okay.  What type of securities work did the firm
8  do?
9      A.   Assisted in drafting private placement memos.
10 That would have been the principal work that it did.
11     Q.   Was that work that you did?
12     A.   I did some of it.  We had an associate who did a
13 lot of the heavy lifting on -- maybe an original draft.
14     Q.   Did you do any IP work?
15     A.   On occasion I would do some intellectual property
16 work.  That's not my -- I am not an engineer by training,
17 and many intellectual property lawyers are engineers.
18     Q.   So out of those three, the intellectual property,
19 corporate, and bankruptcy, where did you focus your
20 attention, most of your work for the law firm?
21     A.   Corporate and bankruptcy.
22     Q.   Okay.  In '04, '05, walk me through what type of
23 clients the law firm had.
24     A.   I don't remember back then.  I mean -- I don't
25 remember.

---

30

1      Q.   How about public companies?  Did you do any work
2  for public companies?
3      A.   Not that I remember.
4      Q.   Okay.  Private entities?
5      A.   It would have been -- if it wasn't a public
6  company, it would have had to have been a private entity or
7  an individual who was entrusted in becoming -- you know,
8  forming an entity and undertaking a business.
9      Q.   Okay.  So how about throughout your tenure there
10 at Adams -- well, you know -- we will just call it "The law
11 firm" since the name may have changed a little bit.
12          Since '04, '05, did the law firm have any public
13 company clients?
14     A.   I don't remember.
15     Q.   Okay.
16     A.   I don't remember one that sticks out.
17     Q.   How about Scio Diamond Technology Corporation; was
18 that a client, do you remember?
19     A.   It was a corporate and intellectual property
20 client.  We didn't do the securities work.
21     Q.   What type of corporate work did it do for Scio
22 Diamond technology?
23     A.   I would have to look back at my billing records,
24 but it would have drafted a private placement memo.  It
25 would have interacted with potential partners.  You know,

---

31

1  what I would call general corporate work, contractual work,
2  you know.  That's what it would have generally done, would
3  be my recollection.
4          MR. SIKORA:  Kevin, just to be clear, are you
5  talking about '04, '05 work for Scio Diamond?
6          MR. WISNIEWSKI:  I am just talking about any type
7  of work he did for Scio Diamond or the law firm did.
8          MR. SIKORA:  Throughout the entire time frame?
9          MR. WISNIEWSKI:  Yes.
10         BY THE WITNESS:
11     A.   That Scio did.
12         BY MR. WISNIEWSKI:
13     Q.   '04, '05, what was the annual revenue of Adams
14 Monohan?  Again, I will call it "The law firm."
15     A.   I don't remember.
16     Q.   Okay.  So how about '06?
17     A.   I don't remember.
18     Q.   Do you know the annual revenue for any year for
19 the law firm?
20     A.   I would say -- I am just thinking of the tax
21 return for '13.  We haven't finalized '14, I guess.  I don't
22 do it, but we have an administrative person who works with
23 the accountant.
24         I think in 2013 it was probably 500,000, $600,000.
25 I don't know.

DSM-000408

32

```
1     Q    Okay.  So 2013, 500, $600,000 was the annual
2   revenue of the law firm?
3     A    It's my supposition.  I don't -- you know, I am
4   not the accountant for the firm, and it wasn't -- I get what
5   I get based on, you know, my work, so --
6     Q    So it was -- as a 50 percent stakeholder of the
7   law firm, you would have some idea of the annual revenue
8   that the firm brought in, right?
9     A    I would.
10    Q    Okay.
11    A    I am more focused on doing the work, but yes.
12    Q    Right.  But revenue, right, is something that you
13  are aware of?
14    A    Generally.
15    Q    Okay.  And it's something that you have access to
16  as a 50 percent stakeholder in the company, the firm's
17  revenue?
18    A    Oh, I would have, yes.
19    Q    Okay.  So how about in 2000 -- let's walk
20  backwards.
21         How about in 2012; was the annual revenue greater
22  or less than the 500 or $600,000 that it did in 2013?
23    A    I don't remember.
24    Q    Was it more than a million dollars?
25    A    I would seriously doubt it.
```

[8/27/2015] ADAMS_EDWARD_20150827

33

```
1     Q    Okay.  So less than a million dollars?
2     A    That would be what I would guess.
3     Q    Okay.  So 2012, less than a million dollars in
4   annual revenue?
5     A    Yes.
6     Q    Okay.  How about 2011?
7     A    How about --
8     Q    The annual revenue for 2011.
9     A    Again, I don't know.
10    Q    Less than a million dollars?
11    A    I would imagine it was less than a million
12  dollars, but it's pure -- I am purely guessing here.
13    Q    Okay.  Would there be any document that would
14  refresh your recollection of how much revenue the firm made?
15    A    Tax return.
16    Q    Okay.  And those are documents that have been
17  requested from your law firm?
18    A    Uh-huh.
19         MR. SIKORA:  They will be forthcoming.
20         MR. WISNIEWSKI:  Okay.
21         BY MR. WISNIEWSKI:
22    Q    In 2013, what was your revenue or compensation
23  from the law firm?
24    A    I don't know.
25    Q    You don't know how much revenue or compensation
```

[8/27/2015] ADAMS_EDWARD_20150827

34

```
1   you received from the law firm in 2013?
2     A    I would imagine it was de minimis.  I don't know.
3     Q    What do you mean by "de minimis"?
4     A    Meaning I didn't do a lot of legal work for
5   clients in 2013.
6     Q    Why not?
7     A    I was focused on some other businesses I was
8   interested in developing.
9     Q    Okay.  How about the last five years, starting
10  from 2015 to 2010; what would you say was your annual
11  compensation from the law firm?
12    A    I can give you what I think might be a range, but
13  again, it's speculation.  I would say on the low end it was
14  almost nothing; several thousand dollars, $10,000, you know.
15  On the high end it might have been 150 to $200,000.
16    Q    And so it dips -- peaks and valleys throughout the
17  years, I guess you are saying, as far as compensation goes
18  from the law firm?
19    A    Right.
20    Q    Okay.  Can you recall, what was the high water
21  mark --
22    A    I can't.
23    Q    -- for you as far as compensation goes from the
24  law firm?
25    A    I can't.
```

[8/27/2015] ADAMS_EDWARD_20150827

35

```
1     Q    Okay.  Looking back at Exhibit 29, I see you have
2   on Page SECBG Adams 11, you have listed Albany Law School,
3   Union University.
4          Are you currently employed by Albany Law School?
5     A    No.  I understood -- I'm sorry if that was what
6   was being asked.  I understood this to mean where was I --
7   where did I work, and then I went backwards.
8     Q    Right.  I am just clarifying.
9     A    Oh, yeah.  No, I am not.
10    Q    Okay.  So other than the law firm and the
11  University of Minnesota, are you currently employed by any
12  other entity?
13    A    I do work individually as an expert, which I
14  sometimes do through ESA Consulting.  But often I just bill
15  that directly as an individual, so I would say that is not
16  employment by an entity.
17    Q    Okay.
18    A    It's just working as an individual consultant.  So
19  I don't want to be cryptic, but I don't want you to
20  misunderstand either.
21    Q    So have you received compensation acting as an
22  expert in 2014?
23    A    2014?  I believe I did.
24    Q    Okay.  And how long have you been -- you mentioned
25  ESA Consulting.
```

[8/27/2015] ADAMS_EDWARD_20150827

36

1    A   Right.
2    Q   What is that?
3    A   It is a firm that I set up -- I don't even
4  remember when -- a decade plus ago for when I was going to
5  do expert witness work principally and/or legal work that
6  was -- or even general work.
7        So sometimes I have been asked to provide a damage
8  calculation.  So is that really legal work or not, you know?
9  So that's why I say it's kind of an generic consulting
10 practice sometimes.  And I set that entity up for liability
11 purposes so that I would have -- be shielded from liability
12 as an LLC.  And I run some of my work through that, if I
13 think that that's an appropriate place to run the work
14 through.  I wish I could say there was a method to my
15 madness in that, but I am not sure there particularly is
16 sometimes.
17   Q   And when was that LLC established?
18   A   Again, I don't know.  I would guess 2001, 2.  I
19 don't know.
20   Q   Are you the sole member of that LLC?
21   A   I am the sole member.
22   Q   Are you 100 percent interest in the LLC?  Do you
23 own 100 percent interest in the LLC?
24   A   I own 100 percent interest in the LLC.
25   Q   And you mentioned expert testimony work that you

[8/27/2015] ADAMS_EDWARD_20150827

37

1  have done.
2    A   Correct.
3    Q   Okay.  Explain to me what type of expert testimony
4  you have provided.
5    A   Well, to be clear, I have done expert consulting
6  work and then expert testimony work.
7    Q   Let's start with the expert testimony.
8    A   I have been an expert in matters relating to
9  bankruptcy cases, as an example.  I don't remember the
10 specifics of them, but throughout the last, probably,
11 15 years, I have probably been an expert in four or five,
12 six of those cases.  It's a guess.
13      MR. SIKORA:  Just to be clear for the record, with
14 respect to expert consulting, that could be confidential and
15 privileged, so you wouldn't be in a position to describe
16 that in detail.
17      BY MR. WISNIEWSKI:
18   Q   So how about some of the other testimony you have
19 given as an expert?  What other kind of general categories
20 of topics have you been employed to give expert testimony
21 on?
22   A   Commercial law.
23   Q   Okay.  What do you mean by that?
24   A   Uniform Commercial Code.
25   Q   Anything else under that rubric of corporate law?

[8/27/2015] ADAMS_EDWARD_20150827

38

1    A   Those are the categories that I remember.
2    Q   How about corporate governance?
3    A   I don't think so.
4    Q   Federal securities laws?
5    A   I don't remember specifically that.
6    Q   Okay.  So your expert consulting work, kind of
7  explain to me what type of consulting work you provide.
8    A   So right now I am active as an expert in a
9  significant bankruptcy case, and I am providing bankruptcy
10 expertise to a very prominent litigation firm in D.C.
11   Q   So you are not necessarily a testifying expert;
12 you are kind of a consulting expert?
13   A   Yes, I think it could turn into a testifying
14 expert sometimes, but I don't know if it will in this
15 instance.
16   Q   Other than bankruptcy, what other services have
17 you provided in connection with your expert consulting?
18   A   I think early on I might have done some damage
19 analysis for a breach of contract situation.  I have some
20 vague recollection of that.  I did some work for -- I did
21 some work relating to the Uniform Fraudulent Transfer Act, I
22 think, if I remember.
23   Q   How about corporate law?  Have you done any expert
24 consulting with regard to corporate law?
25   A   That I don't remember specifically.

[8/27/2015] ADAMS_EDWARD_20150827

39

1    Q   How about generally?
2    A   I mean, the rubric of corporate law, if you assume
3  it involves corporations, then, you know, almost all of this
4  would involve that because I don't represent individuals
5  usually, or I am not working for an individual typically.
6  But specifically, I don't remember anything.
7    Q   Okay.  And you said that ESA Consulting is still
8  in existence?
9    A   Yes.
10   Q   You are still doing work through ESA Consulting or
11 performing services for individuals or entities through ESA
12 Consulting?
13   A   Yes.  I don't believe I am at this very moment,
14 but I would not have a reason not to if it was appropriate
15 in my mind.
16   Q   How about any other sources of income that you
17 received, let's say, last year?
18   A   I have some investments.
19   Q   Okay.  Anything else?
20   A   Not that I can think of.
21   Q   Okay.  How about Focus Capital Group?  Were you
22 ever an employee of Focus Capital Group?
23   A   I was.
24   Q   What is Focus Capital Group?
25   A   Focus Capital Group was a broker-dealer.

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000410

40

```
 1      Q.   Okay.  How long were you an employee of Focus
 2  Capital Group?
 3      A.   So can we back up for one moment and just clarify
 4  something?  I don't know if I was technically ever an
 5  employee.  I was an owner of Focus Capital Group.  So I just
 6  don't want to misstate that I was an employee.
 7      Q.   I appreciate that.
 8      A.   From inception to when we filed a BDW, I think
 9  it's called.  So that would have been, I think, 2012 or '13.
10      Q.   Okay.  Was when --
11      A.   Right.  I don't know when Focus was formed.  I
12  think it might have been 2009.  And then I am pretty certain
13  it was -- we filed a BDW, I think, December of 2012.
14      Q.   And what was your interest -- ownership interest
15  in Focus Capital?
16      A.   It changed over time.
17      Q.   Walk me through the different changes.
18      A.   I believe it was initially 50 percent, and then it
19  was reduced because we had some individuals who came and
20  invested in Focus Capital and essentially bought a portion
21  of our stake, meaning my principal share -- my principal
22  fellow shareholders' and my stakes.  So my ownership
23  interest was reduced to, I think it was, 37 point something
24  percent.  I think that's right.
25      Q.   And what type of work did Focus Capital do?
```

[8/27/2015] ADAMS_EDWARD_20150827

41

```
 1      A.   It did advisory services, M&A advisory services.
 2  It did capital raises mostly for -- mostly through -- for --
 3  institutional placements, if you will.  A lot of debt
 4  placements it did.  Bank debt transactions, I guess you
 5  would describe them as.  It did -- we looked at doing some
 6  private placements.  I don't know if we ever really
 7  consummated one.  I don't remember.  So to individuals, I am
 8  talking about; accredited investors.
 9      Q.   Were its clients public companies or private
10  companies?
11      A.   I believe they were both.
12      Q.   Okay.  One more than the other?
13      A.   I think there were some hedge funds in the mix
14  too.  I don't know if I can say which was the dominant
15  client, if you will.
16      Q.   And did you partake in any brokerage activity
17  yourself?
18      A.   Brokerage activity?
19      Q.   Did you talk to investors, potential investors, or
20  individuals that you were trying to raise capital from?
21      A.   I talked to prospective clients about assisting
22  their corporations.
23           Did I talk to investors?  I think I did
24  a little of that, but not a lot.
25      Q.   Okay.  For what client did you do that work for?
```

[8/27/2015] ADAMS_EDWARD_20150827

42

```
 1      A.   I don't remember.
 2      Q.   Do you recall any client which you did any
 3  brokerage work for?
 4      A.   Focus was briefly engaged by Scio.  The engagement
 5  was terminated several weeks after it started.  I talked, I
 6  think, to some institutions that we had previously been
 7  speaking with when the company was Apollo, on behalf -- let
 8  me rephrase that -- entities we had spoken to on behalf of
 9  Apollo previously, to let them know that there was a change
10  potentially occurring.  That's my recollection.
11      Q.   Okay.  Other than you, who else had an ownership
12  interest in Focus Capital?
13      A.   Michael Monohan initially with me, and then there
14  were three other individuals who bought, as I said, this
15  24 point -- I want to say it was 24.99 percent stake, and
16  those were Christopher Mack, Paul Rapello, and David Platt.
17      Q.   What was your annual compensation from
18  Focus Capital?
19      A.   I don't know.
20      Q.   Can you ball park it?
21      A.   I think -- I am guessing in an extraordinarily
22  good year it would have been $150,000.  There were probably
23  years ago where it was zero.
24      Q.   Okay.  I am going to hand you an exhibit marked as
25  Commission Exhibit 31.
```

[8/27/2015] ADAMS_EDWARD_20150827

43

```
 1           (SEC Exhibit No. 31 was marked for
 2                identification.)
 3      BY MR. WISNIEWSKI:
 4      Q.   Mr. Adams, I handed you a document that's been
 5  marked as Commission Exhibit 31.  It appears to be a
 6  printout from Web CRD representing a U4 employment history.
 7           Have you seen this document before?
 8      A.   I have not in this form, no.
 9      Q.   Okay.  And my purpose in showing you this exhibit
10  is just to kind of, maybe, quicken the pace to walk through
11  some of these things, just so you can kind of explain to us
12  what some of these employers are.
13           Now, I notice up top there, it has a breakdown of
14  Focus Capital -- Focus Capital Group, and it has that you
15  were employed there to 2/19/2013.  Do you see that?
16      A.   I do.  I see that.
17      Q.   Do you have any reason to believe that you didn't
18  stop working from February of 2013, in or around that
19  time?  Does that seem right?
20      A.   I thought the firm -- I thought we filed a BDW at
21  the end of 2012, but maybe there was a lapse in time.
22      Q.   Okay.
23      A.   I don't know.  I would be speculating.
24      Q.   Okay.  And going down that same table up there, it
25  says, you know -- it mentions 2006.  Was Focus Capital in
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000411

44

```
1    business in 2006?
2         A    I think we had applied to be a BD at one point,
3    and then we withdrew the application.  So I don't know -- I
4    remembered -- as I said, I remember it sometime in 2009 but,
5    you know, my recollection could be wrong about that.
6         Q    Why don't we skip down to the second half of this
7    page in Exhibit 31.  We talked -- we haven't talked about
8    Scio Diamond, but we talked about Adams Monohan, LLP.  And
9    there is an entity called Deep Value Advisers, LLP.  Do you
10   see that?
11        A    Uh-huh.
12        Q    What is that?
13        A    It's a small, what I would call hedge fund, I
14   guess; investment fund.
15        Q    Okay.  Explain to me what you mean about a hedge
16   fund.
17        A    It's an investment fund where we had several
18   partners, and we were looking for opportunities that we
19   thought were deeply valued.
20        Q    Okay.  Is it an investment advisory fund?
21        A    No.  I don't think it's characterized as that.
22        Q    Is it registered as an investment advisory?
23        A    No, I don't believe so.
24        Q    And what is your role at Deep Value Advisers?
25        A    Well, it doesn't exist anymore.  It hasn't for
```

45

```
1    awhile.  So this is -- the entity may exist, but there's no
2    investors anymore.  There's no investments.
3         Q    When did your involvement with Deep Value Advisory
4    end?
5         A    Probably in 2013, would be my guess.
6         Q    Okay.  In 2013 and prior, what type of ownership
7    interest did you have in Deep Value Advisers?
8         A    I think 50 percent.
9         Q    Okay.  And who is the other 50 percent owner, or
10   who were the other owners?
11        A    You know, it was -- I think it might have been
12   33 percent, now that I think about it.  Steve Hey was
13   another owner, and Laurence Zipkin was another owner.
14        Q    How do you spell Steve Hey's last name?
15        A    H-e-y.
16        Q    Okay.  And Zipkin?
17        A    Z-i-p-k-i-n.
18        Q    That sounds -- okay.
19             Okay.  And then University of Minnesota Law, we
20   talked about that.  We will get into the Apollo entities.
21             How about ORCG, Inc.?
22        A    Oak Ridge Capital Group.
23        Q    Is that -- what is Oak Ridge Capital Group?
24        A    I think I would describe it as a holding company
25   for a brokerage firm in -- in a real estate brokerage firm,
```

46

```
1    a more traditional stock brokerage firm, a land development
2    company.
3         Q    So it was a holding company for various --
4         A    Vertical businesses.
5         Q    Okay.  What were the vertical businesses
6    underneath the holding company?
7         A    Stock brokerage.
8         Q    That was the name of the entity?
9         A    No.  I'm sorry, you want the name.  Oak Ridge
10   Financial Services Group.
11        Q    Okay.
12        A    Then there was a land investment company, if you
13   will.  So land development, I think, you would term it.  It
14   developed land in New Mexico principally.
15        Q    What was the name of that entity?
16        A    I don't remember.
17        Q    You mentioned a third vertical company.
18        A    The third one was -- I think it was technically an
19   agent, a real estate agent or real estate brokerage firm in
20   New Mexico, in Scottsdale.  And I don't remember the name of
21   it either.  We sold it -- the company sold it.  I don't
22   remember.
23        Q    Is ORCG still in business?
24        A    No.
25        Q    Okay.  When did that terminate, or when did that
```

47

```
1    business end?
2         A    I think it statutorily dissolved sometime in, I
3    would imagine, 2012, something like that.  I am just
4    guessing.
5         Q    And you mentioned Oak Ridge Financial Services
6    Group.  That was the brokerage -- broker-dealer that you
7    mentioned.  That's one of the vertical companies?
8         A    Yes.
9         Q    And did you work for Oak Ridge Financial -- or Oak
10   Ridge Financial Services Group?
11        A    I did.
12        Q    Okay.  In what capacity did you work?
13        A    It was various capacities.  I believe at one point
14   I was vice chairman.  At one point I was a managing
15   director, I think was the term.  I don't remember the rest
16   of the titles, if there were any others.
17        Q    How long were you employed by Oak Ridge Financial
18   Services?
19        A    It would have been -- between Oak Ridge and its
20   predecessor, it would have been from, I think, 1999 through
21   2005 or 6.
22        Q    And apart from being employed by Oak Ridge
23   Financial Services, did you have an ownership interest?
24        A    I did initially, yes.
25        Q    Okay.  What type of interest was that?
```

DSM-000412

48

1   A   Equity ownership interest.

2   Q   What percentage of equity ownership interest?

3   A   I guess a minority interest.  I don't remember the

4  precise number.

5   Q   Who else had ownership interest in Oak Ridge

6  Financial Services Group?

7   A   Mr. Zipkin, and I think there were other people as

8  well.  I don't remember.

9   Q   Okay.  So did ORGC have an ownership interest in

10  Oak Ridge?

11   A   Yes.  What happened is, essentially, ORCG bought

12  Oak Ridge, I think is legally what transpired.

13   Q   Okay.  And when did you say you stopped working

14  for Oak Ridge Financial Group?

15   A   I think it was '05 or '06.  I am not sure.

16   Q   Okay.  Why did you stop working there?

17   A   Because Oak Ridge Financial Services Group was

18  sold to an employee group, who became employee owners of it.

19   Q   Okay.  So you sold the business, basically?

20   A   Well, I didn't.  I wasn't the owner of it.  But

21  Oak Ridge Capital did.

22   Q   Okay.  So the Capital group sold the BD portion of

23  it?

24   A   Correct.

25   Q   I am going to hand you an exhibit that's been

[8/27/2015] ADAMS_EDWARD_20150827

49

1  marked as Commission Exhibit 32.

2          (SEC Exhibit No. 32 was marked for

3              identification.)

4  BY MR. WISNIEWSKI:

5   Q   Mr. Adams, I handed you a two-page document that

6  purports to be, again, a printout from a Web CRD.  At the

7  top of it, it says Disclosure/Occurrence Composite.  Do you

8  see that?

9   A   Uh-huh.

10   Q   Do you know what this document is?

11   A   A disclosure occurrence composite.  I really don't

12  know.

13   Q   Do you know what a U5 Form is?

14   A   Yes.

15   Q   What is that?

16   A   It's a document that's filed -- I believe I know

17  what it is.  It's a document that's filed when there is a

18  separation between you and a brokerage firm.

19   Q   Okay.  And do you know if a U5 was filed by Oak

20  Ridge Financial Services Group in connection with your

21  employment there?

22   A   I presume it was.

23   Q   Okay.  And --

24   A   Most likely.

25   Q   Okay.

[8/27/2015] ADAMS_EDWARD_20150827

50

1   A   If this is it.

2   Q   This is it?

3   A   I guess.  I mean -- yeah, I don't know.

4   Q   Okay.  And it says -- there is a number there.  It

5  says -- the number is on the second half of the page.

6  There's 1, 2, 3, and it says "Termination type."  It says

7  "Voluntary resignation."  Do you see that?

8   A   Yes.

9   Q   Okay.  And did you voluntarily resign from the Oak

10  Ridge Financial Services Group?

11   A   I believe I did, if it says that.  Yes.

12   Q   And Number 4 there, it says Allegations.  Turn the

13  page.  It goes on and it says, "Failure to follow firm and

14  industry rules and regulations."

15       Do you know what that is -- what that's

16  describing?

17   A   I don't.

18   Q   Okay.  Do you know if there is any internal review

19  performed by Oak Ridge Financial regarding your employment

20  there?

21   A   I know that I received -- I should answer -- I

22  don't know that.  I don't know what their procedures were.

23   Q   Okay.  Were you ever notified by Oak Ridge

24  Financial Services Group that they were performing an

25  internal review with regards to your employment there?

[8/27/2015] ADAMS_EDWARD_20150827

51

1   A   Not that I recall.

2   Q   Okay.  Do you know what NASD Rule 330 is?

3   A   No.

4   Q   How about 340?

5   A   I don't.

6   Q   Okay.  Turning back to Exhibit 31.  And I won't --

7  the last one there is Apex Capital, LLP.  Do you see that?

8   A   Yes.

9   Q   What is that?

10   A   That was an entity I formed to make investments,

11  potentially, in other companies.  I formed it with another

12  individual.

13   Q   Okay.  And what was your ownership interest in

14  that?

15   A   I believe it was 50 percent.

16   Q   50 percent?

17       Who were the other owners of that business?

18   A   I believe it was just Mr. Zipkin and myself.

19   Q   Okay.  And that was the same Mr. Zipkin that was

20  an owner or had an ownership interest in the ORGC, Inc. and

21  Oak Ridge Financial Services Group?

22   A   Right.

23   Q   So other than Focus Capital and Oak Ridge

24  Financial Services Group, were you ever employed by another

25  broker-dealer?

[8/27/2015] ADAMS_EDWARD_20150827

52

```
 1       A    Can you read that -- I want to make sure I am
 2   accurate.
 3       Q    Other than Focus Capital Group and Oak Ridge
 4   Financial Services Group, have you ever been employed by
 5   another broker-dealer?
 6       A    So before Oak Ridge Financial Services Group was
 7   Oak Ridge Financial Services Group, it was named Equity
 8   Securities Investments.
 9       Q    Okay.
10       A    So -- and I believe that all that happened there
11   was there was a name change.
12       Q    Okay.
13       A    So --
14       Q    Other than Equity Services --
15       A    Securities Investments, Inc.
16       Q    -- okay -- Focus Capital or Oak Ridge Financial
17   Services, have you ever been employed by any other
18   broker-dealer?
19       A    No.
20       Q    How about an ownership interest in any
21   broker-dealer, other than those three entities we just
22   discussed?
23       A    No.
24       Q    Direct or indirect ownership interest in any
25   broker-dealer?
```

54

```
 1   direct or indirect ownership interest in?
 2       A    Over the course of my life, of course.  I don't
 3   know -- I can't -- as I sit here, these are the ones that
 4   occur to me.
 5       Q    Okay.  How about your experience as a board of
 6   directors?  Have you ever served on a board of directors?
 7       A    Yes.
 8       Q    Okay.  Of a public company?
 9       A    Yes.
10       Q    What companies?
11       A    Scio, Oak Ridge Capital.
12       A    Scio Diamond Technology Corporation, just for the
13   record.  Sorry.
14            What was the second one you said?
15       A    Oak Ridge Capital Group.
16       Q    So Oak Ridge Capital Group was a public company?
17       A    Right.
18       Q    Okay.
19       A    Dental Resources.
20       Q    Okay.  What's Dental Resources?
21       A    It was a company that produced dental-related
22   products.
23       Q    And how long were you a board member there?
24       A    I don't remember.
25       Q    Are you currently a board member?
```

53

```
 1       A    How do you define -- I think I know what "direct"
 2   means.  I own it individually, right?
 3            What's indirect?
 4       Q    You can own it through a trust.  You can own it
 5   through another entity.  So you can have an ownership
 6   interest in an LLC --
 7       A    No.
 8       Q    So no indirect --
 9       A    I don't know of anything like that.
10       Q    Okay.  Turning back to Exhibit 29 really quick.
11   This is your questionnaire.  And I will turn to
12   Page SECBG_Adams at Page 4.
13       A    Uh-huh.
14       Q    And Question 16 asks you to identify beneficial
15   owner, directly or indirectly, in any privately-held
16   company.
17       A    Yes.
18       Q    You have listed nine companies on here.  Can you
19   think of any other companies that you may have not listed on
20   this form?
21       A    I forgot about Apex, right?  I don't know that
22   that still counts.
23       Q    We will add Apex.
24            Other than what you see on Exhibit 29 and
25   Exhibit 31, are there any other entities that you had a
```

55

```
 1       A    No.  No.
 2       Q    Okay.  How long ago since you were no longer a
 3   board member?
 4            I am just trying to get a timeline here.
 5       A    2007, maybe.  I don't remember.
 6       Q    Okay.  2007 through --
 7       A    No.  I think it might have ended in 2007.
 8       Q    Oh, okay.
 9       A    I don't really -- it's all conjecture at this
10   point.  I don't remember.
11       Q    Okay.  Any other public companies?
12       A    I guess American Student Financial Group.
13       Q    What is that?
14       A    A company that makes loans to students, or did
15   make loans to students.  I haven't been involved with it in
16   a decade, probably.
17       Q    So time lining --
18       A    Five, six.  I don't even know.
19       Q    Any other public companies?
20       A    No.
21       Q    How about something called Momentum Advisers?
22       A    Okay.  That was an entity that -- I don't think it
23   exists anymore.  That was an entity that owned -- it was
24   formed to own investments --
25       Q    Okay.
```

DSM-000414

56

1    A    -- with -- and to do consulting work that was
2    non-legal work.
3    Q    Was it a public company?
4    A    No, it was a private --
5    Q    It was a private company?
6    A    Yes.
7    Q    When was that formed?
8    A    Sometime in the early 2000s.
9    Q    And were you on the board of directors of that
10   company?
11   A    I would have been on the -- it was an LLC, I
12   think, so I don't know that the -- it had a board of
13   directors.  It would have had a board of members, or
14   something like that; a governing committee.  And I would
15   have been on that, I am sure.
16   Q    How about private companies?  Did you serve on the
17   board of any private companies?
18   A    Well, when some of these -- if it's me and another
19   person that owns it, then, you know, you kind of are the
20   board.  So, like, Linnise Development, I kind of am the
21   board with my colleague.
22   Q    So would Linnise Development have a board -- would
23   have an actual board?
24   A    Yes.
25   Q    Okay.  And you would serve on the board?

[8/27/2015] ADAMS_EDWARD_20150827

---

58

1    Q    What time in 2011?
2    A    I remember it being late February, early March,
3    but --
4    Q    So February or March 2011 --
5    A    That's my recollection.
6    Q    -- you held no executive position -- employment or
7    board position at either Apollo Diamond, Incorporated or
8    Apollo Diamond Gemstone?
9    A    I wasn't on the board.  I wasn't an executive
10   officer.  I was trying to help my father-in-law with stuff,
11   but I don't know that I was -- I wouldn't consider myself an
12   employee per se; more of an advisor.
13   Q    Okay.  So you weren't a board member at that
14   point?
15   A    No.
16   Q    Okay.  What licenses do you hold?
17   A    I hold a law license to practice law in Illinois,
18   a law license to practice law in Minnesota, and a law
19   license to practice law in Massachusetts.
20   Q    How about any -- do you hold a Series 7?
21   A    I did, but I don't any longer because I haven't
22   been affiliated with a BD for -- I think it's two years, or
23   something.
24   Q    How about a 24?
25   A    I held that.

[8/27/2015] ADAMS_EDWARD_20150827

---

57

1    A    Yes.
2    Q    Okay.  So any other private companies that you
3    served on the board of?
4              (Whereupon, Mr. Hayes left the
5              deposition proceedings.)
6         BY THE WITNESS:
7    A    There was a brief period of time I think I was --
8    I might have been on the board of Apollo Diamond Gemstone.
9         BY MR. WISNIEWSKI:
10   Q    How about Apollo Diamond, Inc.?
11   A    I don't remember that.
12   Q    Apollo Diamond Gemstone, when were you a board
13   member?
14   A    I think it would have been circa 2008 or 9.  I
15   don't remember.
16   Q    Ending at 9 or --
17   A    I don't remember.  I resigned from everything in
18   2011.  So I might have been on the board and resigned
19   earlier.  I don't remember.
20   Q    So you resigned from everything at Apollo Diamond
21   Gemstone in 2011?
22   A    Both.
23   Q    Both Apollo Diamond, Inc. and Apollo Diamond
24   Gemstone?
25   A    Yes.  If I remember correctly, that's what I did.

[8/27/2015] ADAMS_EDWARD_20150827

---

59

1    Q    And a 63?
2    A    I did, and both of those -- I am not sure what the
3    term is -- lapsed.
4    Q    Those licenses are no longer active?
5    A    No longer active.
6    Q    And they became inactive approximately when?
7    A    I am going to suggest they became inactive two
8    years after the BDW was filed with Focus.  I think that's
9    the rule.
10   Q    Okay.
11   A    You would probably know better than me.  I don't
12   really know; or FINRA would know.
13   Q    And this may be covered by your background
14   questionnaire, but I will ask anyway.
15   Have you ever been a named defendant in a federal
16   regulatory action or investigation?
17   A    No.
18   Q    How about a state regulatory action or
19   investigation?
20   A    No.
21   Q    Have you ever been named as a defendant in a
22   criminal action or investigation?
23   A    No.
24   MR. SIKORA:  Whenever you reach a good point --
25   MR. WISNIEWSKI:  I think we are about there.

[8/27/2015] ADAMS_EDWARD_20150827

60

1    Let's take a ten-minute break.  Is that okay?

2              We will go off the record at 10:19.

3              (Whereupon, a recess was had.)

4         MR. WISNIEWSKI:  We are going to go back on the

5    record at 10:27 a.m.

6         BY MR. WISNIEWSKI:

7         Q    Mr. Adams, while we were off the record, did you

8    and I have any conversations off the record?

9         A    No.

10        Q    Okay.  Apollo Diamond, Incorporated, when did you

11   first become involved with Apollo Diamond, which I will just

12   call Apollo Diamond?  Is that okay?

13             When did you first become involved with Apollo

14   Diamond?

15        A    I think it was 1999 or 2000.

16        Q    Okay.  Explain to me your involvement.

17        A    You mean from inception to --

18        Q    Just, you know, walk me through, you know, what

19   you did for the company, what roles you played for the

20   company.

21        A    Okay.  I will try to do that and try to be

22   complete.

23        Q    Yes.

24        A    It's a long period of time.

25             My father-in-law, Robert Linares, and I started

[8/27/2015] ADAMS_EDWARD_20150827

---

61

1    talking -- I think it was '98 or '99.  He had a previous

2    business that had been successful, and had developed a

3    process for growing gallium arsenide.  I think the company's

4    name was Spectrum Technology.

5              Gallium arsenide is a crystal that's in cell

6    phones.  He had sold that company, as I understand it, to a

7    large company.  And he, after that, had pursued the idea of

8    growing diamond and gallium nitride.  Gallium nitride is --

9    if any of this is too much, just tell me.  I am trying to

10   give you a perspective --

11        Q    I got you.

12        A    Gallium nitride, it's a crystal used in lighting,

13   like LED.  And my father-in-law also thought he could grow

14   diamond using a process called chemical vapor deposition.

15   Chemical vapor deposition is used to coat windshields if you

16   have a tinted windshield.  It's used to grow various forms

17   of crystal.  He has a Ph.D. in crystal growth.  That's his

18   degree -- one of his degrees.

19             And he said, I have had a breakthrough, literally

20   in my garage, and I can grow diamond using chemical vapor

21   deposition, which, as I understand it from the literature --

22   and I reviewed some of this long, long ago.  And I am not a

23   scientist.  But as I understand it, the literature for a

24   long period of time said that was not feasible; you couldn't

25   grow diamond using chemical vapor deposition.  Diamond had

[8/27/2015] ADAMS_EDWARD_20150827

---

62

1    been grown for years by man, produced by man for years.  All

2    of us have seen it, probably, in a diamond tool bit.  That's

3    diamond that's made using high pressure, high temperature.

4    That's a totally different technique.  It was developed in

5    the '50s, I think, by GE.

6         Q    I don't want to cut you off.  I understand the

7    background.  But why don't we get to the point where you

8    became involved in the company.

9         MR. KOPECKY:  He's got the chemical vapor part

10   down.

11        BY THE WITNESS:

12        A    I became involved because he thought he got to a

13   point where he could either sell the company or potentially

14   raise capital for it.  So I initially tried, with a

15   colleague of mine, to market the company for sale, and --

16        BY MR. WISNIEWSKI:

17        Q    Who is that colleague?

18        A    An individual named John Sabes.

19        Q    Can you spell that?

20        A    S-a-b-e-s.  And we weren't successful.  There were

21   parties that had an interest, but -- I don't remember why.

22   It didn't get any traction.

23             And then we started talking about raising capital

24   for the company and essentially building out a prototype

25   facility where diamond would be grown in a consistent way,

[8/27/2015] ADAMS_EDWARD_20150827

---

63

1    and then that would allow further commercialization of the

2    opportunity.  And there were discussions about the uses of

3    diamond in -- both in the industrial world, technology

4    world -- so, I guess, three prongs; technology, industrial,

5    gemstone.

6              So in 2000 -- and the dates are fuzzy because it's

7    a long time ago.  But in 2000 or 2001, I raised -- I was

8    affiliated with Equity Securities.  And I, along with some

9    other individuals at Equity, raised some money for Apollo.

10        Q    Okay.  And did you receive compensation from

11   Apollo Diamond -- did Equity Securities receive compensation

12   from Apollo Diamond for raising that money?

13        A    It did.

14        Q    So it was a broker-dealer?

15        A    It was.

16        Q    And did you talk to any investors -- reach out to

17   any investors about the opportunity to invest in Apollo

18   Diamond?

19        A    I did.

20        Q    And after performing those services for Equity

21   Securities, when did you actually become -- let me ask you

22   this:  Did you ever become an employee of Apollo Diamond?

23        A    So this is where we are going to need to talk

24   about definitions, because the "employee" definition, you

25   know, has different meanings, I think, depending on what

[8/27/2015] ADAMS_EDWARD_20150827

64

1  context.

2         I became general counsel for Apollo, and I think

3  that was in 2004 or so.

4      Q   So you were Apollo's general counsel?

5      A   For a period of time, yes.

6      Q   How about any other roles did you act on behalf of

7  the company?

8      A   We are talking about Apollo Diamond, not Gemstone?

9      Q   Apollo Diamond.

10     A   Okay.  So I believe later I became -- I think I

11 was general counsel, perhaps secretary, and executive vice

12 president, and then I think I later became briefly

13 president.  And I don't remember when, you know, the roles

14 changed and how.

15     Q   That's exactly what I was going to ask.

16        If you could just ball park, you know, to the

17 extent -- you said 2006 you became general counsel.  So --

18     A   No, 4.  2004.

19     Q   2004.  So were you secretary in 2004?

20     A   I don't remember.

21     Q   Okay.

22     A   I don't know if I was ever secretary or -- if I

23 was, it might have been for a brief -- I might have been

24 secretary for meetings, but not necessarily the corporate

25 secretary.  So in other words, I would take a note -- notes

---

65

1  at a meeting.

2      Q   Okay.  I will show you Commission Exhibit -- a

3  document marked as Commission Exhibit 33.

4             (SEC Exhibit No. 33 was marked for

5                identification.)

6      BY MR. WISNIEWSKI:

7      Q   So Commission Exhibit 33 is -- I will classify it

8  as a group exhibit that has various Form Ds that have been

9  filed by Apollo Diamond, Incorporated.

10        Mr. Adams, do you recognize these documents?

11     A   I mean, I recognize the Form D.  I don't recognize

12 this specific one.

13     Q   Okay.  And what I want to do is just walk through

14 some of these pages or some of these filings, because I want

15 to try to establish the time period in which you served as a

16 certain position or purported to serve in a certain

17 position.

18        So if you can look at the first page here, which

19 is the Form D that -- it looks like it was filed on

20 November 7, 2005.

21     A   Okay.

22     Q   If you turn to the last page -- it looks like it

23 was filed on September 15, 2004.  Sorry.

24        Do you see that?  It doesn't have page numbers.

25     A   I'm sorry, where are you asking me to look?  The

---

66

1  last page, did you say?

2      Q   So it's the last page of the first Form D.  And I

3  should have separated this out, but I was hoping to do it a

4  little bit quicker.

5         It was filed on 9/15/04, it looks like.

6      A   Yes.

7      Q   Okay.  And if you turn back a few pages to where

8  it identifies the executives or some employees of the

9  company.

10        MR. SIKORA:  What page are you on?

11        MR. WISNIEWSKI:  Page 3 of Exhibit 33.

12        BY MR. WISNIEWSKI:

13     Q   It says "Basic identification data."  And it lists

14 Robert Linares, Martha Linares, Bryant Linares, and Patrick

15 Doering.  Am I saying that right?

16     A   Yes.

17     Q   So you are not listed as an executive here.  So in

18 2004, were you -- were you an executive or a secretary of

19 Apollo Diamond?

20     A   I don't remember.

21     Q   Okay.

22     A   It's very possible that -- I don't remember.

23     Q   Okay.  And let's turn to the next -- still within

24 Exhibit 33 here.  It's a document -- it's a Form D that

25 looks like it was received by the SEC on October 26, 2006.

---

67

1      A   Okay.

2      Q   Do you see that document?

3      A   I do.

4      Q   It's Page 1 of 9.

5      A   Yes.

6      Q   And then if you turn to Page 6 of 9.

7      A   Okay.  Page 6.  Yes.

8      Q   Okay.  And at the bottom there, it says, "Federal

9  signature."  It says, "Name of signature, Edward S. Adams."

10 Is that you?

11     A   That's me.

12     Q   Is that your signature?

13     A   That is.

14     Q   And it says the title of the signer is secretary

15 of Apollo Diamond, Inc., and it's dated October 25, 2006.

16 Do you see that?

17     A   I see that.

18     Q   Okay.  So as of October 25, 2006, were you the

19 secretary of Apollo Diamond, Inc.?

20     A   I presume so.

21     Q   Okay.  And again, I am just trying to figure out

22 the timeline.  I am hoping this helps you a little bit, as

23 far as your memory goes.

24        And so if you turn to the next Form D, which was

25 received by the SEC on November 19, 2007.  Again, if you

DSM-000417

68

1   turn to the last -- Page 6 of 9, which is the last page of
2   this Exhibit 33, there is a signature on the last page.  And
3   let me know when you are there.
4       A   Okay.
5       Q   There is a signature on the last page there.  Is
6   that your signature again?
7       A   Yes.
8       Q   This document is dated November 13, 2007?
9       A   Yes.
10      Q   Okay.  So at least in November 2007, you were --
11  you are the secretary of Apollo Diamond.
12          Do you recall when you stopped being the secretary
13  of Apollo Diamond?
14      A   I don't.
15      Q   Okay.  So this doesn't in any way help you refresh
16  your recollection of when you served in what role or what
17  capacity?
18      A   Well, it suggests that I served as secretary in
19  these times.  I don't remember --
20      Q   Okay.
21      A   -- after that.
22      Q   So executive vice president?
23      A   I think I had that title; I just don't remember
24  when.
25      Q   And president.  Do you recall when you were the

[8/27/2015] ADAMS_EDWARD_20150827

69

1   president of Apollo Diamond?
2       A   I don't know for sure.
3       Q   Okay.  And as secretary, do you remember what your
4   compensation was?
5       A   Well, I think it was folded into my role as
6   general counsel/secretary.  I don't think there was specific
7   compensation for being secretary.
8       Q   What was your compensation for being the general
9   counsel?
10      A   I believe it was $7,500 a month.
11      Q   Okay.  And were you a shareholder of Apollo
12  Diamond?
13      A   Yes.
14      Q   When did you become a shareholder?
15      A   I would imagine in 2000, 2001.  I don't remember.
16          MR. SIKORA:  Kevin, to your earlier point, when
17  you asked about compensation, were you asking about cash
18  compensation or all forms of compensation?
19          MR. WISNIEWSKI:  What he considered compensation.
20  We can narrow it down.  We will narrow it down.
21          MR. SIKORA:  I want to make sure the Q and A is
22  clear about that.
23          MR. WISNIEWSKI:  So it's in the Q and A?
24          MR. SIKORA:  Your back and forth.  Your question
25  was about his compensation.  I want to make sure that you

[8/27/2015] ADAMS_EDWARD_20150827

70

1   guys are of like minds as to what you mean.
2           MR. KOPECKY:  But what Q and A you talking
3   about?
4           BY MR. WISNIEWSKI:
5       Q   Did you acquire additional shares over time when
6   you first became a shareholder?
7       A   Yes.
8       Q   Okay.  And you said you stopped being affiliated
9   or working for the company in or around 2011; February,
10  March 2011?
11      A   I resigned from my offices around then, is my
12  recollection.
13      Q   Okay.  So whatever offices you may have held at
14  Apollo Diamond, you resigned from those in February,
15  March 2011?
16      A   That's my recollection.
17      Q   Okay.  When you resigned your offices of Apollo
18  Diamond, do you recall how many shares of Apollo Diamond you
19  owned at that point?
20      A   I owned, I believe -- I want to say 60,000 shares
21  and millions of warrants.
22      Q   Okay.  And did you exercise any of those warrants?
23      A   I had the right to exercise them at a penny.  I
24  don't remember -- I don't remember my history of the
25  warrants, exercising them.

[8/27/2015] ADAMS_EDWARD_20150827

71

1       Q   Okay.  How about any members of your immediate
2   family; were they shareholders of Apollo Diamond?
3       A   My wife was.
4       Q   Okay.  And how many shares did she own as of
5   February, March 2011?
6       A   I believe around 230 some thousand.
7       Q   Okay.  So almost around 300,000 shares between the
8   two of you?
9       A   That sounds approximately right, of shares, and
10  then the right to acquire millions more.
11      Q   She had warrants as well?
12      A   She might have.  I don't know.
13      Q   Okay.  And how did you acquire those warrants?
14      A   As part of the compensation for doing work for the
15  company.
16      Q   I am going to hand you an exhibit that's been
17  previously marked as Commission Exhibit 22.  This is a
18  Form AK filed -- purports to be a Form AK filed by Scio
19  Diamond Technology Corporation.  The date of the report is
20  August 31, 2015.  But if you actually turn to the last page
21  of Exhibit 22, it's dated May 15, 2012.
22          And I am going to direct your attention -- have
23  you ever seen this document before, Mr. Adams?
24      A   Probably long ago.
25      Q   Okay.  I am going to direct your attention to

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000418

72

1   Page 2 of this document, of Exhibit 22, the last paragraph
2   there.  It starts with, "The company understands."
3            MR. SIKORA:  What page?
4            MR. WISNIEWSKI:  Page 2.
5            MR. SIKORA:  The last --
6            MR. WISNIEWSKI:  The paragraph that starts with --
7            BY MR. WISNIEWSKI:
8        Q   The paragraph that starts with, "The company
9   understands."  Do you see that?
10       A   I do.
11       Q   I want to turn to the second sentence.  It says,
12  "Edward S. Adams, the chairman of the company's board of
13  directors, served in various capacities at each ADI," which
14  is defined above as Apollo Diamond, Incorporated, "and
15  ADGC," which is defined above as Apollo Diamond Gemstone
16  Corporation, "through early 2011."
17           The next sentence says, "Mr. Adams and his spouse
18  own approximately two percent of the common stock of ADI and
19  11 percent of the common stock of ADGC (prior to the stock
20  repurchases by such company in 2011)."
21           So, you know, does two percent -- is that a
22  correct percentage?  Does that sound correct of the amount
23  of the percentage of equity ownership you had in Apollo
24  Diamond at the time you resigned your offices in February or
25  March 2011?

[8/27/2015] ADAMS_EDWARD_20150827

---

73

1        A   It's a percentage of the actual stock.  It
2   isn't -- doesn't include the warrants.  I was asked by the
3   lawyers my stock ownership when I prepared this.  And I told
4   them about warrants, I think, and they said, Well, we are
5   not using that to calculate this number.
6        Q   Okay.  So this is just the stock; ownership of
7   common stock?
8        A   Correct.
9        Q   Okay.  And two percent seems correct to you?
10       A   Well, I am not a securities lawyer for this.  I
11  don't know if you are supposed to include beneficial
12  ownership, which includes warrants.  If you did that, it
13  would be a much larger number, right?  They told me they had
14  it figured out and were handling it.
15           (Whereupon, Mr. Shank entered the
16                examination proceedings.)
17           BY MR. WISNIEWSKI:
18       Q   You are referring to who?  I'm sorry.
19       A   Whoever the law firm was at this time.
20       Q   Okay.  So two percent of the common stock of ADI.
21  Again, does that seem to represent or accurately represent
22  the percentage of common stock that you owned as of February
23  or March 2011?
24       A   Again, it doesn't represent what I had the right
25  to acquire.

[8/27/2015] ADAMS_EDWARD_20150827

---

74

1        Q   Right.  And I understand that you had some
2   warrants outstanding.  But as far as actually the shares
3   that you owned in February or March 2011, does the two
4   percent figure accurately reflect the percentage of your
5   equity interest in common stock of Apollo Diamond,
6   Incorporated?
7        A   As defined the stock owned at that exact moment
8   versus the right to acquire stock, it does.
9        Q   Okay.  And how about the second statement there,
10  the 11 percent of common stock of Apollo Diamond Gemstone
11  Corp?  Does that accurately represent the percentage of
12  common stock that you owned as of the time, February or
13  March 2011?
14       A   I would have to look at the records.
15       Q   Do you have any reason to believe that this is
16  untrue --
17       A   Not as I sit here, no.
18       Q   -- or inaccurate?
19       A   Again, this would have not included warrants that
20  I had the right to acquire stock of the company.
21       Q   And you said you worked with an attorney or you
22  spoke with an attorney prior to this being filed; is that
23  correct?
24           MR. SIKORA:  By the way, if that conversation is
25  privileged, we want to make sure -- there is no waiver in

[8/27/2015] ADAMS_EDWARD_20150827

---

75

1   place to allow him to discuss the content of that
2   communication.
3            BY MR. WISNIEWSKI:
4        Q   So my question was, you spoke to an attorney prior
5   to this being filed -- you spoke with an attorney prior to
6   this being filed about these numbers; is that correct?
7        A   I believe I did.
8        Q   Okay.
9        A   I want to be accurate.
10       Q   And this is accurate?
11       A   Again, it doesn't include my warrant ownership in
12  the company.
13       Q   Right.  So as far as it says the two percent of --
14  owned approximately two percent of common stock, my question
15  is, is that an accurate statement as of your ownership
16  interest of common stock?
17       A   I didn't do the calculation, so I don't know, you
18  know, what the numerator -- I have a sense of what the
19  numerator was; 300,000.  I don't remember the denominator.
20       Q   After this was filed, did you review this filing?
21       A   I don't remember.
22       Q   But it was important to you that this filing was
23  correct, right?
24       A   It was important to me that all filings that we
25  did were correct.

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000419

76

```
 1        Q    Okay.  So if this was incorrect, what would you
 2   have done?
 3        A    Probably called Mr. Nichols, the CFO.
 4        Q    And done what?
 5        A    And said, I notice there is an issue, if I had
 6   seen one.
 7        Q    And do you know if there was ever any correction
 8   filed by Scio Diamond Technology Corp regarding the
 9   percentage of common stock that you owned --
10        A    I don't know.
11        Q    -- as of early 2011?
12        A    I don't know that.
13        Q    You don't know that.  Okay.
14             Who were the other executives at Apollo Diamond?
15        A    Robert Linares, Bryant Linares, Patrick Doering,
16   Hans Ludi.  Those are some that I remember.
17        Q    And what were their roles?
18        A    Those roles, I don't remember exactly.  I mean,
19   they were the management of the executive officers of the
20   company.  I don't remember what their exact titles were
21   throughout that, you know, period, meaning from the
22   inception of the company until 2011.
23        Q    So other than you, Robert Linares, Bryant Linares,
24   Patrick Doering --
25        A    Doering.
```

[8/27/2015] ADAMS_EDWARD_20150827

---

77

```
 1        Q    -- and Hans Ludi, who else was employed by Apollo
 2   Diamond?
 3        A    There were probably two dozen employees who worked
 4   in engineering, production, maintenance of the machinery.
 5        Q    How about executives?  Were there any other
 6   executives of the company?
 7        A    It was Rachel Barenbaum, I believe her name was.
 8   She was a marketing person.  Bill -- I can't remember his
 9   last name.  There was an individual named Bill.  There were
10   some other people who might have been -- had title of vice
11   president.  I don't know.
12        Q    Okay.  Who was responsible for Apollo Diamond's
13   financials; the accounting, maintaining the records, the
14   financial records?
15        A    I think that changed over time.
16        Q    Okay.  Walk me through who was responsible, the
17   different people.
18        A    I know at one point Lisa Linares was.  That's the
19   only person that I remember.  I think it might have started
20   that it was Martha Linares, and then it became Lisa Linares.
21   I don't remember.
22        Q    Okay.  Did you have any role or responsibility for
23   Apollo Diamond's finances?
24        A    At some points I was involved or I was asked to be
25   involved.  I don't remember having a title as it related to
```

[8/27/2015] ADAMS_EDWARD_20150827

---

78

```
 1   that --
 2        Q    Okay.
 3        A    -- in Apollo Diamond, Inc.  I don't remember.
 4        Q    So when you say you were involved, how were you
 5   involved?
 6        A    Negotiating with vendors, paying bills sometimes,
 7   paying bills on behalf of advancing the company money,
 8   paying bills on behalf of the company to lawyers or
 9   something like that for IP work, helping with financing,
10   raising of capital.  That was -- I don't know if there is
11   anything else.
12        Q    How about the general ledger; did you make any
13   entries in the general ledger?
14        A    No.
15        Q    As an executive of Apollo Diamond, did you have
16   access to the general ledger?
17        A    Not that I recall.
18        Q    So you never reviewed the general ledger of Apollo
19   Diamond?
20        A    So when you say the "general ledger," I want to
21   make sure we are on the same -- like debits, credits, that
22   type of thing?  I don't remember that per se.  I don't
23   remember that.
24        Q    Who was in charge of the general ledger?
25        A    I think ultimately it would have been the
```

[8/27/2015] ADAMS_EDWARD_20150827

---

79

```
 1   chairman, Bob.  I mean, I know Lisa did a lot of that work,
 2   Lisa Linares.  I don't know.  I wasn't on the ground,
 3   physically there, asking that question, so I don't know.
 4        Q    Well, so that's -- so Apollo Diamond, where did it
 5   operate out of?
 6        A    Massachusetts.
 7        Q    You were -- during the time you were an executive
 8   there, you were in --
 9        A    Minnesota.
10        Q    -- Minnesota.
11             Did you ever live in Massachusetts during the time
12   Apollo Diamond was in business?
13        A    In the summer I spent some time with my in-laws
14   but, no, I didn't live there to work there.
15        Q    Okay.  So did you work remotely -- the work you
16   did for Apollo Diamond was remotely?
17        A    Yes.
18        Q    Did you have any occasion to review the general
19   ledger or the financial records of Apollo Diamond?
20        A    Financial records I would have reviewed in
21   connection when we were, as an example, working with
22   Deutsche Bank and Ambrian, which was a London-based
23   investment bank, to raise capital.  I would have reviewed --
24   I don't know if it would have been the general ledger.  I
25   don't remember that.
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000420

80

```
 1      Q    Okay.
 2      A    I would have reviewed, you know, the -- I would
 3  have reviewed, like, the top financial statements, the
 4  balance sheet, the income statement, that sort of thing.
 5      Q    How about --
 6      A    Worked on financial models for the company in
 7  terms of what a machine could produce in terms of carats, or
 8  something like that.
 9      Q    How about bank accounts?  Do you know where Apollo
10  Diamond banked at?
11      A    There was some in Minnesota with -- where I was
12  involved, and then I think the rest were in Massachusetts.
13      Q    How many total?
14      A    I have no idea.
15      Q    Okay.  The account in Minnesota, where was that
16  account held at?
17      A    I believe it was at Venture Bank.
18      Q    Okay.  And Venture Bank is a bank in Minneapolis,
19  or where is it located?
20      A    It's a suburb of Minneapolis.  They may have an
21  office in Minneapolis, though.
22      Q    Do you have any direct or indirect interest in
23  Venture Bank?
24      A    I don't.
25      Q    Have you ever been a board member of Venture Bank?
```

[8/27/2015] ADAMS_EDWARD_20150827

81

```
 1      A    No.
 2      Q    Okay.  Have you ever been an executive?
 3      A    No.
 4      Q    Have you ever done any consulting work for Venture
 5  Bank?
 6      A    No.
 7      Q    What was the Venture Bank account in Minneapolis
 8  used for?
 9      A    I don't remember specifically why we opened that
10  account, meaning the company.  I don't remember.  I think it
11  was to pay bills that were service provider bills in
12  Minneapolis principally.
13      Q    And what service provider bills did you have in
14  Minneapolis?
15      A    Law firms that were doing IP work in my law firm.
16      Q    So it was set up to pay law firms doing work for
17  the company in Minneapolis?
18      A    Well, I wouldn't say it was exclusively set up for
19  that.  I think it was also set up to pay consultants.  And I
20  don't remember why we set it up, other than I think we did
21  it because the company was continually strained in terms of
22  the number of people that could -- essentially from around
23  2009 onward, the company wasn't compensating people, so
24  there was a -- there was a need to divide responsibilities
25  among people to try to facilitate work.
```

[8/27/2015] ADAMS_EDWARD_20150827

82

```
 1      Q    Did you have access to that account at Venture
 2  Bank?
 3      A    Yes.
 4      Q    Who were the signatories on that account?
 5      A    I am not sure.
 6      Q    Were you a signatory?
 7      A    I believe I was, yes.
 8      Q    Were there any other employees of Apollo Diamond
 9  living in Minneapolis?
10      A    Mr. Monohan, I think, was -- again, "employee," we
11  should agree on what that means.  I don't think he was an
12  employee as we would -- say, paid a wage.
13      Q    What was Mr. Monohan's role?
14      A    I don't remember precisely.  But when I say
15  "employee," I think of an employee as someone who is paid a
16  wage.
17      Q    Did he get a W2?
18      A    I don't think so.
19      Q    Did you get a W2?
20      A    I don't remember getting one.
21      Q    Other than the Venture Bank account, where were
22  the other accounts that Apollo Diamond banked at?
23      A    I don't -- well, there were accounts in
24  Massachusetts.  Perhaps TD Bank.  I don't remember.
25      Q    Did you have access to those accounts?
```

[8/27/2015] ADAMS_EDWARD_20150827

83

```
 1      A    I don't remember.
 2      Q    Were you a signatory on those accounts?
 3      A    I don't believe so, but I don't remember.
 4      Q    You mentioned that your law firm did work for
 5  Apollo Diamond.  Is that correct?
 6      A    It is correct.
 7      Q    When did it start doing work for Apollo Diamond?
 8      A    I think 2004 or 5.
 9      Q    Okay.  And how long did that work continue until?
10      A    2013.
11      Q    Okay.  So '05 to '13, your law firm provided
12  services to Apollo Diamond?
13      A    That sounds right.
14      Q    And when I say "your law firm," I am referring to
15  Adams Monohan, LLP or Adams Grumbles.
16      A    Yes.
17      Q    Okay.  Could we just -- for ease of reference,
18  could we just -- Adams Monohan; is that okay?
19      A    Sure.
20      Q    Okay.  What type of work did Adams Monohan do for
21  Apollo Diamond?
22      A    Corporate and intellectual property work.
23      Q    Corporate work; what do you mean by that?
24      A    Contractual work, negotiating with potential
25  parties about doing a -- you know, a financing.  So we
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000421

84

```
1   negotiated and documented the Deutsche Bank engagement, met
2   with representatives who owned diamond companies, and
3   negotiated transactions -- potential transactions with them.
4          We developed an intellectual property strategy and
5   portfolio, and assisted with the filing of patents for the
6   company, and attempted to manage that.  We worked on private
7   placement memos for the company.  General corporate
8   housekeeping is what I would call it.
9      Q   And did Adams Monohan also serve as the general
10  counsel to Apollo Diamond?
11     A   Well, I don't know if you would formally say it
12  felt like that.  I think many people could describe the
13  relationship as akin to that in some ways.  I don't know
14  that we were ever formally general counsel to the company,
15  named somewhere, whatever that would be, hypothetically.
16  But we certainly did a lot of work that counsel do.  So I
17  think technically the answer is no.
18     Q   But you mentioned that you were general counsel.
19     A   I was.
20     Q   You were general counsel in your individual
21  capacity or in your capacity as an attorney at Adams
22  Monohan, LLP?
23     A   No, I was -- I am not sure -- I am not sure, okay,
24  in the sense that I was doing the work individually, but
25  then the moneys that I was paid we would deduct from the
```

85

```
1   legal bills that we would submit through Adams Monohan.  So,
2   in other words, it -- Apollo was getting a credit for the
3   work I was doing individually with respect to its bills at
4   Adams Monohan.
5      Q   Do you know how that credit was reflected in its
6   books?
7      A   I think it was reflected on the bill.  I don't
8   remember.
9      Q   So that would have been reflected on Adams
10  Monohan's bill?
11     A   Maybe, yeah, or it would have been agreed to some
12  way.  I don't know.  I don't remember.
13     Q   Is there some type of agreement or document, you
14  know, documenting, for lack of a better word, the agreement
15  that Apollo Diamond would credit work you performed in your
16  individual capacity against the bills invoiced by Adams
17  Monohan?
18     A   I think it's on some of the bills.
19     Q   Okay.  But there's no formal -- there's no, like,
20  written agreement, formal agreement?
21     A   I don't recall one, but I don't -- you know, if
22  you went back to 2005 or 6, there very well could have been.
23  I don't remember.
24     Q   And when you did your search of documents in
25  response to the subpoena, you didn't find any agreement?
```

86

```
1      A   No.
2      Q   Did you have a separate -- so I guess I just want
3   to understand the difference between the work you were doing
4   as general counsel individually and the work Adams Monohan
5   was providing the company with regard to that -- the
6   corporate work they were doing.
7      A   Okay.
8      Q   Explain to me the difference.
9      A   Well, Adams Monohan involved multiple people
10  besides me who were doing work.
11     Q   Okay.  So did everything you -- everything you did
12  in your individual capacity, did you bill Apollo Diamond
13  through Adams Monohan?
14     A   If it was legal work, I think that's what I would
15  have done.
16     Q   So in your capacity as general counsel for the
17  company, you would have billed the company through your law
18  firm, Adams Monohan?
19     A   Well, when you say "billed," I think I would have
20  recorded what I did.  Would I have sent them a bill?  I am a
21  little confused with the terminology.
22          So I would write down what my -- what I was doing.
23  That would be put into our -- you know, put into a bill.
24  Okay.  So I am lost.  I'm sorry.
25     Q   So you were employed by -- you were employed by
```

87

```
1   Apollo Diamond as a general counsel?
2      A   General counsel, secretary, executive vice
3   president.
4      Q   Separate and apart from the work your law firm
5   did?
6      A   Right, because that involved business and other
7   work as well as some legal work.
8      Q   So your law firm would bill Apollo Diamond for
9   services it performed?
10     A   Yes.
11     Q   It would invoice them monthly?
12     A   I think so.  Monthly or quarterly.
13     Q   And that monthly or -- invoice would include the
14  work that you performed in your role as Adams Monohan,
15  right?
16     A   Yes.
17     Q   Okay.  Would the invoice that Adams Monohan gave
18  to Apollo Diamond also include the work you were performing
19  in your individual capacity as general counsel?
20     A   No, I don't think it would.  I don't know.  I
21  mean, I don't remember us doing that formally.  You know, I
22  kept track of what I was doing.  And the general counsel
23  role really kind of morphed into more of an executive role
24  at the company versus a legal role.  So that's why I can't
25  talk to -- exactly to where, you know -- what the hours were
```

88

1   in one versus where it went into another, because I was
2   doing more corporate type of executive work versus legal
3   work.
4       Q   Let me ask you that.  How did you separate your
5   legal work from your executive work?
6       A   If it was a legal issue or involved what I
7   considered to be legal versus looking at a financial model,
8   potentially, from a -- you know, you can look at a financial
9   model from a legal perspective for sure, but you can also
10  look at a financial model, put your MBA hat on, and try to
11  understand the financial model and ask questions about the
12  assumptions, and that sort of thing.  So that would be an
13  example.
14      Q   How did you differentiate those two?
15          Because you billed for the legal work, right?
16      A   Yes, and --
17      Q   I am assuming you didn't bill --
18      A   I didn't --
19      Q   -- for the executive work.
20      A   Yeah, I didn't get paid for that because I was an
21  officer -- I got a salary, but it was never paid.
22          I don't know that I have clarity on how exactly
23  the question is, you know.  I didn't make a huge -- I didn't
24  spend time necessarily trying to distinguish between those
25  roles in a way where I had kept, you know, hourly records of

[8/27/2015] ADAMS_EDWARD_20150827

90

1       MR. SHANK:  Where did you draw the line between
2   what was legal work and what was non-legal work?
3       THE WITNESS:  My line was generally -- it was
4   something that someone with a law degree would need to
5   perform.
6       MR. SHANK:  As general counsel, wouldn't some of
7   your responsibilities include legal work for the company?
8       THE WITNESS:  Yes.
9       MR. SHANK:  So how did you determine what legal
10  work was the type of legal work you should be billing
11  through your law firm versus the legal work that's being
12  performed in your capacity as general counsel of the firm?
13      THE WITNESS:  That's why we had this system where
14  we were crediting the work so that, you know, if I was paid
15  a general counsel sum, that amount was credited to the law
16  firm bill so the company wasn't paying twice on that.
17      MR. SHANK:  So just the amount that was actually
18  paid is what you would credit as opposed to what was
19  accruing?
20      THE WITNESS:  Right.
21      MR. SHANK:  Was there difference between your
22  hourly rate that you would be billing through Adams Monohan
23  versus your implied hourly rate as general counsel?
24      THE WITNESS:  Not that I recall.
25      BY MR. WISNIEWSKI:

[8/27/2015] ADAMS_EDWARD_20150827

89

1   this I did as an executive, this I did as a lawyer.
2       Q   Why not?
3       A   It just never occurred to me that that was
4   required necessarily.  No one asked for it.  I certainly
5   don't think it would have been required in that context.
6       Q   You were paid a salary as an executive, right?
7       A   I was due a salary, and for many years I wasn't
8   paid it.
9       Q   But you were paid a salary -- a salary was
10  accrued, right, as your role as an executive?
11      A   Accrued, yeah.
12      Q   Okay.  And then your law firm also billed the
13  company for --
14      A   Correct.
15      Q   -- for services it performed?
16          So I guess what I am getting at is, how did you
17  make sure that you weren't billing the company for work you
18  were doing as an executive in your legal work?
19      A   Because it would have been corporate work that was
20  not legal.
21      Q   Right.  And how did you keep track of the
22  non-legal corporate work?
23      A   I kept track of the legal work.  So everything
24  else would fall within the rubric of non-legal work.
25      Q   Okay.

[8/27/2015] ADAMS_EDWARD_20150827

91

1       Q   How many clients did Adams Monohan have?  Let's
2   start in, like -- we will narrow it down.  Let's say 2009.
3   How many clients did it have in 2009?
4       A   I don't know.  Several dozen would be my guess.
5       Q   Was Apollo Diamond -- would you consider Apollo
6   Diamond a big client or a large part of your business?
7       A   We spent a large part of our time on Apollo
8   Diamond work.
9       Q   What percentage?  50 percent, more than
10  50 percent?
11      A   I bet it was more than 50 percent.
12      Q   75 percent?
13      A   That I don't know.
14      Q   Okay.
15      A   I don't think it would have been more than
16  75 percent.
17      Q   How many hours did you bill annually,
18  approximately, at Adams Monohan?  Again, we will start in
19  2009.  You know, approximately.
20      A   How many hours did I bill to who, Apollo Diamond
21  or generally?
22      Q   Generally.
23      A   I don't know.  I have to go back and look.
24      Q   You were a professor of law in Minnesota in 2009,
25  right?

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000423

92

1    A   Absolutely.

2    Q   Were you working for Oak Ridge Financial at that

3  time in 2009?

4    A   I don't think there was really an active Oak Ridge

5  in 2009.

6    Q   Okay.  How about Focus Capital?

7    A   Yes.

8    Q   Okay.  As far as your time spent, you know,

9  working in these various different ventures, what percent

10  was Adams Monohan?  Like, was over 50 percent of your

11  workweek devoted to work at Adams Monohan?

12    A   I would guess it would be 40 to 50 percent.  It's

13  a guess.  I don't remember.  It varied dramatically based on

14  week and --

15    Q   So what percentage of Adams Monohan's total annual

16  revenue was derived from Apollo Diamond?

17    A   I don't know.

18    Q   More than 50 percent?

19    A   I don't know.  I don't think so, necessarily.  I

20  don't know.  I think it depended on the year, probably.  I

21  don't know.

22    Q   Okay.  So as one of the co-owners of Adams

23  Monohan, LLP, you can't put a number on as far as about

24  what percentage of your total revenue is derived from Apollo

25  Diamond?

[8/27/2015]  ADAMS_EDWARD_20150827

---

93

1    A   I really can't.  I would have to go back and look

2  at the documents.

3    Q   Okay.

4    MR. SHANK:  What type of time commitment is the

5  professor position at University of Minnesota?

6    THE WITNESS:  You know, it's a varied one based on

7  week.  I teach and then -- I teach six to eight hours a

8  week, and then I write scholarship.  So it's a hard question

9  to -- there's some people that are there 20 hours.  There

10  are some people that are there 40, and there are some people

11  that are there five.  And it's all varied depending on the

12  week.

13    MR. SHANK:  Understanding that varies from week to

14  week, can you give me an average about how much time you

15  spend per week with your Minnesota law position?

16    THE WITNESS:  25 hours would be my guess.

17    BY MR. WISNIEWSKI:

18    Q   Mr. Adams, I am going to hand you a document

19  that's been marked as Exhibit 34.

20    (SEC Exhibit No. 34 was marked for

21    identification.)

22    BY MR. WISNIEWSKI:

23    Q   Mr. Adams, Exhibit 34 is a document that purports

24  to be an invoice dated January 2, 2009 from Adams Monohan,

25  LLP to Apollo Diamond, Inc. and Apollo Diamond Gemstone

[8/27/2015]  ADAMS_EDWARD_20150827

---

94

1  Corporation.

2    Do you recognize this document?

3    A   I do.

4    Q   Okay.  And what is it?

5    A   It's an invoice that we would have generated at

6  the end of the year for Apollo.

7    Q   And did you invoice Apollo -- when you say

8  "Apollo," you are referring to both Gemstone and --

9    A   I think in this case, yes.

10    Q   Okay.  And would you -- was it Adams Monohan's

11  practice to invoice them annually or would you invoice them

12  monthly?

13    A   I think we did both.  We would do monthly bills

14  and then we would summarize annually, I think, if I

15  remember.

16    Q   Okay.  And where on this invoice is the credit

17  that you referred to as far as the work you did on general

18  counsel?  Where is that reflected in this invoice?

19    A   I don't know that it is.  I don't see it here.  I

20  am sure we made some adjustment to it but -- I would

21  imagine.  I don't see it here.

22    Q   Would the adjustment be somewhere in this invoice?

23    A   I don't know.

24    Q   Do you want to take a second to review it?

25    A   Sure.

[8/27/2015]  ADAMS_EDWARD_20150827

---

95

1    I don't see it here.

2    Q   Do you think it's reflected in any other document?

3    A   I am sure -- I don't know.  I wasn't the -- I

4  wasn't our accounting person so --

5    Q   Okay.  And on Page 1 of Exhibit 34, it has 2008

6  fees for service, and it's $935,332.  Do you see that?

7    A   Uh-huh.

8    Q   And I think we spoke earlier this morning about

9  the annual revenue.  You estimated, kind of, the annual

10  revenue of Adams Monohan being, at the max, kind of, a

11  million dollars or so.

12    Would this -- do you recall whether the fees for

13  Apollo Diamond in 2008 -- approximately how much of the --

14  Adams Monohan's total revenue did this comprise?

15    A   Fee is different than revenue.  That's just what

16  we would have billed, but not collected.

17    Q   Okay.

18    A   So I would use the $330,000 number, I guess.

19    Q   Go ahead.  I'm sorry.

20    A   Half.  I don't know.

21    Q   How about fees; total amount of fees Adams Monohan

22  billed --

23    A   Again, I don't know.

24    Q   -- for 2008?

25    Approximately what percentage of the total amount

[8/27/2015]  ADAMS_EDWARD_20150827

96

```
1   of fees for service did Apollo Diamond -- did the work for
2   Apollo Diamond comprise for Adams Monohan, LLP?
3       A    We, unfortunately, have clients who don't pay us
4   in addition to Apollo, you know.  I don't know how much --
5   how many hours we, quote, unquote, "eat" or "ate" from the
6   various clients that we had.  We don't have the greatest
7   realization rate, or didn't.  So I don't know what that
8   number is.
9       Q    If you turn to the next page, Page 2 of
10  Exhibit 34, there's some time entries starting January
11  through March 2008.
12      A    Uh-huh.
13      Q    And there's various entries here.  There's a
14  column for time and then an attorney, and there is the
15  column that says ESA.  Is that you, Edward Scott Adams?
16      A    Yes.
17      Q    So this is the time entries that you had for 2008
18  for work performed for Apollo Diamond and Apollo Diamond
19  Gemstone; is that correct?
20      A    It appears to be, yes.
21      Q    So if we turn to Page 2, 3, 4 -- let me know when
22  you are at Page 4.  On the bottom there, it kind of totals
23  up the months for 2008, and there's a total hours and fees
24  for period, which is 2008, right?
25      A    Okay.
```

97

```
1       Q    And the total hours worked, it says -- that's the
2   period, I'm sorry.  I am looking at the yearly totals.  I'm
3   sorry.  There is a column that says "Yearly totals."  Do you
4   see that?
5       A    I do.
6       Q    And the amount of hours is 912 hours.  Do you see
7   that?
8       A    I do.
9       Q    So that's the number -- that represents the amount
10  of time or number of hours that you billed Apollo Diamond
11  and Apollo Diamond Gemstone for your work at Adams Monohan,
12  LLP?
13      A    Yes.
14      Q    Approximately how many hours do you bill annually
15  for Adams Monohan, LLP?
16      A    I might have billed that year 1400.  I don't know.
17  It's just conjecture.
18      Q    Okay.  On average.
19      A    Well, not many lately because I have been focused
20  on other businesses.  25 hours a week, maybe.  I don't know.
21  I don't remember.
22      Q    Is 900 hours a lot per year for you for one
23  client?
24      A    I did a lot of work.
25      Q    Is 912 hours a lot of work for you to have done
```

98

```
1   for one client?
2       A    Yeah.  I spent a lot of time on this client's
3   work.  Absolutely.
4       Q    Okay.  So you said 1400 hours.  Is that --
5       A    You know, I don't know.
6       Q    Okay.
7       A    I just -- I really couldn't tell you.
8       Q    Okay.  But for this year at least, for 2008, a
9   large part of your practice was devoted towards Apollo
10  Diamond and Apollo Diamond Gemstone?
11      A    That would make sense.
12      Q    Is that a fair statement?
13      A    Yes, I think it's a fair statement.
14      Q    I am going to hand you a document that's been
15  marked as Commission Exhibit 35.
16           (SEC Exhibit No. 35 was marked for
17           identification.)
18      BY MR. WISNIEWSKI:
19      Q    Mr. Adams, Document 35 or marked as Commission
20  Exhibit 35 purports to be an invoice dated January 4, 2010
21  from Adams Monohan, LLP to Apollo Diamond, Inc. and Apollo
22  Diamond Gemstone Corp.
23           Have you seen this document before?
24      A    I believe I have.
25      Q    What is it?
```

99

```
1       A    It's a summary of the year's billings.
2       Q    And again, it's kind of an annual invoice issued
3   to the companies?
4       A    Yes.
5       Q    Okay.  And on this document -- does this document
6   reflect the credit that was given for your work as general
7   counsel for Apollo Diamond?
8       A    I think the credits stopped at that point.  And
9   there was payments stopped in 2009 as general counsel.  So
10  it wouldn't reflect that.
11           MR. SHANK:  Did you review this invoice before it
12  went out the door?
13           THE WITNESS:  I don't remember.  It was awhile
14  ago.
15           MR. SHANK:  Who was responsible for putting
16  together these invoices?
17           THE WITNESS:  Michael, myself, our assistants.  I
18  don't remember.
19      BY MR. WISNIEWSKI:
20      Q    Was it your general practice to review invoices
21  before they were sent to a client?
22      A    Not particularly.
23      Q    Who was responsible for doing that?
24      A    I don't know that I would have someone who was
25  particularly responsible.  There would be someone who had
```

DSM-000425

100

1   compiled that information.  And we had various people at
2   various times who did that.
3       Q    So how would they determine whether the amounts
4   that were invoiced were actually true and correct?
5       A    I assume they would rely on documents we gave
6   them.
7       Q    What documents were those?
8       A    Like, a summary of our hours.
9       Q    Where did you keep those documents?
10      A    I am old fashioned, so I keep them on a notepad.
11      Q    Okay.  And you would write down on a notepad how
12  many hours you spent?
13      A    Yeah.  That's probably what I would do.
14      Q    And how did you compile those notepads?
15      A    When you say "compile the notepads," I would
16  probably just talk to whoever the person was who was working
17  on the bills -- might have been me, might have been Michael,
18  might have been someone else -- and say, Okay, here are my
19  hours.
20           In 2011 we formalized it by getting a system which
21  allowed us to keep track of our hours more readily;
22  software.  But we didn't have it back then.
23      Q    Okay.  So as far as the bills going out, you
24  didn't review the invoices before they were sent out?
25      A    No, I might have; I just don't remember this exact

[8/27/2015] ADAMS_EDWARD_20150827

101

1   invoice.
2       Q    Okay.  But your general practice.  Was it your
3   general practice to review invoices before they go to the
4   client?
5       A    I would review them on a cursory level.  I don't
6   remember looking exactly at every entry in this bill.
7       Q    I am going to hand you an exhibit that's been
8   marked as Commission Exhibit 36.
9            (SEC Exhibit No. 36 was marked for
10           identification.)
11  BY MR. WISNIEWSKI:
12      Q    Mr. Adams, Commission Exhibit 36 purports to be an
13  invoice dated January 3, 2011, from Adams Monohan, LLP to
14  Apollo Diamond, Inc. and Apollo Diamond Gemstone Corp.
15           Do you recognize this document?
16      A    I do.
17      Q    Okay.  And what is it?
18      A    It's an invoice that we provided -- Adams Monohan
19  provided to Apollo Diamond and Gemstone Corporation.
20      Q    Okay.  So looking down below at this invoice, on
21  Page 1 of Exhibit 36, it says -- I am looking at the second
22  paragraph -- "As detailed below, 1,041,946 remains due and
23  owing law firm as of December 31, 2010."  Do you see that?
24      A    Uh-huh.
25      Q    Okay.  And it seems like there is a carryover from

[8/27/2015] ADAMS_EDWARD_20150827

102

1   '09 -- 2009 of $981,847.
2       A    Yes.
3       Q    Okay.  And the 2010 fees were $734,415?
4       A    Yes.
5       Q    Okay.  That totals up to 1.7 -- approximately a
6   little over $1.7 million?
7       A    Okay.  Yes.
8       Q    Okay.  And then it says the payments to date for
9   2010 were $674,316.
10      A    Yes.
11      Q    Okay.  Do you know how -- let me ask you this:  As
12  far as Adams Monohan, LLP, how did you keep track of client
13  payments?
14      A    We had a bookkeeper that did that.
15      Q    Was that someone that was hired or --
16      A    Yes.  I don't know if she was an employee or a
17  consultant, or something.  I don't know how we actually paid
18  her.
19      Q    Okay.  As far as the Apollo Diamond side of this
20  equation goes, who would review the invoices that were sent
21  to them; the legal invoices that were sent to Apollo
22  Diamond?
23      A    I don't know.  Are you asking me who at Apollo
24  would review them?
25      Q    Yes.

[8/27/2015] ADAMS_EDWARD_20150827

103

1       A    We would direct them to Bob Linares.  I don't know
2   who would review them.
3       Q    Bob would review them?
4       A    I don't know.  I presume he did.  I don't know.
5       Q    So as general counsel of Apollo Diamond, you
6   didn't review the legal invoices?
7       A    No.
8       Q    That wasn't part of your role as a general
9   counsel?
10      A    I don't remember that, no.
11      Q    Okay.  Why would you designate it to Bob?
12      A    I would be reviewing my own invoice, so it would
13  make more sense that he would review them.
14      Q    And what was the approval process as far as what
15  Bob did to review them?
16      A    I don't know.
17      Q    And do you know from which account Apollo -- Adams
18  Monohan was paid out of?
19      A    I think it wholly depended on the year.
20      Q    Okay.  Generally?
21      A    I don't.
22      Q    Okay.  Was it that Venture Bank account in
23  Minneapolis?
24      A    Sometimes it was.
25      Q    Okay.  And you were the signatory on the Venture

[8/27/2015] ADAMS_EDWARD_20150827

104

1  Bank account?
2      A   I was.
3      Q   Okay.
4          MR. WISNIEWSKI:  Mr. Adams, I am going to hand you
5  a document that's been marked as Commission Exhibit 37.
6          (SEC Exhibit No. 37 was marked for
7              identification.)
8      BY MR. WISNIEWSKI:
9      Q   Commission Exhibit 37 purports to be some, again,
10 billing invoices, with the header Apollo Diamond and Apollo
11 Diamond Gemstone Corp.
12         Do you recognize this document, Mr. Adams?
13     A   Yes.
14     Q   What is it?
15     A   It's a summary that I believe I compiled of the
16 hours that were devoted to Apollo in 2011.
17     Q   Okay.  And so this is all the work that Adams
18 Monohan did for Apollo Diamond, Apollo Diamond Gemstone in
19 2011?
20     A   No.
21     Q   Okay.
22     A   No.
23     Q   What's missing off of here?
24     A   Well, at a certain point I certainly -- and I
25 think -- I believe Michael did -- we all stopped keeping

[8/27/2015]  ADAMS_EDWARD_20150827

---

105

1  track because we weren't going to be paid any more money.
2  So there was no point in continuing to keep track of what we
3  were, quote, "billing."
4          So, you know, JR stopped, it appears, in 2011.  I
5  stopped March of 2011.  Michael stopped April of 2011.
6  There were -- Chris Mumm, I guess, kept track, and I found
7  this and put it in here.  But I would have kept -- I would
8  have kept working.
9      Q   There's actually work done that you performed
10 that's not reflected in this invoice?
11     A   Yes.
12     Q   Okay.  On Page 1 of Exhibit 37, if you skip down
13 to the second entry, there is an entry for 1/31/2011 by, it
14 looks like, Monohan -- Mike Monohan.
15     A   Kevin, I'm sorry about this.  Where were you?
16     Q   So on the first page on Exhibit 37, which is Bates
17 numbered SEC-Adams 33909.
18     A   Uh-huh.
19     Q   There is -- the second entry, dated January 31,
20 2011.
21     A   Uh-huh.
22     Q   It says -- the next column is "Monohan," which I
23 am assuming is Michael Monohan.
24     A   Yes.
25     Q   It says, "Discussions with potential investors,

[8/27/2015]  ADAMS_EDWARD_20150827

---

106

1  including Howard University, N. Koppel, T. Howard, and
2  Stoning Group."  Do you see that?
3      A   I do.
4      Q   Then there is an entry for 17 hours.
5      A   Yes.
6      Q   Explain to me how that's 17 hours.  Is that one
7  day or is that a cumulative --
8      A   I think it's cumulative for the month, because
9  they are all dated the end of the month.
10     Q   Okay.
11     A   So we were just accumulating for the end of the
12 month, you know.  I never had a discussion -- the client
13 never said, I need to see hours by the day or the -- or
14 whatever, so we didn't do that.
15     Q   So they just totaled up at the end of the month --
16     A   Yes.
17     Q   -- what you did.  And that was --
18     A   Yes.
19     Q   -- the line item.  Okay.
20     A   I think it depended on the attorney, how they did
21 theirs.
22     Q   Mr. Adams, what sources of revenue did Apollo
23 Diamond have?
24     A   It sold diamond gemstones through a website.
25     Q   Okay.

[8/27/2015]  ADAMS_EDWARD_20150827

---

107

1      A   It might have sold diamond pieces through that
2  same website, so a piece that would be -- you and I wouldn't
3  recognize it as diamond.  It would just be, like, almost a
4  cutting blade-looking thing.
5      Q   Okay.
6      A   You know.
7      Q   Maybe I should have directed my question a little
8  bit better.  But what categories of revenue?  So sales,
9  product sales?
10     A   Yes.  Gemstone and technology, and there was
11 government contracts.
12     Q   Okay.  How about -- did it raise capital from
13 investors?
14     A   Yes.
15     Q   Okay.  Do you recall how many rounds or how many
16 offerings it raised money pursuant to?
17     A   I don't recall the exact number.
18     Q   Okay.  How about loans?
19     A   It received loans from Bob, Bryant, and myself.
20     Q   Okay.  So Robert Linares, Bryant Linares, and
21 yourself?
22     A   And me.  And it depends how you characterize a
23 loan.  If a law firm doesn't get paid for a long period of
24 time, that's technically, I guess, a loan because it's an
25 account payable.

[8/27/2015]  ADAMS_EDWARD_20150827

DSM-000427

108

1    Q   Okay. Did Apollo Diamond consider that a loan?

2    A   I don't know what they considered a loan. I would

3    consider it a loan because it would be, I would imagine, an

4    account payable on their financial statements, so that would

5    go under a liability.

6    Q   So as an executive and general counsel of Apollo

7    Diamond, do you know if Apollo Diamond categorized that as a

8    loan, the amounts due and payable to them, to Adams Monohan,

9    LLP?

10   A   I don't know that at all. I don't.

11   Q   How much money did you loan to Apollo Diamond?

12   A   I don't remember.

13   Q   Can you approximate?

14   A   Several hundred thousand dollars, probably.

15   Q   More than -- so more than a hundred?

16   A   Yes.

17   Q   Two?

18   A   Probably.

19   Q   Three?

20   A   Yeah. Let's go back and talk about what a loan

21   is. I probably advanced expenses which I did not get paid

22   for.

23   Q   What are advance expenses?

24   A   Go on a business trip, pay my own airfare.

25   Q   Okay.

[8/27/2015] ADAMS_EDWARD_20150827

---

110

1    a bunch of expenses. I am sure that that was true for my

2    father and brother-in-law and others.

3    MR. SHANK: Did you bill or submit expense reports

4    to the company for those expenses?

5    THE WITNESS: I definitely submitted expense

6    reports. I don't know that I did it for every expense.

7    Certainly when the company's financial situation became a

8    challenged one, there was really no point in doing that.

9    BY MR. WISNIEWSKI:

10   Q   The loans that you made to the company, how are

11   they documented?

12   A   Some set of them were documented in connection

13   with an entity that we formed called RBE. I think RBE

14   Investments. It stands for Robert, Bryant, Ed. Very

15   clever. And that entity loaned Apollo money, I believe it

16   was. Might have been Gemstone, too.

17   Q   So were all the loans you made to the company done

18   through RBE?

19   A   No.

20   Q   How about the ones that weren't done through RBE;

21   how were those documented?

22   A   There would have been an agreement and/or a check

23   or wire, something like that, you know, that wasn't

24   always -- I think my in-laws did some stuff where they

25   basically wrote it in. I probably did stuff like that too.

[8/27/2015] ADAMS_EDWARD_20150827

---

109

1    A   Take someone to lunch.

2    MR. SHANK: Did you deduct those expenses on your

3    tax return?

4    THE WITNESS: If I didn't get paid them, I

5    probably did. If I got paid them, I couldn't have. But I

6    am not a tax accountant, so I don't remember exactly that

7    stuff.

8    BY MR. WISNIEWSKI:

9    Q   I'm sorry, was that a yes or a no?

10   A   I don't remember. I wouldn't have deducted them,

11   I don't think, if -- how could I have if I had gotten

12   reimbursed the money?

13   Q   Okay.

14   A   But I am not an accountant who does this stuff.

15   MR. SHANK: I am trying to get a sense from your

16   perspective. Were you taking this as a business expense

17   that you just deduct personally, or did you also have a --

18   view yourself as having a payable from the company on it as

19   well.

20   THE WITNESS: I see what you are saying. At some

21   point I just -- I don't know the answer to the question,

22   because at some point I just said, Well, there's a lot of

23   expenses here that I am incurring that I am never going to

24   see, and it's just the reality of the situation. If I want

25   to keep trying to make this work, I am going to have to eat

[8/27/2015] ADAMS_EDWARD_20150827

---

111

1    I also, towards the end of the company's life -- and I am

2    going to define the end of its life, so that we are on the

3    same page, as 2011.

4    Q   Okay.

5    A   Okay. At that point, the company owed the

6    Commonwealth of Massachusetts a significant amount of money,

7    and it owed the landlord some money. The landlord had taken

8    possession of its property, and it moved it offsite to

9    another, I guess, facility the landlord owned. So I paid

10   those directly, my entities did, I think it was. I paid

11   those directly on behalf of Apollo.

12   So is that a loan? I would say that's a loan.

13   But I didn't loan the money to the company for the company

14   to pay, okay. So I just want to be clear on what I think of

15   as a loan versus --

16   Q   What company made that? Which one of your

17   companies made that payment?

18   A   I want to say the landlord one was ESA Consulting.

19   And I think the Commonwealth would have been either

20   me directly or through Linnise Development Corporation or

21   LDC, maybe.

22   Q   You talked about the RBE entity. So RBE made a

23   loan to Apollo Diamond?

24   A   Yes. I don't know -- so I want to be precise.

25   Did RBE make a loan? We put money into Apollo. Did we put

[8/27/2015] ADAMS_EDWARD_20150827

112

1  it in through RBE or did we put it in individually?  Like,
2  what was the trail of the money?  I don't remember.  The
3  intent was that RBE was the lender, okay.  So I don't know
4  if we took the additional step of I sent money to RBE; RBE
5  sent money to Apollo.  It might have just been I sent money
6  to Apollo.
7      Q   Okay.  And when was that?
8      A   2009 or '10.
9      Q   Okay.  And do you know how much it was for?  Do
10 you recall?
11     A   The money I sent?
12     Q   The money that was loaned to Apollo Diamond from
13 RBE.
14     A   I don't recall exactly.  5 or $600,000, probably.
15     Q   I will show you a document that's been -- I will
16 mark as Exhibit 38.
17             (SEC Exhibit No. 38 was marked for
18                 identification.)
19     MR. WISNIEWSKI:  We will go off the record at
20 11:40 a.m.
21             (Whereupon, a recess was had.)
22     MR. WISNIEWSKI:  Back on the record at 11:50.
23     BY MR. SHANK:
24     Q   Mr. Adams, other than hot dog recommendations, did
25 we have any discussions off the record?

[8/27/2015] ADAMS_EDWARD_20150827

113

1      A   No.
2      Q   And I believe I handed you before we went off the
3  record a document that is labeled as Commission Exhibit 38.
4  And Exhibit 38, which is Bates numbered
5  SEC-Adams-28048, is -- purports to be a demand promissory
6  note in the amount of $495,000 between RBE Gem Investments
7  and Apollo Diamond, Incorporated.
8      Mr. Adams, do you recognize this document?
9      A   I do.
10     Q   And what is it?
11     A   It's a demand promissory note from RBE to Apollo.
12     Q   Okay.  And the $495,000, does that reflect the
13 amount of money that was loaned by RBE to Apollo Diamond?
14     A   I don't remember.  I presume it was, or a greater
15 amount.  I don't remember.
16     Q   Okay.  So RBE may have loaned more than $495,000?
17     A   Well, again, I want to be precise because it might
18 have been the principals of RBE, the members, okay; us,
19 collectively.  So I don't know that the money went from RBE
20 to Apollo.  It might have gone from us to Apollo.  But if it
21 were us, meaning the members of RBE, I believe it was 495 or
22 more.
23     Q   Okay.  So whether it was RBE or the individual
24 members of RBE, when was the $495,000 paid or loaned to
25 Apollo Diamond?

[8/27/2015] ADAMS_EDWARD_20150827

114

1      A   I don't remember.  Probably in 2008 or 9, because
2  it's dated February 3, 2009.  I don't remember.
3      Q   So the amount loaned wouldn't have been
4  necessarily on February 3, 2009?
5      A   No.
6      Q   Okay.
7      A   It might have been loaned as a -- before or even
8  in an ongoing way, if it kept increasing.  I don't remember.
9      Q   Did RBE make any additional loans to Apollo
10 Diamond?
11     A   Again, I don't remember the exact dates and what
12 they were.  I know this would have memorialized the intent
13 of the RBE entity.
14     MR. SHANK:  When was RBE created?
15     THE WITNESS:  I would imagine in 2009.
16     MR. SHANK:  Around the time of this loan?
17     THE WITNESS:  Yes.
18     MR. SHANK:  Was it created for the purpose of
19 loaning this money to Apollo?
20     THE WITNESS:  Yes.
21     MR. SHANK:  Did the business have any other
22 purpose, other than to loan money to Apollo?
23     THE WITNESS:  I don't believe it did.  I don't
24 recall it doing anything else.
25     MR. SHANK:  What was the rationale behind creating

[8/27/2015] ADAMS_EDWARD_20150827

115

1  RBE as the lender to Apollo?
2      THE WITNESS:  I am a corporate lawyer, so I think
3  forming entities is a way to provide limited liability
4  protection.  That's probably the only thing I would have --
5  and then I think I came -- you know, I had formation
6  documents that accompanied it, and we filed the UCC-1, and
7  that sort of thing.
8      BY MR. WISNIEWSKI:
9      Q   Did RBE maintain a bank account?
10     A   I think it did.
11     Q   Where?
12     A   I don't remember.
13     Q   Do you have any records relating to where RBE
14 would have maintained a bank account?
15     A   I don't remember any off the top of my head.
16     Q   This $495,000 that's referenced in this promissory
17 note of Exhibit 38, if the amounts were transferred from the
18 individual members of RBE, that would have included you,
19 right?
20     A   Yes.
21     Q   Where would that money have come from, your
22 contribution or your loan?
23     A   Probably my checking account.
24     Q   And which checking account is that?
25     A   It's a Wells Fargo account.

[8/27/2015] ADAMS_EDWARD_20150827

116

1   Q   Any other account it could have possibly come out
2   of?
3   A   Savings.  I don't know.
4   Q   Okay.
5   A   Like I said, I don't remember.  Maybe we had an
6   RBE account, put the money in RBE, or maybe we sent it
7   directly.  And I don't know what my in-laws did, okay.  I
8   have no idea what they did.
9          MR. SHANK:  Was what your ownership interest in
10  RBE back when it was created?
11         THE WITNESS:  I think it was -- well, I presume --
12  it was three of us, or 100 divided by 3, so
13  33 percent.  That's my presumption.
14         MR. SHANK:  Did you contribute a third of all the
15  amounts lent by RBE to Apollo Diamond?
16         THE WITNESS:  Can be clear on this, just
17  because I don't want to misstate something?
18         I don't want to keep saying RBE lent; that we lent
19  collectively.  I don't know if I contributed a third.  I
20  might have contributed more or slightly less.  I don't
21  remember.
22         MR. SHANK:  Who was involved in the determination
23  of the terms of this promissory note?
24         THE WITNESS:  The three of us, I would imagine.
25         MR. SHANK:  Who are "the three of us"?

[8/27/2015] ADAMS_EDWARD_20150827

117

1          THE WITNESS:  I'm sorry.  Myself, Bob, and Bryant
2   Linares.
3          MR. SHANK:  Was anyone else involved?
4          THE WITNESS:  I don't recall.
5          MR. SHANK:  How did you determine to have a
6   10 percent interest rate on the promissory note?
7          THE WITNESS:  I don't remember.  I don't believe
8   it was ever paid.
9          BY MR. WISNIEWSKI:
10  Q   So whether it was one -- whether it was RBE or the
11  members of RBE, was the $495,000 -- was the sum of $495,000
12  transferred to Apollo or paid to Apollo at one point in
13  time, on one day?
14  A   I think it was on a rolling basis.
15  Q   Okay.  When did that start?
16  A   But can we go back just -- I don't know what my
17  in-laws paid when, okay.  I don't have any basis to know
18  that.  So I don't want to say that I can speak for when they
19  did it or how they did it.  I don't know.
20  Q   As far as your membership of RBE, how did you know
21  how much to pay to Scio -- to Apollo, sorry, without knowing
22  what the other two members of RBE were doing?
23  A   They probably told me, and I trusted what they
24  said.
25  Q   Okay.  And was that documented in any way?

[8/27/2015] ADAMS_EDWARD_20150827

118

1   A   I think there was a -- I would imagine we had an
2   agreement of capital contributions, or something.  I don't
3   remember.  I don't remember.
4   Q   Okay.
5          MR. SHANK:  Now, do you know the earliest period
6   at which RBE and Gem Investment lent or you guys personally
7   lent money to Apollo Diamond?
8          THE WITNESS:  I think the earliest period that we
9   would have lent money -- so when you say "you guys," I am
10  going to assume it's Bob, Bryant, and myself.
11         MR. SHANK:  Correct.
12         THE WITNESS:  Is that okay?
13         MR. SHANK:  Yes.
14         THE WITNESS:  2008, would be my guess.  But it's a
15  guess.
16         MR. SHANK:  So this promissory note would reflect
17  payments made in 2008 or 2009?
18         THE WITNESS:  Loans, 2008, 2009.  I don't think it
19  would have reflected anything after that.  In other words, I
20  didn't go back and amend it, or something.  If I did, I
21  couldn't find it, so I don't think there is such a thing
22  because I couldn't find it.
23         MR. SHANK:  And it didn't include any money that
24  might have been given in 2005, or something like that, to
25  Apollo Diamond?

[8/27/2015] ADAMS_EDWARD_20150827

119

1          THE WITNESS:  My in-laws -- let me be precise.  My
2   father and brother-in-law, Bob and Bryant, had lent Apollo
3   over a million dollars in, I want to say, 2002, 3, 1.  I
4   don't remember.
5          BY MR. WISNIEWSKI:
6   Q   How do you know that?
7   A   Financial statements.  I think they told me that.
8   Q   So when you reviewed the financial statements, you
9   saw a loan made by Bryant, Robert Linares --
10  A   Stockholders.
11  Q   Oh, stockholders?
12  A   I think it said "loan from stockholders."
13  Q   So "stockholders loan" was a category of
14  liabilities they had on the financial statements?
15  A   Right.
16         MR. SHANK:  This promissory note, was that
17  intended to include the moneys that your in-laws lent back
18  in 2003 or 2004 time period?
19         THE WITNESS:  I don't believe so, because it
20  wasn't for $1,495,000.  And I don't know why.  I don't
21  remember that.
22         BY MR. WISNIEWSKI:
23  Q   So this is new money coming in?
24  A   Yes.
25  Q   Coming into Apollo Diamond?

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000430

120

```
1        A    Yes.
2        Q    Mr. Adams, I am going to hand you an exhibit
3   that's been marked as -- a document that's been marked as
4   Commission Exhibit 39.
5                 (SEC Exhibit No. 39 was marked for
6                      identification.)
7        BY MR. WISNIEWSKI:
8        Q    Mr. Adams, Exhibit 39 is a document that's Bates
9   numbered SEC-Scio 19842.  And the top of it, it says
10  "Document placeholder" with a file name Generalledger.xls.
11  Do you see that?
12       A    Okay.
13       Q    Do you see that?
14       A    Yes.
15       Q    Okay.  This is a file -- do you know what .XLS
16  means?
17       A    No.
18       Q    It's an Excel file that was produced by Scio
19  Diamond.  And basically what follows is a 1 through --
20  207-page native file that is essentially the Excel
21  spreadsheet produced or represented by the file name here.
22  Does that make sense?  Are we understanding each other?
23       A    Not particularly.  I'm sorry.
24       Q    So when the document was produced to the SEC, they
25  put a document placeholder, right?
```

[8/27/2015] ADAMS_EDWARD_20150827

121

```
1        A    Okay.
2        Q    And then they also produced -- Scio also produced
3   a native file, which is the Excel file.
4        A    Okay.
5        Q    And the 207 pages that follow the top page,
6   SEC-Scio 19842, is the actual file that was produced as
7   SEC-Scio 19842.
8        A    Okay.
9        Q    Okay.  Looking at the Excel file, do you recognize
10  this at all?
11       A    No.
12       Q    Do you know what this is?
13       A    No idea.
14       Q    Have you ever reviewed the general ledger of
15  Apollo Diamond or Apollo Diamond Gemstone before?
16       A    Not that I recall.  I think I said that.
17       Q    Okay.  This -- the file name is General Ledger
18  XLS.  And it appears that it relates to the liabilities and
19  expenses and assets of Apollo Diamond and Apollo Diamond
20  Gemstone.  But you have never seen this document before,
21  right?
22       A    No.
23       Q    Okay.  Can you turn to Page 105.
24            MR. SIKORA:  Can you say that again?
25            MR. WISNIEWSKI:  105.
```

[8/27/2015] ADAMS_EDWARD_20150827

122

```
1        BY MR. WISNIEWSKI:
2        Q    Let me know when you are there.
3        A    Okay.  I am here.
4        Q    Do you see the category in the middle of the page?
5   It's Liabilities, and then it has a number 248000, and it
6   says "Loans from stockholders."  Do you see that?
7        A    Uh-huh.
8        Q    Is that the similar kind of entry or liability
9   entry that you reviewed on the financial statements of
10  Apollo Diamond that you referred to earlier in your
11  testimony?
12       A    No, I don't think so.
13       Q    Okay.  So you referenced that you reviewed on
14  Apollo's ledger, right, or the financial statement a
15  liability categorized as "loans from stockholders"?
16       A    I reviewed -- I represented that I thought I saw
17  on a financial statement dating back to 2002 or 3 a
18  financial statement, not a ledger, a category that said
19  "loans from stockholders."
20       Q    Okay.  And if we go down and start looking at some
21  of the entries here, under the header Loans From
22  Stockholders, there's something called BRL Loan.  Do you see
23  that on 12/12/08?
24       A    Uh-huh.
25       Q    What does BRL mean?
```

[8/27/2015] ADAMS_EDWARD_20150827

123

```
1        A    I didn't enter this, but those are the initials of
2   my brother-in-law.
3        Q    How about the one below that, RCL Loan?
4        A    I am going to presume those are the initials of my
5   father-in-law.
6        Q    And the one -- two below that, ESA Loan?
7        A    Those are the initials of myself.
8        Q    Okay.  If you could, take a look at Page 105 and
9   106, and look at the ESA loans.  Let me know how many you
10  find there.
11       A    Looks like -- looks like four.
12       Q    Okay.  So the first one looks like it's on
13  12/3/09 -- I'm sorry, 2/3/09, for $50,000.
14       A    Okay.
15       Q    Do you recall making a $50,000 loan to Apollo --
16       A    I don't.
17       Q    You don't.  Okay.
18            You don't know if that loan is documented in any
19  way?
20       A    Oh, can I look at what I was looking at a moment
21  ago?
22       Q    Yes.  I think it's right here.
23       A    Did I bury it?  Oh, thanks.
24            Okay.  Well, that's dated 2/3, so I am guessing
25  that refers to this, but I don't know, you know.  I presume
```

[8/27/2015] ADAMS_EDWARD_20150827

124

1  it does.  I didn't do this, so I don't know the mindset of
2  the person who did this.
3      Q   Sure.
4      A   But I would guess that's part of this.
5      Q   So you think that's part of the loan made by RBE
6  to Apollo Diamond?
7      A   I would think so.
8      Q   Okay.  And the next one that I see from ESA is
9  3/13/09.  Do you see that one?  It says "Wire Dep from ESA."
10     A   Yes.
11     Q   For $50,000.
12     A   Yes.
13     Q   Do you have any recollection of loaning $50,000 to
14 Apollo Diamond?
15     A   No.
16     Q   Do you think that's part of the RBE loan?
17     A   I presume it would have been.
18     Q   Okay.  And why do you presume that?
19     A   Because it was around the same time frame.
20     Q   Okay.  So around the same time frame.  And if you
21 go a column over to the right, there is a $495,000 balance
22 there.
23     Q   Okay.
24     Q   So it seems to add up there, right?
25     A   Sounds right.  Yes.

[8/27/2015] ADAMS_EDWARD_20150827

---

125

1      Q   I don't see any reference to ESA on the rest of
2  this page.  But if you turn to 106, there seems to be
3  another loan on 6/29/2009 of $8600.  Do you see that?
4      A   Uh-huh.
5      Q   Do you recall making an $8600 loan to Apollo
6  Diamond?
7      A   I don't.
8      Q   Do you have any reason to believe it's part of
9  this RBE loan?
10     A   I presume it is.
11     Q   Okay.  How about the entry below that on 7/15/09?
12 It says Loans from RCL, ESA and BRL for $13,380.  Do you
13 recall making a loan in that amount to Apollo Diamond
14 Gemstone?
15     A   No, not particularly.
16     Q   Okay.  So you don't have any basis to know if
17 that's correct?
18     A   I made loans.  I made them, I believe, around this
19 time.
20     Q   Okay.
21     A   I don't recall the specifics of when they were
22 made and how much.
23     Q   How did you document your loans to Apollo Diamond
24 and Apollo Diamond Gemstone?
25     A   Well, this would have been part of it.

[8/27/2015] ADAMS_EDWARD_20150827

---

126

1      Q   Okay.
2      A   It might have been just a handwritten thing on
3  occasion, or something that was typed up on occasion.  I
4  can't imagine any other way to do it.
5      Q   So in your review of the files when you are
6  looking for documents in response to the subpoenas that were
7  issued to you, did you come across any other documents
8  evidencing any type of loan you made to either Apollo
9  Diamond or Apollo Diamond Gemstone, other than this
10 promissory note that's been marked as Exhibit 38?
11     A   I think I provided some documents about ESA and
12 those loans we talked about in 2011.
13     Q   Okay.
14     A   So that was -- I think I just paid those and then,
15 you know -- through some agreement with Bob orally.  That
16 was it.  I know there was -- I think there was a loan made
17 for $95,000 in 2008.  I thought I had that document and
18 provided that.  I don't remember.
19     Q   Let me ask you this:  Looking at these records and
20 these entries in what purports to be the general ledger of
21 Apollo Diamond and Apollo Diamond Gemstone, does this
22 refresh your recollection at all of whether RBE as an entity
23 made the loan to Apollo Diamond or whether the individual
24 members of RBE made a $495,000 loan to Apollo Diamond in and
25 around 2000 -- February 2009?

[8/27/2015] ADAMS_EDWARD_20150827

---

127

1      A   I don't remember, and I don't know why -- I don't
2  know -- because I don't know the rationale of the party
3  behind this, I don't know -- no, it doesn't.
4      Q   Okay.  So you don't know if -- RBE may have still
5  made that loan itself?  These records don't refresh your
6  recollection?
7      A   Possible, yeah.
8      Q   Okay.
9      MR. SHANK:  Did you make any loans to Apollo
10 Diamond or Apollo Diamond Gemstone prior to 2009?
11     THE WITNESS:  I think I made at least one in 2008;
12 perhaps more.  But I think I made a $95,000 loan in 2008.
13     MR. SHANK:  Anything besides that?
14     THE WITNESS:  I don't remember.  I mean, there was
15 a lot going on in the company.  When it required capital, we
16 would loan it money, so I don't remember, Mr. Shank.  I
17 really don't.
18     MR. SHANK:  When did you start earning a salary
19 from Apollo Diamond or Apollo Diamond Gemstone?  I say
20 "earning"; not necessarily having been paid.
21     THE WITNESS:  I will modify it to say
22 "compensation," if that's okay.
23     MR. SHANK:  That's fine.
24     THE WITNESS:  Because a salary implies W2 income.
25 That would have been in -- I guess it was 2004, I think.

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000432

128

1      MR. SHANK:  Were you ever paid for your
2  compensation that you were earning?
3      THE WITNESS:  Yes.
4      MR. SHANK:  During what period?
5      THE WITNESS:  I believe it was through 2008, early
6  2009.
7      MR. SHANK:  Early 2009 is the point when you
8  stopped being paid?
9      THE WITNESS:  Yes.  So there were -- that's my
10 recollection.
11     BY MR. WISNIEWSKI:
12     Q    Mr. Adams, I am going to hand you a document
13 that's been marked as Commission Exhibit 40.
14          (SEC Exhibit No. 40 was marked for
15          identification.)
16     BY MR. WISNIEWSKI:
17     Q    Mr. Adams, Commission Exhibit 40 is a document
18 that's Bates numbered SEC-LinaresR-P-911, which purports to
19 be an agreement between Apollo Diamond, Inc. and Edward S.
20 Adams.  It's undated.
21          Do you recognize this document?
22     A    Yes.
23     Q    And what is it?
24     A    It's an agreement by and between Apollo and Edward
25 S. Adams.

[8/27/2015] ADAMS_EDWARD_20150827

129

1      Q    What's it an agreement for?
2      A    To essentially advance -- have the corporation
3  advance me moneys that were owed to Bob and Bryant.
4      Q    How much money?
5      A    $400,000.
6      Q    And when was this agreement reached?
7      A    I don't know why it isn't dated.  2011.
8      Q    Do you know when?
9      A    I don't.
10     Q    Was it before or after the March 2011 date that we
11 said the company kind of terminated?
12     A    Well, so the company -- can I correct something?
13 Because I don't want to say the company terminated in
14 March 2011.  There was a shareholder meeting in 2011, and
15 the assets were sold in 2011, August.  I am going to imagine
16 it was reached after August.
17     Q    Okay.  So after August 2011, this is -- okay.
18     A    That would be my guess.
19     Q    And this $400,000, did this in any way relate to
20 the loan made by RBE to Apollo Diamond?
21     A    I think it related to that potentially, and also
22 other moneys that were owed to Bob and Bryant.  There was
23 hundreds of thousands, if not millions of dollars at that
24 point that were owed to them.
25     Q    How do you know there were hundreds of thousands,

[8/27/2015] ADAMS_EDWARD_20150827

130

1  if not millions owed to them?
2      A    Because they told me that.
3      Q    And how much are we talking?
4      A    I am only going to tell you what I know because I
5  can't tell you --
6      Q    Sure.
7      A    So what I understand is that they were not -- they
8  were not receiving a salary for years, okay, beginning in
9  2009 or 8.  I am not sure.  They obviously loaned the
10 company money.  I think this shows that.  When I say
11 "this," whatever your exhibit is here.  I know they incurred
12 expenses, they told me, of hundreds of thousands of dollars,
13 which is totally consistent with what I saw in terms of
14 travel and that sort of thing.  That's why I say -- I mean,
15 I add up the numbers, and I know what their salaries were
16 under their agreements.  They were owed millions of dollars.
17     Q    Did you do anything to ensure that the company
18 actually owed Robert Linares and Bryant Linares $400,000 at
19 the time this agreement was executed?
20     A    I had seen their employment agreements.  They had
21 told me they hadn't been paid.  I had no reason to believe
22 they could have been paid.  I was confident that that was
23 dramatically less than they were, in fact, owed.
24     Q    This was a conversation you had with --
25     A    Yes.

[8/27/2015] ADAMS_EDWARD_20150827

131

1      Q    -- Bryant Linares or Robert Linares?
2      A    Robert, I believe.
3      Q    Okay.  So you had a conversation with Robert
4  Linares about the $400,000 that was owed to them by Apollo
5  Diamond?
6      A    I had a conversation about moneys owed to them by
7  Apollo Diamond.  At some point, I think he even sent me a
8  bunch of bills that he had paid.  I can see them.  I just
9  don't know where they went.  But I remember seeing them, and
10 putting them on my desk.
11     Q    So other than that conversation, what did you do
12 independent of that conversation to ensure that the company
13 actually owed Bryant Linares and Robert Linares $400,000?
14     A    I didn't feel I needed to do anything more, given
15 what I knew about the company and the integrity of the
16 people involved.
17     Q    Were you paid this $400,000?
18     A    Yes.
19     Q    When were you paid?
20     A    You know what, I want to step back.  I think I was
21 paid that $400,000.  I don't remember.  But if I would have
22 been, it would have been 2011 or '12.
23     Q    So you don't remember being paid $400,000 from
24 Apollo Diamond?
25     A    I don't remember the exact date of it.

[8/27/2015] ADAMS_EDWARD_20150827

132

1    Q    Do you remember being paid the $400,000 by Apollo
2  Diamond?
3    A    I remember being paid money by Apollo Diamond
4  around 2011 or 2012.  I don't remember the exact amounts.
5    Q    Do you remember being paid the amount documented
6  here of $400,000 by Apollo Diamond?
7    A    I was paid hundreds of thousands of dollars by
8  Apollo Diamond, if I remember correctly.  I don't remember
9  that exact amount.
10   Q    Do you know if it was in satisfaction of this
11 agreement?
12   A    That would have made sense, but I don't remember
13 exactly.
14   Q    I will hand you an exhibit -- or a document that's
15 been marked as Commission Exhibit 41.
16             (SEC Exhibit No. 41 was marked for
17             identification.)
18  BY MR. WISNIEWSKI:
19   Q    Exhibit 41 is a document that's Bates numbered SEC
20 Linares R-P-912.  And it purports to be a promissory note
21 for $400,000 that again is undated.
22        Mr. Adams, do you recognize this document?
23   A    It's a promissory note I apparently signed, yes.
24   Q    And what is it?
25   A    A promissory note for $400,000 that I signed.

[8/27/2015] ADAMS_EDWARD_20150827

133

1    Q    What does the agreement do and what is the
2  promise?
3    A    To pay to Robert and Bryant $200,000 each on or
4  before March 31, 2020.
5    Q    When was this executed?
6    A    I don't know.
7    Q    Okay.  Was it executed in or around the same time
8  as the agreement between you and Apollo Diamond for the
9  $400,000 -- for Apollo to pay you $400,000?
10   A    I would imagine it was.
11   Q    Have you paid any money to Bryant Linares or
12 Robert Linares under this promissory note?
13   A    Yes.
14   Q    How much have you paid?
15   A    I think I paid 79,000 or $80,000 to Bob.  I also
16 gave him -- or transferred to him stock in Scio that I
17 owned.  And then I transferred stock to Bryant that I owned.
18 I don't remember if I paid Bryant 79,000 or $80,000.  I knew
19 it was a weird number because there was some complicated way
20 we figured out what 200,000 was based on the stock price.
21   Q    So Scio stock to both Bryant and Robert Linares?
22   A    Yes.
23   Q    When did you make that transfer?
24   A    A year ago.  I don't remember.
25   Q    How many shares were transferred?

[8/27/2015] ADAMS_EDWARD_20150827

134

1    A    I would have to go back and look at my filing.  I
2  don't remember.
3    Q    And how did you value those shares?
4    A    I don't remember.
5    Q    So you don't remember making -- you don't remember
6  when or how the shares were transferred --
7    A    No, I think -- I'm sorry.
8    Q    -- in satisfaction of this promissory note?
9    A    No, I think it was about a year ago that -- I
10 think I stated that.
11   Q    So 2014?
12   A    Right.
13   Q    Okay.
14   A    I think.  But I don't remember the calculation
15 that we engaged in to figure out what was owed and what was
16 being transferred.
17   Q    And how was the transfer documented?  Is there an
18 agreement?  Is there a share transfer agreement?
19   A    I sent a check to Bob, I think, and Bryant.
20   Q    The shares were in your name?
21   A    Yes.
22   Q    And how did you transfer them over to Robert and
23 Bob?
24   A    I think through a transfer agent.
25   Q    So there is a record of a transfer agent making

[8/27/2015] ADAMS_EDWARD_20150827

135

1  that exchange or transfer?
2    A    I assume they have that.  Sure.
3    Q    Okay.  Why did you enter into the agreement with
4  Apollo?
5    A    I had a business idea that I wanted to pursue, and
6  I asked them if it was all right -- if I could borrow the
7  money, essentially, from Apollo -- from them through Apollo.
8    Q    What was the business idea?
9    A    Frozen yogurt.
10   Q    Was it a company?
11   A    It was an investment in a company, and then it was
12 a standalone company.
13   Q    And did you use the money that you obtained from
14 Apollo --
15   A    Not -- I don't know that I used that exact money,
16 but that was the impetus for the idea.  And then I said I
17 would pay them back as soon as I could.
18   MR. SHANK:  What's the name of the company, the
19 standalone company?
20   THE WITNESS:  DEB Holdings, D-E-B Holdings.  And
21 then there was another investment I made in a company called
22 Yogurt Lab.  But I don't remember if that was this or I had
23 another idea.  Because I have been involved in a variety of
24 private businesses, and I don't remember what the impetus
25 was for this loan.

[8/27/2015] ADAMS_EDWARD_20150827

136

```
1        MR. SHANK:  In the 2011 time period, was Apollo
2   Diamond indebted to you personally?
3        THE WITNESS:  For millions of dollars in salary
4   and money that I was owed, yes.
5        MR. SHANK:  So why is this done in a way where
6   Apollo Diamond is giving you money in exchange for you
7   giving the Linareses a promissory note?
8        THE WITNESS:  Because they were the ones that were
9   owed this money, because they had been owed money by the
10  company, and there was really -- if this occurred when I
11  think it did, the company really didn't have any
12  shareholders left except the Linareses, or very few others.
13  I don't even know if there were any others.
14       So this would have been post August, I would
15  imagine.  It's a guess.  And so at that point, they were
16  owed a bunch of money for all the things they had put into
17  the company as well as their salaries.  So, you know, that's
18  how we documented it.
19       MR. SHANK:  But you continued to be a creditor of
20  Apollo Diamond yourself, even after taking this effective
21  loan from the Linareses?
22       THE WITNESS:  Yes.  I was a big creditor of
23  Apollo.
24       BY MR. WISNIEWSKI:
25  Q    What's ADR Investments, LLC?
```

[8/27/2015] ADAMS_EDWARD_20150827

137

```
1   A    An entity formed for which money was raised for
2   Apollo.
3   Q    Did you have an ownership interest in ADR
4   Investments?
5   A    I believe I did.
6   Q    Okay.  And what was that ownership interest?
7   A    I don't recall.
8   Q    Were there any other members of the LLC?
9   A    I don't recall.
10  Q    And what was the nature of the relationship
11  between ADR Investments and Apollo Diamond?
12  A    If I remember correctly, Bob, Bryant and I had
13  warrants in Apollo which we contributed to ADR so that money
14  could be raised through the sale of those to capitalize
15  Apollo in a way that was non-dilutive to Apollo or its
16  shareholders.
17  Q    So explain that again.  Apollo transferred the
18  warrants to ADR Investments?
19  A    No.  I am trying to think.
20       Do you have a time frame or any --
21  Q    2009.
22  A    Yeah, I don't remember exactly the mechanics of
23  all that.
24  Q    What did ADR do again?
25  A    My recollection was that we didn't want to
```

[8/27/2015] ADAMS_EDWARD_20150827

138

```
1   dilute -- we, Bob, Bryant and me, did not want to dilute the
2   shareholders of Apollo, so we essentially gave ADR our
3   warrants to invest from the sale that if ADR sold its
4   interest, that money would be reinvested largely in Apollo.
5   I don't remember, to be honest, because it was a long time
6   ago.  So I don't remember the exact specifics of the
7   transaction.
8   Q    So did ADR Investments raise money for Apollo?
9   A    I don't think that that's how you could
10  characterize it.
11  Q    Okay.  How am I mischaracterizing it?
12  A    Well, it wasn't a brokerage firm or anything like
13  that.
14  Q    So it wasn't a registered broker-dealer?
15  A    No.
16  Q    Did ADR transfer money to Apollo?
17  A    I think it did, yes.
18  Q    Why?
19  A    To maintain the viability of Apollo, I presume,
20  for operating and expenses.
21  Q    Okay.  Where did ADR Investments obtain its
22  capital to transfer to Apollo?
23  A    Warrants or shares that Bob, Bryant or I gave ADR
24  so that the shareholders of Apollo would not be diluted by
25  the additional raising of capital.
```

[8/27/2015] ADAMS_EDWARD_20150827

139

```
1   Q    So did ADR sell the shares?
2   A    I think so.
3   Q    Okay.  And who did it sell them to?
4   A    I don't remember.
5   Q    Okay.  Who else worked at ADR?
6   A    I don't know that there was anyone else that
7   worked at ADR.
8   Q    Other than you?
9   A    I don't know that I worked at ADR.  I don't know
10  in that context what "work" would have meant.
11  Q    You told me that -- you explained that ADR sold
12  warrants, Apollo warrants, to individuals or entities,
13  right?
14  A    This is what I remember -- I think is what
15  happened, so yes.
16  Q    Okay.  So who facilitated those transactions?
17       MR. SHANK:  On behalf of ADR?
18       BY THE WITNESS:
19  A    I don't remember.
20       BY MR. WISNIEWSKI:
21  Q    So you don't recall any of the transactions that
22  ADR was involved in, as far as a sale of a warrant?
23  A    I don't recall the specifics of those, no.
24  Q    How about generally?
25  A    I have told you what I recall generally.
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000435

140

1    Q    How much money did ADR raise with the sale of the
2   warrants?
3    A    I don't remember.
4    Q    50,000?
5    A    I don't remember.
6    Q    A hundred thousand?
7    A    I think it's greater than a hundred thousand.
8    Q    200?
9    A    I don't remember.
10   Q    And what was the agreement between ADR and ADI --
11  or Apollo Diamond?  Sorry.
12   A    I think the agreement was that the money raised
13  would -- some portion of it would go to pay Apollo's --
14  would be reinvested in Apollo or invested in Apollo.
15   Q    Was there a written agreement between ADR
16  Investments and Apollo Diamond?
17   A    I don't recall one.
18   Q    Maybe if you can explain for me again, because I
19  think I am a little unclear what ADR was actually doing or
20  why it was formed.
21   A    I am going off of memory that's old.  I think ADR
22  was essentially an effort to not dilute the shareholders of
23  Apollo by having Bob, Bryant and I sell our stock in Apollo
24  or warrants, and reinvest that largely in Apollo.
25       So rather than dilute the shareholders of Apollo

[8/27/2015] ADAMS_EDWARD_20150827

141

1   by selling stock, new stock, it was selling our stock,
2   reducing our ownership or warrants, and then reinvesting it
3   in the company.
4    Q    So it sold your stock, your warrants?
5        So ADR was selling your stock, or was it selling
6   your warrants?
7    A    I don't remember.
8    Q    Okay.  And that money was supposed to be
9   reinvested in --
10   A    I think primarily it was -- not exclusively, but
11  it was primarily to be reinvested.
12   Q    And put towards what purposes?
13   A    If it was -- did you say it was 2009?
14       Around 2009, the company was engaged -- had
15  engaged Deutsche Bank, and Deutsche Bank was out trying to
16  recapitalize the company with a 50 to $100 million capital
17  raise.
18       So I am assuming that it was to maintain the
19  company's momentum until it was recapped with the
20  significant raise that Deutsche Bank was doing.  I think it
21  was -- Deutsche Bank and Ambrian were both out there in
22  2009.  Ambrian is a broker-dealer in England.
23   Q    I am going to hand you a document that has been
24  Bates numbered -- or, I'm sorry, marked as Commission
25  Exhibit 42.

[8/27/2015] ADAMS_EDWARD_20150827

142

1            (SEC Exhibit No. 42 was marked for
2                 identification.)
3   BY MR. WISNIEWSKI:
4    Q    Commission Exhibit 42 purports to be an account
5   statement from Venture Bank.  It is actually a group exhibit
6   that includes all account statements from 2009 for Apollo
7   Diamond, Incorporated.
8        Mr. Adams, do you recognize Exhibit 42?
9    A    Not particularly.
10   Q    Venture Bank, we mentioned that before, right?
11   A    Uh-huh.
12   Q    What is Venture Bank?
13   A    A bank in Minnesota.
14   Q    Apollo Diamond held an account there --
15   A    Yes.
16   Q    -- is that correct?
17       And in the upper right-hand corner on Page 1 of
18  Exhibit 42, it's Account Number 15792.  Do you see that?
19   A    Uh-huh.
20   Q    Is that the account number?
21   A    I presume it is.
22   Q    Okay.  And Venture Bank -- and the address listed
23  on the account is "Apollo Diamond, Care of Ed Adams, 2010
24  West 49th Street, Minneapolis 55419."
25       Do you recognize that address?

[8/27/2015] ADAMS_EDWARD_20150827

143

1    A    That's my home address.
2    Q    So the account was in Apollo Diamond's name, but
3   the statements were forwarded to your home address; is that
4   correct?
5    A    Right.
6    Q    Okay.  What I want to do is draw your attention to
7   the bank statement for July -- that ends July 31, 2009.
8    A    Okay.
9    Q    Let me know when you are there.
10   A    Yes.
11   Q    Okay.  And if you look down at the account
12  statement here, there's one credit to the account on 7/29;
13  July 29th.  Do you see that?  And it's a telephone transfer
14  from ADR Investments for $630,000 -- $630,100.  Do you see
15  that?
16   A    Yes.
17   Q    Okay.  And that money came from ADR Investments;
18  is that right?
19   A    It appears to, yes.
20   Q    And what were the sources of those -- what was the
21  source of that $631,000 -- approximately $631,000?
22   A    I don't recall.  The sale -- like I said, the sale
23  of stock, I guess, and warrants from Bob, Bryant and myself.
24   Q    Okay.  And there's a few wire transfers out of the
25  account the same day for 150,000, another one for 150,000,

[8/27/2015] ADAMS_EDWARD_20150827

144

1    another one for 150,000, and another one for 180,000.  Do

2    you see that?

3         A    Uh-huh.

4         Q    Do you know where those amounts were wired to?

5         A    I don't.

6         Q    Okay.  And it looks like the amount wired out was

7    almost equal to that $630,000 deposited in July.  Is that

8    right?

9         A    Yes.

10        Q    I am going to hand you a document that has been

11   marked as Commission Exhibit 43.

12                  (SEC Exhibit No. 43 was marked for

13                   identification.)

14        BY MR. WISNIEWSKI:

15        Q    And Commission Exhibit 43, the top of it purports

16   to be a Venture Bank temporary wire agreement.  Do you see

17   that?

18        A    Uh-huh.

19        Q    And the exhibit is four pages.  All four pages are

20   wire agreements; is that right?

21        A    Yes.

22        Q    Do you recognize these documents?

23        A    No.

24        Q    Okay.  On the bottom of Page 1 of 43, there's a

25   customer signature on the bottom.  Is that your signature?

[8/27/2015] ADAMS_EDWARD_20150827

---

146

1         A    It does, yes.

2         Q    Okay.  And there is an account holder name of

3    Apollo Diamond, Inc.  Do you see that?

4         A    I do.

5         Q    And there is a mailing address of 701 Xenia

6    Avenue.

7         A    I do.

8         Q    What is that address?

9         A    That would have been Adams Monohan's address, I

10   think.

11        Q    And the box below that says "Business type,

12   corporation," and then "Signatures, authorized individuals."

13   Do you see that?

14        A    Yes.

15        Q    And is that your signature there?

16        A    That's my signature.

17        Q    Okay.  And it seems like you are the only or sole

18   signatory authority on this account.

19        A    According to this document.  I have no idea if

20   there were others.

21        Q    Okay.  Do you know of anyone else that had

22   signatory authority on this account?

23        A    I don't remember.

24        Q    Who else worked at Apollo Diamond in Minneapolis?

25        A    Nobody -- well, Michael, I guess, was -- he had a

[8/27/2015] ADAMS_EDWARD_20150827

---

145

1         A    Doesn't look like it.

2         Q    Okay.  And how about -- turn to the next page,

3    Page 2 of Exhibit 43.  Is that your signature?

4         A    I don't think so.

5         MR. SHANK:  Do you know whose it is?

6         THE WITNESS:  I don't.

7         MR. SHANK:  Do you know why you are listed as the

8    contact person for Apollo Diamond, Inc. in connection with

9    these transfers?

10        THE WITNESS:  I don't.

11        BY MR. WISNIEWSKI:

12        Q    Mr. Adams, I am going to hand you a document

13   that's been marked as Commission Exhibit 44.

14                  (SEC Exhibit No. 44 was marked for

15                   identification.)

16        BY MR. WISNIEWSKI:

17        Q    Commission Exhibit 44 is a Venture Bank document

18   that's a single page.  Have you seen this document before?

19        A    Not that I recall.

20        Q    Okay.  And what it appears to be is a -- at the

21   top there, it says "Venture Bank," and there is a number

22   015792.  Do you see that?

23        A    I do.

24        Q    And that seems to match up with the account number

25   of Apollo Diamond at Venture Bank; is that right?

[8/27/2015] ADAMS_EDWARD_20150827

---

147

1    role at Apollo.  And then -- I think that would have been it

2    in Minneapolis.

3         Q    So turning back to exhibit --

4         MR. SHANK:  Did you ever give anyone else

5    authority -- signatory authority on this account?

6         THE WITNESS:  I don't remember.

7         BY MR. WISNIEWSKI:

8         Q    Turning back to Exhibit 43, the wire transfers.

9    On the first page there, it says "Sender information, Apollo

10   Diamond."  Do you see that?

11        A    Yes.

12        Q    It's dated July 29, 2009.

13        A    Okay.

14        Q    And the receiver information below, it lists you

15   as the beneficiary.  Do you see that?

16        A    Yes.

17        Q    And what is the amount there?

18        A    $150,000.

19        Q    Okay.  So does this document reflect a $150,000

20   wire transfer to you from Apollo Diamond, Incorporated?

21        A    I guess.

22        Q    Do you recall receiving this wire from Apollo

23   Diamond?

24        A    I don't.

25        Q    Okay.  If you pull out Exhibit 42.  We were on the

[8/27/2015] ADAMS_EDWARD_20150827

148

July 21, 2009 statement.

A    Uh-huh.

Q    Do you see there is a wire transfer dated 7/29 for
$150,000?

A    Yes.

Q    Do you have any reason to believe that one of
those transfers is not the $150,000 reflected in Exhibit 43,
the first page of 43?

A    I don't have a reason to believe it is or is not,
no.

Q    So turning back to Exhibit 43, the next page,
Page 2.  It's a second wire transfer on July 29, 2009.  Is
that right?

A    Okay.

Q    Okay.  And that's a wire transfer in the amount of
$150,000 to Robert -- Lisa M. Linares and Bryant R. Linares;
is that correct?

A    That looks correct, yes.

Q    Okay.  And is that your signature on the bottom
under the "customer signature"?

A    I don't think it is.

Q    Do you know anyone else that would have signed on
behalf of this transfer?

A    I don't know.

Q    Okay.  Did you give anyone authority to sign on

[8/27/2015] ADAMS_EDWARD_20150827

---

150

Q    So individually you don't recall -- you don't know
why this money was paid to you individually?

A    I don't remember.  Potentially in connection with
those loans.  I don't remember.

Q    Do you know why these amounts are not noted in the
general ledger of Apollo Diamond?

MR. KOPECKY:  There is a serious foundation
objection there.  Try to answer that if you can.

BY MR. WISNIEWSKI:

Q    Do you know if those wire transfers are
reflected -- or the amounts paid from ADR Investments to
Apollo Diamond are reflected in the general ledger of Apollo
Diamond or Apollo Diamond Gemstone?

A    I never saw it until today, so I would have to
look at that.

Q    Let me ask you this:  Would there be any reason
why they wouldn't be reflected in the general ledger of a
company?

A    I wasn't responsible for the general ledger.  I
have no idea how people maintained it.  I don't think I have
ever maintained a general ledger, and I have no idea.

Q    Apart from maintaining a general ledger, as an
executive of a corporation, would you expect accounting being
deposited in the name of a corporation to be reflected on
the general ledger of a company?

[8/27/2015] ADAMS_EDWARD_20150827

---

149

behalf of this account as of July 29, 2009?

A    I don't remember six years ago.  I'm sorry.

Q    Okay.  If you turn the page to Page 3 of
Exhibit 43.  It's another temporary wire agreement dated
July 29, 2009, and the beneficiary is Robert C. Linares and
Martha V. Linares, in the amount of $150,000.  Do you see
that?

A    I do.

Q    And that's dated July 29, '09.

A    Okay.

Q    And if you turn the page of Exhibit 43 to Page 4,
there is another wire transfer agreement dated July 29, '09.
And the beneficiary of the transfer is -- or the wire is
Adams Monohan, LLP in the amount of $180,000.  Do you see
that?

A    I do.

Q    And the wires that we went through in Exhibit 43,
the amounts seem to match up to the wire transfers noted in
the account statement -- the Venture Bank account statement,
on July 31st 2009; is that correct?

A    They seem to.

Q    Okay.  Why is Apollo transferring this money to
yourself, Bryant Linares, Robert Linares, and your law firm?

A    My law firm, I assume it was for past moneys due
and owing.  I don't remember for us individually.

[8/27/2015] ADAMS_EDWARD_20150827

---

151

A    I really -- I have no expectation about that.  I
am not -- I have never done a general ledger that I can
recall.  So I don't know what the appropriate procedures
are.  I don't even know if that's the all-general ledger.

MR. SHANK:  Let's broaden the question.  Would you
expect a $630,000 payment from ADR Investments to Apollo
Diamond to be reflected in Apollo Diamond's accounting
records in some way?

THE WITNESS:  Potentially.  I don't know -- I
don't know.  I am not an accountant by training, so I don't
know.

MR. SHANK:  Do you have an understanding as to
whether corporations need to account for money coming into
their bank accounts?

THE WITNESS:  I do have an understanding that
that's a typical thing to account for, yes.

MR. SHANK:  Can you think of any reason why in
this instance there wouldn't be a deposit reflected in
Apollo Diamond's accounting records?

THE WITNESS:  Can I think of any reason why -- I
don't know.

BY MR. WISNIEWSKI:

Q    Who purchased these warrants from ADR?

A    I don't recall.

Q    Were you involved at all in the transaction

[8/27/2015] ADAMS_EDWARD_20150827

152

1  between selling the warrants or the shares of stock to
2  individuals or entities?
3      A   I don't recall.
4      Q   Who would have been?
5      A   I don't recall.  It was a long time ago.  I don't
6  remember exactly.
7      Q   Who else was affiliated or did any work on behalf
8  of ADR Investments, LLC?
9      A   I don't remember.
10     Q   You can't think of a single employee or a single
11 person that did any work on behalf of ADR Investments, LLC?
12     A   I can't right now, no.
13     Q   How about you?  Did you do any work on behalf of
14 them?
15     A   I don't remember.  I mean, that was six years ago.
16 I really -- I don't remember.  I'm sorry.
17         MR. WISNIEWSKI:  Good time to take a break.  We
18 will break for lunch.  What do you want to say, an hour?  We
19 will go off the record at 12:48.
20             (Whereupon, the examination was recessed
21                  until 1:44 p.m., this date.)
22         MR. WISNIEWSKI:  Back on the record at 1:44 p.m.
23      BY MR. WISNIEWSKI:
24     Q   Mr. Adams, again, going back on the record.
25         While we were off the record, did you and I have

[8/27/2015] ADAMS_EDWARD_20150827

---

153

1  any conversations, other than a reference to, again, food?
2      A   No.
3      Q   Okay.  When we left, we were talking about Apollo
4  Diamond's sources of revenue and the different sources --
5  various sources of revenue that Apollo had.  And I wanted to
6  ask you about an investment that was made by Howard
7  University and Apollo Diamond.
8      A   Yes.
9      Q   And I think it was, like, the 2010 time frame.
10     A   Okay.
11     Q   Is that right?  Does that sound right?
12     A   That sounds right.
13     Q   Okay.  Can you kind of explain to me what the
14 investment was; what the investment -- explain to me what
15 the investment was; what it was for?
16     A   Terrence Howard, ironically, was an investor in
17 Apollo and an advocate of the company's.  He is an actor --
18     Q   Okay.
19     A   -- and a really wonderful person.  Anyway, he had
20 some relationships at Howard University, ironically, and in
21 the U.S. Government, Chamber of Commerce and, I think, some
22 other -- I don't remember -- Secretary of Commerce and other
23 places in the government that he introduced Apollo and
24 myself and Michael Monohan to and the principals of Apollo.
25 One of them was Howard University.

[8/27/2015] ADAMS_EDWARD_20150827

---

154

1          Howard University, as you may know, is a prominent
2  institution in D.C.  We went out and met with all the
3  principals of Howard.  We met extensively with the -- I
4  think he is either the chancellor or provost of Howard, Jim
5  something.  I don't remember his exact name.  And they were
6  very intrigued with the opportunity to become part of the
7  Apollo -- to become part of the Apollo opportunity.
8          They were interested in having the company
9  relocate to a technical park, I think, or commercial
10 technical park that they had in Maryland, I believe it was.
11 And we spent a considerable amount of time presenting -- I
12 think we presented to a group of trustees, and we presented
13 to the -- we went to dinner with them several times.  When I
14 say "we," I mean people from Apollo, including myself.
15         We went to dinner with Jim and others from Howard.
16 And ultimately, we were told by Howard through Jim, I
17 believe, I want to say in 2010 -- I think you are right --
18 that we were -- they were going to pursue a significant
19 investment in Apollo; that they believed that the
20 opportunity was terrific.  They had some people who -- I
21 didn't say this.  They had professors who understood the
22 science and were interested in working on it.
23         And so we drafted reams of documents related to a
24 potential 10 million -- I think it was 5 or $10 million
25 investment, and then the company was going to move its

[8/27/2015] ADAMS_EDWARD_20150827

---

155

1  operations or a significant portion of them to the D.C.
2  area.
3      Q   Okay.
4              (Whereupon, Mr. Hayes entered the
5                  examination proceedings.)
6          BY THE WITNESS:
7      A   And they ultimately made a placeholder investment
8  to preserve their, sort of -- we were talking to other
9  people, and they were keen on making sure that we didn't --
10 we didn't do something that forbade them -- that somehow
11 precluded them from doing something with us.
12         So they made a placeholder investment, and then
13 they intended, they told us, to invest more; they just had
14 to get approval from the -- I think it's called the Board of
15 Trustees at Howard.  And then they -- around the end -- I am
16 pretty sure you are right, it's 2010.  Around the end of
17 2010, they came back to us and said, Okay, everything is
18 great; the board is going to move forward.
19         And then I want to say at the beginning of 2011,
20 they had some issue or something -- they had some issue
21 internally, like -- I think there was a problem or they had
22 a deficit that they didn't expect themselves to have had.
23 And as a result of that deficit, they couldn't move forward
24 with the transaction in its entirety, which was a
25 significant blow, if you will.  It was a significant --

[8/27/2015] ADAMS_EDWARD_20150827

156

```
1    that's not the right word.  But we really had a great
2    relationship, we thought, with them and a great cadence with
3    them as an entity.  And there was excitement about doing
4    something with these really, you know, committed,
5    intelligent people who understood the space, meaning the
6    diamond space.  So that was -- that was disheartening.
7           BY MR. WISNIEWSKI:
8    Q    So what I gather -- just to kind of summarize
9    partially what you said.  And let me know if it's not
10   accurate.  But they agreed to make an investment in Apollo?
11   A    Yes.
12   Q    Okay.  And in exchange for that investment, they
13   were going to get what in return?
14   A    Well, they agreed to make -- ultimately they made
15   a small initial -- big or small -- initial investment, and
16   then they were going to invest even more money, and they
17   were going to have a significant equity stake in Apollo and
18   have a license agreement with Apollo, I think.
19          I mean, I don't remember because it's been awhile.
20   But an invention sharing agreement, I think, we drafted.  So
21   that meant if we invented something, they could participate;
22   and if they invented something in the same space, we could
23   participate.  So it was intended to be a very symbiotic and
24   huge relationship.
25   Q    The equity interest, what form would that equity
```

158

```
1    Bates numbered SEC-Adams-29569 through 29574.  And it
2    purports to be an Apollo Diamond term sheet that summarizes
3    the terms of anticipated investments by Howard University.
4           Have you seen this document before, Mr. Adams?
5    A    Have I seen it before?
6    Q    Yes.
7    A    Yeah, I believe I have.  Sure.
8    Q    Okay.  And if you turn to the last page of the
9    document, Exhibit 45, is that your signature under Apollo
10   Diamond?
11   A    It is.
12   Q    And it identifies you as the chief executive
13   officer?
14   A    Yes, it does.  Yes.
15   Q    And this is dated July 23, 2010?
16   A    Yes.
17   Q    Okay.  So as of that date, were you the CEO of
18   Apollo Diamond, Incorporated?
19   A    I was the president.  I don't remember being CEO.
20   But maybe -- I don't remember that, actually.
21   Q    Okay.  And Exhibit 45 is the term sheet that kind
22   of summarizes -- or actually details what you summarized
23   before as the investment that Howard University was to make
24   in Apollo Diamond; is that correct?
25   A    It's a summary of that, yes.
```

157

```
1    interest take?
2    A    A stock investment, I assume.
3    Q    Okay.  So they would get some stock of Apollo
4    Diamond?
5    A    Yes.
6    Q    And they made an initial investment.  Do you
7    recall how much that was?
8    A    I don't.
9    Q    They made an initial investment, but they didn't
10   make the full investment?
11   A    Right.
12   Q    The initial investment, was that in any way
13   returned to Howard University?
14   A    No, I don't think so.
15   Q    Okay.  Did they obtain stock as part of that
16   initial investment?
17   A    Sure.  I am sure they did.
18   Q    So they became stock -- a shareholder of --
19   A    Yes.
20   Q    Okay.  I am going to hand you an exhibit that's
21   been marked as 45.
22          (SEC Exhibit No. 45 was marked for
23                identification.)
24          BY MR. WISNIEWSKI:
25   Q    Okay.  And Commission Exhibit 45 is a document
```

159

```
1    Q    Okay.
2    A    Yes.
3    Q    And on the first page of Exhibit 45, it has a,
4    kind of, category there.  It says "Investment."  And it says
5    an initial investment of $5 million.  Do you see that?
6    A    Yes.
7    Q    Okay.  And was that the total amount that was
8    going to be invested?
9           You are saying that there was an agreed upon
10   amount that wasn't reached and an initial amount.  Was the
11   5 million the total amount that we were talking about
12   before?
13   A    I'm sorry.  Forgive me.  Ask that one more time.
14   Q    So when -- you were describing that Howard
15   University was supposed to make an investment of X, right?
16   A    And is that X the $5 million that you were
17   referring to before?
18   A    Well, that was the amount that they told us they
19   were going to invest.  I don't think they invested anywhere
20   near that much.
21   Q    Okay.  And there is a second paragraph -- indented
22   paragraph there under Term Sheet and Preliminary Closing.
23   And it says -- that subparagraph starts, "The investor shall
24   make a preliminary investment of $500,000."
25
```

DSM-000440

160

1    A    Okay.

2    Q    Does that seem right?

3    A    That makes sense, yes.

4    Q    Okay.  So Howard made that $500,000 investment in

5  Apollo Diamond; is that correct?

6    A    I presume so.

7    Q    Okay.  Now, Page 3 of Exhibit 45, which is Bates

8  numbered SEC Adams 29571.  There is a section there that

9  says "Use of investment proceeds."

10   A    Uh-huh.

11   Q    Do you see that?

12   A    Yes.

13   Q    And it says, "In collaboration with the investor,"

14  which is identified as Howard University, "the Company,"

15  which is defined as Apollo Diamond, "will utilize the

16  proceeds from the investment," which is defined as the

17  $5 million, "for applied research and development of its

18  proprietary process to manufacture diamond materials for the

19  development of diamond-based technology/products."  And it

20  kind of goes on into the various uses which the investment

21  would be put towards.  Do you see that?

22   A    Yes, for general corporate work -- yes.

23   Q    That's kind of what you described before, right?

24   A    I'm sorry, what --

25   Q    What they were doing, what the investment was for,

[8/27/2015] ADAMS_EDWARD_20150827

---

161

1  why they were interested in investing in Apollo.

2    A    Yes.

3    Q    Okay.  And when did Howard make that initial

4  investment of $500,000?

5    A    I don't know.

6    Q    Okay.

7         MR. KOPECKY:  I am going to -- that's a

8  preliminary investment.

9         MR. WISNIEWSKI:  The preliminary investment of

10  $500,000.

11         MR. KOPECKY:  Initial investment is something

12  different.  That's the preliminary investment.

13         BY THE WITNESS:

14   A    There were a lot of other documents, I think, that

15  went along with this.

16         BY MR. WISNIEWSKI:

17   Q    Mr. Adams, I am going to hand you a document

18  that's been marked as Commission Exhibit 46.

19             (SEC Exhibit No. 46 was marked for

20             identification.)

21         BY MR. WISNIEWSKI:

22   Q    Mr. Adams, Commission Exhibit 46 purports to be

23  monthly account statements issued by Venture Bank to Apollo

24  Diamond, Incorporated with regards to Account Number 15792.

25  Do you see that?

[8/27/2015] ADAMS_EDWARD_20150827

---

162

1    A    Uh-huh.

2    Q    Have you seen these documents before?

3    A    I don't recall.

4    Q    You don't recall seeing the account statements?

5    A    I probably received them.  I don't recall them.

6    Q    Okay.  They were addressed to you?

7    A    Yes.

8    Q    And that's your home address, the 2010 West 49th

9  Street?

10   A    Yes.

11   Q    Okay.  And if you could turn to the account

12  statement -- this is a group exhibit that has all the

13  account statements issued from Venture Bank for this account

14  in 2010; from January 2010 through December 2010.

15   A    Okay.

16   Q    If you could turn to the account statement for

17  July 2010.  And let me know when you are there.

18   A    I am there.

19   Q    Okay.  And this account statement for July 30,

20  2010, or the period ending July 30, 2010, shows two credits

21  to Apollo Diamond's account.  The first is an incoming wire

22  of $17,000 on 7/21 from Apollo Diamond.  I am assuming

23  that's a different Apollo Diamond account.

24   A    I assume so.  I don't know.

25   Q    Okay.  And the second incoming wire is from Howard

[8/27/2015] ADAMS_EDWARD_20150827

---

163

1  University on 7/30 for $500,000.

2    A    Yes.

3    Q    Okay.  So does that refresh your recollection of

4  whether -- the time frame in which Apollo Diamond received

5  that initial or preliminary investment from Howard

6  University?

7    A    It was apparently July 30th of 2010.

8    Q    Okay.  So that's the investment, the preliminary

9  investment?

10   A    Yes.

11   Q    And what were these funds used for?

12   A    We had told them that there were a variety of

13  outstanding payables, including a large one to us, that --

14   Q    When you say "us," who are you referring to?

15   A    Adams Monohan.

16   Q    Adams Monohan, LLP, your law firm?

17   A    Right.

18   Q    You informed Howard University that there was a

19  large payable owed to Adams Monohan, LLP?

20   A    Bob Linares knew that as well.  So we had said

21  that, you know, there were a lot -- I think we told them

22  there were a lot of payables.  I think they actually -- I am

23  pretty sure they presented that information to their board

24  even.  I know there was significant payables that needed to

25  be addressed, and that this would be used in part, if not

[8/27/2015] ADAMS_EDWARD_20150827

164

1  exclusively -- initially, the moneys would be used to catch
2  up on payables the company had.
3       Q.  Okay.  So Apollo Diamond informed Howard
4  University that its investment was going to be used to pay
5  Apollo Diamond's payables?
6       A.  That's what I remember.  I remember conversations
7  about that.
8       Q.  And you were part of those conversations?
9       A.  I was certainly part of a conversation.  I don't
10  remember if there were multiple conversations.
11      Q.  And who is -- the conversation that you had or you
12  recall, who was that between?
13      A.  I think it was with this Jim individual.
14      Q.  I'm sorry?
15      A.  Jim, the provost at Howard, if I remember
16  correctly.
17      Q.  And Jim's last name?
18      A.  Wright maybe.  I want to say Wright.
19      Q.  Okay.  And what was -- what -- kind of explain to
20  me what was said about the use of the money or the use of
21  the $500,000 investment.
22      A.  I think -- we, at some point, meaning Adams
23  Monohan and Apollo, helped them craft a PowerPoint
24  presentation that they used to their board.
25      Q.  Who is "they"?

[8/27/2015] ADAMS_EDWARD_20150827

---

166

1       Q.  Okay.  And what did they say in response to that?
2       A.  Okay.  I don't remember exactly.  I don't remember
3  how the cadence or the conversation went.
4       Q.  Do you recall how much was -- how much of the
5  initial investment was paid to Adams Monohan?
6       A.  I don't.
7       Q.  A good chunk of it?
8       A.  It would have depended what we were owed by this
9  point, which was probably a good chunk of money because we
10  had been working for -- I would have to go back and look at
11  what the invoice was at the end of 2008 -- 9, I guess we
12  would look.  Can I look at that or --
13      Q.  Yes.
14      A.  Is that all right?
15      Q.  Uh-huh.
16      A.  Okay.  So due as of 12/31/2009 was $981,000.
17      Q.  What was that number?
18      A.  $981,000.
19      Q.  Okay.
20      A.  So I don't know --
21      Q.  So if you go back to Exhibit 46.  If you could
22  turn the page to the August 2010 statement -- August 31,
23  2010.
24      A.  Yes.
25      Q.  Let me know when you are there.

[8/27/2015] ADAMS_EDWARD_20150827

---

165

1       A.  Howard.
2       Q.  I'm sorry, I am going to be a little --
3       A.  That's good.  I appreciate that.
4           That Howard was going to use in presenting to its
5  board.
6           So my understanding of Howard, which I think is
7  typical, is that schools, they have their internal people,
8  and then there's the external Board of Trustees, some of
9  whom are people from Howard, and others are just people who
10  either are graduates, or something.
11          So they were going to present the opportunity to
12  their board, and we helped them, meaning Howard's internal
13  people, Jim and others -- there was an individual named
14  Reginald, I think, who was a professor.  We helped them
15  craft a PowerPoint which explained where Apollo was, what it
16  was doing, what the opportunity was for both companies --
17  both entities, right, et cetera.  So in there, they, you
18  know, point out Apollo has payables and -- I think that's
19  right -- and moneys going to satisfy that, or something like
20  that.
21      Q.  So the money was going to satisfy the work that
22  Apollo -- that Adams Monohan did to prepare a presentation?
23      A.  Partly, yeah.  A large part of it, because we
24  had -- no, not just this work.  It was all the work that we
25  had been doing for Apollo up to this point.

[8/27/2015] ADAMS_EDWARD_20150827

---

167

1       A.  Okay.
2       Q.  Are you there?
3       A.  Yes.
4       Q.  Okay.  So on the August 31, 2010 -- on the bottom
5  of the statement for 8/31/2010, there's a few debits there.
6  There's an outgoing wire.  Do you see there's an outgoing
7  wire Number 473 to Adams Monohan, LLP in the amount of
8  $20,000?
9       A.  Okay.
10      Q.  Do you see that?
11      A.  Yes.
12      Q.  If you turn the page, there's a list of other
13  debits, and there's an outgoing wire Number 575 to Adams
14  Monohan, LLP in the amount of $450,000.  Do you see that?
15      A.  Yes.
16      Q.  So if you add up the 450 and the 20,000, that's
17  about 470,000?
18      A.  Yes.
19      Q.  Okay.  Was Howard made aware that almost nearly
20  all of their initial investment was going to be paid towards
21  Adams Monohan, LLP?
22      A.  I believe they were.  I don't remember exactly
23  what we talked about precisely with them on that.
24      Q.  And did you speak to Jim Wright at Howard
25  University about the amount of money that was being

[8/27/2015] ADAMS_EDWARD_20150827

168

1  transferred -- that was going to be transferred to Adams
2  Monohan, LLP as part of their initial investment?
3       A    I don't remember the exact substance of the
4  conversation, but I remember him -- I remember us talking
5  about the fact there was significant payables.
6       Q    So if we went to Howard University -- let me ask
7  you this: Did you communicate -- was it a verbal
8  conversation or did you communicate over e-mail?
9       A    I don't remember.
10      Q    Okay.  Who else other than Jim Wright would know
11  anything about that transaction at Howard University?
12           MR. KOPECKY:  Would know that Adams Monohan was
13  paid or about their investment?
14           BY THE WITNESS:
15      A    I mean, Sidney Ribeau signed this.  I don't know
16  what he knows or didn't know.
17           BY MR. WISNIEWSKI:
18      Q    How about you?  Did you deal with anyone else at
19  Howard University regarding this transaction?
20      A    Jim was the primary contact that I remember.  Like
21  I said, there was a couple professors there; at least one
22  that I remember named Reginald.  And I don't remember his
23  last name.  So that was it.
24      Q    Okay.
25      A    I think they would say -- and we all intended

[8/27/2015] ADAMS_EDWARD_20150827

169

1  this -- in their mind, this was a placeholder investment.
2  They understood that to really fund this opportunity, they
3  needed to invest a significant amount of additional money.
4  Hence, the term sheet.
5       Q    You said they received shares of Apollo Diamond in
6  return for that initial investment?
7       A    Yes.
8       Q    Okay.  Do you know if they redeemed their shares
9  in March of 2011 or around that time frame?
10      A    I am sure they were sent the materials.  I don't
11  know if it would have been March, but they would have been
12  sent the materials, I am sure.
13      Q    Do you know if they redeemed their shares as part
14  of the proxy?
15      A    I don't know.
16      Q    Apollo Diamond Gemstone Corp.  I am going to just
17  refer to that as Apollo Gemstone for ease of reference.  Is
18  that okay?
19      A    Sure.
20      Q    Okay.  We talked a little bit about your role
21  there before, but can you kind of explain to me or walk me
22  through the roles or the positions you held at Apollo
23  Gemstone?
24      A    If I had my employment agreements, that would be
25  helpful.  But I think at one point I was CFO and then later

[8/27/2015] ADAMS_EDWARD_20150827

170

1  became president.
2       Q    Okay.
3       A    I might have -- I think I was a director as well
4  for a brief period of time or for a period of time.
5       Q    So what period of time were you the president --
6  did you say president or CFO?
7       A    I think I was CFO, then I became either president
8  or CEO.  But I think it was president.  And CFO might have
9  been in 2008 or 9.  President might have been 2010.
10      Q    How about 2011?
11      A    Then I resigned in 2011.
12      Q    When did you resign in 2011?
13      A    I think late February or early March of 2011.
14      Q    Did you submit a resignation letter?
15      A    I think I gave my father-in-law a letter.  Yeah.
16      Q    Okay.  So from 2008 to, what, March 2011, did you
17  say?
18      A    I think it was February or March.
19      Q    From 2008 to February or March 2011, you were an
20  executive of Apollo Gemstone?
21      A    Well, I don't know if it was from 2008.  But 2008
22  or 9 to 2011.
23      Q    Okay.  And what was your compensation in those
24  various roles?  Annual compensation, sorry.
25      A    I was paid a salary and I was issued warrants

[8/27/2015] ADAMS_EDWARD_20150827

171

1  and/or stock.  I mean, I was never paid, actually, anything,
2  that I recall, in cash.
3       Q    You never received any salary or any shares of
4  stock?
5       A    Oh, I would have received warrants, I think.
6  Yeah.
7       Q    So you received warrants.  How about actual
8  shares?  Did you receive any shares?
9       A    I received warrants that I exercised, and they
10  became stock.
11      Q    Okay.  How many shares did you exercise -- how
12  many warrants did you exercise?
13      A    I think it was several million.
14      Q    Okay.  All I am trying to get, Mr. Adams, is
15  what -- like we talked about for Apollo Diamond.  What
16  percentage -- what was your stake in Apollo Diamond
17  Gemstone?  You know, what percentage equity owner were you?
18      A    Significant.
19      Q    Okay.  When you say "significant," more than
20  50 percent?
21      A    No.
22      Q    Okay.  25 percent?
23      A    I don't know.  I know I had written it down at
24  some point, because I had warrants and I had stock -- or I
25  had warrants that I converted into stock, and I had

[8/27/2015] ADAMS_EDWARD_20150827

172

1  warrants.  So I would need to -- if I had the notes, you
2  know -- I don't know.
3      Q    If you can pull out Commission Exhibit 22 for me,
4  which was the Form AK filed by Scio Diamond Technology
5  Corporation on May 15, 2012.  And if you could turn to
6  Page 2 of Exhibit 22 for me.  And I am going to point you to
7  that last paragraph that starts with, "The company."
8      A    Okay.
9      Q    So the last sentence of that paragraph starts,
10  "Mr. Adams and his spouse" -- it goes on to Page 3 -- "owned
11  approximately two percent of the common stock of ADI and
12  11 percent of common stock of ADGC at or through early
13  2011."
14          Does that number -- does that 11 percent appear to
15  be correct or -- does it accurately reflect your percentage
16  share ownership of Apollo Gemstone in early 2011?
17      A    I didn't prepare this, but I have no reason to
18  believe it is not accurate.  It would reflect my common
19  stock ownership.  As I said, I am pretty confident it does
20  not reflect my warrant ownership.
21      Q    As far as your common stock ownership goes,
22  11 percent seems to be correct?
23      A    Yes, I think that's probably right.
24      Q    Okay.
25      A    I would have to go back and look at my records.

[8/27/2015] ADAMS_EDWARD_20150827

173

1      Q    Okay.  Why don't you explain to me or walk me
2  through the events leading up to the March 2011 asset
3  purchase agreements between Apollo Diamond, Apollo Gemstone,
4  and Scio Diamond Corporation.
5      A    When you say walk you through the events --
6      Q    What was the state of Apollo Diamond and Apollo
7  Gemstone at this point?
8      A    My father-in-law had been very ill beginning in
9  2010.  He had an issue with his liver, which miraculously he
10  survived.  And the company, we had -- when I say "we," all
11  of us that were a part of Apollo and Adams Monohan, because
12  we were working so closely with the company, had spent a
13  huge amount of effort trying to bring this Howard University
14  transaction to fruition.  We were also working on some other
15  things.
16          I think at one point in 2010 we talked extensively
17  to Tiffany.  That could have been earlier, but I think it
18  was still ongoing in 2010; Tiffany, the jeweler.  We had
19  talked to somebody who had a public company with $30 million
20  in cash.  I don't remember if that was middle of 2010 or
21  late.  And we had had ongoing conversations, because we
22  believed we got the technology -- the company believed it
23  had the technology to the point where it was commercially
24  viable, and it just needed an infusion of cash to build out
25  the manufacturing facility and scale it up, which was the

[8/27/2015] ADAMS_EDWARD_20150827

174

1  whole, sort of, premise beginning in 2001 for what the
2  company was seeking to do.
3      Q    But my father-in-law was ill.  My brother-in-law,
4  I think, resigned in 2010 because he had gone a long time
5  without being paid and was frustrated with that situation.
6  And I think he was just -- I can't speak for him, but I
7  think he was tired of dealing with it from that perspective,
8  especially when Howard cratered.
9          So in -- through a period of time, January,
10  February, even -- I think it was January, February, we
11  talked about options for the company.  We talked to Deutsche
12  Bank.  We tried to -- we had a Deutsche Bank person -- a
13  former Deutsche Bank person who had specialized in selling
14  middle market -- specialized in middle market mergers and
15  acquisitions; so middle-sized companies.  He was out
16  actively trying to sell the assets or the company, Apollo
17  and Apollo Diamond Gemstone.
18          Michael and I were talking to a variety of large
19  players about a potential investment in the company, and/or
20  a sale of the company's technology or assets.  And we were,
21  frankly, getting nowhere.  You know, there was -- I mean,
22  you may remember -- I guess it depends on your view.  But
23  2011 was, I think, still a pretty depressed market state,
24  and so I think companies were still very leery about doing
25  anything.  And we weren't -- we weren't really getting any

[8/27/2015] ADAMS_EDWARD_20150827

175

1  significant traction.  We had a lot of conversations, but we
2  weren't getting any traction.
3          So now we started talking about ideas, you know,
4  and wanting to do -- we didn't want -- I mean, one option we
5  explored was bankruptcy.  You know, should we just bankrupt
6  the company?  Should the company file bankruptcy?  Should
7  that be the advice that we give the company?  And we talked
8  about -- when I say "we," I mean Bob and I and Michael and
9  Bob and others who were attorneys that we -- so I want to be
10  a little careful because I don't want to break any privilege
11  here.
12          But we had engaged Paul Hastings, and they had
13  been engaged over a period of time.  They were involved in
14  some of these discussions and attorneys there.  And we
15  talked about, you know, the strategy for what the company --
16  what would bankruptcy mean.  And the general view was that
17  bankruptcy would -- it could open the company up to someone
18  buying the assets, and the shareholders getting very little,
19  and -- particularly when you considered that there were law
20  firms that were owed a significant amount of money like
21  ours.  There were people like us that were secured
22  creditors, meaning Bob, Bryant and myself.  And so that
23  didn't seem appealing because that would have wiped out the
24  shareholders.
25      Q    So other than the secured creditors and your law

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000444

176

1  firm, what other debts and liabilities did Apollo Diamond
2  have in that early 2011 period?
3      A    Landlord.  We had -- the company had a lease.
4      Q    How much was due on the lease?
5      A    I don't remember.  A couple hundred thousand
6  dollars.
7      Q    What else?
8      A    It had a variety of vendors that it owed money to.
9      Q    Okay.  What type of vendors?
10     A    Equipment, power.
11     Q    How much cumulative for those vendors are we
12  talking?
13     A    5, 700,000.  I don't remember.
14     Q    Okay.  So 5, $700,000 for various vendors?
15     A    That we knew of, that Bob could readily identify.
16  Part of the problem was everyone had, sort of, left the
17  company by this point, so we didn't have terrific records or
18  the company didn't have terrific records about who was a
19  vendor and who was owed what.  So some of it was
20  guesstimating.
21     Q    So your law firm, the secured creditor, these
22  vendors.  What else?
23     A    Landlord.  I said that.
24     Q    Landlord.
25     A    Other law firms --

[8/27/2015] ADAMS_EDWARD_20150827

---

177

1      Q    Okay.  So other law firms.
2      A    -- that had done intellectual property work for
3  the company.  And we were concerned about the potential
4  liability of a lawsuit that might be brought by somebody as
5  a potential investor who was unhappy with their investment.
6      Q    So walk me through why you decided to sell the
7  assets of Apollo to the entity Scio Diamond?
8      A    I didn't decide, but --
9      Q    Who made that decision?
10     A    Bob Linares.
11     Q    Okay.  Who else was at the company at this time?
12     A    I don't know, other than Bob Linares.  I am not
13  sure.  I wasn't there.
14     Q    So you weren't involved in any decisions at Apollo
15  Diamond to sell the assets of the company to Scio Diamond?
16     A    I provided legal advice about structure in the
17  transaction relating to that.
18     Q    And you provided that in your capacity as general
19  counsel or as Adams Monohan, LLP?
20     A    I think, actually, at the time I started providing
21  it, I was still an officer.  But by the time March rolled
22  around, I think I had resigned, and so it would have just
23  been at Adams Monohan.
24     Q    While you were an officer, what were the
25  discussions regarding the transaction to sell the company's

[8/27/2015] ADAMS_EDWARD_20150827

---

178

1  assets to private -- Scio Diamond?
2      A    Well, they revolved around how did we maximize the
3  opportunity for the shareholders, and why bankruptcy would
4  not work, and that would be a bad outcome for the
5  shareholders; and how just taking the assets, because we
6  were secured creditors -- "we," meaning Bob, Bryant and
7  myself -- wasn't what we thought was fair to the
8  shareholders.  And what could we do?
9           Could we find a new investor, new investors --
10  would someone buy the assets?  How did we create a potential
11  tax loss for the shareholders and still allow them to
12  participate going forward in the company?  We talked about
13  that.
14     Q    So shareholder participation in the company, was
15  that an important feature for you as an executive with
16  Apollo Diamond?
17     A    Very.
18     Q    Okay.  Why is that?
19     A    Because these are people who had invested in the
20  company.  Many of them were friends; people we cared about
21  personally.  And we believed that we wouldn't be where we
22  were but for their investment.  And so it was important to
23  allow them to participate going forward in the upside of the
24  opportunity.
25     Q    So why did you think a sale of the asset was in

[8/27/2015] ADAMS_EDWARD_20150827

---

179

1  the best interest of the shareholders?
2      A    Because it would allow them -- we had talked -- my
3  own research confirmed that if structured in a way that was
4  appropriate, they could -- we could sell the assets, allow
5  them, the shareholders, to buy a stake in the new entity,
6  which was better than their stake in the old one, in terms
7  of percentage ownership, and with a better capital
8  structure, because there was no preferred stock or debt.
9           And they would have a tax loss on the sale of -- if
10  we bought their -- "we," the company, Apollo, bought their
11  stock back, my research and research of other counsel
12  confirmed that they would then have -- as soon as the cap
13  structure was changed -- if it was the exact same cap
14  structure, the IRS would not -- wouldn't allow a tax loss to
15  the shareholders.
16           So one of the things we looked at and had others
17  look at was making sure we did it in a way that allowed, we
18  thought, and preserved the tax loss of the shareholders and
19  allowed them to invest in this new entity, in a percentage
20  ownership position that was greater than their old one.
21     Q    That was an important feature of the deal to you?
22     A    Yes.
23     Q    Okay.  So ultimately -- you know, we will deal
24  with one first, Apollo Diamond.
25           Did Apollo Diamond actually enter into an

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000445

180

1    agreement with Scio Diamond Corporation, the asset purchase
2    sale --
3        A    Yes.
4        Q    -- asset purchase agreement?
5             And when was that?
6        A    Late February, March of -- I think it was March of
7    2011.
8        Q    Okay.  And March, February 2011, Scio Diamond
9    Corporation was a private entity; is that correct?
10       A    Right.  We are going to define "private" as an
11   entity that doesn't trade in the public marketplace.  Can we
12   agree on that?
13       Q    I would agree with that.
14       A    Okay.
15       Q    So it was a private entity?
16       A    It was.
17       Q    When was -- again, just because it changes later
18   on, I am just going to refer to that as "private Scio," as
19   it's referred to in some of these filings.
20       A    Yes.  Absolutely.
21       Q    When was private Scio formed?
22       A    I would imagine February of 2011, March of 2011.
23       Q    Okay.
24       A    I don't remember.
25       Q    And just -- I am not meaning it to be a memory

---

181

1    test here, but I just want to lock down the dates.
2             MR. KOPECKY:  Maybe he can refresh your
3    recollection with the actual formation documents.
4             BY MR. WISNIEWSKI:
5        Q    I am going to hand you an exhibit that's marked as
6    Commission Exhibit 46.
7             (SEC Exhibit No. 46A was marked for
8             identification.)
9             BY MR. WISNIEWSKI:
10       Q    Commission Exhibit 46, Mr. Adams, purports to be a
11   printout of an articles of incorporation for an entity named
12   Scio Diamond Corporation, which was filed on February 1,
13   2011.
14            Have you seen this document before?
15       A    Is that February or March?  I can't read that.  I
16   think that's March or --
17            MR. KOPECKY:  I would have said March 1st.
18            MR. WISNIEWSKI:  I am looking at the top
19   right-hand side.  Filed in the Office of the Secretary of
20   State of the State of Nevada.
21            THE WITNESS:  Yes.
22            BY MR. WISNIEWSKI:
23       Q    And if you turn to the last page of this document,
24   which is Page 3, is that your signature on the bottom?
25       A    That looks like my signature, yes.

---

182

1        Q    Okay.  And you are identified above as the
2    president, treasurer, and director; is that correct?
3        A    I am.
4        Q    And are those the roles that you served for this
5    private Scio entity?
6        A    I think for seven or eight days, yes.
7        Q    And when -- after that, what happened?  How did
8    your role change after seven or eight days?
9        A    I was just a director, if I remember correctly.
10   Perhaps chairman.
11       Q    Okay.  So you became the chairman of private Scio.
12   Okay.
13            And did you have an ownership interest in private
14   Scio?
15       A    I did.
16       Q    And what was that interest?
17       A    I don't remember the exact share.  It changed over
18   time as more work was done.
19       Q    Okay.
20            THE COURT REPORTER:  We already had a 46.
21            MR. WISNIEWSKI:  Can we mark that as 46A?
22            (SEC Exhibit No. 47 was marked for
23            identification.)
24            BY MR. WISNIEWSKI:
25       Q    Mr. Adams, I am going to hand you a document

---

183

1    that's been numbered Commission Exhibit 47, which purports
2    to be a Scio Diamond Technology Corporation initial stock
3    ledger as of April 1, 2011, and is a three-page document
4    that's Bates labeled SEC Adams 31152 through 54.
5             Have you seen this document before?
6        A    I really don't remember seeing it, no.
7        Q    Okay.  And on the first page of Exhibit 47, it
8    lists an initial stock ledger for the company, for private
9    Scio, as of April 1, 2011.  The top of the page, it lists
10   you as owning a million shares, and your wife -- Denise L.
11   Adams, is that your wife --
12       A    Yes.
13       Q    -- as owning a million shares as well.
14       A    500,000, I think.
15       Q    Oh, I'm sorry.  Okay.  Yes, I'm sorry, 500,000.
16            And then below her name is also -- is your name
17   again, as reflecting another ownership interest in 500
18   shares of private Scio?
19       A    500,000 shares.
20       Q    Okay.  So collectively between you and your wife,
21   2 million shares?
22       A    Correct.
23       Q    Okay.  And does this accurately reflect the number
24   of shares outstanding of private Scio as of April 1, 2011?
25       A    Does this document or does what you just

DSM-000446

184

1   described?

2       Q   Do the number of shares that's reflected on the

3   document, does that accurately reflect the amount of shares

4   that were outstanding as of this time?

5       A   I presume.  I don't remember the document.

6       I'm sorry, the number of shares that have been

7   issued or held by an individual.

8       A   Do these reflect the number of shares that were

9   held by my wife and I as of this date?

10      Q   Yes.

11      A   I presume so.  I would want to see the board

12  minutes, you know.

13      Q   So you are not sure?

14      A   Sounds right, but I am not sure.

15      Q   Okay.  Taking a look at this first page, were

16  there any other shareholders of private Scio that you were

17  aware of as of April 1, 2011, that are not reflected on this

18  sheet?

19      A   I don't remember.  I know other people later got

20  shares because of work they were doing, but I don't

21  remember --

22      Q   Okay.

23      A   -- as of that date.

24      Q   So as of April 1, 2011, what were the total number

25  of shares outstanding of private Scio?

[8/27/2015] ADAMS_EDWARD_20150827

---

185

1       A   I don't know.  I mean, I would add these up.

2   That's one way to calculate if this is an accurate summary

3   of everything that was outstanding.  But I would look at the

4   board minutes to make sure.

5       Q   Well, you know, I added them up, and I will throw

6   out what it adds up to.  You can take my representation for

7   whatever it's worth.  It's a little over 5 million shares.

8       A   Okay.

9       Q   Does that seem accurate as the number of shares

10  outstanding as of April 1, 2011?

11      A   You know, so there's a technical thing under

12  Nevada law, and it's the fact that you have shares that are

13  outstanding, but they haven't -- they are restricted because

14  you haven't performed the services yet fully.  So I don't

15  know if those were -- I mean, as a corporate lawyer, I don't

16  know if I would call those outstanding or had been issued,

17  subject to ultimate --

18      Q   What I am looking at here is the number of shares.

19  What does that column reflect; the number that's issued?

20      A   On the left-hand side, "number of shares," I

21  think, reflects the number of shares that have been issued,

22  whereas, the right-hand side are the ones that have been

23  fully paid for.  So services were provided at that point for

24  those.

25      Q   Okay.

[8/27/2015] ADAMS_EDWARD_20150827

---

186

1       A   And, you know, you multiply this times whatever

2   the prior value was to figure out the consideration that was

3   provided.

4       Q   Sure.  Okay.  So the number of shares that are

5   issued, that column to the left, you are saying, it adds up

6   to about 5 million -- a little over 5 million?

7       A   Are the two --

8       Q   No, the second page is as of June 30, 2011.

9       A   Yeah.  That doesn't look right to me.  But okay.

10      Q   Okay.  What -- I'm sorry, what doesn't look right

11  to you?

12      A   Because --

13      Q   Page 27

14      A   I don't think it fully reflects other people who

15  had done work who had gotten shares.

16          MR. KOPECKY:  Between March and June.

17          BY THE WITNESS:

18      A   It doesn't look right.  I think Bob Linares would

19  have been in there.

20          MR. RYBA:  Page 2 reflects stock ownership or

21  shares issued as of June 30th, which is -- the first page is

22  only April 1st.

23          THE WITNESS:  I appreciate that.  But it

24  doesn't -- you know, it doesn't include people who -- like

25  Greg Spitzer, I know, has done work and been issued shares.

[8/27/2015] ADAMS_EDWARD_20150827

---

187

1   It doesn't reflect Bob Linares.  I don't know why, but it

2   doesn't.  I don't know who maintained this.

3           BY MR. WISNIEWSKI:

4       Q   So Mr. Adams, as of April 1, 2011, what was your

5   percentage ownership of private Scio?

6       A   I would add the fully paid outstanding shares, and

7   then -- whatever I had divided by the denominator.  So in

8   this case, it looks like 50 percent.

9       Q   Okay.  And all I am trying to establish is -- so

10  is that 50 percent number, is that an accurate reflection of

11  your ownership interest in private Scio as of April 1, 2011?

12      A   I don't think it is because I think there were

13  shares issued in board minutes that somehow didn't make it

14  on here or this wasn't a complete ledger.  So I don't

15  remember.

16      Q   Okay.  So you think it was less than 50 percent

17  that's represented on this --

18      A   I think it was, yeah.

19          MR. SHANK:  If there were additional shares

20  issued, would those be reflected in board minutes?

21          THE WITNESS:  Yes, they should be.

22          BY MR. WISNIEWSKI:

23      Q   Let me hand you a document that's been marked as

24  Commission Exhibit 48.  Mr. Adams, Exhibit 48 is a --

25  purports to be an 89-page -- wait a minute.  Let me pull

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000447

188

1 that back from you, if you don't mind.

2     MR. WISNIEWSKI:  I marked the wrong document,

3 Guys.  Sorry.  I am going to scratch that 48.  This document

4 has been previously marked as Commission Exhibit 20.

5     BY MR. WISNIEWSKI:

6     Q   Mr. Adams, Exhibit 20 is a 110-page document that

7 purports to be a printout of the Form 10K filed by Scio

8 Diamond Technology Corp for the fiscal year ending March 31,

9 2012.

10     Have you seen this document before, Mr. Adams?

11     A   Probably.  It looks like in a different format

12 than I saw it, but -- yes, I have probably seen it.

13     Q   Okay.  What I want you to do is -- on the top of

14 the page, there's Page Numbers 1 through 111.

15     A   Yes.

16     Q   Can you turn to Page 47 of 111.  Let me know when

17 you are there.

18     A   Okay.

19     Q   Okay.

20     A   I want to make sure.  This is March of 2012, you

21 said, right?

22     Q   March 31, 2012.

23     A   Okay.

24     Q   Okay.  Under Item 13, which is titled "Certain

25 relationships and related transactions and director

189

1 independence."  Under that section, the third paragraph that

2 starts "On August 5, 2011," do you see that?

3     A   Yeah, barely.

4     Q   It says, "On August 5, 2011, the company," which

5 is defined as Scio Diamond, right, "executed the Scio asset

6 purchase agreement with another privately held Nevada

7 corporation that also had the name Scio Diamond Technology

8 Corp, private Scio."  Okay.  And skip the next sentence

9 there.

10     I want to begin with the sentence that starts,

11 "Our directors."  Do you see that?

12     A   Yeah.

13     Q   "Our directors, Edward S. Adams and Michael R.

14 Monohan, were directors of private Scio, and Joseph D.

15 Lancia was an officer of private Scio, and they owned

16 31.5 percent, 31.5 percent, and 15.4 percent respectively of

17 public Scio."  Do you see that?

18     A   Of "private Scio," I think it says.

19     Q   Did I say "public"?  I meant private Scio.

20     Do you see that?

21     A   Okay.

22     Q   Okay.  So let me ask you, is that an accurate

23 statement of your percentage ownership in private Scio as of

24 August 5, 2011?

25     A   I didn't write it.  It was written by the lawyers

190

1 for the company.

2     I assume it was.  Yeah, right away when I see

3 Lancia -- his name was missing on this thing, I think.

4     MR. SHANK:  This is as of August 5, 2011.

5     BY MR. WISNIEWSKI:

6     Q   So I am saying, as of August 5th, did you own a

7 31.5 percent interest in private Scio?

8     A   If it says it, I presume it's true.  I didn't

9 write this document.

10     Q   Do you have any reason to believe that that is

11 untrue?

12     A   I didn't calculate it but, no, I don't.

13     Q   So you have no reason to believe that's untrue?

14     A   No.

15     Q   Okay.  So on March 1, 2011, did you have a greater

16 ownership interest in private Scio than 31.5 percent, or a

17 lesser ownership interest in private Scio as of --

18     A   I believe this is lesser.

19     Q   Okay.  And all I am trying to do is ball park

20 where we are at.

21     A   I read myself as having a lesser interest as of

22 this date, which is August 5th on this --

23     Q   Okay.

24     A   -- than I do on this.

25     Q   Okay.  So at least -- so in March of -- March 1,

191

1 2011, you at least had a 31.5 percent interest in private

2 Scio?

3     A   Yes.

4     Q   Who else had an ownership interest in private Scio

5 when it was formed on March 1, 2011?

6     A   I would have to look at the --

7     Q   Was Michael Monohan an owner in private Scio in

8 March of 2011?

9     A   Yes.

10     Q   Was he an executive of private Scio in March of

11 2011?

12     A   March 1st, he was, according to the document you

13 gave me that was Exhibit 46A.

14     Q   How about after March 1, 2011; was Mr. Monohan an

15 executive of private Scio?

16     A   I think he resigned on March 8th or 9th or 10th,

17 or something like that, along with me.  I know it was

18 several weeks or -- after the entity was formed, because

19 Lancia was doing all that then.

20     Q   So your ownership in private Scio was at least

21 31 percent on March 1, 2011?

22     A   Yes.

23     Q   Okay.  And that was greater than your ownership

24 interest in Apollo Diamond in March 2011; is that right?

25     A   Are you talking about including the warrants?

DSM-000448

192

1    Q    I am talking about the common share ownership.

2    A    Common share ownership, according to the document

3  you gave me, yes.

4    Q    Okay.  And that was representing you had two

5  percent interest, right?

6    A    Correct.

7    Q    And the 31 percent ownership interest you had in

8  private Scio was greater than the 11 percent interest you

9  had in Apollo Diamond Gemstone as of March 2011; is that

10 correct?

11   A    Percentage-wise, yes.

12   Q    Okay.

13   A    31 is more than 11.

14   Q    Okay.  Why was private Scio formed?

15   A    To complete a transaction that would allow the

16 shareholders the opportunity to have a tax loss.

17   Q    I'm sorry, and just to be clear, what shareholders

18 are you referring to?

19   A    Of Apollo and Apollo Diamond Gemstone.

20   Q    Okay.

21   A    And also to participate in another entity where

22 their ownership was greater than it was in the previous

23 entity, or at least equal.

24   Q    Okay.  So private Scio was formed expressly for

25 the purposes of entering into this asset purchase agreement

[8/27/2015] ADAMS_EDWARD_20150827

---

193

1  with Apollo Diamond and Apollo Diamond Gemstone?

2    A    That was why it was initially formed.  You know,

3  it was unclear, I think -- it's important to appreciate, at

4  the time, we didn't know if someone -- we were talking to

5  numerous people, okay.  So I want to put some context in

6  this for your benefit.

7    Q    When you say you were talking to numerous people,

8  to whom are you referring?

9    A    Bob, myself, people at Focus.

10   Q    Okay.

11   A    Okay.  Michael.

12   Q    And you are saying you were speaking on behalf of

13 Apollo Diamond?

14   A    Joe Lancia.

15        No, we were speaking -- I would have been speaking

16 probably on behalf of Scio when I was talking to potential

17 people about -- I would describe Apollo's situation -- I am

18 summarizing what I imagine happened because I don't remember

19 the exact conversations precisely.

20        But I would have described Apollo's situation, the

21 fact that we were trying to accomplish something for the

22 shareholders, and there was an opportunity to essentially

23 buy the assets of Apollo, and you would have the

24 shareholders tag along with you.  They would get a tax loss,

25 and you would have the opportunity to run this company; do

[8/27/2015] ADAMS_EDWARD_20150827

---

194

1  whatever you wanted with this company.  We talked to people

2  about investing millions of dollars, tens of millions of

3  dollars, where they would essentially control, of course,

4  private Scio.

5        We were -- when I say "we," the initial people who

6  owned the shares were placeholders.  We could have stayed in

7  place, but we also were open to the possibility of someone

8  else taking our place if they were willing to make an

9  investment and honor the transaction for the shareholders.

10 That was what we had always talked about.

11   Q    Who controlled private Scio as of March 2011?

12   A    Mr. Monohan and myself.

13        "Controlled," meaning controlled, owned the

14 shares.

15   Q    "Controlled," meaning owning the shares?

16   A    That's how I would define "control."

17   Q    Okay.

18   A    But, you know, you could also define it as who was

19 the CEO, and that would have been Lancia.

20   Q    Okay.  How about the board members of private Scio

21 in March 2011; who was on the board?

22   A    I think it was Lancia, myself and Monohan.  We

23 talked actively about adding other board members as well.

24   Q    So another form of control is you and Mr. Monohan

25 being majority board members, having a majority of the board

[8/27/2015] ADAMS_EDWARD_20150827

---

195

1  positions?

2    A    Yes.

3    Q    When you were out talking to individuals about

4  private Scio, did you disclose to them your ownership

5  interest and your control over private Scio?

6        MR. SIKORA:  Can we go back to the last question?

7  You said "control" was if he and Mr. Monohan collectively

8  owned a majority of -- collectively vote a majority of the

9  board -- board votes.  But I think your question posed to

10 him individually.  That's -- I wanted to make sure we are

11 clear about what control is.  You are defining it.  I want

12 to make sure it's clear for the record.

13        BY MR. WISNIEWSKI:

14   Q    When you were out meeting with investors or other

15 people that you were talking to on behalf of private Scio,

16 did you disclose to them or talk about your control over

17 private Scio?

18   A    I didn't individually control private Scio.  I

19 would certainly tell people that --

20   Q    But you defined --

21        MR. SIKORA:  Could you let him finish his answer.

22 That would be helpful.

23        MR. KOPECKY:  Can we start that question again;

24 have her read it back?

25        BY MR. WISNIEWSKI:

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000449

196

1    Q    You can correct me if I am wrong.  But you said
2    that you owned -- you and Mr. Monohan controlled private
3    Scio due to your share ownership, right?
4           MR. KOPECKY:  If they acted together, they could
5    control private Scio.
6           MR. SIKORA:  Those -- you understand that if they
7    vote in lockstep, yes.  If they don't --
8           BY MR. WISNIEWSKI:
9    Q    You stated that the control of private Scio was
10   between you and Mr. Monohan owning --
11   A    If we voted together -- there was no shareholder
12   agreement or anything like that, that obligated us to vote
13   together.  So if we voted -- if a majority of shareholders
14   together vote on an action, then they can take that action.
15   Q    Okay.  And I understand you did not own more than
16   51 percent of the shares of private Scio.
17   A    Correct.
18   Q    I understand that.  But you and Mr. Monohan
19   together or collectively did?
20   A    That is correct, I believe.  Yes.
21   Q    Okay.  And my question is, when you were out
22   talking to individuals about private Scio, whether it be
23   making an investment or them assuming control over private
24   Scio, did you tell them or talk to them about your
25   percentage interest and Mr. Monohan's percentage interest;

[8/27/2015] ADAMS_EDWARD_20150827

197

1    who actually controlled the company?
2    A    When you say "individuals," are you talking
3    generically?
4         I don't remember what I said to who.  If they
5    asked me who owned shares in Scio, I certainly would have
6    said it was me.
7    Q    I thought you just told me that you were out
8    talking to individuals about this company.
9    A    On behalf of the company.
10   Q    On behalf of the company, about investing in the
11   company?
12   A    These were institutions.  Yeah.
13   Q    Okay.  About purchasing the company potentially?
14   A    Absolutely.
15   Q    And when you had those conversations, did they
16   include, Who owns the company now?
17   A    They probably did.  I don't remember specifically.
18   Q    Okay.  So you don't remember having any
19   conversations about your ownership interest in private Scio
20   with these individuals or entities you spoke with?
21   A    I don't remember the context of the conversations
22   I would have had.  If somebody asked me, who are the present
23   owners of private Scio, I certainly would have told them.
24   There is no reason not to.
25         So I don't remember specifically a conversation

[8/27/2015] ADAMS_EDWARD_20150827

198

1    with a potential investor.  Again, these are -- the
2    conversations I remember is one was a company called Rosy
3    Blue, which is a large diamond wholesaler, multi-billion
4    dollar company, you know.  Do I remember exactly what Dilip
5    or Dipu -- those are the gentlemen's names, if I remember
6    correctly -- and I talked about in terms of ownership?  I
7    don't.  I'm sorry, I really don't.  I can imagine that if
8    they asked me, I would have for sure said it.
9    Q    Okay.  Going back to the March 2011 asset purchase
10   agreement between Apollo Diamond and private Scio.  Explain
11   to me how the agreements were reached.
12   A    Bob and I talked.  I said, you know, You are going
13   to have to sign a conflict waiver, because if our law firm
14   is going to try to provide services for both Scio and
15   Apollo -- and there's no money, so someone is going to have
16   to do it -- and were willing to do it -- we have to sign a
17   conflict waiver, and I am going to need to resign, and we
18   are going to try to reach -- hopefully we can reach an
19   agreement which allows a win-win for the shareholders of
20   Apollo and Gemstone through the structure.
21   Q    So did you approach Mr. Linares on behalf of
22   private Scio?
23   A    I don't know if I approached him or we just had a
24   conversation.  I don't know.  He is my father-in-law.  I
25   don't remember if it was approaching him or we just started

[8/27/2015] ADAMS_EDWARD_20150827

199

1    talking about a strategy for allowing the shareholders to
2    participate.
3    Q    Okay.  And were you talking to him as an executive
4    or chairman of private Scio?
5    A    I don't know -- I didn't wear a particular hat
6    that I can remember.  I certainly -- I understood that this
7    was a negotiation between two parties.  We both had the same
8    objective, which was to give the shareholders an opportunity
9    to participate going forward, and to save -- we believed --
10   saved the opportunity for the shareholders.  But I don't
11   remember if I said to him, Bob, I am going to -- I am
12   wearing this hat right now.  I don't remember that.
13   Q    So who were the two companies?
14   A    Private Scio and Apollo.  It was really three; and
15   Apollo Diamond Gemstone.
16   Q    So you were talking to Bob Linares about the
17   Apollo Diamond/private Scio asset purchase agreement?
18   A    I was or Michael Monohan was or Joe Lancia was.
19   Q    Okay.  Who was the primary point of contact as far
20   as private Scio goes?
21   A    It became Joe Lancia.  I don't know when that
22   happened.  But he certainly took an active role, because he
23   was being paid as a consultant to do that.
24   Q    Who negotiated that agreement, the asset purchase
25   agreement?

[8/27/2015] ADAMS_EDWARD_20150827

200

```
 1      A    I don't remember if that was all of us or Joe
 2   or -- I don't remember.
 3      Q    Okay.  And you said ultimately you reached an
 4   agreement in March of 2011, right?
 5      A    Right.  If I remember correctly, the document was
 6   signed in March of 2011.
 7      Q    Okay.
 8      A    The asset purchase agreement.
 9      Q    And what was the purchase price?
10      A    I believe it was $2 million.
11      Q    Okay.  And how was private Scio going to pay
12   Apollo Diamond $2 million?
13      A    It was going to go raise money to do that through
14   conversations we were having with parties like Rosy Blue.
15      Q    And did it ultimately raise that money?
16      A    It ultimately raised -- well, private Scio, I am
17   pretty sure, raised no money.  It became public Scio prior
18   to it raising money.  So I want to be precise.  I don't
19   think private Scio actually raised any money.  I think it
20   made efforts to raise money, and ultimately concluded after
21   we had talked to numerous parties that it wasn't going to
22   happen.
23      Q    Okay.  So private Scio attempted to raise money to
24   pay the purchase price?
25      A    Starting in, I would like to say, May of 2011.
```

[8/27/2015] ADAMS_EDWARD_20150827

201

```
 1      Q    I will hand you a document that's been previously
 2   marked as Commission Exhibit 13.  Commission Exhibit 13 is a
 3   document that's Bates labeled SEC Adams-25802 through
 4   25914.
 5      A    Okay.
 6      Q    Is this the private placement memorandum pursuant
 7   to which private Scio attempted to raise capital in May of
 8   2011?
 9      A    Yeah, I don't know if -- so I don't remember if
10   this or there were subsequent amendments to it that were
11   circulated.  But sum and substance was similar to this
12   document.  There might have been an amendment to it.
13      Q    Okay.
14      A    But this is the heart of the document, probably,
15   yes.
16      Q    Okay.  And if you go ahead and turn to Page 1 of
17   Exhibit 13.
18      A    Actual Page 1, not Roman?
19      Q    Actual page.
20           Okay.  And it kind of gives the offering summary;
21   kind of the details of the --
22      A    Yes.
23      Q    Outlines the raise or what the capital raise is
24   for; is that right?
25      A    Sure.
```

[8/27/2015] ADAMS_EDWARD_20150827

202

```
 1      Q    Okay.  And if you turn to Page 3 of Exhibit 13
 2   under Executive Summary, under the situation overview.  Do
 3   you see that?
 4      A    Yes.
 5      Q    It says, "Scio Diamond Technology Corp was formed
 6   in March 2011 for the purpose of acquiring substantially all
 7   the assets of both Apollo Diamond, Inc. and its subsidiary
 8   Apollo Diamond Gemstone."  Do you see that?
 9      A    Yes.
10      Q    Okay.  And then further in that paragraph, it
11   says, "Scio Diamond has successfully negotiated separate
12   agreements with Apollo Diamond and Apollo Gemstone, whereby
13   each of the Apollo companies would sell all of its
14   respective assets to Scio Diamond for a cumulative 2 million
15   and $10,000."  Do you see that?
16      A    I do.
17      Q    So the 2 million purchase price agreement was
18   between Apollo Diamond and private Scio?
19      A    Yes.
20      Q    Okay.  And then there was a second agreement
21   between Apollo Gemstone and private Scio for $10,000?
22      A    Right, which was later amended.  Yes.
23      Q    And the next paragraph, the third sentence that
24   starts with, "As an additional."  It says, "As an additional
25   consideration" -- sorry, "an additional condition to the
```

[8/27/2015] ADAMS_EDWARD_20150827

203

```
 1   asset purchase, each qualified stockholder of the Apollo
 2   companies will be permitted a limited opportunity to
 3   purchase shares of common stock of Scio Diamond in a number
 4   equal to his, her or its ownership of common stock of Apollo
 5   Diamond and/or Apollo Gemstone at a price of one penny per
 6   share."  And it's -- they kind of refer to that as a
 7   negotiated subscription.
 8           Do you see that?
 9      A    I do.
10      Q    Okay.  Was that an actual condition -- was that an
11   actual agreement reached between Apollo Diamond and private
12   Scio?
13      A    Yes, we agreed on that.  I mean, the companies
14   agreed that that would be -- that was fundamental to the
15   transaction, yes.
16      Q    Was there a formal agreement, a written agreement,
17   that provided those terms?
18      A    I don't remember that.  I know it was an agreement
19   that we intended to honor for sure.  That was the whole
20   point of the transaction.
21      Q    And how was that memorialized in the agreement?
22      A    I don't know.  I don't know.  I have to look at
23   the agreement.
24      Q    Okay.  It was in the agreement --
25      A    I don't remember that it was or was not.
```

[8/27/2015] ADAMS_EDWARD_20150827

## 204

```
 1        Q    Okay.  If it was an important part of the
 2   agreement -- it was an important part of the agreement,
 3   right?
 4        A    Absolutely.
 5        Q    You said it was -- I don't want to
 6   mischaracterize -- the essence of the agreement or --
 7        A    I don't think I used the word "essence."  But the
 8   whole reason the transaction was structured this way was to
 9   make sure that Apollo shareholders and Apollo Diamond
10   Gemstone shareholders had a right to participate in Scio for
11   a penny.
12        Q    Okay.  And you just don't know where that
13   agreement was memorialized or how that was memorialized --
14   that point was memorialized?
15        A    I don't.
16        Q    Okay.
17        A    I mean, it exists because here it is in the
18   document.  And I know Lancia sent out a letter later, you
19   know.  We talked to the shareholders and told them that.
20        Q    If you could turn to Page 60 of Exhibit 13, which
21   is Bates numbered SEC Adams 25870.  Let me know when you are
22   there.
23        A    Okay.
24        Q    There is a section that says, "Risk relating to
25   this offering."
```

[8/27/2015] ADAMS_EDWARD_20150827

## 205

```
 1        A    Yes.
 2        Q    And under that there is a subheading that says,
 3   "Shareholders may be unable to exercise control because
 4   management will own and controls a large percentage of the
 5   company's stock."  Do you see that?
 6        A    I do.
 7        Q    Why was that disclosed as a risk?
 8        A    I think that's a pretty standard disclosure if
 9   it's true, of course.
10        Q    Why disclose that?
11        A    To inform the shareholders about the situation.
12        Q    What do you mean, "about the situation"?
13        A    That management owned and controlled a large
14   percentage of the company's stock.
15        Q    Okay.  Is that an important fact for shareholders,
16   in your opinion?
17        A    Sometimes.
18        Q    Okay.
19        A    I mean, it depends on the situation.
20        Q    Okay.  If you turn the page to Page 61.  On the
21   bottom of 61, there is a heading that says "Potential
22   conflicts of interest could develop, relate to certain of
23   our board members."  Do you see that?
24        A    I do.
25        Q    Okay.  And it starts there -- it says, "Certain
```

[8/27/2015] ADAMS_EDWARD_20150827

## 206

```
 1   board members of the company are partners in the law firm
 2   Adams Monohan, LLP, which has provided legal services to
 3   both Apollo Diamond, Inc. and Apollo Diamond Gemstone Corp,
 4   collectively Apollo" -- this goes on to Page 62 -- "and the
 5   company for which fees are currently due and outstanding.
 6   We anticipate that this relationship will continue going
 7   forward and that Adams Monohan, LLP will continue to provide
 8   legal services on behalf of the company."
 9        Why was that disclosed?
10        A    To inform the shareholders -- potential
11   shareholders of Scio that at that point, we were
12   shareholders -- or, excuse me, we had done legal work for
13   the company --
14        Q    Okay.
15        A    -- Apollo.  Well, we had done legal work for
16   Apollo, and we were going to do legal work going forward for
17   the company defined as -- "the company" here is defined, so
18   it's Scio.
19        Q    Okay.  And why did you think that was important to
20   disclose to potential shareholders?
21        A    Because by May of 2011, we hadn't found anyone
22   else who seemed interested in being involved in a serious
23   way, and it was clear that, unfortunately or fortunately,
24   Adams Monohan -- Adams and Monohan and the others who were
25   working with us were going to have to be actively involved
```

[8/27/2015] ADAMS_EDWARD_20150827

## 207

```
 1   to make sure this company was successful.
 2        Q    Okay.  And would their involvement, would that be
 3   the conflict of interest?
 4        A    I don't think it is a conflict of interest.  I
 5   don't even know what "conflict of interest" is per se.  I
 6   don't think it's defined.
 7        Q    Let me ask you this:  Who drafted this PPM?
 8        A    My law firm along with -- I am sure Joe Lancia had
 9   input on it, and perhaps others.
10        Q    So when your law firm says "a potential conflict
11   of interest," what did that mean?
12        MR. SIKORA:  By the way, I don't think that's what
13   he just testified to.  He mentioned a group of people
14   working on this document.
15        MR. SHANK:  Did you review this document before it
16   went out?
17        THE WITNESS:  I believe I did.  I don't remember.
18        MR. SHANK:  What did "potential conflict of
19   interest" mean to you?
20        THE WITNESS:  That we were going to be doing legal
21   work and also owning equity in the company; 16 percent, as
22   it says in the next -- I don't -- I have never understood --
23   I think conflict of interest is one of those things where
24   it's very nebulous.
25        MR. WISNIEWSKI:  Why don't we go off the record at
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000452

208

```
 1    3:05.
 2                    (Whereupon, a recess was had.)
 3         MR. WISNIEWSKI:  Back on the record at 3:16.
 4         BY MR. WISNIEWSKI:
 5         Q    Mr. Adams, we were talking about Exhibit 13;
 6    Commission Exhibit 13.  And will you turn to Page 63,
 7    please, which is Bates numbered SEC Adams 25873.
 8         A    Yes.
 9         Q    Okay.  And it provides a use of proceeds.  And I
10    am assuming this is the use of the proceeds of the funds
11    that are raised pursuant to this PPM.  Is that correct?
12         A    Yes.
13         Q    Okay.  And down on the bullet points there, the
14    first bullet says, "Approximately 2 million will be used to
15    acquire the assets of Apollo," okay.  "Such assets were
16    developed over a ten-year period.  A portion" -- I will kind
17    of skip on that sentence there.
18             "A portion of the 2 million received by Apollo in
19    connection with the anticipated purchase of assets will be
20    used to, 1, pay certain moneys owed to Adams Monohan, LLP in
21    connection with prior legal services to Apollo; 2, to
22    satisfy certain liabilities owed to a secured creditor of
23    Apollo who was also a shareholder of both Adams Monohan,
24    LLP; and 3, satisfy certain liabilities owed to secured
25    creditors of Apollo, including Robert Linares, who is
```

[8/27/2015] ADAMS_EDWARD_20150827

---

209

```
 1    expected to serve as the technology consultant to the
 2    company."  Do you see that?
 3         A    I do.
 4         Q    Why was it important to disclose that certain of
 5    the proceeds raised were going to be used to pay those three
 6    categories listed in this first bullet?
 7         A    I think later that was removed because there was a
 8    feeling that -- I think Counsel later told us, Well, you
 9    don't --
10         Q    We don't need to know that.  And I certainly don't
11    want to know what counsel stated.
12             But as private Scio is the entity -- as a
13    representative or chairman of the entity raising this money,
14    why was it important to tell potential shareholders that
15    that was how 2 million of the proceeds was going to be used
16    or distributed?
17         A    Because that's what we believed was going to
18    have -- what we thought, knowing what we did at Apollo --
19    because remember, it's a different entity -- what we thought
20    Apollo was going to do with the money at the time.  We
21    didn't know.  I am now at private Scio.  I am not certain
22    what Apollo was going to do with the money.
23             So it was to the best of our knowledge, what we
24    thought was going to happen.  We thought they should know
25    that, to the best of our knowledge at the time.
```

[8/27/2015] ADAMS_EDWARD_20150827

---

210

```
 1         Q    And why?  Why let them know that?
 2         A    Like I said, later I think it was taken out
 3    because we were told, You don't need to do -- when you sell
 4    your house, you don't need to tell the buyer what you are
 5    going to do with their money.
 6         Q    But as it's written here, why was it important to
 7    include here?
 8         A    I don't remember what the rationale was for it.
 9         MR. SHANK:  Does this accurately reflect what you
10    understood the intentions to use the sale proceeds for as of
11    the time of this memorandum?
12         MR. KOPECKY:  Who are you --
13         MR. SHANK:  I will reask the question.
14             Does this bullet point accurately reflect what you
15    personally understood the sale proceeds to be used for?
16         MR. KOPECKY:  That Apollo would use them for?
17         MR. SHANK:  Yes, that Apollo would use the sale
18    proceeds for.
19         THE WITNESS:  I don't know if it was what I
20    understood.  It was what us at Scio understood, to the best
21    of our knowledge, would be done with Apollo -- with what
22    Apollo would do with the money.
23         MR. SHANK:  Was your understanding consistent with
24    private Scio's understanding?
25         THE WITNESS:  Was my personal understanding?
```

[8/27/2015] ADAMS_EDWARD_20150827

---

211

```
 1         MR. SHANK:  Yes.
 2         THE WITNESS:  I don't know what other people at
 3    private Scio knew, so I can't really testify to that.  I'm
 4    sorry.
 5         MR. SHANK:  What -- never mind.  Go ahead.
 6         MR. KOPECKY:  I am still late to this game.  But
 7    this is private Scio's.  They didn't raise any money -- you
 8    didn't raise any money with this?
 9         THE WITNESS:  No.  Well, I don't know.
10         MR. KOPECKY:  "You" being private Scio didn't.
11         THE WITNESS:  Yeah, I mean, we changed the
12    document or it got changed, because later this other
13    attorney came in -- I won't go there.
14         BY MR. WISNIEWSKI:
15         Q    When was this document changed?  You said this
16    document was changed -- or this was taken out.  When was
17    this taken out?
18         A    I think in 2011 or '12.  I don't really remember.
19         Q    This bullet point was removed in 2010?
20         A    No, not 2010.  I think you said 2010.  I'm sorry
21    if you didn't.  I think it was in 2012, I think.  I think it
22    was altered, the way this was worded, because other
23    attorneys were engaged, and they had a different
24    perspective.
25         Q    So in --
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000453

212

1  MR. SIKORA:  Can you let him finish?
2  BY MR. WISNIEWSKI:
3  Q   I want to make sure I don't invade the privilege.
4       So this bullet point was taken out of this PPM
5  sometime in 2012?
6  A   No.  Let me be clear, okay.  The PPM was
7  restructured and changed, my recollection, in 2012, because
8  what ended up happening was public -- so can I use that
9  phrase?
10  Q   Sure.
11  A   Public Scio now had new securities and counsel,
12  period, and they made alterations to it.  And I wasn't -- I
13  had nothing to do with those documents anymore, other than
14  looking at them.  And I was merely the chairman of public
15  Scio.
16  Q   Okay.  But Exhibit 13, as it's written here, this
17  was distributed to individuals and potential investors,
18  correct?
19  A   I don't remember if this exact document was or
20  there were addendums to it that were included along with
21  this document.  I don't remember because -- I am trying to
22  think, did I send it to anyone.  I don't remember that I --
23  I might have sent it to people that were interested, but I
24  don't remember if it was this document or another one that
25  included addendums or --

214

1  MR. KOPECKY:  You are going to have -- there's got
2  to be ones with the number on them; a memo number, or
3  whatever.
4       THE WITNESS:  That would have been controlled by
5  the -- by Maxwell Simon, I imagine, or the company in
6  Greenville.
7       MR. KOPECKY:  I am saying then there would be no
8  doubt.  If it was handed out to an investor --
9  BY MR. WISNIEWSKI:
10  Q   I am going to hand you a document that's been
11  previously marked as Commission Exhibit 14.  Commission
12  Exhibit 14 purports to be a document labeled -- titled
13  "Supplement to the confidential private placement
14  memorandum" dated May 10, 2011, and is a two-page document
15  Bates numbered SEC Adams 26178 through 26179.
16       Do you know what this document is, Mr. Adams?
17  A   I believe it's a document that was drafted to
18  accompany the document that you just put in front of me.
19  Q   So is this the addendum that you were referring
20  to?
21  A   I think there was another one.  I think this was a
22  draft.  I don't think this was the only -- I don't think
23  this was the final.  I am pretty sure it was never used in
24  this form, because Focus wasn't involved within several
25  weeks after this.

213

1  MR. KOPECKY:  Do you have that addendum, Kevin?
2  MR. WISNIEWSKI:  I do.
3  BY MR. WISNIEWSKI:
4  Q   So if there was an addendum to this document, this
5  document would still have been circulated to potential
6  investors, right?
7  A   Yeah, if there was an addendum that would have --
8  it would have been an addendum to this document, I would
9  imagine.  But, you know, I don't know -- my issue is I don't
10  know if this is a draft or the actual document that we sent.
11  I just don't know.
12  Q   You don't know.  You don't know if this is a draft
13  or the final document?
14  A   I don't.
15  Q   Who was the placement agent in connection with
16  this private placement?
17  A   So there was a period of time where it was --
18  Focus Capital was intended to be the placement agent.  That
19  was a three-week, perhaps, period, or a month.  I don't even
20  remember.  And then ultimately, I think there was a new
21  agreement signed with another entity called Maxwell Simon,
22  but that might have been post private and now public Scio.
23  Q   And how could I tell if this was a final version
24  or a draft?
25  A   I don't know.  I'm sorry, I really don't.

215

1  Q   So was Commission Exhibit 14 ever distributed to
2  any potential investors?
3  A   I don't remember.  It's possible it was, but I
4  don't remember.
5       MR. SHANK:  Do you know who drafted this document?
6       THE WITNESS:  It would have been drafted, I
7  presume, by Adams Monohan, along with Joe Lancia.
8  BY MR. WISNIEWSKI:
9  Q   Why was it drafted?
10  A   Because, if I remember correctly, Focus had been
11  engaged by Scio, private Scio, to raise capital.
12  Q   It announces that Focus was retained as placement
13  agent?
14  A   Yes.
15  Q   The first page, it's three paragraphs down.  The
16  second paragraph, as you said, basically, announces that
17  Focus Capital was retained to be the placement agent.
18  A   Uh-huh.
19  Q   I direct your attention to the third paragraph
20  that starts with, "Important."  It says, "Important is
21  certain of our board members are shareholders and officers
22  of the placement agent," which is Focus Capital.
23       The second paragraph, skipping that first clause,
24  "We understand that potential conflicts of interest could
25  develop, and have taken care to disclose such relationship

216

1   and implement safeguards in an effort to prevent any such
2   conflicts."
3       Then why would that be a potential conflict of
4   interest?
5       A   I think we were told to put language in there like
6   that because of our compliance person.  It was an offsite
7   compliance person, and he said that's a standard -- that's
8   standard language that you need to include when you are a
9   shareholder of the entity that's raising capital.
10      Q   You said a compliance agent.  What was the name of
11  that compliance agent?
12      A   They are in New Hampshire.  It's a service.  We
13  talked to most people there.  It is an outsource compliance
14  function, and I don't remember the woman's name.  I know it
15  was a woman.
16      Q   So did you speak with them in your capacity as the
17  chairman of the board of private Scio, or was this in
18  connection with your legal work on behalf or for private
19  Scio?
20      A   Actually, I think it would have been done in
21  connection with Focus Capital's involvement.
22      Q   Okay.  So did Focus Capital request that this
23  information be placed in the supplement?
24      A   We would have -- the standard procedure would be
25  to run -- if we were involved in a transaction, we would run

[8/27/2015] ADAMS_EDWARD_20150827

217

1   elements of it that we thought were appropriate by
2   Compliance, both internal and external; "we" meaning Focus
3   Capital.
4       Q   Okay.  So Focus Capital would run it by a
5   compliance agent?
6       A   In some cases, yes.
7       Q   Okay.  And in this instance, the compliance agent
8   recommended that this --
9       A   I don't remember that, okay.  I am just saying I
10  think that that's probably what happened, because I remember
11  talking to Compliance about the transaction.  I just don't
12  remember the specifics of how this language got inserted
13  into this document.
14      Q   Did Adams Monohan draft this supplement?
15      A   I presume we did.
16      Q   Okay.  But you don't remember how this got in
17  there?
18      A   Well, I don't think I drafted it.  So I am
19  assuming it was one of the people that worked at Adams
20  Monohan.
21      Q   Did you review it prior to the final version or --
22      A   I don't remember.
23      Q   And it says, "Care to disclose such relationships
24  and implement safeguards in an effort to prevent such
25  conflicts."

[8/27/2015] ADAMS_EDWARD_20150827

218

1       What safeguards were implemented?
2       A   I don't remember.
3       Q   Okay.
4       A   I mean, it says in the next sentence, "Such
5   safeguards include, but are not limited to, seeking approval
6   of third-party legal counsel in establishing an initial
7   independent board."
8       Q   And was that done?
9       A   We talked to third-party counsel, Paul Hastings,
10  among others.
11      Q   I don't mean to interrupt, but we -- we are using
12  the word "we."  When you say "we" --
13      A   Private Scio.
14      Q   So private Scio spoke with Paul Hastings about --
15  I don't need to know the content or want to know the content
16  of the communication.  But did -- were they the third-party
17  counsel that's referenced here?
18      A   I don't remember if they were or it was some other
19  party.  But I remember we talked to them about the
20  transaction.
21      Q   It was some -- was any law firm contacted in
22  regards to this safeguard?
23      A   I don't remember.  I presume so.
24      Q   Why do you presume so?
25      A   Because it says "third-party legal counsel."  So I

[8/27/2015] ADAMS_EDWARD_20150827

219

1   don't remember.
2       Q   The next sentence says, "Additionally, certain of
3   our board members are also partners of a law firm Adams
4   Monohan, LLC, which provided legal services to the company
5   for which fees are currently due and outstanding."  Do you
6   see that?
7       A   Yes.
8       Q   Why was that disclosed?
9       A   It was a decision made to disclose it.  I don't
10  remember why.  I don't.
11      Q   Did private Scio think it was important to
12  disclose the fact that certain of its board members were
13  also performing legal work for it?
14          MR. SIKORA:  Did private Scio think that?
15          BY THE WITNESS:
16      A   Was that the question?
17          MR. SIKORA:  You are asking if he thought that or
18  whether private Scio thought something?
19          MR. WISNIEWSKI:  I am asking private Scio.
20          BY THE WITNESS:
21      A   I don't know what private Scio thought.
22          BY MR. WISNIEWSKI:
23      Q   Did you think it was important to disclose?
24      A   I don't remember if I had input on that or not.
25      Q   How about today?  Do you think -- sitting here

[8/27/2015] ADAMS_EDWARD_20150827

220

1   today, do you think it was an important fact to disclose to
2   potential shareholders back in May 2010 or May 2011, that
3   your law firm was providing services to private Scio?
4       A    Not necessarily.
5       Q    Why not?
6       A    It's a de minimis amount, I would imagine.  I
7   don't remember.
8       Q    So if it was a de minimis amount, you don't think
9   it was necessary to disclose that to potential investors?
10      A    I guess the standard is, is it material to an
11  investor.  That's the general standard.  I would have to
12  evaluate -- I don't know what my thought was in May of 2011
13  about that.
14      Q    How about now?  Do you think that was a material
15  fact?
16      A    I don't think so.
17          MR. SIKORA:  What's your definition of "material"?
18  Now you are getting into a term that people can --
19          MR. WISNIEWSKI:  He can answer the question.
20          MR. SIKORA:  If he understands it.  If you are
21  going to take this answer as an answer that has some value
22  to it, you should know and have a common understanding of
23  what that term means.
24          MR. KOPECKY:  Many things today are irrelevant to
25  what he did back then.

221

1           MR. WISNIEWSKI:  Gentlemen, you can speak in
2   objections.
3           MR. SIKORA:  Objection.
4           MR. SHANK:  Do you understand the question?
5           THE WITNESS:  No, I'm sorry.
6           BY MR. WISNIEWSKI:
7       Q    As you sit here today, do you think this was a
8   material fact that needed to be disclosed to shareholders or
9   potential shareholders of private Scio?
10      A    I would need to know what "material" meant.
11      Q    What do you think -- what is your definition of
12  "material"?
13      A    Something that a reasonably informed investor
14  would consider to be significant.
15      Q    Taking that definition, as you sit here today, do
16  you think this was a material fact that needed to be
17  disclosed to potential shareholders?
18      A    Not necessarily.
19      Q    Why not?
20      A    Because it doesn't have a significant impact on
21  the operation of the business in any way or the success or
22  failure of the business.
23      Q    In May 2011, what conversations were -- were you a
24  part of any conversations with anyone else at private Scio
25  about the disclosure of that fact?

222

1       A    I don't remember.
2       Q    Okay.  Who else was employed at private Scio,
3   other than yourself?
4       A    I wasn't employed at private Scio.
5       Q    Who else was a board member?
6       A    I believe it was Mr. Monohan and Mr. Lancia.
7       Q    Did you have any conversations with Mr. Monohan or
8   Mr. Lancia about the disclosure of the legal work Adams
9   Monohan was performing on behalf of private Scio?
10      A    It's possible I did, but I might have also had
11  them in the context of a counsel.  So in other words --
12      Q    And I want to -- yeah, I want to split those
13  two --
14      A    I don't think I can split those two.  I don't know
15  which hat I was wearing.
16      Q    How about Joe Lancia?  Did you have any
17  conversations with Joe Lancia back in May 2011 about the
18  disclosure of the legal work Adams Monohan, LLP was
19  performing in private Scio in the PPM?
20      A    I don't remember.
21      Q    But somehow, some way, this disclosure was made,
22  right?  Someone made a decision that this should be
23  disclosed in the PPM?
24      A    This was a draft.
25      Q    This was a draft?

223

1       A    I don't know.  I don't know, you know.  So this
2   was a document that -- if I produced it, I don't know
3   where -- you know, where it came from, in terms of whether
4   it was a draft or original -- or final document.
5       Q    Let's assume that it was produced for the sake of
6   argument.
7       A    Okay.
8       Q    It was produced to investors or given to potential
9   investors.
10      A    Not produced by me to you.
11      Q    No.  But let's say -- who made the decision to
12  include this?
13      A    I don't know.
14      Q    You weren't part of the decision?
15      A    I don't know.
16          MR. SHANK:  Do you recall anyone at Focus Capital
17  ever raising concerns about related party and conflict of
18  interest disclosures in the original PPM, or lack thereof?
19          MR. SIKORA:  Which original PPM are you talking
20  about, Jeff?
21          MR. SHANK:  The one we looked at, Exhibit 13.  The
22  private placement memorandum as of May 1, 2011.
23          THE WITNESS:  Do I recall anybody at Focus Capital
24  thinking --
25          MR. SHANK:  Raising any concerns about the

DSM-000456

224

1  sufficiency of related party or conflicts of interest
2  disclosures in the originally drafted private placement
3  memorandum?
4       THE WITNESS:  We all talked about how to
5  appropriately disclose relationships.  We, all people
6  at Focus talked about that.
7       MR. SHANK:  My question is, do you recall anyone
8  at Focus Capital raising concerns about the sufficiency of
9  the original disclosures?
10       THE WITNESS:  I think a couple of the principals
11  there did raise concerns, yes.
12       MR. SHANK:  Who?
13       THE WITNESS:  I think it was Christopher Mack and
14  Paul Rapello.
15       MR. SHANK:  Tell me about the concerns they
16  raised.
17       THE WITNESS:  I think their concern was, We should
18  talk to the people at Compliance -- if I remember correctly,
19  We should talk to the people at Compliance and make sure
20  they are signing off on whatever we disclose.  And if Focus
21  Capital is going to be involved, it's important that we
22  describe its role correctly as a placement agent, which, of
23  course, we all agreed with.
24       MR. SHANK:  Did either of them raise any concerns
25  about disclosing the nature of Adams Monohan's involvement

226

1       Q   So no one at Focus Capital raised any concerns
2  about the disclosure -- about the nature of the disclosure
3  in the PPM, which I will refer to as Exhibit 13?
4       A   I am not saying that they didn't raise any
5  concerns about the nature of the disclosure.  They might
6  have had an opinion on disclosure.  I just don't know that
7  they raised it specifically about Adams Monohan or not.  I
8  don't remember.
9       Q   Did they have an opinion on that specific
10  disclosure?
11       A   I don't remember.  I know they had an opinion on
12  Focus Capital, because they were members of Focus Capital,
13  and so they had an opinion.  They weren't members of Adams
14  Monohan.  They can't be, because they weren't lawyers, so
15  they can't, obviously, practice law.  And that was a source
16  of continuing tension between us, because they -- I think
17  they were resentful of the fact that we were practicing law
18  and not just working at Focus Capital.
19       Q   Turning back to Exhibit 14, Commission Exhibit 14,
20  on Page 2.
21       A   I'm sorry, 14?
22       Q   Commission Exhibit 14.
23       A   Okay.  Got it.
24       Q   Page 2.
25       A   Yes.

225

1  in the private Scio fundraising?
2       THE WITNESS:  That I don't remember because the
3  documents were probably disclosing that already, I am sure,
4  in terms of this document.  We just looked at it.  I don't
5  know whether it's a draft or it's a final.  So that I don't
6  remember specifically.
7       MR. SHANK:  Were Mr. Mack's and Mr. Rapello's
8  concerns the impetus towards creating the supplement to the
9  private placement memorandum?
10       THE WITNESS:  No.  I believe the impetus was the
11  involvement of Focus Capital as a placement agent.
12       BY MR. WISNIEWSKI:
13       Q   Did anyone at Focus Capital raise any concerns
14  regarding your service as a board member of private Scio?
15       A   We had that conversation because Mack was
16  concerned that it would take more time, and that would be
17  less -- I or Mike Monohan would have less time to devote to
18  the operations of Focus and making money for Mr. Mack and
19  Mr. Rapello.
20       Q   Did anyone at Focus Capital raise any concerns
21  regarding the need to disclose that as a board member, your
22  law firm was also performing services on behalf of the
23  company?
24       A   That I don't remember, because I think it was
25  already disclosed on Page 62.

227

1       Q   Again, there's some bullet points about the uses
2  of the money raised through the PPM.  And that first bullet
3  point says, "Approximately $2 million will be used to
4  acquire the assets of Apollo, Inc. and Apollo Diamond
5  Gemstone."  I will skip the parens.
6       "A portion of the 2 million received by Apollo in
7  connection with the anticipated purchase of assets will be
8  used to pay certain moneys owed to Adams Monohan, LLP, which
9  is disclosed above, shares some element of common ownership
10  with Focus, and to satisfy a percentage of certain
11  liabilities owed to a secured creditor of Apollo, who is
12  also a shareholder of Focus."
13       Why was it important to disclose that?
14       A   I don't remember.
15       Q   Who decided to disclose that?  Who made the
16  decision to disclose that?
17       A   Scio, I presume, among consultation with counsel.
18  I don't remember.
19       Q   Who at private Scio?
20       A   Collectively all of us, I imagine.  I don't
21  remember.
22       Q   So you have no recollection of this disclosure or
23  the decision to make this disclosure?
24       A   I have a recollection of a disclosure, because I
25  am looking at it.  I don't recall the conversations relating

DSM-000457

228

```
 1   to this disclosure specifically.  I don't.  I'm sorry, I
 2   don't.
 3        Q   Okay.  Now, as part of the asset purchase
 4   agreement, I should say between Apollo Diamond and private
 5   Scio, Apollo Diamond issued a proxy statement to its
 6   investors; is that correct?
 7        A   Yes.
 8        Q   Okay.  And I am going to hand you an exhibit
 9   that's been previously marked as Commission Exhibit 6.
10        A   Thank you.
11        Q   Commission Exhibit 6 is a three-page document
12   that's Bates labeled SEC Monohan 240 through 242.  It's
13   dated March 11, 2011.
14            Have you seen this document before, Mr. Adams?
15        A   Yes.
16        Q   What is it?
17        A   It's a letter sent to shareholders of Apollo by
18   Robert Linares.
19        Q   Did you have any involvement in drafting this
20   document?
21        A   My firm, Adams Monohan, I believe, had some input
22   on this.
23        Q   So did Adams Monohan draft the document?
24        A   That I don't remember.
25        Q   Okay.  Did you individually, outside of your
```

[8/27/2015] ADAMS_EDWARD_20150827

229

```
 1   capacity at Adams Monohan, LLP, have any involvement in
 2   drafting this document?
 3        A   I don't believe outside of my capacity I did.
 4        Q   So you may have had involvement as an attorney or
 5   in your role as an Adams Monohan, LLP --
 6        A   Yes.
 7        Q   Okay.  So let's look at the first page of
 8   Exhibit 6, at the last paragraph there.  That starts with,
 9   "At this point."
10        A   Okay.
11        Q   The third sentence of that says -- states that,
12   "The company," which is defined as Apollo Diamond, "has
13   outstanding liabilities that total nearly $2 million."  Do
14   you see that?
15        A   Yes.
16        Q   What were those liabilities?
17        A   Moneys owed -- well, again, I wasn't an accountant
18   for the company, meaning Apollo.  But there were moneys
19   owed, I believe, to vendors, moneys owed to professional
20   service providers, moneys owed for expenses and loans that
21   had been made by parties like myself, Bob and Bryant to the
22   company; rent.  Money owed to the Commonwealth of
23   Massachusetts, I think, was included in that.  That's kind
24   of what I remember.
25        Q   How much of that 2 million was due to you?
```

[8/27/2015] ADAMS_EDWARD_20150827

230

```
 1        A   Well, I don't know -- when you say due to me, I
 2   was owed millions of dollars both at Adams Monohan -- well,
 3   1,041,000, I guess, at Adams Monohan, and then money as --
 4   for salary and expense, and that sort of thing, as an
 5   officer/executive of Apollo and lender.  So I don't know --
 6   I don't remember the exact amount.
 7        Q   March 2011, ball park it.  Can you ball park how
 8   much money of this 2 million was owed to you?
 9        A   Of that 2 million?  I don't know.
10        Q   Okay.
11        A   I don't know that we broke it down of that
12   2 million.  We -- I broke -- I wrote something up that I
13   used to understand what I thought I was owed at some point,
14   but I don't remember what was owed to me of this 2 million;
15   what we would characterize as owed to me of the 2 million.
16   That would have been -- I don't remember.
17        Q   Did Apollo Diamond have more than $2 million of
18   outstanding liabilities at this point?
19        A   Contractual and other liabilities, it had
20   millions, yes.
21        Q   Okay.  More than 2 million?
22        A   Millions.  More than 2 million.
23        Q   Okay.  So when it says, "The company has
24   outstanding liabilities that total nearly 2 million" --
25        A   Negotiated liabilities at that point.
```

[8/27/2015] ADAMS_EDWARD_20150827

231

```
 1        Q   Okay.
 2        A   Well, I wouldn't add the word "negotiated."  But
 3   there were millions -- I think it depends how you
 4   characterize a liability versus a contractual obligation.
 5   That's why the next clause, "that total nearly 2 million,
 6   various contractual obligations that approximate several
 7   times that number" -- I would say those are also
 8   liabilities.  So that's why I say the liabilities were in --
 9   far in excess of $2 million, in my mind.
10        Q   Okay.  Turning to the second page there on
11   Exhibit 6.  It says, "To that end, the company has entered
12   into an asset purchase agreement with Scio Diamond
13   Technology Corporation."  And as of March 11, 2011, that's
14   private Scio; is that correct?
15        A   Yes.
16        Q   "Whereby, Apollo has agreed to sell substantially
17   all of its assets for approximately 2 million to private
18   Scio.  The cash obtained from the sale, asset sale, will
19   largely be applied towards existing liabilities and
20   contractual obligations of the company."
21            Do you see that?
22        A   Yes.  That's what Bob and I thought -- all
23   collectively thought at the time.
24        Q   I will skip down to the next paragraph.  "In an
25   effort to create what may prove to be a tax advantage event
```

[8/27/2015] ADAMS_EDWARD_20150827

232

1  for many of our shareholders, we are offering to repurchase
2  the outstanding shares of common stock held by our
3  stockholders at a price of one cent per share."  Do you see
4  that?
5      A   I do.
6      Q   And was that the -- repurchase, was that
7  actually part of the asset purchase agreement or something
8  completely separate?
9      A   I don't remember how that was documented.  Is that
10  what you are asking?
11         I mean, it was part and parcel of the transaction.
12  As I stated, just to go back, remember, the big theme was,
13  how do we make sure that the assets move without all the
14  liabilities to a new entity, and give the shareholders an
15  opportunity to participate in that new entity for --
16  essentially for free.
17         In other words, we are going to pay them a penny a
18  share -- "we," meaning Apollo, is going to pay them -- in
19  this case I am using that term -- Apollo is going to pay or
20  Gemstone is going to pay people a penny a share for their
21  stock, and then they are going to have the right to invest
22  at a penny in Newco, Scio.  Private Scio at the time was the
23  contemplation.
24         So that was all part and parcel of the same
25  transaction, in our minds; "in our minds," meaning the

[8/27/2015] ADAMS_EDWARD_20150827

233

1  people at Apollo and the people in Scio, Joe Lancia, and
2  everybody.  Everyone understood that that was the objective
3  of the transaction.
4      Q   Okay.  And the next paragraph kind of memorializes
5  that, right?  It says, "In addition to repurchasing your
6  shares of the company, we have negotiated an agreement
7  with" -- bracketing there -- "private Scio, whereby our
8  stockholders who share in a repurchase by the company will
9  be permitted to invest in private Scio at a price of one
10  penny per share."
11         Do you see that?
12      A   Yes.
13      Q   So that's the agreement we were just talking
14  about.
15         Okay.  Now, as we talked about before -- I asked
16  you before, that agreement that's referenced in that
17  paragraph, where Apollo shareholders would have an
18  opportunity to buy shares in private Scio, was that an
19  actual written agreement between private Scio and Apollo
20  Diamond?
21      A   I don't remember.  I mean, I know, as an example,
22  in this confidential private placement memo, we flag it on
23  Page 1; assuming all eligible shareholders subscribe for the
24  purchase of stock at a purchase price of a penny.  I mean,
25  everybody knew that that was part and parcel of the deal.

[8/27/2015] ADAMS_EDWARD_20150827

234

1  Forgive me, I am on Page 1 of the --
2      Q   Of Exhibit 13?
3      A   Thank you.  But I don't remember how that was
4  documented.
5      Q   I am going to hand you a document that's been
6  previously marked as Commission Exhibit 7.  Commission
7  Exhibit 7 purports to be a proxy statement for the 2011
8  special meeting of stockholders, and it's Bates numbered SEC
9  Monohan 221 through 248.  And I will represent that it's not
10  consecutively Bates numbered.
11      A   Okay.
12      Q   Okay.  Have you seen Commission Exhibit 7 before,
13  Mr. Adams?
14      A   Yes.
15      Q   Okay.  What is it?
16      A   It's a proxy statement.  I mean, it's titled
17  "Proxy statement for 2011 special meeting of stockholders of
18  Apollo Diamond."
19      Q   And was this the document -- was this proxy
20  statement -- was this the final version that was distributed
21  to the shareholders of Apollo Diamond?
22      A   I don't know that.
23      Q   Do you have any reason to believe that it's not?
24      A   I don't.  I don't have any reason to believe it
25  was or was not.

[8/27/2015] ADAMS_EDWARD_20150827

235

1      Q   Okay.  And the first page, the summary sheet kind
2  of addresses the terms of the agreement, as we kind of
3  covered before.
4         The second sheet -- or Page 2, I should say, Bates
5  numbered SEC Monohan 222, references a separate agreement
6  between private Scio and Apollo Diamond Gemstone.  Do you
7  see that?  The first paragraph there.
8      A   I do.
9      Q   And that paragraph essentially says that Apollo
10  Diamond will seek approval from its stockholders to enter
11  into an asset sale with private Scio, through which it also
12  sells substantially all of its assets to private Scio for
13  approximately $10,000.
14         Do you see that?
15      A   Yes.
16      Q   Okay.  And then it also says that it will seek to
17  repurchase the shares of -- or seek consent to repurchase
18  the shares of Apollo Diamond Gemstone shareholders?
19      A   I see that.
20      Q   Okay.  And then the last paragraph there,
21  consistent with what Apollo Diamond had agreed to, it also
22  references Apollo Diamond Gemstone stockholders will have
23  the ability to repurchase -- Apollo Gemstone stockholders
24  that do repurchase their shares will have the ability to
25  purchase an equal number of shares of private Scio.  Is that

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000459

236

1  correct?

2      A   Can I tweak that a little?

3      Q   Uh-huh.

4      A   Everyone whose shares were repurchased had a right

5  to purchase an equal number of shares of private Scio.

6      Q   Whether they were a shareholder of Apollo Diamond

7  or Apollo Gemstone?  Both shareholders -- both sets of

8  companies' shareholders?

9      A   Yes.  Right.

10     Q   Okay.  And if we skip down to the third paragraph

11 there, it says, "The following is a table of current capital

12 structures of ADI and ADG as well as the proposed capital

13 structure of private Scio, assuming that all ADI and ADG

14 shareholders consent to respective repurchase."

15         Do you see that?

16     A   Yes.

17     Q   Okay.  And so for ADI, it lists over 21 million

18 outstanding shares?

19     A   Okay.

20     Q   And that's the same amount of shares eligible for

21 repurchase, approximately -- or exactly, actually.  Do you

22 see that?

23     A   Yes.

24     Q   Why weren't the outstanding warrants and options

25 included?

[8/27/2015] ADAMS_EDWARD_20150827

---

238

1  warrants and options outstanding?

2         THE WITNESS:  Because we wanted to give the

3  shareholders a chance to make money.  They had supported the

4  company.  We thought that if we had 100 million -- let's do

5  the math -- it would be 45 plus 43.  So what's that,

6  89 million shares outstanding if everyone had exercised,

7  right?  We thought that would be a challenge -- that would

8  challenge the valuation, and it would make it difficult for

9  the company to raise capital and, most importantly, for

10 people to realize a return on their investment.

11         So we also thought -- I mean, if we had

12 exercised -- it goes back to that tax point.  If we

13 exercised -- so can I just -- we thought about could we

14 exercise our stock first -- or our warrants first, and then

15 do a transaction.  The problem with that, we were told, was,

16 well, no, then you have got the exact same structure.  So if

17 you have the exact same structure, people can't get a tax

18 loss.

19         So, in other words, if we had just ported the

20 structure of Apollo and Gemstone over to Scio, we would have

21 had a tax loss issue, where people couldn't have enjoyed a

22 tax loss, and we would have had more shares, which would

23 have been good for us, but we didn't feel that that would

24 give the shareholders an optimal chance to make this work

25 for them.  And we knew we were going to have to raise

[8/27/2015] ADAMS_EDWARD_20150827

---

237

1         MR. KOPECKY:  Included in the shares eligible for

2  repurchase?

3         MR. WISNIEWSKI:  Thank you.

4         BY THE WITNESS:

5      A   Because Bob, Bryant -- not Bryant at this point,

6  but Bob and myself, we agreed that we wanted to provide

7  shareholders with more shares in -- at this point, it was

8  private, and ultimately became public Scio --

9         BY MR. WISNIEWSKI:

10     Q   Okay.

11     A   -- percentage-wise than they had in Apollo.  And

12 so the way we were going to do that was, in effect, cancel a

13 lot of our warrants.

14     Q   So they were going to get a greater percentage

15 ownership of private Scio than they had in Apollo?

16     A   On a fully diluted basis, which included the

17 options and warrants, which we state many times.

18     Q   That's reflected below, right, on the comparison

19 of -- on Page 2 here of Exhibit 7 --

20     A   Yes.

21     Q   -- there is kind of an example of 100,000 shares

22 of --

23     A   Yes, and that was the intent with private, which

24 later became public Scio.

25         MR. SHANK:  Why were you agreeing to cancel the

[8/27/2015] ADAMS_EDWARD_20150827

---

239

1  additional capital.  In Bob's letter, I think -- somewhere

2  we say that; that, you know, it's going to include

3  the raising -- you are going to be diluted.  We weren't

4  going to guarantee that we would never raise capital, of

5  course, and we knew that.

6         BY MR. WISNIEWSKI:

7      Q   With regard to ADG here, outstanding shares of 25

8  million, over 25 million, why are the shares eligible for

9  repurchase only 985,000?

10     A   Because the rest were owned by insiders.

11     Q   Okay.

12     A   Those were the only -- when I say an insider, I

13 mean someone who was an employee of Gemstone, a person like

14 me who, you know, was an employee/counsel.  I was really

15 never, like I said, an employee because I never was a W2.

16 But somebody who worked as an executive officer.  So those

17 were -- the 985,000, I believe, were people who actually

18 invested money in third parties -- not us, but third parties

19 who invested money in ADGC.  So we essentially eliminated

20 our interest by doing this through ADGC.

21     Q   So between the two companies, 22.6 million shares

22 were eligible for repurchase?

23     A   Yes.

24     Q   Okay.  And then the amount of outstanding shares

25 of private Scio is represented -- or noted as --

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000460

240
```
1   contemplated being 25 million -- around 25 million, right?
2      A   Yes.
3      Q   So is it 22 million -- the 25 million of private
4   Scio, does that include the 22.6 million shares were
5   eligible for repurchase?
6      A   I don't remember.  I think it did.
7      Q   Okay.  So essentially, you know -- I can't do the
8   math here, but 90 percent of the outstanding shares of
9   private Scio would be owned by the former shareholders of
10  Apollo Diamond and Apollo Diamond Gemstone?
11     A   In this illustration at this time, okay.  Then,
12  obviously, as time went by and we did additional work, we
13  had to add Joe Lancia and other people who were doing work.
14  So at this moment in time, this is what was contemplated or
15  we understood to be possible.
16     Q   As communicated to Apollo Diamond --
17     A   Yes.
18     Q   -- shareholders?
19     A   Right.  That Bob understood to be possible and the
20  company understood, meaning Apollo understood to be
21  possible.  Yes.
22     Q   So at this time, it was anticipated that -- again,
23  I won't do the math, but of the 25 million outstanding
24  shares of private Scio, 22.6 of those would be former
25  shareholders of Apollo Diamond and Apollo Diamond Gemstone?
```
[8/27/2015] ADAMS_EDWARD_20150827

241
```
1      A   Yes.
2      Q   Okay.  If you could, within exhibit -- Commission
3   Exhibit 7, turn to Page 14 -- or I should say Page 13,
4   sorry, which is Bates numbered SEC Monohan 233.  Let me know
5   when you are there.
6      A   Okay.
7      Q   It starts off, "The risk factors that are being
8   disclosed to Apollo Diamond shareholders."
9      I will skip to the next page, which is 14, under
10  the heading "Our directors and executive officers may have
11  interest in asset sale other than or in addition to the
12  interest of our stockholders generally."
13     Do you see that?
14     A   I do.
15     Q   And why was that disclosed?
16     A   I don't remember what the discussion was.  I mean,
17  it would have been an attorney/client situation.  I am
18  pretty sure that we made that call and we talked to Bob --
19  with Bob.
20     Q   So were you involved in making the decisions on
21  behalf of Apollo Diamond --
22     A   No.
23     Q   -- at this time -- at the time of the proxy?
24     A   No, but I was -- I would have been involved in
25  providing legal guidance.
```
[8/27/2015] ADAMS_EDWARD_20150827

242
```
1      Q   Okay.  Did Adams Monohan draft this document?
2      A   Portions of it, I believe.
3      Q   Okay.  And Adams Monohan -- and Apollo Diamond
4   retained Adams Monohan to handle the proxy solicitation?
5      A   Yes, for which we were never paid, if I remember
6   correctly.
7      Q   So why were there no disclosures in the proxy
8   statement to Apollo Diamond shareholders regarding the
9   outstanding liabilities Apollo Diamond had to Adams Monohan,
10  LLP?
11     A   I think there was a disclosure about liabilities
12  generally.
13     Q   Okay.  Are you referring to Page 4 of the proxy
14  statement, which is SEC -- Bates numbered SEC Monohan 224?
15     A   Yes.
16     Q   That paragraph reads, "The proceeds of the asset
17  sale will be used to pay off ADI's debts and liabilities,
18  including certain lease payments, professional service fees,
19  and transaction costs associated with the proposed asset
20  sale as well as the stock purchase."
21     A   That's what it reads.
22     Q   Okay.  And does that reference the amounts due and
23  outstanding to Adams Monohan, LLP?
24     A   It doesn't to any vendor, no.
25     Q   Okay.  And why did you not specify that Adams
```
[8/27/2015] ADAMS_EDWARD_20150827

243
```
1   Monohan, LLP was one of those professional service fees in
2   the debts and liabilities of the company?
3      A   Under bankruptcy law -- I am going to try to
4   answer this without giving attorney/client information.
5      Under bankruptcy law, there's something called an
6   involuntary bankruptcy.  An involuntary bankruptcy can be
7   initiated by three or more creditors.  There was a -- I will
8   be careful.  Apollo did not have, I believe, a desire to
9   provide a road map -- it was not prudent in Apollo's mind, I
10  believe, to provide a road map for creditors of who to
11  contact to force Apollo into an involuntary bankruptcy.  And
12  if we -- if the company had listed its creditors, that was a
13  potential risk.
14     Q   Okay.
15     MR. SHANK:  Was that a risk if you listed Adams
16  Monohan?
17     THE WITNESS:  Well, it's possible, because any
18  creditor -- I am going to play bankruptcy lawyer.  One of
19  the things I learned early on as a lawyer for debtors is you
20  advise your client never -- so this is generally speaking,
21  okay.  Forgive me.  I am just going to generally speak.  You
22  never tell your creditors who other creditors are, okay.
23  And you never hint at that, and you never disclose that, if
24  you can avoid disclosing that, you know.  Because if you
25  disclose it, and they are clever, they will potentially
```
[8/27/2015] ADAMS_EDWARD_20150827

DSM-000461

244

1   contact other creditors and see if they can force you into
2   an involuntary bankruptcy.
3           We had an attorney's lien -- attorneys have liens.
4   I am telling you a lot of stuff you already know.  Attorneys
5   have liens.  We had a lien.  It would have been a huge,
6   monumental step to figure that other attorneys might have
7   had liens.  So the less information we felt -- generally in
8   the case of this, the less information that's provided about
9   specific creditors, the better.  Bankruptcy would have been
10  a bad outcome for the shareholders, I believe.
11          BY MR. WISNIEWSKI:
12      Q   So this is a disclosure to the shareholders,
13  right, the proxy statement?
14      A   Yes.  It wasn't necessary but, yeah, it was done.
15      Q   I'm sorry, I don't think I understood.
16      A   Yes.
17      Q   Okay.
18      A   It wasn't a necessary disclosure, in my mind,
19  because the Linareses controlled the company.  And under
20  Nevada law or Delaware law, both, a majority shareholder can
21  sell the assets without a formal vote.
22          MR. SHANK:  How many creditors did Apollo have
23  that were not related to the company?
24          THE WITNESS:  Several dozen probably.  I saw a
25  list of several dozen.  I don't know because I wasn't -- you

[8/27/2015] ADAMS_EDWARD_20150827

246

1   money.  That's another reason we didn't list the creditors.
2   I mean, if we listed -- if the company had raised $400,000,
3   how would that have worked?  We didn't know.  It's all
4   speculation.
5           We had an idea, which we had talked to counsel
6   about, which they thought was an intelligent way to preserve
7   shareholder value, potentially.  And we were trying,
8   frankly, to thread a number of needles, not let the company
9   go into bankruptcy, and to give the shareholders an
10  opportunity, moving forward.  But I couldn't -- I didn't
11  feel -- I met Joe Lancia three months ago.  I don't
12  remember, but it was three or four months.  I couldn't trust
13  Joe Lancia to be the sole owner of private Scio, because if
14  he had been the sole owner of private Scio, I had no idea
15  what -- would he honor the agreement?  What would he do to
16  the shareholders of Apollo?  Would he issue himself millions
17  of shares?  Would he go sell shares at pennies to friends of
18  his?  I am not saying any of those things were likely.  I
19  don't know.  But I certainly couldn't be in a position
20  where -- that would be foolish.
21          I am not saying I am the only person I could
22  trust.  That's certainly not true.  But I feel like it was
23  my and Monohan's role to make sure that we managed this to
24  the best of our ability, knowing what we knew, so there was
25  an outcome that was favorable to the shareholders.

[8/27/2015] ADAMS_EDWARD_20150827

245

1   know, I didn't have the ledger, or whatever.  So I don't
2   know.  I didn't have access to its finances.
3           BY MR. WISNIEWSKI:
4       Q   Were any disclosures made in the proxy to Apollo
5   Diamond investors notifying them that you and Mr. Monohan
6   were the majority shareholders of private Scio?
7       A   It wasn't in the proxy.  No.
8       Q   Why not?
9       A   Because we were placeholders, we thought,
10  initially.  We didn't know if we would continue to be the
11  majority or shareholders in any way.  As I said, if someone
12  had come forward and said, I want to invest $10 million, but
13  the condition is that I control private Scio entirely, I am
14  going to give all the shareholders their shares, including
15  you, and warrants, or whatever the negotiation would have
16  been, then we would have resigned and done whatever we
17  needed -- I am assuming, right -- I can't speak for
18  Mr. Monohan.  But I would have certainly resigned if that
19  was what was required, and I would have done away with my
20  shares.
21          I mean, I was trying to facilitate a transaction
22  that allowed the shareholders to have a second bite at their
23  apple.  That's what my goal was here.  But I wasn't sure
24  what that bite would look like because I didn't have --
25  private Scio raised no money.  It may never have raised any

[8/27/2015] ADAMS_EDWARD_20150827

247

1       Q   But at the time this asset purchase agreement was
2   executed, you were the -- you and Mr. Monohan were the
3   majority shareholders of private Scio?
4       A   Somebody has to be, correct, and we were.
5       Q   And you were?
6       A   Yes.  Absolutely.
7       Q   And at the same time, Apollo Diamond owed you a
8   million dollars in unpaid salary, expenses, your law firm --
9       A   I'm sorry, but I have to look at my notes.  It was
10  millions of dollars.
11      Q   So at the same time, Apollo Diamond owed you
12  millions of dollars, right?
13      A   Yes, it did.
14      Q   Okay.  So would a shareholder want to know -- I
15  guess, if you were investing as shareholder, would you want
16  to know if the company you are -- if the company which your
17  company is doing a deal with is owned by someone -- I am
18  just going to void that question right now.  It's so bad.
19          MR. SHANK:  Did you give any consideration to
20  disclosing your financial interests on either the private
21  Scio side or as a creditor to --
22          MR. KOPECKY:  I will let you finish your question,
23  then I will object.  You are lacking a foundation for this.
24  This might not be the only disclosure made to people who
25  were involved in this purchase.

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000462

248

```
1        MR. SHANK:  Fair enough.
2        MR. KOPECKY:  They had a huge meeting.  They
3   presented a PowerPoint.  They told --
4        MR. HAYES:  I think the question was, Did you
5   consider --
6        MR. KOPECKY:  Perhaps Scio never went through with
7   the purchase agreement.
8        MR. SHANK:  Did you give any consideration to
9   disclosing in this proxy statement your financial interest
10  as either an owner of private Scio or as a creditor to
11  Apollo Diamond?
12       THE WITNESS:  This was intended -- I don't recall
13  that precise -- I don't recall precisely whether I
14  considered that, okay.  I know that this was intended as an
15  invitation to solicit input from people.  Maybe someone knew
16  somebody or they themselves wanted to do this and invest
17  $10 million.  That was possible.  There were a lot of
18  wealthy individuals who had invested.  Maybe they knew
19  someone who wanted to buy the company.  And it was intended
20  to be an invitation for comment, which we hoped would take
21  place either after this was sent, Bob did, or at the
22  shareholder meeting.
23       So this was not intended, in my mind -- and I
24  can't speak for Bob, but this was intended to be the opening
25  discussion point for people.  It was not intended to be the
```

[8/27/2015] ADAMS_EDWARD_20150827

249

```
1   be-all-end-all of documents or discussion or disclosure
2   about whatever roles people were playing or who owned what.
3        MR. SHANK:  Are you aware of any instances where
4   your or the Linareses' financial interests in the asset
5   purchase agreement were disclosed to shareholders?
6        THE WITNESS:  Their interests -- so I am going to
7   back up.  They didn't have any -- I would not say that
8   myself or the Linareses had any interest in the asset
9   purchase agreement.  I think that's what you said.
10       MR. SHANK:  Yes.  You don't believe you did -- had
11  any interest in it?
12       THE WITNESS:  We had an interest in private Scio,
13  which we told people about at the shareholder meeting, which
14  we told people about -- I think -- I remember that.  We told
15  people if they called and asked who this private Scio thing
16  was, we would absolutely tell them.  And it's -- it was told
17  to them in the PPM, which they would have -- if anyone at
18  Apollo had called and said, you know, how was this working,
19  it's obvious that the company, private Scio, was raising
20  money, can we see the PPM, obviously, it says all that in
21  the PPM.  So that was -- they had plenty of ability to learn
22  and/or be told that, and were.
23       MR. SHANK:  Was private Scio's PPM distributed to
24  all Apollo shareholders?
25       THE WITNESS:  No.  Anyone who expressed an
```

[8/27/2015] ADAMS_EDWARD_20150827

250

```
1   interest in receiving it, received it.  I should back up.
2   If, you know, we had filed the appropriate Reg D, or
3   whatever, and that kind of stuff; Blue Sky.
4        MR. SHANK:  What was told to shareholders at the
5   related shareholder meeting regarding your -- Mr. Monohan's
6   or the Linareses' interest in the transaction, either at the
7   private Scio side or as creditor to Apollo?
8        THE WITNESS:  So I don't remember the exact words.
9   I remember that I had a PowerPoint, and I can't remember if
10  I used it or I talked off of it, as did Bob.  He might have
11  had a separate PowerPoint or the same PowerPoint, and we
12  disclosed what we thought people would want to know about
13  everything from who is getting paid to who owned private
14  Scio.
15       MR. SHANK:  So you used this PowerPoint as your
16  guide for what -- the information provided to shareholders?
17       THE WITNESS:  I think I used it as a guide.  I
18  don't remember if it was also shown or -- I do a lot of
19  presentations, okay, quite honestly, because it's what I do
20  as a professor.  And I can't remember precisely whether
21  there was a technical issue with the projector or not.  But
22  for some reason that sticks in my head.
23       MR. SHANK:  Who presented at the shareholder
24  meeting?
25       THE WITNESS:  Bob Linares and I were the ones who
```

[8/27/2015] ADAMS_EDWARD_20150827

251

```
1   were present at the shareholder meeting.  We both spoke.
2        MR. SHANK:  Who else was present at the
3   shareholder meeting?
4        THE WITNESS:  I don't remember.
5        MR. SHANK:  How many shareholders attended?
6        THE WITNESS:  My best recollection is 25, 30.  I
7   don't remember.
8        MR. SHANK:  And how many shareholders did the
9   Apollo companies have?
10       THE WITNESS:  400.
11       MR. SHANK:  Was anything provided in writing to
12  Apollo or Apollo Gemstone shareholders that disclosed your,
13  Mr. Monohan or Mr. Linares' interest in the transaction from
14  either the private Scio side or as a creditor to Apollo?
15       THE WITNESS:  The PPM.  They all got a PPM where
16  that was disclosed in great detail when they invested.
17       MR. SHANK:  I thought you said all the Apollo
18  shareholders did not receive a PPM.
19       THE WITNESS:  They didn't receive the original one
20  unless they called up and asked for it.  When they were
21  asked to invest at a penny, if they wanted to, they received
22  a detailed -- a PPM in 2012, which described everything in
23  great detail.
24       MR. SHANK:  Did they receive anything prior to
25  2012 describing those interests?
```

[8/27/2015] ADAMS_EDWARD_20150827

252

1      THE WITNESS:  I don't know.
2      MR. KOPECKY:  Before you leave the proxy, why
3  don't I ask my question regarding it now.
4      Explain to them why this was not -- why the
5  Linareses didn't have to do this; why it wasn't necessary.
6  It seems to be something that's catching you off guard.
7      MR. SHANK:  No.
8      MR. KOPECKY:  Okay.  You understand that this was
9  a completely unnecessary proxy?
10      MR. SHANK:  Well --
11      MR. WISNIEWSKI:  We can take a break now.
12      MR. SHANK:  Let's go off the record.
13      MR. WISNIEWSKI:  Off the record at 4:21.
14      (Whereupon, a recess was had.)
15      MR. WISNIEWSKI:  Back on the record at 4:30 p.m.
16      BY MR. WISNIEWSKI:
17      Q   Mr. Adams, while we were on break, did you, I or
18  anyone else on the Commission -- did you have conversations
19  with myself or anyone at the Commission during the break?
20      A   No.
21      Q   Okay.  Before we took a break, one of your counsel
22  suggested an explanation -- Jim, I don't want to put words
23  in your mouth -- but about the fact that they didn't need --
24  Apollo didn't need to do the proxy solicitation.  Is that
25  correct?

[8/27/2015] ADAMS_EDWARD_20150827

---

253

1      MR. KOPECKY:  Yes.
2      BY MR. WISNIEWSKI:
3      Q   Go ahead and please explain what -- what you meant
4  by that.
5      A   I think he meant the following -- this is my
6  interpretation, certainly, too.  Delaware or Nevada
7  law -- they are both the same, really, in this regard --
8  provides that a majority shareholder can take written action
9  that binds the corporation.  When I say "majority
10  shareholder," majority shareholder or shareholders.  And
11  that's done, really, to facilitate transactions where you
12  don't -- where you know the outcome.  So -- because you know
13  the vote, right?  And so that was the case here.
14      I mean, there was no need to have done any of
15  this.  The only reason -- from a law -- corporate law
16  perspective, there was no need.  The only reason -- there
17  was a decision made, and I had some input in this -- was
18  wanted, again, to give the shareholders a chance to voice --
19  to let them know what was happening and to give them a
20  chance to voice positives and negatives that they felt about
21  the transaction.
22      At the end of the meeting, actually, people
23  clapped, for whatever it's worth, to thank us.  So there
24  wasn't a legal requirement under Delaware or Nevada law.
25      MR. SHANK:  Was there any one shareholder who was

[8/27/2015] ADAMS_EDWARD_20150827

---

254

1  a majority owner of Apollo?
2      THE WITNESS:  Bob and Bryant owned preferred
3  shares, which gave them control over Apollo, from a voting
4  perspective, because they were 200 to 1 voting shares.
5      MR. SHANK:  Did either one of them individually
6  have a majority ownership?
7      THE WITNESS:  I don't think so.  I don't remember.
8      MR. SHANK:  Sorry, not ownership; majority voting.
9      THE WITNESS:  Controlling, yes.
10      MR. SHANK:  Would the Linareses have had the
11  ability to give away all the assets of the company for a
12  penny, for example?
13      THE WITNESS:  They would have had the ability to
14  sell the assets of the company for the amount to satisfy the
15  indebtedness to themselves and others, as an example.  So if
16  the total indebtedness was $10 million, let's say,
17  hypothetically -- and I am not talking about numbers that
18  were reduced; I am talking about, you know, full salaries
19  paid for work performed and that sort of thing -- they could
20  have absolutely sold the company for $10 million.
21      They could have themselves in a bankruptcy
22  participated in the bankruptcy process, as could I, and done
23  what's called a credit bid, where I basically turn in my
24  legal bills and say, I am owed 1,041,000, and that's my bid
25  to buy the assets.  So could other creditors have done the

[8/27/2015] ADAMS_EDWARD_20150827

---

255

1  same.
2      So again, this -- I know this may be hard to
3  believe.  I understand that, if you guys -- okay, because of
4  what you do.  But the reality was we were trying to help the
5  shareholders by doing this whole thing, and give them a
6  second bite at the apple.
7      MR. SHANK:  What was the total amount of
8  liabilities for the Apollo companies, outside of that owed
9  to Mr. -- to the Linareses, yourself, Adams Monohan?
10      THE WITNESS:  I don't know, Mr. Shank.  I don't
11  know that I remember that.  It would be the landlord.  It
12  would be the vendors.  There's third-party vendors.  I don't
13  know.
14      MR. SHANK:  How many employees at Apollo Diamond
15  were on payroll?
16      THE WITNESS:  20 some, I think, at the peak.
17  Maybe 25, 24.  Something like that.  I remember the number
18  24 for some reason.
19      MR. SHANK:  How many weren't getting paid?
20      THE WITNESS:  I think it depends on the time
21  period.  For a long period it was Bob, Bryant, myself --
22  again, I am going to assume we are going to call me an
23  employee, even though I wasn't a W2.  Can we agree on that?
24      MR. SHANK:  Yes.
25      THE WITNESS:  Okay.  So Michael, I think, was --

[8/27/2015] ADAMS_EDWARD_20150827

256

1  Michael Monohan.  I think Lisa Linares, who -- Martha
2  Linares, who all did work.  So anyone who is -- the
3  family -- I am going to include myself in the family right
4  now -- paid everybody first before themselves when money
5  became tight.  That was my understanding of what was
6  happening.  So they were paying, you know, the people that
7  keep the machines running and that sort of thing.  And they
8  weren't taking a salary.  And I think that depends on who it
9  was.  I think Bryant stopped taking a salary in 2008 or 9.
10  Bob might have been 2009.  I don't even remember.
11          MR. SHANK:  Did Apollo Diamond have the financial
12  wherewithal to pay its creditors outside of those who had an
13  affiliation with the company?
14          THE WITNESS:  The company was out of money.
15          MR. SHANK:  Is that a no?
16          THE WITNESS:  It's a no.  I mean, barring the
17  raising of additional money, or a sale of its assets, which
18  would have essentially stripped the company of any value,
19  there was -- we looked at every opportunity conceivable.
20          MR. SHANK:  Was any work done to estimate the
21  value of the assets held by Apollo Diamond?
22          THE WITNESS:  Bob Linares or someone -- either Bob
23  or Patrick Doering, perhaps; someone told me at one point,
24  if I remember, that the replacement costs, which meant if
25  you were going to put all the men -- that's not a great

257

1  gender term.  If you are going to put all the person hours
2  into reproducing all this, and all the costs for the
3  equipment, and everything, it would cost a third party
4  15 some -- 15 to 20 some million dollars to do that.  That
5  was what they believed, either one of them or both of them.
6  I don't remember.  We had a conversation about that, I
7  think.  But that, of course, did not represent the fair
8  market value, right, because we tried to sell the company
9  and couldn't find a single buyer.  And we tried and
10  overturned a lot of stones.
11          The market was bad in 2011 and, you know, if the
12  company could have hung out another five years, three years,
13  maybe things would have changed.  But at that point in
14  time -- and the other thing that was happening was that
15  people that worked there were the intellectual lifeblood of
16  the company.  They were going on to find other jobs, right.
17  I mean -- and I am not just talking about Bob Linares.  He
18  is a brilliant guy, okay.  But I am talking about the people
19  who worked on the floor, who knew how the machines -- these
20  machines are very idiosyncratic.  So the best way I could
21  describe them is, you know, they are Ferraris, right.  I am
22  sure it's a wonderful car if you own one, but the reality is
23  it's a pretty crazy thing mechanically.  At least I have
24  heard stories that it is.  So that's what these machines
25  are.  They needed the touch of someone who saw what was

258

1  going wrong with the machine and adjusted it.  So those
2  people were going to find other jobs.
3          So that's why there was a real sense of urgency
4  of -- I have got a father-in-law who is sick.  He's already
5  told me, I am 70 some years old; I am not going to do this
6  forever, if at all, anymore.  And, you know, we are thinking
7  about, how do we find a way -- because it was important to
8  him -- to reward the shareholders, and we are losing all the
9  people who -- "we," meaning the company, Apollo, is losing
10  all the people that were really instrumental to making it
11  work on a day-to-day basis because they are not paid.  So
12  there wasn't -- there wasn't time, frankly, to futz around
13  anymore.
14          MR. WISNIEWSKI:
15      Q   Was the asset sale approved by Apollo Diamond
16  shareholders?
17      A   I think one or two voted no but, yes, otherwise
18  overwhelmingly.
19      Q   When was it approved?
20      A   People submitted their proxies and/or they voted
21  by ballot on -- in that meeting.  So it would have been
22  sometime in April.
23      Q   April 2011?
24      A   Yes.
25      Q   Okay.  How about the Apollo Diamond Gemstone

259

1  private sale?
2      A   I think it was the same thing.
3      Q   Same day, April -- sometime in April 2011?
4      A   Yes.
5      Q   Okay.  I am going to hand you a document that's
6  labeled Commission Exhibit 48.
7              (SEC Exhibit No. 48 was marked for
8              identification.)
9  BY MR. WISNIEWSKI:
10      Q   Commission Exhibit 48 is a two-page document Bates
11  labeled SEC Adams 33076 through 33077.
12          Mr. Adams, what is this document?
13      A   I think this was a list of obligations that was
14  sent to me by Bob Linares, I think.
15      Q   Obligations of who?
16      A   Apollo and Apollo Diamond Gemstone.
17      Q   This is both Apollo Diamond and Apollo Diamond
18  Gemstone?
19      A   I think so.
20      Q   When was this document dated, and when did you
21  receive this document?
22      A   I don't remember.  If it was dated -- I don't
23  remember.
24      Q   So what do these different categories reflect?
25  Are these the outstanding liabilities of Apollo Diamond and

DSM-000465

260

Apollo Diamond Gemstone?

1   A   They are obligations that Bob knew of at the -- at

2   that moment in time, I believe. He was the last -- I mean,

3   he was the only person there, I think, at this point. So I

4   think -- you know, I think he cobbled this together of what

5   he knew.

6       Some of this was input I had, like the State of

7   Massachusetts. I had negotiated a settlement with the

8   Commonwealth down from several hundred thousand to 80,000 or

9   100,000. I don't remember what the number was. So this was

10  a compilation of the best guesstimate that we had of what we

11  could likely settle the obligations for, pay the obligations

12  off, and have the assets transferred free and clear without

13  creditor claims.

14  Q   And this is for Apollo Diamond, Incorporated and

15  Gemstone?

16  A   You know, I don't know that there was a

17  distinction made, because the focus point was primarily on

18  Apollo Diamond.

19  Q   Okay. And so, you know, it's split up into

20  various categories here, but the top category, Vendor

21  Obligation, do you see that?

22  A   I do.

23  Q   Those total around 164,000?

24  A   Uh-huh.

25

[8/27/2015] ADAMS_EDWARD_20150827

---

262

1       THE WITNESS:  It isn't.  It was not -- I mean, I

2   had a discussion with Bob where -- I mean, it's a

3   recognition, it was never going to be paid, unfortunately.

4   It was work that we were never going to be paid for.

5   There's no point of putting it on a schedule.  That's why I

6   think the letter says "Other contractual" -- whatever.

7       MR. SHANK:  What is the 255,000 for Schwegman?

8       THE WITNESS:  Legal fee.

9       MR. SHANK:  For what?  What type of work did they

10  provide?

11      THE WITNESS:  Intellectual property work.

12      MR. SHANK:  What about for Merchant Gould?

13      THE WITNESS:  That one sticks in my craw a little

14  because they did -- they literally took one or two of our

15  patents and reworked them, and I think charged quite a bit

16  for that.  So that was for intellectual property work that

17  was not -- it was not drafting a patent; it was actually,

18  quote, "improving the patent."  I am not conversant enough

19  in intellectual property to know if there was real

20  tremendous value as a result of that.  So that's why I say

21  -- I find it a little annoying.

22      MR. SIKORA:  Can I jump in to clarify on this

23  document?  Is this document reflecting the negotiated vendor

24  obligations or --

25      THE WITNESS:  Among other things, yes.  Some of

[8/27/2015] ADAMS_EDWARD_20150827

---

261

1   Q   Then there is a category of Merchant Gould,

2   Kirkland & Ellis, Paul Hastings, Adams Monohan, LLP.  Those

3   all look like law firms; is that right?

4   A   Yes.

5   Q   And that totals around a million?

6   A   Yes.

7   Q   And then Individual Obligations, what are those?

8   A   I don't remember.

9   Q   What is RCL?

10  A   Robert Linares.

11  Q   Then BRL?

12  A   Bryant Linares.

13  Q   And ESA?

14  A   That's me.  I think these were amounts that we had

15  talked about as agreeing to accept in lieu of all the moneys

16  we were owed or -- I don't remember, to be honest, where

17  those numbers come from.

18  Q   Did that include the loan made by RBE Gemstone?

19  A   Did it include the loan made by -- I don't know.

20  Q   Okay.  The next one is Rent Obligation.

21      MR. SHANK:  Sorry.  Did it include the accrued

22  compensation?

23      THE WITNESS:  No.

24      MR. SHANK:  So where is the accrued compensation

25  reflected on here?

[8/27/2015] ADAMS_EDWARD_20150827

---

263

1   them were negotiated because they were small.  Some of them

2   changed because it turned out we owed people more than we

3   thought or --

4       MR. KOPECKY:  It looks like two different

5   documents.

6       MR. WISNIEWSKI:  That was my next question.

7       BY MR. WISNIEWSKI:

8   Q   Can you reconcile Page 1 with Page 2?  What is the

9   difference?

10  A   No idea.  I don't remember.

11  Q   But this is a document that was produced by you?

12  A   Apparently, yes.

13  Q   Did you say who created this document?

14  A   I don't remember.

15  Q   And you said it reflects the negotiated amounts.

16  A   Well, in some cases I know it does.  I mean, like

17  Adams Monohan, that's $550,000.  That's what we said we

18  would accept.

19  Q   Does that help you narrow in on the date of this

20  document?

21  A   Not particularly.  I mean, I assume it's in early

22  2011.  That first quarter of 2011.

23      MR. SHANK:  What was the debt to the State of

24  Massachusetts?

25      THE WITNESS:  That's a long story, but I will go,

[8/27/2015] ADAMS_EDWARD_20150827

264

1  okay.  So here is the thing.
2      MR. SHANK:  Let's get the abbreviated version.
3      THE WITNESS:  So here is the deal.  Apollo moved
4  to a new facility at one point, all right.  Apollo used a
5  lot of power.  Be nice.
6      Apollo used a lot of power, okay.  The person who
7  hooked up the power, right, switched between Apollo and the
8  Massachusetts Bay Community College power.  They made a
9  mistake, okay.  So what was happening was Mass Bay was
10  paying for Apollo's power, and Apollo was paying for Mass
11  Bay's power.  But Apollo didn't know this.  No one did.
12  They paid it for years.
13      You would think someone -- the light bulb would go
14  off and go, Why are we spending 30,000 a month on power, and
15  we are lighting up a bunch of classrooms?  I don't know what
16  they did there.
17      They finally figured this out, right.  And then
18  they sued -- I think they sued the electrician and they sued
19  Apollo or came to us and -- I was representing them as
20  counsel.  And eventually we worked through a settlement that
21  worked for Apollo.
22      My argument, which I think was fair, was, wait a
23  minute, how would we have known -- you know what I mean?  So
24  we -- Apollo paid the money for several years.  Like, they
25  paid it down.  And then Apollo ran -- as you know, had got

[8/27/2015] ADAMS_EDWARD_20150827

266

1      So it occurred to us that we needed to think
2  about, well, what happened about contingent liabilities?
3  Who is going to pay anything like that?  Because under
4  Delaware law, the creditors of a company have the ability to
5  recover money against its shareholders if the shareholders
6  received money.
7      So we were concerned about the possibility of
8  creditors going after all the shareholders whose stock had
9  been purchased back at a penny -- yeah.  So rather than, you know --
10  which would have been a debacle, of course.  I agreed to
11  sort of step in and deal with that situation.
12      MR. SHANK:  You agreed to take on all the
13  contingent liabilities of the company?
14      THE WITNESS:  Up to $300,000.  I am not nutsy
15  coo-coo.
16      MR. SHANK:  Is that documented anywhere?
17      THE WITNESS:  I think it is.
18      MR. SHANK:  Now, the scenario you just described
19  that -- it would be limited to the amount they got back from
20  the company, right?  Creditors wouldn't have unlimited
21  liability?
22      THE WITNESS:  Right.  Yes.  You can't go after
23  people for more than a penny -- yeah.  That would have been,
24  you know -- it would have opened up a messy situation.
25  Right.

[8/27/2015] ADAMS_EDWARD_20150827

265

1  into a situation where it couldn't pay anything.  Then we --
2  I think I revisited the settlement, and we settled for
3  80,000.  Sorry, but it is kind of a funny story.
4      BY MR. WISNIEWSKI:
5      Q   So Exhibit 48, is this -- was this accurate?  Did
6  this reflect the amounts that were paid out -- that were
7  ultimately paid out to Apollo Diamond's vendors?
8      A   I don't know that.  I would imagine it's somewhat
9  accurate.  Might have been less or more.  I don't remember.
10      Q   How about the amount paid to you, the $208,000?
11  Did you receive $208,000 ultimately from Apollo Diamond?
12      A   No, I think I received more, but I actually took
13  on more responsibilities.  So it kind of morphed.
14      Q   Explain that to me.  What additional
15  responsibilities?
16      A   I basically agreed to be liable for debts we
17  didn't know what they were going forward.  You know, this
18  all worked pretty well except that it occurred to Bob and
19  myself at the end of 2011 or so, Well, what about debts we
20  don't even know exist?  You know, what about potential
21  lawsuits, which we hoped there weren't any.  Unfortunately,
22  there were.  Or what about, you know, vendors who --
23  remember, Bob wasn't running the company on a day-to-day
24  basis.  He was the chairman and CEO, but he wasn't in the
25  nitty-gritty of sending out bills or paying them.

[8/27/2015] ADAMS_EDWARD_20150827

267

1      MR. HAYES:  So you received additional
2  compensation for taking on that additional liability?
3      THE WITNESS:  When I say -- I was owed millions of
4  dollars personally because of money I loaned the company.
5  And forgive me, I don't know if you were here when this --
6  but money I loaned the company, salaries that I hadn't been
7  paid, and expenses that I had that hadn't been reimbursed.
8  So what I basically said is -- I mean, this is never going
9  to all get paid, right.  There is no way.  There is not
10  enough money.  It's not going to happen.
11      So what I am going to do is I will take on -- my
12  father-in-law at this point is a 77-year-old guy, right.  I
13  mean, he is not going to be, you know, dealing with all
14  this -- he is a brilliant guy, okay, but this isn't what --
15  you know, he doesn't deal with the day-to-day things like
16  this.  Not that I do particularly either, but at least I am
17  younger.
18      So I said, Look, I will try to shepherd the thing
19  going forward through whatever issues; dissolving the
20  company, dealing with anybody that comes out of the woodwork
21  as a creditor, as a shareholder who's got a problem, and I
22  will basically absorb the liabilities up to this amount.
23  And can we reach a resolution?  And we did.
24      MR. HAYES:  And you got paid additional money for
25  helping wind up the company?

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000467

268

```
 1          THE WITNESS:  Yeah.  When you say *additional
 2   money,* I got paid money.  It was far below what I was owed.
 3          MR. HAYES:  On this exhibit that we just looked
 4   at, it says $208,000.
 5          THE WITNESS:  Yeah.
 6          MR. HAYES:  What was that for?
 7          THE WITNESS:  That -- so my recollection of that
 8   was that was just expenses that I was owed.
 9          MR. HAYES:  Okay.
10          THE WITNESS:  It wasn't even loans.  I don't
11   remember.  But I think it was expenses that I was owed.
12          MR. HAYES:  All right.
13          THE WITNESS:  And I don't remember exactly.  But
14   that's what I think it was.
15          MR. HAYES:  When Kevin asked you earlier if you
16   received that, you had said you actually received some more
17   than that, you believed.
18          THE WITNESS:  Well, I received a payment that
19   arguably included that, I guess.
20          MR. HAYES:  Okay.
21          THE WITNESS:  That's how I would think of it.
22          MR. HAYES:  But it was higher than the $208,000?
23          THE WITNESS:  Yes.  But by this point, I had
24   paid -- so the other thing is I paid 80,000 to the State of
25   Massachusetts.  So if you take the 208, plus the 80, I am at
```

[8/27/2015] ADAMS_EDWARD_20150827

---

269

```
 1   288, okay.  All right.  Plus I paid money to -- no, I am
 2   going to get that wrong -- New Englander, or something,
 3   which was the landlord of Apollo.  I paid them $21,000.
 4          MR. HAYES:  You paid -- that's money you are
 5   paying out of your own pocket --
 6          THE WITNESS:  Yes.
 7          MR. HAYES:  -- to the State of Massachusetts and
 8   the landlord?
 9          THE WITNESS:  Yes.  Well, the State of -- so both
10   of them I paid out of entities that I put money into to pay,
11   yes.  So really when you add those two numbers up, now you
12   are at 300 some thousand dollars.
13          MR. HAYES:  Where did the money that you used to
14   pay off those -- the State of Massachusetts and -- what was
15   the other company --
16          THE WITNESS:  The New Englander.
17          MR. HAYES:  Where did the money that you used to
18   pay them come from?
19          THE WITNESS:  Money I earned as a lawyer or as a
20   legal consultant or expert or trade in securities or
21   inherited, or whatever.  I don't know.  When you say that, I
22   don't really know, you know.
23          MR. HAYES:  It wasn't through any sale proceeds
24   related to sale of assets?
25          THE WITNESS:  No, no.
```

[8/27/2015] ADAMS_EDWARD_20150827

---

270

```
 1          MR. HAYES:  Okay.
 2          BY MR. WISNIEWSKI:
 3       Q  After March 2011 to the present, how much did you
 4   receive from Apollo Diamond?
 5       A  How much did I personally receive from Apollo
 6   Diamond?
 7          MR. SHANK:  You or any entities owned by you.
 8          BY MR. WISNIEWSKI:
 9       Q  We will start with you personally.
10       A  I don't know.
11       Q  More than --
12       A  I have to go back and look.
13       Q  More than $208,000?
14       A  Well, the loan you saw was for $400,000 that you
15   showed me, right, before.  I don't remember the exhibit.  So
16   that right away is -- but that was really from Bob and
17   Bryant.  So I don't know.  Is that from Apollo or -- I am
18   not trying to be cute.  I am just saying that --
19       Q  So you received that $400,000 after March 2011?
20       A  I believe so, yes.  I would assume.  Sure.
21       Q  In addition to that $400,000, you also received
22   200,000?
23       A  No.  I think it was 300,000.
24       Q  Okay.  So around 700,000?
25       A  That sounds right.
```

[8/27/2015] ADAMS_EDWARD_20150827

---

271

```
 1       Q  How about the entities that you have an interest
 2   in, direct or indirect; since March 2011, how much were they
 3   paid?
 4       A  I think the only entity that would fall into the
 5   category you just described is 550,000 to Adams Monohan --
 6       Q  Okay.
 7       A  -- of which I received, I think, 50,000.
 8       Q  How about ESA Consulting?
 9       A  I don't remember if ESA was reimbursed the money
10   in advance to the landlord or not.  I don't remember.
11       Q  How about ADR Investments?
12       A  I don't think ADR was involved at this point.
13       Q  Now, did the asset sale -- asset purchase
14   agreement between Apollo Diamond and private Scio ever
15   become effective?
16       A  It was assigned to -- so to answer your question,
17   between private Scio and Apollo, did it become effective?
18   No.  It was assigned to Crossbow, which became public Scio.
19       Q  When you say *it,* what do you mean by *it*?
20       A  The asset purchase agreement.
21       Q  So private Scio assigned the asset purchase
22   agreement, which was not finalized, to public Scio?
23       A  It did.  It was finalized.  I mean, it wasn't --
24   it was executed.  It required money to be completed, right.
25   So the asset purchase agreement -- just simple, right -- is
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000468

272

```
1    I, Party A, I am going to buy the assets of Apollo for
2    $2 million, but there was no $2 million yet.  And it expired
3    by its terms.  It was set to expire by its terms on
4    June 30th of 2011, if I remember right.  So there was an
5    extension signed to extend that document, okay.
6         Then subsequent to that extension, it was --
7    acquired the rights to that document, and the name Scio were
8    acquired by the public company, Crossbow, which then changed
9    its name to Scio and became public Scio.  I want to just
10   short circuit that and just kind of try to summarize what
11   happened.
12        Q    So the agreement between Apollo Diamond and
13   private Scio was never effective -- never became effective?
14        A    No.  As a lawyer, as a corporate lawyer, I would
15   say it was effective.
16        Q    Okay.
17        A    And it was not consummated.  It was assigned.  It
18   was extended first, because it expired.  It was going to
19   expire, okay.  It was going to expire by its terms on
20   June 30th, at which point the deal would have just gone
21   poof, right.  But it was extended to -- I want to say a
22   year.  I don't remember the documents, but I am pretty sure
23   it was a year.  And then that was later assigned.  So the
24   right to that transaction, the right to acquire the assets
25   of Apollo, were later assigned by private Scio to public
```

[8/27/2015] ADAMS_EDWARD_20150827

274

```
1    they agree to redeem -- have their shares redeemed?
2         A    Yes.  I mean, they agreed by filling out a
3    document and sending it to Apollo.
4         Q    Okay.  And when -- do you recall when -- but that
5    was before the assignment happened; is that right?
6         A    It might have been very close, contemporaneous or
7    before.  I don't remember.
8         Q    Okay.
9         A    I think it -- yeah, I don't remember.
10        Q    Okay.  Did Apollo Diamond purchase the
11   shareholders' share prior to the assignment?
12        A    So the shareholders would agree to have their
13   shares repurchased, and then did Apollo actually repurchase
14   those shares?
15        A    I don't remember the date of when it did that.
16        Q    Okay.  I am going to hand you a document that's
17   marked Commission Exhibit 49.
18             (SEC Exhibit No. 49 was marked for
19              identification.)
20   BY MR. WISNIEWSKI:
21        Q    Mr. Adams, Commission Exhibit 49, it's actually
22   two documents, two separate documents titled "Stock
23   repurchase agreement."  Do you see that?
24        A    Okay.
25        Q    And the first document is Bates numbered SEC Adams
```

[8/27/2015] ADAMS_EDWARD_20150827

273

```
1    Scio.
2         Q    What was it assigned in exchange for?
3         A    Shares in the public entity, Crossbow.
4         Q    How many shares?
5         A    Well, the name itself, I think -- so this is where
6    it gets fuzzy, because I didn't do this; another lawyer did.
7    I think the way he structured it was the -- the name and the
8    rights to acquire the assets of Apollo and Gemstone were
9    transferred for 13 million shares to private Scio.
10        Q    Say that again.  The name --
11        A    The name Scio, okay, and the right to acquire the
12   assets of Apollo per this agreement, per the asset purchase
13   agreements that had been amended and were now being
14   assigned, okay, all that was transferred to public Scio,
15   which was Crossbow.  This is -- I don't want to make it
16   goofy.  But Crossbow was a separate entity that had now --
17   was going to change its name to Scio; were all assigned
18   to -- and were transferred to public Scio/Crossbow for
19   13 million shares in Crossbow.
20        Q    Okay.  When was that assignment made?
21        A    Well, that was -- I think that was in August --
22   early August of 2011.  I don't remember what date exactly.
23        Q    Okay.  So prior to the assignment of the asset
24   purchase agreement from private Scio to public Scio, did
25   shareholders of Apollo Diamond redeem their shares?  Did
```

[8/27/2015] ADAMS_EDWARD_20150827

275

```
1    17474 through 17485.  And the second document in Exhibit 49
2    is Bates numbered SEC Adams 17526 through 17527.
3         Do you recognize either of these two documents,
4    Mr. Adams?
5         A    They look like stock repurchase agreements for
6    Apollo Diamond.
7         Q    Okay.  And were these the actual documents, or
8    this is an example of one of the documents that were
9    actually executed by a shareholder of Apollo Diamond?
10        A    It appears to be, yeah.
11        Q    Okay.  And the date of this first document is
12   April 19, 2011; is that correct?
13        A    Yes.
14        Q    And the date of the second document in Exhibit 49
15   is dated May 12, 2011; is that correct?
16        A    Sure.
17        Q    Okay.  And I am going to hand you a document which
18   has been labeled Commission Exhibit 50.
19             (SEC Exhibit No. 50 was marked for
20              identification.)
21   BY MR. WISNIEWSKI:
22        Q    Okay.  Commission Exhibit 50 is a four-page
23   document that is not Bates labeled.  The first page of
24   Exhibit 50 appears to be a check issued from Apollo Diamond
25   to a John J. Bruggeman.  Do you see that?
```

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000469

276

```
 1        A    Yes.
 2        Q    And the date of the check is June 30, 2011?
 3        A    Okay.
 4        Q    And is this the payment -- I am going to ask you,
 5   kind of, you know, to compare two documents here.  But if
 6   you take Exhibit 49 and compare it to exhibit --
 7   Commission Exhibit 50, is this the payment from Apollo
 8   Diamond to John J. Bruggeman to redeem his shares pursuant
 9   to the stock repurchase agreement that he executed on
10   April 19, 2011?
11        A    I presume it was.
12        Q    Okay.  So essentially, like we said, this -- some
13   payments, right, or some of these share redemptions from
14   Apollo Diamond shareholders occurred before that assignment
15   of the public Scio -- the private Scio asset purchase
16   agreement to public Scio; is that correct?
17        A    Yes.
18        Q    Okay.  Now, were shareholders of Apollo notified
19   that private Scio -- let me put it this way:  Shareholders
20   of Apollo Diamond, were they notified that the asset
21   purchase agreement between a public -- between private Scio
22   and Apollo Diamond had been assigned to public Scio?
23        A    Were they notified?  Well, I mean, there was a
24   public filing about it of Crossbow.  They were told to look
25   and read about Crossbow, if they asked.
```

278

```
 1   to have the opportunity to purchase shares in a private
 2   company, right?
 3        A    That was the intent at the time of the proxy
 4   statement.  There was no contemplation of the company
 5   becoming public.  But when money could not be raised in the
 6   public setting, I think people at Maxwell Simon, among
 7   others, suggested, You might want to consider finding a way
 8   to create an opportunity for more liquidity by doing some
 9   sort of transaction which allowed the company to become
10   public.
11        Q    When did it become clear to you at private Scio
12   that you were going to be unable to raise money to
13   consummate the asset purchase agreement?
14        A    Probably July of 2011.
15        Q    Okay.  Were Apollo Diamond shareholders
16   notified --
17        A    Can I go back for a second?
18             When did it become clear?  We had spent time and
19   effort to try to raise money.  Maxwell Simon, I think, had
20   spent some time or effort to raise money, I think.  And it
21   didn't seem like -- there was no traction.
22             So looking at the situation, but still wanting to
23   fulfill the commitments we made to people -- and at this
24   point, I felt we had made them at Scio, and I know Bob felt
25   he had made them at Apollo -- we looked at an alternative,
```

277

```
 1        Q    Who told them to do that?
 2        A    I am sure anybody affiliated with Apollo or Scio.
 3        Q    Did you contact any Apollo investors?
 4        A    I probably did, yeah.  They more likely contacted
 5   me.  I don't remember.
 6        Q    So apart from the public filing that Crossbow
 7   made, were Apollo Diamond shareholders notified that that
 8   asset purchase agreement had been assigned to public Scio?
 9        A    They couldn't have been before it occurred because
10   that would have created an insider trading problem,
11   potentially.  I mean, if they had -- if they had been told
12   that we were -- that the company was planning on doing a
13   transaction with a public company, then I would have been
14   worried that someone would have bought stock in that public
15   company and tried to trade on it.
16        Q    How about afterwards; after the assignment?
17        A    I think we sent -- "we," meaning, I think, Scio at
18   that point, sent a letter to people saying, you know, this
19   is the transaction as -- you know, as it's happening or
20   happened.
21        Q    Okay.
22        A    And it's the exact thing we talked about, other
23   than now, the good news is you are involved in a public
24   company.
25        Q    So the proxy statement stated that they were going
```

279

```
 1   which was to do this Cross -- ended up being a Crossbow
 2   transaction.  Didn't know what Crossbow was at the time.
 3        Q    So when the proxy was issued in March 2011, and
 4   ultimately approved in April 2011, Apollo Diamond
 5   shareholders thought that they would have the opportunity to
 6   purchase shares in a private company; is that correct?
 7        A    That was the structure that was contemplated at
 8   that moment.
 9        Q    Okay.  And that was one of the key points in the
10   transaction -- the contemplated transaction, right?
11        A    The key point was they would have an opportunity
12   to purchase stock in the company that owned the assets of
13   Apollo.
14             I have to say, I mean, as a shareholder in private
15   companies, I would be belated to have my stock turned into
16   public stock.  So this was an incredible -- I believe, an
17   incredible benefit to the stockholders that was not
18   anticipated as occurring in March.
19        Q    Okay.  And they were also told that the
20   transaction -- the contemplated transaction with private
21   Scio had a certain capital structure?
22        A    Subject to, you know, additional capital being
23   raised and other circumstances, yes.
24        Q    And that capital structure they were presented
25   with basically told them -- again, we didn't do the math, we
```

DSM-000470

**280**

1  didn't go through the math -- but it was that their
2  ownership would initially be around 90 percent of the
3  ownership of the private Scio, right?
4      A   Private Scio, yes.
5      Q   Okay.  So based upon the information that was
6  provided in the proxy statement and the materials given to
7  them in connection with that, some shareholders elected to
8  redeem their shares, right?
9      A   Yes.
10      Q   Okay.  And --
11      A   I don't know what they -- why they elected to
12  redeem their shares.  I don't know what went into their
13  mindset.  But yes, they elected to redeem their shares.  I
14  don't know on what basis.
15      Q   The redemption of shares, was that part and parcel
16  of the deal or the proxy solicitation as well?
17      A   You could have voted to sell the company, but not
18  redeem your shares.  There was no requirement to redeem your
19  shares.
20      Q   Okay.
21      MR. SHANK:  But the option to redeem the shares
22  was part of the -- wrapped in the same deal that included
23  the asset purchase agreement, correct?
24      THE WITNESS:  If you wanted to give people a tax
25  loss, it seemed like you needed to create an event for them,

[8/27/2015] ADAMS_EDWARD_20150827

**282**

1  stake in the company that ended up with Apollo's assets
2  change as a result of the switch from the contemplated
3  private Scio deal and the public Scio deal that was
4  ultimately executed?
5      THE WITNESS:  Well, they still had more ownership
6  than they had in Apollo or Apollo Gemstone when they were
7  put together, which was the point, because their assets were
8  put together.  But their overall ownership went down because
9  now you have public shareholders who owned shares in
10  Crossbow.  That was, I would think -- I would articulate
11  that as part of the financing strategy.  There were these
12  existing public shareholders.  Don't know who, but they were
13  out there.  And so they owned stock in what was effectively
14  now a company that had the assets of Apollo.  So there was
15  dilution to the shareholders, but they also now had the
16  benefit of being in a public company.
17      MR. SHANK:  They did end up with a more diluted
18  level of ownership than what was originally contemplated?
19      THE WITNESS:  They ended up better than they were
20  in Apollo and Gemstone, but what was originally contemplated
21  in private Scio, because of the inclusion now of the public
22  shareholders, they owned less, percentage-wise.
23      MR. SHANK:  Did you take any steps to communicate
24  with Apollo shareholders, to explain the changes in capital
25  structure as a result of the assignment of the asset

[8/27/2015] ADAMS_EDWARD_20150827

**281**

1  where they sold their shares.  Because if they continued to
2  own shares in a company -- it was a zombie company, for lack
3  of a better word; had no assets -- that would be a less
4  definitive event for them to be able to take that as a tax
5  loss, so yes.
6      BY MR. WISNIEWSKI:
7      Q   So what percentage of Apollo Diamond shareholders
8  redeemed their shares following the issuance of the
9  March 2011 proxy?
10      A   A very high percentage.
11      Q   Okay.
12      A   They were being given a penny for a company that
13  had no -- it was bankrupt, in effect, because it had no
14  cash, and its assets had been tried to be sold and couldn't
15  be.
16      Q   Okay.  And so whether that was a private company
17  or the right to -- whether it was a right to purchase shares
18  in a private company or in a public company, it didn't
19  matter, or in your mind, it didn't matter?
20      A   Well, I think they had a much -- their situation
21  improved because now they were in a public company that had
22  raised a lot -- was going to raise, as it turned out,
23  significant capital.
24      Q   Okay.
25      MR. SHANK:  How, if at all, did their ownership

[8/27/2015] ADAMS_EDWARD_20150827

**283**

1  purchase agreement to public Scio?
2      THE WITNESS:  Once it was announced, and I didn't
3  have a fear that someone would go buy the shares of Crossbow
4  and trade illegally on it, yes.
5      MR. SHANK:  What did you do?
6      THE WITNESS:  Anyone who -- people called in all
7  the time and said -- when I say "called in," they called
8  Adams Monohan or they called Bob.  They called Joe Lancia.
9  They would call me.  Some of them had my phone number.  And
10  we would tell them, you know, this is what transpired.  You
11  can read about Crossbow.  It's a public entity.  You can
12  read about the filings, what transpired there, you know.
13  This is terrific for you, we believe, because there's
14  transparency and liquidity.  So that was -- we would tell
15  them.
16      And at some point, Joe Lancia sent out a letter
17  introducing the fact the transaction had taken place.  And
18  there was a gap, I think, between when the transaction took
19  place and the stock actively traded.  So there was a time we
20  could do this and nobody would be able to benefit.
21      BY MR. WISNIEWSKI:
22      Q   I am going to hand you a document that's been
23  marked as Commission Exhibit 51.
24      (SEC Exhibit No. 51 was marked for
25      identification.)

[8/27/2015] ADAMS_EDWARD_20150827

DSM-000471

284

```
 1        BY MR. WISNIEWSKI:
 2        Q    Mr. Adams, Commission Exhibit 51 is a document
 3   Bates numbered SEC Adams 31076.  It's titled "Amendment to
 4   the asset purchase agreement by and between Apollo Diamond
 5   and Scio," dated July 1, 2011.
 6        Do you recognize this document?
 7        A    I do.
 8        Q    What is it?
 9        A    It's the document I described before.  I think
10   it's one of them where it's an amendment to the asset
11   purchase agreement.  There's probably one for Apollo Diamond
12   Gemstone too.  And it just extends the term of the
13   transaction so that the transaction can continue to be
14   pursued.
15        Q    And it gives private Scio the right of first
16   refusal?
17        A    Right to acquire the assets of Scio -- or excuse
18   me, the right of first refusal to acquire the assets of ADI.
19        Q    Was it that right that was assigned --
20        A    Yes.
21        Q    -- to public Scio?
22        A    That's how I would understand it as an attorney,
23   yes.
24        Q    Okay.  And in exchange -- the consideration that
25   was exchanged for that right was the 13 million shares --
```

285

```
 1        A    Right.
 2        Q    -- of Apollo -- I'm sorry, of public Scio?
 3        A    Of Crossbow.
 4        Q    Crossbow.
 5             And explain how you became involved with Crossbow
 6   in August 2011.
 7        A    It was becoming clear that to make a transaction
 8   happen for the benefit of the shareholders, and to get this
 9   transaction done, we were going to need to explore
10   alternatives.
11             I want to say that Maxwell Simon suggested that I
12   talk to somebody at a company called Campus Ventures.  As it
13   turned out, I met this person before, a long time ago.  And
14   we started talking.  Campus Ventures specialized in finding
15   public companies that were interested in doing transactions.
16             They then introduced -- "they," meaning Campus
17   Ventures, the principals there, introduced us to an
18   attorney.  Luke Zouvas was his name, I think.  And
19   Mr. Zouvas ultimately structured the transaction and the
20   documents and became securities counsel for Scio.
21        Q    Okay.  And you said -- who is the individual you
22   spoke with at Campus Ventures?
23        A    I believe it was Chris Larson.
24        Q    Okay.  And who is Chris Larson?
25        A    Somebody at Campus Ventures.
```

286

```
 1        Q    Did you have any past relationships or business
 2   dealings with Mr. Larson?
 3        A    So he reminded me that we did.  I didn't really
 4   remember it; that at some point I had been involved in -- I
 5   think it was loaning his company money, or something.  I
 6   don't remember.  This was a decade, probably, ago.
 7        Q    It was Campus Ventures --
 8        A    No, no.  It was some other company he was involved
 9   with.  I don't even remember what it was.
10        Q    And is Campus Ventures someone private Scio
11   engaged to find this company?
12        A    That sounds right.
13        Q    Okay.  And do you know when -- about what
14   time that occurred?
15        A    I am going to guess July of 2011.
16        Q    So private Scio engaged Campus to go out and find
17   or locate a shell company or --
18        A    Well, I don't know that it -- you know,
19   "shell company" is a technical term, right?  You know, I am
20   sure.
21             And it more was engaging them -- maybe -- I don't
22   remember.  But the reality was we were just looking for a
23   strategy to create liquidity for the shareholders and to
24   help raise capital.  So, you know, if Campus Ventures had
25   come forward with somebody who was willing to buy the
```

287

```
 1   company -- you know, it was XYZ Corporation.  They were a
 2   public company with $50 million, and they were willing to
 3   buy the company for 20 million, we would have talked to
 4   them.  They were -- the plan was, let's get other people
 5   rolling, hopefully, in the same direction to see if we can
 6   find a way to do a deal, to do a transaction that we talked
 7   about with the shareholders in April.
 8        Q    Okay.  And Campus Venture located Crossbow?
 9        A    Yeah.
10        Q    Okay.  And walk me through how you acquired your
11   interest in Crossbow.
12        A    You say "you."  Me?  You mean me?
13        Q    You, Ed Adams.
14        A    I acquired my interest -- so Luke Zouvas was the
15   attorney for Crossbow.  He said, I do these transactions all
16   the time and, you know, we are going to do this as a -- I
17   want to say he called it a two-step transaction, which he
18   said, you are going to --
19             MR. SIKORA:  Is this a privileged conversation?
20             THE WITNESS:  Yes, actually --
21             MR. SHANK:  At this point, does he have any
22   affiliation with Crossbow?
23             MR. SIKORA:  That's what I want to figure out.
24   Can we take a break just to figure that part out?
25             MR. SHANK:  Yes.
```

DSM-000472

---

**288**

1   MR. WISNIEWSKI:  Off the record at 5:24.

2        (Whereupon, a recess was had.)

3   MR. WISNIEWSKI:  Back on the record at 5:25.

4   Read back my last question.

5        (Whereupon, the record was read by the

6        reporter.)

7   MR. SHANK:  You started to answer about your

8   communications with Mr. Zouvas.

9   MR. WISNIEWSKI:  You said Luke Zouvas said, I do

10  these all the time.  And that's when you were cut off.

11  MR. SHANK:  You said "two-step transaction," and

12  that's when we stopped.

13  THE WITNESS:  Okay.  Thank you.

14  MR. SHANK:  What was the two-step transaction?

15  THE WITNESS:  So the two-step -- I think what he

16  was referring to -- I never heard of this -- was you would

17  become -- you would become a director, an owner, a

18  controlling owner of Crossbow, and then Crossbow would

19  acquire the assets of private Scio.  So that's the two

20  steps.  You have to become an owner, a controlling owner of

21  it, and then you can direct it to acquire the assets of

22  Apollo and Gemstone.  I think that's what he meant.

23  MR. HAYES:  How were you going to become a

24  controlling owner of Crossbow?

25  THE WITNESS:  By buying shares from someone who

[8/27/2015] ADAMS_EDWARD_20150827

---

**289**

1   was a shareholder of Crossbow, if I remember correctly.

2   BY MR. WISNIEWSKI:

3   Q   And did you do that?

4   A   Yeah, Mr. Zouvas -- so then what ended up

5   happening was, you know, he started doing all the

6   documentation to do that.  This is where I think it might

7   become a little more privileged.  And I think it is

8   privileged, probably.

9   Q   Let's stay away from that.

10      So did you purchase shares from somebody at

11  Crossbow?

12  A   Yes.

13  Q   Who was that?

14  A   I don't remember.

15  Q   How many shares did you purchase?

16  A   I think it was around 1,700,000 or 1,900,000.  I

17  don't remember the exact number.

18  Q   Okay.

19  MR. HAYES:  That was sufficient to give you

20  control over Crossbow?

21  THE WITNESS:  That's what he represented.

22  MR. HAYES:  Okay.  How much did you pay for those

23  shares?

24  THE WITNESS:  I don't remember.  200 some

25  thousand, I think.

[8/27/2015] ADAMS_EDWARD_20150827

---

**290**

1   MR. HAYES:  Did you pay $200,000 to somebody that

2   you don't -- never met before, based on Mr. Zouvas'

3   representation that you were going to obtain control over

4   the company by doing that?

5   THE WITNESS:  As an attorney, I did.  I assumed --

6   I looked -- I think one of my associates looked him up, and

7   he didn't have any issues.  So, I mean, I trusted him to

8   document the transaction, make sure it worked.  I had no

9   reason not to trust him.

10  MR. HAYES:  Had you ever met Mr. Zouvas before?

11  THE WITNESS:  No.  I haven't to this day.

12  MR. SHANK:  Did the purchase actually give you

13  control?

14  THE WITNESS:  Well, no one has ever said it

15  didn't.  You know, I mean, no one ever came forward who was

16  a shareholder with more shares and said, wait a minute, you

17  know, you don't have control.  That was never an issue.

18  MR. SHANK:  Did Crossbow have any operations at

19  the time?

20  THE WITNESS:  I don't believe -- I mean, if it

21  did, it wasn't an important component.  The only thing I

22  stressed to Mr. Zouvas was I can't have any liabilities.  I

23  am not going to be buying someone else's problem.  I mean, I

24  am not going to pay money and do a transaction and then have

25  a bunch of liabilities for the Apollo shareholders.  That

[8/27/2015] ADAMS_EDWARD_20150827

---

**291**

1   would be a disaster.

2   MR. HAYES:  The Zouvas Law Group, is that the name

3   of it?

4   THE WITNESS:  I think that's what it's called.

5   MR. HAYES:  Where is he located?

6   THE WITNESS:  I think California.

7   MR. SHANK:  You used your personal funds to buy

8   the shares -- the $200,000 worth of shares?

9   THE WITNESS:  I borrowed money.

10  MR. SHANK:  From who?

11  THE WITNESS:  Somebody Zouvas arranged.  He sent

12  me some documents, and I signed them.  I don't remember --

13  that's kind of what I remember.

14  MR. SHANK:  Was there a loan agreement?

15  THE WITNESS:  I am sure there was a loan

16  agreement, yes.

17  MR. HAYES:  Do you have a copy of it?

18  THE WITNESS:  I am sure I do, and I bet I produced

19  it.

20  MR. SHANK:  What kind of interest was due on this

21  loan?

22  THE WITNESS:  I don't remember.

23  MR. SHANK:  So the person you are buying it from,

24  they had shares in an empty company, basically?

25  THE WITNESS:  Yeah, I think it was a development

[8/27/2015] ADAMS_EDWARD_20150827

292

1   stage -- whatever the term of art is that's used to describe
2   it; a development stage company.  Yes.
3         MR. HAYES:  Did you repay the loan?
4         THE WITNESS:  Not yet.
5         BY MR. WISNIEWSKI:
6      Q    As part of the two-step transactions, why was
7   obtaining control of the company important?
8      A    Because then we could facilitate a transaction
9   where the assets were acquired and the shareholders were
10  given stock at a penny; "we" meaning Scio.
11     Q    Okay.  And then -- so you, Ed Adams, could
12  facilitate those transactions on behalf of Scio?
13     A    No.  Scio could do that.  I mean, I was working to
14  do it with -- I mean, look, Joe Lancia was going to run the
15  company.  He had been working for months now without
16  compensation.  He was, like, I gotta get paid; I have to
17  move the transaction forward, blah, blah, blah.
18         So this is what -- this is kind of how it
19  developed with respect to Campus Ventures.  And then there
20  was a decision made where we thought -- "we," meaning the
21  people at Scio, thought this was the best opportunity to do
22  what we said we were going to do originally for Apollo
23  shareholders.
24         MR. HAYES:  Couldn't public Scio have gone through
25  with this transaction without you being controlling

[8/27/2015] ADAMS_EDWARD_20150827

---

294

1   August 11th, but if you turn to the last page of the filing,
2   it was actually filed, looks like, August 15, 2011.
3         Have you seen this document before?
4      A    Yes.
5      Q    Okay.  And what does this 8K relate to?
6      A    A transaction where Crossbow acquired the
7   assets -- acquired the right to acquire the assets and name
8   of Apollo and Apollo Gemstone.
9      Q    Okay.  If you turn to Page 3 of Exhibit 52, it
10  says, "On August 5, 2011, Scio Diamond Technology Corp, a
11  Nevada corporation, executed an asset purchase agreement.
12  Under the terms of the agreement, the name Scio Diamond
13  Technology Corp was purchased for 13 million newly-issued
14  shares of common stock to the company."
15         Do you see that?
16     A    I see that.
17     Q    Okay.  And why did Crossbow purchase the name Scio
18  Diamond Technology Corporation?
19     A    You would have to ask Mr. Zouvas.  He was the one
20  that structured it.  I mean, why he structured it that way
21  and purchased the name and the rights to acquire the assets,
22  I have no idea why.  I guess -- I remember I was thinking it
23  was a good name.  In Greek it means conscience or science.
24  So that was why.
25     Q    And if we turn to page Bates numbered CB Scio 205,

[8/27/2015] ADAMS_EDWARD_20150827

---

293

1   shareholder of the company?
2         THE WITNESS:  I don't know that it could have
3   because then I wouldn't have known -- I mean, I didn't know
4   who the people were I was buying the stock from, so how
5   would I have known if they were going to actually honor a
6   contract?
7         MR. HAYES:  Well, you entered into a contract with
8   buying the shares with people that you didn't know, correct?
9         THE WITNESS:  Yes.  That's true, but that wasn't
10  taking the assets of Apollo and selling it to a group of
11  people I didn't know.
12         MR. HAYES:  Couldn't Mr. Zouvas have arranged for
13  it?
14         THE WITNESS:  Perhaps.  This is what he told me
15  made sense.  So I followed his lead.
16         BY MR. WISNIEWSKI:
17     Q    I am going to hand you a document that's been
18  marked as Commission Exhibit 52.
19         (SEC Exhibit No. 52 was marked for
20               identification.)
21         BY MR. WISNIEWSKI:
22     Q    Mr. Adams, Commission Exhibit 52 is an eight-page
23  document that's Bates numbered CB Scio 188 through 206.  It
24  purports to be a printout of a Form 8KA filed by Scio
25  Diamond Technology Corporation.  The date of the report is

[8/27/2015] ADAMS_EDWARD_20150827

---

295

1   it's Schedule 1.4.  It breaks down how that 13 -- those 13
2   million shares are distributed; is that right?
3      A    It looks right, yes.
4      Q    And the top two names, Denise Adams, is that your
5   wife?
6      A    It is.
7      Q    Okay.  She got 2 million shares?
8      A    Yes.
9      Q    And Ed Adams, that's you?
10     A    Yes.
11     Q    2.1 million?
12     A    Yes.
13     Q    So between the two of you, you acquired
14  4.1 million shares as a result of the asset purchase
15  agreement for the name Scio Diamond Technology Corporation?
16     A    Well, the name and the right to acquire the
17  assets.  That document, Number 51.
18     Q    Okay.  If you turn to page CB Scio 196, Bates
19  number CB Scio 196.
20     A    Yes.
21     Q    What is this?
22     A    Asset purchase agreement.
23     Q    Okay.  And this is the actual asset purchase
24  agreement between Crossbow Holdings and Scio Diamond
25  Technology dated August 4, 2011?

[8/27/2015] ADAMS_EDWARD_20150827

296

```
1        A    Yes.
2        Q    Okay.  And if we turn to the next page, CB Scio
3   197, there is a paragraph numbered 1.1.
4        A    Yes.
5        Q    It says "Acquired assets."
6        A    Uh-huh.
7        Q    It says, on the terms, "Subject to the conditions
8   set forth in this agreement, Seller, pursuant to the bill of
9   sale, to be delivered pursuant to 3.1, shall convey,
10  transfer, assign, sell and deliver to Buyer, and Buyer shall
11  acquire and accept and purchase substantially all the assets
12  and properties and rights of Seller used or useful in the
13  business, including without limitation those assets listed
14  on Schedule 1.1."
15            And then if we turn to page CB Scio 206, there's
16  Schedule 101.
17       A    Uh-huh.
18       Q    And the assets identified are the names Scio
19  Diamond Technology Corp, including any and all rights
20  thereof.  Is that right?
21       A    Right.
22       Q    What does that mean, "including any and all rights
23  thereof"?
24       A    I didn't draft this document.
25       Q    Okay.
```

[8/27/2015] ADAMS_EDWARD_20150827

298

```
1        A    I don't remember.
2        Q    Okay.  So if we turn back to Bates number CB Scio
3   190.
4        A    Sure.
5        Q    Under Item 302, the table sets forth the ownership
6   interest of public Scio as of August 5, 2011; is that right?
7        A    Yes.
8        Q    It shows your name there as owning 5.1 million
9   shares, which is equal to 26.28 percent of the company?
10       A    I see that.
11       Q    And is that an accurate reflection of your
12  ownership interest as of that time?
13       A    Prior to the shareholders of Apollo being issued
14  their shares, yes, it is.
15       Q    And that was greater than your two percent
16  interest in Apollo Diamond?
17       A    Right.  But this doesn't -- this is before they
18  were issued their shares.  So the whole point was this was
19  going to go down, of course, because they were going to be
20  issued their shares.  I mean, anyone subscribed at a penny
21  was going to get their share.  So I just don't want to
22  compare apples to oranges.
23            MR. SHANK:  You understood your diluted interest
24  was much lower because there were obligations out there for
25  purchase of Scio Diamond shares at a penny per share?
```

[8/27/2015] ADAMS_EDWARD_20150827

297

```
1        A    It was drafted by Mr. Zouvas, I believe.  I
2   presume it means the rights to the asset purchase agreement
3   amendment.  In other words, the rights to acquire the assets
4   of Apollo.
5        Q    On August 15, 2011, what was your position with
6   Scio Diamond Technology Corporation?
7        A    I think I was chairman.
8        Q    Okay.  Did you review this filing before it was
9   made?
10       A    I don't remember.  I don't remember.
11       Q    Was it your practice at Scio Diamond -- public
12  Scio, while you served as chairman, to review public filings
13  before they were filed?
14       A    Not all of them, no.
15       Q    Were there certain categories of filings you
16  reviewed?
17       A    I think it depended on what else was going on at
18  that moment in my life.
19       Q    So who at public Scio was responsible for
20  reviewing the public filings?
21       A    I was the chairman, so Joe Lancia was being paid
22  to be CEO.  I think at one point he was acting CFO, or there
23  was an acting CFO.  They were responsible for that.
24       Q    So you never reviewed this filing before it was
25  actually filed?
```

[8/27/2015] ADAMS_EDWARD_20150827

299

```
1            THE WITNESS:  There was the intent at -- because
2   that was something that was important to offer -- and we put
3   that in the PPM -- to offer shareholders the right to buy
4   stock at a penny, exactly.  And we were -- I know we were
5   struggling with how that -- at points, we were struggling
6   with, how do you do that?  Do you do that in the context of
7   Apollo Diamond Gemstone?  Do you do it before that?  Do you
8   do it after that?  So there was some debate internally with
9   Zouvas, I think, and others.
10           But yeah, I mean, the point of this whole thing
11  was my shareholding interest percentage-wise was -- I
12  expected that people exercised to go in on.  I was doing
13  this to facilitate a transaction so the shareholders could
14  have -- the shareholders of Apollo could have liquidity and
15  we could complete a transaction which allowed them to have
16  an opportunity to invest in this new entity.
17           MR. SIKORA:  Do you think we will be in a position
18  to wrap up today?
19           MR. WISNIEWSKI:  No, probably not.  So why don't
20  we bring this subject to a close.  We will hopefully wrap
21  this up pretty soon, and we will move on from there.
22           BY MR. WISNIEWSKI:
23       Q    When did shares of public Scio first become
24  available, publicly available, for purchase?
25       A    I am not sure I understand.
```

[8/27/2015] ADAMS_EDWARD_20150827

300

1    Q    When was the public first able to purchase shares
2    of public Scio?  When were they publicly traded?
3         A    I don't remember.
4         Q    Okay.
5         A    I think it was sometime after this announcement
6    was made.  I don't remember.  I think there had to be some
7    documents filed, or something.  I don't remember.  Zouvas
8    took care of all of that.
9         Q    Do you remember what the share price was when it
10   first started trading?
11        A    I don't.  I mean, I would say it was really kind
12   of irrelevant, but that's, you know -- whatever.  It was
13   what it was.
14        Q    So without the asset purchase agreement between
15   Apollo Diamond and ultimately public Scio, what was the
16   result -- what was going to be the result of -- or what were
17   the other options for Apollo Diamond, other than entering
18   into the asset purchase agreement?
19        A    Are we going all the way back to 2011, early?
20        Q    In 2011 --
21        A    Okay.
22        Q    -- on to August --
23        A    File bankruptcy, sell the assets to its creditors,
24   and outside of bankruptcy, dissolve the entity.  You know,
25   there was -- forgive me.  I don't want to -- I don't know

[8/27/2015] ADAMS_EDWARD_20150827

302

1    all these options what the liquidation value would have been
2    of the assets of the company?
3         THE WITNESS:  We didn't get a bid, you know.  So
4    there was nobody who came forward and said, I will pay you a
5    million dollars, I will pay you $500,000, I will pay you
6    $6 million.  So, I mean, candidly, I would say the value was
7    zero.
8         I mean, now -- you know, an indefinite amount of
9    time, shopping to the entire world -- assuming I could find
10   someone who was willing to devote the time to shop the
11   entire world, could they have found a buyer?  Maybe.
12   Deutsche Bank couldn't find a buyer.  Ambrian couldn't find
13   a buyer.  Bear Stearns couldn't find a buyer.  They were
14   engaged by the company at one point, long before, okay.
15        So I have to tell you, I mean, I can't -- I can't
16   tell you there wasn't a buyer out there, but I don't think
17   it was high probability that if there was, we were going to
18   find them.
19        MR. SHANK:  So from your perspective, the value of
20   the assets was virtually zero?
21        THE WITNESS:  It was virtually zero.
22        MR. SHANK:  How much would you have personally
23   gotten for your shareholder interest and your creditor
24   interest in Apollo Diamond and Apollo Gemstone had this
25   transaction not been consummated?

[8/27/2015] ADAMS_EDWARD_20150827

301

1    what you know about corporate or bankruptcy law, so I am --
2    I know a lot about bankruptcy law.  But you could have also
3    dissolved it under State law.  Not a lot of people do that.
4    But you could have dissolved it under State law.
5         We could have just disbanded -- we could have
6    quit, right.  There's no magic involved in continuing to do
7    this.  I always find this interesting when people say, Why
8    did you keep going?  And I kept going because I wanted to do
9    what I thought was the right thing for the shareholders.
10        But the reality is, my father and brother-in-law
11   and me aren't slaves, right.  I mean, no one required us to
12   go and do anything.  We could have just stopped working.  So
13   that was an option.  Selling the company was an option.
14   Selling a part of the company, licensing the technology, we
15   looked at all those things and tried to make the best
16   decision we could.  A lot of those require a third party to
17   want to engage in a transaction.
18        MR. SHANK:  What viable options were there after
19   exploring all those possibilities?
20        THE WITNESS:  I sit here today thinking this is
21   the only one that would have got the shareholders any
22   opportunity to recover their investment.  And frankly, I am
23   proud of the fact that we are even still around, because
24   GM and Bear Stearns aren't.  We are.
25        MR. SHANK:  Did you have a sense after exploring

[8/27/2015] ADAMS_EDWARD_20150827

303

1         THE WITNESS:  I don't know.  If we would have gone
2    through -- the thing -- bankruptcy introduces an entirely --
3    you just don't know.  Would people come out of the woodwork,
4    right?  Would a company like De Beers come out of the
5    woodwork and say, We are going to buy the company, we are
6    going to buy the assets of the company?  I don't know.
7         MR. SHANK:  Is it fair to say you were at risk of
8    getting zero?
9         THE WITNESS:  Yes.  Everyone would have gotten
10   zero; the shareholders, me, everyone.
11        BY MR. WISNIEWSKI:
12        Q    The last thing on the $13 million share
13   purchase -- 13 million shares.
14        When that was consummated, I think, on August 5,
15   2011, did public Scio consider this to be a related-party
16   transaction?
17        A    I don't know.
18        Q    You don't know if they considered it to be one or
19   you don't know if it was?
20        A    Both.
21        Q    Okay.
22        A    Zouvas was the one who was the securities lawyer.
23   I don't know.
24        Q    Okay.
25        A    To me, a related-party transaction is something

[8/27/2015] ADAMS_EDWARD_20150827

304

1  that has specific import in the public disclosure securities
2  world.  So I didn't consider it.  He was being paid to do
3  that.
4      Q    So in August 2011, you didn't consider this to
5  be --
6      A    I didn't consider the issue, quite honestly.
7      Q    Okay.  You relied on counsel?
8      A    Yes.
9      Q    Okay.  Mr. Adams, we have no further questions at
10 this time.  We may, however, call you back to testify in
11 this investigation.  Should this be necessary, we will
12 contact you through your counsel.
13          Do you wish to clarify anything on the record or
14 add anything before we go off the record?
15          THE WITNESS:  Is there anything?
16          MR. SHANK:  We are probably going to need
17 additional testimony.  So would you prefer to -- us to just
18 adjourn and not issue a new subpoena?  We can do it either
19 way.
20          MR. WISNIEWSKI:  We can adjourn it --
21          MR. SIKORA:  I don't know what that means.  Just
22 issue a new subpoena.
23          MR. SHANK:  Okay.
24          MR. WISNIEWSKI:  That's fine.
25          MR. SIKORA:  Otherwise, are we walking around

[8/27/2015] ADAMS_EDWARD_20150827

---

306

1              PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   SCIO DIAMOND TECHNOLOGY
4                      CORPORATION
5  Witness:            Adam Edwards
6  File Number:        C-08091-A
7  Date:               August 27, 2015
8  Location:           Chicago, IL
9
10
11      This is to certify that I, Nicholas Wagner,
12 (the undersigned), do hereby swear and affirm
13 that the attached proceedings before the U.S.
14 Securities and Exchange Commission were held
15 according to the record and that this is the
16 original, complete, true and accurate transcript
17 that has been compared to the reporting or recording
18 accomplished at the hearing.
19
20
21
22  _____   _____
23  (Proofreader's Name)      (Date)
24
25

[8/27/2015] ADAMS_EDWARD_20150827

---

305

1  under a subpoena?  That's a nonsensical idea.
2          MR. WISNIEWSKI:  Jim, John, do you guys have
3  anything to add or wish to clarify?
4          MR. KOPECKY:  No.
5          MR. WISNIEWSKI:  We will go off the record at
6  5:48.
7          (Whereupon, at 5:48 p.m., the examination was
8  concluded.)
9                  * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

[8/27/2015] ADAMS_EDWARD_20150827

C-08091

*ADAMS_EDWARD_20151008*

*10/8/2015 9:00 AM*

**Full-size Transcript**

Prepared by:

C-08091

Thursday, October 29, 2015

---

309

```
1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         KEVIN WISNIEWSKI, ESQ.

5         JEFFREY SHANK, ESQ.

6         Securities and Exchange Commission

7         Division of Enforcement

8         175 West Jackson Boulevard

9         Suite 900

10        Chicago, Illinois 60604

11        312-886-3803

12

13   On behalf of the Witness:

14        JOHN SIKORA, ESQ.

15        Latham & Watkins

16        330 North Wabash

17        Chicago, Illinois 60606

18        312-876-6580

19        john.sikoraslw.com

20

21

22

23

24

25
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

308

```
1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    IN THE MATTER OF:            )

4                                 ) File No. C-08091-A

5    SCIO DIAMOND TECHNOLOGY      )

6    CORPORATION                  )

7

8    WITNESS:  Edward Adams

9    PAGES:    308 through 562

10   PLACE:    Securities and Exchange Commission

11             175 West Jackson Boulevard, Suite 900

12             Chicago, Illinois 60604

13   DATE:     Thursday, October 8, 2015

14

15       The above-entitled matter came on for hearing,

16   pursuant to notice at 9:00 a.m.

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25            (202) 467 9200
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

310

```
1    APPEARANCES (CONT.):

2

3    On behalf of the Witness (cont.):

4         JAMES KOPECKY, ESQ.

5         Kopecky Schumacher Bleakley Rosenburg PC

6         203 North LaSalle Street

7         Suite 1620

8         Chicago, Illinois 60601

9         312-527-3966

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

**EXHIBIT**

**DX-51**

311

```
                    C O N T E N T S
```

1
2
3   WITNESS:                          EXAMINATION
4   Edward Scott Adams                     313
5
6   EXHIBITS:      DESCRIPTION:       IDENTIFIED:
7   Exhibit 53     Subpoena                313
8   Exhibit 54     Written Action          331
9   Exhibit 55     Written Action
10  Exhibit 56     Email from Adams to      343
11                 Platt dated 5/6/11
12  Exhibit 57     Form AK dated 8/17/11    358
13  Exhibit 58     Asset Purchase Agreement 390
14                 3/31/2011
15  Exhibit 59     Board of Directors Meeting 405
16                 Minutes 3/27/11
17  Exhibit 60     PowerPoint Shareholder   421
18                 Meeting 4/11
19  Exhibit 61     Agreement between ADI and 446
20                 Edward Adams 1/2/12
21  Exhibit 62     Account statement from   458
22                 Venture Bank 1/31/11
23                 Through 12/30/12
24
25

---

313

```
                    P R O C E E D I N G S
```

1
2       MR. SHANK:  We're on the record at 9:09 on
3   October 8, 2015.  Mr. Adams, raise your right hand,
4   please.
5   Whereupon,
6               EDWARD SCOTT ADAMS,
7   was recalled as a witness and, after having been first
8   duly sworn, was examined and testified as follows:
9               EXAMINATION
10      BY MR. WISNIEWSKI
11      Q    And please state your name and spell your
12  name for the record?
13      A    Edward Scott Adams, E-D-W-A-R-D SCOTT
14  A-D-A-M-S.
15      Q    Mr. Adams, my name is Kevin Wisniewski.
16  This is Jeff Shank.  We are officers of the
17  Commission for the purposes of this proceeding.
18  This is an investigation by the United States
19  Securities & Exchange Commission in the matter of
20  Scio Diamond Technology Corporation, C-08091, to
21  determine whether there have been violations of
22  certain provisions of the federal securities laws.
23  However, the facts developed in this case or this
24  investigation may constitute violations of other
25  federal or state civil or criminal laws.

---

312

```
                C O N T E N T S (CONT.)
```

1
2
3   EXHIBITS:      DESCRIPTION:       IDENTIFIED:
4   Exhibit 63     Venture Bank account     458
5                  Statement Scio Diamond
6                  Technology Corp.
7   Exhibit 64     Venture Bank Account     465
8                  Statement of Scio
9                  Diamond Technology Corp.
10  Exhibit 65     Two-page document business 468
11                 Application with Venture Bank
12  Exhibit 66     Invoice for legal services 484
13                 And expense through
14                 March 31,2012 dated 6/1/12
15  Exhibit 67     Adams Monahan letter 6/1/12 486
16  Exhibit 68     Invoice from AMLLP       495
17                 Scio Diamond Technology
18                 Corp. 5/14/12
19  Exhibit 69     Email from Adams to       531
20                 Nichols,Monahan & Lancia
21                 3/26/12
22  Exhibit 70     Questionnaire of          534
23                 Edward Adams Chairman
24  Exhibit 71     Venture Bank checks for   547
25                 ADGC

---

314

1       Prior to the opening of the record, you
2   were provided a copy with the Formal Order of
3   investigation in this matter and supplemental order
4   designating additional officers.  It will be
5   available for you during the examination and during
6   the course of this proceeding.
7       Mr. Adams, have you had an opportunity to
8   review that Formal Order?
9       A    I have.
10      Q    And prior to the record or currently, you
11  will be provided a copy of Commission Supplemental
12  Information Form.  A copy of that has been marked as
13  Commission Exhibit Number 1.  The same exhibit was
14  provided to you at your first testimony.
15      Mr. Adams, have you had an opportunity to
16  to review Commission Exhibit 1?
17      A    I believe I have.
18      Q    Do you have any questions about the
19  exhibit?
20      A    No.
21      Q    Concerning the notice?
22      A    No.
23      Q    And, Mr. Adams, you are represented by
24  counsel today?
25      A    I am.

DSM-000479

315

```
 1        Q    Would you please have them identify
 2   themselves?
 3            MR. KOPECKY:  Jim Kopecky and the Court
 4   Reporter has my card.  Jim Sikora, the Court Reporter
 5   also has his card.
 6            BY MR. WISNIEWSKI
 7        Q    Mr. Adams, this is a copy of the subpoena
 8   issued on September 23rd. I'm going to mark it as
 9   Commission Exhibit 53.
10                (SEC Exhibit 53 was marked
11                 for identification)
12            BY MR. WISNIEWSKI
13        Q    Mr. Adams, this is a copy of the subpoena
14   you were appearing pursuant here today?
15        A    Yes.
16        Q    And just to get it out of the way, before
17   we proceed, the same ground rules as the last time.
18   The oath I gave you when we first started you
19   understand the oath?
20        A    I think I do.
21        Q    Is there anything that prevents you today
22   from giving full, complete and truthful answers to
23   my questions?
24        A    I hope not.  My migraine medicine, but --
25        Q    If you don't understand a question, will
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

316

```
 1   you let me know that?
 2        A    Sure.
 3        Q    If you don't know the answer to a
 4   question, would you let me know that?
 5        A    Sure.
 6        Q    If you don't have any knowledge about a
 7   particular question or particular subject matter,
 8   will you let me know that as well?
 9        A    I will.
10        Q    If we take a break and go off or we take a
11   break and go off the record for any reason, I am
12   going to ask you that each time we go back on the
13   record, whether or not you and I had any
14   conversations during the break.  And that's just to
15   let you know I'm going to say that for the record
16   each time.  At the end of your testimony all
17   exhibits will be returned back to me.  You and your
18   counsel cannot take any of those exhibits with you,
19   after your testimony today.
20            As always, if you need a break -- you know,
21   as we have been warned, speak up so that the Court
22   Reporter can get your responses.  Please provide
23   verbal responses to my questions.  And nods, head
24   nods -- so she can record those as well.  And then
25   I'll wait -- I'll ask that you wait until I'm done
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

317

```
 1   asking the questions before you give your response to
 2   help the Court Reporter out.
 3        Q    Did you understand that?
 4        A    I do.
 5        Q    Do you have any questions before we start?
 6        A    I don't.
 7        Q    Kind of picking up where we left off last
 8   time, I want to start by talking about what we
 9   referred to last time as "private Scio", which is a
10   corporation in Scio Diamond Technology Corporation,
11   which was formed in March 2011, is that correct?
12        A    That's correct.
13        Q    And I'm going to hand you an exhibit that
14   was previously marked as Commission Exhibit 41.
15   And I know we covered this exhibit a little bit, but
16   I think it will just be easier to have kind of a
17   reference piece out in front of us.  Again,
18   Mr. Adams, this is a three-page document, Commission
19   Exhibit 47, a three-page document Bates Number,
20   SEC-ADAMS 31152 through 31154.
21            And again I just asked you have you seen
22   this document before?
23        A    I believe so.
24        Q    And when is the last time you saw this
25   document?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

318

```
 1        A    The last time we were together.
 2        Q    And the heading of this document is
 3   Initial Stock Ledger as of April 1, 2011 for SCIO
 4   Diamond Technology Corp.  The next page of
 5   Commission Exhibit 47, is the Stock Ledger as of
 6   June 30, 2011.  And going back to Page 1, does
 7   Page 1 accurately reflect the number of shares that
 8   you held in what I'll call private Scio as of
 9   April 1, 2011?
10        A    I believe so.  I don't know that I have
11   got a share certificate, but, you know, it says
12   that.  It says that.
13        Q    Do you have any reason to believe that
14   these numbers represented in Exhibit 47 are wrong or
15   incorrect?
16        A    No.  Excuse me.  I know there was some
17   discussion about -- depending on who was involved as
18   we -- Joe Lancia, private Scio had come to an
19   agreement with Joe Lancia.  Joe Lancia was receiving
20   shares in private Scio, and I want to say he was
21   receiving up to 2 million shares or warrants or
22   options.  I think initially it was 200,000 shares
23   and then warrants and options.  Those aren't
24   reflected in here.  Even though we had come to an
25   agreement with him.  So I'm not sure why.  And then
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000480

319

1    there was some discussion about him bringing a
2    financing -- Joe Lancia, forgive me, Joe Lancia was
3    the CEO of private Scio sometime beginning in March.
4    And then there was some discussion about him
5    bringing capital in and this would change this cap
6    table.  So I don't know why he isn't on here, but --
7        Q    You're saying that both the shares and the
8    warrants that were being contemplated being issued
9    to Joe Lancia are not reflected in this initial
10   Page 1 of Commission Exhibit 47?
11       A    Right.  Well, actually -- yeah, right.
12       Q    And what type of capital was he
13   anticipating bringing into private SCIO?
14       A    I don't remember if it was him or someone
15   else who said they were going to fund the entire
16   entity or they could bring in capital to fund the
17   entire entity, which would have changed things
18   dramatically.  And positively rather it would have
19   been good to not be as involved as I had to be.
20       Q    When private Scio was formed, you were the
21   present CFO and Treasurer, is that right?
22       A    It was a company that was formed, yeah
23   right.  And somebody has to be those things under
24   state law.  And then I think within days Joe became
25   all of those things.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

320

1        Q    So you resigned or --
2        A    I resigned.
3        Q    So Joe Lancia took over each of those
4    roles?
5        A    Yeah, the only one I don't know if he took
6    over -- I think he took overall all of them.  I
7    think the only thing I was involved in as a lawyer
8    and as a shareholder.
9             BY MR. SHANK
10       Q    And to clarify, as a lawyer, you mean as
11   outside counsel?
12       A    As outside lawyer.
13       Q    You had no employment at private Scio
14   except in those initial --
15       A    No.  I mean somebody -- when you form an
16   entity obviously somebody has to have those rules.
17   And I think we actually even reached an agreement
18   with Lancia prior to March 1st that he would be
19   serving in those roles.  And then we formed the
20   entity and he resigned and he was off to the races.
21            BY MR. WISNIEWSKI
22       Q    When you resigned as CEO President, CFO
23   and Treasurer, did you -- were you still a Board
24   member of private Scio?
25       A    Yes, I was.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

321

1        Q    Who was a Board member -- who were the
2    Board members of private Scio?
3        A    I think at that point it was myself,
4    Mr. Monahan, Michael Monahan and Joe Lancia.  And
5    then we were talking to other people.  We had
6    extensive discussions with being involved, those
7    discussions went from they might have gone back as
8    far as February.  I know they went through May and
9    the problem that we kept having with people
10   wanting -- no one wanted to be involved unless we
11   had DNO coverage, Directors and Officers insurance
12   coverage.  I talked to a lot of very qualified
13   people who were very excited about the company that
14   had either been investors or interested in being
15   investors, but there was resistance on everyone's
16   part about being involved without DNO coverage.
17            I remember one gentleman in particular,
18   Gordon Gilcrest I think was his name.  He's in
19   Australia.  He's a very influential person.  I think
20   he might have run the BHP Billiton Diamond operations.
21   I may be getting confused.  It might have been
22   Anglo-American, but he had been somebody we talked to
23   forever.  And he -- he I remember distinctly him
24   saying, "Too much litigation in the United States.
25   I'm going to beg off this.  I don't want to be

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

322

1    involved."
2            So to answer your question, these were the
3    three people.  And then other people joined later but
4    I can't remember when.  And I tried to get out of
5    this, but again no one would do it without DNO.
6        Q    Who else joined the private or private Scio?
7        A    I don't know that anyone else was a member
8    of the private Scio Board.  When it become public
9    Scio and we got DNO coverage, then other people
10   joined.
11       Q    So private SCIO, you and Mike Monahan and
12   Joe Lancia were the Board members?
13       A    Correct.
14       Q    And then Commission Exhibit 47 here on the
15   first line Item on Page 1, Adams, and it goes to the
16   middle section and says "250,000 fully paid for
17   services, fully paid for services to date to
18   corporation, 750 restricted issued in consideration,
19   future services."  Explain to me what that means?
20       A    So my recollection in Nevada, this was a
21   Nevada entity.  Nevada is pretty typical.  I don't
22   think it's unusual.  When you form an entity, you
23   have to issue shares.  Somebody has to be a
24   shareholder.  You can't form an entity without
25   having shareholders.  Somebody has to be a

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

323

```
 1   shareholder.  The shares can be issued for a
 2   consideration.  In most states it says -- I think
 3   this is true in Nevada, the consideration can be for
 4   future services.  It could be for past services.  It
 5   can be for cash.  It could be for, you know, I can
 6   tribute on the computer.  And, you know, the general
 7   rule of thumb on that is courts kind of really beg
 8   off that question, because they don't -- you know,
 9   considerations, you know, it is sort of -- you are
10   given broad latitude of what consideration is.  And
11   the only legal requirement in states and in case law
12   that I'm aware of is that the consideration equals
13   the value of the shares as measured by their par
14   value.  So and I know you guys know all this, but
15   I'll just for my sake I'll say it.  I mean par value
16   is fiction, right?  I mean it's whatever you want it
17   to be.  But the general rule of thumb would be in
18   most entities that are formed, you never choose a
19   high par value, because if you do and you don't
20   contribute enough capital, it ends up being an
21   issue.  So I don't know that I ever formed an entity
22   in my entire life.  And I don't know a single
23   lawyer, that I know, who ever has, who hasn't unless
24   it's preferred stock.  Who picks par value that's
25   not very nominal.  So in this case I think it is
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

325

```
 1   probably allows that.  I don't remember.  But it's
 2   pretty common to have that kind of dichotomy between
 3   shares that are fully issued, which means you earned
 4   and restricted.  But again earning in this case
 5   means you contributed $250 of value or whatever it
 6   is times -- the number of shares times .001.
 7        Q    Who determines whether or not --
 8        A    The Board.  That's true in every company,
 9   you don't go into a third party because who is the
10   third party, you know.  So the Board determines.
11   And courts give tremendous latitude to that, because
12   how else would you form an entity.  I mean bill
13   Gates determined what, you know, when he formed
14   Microsoft, how many shares he got and what the value
15   was he gave.
16        Q    So how did the private Scio Board
17   determine how shares were earned and who earned
18   shares and who didn't earn shares?
19        A    We asked the question well, who did work
20   and what was the work that they did and what was the
21   value of the work?  I mean remember private Scio at
22   this point is a company with nothing.  It doesn't
23   have any assets.  It has an agreement that it has to
24   perform on by raising capital to buy the assets of
25   Apollo and Apollo Diamond Gemstone.  That didn't
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

324

```
 1   .001 cent.
 2        MR. SHANK:  .1 cents or .00 --
 3        THE WITNESS:  .001.  One one-hundredth of a
 4   cent.  If you looked at Nevada companies, I think
 5   that's very common, you know.  It's common to have .01
 6   or it's common to have .001.  Sometimes it's even more,
 7   right .0001.  So then you have to contribute, in this
 8   example if you've got 250,000 shares, I don't know if I
 9   could do the math.  I don't have a calculator, but I
10   think it's only $250 of consideration.  It could be
11   services, et cetera.
12        So with this restricted thing -- so
13   Nevada, which I think is true in many states too, is
14   Nevada allows you to say we're going to issue
15   shares, but you're going to earn them.  So they are
16   restricted until you perform the services.  So I
17   think that's what we had in mind here.  So you got
18   250 right away and then they were restricted until
19   you performed another $750 worth of services, right.
20   So -- and we did that later with other people's
21   shares, because if you give someone shares and then
22   they don't do the work, you know, you are kind of
23   in a weird situation where if the shares have value
24   in the future, you've given them the shares.  How do
25   you get them back?  So Nevada, I think Delaware
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

326

```
 1   even exist then, right?  I mean it didn't have that
 2   agreement until several weeks later, I think.  So
 3   it's just, you know it's a placeholder company
 4   basically, right, for something that may or may not
 5   occur.  And so, you know, to the Board, I mean I
 6   would say if you look at the way companies typically
 7   do it, I believe, this is me now as a corporate
 8   lawyer, the way it's typically done is the Board has
 9   great latitude in figuring out did someone
10   contribute the services that were relevant.  And if
11   the Board decides they did, you know, they're
12   awarded the shares.  And if they are restricted,
13   they come off restrictions.  And, you know, the
14   Board is usually the founders because -- I mean no
15   one else would serve on a board and take on
16   liability of making that determination generally
17   without DNO.  So it is very common to do exactly
18   what we did here.  It's just -- that's how it works.
19   I mean at least in my experience.
20        BY MR. SHANK
21        Q    And who specifically was involved in the
22   discussions deciding that you would get a million
23   shares -- Adams would get 500,000 shares and so on,
24   the actual allocation?
25        A    I think it was Mike or myself and Joe.  I
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

327

```
1   don't remember exactly, Joe.  I'm sorry.  But I am
2   pretty sure those would have been the only people
3   that would have -- and at one point we said.
4            MR. KOPECKY:  You have the Board resolutions
5   here.  And it is going to say who discussed what and
6   signed it.
7            MR. SHANK:  We have the other resolutions.  I
8   am just asking, though, as a practical matter.
9            MR. KOPECKY:  What he remembers sitting here
10  as opposed to using the Board resolution?
11           MR. SHANK:  Right.
12           MR. KOPECKY:  Just checking.
13           THE WITNESS:  So -- now I'm mixed up.  Well,
14  the Board resolution is the most accurate.
15           MR. SHANK:  Well, I'm asking regardless what
16  the Board resolution says, as a practical matter, who
17  sat down and figured this out is what I'm trying to get
18  at.  Regardless of what -- obviously an official vote
19  that the Board approves --
20           MR. KOPECKY:  And are there minutes of a
21  meeting?  You think that the minutes might not be
22  accurate?
23           MR. SHANK:  I'm just asking who -- I would
24  say -- figuring this out, because in the proposal to
25  Board, the Board can vote.  But I'm trying to figure
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

328

```
1   out who practically decided how the allocation should
2   go.
3            MR. KOPECKY:  Can I also interpose an
4   objection, because the exhibit was covered at the last
5   testimony and he provided additional reasons to make it
6   inaccurate.  I object to this actually constituting the
7   stock ledger.  He testified at the prior testimony as
8   to reasons why it is not accurate.  Three additional
9   people who had shares.
10           BY MR. SHANK
11      Q    My basic question was obviously the
12  Board -- you testified the Board ultimately approved
13  and decided who got what shares?
14      A    Right.
15      Q    And I was asking who was part of the
16  decision making to figure out how to allocate the
17  shares for the Board's ultimate approval?
18      A    I mean the backdrop -- I believe it was
19  ultimately those three individuals and then it was
20  with consultation from Bob Linares, because we were
21  trying to figure out -- look, the objective here was
22  to figure out a way to get the shareholders more
23  shares than they had in the fully diluted basis in
24  Apollo and Apollo Diamond Gemstone, which we did.
25  You know, someone has to form an entity.  I would
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

329

```
1   have been thrilled if someone else was going to do
2   all this work for free and do all the -- but nobody
3   volunteered.  There were no hands that went up.
4   When I tried to ask other people, a lot of people --
5   I remember one discussion the guy said "Just forget
6   it.  It doesn't always work out.  Not every deal
7   works out.  Just leave it."  Maybe that was good
8   advice, but I kept on it.
9            I thought, no, there is a way, that this is
10  a way for people.  And ultimately it came down to us
11  enlisting the help -- I mean I can't run a business
12  like Lancia can.  That was his -- that was what he had
13  done.  He had brung some other businesses here.  I
14  never met the man in my life until probably January of
15  2011.  And he was referred to me by one of the people
16  at Focus Capital.  And as a result of that, I want to
17  say Mike met him and Bob Linares met him and we were
18  impressed with him.  This guy at Focus spoke very
19  highly about him.
20           He had sold a business that Lancia
21  was the CEO of for a lot of money and it had been a
22  successful business.  And so we kind of -- we said to
23  Joe, you know, we have an idea here which would allow
24  the shareholders to get a tax loss according to Paul
25  Hastings.  And we'll allow the company to kind of
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

330

```
1   reboot and it will be less dilutive than if we just
2   keep going the way we are where there is millions of
3   warrants out and there's preferred shares and there's
4   debt.
5            So -- and I remember one of things Paul
6   Hastings, an attorney at Paul Hastings, and I'm
7   never going to say his name.
8            MR. SHANK:  Hang on.  You might be getting
9   into privileged materials.  So please don't testify
10  about what the attorneys at Paul Hastings are advising
11  you on.
12           THE WITNESS:  Okay.  I'm sorry.  Thank you.
13           MR. SIKORA:  We accept your objection.
14           BY MR. WISNIEWSKI
15      Q    Who is Christopher Mum?
16      A    An associate of the law firm of Adams
17  Monahan.
18      Q    And he was issued looks like 125,000
19  shares restricted in consideration of future
20  services?
21      A    I mean I have to look at the Board
22  minutes, but that seems right here based on what
23  you've said here.
24           MR. WISNIEWSKI:  I'm marking this exhibit,
25  Commission Exhibit 54.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000483

---

331

1            (SEC Exhibit 54 was marked for
2        identification.
3        BY MR. WISNIEWSKI
4    Q    Commission Exhibit 54, Mr. Adams, is a
5 two-page document that is Bates Number SECADAMS
6 30888 through 30889.  At the top of this document is
7 Scio Diamond Technologies written action of the
8 Board of Directors of March 15, 2011.
9    A    Yes.
10   Q    Mr. Adams, have you seen this document
11 before?
12   A    I have.
13   Q    What is it?
14   A    It's a written action of the Board of
15 Directors of Scio Diamond Technology Corporation
16 issuing shares or well -- issuing restricted shares
17 to be more precise.
18   Q    If we go down to the last paragraph on the
19 first page, Commission 54, it says "Resolved the
20 corporation shall issue 125,000 restricted shares of
21 common stock par value .001 cent per share to
22 Christopher J. Mum in consideration for services to
23 be performed to date to the corporation."
24        Did you see that?
25   A    Uh-huh.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

333

1 capital.  I guess, you know -- so, you know, you
2 have to -- I guess I would say is when people are
3 involved early on and you aren't paying them -- I
4 haven't been real successful in finding a lot of
5 people that work for free.  We had to compensate
6 people.  And at the time in question, these are hope
7 certificates.  That's what I would call them.  Their
8 hope that they have value some day.
9        MR. SHANK:  Did you say "hope certificates"?
10       THE WITNESS:  H-O-P-E, you know.  I mean --
11 as sitting here on March 15th of 2011, I had no idea if
12 the shareholders, even though Linares had the most to
13 do was sell the assets, I didn't know if the
14 shareholders' would approve it and that Linares would
15 say, you know what, there is so many people, we are not
16 going to do it.  I didn't know anything.  So it was a
17 hope certificate because we just didn't know how it was
18 going to play out.
19       BY MR. WISNIEWSKI
20   Q    Was Adams Monahan billing private Scio for
21 any work?
22   A    We might have kept records of work we were
23 doing, but we weren't actually officially -- I don't
24 remember us billing it at that point.
25   Q    So instead of billing the work, instead of

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

332

1    Q    You said Mr. Mum was an associate at Adams
2 Monahan?
3    A    Uh-huh.
4    Q    And what services was he being issued 125
5 shares for?
6    A    He was doing all the work with respect
7 to -- first that is $125 in value.  But he was doing
8 all the work with respect to both the proxy and for
9 Apollo and the work to sort of draft the PPM for
10 this entity and the business plan, as we all were,
11 for this entity.  He was doing essentially legal
12 work.
13   Q    And was he doing that legal work in his
14 role as the attorney at Adams Monahan LLP?
15   A    Yes.
16   Q    And was Adams Monahan LLP being paid for
17 the services that Adams Monahan LLP provided the
18 private Scio?
19   A    I don't remember us being paid by private
20 Scio ever.  Private Scio was just a company without
21 any money, right?  It was just a company that we
22 spent money to form, but the idea that we would
23 hopefully be successful, Lancia and all of us in
24 capitalizing it and fulfilling the contract with
25 Apollo and Apollo Gemstone.  So it didn't have any

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

334

1 billing the legal work that Mr. Mum performed, he
2 was issued 125 shares?
3    A    125,000.
4    Q    Was he issued any additional shares of
5 private Scio?
6    A    I don't think so.  I would have to look at
7 all these.  I don't believe so.
8    Q    Turning back to Commission Exhibit 47, who
9 is JR Maddox?
10   A    Another associate.  He might have
11 technically been a partner in Adams Monahan.
12   Q    And he was issued 125,000 restricted
13 shares in consideration of future services?
14   A    Yes, I guess, yeah.
15   Q    And what were those services?
16   A    Well, JR's speciality, he was an
17 intellectual property lawyer, so related to I'm sure
18 patent portfolio, perhaps writing patents, that kind
19 of thing.
20   Q    So same type of -- the legal work that he
21 performed at Adams Monahan LLP on behalf of private
22 Scio?
23   A    Right.
24   Q    Same kind of deal as Christopher Mum,
25 basically?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000484

335

```
 1      A   Right.  And he was also doing work for
 2   Apollo, right.  So I mean which wasn't paying.  But
 3   I don't remember exactly what work he did for the
 4   respective entities, but, yeah, it's the same idea.
 5      Q   Was the 125,000 shares compensation for
 6   the work that he had done for Apollo?
 7      A   I remember -- I don't remember precisely.
 8   It was work for Scio, because we were doing constant
 9   work to move Scio forward.
10      Q   And how about Lauren Zipkin, who is that?
11   Z-I-P-K-I-N?
12      A   I think he skipped Platt.  Did you want to
13   talk about Platt or did you just want to go to
14   Zipkin?
15      Q   The next one I see here on Exhibit 47 is
16   Zipkin.
17      A   Sorry.  I'm mixed up.  Yeah, he was giving
18   business advice to the company.  At that point, if I
19   remember right, or was going to give business advice
20   to the company.
21      Q   And who did he work for?
22      A   Himself.
23      Q   Had he done any work for Apollo Diamond or
24   Apollo Diamond Gemstone?
25      A   Previously he had, yeah.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

337

```
 1   services for public Scio?
 2      A   As a -- Theo Strous was on the Board of
 3   Directors of public Scio and a committee was formed
 4   to which Mr. Zipkin was added.  So he was a
 5   committee -- see if I can say this.  He was a
 6   non-board committee member.
 7      Q   And when was that Committee formed?
 8      A   I want to say 2013, '14.
 9      Q   Was he compensated?
10      A   He was given shares, which to my knowledge
11   based on the filings that I read today, I think
12   that's right.  He was never paid.  So in other
13   words, the company never compensated him.  I think
14   that's right.  I don't remember is the short answer.
15      Q   And did you have any business dealings
16   with Mr. Zipkin outside of the private Scio as of
17   March 15, 2011?
18      A   We -- I don't think we were doing anything
19   actively at that time.  We were -- I don't think we
20   were active in anything.  I mean we may have been
21   investors in an entity together, but I don't
22   remember if that was the case in 2011.  I don't
23   think so actually.
24      Q   What entity was that?
25      A   We might have invested in -- I can't
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

336

```
 1      Q   In what capacity?
 2      A   Investment banking, consulting, that sort
 3   of thing.  He's not a lawyer.  He's a human being.
 4      MR. KOPECKY:  I don't know how to take that.
 5      THE WITNESS:  Well, we are all lawyers.
 6      BY MR. WISNIEWSKI:
 7      Q   Was Mr. Zipkin a shareholder of Apollo
 8   Diamond or Apollo Diamond Gemstone?
 9      A   I think he was actually.  I don't
10   remember.
11      Q   What role, if any, did Mr. Zipkin have at
12   public Scio?
13      A   Public Scio?
14      Q   (Shaking head).
15      A   I think later he was on a committee of
16   public Scio.  This was years later.  Which was
17   investigating some actions that were taken on the
18   part -- or taken by a former, well, now the Chairman
19   of public Scio.  He was charged with
20   investigating -- he and another gentleman, Theo
21   Strous, T-H-E-O S-T-R-O-U-S, were charged with
22   investigating breaches of fiduciary duty and
23   violations of the securities laws by Barton McFeely
24   and others.
25      Q   In what capacity did he perform those
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

338

```
 1   remember if he invested -- this is probably later.
 2   I think he invested in a -- we were a minority
 3   investors in a company called -- I want to say ARC,
 4   A-R-C, American Residential Communities.  American
 5   Residential Communities was the single largest --
 6   well, I think this was true because I wasn't
 7   involved.  As a principal I don't know.  But it was
 8   represented as the single largest residential
 9   community owner of mobile homes in the United
10   States.  And it was somebody that, oh, Larry,
11   Laurence, I call him Larry, knew out of Chicago who
12   was the owner of it and we invested and we were
13   still investors at that time.
14      Q   And when was that?
15      A   When did we invest?  I think we invested
16   at the worst possible time.  I want to say whenever
17   that was 2008.  I don't even remember.
18      Q   So it was before?
19      A   It was before.  And we were just minority
20   shareholders, but we would talk about it, because
21   this guy, who was involved, he is a very sharp guy.
22   Now he is in business with Sam Zell, who you may
23   know in the real estate communities, big person in
24   Chicago.
25      Q   So other than that ARC Investment, did you
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000485

339

1  have any other investment, any other entities or
2  investments with Mr. Zipkin prior to April 1, 2011
3  or March 2011?
4      A    Well, we were shareholders of Equity
5  Securities together, with some others I think back
6  in the range of 2000.
7      Q    And what type of securities?
8      A    It was a dealer, a broker dealer.
9      Q    Is Mr. Zipkin a broker dealer?  Is he
10  registered as a broker dealer?
11     A    Right now?
12     Q    Back there in March 2011?
13     A    Oh, back then.  I don't think so.
14     Q    Turning back to Commission Exhibit 47, the
15  next name is Christopher Max?  Who's that?
16     A    So Focus Capital Group was a broker dealer
17  that I was a significant minority shareholder of as
18  was Mr. Monahan.  And Mr. Max was a minority
19  shareholder of Focus Capital.  He was in the
20  New York office and he had indicated he was going to
21  work actively to help facilitate a transaction on
22  behalf of Scio -- really raising the money for Scio
23  to acquire the assets and frankly fulfill its
24  business plan with respect to Apollo.  Acquire the
25  assets of the Apollo and Apollo Gemstone and then

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

340

1  fulfill the business plan that Scio had.  So he was
2  a banker represented he was going to work diligently
3  to raise money and otherwise introduce Scio to
4  Strategic Partners.
5      Q    Is that why you were issued 125,000
6  restricted shares?
7      A    Yes.
8      Q    And we could group the next two, Paul
9  Rapello, David -- and they were also shareholders of
10  Focus Capital, is that correct?
11     A    Right.
12     Q    And they were issued similar shares.  They
13  were issued restricted shares in connection with
14  what you just described Focus Capital was going to
15  do on behalf of private Scio was help raise money?
16     A    Right.  And Platt -- the reason Platt had
17  more was because Platt had been actively involved.
18  So Platt was a banker in middle market at Deutsche
19  Bank and then he joined Focus.  He actually -- I had
20  never met the other two individuals.  He knew them.
21  And so he recruited them to join Focus, if I
22  remember, and invested in Focus.  And Platt was
23  going to be very actively involved.  He
24  represented -- and I believe in assisting Scio.  He
25  had run the M&A -- he had run the M&A engagement of

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

341

1  Apollo with Deutsche Bank in 2009 maybe, 2009 or '10.
2      Q    So that's why -- and again, why was he
3  issued more shares than --
4      A    Well, because he really had invested his
5  time and energy and understanding the deal and was
6  going to be one of the lead parties, we believe, in
7  actually finding Strategic Partner, a distributor of
8  the product.  He had a lot of connections in the
9  industry he represented and was going to -- I mean
10  quite, quite honestly what I saw with him was that
11  he was a very, very, very active person in terms of
12  understanding this deal.  The other two, they
13  were -- they just weren't that interested in
14  being -- putting full-time into it is what I would
15  describe.  He was going to make this his focal
16  point.  At least he represented that he was.
17     Q    And I don't want to cover old ground we
18  did last time, but this is related to the PPM that
19  private Scio issued to raise money in order to enter
20  into the transactions with Apollo Diamond and Apollo
21  Diamond Gemstone; is that right?
22     A    Well, he -- you say more about related.  I
23  don't want to say if it is not true.
24     Q    Sure.  Okay.  So the last time we looked
25  at a PPM that was issued by private Scio to raise

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

342

1  what it like $5 million or something like that.  Do
2  you recall that?
3      A    Yes.
4      Q    And then there was a supplement issue to
5  the PPM that you said that you weren't sure if it
6  was actually issued or distributed that noted that
7  Focus Capital was the placement agent for that PPM
8  offer?
9      A    Okay.  That's true.
10     Q    And is the work that you're describing for
11  why Mack, Rapello and Platt were issued shares by
12  private Scio.  Is it in connection --
13     A    Not really.  I mean certainly that was --
14  the PPM was documenting that there would be money
15  raised and that Focus Capital at one point was
16  engaged to do that.  But this was more about, you
17  know, read the business plan, you know.  Who do you
18  know in the industry that we can talk to?  Not only
19  about money, but distribution, strategic
20  partnerships, who could we get as an investment bank
21  to help the company, because you want to build a
22  crescendo of events including getting investment
23  banks involved and that sort of thing.  Because, I
24  mean, I did not view this as a one time thing, raise
25  money, do a transaction.  To me if it was going to

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

343

1   work, you needed, you know, grow the company, have
2   access to the capital markets.  And these people had
3   been on the Wall Street, which I've never been.  And
4   they had said, you know, look we know a bunch of
5   contacts and, you know, we are going to help you do
6   all that.  So that's why they got what they got
7   here.
8        Q    I'm going to hand you an exhibit that has
9   been marked as Commission Exhibit 55.
10                  (SEC Exhibit 55 was marked for
11                  identification)
12       BY MR. WISNIEWSKI
13       Q    Mr. Adams, I hand you a three-page
14  document SEC-ADAMS 30902 through 30904.  The top of
15  the document it says, "Apollo Diamond -- Scio
16  Diamond Technology Corp. written action of the Board
17  of Directors effective July 7, 2011.  Do you see
18  that?
19       A    Yeah.
20       Q    Have you seen this before?
21       A    Yes.
22       Q    What is it?
23       A    It's a share action of the Board of
24  Directors of Scio Diamond.
25       Q    And on the last page of Commission Exhibit

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

344

1   55, you're noted as a Board member or Chairman, I
2   should say?
3        A    Yes.
4        Q    Is that your signature?
5        A    Yes.
6        Q    And it looks like this -- the meeting
7   minutes here reflect some additional shares that
8   were issued by private Scio, is that correct?
9        A    Yes.
10       Q    There is some additional shares.  Start on
11  Page 1 here.  I know we covered most of these, but
12  50,000 shares issued to you.  The second page it
13  looks like there's an additional $50,000 shares of
14  common stock issued to Mr. Monahan?
15       A    Okay.  Yeah.  That was in exchange for
16  preferred that was being relinquished.
17       Q    Okay.  And if you turn to Page 2 on the
18  second "Resolve", there is a million shares of
19  common stock being issued to Joe Lancia.  Do you see
20  that?
21       A    Yep.
22       Q    Is that what you were referring before as
23  far as the shares that were not reflected in Exhibit
24  47 that are reflected in those Board minutes?
25       A    Yeah, maybe.  I mean I think there were

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

345

1   more shares that went to Lancia, but these are
2   certainly some that went to Lancia.
3        Q    And it says, "Considered fully paid in
4   consideration to the services to the corporation to
5   date."
6             What services did Mr. Lancia provide as of
7   July 7, 2011?
8        A    Well he had been the acting as President
9   and CEO of the company from March whatever to this
10  date sometime early in March.  He had been helping
11  with -- I mean he was instructing us what to do,
12  instructing the law firm what to do with the PPM,
13  what to do with the business plan, et cetera.  So --
14  yeah.
15       Q    The next paragraph, there is 700,000
16  shares issued to Gregory E. Spitzer?
17       A    uh-huh.
18       Q    Who's that?
19       A    A lawyer at Paul Hastings.
20       Q    And why was he issued shares?
21       A    For business consulting.  He had been very
22  active in introducing the company to some investment
23  banks for giving his insights on structure of the
24  deal and on the PPM and that sort of thing.
25       Q    Before you mentioned that Paul Hastings

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

346

1   had performed or provided advice to private Scio,
2   is that correct?
3        A    Yeah.  Apollo and private Scio, you know,
4   that was the law firm for both.
5        Q    And was Mr. -- was Greg Spitzer, Gregory
6   Spitzer, was he the attorney that was providing
7   advice on behalf of Paul Hastings to Apollo Diamond
8   and private Scio?
9        A    And I should say, they gave advice to
10  Apollo Gemstone, Apollo Diamond, private Scio and
11  public Scio, okay.  He was one of the attorneys.
12  There was another tax person who was involved later.
13  There were IP -- I think they were IP people,
14  intellectual property people involved.  There were
15  corporate people involved.  Greg -- Gregory was one
16  of them.
17       Q    And he also provided business consulting
18  services to private Scio?
19       A    I think he's a CPA.  And so he was, you
20  know, reading financial -- what I would call
21  business financial model, right.  So looking at how
22  do you -- what do you have to sell diamonds at to
23  make a profit?  What are the variable costs and that
24  sort of thing.  So he delved into that, if I
25  remember correctly.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

347

```
 1      Q    And outside of the legal services that he
 2  performed for Apollo Diamond, Apollo Diamond
 3  Gemstone and private Scio and the business
 4  consulting services you provide for private Scio,
 5  did you individually have any business relationships
 6  with Mr. Spitzer outside of those?
 7      A    Yes.
 8      Q    Generally, what were those relationships?
 9  We don't need a lot, but just generally what was
10  your relationship with Mr. Spitzer?
11      A    We had invested in some real estate
12  together.
13      Q    And when is this?
14      A    Probably about mid 2000s onward.  So this
15  is going to become cloudy, because I don't know.  I
16  have been in a lot of investments with him, probably
17  four or five, so I don't remember when they were.
18  We had invested in some real estate together.  We
19  invested, I think, subsequent to this, in a business
20  together through a private equity firm.  I think
21  that's it.
22      Q    Okay.  And the next paragraph here on
23  Exhibit -- Commission Exhibit 55, Robert Linares.
24  Who's that?
25      A    That is the founder of -- I guess the
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

349

```
 1  additional shares that were issued to -- also in the
 2  next paragraph there about Mr. Christopher Mum
 3  and K.R. Maddox.  This is just confirming that date.
 4  The services that they are anticipated performing
 5  and that was sufficiently received by the
 6  corporation?
 7      A    Yeah.
 8      Q    And that they are considered fully paid,
 9  is that correct?
10      A    Yep.
11      Q    And it seems like that is the same thing.
12  Skipping to another paragraph with Mr. Platt.
13      A    Well, for 50,000 up $500,000.
14      Q    50,000 and up.  And if you turn to the
15  next page, the last two paragraphs deal with the
16  shares that were previously issued to Christopher
17  Mack and Paul Rapello?
18      A    Uh-huh.
19      Q    And both of those paragraphs essentially
20  state that the shares that had been issued to those
21  individuals previously they are not received or has
22  not been sufficiently received -- the consideration,
23  right, of the services to be performed by those two
24  individuals was not sufficiently received by the
25  corporation.  And then private Scio therefore
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

348

```
 1  cofounder or principal founder of Apollo and Apollo
 2  Diamond Gemstone.
 3      Q    And he was -- 350 shares fully paid in
 4  consideration of services to the corporation to
 5  date.  What services did he provide to private Scio?
 6      A    He's not a lawyer, but he provided
 7  business services in terms of commenting on the
 8  private placement memo and the business plan, given
 9  inputs and data on the business plan.  We were
10  talking about strategic partners to talk to.  I mean
11  it is hard to encapsulate this all because, you
12  know, you have a finite amount of time.  But I mean
13  this was a group effort.  I had never -- I'm a
14  lawyer.  And so I had never done a model of a
15  diamond production facility.  So between him and
16  Greg and all of us working collectively, we, you
17  know, worked on that kind of stuff and that was
18  business stuff really.  It wasn't legal stuff
19  particularly at all.
20           So I mean parts of it was legal and we did
21  the legal stuff.  But, you know, model for
22  electricity inputs in a diamond production facility
23  is just, you know what Bob who have done, right.
24  That would have been his role as an example.
25      Q    Okay.  Continuing down here, there's some
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

350

```
 1  canceled the shares that were previously issued, is
 2  that correct?
 3      A    Correct.
 4      Q    Explain to me why they were canceled?
 5      A    Well, they were -- I would say that as far
 6  as Mack and Rapello were very good at telling you
 7  what they were going to.  I'm going to be a little
 8  pejorative, but not as effective in actually doing
 9  it in my experience, at least when it came to this
10  company.  And so they were going to introduce the
11  company to Chris Burch, if you have ever heard of
12  Tory Burch.  Chris Burch is Tory Burch's ex-husband.
13  Tory Burch is a women's handbag designer.  T-O-R-Y.
14  Your spouses might, whatever.  Anyway, Chris Burch
15  had made a lot of money as an investor with Tory
16  Burch and Tory Burch's business, I guess.  And Mack,
17  "Oh, I know Chris Burch.  She's a good friend of
18  mine.  I know Steve Cohen.  He's a good..."  Steve
19  Cohen, you've probably heard of, right?  "He and I
20  go out to the Hamptons and we pal around all the
21  time."  Okay, whatever.  It's not my league.  I
22  don't know.  I mean I know of these people because i
23  Read the newspapers, but I don't know who they are,
24  but never met them.  I really don't have any
25  interest in meeting them, quite frankly.  I'm happy
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000488

351

1   with my life.  Anyway.
2        But anyway, so, you know, Mack and Rapello
3   talked about, you know, we know all these rich
4   people and all these contacts and, you know, we know
5   New York and, okay, fine.  And they really just
6   never delivered.  I mean, you know, I don't think I
7   ever had a conversation with any serious person in
8   New York about this transaction, and they never
9   brought a single person to the table who indicated
10  they had any interest in participating as a Board
11  member, as an investor, as a potential strategic
12  partner.  So at some point -- and then at one point
13  they kept saying, you know, there is all these -- we
14  want to be actively involved on the Board and you
15  need to put -- it was more about Chris Mack.  Chris
16  Mack needs to be the Chairman of Focus and he needs
17  to be on the Board of Scio, private Scio.
18       And, you know, I would say look, I'm going
19  to say this.  You probably will figure this out.  So
20  if you haven't, I'll tell you.  Chris Mack is not a
21  fan of Ed Adams and I'm not a big fan of Chris Mack.
22  You know, he was -- he said, not to me, because that
23  would of course involve actually being forthright.
24  He said to others that, you know, I should be,
25  meaning Chris Max, I should be the Chairman of

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

352

1   Focus.  Quite honestly, if he had offered to take on
2   all the responsibility and shown that he was going
3   to do that, you know what, I would have been like
4   great.  It is not the pleasant thing to be the
5   chairman of a broker dealer, which you might
6   appreciate.  So I would have been receptive
7   potentially to that.
8        But anyway, there was a clash of views on
9   a variety of issues is what I would tell you.  And
10  at the end of the day, one of the things was, well,
11  we -- I don't like the way we're going.  This is
12  Mack.  I'm paraphrasing.  I don't like the way we're
13  going raising money for private Scio.  I don't like
14  the transaction.  I don't like the way we're going
15  about it, et cetera.  I said, okay, you know, great,
16  I mean come up with an idea.  Come up with something
17  that's constructive.  I'm all ears.  If Chris Burch
18  wants to put in $10 million and run private Scio,
19  I'm done, okay.  I will get out of the way, subject
20  to one thing, that we honor what we told people we
21  were going to do here at private Scio with respect
22  to Apollo.  But otherwise, I don't care.  I have no
23  personal -- I really don't have a personal interest
24  in -- all I cared about was moving it forward.
25  Okay.  If we could move it forward in a positive

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

353

1   way, great.  Yeah, do I think that controlling it
2   allowed to move it forward?  Potentially, if no one
3   else was going to do, but if someone else was going
4   to be involved at it and take control and run the
5   thing effectively, I would have actually viewed that
6   as a relief.  But that never happened.  Right.  It
7   was a bunch of what I would call promises that were
8   never delivered.  And then we sort of got to the
9   point in May, I think it was, May or June, I don't
10  remember, where, you know what, we just said, you
11  know what, the heck with this.  We are not going to
12  have Focus raise money for this thing.  You are
13  putting every roadblock imaginable.  That's fine.
14  Focus is out of this picture.  Focus is not going to
15  raise money.  I'll call people and see if they want
16  to invest as a principal of Scio.  I'll talk to
17  people.  But I'm not going to -- where are my broker
18  dealer at.  We are not going to get the broker
19  dealer involved anymore.  And we terminated the
20  agreement or Joe did.  I don't remember how it all
21  worked.  But he was very disgusted with the whole
22  thing, Lancia, because these guys were constantly --
23  guys, meaning Mack and Rapello, were constantly
24  nonconstructive.
25       So as a result of all that, they had been

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

354

1   given shares to be helpful.  They had not been
2   helpful in any manner whatsoever.  I mean I don't
3   know what they -- to this day, I don't they did
4   anything positive.  So the shares were canceled.
5        BY MR. SHANK
6   Q    You said that you would have been done as
7   long as they did what was promised they would do
8   with respect to Apollo.  What were you referring to
9   there?
10  A    If somebody had come forward, and we
11  talked to a lot of people about being a large
12  investor in Scio, taking control of Scio.
13  Q    I meant on the Apollo side.  What were you
14  referring to when you said as long as they did what
15  you said?
16  A    Well, if they had said we're going to
17  honor the agreement that you have with the
18  shareholders in effect and give them -- when I say
19  "we", I mean, if someone had said look, we're going
20  to permit the Apollo shareholders to have their
21  stock in our new company in the way that the own
22  stock in the old company, and we could have got to
23  the point where they weren't going to dilute those
24  people considerably by doing something else later,
25  have at it.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000489

355

1    Q    I just wanted to be clear what you meant
2  by that --
3           And you said that Mack didn't like the
4  deal and was putting up roadblocks.  What were you
5  referring to there?
6    A    I think he didn't like the concept that
7  there was preferred stock.  The reason that was in
8  there was this was a private company.  There had
9  always been a fear in the history of this
10 transaction, I mean wholly back to Apollo days, of
11 somebody in the industry who wanted to kill the
12 transaction or create havoc.  Buying enough shares
13 or getting proxies from enough shareholders like at
14 De Beers, okay, that would have taken control of the
15 company and basically killed the technology.  So the
16 reason we built in preferred shares was to prevent
17 that from happening, having a super majority as a
18 preferred shareholder, which is my father and
19 brother-in-law, Bob and Brian had.  They had super
20 majority shares.
21          Mack didn't like that.  He said it would
22 be hard to finance the deal, et cetera.  Okay.  So
23 we listened to him, me, myself and Lancia.  And we,
24 as you saw in this, canceled our preferred shares.
25 I don't know that that was needed, but whatever.

357

1  everyone I think would have said you are in control,
2  just honor what we have been telling the people at
3  Apollo.  Have fun.
4    Q    Outside of the preferred shares that you
5  already mentioned, did Mack raise any significant
6  concerns about how things were being structured,
7  other than just kind of general pooh-poohing ideas?
8    A    He talked about, you know, making sure
9  that we disclosed Focus' role, which we talked to
10 our broker dealer compliance person, and absolutely
11 we were going to disclose Focus' role.  And that's
12 what gave birth to that supplementary document,
13 right. I mean, but that was no news to us.  I mean
14 we knew we -- we had been talking to her for months
15 about how Focus could be involved if it should be
16 involved, how do we disclose its involvement.  I
17 mean, so, you know, I would say Chris Mack had never
18 run a brokerage firm.  A lot of the stuff he said
19 was second nature to us, because we had been
20 involved with Focus for a while, and I had been
21 involved earlier with another firm.  So what he was
22 saying wasn't particularly novel.
23          MR. WISNIEWSKI:  Why don't we just close out
24 this issue and then take a break and hopefully we won't
25 be much longer.

356

1           Every time we thought we were going to go
2  talk to GT Silver, at some point -- GT Silver is now
3  gone bankrupted.  But it was a producer of machines,
4  machines that grow crystals, okay.  And Apple is in
5  a deal with them.  That may resonate with you, the
6  GT Silver name because of Apple.  And Platt was
7  actively working that.  And these two guys were
8  like, "We don't want to deal with GT Silver."  I
9  don't know why they thought they should have an
10 opinion on it.  But they were -- it was one of the
11 things where they always were -- what everyone else
12 was doing, but never came up with any constructive
13 ideas of what they should do.  At least never they
14 were an action item.  If they -- like I said, I mean
15 I know we all know about Steve Cohen's problems.
16 But I don't think he had any problems at the time
17 that I was aware of certainly.  I mean I don't
18 remember temporally what his problems were.  All I
19 know is that -- look, Chris Mack was supposedly
20 buddy buddy with this guy.  He comes forward with
21 Steve Cohen, if Steve Cohen had said I want to
22 invest $20 million, that would have been a
23 constructive conversation to have had.  And if we
24 could have got comfortable with the way he was going
25 to do it, we would have done that deal, meaning

358

1           (SEC Exhibit 56 was marked
2              for identification)
3          BY MR. WISNIEWSKI
4    Q    I'm going to hand you what is marked as
5  Commission Exhibit 56.  Mr. Adams, this is a
6  document that's not Bates numbered.  And the top of
7  Commission Exhibit 56 looks like it is an e-mail
8  from you dated May 6, 2011 to David Platt,
9  Christopher Mum and Paul Rapello and Mike Monahan
10 with the subject line "Partner call".  Do you see
11 that?
12   A    Uh-huh.
13   Q    Have you seen this document before?
14   A    Not recently, no.
15   Q    Have you seen it ever?
16         MR. KOPECKY:  I mean that's just a tough
17 question, because it's not a document.  You stapled a
18 bunch of pages together.  You have seen this e-mail.
19 You have seen the attachments to e-mails, things like
20 that.  Foundation would be my objection, right.  He may
21 have seen the e-mail before or one of the attached
22 documents.  But it looks like something you put
23 together yourself.  He didn't produce it and he
24 couldn't have seen this exhibit as a document.  Object
25 to foundation.

359

```
1
2              BY MR. WISNIEWSKI
3       Q    Mr. Adams, have you seen this document?
4       A    Not as a document, no.
5       Q    What I want you to do is -- the pages
6   aren't numbered, but if you could turn to the --
7            MR. SHANK:  Why don't you take a minute to
8   read through the chain, just so you are familiar with
9   it.
10           MR. WISNIEWSKI:  Why don't we start at --
11  there is a page here.  It's a little bit hard to see
12  the date here, the e-mail communication.  But it says,
13  on May 5, 2011 at 6:45 a.m. at Adams.  And it starts
14  with "All".
15           MR. SHANK:  What page is it on?
16           MR. WISNIEWSKI:  It's kind of hard to
17  identify, but on page -- six pages into it.
18           THE WITNESS:  Yeah, okay.
19           BY MR. WISNIEWSKI
20      Q    Do you see where I'm at here?  And that is
21  not a great description for the Court Reporter,
22  Exhibit 56.  This appears to be an e-mail that was
23  drafted by you.  For some reason the from to,
24  subject line, date is kind of cut off.
25           Do you have any recollection of this
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

361

```
1       A    Oh, turn back a page.  I'm getting all
2   messed up here?  This one? (indicating)
3       Q    Right there.  Okay.  Okay.  And it is a
4   partner call.  And kind of -- question, do you
5   recall having an e-mail exchange with Mr. Mack,
6   David Platt, Paul Rapello and Michael Monahan in or
7   around this time regarding, I guess, a partner call
8   at Focus Capital?
9       A    Do I recall that?  Not really.
10      Q    Why don't we start at that e-mail on
11  May 5, 2011 at 6:45 a.m.
12      A    Uh-huh.
13      Q    And it says, the e-mail or the document
14  says, "At that time, Adams, I think it would be
15  helpful to get an update from Paul."  I'm assuming
16  that is Paul Rapello, is that right?
17      A    I presume that.
18      Q    "Via e-mail at the end of the day relating
19  to Inflection."  What is "Inflection"?
20      A    A client I suppose.  I don't remember.
21      Q    And then I'll skip down to the second
22  paragraph there.  It says, "Also, I thought more
23  about the rules Mike and I -- at Scio."  Do you see
24  that?
25      A    Uh-huh.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

360

```
1   e-mail or the drafting of this e-mail here?
2       A    Not really.
3       Q    If you turn a page --
4            BY MR. SHANK
5       Q    The big picture, look at the entire chain.
6   Did you engage in any e-mail discussion with
7   Christopher Mack in May of 2011 as reflected in this
8   document?
9       A    I remember talking to him.  I don't
10  remember the e-mail.
11      Q    Do you have any reason to believe that you
12  did not engage in the e-mail discussion as reflected
13  here?
14      A    I don't have any reason to believe, either
15  I did or did not.
16           MR. KOPECKY:  We don't know if this is the
17  whole of the e-mail discussion.  This could be a part
18  of the e-mail.  We don't know what this is.  So I don't
19  know if it's a whole e-mail discussion or not.
20           BY MR. WISNIEWSKI
21      Q    Okay.  And if you turn back one page
22  further to Page 7, you were on six there and there
23  is -- below that there seems to be a -- I'm sorry.
24  Turn one page back.  The first e-mail on the bottom
25  here is from Christopher Mack to D. Platt.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

362

```
1       Q    Is that Michael Monahan that you are
2   referring to there?
3       A    I presume.  I don't know, but I presume,
4   yeah.
5       Q    I guess -- the e-mail continues, "I guess
6   I assume that they were not a problem because
7   various partners..." and turn the next page,
8   "...served on various boards or various entities
9   with which we have sought engagements in the past.
10  And small firms such as you are is the use of DB
11  protocols and policies."  Do you know what DB
12  refers?
13      A    I assume Deutsche Bank.
14      Q    Why is that?
15      A    Because that's where Chris Mack worked and
16  David Platt.
17      Q    And what were those protocols and policies
18  that you were referring to here?
19      A    I mean I don't remember.
20      Q    The use of DB protocols --
21      A    I think it might have been something about
22  you can't be on a board of a client or something
23  like that.  I don't remember.
24      Q    "The use of DB protocols and policies,
25  (which might make complete sense in that setting
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

363

1   would probably make it almost impossible for us to
2   utilize our relationships (the thing we have of most
3   value) to maximize our collective outputs. I feel
4   that we will be left to work only as agents on
5   behalf of other parties we sincerely all feel free
6   not to pass. I'm sorry. The next paragraph
7   continues, "I acknowledge that there is some risk in
8   our involvement, but there is also control."
9        What risk are you referring to there?
10       A    The deal doesn't work out, it doesn't work
11  out I guess. I don't really remember. I don't
12  remember typing that. But I don't -- the only risk
13  I could imagine is that the deal didn't work out,
14  money raised and the shareholders sue.
15       Q    So how would that relate to your
16  involvement? How would that risk relate to your
17  involvement?
18       A    Well, our involvement -- our presume, our
19  mean focus and the party that raised the money and
20  the deal didn't work out, the investors -- I don't
21  think it would be unusual for them to sue the broker
22  dealer potentially.
23       Q    You think the risk gives Focus by being
24  involved the raising of money for private Scio,
25  there may results in some liability or potential

365

1        Q    Now, do you have any recollection of what
2   you meant?
3        A    No.
4        Q    And "no board", are you referring to the
5   private Scio -- the board of private Scio?
6        A    I don't know. I don't know if it's
7   private Scio or Focus.
8        Q    Who is on the board of private Scio, as of
9   May 4, 2011?
10       A    If I remember it was Monahan, myself and
11  Lancia.
12       Q    Who was on the Board of Focus Capital as
13  of May 4, 2011?
14       A    That one I don't remember.
15       Q    Were you ever a Board member?
16       A    Yes.
17       Q    Of Focus Capital?
18       A    I was.
19       Q    And was Monahan a Board member of focus?
20       A    Yes, and Mack was. It might have been
21  Mack and Platt too. I don't remember.
22       Q    So the next sentence says, "We did it
23  because we recognized the value that you all
24  collectively play to ensure the long-term success of
25  the enterprise."

364

1   liability or legal action against Focus Capital?
2        A    Absolutely.
3        Q    "But there's also control...", the
4   sentence continues on. "...control which we can
5   utilize to effectuate a favorable outcome. To be
6   clear, no one in NY would have any shares in Scio if
7   we were not the driver of the opportunity." And
8   that Scio there, is that private Scio?
9        A    Yep.
10       Q    And who -- it says "No one in NY", who is
11  that?
12       A    I presume I was referring to Platt, Mack
13  and Rapello, if that was me.
14       Q    So they wouldn't have any shares in Scio
15  if -- it says "we", if that Focus?
16       A    Yes, I guess.
17       Q    If Focus were not the driver of the
18  opportunity?
19       A    Yeah.
20       Q    And the next sentence, "Surely no board
21  that is not influenced by us would have seen fit to
22  issue them."
23       Explain to me what you meant by that?
24       A    I don't know. I remember writing this,
25  but I don't know what I meant by writing it.

366

1        Do you see that?
2        A    Uh-huh.
3        Q    The next sentence says, "To also be clear,
4   there is no Scio opportunity - none - without us."
5   This transaction was our idea. We have managed it
6   and we need to continue to manage it toward a
7   successful outcome."
8        Do you see that?
9        A    Uh-huh.
10       Q    So just generally, what point were you
11  trying to get across here to Mr. Mack, Rapello and
12  Monahan?
13       A    I guess that -- I mean again I don't
14  remember these words. But when I read it now, would
15  I interpret it to mean is that I was trying to focus
16  their attention on moving the thing forward so it
17  got capitalized, we got the transaction done,
18  meaning private Scio and Focus. Got the transaction
19  done. Got the shareholders their stock and moved
20  Scio forward, meaning the shareholders and Apollo
21  Gemstone. Did somebody needed to do something and
22  it had to be, at this point it was increasingly
23  clear it had to be us, meaning Focus and Adams,
24  Monahan and Messrs. Adams, Monahan, Mack, Rapello.
25       You know, all I can say is from March to

DSM-000492

367

1   certainly through June or July, lots of
2   conversations and lots of people who promised to do
3   lots of things and no one did anything?
4       Q   You mean at Focus?
5       A   I mean everywhere.  I mean at Focus.  I
6   mean other people who were shareholders of Apollo.
7   I mean people that were introduced to us that said,
8   oh, yeah, we'll invest.  We'll do this.  We'll do
9   that.  I got lots of those.  Okay.  And nobody was
10  doing anything.  So somebody has to do something to
11  remove the opportunity forward.  I wish I could have
12  been a bystander now in hindsight, but no one was
13  doing anything, and this is my point.  If I wrote
14  this -- and I don't remember, but that's fine.  You
15  know, this is going to work.  People have got to
16  roll up their sleeves and get going.  I mean I think
17  you, in this earlier thing, you know, I was -- there
18  is this e-mail where I was saying no recruiting
19  these people and some of these people again, I don't
20  remember this e-mail either, but some of these
21  people were people who were talking about putting
22  real money into the deal, you know, telling me, yeah
23  I'm going to put money in.  At one point there was
24  even a thought that one of these people had become
25  chairman or chairperson.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

368

1       Q   You are talking about the page -- it is
2   not numbered.  On top of it it says "Sent from my
3   iPhone on May 5th of 2001 at 4:40 p.m. at Adams and
4   there is an e-mail address, jeffman1syahoo.com?  Is
5   that the one that you are referring to?
6       A   Yes.
7       Q   Is that your e-mail address?
8       A   Yes.
9       Q   Jeffman1syahoo.com?
10      A   It's an e-mail address, yes.
11      Q   Did you maintain that e-mail address on
12  May 5, 2011?
13      A   I presume.  Don't remember.
14      Q   And you're addressing -- in this e-mail
15  you are addressing -- is that Chris Mack, is that
16  who you're addressing?
17      A   Yes, I presume.
18      Q   And you refer to the paragraph Board
19  member consist of seven to nine members?
20      A   Yes.
21      Q   What Board is that?
22      A   Private Scio.  There was no public Scio at
23  this point.  It was -- is not anything other than --
24  I don't think we contemplated that.  So that's
25  private Scio.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

369

1       Q   So as of May 5, 2011, did you contact the
2   individuals that are listed in this paragraph
3   regarding their potential involvement on the Board
4   of private Scio?
5       A   Absolutely.
6       Q   And that would be Joe Lancia, Greg
7   Spitzer, Kevin Chase, Theo Margus, Roger Hedricks
8   and Noel --
9       A   I think he says it Ron.  I contacted a lot
10  of people in addition to them.
11      Q   Okay.
12      A   But these are people that obviously --
13  this is mine, which I don't remember writing, but
14  let's just assume it is for this discussion,
15  I certainly -- those people.
16      Q   Going back a page on Exhibit 56, if you go
17  back a page to the e-mail we were looking at before
18  and I'm looking at an e-mail that is dated March 5,
19  2011 from Christopher Mack.  And it's responding to
20  your e-mail dated March 5, 2011?
21          MR. KOPECKY:  May.
22          BY MR. WISNIEWSKI
23      Q   May 5, 2011.  Do you see that?
24      A   Yes.  Okay.  Is that the right page?
25      Q   I think we are on the wrong page.  Go back

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

370

1   a few pages.  There you go.  And the e-mail from --
2   the e-mail I'm referring to dated May 5, 2011 starts
3   "I'm on the Board of StyleOwner", do you see that?
4   Do you see that?
5       A   Yes.
6       Q   And that paragraph continuous and this is
7   e-mail from the Mr. Mack to yourself Mr. Platt,
8   Mr. Rapello, and Mr. Monahan.  Do you recall
9   receiving this e-mail?
10      A   Not really.
11      Q   Do you have any reason to believe that he
12  did not receive this e-mail?
13      A   This one says that says that I'm on the
14  Board of StyleOwner", is that the one you are
15  talking about?
16      Q   Yes.
17      A   I don't remember.
18      Q   The e-mail is addressed to Ed Adams, and
19  the e-mail that's next to your name is
20  jeffman1syahoo.com?
21      A   Yes.
22      Q   And that was one of the e-mails you
23  maintained on March 5, 2011?
24      A   Yes.
25      Q   And going to the body -- the body of the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

371

```
1   e-mail, the second sentence starts, "I have told the
2   CEO of StyleOwner several times weeks ago during
3   our -- that I would need to resign my Board position
4   if we were hire Focus or Capital due to the
5   conflict.  That is just me.  I would not risk my
6   firm or exposure or expose my partners to undue
7   liability without some serious vetting.  My
8   understanding of this situation, if it is not just a
9   Board seat to the firm, but will have..." -- sorry.
10  "It is not just a Board seat, but the firm will have
11  but three out of five Board seats and actually
12  control the company through the Board."
13          What Board is he referring to there?
14      A   I don't know.
15      Q   Did Mr. Mack ever raise concerns with you
16  regarding the composition of private Scio's board?
17      A   I don't remember.
18      Q   Outside of this e-mail, did you have any
19  conversations with Mr. Mack regarding the Board
20  composition of private Scio?
21      A   I think my conversations were -- I think
22  at one point I asked someone do you know people that
23  would be on the Board.  And that's -- and maybe
24  that's when Chris Burch's name came up or Steve
25  Cohen's name came up.  And then I think I -- that's
```

373

```
1       Q   And did you call them or her or she?
2       A   It was a woman.  There were numerous
3   people we spoke to there over the course of the
4   relationship, but I think our primary contact was a
5   woman.
6       Q   Do you remember her name or?
7           MR. SIKORA:  Was she an attorney or not?
8           THE WITNESS:  She might have been.  I never
9   had attorneys on staff there, I think.  I don't know if
10  she was an attorney.  Certainly talked like she -- I
11  mean --
12          MR. SIKORA:  There is a reference to talking
13  to outside counsel.  I'm not sure we're talking about
14  the same person or not.  But that would be my essential
15  concern.
16          MR. KOPECKY:  Mack did and --
17          BY MR. WISNIEWSKI
18      Q   So do you recall the firm's name.
19      A   I think it was Broker Dealer Compliance.
20      Q   That was --
21      A   I think that was the name of the firm.
22      Q   broker Dealer Compliance?
23      A   I think it was.
24          BY MR. SHANK
25      Q   What was that, a compliance consultant?
```

372

```
1   what I remember about my conversations with him.
2       Q   Did he ever raise a concern regarding the
3   composition of private Scio's Board?
4       A   That I don't remember.
5       Q   Did he ever raise a concern that you and
6   Mr. Monahan were members of private Scio's Board
7   and also shareholders of Focus Capital.
8       A   I don't remember.  If he did, it might
9   have been in the context of talking to our
10  regulatory person.
11      Q   And who is your regulatory person?
12      A   It was an outsource regulatory person in
13  New Hampshire, broker dealer compliance maybe.
14      Q   And did you talk to that compliance
15  individual regarding your service on the private
16  Scio Board?
17      A   I imagine we did.
18      Q   And when was that?
19      A   Probably February or March.  I don't even
20  know.
21      Q   And what were those conversations?
22      A   I don't remember.  I mean we were pretty
23  actively talking to this person because we were
24  paying them a monthly retainer.  So if we had
25  questions, we would call them.
```

374

```
1       A   Yeah.
2       Q   Yes?
3       A   Yes.
4       Q   You don't know one way or the other
5   whether it was an attorney that you were dealing
6   with.
7       A   I don't.
8       Q   Were you seeking legal advice from them?
9       A   I don't know.  I don't know if asking them
10  questions about compliance is legal advice.  I think
11  sometimes it is.  I mean we would ask some questions
12  about did you read the PPM, is the disclosure
13  appropriate, do we need to add anything more?  Did
14  you read this document, the proxy?  What do you
15  think?  I mean we're paying them a monthly retainer,
16  so there was no reason not to run stuff by them.
17  They were smart people.
18      Q   Were you seeking legal advice from this
19  firm with respect to the composition of private
20  Scio's Board?
21      A   I don't remember.
22          BY MR. WISNIEWSKI
23      Q   Turning back to that e-mail on May 5,
24  2011, Commission Exhibit 56, Mr. Mack's e-mail says,
25  "My understanding of the situation is not just a
```

375

1  Board seat that the firm will have, but three out of
2  five Board seats."
3      A    Yes.
4      Q    Was there a contemplation of three members
5  of Focus Capital serving as Board members of private
6  Scio?
7      A    I don't remember.
8      Q    You were a Board member?
9      A    Yes.
10     Q    Monahan was a Board member?
11     A    Uh-huh.
12     Q    And you two were both members of Focus
13 Capital?
14     A    Right.
15     Q    Was there any talk in consideration of
16 adding a third member of Focus Capital to the Board
17 of private Scio?
18     A    Mack was the one that always wanted to be
19 a third people of anything.  I mean -- but I don't
20 remember in this case.
21     MR. KOPECKY:  What happened?  Who ended up
22 being the Board of private Scio?
23     THE WITNESS:  Myself, Monahan, Lancia.
24     MR. KOPECKY:  Okay.  Was Lancia a member of
25 Focus Capital?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

376

1      THE WITNESS:  No.
2      MR. KOPECKY:  So it never happened.  This is
3  a discussion on who should be on the Board.  And yes,
4  Mack raised concerns about who should be on the Board
5  and clearly discussed it and at the end of the day --
6      THE WITNESS:  Well, I'm not going to say.
7      MR. KOPECKY:  They are all talking about how
8  this is going to be set up.  Well, we are supposed to
9  be asking facts.  He doesn't remember a single thing
10 about this e-mail or discussion.  And you are still
11 going into it.  Was there a concern about whether
12 something should be done that was then never done.  So
13 I have an objection to that, because the Formal Order
14 allows you to ask questions to get at facts and your
15 questions are not getting at facts.
16     MR. SHANK:  They do get at facts.  But these
17 are all things that obviously happened that were
18 discussed.  So whether something --
19     MR. KOPECKY:  The SEC encourages companies to
20 do, deliberate, discuss and focus on it and try to get
21 to the facts which are the conclusions of what happens.
22 You're not asking fact questions.  That's my objection,
23 but let's take our break.  We are going to take a
24 break.  I'm taking a break.
25     MR. WISNIEWSKI:  Let's go off the record at

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

377

1  10:35, do you have?
2      THE WITNESS:  Can I remove this now from the
3  room?
4      MR. WISNIEWSKI:  No.
5          (Brief recess.)
6      MR. WISNIEWSKI:  Back on the record at
7  10:46 p.m.
8      Mr. Adams during our break or while we were
9  off the record, other than our conversations of animal
10 removal, have we had any discussion during the break?
11     A    No.
12     Q    Mr. Adams, I'm going to hand you an
13 exhibit that was previously marked or documents
14 previously marked as Commission Exhibit 52.
15 Mr. Adams, Commission Exhibit 52 is a document
16 that's Bates number CB-SCIO188 through CB-SCIO286,
17 which purports to be Form AK that was filed by Scio
18 Diamond Technology Corp on August of 2011.
19     Have you seen this document before?
20     A    I think I saw it when we were last
21 together.
22     Q    And what is it?
23     A    It's an AK of Scio Diamond, the public
24 Scio.
25     Q    And this AK was filed in connection with

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

378

1  the Asset Purchase Agreement executed between
2  private Scio on the one hand and Crossbow Holdings
3  Corporation on the other, is that correct?
4      A    I think so.  The attorney filed it, but I
5  believe that's why he filed it.
6      Q    And you're familiar with that agreement,
7  that is referred to, right, the Asset Purchase
8  Agreement between private Scio and Crossbow
9  Holdings?
10     A    I didn't draft it, but I'm familiar with
11 it.
12     Q    Why don't we turn to page -- the third
13 page of Exhibit 52, which is Bates numbered
14 CB-SCIO190 and let me know when you are there?
15     A    Okay.
16     Q    Under Item 101, it says "On August 5,
17 2011, Scio Diamond Technology Corporation executed
18 an Asset Purchase Agreement.  Under the terms of the
19 agreement the name Scio Diamond Technology Corp was
20 purchased for 13 million newly issued shares of
21 common stock of the company."
22     Do you see that?
23     A    Yes.
24     Q    And the company is defined as "Scio
25 Diamond Technology Corporation which was formerly

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

379

```
1    Crossbow Holdings Corporation."
2           Do you see that?
3       A   Yes.
4       Q   We discussed that agreement the last time,
5    is that correct, the last testimony that we had?
6       A   Which agreement?  I'm sorry.
7       Q   The August 5, 2011 Asset Purchase
8    Agreement between private Scio and Crossbow Holdings
9    Corporation?
10      A   I don't remember that.  I'm sorry.
11      Q   Are you familiar with that agreement?
12      A   Yes, I believe it's an appendix here.
13   It's attached here.
14      Q   Why don't we turn -- why don't we go ahead
15   and turn to that appendix.  I guess we'll start --
16   the actual Asset Purchase Agreement is on Page
17   CB-SCIO196.  Let me know when you are there?
18      A   Okay.
19      Q   And explain to me what this Asset Purchase
20   Agreement -- what did Crossbow purchase?
21      A   The required assets that are listed in
22   1.1.
23      Q   I'm sorry?
24      A   The acquired assets that are listed in
25   1.1, I guess.  I didn't draft it.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

381

```
1    His law firm, it's a he, ultimately became counsel.
2    Right.  Around now or right after to Scio, because
3    he had been counsel I think to Crossbow.  So I don't
4    really know.
5       Q   As of August 5, 2011, what role did you
6    have at private Scio?
7       A   I guess I was still the Director of
8    private Scio.
9       Q   Were you a shareholder of private Scio?
10      A   Yes.
11      Q   As of August 5, 2011, what role did you
12   have at Crossbow?
13      A   I would have to look at corporate minutes.
14   I think a Board of Director member.  I became a
15   member of the Board on August 4th or 5th.  I don't
16   remember.  I have to look.
17      Q   Were you a shareholder of public Scio at
18   this time?
19      A   I think it was simultaneously to this or
20   very close to this time that I became a shareholder.
21      Q   How did you become a shareholder of public
22   Scio?
23      A   Through the issuance of shares in
24   connection with this that's described and then also
25   purchasing insurance.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

380

```
1       Q   All right.  Let's turn to 1.1.  That is on
2    CB-SCIO206?
3       A   Uh-huh.
4       Q   And what are the assets?
5       A   The name and any rights thereof.
6       Q   And the name is Scio Diamond Technology
7    Corp?
8       A   Yes.
9       Q   Any and all rights thereof?
10      A   Right.
11      Q   What does that mean, "including any and
12   all rights thereof"?
13      A   I assume the right to buy the assets of
14   Apollo Diamond Inc.  I didn't draft it, but that's
15   the only other right I could imagine.
16      Q   You didn't draft this Asset Purchase
17   Agreement?
18      A   No.
19      Q   Do you know who did?
20      A   The Zouvas Law Group.
21      Q   Zouvas Law Group?
22      A   Yes.  Zouvas Law Group, Z-O-U-V-A-S?
23      Q   And Zouvas Law Group was acting as counsel
24   to who?
25      A   I guess both entities.  I don't remember.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

382

```
1       Q   So you acquired shares pursuant to this
2    Asset Purchase Agreement that's noted in Exhibit 52?
3       A   Uh-huh.  I think that's right.
4       Q   And if we turn to Page CB-SCIO 205, there
5    is a schedule 1.4?
6       A   Uh-huh.
7       Q   And it looks like there is a name,
8    address, and a bunch of information regarding
9    recipients of shares pursuant to this agreement, is
10   that correct?
11      A   Yep.
12      Q   And the total number of shares that were
13   issued by Crossbow to private Scio was 13 million;
14   is that right?
15      A   Yes.
16      Q   And Schedule 1.4 illustrates how those
17   shares were distributed?
18      A   Yes.
19      Q   And to whom they were distributed, I
20   should say?
21      A   Right.
22      Q   Who made -- who decided how these shares
23   would be distributed?
24      A   It was based on share ownership in private
25   Scio, but there was a split done at the suggestion
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

383

1   of -- well, this is where we're going to --
2       Q    And again if there is any privilege
3   information, I don't want to discuss that with you.
4   But to the extent -- well, why don't you identify --
5   I guess who made the determination of how these
6   shares are going to be disclosed?
7       A    Zouvas recommended --
8       Q    Stop there.  So did you -- who contacted
9   the Zouvas law firm in connection with -- what role
10  did you have in determining how these shares were
11  distributed to individuals?
12      A    I followed the advice of counsel.
13      Q    And what counsel is that?
14      A    Zouvas Law Group.
15      Q    And who -- in what capacity did you
16  contact the Zouvas Law Group there seeking that
17  advice?
18      A    Okay.  I don't know if we contacted him,
19  meaning people at Scio or he contacted us through
20  the party that we had retained to find an entity
21  like Crossbow.  I think it was actually the latter.
22  In other words, the party that we had contracted
23  with to find an entity like Crossbow recommended
24  Zouvas.  I had never heard of Zouvas.  And so I
25  think Ben Zouvas called us as a result of that

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

384

1   recommendation.
2       BY MR. SHANK
3       Q    Why was private Scio interested in finding
4   an entity like Crossbow?
5       A    By June, July, I think probably by June or
6   late June, late June or July.  I don't remember
7   which.  It was pretty apparent that it was going to
8   be very difficult to raise capital for a private
9   entity like Scio.  I'm saying private Scio and had
10  conversations with a variety of people.  One in
11  particular that I remember was a gentleman whose
12  name is Rob Goodmanson.  He is at Maxwell Simon
13  which is a broker dealer.  Maxwell Simon ultimately
14  raised money for what became public Scio in effect.
15  Goodmanson said to me, you know one solution to your
16  challenge here is you should find a way to get
17  liquidity for the shareholders in whatever
18  investment they are investing.  So they would have
19  the ability to buy and sell shares in the open
20  market and sell their stock, right.  I think he
21  said -- it was kind of a memorable -- I'm going to
22  paraphrase what he said because it was memorable to
23  me.  He said, "Being an investor in a private
24  company..., and this is not terribly politically
25  correct, but "...it's like being a blind man in a

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

385

1   darkroom with no exits."  So you need to find a way
2   out of that dark room for any potential investors.
3   And then if you do that, I think I can raise you a
4   bunch of money, which he ultimately did.  So then
5   that got me down the path of thinking far more
6   seriously about doing a transaction with an entity
7   like Crossbow.
8       Q    A public shell entity?
9       A    I mean it wasn't a true public shell
10  transaction, right, because ultimately it wasn't a
11  merger.  But that, for a lot of reasons, that I
12  wasn't attracted to doing a reverse merger.  It was
13  actually an asset acquisition.  But yes, that's
14  exactly how people would characterize it.
15      Q    So the deal ultimately wasn't an asset
16  acquisition, right?
17      A    Right.
18      Q    So did -- we looked at Schedule 1.1a which
19  talks about acquiring the names and any and all
20  rights thereof?
21      A    Uh-huh.
22      Q    Did Crossbow acquire any liabilities of
23  private Scio?
24      A    Yeah, that's, as I'm sure you know, I
25  mean that's the point of an asset acquisition not to

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

386

1   acquire liabilities.
2       Q    So they did not acquire liabilities?
3       A    There were agreements that some of the --
4   much of the work that was done would be addressed.
5   There was no formal liability agreement, if I
6   remember correctly.
7       Q    Do you know how it was determined that
8   13 million shares of Crossbow would be in
9   consideration given for the acquisition?
10      A    I think this was based on the number of
11  shares that were in Crossbow and making sure that
12  there was control in the group that was taking
13  control of Crossbow by those parties.  So there
14  were -- I don't remember how many shares.  I don't
15  remember if I ever knew how many shares were
16  actually in Crossbow.  Other than I had -- I
17  remember the other conversation I had with
18  Mr. Zouvas about this.  You've got to tell me
19  there's no -- the critical thing is there can't be
20  any liabilities in Crossbow.  You can't do a
21  transaction where suddenly there's a bunch of
22  liabilities in Crossbow and then, you know, there is
23  no issues with Crossbow that you know of, right?
24  And then he was the one that recommended, I think,
25  the split and all this other stuff.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000497

387

1    Q    Go to page 190.
2    A    Yeah.
3    Q    There's a table of the directors and
4    officers and the amount and nature of ownership.  Do
5    you see that?
6    A    Yeah.
7    Q    Is that yes?
8    A    Yes.
9    Q    You can see based on the percentages,
10   would you agree that there appears there was about
11   20 million outstanding shares of Crossbow at this
12   time, the time of this AK?  Like if you --
13        MR. KOPECKY:  It's pointed to you.  It says
14   there is 19,400,000 --
15        THE WITNESS:  Okay.  I guess there are.
16        BY MR. SHANK
17   Q    So 13 million gave the owners of private
18   Scio control over the company?
19   A    Yes.
20   Q    Do you know who owned the other
21   6.4 million shares?
22   A    I don't.
23   Q    Did you at the time?
24   A    No.  I don't know that I ever even saw a
25   shareholder list.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

388

1
2        BY MR. WISNIEWSKI
3    Q    You mentioned that Crossbow didn't acquire
4    any liabilities, but there was an agreement between
5    the companies?
6    A    I think there was an understanding that,
7    you know -- I don't remember, Kevin.  I don't
8    remember.  I don't want to misspeak, because I don't
9    remember what we had talked about, Lancia, Zouvas.
10   I don't remember.
11   Q    But there was no -- in the Asset Purchase
12   Agreement, did Crossbow acquire any liabilities of
13   private Scio?
14   A    I don't think so.  I don't know the terms.
15        MR. KOPECKY:  1.2.
16        THE WITNESS:  "Buyers not assuming and will
17   not be obligated or liable for any liability of
18   seller."  That claims will be indemnified against
19   claims or obligation of seller pursuant to 5.2."  So
20   look at that.  It says -- doesn't seem to match this.
21        BY MR. WISNIEWSKI
22   Q    Turning to Page SCIO204.
23   A    Okay.
24   Q    This agreement was executed by Joe Lancia,
25   both in his capacity as the President and CEO of

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

389

1    Crossbow and in his capacity as President and CEO of
2    Scio Diamond Technology Corp., is that right?
3    A    It seems to be, yeah.
4    Q    And if you could turn to CB-SCIO191.  Let
5    me know when you are there?
6    A    Okay.
7    Q    Item 5.01, "Changing control of
8    registrant."  Underneath there the bullets there
9    kind of give notes that you were appointed as the
10   Company's Chairman.  Joe Lancia was appointed as CEO
11   and Michael Monahan was the Board of Director of the
12   company?
13   A    Yes.
14   Q    So that's who you referred to before that
15   concurrently you were also appointed in connection
16   with this agreement, the Asset Purchase Agreement
17   you were also appointed as the Chairman of the Board
18   of Directors of Scio?
19   A    Yeah.  I was actually referring that
20   there's probably a formal Board minute or something
21   doing that.
22   Q    But this AK reflects the appointment of
23   you as Chairman?
24   A    Yes, it does.
25   Q    Mr. Adams, I'm going to hand you a

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

390

1    document that has been marked as Commission Exhibit
2    57.
3        (SEC Exhibit 57 was marked for
4        identification)
5        BY MR. WISNIEWSKI
6    Q    Mr. Adams, Commission Exhibit 57 is a
7    38-page document that is not Bates numbered that
8    purports to be a Form AK filed by Scio Diamond
9    Technology Corp.  The day of the report is noted as
10   August 17, 2011.
11        Have you seen this document before?
12   A    Maybe.  I don't remember specifically.
13   Q    Take your time to review it.
14        MR. WISNIEWSKI:  I just want to see if he is
15   familiar with the document?
16        THE WITNESS:  It's prepared by Zouvas' group
17   -- firm.  That's it.  I don't know.  That's it.  I
18   don't know anything else about it particularly.
19        BY MR. WISNIEWSKI
20   Q    So in August of 2011, who was responsible
21   at public Scio for review of SEC filings?
22   A    Joe Lancia.
23   Q    Anyone else other than Joe?
24   A    I think there was an acting CFO.  It
25   almost had to be.  I don't remember who that was.  I

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

391

```
 1   don't know if that was somebody who was like an
 2   outsource CFO.  Yeah.  That is what I remember.
 3       Q    Did you review SEC filings prior to them
 4   being filed?
 5       A    I don't remember doing that.  I mean part
 6   of the reason -- I mean I always viewed it this way.
 7   The company had a CEO/CFO.  That was their
 8   responsibility to work with the lawyer to do that.
 9   It wasn't mine as a Board member.
10       Q    Did the Board ever review -- while you
11   were a Board member of public Scio, did the Board
12   ever review SEC forms prior to them being filed?
13       A    Later on when there was an accounting
14   firm brought in by Lancia called Cherry Becker,
15   maybe they would do a presentation to the Board.
16   And then we would review their -- it was a Power
17   Point.  And we reviewed the Power Point.  I don't
18   know if we actually reviewed the formal document
19   that had been prepared by counsel.  They might have
20   sent it to you.  But it would be mostly reacting to
21   what Cherry Becker said in its Power Point.
22            So to answer your question precisely, I
23   don't remember going line by line through something
24   like this and reviewing it like that as an attorney
25   for sure.  I don't remember.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

392

```
 1       Q    And you said the Zouvas law firm prepared
 2   this document?
 3       A    Right.  We probably gave them a business
 4   plan or something that they had utilized.  We
 5   meaning the Adams Monahan firm might have given them
 6   a business plan that they then utilized it to
 7   prepare some of the, you know, in terms of the
 8   business stuff.
 9       Q    Did Adams Monahan LLP ever review or draft
10   in SEC filing on behalf of public Scio?
11       A    I don't remember that.  And Zouvas was the
12   SEC attorney.
13       Q    For how long was Zouvas the SEC and public
14   Scio's SEC attorney?
15       A    From the beginning of August of 2011
16   through sometime in 2012, early 2012 I think.
17       Q    Who took over and who assumed these
18   responsibilities after Zouvas?
19       A    Nelson Mullins something something in
20   South Carolina.
21       Q    Why did public Scio replace Zouvas for --
22       A    What I remember was that Lancia wanted
23   someone that was closer to where he was in South
24   Carolina and we said sure, whatever, it's your call.
25       Q    So Joe made that decision?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

393

```
 1       A    Yeah.  I think we approved the decision on
 2   the Board, but, yeah, it was his call, his
 3   relationship.  I don't know that he -- I think his
 4   CFO that he brought in was a gentleman that knew
 5   somebody, played tennis or something with somebody
 6   at Nelson Mullins.  And so this new CFO said, yeah,
 7   I want to work with these guys I know.  Whatever,
 8   that's fine.  If you trust them and know them and
 9   think -- I mean the only conversation I remember
10   having was, you know, this isn't a Rolls Royce in
11   terms of budget.  You can't spend $100,000 a month
12   on compliance stuff, because we don't have that.
13   It's not going to work.  You have got to be
14   sensitive to cost and they need to be.
15       Q    Do you know what a related to party
16   transaction is?
17       A    Generally.  I mean -- I guess.  I don't
18   know if I could define it.
19       Q    Well, what's your understanding of the
20   party transaction?
21       A    It's a -- I guess it would be something
22   where if parties who were -- worked at one company
23   and were on the Board of another company and those
24   two entities were doing a transaction, that might be
25   a disclosable event.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

394

```
 1       Q    So it is your understanding that the party
 2   transaction would have to be disclosed?
 3       A    Well, it might be a disclosable event.
 4       MR. SIKORA:  Can I jump in and it can be very
 5   confused back and forth.  You're asking about related
 6   party transactions in general, if I understand it
 7   versus the legal significant under say regulation SK
 8   versus accounting principals.  There is a lot of
 9   different ways to slice and dice it definitionally.
10   And I want to be super clear since you are asking him
11   for --
12       MR. WISNIEWSKI:  Sure.
13       MR. SIKORA:  -- to disclose operations and
14   stuff like that.
15       MR. WISNIEWSKI:  -- asking the question in
16   response to him saying there was potentially --
17       MR. SIKORA:  That is left open by your
18   question.  So really for this back and forth, I would
19   appreciate if you would be more -- a little more
20   specific in your definition of what you mean.
21       BY MR. SHANK
22       Q    When you say a -- party transaction may be
23   a disclosable event, disclosable where, as you
24   understood it?
25       A    Well, if it was an accounting scenario
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000499

395

1    disclosable in the notes.

2         Q    The financial statements?

3         A    Yes.

4         Q    Anywhere else that you were aware of back

5    when party related transactions may need to be

6    disclosed?

7         A    That is where I have seen it.

8         BY MR. WISNIEWSKI

9         Q    What is your understanding of why they may

10   need to be disclosed?

11        MR. SIKORA:  I'm sorry.  This is hard.  You

12   are asking -- if his answer is in terms of accounting,

13   okay.  Then you are really asking about the rationale

14   for a GAAP principal.  And there might be a way to get

15   there, but I don't think the way you are getting there

16   is actually going to be fruitful for anybody here.

17        MR. WISNIEWSKI:  I'm asking his

18   understanding.

19        MR. SIKORA:  But you are asking why, you are

20   asking why does the Accounting Board place regarding

21   related party transactions.  He is not a CPA.  I

22   understand you can find ways to get to an answer, but I

23   think the route you are going down is probably not

24   going to lead to a fruitful answer for anybody.

25

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

396

1         BY MR. WISNIEWSKI

2         Q    What is your understanding of why party

3    related transactions may have to be disclosed?

4         A    It's a GAAP rule.

5         Q    And that is your understanding of why it

6    has to be?

7         A    Yeah.  The rules of GAAP govern public

8    accounting.  That is all I know.

9         BY MR. SHANK

10        Q    I understand you are not a CPA, but in

11   your business experience, have you obtained any

12   understanding as to the principals behind having

13   related party transactions disclosures?

14        A    I know that GAAP requires them generally.

15   And I don't understand what the threshold is,

16   because I have -- that isn't something that I have

17   not prepared a financial statements on account.

18        Q    And did you have any understanding, views

19   or opinions as to why related party transactions may

20   require disclosures in certain instances?

21        A    Not particularly.

22        BY MR. WISNIEWSKI

23        Q    Commission Exhibit 57, if you could turn

24   to Page 28.  I am sorry.  Let me know when you are

25   there.  I'm referring to Page 28 at the top of the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

397

1    document.

2         A    Oh, okay.  Thanks.  I was going the wrong

3    way.

4         Q    I'm looking at Item 7.  Do you see that?

5         A    Okay.

6         Q    It says, "Several relationships are

7    related party transactions and direct independents."

8    Under that item there -- it says "related party

9    transactions."  The paragraph continues "None of the

10   directors or executive officers of the company, nor

11   any person who owned of record or was known to own

12   beneficially more than five percent of the company's

13   outstanding shares of the common stock or any

14   associate or affiliate of such persons or -- has any

15   material interest, direct or indirect, in any

16   transaction that has occurred during the past fiscal

17   year, or in any proposed transaction which has

18   materially affected or will affect the company."  Do

19   you see that?

20        A    Uh-huh.

21        Q    So Scio Diamond is saying that there is no

22   related party transactions at this time, is that

23   correct?

24        A    It seems like it.  Uh-huh.

25        Q    Did you have any discussions with anyone

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

398

1    at the company regarding this disclosure?

2         A    I don't remember that.

3         Q    As of August 17, 2011, the day that this

4    was filed, the private Scio/Krossbow Holdings

5    Corporation Asset Purchase Agreement had become

6    effective?

7         A    Yes, it was.

8         Q    Do you know why that was not disclosed as

9    a related party transaction?

10        A    I don't remember reading Item 7, you know.

11   I don't know.  I have no idea.

12        MR. KOPECKY:  The objection was to the

13   foundation.  It wasn't a related party transaction.

14   Objection.  Foundation.

15        BY MR. WISNIEWSKI

16        Q    As of August 17, 2011, was Adams Monahan

17   performing legal work for public Scio?

18        A    I believe it was intellectual property in

19   general corporate work.

20        Q    Under the definition that's set forth in

21   Item 7 here, would you consider that to be a related

22   party transaction?

23        A    No.

24        Q    Why not?

25        A    Material interest.  I mean.  I don't know.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

399

1    I don't know what the rules are for a related party
2    transaction in this setting.
3        Q    But as it's set forth here, as the
4    definition is explained or how it's explained in
5    this filing?
6        A    Materially affected or will affect -- I
7    don't know.  You would have to ask Zouvas.  I mean
8    he knew that we were doing work.  I mean that was
9    clear.
10       Q    How can the private Scio/Crossbow Holdings
11   transactions pursuant to this definition here, would
12   you consider that a related party transaction?
13       A    I would defer to Zouvas who wrote the
14   document.  I mean he's a securities lawyer.  That is
15   my understanding of what he does.  This is what he
16   does.  So I will rely on him.
17            BY MR. SHANK
18       Q    Did you personally have an interest in the
19   private Scio/Crossbow Holdings transaction?
20       A    Yes, I own stock in private Scio.
21       Q    And did you get any -- directly or
22   indirectly get any consideration from that
23   transaction?
24       A    I got shares in Crossbow.
25            MR. SIKORA:  Can I ask a question, Kevin.  I

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

400

1    believe -- are you talking about the transaction that
2    was disclosed in the prior AK, that between Crossbow
3    and what we call private Scio?
4            MR. WISNIEWSKI:  The Asset Purchase
5    Agreement.
6            MR. SIKORA:  The Asset Purchase Agreement and
7    the changes -- in the registrant.  What you ran through
8    in the last exhibit, 52.
9            MR. WISNIEWSKI:  Is that what I'm referring
10   to, yes.
11           MR. SIKORA:  If I understand your question.
12   Your questions are where is the disclosure about this
13   related party transaction in Item 7.  And I'm asking
14   are you talking about what was disclosed in prior AK.
15           MR. WISNIEWSKI:  My question was, John, was
16   whether or not he would consider that to be a related
17   party transaction under this definition here.
18           MR. KOPECKY:  He never said why it was
19   disclosed.  We're going back and forth this.  I mean
20   let's get to later disclosures.
21           Did Joe Lancia, who signed this as the chief
22   CEO, did he know that Adams Monahan did work for
23   public Scio at the time of this filing?
24           THE WITNESS:  Of course.
25           MR. KOPECKY:  Did he know about the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

401

1    Crossbow/private Scio transaction at the time of this
2    filing?
3            THE WITNESS:  Of course.
4            MR. SIKORA:  Just to be clear, the Crossbow
5    is disclosed in the prior AK.
6            MR. WISNIEWSKI:  I understand.
7            MR. SIKORA:  I'm just wondering if you are
8    talking about the same thing.  It's apples to apples..
9            THE WITNESS:  Okay.  I'm really lost now.
10   So, sorry.
11           MR. WISNIEWSKI:  There is no question
12   pending.
13                (SEC Exhibit 58 was marked for
14                identification)
15           BY MR. WISNIEWSKI
16       Q    Mr. Adams, I'm going to hand you a
17   document that has been marked as Commission Exhibit
18   58 which is Bates Number SEC-SCIO 16572 through
19   16613.
20       A    Thanks.
21           MR. SIKORA:  What exhibit number is this,
22   Kevin?
23           MR. WISNIEWSKI:  58.
24           BY MR. WISNIEWSKI
25       Q    And, Mr. Adams, Commission Exhibit 58

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

402

1    purports to be an Asset Purchase Agreement dated
2    August 31, 2011 between Apollo Diamond Inc. and Scio
3    Diamond Technology Corporation.
4            Have you seen this document before?
5        A    Yes.
6        Q    And what is it?
7        A    It is an Asset Purchase Agreement between
8    Scio Diamond and Apollo.
9        Q    And if you could turn to SEC-SCIO 16602?
10       A    Okay.
11       Q    And this document was signed on behalf
12   of -- signed on behalf -- signed by Robert Linares
13   on behalf of Apollo Diamond Incorporated as
14   Chairman?  And signed on behalf Joe Lancia on behalf
15   of Scio Diamond Technology, is that correct?
16       A    Yes.
17       Q    And I don't know if I asked you, have you
18   seen this document before?  Sorry if I did ask you.
19       A    Yes.
20       Q    And this is an executed copy of the Asset
21   Purchase Agreement Between Apollo Diamond and Scio
22   Diamond, I should say?
23       A    Yes.  Appears to be, yes.
24       Q    And essentially this agreement -- through
25   this agreement public Scio acquired the assets of

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

403

1   Apollo Diamond Incorporated, is that right?
2       A    Yes.
3       Q    And the purchase price is $2 million?
4       A    Yes.  A million, a million promissory note
5   16582, yeah, that's what the consideration stated
6   here.
7       Q    So a total of $2 million?
8       A    Uh-huh.
9       Q    And how is that $2 million purchase price
10  negotiated?
11      A    I don't remember.
12      Q    Were you involved in the negotiations?
13      A    I might have been in some of it.  I don't
14  remember.  It was Bob and Joe or Bob, Joe and me or
15  Bob, Joe, Michael and me.  I don't remember.
16      Q    And how about on the public Scio side, who
17  was involved in negotiating the purchase price on
18  the public Scio side?
19      A    I would assume it was Lancia.
20      Q    Anyone else?
21      A    If he had a CFO.  I don't remember.
22      Q    How about on the Apollo Diamond side?
23      A    It would have had to be principally Bob
24  Linares.
25      Q    And why is that?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

404

1       A    Apollo Diamond.
2       Q    As of August 31, 2011, who was -- who was
3   a part of Apollo Diamond?  Who was on the Board?
4       A    I think Bob was the only person.
5       Q    How about executive or management?
6       A    I think it is Bob.
7       Q    Anyone else other than Bob Linares
8   employed at Apollo Diamond at this time?
9       A    I don't think so.  I don't know.
10          MR. SHANK:  I believe you previously
11  testified that you had various roles at Apollo Diamond,
12  including General Counsel and Vice President.  Had you
13  resigned from those positions?
14          THE WITNESS:  Resigned on February 28, 2011.
15          BY MR. WISNIEWSKI
16      Q    Did you provide any services to Apollo
17  Diamond as of August 31, 2011?
18      A    If I were providing services, it was as an
19  attorney.
20      Q    So in your role or in your capacity as an
21  attorney at Adams Monahan?
22      A    Yes.
23      Q    How about any type most of business
24  advisor?
25      A    I don't remember that.  I don't remember

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

405

1   that I did or did not.  I don't remember.
2       Q    Did you ever provide business advisory
3   services for Apollo Diamond separate and apart from
4   your duties as general counsel as an executive or as
5   an attorney at Apollo Diamond?
6       A    I might have.  I don't remember.
7       Q    As of August 31, 2011, were you a
8   shareholder of Apollo Diamond Incorporated?
9       A    No.  Probably -- I don't remember.
10          (SEC Exhibit 59 was marked for
11          identification)
12          BY MR. WISNIEWSKI
13      Q    Mr. Adams, I'm going to hand you a
14  document that is marked as Commission Exhibit 59
15  and is Bates Number SEC-ADAMS 30910.
16          Mr. Adams, Commission Exhibit 59 is a
17  one-page document SEC-ADAMS 30910.  It purports to be
18  the Minutes of the Meeting of the Board of Directors
19  of Apollo Diamond Incorporated as of August 27, 2011.
20          Have you seen this document before?
21      A    Uh-huh.
22          MR. SHANK:  Yes?
23          THE WITNESS:  Yes.  I think I have.
24          BY MR. WISNIEWSKI
25      Q    We have to get the affirmative response

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

406

1   for the Court Reporter.
2       A    I think I have.
3       Q    And what is this for.  What does these
4   minutes reflect?
5       A    No.  A meeting of the Board of Directors
6   of Apollo as of August 27th with Bob Linares being
7   the sole member.
8       Q    And under the heading of "The sale of
9   Assets", it says, "Ed Adams advised the Board that a
10  sale of the Corporation's assets of Scio Diamond for
11  $2 million over a two-year period plus shares issued
12  to former shareholders of the Corporation qualify
13  for such issuance was now possible and could be
14  undertaken."
15          Do you see that?
16      A    I do.
17      Q    And what role were you advising the Apollo
18  Diamond Board?
19      A    I assume in the capacity as a lawyer.
20      Q    As a lawyer you are advising the Board
21  here, yes?
22      A    Yeah.
23      Q    And that's as your capacity here, your
24  capacity as outside counsel for the Board?
25      A    Yes.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000502

407

1    Q    And the meeting minutes are signed by you?
2    Is that your signature there?
3    A    Yeah.
4         MR. SHANK:  Yes.
5         THE WITNESS:  Yes.
6         BY MR. WISNIEWSKI
7    Q    And you signed as Secretary of the
8    meeting?
9    A    Yep.  Yes.
10   Q    And that's different than being a
11   Corporate Secretary, is that right?
12   A    It is.
13   Q    So you were just there -- you were the
14   person who was recording the minutes essentially?
15   A    Correct.
16        BY MR. SHANK
17   Q    Who was Apollo Diamond's Corporate
18   Secretary at the time of this meeting?
19   A    I assume Bob was in all those capacities.
20   I don't remember.
21   Q    Is the shares issued to former
22   shareholders of the Corporation who qualify for such
23   issuance, that in reference to the Apollo Diamond
24   shareholders right to purchase shares in public
25   Scio?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

409

1    March 2011 proxy that was issued to Apollo Diamond
2    shareholders?
3    A    Right.
4    Q    And that proxy discussed a transaction
5    between Apollo Diamond and private Scio?
6    A    Yes.
7    Q    So it's a different entity than public
8    Scio?
9    A    Right.
10   Q    And the shareholders of Apollo Diamond in
11   2011 approved the Asset Purchase Agreement between
12   Apollo Diamond and private Scio?
13   A    Right.  I mean Bob and Brian could have
14   always approved everything, but the other
15   shareholders who constituted a minority
16   overwhelmingly approved it too.
17   Q    And they didn't approve a transaction with
18   a public company?
19   A    Well, they weren't shareholders to approve
20   it.
21   Q    But in 2011, March of 2011, the
22   shareholders of Apollo Diamond did not approve
23   Apollo Diamond Incorporated into entering into an
24   Asset Purchase Agreement with a public entity?
25   A    It wasn't contemplated at that time.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

408

1    A    Correct.  I believe.  That's what I
2    interpret that to mean.
3    Q    Did you understand that right to purchase
4    shares in public Scio to be part of the deal between
5    public Scio and Apollo Diamond?
6    A    Yes.  It was part of the deal.
7         BY MR. WISNIEWSKI
8    Q    The August 31, 2011 Asset Purchase
9    Agreement between public Scio and Apollo Diamond,
10   did Apollo Diamond shareholders approve that Asset
11   Purchase Agreement?
12   A    Well, the only Apollo Diamond shareholders
13   I think at this point would have been Bob and Brian.
14   I believe they must have.
15   Q    How about Apollo Diamond shareholders that
16   had to redeem their shares prior to this Asset
17   Purchase Agreement?  Were they informed or notified
18   that Apollo Diamond was entered into an Asset
19   Purchase Agreement with public Scio?
20   A    Well, they received an earlier draft of
21   this document, if I remember right in the proxy.  I
22   don't know how you would inform non-shareholders of
23   something that wasn't their right to dispute as a
24   non-shareholder.
25   Q    The proxy that you are referring to is the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

410

1    Q    Did Apollo Diamond, as of August 31, 2011,
2    did Apollo Diamond consider notifying the
3    shareholders, former shareholders.  That was now
4    entered into an agreement with the public company?
5         MR. KOPECKY:  Objection.  Foundation.
6         THE WITNESS:  I don't know what Bob
7    considered.
8         MR. SIKORA:  And again for clarify, let's
9    talk about what's been approved.  Are we talking about
10   approval -- this is approval of a structure which
11   ultimately was a structure that came to pass, right,
12   which they could get a penny a share for full purchase
13   into the new entity, whatever that was.
14        THE WITNESS:  Only in a public which had
15   liquidity versus a private company.
16        MR. SIKORA:  Right.  I think we need to be
17   precise to what was approving at the time.  It was a
18   time when events were unfolding in a certain way.  This
19   structure came to pass.
20        BY MR. SHANK
21   Q    Let me back up a second.  What was your
22   understanding as to what shareholders were approving
23   in March of 2011 in connection with the proxy vote?
24   A    They were voting for an asset sale of
25   Apollo's assets to a third entity, Scio.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000503

411

```
 1        Q     Private Scio?
 2        A     Well, it was private at the time.  They
 3   didn't specifically -- you know, it didn't say it
 4   was going to be a private company forever.  It
 5   didn't say it would ever be a public company.  It
 6   didn't say it would be a public company.  They were
 7   just voting on the sale of the assets.
 8        Q     To Scio Diamond Technology Incorporated.
 9   That was the agreement, right?
10        A     At that moment that is what was
11   contemplated.
12        Q     And what were the terms under which that
13   transaction would occur as approved by the
14   shareholders?
15        A     The term was -- so could you be more
16   specific?
17        Q     Sure.  For example, what was Apollo
18   Diamond -- what was Apollo Diamond shareholders
19   getting in exchange for surrendering the assets of
20   Apollo Diamond?
21        A     They were getting the opportunity to
22   invest in this new entity at a penny a share.  That
23   was what was contemplated.
24        MR. KOPECKY:  I don't think that was
25   surrendering.  I think that mischaracterizes the proxy.
```

412

```
 1   If you want to talk about the proxy, why don't we talk
 2   about what the proxy says, which we covered in depth at
 3   the last testimony?
 4        MR. SHANK:  I'm trying to be clear for the
 5   record based on John's comment that we are all talking
 6   about the same thing as what he understood the
 7   shareholders were approving.
 8        THE WITNESS:  I guess I can't testify to what
 9   the shareholders understood they were approving.  It
10   was not contemplated at the time that that would be a
11   public company.  That was, I believe, positive
12   development because they had liquidity.  So I think
13   they were better off.
14        BY MR. SHANK:
15        Q     And as part of that structure, was it your
16   understanding that the deal would include the
17   shareholders would own at least the same amount of
18   ownership interest in the new company as they did in
19   the old one?
20        MR. KOPECKY:  I think that misstates the
21   proxy, so I object.  The proxy, get it out.  This is
22   useless.  The proxy says something different than what
23   you guys said.
24        THE WITNESS:  On a fully diluted basis my
25   understanding, which includes options and warrants, the
```

413

```
 1   shareholders would own shares equal to what they owned,
 2   assuming they participated.
 3        MR. KOPECKY:  They didn't have to participate
 4   in both halves either.
 5        THE WITNESS:  Right.
 6        BY MR. SHANK
 7        Q     You tailed off there.  I'm sorry.
 8        A     I'm sorry.  So if they owned 10,000 shares
 9   in Apollo, they would have the right to acquire
10   10,000 shares in Scio.  And on a fully diluted
11   basis, which came to pass in a much more favorable
12   way than we even thought, it went from 80 --
13   90 million shares in the combined entities to 50
14   million in Scio.  So they ended up improving their
15   position basically by double.  So that was what I
16   always understood as the objective.  And on the
17   advice of Paul Hastings, we structured it in a way
18   that would get them, we believed, a tax loss.
19        BY MR. WISNIEWSKI
20        Q     Did public Scio pay Apollo Diamond the
21   full $2 million purchase price?
22        A     I think so.
23        Q     And when?  Was it over a period of time?
24        A     I think so.
25        Q     Did Apollo Diamond direct Apollo -- to pay
```

414

```
 1   any third parties directly?  The $2 million purchase
 2   price, did Apollo Diamond ever public Scio to pay a
 3   third party on it's behalf?
 4        A     I think they did.  I don't remember who.
 5   I think it was maybe our firm, meaning Adams
 6   Monahan.
 7        Q     Adams Monahan.
 8        A     Yeah.
 9        Q     So you think --
10        A     I think.  I don't remember.
11        Q     You think possibly public Scio could have
12   paid Adams Monahan directly a part of that
13   $2 million purchase price?
14        A     Probably.  Maybe.
15        Q     How was it determined how the $2 million
16   Apollo Diamond received would be distributed?
17        A     My father in-law.
18        Q     So Robert Linares made that decision?
19        A     Uh-huh.
20        MR. SHANK:  Is that a yes?
21        THE WITNESS:  Yes.
22        BY MR. WISNIEWSKI
23        Q     And when did Robert Linares do that?
24        A     I think he and I spoke about it in a
25   period from 2011 to 2012, I guess.  I don't remember
```

DSM-000504

415

1   the time frame.
2       BY MR. SHANK
3       Q    Had it been determined how the $2 million
4   would be divided up prior to the entry of the Asset
5   Purchase Agreement or did that occur afterwards?
6       A    Bob had understanding -- he was sort of
7   the only person -- my recollection is that Bob was
8   the only person sort of involved in Apollo circa
9   early 2011.  He was kind of wearing all these hats.
10  And he compiled and shared with me orally I remember
11  a list of creditors that he knew of.  But he said, I
12  don't know all the creditors, because we're trying
13  to -- I'm trying my best given what I have here.  So
14  I have an idea this could be significantly off.  But
15  I think these are creditors who have sent either
16  communications or something that he had been picking
17  up.  And I said okay, we'll work with -- the best we
18  can.  I'll get on the phone and call people and I'll
19  take care of, if you want me to, I'll try to
20  negotiate and pay them to the extent we can and go
21  from there.
22           So I think I looked at the lease at that
23  point, tried to figure out what "we", meaning Apollo,
24  at this point owed the landlord.  There were a couple
25  of leases.  And then there was -- then there were

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

416

1   issues regarding former employees, if I remember, and
2   Bob tried the best he could.
3       BY MR. WISNIEWSKI
4       Q    I'm going to hand you a document that was
5   previously marked as Commission Exhibit 48.  It is a
6   two-page document.  SEC-ADAMS 33076 through 33077.
7   We spoke about this the last time, but is this a
8   list -- well let me ask.
9            Have you seen this document before?
10      A    Yes, the last time.
11      Q    And what's your understanding of what this
12  document is?
13      A    Liabilities, potential liabilities.  I
14  don't know if these are liabilities that Bob spoke
15  to the parties about reducing them.  I don't
16  remember.  These are potential or known actual
17  liabilities apart from inside parties.  So except us
18  they are -- these are obligations that are owed to
19  third parties and some owed to RCL BRL and ESA
20  independent of our employment agreements and that
21  sort of thing.  These were, I think, expenses that
22  we were owed or something.  I don't remember.
23      Q    Do you know who drafted this document?
24      A    I don't.
25      Q    Do you know if this document reflects how

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

417

1   the $2 million purchase price is going to be
2   distributed?
3       A    I think it reflects what was known about
4   creditors at that point.  I mean whenever it was
5   drafted.
6       Q    So looking at this document now, you can't
7   say, yeah, you know, I have seen this before and
8   this is how -- this is my understanding that this is
9   how the money was going to be distributed by Apollo
10  Diamond?
11      A    Well, I have seen it before as we talked
12  about.  Yeah, yeah.
13      Q    I mean before your last testimony, while
14  you were working for Apollo Diamond or --
15      A    Yes.  I don't know why there is two of
16  them.  I don't remember why that came to pass.  Why
17  the numbers are different.  So I don't remember.
18      Q    Did Robert Linares or ever tell you or
19  indicate to you that he had some list of how he was
20  going to distribute the $2 million purchase price?
21      A    I think he told me.  I have a list that I
22  compiled as vendors and others that are owed money.
23      Q    But you don't know if this Exhibit,
24  Commission Exhibit 48 is that list that Robert
25  referred to?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

418

1       A    I don't.  He sent me a bunch of bills,
2   literally a stack that is 700 pages tall.  I don't
3   remember.  I don't remember what happened after that
4   to it.
5       Q    The money that Apollo Diamond received
6   from public Scio as part of this Asset Purchase
7   Agreement, what account did that money go into?
8       A    In an account at Venture Bank, I think.
9       Q    Apollo -- and the other account that
10  Apollo diamond had at Venture Bank?
11      A    Yes.
12      Q    And what was that account -- I guess --
13  who was the signatory on that account?
14      A    I think it was me.
15      Q    Anyone else?
16      A    I don't remember.
17      BY MR. SHANK
18      Q    Going back one minute to the $2 million in
19  liability and how the purchase price would be
20  divided up.  Was there any discussion at the
21  shareholder meeting where the Asset Purchase
22  Agreement was executed as to how the $2 million
23  would be divided up?
24      MR. KOPECKY:  Okay.  There was no shareholder
25  meeting where an Asset Purchase Agreement was executed.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

419

1   Right.
2       MR. SHANK:  Sorry.  Maybe I'm incorrect.  Let
3   me back up a second.
4       BY MR. SHANK
5   Q   I believe the last time you testified
6   there was a meeting with shareholders where you had
7   a Power Point that you either presented or discussed
8   off of in discussing the Asset Purchase Agreement,
9   correct?
10  A   That's what I remember.
11  Q   And so at that meeting was there any
12  discussion about how the $2 million in the purchase
13  price would be allocated?
14  A   I believe so.
15  Q   Do you remember what was discussed?
16  A   I'm sure I went off the Power point.  I
17  don't remember other than that.
18  Q   Do you know who was the one discussing how
19  the $2 million would be used?
20  A   It was either Bob or I.  I don't remember
21  who.
22  Q   You can't recall what was told to the
23  shareholders about how the purchase price would be
24  used?
25  A   If somebody asked a question, there was no

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

420

1   reason we wouldn't have told them to the best of our
2   ability what the answer was.
3       Q   I'm just asking what you remember about
4   what was discussed at that meeting about how the
5   $2 million would be used?
6   A   I don't.
7       BY MR. WISNIEWSKI
8   Q   Who attended that shareholder meeting?
9   A   Bob and I and shareholders.  I don't
10  remember who.
11  Q   Do you know how many shareholders?
12  A   Twenty-five or 30, maybe.
13  Q   Do you remember any one specific name that
14  attended?
15  A   I don't.
16  Q   It was around 25 or 50 people?
17  A   Twenty-five to 30 people.
18  Q   I'm sorry, 25 or 30 people?
19  A   I think.
20  Q   Was there a log in sheet that was kept?
21  A   There might have been.  There might have
22  been.
23      BY MR. SHANK
24  Q   Have you seen any such attendance sheet in
25  gathering documents --

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

421

1   A   No.  I mean -- understand that was -- I
2   mean I know you know this, but people probably
3   already voted by proxy, which meant they gave their
4   proxy to Bob, I think.  It was more of an
5   informational meeting.  They could have changed
6   their vote, I believe.  But that was kind of what
7   the purpose of the meeting was to tell people,
8   answer questions people had.
9       MR. KOPECKY:  Did you produce the Power
10  point?
11      THE WITNESS:  What do you mean did I produce
12  the Power Point?
13      MR. SIKORA:  You have the Power Point?
14      MR. WISNIEWSKI:  We have it.
15      MR. SIKORA:  What were you thinking as far as
16  lunch?
17      MR. WISNIEWSKI:  That would probably be a
18  good breaking spot.
19          (SEC Exhibit 60 was marked for
20           identification)
21      BY MR. WISNIEWSKI
22  Q   Commission Exhibit 60 is a nine-page
23  document, Bates Number SEC Linares R-P-805 through
24  813.
25  A   What does that mean?  My father in-law

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

422

1   produced it or somebody produced it?  Linares.
2   Q   It is a Bates number that's assigned to
3   it.
4   A   Oh.
5   Q   Mr. Adams, Commission Exhibit 60 purports
6   to be a Power Point, entitled "Apollo Diamond,
7   Apollo Diamond Gemstone Shareholder Meeting as of
8   April 2011."
9       Have you seen this document before?
10  A   I think so.
11  Q   And what is it?
12  A   It's a document that's prepared for a
13  shareholder meeting.
14  Q   Did you use this Power Point?  Was there a
15  shareholder meeting in April of 2011 for Apollo
16  Diamond and Apollo Diamond Gemstone shareholders?
17  A   Yes.
18  Q   Where was that meeting held?
19  A   Somewhere in Boston.
20  Q   Did you attend?
21  A   I did.
22  Q   Did Robert Linares attend?
23  A   Yes.
24  Q   Did anyone else attend on behalf of Apollo
25  Diamond or Apollo Diamond Gemstone?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

423

```
 1        A    That I don't remember.
 2        Q    Did shareholders attend?
 3        A    Yes.
 4        Q    And I think you testified earlier that it
 5   was around 25 or 30 people to the best of your
 6   recollection that attended the meeting?
 7        A    Right.
 8        Q    Did you use this shareholder -- was this
 9   Power Point distributed to shareholders at this
10   meeting?
11        A    I don't remember?
12        MR. SIKORA:  When you say "distributed", do
13   you mean physical copy or broadcast as in --
14        MR. WISNIEWSKI:  Physical copies.
15        MR. SIKORA:  There is different things.  I
16   just want to make sure --
17        BY MR. WISNIEWSKI
18        Q    Sir, were there physical copies of this
19   Power Point presentation distributed to shareholders
20   at the meeting?
21        A    I don't remember.
22        MR. SHANK:  The first page of the document
23   says in parenthesis, "Please do not remove from room."
24   Does that give you an indication as to refresh your
25   recollection as to whether this was distributed in hard
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

424

```
 1   copy to shareholders?
 2        THE WITNESS:  It might have been.  I don't
 3   know if it means it was.
 4        Q    And who prepared the Power Point?
 5        A    I don't know.
 6        BY MR. WISNIEWSKI
 7        Q    Was the Power Point projected to
 8   shareholders at the meeting?
 9        A    I remember a projector.  I do remember
10   that.
11        Q    So you don't know if this was ever -- if
12   the content of this Power Point was ever shown to
13   shareholders at the April 2011 shareholders meeting?
14        A    I presume it was, if Bob had it.  I just
15   don't know.  I can't see it in my mind on a
16   projector screen what the words were on the screen.
17   So I don't want to say that I know for sure.  I
18   don't remember.
19        MR. SHANK:  To the best of your recollection,
20   was the Power Point shown to shareholders in either
21   hard copy or projection or both?
22        THE WITNESS:  I know I spoke off of notes
23   that were from something like this.  I don't remember.
24   Then was it distributed to people?  Was it shown?  We
25   definitely showed something.  I don't remember what.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

425

```
 1   It was partly this or something else, you know, like --
 2   could we have gone on the internet?  I don't remember.
 3        BY MR. WISNIEWSKI
 4        Q    Other than this Power Point presentation,
 5   what else was prepared and shown to investors as
 6   part of that April 11, 2011 meeting?
 7        A    A proxy in March of 2011 that you spoke
 8   about.
 9        Q    So that was provided to shareholders at
10   the meeting?
11        A    No.  I'm sorry.  No, that would have been.
12   That would have been sent to them prior to the
13   meeting.  I don't know that there was -- I don't
14   know what else would have been at the meeting.  I
15   don't remember.  It's possible there were other
16   documents.  I don't remember.  I know there was a
17   lot of conversations with shareholders up to that
18   meeting.  But I don't know if there were documents
19   provided like this or other documents provided.  I
20   don't remember.
21        Q    Did the shareholders who attended the
22   meeting, did they ask questions?
23        A    Yes.
24        Q    What questions did they ask?
25        A    Questions about the structure of the
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

426

```
 1   company.
 2        Q    When you say "the company", what company
 3   are you referring to?
 4        A    Scio.
 5        Q    Private Scio?
 6        A    Private Scio.  What was Lancia's role.  I
 7   remember there was a huge number of questions about
 8   who this Lancia guy is, you know, is he going to be
 9   able to deliver around what -- he incorporated a
10   letter and the proxy that he had written to the
11   shareholders of Apollo and Apollo Diamond Gemstone.
12   And there was a lot of questions about who Lancia
13   was.  And, you know, whether we were confident he
14   would be successful.
15        There was some questions about the tax
16   consequences.  I remember we got into some discussion
17   about the Wash Sale Rules, which I'm certainly no
18   expert -- the Wash Sale Rules which I'm no expert on.
19   I kind of just remember that because it stood out that
20   you can't give you tax advice.  You know, there was a
21   lot of talk about what had happened with Deustche Bank
22   and Ambrian, which is an investment bank in London.
23   Were there other likely investment banks of that
24   caliber which would be helpful in the future, if I
25   remember right.  This one talks about Kiffany.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000507

427

1      Q    How about your role at private Scio.  Was
2  there any question about what your role would be at
3  private Scio?
4      A    I think I said that my role would be.
5  That I was Chairman and that I would, you know,
6  shares -- I would do my best, at least temporarily
7  to move the company forward with Lancia being the
8  CEO.
9      Q    How about Robert Linares?  Was there any
10  questions about what role Robert Linares would play
11  in private Scio?
12      A    There probably would have been.  I don't
13  remember specifically.  I can imagine there would be
14  because he's the tech guy.  So I'm sure people took
15  great comfort in the fact that he promised to be
16  involved if Joe wanted him.
17      Q    How about questions regarding Mike
18  Monahan's role at private Scio?  Was there any
19  questions about what role Mike Monahan would play at
20  private Scio?
21      A    I don't remember that.
22      Q    What other questions can you recall that
23  were asked by shareholders at this meeting?
24      A    I think one question -- I think there was
25  a question of how confident is the -- are you

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

428

1  meaning Bob and I in this context, that you'll be
2  successful in moving this and getting this done and
3  getting the company to move forward.  And I think I
4  probably answered, you know, we're hopeful, but, you
5  know, capital markets aren't great and let's see
6  what the best we can do.  And there may be some
7  twists and turns, you know, between now and
8  whatever ends up happening.
9      Q    Were there any questions how these
10  shareholders would obtain shares in the new company?
11      A    At this time if I remember correctly, what
12  had been contemplated was giving people a warrant in
13  the new company.  And that ultimately changed
14  because somebody -- and Nelson Mullins, I think,
15  asked -- or maybe it was me or Monahan.  I don't
16  know, or Lancia, or somebody asked the question,
17  well, why would we -- that's just an unnecessary
18  step.  If you give somebody a warrant, then they
19  have to exercise it and they are going to lose it,
20  or they are not going to remember they have it.  So
21  why don't you just give them shares at a penny
22  versus the warrant at a penny.  So it kind of
23  morphed from a warrant which again I think is a
24  positive for the shareholders to do shares at a
25  penny.  So I think the questions to the extent that

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

429

1  there were questions about warrants.
2      Q    Were there questions about how these --
3  did the shareholders ask any questions about how
4  they would acquire these warrants in the new
5  company?
6      A    I don't remember that specifically.  I
7  know there were questions I feel that from people
8  who would call in telephonically and ask me that.
9      Q    Did anyone ask whether there was an actual
10  written agreement between private Scio and Apollo
11  Diamond that gave shareholders these warrants?
12      A    I don't remember that.
13          MR. WISNIEWSKI:  Let's go off the record at
14  noon.
15          (Whereupon, a luncheon recess was taken.)
16          A F T E R N O O N  S E S S I O N
17          MR. WISNIEWSKI:  We're back on the record at
18  1:09 p.m.
19  BY MR. WISNIEWSKI
20      Q    Mr. Adams, while we broke for lunch, did
21  you and I have any conversations during the break?
22      A    No.
23      Q    Before the break, we were looking at
24  Commission Exhibit 60 and can you pull that out
25  really quick.  Just one more --

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

430

1          MR. KOPECKY:  Which one?
2          BY MR. WISNIEWSKI
3      Q    Can you turn to Bates Number SEC-LINARES
4  P8107?
5      A    Uh-huh.
6      Q    And the head of this page is "Proposed
7  Transaction."  And there is three bullet points is
8  "Objective:  Scio and liability."  Do you see that?
9      A    Yes.
10      Q    And you are unclear whether or not this
11  Power Point was distributed to the shareholders at
12  that meeting, is that correct?
13      A    I'm not sure if it was distributed.
14      Q    And do you know whether or not you used
15  this Power Point -- just to confirm, was this Power
16  Point projected or somehow shown to the shareholders
17  at this meeting?
18      A    I don't remember.
19      Q    Going to the third bullet point near
20  liabilities, the liability states "secure debt,
21  accrued salaries, unsecured creditors, and including
22  (landlord, legal), transaction fees and shareholder
23  repurchased."  Do you see that?
24      A    Uh-huh.  Yes.
25      Q    And what are those liabilities?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

431

```
 1      A    What are they specifically?
 2      Q    Are those Apollo Diamond's liabilities?
 3      A    Yes.
 4      Q    And so these say what Apollo Diamond's
 5 liabilities are at the time of purchase?
 6      A    The Apollo Diamond and Apollo Diamond
 7 Gemstone.
 8      Q    Oh, both?
 9      A    That would be.  Because it is a joint
10 meeting.  So both.
11      Q    And did any shareholders at the meeting
12 ask about what liabilities Apollo Diamond had at the
13 time of the Asset Purchase Agreement?
14      A    I don't remember.
15      Q    What about Apollo Diamond Gemstone
16 Corporation?
17      A    I don't remember.
18      Q    As you look at this Power Point, is it
19 your understanding that those are in fact the
20 liabilities that existed at the time of the
21 April 2011 shareholder meeting for Apollo Diamond
22 and Apollo Diamond Gemstone?
23      A    Well, it doesn't identify who, I guess
24 other than landlord/legal.  You say -- I'm not sure
25 I understand the question.  I'm sorry.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

433

```
 1 Apollo --
 2      A    I don't remember specifically that
 3 discussion.
 4      Q    Was there any discussion at that
 5 shareholder meeting about the amounts of the
 6 purchase proceeds that would be going to the
 7 Linareses and yourself?
 8      A    I think there was a discussion about the
 9 Adams Monahan law firm and the debts were owed,
10 because it was in the letter that Bob sent that
11 people had foregone contractual obligations and that
12 sort of thing.  I think that was one of the -- I
13 don't remember if the question came up in the
14 shareholder meeting or it came up in conversations
15 that I had telephonically with people, because we
16 were named as the proxy solicitors, meaning the
17 Adams Monahan law firm.  So people called.  So I
18 don't remember the context of when those
19 conversations took place.  But I know people asked
20 questions and we told them what we knew at the time.
21      Q    Other than Adams Monahan LLP, did anyone
22 ask any questions about any other particular vendor,
23 salary or any other questions about who specifically
24 would be getting the distributions from the purchase
25 price, of the $2 million purchase price?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

432

```
 1      Q    Are there any other liabilities other than
 2 these listed here that you are aware of in April of
 3 2011 that --
 4      A    Probably contingent stuff.  Probably
 5 should have had another category that said
 6 "contingent".
 7      Q    What do you mean by "contingent stuff"?
 8      A    People who may bring a suit, may, you
 9 know, have a claim that we didn't even understand,
10 or Bob and I didn't understand at the time.  Because
11 again it was very -- I think the understanding of
12 what the liabilities were, were fairly vague.  I
13 mean trying to be as concrete as possible, but this
14 isn't a great example, but it is an example.  I mean
15 was there -- the Environmental Protection Agency,
16 were they going to come forward and say, you know,
17 you were doing X, Y and Z, or is some former
18 employee going to say you should have been doing X,
19 Y and Z.  I didn't get paid a certain amount, but I
20 was owed.  So I mean there was all that stuff, but
21 there was no way to quantify.  And I'm not sure Bob
22 had a complete grasp necessarily on all the vendors.
23           BY MR. SHANK:
24      Q    What if any discussion was at this
25 shareholder meeting without the liabilities of the
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

434

```
 1      A    Again I don't remember specifically
 2 whether it was at the meeting or some other context.
 3 I remember that I would tell people, you know, we're
 4 secured creditors, meaning "we", meaning Bob, Brian
 5 and I are secured creditors and there's a bunch of
 6 money that's owed as a result of that, both salaries
 7 and other monies that are owed as a result of that.
 8      Q    And did they ask how much money was part
 9 of that?
10      A    I don't remember that.
11           MR. SHANK:  Did you ever quantify that prior
12 to the purchase going into effect, the amount that
13 would be paid out to Adams Monahan, yourself and the
14 Linareses?
15           THE WITNESS:  Well, I had a list of monies
16 that I know that I was owed and maybe Bob and Brian and
17 even maybe Michael were owed based on our employment
18 agreements and monies and expenses and that sort of
19 thing.  I had maintained a private list.  I know Bob
20 had some stuff he sent me at one point that was sort of
21 background for how the money he had advanced the
22 company, but I don't have it, but he sent me that.  So
23 we knew it was millions of dollars.  That was, you
24 know, a given.  And we knew that there was no way that
25 we could raise millions of dollars.  No way Scio could
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000509

435

1  raise millions of dollars to pay off all that debt.
2  That was part of the reason that, you know, the
3  transaction was structured like this with a cap.  So it
4  wasn't going to be a situation.
5          BY MR. WISNIEWSKI
6      Q   Did anyone ask you directly how much money
7  you were going to take home of the $2 million
8  purchase?
9      A   No, that I don't remember.
10     Q   How about Linares, did anyone ask you
11 directly how much Robert Linares was going to take
12 home?
13     A   I don't remember.
14     Q   How about Brian Linares?
15     A   Again, I don't remember.
16         MR. SHANK:  Do you remember ever telling
17 anybody how much you would be taking home or the
18 Linareses would be taking home regardless of whether
19 they asked or not?
20         THE WITNESS:  No, I don't.
21         BY MR. WISNIEWSKI
22     Q   In April of 2011, did you know how much of
23 the $2 million purchase price you were going to take
24 home?
25     A   Well, first of all, you have to presume

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

437

1  The money had to be raised.  All these things had to
2  be accomplished.  None of them were in April yet.
3      Q   So in April 2011 you did not know how much
4  of a negotiated purchase price, which was $2 million
5  at that time, was going to go to you directly?
6      A   I was not sure.  I knew that Adams and
7  Monahan had agreed to accept $515,000, I think.  But
8  I wasn't sure about other amounts.
9      Q   How about in August 2011 when the purchase
10 agreement, Asset Purchase Agreement between public
11 Scio and Apollo Diamond occurred, did you know how
12 much of the $2 million you were going to take home?
13     A   I don't think I did even then, no.
14     Q   Did anyone at Apollo know how much or who
15 was going to be paid what out of the $2 million?
16     A   The money hadn't been raised.  It was
17 starting to be, I think, if I remember correctly, in
18 August.
19     Q   So no one at Apollo knew when they were
20 going to start receiving this money back from public
21 Scio?  No one at Apollo knew how that money was
22 going to be distributed?
23     A   Well, I think there were creditors that
24 were going to be paid.  The objective was to pay
25 every third party creditor in full.  That was the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

436

1  that there was going to be money raised to actually
2  do it.  So if the company had raised a million
3  dollars, as we talked about this possibility,
4  Lancia, myself, Bob, that would have changed
5  everything.  So there was never -- no, there was no
6  way to know, because it depended on contingent
7  liabilities.  It depended on negotiating with the
8  creditors.  It depended on how the amount of money
9  that was raised.  It depended on -- look, if
10 somebody else had come forward -- we talked about if
11 Lancia had brought somebody forward or some of the
12 other people who claimed that they were going to
13 have an investors come forward and that investor had
14 said, you know, I'm interested in putting
15 $10 million in, but these are the terms, that would
16 have had to have been in a conversation.  So there
17 was -- maybe that would have gotten done.  Meaning
18 if that conversation had been, you know, no one is
19 going to get paid anything, then I guess that would
20 have been the possibility it would have been
21 contemplated seriously.
22         So it was extremely -- you know, remember,
23 this isn't flux.  I mean we're looking at this now in
24 the context of what we know happened, sort of.  But I
25 mean, this was an idea that had to be effectuated.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

438

1  objective, with the exception of us, as a law firm,
2  meaning Adams Monahan.  I think we accomplished
3  that, at least everyone that we knew of or I was
4  apprized of and that sort of thing.  No, I don't --
5  I don't think it's possible that everyone knew what
6  was going to happen in August.  I just don't think
7  we knew that exactly.
8      Q   So -- but what ultimately happened you're
9  saying is that all the creditors of Apollo Diamond
10 were paid?
11     A   My understanding is based on what I knew
12 about the creditors of Apollo was provided to me by
13 Bob was that the creditors got paid.  I mean I
14 negotiated something with the landlord at some
15 point.  I don't remember what the comment was, but
16 we had reached an agreement on that earlier or
17 later.  I don't remember.
18     Q   So Apollo Diamond's landlord?
19     A   Right.
20     Q   The Commonwealth of Massachusetts?
21     A   Massachusetts.
22     Q   Who else?
23     A   I don't remember.
24     Q   Were you a creditor?
25     A   Oh, for sure.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

439

```
1        Q    And how much were you owed as of August
2    2011?
3        A    I need to get my handwritten notes.
4    Millions of dollars.  I don't remember.
5        Q    So you kept a handwritten note or
6    handwritten ledger of how much you were owed by
7    Apollo Diamond?
8        A    Right.
9        Q    And how much did you ultimately receive
10   from Apollo Diamond in satisfaction of --
11       A    I don't remember.
12       Q    Who negotiated whatever amount that you
13   ultimately received?
14       A    Bob and I.
15       Q    You and Bob sat down?
16       A    Well, I think it was sort of like we had
17   to pay -- again, this commitment to pay everybody to
18   the best of our knowledge who was a third party and
19   then figure out, okay, there is always monies owed
20   Bob and Brian and myself and the law firm, meaning
21   Adams Monahan, okay.  And there was a need which
22   kind of got recognized late, a minute late, that wow
23   there is a bunch of other people that could come out
24   of the woodwork and create a problem.  Somebody has
25   got to be responsible for that potentially.  So I
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

441

```
1        Q    Explain to me how he ultimately got to
2    amount time that you got?
3        A    I don't know that I could do that, because
4    I don't remember precisely how we got to the amount.
5    I know that there was -- we talked about the fact
6    that Bob and Brian were owed millions of dollars in
7    salaries, as was I.  At one point I can remember
8    looking at the Employment Agreement and reading
9    them.  I don't remember -- I don't remember
10   specifically talking to him about what they said,
11   but I'm sure I read them, because I can of remember
12   doing that, you know.  And then having a
13   conversation about -- I am worried about somebody
14   who brings a lawsuit later potentially because
15   people can sue pretty much for everything and
16   anything.  And said we need to be cognizant of that
17   possibility.  I remember talking about not winding
18   the company down for a period of four or five years.
19   That's kind of what I remember.  I just remember
20   talking about it because it was a biggy issue.  It
21   was a lot of money owed a lot of people.  Meaning
22   when I say that, I mean my law firm, Adams Monahan,
23   Bob, Brian, me, and obviously all the other people
24   that got paid.
25       Q    So did you say, "Bob, I'll accept X"?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

440

```
1    took on that responsibility.
2        Q    So you sat down with Robert Linares and
3    worked out how much Apollo Diamond would pay you in
4    exchange for all the liabilities that it had --
5        A    Well, you mean sat down.  I don't know if
6    I did it over the phone or sat down in a formal
7    meeting, but we talked about it at length.
8        Q    And when was that?
9        A    That I don't remember.
10       Q    How many conversations did you have?
11       A    I don't remember.
12       Q    Walk me through generally how the
13   conversations were or how the discussions went
14   between you and Bob?
15       A    I really don't remember the details.
16       Q    Did you present him with the total amount
17   of liabilities that were outstanding to you?
18       A    I think he was conversant in the
19   liabilities outstanding to me and himself and Brian
20   and Michael.  I'm sure he was.  I don't remember how
21   he was, if I told him that or he did his own
22   analysis at some point.  I knew he knew there was
23   millions of dollars he was owed because he had not
24   been paid money as a salary for a considerable
25   period of time.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

442

```
1    I'll accept a defined amount of money?
2        A    I think at one point that's what we
3    structured, where I would -- and then I think we
4    actually went back and talked about it again later
5    and we agreed.  I remember conversations after that
6    where we said all that wasn't right, because you got
7    stuck with too much, meaning he got stuck with too
8    much of the liabilities, but I don't remember.
9        Q    You are owed millions of dollars in
10   accrued salaries, haven't been paid, outstanding
11   warrants, work you've done for Apollo Diamond?
12       A    Yeah.
13       Q    Did you ultimately say, okay, taken all
14   those liabilities and everything that the company
15   owes me, "I'll accept x"?
16       A    I think I said "I'll accept x", but then
17   we went back and revisited it, because it didn't
18   seem right when we talked about it.
19       Q    So did it go down or did it go up?
20       A    I don't remember.  I think it might have
21   gone up.  I don't remember.  I remember the thing
22   that -- I remember I felt like I was in this funny
23   place.  I'm negotiating against myself, because I'm
24   owed all this money.  I don't want to be unfair and
25   take -- so my father and brother-in-law.  They are
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

443

1　my father and brother-in-law, right.  So I'm not
2　negotiating with some third party where, you know,
3　gee, I feel good because I won against my father and
4　brother-in-law.  They are my father and
5　brother-in-law.  And, you know, they had run the
6　company and they had been responsible for much of
7　its success for sure.  I mean the company doesn't
8　exist without my father-in-law.  You know, and I
9　have a wife that I ultimately have to answer to.  I
10　don't know about your situation.
11　　　　So I remember that being part of the whole
12　thing where it was like I feel this is like crazy.
13　I'm trying to do the right thing for you too Bob and,
14　you know, I'm going to take a haircut that's
15　significant and I'm going to take on these
16　liabilities, but what about your hands going up saying
17　I'm willing to do that?
18　　　Q　Was there -- did you document in any
19　fashion the amount that you were going to accept
20　from Apollo Diamond?
21　　　A　I think at one point we did.
22　　　Q　And how was that documented?
23　　　A　In an agreement I think between the
24　company and me.
25　　　Q　You drew up a formal agreement between you

444

1　and the company?
2　　　A　Right.  I think it might have changed
3　because I remember doing it and then we talked later
4　about it.  And I think I said, you know, there is a
5　bunch of worms here, Bob, that I didn't really
6　anticipate.  So I don't remember how that all got
7　resolved ultimately.
8　　　Q　Did you draft that document?
9　　　A　Probably.  I don't remember.
10　　　Q　Do you remember if you kept it?
11　　　A　I presume I did, but I don't remember.
12　　　Q　Do you know if you produced that in
13　response to the subpoenas that were issued to you?
14　　　A　Yes.  If it was responsive.
15　　　MR. SIKORA:  Can we go off the record to
16　clarify something.
17　　　MR. WISNIEWSKI:  Off the record at 1:27.
18　　　　　(Brief recess.)
19　　　MR. WISNIEWSKI:  Let's go on the record at
20　1:35 p.m.
21　　　BY MR. WISNIEWSKI:
22　　　Q　So, Mr. Adams, going back to our
23　conversation or getting back to our conversation
24　about discussions you had with Robert Linares about
25　how much of the purchase, the $2 million purchase

445

1　price that Apollo Diamond received from public Scio
2　would be distributed to you?
3　　　A　Yes.
4　　　Q　And you had said that you had spoke to Mr.
5　Linares about the amount that would be distributed
6　to you from that purchase price, is that correct?
7　　　A　Yeah.  I think we had conversations about
8　it.
9　　　Q　Okay.
10　　　　And one of my questions to you was,
11　was there some type of agreement between you and
12　Mr. Linares or Apollo, right, about how much you
13　would receive from that $2 million purchase price?
14　　　A　Well, there was a document that was the
15　one I think we were just talking about off the
16　record of $300,000.  That's the only thing I
17　remember.
18　　　Q　Okay.
19　　　A　And then I remember we had conversations
20　because I ended up spending a lot more than
21　$300,000.
22　　　Q　Okay.  Well, let me pull that document out
23　then.
24　　　A　It might have been more if that is the one
25　that I remember.

446

1　　　　(SEC Exhibit 61 was marked
2　　　　　for identification)
3　　　BY MR. WISNIEWSKI
4　　　Q　Mr. Adams I'm going to hand you a one page
5　document that's Bates numbered SEC Linares R-P-913.
6　That has been marked as Commission Exhibit 61.
7　Commission Exhibit 61 at the top states it's an
8　agreement by and between Apollo Diamond Incorporated
9　and Edward S. Adams dated January 2, 2012.
10　　　　Do you see that?
11　　　A　Yes.
12　　　Q　Is this the document that you are
13　referring to?
14　　　A　This is the document I had in mind, you
15　know, that maybe it would have been more, but this
16　is one.
17　　　Q　And what is this document?
18　　　A　It is an agreement between Apollo Diamond
19　and me.
20　　　Q　And what's the agreement for?
21　　　A　I'm essentially agreeing to serve as an
22　advisor and accept liabilities of the company up to
23　the amount of $300,000, which I exceeded.
24　　　Q　And this document is dated January 2,
25　2012, correct?

447

1   A    It appears to be, yes.

2   Q    The Asset Purchase Agreement between Scio,

3   public Scio and Apollo Diamond was in August 2011,

4   is that correct?

5   A    Yes.

6   Q    So at any time prior to January 2, 2012,

7   was there any type of written agreement between you

8   and Apollo Diamond regarding how much of the

9   $2 million purchase price would be distributed to

10  you?

11  A    I'm sure we had conversations, Bob and I,

12  and some of it might have been paid to me.  Then we

13  memorialized it.  And this, I don't remember.

14  Q    Other than this agreement, was there any

15  other written agreements between you and Apollo

16  Diamond regarding how much of the $2 million

17  purchase price would be distributed to you?

18  A    There was an agreement between Bob and

19  myself about the $400,000 that was a loan.  And then

20  there was money owed me from advances that I had

21  made for the landlord and Commonwealth that Bob said

22  I should get paid and I think I was.

23  Q    Was there a written agreement between you

24  and Apollo to be paid -- to be reimbursed those

25  amounts?

449

1   Q    Did you have -- did you receive payments

2   other than this money of $300,000?

3   A    I believe I did, yes.

4   Q    In what amounts and when?

5   A    That I don't remember.

6   Q    Do you remember for what?

7   A    I know a loan that I received from

8   effectively Bob and Brian because of monies owed

9   them and then I repaid them.  I think we talked

10  about this last time.

11      BY MR. WISNIEWSKI

12  Q    How much was that?

13  A    I think it was $400,000.  And then I

14  repaid in stock and money much of that.  Then I

15  think there might have been, as I said before,

16  monies for the landlord.  I'm not remembering when

17  that got done.  I paid money for the land -- Apollo

18  was evicted and I paid money to the landlord to make

19  sure that the landlord did not sell Apollo's

20  property.  That would have been all moot.  I don't

21  remember.  Then I wrote about the common law, but I

22  don't remember when those payments were made

23  exactly.  And that was about $100,000 I seem to

24  remember.

25      BY MR. SHANK

448

1   A    It might have been.  I don't remember.

2       MR. SHANK:  Now this agreement refers to

3   purchasing your equity participation of the sum of

4   $300,000.  So is that referring to your equity stake in

5   the Apollo entities?

6   A    Yes.

7       MR. KOPECKY:  I think it is defined.  It is

8   in the document itself.

9       THE WITNESS:  I guess, Apollo Diamond, yeah,

10  Inc.

11      BY MR. SHANK

12  Q    As your counsel points out it says -- it

13  is defined as "millions of warrants and/or shares in

14  the corporation"?

15  A    Okay.

16  Q    So was -- did any of this $300,000

17  constitute settlement of things such as accrued

18  salaries, loans, law firm bills, anything outside of

19  your equity ownership?

20  A    I don't remember what was contemplated

21  like that.  I don't remember specifically what we

22  were contemplating.  I remember it would be the

23  purchase of -- I would be involved as an advisor and

24  help the company and then we would purchase -- and I

25  would accept contingent liabilities up to $300,000.

450

1   Q    Were you ever paid to the accrued salaries

2   owed to you?

3   A    I don't think so.

4   Q    Were you ever paid for any money you had

5   lent to the company over the years?

6   A    I might have been paid for expenses that I

7   advanced to the company or Apollo Diamond Gemstone,

8   because there was thousands of dollars in those, if

9   I remember correctly.

10  Q    How much were you paid?

11  A    That I don't remember.

12  Q    Were you paid for Adams Monahan services

13  to Apollo either directly or indirectly?

14  A    Adams Monahan was paid.

15  Q    Do you know how much they were paid?

16  A    $515,000, I think.  Whatever you showed me

17  before.

18  Q    Do you know what the total liability owed

19  to Adams Monahan was prior to any negotiations?

20  A    It was over $1 million as of 2010.  I

21  think there was additional monies that were accrued

22  throughout 2011, which it had to have been

23  $1.4 million.

24  Q    $1.4 million?

25  A    $1.4 million.  That's my guess, based on

DSM-000513

451

1  what was owed up to 2010 and then what became owed
2  after 2011.
3       BY MR. SHANK
4       Q    You had made reference in one of your
5  answers that you paid out more than $300,000 on
6  behalf of Apollo Diamond.  Did I get that right?
7       A    Yes.
8       Q    What were those payments for?
9       A    For litigation that developed later.  I
10  mean that was one element, to settle a lawsuit that
11  Mack and Rapello brought.
12       Q    Now, were those personal litigation
13  expenses and settlements or litigation expenses on
14  behalf of Apollo?
15       A    They were named as a party, Apollo.  I
16  don't know how you would characterize them.  I think
17  you would characterize them as corporate and
18  personal obligations.
19       BY MR. WISNIEWSKI
20       Q    Did that lawsuit have to do with your
21  actions in connection as an executive or director of
22  Apollo?
23       A    A lawsuit involving Mack and Rapello?
24       Q    Yeah.
25       A    There's a context behind that.  So Mack

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

452

1  and Rapello, as you recall, are owners of -- they
2  were minority owners of Focus.  They -- my assistant
3  got a phone call.  You remember that we did not give
4  them those shares, right.  Remember that the shares
5  were reversed.  This is -- okay.  And there was a
6  dispute about that on their part.  Then what ended
7  up happening to precipitate the lawsuit was Focus
8  sued them.  And the reason Focus sued them is
9  because -- I remember this very distinctly because
10  it's so remarkable.
11       My assistant got a phone call from Bank of
12  America.  And Bank of America said, "Hey, we're just
13  confirming something about the Focus account in New
14  York City bank account."  And she came into my office
15  and said, "You know, we don't have a bank account in
16  New York City."  And I said, yeah, what are you
17  talking about?"  So we kind of followed it up.  And it
18  turned out that Mack and Rapello had basically in an
19  unauthorized manner opened a brokerage account, excuse
20  me, a bank account in the name of Focus and
21  represented that they were -- had the authority to do
22  that which was untrue.  And it deposited funds from a
23  client, investment banking client.  Not an individual.
24  It was a company, if I remember, or two companies into
25  that account that they controlled.  And that needless

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

453

1  to say created a -- that was a variety of issues that
2  resulted from that.  Ultimately, we ended up suing
3  them because of that and some other things.
4       Q    Who is "we"?
5       A    "We" in this case, Focus, if I remember
6  correctly.  And then maybe even Adams, me and
7  Monahan, because we were partners and they had not
8  contributed the capital like they were supposed to
9  under the terms of the agreement that we had with
10  them.
11       And then FINRA got involved and we had to
12  provide all the documents about what these guys had
13  done.  You know, we talked to our compliance person
14  and said wow, that's really an unusual thing to have
15  done on their part.  And so I think they took the
16  position when they sued us that the best defense was a
17  good offense.  So I think that -- I mean I think it's
18  a fact that the lawsuit that they brought came after
19  the lawsuit we had brought.
20       Q    So the lawsuit they brought against you,
21  did it have to do with your role or your position at
22  Apollo Diamond?
23       A    So this is what I don't remember.  I mean
24  it was a long time ago, but I think that they sued,
25  because of my position outside or Apollo Diamond, I

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

454

1  don't know remember if they sued Apollo and Scio.  I
2  know they sued Lancia and myself and they may have
3  sued Apollo.  But I could be getting confused,
4  because there were people who later sued Apollo.
5  And I just don't remember who sued who on this.  So
6  I need to look at the Complaint to figure that out.
7       Q    But -- and again, I don't know if I'm
8  stating this wrong, but some of the money that you
9  paid out in addition to the $300,000 was part of
10  that lawsuit to settle that lawsuit?
11       MR. KOPECKY:  Money you paid out?
12       MR. WISNIEWSKI:  That you paid.
13       THE WITNESS:  Yes, so I paid their law firm.
14  We made a decision, meaning myself, and I talked to my
15  father-in-law in this matter.  We made a decision
16  that spending money to defend the frivolous lawsuit
17  against these two individuals, frivolous in our
18  judgment, would cost a lot of money and would not serve
19  the Company's interest, meaning Scio or Apollo.
20       And Joe Lancia, remember he was the CEO of
21  course we know.  He was pretty -- he was very upset
22  about the fact that he had been served process.  At
23  the time I guess he -- he sort of indicated to me he
24  had never been served process before.  And later I
25  found out that was probably not an accurate statement

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000514

455

1  of the situation.  But he was very, "Oh, my God.  They
2  are serving me at my house", you know.  And I remember
3  making the decision, oh, my God.  I can't lose my CEO.
4  The CEO of the company because he's getting served by
5  these guys.  So that's why everything got settled.
6      Q   Did Apollo Diamond reimburse you for any
7  monies you paid out as a representative of that
8  settlement?
9      A   No.  There was an effort by Scio to do it
10 and it didn't happen.
11     Q   Getting back to Commission Exhibit 61, the
12 agreement dated January 2, 2012, you accepted
13 responsibility.  I'll go to skip to the Resolve
14 paragraph there.  It says, "Robert Linares --
15 directs the corporation, when able, to purchase all
16 of Adams equity participation for a sum of $300,000,
17 with an understanding that E. Adams shall release
18 the corporation from any and all liabilities owed to
19 him and shall be responsible for up to $300,000 of
20 the corporation's liability pursuant to the DCL."
21         Do you see that?
22     A   Yes.
23     Q   When were you actually paid this?  Were
24 you paid this?  Were you paid $300,000 by the
25 company under this agreement?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

456

1      A   I believe so.  I don't remember if it was
2  before or after or whatever.  I don't remember.
3      Q   You don't remember when you were paid?
4      A   No.
5      Q   But you were ultimately paid the $300,000?
6      A   Yeah.
7          MR. SHANK:  Is that a yes?
8          THE WITNESS:  Yes.  I'm sorry.  Yes.
9          BY MR. WISNIEWSKI
10     Q   And your liability for the corporation is
11 any outstanding debts, right, or unknown debts that
12 were capped at $300,000, is that right?
13     A   Right.
14     Q   As of January 2, 2012, what funds did
15 Apollo Diamond have to pay this agreement?
16     A   Whatever it received from Scio I would
17 guess.  I don't remember.
18     Q   So this payment, the $300,000 payment came
19 out of the funds that Apollo Diamond received from
20 public Scio?
21     A   Apollo had other funds there as well.  I
22 don't remember.
23     Q   Going back through the list, you received
24 $300,000 pursuant to this agreement.  You received
25 $400,000 in response to the loan with liabilities

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

457

1  owed to Frank Linares and Robert Linares that
2  ultimately they were paid to pursuant to a loan?
3      A   Right.  That I paid them back from cash
4  and stock.
5      Q   And then you mentioned another $100,000
6  approximately that you received for landlord
7  payments and a payment you made to the Commonwealth
8  or is that just for the payment that you made to the
9  Commonwealth?
10     A   I think it was both, the landlord and the
11 Commonwealth.  But I don't know if that was subsumed
12 in the three or outside of the three.  I don't know
13 remember when I made it.
14     Q   So that's $700,000 of the four?
15     A   And the one --
16     Q   The promissory.
17     A   The 4, 3 and 1.  If you count the one.  I
18 don't know if that is within here or not.
19     Q   Okay.  So around 700 or $800,000 you
20 received from Apollo Diamond?
21     A   Right.
22     Q   And is it your understanding that those
23 funds were distributed to you from the funds that
24 public Scio paid to Apollo Diamond under the terms
25 of the 2011 Asset Purchase Agreement?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

458

1      A   I mean Apollo did not have significant
2  resources before that.
3      Q   Is that --
4      A   I mean I don't know.  I'm not an
5  accountant.  So I don't know that that's, you know,
6  the way he would say it was received.  I don't know.
7      Q   Did you receive the 7 or $800,000 that you
8  received from Apollo Diamond.  Was it after Apollo
9  entered into the August 30, 2011 Asset Purchase
10 Agreement?
11     A   I don't remember that.  I mean it's
12 possible that some of it -- like with the landlord,
13 et cetera, was paid before.  I don't remember the
14 time exactly.
15     Q   Mr. Adams, I'm going to hand you two
16 documents that have been marked as Commission
17 Exhibit 62 and 63.
18         (SEC Exhibits 62 and 63 were
19         marked for identification)
20         MR. WISNIEWSKI:  This is 63, guys and this is
21 62.
22         BY MR. WISNIEWSKI
23     Q   Mr. Adams, Commission Exhibit 62 purports
24 to be an account statement from Venture Bank for
25 accounts held in the name of -- and they are the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

### 459

```
 1   statements from January 31, 2011 through
 2   December 30, 2011?
 3        A    Okay.
 4        Q    Let me know when you have went through
 5   those?
 6        A    Okay.
 7        Q    Have you seen these documents before?
 8        A    I don't think so.  I mean I might have a
 9   long time ago.
10        Q    You don't recall seeing these documents
11   before?
12        A    Not recently.
13        Q    Did Apollo Diamond Incorporated have a
14   bank account at Venture Bank?
15        A    Yes.
16        Q    Were you the signatory of that account?
17        A    Yes.
18        Q    Were you the sole signatory of that
19   account?
20        A    That I don't remember.
21        Q    Do you remember anyone else being a
22   signatory on that account?
23        A    I don't.
24        Q    Do you think that there would be documents
25   would be reflecting if anyone was odd Apollo diamond
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

### 461

```
 1   these account statements aren't what you received
 2   back in 2011?
 3        A    No.
 4        Q    Turning to Commission Exhibit 63.
 5   Commission Exhibit 63 is a two-page document with an
 6   account number on the top of it, 27243.  It looks
 7   like another Venture Bank account statement in the
 8   name of Scio Diamond Technology Corp.
 9             Do you see that?
10        A    Okay.  Yes.
11        Q    Did Scio Diamond Technology Corp. have an
12   account at Venture Bank?
13        A    Yes.
14        Q    And the address on the top of this
15   document, 2010 West 49th Street, Minneapolis,
16   Minnesota 55409.  What is that?
17        A    That was my old address.
18        Q    This may just be an accounting error.  I
19   noticed that the zip code is a little bit different.
20   With 63 it is 55409 and with 62 it is 55419.
21        A    I don't know.
22        Q    Which is the correct?
23        A    I think 19.
24        Q    19 is?
25        A    Okay.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

### 460

```
 1   tad it that account?
 2        A    I would assume it would be.
 3        Q    Do you recall authorizing another
 4   signatory to this account?
 5        A    No.
 6        Q    The top of the first page of Commission
 7   Exhibit 62 on the statement for the first page there
 8   on top it says "Apollo Diamond Incorporated in care
 9   of Edward S. Adams, 2010 West 49th Street,
10   Minneapolis, Minnesota 54519."  Do you see that?
11        A    I do.
12        Q    Whose address is that?
13        A    That is my address.
14        Q    Is that your home address?
15        A    Home address.
16        Q    So do you recall receiving these account
17   statements to your home address?
18        A    I don't, but if they were going there, it
19   would make sense I got them.
20        Q    Do you recall Venture Bank issuing monthly
21   account statements to you for this account?
22        A    I do remember getting account statements.
23   I don't know if it was for this account.  I presume
24   it was.
25        Q    Do you have any reason to believe that
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

### 462

```
 1        Q    Do you know -- where else did public Scio
 2   have an account other than Venture Bank?
 3        MR. KOPECKY:  Can you back up.  So 63 is
 4   public Scio?
 5        MR. WISNIEWSKI:  Well, let me ask.
 6        BY MR. WISNIEWSKI:
 7        Q    Mr. Adams, is 63, is that public Scio's
 8   account?
 9        A    I don't remember.  I mean I presumed it
10   was if it was 8/31.  I don't know.
11        Q    Okay.  Could you turn to -- well, let me
12   ask my question.  Do you know what other accounts
13   public Scio had other than the account at Venture
14   Bank?
15        MR. KOPECKY:  What bank?
16        BY MR. WISNIEWSKI:
17        Q    As of August 2011?
18        A    If Lancia opened an account, I presume he
19   did in South Carolina.  I don't know how many
20   accounts he opened there.
21        Q    So you are not aware -- how about going
22   forward.  Were you aware of any other accounts that
23   public Scio held other than the Venture Bank
24   account?
25        A    I think there was accounts in South
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

463

```
1    Carolina.  It must have been.
2        Q    Do you know what bank that was at?
3        A    I don't know.
4        Q    Turning to Commission Exhibit 62, if you
5    could turn to the August 31, 2011 account statement
6    and let me know when you get there?
7        A    Okay.
8        Q    On top the Apollo Diamond Incorporated
9    account number associated this or at least
10   represented on this account statement is 15792.
11       Do you see that?
12       A    Okay.
13       Q    Is that -- are there any other accounts
14   at -- did Apollo Diamond Incorporated have any other
15   accounts at Venture Bank other than this 15792
16   account?
17       A    I don't remember.
18       Q    On the 8/31/2011 account statement here,
19   there is a credit portion of this.  The description
20   says "Telephone transfer from XX243 dated 8/11 in
21   the amount of $100,000."
22       Do you see that?
23       A    Okay.
24       Q    Where is that coming from?  Where is that
25   credit coming from?
```

465

```
1        A    I don't know.
2        Q    Why don't you turn to Exhibit 62 --
3    Commission Exhibit 62 for the month ending
4    9/30/2011.  Let me know when you are there?
5        A    I am.
6        Q    And you'll see there's a credit on this
7    account statement noted that there's a transfer from
8    Scio in the amount of $500,000 on September 9, 2011.
9    Do you see that?
10       A    I do.
11       Q    Do you know where that's coming from?
12       A    Scio, I guess.  I don't know.
13       Q    Which Scio, public Scio account?
14       A    I don't know.
15            (SEC Exhibit 64 was marked for
16            identification)
17   BY MR. WISNIEWSKI
18       Q    I'm going to hand you an exhibit that has
19   been marked as Commission Exhibit 64.  Commission
20   Exhibit 64 is a two-page document that purports to
21   be an account statement from Venture Bank in the
22   name of Scio Diamond Corp for ending 2011, is that
23   correct?
24       A    Yes.
25       Q    Have you seen this document before?
```

464

```
1        A    I don't remember.
2        Q    If you pull out Exhibit 63.  Commission
3    Exhibit 63 is the account statement for Scio Diamond
4    Technology Corp with the account number 27243.  If
5    you looked down under the other debits portions of
6    this, you will see there is a telephone transfer to
7    XX792 on 8/11 in the amount of $100,000?
8        A    Okay.
9        Q    Do you see that?
10       A    I do.
11       Q    And so did the $100,000 that went in
12   Apollo Diamond's bank account, Account Number
13   15792 on 8/11, did that come from the Scio Diamond
14   account?
15       A    It appears to.
16       Q    And are you aware of any other subsequent
17   transfers or wires from the public Scio account into
18   the Apollo Diamond account?
19       A    I presume there was, but I don't know.
20       Q    Let me ask a more general question.  Is
21   this Apollo Diamond account -- did this account, is
22   this an account where Apollo Diamond received all
23   the transfers or funds from public Scio as a result
24   of the $2 million Asset Purchase Agreement, purchase
25   price of the Asset Purchase Agreement?
```

466

```
1        A    Not that I remember.
2        Q    If you looked down to the first page of
3    Commission Exhibit 64 under the "other debits"
4    portion, you'll see that there is a -- that the
5    third line down or third debit down you'll see
6    there's a transfer to Apollo Diamond on 9/09 in the
7    amount of $500,000.
8        A    Yep.  I see that.  I'm sorry.
9        Q    So did public Scio transfer $500,000 from
10   this Venture Bank account into Apollo Diamond's bank
11   account on 9/09/2011?
12       A    It appears it did.
13       Q    Turning back to Commission Exhibit 62.  If
14   you could turn to the statement for October 31,
15   2011.  Let me know when you're there.
16       A    Got it.
17       Q    And on this account statement under the
18   other credit section there is a description of a
19   telephone transfer from XX243 in the amount of
20   $75,000 to this account.
21       Do you see that?
22       A    I do.
23       Q    And XX243, what account is that?
24       A    It appears to be Scio.
25       Q    The Public Scio account, the Venture Bank
```

467

1    account?

2        A    Yes.

3        Q    And again all I'm trying -- again, I don't

4    know if I want to go through all the transfers, but

5    is there any reason or are you aware of any other

6    accounts from which public Scio transferred money to

7    Apollo Diamond after August 2011?

8        A    Oh, I'm sure there had to have been,

9    because there was a CFO that joined in a formal

10   role.  I want to say in February of 2012, Scio.  And

11   I would imagine he made the payment for that

12   $1 million promissory note.

13       Q    And do you know what account he made those

14   out of?

15       A    I don't.

16       Q    Turning back to Commission Exhibit 63, the

17   account statement for Account Number 27243 in the

18   name of Scio Diamond Technology Corp.  Were you a

19   signatory for that account?

20       A    You're asking about 63, right?

21       Q    Commission Exhibit 63.  I'm asking

22   particular about that account.

23       A    I think I was.

24       Q    Do you know who else was a signatory to

25   that account?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

469

1        Q    Is it your signature?

2        A    I assume it is, yeah.

3        MR. SIKORA:  Can I make a suggestion.  I

4    don't think that we are disputing the records of

5    signature cards.  You might can save some time?

6        MR. KOPECKY:  What was the dog's name at

7    the time?

8        THE WITNESS:  Kelly.

9        BY MR. WISNIEWSKI

10       Q    This document is dated 7/13/2011.  Do you

11   see that?

12       A    Okay.  Yes, I do.

13       Q    Is that the date that you applied for this

14   account?

15       A    I guess.

16       Q    And as of July 13, 2011, Scio Diamond

17   Corporation was a private company, right?

18       A    Yes.

19       Q    There was no such thing as public Scio at

20   this time?

21       A    Correct.

22       Q    And if you look at the upper right hand

23   side of the Tax ID Number 27528384.  Whose Tax ID

24   number is that?

25       A    I have no idea.  I assume Scio Diamond

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

468

1        A    I don't know.

2        Q    Do you know if there was another signatory

3    to that account?

4        A    Maybe Lancia.  That is the only other

5    person.  I don't know.

6        Q    Mr. Adams, I'm going to hand you a

7    document that is going to be marked as Commission

8    Exhibit 65.

9            (SEC Exhibit 65 was marked for

10           identification)

11       BY MR. WISNIEWSKI

12       Q    Commission Exhibit 65 is a two-page

13   document, which is a business account or purports to

14   be a business account application from Venture Bank.

15       Have you seen this document before,

16   Exhibit 65?

17       A    I don't remember.

18       Q    Do you recall filling this document out?

19       A    Not particularly.

20       Q    At the bottom of page -- Commission

21   Exhibit 65, is that your signature?

22       A    It appears to be.

23       Q    Do you have any reason to feel that is not

24   your signature?

25       A    No.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

470

1    Technology Corporation.

2        Q    Was it public Scio's Tax ID number or

3    private Scio's Tax ID number?

4        A    Private.

5        Q    Why do you think it's private?

6        A    Because it wasn't public yet.

7        MR. SIKORA:  It's literally over -- Tax ID

8    Number.  We won't dispute IRS records or the bank's

9    records.

10       MR. SHANK:  We can represent to you that it

11   is private Scio's Tax ID.

12       BY MR. WISNIEWSKI

13       Q    Let me ask you, Mr. Adams.  Were you the

14   sole signatory on this account?

15       A    Well, at this point I don't know if that

16   will ultimately change, but at this point I was.

17       Q    And do you know if there was ever another

18   signatory on this account?

19       A    I don't recall.

20       MR. SHANK:  Why were you signatory to Scio

21   Diamond's, private Scio's bank account given that you

22   were at this point were not an officer of the company?

23       THE WITNESS:  I don't remember.  As I said, I

24   was Chairman.  I don't know.  I think it was just

25   convenience, because Lancia was trying to get the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

471

1  business up and running and I was trying to help him
2  with everything else.  I mean later it changed to --
3  the CFO went and got a formal CFO, if I remember
4  correctly.
5       BY MR. WISNIEWSKI
6       Q   And what CFO were you referring to?
7       A   I think his name was Charlie Nichols.
8       Q   Is that the CFO on public Scio now?
9       A   Yes.
10      Q   And you are saying that the CFO public
11  Scio was a signatory to private Scio's account?
12      A   I don't know if he was a signatory of this
13  account or the money was transferred to an account
14  that he was a signatory of.
15      MR. SIKORA:  Can we go off the record for a
16  second.  We could cut through some of this.
17      MR. SHANK:  Sure.
18      MR. WISNIEWSKI:  Sure.  Let's go off the
19  record at 2:14.
20              (Brief recess.)
21      MR. WISNIEWSKI:  We'll go back on the record
22  at 2:14.
23      MR. SIKORA:  We should take a break.
24      MR. WISNIEWSKI:  Back on the record at 2:14.
25      BY MR. WISNIEWSKI

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

472

1       Q   So Scio Diamond Technology Corp was from
2  this Venture Bank account of Scio Diamond to Apollo
3  Diamond Incorporated, right?
4       MR. KOPECKY:  Private Scio or public Scio?
5       MR. WISNIEWSKI:  Well, was private Scio or
6  public Scio making payments from this account?
7       MR. KOPECKY:  I am sorry, from which account?
8       MR. WISNIEWSKI:  Venture Bank account 27243.
9       THE WITNESS:  Apparently there was a payment
10  of $500,000 on 9/30/ -- 9/9.  Excuse me.
11      BY MR. SHANK
12      Q   Did private Scio ever have that kind of
13  money?
14      A   Do you remember it having that kind of
15  number.
16      Q   So that $500,000 would have come from
17  funds raised by public Scio?
18      A   I guess.
19      Q   Do you know why public Scio's funds that
20  are being raised are going into a private Scio bank
21  account?
22      A   I guess someone didn't change the Tax ID
23  Number -- I guess.  I really don't know.
24      MR. KOPECKY:  Now I see what you are saying.
25      BY MR. WISNIEWSKI

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

473

1       Q   Was it your understanding that all public
2  Scio needed to do was change the Tax ID number on
3  private Scio's account and then therefore it would
4  be a public Scio account?
5       A   Same company and same name.  It was the
6  same name.
7       Q   They are not the same company, right?
8       A   Well, it is the same name, otherwise it is
9  a different company.  But I mean it is essentially
10  stepping into the shoes of what private Scio had,
11  which was the agreement to acquire the assets of
12  Apollo.
13      MR. SHANK:  But it was an Asset Purchase, not
14  an acquisition of --
15      THE WITNESS:  It was an acquisition.
16      BY MR. SHANK
17      Q   They didn't acquire private Scio bank
18  accounts or anything like that, correct?
19      A   You would have to go with the document.  I
20  don't remember.
21      Q   Well, we looked at it before.  Do you
22  recall that?
23      A   I do recall it.
24      Q   It was for the name and --
25      A   The rights.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

474

1       Q   The rights, yeah.
2       A   I don't know if this is a right or not.
3  I'm not sure.
4       BY MR. WISNIEWSKI
5       Q   It your understanding one of the rights
6  that public Scio or Krossbow acquired in connection
7  with that Asset Purchase Agreement, private Scio was
8  private Scio's bank account?
9       MR. SIKORA:  He didn't say that.
10      MR. WISNIEWSKI:  I'm confirming.
11      MR. SIKORA:  No, you are not.  You're
12  confirming by saying that is what he said.  He didn't
13  say that.
14      THE WITNESS:  Okay.  I remember having a
15  discussion with Counsel about the situation and that is
16  all.  I think he was the one -- again, I don't want to
17  get into this attorney/client privilege thing.
18      BY MR. WISNIEWSKI
19      Q   About what situation are we talking about?
20      A   About a bank account that was already
21  opened.
22      Q   You had a conversation with the counsel?
23      A   I remember I did.
24      Q   Who's counsel was it?
25      A   I think it was Zouvas.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000519

475

1     Q   And Zouvas was public Scio's counsel?

2     A   Yes, he was public Scio's counsel.

3     Q   So you had a conversation with Mr. Zouvas

4 about whether or not this account, this specific

5 account at Venture Bank?

6     A   I think I had it covered.  I don't

7 remember.

8     MR. SIKORA:  The question -- now you are

9 getting real specific about what communications.  I had

10 communications with counsel.  You could generally --

11     MR. KOPECKY:  Where is the rest of the

12 statement for this account?  What happened to this Scio

13 account?  It was opened in July of 2011.  This is a

14 September statement.  What happened next?  Where is the

15 rest of the statement?

16     MR. WISNIEWSKI:  Exhibit 64 is for

17 September 2011.

18     MR. SIKORA:  There is excerpts.  That is the

19 problem.  He might be able to figure out what is

20 happening.

21     MR. WISNIEWSKI:  One of the things I can

22 represent to you is that this account was still being

23 used to transfer money to Apollo Diamond into 2012.

24     MR. KOPECKY:  Into 2012.  Okay.  The money --

25 and where did the money that was transferred into this

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

476

1 Scio Diamond private account came from?

2     BY MR. WISNIEWSKI:

3     Q   Do you know where the money came from?

4     MR. KOPECKY:  You guys do.  They are on the

5 bank statements.

6     THE WITNESS:  People were investing.

7     MR. WISNIEWSKI:  Investing in public Scio or

8 private Scio?

9     A   They got -- public Scio.

10     Q   So people investing in public Scio were --

11 the people that were investing in public Scio those

12 funds were being deposited into Scio Diamond's

13 Venture Bank account?

14     A   Apparently.

15     MR. KOPECKY:  Don't say "apparently".  Either

16 you know or you don't know.

17     THE WITNESS:  I don't know.

18     MR. SIKORA:  Can we clarify this?  I think

19 there is a $2 million purchase price, right, that's

20 being paid by --

21     MR. WISNIEWSKI:  Hold on.  We can talk about

22 this.  We can talk off the record.  I want to have him

23 answer.

24     MR. SIKORA:  Let's take a break.  This has

25 been a tedious ineffective line of questioning.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

477

1

2     BY MR. WISNIEWSKI:

3     Q   Can you pull out Commission Exhibit 63,

4 Mr. Adams?

5     A   Yes.

6     Q   Commission Exhibit 63 is a statement for

7 August 31, 2011?

8     A   Yes.

9     Q   Under the credits portion of this

10 statement, there are three incoming lawyers.  There

11 is one for Jennifer Carson, Jennifer D. Cason in the

12 amount of $131,000.10.  Do you know what that

13 deposit is?

14     A   No.

15     Q   As a sole signatory on this account, did

16 you know what that deposit was?

17     A   I don't remember now.

18     Q   Do you know if Jennifer D. Cason was an

19 investor in public Scio?

20     A   I don't remember.

21     Q   Is there any document that would refresh

22 your recollection as to whether Jennifer D. Cason

23 was a shareholder in public Scio?

24     A   Subscription agreement.

25     BY MR. SHANK

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

478

1     Q   Are you aware of any six figure amounts

2 coming into either private Scio or public Scio in

3 the 2011 to early 2012 time period other than

4 investor contributions?

5     A   I don't remember.  I don't remember what

6 was funding this or what was coming in from where.

7     Q   So did either public Scio or private Scio

8 have any other sources of revenue or other deposits

9 coming in that you are aware of other than investor

10 money in public Scio?

11     A   Not that I remember.

12     MR. WISNIEWSKI:  We'll go off the record at

13 2:20 p.m.

14     (Brief recess.)

15     MR. WISNIEWSKI:  Back on the record at

16 2:39 p.m.

17     BY MR. WISNIEWSKI:

18     Q   Mr. Adams, looking over Commission

19 Exhibits 62, 63, 64, 65, and just generally, did

20 public Scio use private Scio's Venture Bank account

21 to make payments to Apollo Diamond?

22     A   I don't remember.  I think the auditor

23 would know better than me.  They did an audit of all

24 this stuff.  I'm sure they tied it all up.  I don't

25 remember.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

479

1     Q    So the transfers of monies -- the transfer
2   of money that we just covered from Scio Diamond's
3   bank accounts to Apollo Diamond's bank account,
4   were you in any way personally involved in the
5   transfer of those funds?
6     A    I presume so.
7     Q    Why do you presume so?
8     A    Because I was a signatory on the accounts.
9     Q    What were those payments made for?
10    A    $2 million.
11    Q    The purchase price?
12    A    The purchase price.
13    Q    For the Asset Purchase Agreement between
14  public Scio and Apollo Diamond?
15    A    Yes.
16    Q    So public Scio did use private Scio's bank
17  account at Venture Bank to make those payments to
18  Apollo Diamond?
19    A    Public Scio got credit for those payments.
20  I mean I'm not sure.  Somehow --
21         MR. KOPECKY:  Was there more than one payment
22  to Apollo Diamond?
23         THE WITNESS:  I guess I'm not really
24  understanding the question.  So did they use -- well,
25  they used because they benefited from it because there

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

480

1   was a consideration that they received that they paid
2   Apollo.
3         BY MR. WISNIEWSKI.
4     Q    Who is "they", just to make sure?
5     A    Public Scio.
6     Q    And public Scio made those payments to
7   Apollo Diamond from an account opened up in private
8   Scio's name?
9     A    Right.  Like I said they right to,
10  whatever.
11    Q    Why did they have a right to that?
12    A    I think that's a way to read the Asset
13  Purchase Agreement.
14    Q    So you read the Asset Purchase Agreement
15  as public Scio -- giving public Scio the right to
16  use private Scio's bank account?
17    A    I don't remember.  I remember we had a
18  conversation.  Like I had a conversation with
19  counsel about does something need to be done.  And I
20  know we later had -- I later had a conversation
21  briefly with the auditors and with Lancesia who tied
22  it all out.  I don't, you know, because obviously
23  public Scio is a public company and they were doing
24  an audit and they went through all these documents,
25  I'm assuming.  So I don't know if that's an answer.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

481

1   That is what I remember.
2     Q    Let me unpack that a little.  You had a
3   conversation with Counsel regarding this bank
4   account?
5     A    Pretty sure I did.
6     Q    And in what capacity, did you have that
7   conversation?
8     A    I think as a Director.
9     Q    Of what entity?
10    A    Well, I wasn't a Director of Apollo.  So
11  it had to be Scio.
12    Q    Public Scio?
13    A    I can't remember if I -- I didn't get on
14  the phone and say hey, I'm operating right now as a
15  Director of private Scio.  I don't remember.  That
16  just would have been the conversation.  I mean it
17  might have been something.  You know, I don't want
18  to testify to something I don't remember
19  specifically.  I just remember there were
20  conversations about it.
21    Q    And you requested advice from Mr. Zouvas
22  in regards to this bank account?
23    A    That I don't remember.  I remember talking
24  about, hey, we have an account.  Is this going to be
25  an issue?  That's -- I don't remember the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

482

1   specifics.
2     Q    Did you request his legal advice in
3   regards to whether or not public Scio could use that
4   bank account?
5     A    I was calling him because he was a lawyer,
6   yes.
7     Q    And you were seeking that advice from
8   Mr. Zouvas?
9     A    Yes.
10    Q    And you were seeking that advice in what
11  capacity?
12    A    Director of Scio.
13    Q    Public Scio or private Scio?
14    A    Public.  I don't remember.  Like I said I
15  don't remember specifically being in -- identifying
16  my capacity.
17    Q    Do you recall when that conversation
18  occurred?
19    A    I don't.
20    Q    Did public Scio use private Scio's
21  account?
22    A    Well, indirectly I suppose they did,
23  because the monies were -- you said that these were
24  investors and the investor money flowed to public
25  Scio through this.  So -- I don't know if it was a

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

483

1　formal document.  It might have been.  I don't
2　remember.  Understand Joe Lances one guy in South
3　Carolina, he has a temporary accounting guy.  And
4　this is just the inception of the company.  So, you
5　know, not a big staff.  People are trying to
6　facilitate it, you know, trying to do the work they
7　can with limited resources.
8　　　　Q　What type of legal services did Adams
9　Monahan provide to public Scio?
10　　　　A　I think general corporate, a lot of
11　intellectual property, if I remember correctly.
12　　　　Q　How about securities work?
13　　　　A　I think at one point Nelson Mullins asked
14　us to handle, because they felt it was cheaper to
15　have our paralegal, meaning Adams Monahan, handle
16　the blue sky filings that were done.  Maybe we
17　provided drafts of documents that were ultimately in
18　the private placement memo.  But none of the public
19　securities work, if I remember right?
20　　　　Q　What do you mean by "public securities"?
21　　　　A　Like the filings that were done.  That is
22　what Zouvas was supposed to be doing.
23　　　　Q　Your firm never handled that?
24　　　　A　I don't remember that.  I don't remember
25　us doing that.

484

1　　　　Q　Which attorneys at your firm at Adams
2　Monahan performed legal work for public Scio?
3　　　　A　I presume everyone.  I don't remember.
4　　　　Q　Who is "everyone"?
5　　　　A　Me, Monahan, Mum, Maddox, our paralegal,
6　what's her name?  We had two paralegals.  I don't
7　remember their names.  It's so terrible.  I'm sorry.
8　　　　Q　And what time period did your firm provide
9　legal services to public Scio?
10　　　　A　I think from August of 2011 to some time
11　in 2013.
12　　　　Q　I'm going to hand you exhibit -- a
13　document that has been marked as Commission Exhibit
14　66.
15　　　　　　　(SEC Exhibit 66 was marked for
16　　　　　　　identification)
17　　　　BY MR. WISNIEWSKI
18　　　　Q　Commission Exhibit 66, Mr. Adams is
19　actually -- it's two documents.  They are not
20　consecutively Bates numbered, but you can let me
21　know if they go together.  The first document is
22　Bates Number SEC-ADAMS 4609 through 4610.  And it
23　purports to be an invoice for legal services and
24　expense through March 31, 2012 and it's dated
25　June 1, 2012.

485

1　　　　Do you see that, Mr. Adams?
2　　　　A　This one. (Indicating)
3　　　　Q　The first two pages of Commission Exhibit
4　66.
5　　　　A　Yeah, I see it.
6　　　　Q　And then the next pages of Commission
7　Exhibit 66 are Bates numbered SEC-ADAMS 4582 through
8　4608.  And they purport to be what looks like a
9　description of legal services provided by Adams
10　Monahan dating from February 1, 2011.  You go all
11　the way back to the last page, through March 30,
12　2012.
13　　　　MR. SIKORA:  Counsel, can I ask you a
14　question?  Did you receive it in a redacted form too?
15　　　　MR. WISNIEWSKI:  I'm not seeing a redaction
16　in this version.  I have seen other -- redacted, but I
17　don't know about this specific document.
18　　　　MR. KOPECKY:  Because that is not what the
19　bills looked like.
20　　　　MR. SIKORA:  Can we go off the record just to
21　make sure.
22　　　　MR. WISNIEWSKI:  Yeah. Sure.  Going off the
23　record at 2:50 p.m.
24　　　　MR. WISNIEWSKI:  Back on the record at 3:20.
25　　　　MR. SHANK:  So we took a little break to deal

486

1　with a call back claim on Exhibit 66, specifically the
2　details of legal services that were not redacted.
3　Mr. Sikora has indicated there might be an inadvertent
4　production and maybe subject to a call back.  We needed
5　to do some work on our end to figure out whether there
6　has been any kind of waiver on their if or if that is the
7　case.  So at this point we're going to move forward and
8　just -- we're going to be done with Exhibit 66 for now.
9　And we are going to remark new exhibits and move
10　forward and not use Exhibit 66 for now until we could
11　work through the privilege issues with Mr. Kopecky and
12　Mr. Sikora.
13　　　　MR. SIKORA:  Thank you.
14　　　　　　　(SEC Exhibit 66 was withdrawn)
15　　　　MR. WISNIEWSKI:  Mark Commission Exhibit
16　Number 67.
17　　　　　　　(SEC Exhibit 67 was marked for
18　　　　　　　identification)
19　　　　BY MR. WISNIEWSKI
20　　　　Q　Mr. Adams, I hand you Exhibit 67 which is
21　a two-page document, 4609 through 4610.  The
22　document is a letter on Adams Monahan letterhead
23　dated June 1, 2012.  And it is for -- Invoice for
24　legal services and expenses through March 31, 2012.
25　And it's sent to Scio Diamond Technology's Chief

DSM-000522

487

1    Financial Officer, Charles --
2           Mr. Adams, have you seen this document
3    before?
4        A    I presume I did.  I signed it, I think.
5        Q    And what is it?
6        A    Invoice for legal services.  Transmittal
7    letter.
8                    (Whereupon the court reporter
9                    had to start another file)
10           BY MR. WISNIEWSKI
11       Q    Exhibit 67, Mr. Adams, purports to be a
12   letter dated June 2012 from your law firm Adams
13   Monahan LLP to Scio Diamond Technology for Invoice
14   for legal services and expenses through March 31,
15   2012.
16           Do you see that?
17       A    Yes.
18       Q    Do you recognize this document?
19       A    I believe it's a document I signed.
20       Q    Did you send this document -- did Adams
21   Monahan LLP send this document to Scio Diamond?
22       A    I don't know.
23           BY MR. SHANK
24       Q    Prior to March 31, 2012, had Adams Monahan
25   billed either private Scio or public Scio for any

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

489

1           So is it correct that this invoice would
2    cover from the inception of private SCIO through
3    March 31, 2012?
4        A    Essentially.  It's not the only one.  And
5    like I said, I don't know if there were others.
6           BY MR. WISNIEWSKI
7        Q    Why is Adams Monahan invoicing public SCIO
8    for the work it performed on behalf of Loblolly or
9    private Scio?
10       A    I think that is why we are calling it to
11   their attention that some of this stuff -- obviously
12   it says "now known as Loblolly."  I think it was a
13   discussion.  There was a committee that approved of
14   all this.  And there was a discussion about -- well,
15   all the work that was done, that ultimately was
16   utilized by public Scio, how was that going to be
17   handled.  And I remember that is why there was a
18   committee and the committee took care of it and
19   whatever the committee did.
20       Q    So Loblolly or private Scio was a
21   different entity than public Scio, correct?
22       A    It is.
23       Q    So why is public Scio being invoiced for
24   services that is Adams Monahan provided for a
25   different entity?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

488

1    legal services?
2        A    That I don't know.
3           MR. KOPECKY:  These are the unbilled ones,
4    though, regardless, right?
5           BY MR. WISNIEWSKI
6        Q    So the letter said, "Including herewith,
7    please find an invoice and a summary of unbilled
8    legal services and related expenses provided by
9    Adams Monahan LLP from the exception of Scio Diamond
10   Technology Corporation, including the entity now
11   known as Loblolly and formerly known as Krossbow
12   Holdings Corp defined as the company through
13   March 31, 2012".
14           Do you see that?
15       A    Yes.
16       Q    In what time period does the legal invoice
17   attach to this cover?
18       A    I don't know.
19           MR. KOPECKY:  This is the invoice attached.
20           THE WITNESS:  It covers whatever it doesn't
21   say.
22           MR. SHANK:  The letter says it is "from the
23   inception of the Scio Diamond Technology Corporation
24   including Loblolly and Krossbow through March 31,
25   2012."

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

490

1        A    Because public Scio was using the work
2    product for that, I guess.  And that's what I
3    remember the discussion being with the committee.
4        Q    You issued this bill, right?
5        A    Right.
6        Q    And was there some type of agreement
7    between public Scio and the Loblolly or private Scio
8    under which public Scio agreed to pay for legal work
9    conducted on behalf of private Scio or Loblolly?
10       A    I remember that -- I don't remember if it
11   was an agreement.  I remember Lancia submitted a
12   bill for all his work from the beginning of private
13   Scio as a consultant, and he asked is that fair to
14   pay that because of all the work we did.  And I
15   said, you know, well, let's talk about that.  And
16   then ultimately the decision was made to pay Lancia
17   the entire amount.  I don't know if the other
18   disinterested director was involved in that or not.
19   I think he might have been.  We had had the same
20   conversation about Adams Monahan.  And I think again
21   we simply -- we should ask the other disinterested
22   director what his perspective is on this.
23           MR. SHANK:  Who is the disinterested
24   director.
25           THE WITNESS:  Theo Strous.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000523

491

```
         BY MR. WISNIEWSKI
 1
 2       Q    And what did Mr. Strous conclude?
 3       A    He concluded yes, because of all the
 4   patent and all this other stuff that was being used.
 5       Q    Why did he conclude that?
 6       A    You would have to ask him.
 7       Q    Was there a report or some type of report
 8   back to the Board of public Scio as to why,
 9   justifying public Scio paying legal expenses for
10   private Scio?
11       A    Well, there was a committee.  I don't know
12   if they did a report or not.  I know they took
13   action and approved it, because I was told that they
14   took action and approved it.
15       Q    Did the committee report to the Board its
16   findings or its conclusions?
17       A    That I don't remember.  I would have asked
18   them.  I think we would have said as a Board, tell
19   the CFO if you think it is appropriate or not.
20       Q    So the committee which was Theo Strous the
21   only member of that committee?
22       A    I don't remember.  It wasn't me or Monahan
23   obviously.  I think it was Theo Strous.
24       Q    Who else was on the Board?
25       A    Theo, Joe Lancia, myself and Mr. Monahan,
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

492

```
 1   I think.  There might also have been Bernie
 2   McFeeley.
 3       Q    Did anyone else raise concerns about public
 4   Scio paying the legal fees and the legal bills of
 5   private Scio?
 6       A    That's why we sent it to a committee to
 7   evaluate.  I mean obviously --
 8       Q    Who raised it?
 9       A    I don't know.  I mean they had a private
10   discussion.  I don't really know, you know, I wasn't
11   privy to what their discussion was.
12       BY MR. SHANK
13       Q    Did the committee solicit any information
14   from you or any discussion from you on the issue?
15       A    No.  I mean it was clear.  I think it was
16   clear to them that this was obviously the way it
17   said in the thing.  You know, we're not hiding
18   anything.  These are for services that started with
19   Loblolly, right?  And you need to decide whether you
20   want to pay that or what you want to pay.
21       Q    My question is, did you just send them
22   this invoice and there was no discussion involving
23   you and the committee decided or were you involved
24   in any discussion with the committee on the issue?
25       A    That I don't remember.  I don't remember
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

493

```
 1   that discussion.
 2       BY MR. WISNIEWSKI
 3       Q    On the second page of Exhibit 67, it has a
 4   total fees of $257,025.99.
 5       A    Uh-huh.
 6       Q    And it says "less 50 percent discount", do
 7   you see that?
 8       A    Uh-huh.
 9       Q    Who decided to discount the total fees by
10   50 percent?
11       A    I don't remember.  And I don't even
12   remember if this was the original invoice or a
13   second invoice.  I don't remember.
14       Q    Did the Board of public Scio request a
15   discount on the legal fees performed by Adams
16   Monahan?
17       A    I don't remember.  We might have
18   voluntarily done that.  I don't remember.
19       Q    Would anyone else at Adams Monahan LLP be
20   involved in issuing of this invoice?
21       A    My assistant.  Perhaps the associates
22   involved, Mr. Monahan.  I don't remember.
23       Q    How about was anyone else involved in the
24   decision to discount the rates to public Scio to
25   50 percent?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

494

```
 1       A    I don't remember.
 2       Q    Was your assistant involved in that?
 3       A    I don't remember.
 4       Q    Did public Scio ultimately pay the
 5   amount -- total amount due which is $131,984.19?
 6       A    I don't know.
 7       Q    Where could we go to find out if public
 8   Scio made that payment?
 9       A    A check register.  I don't know.
10       Q    Do you know if Adams Monahan received
11   payment from public Scio in the amount of
12   $131,984.19?
13       A    I'm not sure.
14       Q    Who else at Adams Monahan knows if they
15   received that payment?
16       A    Our accountant.
17       Q    So that's where I would go to see if you
18   received -- Adams Monahan received that payment, I
19   would go to the Adams Monahan accountant?
20       A    I think you would go to the office
21   administrator, and then whoever consolidates the
22   accounting.  the.
23       MR. KOPECKY:  It should be quicker than
24   public Scio.
25       MR. SIKORA:  I assume you know the answer to
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

495

1  the question, right?

2  MR. WISNIEWSKI:  I'm going to mark a document

3  as Commissioner Exhibit 68.

4  (SEC Commission Exhibit 68

5  was marked for identification)

6  MR. WISNIEWSKI:  Commission Exhibit 68 is a

7  55-page document Bates numbered SEC-ADAMS 34077 through

8  34131.  Commission Exhibit 68 purports to be an

9  invoice from Adams Monahan LLP issued to Scio Diamond

10  Technology Corp on May 14, 2012.

11  Mr. Adams, do you recognize Commissioner

12  Exhibit 68?

13  A   No.

14  Q   Do you know whether or not this invoice

15  was issued to Scio Diamond Technology Corp.?

16  A   No idea.

17  Q   How were Adams Monahan's bills created?

18  I'm sorry, the invoices.  How were the invoices

19  created?

20  A   By the administrator I guess.  By the

21  administrator of the firm.

22  Q   Who is that administrator?

23  A   Sarah Cameron I think her name was.

24  Q   And was Miss Cameron responsible for

25  creating these invoices?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

496

1  A   I think it feeds into a system called

2  Harvester something and then -- I don't know how it

3  gets created like this.

4  Q   How are these maintained or stored, the

5  invoices?

6  A   I don't know.

7  Q   Who would know?

8  A   I presume Sarah Cameron.

9  Q   Did you review this invoice?

10  A   I don't remember looking at it.

11  Q   For legal bills issued to Scio Diamond

12  Technology Corp., who would review the invoice prior

13  to them leaving Adams Monahan LLP?

14  A   I don't remember.

15  Q   Who would typically do it?

16  A   I don't know that there was anyone that

17  would typically do it.  I don't know that there were

18  that many.  I don't know.  I don't know if she would

19  just take them and put them into Harvest or Harvest

20  would spit out the invoice.  I don't really know how

21  it operates.

22  Q   Did you ever review an invoice directed to

23  Scio Diamond Technology Corporation prior to the

24  issue?

25  A   I don't remember.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

497

1  Q   Was it your typical practice to review

2  invoices, client invoices prior to issuing them?

3  A   No.

4  Q   Who would do that at your firm?

5  A   I don't know that anyone would actually.

6  Q   So Adams Monahan would just shoot off the

7  bills without anyone prior to issuing them to the

8  client?

9  A   I think data would be put into Harvest and

10  then it would be -- it would populate the fields, as

11  I understand it, and then it would generate an

12  invoice.

13  Q   So would you review the data that went in

14  Harvest?

15  A   No.

16  Q   Who would?

17  A   Well, I think the individual attorneys put

18  that data into Harvest.  I don't know if they are

19  reviewing it when they are doing it.  I'm not

20  exactly sure how it would work.

21  Q   Would anyone do a second layer of review

22  to the information being inputted into the Harvest

23  system?

24  A   That I don't know.

25  Q   Looking at Commission Exhibit 68 on Page 1

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

498

1  Bates numbered SEC ADAMS 345077.  The first time

2  entry is for a description of services and it looks

3  like it was provided by JR Maddox.  Do you see that?

4  A   Uh-huh.

5  Q   Who is JR Maddox?

6  A   A partner at the law firm.

7  Q   His unit price is $225?  Do you see that?

8  A   I do.

9  Q   Was that Mr. Maddox's hourly billing rate

10  as of May 14, 2012?

11  A   I think it depended on the client, the

12  manner --

13  Q   How about for public Scio, what was JR

14  Maddox's rate for public Scio as of May 14, 2012?

15  A   I don't know.

16  Q   What was your rate for public Scio as of.

17  May 14, 2012?

18  A   495 maybe.  I don't know.

19  Q   Do you know any other attorneys' rates,

20  what they billed out hourly for public Scio in May

21  2012?

22  A   No.

23  Q   Do you know if that rate ever increased in

24  2012?

25  A   I don't know.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

499

1      Q    Did Adams Monahan typically provide a
2  discount on the hourly rates that the attorneys
3  provided services for public Scio?
4      A    I don't know.
5      Q    How are the individual rates that were
6  charged by Adams Monahan, how were they determined
7  for public Scio?
8      A    I don't remember how that got done.
9      Q    Was there an engagement letter between
10 public Scio and Adams Monahan?
11     A    Yeah, there probably would have been.
12     Q    And would the letter have the hourly rates
13 that Adams Monahan was going to be charging public
14 Scio?
15     A    It might have.
16     Q    Did you ever negotiate the rate at which
17 you or any of the members of your firm would charge
18 public Scio?
19     A    That I don't remember.
20     Q    How were the rates determined?
21     A    I don't know that I know that actually.
22 It might have been we talked -- I talked with
23 Lancia.  That would have been my only reference
24 point, I would imagine.  And I don't remember if I
25 talked to Lancia or someone else did.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

501

1  Mr. Zouvas.
2      MR. KOPECKY:  Now you are jumping to
3  conclusions.
4      THE WITNESS:  Yeah, you are right.  I don't
5  know.  It would have been public Scio or Joe or the
6  CFO.
7      MR. SIKORA:  Kevin, are you still on track?
8      MR. WISNIEWSKI:  I hope so.
9      BY MR. WISNIEWSKI
10     Q    Mr. Adams, I'm done talking about what I
11 guess we'll refer to as the warrants that we talked
12 about before, you know, in connection with the
13 March 2005 proxy statements and the Asset Purchase
14 Agreement.
15     MR. KOPECKY:  2011.
16     MR. WISNIEWSKI:  2011 proxy statement and the
17 Asset Purchase Agreement between private Scio and
18 Apollo Diamond and also private Scio and Apollo Diamond
19 Gemstone.  Each of those Apollo entities entered into
20 an agreement with private Scio under which private Scio
21 would issue warrants to purchase common stock of
22 private Scio for a penny a share, is that correct,
23 per -- let me do it.
24     When we refer to the Apollo warrants, right,
25 can we agree that we are talking about the agreement

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

500

1      MR. SHANK:  How did the rates charged by
2  Adams Monahan's lawyers to public Scio compare to the
3  rates charged to other clients?
4      THE WITNESS:  I think they were probably
5  lower.  I want to say that my rate is 495 normally.  I
6  have no idea.  I don't see it on here.  So I don't
7  really know.
8      BY MR. WISNIEWSKI
9      Q    In May of 2012, what client did you charge
10 $495?
11     A    I have no idea.  That's just been my rate
12 for a long time.
13     Q    That has been your rate for -- how long
14 has that been your billable rate?
15     A    I don't even know.
16     Q    More than a year?
17     A    Yep.  I mean I would say it depends on the
18 client.  I have charged as high as 895 an hour and I
19 probably charge as low as 375.  I don't remember.
20 Depends on the nature of the work, the urgency of
21 the work and a variety of things.
22     Q    Do you know if public Scio disclosed to
23 its shareholders for an in public filing that it was
24 paying the legal bills of private Scio?
25     A    I don't know.  That would have been

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

502

1  under which shareholders of Apollo Diamond and Apollo
2  Diamond Gemstone would have the opportunity to
3  purchase shares in private Scio, as a result of
4  redeeming their shares in Apollo Diamond or Apollo
5  Diamond Gemstone.
6      MR. KOPECKY:  Can you read that back?  I
7  don't like "the results of" -- they received.
8      MR. SIKORA:  If you would review --
9      MR. KOPECKY:  They are paid to redeem their
10 shares.  As a result of redeeming their shares.  Don't
11 answer the result of?  I don't care, I'll just tell you
12 what it said later.
13     BY MR. WISNIEWSKI
14     Q    On August 31, 2011 pursuant to the public
15 Scio, Apollo Diamond Incorporated Asset Purchase
16 Agreement, did Apollo Diamond and public Scio have
17 in place an agreement that would allow former
18 shareholders of Apollo Diamond Incorporated to
19 purchase shares in public Scio for a penny a share
20 in amounts equal to the shares they owned in Apollo
21 Diamond Incorporated?
22     A    In private Scio, public Scio?
23     Q    Public Scio, August 31, 2011?
24     A    That was the understanding.
25     Q    Was there actually an agreement between

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000526

503

```
1   public Scio and Apollo to give former shareholders
2   of Apollo Diamond that right?
3       A    I don't remember.  It was all
4   understanding between all the relevant parties.  I
5   don't remember if there was an agreement.
6       Q    Who were the relevant parties?
7       A    Joe Lancia on behalf of Scio and Bob
8   Linares on behalf of Apollo and Apollo Gemstone.
9       Q    How about the Apollo Diamond shareholders,
10  did they have some type of agreement that gave them
11  the right to purchase shares in public Scio?
12      A    There were no Apollo Diamond shareholders
13  at that point.
14      Q    How about in March of 2011?
15      A    Did they have an agreement?  I don't know
16  if they had an agreement in writing.
17      Q    And I think you testified before that that
18  was everyone's understanding.  That was the goal of
19  this transaction to give shareholders of Apollo
20  Diamond the ability to own or have an ownership
21  interest in private Scio equal to or greater than
22  their interest in Apollo Diamond?
23      A    That was a goal turned into public Scio.
24      Q    And why was that a goal of the
25  transaction?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

505

```
1       Q    Were you involved in those discussions?
2       A    Yes.
3       Q    As a Board member.
4       A    As a Board member.
5       Q    What can you tell me about those
6   discussions, excluding anything that may be legal
7   advice from Nelson Mullins?
8       A    Excluding the -- okay.  If I trip up would
9   you tell me if I'm traveling --
10      MR. KOPECKY:  I won't never interrupt any of
11  you guys.
12      THE WITNESS:  I want to say it was March
13  Nelson Mullins came on board as counsel for Scio,
14  public Scio.  There is no private anymore.  Public
15  Scio, okay.
16      MR. WISNIEWSKI:  March 2012.
17      THE WITNESS:  Thank you.  March 2012.  In
18  early April, they prepared a document which was
19  circulated to potential investors.  That document
20  included, as our documents had, information about the
21  potential for shares or warrants I think it said being
22  issued to former Apollo shareholders.  I mean they
23  prepared the document.  They knew that right existed.
24  "They" meaning Nelson Mullins.
25      BY MR. SHANK
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

504

```
1       A    So that the shareholders would have an
2   interest in effectively the same assets that they
3   did before and have a tax loss.
4       Q    And did the shareholders have a right to
5   purchase shares of private Scio?
6       A    I don't know that I understood there to
7   be -- all I understood there to be a right ever was
8   the right to own a share in whatever the company was
9   that had the assets of Apollo.
10      Q    And when would that right -- when did that
11  right -- when was that right created?
12      A    I think they got the documents in 2012,
13  May, maybe.
14      BY MR. SHANK
15      Q    Why did that occur in May of 2012, as
16  opposed to earlier or later?
17      A    Why did it occur?
18      Q    Yes.
19      A    You would have to ask Counsel on that.
20      Q    I don't want to get into the privilege.
21  Do you have an understanding as to why those rights
22  were created in May of 2012?  Yes or no question for
23  starters.
24      A    That was a determination that Nichols and
25  Lancia made with Nelson Mullins and the Board.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

506

```
1       Q    And that document was -- what type of
2   document was this?
3       A    An offering document.
4       Q    And was it in fact distributed to
5   shareholders?
6       A    Yes. Bernie McFeeley invested in it as did
7   others.
8       Q    So these were offering materials in
9   connection with a private offering of public Scio
10  stock?
11      A    Correct.  Thank you.  You articulated it
12  far better than I.  Then that led to discussions
13  about, okay, I think it was Nelson Mullins had said,
14  well, we should --
15      MR. SIKORA:  Hold on.  Once you enter the
16  substance of he discussion, that is when we are out of
17  bounds.
18      BY MR. SHANK
19      Q    Well, why don't we back up a step Let's
20  talk pre-March 2012 before Nelson Mullins got
21  involved in this.  Had any warrants been issued
22  prior to March 2012?
23      A    I don't remember that.
24      Q    Now, the Asset Purchase Agreement had
25  become effective in August 2011, correct?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000527

507

1     A   Of Apollo Diamond Inc., yes.

2     Q   So why at that time in August of 2012, '11

3  or shortly thereafter did Apollo Diamond Inc.

4  shareholders not get warrants?

5     A   I think what happened is a letter -- an

6  indication of interest letter was sent out to verify

7  that people were -- that the blue sky stuff was

8  correctly done.  That they wanted to invest

9  potentially in public Scio.  That they expressed

10  interest in investing or that they would express

11  interest.  I think we ran FINCEN and OPAC maybe

12  against some of the names that -- I don't remember

13  if it was about all of the names.  Just to make sure

14  there wasn't a problem with someone.  And then,

15  yeah, and that is kind of -- I remember it being,

16  okay.  Then there was discussion about well, is the

17  appropriate point to do it when we complete the

18  transaction with Apollo Diamond Gemstone.  And I

19  think that is when other counsel weighed in and

20  said --

21     Q   Wait.

22     MR. SIKORA:  So you are sneaking in there.

23  You got to remember if you are talking about -- that is

24  what is privilege and that is what you have to stay

25  away from.  Thank you by the way, SEC, for catching

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

508

1  these things as well.

2     BY MR. SHANK

3     Q   Who was involved in those initial

4  discussions waiting until the Asset Purchase

5  Agreement with Apollo Diamond Gemstone was executed?

6     A   It would have been Lancia.  So me -- I

7  think -- and I don't remember when that was

8  discussed.  I know there is communication between my

9  associates and Zouvas on this issue.

10     Q   Did you have any opinions as of the fall

11  of 2011 whether those warrants should be issued to

12  Apollo Diamond, Inc. shareholders?

13     A   I think I had an opinion that we needed to

14  do -- I think it was in the PPM.  And I had an

15  opinion that we should ask Zouvas about what's the

16  appropriate -- when do we disclose this or do this.

17     Q   As of the fall of 2011, to your knowledge,

18  had there been any public disclosure of those

19  warrants rights to public Scio shareholders?

20     MR. KOPECKY:  I think you throw in the word

21  "rights" brings us back to -- I believe he testified

22  there were no rights.  I'm getting thrown on that.

23     THE WITNESS:  2012.  I know that Lancia sent

24  out a letter, I think, in September of 2011, maybe.

25     BY MR. SHANK

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

509

1     Q   A letter to whom?

2     A   To former Apollo people.

3     Q   What about -- had any of the public Scio

4  shareholders been informed of the existence of this

5  oral or otherwise arrangement for Apollo

6  shareholders to buy into the company?

7     A   It was in all the offering documents, so I

8  guess if they read the offering documents, they

9  would have seen that.  I don't know.  I mean --

10  again this was the reason Zouvas was -- he was

11  responsible for that.  And the Lancia was

12  coordinating that with him. so I don't know what

13  they said.  For all I know they filed documents and

14  said that.  I didn't -- I never spent a lot of time

15  thinking about it, because I figured Lancia was the

16  CEO and being paid a lot of money to be it.

17     Q   And to what degree did you focus on or

18  review any SEC filings that public Scio was making

19  in the fall of 2011 or 2012?

20     A   Me personally?

21     Q   Yes.

22     A   I might have reviewed them in passing just

23  to familiarize myself with it.

24     Q   What type of files would you review in

25  passing?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

510

1     A   Whatever the filings were that were being

2  done.

3     Q   What about quarterly reports on 10Q, would

4  you review those?

5     A   Probably reviewed them.  I don't remember

6  if I reviewed them prior to or after they were

7  filed.

8     Q   Would it have been either prior to or

9  shortly after they were filed?

10     A   Not necessarily.  It could have been weeks

11  after.

12     Q   Did you have a practice of reviewing Form

13  AKs that the company was issuing?

14     MR. KOPECKY:  I want to say -- just going to

15  object.  It was asked and this has been asked and

16  answered and covered on both in the last testimony and

17  earlier today.

18     THE WITNESS:  I don't remember specifically.

19     BY MR. WISNIEWSKI

20     Q   I'm going to hand you a document that was

21  previously marked as Commission Exhibit 22.

22  Commission Exhibit 22 is a seven-page document.  On

23  Page 1 it purports to be a Form AK filed on Scio

24  Diamond Technology Corp.  The date of the report is

25  August 31, 2011.  Actually referring to the last

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

511

1  page of Exhibit 22.  It seems to have been filed on
2  May 15, 2012.
3         Mr. Adams, do you know what this document
4  is?
5       A    An AK that was filed.
6       Q    Have you seen this document prior to
7  today?
8       A    I presume I have.  I don't remember
9  specifically.
10      Q    In what context did you see this document?
11      A    I think it was in the context of advice by
12  Nelson Mullins as a Board member that we needed to
13  file something like this.
14      Q    And who prepared this AK?
15      A    I'm presuming the attorneys at Nelson
16  Mullins and Joe Lancia working with Charles Nichols.
17      Q    What involvement did you have in preparing
18  this document?
19      A    I don't imagine much.  I don't remember.
20      Q    Did you review it prior to it being filed?
21      A    I might have.
22      Q    I want to turn to the second page of
23  Commission Exhibit 22 and the third paragraph,
24  specifically the third paragraph.  It starts "Each
25  of ADGC and ADI had originally contracted in March

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

512

1  of 2011."
2       A    Yes.
3       Q    Do you see that?
4       A    Yes.
5       Q    And referring to that second sentence, "In
6  connection obtaining the shareholders' approvals for
7  those transactions, and the redemption of
8  outstanding ADI and ADGC shares for one penny per
9  share, each ADI and ADGC arrange for private Scio to
10  agree to issue warrants to purchase common stock of
11  private Scio exercisable for one cent per share to
12  stockholders of ADI and ADGC that were accredited
13  investors and that agreed to have their shares of
14  ADI and ADGC redeemed by such companies."
15      Do you see that?
16      A    Yes.
17      Q    And skip down to the last sentence of this
18  paragraph.  It says, "However, the Company did not
19  have a definitive written agreement with ADGC with
20  respect to the ADGC transaction.  And based on the
21  advice of its then counsel, the company concluded
22  that it is does not have an obligation to issue the
23  warrants or an obligation to disclose the proposed
24  warrant issuance until it reached a definitive
25  agreement with ADGC to complete the ADGC

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

513

1  transaction."
2       Do you see that?
3       A    Yes.
4       Q    Then counsel of the company -- who is
5  that?
6       A    Luke Zouvas.
7       Q    And it says that, "The company concluded
8  that it did not have an obligation to issue the
9  warrants or obligation to disclose the warrants
10  until they reached a definitive agreement with the
11  ADGC."
12      Do you see that?
13      A    Yes.
14      Q    Why were the obligation to issue warrants
15  to Apollo Diamond Inc. shareholders contingent or
16  dependent upon public Scio entering into an
17  agreement with ADGC?
18      A    I don't remember other than there was a
19  licensing agreement between the entities and Apollo.
20  It was a licensing agreement and it was critical as
21  a result of who owned what intellectual property
22  between those two companies.  That if the company,
23  Scio, was going to operate in the space of Diamond
24  Gemstones, it needed the intellectual properties
25  that resided there in the ADGC.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

514

1       MR. SHANK:  Was there anything in the Asset
2  Purchase Agreement of ADI that placed any kind of
3  contingencies on also entering into an agreement with
4  the ADGC?
5       THE WITNESS:  I don't remember that.
6       BY MR. WISNIEWSKI:
7       Q    ADI is a separate entity of ADGC, correct?
8       A    Yes.
9       Q    And private Scio entered into a separate
10  agreement with Apollo Diamond Incorporated and
11  Apollo Diamond Gemstone Corporation, is that
12  correct?
13      A    Yes.
14      Q    Did the Asset Purchase Agreement between
15  Apollo Diamond and private Scio reference the
16  purchase agreement between private Scio and ADGC?
17      A    I don't remember that.
18      BY MR. SHANK
19      Q    Were you aware of any hold up as to why
20  the ADGC transaction was not being executed at or
21  around the same time as the ADI transaction?
22      A    I think it was a question of where were
23  the assets of the respective companies and how did
24  you correctly divide them, because remember
25  everything -- I testified earlier I think that this

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000529

515

```
1    landlord had taken and basically took all the
2    property and put it in a warehouse and kind of
3    jumbled it all together.  So I don't think that it
4    was clear what the inventory -- the way the
5    licensing and the agreement between the entities is
6    that they -- Gemstone was owned by Gemstone and so
7    --
8        Q    Gemstone was owned by Gemstone?
9        A    Diamond Gemstone was owned by Gemstone.
10   But it was all lumped together.  So there was a
11   sorting out that had to occur about whose property
12   is this.  I mean it was at one point very clear, but
13   then when the landlord kind of mixed everything
14   together, it became unclear.  And so it was that and
15   it was the intellectual property portfolio, figuring
16   out who owned what.
17       Q    But if you are entering into an agreement
18   to buy both of the entities' assets, wouldn't that
19   simplify the matter.  So it really wouldn't matter
20   whose assets they were since you buying them both?
21       A    You still have to figure out what the
22   value is potentially, the assets.  And you have to
23   make sure you are transferring the assets correctly
24   through a Bill of Sale.  So, you know --
25       Q    But why didn't that cause a hold up on the
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

516

```
1    Apollo Diamond Inc. transaction, if you weren't sure
2    which assets were Apollo Diamond?
3        A    I don't remember why, why there was an
4    conclusion made that that was not something that
5    needed to be done right away.  I don't remember.
6        Q    And you had already agreed -- there had
7    already been an agreement on the purchase price for
8    both entities, correct?
9        A    There had been an agreement and there was
10   discussions about needing to evaluate that.  So I
11   don't remember if it stayed that number or not.  I
12   don't remember.
13       Q    Who was involved in those discussions to
14   re-evaluate?
15       A    I think Bob and Joe Lancia principally.
16       Q    Were you involved in those discussions?
17       A    I think I was as well as a lawyer.
18       Q    What was the nature of those discussions?
19       A    I think it was back to trying to figure
20   out what the assets were of the respective entities.
21       Q    When were these discussions occurring?
22       A    I don't remember the timeframe.  I'm sure
23   in -- I don't remember.
24       MR. WISNIEWSKI:  I guess I'm a little unclear
25   as to why the obligation to issue shares or warrants to
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

517

```
1    Apollo Diamond Inc. shareholders was tied or contingent
2    on the ADGC agreement.
3        MR. KOPECKY:  So is he.
4        THE WITNESS:  I don't know.
5        MR. WISNIEWSKI:  Didn't you explain like the
6    IP.
7        MR. KOPECKY:  Well, I'm saying the best thing
8    I can remember is GAAP.  He is unclear.
9        MR. WISNIEWSKI:  I'm trying to figure that
10   out.
11       THE WITNESS:  The inventory of the company
12   had not been sorted out, as I understood it.  I wasn't
13   physically in Massachusetts or South Carolina.  So I
14   don't really -- when people told me it was a jumbled
15   mess I just take their word for it.  So there was a
16   need to sort through the inventory as I understood it
17   and figure out what was Apollo, which would have been
18   stuff like flat pieces of diamond that would be used
19   for -- electronics, cutting.  And then there is
20   gemstone.  And gemstone, we can appreciate is a thicker
21   diamond, right.  And maybe even formulate it into a
22   cylinder or a gemstone.
23       So there was a need to try to figure out
24   what was what of that stuff and sort through it and
25   log it, which I think happened at some point.  And
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

518

```
1    then also go through the IP and figure out, okay,
2    how does the license relate to this, the license
3    that actually existed between the parties.
4        You know, and again the company was trying
5    to run the business at the same time it was trying
6    to minimize cost with few personnel to try to get a
7    transaction like this done.  So I think everyone was
8    working as hard as they could to get it done as fast
9    as they could, but the reality was, we were
10   shorthanded, the company was shorthanded.
11       Q    Those circumstances impacted the ability
12   to issue warrants or shares to Apollo Diamond
13   Incorporated and the shareholders?
14       A    It sooner or later certainly had an
15   impact, yeah.  I mean you have to send paperwork.
16   Somebody has to draft the paperwork and you have to
17   make sure blue sky is followed.  And there was an
18   ongoing debate when Nelson Mullins entered the
19   picture about should it just be shares and not
20   warrants.  That took a while to figure out.  And
21   ultimately they drafted the documents for that and
22   it was shares, which I think was a good result.
23       Q    So from March 2011 to May 2012, did any
24   Apollo Diamond Inc. shareholder raise issues or ask
25   questions about where their shares were or where
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000530

519

1 their warrants were?

2     A   I don't remember that.

3     Q   Do you recall ever receiving a call or an

4 e-mail from a former Apollo shareholder asking where

5 their shares are?

6     A   I could have, but I don't remember.

7     Q   Do you know if anyone else at public Scio,

8 received any calls from shareholders asking about

9 their warrants?

10     A   I don't remember.  I know they got, as I

11 said before, I know Lancia had sent something out to

12 apprize them of where things were going and how it

13 was taking him -- what was happening.  And I think

14 he might have done that more than one time.  So

15 again Lancia is running the company.  I'm on the

16 Board.  I'm not capable of doing everything by

17 myself, if anything.  To the extent the people are

18 being notified, it was going to be notified in the

19 normal chain of command which was the CEO, et

20 cetera.

21     Q   At any time between August -- at any time

22 between August of 2011 and May 2012, did you believe

23 that public Scio needed to disclose the existence of

24 those ADI warrants, in a public filing --

25     A   If I remember I asked counsel that

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

520

1 question.  I know my associate asked counsel that

2 question in writing.

3     Q   Independent of asking Counsel or Counsel

4 told you, did you think that public Scio needed

5 to --

6     A   I didn't think about it.  That is why I

7 hired a lawyer and the company hired a lawyer.  And

8 they were working with Lancia.  I mean this was

9 Lancia's thing.  My whole point of the situation was

10 I was on the Board.  Lancia was being paid 200

11 something thousand dollars.  I said take the counsel

12 you need, find the counsel you need.  This was my

13 general advice.  It had nothing to do with this.

14 Find the counsel, work with the counsel, do what

15 they say.  If they say we need to disclose whatever,

16 disclose it.  If they don't say anything, you know,

17 you are the man running the show, right.  Find a CFO

18 you're comfortable with.

19         I didn't particularly like Charlie

20 Nichols, but Joe liked him and trusted him and that

21 was his CFO.  He changed to Nelson Mullins, again I

22 understand in a way, you know.  He was running the

23 show.  I was really trying -- I won't say distance

24 myself, but I was not trying to be actively

25 involved.  This is not what I wanted to spend my

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

521

1 time on frankly at this point.

2         BY MR. SHANK

3     Q   Why was your associate at Adams Monahan

4 involved in discussions with Zouvas that was

5 regarding these disclosures?

6     A   Because I think at one point we internally

7 huddled and I said -- and I don't remember if it was

8 me or somebody else.

9         MR. SIKORA:  I caution you in case this is a

10 privilege communication.

11         THE WITNESS:  I want to be really --

12         BY MR. SHANK

13     Q   Did Adams Monahan get involved in any

14 capacity with discussions regarding disclosure

15 obligations of public Scio relating to the warrants?

16     A   I think your question was asked of

17 Counsel.

18     Q   Adams Monahan got involved in those

19 discussions?

20     A   Adams Monahan asked a question of Counsel.

21     Q   Did anyone at public Scio request that

22 Adams Monahan look into that issue or get involved

23 in that issue?

24     A   I don't remember that.

25     Q   So what prompted Adams Monahan to get

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

522

1 involved?

2     A   I think that my associate was doing some

3 of the documents for private placement, which I said

4 before.  And he might have asked -- it might have

5 occurred to him to ask the question on the public

6 stuff that was handled by another lawyer.

7         MR. SIKORA:  At some point the last break of

8 the day.

9         MR. WISNIEWSKI:  We can take a break.  Let's

10 go off the record at 4:14.

11         (Brief recess.)

12         MR. WISNIEWSKI:  Let's go back on the record

13 at 4:28, please.

14         BY MR. WISNIEWSKI

15     Q   Mr. Adams, prior -- during the break, did

16 you an I have any discussions?

17     A   No.

18     Q   I want to turn shortly back to Commission

19 Exhibit 22, which is the AK filed on May 15, 2012.

20 The fourth paragraph down starts with, "The

21 company", do you see that?

22     A   Yes, I do.

23     Q   It says, "The company still does not have

24 a definitive written agreement with the ADGC

25 transaction.  However, the company has reviewed and

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

523

1   further analyzed its previously completed ADI Asset
2   Purchase and the background of the proposed ADGC
3   transaction and the company has concluded that it
4   was obligated to complete the ADI warrant issuance
5   as a result of the ADI transactions and that it is
6   obligated to complete the ADGC warrant issuance
7   subject to the closing of the ADGC transaction."
8           Do you see that?
9       A   Yes.
10      Q   And the next sentence says, "The Board of
11  Directors of the Company concluded that it intended
12  the ADI warrant issuance should have been treated as
13  part of the purchase price of the ADI assets
14  pursuant to the ADI Asset Purchase.  And that the
15  company will be required to restate its quarterly
16  financial statements per each of the quarters ended
17  September 30, 2011 and December 31, 2011 and that it
18  will mend the Form 10Qs filed by the company for
19  such a period."
20          Do you see?
21      A   Yes.
22      Q   Can you walk me through the of -- were you
23  involved in the discussion of needing to revise or
24  restate the company's prior quarterly financial
25  statements?

525

1   -- what were the discussion public Scio's board had
2   regarding the need to restate and what that impact
3   would be, what impact a restatement would have on
4   the company?
5           MR. SIKORA:  This is something -- the part of
6   that discussion involves Counsel is not fair game for
7   you to testify to.
8           MR. WISNIEWSKI:  Maybe I should have referred
9   to that.
10          MR. SIKORA:  Given that I was not part of the
11  discussion, I'm not sure it was segregable.  In other
12  words, I'm not sure that -- be care of that.
13          BY MR. SHANK
14      Q   Let's go slowly.  How did it first come
15  up, the issue of the potential for restating the
16  10Qs?
17      A   This is now three years or four years ago.
18  I think it was -- so Nelson Mullins become the new
19  counsel.  They obviously prepared that document, the
20  disclosure document, which they knew all about these
21  warrants that were being issued or going to be
22  issued.  And they put that in the disclosure
23  document.  Sometime I presume after that they said
24  to us --
25          MR. WISNIEWSKI:  Be careful.

524

1       A   I believe I was, yes.
2       Q   And kind of walk me through or explain to
3   me how it was determined that the company would need
4   to restate the financial statements?
5       A   I think there was a discussion about the
6   opinion of prior Counsel.
7           BY MR. SHANK
8       Q   First, when did those discussions first
9   arise?
10      A   Very close to when this was filed.
11      Q   Okay.
12      A   Sorry.  May 15th -- it was filed -- it
13  must have been early May.
14          BY MR. WISNIEWSKI
15      Q   Was there any discussion about the impact
16  of the refilings, what impact that would have on the
17  financial statements?
18      A   No.  I don't know that I would still know
19  to this day what impact it had.  I don't remember
20  that.  I know it had -- I remember it was like --
21  well, it is what it is, you now.  When you say
22  "impact".  I don't even know like what the
23  adjustment meant.  Is that what you are saying, what
24  the adjustments were?
25      Q   I was just wondering what were public Scio

526

1           BY MR. SHANK
2       Q   Did the potential for restatement come to
3   your attention through counsel or through other
4   means?
5       A   It was either Lancia and the CFO talking
6   to counsel or it was counsel directly.  I don't
7   remember which.
8       Q   What was the triggering issue that kicked
9   off the discussion?  What happened in early May.
10      A   No.  I don't remember.  I think what
11  kicked it off was -- I'm trying to remember.  I have
12  to assume it was through Nelson Mullins.  I don't
13  know either.  Nelson Mullins or the CFO would have
14  been CFO for maybe two months.
15      Q   Did any new information come to light
16  among management and the Board that kicked off the
17  discussions?  I'm sorry my question is unclear.
18  What I'm trying to get at, something must have
19  happened to say we have to consider whether to
20  restate.  I'm trying to figure out what that initial
21  event was that kicked things off.
22          MR. SIKORA:  Can we go off the record?  I
23  realize a question is pending, but I think I might be
24  able to help.
25          MR. WISNIEWSKI:  Go off the record.  It is

DSM-000532

527

```
1    4:35 p.m.
2              (Discussion held off the record)
3         MR. WISNIEWSKI:  Back on the record at 4:35.
4         MR. SHANK:  We took a short break so that
5    counsel could confer with the witness.
6         MR. SIKORA:  Thank you.
7         THE WITNESS:  I don't remember who raised the
8    issue or how it got raised.
9    BY MR. SHANK
10        Q    What was the issue that was raised?
11        A    The idea that they had to disclose the ADI
12   or ADGC transaction.
13        Q    Sorry.  Go ahead.
14        A    And I remember there was a discussion
15   about, you know, what the right was?  When did it
16   accrue?  Legal discussion.  Monahan and I weighed
17   in.  I think Monahan weighed.  I weighed in.  Then
18   we sort of let counsel, the securities counsel make
19   the call with the company's CFO and CEO.  They were
20   the ones signing the documents.  I said whatever you
21   think.  That is ultimately the issue.
22        Q    Based on discussions you had, did you
23   have -- get a sense as to whether Mr. Lancia was
24   fully apprized of the warrant issue prior to May of
25   2012?
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

529

```
1         Q    By early April?
2         A    Yeah.
3         Q    Is that yes?
4         A    Yes.
5         Q    Do you have any knowledge of him being
6    aware prior to early April?
7         A    I imagine Joe told him.  I mean, you know,
8    that was his CFO.
9         Q    I'm just asking for your knowledge about
10   whether he knew or not prior to April.
11        A    I think at one point he sent me an e-mail
12   and the e-mail said something like lot of good stuff
13   happening, there may be an issue with the warrants,
14   not anything to concern yourself or not anything to
15   concern ourselves with now.  And then he went on to
16   talk about -- I remember thinking, okay, you know, I
17   think I called him and said, you better figure this
18   out, dude.  You know you are the CFO.  I mean you
19   are the guy who is supposedly has the CPA.  I think
20   he had a CPA or was a CPA or is a CPA.  You should
21   figure this out and get it -- there were constant
22   issues with them, them being that management team.
23   They missed some other deadlines of filings.  So I
24   don't think they had a firm grasp, I don't believe.
25   As I saw them in action, had a full grasp of
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

528

```
1         A    Oh my, gosh, for sure.  You mean that
2    there were warrants or shares being issued to
3    people, that were going to be issued to people?
4         Q    Yes.
5         A    There was a plan to issue them?
6         Q    Yes.
7         A    Oh, for sure.
8         Q    And why do you say that?
9         A    I mean I can't testify to his state of
10   mind, but that was a constant conversation that --
11        MR. SIKORA:  Just based on something in the
12   record already, wasn't there a letter?
13        THE WITNESS:  Yeah, sent a letter to the
14   shareholders.
15   BY MR. SHANK
16        Q    So what about Mr. Nichols, did you get a
17   sense as to when Mr. Nichols first learned about the
18   ADI warrants?
19        A    When he worked with Nelson Mullins, I'm
20   very sure of this, to prepare that April -- in early
21   April letter to people like McFeeley who were
22   potential investors and that was in there.  So, you
23   know, 17 million warrants or something, if I
24   remember right.  So he was certainly aware of it,
25   long, long before this.
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

530

```
1    understanding the need for focusing on this stuff in
2    an appropriate timeframe, which I found frustrating,
3    but that's a different --
4              BY MR. WISNIEWSKI
5         Q    On Exhibit 22, the paragraph after the one
6    that we just looked at, the company understands that
7    most of the outstanding share of ADI and ADGC.  Do
8    you see that paragraph?
9         A    Uh-huh.
10        Q    And this paragraph basically states that
11   you were formerly a director and served in various
12   executive capacities for ADI and ADGC and state your
13   prior ownership interest of both of those entities?
14        A    I want to go back.  I don't think it
15   states that I was a director of ADI.
16        Q    The second sentence, chairman of the
17   company Board of Directors.  Okay.  I'm sorry.
18        A    That's this company.
19        Q    Why was this -- explain to me why this was
20   included in this filing?
21        A    Ask counsel.  They said we needed to do
22   some disclosure on that.  I said do disclosure.
23   Whatever you need to do, go do it.
24        Q    Was this the first time that your interest
25   in Apollo Diamond and Apollo Diamond Gemstone was
```

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

531

1  disclosed in a public filing with the SEC?

2      A   I don't know.

3      Q   Did anyone at public Scio ask you

4  previously what your role was at Apollo Diamond or

5  Apollo Diamond Gemstone?

6      A   I think Lancia, maybe.  Lancia or Nicols.

7      Q   How Nichols, did Nichols ask?

8      A   Might have.

9      Q   I'm going to show you a document that has

10 been marked as Commission Exhibit 69.

11             (SEC Exhibit 69 was marked for

12             identification)

13         BY MR. WISNIEWSKI

14     Q   Mr. Adams, Commission Exhibit 69 is not

15 Bates numbered and purports -- the top e-mail

16 purports to be an e-mail from you at the e-mail

17 address, edwardadams@yahoo.com on March 26, 2012 to

18 Charlie Nichols, Michael Monahan and Joe Lancia.

19         Do you see that?

20     A   Yes.

21     Q   The subject line reads "ADI/ADGC".  I'll

22 have you take a minute to review the document.  Let

23 me know when are you ready.

24     A   Okay.

25     Q   Did you send the e-mail that is on top

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

532

1  there of March 26, 2012?

2      A   I presume I did.

3      Q   That's your e-mail address,

4  edwardadams@yahoo.com?

5      A   Yes.

6      Q   One of the addresses that you maintained

7  in March of 2012?

8      A   Uh-huh.

9          BY MR. SHANK

10     Q   Is that a yes?

11     A   Yes.

12         BY MR. WISNIEWSKI

13     Q   If you look below, there is an e-mail,

14 earlier e-mail from Charlie Nichols dated March 26,

15 2012 to you, Mike Monahan and Joe Lancia talking

16 about or requesting information from you regarding

17 your roles at ADI and ADGC.

18         Do you see that?

19     A   I do.

20     Q   In the second paragraph, Mr. Nichols

21 states, "We also need to disclose any executive

22 officer or director relationships involving ADI and

23 assuming the warrants are issued, ADGC."

24 Mr. Nichols states, "I do not know what you guys

25 maybe or may have been, but certainly we need to

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

533

1  know exactly what Bob's positions were/are at both

2  ADI and ADGC.  If you guys have resigned any

3  relative positions or board seats, please let me

4  know when that happens so we can be comfortable that

5  we don't need to disclose."

6          Do you see that?

7      A   Yep.

8      Q   And I'm assuming you are responding to

9  Mr. Nichols in the e-mail above.  And I'll just skip

10 to the third sentence there.  It says, "Bob, was on

11 the board of both companies and CEO above.  Michael

12 and I were neither ever and Platt is nothing related

13 to this in any way."

14     A   Yep.

15     Q   Can you explain what you meant by Michael

16 and I were neither ever?

17     A   On the board or CEO.  I think I called

18 them back and said I need to look through the files,

19 because I don't really know, and that's why it made

20 its way into here and the way it did.  Something

21 about served in various executive capacities.  So

22 that is why it made its way into the AK the way it

23 did, because I wet back and looked.  I don't think I

24 was ever on the board.  I don't remember.  I don't

25 remember being CEO.  I did remember certainly at this

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

534

1  point.  I know I talked to him later and something

2  like this made its way in here.

3      Q   So you followed up with him after this

4  e-mail on this subject?

5      A   Yes, because it made it into here.

6      Q   And that's why -- how that -- whatever is

7  in the disclosure there Commission Exhibit 22, about

8  your positions as an executive at ADI?

9      A   There is no other way.  I don't think that

10 they would have known that.

11     Q   And was this by e-mail or telephone call?

12     A   You know I talked to him probably once or

13 twice at some points, because of this whole

14 documentation regarding -- so I was probably talking

15 to him more frequently back then.  I don't remember.

16     Q   I'm going to hand you an exhibit that is

17 marked as Commission Exhibit 70.

18             (SEC Exhibit 70 was marked for

19             identification)

20         BY MR. WISNIEWSKI

21     Q   Mr. Adams, Commission Exhibit 70 is a

22 document Bates numbered 15682 through 15700.  And

23 purports to be a questionnaire for directors,

24 officers, and five percent shareholders of Scio

25 Diamond Technology Corp.  And the director and

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

535

1   officer name on top, it says "Edward S. Adams title

2   Chairman." Do you see that?

3        A    Uh-huh.

4        Q    Have you seen this document before?

5        A    Maybe.  I don't remember.  It appears that

6   I filled it out.

7        Q    Could you turn to the last page of this

8   which is SEC Scio 15700?

9        A    15 -- what is it?

10       Q    The last page of the document.  Is that

11  your signature?

12       A    Yes.

13       Q    And it's dated May 23, 2012?

14       A    It appears to be, yes.

15       Q    And what was the purpose of this document?

16       A    I don't -- I guess it is a document, it is

17  DNO Questionnaire.

18       Q    And what is a DNO Questionnaire in your

19  experience?

20       A    It's filled out by directors and officers

21  of public companies.

22       Q    If you could turn to the second page of

23  Commission Exhibit 70, which is SEC Scio 15680?

24       A    Yes.

25       Q    And there is a sub -- that says officers

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

536

1   and positions held?

2        A    Yes.

3        Q    And the question is, "Please list all of

4   the positions you currently hold or have held within

5   the past five years with the company or any other

6   company."

7             Do you see that?

8        A    Yes.

9        Q    I notice Apollo Diamond and Apollo Diamond

10  Gemstone are not listed on that?

11       A    Right.

12       Q    Do you know why?

13       A    Other than they already knew that.  I

14  don't know why I didn't put it in there.  Probably

15  other companies that are private companies that I

16  was involved in that I didn't put in there.

17       Q    And did anyone follow up or did you ask

18  anyone or did you follow up on this to tell them

19  hey, in this filing I was an executive of ADI or

20  anything like that, kind of what you did with

21  Mr. Nichols?

22       A    I do not know that I did or didn't.  I

23  mean -- I don't know that I did or didn't.

24       Q    If you could turn to Bates Number 15694.

25       A    Yep.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

537

1        Q    And under the heading it says

2   "Transactions with the company and others"?

3        A    Uh-huh.

4        Q    Forty-seven asks, "Are there any

5   transactions in which the amount involved exceeds

6   $10,000 that have occurred after..." -- I'll skip

7   the paren, "...April 1, 2011 in which the company is

8   a participant and in which you are any member of

9   your immediate family had or will have any direct or

10  indirect interest." See that?

11       A    Yes.

12       Q    And you answered that no?

13       A    Apparently, yes.

14       Q    And the transactions between Apollo

15  Diamond Incorporated and public Scio, would that

16  fall into that description of a transaction with the

17  company and others?

18       A    Maybe.

19       Q    I'm just wondering why, you know, the ADI

20  transaction and the ADGC transactions, the Asset

21  Purchase Agreement with private Scio and Adams

22  Monahan for legal services it was providing to

23  public Scio, why those were not disclosed in

24  connection with 47?

25       A    It says it has it on Page 10.  Legal fee

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

538

1   of the law firm.  I don't know if I just rushed

2   through that one.  I don't know why.  I sort of go

3   through what I was -- what the law firm was, et

4   cetera.  What the law firm was getting and that sort

5   of thing.

6        Q    Did anyone ask you or subsequently ask you

7   regarding -- about that, about your statement here

8   or response in connection with 47 about those

9   different transactions that listed the Apollo

10  Diamond Asset Purchase Agreement and private Scio

11  Asset Purchase Agreement or Apollo Diamond Gemstone

12  Asset Purchase agreement?

13       A    Did they ask me what?

14       Q    Did they come back and say, hey, you know,

15  I saw you circle no, but what about these

16  transactions?

17       A    Not that I remember.

18       Q    No one asked you about any of those

19  transactions in connection with DNO disclosures?

20       A    If it was, it would have been Nelson

21  Mullins and I'm sure I would have said, you know,

22  okay.  Let's go through and figure out what the

23  question is asking.  I don't know if I ever filled

24  out a DNO Questionnaire before.

25       Q    Is this the first one that you filled out

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

539

1   in connection with public Scio or was there any
2   previous versions?
3       A   I think it was.  I don't remember.
4       Q   This one you said was Nelson Mullins?
5       A   Yeah.  I mean it's at the bottom there,
6   Page 13.  Whatever.  This is one they sent, I think.
7       Q   Did you fill out any similar forms for
8   Zouvas law firm?
9       A   No, not that I remember.
10      Q   Turning to the public Scio ADGC Asset
11  Purchase Agreement, when was that executed or when
12  did that become effective?
13      A   I think some time in May.
14      Q   May 2012?
15      A   Yes.
16      Q   I'm going to hand you an exhibit that was
17  previously marked as Commission Exhibit 9.
18  Commission Exhibit 9 is a three-page document Bates
19  numbered SEC ADAMS 27940 through 27942.  It is dated
20  March 18, 2011.  And it purports to be a letter from
21  Apollo Gemstone to its shareholders and it's
22  authored by or signed by Robert Linares.
23          Mr. Adams, do you recognize this document?
24      A   It is a version of the document that was
25  signed.  I don't know if it is the final version or

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

541

1   that led to that change?
2       A   I think I did.  It was the one -- there
3   was a lot of uncertainty about what assets were
4   what, owned by what entity and what assets there
5   even were, particularly the Gemstone assets.  And
6   there was an effort that was undertaken by Lancia, I
7   believe, perhaps Nichols, Bob Linares to figure out
8   and value them.  At some point there was a report
9   done by a third party that said the value was
10  $600,000 or something in assets.
11      Q   Of Gemstone?
12      A   Of Gemstone, yeah.
13      Q   So how did you agree upon -- had you
14  settled on $100,000?
15      A   Bob Linares and Joe Lancia, were the ones
16  that talked about that.  I don't remember exactly.
17      Q   Now, you had already purchased Apollo
18  Diamond's assets for $2 million as originally agreed
19  upon, right?
20      A   Right.
21      Q   And so in total you were going to pay Scio
22  was going to pay $2,010,000 for collective assets of
23  the two amenities, correct?  And the end of day
24  ended up paying 2.1 million.
25      A   Yes.  I think that's right.  If that is

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

540

1   not.
2       Q   And if you turn to Page 2 of Commission
3   Exhibit 9, the third paragraph states that "The
4   company has entered into an Asset Purchase Agreement
5   with Scio Diamond technology Corp."
6           Do you see that?
7       A   Yes, I do.
8       Q   And the last sentence of that paragraph
9   says, "Under the terms of the agreement, we have
10  agreed to sell substantially all of our assets for
11  $10,000 to Scio Diamond Technology Corp."
12          Do you see that?
13      A   Yes.
14      Q   Now, the ultimate purchase price between
15  Apollo Diamond Gemstone and public Scio was
16  $100,000, is that correct?
17      A   Okay.  Do we know?  Do we have it
18  somewhere.  That sounds right.
19          BY MR. SHANK
20      Q   You don't recall there being a change in
21  the purchase price from the original agreed upon
22  $10,000?
23      A   I'm going to say yes.  I think there was a
24  change.  Yes.
25      Q   Can you describe for us the circumstances

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

542

1   what you remember, if that is what you said the
2   document said.  I'll assume that's true.
3       Q   Now, how did the original $2,010,000
4   relate to the value of those assets --
5       A   I don't remember how that was.  I think
6   Bob said -- I think if we were going to go back and
7   duplicate the assets from start to finish, it would
8   cost "x".  And then there was a discussion between
9   Lancia and Bob and perhaps me and Monahan about
10  well, that's not feasible to pay that amount.  You
11  have to satisfy creditors.  Kind of -- I don't
12  remember the exact way that it got hammered out.
13      Q   You said it wasn't feasible to pay that
14  amount?
15      A   Fifteen or $23 million.
16      Q   So the assets had been estimated to be
17  worth 15 to 23 million?
18      A   No, no, no.  Bob said to re-create the
19  assets would take him 15 to $23 million.  But
20  remember that the company had been trying to be sold
21  and there were no buyers.  So I mean I could argue
22  the assets were worth nothing and I could argue that
23  they were worth something north of nothing.  It
24  seems to me the true place to figure it out is the
25  market.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

543

1      I remember at one point David Platt was
2   out actively shopping the company and he couldn't
3   get any traction.  And I testified earlier to GT
4   Solar who basically said "No, we don't want to buy
5   the company."  There was no market value for the
6   company that we knew of.
7      Q   Although, you're talking about the market
8   value of the company as opposed to the assets,
9   right?  Are we talking --
10     A   Well, okay.  I mean it would have offset,
11  whatever, if you had paid, then you would have had
12  to deal with the liabilities which are $10 million
13  I'd say.
14     Q   I want to make sure we are not --
15     A   Right, mixing apples and oranges.
16     Q   So when you were going out looking for
17  buyers.  You were talking about looking for buyers
18  for the company which include inheriting millions of
19  dollars of liabilities.
20     A   It would have been anything.  It was an
21  open dialogue.  It wasn't, you know, if somebody had
22  said "I'm not buying the liabilities", that would
23  have certainly been -- buyers aren't dumb.  They are
24  not going to pay for a bunch of liabilities
25  typically.  So I don't --

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

544

1      Q   Was there any discussion about whether
2   there was a need to increase the $10,000 purchase
3   price up to $100,000 or whether it could stay
4   $10,000?
5      A   I think it was a discussion between Bob,
6   Brian -- not Brian, Bob, myself, Lancia about what
7   happens because the assets were worth more.  And we
8   got to, you know, that's the only thing I
9   remember.  And I remember Bob being steadfast and I
10  think understandably about $100,000, because the
11  assets were worth a lot more and they would
12  intergrowth the success of the business.  Because
13  there was an increasing view that this was going
14  to -- the focal point of the business was going to
15  be gemstones.
16     Q   But hadn't Apollo Diamond Gemstone
17  committed in an agreement to sell it for $10,000?
18     A   It had -- well, and that agreement was
19  renewed, and then if Apollo had decided it was going
20  to find another buyer, it would have cost Scio
21  $250,000 to continue the agreement.  So there was an
22  extension to the Asset Purchase Agreement.  That
23  Asset Purchase Agreement by its terms expired in
24  June of 2011.
25     Q   And then it was extended until when?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

545

1      A   That I don't remember.
2      Q   I'm saying there was an effective --
3   extended as a purchase agreement in place for
4   $10,000, right?
5      A   Right.  But the way that the agreement was
6   structured is that Bob had gone and sold the assets
7   for $600,000, $200,000, $500,000, whatever we could
8   have gotten in excess of what was agreed to.  The
9   only way that Scio could have stopped that was by
10  paying him $250,000.
11     Q   Why is that?
12     A   Because that was what the terms of the
13  document said, the extension.
14     Q   So the extension gave him the right to go
15  out and try to sell them for more?
16     A   Yeah.
17     Q   I'm sorry, is that a yes?
18     A   Yes.
19     BY MR. WISNIEWSKI:
20     Q   On Exhibit 9, Commission Exhibit 9, the
21  last sentence the first paragraph, "The company has
22  outstanding liabilities and the company is Apollo
23  Diamond Gemstone of more than $1.25 million --
24  insufficient cash and to satisfy the liability."
25      Do you see that?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

546

1      A   Yes.
2      Q   Who were those liabilities payable to,
3   outstanding liabilities?
4      A   I think some of them were Apollo per
5   licensing fees.  Some of them were attorneys.  Some
6   of them were the principals of the company,
7   including me.
8      Q   And it was the same type of deal Apollo --
9   that you negotiated -- that Apollo Diamond Gemstone
10  negotiated those liabilities to be satisfied with
11  ultimately the $100,000 purchase price?
12     A   If I remember right, yes.
13     Q   Was the $100,000 purchase price -- was
14  that actually paid to Apollo Diamond Gemstone?
15     A   I think so.
16     Q   Do you know when?
17     A   No.
18     Q   Do you know how Apollo Diamond Gemstone
19  distributed the $100,000 purchase price?
20     A   I think it was to -- I think Bob, Brian
21  and I was the largest creditors.  Probably to us.
22     Q   How much went to you, Bob and Brian?
23     A   That I don't remember.
24     Q   I am handing you a document that has been
25  marked as Commission Exhibit 71.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

547

1        (SEC Exhibit 71 was marked for
2        identification)
3        BY MR. WISNIEWSKI
4    Q    Commission Exhibit 71 has a whole bunch of
5    checks or canceled checks, I should say included
6    in -- and if we walk through these, the first check,
7    this is a Venture Bank check with ADGC.  At the
8    upper left-hand corner it's made out to Robert
9    Linares for $33,000.
10       Do you see that?
11   A    Yes.
12   Q    And is that your signature on the lower
13   right hand side?
14   A    Looks like it.
15   Q    And it says -- the memo lines says "for
16   expense"?
17   A    Right, expenses.
18   Q    Do you recall issuing this check to Bob
19   Linares?
20   A    Not particularly.
21   Q    And if we turn to the third page of
22   Commission Exhibit 71, there is another ADGC Venture
23   Bank account check.  This one dated February 1, 2013
24   in the amount of $33,000 to Brian Linares?
25   A    Yes.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

549

1    obligations of this --
2    Q    One hundred percent of the what?
3    A    I'm imagining we had 100 percent of the
4    obligations.
5    Q    So there were no other obligations that
6    Apollo Diamond Gemstone had?
7    A    Oh, no.  I don't know about -- I don't
8    know when the money was paid to Apollo by Scio,
9    because now this is six months later after the
10   closing of the transaction, so I don't really know.
11   Q    If I represent to you it was paid in March
12   and April of 2011 -- 2013, does that seem correct to
13   you?  Or wait a minute.  That's wrong.  Yeah,
14   that's right.  If it was paid on January 14, 2013 by
15   check from Scio Diamond, public Scio, does that seem
16   right?
17   A    It doesn't really ring a bell one way or
18   the other, but --
19   Q    Do you have any reason to dispute that it
20   was not received in 2013?
21   A    No.  I know through 2012 we were trying to
22   figure out what potential liabilities were still
23   out.
24       MR. SHANK:  What types of liabilities did
25   Apollo Diamond Gemstone have?

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

548

1    Q    And the memo line says "loan expense"?
2    A    Yes.
3    Q    And is that your signature on the bottom
4    right?
5    A    Yep.  Yes.
6    Q    You recall issuing this check to Brian
7    Linares?
8    A    Not particularly.
9    Q    And then if you turn two more pages there
10   is a third check of Apollo Diamond Gemstone from
11   Venture Bank dated February 7, 2013 in the amount of
12   $33,000 payable to Edward S. Adams.  And the memo
13   line says "expense reimbursement".
14       Do you see that?
15   A    Yes.
16   Q    Is that your signature on the bottom
17   right?
18   A    Yes.
19   Q    So of the $100,000 that was paid to Apollo
20   Diamond Gemstone from public Scio, does this reflect
21   your recollection of how the money was distributed?
22   A    $33,000 to Bob, Brian and myself.
23   Q    So almost 100 percent of the purchase
24   price was distributed to you?
25   A    Sure.  We had the 100 percent of the

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

550

1    A    Well, that was one of the issues.  Did it
2    have independent liabilities of Apollo Diamond.  So
3    we were trying to figure that out.
4    Q    What was the shareholder -- various
5    shareholder interest in Apollo Diamond Gemstone?
6    A    So say that one more time?
7    Q    Who owned Apollo Diamond Gemstone?
8    A    Apollo Diamond Inc. owned a significant
9    portion of it.  There was some independent
10   shareholders who owned it, and then there were
11   people that had contributed services to the company,
12   including myself, who owned it.
13   Q    Now, these checks talk about expense
14   reimbursement for you or loans/expense for Brian and
15   then expense for Robert Linares.  What expenses are
16   being referred to there?
17   A    I don't remember.  I presume it's expenses
18   that were advanced to Apollo Diamond Gemstone for
19   its work.
20   Q    Do you know what type of work the three of
21   you fronted for Apollo Diamond Gemstone?
22   A    Probably travel and travel related
23   expenses.  It might have been annuity fees, payments
24   that were made to maintain the patents.  It might
25   have been consultants that were paid at some point.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

551

1    Q   Those were payments made out of -- those
2  are the type of payments made out of your pocket?
3    A   Yes.
4    Q   So you wrote out of your own personal
5  accounts of those expenses for Apollo Diamond
6  Gemstone?
7    A   I would charge things on my credit card
8  and then hold them.
9    Q   What specific types of expenses do you
10 personally -- before we were lumping everyone
11 together, what personal expenses did you personally
12 make out of your own funds for Apollo Diamond
13 Gemstone?
14   A   Travel, entertainment.  I believe I paid a
15 consultant.
16   Q   What consultant?
17   A   I think it was -- it might have been
18 multiple consultants.  Gordon Gilcrest, Jim Butler,
19 Paula something, some woman who worked with Tiffany.
20   Q   The company Tiffany?
21   A   Yeah, yeah.  Not the person Tiffany.
22       MR. WISNIEWSKI:  The singer?
23       THE WITNESS:  I'm not a big fan of hers.  So
24 I don't remember exactly.  I mean this stuff would have
25 gone back years because it would have been accruing for

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

552

1  years.
2       BY MR. SHANK
3    Q   So Apollo Diamond Gemstone, was Apollo
4  Diamond Gemstone reporting those expenses in their
5  accounting records?
6    A   I have no idea.
7    Q   Were you putting in any kind of expense
8  reports or in any way documenting these expenses you
9  were paying on behalf of Apollo Diamond Gemstone?
10   A   I'm sure they and I were both written.  I
11 had a list.  That's kind of how I did my work.  I
12 would have a pencil, not a pencil, but a pen and
13 keep a list on it.  I can't type, remember we talked
14 about that.  I was keeping it on a, you know, lined
15 piece of paper.
16   Q   So you were keeping a log?
17   A   Yeah.
18   Q   The only place you were keeping a log of
19 the expenses, in your opinion, for Apollo Diamond
20 Gemstone was on a lined piece of paper?
21   A   That's what I remember.  I remember
22 distinctly the lined piece of paper.
23   Q   Do you have the lined piece of paper?
24   A   No, not that -- I looked all over for it.
25 I can't find it.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

553

1    Q   As far as travel expenses, did you at any
2  point ever take any tax deductions on your personal
3  tax returns related to travel expenses for Apollo
4  Diamond Gemstone?
5    A   I don't think I would have, because I
6  think I would have told the accountant that this was
7  stuff that, you know, was in a business capacity.
8    Q   How was it determined to split the
9  $100,000 exactly evenly three ways between the three
10 of you as opposed to some sort of pro rata or some
11 other type of division based on the expenses you
12 fronted?
13   A   I think we were all so buried in the
14 situation in terms of the money we were owed, and I
15 just think that, you know -- I had a conversation I
16 think with Bob.  I don't if I had one with Brian
17 too.  We said we were never going to see any of this
18 in a substantial way.  This is how it's going to
19 work.  If you are okay with that.  I think that is
20 what he said to me or I said to him and said okay.
21       BY MR. WISNIEWSKI
22   Q   Who made the determination of how to split
23 this?  Was it the three of you combined?
24   A   It was Bob and I for sure.  I don't
25 remember if Brian was privy to that or not.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

554

1    Q   When did you make that decision?
2    A   Probably after I figured out, you know,
3  were there any other liabilities that were creeping
4  around out there and related to, you know, some of
5  the vendors and that sort of thing.
6    Q   So back in like March of 2011, did you
7  know that ADGC was going to distribute the purchase
8  price, whatever that may have been at the time,
9  equally to Robert, Brian and yourself?
10   A   No way.
11       BY MR. SHANK
12   Q   Who on the public Scio side was involved
13 in the decision to increase the purchase price from
14 $10,000 to $100,000?
15   A   I think Lancia, and whoever was on the --
16 I think it was a committee who actually approved it.
17 It was independent.
18   Q   Who was the committee?
19   A   It might have been McFeeley.  It was
20 McFeeley potentially Theo Strous, Joe Lancia, I
21 would imagine.  I don't know if Lancia was on it or
22 not.  I wasn't.  I know Theo Strous is the former
23 head of Antwerp Diamond Bank.  I mean he is a real,
24 you know, player in the diamond space.
25       BY MR. WISNIEWSKI

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

DSM-000539

555

```
 1        Q   Did anyone raise any concerns like, hey,
 2   we will pay ten times the price we originally
 3   agreed?
 4        A   Well, Bob had been able to sell the
 5   assets, which he could have forced them to -- they
 6   would have had to pay him 250.  You see, if Bob had
 7   gotten a buyer -- if he had gone to someone and
 8   said, "Look, do you want to buy these assets for
 9   $11,000?"  The only way the company would have been
10   able to preserve the right to acquire the assets
11   would have been to pay him $250,000.  So I don't
12   think anyone thought there was an issue.
13        Q   Did Bob do that?  Did he find a buyer?
14        A   I don't really know what Bob is doing at
15   this point with respect to that.  I mean he
16   certainly should have been.
17        BY MR. SHANK
18        Q   What type of documentation was created
19   that supported this $100,000 evaluation?
20        A   It was an independent third party
21   evaluation firm that did it.
22        Q   Who?
23        A   It was somebody Nichols found.
24        MR. SIKORA:  You guys have copies of the
25   appraisals.
```

557

```
 1        MR. SHANK:  If we take two minutes, we'll see
 2   if we have any other questions.
 3        MR. SIKORA:  I have to scoot.
 4        MR. SHANK:  It would really only be like
 5   cleanup.
 6        MR. SIKORA:  Not the whopper.
 7        MR. WISNIEWSKI:  We'll go off the record at
 8   5:15.
 9             (Brief recess.)
10        MR. WISNIEWSKI:  We're back on the record at
11   5:19 p.m.
12        BY MR. WISNIEWSKI
13        Q   Mr. Adams, could you pull out Commission
14   Exhibit 68 and let me know when you are there?
15        A   I'm there.
16        Q   Can you turn to Page 47 of Commission
17   Exhibit 48.  These are the -- this is an invoice,
18   Adams Monahan LLP issued to Scio Diamond Technology
19   Corp.  And I just want to cover some of the time
20   entries that are there regarding some securities log
21   counsel work that the company purportedly performed
22   for Scio Diamond.
23        MR. KOPECKY:  I do object to the
24   characterization that's issued to -- it says "issued
25   for", and he says he don't know if anything was ever
```

556

```
 1        THE WITNESS:  I think I have them and gave
 2   them to you that I had.
 3        MR. SIKORA:  Are you at a stopping point?
 4        MR. WISNIEWSKI:  Yeah.
 5        BY MR. WISNIEWSKI
 6        Q   At the time that agreement was executed,
 7   were you still and executive of Apollo Diamond
 8   Gemstone?
 9        A   No.
10        Q   Were you a shareholder?
11        A   Was I a shareholder?  I don't think so.
12        Q   Were Apollo Diamond Gemstone shareholders
13   notified of how the purchase price was going to be
14   distributed?
15        A   There were no shareholders.
16        Q   So at this time --
17        A   Except Bob and Brian.
18        Q   So those were the only two shareholders?
19        A   I think.
20        MR. SHANK:  What about Apollo Diamond, what
21   about their interest.  You said they owned it before.
22        A   Oh, yeah, right.  I guess -- that would
23   have been Bob notifying Bob, you know, because he
24   was the only shareholder with Brian at Apollo
25   Diamond too, to my knowledge.
```

558

```
 1   provided.
 2        BY MR. WISNIEWSKI
 3        Q   If you could look Page 47.  If you could
 4   look at the third time entry there.  It says, "legal
 5   analysis Chris Mum agreements for security filings
 6   and Asset Purchase Agreement."
 7        A   Uh-huh.
 8        Q   There's an entry below that two down that
 9   says "Document preparation/Chris Mum matters re: AK
10   reporting requirements, etc."
11        A   Okay.
12        Q   And the entry below that 9/1/2011 that
13   says "Conference call with co-counsel on client
14   matters/Chris Mum and conference security filings
15   and investor inquiries."
16        So just taking a look at those time entries,
17   did Adams Monahan provide any legal advice with regard
18   to public Scio's public filings, an AK or any type of
19   other SEC filings?
20        A   I think this was actually after the AK was
21   filed, right on 8-18.  It was filed on 8-17.  I
22   think this was Mum trying to understand how this
23   impacted any private placement memo that was being
24   drafted.
25        Q   So Chris Mum did provide these services to
```

DSM-000540

559

Scio Diamond?

1    A    I don't know.  I mean if it says that he

3  did, I don't know.  I wasn't standing there when he

4  did it or that sort of thing.  I don't know.

5         MR. KOPECKY:  You might be answering

6  questions from the Counsel preparing it on those

7  issues.  We can ask him.

8         BY MR. SHANK

9    Q    The bottom line is our question, to what

10  degree, if any, did Adams Monahan have involvement

11  in AK filings or other SEC filings for public Scio?

12    A    To my knowledge, none.  He was doing this

13  because he was trying to figure out the private

14  placement on how that was coordinated with whatever

15  the filing were and what they meant.

16    Q    And that last part says do you know that

17  or are you speculating as to what he was doing?

18    A    I'm very confident that he was focused on

19  making sure the private placement memo was right

20  vis-a-vis whatever the filings were saying, because

21  we weren't doing the filings.  What's his name was

22  in charge of the filings, Zouvas, and that was the

23  point.

24         MR. WISNIEWSKI:  Okay.  I think that's all we

25  have.

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

561

PROOFREADER'S CERTIFICATE

In the Matter of: SCIO DIAMOND TECHNOLOGY CORPORATION

4  Witness:        Edward S. Adams

5  File Number:    File No. C-08091

6  Date:           October 8, 2015

7  Location:       Chicago, Illinois

10         This is to certify that I, Nicholas Wagner,

11  (the undersigned), do hereby swear and affirm that the

12  attached proceedings before the U.S. Securities and

13  Exchange Commission were held according to the record

14  and that this is the original, complete, true, and

15  accurate transcript that has been compared to the

16  reporting or recording accomplished at the hearing.

18  _____        _____

19  (Proofreader's Name)            (Date)

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

560

1         Mr. Adams, we have no further questions at

2  this time.  We may, however, call you again to testify

3  in this investigation.  Should that be necessary,

4  we'll contact your counsel.

5         Do you wish to clarify, Mr. Adams,

6  anything or add anything to the statements you made

7  here today?

8    A    Not right now.  If I think of something,

9  I'm happy to do that.

10         MR. WISNIEWSKI:  Jim, do you have anything to

11  add.

12         MR. KOPECKY:  I have nothing to add or

13  clarify at this time.

14         MR. WISNIEWSKI:  We'll go off the record at

15  5:22 p.m.

16         (Whereupon, at 5:22 p.m., the examination

17  was concluded.)

18              * * * * *

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

---

## Transcript Word Index

[& - 203]

(word index columns)

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

## [205 - 55419]

**205**
382:4
**22**
510:21,22 511:1,23 522:19
530:5 534:7
**225**
498:7
**23**
535:13 542:15,17,19
**23rd**
315:8
**25**
420:16,18 423:5
**250**
324:10,18 325:5 555:6
**250,000**
322:16 324:8 544:21
545:10 555:11
**257,025.99.**
493:4
**26**
531:17 532:1,14
**27**
405:19
**27243**
461:6 464:4 467:17 472:8
**27528384**
469:23
**27940**
539:19
**27942**
539:19
**27th**
206:6
**28**
396:24,25 404:14

**3**
**3**
457:17
**3/26/12**
312:21
**3/27/11**
311:16
**3/31/2011**
311:14
**3.20**
485:24
**30**
318:6 420:12,17,18 423:5
458:9 459:2 485:11 523:17
530:20 558:2
**300**
445:16,21 446:23 448:4,16
448:25 449:2 451:5 454:9
455:16,19,24 456:5,12,18
456:24

**308**
308:9
**308es**
331:6
**30889**
331:6
**30902**
343:14
**30904**
343:14
**30910**
405:15,17
**31**
402:2 404:2,17 408:7 408:8
410:1 459:1 463:5 466:14
477:7 484:24 486:24
487:14,24 488:13,24 489:3
502:14,23 510:20 523:17
**31,2012**
312:14
**31152**
317:20
**31154**
317:20
**312-527-3966**
310:9
**312-876-6580**
309:18
**312-886-3803**
309:11
**313**
311:4,7
**33,000**
547:9,24 548:12,22
**330**
309:16
**33076**
416:6
**33077**
416:6
**331**
311:8
**33077**
495:7
**34131**
349:8
**343**
311:10
**345077**
498:1
**350**
348:3
**358**
311:12
**359**
500:19

**38**
390:7
**390**
311:13

**4**
**4**
365:9,13 457:17
**4.11**
311:18
**4.14**
522:10
**4.22**
527:1,3
**4.35**
527:1,3
**4.40**
308:3
**400,000**
447:19 449:13 456:25
**408**
311:15
**41**
317:14
**421**
311:17
**446**
311:19
**458**
311:21 312:4
**4582**
485:7
**4608**
485:8
**46**
484:22 486:21
**4610**
484:22 486:21
**465**
311:7
**467**
308:25
**468**
312:10
**47**
317:19 318:5,14 319:10
322:14 334:8 335:15
339:14 344:24 537:24
538:8 557:16 558:3
**48**
416:5 417:24 557:17
**484**
312:12
**486**
311:20
**495**
312:16 498:18 500:5,10

**49th**
460:9 461:15
**4th**
381:15

**5**
**5**
342:1 359:13 361:11
368:12 369:1,18,20,23
370:2,23 374:23 378:16
379:7 381:5,11
**5.07**
389:7
**5.2.**
388:19
**5/12**
312:18
**5/6/11**
311:11
**5/8/11**
312:2
**5:15**
357:8
**5:18**
535:14 552:1
**5:22**
560:15,16
**50**
413:13 420:16 493:6,10,25
**50,000**
344:12,13 349:13,14
**500,000**
326:23 349:13 465:8 466:7
466:9 472:10,16 545:7
**515,000**
437:7 450:16
**52**
377:14,15 378:13 382:2
400:8
**53**
311:7 315:9,10
**54**
312:19
**54**
312:22
**54519**
460:10
**547**
312:24
**55409**
461:16,20
**55419**
461:20

---

## [actively - answers]

**actively**
337:19 339:21 340:17,23
351:14 356:7 372:23
520:24 543:2
**actual**
326:24 379:16 416:16
429:9
**adams**
308:3 311:4,10,20 312:15
312:19,23 313:3,6,13,15
314:7,15,23 315:7,13
317:18,20 322:15 326:23
330:16 331:4,10 332:1,14
332:16,17 333:20 334:11
334:21 343:13,14 351:21
358:5 359:3,13 361:14
366:23,24 368:3 370:18
377:8,12,15 389:25 390:6
392:5,9 398:10 400:22
401:16,25 404:21 405:13
405:15,16,17 406:9 414:5,7
414:12 416:6 422:5 429:20
433:9,17,21 434:13 437:8
438:2 439:21 441:22
444:22 446:4 448:21 449:2
456:15,23 460:9 462:7
466:8,18 468:21 472:1,9
468:7,10,22 487:2,11
487:12,20,24 489:4 490:7
489:24 490:20 493:15,19
494:10,14,18,19 495:7,9,11
495:17 496:13 497:6 498:1
499:1,6,10,13 500:2 501:10
511:3 521:3,13,18,20,22,25
522:15 531:14 534:21
535:1 537:21 539:19,23
548:12 557:13,18 558:17
559:10 560:1,5 561:4
**addition**
500:18 459:9
**additional**
344:8 328:5 334:4 344:7
344:10,13 349:1 450:21
**address**
368:4,7,10,11 382:8 460:12
460:13,14,17 461:14,17
531:17 532:3

**addressed**
370:18 386:4
**addresses**
532:6
**addressing**
368:14,15,16
**adge**
312:25 511:25 512:8,9,12
512:14,19,20,25,25 513:11
513:17,25 514:4,7,16,20
517:2 522:24 523:2,6,7
527:12 530:7,12 531:21
532:17,23 533:2 537:20
539:10 547:7,22 554:7
**adi**
311:19 511:25 512:8,9,12
512:14 514:2,7,21 519:24
523:1,4,5,12,13,14 527:11
528:18 530:7,12 15 531:21
532:17,22 533:2 534:8
536:19 537:19
**adjustment**
524:23
**adjustments**
494:21 495:20,21,22
**advanced**
434:21 450:7 550:18
**advance**
447:20
**advances**
329:8 335:18,19 346:1,7
374:8,10,18 383:12,17
413:17 426:20 481:21
462:2,7,10 505:7 511:11
512:21 520:13 558:17
**advertising**
404:6
**advising**
330:10 406:17,20
**advisory**
405:2
**affect**
397:18 399:6
**affirm**
561:11
**affirmative**
312:4
**agency**
432:15

**agent**
342:7
**agents**
363:4
**age**
371:2 453:24 459:9 551:5
**agree**
387:10 501:25 512:10
516:6 540:10,21 541:18
545:6 555:3
**agreed**
437:7 442:5 490:8 512:13
516:6 540:10,21 541:18
**agreement**
311:13,19 318 19,25
320:17 325:23 326:2
353:20 354:17 378:1,6,8,18
378:19 379:4,6,8,11,16,20
380:17 382:2,3 386:5 388:9
388:12,24 389:16 398:5
400:5,6 402:1,7,21,24,25
408:9,11,17,19 409:11,24
410:4 411:9 415:5 418:7,22
440:8,18,20 447:2,7,14,18
447:23 448:2 453:9 455:12
455:25 456:15,24 457:25
458:10 464:24,25 473:11
474:7 477:24 479:13
480:13,14 490:6,10 501:14
501:17,20,25 502:16,17,25
503:5,10,15,16 506:24
508:5 512:19,25 513:10,17
513:19,20 514:2,3,10,16,18
515:5,17 516:7,9 517:2
522:24 537:21 538:10,11
538:12 539:11 540:4,8
544:11,18,21,22,23 545:3,5
554:21 556:6
**agreements**
386:3 416:20 434:18
447:15 558:5
**ahead**
379:14 527:13
**air**
311:12 317:17,23,25
387:12 389:22 390:8 400:2
400:14 401:5 510:23 511:5
558:9,18,20 559:11
**aks**
315:22 451:5

**agree**
387:10
**aki**
446:21
**agreement**
311:13
**america**
452:12,12
**american**
321:22 338:4,4
**amlip**
312:16
**amount**
432:19 434:12 436:8
432:19 434:12 436:8
442:1 443:19 445:5 446:23
463:2 464:7 465:8 466:7
494:5 497:17 542:10,14
547:24 548:11
**analysis**
523:1
**analyzed**
523:1
**anglo**
321:22
**animal**
312:16
**answer**
316:3 322:2 337:14 391:22
395:12,22,24 420:2 421:8
443:9 476:23 480:25
494:25 502:11
**answered**
428:4 510:16 537:12
**answering**
559:5
**answers**
315:22 451:5

---

## [56 - active]

**56**
311:10 358:1,5,7 359:22
369:16 374:24
**562**
308:9
**57**
311:12 390:2,3,6 396:23
**58**
311:13 401:13,18,23,25
**59**
311:15 405:10,14,16
**5th**
363:3 381:15

**6**
**6**
358:8
**6.4**
387:21
**6/1/12**
312:14,15
**6:45**
359:13 361:11
**60**
311:17 421:19,22 422:5
429:24
**600,000**
541:10 545:7
**60601**
310:8
**60604**
308:12 309:10
**60606**
309:17
**61**
311:19 446:1,6,7 455:11
**62**
311:21 458:17,18,21,23
460:7 461:20 463:4 465:2,3
466:13 478:19
**63**
312:4 458:17,18,20 461:4,5
461:20 462:3,7 464:2,3
467:16,20,21 477:3,6
478:19
**64**
312:7 465:15,19,20 466:3
475:16 478:19
**65**
312:10 468:8,9,12,16,21
478:19
**66**
312:12 484:14,15,18 485:4
485:7 486:1,8,10,14
487:11 493:3

**68**
312:16 495:3,4,6,8,12
497:25 557:14
**69**
312:19 531:10,11,14
**9/10/2011**
558:12
**9/30**
472:10
**9/30/2011**
465:4
**9:00**
308:16
**9:03**
313:2
**9:09**
410:13
**900**
418:2 457:19
**700,000**
345:15 457:14
**71**
312:24 546:25 547:1,4,22
**75,000**
466:20
**750**
322:18 324:19

**8**
**8**
308:13 313:3 561:6
**8/11**
463:20 464:7,13
**8/17/11**
311:12
**8/31**
472:10
**8/31/2011**
463:18
**80**
312:19 476:9 478:7
**800,000**
479:10 458:7
**805**
421:23
**813**
421:24
**8-17**
558:21
**8-18**
558:21
**818**
500:18

**9**
**9**
465:8 539:17,18 540:3
541:5,20

**9/09**
466:6
**9/09/2011**
466:11
**9/12/2011**
558:11
**958**
472:10
**9/13/2011**
469:10
**70**
312:22 534:17,18,21
535:23
**700**
418:2 457:19
**700,000**
345:15 457:14
**71**
312:24 546:25 547:1,4,22
**73**
311:9 309:9
**913**
466:8
**9200**
308:25

**a**
**a.m.**
308:16 359:13 361:11
**ability**
384:19 420:2 503:20
518:11
**able**
426:9 455:15 475:19
526:24 555:4,10
**absolutely**
357:10 364:2 369:5
**accept**
330:13 437:7 441:25 442:1
442:15,16 443:19 446:22
448:25
**acquired**
379:24 382:1 402:25 474:6
**acquiring**
385:19
**acquisition**
395:13,16,25 386:9 473:14
473:11
**acting**
345:8 380:23 390:24
**action**
452:15,19,20 454:23
356:14 364:1 491:13,14
473:11 476:10
**actions**
336:17 451:21
**active**
337:20 341:11 346:8

**account (cont.)**
467:13,17,17,19,22,25
468:3,13,14 469:14 470:14
470:18,21 471:11,13,13
472:2,6,7,8,21 473:3,4
474:8,20 475:4,5,12,13,22
476:1,13 477:15 478:20
479:3,17 480:7,16 481:4,22
481:24 482:4,21 547:23
**accountant**
458:5 494:16,19 553:6
**accounting**
391:13 394:8,25 395:12,20
396:8 461:18 483:3 494:22
552:5
**accounts**
462:12,22,20,22,25
463:13,15 467:6 473:18
479:3,8 551:5
**accredited**
512:12
**accrue**
527:16
**accrued**
430:21 442:10 448:17
450:1,21
**accruing**
551:25
**accurate**
327:14,22 328:8 454:25
561:15
**accurately**
318:7
**acquisition**
312:11 468:14
**applied**
469:13
**appointed**
389:9,10,15,17
**appointment**
389:22
**appraisals**
555:25
**appreciate**
352:6 394:19 517:20
**apprize**
519:12
**appraised**
438:4 527:24
**appropriate**
343:2 469:17 472:23
472:25 458:25
**approval**
328:17 410:10,10
**approvals**
512:5
**approve**
333:14 408:10 409:17,19
514:1 523:1,1,4 539:23
**approved**
520:25 531:4,5 536:9,9

**apollo (cont.)**
537:14 538:9,11 539:21
540:15 541:17 544:16,19
542:5 546:23,8,9,14,18
548:10,19 549:6,8,25 551:2
550:5,7,8,18,21 551:5,10,12
552:3,3,9,19 553:3 556:7
556:12,20,24
**apollo's**
452:16,24 485:19
**apparent**
384:7
**apparently**
472:9 476:14,15 537:13
**appearances**
309:1 310:1
**apple**
325:25,25 326:24,24 332:9
332:25,25 335:2,6,23,24
336:7,8 338:24,25,25 341:1
341:20,20 342:6,6,24 343:3
343:5 344:4,6 345:18,19,25
346:1,7 347:22,22,24 348:6
350:5,11,12,13,22 351:25
357:3 366:20 367:6 380:14
402:7 408:24,25 412:10,21
413:3 414:2,16 415:8,23
415:25,25 416:12,14,16,19
417:11,12,25 418:2,10,24
419:24 420:6,8 421:12,15
421:20 422:1,2,5,8 422:18
423:11,14,16,19 429:5
431:12,15,19,22 432:1,3
437:11,14,19,21 440:10,13
438:18 439:4,12 440:6,12
442:11 443:20 445:1,12
448:6,14 447:3,10,15,17,24
449:15,15 450:24 451:15,16
451:6,14,15,22 453:22,25
454:1,6,9,14,19,24 460:21
454:8,16 455:24 457:15,19
456:19,21 457:20,24 458:9
463:9,16 464:2,8 468:19,20
468:6 469:7,11,24 472:7,25
480:16 481:6,9 482:4
481:4,21 482:4,22 483:8,10
483:5,9,10,18 484:7 486:14
484:12,13,14,16,17 485:8
464:22 465:7,9,13,21 467:9
473:1 476:17 483:6 490:24
473:17 484:1 486:12
485:5,8 490:6 506:14,22
487:12,13,24 488:14,24
489:3 502:14,23 510:20

---

## [anticipate - attorneys]

**anticipate**
444:6
**anticipated**
349:4
**anticipating**
319:13
**antwerp**
554:23
**anybody**
353:19 505:14
**anymore**
353:19
**anyway**
350:14 351:1,2 352:8
**apart**
405:3 416:17

**apollo (cont.)**
534:14 538:9,11 539:21
540:15 541:17 544:16,19
542:5 546:4,8,9,14,18
548:10,19 549:6,8,25 551:2
550:5,7,8,18,21 551:5,10,12
552:3,3,9,19 553:3 556:7
556:12,20,24
**approved (cont.)**
410:9 411:13 489:13
491:13,14 554:16
**approves**
527:19
**approving**
410:17,22 412:7,9
**approximately**
457:6
**april**
318:3,9 339:2 422:8,15
424:13 425:6 431:21 432:2
435:22 437:2,3 505:18
528:20,21 529:1,6,10 537:7
549:12
**arc**
338:3,25
**argue**
542:21,22
**arrange**
512:9
**arrangement**
509:5
**articulated**
506:11
**asked**
317:21 325:19 371:22
422:17 419:25 427:23
428:15,16 433:19 435:19
433:20 450:2 531:25 547:5
**asking**
317:1 327:8,15,23 328:15
374:9 376:23 384:11,14,15
385:25 386:11 387:22
393:2 394:5,10,15 395:5
429:6 443:11 458:15
421:11,19 426:8 429:7
413:25 414:2,16 415:8,23
420:1 515:18 515:20 519:21
517:18 516:22 519:14
520:25 531:4,5 536:9,9

**apollo (cont.)**
537:14 538:9,11 539:21
**approved (cont.)**
410:9 411:13 489:13
**assets**
325:23,24 333:13 339:23
339:25 379:21,24 380:4,13
402:25 406:9,10 410:25
411:7,19 473:11 504:2,9
514:23 515:18,20,22,23
516:2,20 523:13 540:10
541:3,4,5,10,12 542:4,7
542:16,21,22 543:8 544:7
544:11 545:16 555:5,8,10
**assigned**
541:5 545:6 555:5,8,10
**assist**
541:21 493:4
**assistant**
452:2,11 493:21 494:2
**assisting**
340:24
**associate**
330:16 332:1 334:10
397:14 520:1 521:3 522:2
**associated**
463:9
**associates**
493:21 508:9
**assume**
362:6,13 369:14 380:13
476:2 468:2 469:25 494:2
526:12 542:2
**assuming**
345:15 388:16 413:2
**assumption**
489:17
**attached**
358:21 379:13 488:19
488:22
**asks**
537:4
**asset**
311:13 378:1,7,18 379:7,16
379:19 380:16 382:2
385:15,25 386:5 388:12,24
392:8 398:5 480:9 490:6
402:1 406:9,11 408:9 410:24
410:17 411:9 513:20 514:1
514:10,21 515:5 517:1
538:10 540:4 544:22 545:3
510:25 540:4 544:22 545:3
**attendance**
420:24
**attended**
428:20,23,25
**attention**
309:8 311:8 379:6
402:20,22,24 423:2
**attorney**
366:18 480:11,13 526:3
528:19,20,23 529:2,4,5,15
531:6,7 532:21 534:6
532:15,18 533:8 534:6,7
**attorneys**
310:3 311:9 499:2

DSM-000542

## [attorneys - bob]

**attorneys (cont.)**
511:15 546:5
**attracted**
385:12
**audit**
478:23 480:24
**auditor**
478:22
**auditors**
448:11
**august**
377:18 378:16 379:7 381:5
381:11,15 390:10,20
392:15 398:3,16 402:2
404:2,17 405:7,19 406:6
408:8 410:1 437:9,18 438:6
439:1 447:3 458:9 462:17
463:5 467:7 477:7 484:10
502:14,23 506:25 507:2
510:25 519:21,22
**australia**
321:19
**authored**
539:22
**authority**
452:21
**authorizing**
460:3
**available**
314:5
**awarded**
326:12
**aware**
323:12 356:17 395:4 432:2
462:21,22 464:16 467:5
478:1,9 514:19 528:24

**b**

**back**
316:12,17 318:6 321:7
324:25 334:8 339:5,12,13
339:14 355:10 360:21,24
361:1 369:16,17,25 374:23
377:6 394:5,18 395:4
400:19 410:21 418:18
419:3 429:17 437:20 442:4
442:17 444:22,23 455:11
456:23 457:3 461:2 462:3
466:13 467:16 471:21,24
478:15 486:11,24 486:1,4
491:8 502:6 506:19 508:21
516:19 522:12,18 527:3
530:14 533:18,23 534:15
538:14 542:6 551:25 554:6
557:10

**backdrop**
328:18
**background**
424:21 523:2
**bank**
311:22 312:4,7,11,24
340:19 341:1 342:20
362:13 418:8,10 426:21,22
452:11,12,14,15,20 458:24
459:14,14 460:20 461:7,12
462:2,14,15,23 463:2,15
464:12 465:21 466:10,10
466:25 468:14 470:21
472:2,8,20 473:17 474:8,20
475:5 476:5,13 478:20
479:3,3,16,17 480:16 481:3
481:22 482:4 547:7,23
548:11 554:23
**banker**
340:2,18
**banking**
336:2 452:23
**bankrupted**
356:3
**banks**
342:23 345:23 426:23
**bank's**
470:8
**barton**
336:23
**based**
330:22 337:11 382:24
386:10 387:9 412:5 434:17
438:11 450:25 512:20
527:22 528:11 553:11
**basic**
328:11
**basically**
326:4 334:25 355:15
413:15 452:18 515:1
530:10 543:4
**basis**
328:23 412:24 413:11
**bates**
317:19 331:5 336:6 377:16
378:13 390:7 401:18
405:15 421:23 422:2 430:3
446:5 484:20,22 485:7
495:7 498:1 531:15 534:22
536:24 539:18
**becker**
391:14,21
**beers**
355:14
**bell**
321:25 323:7

**beginning**
319:3 392:15 490:12
**behalf**
309:3,13 310:3 334:21
339:22 340:15 346:7 363:5
392:10 402:11,12,13,14,14
414:3 422:24 451:6,14
489:8 490:9 503:7,8 552:9
**believe**
314:17 317:23 318:10,13
326:7 328:18 334:7 340:24
341:6 360:11,14 370:11
378:5 379:12 398:18 400:1
404:10 408:1,14 417:21
419:15,14 421:6 449:3 456:1
470:8 477:19 508:21
510:22 524:1 529:24 541:7
551:14
**believed**
413:18
**bell**
549:17
**ben**
383:25
**beneficially**
397:12
**benefited**
479:25
**bernie**
492:1 506:6
**best**
415:13 417:6,12 420:1
423:5 424:19 427:6 428:6
439:18 453:16 517:7
533:11,17,24
**boards**
362:8
**board's**
328:17
**bob**
328:20 329:17 348:23
355:19 403:14,14,15,23
404:4,6,7 406:6 407:19
408:13 409:13 410:6 415:6
415:7 416:2,14 419:20
432:10,21 433:10 434:4,16
434:19 436:4 438:13
439:14,15,20 440:14 441:6
441:23,25 443:13 444:3
444:11,18,21 449:8 503:7
516:15 533:10 547:7,15
542:6,5,18 544:5,6,9 545:6
546:20,22 547:18 548:22
553:16,24 555:4,6,13,14
556:17,23,25

**bills (cont.)**
497:1 496:11 497:7
500:24
**birth**
357:12
**bit**
317:15 359:11 461:19
**bleakley**
310:5
**blind**
384:25
**blue**
483:16 507:7 518:17
**board**
311:15 320:23 321:1,2
322:6,8,12 325:8,10,16
326:5,8,11,14,15 327:4,10
327:14,16,19,25,25 328:12
328:12 330:21 331:8,14
337:2,2 332:2 337:8,8,14
337:22 338:23 343:1,24
351:10,14,17 362:22
364:20 365:4,5,8,12,15,19
368:18,21 369:3 370:3,14
371:3 376:10,11,12,13,16
371:23 372:3,6,16 374:20
383:2,23 395:20 404:3
384:24 387:11 389:10,17
389:20 391:9,10,11,11,15
393:2,23 395:20 404:4,5
405:18 406:5,9,18,20,24
406:25 410:8,15 411:2,6
408:18 409:11 410:4,6,16
417:2 419:3 420:15 421:9

## [cfo - company]

**cfo**
319:21 320:22 390:24
391:2,7 393:4,6 403:21
467:9 471:3,3,6,8,10
491:19 501:6 520:17,21
526:5,13,14 527:10 529:5
529:18
**chain**
359:8 360:5 519:19
**chairman**
312:23 336:18 344:1
351:16,25 352:5 367:25
389:10,17,23 402:14 427:5
470:24 530:16 535:2
**chairperson**
448:25
**challenge**
384:16
**change**
319:5 470:16 472:22 473:2
540:20,24 541:1
**changed**
319:17 421:5 428:13 436:4
444:2 471:2 520:21
**changes**
404:7
**changing**
389:7
**characterization**
557:24
**characterize**
385:14 451:16,17
**characterized**
432:9 486:1
**chapter**
499:17 500:9,19 551:7
559:22
**charged**
336:19,21 499:6 500:1,3,18
**charles**
487:1 511:16
**charlie**
471:7 520:19 531:18
532:14
**chase**
321:25
**cheaper**
484:14
**check**
344:9 547:6,7,18,23 548:6
548:10 549:15
**checking**
327:12
**checks**
312:24 547:5,5 550:13

**cherry**
394:11,21
**chicago**
308:12 309:10,17 310:8
338:11,24 561:7
**chief**
402:1 486:25
**china**
323:18
**chris**
350:11,12,14,17 351:15,15
351:20,21,25 352:17
356:19 357:17 362:15
368:15 371:24 558:5,9,14
558:25
**christopher**
330:15 331:22 334:24
339:15 349:2,16 359:8
360:7,25 369:11
**circa**
413:6
**circle**
538:15
**circulated**
518:11 540:25
**circumstances**
518:21 533:23
**city**
452:14,16
**claim**
432:9 486:1
**claimed**
436:12
**claims**
388:18,19
**clarify**
320:10 410:8 444:16
476:18 560:5,13
**clarity**
352:8
**clear**
351:3 364:6 366:3,23
394:10 399:9 401:4 412:4
492:15,16 515:4,12
**clearly**
466:3 546:15
**client**
361:20 362:22 452:23,23
474:17 497:2,8 498:11
512:23 522:18 531:16,18
534:7,17,21 535:23 539:17
539:19 540:2 545:20
**clients**
500:3

**close**
357:23 381:20 524:10
**closer**
392:23
**closing**
523:7 549:10
**cloud**
347:15
**code**
461:19
**cofounder**
348:1
**cognizant**
441:16
**cohen**
350:18,19 356:21,21
**cohen's**
356:15 371:25
**collective**
363:3 541:22
**collectively**
348:16 365:24
**combined**
413:13 553:23
**comfort**
427:15
**comfortable**
356:24 520:18 533:4
**command**
519:19
**comment**
412:5 438:15
**commenting**
339:8
**comments**
338:16 318:9
**commission**
308:1,10 309:3 313:17,19
314:11,13,16 315:9 317:14
317:18 318:5 319:10
322:14 330:25 331:4 338:9
338:18 340:13 341:15,16
340:7,25 462:4 475:23
468:3 463:2,23 465:13,19
466:3,13 467:16,21 468:7
468:12,20 477:3,6 478:7
401:17,25 465:14,16 416:5
463:4 464:2 465:3,19 19
466:2,15 467:16,23 468:11
470:22 473:5,5,7 480:22
472:22 475:5,7 476:6,17,9
473:6 474:17,20 475:7
481:21,23 518:7 520:17
483:6 491:16 501:3 502:13
519:15 520:7 522:21,23,25
523:3,11,15,18 524:3 525:4

**commission (cont.)**
546:25 547:4,22 557:13,16
561:13
**commit**
439:17
**commitment**
439:17
**committed**
544:17
**committee**
336:15 337:3,5,6,7 489:13
489:18,18,19 490:3 491:1
491:15,20,21 492:6,13,23
492:24 554:16,18
**common**
335:2,8 326:9 328:1 331:3
331:21 344:14,19 378:21
397:13 449:21 501:21
512:10
**commonwealth**
438:20 447:21 457:7,9,11
**communication**
359:12 508:8 521:10
**communications**
415:16 475:9,10
**community**
338:9
**companies**
324:4 326:6 376:19 388:5
452:24 512:14 513:22
514:23 533:11 535:21
536:15,15
**company**
322:8,12,13 325:8,22
326:3 329:20 332:20,21
335:18,20 337:13 338:3
342:21 343:1 345:9,22
346:6 347:8 388:4,21
347:11,19 348:21 428:1,17
429:5 434:22 436:2 441:8
442:14 443:8,24 444:4
442:16 445:5,19,21 443:9
472:22 473:5,7 470:25
475:5 476:4 477:6 480:22
483:4,6 491:16 501:3
506:13 510:24 519:6,12
510:5 512:22 519:6,12
519:15 520:7 522:21,23,25
523:3,11,15,18 524:3 525:4

## [bob's - cetera]

**bob's**
370:25,25
**body**
370:25,25
**boston**
422:19
**bottom**
360:24 468:20 539:5 548:3
548:16 559:9
**boulevard**
308:11 309:8
**bounds**
506:17
**breaches**
421:18
**break**
316:10,11,14,20 357:24
376:23,24,24 377:8,10
429:21,23 471:23 476:24
485:25 522:7,9,15 527:4
**breaking**
421:18
**brian**
355:19 408:13 409:13
434:4,16 435:14 439:20
440:19 441:6,23 449:8
544:6,6 546:20,22 547:24
548:6,22 550:14 553:25
554:9 556:17,24
**brief**
377:5 444:18 471:20
475:3 523:1 524:23
**briefly**
480:21
**bring**
319:16 432:8
**bringing**
319:1,5,13
**brings**
441:14 508:21
**bri**
416:19
**broad**
322:10
**broadcast**
423:13
**broke**
429:20
**broker**
339:8,9,10,16 352:5 353:17
353:18 357:10 363:21
372:13 373:19,22 384:13
**brokerage**
357:18 452:19
**brother**
355:19 442:25 443:1,4,5

**brought**
351:9 391:14 393:4 436:11
451:11 453:18,19,20
**brung**
329:13
**buddy**
396:20,20
**budget**
393:11
**build**
342:21
**built**
355:16
**bullet**
430:7,19
**bullets**
389:8
**bunch**
343:4 353:7 358:18 382:8
385:4 386:21 418:1 434:5
439:23 444:5 543:24 547:4
**bunch's**
350:11,12,12,13,14,16,17
352:17
**burch's**
350:12,16 371:24
**buried**
553:13
**business**
312:10 329:11,20,22
332:10 335:18,19 337:15
338:22 339:24 340:1
342:17 345:13,21 346:17
346:21 347:8,13 348:7,8
348:15 350:16 392:3,6,8
348:1 482:11,16 521:1 518
544:12,14 553:7
**businesses**
329:13
**butler**
551:18
**buy**
354:20 380:13 384:19
509:6 515:18 543:5 553:8
**buyers**
388:16 542:21 543:17,17
543:23
**buys**
512:5,15,20 543:22
**bystander**
367:12

**c**

**calculator**
324:9
**caliber**
426:24
**call**
318:8 333:7 338:11 346:20
357:15 358:10 361:4,7
372:25 373:1 392:24 393:2
400:3 415:18 429:8 452:3
452:11 486:1,4 519:3
527:19 534:11 558:13
560:2
**called**
338:3 383:25 391:14
433:17 496:1 529:17
533:17
**calling**
482:5 489:10
**calls**
519:8
**cameron**
495:23,24 496:8
**canceled**
350:1,4 354:4 355:24 547:17
**cap**
319:5 435:3
**capable**
519:16
**capacities**
407:19 530:12 533:21
**capacity**
336:1,25 383:15 388:25
389:1 404:20 406:19,23,24
481:6 482:11,16 521:14
553:7
**capital**
319:5,12,16 323:20 325:24
326:16 349:13 393:16,19
428:4 437:21 458:15 512:5
512:15,20 542:7,8,9,10
**capped**
366:17
**capitalizing**
332:24
**card**
315:4,5 517:7
**certify**
561:10
**cetera**
324:11 345:13 352:15
355:22 458:13 519:20
538:4

**cared**
432:13
**careful**
525:25
**carolina**
392:20,24 462:19 463:1
483:3 517:13
**caret**
477:11
**case**
313:23 323:11,25 325:4
327:22 375:20 453:5 486:7
521:9
**cash**
437:5 543:25 545:24
**cason**
477:11,18,22
**catching**
507:25
**category**
432:5
**cause**
515:25
**caution**
442:3
**cb**
319:5
**cc**
324:1,4 331:21 512:11
**cents**
324:3
**ceo**
319:3 320:22 329:21 345:9
371:2 388:25 389:1,10
391:7 400:22 427:8 454:20
455:3,4 509:16 519:19
527:19 533:11,17,25
**certain**
342:13 345:2 356:17 367:1
369:15 373:10 426:17
518:14 528:24 532:25
533:23 543:23 555:16
554:24
**certainly**
324:14 345:25 512:6
**certificate**
318:11 333:17 561:1
**certificates**
333:7,9
**certify**
561:10
**cetera**
324:11 345:13 352:15
355:22 458:13 519:20
538:4

## [company - corporate]

**company (cont.)**
530:8,17 536:5,6 537:2
537:7,17 540:4 542:20
543:2,5,6,8,18 545:21,22
545:25 551:6 552:5 555:9
557:21
**company's**
389:10 397:12 454:19
523:24 527:19
**compare**
500:2
**compared**
561:15
**compensate**
333:5
**compensated**
337:9,13
**compensation**
335:6
**compiled**
415:10 417:22
**complaint**
454:6
**complete**
315:22 362:25 432:22
507:17 512:25 523:4,6
561:14
**completed**
341:8
**compliance**
357:10 372:13,14 373:19
373:22,25 374:19
**computer**
323:6
**concept**
372:2,5 373:5 376:11
529:14,15
**concern**
372:2,5 373:5 376:11
529:14,15
**concerning**
314:21
**concerns**
555:1
**conclude**
556:4 561:21
**concluded**
491:3 512:21 513:7 523:3
523:11 560:17
**conclusion**
516:4
**conclusions**
376:21 491:16 501:3

**concrete**
432:13
**concurrently**
389:15
**conducted**
407:18
**confer**
527:5
**conference**
352:17 356:12,23
**confident**
426:13 427:25 559:18
**confirm**
430:15
**confirmed**
349:3 452:13 474:10,12
**conflict**
371:5
**confused**
321:21 394:5 454:3
**connection**
340:13 342:12 377:25
381:24 383:9 389:15
410:23 451:21 474:6
501:12 506:9 512:23 526:6
538:8,19 539:1
**connections**
341:8
**consecutively**
484:20
**consequences**
426:16
**consideration**
386:25 408:18 413:22
412:12 445:4 447:25
**consulted**
328:20
**consult**
310:1,3 312:1
**contact**
369:1 373:4 383:16 560:4
436:16,18 441:13 444:23
444:23 474:22 475:3
480:18,18,20 481:2,7,16
482:17 490:20 528:10
555:15
**contacts**
343:5 351:4
**contemplated**
319:8 368:24 409:25
411:11,23 412:10 428:12
436:21 448:20
**contemplating**
475:8
**contemplation**
441:1
**content**
538:2
**contest**
424:22
**context**
372:9 428:1 433:18 434:2
436:24 451:25 511:10,11
**continue**
564:6 441:20
**continues**
432:5 363:7 364:4 397:9
**contract**
543:6
**contracted**
383:22 511:25

**constantly**
353:22,23
**constitute**
313:24 448:17
**constituted**
409:15
**continuously**
328:6
**contributions**
478:4
**control**
353:4 354:12 355:14 357:1
363:8 364:3,4 371:12
386:12,13 387:18 389:7
397:9 436:22 441:6,13,23
**contributed**
452:25
**convenience**
470:25
**convention**
440:18
**conversation**
351:7 356:23 386:17 393:9
436:16,18 441:13 444:4
444:23 474:22 475:3
480:18,18,20 481:2,7,16
482:17 490:20 528:10
555:15
**conversations**
316:14 367:3 371:19,21
372:1,21 377:9 384:10
422:6 423:11 433:14,19
480:18,18,20 442:17,25
482:17 490:20 528:10
**coordinated**
559:14
**coordinating**
509:12
**copies**
314:2,11,12 315:7,13
402:20 423:13 424:1,21
**corner**
547:9
**corporate**
312:6,9 318:8 343:16
377:18 378:19 380:7 389:2
390:9 461:8,11 464:4
488:12 495:10,15 496:12
510:24 534:25 545:5,11
557:16

**contractual**
433:11
**contribute**
323:20 324:7 326:10
**contributed**
325:5 453:8 550:11
**contributions**
478:4
**control**
353:4 354:12 355:14 357:1
363:8 364:3,4 371:12
386:12,13 387:18 389:7
397:9 436:22 441:6,13,23
452:5,6,9,10 453:20 460:6
460:24 461:25 462:9,14
463:4 464:2 465:3,19 466:2
**corporate (cont.)**
328:7 346:13 481:5,18,23
483:10

DSM-000543

## [corporation - deliberate]

corporation
308:6 313:20 317:10,10
322:18 331:15,20,23 345:4
348:4 349:6,25 378:3 17,25
379:1,9 398:5 402:3 406:12
407:22 431:16 448:14
455:15,18 456:10 469:17
470:1 488:10,23 496:23
514:11 561:3
corporation's
406:10 455:20
correct
317:11,12 322:13 340:10
344:8 346:2 349:9 350:2,3
378:3 379:5 382:10 384:25
397:23 402:15 407:15
408:1 419:9 430:12 445:6
446:25 447:4 461:22
465:23 469:21 473:18
489:1,21 501:22 506:11,25
514:7,12 516:8 540:16
541:23 549:12
correctly
346:25 386:6 428:11
437:17 450:9 453:6 471:4
483:11 507:8 514:24
515:23
cost
344:20 454:18 518:6 542:8
544:20
costs
346:23
counsel
314:24 316:18 320:11
373:13 380:23 381:1,3
383:12,13 391:19 404:12
405:4 406:24 448:12
474:15,22,24 475:1,2,10
480:19 481:3 485:13
504:19 505:13 507:19
512:21 513:4 519:25 520:1
520:3,3,11,12,14,14 521:17
521:20 524:6 525:6,19
526:3,6,6 527:5,18,18
530:21 557:21 558:13
559:6 560:4
count
457:17
couple
415:24
course
314:6 351:23 373:3 400:24
401:3 454:21
court
315:3,4 316:21 317:2
359:21 406:1 487:8

courts
323:7 325:11
cover
341:17 488:17 489:2
557:19
coverage
321:11,12,16 322:9
covered
317:15 328:4 344:11 412:2
475:6 479:2 510:16
covers
488:20
cpa
346:19 395:21 396:10
529:19,20,20,20
crazy
443:12
create
355:12 439:24 542:18
created
453:1 495:17,19 496:3
504:11,22 555:18
creating
495:25
credit
469:13,25 465:6 466:18
479:19 551:7
creditor
437:25 438:24
creditors
415:11,12,15 417:4 430:21
434:4,5 436:8 437:23 438:9
438:12,13 542:11 546:21
credits
477:9
creeping
554:3
crescendo
342:22
criminal
313:25
critical
386:19 513:20
crossbow
378:2,8 379:1,8,20 381:3
381:12 382:13 383:21,23
384:4 385:7,22 388:8,11,13
386:16,20,22,23 387:11
388:3,12 389:1 390:10,19
399:24 400:2 401:1,4
crystals
356:4
currently
314:10 536:4
cut
334:22 471:16

cutting
517:19
cylinder
517:22

**d**

dark
385:1
darkroom
385:1
data
308:13 322:17 331:23
345:5,10 348:5 349:3
359:12,24 469:13 510:24
561:6,19
dated
311:11,12 312:14 358:8
369:18,20 370:22 402:1
446:9,24 455:12 463:20
469:10 484:24 486:23
487:12 532:14 535:13
539:19 547:23 548:11
dating
485:10
david
340:9 358:8 361:6 362:16
543:1
day
485:10
days
319:24 355:10
db
362:10,11,20,24
dbl
455:20
de
355:14
debates
529:23
deal
378:2,8 379:1,8 385:22
356:5,25 363:10 113:20
367:22 385:15 408:4,6
412:16 485:25 543:12
dealer
339:8,9,10,16 385:12
353:18,19 357:10 363:22
372:13 373:19 382 384:13
dealing
374:5

dealings
337:5
debate
518:18
debt
466:5
debts
464:5 466:3
debt
330:4 430:20 435:1
debts
435:9 456:11,11
december
459:2 523:17
decide
362:10
decided
328:1,13 382:22 492:23
493:9 544:19
decides
326:11
deciding
326:22
decision
328:16 392:25 393:1
414:18 454:14,15 455:3
490:16 493:24 554:1,13
deductions
553:2
defend
454:16
defense
371:8
defer
399:13
define
393:18
defined
378:24 442:1 448:7,13
488:12
definitely
424:25
definition
394:20 398:20 399:4,11
400:17
definitionally
394:9
definitive
512:19 513:10 522:24
degree
512:17 559:10
delaware
324:25
deliberate
376:20

## [distributor - entries]

distributor
308:11
diversified
308:24
divide
514:24
divided
415:4 418:20,23
division
309:7 553:11
dno
321:11,16 322:5 326:17
535:17,18 538:19,24
document
312:10 317:18,19,22,25
332:4 351:9 363:14
352:1 357:12 58:6,13,17
357:24 359:3,4 360:8
361:13 374:14 377:15,19
390:1,7 390:11,15 391:18
392:2 402:11,18 405:14,17
405:20 408:21 416:4,6,9,12
416:23,25 417:6 421:23
422:9,12 423:22 443:18
444:8 444:24 448:8 461:5
461:15 465:20,25 468:7,13
468:15,18 469:13 477:21
478:5,11 483:1 484:13,21
485:1,5 489:22 511:3,6,10
511:18 529:16,20,23 542:2
545:13 546:24 555:8
documentation
534:14 555:18
documented
443:22
documenting
342:14 552:8
documents
358:22 371:13 420:25
425:16,18,19 453:12
458:16 459:7,10,24 480:24
483:17 484:19 504:14
505:20 509:7,8,13 518:21
522:3 527:20
dog's
469:6
doing
332:6,7,11,13 333:23
335:1 335:8 337:18 350:8
353:24 356:12 367:10,13
385:6,12

doing (cont.)
389:21 391:5 393:24 399:8
432:17,18 441:12 444:3
480:23 483:22,25 497:19
519:16 522:2 555:14
559:12,17,21
dollars
434:23,25 435:1 436:3
439:4 440:23 441:6 442:9
450:8 520:11 543:19
double
413:15
draft
332:9 378:10 379:25
380:14,16 392:9 408:20
444:8 518:16
drafted
359:23 416:23 417:5
518:21 558:24
drafting
360:1
draft
400:2
drafts
483:17
dramatically
319:18
drew
443:25
driver
364:7,17
dude
529:18
due
371:4 494:5
duly
313:8
duties
405:4
duty
541:19

**e**

e.r.
349:3
earlier
357:21 367:17 408:20
423:4 438:16 504:16
510:17 514:25 532:14
522:5 527:20
early
333:6

earn
324:15 325:18
earned
325:3,17,17
earning
325:4
ears
352:17
easier
317:16
ed
351:21 370:18 406:1
edward
308:8 311:4,20 312:23
313:6,13 446:9 460:9
531:1 548:12 561:4
edwardadams
531:17 532:4
effect
354:18 384:14 434:12
effective
343:17 350:8 398:6 506:25
539:12 545:2
effectively
353:5 449:8 504:2
effectuate
364:5
effectuated
436:25
effort
321:14 360:14 367:20
413:4 415:15 419:7 420:20
424:20 450:13 476:15
478:2,7 487:25 510:8
526:5 526:13
electricity
348:22
electronics
517:19
element
451:10
email
311:10 312:19
employed
404:8
employee
432:18
employees
310:4 407:22
employment
320:13 416:20 434:17
441:8
encapsulate
528:20 529:1,6

encourages
309:19
ending
575:21 413:14 445:20
452:6 453:2 523:16 541:24
energy
341:5
engage
360:6,12
engaged
340:25 499:9
engagements
362:9
enlisting
320:17
ensure
341:19 506:15
enter
408:18 410:4 458:9 501:19
514:9 518:18 540:4
enterprise
315:17
entertainment
551:14
entire
319:15,17 323:22 360:5
490:17
entirely
348:22
entitled
308:15 422:6
entity
316:16,17 320:16,20
325:12 328:25 332:10,11
337:21,24 383:20,23 384:4
384:9 409:7,24 410:13,25
411:22 481:9 488:10
489:21,25 514:7 541:6
entries
557:20 558:16

## [deliver - distributions]

deliver
426:9
delivered
351:6 353:8
delved
346:24
depended
436:6,7,8,9 498:11
dependent
513:16
depending
318:17
depends
500:17,20
deposit
477:13,16
deposited
452:22 476:12
deposits
478:8
depth
412:2
describe
341:15 540:25
described
340:14 381:24
describing
342:10
description
311:6 312:3 359:21 463:19
466:18 485:9 498:2 537:16
designating
314:4
designer
350:13
details
440:15 486:2
determination
326:16 383:5 504:24
553:22
determine
313:21 325:17
determined
325:13 386:7 414:15 415:3
499:6,20 524:3 553:8
determines
325:17
determining
383:10
deutsche
426:21
deutsche
340:18 341:1 362:13
developed
313:23 451:9

development
412:12
dialogue
543:21
diamond
346:24
308:3 312:5,9,17 313:20
317:10 318:4 321:20
325:25 328:24 331:7,15
335:23,24 336:8,8 341:20
341:21 343:15,16,24
346:20 346:10 347:2
348:15 357:14 371:8
373:8 378:17,19,25 377:18
377:23 378:12 388:18
382:4 393:1 408:17
411:16,17,18,20 411:18,20
412:13 413:20,25 414:2,16
417:10,14 418:9 415:6
432:25 434:6 436:6 437:9
439:13 442:6 454:11 456:9
466:1,6 468:22 469:5,7
474:17,18 475:21 481:1,8
481:10,12,18 482:12
490:16 492:24 500:1,11,15
532:22 534:25
diamond's
407:17 431:2,4 438:18
464:12 460:10 462:20

diamond's (cont.)
476:12 479:2,3 541:18
dice
304:9
dichotomy
325:2
different
394:9 407:10 409:7 412:22
417:17 423:15 461:19
473:9 489:21,25 530:3
538:9
diligently
340:2
dilute
384:8
diluted
328:23 412:24 413:10
dilutive
428:1
directed
496:22
directly
399:21 414:1,15 445:3
437:5 450:13 526:6
director
381:7,14 389:11 451:21
481:8,10,15 482:12 490:18
490:22,24 530:11,15
532:22 534:25
directors
311:15 321:11 331:8,15
337:3 343:17,24 387:3
389:18 397:10 406:5
523:13 537:1
directs
401:5
disclosable
393:25 394:3,23 395:1
disclose
357:11,16 394:13 508:16
540:5,11,14 545:23 549:22
551:25 552:12 553:5
disclosed
367:5 383:6 392:14 416:14
417:2 419:8 423:21 434:10
440:13 457:24 497:23
504:4 548:19 553:20
disclosing
342:19
disclosure
342:6 382:17,19,20 395:17
554:8
distribute
417:5 554:7
distributed
342:6 382:17,19,20 395:17
distribution
342:19
distributions
433:24

disclosures
396:13,20 400:20 521:5
538:19
discount
493:6,9,15,24 499:2
discuss
376:20 383:3
discussed
327:5 376:5,18 379:4 409:4
419:7,15 420:4 508:8
discussing
419:8,18
discussion
318:17 319:1,4 329:5 360:6
360:12,17,19 369:14 376:3
376:10 377:10 418:20
419:12 426:16 432:24
433:3,4,8 474:15 489:13,14
490:3 492:10,11,14,22,24
493:1 506:16 507:16
523:23 524:5,15 525:1,6,11
526:7 528:1 541:1 541:5
discussions
321:6,7 326:22 397:25
440:13 444:24 505:1,6
506:12 508:4 516:10,12
519:5 521:16 521:18 524:7
526:17 527:22
disgusted
522:8
disinterested
490:18,21,23
dispute
408:23 452:6 470:8 549:19
distance
520:23
distinction
321:23 452:9 552:22
distributed
342:6 382:17,19,20 395:17
distribution
342:19
distributions
433:24

## [entry - feasible]

entry
416:4 498:2 558:4,8,12
environmental
432:15
equal
413:1 502:20 503:21
equally
554:9
equals
323:12
equity
339:4 347:20 448:3,4,19
455:16
error
461:18
es
304:6
esq
309:4,5,14 310:4
essential
332:11 349:9 402:24
407:14 446:21 473:9 489:4
553:8
essentially
332:11 347:11,18
estimated
542:16
et
324:11 345:13 352:15
355:22 458:13 519:19
evaluate
416:21 456:10,14
evaluation
555:19,21
evenly
554:9
event
393:25 394:3,23 526:21
eventually
415:7 459:2 526:1
everybody
439:17
everyone's
321:15
everyone
321:15 503:18
evicted
449:18
ex
350:12
exact
428:24
exactly
326:17 327:1 335:3 385:14
438:7 449:23 458:14
497:20 533:1 541:16

exactly (cont.)
551:24 553:9
examination
311:3 313:9 314:5 560:16
examine
313:1
examined
313:8
example
324:8 348:24 411:17
415:16 429:22 466:3,7
467:1,21 468:6,13 470:8
476:16 477:3,6 484:12,13
490:1 493:3 495:3,4,6,8
exceeds
537:5
exception
475:18
excerpts
475:1
excess
309:4,5,14 310:4
exchange
308:1,10 309:3 313:19
344:15 361:5 411:19 440:4
461:3,1 561:3
excited
321:13
excluding
338:23 347:11,18
excuse
418:16 452:19 472:10
executed
378:1,17 388:24 402:20
418:22,25 508:5 514:20
539:11 556:6
exempt
559:21
exercisable
323:25 526:21
exercise
326:9 394:13
exhibit
311:7,8,9,10,12,13,15,17
311:19,21 312:4,7,11,16,18
312:12,16 419:20 496:1
421:15,19 422:2,14,16
542:6

exhibit (cont.)
417:23,24 421:19 422:5
429:24 446:1,6 457:1
458:17,23 460:7 461:4
467:16,21 468:8,12,16,23
475:16 477:5,6,12 484:1,5
486:5,7 486:10,14,15,17
486:1,8 493:3 495:3,4,6,8
exhibits
311:23 312:3 316:18 344:5
501:25 557:14,17
exist
308:24 313:2 316:8 478:19
449:18
existed
431:20 505:23 518:3
existence
509:4 519:23
exists
385:1
expand
324:11 354:22 355:17
explain
321:9 354:4 364:23 379:18
441:1 450:17,25
explained
399:4
exploit
349:2
export
326:19 350:9 396:1
exposure
540:2

express
507:10
expressed
507:9
expressly
544:25 545:3
extension
544:22 545:13,14
extensive
321:6
extent
383:4 415:20 428:25
522:12 539:16 557:4,17
extremely
436:22

**f**

facilitate
339:21 483:6
facility
348:15,22
fact
376:22 427:15 431:19
441:5 443:15 454:22 566:6
facts
376:25 443:6
fair
490:13 525:6
fairly
432:12
fall
508:10,17 509:19 537:16
familiar
359:8 378:6,10 379:11
390:15
familiarize
509:23
family
351:21,21 551:23
far
321:8 344:3 350:5 385:5
421:15 506:12 553:1
fashion
443:19
fast
514:8
father
355:18 414:17 421:25
442:25 443:1,3,8 454:15
favorable
364:5 413:11
fear
350:6
feasible
542:10,13

DSM-000544

## [february - free]

**february**
321:8 372:19 404:14
467:10 486:10 547:23
548:11

**federal**
313:22,25

**fee**
537:25

**feeds**
496:1

**feel**
363:3,5 429:7 443:3,12
468:23

**fees**
430:22 492:4 493:4,9,15
546:5 550:23

**felt**
442:22 483:14

**fiction**
323:16

**fiduciary**
336:22

**fields**
497:10

**fifteen**
542:15

**figure**
327:25 328:16,21,22
351:19 415:23 439:19
454:6 475:19 478:1 486:5
515:21 516:19 517:9,17,23
518:1,20 526:20 529:17,21
538:22 541:7 542:24
549:22 550:3 559:13

**figured**
527:17 509:15 554:2

**file**
308:4 487:9 511:13 561:5,5

**filed**
377:17,25 378:4,5 390:8
391:14 392:6 435:9
510:7,9,23 511:1,5,20
522:19 523:18 524:10,12
558:21,21

**files**
509:24 533:18

**filing**
392:10 399:5 402:23 401:2
500:23 519:24 530:20
531:1 536:19 559:15

**filings**
337:11 390:21 391:3
483:16,21 509:18 510:1
529:23 558:5,14,18,19

**filings (cont.)**
559:11,11,20,21,22

**fill**
559:6

**filled**
535:6,20 538:23,25

**filling**
468:18

**final**
539:25

**finance**
355:22

**financial**
346:20,21 395:2 396:17
487:1 523:16,24 524:4,17

**financing**
319:2

**fincen**
507:11

**find**
383:20,23 384:16 385:1
395:22 488:7 494:7 520:12
520:14,17 544:20 552:25
555:13

**finding**
333:4 341:7 384:3

**findings**
491:16

**fine**
351:5 353:13 367:14 393:8

**finish**
542:7

**finra**
453:11

**firm**
330:16 345:12 346:4
347:20 357:18,21 371:6,9
371:10 373:21 374:19
375:1 381:1 383:9 390:17
391:14 392:1,5 414:5 423:19
433:17 438:1 439:20
441:22 448 18:454:13
483:23 484:1,8 487:12
495:21 497:4 498:6 499:17
529:24 538:1,3,4 539:8
555:21

**firms**
362:10

**firm's**
373:18

**first**
313:7 314:14 315:18
322:15 331:19 332:7
322:22,24 325:12 328:25

## first (cont.)

460:6,7 466:2 484:21 485:3
498:1 524:8,8 525:14
528:17 530:24 538:25
545:21 547:6

**fiscal**
397:16

**five**
347:17 371:11 375:2
397:12 420:12,17 441:18
534:24 536:5

**flat**
517:18

**flowed**
482:24

**flux**
436:23

**focal**
341:15 544:14

**focus**
329:16,18 339:16,19
340:10,14,19,21,22 342:7
342:15 351:16 352:1
356:1,15,21 357:4,15,15
372:7 375:5,12,16,25
376:20 452:2,7,8,13,20
453:5 509:17

**focused**
559:18

**focusing**
530:1

**follow**
536:17,18

**followed**
383:12 452:17 518:17

**follows**
313:8

**forced**
555:5

**foregone**
433:11

**forever**
321:23 411:4

**forget**
329:5

**forgive**
532:6

**form**
411:12 314:12 320:15
320:22,24 325:12 435:18

## form (cont.)

332:22 377:17 390:8
485:14 510:12,23 523:18
540:22

**formal**
314:2,8 376:13 386:5
389:20 391:18 440:6
483:20 446:7 471:3 483:1

**formed**
317:11 319:20,22 320:19
323:18,21 325:13 337:3,7

**former**
336:18 406:12 407:21
410:3 416:1 432:17 502:17
503:1 505:22 509:2 519:4
554:22

**formerly**
378:25 488:11 530:11

**forms**
391:12 539:7

**formulate**
517:21

**forth**
394:5,18 398:20 399:3
400:19

**fortnight**
351:23

**forty**
537:4

**forward**
335:9 352:24,25 353:2
354:10 356:20 366:16,20
367:11 427:7 428:3 432:16
436:10,11,13 462:22 486:7
513:8 529:7 555:19

**found**
454:25 530:2 555:23

**foundation**
396:20,25 398:13,14 410:5

**founder**
347:25 348:1

**founders**
326:14

**four**
347:14 441:18 457:14
525:17

**fourth**
522:20

**frame**
415:1

**frank**
457:1

**frankly**
496:19 497:9,14,18,22

**free**
329:2 333:5 363:5

## [haircut - incorporated]

### h

**haircut**
443:14

**halves**
413:4

**hammered**
542:12

**hampshire**
372:13

**hamptons**
350:20

**hand**
313:3 317:13 343:8,13
358:4 377:12 378:2 389:25
401:16 405:13 414:4 446:3
458:15 465:18 468:6
469:22 484:12 486:20
510:20 534:16 539:16
547:8,13

**handbag**
350:13

**handing**
546:24

**handle**
483:14,15

**handled**
483:23 489:17 522:6

**hands**
329:3 443:16

**handwritten**
439:3,5,6

**hang**
330:8

**happen**
438:6 455:10

**happened**
353:6 375:21 376:2,17
418:3 426:21 436:24 438:8
460:7 485:16 541:7,17,25
526:9,19

**happening**
355:17 428:8 452:7 475:20
519:13 529:13

**happens**
376:21 533:4 544:7

**happy**
350:25 560:9

**hard**
333:23 482:2 359:11,16
395:11 423:25 424:21
518:8

**harvest**
496:19,19 497:9,14,18,22

**harvester**
496:2

## hastings

339:10,19 488:12
345:25 346:7 413:17

**hah**
415:9

**havoc**
355:12

**head**
316:23 336:14 430:6
554:23

**healing**
318:2 406:8 537:1

**heard**
350:11,19 383:24

**hearing**
308:15 561:16

**heck**
353:11

**hedricks**
369:7

**held**
318:8 422:18 458:25
462:23 527:2 536:1,4
561:13

**help**
317:2 329:11 339:21
340:15 342:21 343:5
448:24 471:1 526:24

**helped**
354:1,2 361:15 426:24

**helping**
345:10

**herewith**
343:9

**hey**
452:12 481:14,24 536:19
538:14 555:1

**hiding**
492:17

**high**
323:19 500:18

**higher**
351:19 529:23

**hindsight**
367:12

**hire**
371:4

**hired**
520:7,7

**history**
355:9

**hold**
476:21 506:15 514:19
515:25 536:4 551:8

**holdings**
378:2,9 379:1,8 398:4

## holdings (cont.)

399:10,19 488:12
465:16 468:10 484:16
486:18 495:5 531:12
534:19 547:2

**holmfield**
311:6 312:3

**identify**
315:1 359:17 383:4 431:23

**identifying**
482:15

**illinois**
308:12 309:10,17 310:8
561:7

**illustrates**
382:16

**imaginable**
353:13

**imagine**
363:13 372:17 380:15
427:13 467:11 499:24
511:19 529:7 554:21

**imagining**
549:3

**immediate**
537:9

**impact**
518:15 524:15,16,19,22
525:2,3

**impacted**
518:11 558:23

**impossible**
346:3

**impress**
329:18

**impressed**
413:14

**inaccurate**
486:3

**inception**
483:4 488:23 489:2

**include**
412:16 543:18

**included**
505:20 530:20 547:5

**includes**
412:25

**including**
342:22 380:11 404:12
420:21 488:6,10,24 546:7

**incoming**
477:10

**incorporated**
402:13 403:1 405:8,19

### home

437:23 437:12
460:14,15,17

**homes**
543:19

**honestly**
341:10 352:1

**honor**
352:20 354:17 357:2

**hour**
501:6

**hourly**
499:20 499:2,12

**house**
455:2

**huddled**
521:7

**huge**
494:21

**huh**
331:25 332:3 345:17
349:18 358:12 361:12,25
366:2,9 375:11 380:3 382:3
382:6 385:21 397:20,24
403:8 405:21 414:19 430:5
430:24 493:5,8 498:4 530:9
532:8 535:3 537:3 558:7

**human**
336:3

**hundred**
549:2

**hundredth**
324:3

**husband**
350:12

### i

**idea**
320:23 330:11 333:21
335:4 352:16 360:5 398:11
415:14 436:25 469:25
495:16 500:6,11 527:11
552:6

**ideas**
356:13 357:7

**identification**
315:11 331:2 343:11 358:2
390:4 401:14 405:11

**identification (cont.)**
465:16 468:10 484:16
486:18 495:5 531:12
534:19 547:2

## [frequently - guys]

**frequently**
534:15

**friend**
350:17

**frivolous**
454:16,17

**front**
317:17

**fronted**
550:21 553:12

**fruitful**
395:16,24

**frustrating**
530:2

**fulfill**
339:23 340:1

**fulfilling**
332:24

**full**
315:22 341:14 410:12
413:21 437:25 529:25

**fully**
322:16,17 325:3 328:23
345:3 348:3 349:8 412:24
413:10 527:24

**fun**
357:3

**fund**
319:15,16

**funding**
478:6

**funds**
452:22 456:14,19,21
457:23,23 464:23 472:17
472:19 476:12 479:5
551:12

**funny**
442:22

**further**
360:22 523:1 560:1

**future**
322:19 323:4 324:24
330:19 334:13 426:24

### g

**gaap**
395:14 396:4,7,14 517:8

**game**
525:6

**gates**
325:13

**gathering**
420:25

**ged**
443:3

**gemstone**
325:25 328:24 332:25

## gemstone (cont.)

335:24 336:8 339:25
341:21 346:10 347:3 348:2
366:21 422:7,16,25 426:11
431:7,15,22 450:7 501:19
502:2,5 503:8 507:18 508:5
514:11 515:6,8,8,9,9
517:20,20,22 530:25 531:5
536:10 538:11 539:21
540:15 541:5,11,12 544:16
549:5,24 550:14,18 548:10
550:24 549:6,25 550:5,7,18
550:21 551:6,13 552:3,4,9
552:20 553:4 556:8,12

**gemstones**
513:24 544:15

**general**
323:6,17 357:7 394:6
372:19 404:12 405:4
464:20 483:10 520:13

**generally**
326:16 347:8,9 366:10
393:17 396:14 440:12
475:10 478:19

**generate**
497:11

**gentleman**
321:17 336:20 384:11

**getting**
321:21 330:8 342:22
355:13 361:1 376:15
395:15 411:19,21 428:2,3
433:24 444:23 454:3 455:4
455:11 460:22 475:9
417:1,9,20 418:18 426:8
428:19,20 430:19 432:16
432:18 433:8 434:12 435:4
435:7,11,23 436:1,12,19
437:5,12,24 441:13,16
443:14,15,16,19 444:22
446:25 448:25 16
460:18 462:21 465:18
468:6,7 472:20 481:24
482:24 485:4 490:11 509:8
510:10 511:10 513:12,13
515:23 522:23 523:4,6,12
518:22 529:12

## go (cont.)

336:1 369:16,25 370:1
376:25 379:14 387:1
415:20 418:7 429:13 437:5
442:19,19 444:15,19
455:13 467:4 471:15,18,21
473:19 478:12 484:21
485:10,20 494:7,17,19,20
518:1 522:10,12 525:14
526:22,25 527:13 530:14
530:23 538:2,22 542:6
544:6 544:7 560:14

**goal**
503:18,23,24

**god**
455:13

**goes**
322:15

**going**
315:8 316:12,15 317:13
318:6 319:15 321:25
324:15 327:5 339:25
330:2,7 333:16,18 335:19
338:9 340:2,14,23 341:6,9
343:15 345:15 346:23
347:15 350:7,7,10 351:18
352:2,11,13,14,21 353:3
353:11,14,17 358:14,16
364:23 366:1,24 367:1
374:10 375:20 376:4 381:7
370:25 376:6,8,11,23
377:12 383:1,6 384:7 391:1
391:4 393:23 396:3,12
399:9,19 407:6 418:7,18
400:1,16 401:6 414:18
417:1,9,20 418:18 426:8
428:19,20 430:19 432:16

**goodmanson**
384:12,15

**gordon**
321:18 551:18

**gosh**
528:1

**gotten**
436:17 545:8 555:7

**govern**
396:7

**grasp**
422:9 529:24,25

**great**
326:9 352:4,15 353:1
359:21 427:15 428:5
432:14

**greater**
503:21

**greg**
346:5,15 348:16 369:6

**gregory**
345:16 346:5,15

**ground**
315:17 341:17

**grouped**
412:8 414:24 418:12
428:18,24 429:13 430:4,6
429:24 426:25 428:16,20
450:25 453:25 454:6
452:2 480:6 480:11
458:20 476:4 505:11
524:24 533:2 555:24

**good**
319:19 329:7 330:6,17,18
421:18 443:3 453:17
518:22 529:12

**goes**

**guess**
333:1,2 334:14 347:25
350:16 361:7 362:5,5
363:11 364:16 366:1 399:2
436:13 456:14 469:25 509:8
510:24 518:6 523:6

**guys**
323:14 353:22,23 356:7
393:7 412:23 453:12 455:5
526:21 533:7 552:6 555:25
532:24 533:2 555:24

## [incorporated - issues]

**incorporated (cont.)**
405:14 460:4 469:6
459:13 460:8 463:8,14
472:3 502:15,18,21 514:10
521:18 522:4

**incorrect**
318:15 419:2

**increase**
544:2 554:13

**increased**
498:23

**indeed**
398:18

**indemnified**
388:18

**independent**
416:20 520:3 550:2,9
554:17 555:20

**independents**
397:7

**indicate**
417:19

**indicated**
339:20 351:9 454:23 486:3

**indicating**
361:2 485:2

**indication**
423:24 507:6

**indirect**
417:15 537:10

**indirectly**
399:22 450:13 482:22

**individual**
372:15 452:23 497:17
499:5

**individually**
347:5

**individuals**
328:19 340:20 349:21,24
369:2 383:11 454:17

**industry**
341:9 342:18 355:11

**ineffective**
431:16

**infection**
361:19,19

**influential**
364:21

**inform**
323:11

**information**
314:12 382:8 383:3 492:13

## information (cont.)

492:22 505:20 526:15
532:16

**informational**
421:5

**informed**
408:17 509:4

**inheriting**
543:18

**initial**
318:3 319:9 320:14 503:3

**initially**
318:22

**inputs**
348:9,22

**inputted**
497:22

**inquiries**
506:6

**inside**
443:5

**insist**
416:17

**insights**
345:23

**instances**
396:20

**instructing**
345:11,12

**insufficient**
545:24

**insurance**
311:21 381:25

**intellectual**
334:17 346:14 398:18
483:11 513:21,24 515:25

**interest**
350:25 351:10 352:2
397:15 398:24 503:12
421:8 414:24 518:15
412:8 414:16 6,7,10,11
513:20 550:2 550:6

**interested**
341:6,14 383:11 384:3
436:12,14

**intergrowth**
544:12

**internal**
364:21

**internet**
425:2

**interpose**
518:2

## interpret

366:15 408:2

**interrupt**
505:10

**introduce**
340:3 350:10

**introduced**
421:5

**introducing**
320:20

**inventory**
367:8 411:12,16

**invest**
338:15 353:16 356:22
367:8 411:22 507:8

**invested**
337:25 338:1,2,12,15
340:22 341:4 347:11,18,19
344:8 541:1

**investigating**
336:17,20,22

**investigation**
313:18,24 314:3 560:3

**investing**
384:18 476:6,7,10,11
507:10

**investment**
336:2 338:25 339:1 342:20
342:22 345:22 384:18
426:22,23 452:24
498:1 517:3

**investments**
317:18 381:25

**investor**
350:15 351:11 354:12
354:23 456:13 477:19
473:6 476:4 487:24 558:15

**investors**
321:14,15 337:21 338:3,13
363:20 385:22 425:5 436:13
482:24 505:19 512:13
556:25 518:5 527:9,10,11
527:24 528:9 529:19

**invoice**
312:12,16 484:23 488:23
487:6,13 488:7,16,19 489:1
492:23 493:12,13,20 494:18
497:16 7,20 529:4
494:19 518:24 555:8

**invoiced**
487:12 567:1

**invoices**
486:16,18,25 496:5 497:2,2
496:20,22 497:19,23
506:21 508:11 525:21,22
525:8 528:3,5,23 557:18,24

**issue**
322:23 323:21 324:14
331:20 342:4 357:24
364:9 441:20 493:23
364:22 441:23 442:1
492:14,24 494:20 521:11
508:9 517:9 519:18
516:25 518:12 521:22,23
520:12 521:4 523:4,6,12
537:13 557:23

**issues**
352:9 386:23 416:1 453:1

DSM-000545



**[issues - lancesia]**

issues (cont.)
334:18 724:24 529:22
550:1 559:7
issuing
331:16,16 460:20 493:20
497:2,7 510:13 547:18
548:6
item
322:15 356:14 378:16
389:7 397:4,8 398:10,21
400:13

**j**

jackson
308:11 309:8
james
310:4
january
329:14 446:9,24 447:6
455:12 456:14 459:1
449:14
jeff
313:16
jeffmart1
368:4,9 370:20
jeffrey
309:5
jennifer
477:11,11,18,22
jim
315:3,4 551:18 560:10
joe
318:18,19,19 319:2,2,9,24
320:3 321:4 322:12 326:25
327:1 329:23 344:19
353:20 369:6 388:24
389:10 390:22,23 392:25
400:21 402:14 403:14,14
403:15 427:16 454:20
483:2 491:25 501:5 503:7
511:16 516:15 520:20
529:7 531:18 532:15
541:15 554:20
john
300:19
john.sikora
309:19
john's
412:5
join
340:21
joined
322:3,6,10 340:19 467:9
joint
431:9
jr
334:9 498:3,5,13

jr's
334:16
judgment
454:18
july
343:17 345:7 367:1 384:5,6
469:16 475:13
jumbled
515:3 517:14
jump
394:4
jumping
501:2
june
318:6 353:9 367:1 384:5,5
384:6,6 484:25 486:23
487:12 544:24
justifying
491:9

**k**

keep
330:2 552:13
keeping
552:14,16,18
kelly
469:8
kept
321:9 329:8 333:22 351:13
420:20 439:5 444:10
kevin
309:4 313:15 369:7 388:7
399:25 401:22 501:7
kicked
526:8,11,16,21
kiffany
426:25
kill
355:16
killed
355:15
kind
316:7,16 323:7 324:22
325:3 329:22,25 334:18,24
348:17 357:7 359:16,24
361:4 384:21 389:9 415:9
415:14,17,21 455:2 457:11
457:12,18 458:4,5,5,6
459:4 460:23 461:21 462:1
462:10,12,19 463:2,3,6
464:19 465:1,4,11,12,14
466:15 467:4,13,24 468:1,2
468:5 470:15,17,24 471:12
472:19,23 474:2 476:3,16
476:16,17 477:12,16,18
478:23 480:20,22,25
481:17 482:25 483:5,6
484:21 485:17 487:22

knew (cont.)
529:10 536:13 543:6
know
316:1,3,4,15,20 317:15
318:10,11,16 319:6 320:5
321:8 322:7 323:5,6,8,9,14
323:10,12 325:10,13 326:5
326:12,16,18,25 328:22
331:8 337:23 342:17,17,18
343:1,4,4,5 344:1,4,5 344:11
346:20 347:15 348:2,17
350:17,18,20,22 351:4
356:9,15,15,19 357:8,17
360:16,18,19 362:3,11
367:15 371:12,24 372:13,20
373:19 378:14 379:9
381:4 383:18 384:15
385:24 386:7,22,23 387:20
387:24 388:7,14 389:5
390:17,18 391:1,18 392:7
393:3,7,8,10,15,18 396:6
396:14,24 398:9,10,11,25
399:1,7 400:22,25 401:22
402:17 404:9 408:22 410:6
411:3 415:12 416:14,23,25
417:1,15,23 419:18 420:11
421:2,2 424:3,5,11,15,17
424:22 425:1,13,14,16,18
426:8,13,20 427:5 428:3,6
428:7,16 429:7 430:14
432:9,16 433:19 434:6,9,16
434:19,24 435:2,22 436:6,6
436:14,18,22,24 437:3,11
437:14 440:5 441:3,5,12
442:15 469:9 472:4,7,24

know (cont.)
428:18 489:5 490:15,17
491:11,12 492:9,10,10,17
494:6,9,10,25 495:14 496:2
496:6,7,16,17,18,18 497:10
497:5,18,24 498:15,18,19
498:23,25 499:4,21,21
500:7,15,22,25 501:5,12
503:15 504:6 508:8,23
509:9,12,13 511:3 515:24
517:4 518:4 519:7,10,11
520:1,16,22 524:18,18,20
524:22 526:13 527:15
528:23 529:7,16,18 531:2
531:23 532:24 533:1,4,19
533:25 544:8,16,18
549:21 550:20 552:1,14
553:7,15 554:2,4,7,21,22
554:24 555:16 559:2
knowing
336:10
knowledge
316:3 337:10 439:18
316:6 337:10 439:18
559:12
known
397:11 416:16 417:3
488:11,11 489:12 534:10
knows
434:14
kopecky
310:4,5 315:3,3 327:4,9
327:20 328:3 336:4 358:16
360:16 369:21 373:16
376:21,24,25 377:19,23
387:13 388:15 393:22
398:12 400:18,25 410:5
412:20 413:3 418:24 421:9
430:1 448:7 454:11 462:3
462:15 469:9
krosabow
398:4 414:4 488:11,24

**l**

lances
483:2
lancesia
480:21

---

**[looking - members]**

looking (cont.)
417:6 429:23 436:23 441:8
478:18 496:10 497:25
543:16,17
looks
330:18 344:6,13 358:7,22
382:7 461:6 485:8 498:2
547:14
lose
428:19 455:3
loss
329:24 413:18 504:3
lost
401:9
lot
312:12 329:4,21 333:4
341:8 347:9,16 350:15
354:11 357:18 369:9
364:24 370:3 388:4 425:17
395:24 421:3 425:21 426:21
426:12,21 441:21,21
445:20 454:18 483:10
509:14,16 529:12 541:3
544:11
love
367:1,2,3,9
low
500:19
lower
500:5 547:12
luke
513:6
lumped
515:10
lumping
551:10
lunch
421:16 429:20
luncheon
429:15
lw.com
309:19

**m**

m&a
340:25,25
machines
356:3,4
shook
342:11 349:17 350:6,16
351:2,15,16,20,21 352:12
353:23 355:3,21 356:19
357:5,17 360:7,25 361:5
362:15 364:12 365:20,21
366:1,24 368:15 369:20
370:7 371:15,19 374:1,16
375:18 376:4 451:11,23,25
452:18
mack's
374:24
maddox
334:9 349:3 484:5 498:15
maddox's
498:9,14
mail
358:7,18,21 359:12,22
360:1,1,6,10,12,17,18,19
360:24 361:5,10,13,18
362:5 367:18,20 368:7 370:3
384:11,14 369:17 18,20
370:1,2,7,9,12,18,19 371:1
371:19,24 372:4,23 373:4
373:8 374:3,10,13,17,19
374:23 375:5,16,22,23 376:3
376:4,9,19,20,22,23,25
377:2,11,14,24 378:3,5,7,8
378:12,13,15,19,21,24 379:3
385:1 386:5,15,17,19,21,23
386:24 387:7,17,19,24 388:2
mean (cont.)
358:16 362:19 363:19
366:13,15 367:4,5,5,6,7,16
372:22 373:11 374:11,15
375:19 380:11 385:9,25
391:5,6 393:9,17 394:20
398:12,13,14,14 400:19
402:20 403:13,17,4,13
421:1,2,11,23 423:13 432:7
432:13,14,20 436:23,25
433:13 440:5 441:22 443:7
451:10 453:17,23 458:1,4,4
458:11 459:8 462:9 471:2
473:9 479:20 481:1
483:20 492:7,9,15 500:17
505:22 509:9 515:12
518:15 520:8 528:9 529:9
529:13 540:2 547:16,17
554:23 557:1,13,13,17

**[lancia - looking]**

lancia
312:20 318:18,19,19 319:2
319:2,9 320:3,18 321:4
322:12 329:12,20 332:23
344:19 345:1,24 353:22
355:23 365:11 369:9
390:22 391:14 392:22
400:21 402:14 403:19
428:8,12 427:7 428:16
436:4,11 454:2,20 462:18
468:4 470:25 490:11,16
491:25 496:22,25 503:7
504:25 508:6,23 509:11,15
511:16 516:15 519:11,15
520:8,10 526:5 527:23
531:6,8 532:13 541:6,15,16
542:9 544:6 554:15,20,21
lancia's
426:6 520:9
land
449:17
landlord
415:24 430:22 431:24
438:14,18 447:21 449:16
441:19,19 457:6,10 458:12
515:1,13
large
354:11
largest
338:5,8 546:21
larry
338:10,11
lasalle
310:6
las
384:6,6 439:22,22
latham
309:16
latitude
323:10 325:11 326:9
lauren
335:10
laurence
338:11
law
319:24 323:11 330:16
345:12 346:4 355:19
380:20,21,22,23 381:1
381:3 383:6,16,19 384:15
421:25 433:17 438:1
439:20 441:22 442:25
443:1,4,5 448:18 449:21
454:13,15 487:12 498:6
538:1,3,4 539:8
laws
313:22,25 336:23
lawsuit
441:14 451:10,20,23 452:7
453:18,19,20 454:10,10,16
layer
320:7,10,12 323:23 326:8
334:17 336:3 345:19 348:6
348:14 391:8 399:14
406:19,20 482:5 516:17
520:7 522:6
lawyers
336:5 477:10 500:2
liability
320:16 363:25 364:1 371:7
386:5 388:17 418:10 438:0
430:20 450:18 450:20
456:10 545:24
liable
388:17
licensing
513:19,20 515:5 546:5
life
323:22 329:14 351:1
light
520:16
liked
520:20
limited
483:7
linares
333:4:34 14 435:18
length
440:7 454:15
line
352:14,20,22,3
lines
547:15
liquidity
410:15 412:12
list
346:21 369:17,18 397:4
letterhead
313:20 339:14
liabilities
385:22 386:1,2,20,22 388:4
388:12 416:13,13,14,17
430:20,25 431:2,5,12,20
432:1,12,25 436:7 440:4,17
440:18 449:6 446:2 448:5
446:22 448:25 455:18
456:25 543:12,19,22,24
547:25
ligation
356:23
literally
418:2 470:7
litigation
321:24 451:9,12,13
little
317:15 350:7 359:11
394:19 461:19 481:2
485:25 516:24
llc
332:14,16,17 334:21 392:9
340:3,5,6,7,11,18,24 390:2
429:4 492:17 499:4,8
433:2,9 450:1,24 460:14
453:17 456:14 543:9,12
543:18 554:2
listed
369:2 379:21,24 432:2
536:10 538:9
listened
355:23
literally
418:2 470:7
litigation
321:24 451:9,12,13
little
317:15 350:7 359:11
394:19 461:19 481:2
485:25 516:24
llc
332:14,16,17 334:21 392:9
340:3,5,6,7,11,18,24 390:2
429:4 492:17 499:4,8
433:2,9 450:1,24 460:14
453:17 456:14 543:9,12
543:18 554:2
loan
448:18 550:14
location
561:7
located
420:20 517:25 552:16,18
london
421:22
long
354:7,14 365:24 392:13
453:24 459:9 500:12,13
528:25,25
longer
342:15 551:15 561:8
550:15
look
326:6 328:21 330:21 334:6
343:4 351:18 354:19
356:19 360:5 381:13,16
385:20,21 386:4,4 388:4
389:8 459:2,9 465:19
469:22 521:22 532:13
536:14 541:2 542:2
537:25 543:17 544:24
looked
324:4 341:24 385:18
389:22 461:16 500:19
536:4,20 550:13 554:21
547:15
looking
346:21 369:17,18 397:4

---

**[members - negotiated]**

members (cont.)
321:2 322:12 368:19 372:6
millions
330:2 434:23,25 435:1
439:4 440:23 441:6 442:9
448:13 543:18
mind
324:17 424:15 446:14
494:19 469:6 490:10,14,18
469:1,6,10,13 521:3,13,18
521:20,22,25 527:16,17
531:18 532:15 537:22
542:5,19 557:10 558:17
mine
350:18 369:13 391:9
minimize
545:9
minneapolis
460:10 461:15
minnesota
460:10 461:16
minority
338:2,19 339:17 546:9,15
452:2
minute
359:7 389:20 418:18
439:22 531:22 549:13
minutes
311:16 327:20,21 330:22
344:7,24 381:1 405:18
406:4 407:1,14 557:1
472:13 479:6 482:6
516:19 548:21 549:8
557:3,5
miscellaneous
325:14
mischaracterizes
451:5
missed
523:14
missing
473:21
mistakes
412:20
mixed
327:13 335:17 515:13
mobile
543:15
model
346:21 348:14,17
moment
411:10
monahan
312:15,20 321:4,4 322:11
330:17 332:2,14,16,17
334:14 358:9 361:6 362:2
371:6 384:3,3,3 391:5,9
418:16,19 424:10,21,24
419:22 422:15,22,24 475:5
440:4 442:16 443:5 446:18
450:3 452:11 453:14 459:5
476:20,23 501:6,9,15,25
483:6,15 488:2,23 504:9
495:23 535:1 559:21
monahan (cont.)
486:22 487:13,21,24 488:9
489:7,24 490:20 491:22,25
493:16,19,22 494:10,14,18
494:19 496:6 497:19,20
521:22,22,25 527:16,17
531:18 532:15 537:22
542:5,19 557:10 558:17
monahan's
427:18 495:17 500:2
money
329:21 332:21,22 339:22
342:25 350:13 352:13
353:12,15 363:14,19,24
367:19,21 384:14 385:4
417:9,22 418:5,7 434:6,8
434:21 436:6,15,16 437:1,7
437:10,20 439:3,13 440:4
441:21 442:1,24 447:20
449:21 450:1 454:4 461:14
459:21 464:14 466:23
472:10 479:7 486:2,14,22
473:14 480:7 509:2,7,14
468:3 496:10 503:9 516:14
month
327:17,24 459:5,7,20
393:1 465:3
monthly
372:24 374:15 460:20
months
357:14 526:14 549:9
morphed
400:20
move
335:9 352:25 353:3 427:7
428:3 486:7,9
moving
352:24 366:16 428:2
mullins
392:19 393:6 428:14
428:13,17 429:17 430:17
483:10 429:12 430:23
506:13,20 511:12,16
518:18 520:21 525:5 533:5
683:9,15 484:2,485:10
443:3,15 484:2,5 485:10
439:12 546:9,10
multiple
551:18
556:9
name
313:11,12,15 321:18 330:7
339:15 358:8 370:19
371:24,25 373:6,18,21
378:19 380:5,6 382:7
384:12 420:13 452:20
425:6 461:4,17 423:13,9
451:10,15 472:17 473:4,5
477:3 480:24 498:2 561:5
495:23 535:1,5 559:21
named
435:16 451:15
names
385:19 484:7 507:12,13
native
357:19 387:4 500:20
near
431:9
necessarily
560:3
necessary
316:20 347:9 351:15 366:6
371:3 374:4 500:18 510:22
441:16,19 499:12 557:4,11
needed
343:1 355:25 366:21 473:2
466:22 473:6 503:19
513:16 516:5,19,23 520:5
needing
516:10 523:23
needles
442:6
needs
351:16,16
negotiate
415:20 499:16
negotiated
403:10 437:4 438:14
439:12 546:9,10

DSM-000546

## [negotiating - opportunity]

negotiating
403:17 436:7 442:23 443:2
negotiations
403:12 450:19
neither
533:12,16
nelson
392:19 393:6 428:14
483:13 504:25 505:7,13,24
506:13,20 511:12,15
518:18 520:21 525:18
526:12,13 528:19 538:20
539:4
nevada
322:20,21,21 323:3 324:4
324:13,14,25
new
339:20 351:5,8 354:21
372:13 393:6 410:13
411:22 412:18 428:10,13
429:4 432:13,16 486:9
525:18 526:15
newly
378:20
news
357:13
newspapers
350:23
nicholas
561:10
nichols
312:20 471:7 504:24
511:16 520:20 528:16,17
531:7,7,18 532:14,20,24
533:9 536:21 541:7 555:23
nicols
531:6
nine
368:19 421:22
nods
316:23,24
noel
369:8
nominal
323:25
non
337:6 408:22,24
nonconstructive
353:24
noon
429:14
normal
519:19
normally
500:5

north
309:16 310:6 542:23
note
403:4 439:5 467:12
noted
342:6 344:1 382:2 390:9
465:7
notes
389:9 395:1 424:22 439:3
notice
308:16 314:21 536:9
noticed
461:19
notified
408:17 519:18,18 556:13
notifying
410:2 556:23
novel
357:22
number
314:13 317:19 318:7 325:6
331:5 377:16 382:12
386:10 401:18,21 405:15
421:23 422:2 426:7 430:3
461:6 463:9 464:4,12
467:17 469:23,24 470:2,3,8
472:15,23 473:2 484:22
486:16 516:11 536:24
561:5
numbered
358:6 359:6 368:2 378:13
390:7 446:5 484:20 485:7
492:9 498:1 531:15 534:22
539:19
numbers
318:14 417:17
numerous
373:2
ny
364:6,10

**o**
oath
315:18,19
object
328:6 358:24 412:21
510:15 557:23
objection
328:4 330:13 358:20
376:13,22 398:12,14 410:5
objective
328:21 413:16 430:8
437:24 438:1
obligated
388:17 523:4,6
obligation
388:19 512:22,23 513:8,9

obligation (cont.)
513:14 516:25
obligations
416:18 433:11 451:18
521:15 549:1,4,5
obtain
428:10
obtained
428:10
obtaining
512:6
obviously
320:16 327:18 328:11
369:12 376:17 441:23
480:22 489:11 491:23
492:17,19 499:2 509:23
occur
326:5 411:13 415:5 504:15
504:17 515:11
occurred
397:16 437:11 482:18
522:5 537:6
occurring
528:2
october
308:13 313:3 466:14 561:6
odd
459:25
ofac
507:11
offense
453:17
offer
342:8
offered
352:1
offering
506:3,8 509:7,8
office
339:20 452:14 494:20
officers
475:21
officials
313:16 314:4 321:11 328:1
397:10 534:24 535:20,25
official
327:18
officially
333:23
offset
415:14
oh
338:10 339:13 350:17
361:1 367:8 397:2 422:4
431:8 438:25 455:1,3 467:8
528:1,7 556:22

okay
330:12 341:24 342:9
344:15,17 346:11 347:22
348:25 350:21 351:5
352:15,19,25 355:14,22
356:4 359:18 360:21 361:3
361:3 367:9 369:11,24
375:24 376:15 379:18
383:18 387:15 388:23
389:6 395:13 397:2,5 401:9
402:10 415:17 418:24
439:19,21 442:13 445:9,18
445:22 448:15 452:5
457:19 459:3,6 461:10,25
462:11 463:7,12,23 464:8
469:12 474:14 475:24
505:8,15 506:13 507:16
518:1 524:11 529:16
530:17 531:24 538:22
540:17 543:10 553:10,20
558:11 559:24
old
341:17 354:22 412:19
461:17
once
506:15 534:12
ones
488:3 527:20 541:15
ongoing
518:18
onward
347:14
open
384:19 394:17 543:21
opened
452:10 462:18 474:21
475:13 480:7
opening
314:1
operate
513:23
operates
496:21
operating
481:14
operation
321:20 394:13
operations
306:10 508:13,15 524:6
552:19
opinions
396:19 508:10
opportunity
314:7,15 364:7,18 366:4
367:11 411:21 502:2

## [pencil - prepared]

pencil
552:12,12
pending
401:12 526:23
penny
410:12 411:22 428:21,22
422:25 501:22 502:19
512:8
people
321:5,9,13 322:3,3,9 327:2
328:9 329:4,4,10,15 333:2
333:5,6,15 343:2 346:15,17
346:15 350:22 351:4
352:20 353:15,17 354:11
354:24 357:2 367:2,6,7,15
367:19,19,21,21,24 369:10
368:12,15 371:22 373:5
374:17 375:19 383:19
435:15,17,19 434:3 446:18
439:23 441:15,21,23 464:4
476:6,10,11 483:5 507:7
509:2 511:14 519:17 528:3
528:3,21 550:11
people's
320:20
percent
397:12 493:6,10,25 534:24
548:23,25 549:2,3
percentages
387:9
perform
314:16 325:24 336:25
performed
324:19 331:23 334:1,21
346:1 347:2 349:23 484:2
489:8 493:15 557:21
performing
349:4 398:17
period
406:11 413:23 414:25
440:25 441:18 478:3 484:8
501:25 521:21
permit
312:20 329:6
person
321:19 338:23 341:11
346:12 351:7,3 357:10
372:10,11,12,23 377:14
397:11 404:4 407:14 415:7
415:8 453:13 468:5 551:21
personal
352:23,23 451:12,18 551:4

personal (cont.)
551:11 553:2
personally
399:18 479:4 509:20
551:10,11
personnel
307:14
persons
397:14
perspective
490:22
phone
415:18 440:6 452:3,11
441:14
physical
423:13,14,18
physically
517:13
picking
317:7 415:16
picks
323:24
picture
353:14 360:5 518:19
piece
317:17 552:15,20,22,23
528:3,21
pieces
517:18
place
300:10 395:20 433:19
442:23 502:17 542:24
543:3 552:18
placeholder
326:3
placement
342:7 348:8 483:18 522:3
558:23 559:14,19
plan
332:10 339:24 340:1
342:17 345:13 348:9
349:10 497:10
platt
311:11 335:12,13 340:16
342:4,6,7 344:10 345:4
345:6 359:19 466:4 477:9
permit...
played
333:18 365:24 427:10,19
player
554:24

pleasant
352:4
please
313:4,11 315:1 316:22
330:9 423:23 488:7 522:13
533:3 536:3
plus
406:11
pocket
551:2
point
321:3 325:22 327:3 333:24
335:18 341:16 342:15
351:12,12 353:9 354:23
356:2 366:10,22 367:13,23
368:23 371:22 385:25
391:17,17,21 408:15
415:23,24 417:4 419:7,16
421:10,12,13 422:6,14
423:9,19 424:4,7,12,20
425:4 430:11,16,16
431:18,18,24 433:20 455:7
440:22 441:7 442:2 443:21
470:15,16,22 483:13 486:7
499:24 503:13 507:17
509:2 517:9 527:10 529:2,1
521:6 557:25 529:1,2,3
519:6 557:21
pointed
387:9
points
430:7 448:12 534:13
policies
362:11,17,24
politically
384:24
pooh
357:7
poohing
357:7
populate
497:10
porch
406:11 413:23 414:25
portfolio
334:18 515:15
portions
404:5 413:23 534:5
port...
position
371:3 413:15 453:16,21,25
536:4
positions
404:13 533:1,3 534:5 536:1
536:2 472:12 424:4 425:5
505:18,23 511:14 525:19

positive (cont.)
428:24
positively
319:18
possibility
436:3,20 441:17
possible
338:16 406:13 425:15
432:13 438:5 458:12
possibly
414:11
potential
351:11 363:25 369:3 385:2
410:13,16 505:19,21
525:15 526:2 528:22
potentially
352:7 353:2 363:22 394:16
421:10,13 422:6,14
423:9,19 424:4 490:2
425:4 430:11,16,16
515:22 564:20
powerpoint
311:17
practically
243:2
practical
327:8,16
practically
243:2
practice
497:1 510:12
pre
502:6
precipitate
452:7
precise
331:17 410:17
precisely
335:7 391:22 441:4
preferred
323:24 330:3 344:16 355:7
355:16,18,24 357:4
prepared
329:8 339:25 361:20
397:2 528:20
player
554:24

## [opposed - pen]

opposed
327:10 504:16 543:8
553:10
options
318:22,23 412:25
oral
509:5
orally
415:10
oranges
543:15
order
314:2,3 341:19 376:13
403:12 540:21 542:3
561:14
original
493:12 540:15 542:3
561:14
outcome
364:5 366:7
outputs
363:3
outside
320:11,12 337:16 347:1,6
357:4 371:18 373:13
406:24 448:18 453:25
457:12
outsource
372:12 391:2
outstanding
387:11 397:13 440:17,19
442:10 456:11 512:8 530:7
overall
320:6
overwhelmingly
409:16
owed
314:16 418:19,22
417:22 432:20 433:9 434:6
434:7,16,17 439:1,6,19
440:23 441:6,21 442:9,24
447:20 449:8 450:2,18
451:1,1 455:18 457:1
553:14
owes
442:15
owned
387:20 397:11 413:1,8
502:20 513:21 515:6,8,9,16
541:4 550:7,8,10,12 556:21
owner
338:9,12
owners
387:17 452:1,2

ownership
382:24 387:4 412:18
448:19 503:20 530:13

**p**
p.m.
368:3 377:7 429:18 444:20
478:13,16 485:23 527:1
557:11 560:15,16
p810
404:18
page
312:10 317:18,19 318:4,6,7
319:10 322:15 331:5,19
343:13,25 344:11,12,17
349:15 359:1,15,17 360:3
360:21,22,24 361:1 362:7
368:1 369:16,17,24,25
378:12,13 379:16 382:4
390:21,25 391:1 396:2,24
396:25 405:7 414:6 443:2
pages
308:9 358:18 359:1,5
370:1 418:2 485:3,6 548:9
paging
322:16,17 332:16,19
337:12 345:3 348:9 349:8
411:22 432:19 434:13
438:15 440:24 441:24
440:10 447:12,22,24
456:3,5,9 457:12,13 458:7
459:6 459:23 461:19
460:9,21 470:20 471:25
542:5 547:21 551:16 558:3
pal
350:20
paper
552:15,20,22,23
paperwork
518:15,16
par
323:13,15,19,24 331:21
paragraph
331:18 345:15 347:22
349:2,12 361:10 392:5

paragraph (cont.)
368:2 370:6 397:9 379:4
455:14 511:23,24 512:18
522:20 530:5,8,10 532:20
540:3 545:21
paragraphs
349:15,19
paralegal
483:15 484:5
paralegals
484:6
paraphrase
384:22
paraphrasing
352:12
paren
367:3
parenthesis
423:23
part
321:16 328:15 336:18
360:7 391:5 404:3 408:4,6
412:15 414:12 418:6 425:6
434:8 435:2 443:11 452:6
453:15 454:9 523:13 525:5
525:10 559:16
parte
537:8
participate
413:3
participated
413:2
participating
410:25
participation
316:7 321:17
particular
346:23 372:17 384:11
433:22 467:22
particularly
348:19 357:22 390:18
396:21 468:19 520:10
541:5 547:20 548:8
partly
347:24
partner
334:11 341:7 351:12
358:10 361:4,7 498:6
partners
340:4 348:10 362:7 371:6
453:7

partnerships
342:20
parts
348:20
party
325:9,10 363:19 383:20,22
393:15,20 394:1,6,22 395:5
395:21 396:2,13,19 397:7,8
397:22 398:9,13,22 399:1
399:12 400:13,17 414:3
427:25 449:5 451:8,13,14
patent
334:18 491:4
pattern
324:1
paul
329:24 330:5,6,10 340:8
345:19,25 346:7 349:17
362:13 363:5,14 395:2,6
525:10 559:16
pause
551:19
pay
413:20,25 414:2 415:20
435:1 437:24 439:17,17
442:15 454:1 541:7 549:17
payable
546:2 548:12
paying
333:3 335:2 372:24 394:15
491:9 492:4 500:24 541:24
545:10 552:9
payment
456:18,18 457:7,8 467:11
472:9 479:21 494:8,11,15
494:17,19
payments
449:1,22 451:8 457:7 472:6
478:17 479:9,17,19 480:6
550:23 551:1,2
pays
310:5
peculiar
350:8
pen
552:12

## [preparing - public]

preparing
517:7 559:6
present
319:21 440:16
presentation
391:15 433:19 425:4
presented
419:7
preserve
555:10
president
317:9 318:8,18,20 319:13
319:20 320:13,24 321:2
322:6,8,11 325:16,21
332:18,19,20 333:20 334:5
334:21 337:16 340:15
346:13,18 348:6 353:25
346:2,6 360:14,15 361:5,6
352:13,18,21 353:8 360:24
364:8 365:5,6,7,8 366:16
366:25 369:17,22 458:1,14
458:16 459:20 460:11,13,14
458:4 487:4 498:6 511:5
457:6,13,17,22 471:6
545:8 546:21
presume
361:17 362:3,3 363:18
364:12 368:13,17 424:14
435:25 444:11 460:23
presumed
442:9
presuming
511:15
pretty
322:21 325:2 327:2 372:22
384:7 441:15 454:24 481:5
prevent
355:16
prevents
315:21
previous
539:2
previously
317:14 355:25 349:16,21
350:1 377:13,14 404:10
416:5 510:21 523:3 531:4
539:17
price
403:3,9,17 413:21 414:2,13
417:1,20 418:19 419:13,23
433:25,25 435:23 437:4
445:1,6,13 447:9,17 466:25
476:19 479:11,12 498:7
516:11 523:14 541:21
554:8,13,15,18,24 558:22
primary
313:14
principal
338:7 348:1 353:16 395:14
principally
403:23 516:15
principals
394:8 396:12 546:6

prior
314:1,10 320:18 328:7
339:2 391:3,12 400:2,14
401:5 408:16 415:4 425:12
434:11 447:6 450:19
487:24 496:12,23 497:2
506:22 510:8,8 511:6,20
522:14 524:2 526:23
527:24 529:6,10 530:13
probably
310:9 363:19 383:2,22
393:15,20 394:1,6,22 395:5
probably (cont.)
421:2,17 427:12 428:4
397:3 420:9 454:25
499:11 500:4,19 504:5
534:12,14 536:14 546:21
550:22 554:2
problem
321:9 362:6 439:24 475:19
problems
316:22 346:6 347:16,20
367:23 376:13,14 382:6
383:8 382:13,24 384:3
384:24 385:23 387:7
384:13 410:9 425:10
procedure
435:22 457:8 496:19
proceeding
313:17 314:6
proceedings
561:12
proceeds
433:6
process
454:22,24
produce
372:3,6,16 452:13 457:10
producer
350:3
product
431:8 490:2
production
348:15,22 486:4
profit
346:3
profitable
424:21
projection
426:7 430:16
projector
334:5
promised
354:7 367:2 427:15
promises
403:4 457:16 467:2
privilege
321:25 561:2
privy
452:11 553:25
pro
402:11 553:25
probably...
properly
452:11 553:25
properties
513:24
property
498:7 517:11,17,18
491:9,8 492:3 493:14,24
494:4,7,11,24 498:13,14,16
498:20 499:3,10,13 518:8
500:2,22,23 501:5 502:14

proposal
327:24
proposition
432:15
protocols
362:11,17,20,24
provide
316:22 345:6 347:4 348:5
404:16 406:4,13 419:8
448:4 499:1 558:17
provided
314:2,11,14 328:5 332:17
404:16 406:4,13 419:8 488:9
489:24 498:3 499:3 558:1
providing
346:6 404:18 537:22
provisions
313:22
proxy
538:6 374:14 408:21,25
409:1,4 410:23 411:25
412:1,2,21,22 421:2 454:3
425:7 426:10 433:16
501:18
public
322:8 336:12,13,16,19
337:1,3 346:11 368:22
377:21 380:24 383:14
385:8 390:21 391:13
391:15 392:24 394:21
395:14 396:4,24 397:3
398:13,17,19 399:1,22,25

DSM-000547

**[public - recipients]**

**public (cont.)**
502:16,19,22,23 503:1,11
503:23 505:14,14 506:9
507:9 508:18,19 509:3,18
513:16 519:7,23,24 520:4
521:15,21 522:5 524:25
525:1 531:1,3 535:21
537:15,23 539:1,10 540:15
548:20 549:15 554:12
558:18,18 559:11

**purchase**
429:24 445:22 464:2 477:3
557:13

**purchased**
311:13 378:1,7,18 379:7,16
379:19,20 380:16 382:2
388:11 389:16 398:5 400:4
400:6 402:1,7,21 403:3,9
403:17 407:24 408:3,8,11
408:17,19 409:11,24
410:12 413:21 414:1,13
415:5 417:1,20 418:6,19,21
418:25 419:8,12,23 431:5
431:13 433:6,24,25 434:12
435:8,23 437:4,9,10 444:25
444:25 445:6,13 447:2,9,17
448:23,24 455:15 457:25
458:9 464:24,24,25 473:13
474:7 476:19 479:11,12,13
480:13,14 501:13,17,21
502:3,15,19 503:11 504:5
506:24 508:4 512:10 514:2
514:14,16 516:7 522:3,13
523:14 537:21 538:10,11
538:12 539:11 540:4,14,21
544:2,22,23 545:3 546:11
546:13,19 548:23 554:7,13
556:13 558:6

**purchaser**
378:20 541:17

**purchasing**
381:25 448:3

**purport**
488:8

**purportedly**
557:21

**purports**
377:17 390:8 402:1 405:17
422:5 458:23 465:20
469:23 470:4 487:11
495:8 510:23 531:15,16
534:23 539:20

**purpose**
421:7 535:15

**purposes**
313:17

**pursuant**
308:16 315:14 382:1,9
388:19 399:11 455:20
924:24 457:2 502:14
523:14

**put**
351:15 352:18 358:22
367:23 496:19 497:9,17
506:22 515:3 541:19 542:2

**putting**
341:14 353:13 355:4
367:21 436:14 552:7

**q**

**qualified**
321:12

**qualify**
406:12 407:22

**quantify**
432:21 434:11

**quarterly**
510:3 523:15,24

**quarters**
523:16

**question**
315:25 316:4,7 322:2 323:8
325:19 328:11 333:6
358:17 361:4 391:22
394:15,18 399:25 400:11
400:15 401:11 419:25
427:2,24,25 428:16 431:25
433:12 460:12 464:20
475:8 479:24 485:14
492:21 495:1 504:22
520:9 522:1 521:16,20
522:5 526:17,23 536:3
538:23 559:9

**questioning**
476:25

**questionnaire**
312:22 534:23 535:17,18
538:24

**questions**
314:18 315:23 316:23
317:1,5 372:25 374:10,11
376:14,15,22 400:12 421:8
425:22,24,25 426:7,12,15
427:10,17,19,22 428:9,25
429:1,2,3,7 433:20,22,23
445:10 518:25 557:2 559:6

**quick**
531:21

**quicker**
494:23

**quite**
341:10,10 350:25 352:1

**r**

**races**
320:20

**raise**
313:3 340:3,15 341:19,25
342:24 353:12,15 357:5
371:15 372:2,5 384:8 385:3
434:25 435:1 492:3 528:23
555:1

**raised**
312:16 339:22 352:13
363:24

**range**
400:7 507:11

**rapello**
340:9 342:11 349:17 350:6
351:2 353:23 358:9 361:6
361:16 364:13 366:11,24
370:8 451:11,23 452:1,18

**rate**
553:10

**rata**
439:14,16,23 449:1

**rates**
493:24 498:19 499:2,5,12
499:20 500:1,3

**rationale**
395:13

**rcf**
416:19

**reached**
320:17 438:16 512:24
513:10

**reacting**
391:20

**read**
337:11 342:7 350:23
359:8 366:14 374:12,14
441:11 480:12,14 502:6
509:9

**reading**
349:10 398:10 441:8

**reads**
531:21

**ready**
531:23

**real**
334:3 338:23 347:11,18

**reality**
543:1

**realize**
526:23

**rely**
323:7 339:22 341:4 342:13
348:18 350:24 351:5
352:23 360:2 361:9 363:11
370:10 381:4 394:18
395:13 401:9 429:25
440:15 444:5 453:14
472:23 479:23 492:10
506:20 507:5 519:7
517:14 520:23 521:11
533:19 549:10,17 555:14
557:4

**reason**
311:8 318:13 340:16
355:7,16 359:23 360:11,14
370:11 374:16 391:6 420:1
435:2 452:8 460:25 467:5
468:23 509:10 549:19

**reasons**
328:5,8 385:11

**reboot**
330:1

**recall**
342:2 361:5,9 370:8 373:18
419:22 427:22 452:1
459:10 460:3,16,20 468:18
470:19 473:22,23 482:17
519:3 540:20 547:18 548:6

**recalled**
330:3

**receive**
370:12 439:9 445:13 449:1
458:7 485:14

**received**
349:5,21,22,24 408:20
414:16 418:5 439:13 445:1
449:7 456:16,19,23,24
457:6,20 468:4 481:1

**receiving**
318:19,21 370:9 437:20
460:16 519:3

**reception**
352:6

**recess**
377:5 429:15 444:18
471:20 478:14 522:11
557:20

**recipients**
382:9

**[reporting - rushed]**

**reporting (cont.)**
565:16

**reports**
510:3 552:8

**represent**
470:10 475:22 549:11

**representative**
455:7

**represented**
314:23 318:14 338:8 457:21
463:10

**repurchased**
430:23

**request**
482:2 493:14 521:21

**requested**
481:21

**requesting**
532:16

**require**
396:20

**required**
379:21 523:15

**requirement**
323:11

**requirements**
558:10

**requires**
396:14

**resell**
513:25

**residential**
338:4,5,8

**resign**
326:19

**resigned**
320:1,2,20,22 404:13,14
533:2

**resistance**
321:15

**resolution**
416:15

**resolutions**
327:4,7

**resolve**
344:18 455:13

**resolved**
331:19 444:7

**resonate**
356:5

**resources**
468:23 487:3

**respect**
332:6,8 339:24 352:21
354:8 374:19 512:20

**respect (cont.)**
505:15 535:16
555:5

**respective**
455:13

**responding**
369:19 533:8

**response**
317:1 394:16 405:25
444:13 456:25 538:8

**responses**
316:22,23

**responsibility**
352:2 391:8 440:1 455:13

**responsible**
390:20 439:25 443:8
455:19 495:24 509:11

**restate**
523:5,24 524:4 525:2

**restatement**
525:3 526:2

**restating**
353:6 357:13 358:20 361:3
361:16 369:24 375:14

**restrictions**
326:13

**result**
326:19 353:25 383:25
434:6,7 464:23 502:3,10,11
513:21 518:22 523:5

**resulted**
477:23

**returns**
553:3

**revenue**
385:12

**reversed**
452:5

**review**
314:8,16 390:13,21 391:3
391:10,12,16 392:9 496:9
496:12,22 497:1,13,21
502:8 509:18,24 510:4
511:20 531:22

**reviewed**
391:17,18 509:22 510:5,6
522:25

**reviewing**
391:24 497:19 510:12

**revise**
523:23

**revisited**
442:17

**rich**
351:3

**right**
313:3 319:11,11,21,23
323:16 324:7,18,19 326:1,4
327:11 328:14 330:22
332:21 334:23 335:1,2,16
337:12,14 339:11 340:11
340:16 341:24 346:1
348:23 349:20 354:11 356:7
368:7 380:1,10,13,19,20
381:2 382:3,14,21 384:20
385:10,16,17 386:23 389:2
392:3 403:1 407:11,24
408:3,21,23 409:3,9,13
410:11,16 411:9 413:5,9
419:1 423:7 426:25 438:19
439:8 442:6,18 443:1,7
444:2 445:12 451:5 452:4
456:11,12,13 457:3,21
462:24 464:19 467:20 470:2
473:7 474:2 476:19 480:9

**ring**
549:17

**risk**
363:7,9,12,16,23 371:5

**roadblock**
355:4

**rob**
384:12

**robert**
347:23 402:12 414:18,23
417:18,24 422:22 427:9,10
442:22 444:24 452:14 547:8
550:15 554:9

**roger**
369:7

**role**
332:14 336:11 348:24
348:25 351:17,18 453:21
467:10 531:4

**roll**
367:16

**rolls**
393:10

**room**
377:3 385:2 423:23

**ron**
349:10 404:11 532:17

**route**
395:23

**royce**
395:23

**rpr**
393:10

**rsvp**
... 

**rushed**
538:1

**[recognize - reporting]**

**recognize**
487:18 495:11 539:23

**recognized**
365:23 439:22

**recollection**
322:20 359:25 365:1 415:7
423:6,25 424:19 477:22
549:24

**recommendation**
384:1

**recommended**
383:7,23 386:24

**record**
313:2,12 314:1,10 316:11
316:13,15,24 376:25 377:6
377:9 397:11 412:5 429:13
429:17 444:15,17,19
445:16 471:15,19,21,24
476:22 478:12,15 485:20
485:23,24 522:10,12
557:17,19 560:1,6 561:1

**recording**
407:14 561:16

**records**
333:22 469:4 470:8,9 552:5

**recruited**
340:21

**recruiting**
367:18

**redacted**
485:14,16 486:2

**redaction**
485:15

**redeem**
402:16 502:9

**redeemed**
512:14

**redeeming**
502:4,10

**redemption**
512:7

**reducing**
416:15

**reed**
368:18 501:11,24

**reference**
317:17 373:12 407:23
451:4 499:23 514:15

**referred**
317:9 329:15 378:7 389:14
417:25 525:8 550:16

**referring**
322:23 354:8,14 355:5
362:2,18 363:9 364:2
365:4 368:5 370:2 371:13

**referring (cont.)**
389:19 396:25 400:9
408:25 426:3 446:13 448:4
471:6 510:25 512:5

**refers**
362:12 448:2

**refillings**
524:16

**reflect**
318:7 344:7 406:4 548:20

**reflected**
316:24 319:9 344:23,24
360:7,12

**reflecting**
319:12

**reflects**
389:22 416:25 417:3

**refresh**
423:24 477:21

**regard**
558:17

**regarding**
361:7 369:3 371:16,19
372:2,15 382:8 395:20
388:1 416:1 427:17 447:8
448:22 449:5,6 461:21
525:2 532:10,14 534:18
547:17

**regardless**
327:15,18 485:18 488:4

**regards**
481:22 482:3

**register**
494:9

**registered**
339:10

**registrant**
389:8 400:7

**regular**
391:2,5,23,25 392:11,22
393:9 398:2,10 403:11,14
400:15,21 404:25,25 405:1
405:6,9 407:20 408:21
414:4,10,25 415:10 416:1
416:16,22 417:16,17 418:3
418:3,16 419:10,15,17,20
420:3,10,13 423:1,11,21
421:9 427:1,2,4,6,25 428:2
429:6,10,17,20 430:3
430:12 440:9,24,25 441:5
441:11,10 442:4,13,15
443:16 471:10 472:24
475:12 512:22 517:6,15
559:3

**relating**
361:18 521:15

**relationship**
347:10 373:4 393:3

**relationships**
347:5,8 363:2 397:6 532:22

**relative**
533:3

**release**
402:10 503:4,6

**relevant**
310:50 503:6,6

**relief**
353:6

**reluctant**
344:16

**rely**
399:16

**remark**
486:9

**remarkable**
523:17

**remedy**
310:24

**remember**
319:14 321:17,23 322:4
325:1,21 327:1 328:5 330:7
332:19 333:24 335:3,7,7,19
336:10 337:14,22 338:1,17
342:23 346:25 347:17

**remember (cont.)**
444:3,6,9,10,11 445:17,19
445:25 447:13 448:1,20,21
448:22 449:5,6,21,22,24
450:9,11 452:3,4,9,24
453:5,23 454:1,5,20 455:2
456:1,2,3,17,22 457:13
458:11,13 459:20,21
460:22 462:9 463:17 464:1
466:1 468:17 470:23 471:3
472:14 473:20 474:14,23
475:7 477:17,20 478:5,5,11
478:22,25 480:17 481:1
481:13,15,18,19,23,25
482:14,15 483:2,11,19,24
483:24 484:3,7 489:17
490:3,10,10,11 491:17,22
492:25 493:7,12,13,17
493:18,22 494:1,3 496:10
496:14,16 499:6,7,9 500:15
501:9 505:2,9,17,22
507:11 508:10 509:2,25
510:1,2,3,6,9,20,24
512:1,19 519:5,10,13 525:5
526:16 527:12 529:13,14
530:1 531:6,8 533:24 534:2
535:7,8 540:21 543:2 545:2
548:14 558:10

**[sake - sense]**

**s**

**sake**
323:15

**salaries**
430:21 434:6 441:7 442:10

**salary**
433:23 440:24

**sale**
400:6,13 410:24 411:7
426:17,18 515:24

**sam**
342:12 343:15,24 344:8
346:1,3,8,10,11,18 347:3
348:1,6,10,13,16,17 348:1
349:5,23 349:11 451:21,22

**sarah**
327:17 439:15 440:2,5,6

**sat**
327:17 439:15 440:2,5,6

**satisfaction**
439:10

**satisfied**
546:10

**satisfy**
542:11 545:24

**save**
466:6

**saw**
317:24 341:10 355:24
377:20 387:24 529:25
538:15

**saying**
319:7 321:24 351:13
357:22 367:18 384:3
394:17 396:10,11,13
400:3,23 401:1,18 402:2,8
402:8,15,21,25 403:18
443:16 471:10 472:24
474:12 517:7 524:23 540:5
559:20

**says**
318:11,12 322:16 323:2
327:16 331:19 343:15
345:3 351:19 359:15 361:6
364:10,15 365:22 366:6,18
367:16 374:8 385:20 390:6
374:24 375:17 385:21
388:17 423:4,5,9,22
390:18 391:4 395:22 397:8
398:18 400:17,24 400:14
403:1 410:18 411:4 423:25
455:14 460:8 463:20
486:23 489:12 499:23
512:18 513:9 522:23
520:13 521:10,15,15
537:11,14,20 541:12,14,16
548:11 551:15 557:24 554:7

**scanario**
394:25

**schedule**
382:5,16 385:18

**schumacher**
310:5

**scio**
308:5 312:5,8,17 313:20
317:9,10 318:3,18,20
319:3,13,20 320:13,24
321:2 322:6,8,9,11 325:16
325:21 331:7,15 332:16,20
332:20 333:20 334:5,22
335:8,9 336:12,13,16,19
337:1,3,16 339:22,22 340:1
340:3,15,24 341:19,25
343:2 346:16,21 349:20
350:6,14 351:1,18 547:3
540:5,11,15 541:21 544:20
545:9 548:20 549:8,15,15
554:12 587:18,22 559:1,11

**scio (cont.)**
498:14,16,20 499:3,7,10,14
499:18 500:2,22 24 501:5
501:17,18,20,20,22 502:3
502:9,13,15,19,22,23
512:9,11 513:16,23 514:9
514:15,16 519:7,23 520:4
508:19 509:3,18 510:23
512:5 513:16,17,18,20
524:24 535:8,23 537:16,21
533:4 536:8,12 538:7,11,20
529:9 530:10,11 531:3,21

**sce191**
389:4

**scio196**
378:14

**sce191**
378:14 389:4

**scio204**
381:9

**sco206**
377:16

**scio's**
371:16 372:6,6 374:20
392:14 462:7 472:2,3,11,21
472:18,19,20 473:9 474:8
426:25 431:21 441:20 451:6
474:12 517:7 524:23 540:5
558:18

**scio206**
377:16

**scope**
458:16

**scot**
557:3

**scott**
311:4 313:6,13,15
318:11,12 322:16 323:2

**screen**
424:16,16

**sealed**
533:13 340:22 384:19,20

**seat**
476:10,11,12 477:19,23
478:2,2,7,10 502:18,21,22
479:16,19 480:5,15,15,23
548:13 557:24,25 558:4,15
548:1,13 557:24,25 558:15
548:1,13 557:24,25 558:15

**scenario**
394:25

**sec**
315:10 316:4,8,17,20,22
317:5,6,7,9,10,15,16,19,20
343:10,14 358:1 376:19
390:3,6 391:9,12 392:10
392:12,18,19 393:13
400:17,25 400:14
426:8,9 429:11 431:20
426:10,20,24 427:6,13,15
430:20,23 431:1,4,25
415:21 557:24,25 558:15
429:25 530:10,11 531:3,21

**schumacher**
310:5

**scio (cont.)**
...

**sec (cont.)**
484:15,22 485:7 486:14,17
495:4,7 498:1 507:25
519:6 531:1,11 534:18
558:19 559:11

**secadams**
331:5

**second**
344:12,18 357:19 361:21
371:11 410:21 419:3 471:15
539:9 443:3 497:21 512:2
539:22

**secretary**
407:7,11,18

**secure**
322:16 466:18

**secured**
494:15,22

**securities**
308:1,10 309:3 313:19,22
335:23 339:5,7 399:14
483:12,19,20 527:18

**security**
585:15

**seeing**
459:10 485:15

**seek**
374:8,18 383:16 482:7,13

**seemed**
379:10

**sell**
333:13 346:22 384:19,20

**sense**
335:3 346:25 347:18
487:20,21 492:21 518:15

[10/8/2015 9:00 AM] ADAMS_EDWARD_20151008

**[sensitive - singer]**

sensitive
393:14
sent
368:2 391:20 415:15 418:1
425:12 433:10 434:20,22
486:25 492:6 507:6 508:23
519:11 528:13 529:11
539:6
sentence
364:4,20 365:22 366:3
371:1 512:5,17 523:10
530:16 533:10 540:8
545:21
separate
405:3 514:7,9
september
315:8 465:8 475:14,17
508:24 523:17
serious
351:7 371:7
seriously
385:6 436:21
serve
326:15 446:21 454:18
served
362:8 454:22,24 455:4
530:11 533:21
service
372:15
services
308:24 312:12 322:17,17
322:19 323:4,4 324:11,16
324:19 326:10 330:20
331:22 332:4,17 334:13,15
337:1 345:4,6 346:18 347:1
347:4 348:4,5,7 349:4,23
404:16,18 405:3 492:12
483:8 484:9,23 485:9 486:2
486:24 487:6,14 488:1,8
489:24 492:18 498:2 499:3
537:22 550:11 558:25
serving
320:19 375:5 455:2
set
376:8 398:20 399:3
setting
362:25 399:2
settle
451:10 454:10
settled
455:5 541:14
settlement
447:18 455:8
settlements
451:13

seven
366:19 510:22 537:4
shaking
336:14
shank
309:5 313:2,16 320:9 324:2
326:20 327:7,11,15,23
328:10 330:8 333:9 354:5
359:7,15 360:4 373:24
376:16 384:2 387:16
394:21 396:9 399:17
404:10 405:22 407:4,16
410:20 412:4,14 413:6
414:20 415:2 418:17 419:2
419:4 420:23 423:22
424:19 432:23 434:11
435:16 448:2,11 449:25
451:3 456:7 470:10,20
471:17 472:11 473:13,16
477:25 485:25 487:23
488:22 490:23 492:12
500:1 504:14 505:25
506:18 508:2,25 514:1,18
521:2,12 524:7 525:13
526:1 527:4,9 528:15 532:9
540:19 549:24 552:2
554:11 555:17 556:20
557:1,4 559:8
share
318:11 331:21 343:23
382:24 410:12 411:22
501:22 502:19 504:8 512:9
512:11 530:7
shared
415:10
shareholder
311:17 320:8 322:24 323:1
336:7 339:17,19 355:18
381:9,17,20,21 387:25
405:8 408:24 418:21,24
420:8 422:7,13,15 423:8
430:22 431:21 432:25
433:5,14 477:23 518:24
519:4 550:4,5 556:10,11,24
shareholders
322:25 328:22 329:24
333:12,14 338:20 339:4
340:9 354:18,20 355:13
363:14 366:19,20 367:6
372:7 384:17 406:12
407:22,24 408:10,12,15,22
409:2,10,15,19 410:3,11
420:22 411:14,18 412:7,9
412:17 413:1 419:6,23
420:9,11 422:16 423:2,9,19
424:1,8,13,13,20 425:9,17

shareholders (cont.)
425:21 426:11 427:23
428:10,24 429:3,11 430:11
430:16 431:11 500:23
502:1 503:5,13,12,19
504:1,4 505:22 506:5 507:4
508:12,19 509:4,6 512:6
513:15 517:1 518:13 519:8
520:14 526:2 528:4 529:2
550:10 556:12,15,18
shares
311:6 332:21,22 319:7
322:23 323:1,13 324:8,15
324:21,21,23,24 325:3,6,14
325:17,18,18 326:12,23,23
328:9,13,17,23 330:3,19
331:16,16,20 332:5 334:2,4
333:5 334:13 335:5 337:10
340:4 340:12,13 341:3 342:11
344:7,10,12,13,18,23 345:1
345:16,20 348:3 349:1,16
349:20 350:1 354:1,4
355:12,16,20,24 357:4
364:6,14 378:20 381:23
382:1,9,12,17,22 383:6,10
383:18,24 384:1,3,8 385:1,19
385:8,9
sharp
338:21
sheet
420:20,24
shell
385:8,9
shoes
473:10
shop
497:6
shopping
322:18
short
337:14 527:4
shorthanded
518:10,10
shortly
507:3 510:9 522:18
show
520:17,23 531:9
showed
424:25 450:16

shown
424:12,20,24 425:5
430:16
side
354:13 403:16,18,22
460:14 461:2 489:18
signatory
418:13 459:16,18,22 460:4
459:12 468:8 482:18 470:14,18
470:20 471:11,12,14
477:15 479:8
signature
344:4 407:2 468:21,24
469:1,5 535:11 547:12
548:3,16
signed
527:6 400:21 402:11,12,12
402:14 407:1,7 487:4,19
539:22,25
significant
339:17 357:5 394:7 443:15
458:1 550:8
significantly
415:14
signing
394:18 538:11
sikora
309:14 315:4 330:13 373:7
373:12 394:4,13,17 395:11
395:19 399:25 400:6,11
401:4,7,21 410:8,16 421:13
421:15 423:12,15 444:15
469:3 470:7 471:15,23
474:9,11 475:18,19 476:18
476:24 485:13,20 486:3,12
486:19,24 487:7,17 502:8
506:15 507:22 521:9 522:7
525:5,10 526:22 527:6
528:18 555:24 557:6
silver
356:2,2,6,8
similar
340:12 539:7
simon
541:13
simplify
515:19
simply
490:21
simultaneously
381:19
sincerely
363:5
singer
551:22

---

**[stuck - thank]**

stuck
442:7,7
stuff
348:17,18,18,21 357:18
374:16 386:25 392:8
393:12 394:14 432:4,7,20
491:4 507:7 537:18,24
styleowner
370:3,14 371:2
sub
535:25
subject
316:7 352:19 358:10
359:24 486:4 523:7 531:21
supported
555:19
suppose
361:20 482:22
supposed
376:8 453:9 483:22
supposedly
356:19 529:19
sure
316:2,5 318:25 327:2
334:17 341:24 342:5 359:7
375:13 385:24 386:11
391:25 392:24 394:12
413:21 419:7 431:15
445:2,4 446:11,11
448:7,9,21 460:24 465:1
507:13 515:23 516:7,12
516:19 517:25 518:7,22
519:13 520:4,6 521:6,16
522:2 524:5 525:8 528:4,9
528:20 538:21 543:14
548:25 552:10 553:24 554
surgery
364:20
surrendering
386:21
swear
361:11
sworn
452:8
system
496:1 497:23

suit
432:8
suite
308:11 309:9 310:7
sum
443:3 455:16
summary
488:7
super
355:17,19 394:10
supplement
342:4
supplemental
342:11
supplementary
316:7 342:19
subscription
417:24
subsequent
347:19 464:16
subsequently
538:6
substance
506:16
substantial
553:18
substantially
540:10
subsumed
457:11
success
365:24 443:7 544:12
successful
329:22 332:23 333:4 366:7
426:14 428:2
suddenly
386:21
sue
363:14,21 441:15
sued
452:8,8 453:16,24 454:1,2
454:3,4,5
sufficiently
349:5,22,24
suggestion
382:25 469:3
suing
453:2

table
319:6 351:9 387:3

tad
460:1
tailed
423:2
taken
316:18 355:14 422:15
442:13 515:1
talk
335:13 338:20 342:18
348:10 353:16 366:2
372:14 375:15 410:9 412:1
412:1 426:21 476:21,22
490:15 506:20 529:16
553:6
talked
321:12,22 351:3 354:11
357:8,9 373:10 388:9
417:11 436:3,10 440:7
441:5 442:4,18 444:3 449:9
453:13 454:14 499:22,22
499:25 501:11 534:1,12
544:18 551:22 553:17
talking
317:8 321:5 348:10 357:14
360:9 367:21 368:1 370:15
372:9 373:20 373:12 376:7
400:1,14 401:8 410:9 412:5
441:10,17,20 445:15
452:17 474:19 481:23
501:10,25 507:23 526:5
532:15 534:14 543:7,9,17
talks
389:16 426:25
tammy
341:1 348:7 378:18
418:2
tax
329:24 346:12 413:18
426:15,20 469:23,23 470:2
470:3,7,11 472:22 473:2
504:3 553:2,3
team
443:11
tech
427:14
technically
313:8 328:7,12 404:11
419:5 423:4 503:17 508:21
514:25 533:5
technologies
334:11
technology
308:5 312:6,9,17 313:20
317:10 318:4 331:15
343:16 365:15 377:18
378:17,19,25 380:6 389:2
390:9 402:3,15 411:8 461:8
461:11 464:4 467:18 471:8
473:4 487:13 488:10,23

technology (cont.)
501:15 496:12,23
510:24 534:25 540:5,11
557:18 561:5
technology's
476:25
tedious
417:2
telephone
463:20 464:6 466:19
534:11
telephonically
429:8 433:15
tell
351:20 352:9 386:18
417:18 421:7 434:3 491:18
512:1 505:5,9 536:18
telling
512:1 505:5,9 536:18
temporally
518:8
temporarily
427:6
temporary
302:17
tennis
393:5
term
340:25 341:10
terminated
333:23
terms
341:1 348:7 378:18
418:2
terrible
454:7
terribly
384:24
testified
313:8 328:7,12 404:11
419:5 423:4 503:17 508:21
514:25 533:5
testify
330:12 486:13 505:17
506:11 507:25 527:6
testifying
314:14 316:16,19 328:5,7
332:9 412:8 481:18 525:7
testimony
314:14 316:16,19 328:5,7
332:9 412:8 481:18 525:7

---

**[single - structured]**

single
323:22 338:5,8 351:9 376:9
sir
423:18
sitting
327:9 333:11
situation
324:23 371:8 374:25 435:4
443:10 455:1 474:15,19
520:9 553:14
six
359:17 360:22 478:1 549:9
sk
394:7
skip
361:21 455:13 512:17
533:9 537:6
skipped
335:12
skipping
349:12
sky
483:16 507:7 518:17
sleeves
367:16
slice
394:9
slowly
525:14
small
362:10
smart
374:17
sneaking
507:22
solar
543:4
sold
329:20 542:20 545:6
sole
442:19 470:14
477:15
solicit
492:13
solicitors
413:13
solution
384:15
somebody
319:23 320:15,16 321:22
322:23,25 338:10 354:10
355:11 366:21 367:10
391:1 393:5,5 419:25 422:1
428:14,16,18 430:10,11
439:24 441:13 516:16
521:8 543:21 555:23

sooner
518:14
sorry
327:1 330:12 335:17
360:23 363:6 371:9 379:6
379:10,23 395:11 396:24
401:10 402:18 413:7,8
419:2 420:18 425:11
431:25 456:8 466:8 472:7
484:7 495:18 524:12
526:17 527:13 530:17
545:17
sort
323:9 332:9 336:2 342:23
345:24 346:24 353:8 415:6
415:8 416:21 433:12
434:18,20 436:24 438:4
439:16 454:23 517:16,24
527:18 538:2,4 553:10
554:5 559:4
sorted
517:12
sorting
515:11
sought
362:9
sounds
540:18
sources
478:8
south
392:20,23 462:19,25 483:2
517:13
space
323:13 554:24
speak
316:21
speciality
334:16
specific
394:20 411:16 420:13
475:4,9 485:17 551:9
specifically
326:21 390:12 411:3
422:13 429:6 431:1 433:2
433:23 434:1 441:10
448:21 481:19 482:15
486:1 510:18 511:9,24
specifics
482:1
speculating
559:17
spell
313:11
statements
395:2 396:17 459:1 460:17
460:21 462:1 471:20,25

spending
445:20 454:16
spent
332:22 509:14
spit
496:20
spitzer
345:16 346:5,6 347:6,10
369:7
spoke
329:18 373:3 414:24 416:7
spot
421:18
spouses
350:14
stack
418:2
staff
517:12 373:9 483:9
stake
448:4
stand
559:3
stapled
358:17
star
317:5,8 344:10 359:10
361:10 379:15 437:20
516:19 517:25 518:7,22
519:13 520:4,6 521:6,16
stated
503:13 554:4 544:6
starts
319:13 370:2 371:1 514:24
starting
437:17
starts
359:13 370:2 371:1 514:24
state
313:11,25 319:24 349:20
528:9 530:12
statement
311:21 312:5,8 454:25
458:24 460:7 461:7 463:5
466:14,17 467:17 475:12
476:9 477:5 495:21 496:2
491:20,23 554:20,22
structure
345:23 410:10,11,19
412:15 425:25
statements (cont.)
501:13 523:16,25 524:4,17
560:6
states
308:1 318:12 321:24 323:2
323:11 324:13 338:10
430:20 446:7 530:10,15
532:21,24 540:3
stay
454:8
stayed
516:11
steadfast
544:9
step
428:18 506:19
steps
393:9 497:23
stern
513:10 518:23 519:21
stockholders
512:12
stood
426:19
stop
383:8
stopped
545:9
stopping
536:3
stored
496:4
strategic
341:4 347:1 342:19 348:10
351:11
street
310:6 343:3 460:9 461:15
strous
438:24 490:21 495:2
structured
357:6 413:17 435:3 442:3
440:18 442:2,3,16,20

---

**[thanks - tribute]**

thanks
392:7 401:20
theo
336:20 337:2 369:7 490:25
351:3,16,21 451:16 453:15
453:17,17,24 457:10 459:8
453:19 461:23 462:20
467:23 469:4 470:5,24
476:18 478:22 480:12
468:4,6 480:18 503:23
thing
307:24 312:14 334:19 336:3
342:23,24 345:24 346:24
349:11 352:2,20 353:5,12
353:22 363:2 366:16 367:8
367:17 376:9 390:14 416:8
416:24 474:12 487:11,12
469:19 474:17 492:17
492:22 493:19,23 497:9
554:5 559:4
things
319:17,23,25 330:3 350:22
356:11 357:6 358:19 367:3
376:17 423:5 437:3 438:17
458:5 498:9 508:25 510:8
516:19 517:25 518:7,22
519:13 520:4,6 521:6,16
522:2 524:5 525:8 528:4,9
528:20 560:8
think
315:20 316:16 319:20
319:24 320:6,7,17 321:3,18
356:11 357:6 358:9 367:3
337:13,18,20 346:24 402:2
348:25 349:9,18 351:18
350:18 356:15,21,21
371:24

think (cont.)
443:21,23 444:2,4 445:7,15
447:22 448:7 449:9,13,15
453:10,16,21 454:16 455:15
453:17,17,24 459:18
460:23,25 554:20 488:7
459:24 461:23 462:20
467:23 469:4 470:5,24
476:18 478:22 480:12
481:8 488:20 491:1,7
494:20 495:16,19 496:23
497:7 498:11 500:4
499:1,12,17 500:14 502:4
500:17 504:12 505:21
506:1 508:16,18 509:12
516:1 522:2,5 524:3 526:2
529:17 524:22 530:23,16
531:23 535:5 536:12,15
537:3,5 538:25 540:9,12,14
541:19 544:17 547:4,15
550:3 551:20 553:16 557:4
559:5
third
315:17 316:12,16 317:8,8
317:24 318:1 333:6 337:19
338:9,13,16 341:1
342:1,3 345:4 345:7
513:6 520:25 522:15 543:1
551:6
this
315:20 317:16 318:22
319:24 320:6,7,17 321:3,18
324:4,5 339:8,11,13 352:20
327:2,9 329:9,11,17 331:8
331:23 332:9 335:6 336:3,4
336:10,14,15 338:2,6 339:2
339:17,23,25 340:4 348:22
349:13,15 354:23 356:6,9
356:13 357:2,17 362:15
thorough
517:5 512:17,23 521:11
thought
329:9 356:1 361:20
378:4 381:3,14 387:2
383:23 412:20 417:20 456:15
386:18 442:4 449:22 552:12
388:18 390:10 403:15
391:19 395:19 396:7
373:23 374:7 402:2,7
403:15 412:17 428:22 433:5
408:13 410:16 411:21,22
414:25 419:11,22 420:11
419:22 420:1 433:20
424:4,24 428:3 445:25 491:2
432:17 433:8,22 447:2 459:10
435:13 437:12 440:8 442:2
440:18 442:2,3,16,20

thrilled
329:1
throw
508:20
thrown
508:22
thumb
508:25
thumb
468:14
tied
374:18 480:21 517:1
tiffany
551:19,20,21
time
315:17 316:12,16 317:8,8
317:24 318:1 333:6 337:19
338:9,13,16 341:1
342:1,3 345:4 345:7
317:22 512:17,23 521:11
times
316:6 335:12,16
timeframe
516:22 530:2
times
316:6 335:12,16
325:6,8 371:2 553:2
title
535:1
today
314:24 315:14,21 316:19
337:11 510:17 511:7 560:7
total
382:12 403:7 440:16
450:18 493:4,9 494:5
541:25
tough
358:16
track
501:7
traction
543:3
transaction
339:21 342:25 351:8
364:10 365:14,16,16 366:5,17
366:18 385:6,10 386:21
388:25 393:5,5 419:25 422:1
428:14,16,18 430:10,11
439:24 441:13 516:16
521:8 543:21 555:23
transactions
341:24 364:6 395:5,21
396:3,13 439:7,9,22
397:5,17 398:19,21,24
399:2,12,19,20,21,13,17
400:2,23 431:20 490:11,17
transcript
550:12 507:2 509:14
561:15
transfer
321:24 404:4 465:7 466:6,9
466:19 475:23 479:20,22
transferred
467:21,23 473:1,3,4
transferring
512:23
transfers
464:17,23 467:4 479:1
487:6
traveling
509:9
treasurer
319:21 320:23
treated
512:23
tremendous
367:6
tribute
323:6

DSM-000549



**[tried - vis]**

**tried**
322:4 329:4 415:23 416:2
**triggering**
526:8
**trip**
505:8
**true**
323:3 324:13 325:8 338:6
341:23 342:9 385:9 542:2
542:24 561:14
**trust**
393:8
**trusted**
520:20
**truthful**
315:22
**try**
376:20 415:19 517:23
518:6 545:15
**trying**
377:25 328:21 366:11
368:15 412:4 415:12,13
432:13 443:13 467:3
470:25 471:1 483:5,6
516:19 517:9 518:4,5
520:23,24 526:11,18,20
542:20 549:21 550:3
558:22 559:13
**turn**
344:17 349:14 359:6 360:3
360:21,24 361:1 362:7
378:12 379:14,15 380:1
382:4 389:4 396:23 402:9
430:3 462:11 463:5 465:2
466:14 511:22 522:18
535:7,22 536:24 540:2
547:21 548:9 557:16
**turned**
452:18 503:23
**turning**
334:8 339:14 374:23
388:22 461:4 463:4 466:13
467:16 539:10
**turns**
428:7
**twenty**
420:12,17
**twice**
534:13
**twists**
428:7
**type**
319:12 334:20 339:7
404:23 445:11 447:7 483:8
490:6 491:7 503:10 506:1
509:24 546:8 550:20 551:2

**type (cont.)**
552:13 553:11 555:18
558:18
**types**
549:24 551:9
**typical**
322:21 497:1
**typically**
326:6,8 496:15,17 499:1
543:25
**typing**
363:12

**u**

**u.s.**
561:12
**uh**
331:25 332:3 345:17
349:18 358:12 361:12,25
366:2,9 375:11 380:3 382:3
382:6 385:21 397:20,24
402:8 405:21 414:19 430:5
430:24 493:5,8 498:4 530:9
532:8 535:3 537:3 558:7
**ultimate**
518:17 540:14
**ultimately**
328:12,19 329:10 381:1
384:13 385:4,10,15 410:11
428:13 438:8 439:9,13
441:1 442:13 443:9 444:7
453:2 456:5 457:2 470:16
483:17 489:15 490:16
494:4 518:21 527:21
546:11
**unauthorized**
452:19
**unbilled**
488:3,7
**uncertainty**
541:3
**unclear**
430:10 515:14 516:24
517:8 526:17
**underneath**
389:8
**undersigned**
561:11
**understand**
315:19,21 317:3 394:6
395:22 396:10,15 400:11
406:4 412:6 421:1 431:25
432:9,10 483:2 497:11
520:22 558:22
**understandably**
544:10

**understanding**
341:5,12 371:8 374:25
388:6 393:19 394:1 395:9
396:18 306:2,5,12,18
399:15 410:22 412:16,25
415:6 416:11 417:8 431:19
421:11 438:11 455:17
457:22 473:1 474:5 479:24
502:24 503:4,18 504:21
530:1
**understands**
530:6
**understood**
394:24 412:6,9 413:16
504:6,7 517:12,16
**undertaken**
406:14 541:6
**undue**
431:9
**unfair**
442:24
**unfolding**
410:18
**unit**
498:7
**united**
308:1 313:18 321:24 338:9
**unknown**
456:11
**unnecessary**
437:4
**unpack**
481:2
**unsecured**
430:21
**untrue**
452:22
**unusual**
322:22 363:21 453:14
**update**
361:15
**upgrade**
365:3
**upper**
430:10 515:14 516:24
**upset**
454:21
**urgency**
500:20
**use**
342:10,20,24 422:14 423:8
478:20 479:16,24 480:16
482:3,20 486:10
**useless**
412:22
**usually**
326:14

**utilize**
363:2 364:5
**utilized**
392:4,6 489:16

**v**

**vague**
432:12
**value**
323:13,14,16,19,24 324:23
326:1,13 331:21 332:7
333:8 363:3 365:23 515:22
541:8,9 542:4 543:5,8
**variable**
346:23
**variety**
352:9 384:10 453:1 500:21
**vendor**
433:22
**vendors**
417:22 432:22 554:5
**venture**
311:22 312:4,7,11,24 418:8
418:10 458:24 459:14
460:20 461:7,12 462:2,13
462:23 463:15 465:21
466:10,25 468:14 472:2,8
475:5 476:13 478:20
479:17 547:7,22 548:11
**verify**
507:6
**version**
485:16 539:24,25
**versions**
322:2
**versus**
394:7,8 410:15 428:22
**vetting**
371:7
**vice**
404:12
**view**
342:24 544:13
**viewed**
315:5 391:6
**views**
352:8 398:18
**violations**
313:21,24 336:23
**vis**
559:20,20



**[wrote - zouvas]**

**wrote (cont.)**
551:4

**x**

**xx243**
463:20 466:19,23
**xx792**
464:7

**y**

**yahoo.com**
368:4,9 370:20 531:17
532:4
**yeah**
319:11,22 320:5 334:14
335:4,17,25 343:19 344:15
353:1 359:18 361:17 362:4
364:19 367:8,22 374:1
385:24 387:2,6 389:3,19
391:2 393:1,2,6 396:7
403:5 406:22 407:3 414:8
417:7,12,12 442:12 445:7
448:9 451:24 452:16 456:6
469:2 474:1 485:5,22
499:11 501:4 507:15
518:15 528:13 529:2 539:5
541:12 545:16 549:13
551:21,21 552:17 556:4,22
**year**
397:17 406:11 500:16
**years**
336:16 441:18 450:5
525:17,17 536:5 551:25
552:1
**yep**
344:21 349:10 364:9
382:11 407:9 466:8 500:17
532:13 536:25 548:5
**york**
339:20 351:5,8 452:14,16

**z**

**zell**
338:22
**zip**
461:19
**zipkin**
335:10,14,16 336:7,11
337:4,16 339:2,9
**zouvas**
380:20,21,22,23 383:7,9,14
383:16,24,24,25 386:18
388:9 390:16 392:1,5,11,13
392:18,21 399:7,13 474:25
475:1,3 481:21 482:8
483:22 501:1 508:9,15
509:10 513:6 521:4 539:8

**[voluntarily - wrote]**

**voluntarily**
493:18
**volunteered**
329:3
**vote**
327:18,25 410:23 421:6
**voted**
421:3
**voting**
410:24 411:7

**w**

**wabash**
309:16
**wagner**
561:10
**wait**
316:25,25 507:21 549:13
**waiting**
508:4
**waiver**
486:6
**walk**
440:12 523:22 524:2 547:6
**wall**
343:3
**want**
317:8 318:20 321:25
323:16 329:16 335:12,13
337:8 338:3,16 341:17,23
342:21 351:14 353:15
356:8,21 359:5 383:3 388:8
390:14 393:7 394:10 412:1
415:19 422:16 424:17
442:24 467:4,10 474:16
476:22 481:17 492:20,20
500:5 504:20 505:12
510:14 511:22 521:11
522:18 530:14 543:4,14
555:8 557:19
**wanted**
321:10 355:1,11 375:18
392:22 427:16 507:8
520:25
**wanting**
321:10
**wants**
352:18
**warehouse**
515:2
**warned**
316:21
**warrant**
328:12,18,22,23 512:24
523:4,12,22 527:24
**warrants**
318:21,23 319:8 330:3

**warrants (cont.)**
412:25 429:1,4,11 442:11
448:13 501:11,21,24
505:21 506:21 507:4
508:11,19 512:10,23 513:9
513:9,14 516:25 518:12,20
519:1,24 521:15 525:21
528:2,18,23 529:13 532:23
**wash**
426:17,18
**watkins**
309:15
**ways**
394:9 395:22 553:9
**wearing**
415:9
**weeks**
326:2 371:2 510:10
**weighed**
507:19 527:16,17,17
**weird**
324:23
**went**
321:7,8 329:3 345:1,2
413:12 419:16 440:13
442:4,17 459:4 464:11
471:3 480:24 497:13
529:15 546:22
**west**
308:11 309:8 460:9 461:15
**wet**
533:23
**whatsoever**
354:2
**wholly**
355:10
**whopper**
557:6
**wife**
443:9
**willing**
443:17
**winding**
441:17
**wires**
464:17
**wish**
367:11 560:5
**wisniewski**
309:4 313:10,15 315:6,12
320:21 330:14,24 331:3
339:19 336:6 343:12
357:23 358:3 359:2,10,16
359:19 360:20 369:22
373:17 374:22 376:25
377:4,6 388:2,21 390:5,14

**wisniewski (cont.)**
390:19 394:12,15 395:8,17
396:1,22 398:15 400:4,9,15
401:6,11,15,23,24 404:15
405:12,24 407:6 408:7
413:19 414:22 416:3 420:7
424:6 425:3 429:13,17,19
430:2 435:5,21 440:9
451:19 454:12 456:9
458:20,22 462:5,6,16
465:17 468:11 469:9
470:12 471:5,18,21,24,25
472:5,8,25 474:4,10,18
475:16,21 476:2,7,21 477:2
485:15,22,24 486:15,19
487:10 488:5 489:6 491:1
493:2 495:2,6 500:8 501:8
501:9,16 502:13 505:16
510:19 514:6 516:24 517:5
517:9 522:9,12,14 524:14
525:8 525:526,25 527:3
530:4 531:13 532:12
534:20 545:19 547:3
521:22 553:21 554:25
556:4,5 557:7,10,12 558:2
559:24 560:10,14
**withdrawn**
486:14
**witness**
308:8 309:13 310:3 311:3
313:7 324:3 327:13 330:12
333:10 336:5 359:18 373:8
375:23 376:1,6 377:2
387:15 388:16 390:16
400:24 401:3,9 404:14
405:23 407:5 410:6,14
421:11 424:2,22 434:15
435:20 448:9 454:13 456:8
469:8 470:23 472:9 473:15
474:14 476:6,17 479:23
488:20 490:25 500:4 501:4
505:12,17 508:23 510:18
514:5 517:4,11 521:11
527:5,7 528:13 551:23
556:1 561:4
**woman**
354:2,3 551:19
**women's**
350:13
**won**
443:3

**wonder**
401:7 524:25 537:19
**woodwork**
439:24
**word**
508:20 517:15
**words**
337:13 366:14 383:22
424:16 525:12
**work**
324:22 325:19,20,21 329:2
329:9 332:6,8,9,12,13
333:5,21,22,25 334:1,20
335:1,3,6,8,9,21,23 339:21
340:2 342:10 343:1 363:4
345:11 442:11 483:6,12,19
490:1,8,12,14 497:20
500:20,21 520:14 550:19
557:21
**worked**
348:17 353:21 362:15
350:23 440:3 528:19
551:19
**working**
348:16 356:7 417:14
511:16 518:8 520:8
**worms**
444:5
**worried**
441:13
**worst**
338:16
**worth**
324:19 542:17,22,23 544:7
544:11
**wow**
439:22 453:14
**writing**
343:18 364:24,25 369:13
503:16 520:2
**written**
311:8,9 331:7,14 343:16
426:10 429:10 447:7,15,23
512:9 522:24 552:10
**wrong**
318:14 369:25 397:2 454:8
549:13
**wrote**
367:13 399:13 449:21

DSM-000550



ATTORNEYS AT LAW

Jon M. Hopeman
(612) 373-8416
E-mail: jhopeman@felhaber.com

July 8, 2016

**VIA E-MAIL AND U.S. MAIL**

Andrew M. Luger
United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

**RE:    Edward S. Adams**
**Our File No. 29260.001**

Dear Mr. Luger:

As you know, I represent Edward S. Adams, Esq. in connection with a Grand Jury Subpoena that he received from your office.

We recently learned from Yahoo! Inc. that a search and seizure warrant was granted by United States Magistrate Judge Steven E. Rau on January 7, 2016, in Case No. 16-mj-8 (SER), which permitted the seizure of Electronically Stored Information ("ESI") in connection with the following two e-mail accounts: EdwardSAdams@Yahoo.com and Jafam1@Yahoo.com. Both of these addresses belong to Mr. Adams.

As you should know from your review of the ESI and the billing records Mr. Adams previously provided to you, Mr. Adams and his law firm represented and performed legal work on behalf of a variety of parties and clients during the period of time covered by the warrant to Yahoo!. He also, of course, communicated with numerous parties relating to such work and provided legal advice and assistance in connection therewith using the e-mail accounts subject to the warrant, the contents of which are contained in the ESI.  Furthermore, Mr. Adams communicated with other members of the firm Adams Monahan, LLP and its predecessor firm using the e-mail accounts at issue relating to client matters, the contents of which are again contained in the ESI.  Finally, Mr. Adams retained and worked with counsel himself on a variety of matters, the communications and contents of which yet again are contained in part in the ESI obtained from Yahoo!.  Thus, as you are well aware, the ESI contains information and communications protected by the attorney-client privilege and work product doctrines that should not have been sought or reviewed by your office.

220 South Sixth Street
Suite 2200
Minneapolis, MN  55402-4504

Phone: 612-339-6321
Fax: 612-338-0535

felhaber.com



EXHIBIT
DX-58

DSM-000712

Andrew M. Luger
July 8, 2016
Page 2


In addition to the attorney-client privilege and work product concerns implicated in connection with the seizure of the ESI in question, the ESI is believed to contain information that was outside the scope of the warrant. Your retention of such ESI violates the terms of the warrant and has, in essence, converted the warrant into "a general warrant, [thereby] rendering the Fourth Amendment irrelevant." *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (internal quotations omitted).

To resolve this important matter, I propose the following: Your office should return to my firm all of the ESI provided to you by Yahoo!. We will internally review all of the ESI for attorney-client and work product privileges, prepare a privilege log, and then provide you with both the privilege log and all of the non-privileged ESI within the scope of the warrant.

As a separate request, please promptly provide me with evidence of your compliance with all aspects of U.S. Attorneys' Manual § 9-13.420 ("Searches of Premises of Subject Attorneys").

Sincerely,

*s/ Jon M. Hopeman*

Jon M. Hopeman


rjw

cc:     Edward S. Adams

DSM-000713



**U.S. Department of Justice**

United States Attorney
District of Minnesota

---

*600 United States Courthouse*     *Telephone: (612) 664-5600*
*300 South Fourth Street*                *Fax: (612) 664-5787*
*Minneapolis, MN 55415*

August 15, 2016

**RECEIVED**
AUG 16 2016
BY:

Jon M. Hopeman, Esq.
Felhaber Larson
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402-4504

　　　　　Re: Edward S. Adams

Dear Mr. Hopeman:

　　　　I am writing to confirm receipt of your letter dated July 8, 2016, relating to search and seizure warrants executed on two personal electronic mail accounts maintained by your client, Edward S. Adams. We understand our obligations and are taking appropriate steps to comply with the U.S. Attorneys' Manual and to protect any potentially applicable privileges.

　　　　Please feel free to contact me directly if you care to discuss further or have any questions. My direct dial is (612) 664-5681, and I can also be reached via electronic mail at david.maria@usdoj.gov.

　　　　　　　　　　　Sincerely,

　　　　　　　　　　　ANDREW M. LUGER
　　　　　　　　　　　United States Attorney

　　　　　　　　　　　BY: David M. Maria
　　　　　　　　　　　Assistant U.S. Attorney



EXHIBIT
DX-59

Review00000013
DSM-000714

## Kroells, Christine A

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 <David.Maria@usdoj.gov> |
| **Sent:** | Thursday, November 03, 2016 11:46 AM |
| **To:** | Kroells, Christine A |
| **Subject:** | RE: Adams Relativity emails |

Ok - was going to update you on the email situation.  No rush.


-----Original Message-----
From: Kroells, Christine A [mailto:CAKroells@uspis.gov]
Sent: Thursday, November 03, 2016 11:30 AM
To: Maria, David (USAMN) 1 <dmaria1@usa.doj.gov>
Subject: Re: Adams Relativity emails

Jury has a question have deal with. I can call later.

Christie Kroells
Sent from my iPhone

On Nov 3, 2016, at 11:28 AM, Maria, David (USAMN) 1 <David.Maria@usdoj.gov<mailto:David.Maria@usdoj.gov>> wrote:

Give me a call - 664-5681

From: Kroells, Christine A [mailto:CAKroells@uspis.gov]
Sent: Thursday, November 03, 2016 11:20 AM
To: Maria, David (USAMN) 1 <dmaria1@usa.doj.gov<mailto:dmaria1@usa.doj.gov>>
Subject: RE: Adams Relativity emails

There is a "Hot Doc" tag.  I was also wondering is it only the Ed Adams II project that has emails?  I was thinking we had more like 120k emails and this one only says 6k emails.  Maybe it was narrowed down to that after removing taint? Thanks and I can email Cory and ask who would add the tags.

Christie Kroells
Postal Inspector | U.S. Postal Inspection Service | Twin Cities Field Office
7360 Bush Lake Rd., Ste. 100, Minneapolis, MN 55439
Office: 612-884-7877
https://postalinspectors.uspis.gov/

From: Maria, David (USAMN) 1 [mailto:David.Maria@usdoj.gov]
Sent: Thursday, November 03, 2016 7:53 AM
To: Kroells, Christine A
Subject: RE: Adams Relativity emails

These look fine.  We should also probably have an additional tag (that can be added in addition to these) that is "critical" or something along those lines.

Maybe also add one for Adams Taxes.

1



DSM-000715

If you want to pass these on to Cory, she can probably do them (or find the right person to add them).

Good luck with the jury!

From: Kroells, Christine A [mailto:CAKroells@uspis.gov]
Sent: Wednesday, November 02, 2016 12:57 PM
To: Maria, David (USAMN) 1 <dmaria1@usa.doj.gov<mailto:dmaria1@usa.doj.gov>>
Subject: Adams Relativity emails

Hi David, I have some time while waiting for the jury to come back in the Reichel case, so I'm looking at some of the Adams emails. Does it make sense to start organizing the emails by tagging important ones by players and topic? I came up with these but I'm sure there are more. Would Mark Zeitz create these tags for us? I wanted to see what you thought before sending this to him. Thanks!

Adams, Ed
Monahan, Mike
Strous, Theo
Linares, Robert
Linares, Bryant
Zipkin, Larry
Zipkin, Jill
Lancia, Joe
McPheely, Bernard
Nichols, Charlie
Mack, Kris
Maddox, JR
Mumm, Chris
Rapello, Paul
Ward, Sandy
Doering, Pat

Apollo
Apollo Gem
Scio-Private
Scio-Public
Apollo Sale to Public
Apollo Sale to Private
Special Litigation Committee
AMLLP
Sale of Stock/Warrants
Apollo Board
Scio Board
Krossbow
ADR Investments
EAS Consulting
MRM Consulting
RL Investments
RBEMD
DL Investments
LMA
Focus Capital

2

Nelson Mullins
SEC


Christie Kroells
Postal Inspector | U.S. Postal Inspection Service | Twin Cities Field Office
7360 Bush Lake Rd., Ste. 100, Minneapolis, MN 55439
Office: 612-884-7877
https://postalinspectors.uspis.gov/

DSM-000717

Pivot Table of "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx"

| Timestamp | (All) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| Count of Action | Column Labels | | | | | | | | |
| Row Labels | Belich, Brandon | Harris, Martin | Khan, Jennifer | Kroells, Christine | Maria, David | O'Reilly, Sara | Petersen, Coryn | (blank) | Grand Total |
| Conversion Complete | | | | | 105 | | | | 105 |
| Document Query | 21 | 69 | 213 | 4724 | 5129 | 51 | 66 | | 10273 |
| Export | 1 | | | | | | | | 1 |
| Print | | | 9 | 144 | 172 | | | | 325 |
| Query | | | | | 46 | 1 | 2 | | 49 |
| Run | | | | | 77 | | | | 77 |
| Search Cache Table Creation | | | | | 70 | | | | 70 |
| Update | | | | 183 | 1 | | | | 184 |
| View | 7 | | 208 | 4792 | 7442 | 52 | 1 | | 12450 |
| (blank) | | | | | | | | | |
| Grand Total | 29 | 69 | 430 | 9843 | 13042 | 52 | 69 | | 23534 |



EXHIBIT
DX-64

DSM-000741



**FOSTER BREVER WEHRLY, PLLC**
ATTORNEYS AT LAW

Thomas E. Brever (612) 787-7893
Andrew T. Brever (612) 455-8942
John A. Wehrly (612) 455-8944
Of Counsel, Eric B. Brever (612) 787-7891

December 1, 2016

Mr. David Maria, Esq.
Assistant US Attorney
300 South 4th Street, Suite 600
Minneapolis, MN 55415

RE:   GJ Subpoena upon Murry & Assoc., LLC

Dear Mr. Maria:

We are writing in response to the Grand Jury subpoena served upon our assistants, Murry & Associates, LLC, hired under a Kovel arrangement by our firm for the purpose of assisting in rendering legal advice. We are transmitting herewith a USB drive containing copies of electronically stored material that is not subject to claim of privilege, and paper copies of such material from the files of Murry & Associates, along with the Certificate of Authenticity made on behalf of the firm. We are also enclosing herewith our privilege log for materials that sets forth the identification of materials and the claims of privilege for such materials

Please let me know if you have any questions.

Sincerely,

Thomas E. Brever

TEB/skb

Enclosures

2812 Anthony Lane South, Suite 200 • St. Anthony, MN 55418
Fax: (612) 788-9879
www.fosterbrever.com



**EXHIBIT**
**DX-67**

DSM-000752

GRAND JURY SUBPOENA SERVED ON MURRY & ASSOCIATES

## Privilege Log

| Paper Items | Pages | Basis |
|---|---|---|
| Notes of Interview | 4 | Attorney client; work product |
| Summary of items | 1 | Attorney client; work product |
| Letter from PJM to TEB | 2 | Attorney client; work product |
| Summaries of items | 3 | Attorney client; work product |
| Copy of Check with Notes and questions | 1 | Attorney client; work product |
| Summary of items | 2 | Attorney client; work product |
| List of payments | 1 | Attorney client; work product |
| Emails to/from client Sent by AM | 68 | Attorney client; work product |
| Emails sent by EA or TEB to AM | 59 | Attorney client; work product |
| Emails sent by EA or TEB to PM | 45 | Attorney client; work product |
| Emails sent by PM to EA or TEB | 23 | Attorney client; work product |

DSM-000753

| Items on Drive | Pages | Basis |
|---|---|---|
| 2007 folder | 7 | Attorney client; work product |
| 2008 folder | 6 | Attorney client; work product |
| 2009 folder | 2 | Attorney client; work product |
| 2011 folder | 1 | Attorney client; work product |
| 2014 folder | 1 | Attorney client; work product |
| 2016 folder | 22 | Attorney client; work product |
| Billing records | 18 | Attorney client; work product |
| AM email inbox | 41 items | Attorney client; work product |
| Sent email inbox | 33 items | Attorney client; work product |
| PM emails received | 28 items | Attorney client; work product |
| PM emails sent | 12 items | Attorney client; work product |

DSM-000754

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – AUSA Maria**

| | User Name | Timestamp | Details |
|---|---|---|---|
| 1 | Maria, David | 5/4/2016 11:27:38 AM EDT | >zipkin< |
| 2 | Maria, David | 5/4/2016 11:49:35 AM EDT | >warrants< |
| 3 | Maria, David | 5/4/2016 1:24:48 PM EDT | >jail< |
| 4 | Maria, David | 5/4/2016 2:43:47 PM EDT | authorized the sale of warrants |
| 5 | Maria, David | 5/4/2016 2:58:34 PM EDT | sold warrants |
| 6 | Maria, David | 5/4/2016 3:05:08 PM EDT | rl investments |
| 7 | Maria, David | 5/4/2016 3:07:04 PM EDT | dl investments |
| 8 | Maria, David | 5/4/2016 3:07:56 PM EDT | adr investments: |
| 9 | Maria, David | 5/4/2016 3:11:20 PM EDT | >adr< |
| 10 | Maria, David | 5/4/2016 4:21:25 PM EDT | >indicted< |
| 11 | Maria, David | 5/4/2016 4:25:20 PM EDT | >accused< |
| 12 | Maria, David | 5/4/2016 4:35:12 PM EDT | >fraud< |
| 13 | Maria, David | 5/4/2016 4:38:42 PM EDT | >rl & investment< |
| 14 | Maria, David | 5/4/2016 4:38:53 PM EDT | >rl investment< |
| 15 | Maria, David | 5/4/2016 4:42:08 PM EDT | >rbe< |
| 16 | Maria, David | 5/4/2016 4:49:36 PM EDT | >moron< |
| 17 | Maria, David | 5/5/2016 9:52:29 AM EDT | >idiot< |
| 18 | Maria, David | 5/5/2016 9:58:44 AM EDT | >criminal< |
| 19 | Maria, David | 5/5/2016 10:07:49 AM EDT | >indict*< |
| 20 | Maria, David | 5/5/2016 10:12:45 AM EDT | >asshole< |
| 21 | Maria, David | 5/5/2016 10:19:04 AM EDT | >deceiv*< |
| 22 | Maria, David | 5/5/2016 10:34:33 AM EDT | >bishop< |
| 23 | Maria, David | 5/5/2016 10:43:49 AM EDT | >skog< |
| 24 | Maria, David | 5/5/2016 10:48:26 AM EDT | >lzipkin< |
| 25 | Maria, David | 5/5/2016 10:49:33 AM EDT | >larson< |
| 26 | Maria, David | 5/5/2016 10:50:24 AM EDT | >schiprett< |
| 27 | Maria, David | 5/5/2016 10:50:29 AM EDT | >robb< |
| 28 | Maria, David | 5/5/2016 10:53:13 AM EDT | >robb &amp;amp; cameron< |
| 29 | Maria, David | 5/5/2016 10:53:25 AM EDT | >robb cameron< |
| 30 | Maria, David | 5/5/2016 10:58:34 AM EDT | >cameron AND robb< |
| 31 | Maria, David | 5/5/2016 11:11:27 AM EDT | >santoro< |
| 32 | Maria, David | 5/5/2016 11:12:54 AM EDT | >larry AND zipkin< |
| 33 | Maria, David | 5/5/2016 11:13:40 AM EDT | >larry W/2 zipkin< |
| 34 | Maria, David | 5/5/2016 4:48:02 PM EDT | >poznack< |
| 35 | Maria, David | 5/5/2016 4:49:09 PM EDT | >poznak< |



| | User Name | Timestamp | Details |
|---|---|---|---|
| 36 | Maria, David | 5/5/2016 4:49:18 PM EDT | >vanpoznack< |
| 37 | Maria, David | 5/5/2016 4:49:23 PM EDT | >vanpoznak< |
| 38 | Maria, David | 5/5/2016 4:50:07 PM EDT | >disgruntled< |
| 39 | Maria, David | 5/5/2016 5:01:15 PM EDT | >dufresne< |
| 40 | Maria, David | 5/5/2016 5:01:35 PM EDT | >jussaume< |
| 41 | Maria, David | 5/5/2016 5:02:51 PM EDT | >mistretta< |
| 42 | Maria, David | 5/5/2016 5:02:58 PM EDT | >pipkorn< |
| 43 | Maria, David | 5/5/2016 5:04:08 PM EDT | >pinkhasov< |
| 44 | Maria, David | 5/5/2016 5:04:16 PM EDT | >sarris< |
| 45 | Maria, David | 5/5/2016 5:05:04 PM EDT | >devitto< |
| 46 | Maria, David | 5/5/2016 5:05:13 PM EDT | >spaid< |
| 47 | Maria, David | 5/5/2016 5:05:21 PM EDT | >weishaar< |
| 48 | Maria, David | 5/9/2016 3:58:13 PM EDT | >Jill< |
| 49 | Maria, David | 5/9/2016 4:10:23 PM EDT | >Jill NOT jillclarkcpa< |
| 50 | Maria, David | 5/9/2016 4:10:42 PM EDT | >Jill NOT clark< |
| 51 | Maria, David | 5/9/2016 4:10:58 PM EDT | >jill NOT clark< |
| 52 | Maria, David | 5/9/2016 4:11:08 PM EDT | >jill % clark< |
| 53 | Maria, David | 5/9/2016 4:12:11 PM EDT | jill NOT jillclarkcpa |
| 54 | Maria, David | 5/9/2016 4:12:21 PM EDT | jill NOT clark |
| 55 | Maria, David | 5/9/2016 4:12:50 PM EDT | jill NOT jillclarkpa |
| 56 | Maria, David | 5/9/2016 4:15:42 PM EDT | "jill" AND NOT "jillclarkpa" |
| 57 | Maria, David | 5/9/2016 4:15:54 PM EDT | "jill" AND NOT "jillclarkpa" |
| 58 | Maria, David | 5/9/2016 4:16:34 PM EDT | "jill" AND NOT "jillclarkpa" |
| 59 | Maria, David | 5/9/2016 4:16:54 PM EDT | "r&amp;d" |
| 60 | Maria, David | 5/9/2016 4:19:06 PM EDT | "r&amp;d" |
| 61 | Maria, David | 5/9/2016 4:19:13 PM EDT | "money will be used" |
| 62 | Maria, David | 5/9/2016 4:20:28 PM EDT | "money will be used" |
| 63 | Maria, David | 5/9/2016 4:22:15 PM EDT | "money will be used" |
| 64 | Maria, David | 5/9/2016 4:22:23 PM EDT | "proceeds will be used" |
| 65 | Maria, David | 5/9/2016 4:23:46 PM EDT | "proceeds will be used" |
| 66 | Maria, David | 5/9/2016 4:27:11 PM EDT | "proceeds will be used" |
| 67 | Maria, David | 5/9/2016 4:27:40 PM EDT | "stole" |
| 68 | Maria, David | 5/9/2016 4:30:55 PM EDT | "stole" |
| 69 | Maria, David | 5/9/2016 4:31:26 PM EDT | "secret" |
| 70 | Maria, David | 5/9/2016 4:31:39 PM EDT | "fbi" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 71 | Maria, David | 5/9/2016 4:32:26 PM EDT | "fbi" |
| 72 | Maria, David | 5/9/2016 4:36:00 PM EDT | "fbi" |
| 73 | Maria, David | 5/9/2016 4:36:10 PM EDT | "apollo" AND "&amp;" AND "financial statements" |
| 74 | Maria, David | 5/9/2016 4:40:45 PM EDT | "apollo" AND "&amp;" AND "financial statements" |
| 75 | Maria, David | 5/9/2016 4:41:02 PM EDT | "jackass" |
| 76 | Maria, David | 5/9/2016 4:41:48 PM EDT | "jackass" |
| 77 | Maria, David | 5/9/2016 4:42:06 PM EDT | "prison" |
| 78 | Maria, David | 5/9/2016 4:51:23 PM EDT | "prison" |
| 79 | Maria, David | 5/9/2016 4:51:52 PM EDT | "coot" |
| 80 | Maria, David | 5/9/2016 4:52:16 PM EDT | "coot" |
| 81 | Maria, David | 5/9/2016 4:53:01 PM EDT | "duty of loyalty" |
| 82 | Maria, David | 5/9/2016 4:53:24 PM EDT | "duty of loyalty" |
| 83 | Maria, David | 5/9/2016 4:55:10 PM EDT | "duty of loyalty" |
| 84 | Maria, David | 5/9/2016 4:56:19 PM EDT | "duty of loyalty" |
| 85 | Maria, David | 5/9/2016 4:56:34 PM EDT | "deceived" |
| 86 | Maria, David | 5/9/2016 5:00:07 PM EDT | "deceived" |
| 87 | Maria, David | 5/9/2016 5:01:08 PM EDT | "withheld" AND "information" |
| 88 | Maria, David | 5/9/2016 5:02:01 PM EDT | "withheld" AND "information" |
| 89 | Maria, David | 5/9/2016 5:02:22 PM EDT | "RL" AND "warrant" |
| 90 | Maria, David | 5/9/2016 5:02:59 PM EDT | "RL" AND "warrant" |
| 91 | Maria, David | 5/9/2016 5:03:19 PM EDT | "RL" AND "warrant" |
| 92 | Maria, David | 5/9/2016 5:03:37 PM EDT | "RL" AND "warrant" |
| 93 | Maria, David | 5/9/2016 5:03:50 PM EDT | "RL" AND "warrant" |
| 94 | Maria, David | 5/9/2016 5:03:56 PM EDT | "RL" AND "venture" |
| 95 | Maria, David | 5/9/2016 5:04:15 PM EDT | "RL" AND "venture" |
| 96 | Maria, David | 5/9/2016 5:04:24 PM EDT | "RL Investments" |
| 97 | Maria, David | 5/9/2016 5:04:55 PM EDT | "RL Investments" |
| 98 | Maria, David | 5/9/2016 5:05:15 PM EDT | "DL" AND "warrant" |
| 99 | Maria, David | 5/17/2016 1:28:05 PM EDT | "oak ridge" |
| 100 | Maria, David | 5/17/2016 1:30:22 PM EDT | "oak ridge" |
| 101 | Maria, David | 5/17/2016 1:30:35 PM EDT | "oak" AND "/1" AND "ridge" |
| 102 | Maria, David | 5/17/2016 1:31:00 PM EDT | "oak" AND "/1" AND "ridge" |
| 103 | Maria, David | 5/17/2016 1:31:11 PM EDT | oak ridge |
| 104 | Maria, David | 5/17/2016 1:34:03 PM EDT | "oak ridge" |
| 105 | Maria, David | 5/17/2016 1:40:36 PM EDT | "oak ridge" |

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 106 | Maria, David | 5/17/2016 1:40:43 PM EDT | "oak ridge financial" |
| 107 | Maria, David | 5/17/2016 2:43:38 PM EDT | "oak ridge financial" |
| 108 | Maria, David | 5/17/2016 2:43:54 PM EDT | "oak ridge financial" AND "resignation" |
| 109 | Maria, David | 5/20/2016 9:34:31 AM EDT | "fiduciary duty" |
| 110 | Maria, David | 5/20/2016 9:49:37 AM EDT | "fiduciary duty" |
| 111 | Maria, David | 5/20/2016 9:49:55 AM EDT | "fiduciary duty" |
| 112 | Maria, David | 5/20/2016 9:53:26 AM EDT | "fiduciary duty" |
| 113 | Maria, David | 5/20/2016 9:53:51 AM EDT | "fiduciary duty" |
| 114 | Maria, David | 5/20/2016 9:53:58 AM EDT | "disgruntled" |
| 115 | Maria, David | 5/20/2016 9:55:11 AM EDT | "disgruntled" |
| 116 | Maria, David | 5/20/2016 9:55:58 AM EDT | "disgruntled" |
| 117 | Maria, David | 5/20/2016 9:56:22 AM EDT | "disgruntled" |
| 118 | Maria, David | 5/20/2016 9:56:38 AM EDT | "disgruntled" |
| 119 | Maria, David | 5/20/2016 9:56:59 AM EDT | "disgruntled" |
| 120 | Maria, David | 5/20/2016 9:59:24 AM EDT | "disgruntled" |
| 121 | Maria, David | 5/20/2016 9:59:49 AM EDT | "disgruntled" |
| 122 | Maria, David | 5/20/2016 10:00:15 AM EDT | "angry" |
| 123 | Maria, David | 5/20/2016 10:05:52 AM EDT | "angry" |
| 124 | Maria, David | 5/20/2016 10:15:30 AM EDT | "angry" |
| 125 | Maria, David | 5/20/2016 10:15:43 AM EDT | "harry johnson" |
| 126 | Maria, David | 5/20/2016 10:32:56 AM EDT | "harry johnson" |
| 127 | Maria, David | 5/20/2016 10:33:06 AM EDT | "capital requirements" |
| 128 | Maria, David | 5/20/2016 10:33:32 AM EDT | "capital requirements" |
| 129 | Maria, David | 5/20/2016 10:50:20 AM EDT | "capital requirements" |
| 130 | Maria, David | 5/20/2016 10:50:30 AM EDT | "capital infusion" |
| 131 | Maria, David | 5/20/2016 10:50:56 AM EDT | "money will be used" |
| 132 | Maria, David | 5/20/2016 10:52:20 AM EDT | "money will be used" |
| 133 | Maria, David | 5/20/2016 10:54:56 AM EDT | "money will be used" |
| 134 | Maria, David | 5/20/2016 10:57:01 AM EDT | "capital" AND "diamond growing" |
| 135 | Maria, David | 5/20/2016 10:57:20 AM EDT | "capital" AND "diamond growing" |
| 136 | Maria, David | 5/20/2016 10:57:26 AM EDT | "capital" AND "diamond growing" |
| 137 | Maria, David | 5/20/2016 10:57:47 AM EDT | "capital" AND "diamond growing" |
| 138 | Maria, David | 5/20/2016 11:25:57 AM EDT | "capital" AND "diamond growing" |
| 139 | Maria, David | 5/20/2016 3:03:14 PM EDT | "mattress" |
| 140 | Maria, David | 5/20/2016 3:03:36 PM EDT | "mattress" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 141 | Maria, David | 5/20/2016 3:24:00 PM EDT | "mattress" |
| 142 | Maria, David | 5/20/2016 3:24:37 PM EDT | "mattress" |
| 143 | Maria, David | 5/20/2016 3:24:43 PM EDT | "evidence" |
| 144 | Maria, David | 5/24/2016 9:42:07 AM EDT | "maddox" |
| 145 | Maria, David | 5/24/2016 9:42:53 AM EDT | "maddox" |
| 146 | Maria, David | 5/24/2016 9:44:34 AM EDT | "maddox" |
| 147 | Maria, David | 5/24/2016 9:44:50 AM EDT | "maddox" |
| 148 | Maria, David | 5/24/2016 10:16:25 AM EDT | "maddox" |
| 149 | Maria, David | 5/24/2016 10:16:37 AM EDT | "528" OR "286.95" |
| 150 | Maria, David | 5/24/2016 10:16:59 AM EDT | "528" OR "286.95" |
| 151 | Maria, David | 5/24/2016 10:17:06 AM EDT | "528,286.95" |
| 152 | Maria, David | 5/24/2016 10:17:13 AM EDT | "528,000" |
| 153 | Maria, David | 5/24/2016 10:21:02 AM EDT | "528,000" |
| 154 | Maria, David | 5/24/2016 10:21:10 AM EDT | "262,500" |
| 155 | Maria, David | 5/24/2016 10:21:31 AM EDT | "262,500" |
| 156 | Maria, David | 5/24/2016 10:21:44 AM EDT | "225,000" |
| 157 | Maria, David | 5/24/2016 10:22:05 AM EDT | "hidden" |
| 158 | Maria, David | 5/24/2016 10:22:21 AM EDT | "hidden" |
| 159 | Maria, David | 5/24/2016 10:22:25 AM EDT | "hiding" |
| 160 | Maria, David | 5/24/2016 10:22:41 AM EDT | "hiding" |
| 161 | Maria, David | 5/24/2016 10:23:34 AM EDT | "hiding" |
| 162 | Maria, David | 5/24/2016 10:24:04 AM EDT | "hiding" |
| 163 | Maria, David | 5/24/2016 10:29:50 AM EDT | "hiding" |
| 164 | Maria, David | 5/24/2016 10:29:55 AM EDT | "justify" |
| 165 | Maria, David | 5/24/2016 10:30:36 AM EDT | "justify" |
| 166 | Maria, David | 5/24/2016 10:30:44 AM EDT | "justify" |
| 167 | Maria, David | 5/25/2016 11:02:54 AM EDT | "maddox" AND "warrants" |
| 168 | Maria, David | 5/25/2016 11:15:25 AM EDT | "maddox" AND "warrants" |
| 169 | Maria, David | 5/25/2016 12:14:55 PM EDT | "blab" |
| 170 | Maria, David | 5/25/2016 12:15:12 PM EDT | "maddox" AND "quiet" |
| 171 | Maria, David | 5/25/2016 12:15:38 PM EDT | "zipkin" AND "warrants" |
| 172 | Maria, David | 5/25/2016 1:13:00 PM EDT | "zipkin" AND "warrants" |
| 173 | Maria, David | 5/25/2016 1:20:07 PM EDT | "maddox@" |
| 174 | Maria, David | 5/25/2016 1:20:41 PM EDT | "maddox@" |
| 175 | Maria, David | 5/25/2016 1:21:19 PM EDT | "maddox@" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 176 | Maria, David | 5/25/2016 1:21:24 PM EDT | "jrmaddox" |
| 177 | Maria, David | 5/25/2016 1:26:34 PM EDT | "jrmaddox" |
| 178 | Maria, David | 5/25/2016 1:26:38 PM EDT | "shit" |
| 179 | Maria, David | 5/25/2016 2:44:40 PM EDT | "shit" |
| 180 | Maria, David | 5/25/2016 3:25:12 PM EDT | "julie" AND "mack" |
| 181 | Maria, David | 5/25/2016 3:33:17 PM EDT | "julie" AND "mack" |
| 182 | Maria, David | 5/25/2016 3:33:22 PM EDT | "julie" AND "kris" |
| 183 | Maria, David | 5/25/2016 3:37:26 PM EDT | "julie" AND "kris" |
| 184 | Maria, David | 5/25/2016 3:38:57 PM EDT | "julie" AND "kris" |
| 185 | Maria, David | 5/25/2016 3:39:03 PM EDT | "mack" AND "evidence" |
| 186 | Maria, David | 5/27/2016 12:40:16 PM EDT | "bryant" |
| 187 | Maria, David | 5/27/2016 12:40:16 PM EDT | "bryant" |
| 188 | Maria, David | 5/27/2016 12:47:04 PM EDT | "bryant" |
| 189 | Maria, David | 6/6/2016 11:09:44 AM EDT | "hidden" |
| 190 | Maria, David | 6/6/2016 11:10:33 AM EDT | "hidden" |
| 191 | Maria, David | 6/6/2016 11:10:51 AM EDT | "rbe" AND "loan" |
| 192 | Maria, David | 6/6/2016 11:12:28 AM EDT | "rbe" AND "loan" |
| 193 | Maria, David | 6/6/2016 11:12:33 AM EDT | "rbe" |
| 194 | Maria, David | 6/6/2016 11:14:08 AM EDT | "rbe" |
| 195 | Maria, David | 6/6/2016 11:15:34 AM EDT | "julie" |
| 196 | Maria, David | 6/6/2016 11:16:05 AM EDT | "julie" |
| 197 | Maria, David | 6/6/2016 11:17:07 AM EDT | "julie" |
| 198 | Maria, David | 6/6/2016 11:17:12 AM EDT | "chezmono" |
| 199 | Maria, David | 6/6/2016 11:21:02 AM EDT | "chezmono" |
| 200 | Maria, David | 6/6/2016 11:21:10 AM EDT | "chezmono" AND "ed" |
| 201 | Maria, David | 6/6/2016 11:28:41 AM EDT | "chezmono" AND "ed" |
| 202 | Maria, David | 6/6/2016 11:28:56 AM EDT | "jr" AND "j.r." AND "loan" AND "ed" |
| 203 | Maria, David | 6/6/2016 11:29:14 AM EDT | "jr" AND "j.r." AND "loan" AND "ed" |
| 204 | Maria, David | 6/6/2016 11:31:37 AM EDT | "jr" AND "j.r." AND "loan" AND "ed" |
| 205 | Maria, David | 6/6/2016 11:32:34 AM EDT | "jr" AND "j.r." AND "loan" AND "ed" |
| 206 | Maria, David | 6/6/2016 11:32:47 AM EDT | "mack" AND "michaelmonahan" AND "loan" |
| 207 | Maria, David | 6/6/2016 11:33:25 AM EDT | "mack" AND "michaelmonahan" AND "loan" |
| 208 | Maria, David | 6/6/2016 11:33:53 AM EDT | "michaelrmonahan" AND "Maddox" AND "discovered" |
| 209 | Maria, David | 6/6/2016 11:34:33 AM EDT | "michaelrmonahan" AND "Maddox" AND "discovered" |
| 210 | Maria, David | 6/6/2016 11:34:49 AM EDT | "michaelrmonahan" AND "chezmono" |

|     | User Name | Timestamp | Details |
|-----|-----------|-----------|---------|
| 211 | Maria, David | 6/6/2016 11:55:01 AM EDT | "michaelrmonahan" AND "chezmono" |
| 212 | Maria, David | 6/7/2016 2:33:39 PM EDT | "work out" AND "chezmono" |
| 213 | Maria, David | 6/7/2016 2:33:46 PM EDT | "work out" AND "chezmono" |
| 214 | Maria, David | 6/27/2016 2:07:44 PM EDT | "rayburn" |
| 215 | Maria, David | 6/27/2016 2:19:43 PM EDT | "rayburn" |
| 216 | Maria, David | 6/27/2016 2:20:00 PM EDT | "bogus" |
| 217 | Maria, David | 6/27/2016 2:21:08 PM EDT | "bogus" |
| 218 | Maria, David | 6/27/2016 2:21:54 PM EDT | "bogus" |
| 219 | Maria, David | 6/27/2016 2:22:11 PM EDT | "false" AND "/s" AND "loans" |
| 220 | Maria, David | 6/27/2016 2:24:41 PM EDT | "false" AND "/s" AND "loans" |
| 221 | Maria, David | 6/27/2016 2:25:03 PM EDT | "false w/3 loans" |
| 222 | Maria, David | 6/27/2016 2:25:21 PM EDT | false w/4 loans |
| 223 | Maria, David | 6/27/2016 2:25:30 PM EDT | fraudulent w/4 loans |
| 224 | Maria, David | 6/27/2016 2:25:49 PM EDT | "fraudulent" AND "loans" |
| 225 | Maria, David | 6/27/2016 2:25:30 PM EDT | fraudulent w/4 loans |
| 226 | Maria, David | 6/27/2016 2:27:12 PM EDT | >fabricated< |
| 227 | Maria, David | 6/27/2016 2:31:08 PM EDT | >loans w/3 principals< |
| 228 | Maria, David | 6/27/2016 2:31:27 PM EDT | "loans" AND "w/3" AND "principals" |
| 229 | Maria, David | 6/27/2016 2:31:59 PM EDT | "loans" AND "w/3" AND "principals" |
| 230 | Maria, David | 6/27/2016 2:32:08 PM EDT | "loans w/3 principals" |
| 231 | Maria, David | 6/27/2016 2:32:13 PM EDT | "loans w/5 principals" |
| 232 | Maria, David | 6/27/2016 2:32:30 PM EDT | loans w/5 principals |
| 233 | Maria, David | 6/27/2016 2:32:36 PM EDT | loans w/9 principals |
| 234 | Maria, David | 6/27/2016 2:34:30 PM EDT | >loans PRE/5 principals< |
| 235 | Maria, David | 6/27/2016 2:34:57 PM EDT | >fraudulent PRE/8 loans< |
| 236 | Maria, David | 6/27/2016 2:35:06 PM EDT | >fraudulent PRE/8 transaction< |
| 237 | Maria, David | 6/27/2016 2:37:57 PM EDT | >criminally< |
| 238 | Maria, David | 6/27/2016 2:40:12 PM EDT | department of justice |
| 239 | Maria, David | 6/27/2016 2:45:51 PM EDT | >maria< |
| 240 | Maria, David | 6/27/2016 2:46:52 PM EDT | grand jury |
| 241 | Maria, David | 6/27/2016 2:47:46 PM EDT | >authorized W/8 warrants< |
| 242 | Maria, David | 7/18/2016 7:03:26 PM EDT | "pr consultant' |
| 243 | Maria, David | 7/18/2016 7:03:31 PM EDT | "pr consultant" |
| 244 | Maria, David | 7/18/2016 7:04:04 PM EDT | "pr consultant" |
| 245 | Maria, David | 8/29/2016 4:40:52 PM EDT | "guyer" |

|     | User Name    | Timestamp               | Details           |
| --- | ------------ | ----------------------- | ----------------- |
| 246 | Maria, David | 8/30/2016 2:23:01 PM EDT | "goodmanson"      |
| 247 | Maria, David | 8/30/2016 2:30:24 PM EDT | "goodmanson"      |
| 248 | Maria, David | 8/30/2016 2:30:54 PM EDT | "lancia"          |
| 249 | Maria, David | 8/30/2016 2:31:05 PM EDT | "stock split"     |
| 250 | Maria, David | 8/30/2016 2:31:31 PM EDT | "stock split"     |
| 251 | Maria, David | 8/30/2016 2:34:13 PM EDT | "stock split"     |
| 252 | Maria, David | 8/30/2016 2:35:26 PM EDT | "stock split"     |
| 253 | Maria, David | 8/30/2016 2:36:38 PM EDT | "stock split"     |
| 254 | Maria, David | 8/30/2016 2:38:49 PM EDT | "stock split"     |
| 255 | Maria, David | 8/30/2016 2:39:19 PM EDT | "rl investments"  |
| 256 | Maria, David | 8/30/2016 2:40:07 PM EDT | "rl investments"  |
| 257 | Maria, David | 8/30/2016 2:40:12 PM EDT | "dl investments"  |
| 258 | Maria, David | 8/30/2016 2:41:02 PM EDT | "dl investments"  |
| 259 | Maria, David | 8/30/2016 2:41:10 PM EDT | "adr investments" |
| 260 | Maria, David | 8/30/2016 2:51:45 PM EDT | "adr investments" |
| 261 | Maria, David | 8/30/2016 2:56:17 PM EDT | "santoro"         |
| 262 | Maria, David | 8/30/2016 2:56:45 PM EDT | "santoro"         |
| 263 | Maria, David | 8/30/2016 2:56:58 PM EDT | "working capital" |
| 264 | Maria, David | 8/30/2016 2:57:05 PM EDT | "working capital" |
| 265 | Maria, David | 8/30/2016 2:57:30 PM EDT | "diamond growers" |
| 266 | Maria, David | 8/30/2016 2:57:40 PM EDT | "diamond growers" |
| 267 | Maria, David | 8/30/2016 2:57:50 PM EDT | "diamond growers" |
| 268 | Maria, David | 8/30/2016 2:59:00 PM EDT | "diamond growers" |
| 269 | Maria, David | 8/30/2016 2:59:42 PM EDT | "diamond growers" |
| 270 | Maria, David | 8/30/2016 2:59:52 PM EDT | "fund operations" |
| 271 | Maria, David | 8/30/2016 3:02:57 PM EDT | "fund operations" |
| 272 | Maria, David | 8/30/2016 3:03:21 PM EDT | "hidden"          |
| 273 | Maria, David | 8/30/2016 3:03:51 PM EDT | "hidden"          |
| 274 | Maria, David | 8/30/2016 3:04:15 PM EDT | "hidden"          |
| 275 | Maria, David | 8/30/2016 3:38:50 PM EDT | "hidden"          |
| 276 | Maria, David | 8/30/2016 3:39:21 PM EDT | "hidden"          |
| 277 | Maria, David | 8/30/2016 3:39:27 PM EDT | "bogus"           |
| 278 | Maria, David | 8/30/2016 3:42:18 PM EDT | "bogus"           |
| 279 | Maria, David | 8/30/2016 3:42:26 PM EDT | "fbi"             |
| 280 | Maria, David | 8/30/2016 3:45:27 PM EDT | "fbi"             |

|     | User Name | Timestamp | Details |
| --- | --- | --- | --- |
| 281 | Maria, David | 8/30/2016 3:48:30 PM EDT | "fbi" |
| 282 | Maria, David | 8/30/2016 3:49:01 PM EDT | "fbi" |
| 283 | Maria, David | 8/30/2016 3:49:08 PM EDT | "lying" |
| 284 | Maria, David | 8/30/2016 3:49:29 PM EDT | "lying" |
| 285 | Maria, David | 8/30/2016 3:54:12 PM EDT | "lying" |
| 286 | Maria, David | 8/30/2016 3:57:26 PM EDT | "lying" |
| 287 | Maria, David | 8/30/2016 3:57:32 PM EDT | "embezzle" |
| 288 | Maria, David | 8/30/2016 3:58:40 PM EDT | "embezzle" |
| 289 | Maria, David | 8/30/2016 3:58:44 PM EDT | "stole" |
| 290 | Maria, David | 9/6/2016 1:05:44 PM EDT | "zouvas" |
| 291 | Maria, David | 9/6/2016 1:05:51 PM EDT | "krossbow" |
| 292 | Maria, David | 9/6/2016 1:21:18 PM EDT | "krossbow" |
| 293 | Maria, David | 9/6/2016 2:09:11 PM EDT | "krossbow" |
| 294 | Maria, David | 9/6/2016 2:09:18 PM EDT | "kropp" |
| 295 | Maria, David | 9/7/2016 1:01:07 PM EDT | "murryllc" |
| 296 | Maria, David | 9/7/2016 1:05:27 PM EDT | "murryllc" |
| 297 | Maria, David | 9/7/2016 1:07:03 PM EDT | "murryllc" |
| 298 | Maria, David | 9/7/2016 1:07:18 PM EDT | "murryllc" |
| 299 | Maria, David | 9/7/2016 1:18:33 PM EDT | "murryllc" |
| 300 | Maria, David | 9/7/2016 1:30:39 PM EDT | "related party" |
| 301 | Maria, David | 9/7/2016 1:38:08 PM EDT | "related party" |
| 302 | Maria, David | 9/7/2016 1:38:22 PM EDT | "related party" |
| 303 | Maria, David | 9/7/2016 1:42:32 PM EDT | "related party" |
| 304 | Maria, David | 9/7/2016 1:42:42 PM EDT | "crystal grow" |
| 305 | Maria, David | 9/7/2016 1:43:46 PM EDT | "crystal grow" |
| 306 | Maria, David | 9/7/2016 1:43:53 PM EDT | "machines" |
| 307 | Maria, David | 9/7/2016 1:43:53 PM EDT | "machines" |
| 308 | Maria, David | 9/7/2016 1:44:19 PM EDT | "proceeds will be used" |
| 309 | Maria, David | 9/7/2016 1:45:37 PM EDT | "proceeds will be used" |
| 310 | Maria, David | 9/7/2016 1:48:08 PM EDT | "proceeds will be used" |
| 311 | Maria, David | 9/7/2016 1:49:07 PM EDT | "proceeds will be used" |
| 312 | Maria, David | 9/7/2016 1:49:29 PM EDT | "additional crystal" |
| 313 | Maria, David | 9/7/2016 1:49:39 PM EDT | "additional diamond" |
| 314 | Maria, David | 9/7/2016 1:52:51 PM EDT | "additional diamond" |
| 315 | Maria, David | 9/7/2016 1:53:33 PM EDT | "additional diamond" |

|     | User Name    | Timestamp               | Details                 |
| --- | ------------ | ----------------------- | ----------------------- |
| 316 | Maria, David | 9/7/2016 1:56:58 PM EDT | "additional diamond"    |
| 317 | Maria, David | 9/7/2016 1:57:17 PM EDT | "additional diamond"    |
| 318 | Maria, David | 9/9/2016 3:50:53 PM EDT | "cashless"              |
| 319 | Maria, David | 9/9/2016 3:51:24 PM EDT | "cashless"              |
| 320 | Maria, David | 9/9/2016 3:51:44 PM EDT | "45" OR "854" OR "326"  |
| 321 | Maria, David | 9/9/2016 3:52:09 PM EDT | "45" OR "854" OR "326"  |
| 322 | Maria, David | 9/9/2016 3:52:39 PM EDT | "45" OR "854" OR "326"  |
| 323 | Maria, David | 9/9/2016 3:52:50 PM EDT | "consummation"          |
| 324 | Maria, David | 9/9/2016 3:52:58 PM EDT | "333" OR "333"          |
| 325 | Maria, David | 9/9/2016 3:53:05 PM EDT | "333333"                |
| 326 | Maria, David | 9/16/2016 12:40:46 PM EDT | "rbe"                 |
| 327 | Maria, David | 9/16/2016 1:27:54 PM EDT | "rbe"                  |
| 328 | Maria, David | 9/16/2016 1:28:00 PM EDT | "promissory"           |
| 329 | Maria, David | 9/16/2016 1:29:11 PM EDT | "promissory"           |
| 330 | Maria, David | 9/16/2016 1:29:52 PM EDT | "promissory"           |
| 331 | Maria, David | 9/16/2016 1:30:11 PM EDT | "promissory"           |
| 332 | Maria, David | 9/16/2016 1:32:03 PM EDT | "promissory"           |
| 333 | Maria, David | 9/16/2016 1:40:02 PM EDT | "promissory"           |
| 334 | Maria, David | 9/16/2016 1:41:59 PM EDT | "promissory"           |
| 335 | Maria, David | 9/16/2016 1:42:34 PM EDT | "promissory"           |
| 336 | Maria, David | 9/16/2016 1:44:11 PM EDT | "promissory"           |
| 337 | Maria, David | 9/16/2016 1:44:27 PM EDT | "promissory"           |
| 338 | Maria, David | 9/16/2016 1:48:15 PM EDT | "promissory"           |
| 339 | Maria, David | 9/16/2016 1:49:10 PM EDT | "promissory"           |
| 340 | Maria, David | 9/16/2016 1:49:31 PM EDT | "promissory"           |
| 341 | Maria, David | 9/16/2016 1:50:44 PM EDT | "promissory"           |
| 342 | Maria, David | 9/16/2016 1:51:20 PM EDT | "promissory"           |
| 343 | Maria, David | 9/16/2016 1:51:38 PM EDT | "promissory"           |
| 344 | Maria, David | 9/16/2016 1:52:40 PM EDT | "promissory"           |
| 345 | Maria, David | 9/16/2016 1:53:19 PM EDT | "promissory"           |
| 346 | Maria, David | 9/16/2016 1:53:45 PM EDT | "promissory"           |
| 347 | Maria, David | 9/16/2016 1:54:22 PM EDT | "promissory"           |
| 348 | Maria, David | 9/16/2016 1:54:54 PM EDT | "promissory"           |
| 349 | Maria, David | 9/16/2016 1:55:14 PM EDT | "promissory"           |
| 350 | Maria, David | 9/16/2016 1:55:42 PM EDT | "promissory"           |

|     | User Name | Timestamp | Details |
| --- | --- | --- | --- |
| 351 | Maria, David | 9/16/2016 1:56:04 PM EDT | "promissory" |
| 352 | Maria, David | 9/16/2016 1:56:32 PM EDT | "promissory" |
| 353 | Maria, David | 9/16/2016 1:56:51 PM EDT | "promissory" |
| 354 | Maria, David | 9/16/2016 2:21:51 PM EDT | "promissory" |
| 355 | Maria, David | 9/16/2016 2:27:07 PM EDT | "promissory" |
| 356 | Maria, David | 9/16/2016 2:29:43 PM EDT | "promissory" |
| 357 | Maria, David | 9/16/2016 2:30:25 PM EDT | "promissory" |
| 358 | Maria, David | 9/16/2016 2:33:05 PM EDT | "promissory" |
| 359 | Maria, David | 9/16/2016 2:33:31 PM EDT | "promissory" |
| 360 | Maria, David | 9/16/2016 2:33:59 PM EDT | "promissory" |
| 361 | Maria, David | 9/16/2016 2:34:33 PM EDT | "promissory" |
| 362 | Maria, David | 9/16/2016 2:35:12 PM EDT | "promissory" |
| 363 | Maria, David | 9/16/2016 2:35:53 PM EDT | "promissory" |
| 364 | Maria, David | 9/16/2016 2:36:11 PM EDT | "promissory" |
| 365 | Maria, David | 9/16/2016 2:36:51 PM EDT | "promissory" |
| 366 | Maria, David | 9/16/2016 2:38:20 PM EDT | "promissory" |
| 367 | Maria, David | 9/16/2016 2:38:37 PM EDT | "promissory" |
| 368 | Maria, David | 9/16/2016 2:39:25 PM EDT | "promissory" |
| 369 | Maria, David | 9/16/2016 2:39:59 PM EDT | "promissory" |
| 370 | Maria, David | 9/16/2016 2:40:28 PM EDT | "promissory" |
| 371 | Maria, David | 9/16/2016 2:40:57 PM EDT | "promissory" |
| 372 | Maria, David | 9/16/2016 2:41:35 PM EDT | "promissory" |
| 373 | Maria, David | 9/16/2016 2:41:53 PM EDT | "promissory" |
| 374 | Maria, David | 9/16/2016 2:42:46 PM EDT | "promissory" |
| 375 | Maria, David | 9/16/2016 2:43:10 PM EDT | "promissory" |
| 376 | Maria, David | 9/16/2016 2:43:40 PM EDT | "promissory" |
| 377 | Maria, David | 9/16/2016 2:44:05 PM EDT | "promissory" |
| 378 | Maria, David | 9/16/2016 2:44:35 PM EDT | "promissory" |
| 379 | Maria, David | 9/16/2016 2:45:08 PM EDT | "asset purchase" |
| 380 | Maria, David | 9/16/2016 2:46:55 PM EDT | "asset purchase" |
| 381 | Maria, David | 9/16/2016 2:47:21 PM EDT | "asset purchase" |
| 382 | Maria, David | 9/16/2016 2:52:34 PM EDT | "asset purchase" |
| 383 | Maria, David | 9/16/2016 2:53:19 PM EDT | "asset purchase" |
| 384 | Maria, David | 9/16/2016 2:57:55 PM EDT | "asset purchase" |
| 385 | Maria, David | 9/16/2016 2:58:44 PM EDT | "asset purchase" |

|     | User Name    | Timestamp              | Details                        |
| --- | ------------ | ---------------------- | ------------------------------ |
| 386 | Maria, David | 9/16/2016 2:58:54 PM EDT | "dated as of august 31"       |
| 387 | Maria, David | 9/16/2016 2:59:32 PM EDT | "dated as of august 31"       |
| 388 | Maria, David | 9/16/2016 2:59:49 PM EDT | "dated as of august 31, 2011" |
| 389 | Maria, David | 9/16/2016 3:00:37 PM EDT | "dated as of august 31, 2011" |
| 390 | Maria, David | 9/16/2016 3:01:06 PM EDT | "and SCIO may be referred to" |
| 391 | Maria, David | 9/16/2016 3:05:07 PM EDT | "and SCIO may be referred to" |
| 392 | Maria, David | 9/16/2016 3:12:15 PM EDT | "and SCIO may be referred to" |
| 393 | Maria, David | 9/16/2016 3:12:42 PM EDT | "and SCIO may be referred to" |
| 394 | Maria, David | 9/16/2016 3:13:11 PM EDT | "and SCIO may be referred to" |
| 395 | Maria, David | 9/16/2016 3:15:26 PM EDT | "and SCIO may be referred to" |
| 396 | Maria, David | 9/16/2016 3:15:39 PM EDT | "asset purchase"              |
| 397 | Maria, David | 9/16/2016 3:16:05 PM EDT | "asset purchase"              |
| 398 | Maria, David | 9/16/2016 3:18:05 PM EDT | "asset purchase"              |
| 399 | Maria, David | 9/16/2016 3:18:38 PM EDT | "asset purchase"              |
| 400 | Maria, David | 9/16/2016 3:19:49 PM EDT | "asset purchase"              |
| 401 | Maria, David | 9/16/2016 3:20:24 PM EDT | "asset purchase"              |
| 402 | Maria, David | 9/16/2016 3:20:39 PM EDT | "august 31"                   |
| 403 | Maria, David | 9/16/2016 3:22:19 PM EDT | "august 31"                   |
| 404 | Maria, David | 9/16/2016 3:22:47 PM EDT | "august 31"                   |
| 405 | Maria, David | 9/16/2016 3:23:03 PM EDT | "august 31"                   |
| 406 | Maria, David | 9/16/2016 3:23:28 PM EDT | "august 31"                   |
| 407 | Maria, David | 9/16/2016 3:23:53 PM EDT | "august 31"                   |
| 408 | Maria, David | 9/16/2016 3:30:01 PM EDT | "august 31"                   |
| 409 | Maria, David | 9/16/2016 3:34:40 PM EDT | "august 31"                   |
| 410 | Maria, David | 9/16/2016 3:35:03 PM EDT | "august 31"                   |
| 411 | Maria, David | 9/16/2016 3:35:48 PM EDT | "august 31"                   |
| 412 | Maria, David | 9/16/2016 3:36:06 PM EDT | "august 31"                   |
| 413 | Maria, David | 9/16/2016 3:39:55 PM EDT | "august 31"                   |
| 414 | Maria, David | 9/16/2016 3:42:48 PM EDT | "august 31"                   |
| 415 | Maria, David | 9/16/2016 3:44:49 PM EDT | "august 31"                   |
| 416 | Maria, David | 9/16/2016 3:47:37 PM EDT | "august 31"                   |
| 417 | Maria, David | 9/16/2016 3:49:22 PM EDT | "august 31"                   |
| 418 | Maria, David | 9/19/2016 9:51:49 AM EDT | "October 12, 2007"            |
| 419 | Maria, David | 9/19/2016 9:52:48 AM EDT | "October 12, 2007"            |
| 420 | Maria, David | 9/19/2016 9:53:14 AM EDT | "October 12, 2007"            |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 421 | Maria, David | 9/19/2016 9:53:41 AM EDT | "October 12, 2007" |
| 422 | Maria, David | 9/19/2016 9:55:30 AM EDT | "October 12, 2007" |
| 423 | Maria, David | 9/19/2016 9:55:48 AM EDT | "October 12, 2007" |
| 424 | Maria, David | 9/19/2016 9:56:18 AM EDT | "10/12/2007" |
| 425 | Maria, David | 9/19/2016 9:56:28 AM EDT | "10/12/2007" |
| 426 | Maria, David | 9/19/2016 9:56:51 AM EDT | "london" |
| 427 | Maria, David | 9/19/2016 9:58:45 AM EDT | "london" |
| 428 | Maria, David | 9/19/2016 9:58:52 AM EDT | "sale of warrants" |
| 429 | Maria, David | 9/19/2016 10:01:41 AM EDT | "sale of warrants" |
| 430 | Maria, David | 9/19/2016 10:03:50 AM EDT | "sale of warrants" |
| 431 | Maria, David | 9/19/2016 10:03:56 AM EDT | "jill" |
| 432 | Maria, David | 9/19/2016 10:11:15 AM EDT | "jill" |
| 433 | Maria, David | 9/19/2016 11:09:22 AM EDT | "jill" |
| 434 | Maria, David | 9/19/2016 11:11:42 AM EDT | "jill" |
| 435 | Maria, David | 9/23/2016 9:42:01 AM EDT | "marty lackner" |
| 436 | Maria, David | 9/23/2016 9:43:52 AM EDT | "marty lackner" |
| 437 | Maria, David | 9/23/2016 9:43:57 AM EDT | "adr" |
| 438 | Maria, David | 9/23/2016 9:44:38 AM EDT | "adr" |
| 439 | Maria, David | 9/23/2016 9:58:37 AM EDT | "adr" |
| 440 | Maria, David | 9/23/2016 9:59:04 AM EDT | "adr" |
| 441 | Maria, David | 9/23/2016 9:59:30 AM EDT | "adr" |
| 442 | Maria, David | 9/23/2016 10:23:52 AM EDT | "adr" |
| 443 | Maria, David | 9/23/2016 10:24:29 AM EDT | "adr" |
| 444 | Maria, David | 9/23/2016 10:26:36 AM EDT | "adr" |
| 445 | Maria, David | 9/23/2016 10:26:42 AM EDT | "hidden" |
| 446 | Maria, David | 9/23/2016 10:27:06 AM EDT | "hidden" |
| 447 | Maria, David | 9/23/2016 10:28:01 AM EDT | "hidden" |
| 448 | Maria, David | 9/23/2016 10:28:28 AM EDT | "fail" |
| 449 | Maria, David | 9/23/2016 10:28:44 AM EDT | "failed to disclose" |
| 450 | Maria, David | 9/23/2016 10:29:09 AM EDT | "failed to disclose" |
| 451 | Maria, David | 9/23/2016 10:29:16 AM EDT | "transparency" |
| 452 | Maria, David | 9/23/2016 10:29:27 AM EDT | "crook" |
| 453 | Maria, David | 9/23/2016 10:30:25 AM EDT | "crook" |
| 454 | Maria, David | 9/23/2016 10:30:50 AM EDT | "crook" |
| 455 | Maria, David | 9/23/2016 10:31:00 AM EDT | "traitor" |

|     | User Name    | Timestamp                | Details                                 |
| --- | ------------ | ------------------------ | --------------------------------------- |
| 456 | Maria, David | 9/23/2016 10:31:27 AM EDT | "traitor"                               |
| 457 | Maria, David | 9/23/2016 10:31:32 AM EDT | "duped"                                 |
| 458 | Maria, David | 9/23/2016 10:32:42 AM EDT | "duped"                                 |
| 459 | Maria, David | 9/23/2016 10:32:50 AM EDT | "rabbit"                                |
| 460 | Maria, David | 9/23/2016 10:33:43 AM EDT | "rabbit"                                |
| 461 | Maria, David | 10/5/2016 3:47:12 PM EDT | "with respect to David and the warrants" |
| 462 | Maria, David | 10/5/2016 3:48:54 PM EDT | "with respect to David and the warrants" |
| 463 | Maria, David | 10/5/2016 3:49:00 PM EDT | "lszipkin"                              |
| 464 | Maria, David | 10/5/2016 3:49:24 PM EDT | "lszipkin"                              |
| 465 | Maria, David | 10/6/2016 3:22:13 PM EDT | "chris.larson"                          |
| 466 | Maria, David | 10/6/2016 3:25:49 PM EDT | "chris.larson"                          |
| 467 | Maria, David | 10/6/2016 4:28:54 PM EDT | "chris.larson"                          |
| 468 | Maria, David | 10/6/2016 4:29:06 PM EDT | "ZIPKIN" AND "CONSULTING"               |
| 469 | Maria, David | 10/17/2016 10:21:16 AM EDT | "mumm"                                 |
| 470 | Maria, David | 10/17/2016 10:22:09 AM EDT | "mumm"                                 |
| 471 | Maria, David | 10/17/2016 10:25:10 AM EDT | "mumm"                                 |
| 472 | Maria, David | 10/17/2016 10:26:10 AM EDT | "mumm"                                 |
| 473 | Maria, David | 10/17/2016 10:52:32 AM EDT | "mumm"                                 |
| 474 | Maria, David | 10/17/2016 10:53:08 AM EDT | "mumm"                                 |
| 475 | Maria, David | 10/17/2016 10:53:46 AM EDT | "mumm"                                 |
| 476 | Maria, David | 10/17/2016 10:53:56 AM EDT | "mumm17"                               |
| 477 | Maria, David | 10/17/2016 10:54:10 AM EDT | "mumm17"                               |
| 478 | Maria, David | 10/17/2016 10:59:01 AM EDT | "mumm17"                               |
| 479 | Maria, David | 10/17/2016 11:00:10 AM EDT | "mumm17"                               |
| 480 | Maria, David | 10/17/2016 11:00:13 AM EDT | "mumm17"                               |
| 481 | Maria, David | 10/17/2016 11:15:47 AM EDT | "mumm17"                               |
| 482 | Maria, David | 10/17/2016 11:15:56 AM EDT | "we really need to talk"                |
| 483 | Maria, David | 10/17/2016 11:19:34 AM EDT | "we really need to talk"                |
| 484 | Maria, David | 10/17/2016 11:19:45 AM EDT | "transparency"                          |
| 485 | Maria, David | 10/17/2016 11:20:07 AM EDT | "mumm" AND "rl"                        |
| 486 | Maria, David | 10/17/2016 11:20:35 AM EDT | "mumm" AND "rl"                        |
| 487 | Maria, David | 10/17/2016 11:20:41 AM EDT | "mumm" AND "dl"                        |
| 488 | Maria, David | 10/17/2016 11:21:14 AM EDT | "mumm" AND "dl"                        |
| 489 | Maria, David | 10/17/2016 11:21:20 AM EDT | "mumm" AND "adr"                       |
| 490 | Maria, David | 10/17/2016 11:21:44 AM EDT | "mumm" AND "adr"                       |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 491 | Maria, David | 10/17/2016 11:21:58 AM EDT | "mumm" AND "warrants" |
| 492 | Maria, David | 10/17/2016 11:28:19 AM EDT | "mumm" AND "warrants" |
| 493 | Maria, David | 10/17/2016 11:28:25 AM EDT | "mumm" AND "mcpheely" |
| 494 | Maria, David | 10/17/2016 11:28:36 AM EDT | "mumm" AND "zipkin" |
| 495 | Maria, David | 10/17/2016 11:29:07 AM EDT | "mumm" AND "zipkin" |
| 496 | Maria, David | 10/17/2016 11:37:37 AM EDT | "mumm" AND "zipkin" |
| 497 | Maria, David | 10/17/2016 11:37:47 AM EDT | "cmumm" AND "zipkin" |
| 498 | Maria, David | 10/17/2016 11:38:05 AM EDT | "reilly" AND "zipkin" |
| 499 | Maria, David | 10/17/2016 11:39:39 AM EDT | "reilly" AND "zipkin" |
| 500 | Maria, David | 10/17/2016 11:39:46 AM EDT | "lszipkin" |
| 501 | Maria, David | 10/17/2016 11:40:11 AM EDT | "lszipkin" AND "mcpheely" |
| 502 | Maria, David | 10/17/2016 11:40:57 AM EDT | "lszipkin" AND "mcpheely" |
| 503 | Maria, David | 10/17/2016 11:41:03 AM EDT | "bernmcpheely" |
| 504 | Maria, David | 10/17/2016 11:41:13 AM EDT | "bernmcpheely" AND "lszipkin" |
| 505 | Maria, David | 10/17/2016 11:42:37 AM EDT | "bernmcpheely" AND "lszipkin" |
| 506 | Maria, David | 10/17/2016 11:42:44 AM EDT | "bern to mike" |
| 507 | Maria, David | 10/17/2016 1:20:11 PM EDT | "I found the attached on Mumm''s" |
| 508 | Maria, David | 10/17/2016 1:20:16 PM EDT | "I found the attached on Mumm''s" |
| 509 | Maria, David | 10/17/2016 2:34:09 PM EDT | "I found the attached on Mumm''s" |
| 510 | Maria, David | 10/17/2016 2:34:21 PM EDT | "vetting" |
| 511 | Maria, David | 10/17/2016 2:34:30 PM EDT | "venting" |
| 512 | Maria, David | 10/17/2016 2:38:40 PM EDT | "venting" |
| 513 | Maria, David | 10/17/2016 2:39:55 PM EDT | "mumm" AND "adr" |
| 514 | Maria, David | 10/17/2016 2:40:04 PM EDT | "cmumm" AND "adr" |
| 515 | Maria, David | 10/17/2016 3:03:25 PM EDT | "special litigation committee" |
| 516 | Maria, David | 10/17/2016 3:25:48 PM EDT | "special litigation committee" |
| 517 | Maria, David | 10/17/2016 3:25:56 PM EDT | "lisa linares" |
| 518 | Maria, David | 10/17/2016 3:31:08 PM EDT | "lisa linares" |
| 519 | Maria, David | 10/17/2016 4:00:07 PM EDT | "lisa linares" |
| 520 | Maria, David | 10/18/2016 4:53:19 PM EDT | "lisa linares" |
| 521 | Maria, David | 10/18/2016 4:53:26 PM EDT | "lisa linares" |
| 522 | Maria, David | 10/19/2016 9:42:03 AM EDT | "lisa linares" |
| 523 | Maria, David | 10/19/2016 10:08:40 AM EDT | "lisa linares" |
| 524 | Maria, David | 10/19/2016 10:11:01 AM EDT | "lisa linares" |
| 525 | Maria, David | 10/19/2016 10:11:11 AM EDT | "stock ledger" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 526 | Maria, David | 10/19/2016 10:51:12 AM EDT | "stock ledger" |
| 527 | Maria, David | 10/19/2016 10:51:25 AM EDT | " cmumm@adamsmonahan.com " |
| 528 | Maria, David | 10/19/2016 10:51:34 AM EDT | "@adamsmonahan.com" |
| 529 | Maria, David | 10/20/2016 9:32:31 AM EDT | " lisal@lmainc.biz " |
| 530 | Maria, David | 10/20/2016 9:32:57 AM EDT | " lisal@lmainc.biz " |
| 531 | Maria, David | 10/20/2016 9:33:03 AM EDT | "lisal" |
| 532 | Maria, David | 10/20/2016 9:33:10 AM EDT | "lmainc" |
| 533 | Maria, David | 10/20/2016 9:36:07 AM EDT | "lmainc" |
| 534 | Maria, David | 10/20/2016 9:36:28 AM EDT | "sale of warrants" |
| 535 | Maria, David | 10/20/2016 9:36:36 AM EDT | "warrant sale" |
| 536 | Maria, David | 10/20/2016 9:37:02 AM EDT | "warrant sale" |
| 537 | Maria, David | 10/20/2016 9:37:10 AM EDT | "sell warrants" |
| 538 | Maria, David | 10/20/2016 9:37:31 AM EDT | "cherish" |
| 539 | Maria, David | 10/20/2016 9:37:59 AM EDT | "cherish" |
| 540 | Maria, David | 10/20/2016 9:38:34 AM EDT | "sec" |
| 541 | Maria, David | 10/20/2016 9:51:55 AM EDT | "sec" |
| 542 | Maria, David | 10/20/2016 9:52:06 AM EDT | "investigation" |
| 543 | Maria, David | 10/20/2016 9:52:31 AM EDT | "investigation" |
| 544 | Maria, David | 10/20/2016 9:57:53 AM EDT | "personal account" |
| 545 | Maria, David | 10/20/2016 9:57:58 AM EDT | "personal account" |
| 546 | Maria, David | 10/20/2016 9:58:04 AM EDT | "personal" |
| 547 | Maria, David | 10/20/2016 9:58:15 AM EDT | "wells fargo" |
| 548 | Maria, David | 10/20/2016 10:02:37 AM EDT | "wells fargo" |
| 549 | Maria, David | 10/20/2016 10:02:43 AM EDT | "sandy" |
| 550 | Maria, David | 10/31/2016 4:28:11 PM EDT | "strous" |
| 551 | Maria, David | 10/31/2016 4:56:38 PM EDT | "strous" |
| 552 | Maria, David | 11/1/2016 3:36:47 PM EDT | "275000" |
| 553 | Maria, David | 11/1/2016 3:36:56 PM EDT | "275" OR "000" |
| 554 | Maria, David | 11/1/2016 3:37:29 PM EDT | "275" OR "000" |
| 555 | Maria, David | 11/1/2016 3:37:35 PM EDT | "275,000" |
| 556 | Maria, David | 11/1/2016 3:37:45 PM EDT | "275000" |
| 557 | Maria, David | 11/2/2016 10:22:19 AM EDT | "sphere capital" |
| 558 | Maria, David | 11/2/2016 10:22:24 AM EDT | "sphere" |
| 559 | Maria, David | 11/2/2016 10:22:41 AM EDT | "oceans away" |
| 560 | Maria, David | 11/2/2016 10:22:50 AM EDT | "oceans" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – AUSA Maria**

|     | User Name    | Timestamp                  | Details                 |
|-----|--------------|----------------------------|-------------------------|
| 561 | Maria, David | 11/2/2016 10:23:00 AM EDT  | "rbe"                   |
| 562 | Maria, David | 11/2/2016 10:23:44 AM EDT  | "rbe"                   |
| 563 | Maria, David | 11/2/2016 10:23:48 AM EDT  | "robb"                  |
| 564 | Maria, David | 11/2/2016 10:24:47 AM EDT  | "robb"                  |
| 565 | Maria, David | 11/2/2016 10:25:09 AM EDT  | "robb"                  |
| 566 | Maria, David | 11/2/2016 10:25:20 AM EDT  | "lancia"                |
| 567 | Maria, David | 11/2/2016 10:26:16 AM EDT  | "lancia"                |
| 568 | Maria, David | 11/2/2016 10:26:23 AM EDT  | "sphere"                |
| 569 | Maria, David | 11/2/2016 10:26:30 AM EDT  | "santa fe"              |
| 570 | Maria, David | 11/2/2016 10:27:21 AM EDT  | "santa fe"              |
| 571 | Maria, David | 11/2/2016 10:28:53 AM EDT  | "santa fe"              |
| 572 | Maria, David | 11/29/2016 11:42:38 AM EST | "venture unlike names"  |
| 573 | Maria, David | 12/6/2016 11:25:33 AM EST  | "murry"                 |
| 574 | Maria, David | 12/6/2016 11:26:50 AM EST  | "murry"                 |
| 575 | Maria, David | 12/6/2016 11:26:55 AM EST  | "murryllc"              |
| 576 | Maria, David | 12/6/2016 11:27:02 AM EST  | "murryllc"              |
| 577 | Maria, David | 1/10/2017 11:07:51 AM EST  | "rl investments"        |
| 578 | Maria, David | 1/10/2017 11:08:47 AM EST  | "rl investments"        |
| 579 | Maria, David | 1/10/2017 11:08:56 AM EST  | "oak ridge"             |
| 580 | Maria, David | 1/10/2017 11:09:35 AM EST  | "oak ridge"             |
| 581 | Maria, David | 1/10/2017 11:10:22 AM EST  | "oak ridge"             |
| 582 | Maria, David | 1/10/2017 11:11:09 AM EST  | "oak ridge"             |
| 583 | Maria, David | 1/23/2017 10:20:20 AM EST  | "adr"                   |
| 584 | Maria, David | 1/23/2017 10:20:47 AM EST  | "adr"                   |
| 585 | Maria, David | 1/23/2017 10:22:13 AM EST  | "adr"                   |
| 586 | Maria, David | 1/23/2017 10:22:22 AM EST  | "adr"                   |
| 587 | Maria, David | 1/23/2017 10:22:50 AM EST  | "adr"                   |
| 588 | Maria, David | 1/23/2017 10:22:54 AM EST  | "adr"                   |
| 589 | Maria, David | 1/23/2017 10:22:59 AM EST  | "adr"                   |
| 590 | Maria, David | 1/23/2017 10:23:04 AM EST  | "adr"                   |
| 591 | Maria, David | 1/23/2017 10:23:10 AM EST  | "adr"                   |
| 592 | Maria, David | 1/23/2017 10:23:54 AM EST  | "adr"                   |
| 593 | Maria, David | 1/23/2017 10:26:42 AM EST  | "adr"                   |
| 594 | Maria, David | 3/1/2017 4:43:34 PM EST    |                         |
| 595 | Maria, David | 3/9/2017 10:35:28 AM EST   | "bankruptcy"            |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – AUSA Maria**

|     | User Name | Timestamp | Details |
| --- | --- | --- | --- |
| 596 | Maria, David | 3/9/2017 10:38:33 AM EST | "bankruptcy" |
| 597 | Maria, David | 3/9/2017 10:38:34 AM EST | "bankruptcy" |
| 598 | Maria, David | 3/9/2017 10:38:36 AM EST | "bankruptcy" |
| 599 | Maria, David | 3/9/2017 10:38:37 AM EST | "bankruptcy" |
| 600 | Maria, David | 4/4/2017 10:55:46 AM EDT | "rabbit" |
| 601 | Maria, David | 4/4/2017 10:59:17 AM EDT | "rabbit" |
| 602 | Maria, David | 4/4/2017 5:14:29 PM EDT | "rabbit" |
| 603 | Maria, David | 4/4/2017 5:14:59 PM EDT | "genious" |
| 604 | Maria, David | 4/4/2017 5:15:05 PM EDT | "genius" |
| 605 | Maria, David | 4/4/2017 5:15:23 PM EDT | "brilliance" |
| 606 | Maria, David | 4/4/2017 5:16:18 PM EDT | "brilliance" |
| 607 | Maria, David | 4/4/2017 5:16:19 PM EDT | "brilliance" |
| 608 | Maria, David | 4/4/2017 5:16:26 PM EDT | "dl" |
| 609 | Maria, David | 4/4/2017 5:16:46 PM EDT | "dl" |
| 610 | Maria, David | 4/4/2017 5:16:54 PM EDT | "dl investments" |
| 611 | Maria, David | 4/4/2017 5:17:10 PM EDT | "rl investments" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Inspector Kroells**

| | User Name | Timestamp | Details |
|---|---|---|---|
| 1 | Kroells, Christine | 5/5/2016 12:57:27 PM EDT | "sandy" AND "ward" |
| 2 | Kroells, Christine | 5/5/2016 12:57:28 PM EDT | "sandy" AND "ward" |
| 3 | Kroells, Christine | 5/5/2016 2:47:49 PM EDT | "sandy" AND "ward" |
| 4 | Kroells, Christine | 5/5/2016 3:05:14 PM EDT | "sandy" AND "ward" |
| 5 | Kroells, Christine | 5/5/2016 3:05:26 PM EDT | "sandy" AND "ward" AND "secret" |
| 6 | Kroells, Christine | 5/5/2016 3:08:17 PM EDT | "sandy" AND "ward" AND "secret" |
| 7 | Kroells, Christine | 5/5/2016 3:08:21 PM EDT | "sandy" AND "ward" AND "secret" |
| 8 | Kroells, Christine | 5/5/2016 3:08:43 PM EDT | "sandy" AND "ward" AND "apollo" AND "bank" AND "account" |
| 9 | Kroells, Christine | 5/5/2016 3:14:20 PM EDT | "sandy" AND "ward" AND "apollo" AND "bank" AND "account" |
| 10 | Kroells, Christine | 5/5/2016 3:14:56 PM EDT | "sandy" AND "ward" AND "secret" |
| 11 | Kroells, Christine | 5/5/2016 3:15:26 PM EDT | "sandy" AND "ward" AND "secret" |
| 12 | Kroells, Christine | 5/5/2016 3:16:14 PM EDT | "sandy" AND "ward" AND "wire" AND "secret" |
| 13 | Kroells, Christine | 5/5/2016 3:16:31 PM EDT | "sandy" AND "ward" AND "wire" AND "secret" |
| 14 | Kroells, Christine | 5/5/2016 3:16:49 PM EDT | "sandy" AND "ward" AND "scio" AND "wire" |
| 15 | Kroells, Christine | 5/5/2016 3:16:56 PM EDT | "sandy" AND "ward" AND "scio" AND "wire" |
| 16 | Kroells, Christine | 5/5/2016 3:17:09 PM EDT | "sandy" AND "ward" AND "adi" AND "wire" |
| 17 | Kroells, Christine | 5/5/2016 3:18:14 PM EDT | "sandy" AND "ward" AND "adi" AND "wire" |
| 18 | Kroells, Christine | 5/5/2016 3:18:27 PM EDT | "sandy" AND "ward" AND "adgc" AND "wire" |
| 19 | Kroells, Christine | 5/5/2016 3:23:16 PM EDT | "hey" |
| 20 | Kroells, Christine | 5/5/2016 3:23:30 PM EDT | "hey" AND "investor" |
| 21 | Kroells, Christine | 5/5/2016 3:24:17 PM EDT | "hey" AND "investor" |
| 22 | Kroells, Christine | 5/5/2016 3:24:29 PM EDT | "charles" AND "hey" |
| 23 | Kroells, Christine | 5/5/2016 3:25:52 PM EDT | "charles" AND "hey" |
| 24 | Kroells, Christine | 5/5/2016 3:26:00 PM EDT | "charles" AND "hey" AND "deep" AND "value" |
| 25 | Kroells, Christine | 5/10/2016 2:30:04 PM EDT | "jill" AND "problem" AND "issue" AND "secret" |
| 26 | Kroells, Christine | 5/10/2016 2:30:36 PM EDT | "jill" AND "problem" AND "issue" AND "secret" |
| 27 | Kroells, Christine | 5/10/2016 2:30:44 PM EDT | "jill" AND "problem" |
| 28 | Kroells, Christine | 5/10/2016 2:40:55 PM EDT | "jill" AND "problem" |
| 29 | Kroells, Christine | 5/10/2016 2:41:52 PM EDT | "jill" AND "problem" |
| 30 | Kroells, Christine | 5/10/2016 2:41:56 PM EDT | "jill" AND "problem" |
| 31 | Kroells, Christine | 5/10/2016 2:42:16 PM EDT | "jill" AND "2009" |
| 32 | Kroells, Christine | 5/10/2016 4:12:18 PM EDT | "jill" AND "2009" |
| 33 | Kroells, Christine | 5/10/2016 4:12:40 PM EDT | "jill" AND "2010" |
| 34 | Kroells, Christine | 5/10/2016 4:13:33 PM EDT | "jill" AND "2010" |
| 35 | Kroells, Christine | 5/10/2016 4:14:21 PM EDT | "jill" AND "2010" |
| 36 | Kroells, Christine | 5/10/2016 4:14:43 PM EDT | "jill" AND "2010" |



EXHIBIT
DX-81

| | User Name | Timestamp | Details |
|---|---|---|---|
| 37 | Kroells, Christine | 5/10/2016 4:15:05 PM EDT | "jill" AND "2010" |
| 38 | Kroells, Christine | 5/10/2016 4:15:26 PM EDT | "jill" AND "2010" |
| 39 | Kroells, Christine | 5/10/2016 4:20:49 PM EDT | "jill" AND "2010" |
| 40 | Kroells, Christine | 5/10/2016 4:21:13 PM EDT | "jill" AND "laurence" AND "ed" |
| 41 | Kroells, Christine | 5/10/2016 4:35:28 PM EDT | "jill" AND "laurence" AND "ed" |
| 42 | Kroells, Christine | 5/10/2016 4:38:12 PM EDT | "jill" AND "money" AND "capital" AND "raise" |
| 43 | Kroells, Christine | 5/10/2016 5:11:05 PM EDT | "jill" AND "money" AND "capital" AND "raise" |
| 44 | Kroells, Christine | 5/10/2016 5:11:43 PM EDT | "ed" AND "monahan" AND "2011" AND "raised" |
| 45 | Kroells, Christine | 5/10/2016 5:11:57 PM EDT | "ed" AND "monahan" AND "2011" AND "raised" AND "scio" |
| 46 | Kroells, Christine | 5/11/2016 3:34:12 PM EDT | "sale" AND "warrants" |
| 47 | Kroells, Christine | 5/11/2016 3:35:34 PM EDT | "sale" AND "warrants" |
| 48 | Kroells, Christine | 5/11/2016 3:35:40 PM EDT | "sale" AND "warrants" AND "jill" |
| 49 | Kroells, Christine | 5/11/2016 3:36:18 PM EDT | "sale" AND "warrants" AND "jill" |
| 50 | Kroells, Christine | 5/11/2016 3:36:36 PM EDT | "mark" AND "sennott" |
| 51 | Kroells, Christine | 5/11/2016 3:49:06 PM EDT | "mark" AND "sennott" |
| 52 | Kroells, Christine | 5/11/2016 3:49:19 PM EDT | "sennott" |
| 53 | Kroells, Christine | 5/11/2016 4:00:03 PM EDT | "sennott" |
| 54 | Kroells, Christine | 5/11/2016 4:00:28 PM EDT | "berman" |
| 55 | Kroells, Christine | 5/11/2016 4:00:56 PM EDT | "ed" AND "monahan" AND "bob''s" AND "signature" |
| 56 | Kroells, Christine | 5/11/2016 4:04:57 PM EDT | "ed" AND "monahan" AND "bob''s" AND "signature" |
| 57 | Kroells, Christine | 5/11/2016 4:05:15 PM EDT | "insert" AND "signature" |
| 58 | Kroells, Christine | 5/11/2016 4:06:01 PM EDT | "apollo" AND "sale" AND "of" AND "warrants" AND "2007" |
| 59 | Kroells, Christine | 5/11/2016 4:06:23 PM EDT | "crap" |
| 60 | Kroells, Christine | 5/11/2016 4:51:45 PM EDT | "crap" |
| 61 | Kroells, Christine | 5/11/2016 4:52:08 PM EDT | "doug" AND "walker" AND "kelley" |
| 62 | Kroells, Christine | 5/11/2016 4:52:18 PM EDT | "doug" AND "walker" AND "tom" AND "kelley" |
| 63 | Kroells, Christine | 5/11/2016 4:53:59 PM EDT | "doug" AND "walker" AND "tom" AND "kelley" |
| 64 | Kroells, Christine | 5/11/2016 5:02:42 PM EDT | "tax" AND "credits" AND "$2" AND "million" AND "raised" |
| 65 | Kroells, Christine | 5/11/2016 5:03:14 PM EDT | "tax" AND "credits" AND "$2" AND "million" AND "raised" |
| 66 | Kroells, Christine | 5/11/2016 5:06:00 PM EDT | "tax" AND "credits" AND "$2" AND "million" AND "raised" |
| 67 | Kroells, Christine | 5/11/2016 5:06:32 PM EDT | "tax" AND "credits" AND "million" AND "raised" |
| 68 | Kroells, Christine | 5/11/2016 5:07:20 PM EDT | "tax" AND "credits" AND "million" AND "raised" |
| 69 | Kroells, Christine | 5/11/2016 5:07:43 PM EDT | "tax" AND "credits" AND "million" AND "raised" |
| 70 | Kroells, Christine | 5/11/2016 5:08:01 PM EDT | "tax" AND "credits" AND "million" AND "raised" |
| 71 | Kroells, Christine | 5/12/2016 2:17:50 PM EDT | "don''t" AND "tell" |
| 72 | Kroells, Christine | 5/12/2016 2:18:10 PM EDT | "don''t tell" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 73 | Kroells, Christine | 5/12/2016 2:22:45 PM EDT | "don''t tell" |
| 74 | Kroells, Christine | 5/12/2016 2:22:57 PM EDT | "secret" |
| 75 | Kroells, Christine | 5/12/2016 2:23:11 PM EDT | "secret" AND "ed" |
| 76 | Kroells, Christine | 5/12/2016 2:23:25 PM EDT | "secret" AND "ed" AND "apollo" |
| 77 | Kroells, Christine | 5/12/2016 2:24:21 PM EDT | "secret" AND "ed" AND "apollo" |
| 78 | Kroells, Christine | 5/12/2016 2:26:12 PM EDT | "secret" AND "ed" AND "apollo" |
| 79 | Kroells, Christine | 5/12/2016 2:33:07 PM EDT | "secret" AND "ed" AND "apollo" |
| 80 | Kroells, Christine | 5/12/2016 2:35:13 PM EDT | "secret" AND "ed" AND "apollo" |
| 81 | Kroells, Christine | 5/12/2016 2:37:31 PM EDT | "secret" AND "ed" AND "apollo" |
| 82 | Kroells, Christine | 5/12/2016 2:37:48 PM EDT | "secret" AND "ed" AND "apollo" |
| 83 | Kroells, Christine | 5/12/2016 2:38:13 PM EDT | "matt wayne" |
| 84 | Kroells, Christine | 5/12/2016 2:51:55 PM EDT | "matt wayne" |
| 85 | Kroells, Christine | 5/12/2016 2:52:23 PM EDT | "swartz" |
| 86 | Kroells, Christine | 5/12/2016 2:52:31 PM EDT | "wayne" |
| 87 | Kroells, Christine | 5/12/2016 2:53:03 PM EDT | "apollo" AND "linares" AND "ed" AND "wayne" |
| 88 | Kroells, Christine | 5/12/2016 2:56:13 PM EDT | "apollo" AND "linares" AND "ed" AND "wayne" |
| 89 | Kroells, Christine | 5/12/2016 2:56:29 PM EDT | "request" AND "for" AND "information" AND "ed" |
| 90 | Kroells, Christine | 5/12/2016 2:56:30 PM EDT | "request" AND "for" AND "information" AND "ed" |
| 91 | Kroells, Christine | 5/12/2016 2:57:12 PM EDT | "ed" AND "mike" AND "matt" |
| 92 | Kroells, Christine | 5/12/2016 2:59:10 PM EDT | "ed" AND "mike" AND "matt" |
| 93 | Kroells, Christine | 5/12/2016 2:59:21 PM EDT | "ed" AND "mike" AND "matt" AND "moron" |
| 94 | Kroells, Christine | 5/12/2016 2:59:34 PM EDT | "ed" AND "mike" AND "matt" AND "idiot" |
| 95 | Kroells, Christine | 5/12/2016 2:59:43 PM EDT | "ed" AND "mike" AND "matt" AND "hell" |
| 96 | Kroells, Christine | 5/12/2016 2:59:54 PM EDT | "ed" AND "mike" AND "matt" AND "fuck" |
| 97 | Kroells, Christine | 5/12/2016 3:00:04 PM EDT | "ed" AND "mike" AND "matt" AND "shit" |
| 98 | Kroells, Christine | 5/12/2016 3:00:17 PM EDT | "ed" AND "mike" AND "wayne" AND "shit" |
| 99 | Kroells, Christine | 5/12/2016 3:00:26 PM EDT | "swartz" |
| 100 | Kroells, Christine | 5/12/2016 3:24:41 PM EDT | "swartz" |
| 101 | Kroells, Christine | 5/12/2016 3:28:38 PM EDT | "swartz" |
| 102 | Kroells, Christine | 5/12/2016 3:28:47 PM EDT | "lie" |
| 103 | Kroells, Christine | 5/12/2016 3:28:56 PM EDT | "lie" AND "apollo" |
| 104 | Kroells, Christine | 5/12/2016 3:30:13 PM EDT | "lie" AND "apollo" |
| 105 | Kroells, Christine | 5/12/2016 3:31:39 PM EDT | "lie" AND "apollo" |
| 106 | Kroells, Christine | 5/12/2016 3:36:07 PM EDT | "lie" AND "apollo" |
| 107 | Kroells, Christine | 5/12/2016 3:37:08 PM EDT | "stockholder letter" AND "2010" |
| 108 | Kroells, Christine | 5/12/2016 3:37:36 PM EDT | "stockholders letter" AND "2010" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Inspector Kroells**

| | User Name | Timestamp | Details |
|---|---|---|---|
| 109 | Kroells, Christine | 5/12/2016 3:37:56 PM EDT | "stockholders letter" AND "2010" |
| 110 | Kroells, Christine | 5/12/2016 3:38:19 PM EDT | "2010" AND "stockholder" AND "letter" AND "bryant" AND "ed" AND "monahan" |
| 111 | Kroells, Christine | 5/12/2016 3:41:30 PM EDT | "2010" AND "stockholder" AND "letter" AND "bryant" AND "ed" AND "monahan" |
| 112 | Kroells, Christine | 5/12/2016 3:41:44 PM EDT | "jill" AND "purchase" AND "agreement" AND "ed" |
| 113 | Kroells, Christine | 5/12/2016 3:43:50 PM EDT | "jill" AND "purchase" AND "agreement" AND "ed" |
| 114 | Kroells, Christine | 5/12/2016 3:44:08 PM EDT | "jill" AND "zipkin" AND "ed" |
| 115 | Kroells, Christine | 5/12/2016 3:44:46 PM EDT | "jill" AND "zipkin" AND "ed" |
| 116 | Kroells, Christine | 5/12/2016 3:45:19 PM EDT | "jill" AND "zipkin" AND "ed" |
| 117 | Kroells, Christine | 5/12/2016 3:45:36 PM EDT | "jill" AND "zipkin" AND "ed" |
| 118 | Kroells, Christine | 5/12/2016 3:46:07 PM EDT | "jill" AND "zipkin" AND "ed" |
| 119 | Kroells, Christine | 5/12/2016 3:46:28 PM EDT | "jill" AND "zipkin" AND "ed" |
| 120 | Kroells, Christine | 5/12/2016 3:47:15 PM EDT | "jill" AND "zipkin" AND "ed" |
| 121 | Kroells, Christine | 5/12/2016 3:48:20 PM EDT | "jill" AND "zipkin" AND "ed" |
| 122 | Kroells, Christine | 5/12/2016 3:48:49 PM EDT | "jill" AND "zipkin" AND "ed" |
| 123 | Kroells, Christine | 5/12/2016 3:49:09 PM EDT | "jill" AND "zipkin" AND "ed" |
| 124 | Kroells, Christine | 5/12/2016 3:49:25 PM EDT | "jill" AND "zipkin" AND "ed" |
| 125 | Kroells, Christine | 5/12/2016 3:49:49 PM EDT | "jill" AND "zipkin" AND "ed" |
| 126 | Kroells, Christine | 5/12/2016 3:50:33 PM EDT | "jill" AND "zipkin" AND "ed" |
| 127 | Kroells, Christine | 5/12/2016 3:51:53 PM EDT | "jill" AND "zipkin" AND "ed" |
| 128 | Kroells, Christine | 5/12/2016 3:54:16 PM EDT | "jill" AND "zipkin" AND "ed" |
| 129 | Kroells, Christine | 5/12/2016 3:55:05 PM EDT | "jill" AND "zipkin" AND "ed" |
| 130 | Kroells, Christine | 5/12/2016 3:56:09 PM EDT | "jill" AND "zipkin" AND "ed" |
| 131 | Kroells, Christine | 5/12/2016 3:56:24 PM EDT | "jill" AND "zipkin" AND "ppm" |
| 132 | Kroells, Christine | 5/12/2016 3:56:42 PM EDT | "jill" AND "zipkin" AND "ppm" |
| 133 | Kroells, Christine | 5/12/2016 3:56:57 PM EDT | "jill" AND "purchase" AND "agreement" |
| 134 | Kroells, Christine | 5/12/2016 3:57:11 PM EDT | "purchase" AND "agreement" |
| 135 | Kroells, Christine | 5/12/2016 4:49:06 PM EDT | "purchase" AND "agreement" |
| 136 | Kroells, Christine | 5/12/2016 4:49:23 PM EDT | "dl" AND "investment" |
| 137 | Kroells, Christine | 5/12/2016 4:54:20 PM EDT | "dl" AND "investment" |
| 138 | Kroells, Christine | 5/12/2016 4:54:29 PM EDT | "dl investment" |
| 139 | Kroells, Christine | 5/12/2016 4:54:35 PM EDT | "rl investment" |
| 140 | Kroells, Christine | 5/12/2016 4:56:41 PM EDT | "rl investment" |
| 141 | Kroells, Christine | 5/12/2016 4:56:51 PM EDT | "mrm" AND "income" |
| 142 | Kroells, Christine | 5/12/2016 4:58:43 PM EDT | "mrm" AND "income" |
| 143 | Kroells, Christine | 5/12/2016 4:58:49 PM EDT | "mrm income" |
| 144 | Kroells, Christine | 5/12/2016 4:59:10 PM EDT | "ESA income" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Inspector Kroells**

| | User Name | Timestamp | Details |
|---|---|---|---|
| 145 | Kroells, Christine | 5/12/2016 4:59:27 PM EDT | "monahan" AND "income" AND "sale" AND "of" AND "stock" |
| 146 | Kroells, Christine | 5/12/2016 5:00:04 PM EDT | "monahan" AND "income" AND "sale" AND "of" AND "stock" |
| 147 | Kroells, Christine | 5/17/2016 11:13:04 AM EDT | "paul" AND "rapello" |
| 148 | Kroells, Christine | 5/17/2016 11:19:17 AM EDT | "paul" AND "rapello" |
| 149 | Kroells, Christine | 5/17/2016 11:19:25 AM EDT | "paul" AND "rapello" AND "apollo" |
| 150 | Kroells, Christine | 5/17/2016 2:36:03 PM EDT | "paul" AND "rapello" AND "apollo" |
| 151 | Kroells, Christine | 5/17/2016 3:28:46 PM EDT | "paul" AND "rapello" AND "apollo" |
| 152 | Kroells, Christine | 5/17/2016 4:40:55 PM EDT | "charles" AND "frazier" |
| 153 | Kroells, Christine | 5/17/2016 4:40:56 PM EDT | "charles" AND "frazier" |
| 154 | Kroells, Christine | 5/25/2016 5:16:40 PM EDT | "steve" AND "kelley" |
| 155 | Kroells, Christine | 5/25/2016 5:16:41 PM EDT | "steve" AND "kelley" |
| 156 | Kroells, Christine | 5/25/2016 5:16:53 PM EDT | "kelley" |
| 157 | Kroells, Christine | 5/25/2016 5:16:53 PM EDT | "kelley" |
| 158 | Kroells, Christine | 5/25/2016 5:17:10 PM EDT | "steve" AND "kelley" |
| 159 | Kroells, Christine | 5/25/2016 5:18:02 PM EDT | "steve" AND "kelley" |
| 160 | Kroells, Christine | 5/25/2016 5:18:15 PM EDT | "mack" AND "rescind" AND "scio" AND "shares" |
| 161 | Kroells, Christine | 5/25/2016 5:18:22 PM EDT | "mack" AND "scio" AND "shares" |
| 162 | Kroells, Christine | 5/31/2016 10:36:59 AM EDT | "maddox" AND "monahan" AND "loan" |
| 163 | Kroells, Christine | 5/31/2016 10:38:07 AM EDT | "maddox" AND "monahan" AND "loan" |
| 164 | Kroells, Christine | 5/31/2016 10:38:34 AM EDT | "maddox" AND "monahan" AND "loan" |
| 165 | Kroells, Christine | 5/31/2016 10:38:55 AM EDT | "maddox" AND "monahan" AND "shit" |
| 166 | Kroells, Christine | 5/31/2016 10:40:36 AM EDT | "maddox" AND "monahan" AND "shit" |
| 167 | Kroells, Christine | 5/31/2016 10:40:47 AM EDT | "maddox" AND "monahan" AND "fuck" |
| 168 | Kroells, Christine | 5/31/2016 10:41:00 AM EDT | "monahan" AND "maddox" AND "fuck" |
| 169 | Kroells, Christine | 5/31/2016 10:43:53 AM EDT | "monahan" AND "maddox" AND "fuck" |
| 170 | Kroells, Christine | 5/31/2016 10:44:07 AM EDT | "monahan" AND "maddox" AND "secret" |
| 171 | Kroells, Christine | 5/31/2016 10:44:59 AM EDT | "monahan" AND "maddox" AND "secret" |
| 172 | Kroells, Christine | 5/31/2016 10:45:18 AM EDT | "monahan" AND "maddox" AND "don''t" AND "tell" |
| 173 | Kroells, Christine | 5/31/2016 10:45:41 AM EDT | "monahan" AND "maddox" AND "don''t" AND "tell" |
| 174 | Kroells, Christine | 5/31/2016 10:45:57 AM EDT | "monahan" AND "maddox" AND "scared" |
| 175 | Kroells, Christine | 5/31/2016 10:46:16 AM EDT | "monahan" AND "maddox" AND "problem" |
| 176 | Kroells, Christine | 5/31/2016 10:47:30 AM EDT | "monahan" AND "maddox" AND "problem" |
| 177 | Kroells, Christine | 5/31/2016 10:47:42 AM EDT | "monahan" AND "maddox" AND "money" |
| 178 | Kroells, Christine | 5/31/2016 10:53:29 AM EDT | "monahan" AND "maddox" AND "money" |
| 179 | Kroells, Christine | 5/31/2016 10:58:00 AM EDT | "monahan" AND "maddox" AND "money" |
| 180 | Kroells, Christine | 5/31/2016 10:58:10 AM EDT | "devenir" |

Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Inspector Kroells

| | User Name | Timestamp | Details |
|---|---|---|---|
| 181 | Kroells, Christine | 5/31/2016 10:58:10 AM EDT | "devenir" |
| 182 | Kroells, Christine | 5/31/2016 10:58:19 AM EDT | "devenir" AND "shit" |
| 183 | Kroells, Christine | 5/31/2016 10:58:30 AM EDT | "devenir" AND "monahan" AND "loan" |
| 184 | Kroells, Christine | 5/31/2016 11:04:36 AM EDT | "devenir" AND "monahan" AND "loan" |
| 185 | Kroells, Christine | 5/31/2016 11:10:41 AM EDT | "devenir" AND "monahan" AND "loan" |
| 186 | Kroells, Christine | 5/31/2016 11:11:27 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" |
| 187 | Kroells, Christine | 5/31/2016 11:11:37 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" AND "shit" |
| 188 | Kroells, Christine | 5/31/2016 11:11:46 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" AND "fuck" |
| 189 | Kroells, Christine | 5/31/2016 11:11:57 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" AND "crap" |
| 190 | Kroells, Christine | 5/31/2016 11:12:04 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" |
| 191 | Kroells, Christine | 5/31/2016 11:12:26 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" |
| 192 | Kroells, Christine | 5/31/2016 11:22:05 AM EDT | "ed" AND "sell" AND "shares" AND "warrants" AND "apollo" |
| 193 | Kroells, Christine | 5/31/2016 11:22:20 AM EDT | "2012" AND "settlement" AND "scio" |
| 194 | Kroells, Christine | 5/31/2016 11:22:36 AM EDT | "2012" AND "settlement" AND "scio" AND "focus" |
| 195 | Kroells, Christine | 5/31/2016 11:22:50 AM EDT | "2012" AND "settlement" AND "scio" AND "focus" AND "BOD" |
| 196 | Kroells, Christine | 5/31/2016 11:23:22 AM EDT | "2012" AND "settlement" AND "scio" AND "focus" AND "BOD" |
| 197 | Kroells, Christine | 5/31/2016 11:26:31 AM EDT | "apollo" AND "scio" AND "settlement" AND "discussions" |
| 198 | Kroells, Christine | 5/31/2016 11:30:00 AM EDT | "apollo" AND "scio" AND "settlement" AND "discussions" |
| 199 | Kroells, Christine | 5/31/2016 11:30:31 AM EDT | "ed" AND "settlement" AND "lawsuit" |
| 200 | Kroells, Christine | 5/31/2016 11:30:35 AM EDT | "ed" AND "settlement" AND "lawsuit" |
| 201 | Kroells, Christine | 5/31/2016 12:16:02 PM EDT | "ed" AND "settlement" AND "lawsuit" |
| 202 | Kroells, Christine | 5/31/2016 12:16:11 PM EDT | "bribe" |
| 203 | Kroells, Christine | 6/28/2016 10:53:19 AM EDT | "Maddox" AND "monahan" |
| 204 | Kroells, Christine | 6/28/2016 10:54:24 AM EDT | "Maddox" AND "monahan" |
| 205 | Kroells, Christine | 6/28/2016 10:54:45 AM EDT | "Maddox" AND "mike" |
| 206 | Kroells, Christine | 6/28/2016 10:54:56 AM EDT | "Maddox" AND "mike" |
| 207 | Kroells, Christine | 6/28/2016 10:55:29 AM EDT | "Maddox" AND "mike" |
| 208 | Kroells, Christine | 6/28/2016 10:56:27 AM EDT | "Maddox" AND "mike" |
| 209 | Kroells, Christine | 6/28/2016 10:56:37 AM EDT | "shenanigans" |
| 210 | Kroells, Christine | 6/28/2016 10:56:59 AM EDT | "forensic" AND "accounting" |
| 211 | Kroells, Christine | 6/28/2016 10:57:09 AM EDT | "forensic" AND "accounting" |
| 212 | Kroells, Christine | 6/28/2016 10:57:14 AM EDT | "forensic" AND "accounting" |
| 213 | Kroells, Christine | 6/28/2016 10:57:32 AM EDT | "forensic" |
| 214 | Kroells, Christine | 6/28/2016 10:58:06 AM EDT | "forensic" |
| 215 | Kroells, Christine | 6/28/2016 11:02:43 AM EDT | "Maddox" AND "monahan" |
| 216 | Kroells, Christine | 6/28/2016 11:02:56 AM EDT | "Maddox" AND "monahan" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Inspector Kroells**

| | User Name | Timestamp | Details |
|---|---|---|---|
| 217 | Kroells, Christine | 6/28/2016 11:16:31 AM EDT | "Maddox" AND "monahan" |
| 218 | Kroells, Christine | 6/28/2016 11:17:27 AM EDT | "Maddox" AND "mike" AND "problem" |
| 219 | Kroells, Christine | 6/28/2016 11:17:46 AM EDT | "Maddox" AND "mike" AND "problem" |
| 220 | Kroells, Christine | 6/28/2016 11:17:53 AM EDT | "Maddox" AND "mike" AND "shit" |
| 221 | Kroells, Christine | 6/28/2016 11:18:01 AM EDT | "Maddox" AND "mike" AND "concern" |
| 222 | Kroells, Christine | 6/28/2016 11:18:09 AM EDT | "Maddox" AND "mike" AND "help" |
| 223 | Kroells, Christine | 6/28/2016 11:23:48 AM EDT | "Maddox" AND "mike" AND "help" |
| 224 | Kroells, Christine | 6/28/2016 11:23:57 AM EDT | "Maddox" AND "shit" |
| 225 | Kroells, Christine | 6/28/2016 11:25:13 AM EDT | "Maddox" AND "shit" |
| 226 | Kroells, Christine | 6/28/2016 11:25:20 AM EDT | "Maddox" AND "crap" |
| 227 | Kroells, Christine | 6/28/2016 11:25:54 AM EDT | "Maddox" AND "crap" |
| 228 | Kroells, Christine | 6/28/2016 11:26:14 AM EDT | "Maddox" AND "fuck" |
| 229 | Kroells, Christine | 6/28/2016 11:26:48 AM EDT | "Maddox" AND "fuck" |
| 230 | Kroells, Christine | 6/28/2016 11:27:08 AM EDT | "Maddox" AND "secret" |
| 231 | Kroells, Christine | 6/28/2016 11:27:27 AM EDT | "Maddox" AND "dumb" |
| 232 | Kroells, Christine | 6/28/2016 11:28:17 AM EDT | "Maddox" |
| 233 | Kroells, Christine | 6/28/2016 11:41:49 AM EDT | "Maddox" |
| 234 | Kroells, Christine | 6/28/2016 11:41:57 AM EDT | "wire" |
| 235 | Kroells, Christine | 6/28/2016 11:42:27 AM EDT | "wire" |
| 236 | Kroells, Christine | 6/28/2016 11:42:45 AM EDT | "wire" |
| 237 | Kroells, Christine | 6/28/2016 11:44:23 AM EDT | "wire" |
| 238 | Kroells, Christine | 6/28/2016 11:48:14 AM EDT | "wire" |
| 239 | Kroells, Christine | 6/28/2016 11:53:24 AM EDT | "wire" |
| 240 | Kroells, Christine | 6/28/2016 11:54:34 AM EDT | "wire" |
| 241 | Kroells, Christine | 6/28/2016 12:07:14 PM EDT | "wire" |
| 242 | Kroells, Christine | 6/28/2016 12:07:55 PM EDT | "wire" |
| 243 | Kroells, Christine | 6/28/2016 12:07:56 PM EDT | "wire" |
| 244 | Kroells, Christine | 6/28/2016 12:11:35 PM EDT | "wire" |
| 245 | Kroells, Christine | 6/28/2016 12:15:39 PM EDT | "wire" |
| 246 | Kroells, Christine | 6/28/2016 12:17:11 PM EDT | "wire" |
| 247 | Kroells, Christine | 6/28/2016 12:17:42 PM EDT | "wire" |
| 248 | Kroells, Christine | 11/2/2016 1:41:37 PM EDT | "scio" AND "strous" AND "committee" |
| 249 | Kroells, Christine | 11/2/2016 1:42:16 PM EDT | "scio" AND "strous" AND "committee" |
| 250 | Kroells, Christine | 11/2/2016 1:57:27 PM EDT | "scio" AND "strous" AND "committee" |
| 251 | Kroells, Christine | 11/2/2016 1:57:34 PM EDT | "adr" |
| 252 | Kroells, Christine | 11/2/2016 1:57:45 PM EDT | "ADR" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 253 | Kroells, Christine | 11/2/2016 1:57:52 PM EDT | "RL" |
| 254 | Kroells, Christine | 11/2/2016 1:58:07 PM EDT | "RL" AND "Investment" |
| 255 | Kroells, Christine | 11/2/2016 1:58:11 PM EDT | "RL" AND "Investment" |
| 256 | Kroells, Christine | 11/2/2016 2:01:10 PM EDT | "mumm" |
| 257 | Kroells, Christine | 11/2/2016 2:01:32 PM EDT | "mumm" |
| 258 | Kroells, Christine | 11/17/2016 12:47:26 PM EST | "ward" |
| 259 | Kroells, Christine | 11/17/2016 12:47:27 PM EST | "ward" |
| 260 | Kroells, Christine | 11/17/2016 12:47:46 PM EST | "ward" |
| 261 | Kroells, Christine | 11/17/2016 1:00:09 PM EST | "ward" |
| 262 | Kroells, Christine | 11/17/2016 1:30:42 PM EST | "ward" |
| 263 | Kroells, Christine | 11/17/2016 1:32:58 PM EST | "ward" |
| 264 | Kroells, Christine | 11/17/2016 1:35:34 PM EST | "ward" |
| 265 | Kroells, Christine | 11/17/2016 1:39:07 PM EST | "ward" |
| 266 | Kroells, Christine | 11/17/2016 1:44:06 PM EST | "ward" |
| 267 | Kroells, Christine | 11/17/2016 1:46:42 PM EST | "ward" |
| 268 | Kroells, Christine | 11/17/2016 1:47:14 PM EST | "ward" |
| 269 | Kroells, Christine | 11/17/2016 2:31:07 PM EST | "ward" |
| 270 | Kroells, Christine | 11/17/2016 2:33:45 PM EST | "ward" |
| 271 | Kroells, Christine | 11/17/2016 2:58:30 PM EST | "ward" |
| 272 | Kroells, Christine | 11/17/2016 3:17:22 PM EST | "ward" |
| 273 | Kroells, Christine | 11/17/2016 3:18:04 PM EST | "ward" |
| 274 | Kroells, Christine | 11/17/2016 3:20:44 PM EST | "ward" |
| 275 | Kroells, Christine | 11/18/2016 1:17:26 PM EST | "ward" |
| 276 | Kroells, Christine | 11/18/2016 1:28:23 PM EST | "ward" |
| 277 | Kroells, Christine | 11/28/2016 1:06:56 PM EST | "monahan" |
| 278 | Kroells, Christine | 11/28/2016 1:07:12 PM EST | "monahan" |
| 279 | Kroells, Christine | 11/28/2016 1:14:10 PM EST | "monahan" |
| 280 | Kroells, Christine | 11/28/2016 1:14:14 PM EST | "monahan" |
| 281 | Kroells, Christine | 11/28/2016 1:14:18 PM EST | "monahan" |
| 282 | Kroells, Christine | 11/28/2016 2:32:26 PM EST | "monahan" AND "mumm" AND "checks" |
| 283 | Kroells, Christine | 11/28/2016 2:32:37 PM EST | "monahan" AND "mumm" AND "checks" |
| 284 | Kroells, Christine | 11/28/2016 2:43:29 PM EST | "monahan" AND "mumm" AND "checks" |
| 285 | Kroells, Christine | 11/28/2016 2:43:43 PM EST | "monahan" AND "mumm" AND "account" |
| 286 | Kroells, Christine | 11/28/2016 3:13:32 PM EST | "monahan" AND "mumm" AND "account" |
| 287 | Kroells, Christine | 11/28/2016 3:13:48 PM EST | "reill" |
| 288 | Kroells, Christine | 11/28/2016 3:14:03 PM EST | "reill" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 289 | Kroells, Christine | 11/28/2016 3:14:09 PM EST | "reil" |
| 290 | Kroells, Christine | 11/28/2016 3:20:57 PM EST | "lancia" |
| 291 | Kroells, Christine | 11/28/2016 3:30:58 PM EST | "lancia" |
| 292 | Kroells, Christine | 11/28/2016 3:31:27 PM EST | "lancia" |
| 293 | Kroells, Christine | 11/28/2016 3:32:49 PM EST | "lancia" |
| 294 | Kroells, Christine | 11/28/2016 3:33:21 PM EST | "lancia" |
| 295 | Kroells, Christine | 11/28/2016 3:35:20 PM EST | "lancia" |
| 296 | Kroells, Christine | 11/28/2016 3:43:10 PM EST | "lancia" |
| 297 | Kroells, Christine | 11/28/2016 3:43:58 PM EST | "lancia" |
| 298 | Kroells, Christine | 11/28/2016 3:47:32 PM EST | "lancia" |
| 299 | Kroells, Christine | 11/28/2016 3:47:43 PM EST | "monahan" |
| 300 | Kroells, Christine | 11/28/2016 3:47:52 PM EST | "monahan" |
| 301 | Kroells, Christine | 11/28/2016 3:48:00 PM EST | "monahan" |
| 302 | Kroells, Christine | 11/28/2016 3:48:13 PM EST | "monahan" |
| 303 | Kroells, Christine | 11/28/2016 3:48:23 PM EST | "monahan" |
| 304 | Kroells, Christine | 11/28/2016 3:48:36 PM EST | "monahan" |
| 305 | Kroells, Christine | 11/29/2016 8:07:50 AM EST | "monahan" |
| 306 | Kroells, Christine | 11/29/2016 8:08:05 AM EST | "monahan" |
| 307 | Kroells, Christine | 11/29/2016 8:08:12 AM EST | "monahan" |
| 308 | Kroells, Christine | 11/29/2016 8:08:16 AM EST | "monahan" |
| 309 | Kroells, Christine | 11/29/2016 8:08:17 AM EST | "monahan" |
| 310 | Kroells, Christine | 11/29/2016 8:08:21 AM EST | "monahan" |
| 311 | Kroells, Christine | 11/29/2016 8:08:25 AM EST | "monahan" |
| 312 | Kroells, Christine | 11/29/2016 8:08:26 AM EST | "monahan" |
| 313 | Kroells, Christine | 11/29/2016 11:01:22 AM EST | "monahan" |
| 314 | Kroells, Christine | 11/29/2016 11:01:31 AM EST | "monahan" |
| 315 | Kroells, Christine | 11/29/2016 11:01:35 AM EST | "monahan" |
| 316 | Kroells, Christine | 11/29/2016 11:01:38 AM EST | "monahan" |
| 317 | Kroells, Christine | 11/29/2016 11:01:41 AM EST | "monahan" |
| 318 | Kroells, Christine | 11/29/2016 11:01:45 AM EST | "monahan" |
| 319 | Kroells, Christine | 11/29/2016 11:57:54 AM EST | "monahan" |
| 320 | Kroells, Christine | 11/30/2016 2:02:11 PM EST | "00324536" |
| 321 | Kroells, Christine | 11/30/2016 2:07:46 PM EST | "00324536" |
| 322 | Kroells, Christine | 11/30/2016 2:08:02 PM EST | "monahan" |
| 323 | Kroells, Christine | 11/30/2016 2:08:06 PM EST | "monahan" |
| 324 | Kroells, Christine | 11/30/2016 2:08:11 PM EST | "monahan" |

| | User Name | Timestamp | Details |
|---|---|---|---|
| 325 | Kroells, Christine | 11/30/2016 2:08:14 PM EST | "monahan" |
| 326 | Kroells, Christine | 11/30/2016 2:08:18 PM EST | "monahan" |
| 327 | Kroells, Christine | 11/30/2016 2:08:28 PM EST | "monahan" |
| 328 | Kroells, Christine | 11/30/2016 4:26:09 PM EST | "monahan" |
| 329 | Kroells, Christine | 11/30/2016 4:26:15 PM EST | "monahan" |
| 330 | Kroells, Christine | 11/30/2016 4:26:18 PM EST | "monahan" |
| 331 | Kroells, Christine | 11/30/2016 4:26:21 PM EST | "monahan" |
| 332 | Kroells, Christine | 11/30/2016 4:26:24 PM EST | "monahan" |
| 333 | Kroells, Christine | 11/30/2016 4:31:46 PM EST | "monahan" |
| 334 | Kroells, Christine | 11/30/2016 4:31:59 PM EST | "monahan" |
| 335 | Kroells, Christine | 12/13/2016 4:20:15 PM EST | "focus" |
| 336 | Kroells, Christine | 12/13/2016 4:20:28 PM EST | "focus" |
| 337 | Kroells, Christine | 12/13/2016 4:20:45 PM EST | "focus" |
| 338 | Kroells, Christine | 12/13/2016 4:21:00 PM EST | "focus" |
| 339 | Kroells, Christine | 12/13/2016 4:55:33 PM EST | "focus" |
| 340 | Kroells, Christine | 12/13/2016 4:55:46 PM EST | "scio" AND "settlement" |
| 341 | Kroells, Christine | 12/13/2016 4:55:47 PM EST | "scio" AND "settlement" |
| 342 | Kroells, Christine | 4/27/2017 2:09:06 PM EDT | "murry" |
| 343 | Kroells, Christine | 4/27/2017 2:09:35 PM EDT | "murry" |
| 344 | Kroells, Christine | 4/27/2017 2:09:48 PM EDT | "murry" |
| 345 | Kroells, Christine | 4/27/2017 2:10:05 PM EDT | "murry" |
| 346 | Kroells, Christine | 4/27/2017 2:10:07 PM EDT | "murry" |
| 347 | Kroells, Christine | 4/27/2017 2:10:15 PM EDT | "murry" |
| 348 | Kroells, Christine | 4/27/2017 2:11:19 PM EDT | "murry" |
| 349 | Kroells, Christine | 4/27/2017 2:11:21 PM EDT | "murry" |
| 350 | Kroells, Christine | 4/27/2017 2:12:42 PM EDT | "murry" |
| 351 | Kroells, Christine | 5/16/2017 8:46:26 AM EDT | "raised" AND "million" |
| 352 | Kroells, Christine | 5/16/2017 8:49:32 AM EDT | "raised" AND "million" |
| 353 | Kroells, Christine | 5/16/2017 8:52:32 AM EDT | "raised" AND "million" |
| 354 | Kroells, Christine | 5/16/2017 9:00:18 AM EDT | "raised" AND "million" |
| 355 | Kroells, Christine | 5/16/2017 9:01:43 AM EDT | "raised" AND "million" |
| 356 | Kroells, Christine | 5/16/2017 9:06:48 AM EDT | "raised" AND "million" |
| 357 | Kroells, Christine | 5/16/2017 9:07:48 AM EDT | "sell" AND "warrants" AND "apollo" |
| 358 | Kroells, Christine | 5/16/2017 9:07:49 AM EDT | "sell" AND "warrants" AND "apollo" |
| 359 | Kroells, Christine | 5/16/2017 9:07:56 AM EDT | "sell" AND "warrants" AND "apollo" |
| 360 | Kroells, Christine | 5/16/2017 9:08:07 AM EDT | "sell" AND "warrants" AND "apollo" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Inspector Kroells**

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 361 | Kroells, Christine | 5/16/2017 9:08:10 AM EDT | "sell" AND "warrants" AND "apollo" |
| 362 | Kroells, Christine | 5/16/2017 9:08:12 AM EDT | "sell" AND "warrants" AND "apollo" |
| 363 | Kroells, Christine | 5/16/2017 9:08:15 AM EDT | "sell" AND "warrants" AND "apollo" |
| 364 | Kroells, Christine | 5/16/2017 9:08:18 AM EDT | "sell" AND "warrants" AND "apollo" |
| 365 | Kroells, Christine | 5/16/2017 9:08:22 AM EDT | "sell" AND "warrants" AND "apollo" |
| 366 | Kroells, Christine | 5/16/2017 9:08:25 AM EDT | "sell" AND "warrants" AND "apollo" |
| 367 | Kroells, Christine | 5/16/2017 9:08:27 AM EDT | "sell" AND "warrants" AND "apollo" |
| 368 | Kroells, Christine | 5/16/2017 9:08:28 AM EDT | "sell" AND "warrants" AND "apollo" |
| 369 | Kroells, Christine | 5/16/2017 9:08:31 AM EDT | "sell" AND "warrants" AND "apollo" |
| 370 | Kroells, Christine | 5/16/2017 9:08:33 AM EDT | "sell" AND "warrants" AND "apollo" |
| 371 | Kroells, Christine | 5/16/2017 9:08:34 AM EDT | "sell" AND "warrants" AND "apollo" |
| 372 | Kroells, Christine | 5/16/2017 9:08:36 AM EDT | "sell" AND "warrants" AND "apollo" |
| 373 | Kroells, Christine | 5/16/2017 9:08:36 AM EDT | "sell" AND "warrants" AND "apollo" |
| 374 | Kroells, Christine | 5/16/2017 9:08:40 AM EDT | "sell" AND "warrants" AND "apollo" |
| 375 | Kroells, Christine | 5/16/2017 9:08:42 AM EDT | "sell" AND "warrants" AND "apollo" |
| 376 | Kroells, Christine | 5/16/2017 9:08:43 AM EDT | "sell" AND "warrants" AND "apollo" |
| 377 | Kroells, Christine | 5/16/2017 9:08:45 AM EDT | "sell" AND "warrants" AND "apollo" |
| 378 | Kroells, Christine | 5/16/2017 9:08:51 AM EDT | "sell" AND "warrants" AND "apollo" |
| 379 | Kroells, Christine | 8/21/2017 3:50:13 PM EDT | "3 million" |
| 380 | Kroells, Christine | 8/21/2017 3:50:23 PM EDT | "3 million" |
| 381 | Kroells, Christine | 8/21/2017 3:51:38 PM EDT | "3 million" |
| 382 | Kroells, Christine | 8/21/2017 4:06:25 PM EDT | "3 million" |
| 383 | Kroells, Christine | 8/21/2017 4:07:11 PM EDT | "3 million" |
| 384 | Kroells, Christine | 8/21/2017 4:07:56 PM EDT | "3 million" |
| 385 | Kroells, Christine | 8/21/2017 4:18:42 PM EDT | "3 million" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Agent Khan**

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 1 | Khan, Jennifer | 5/5/2016 2:07:07 PM EDT | "ward" |
| 2 | Khan, Jennifer | 5/5/2016 2:07:48 PM EDT | "ward" |
| 3 | Khan, Jennifer | 5/5/2016 2:08:24 PM EDT | "ward" |
| 4 | Khan, Jennifer | 5/5/2016 2:10:30 PM EDT | "ward" |
| 5 | Khan, Jennifer | 5/5/2016 2:10:56 PM EDT | "ward" |
| 6 | Khan, Jennifer | 5/5/2016 2:11:52 PM EDT | "ward" |
| 7 | Khan, Jennifer | 5/5/2016 2:12:54 PM EDT | "ward" |
| 8 | Khan, Jennifer | 5/5/2016 2:27:19 PM EDT | "ward" |
| 9 | Khan, Jennifer | 5/5/2016 2:27:53 PM EDT | "ward" |
| 10 | Khan, Jennifer | 5/5/2016 2:38:28 PM EDT | "ward" |
| 11 | Khan, Jennifer | 5/5/2016 3:07:24 PM EDT | "ward" |
| 12 | Khan, Jennifer | 5/5/2016 3:08:44 PM EDT | "ward" |
| 13 | Khan, Jennifer | 5/5/2016 3:09:14 PM EDT | "ward" |
| 14 | Khan, Jennifer | 5/5/2016 3:09:31 PM EDT | "ward" |
| 15 | Khan, Jennifer | 5/5/2016 3:09:48 PM EDT | "ward" |
| 16 | Khan, Jennifer | 5/5/2016 3:10:39 PM EDT | "ward" |
| 17 | Khan, Jennifer | 5/5/2016 3:11:04 PM EDT | "ward" |
| 18 | Khan, Jennifer | 5/5/2016 3:11:28 PM EDT | "ward" |
| 19 | Khan, Jennifer | 5/5/2016 3:12:10 PM EDT | "ward" |
| 20 | Khan, Jennifer | 5/5/2016 3:12:30 PM EDT | "ward" |
| 21 | Khan, Jennifer | 5/5/2016 3:12:52 PM EDT | "ward" |
| 22 | Khan, Jennifer | 5/5/2016 3:13:08 PM EDT | "ward" |
| 23 | Khan, Jennifer | 5/5/2016 3:13:33 PM EDT | "ward" |
| 24 | Khan, Jennifer | 5/5/2016 3:13:47 PM EDT | "ward" |
| 25 | Khan, Jennifer | 5/5/2016 3:14:27 PM EDT | "ward" |
| 26 | Khan, Jennifer | 5/5/2016 3:14:41 PM EDT | "ward" |
| 27 | Khan, Jennifer | 5/5/2016 3:15:58 PM EDT | "ward" |
| 28 | Khan, Jennifer | 5/5/2016 3:16:18 PM EDT | "ward" |
| 29 | Khan, Jennifer | 5/5/2016 3:16:32 PM EDT | "ward" OR "secret" |
| 30 | Khan, Jennifer | 5/5/2016 3:18:21 PM EDT | "ward" OR "secret" |
| 31 | Khan, Jennifer | 5/5/2016 3:18:40 PM EDT | "ward" OR "secret" |
| 32 | Khan, Jennifer | 5/5/2016 3:19:01 PM EDT | "ward" OR "secret" |



EXHIBIT
DX-83

Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Agent Khan

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 33 | Khan, Jennifer | 5/5/2016 3:19:27 PM EDT | "ward" OR "secret" |
| 34 | Khan, Jennifer | 5/5/2016 3:19:46 PM EDT | "ward" OR "secret" |
| 35 | Khan, Jennifer | 5/5/2016 3:20:00 PM EDT | "secret" |
| 36 | Khan, Jennifer | 5/5/2016 3:20:18 PM EDT | "secret" |
| 37 | Khan, Jennifer | 5/5/2016 3:20:34 PM EDT | "secret" |
| 38 | Khan, Jennifer | 5/5/2016 3:20:47 PM EDT | "secret" |
| 39 | Khan, Jennifer | 5/5/2016 3:21:04 PM EDT | "secret" |
| 40 | Khan, Jennifer | 5/5/2016 3:21:18 PM EDT | "secret" |
| 41 | Khan, Jennifer | 5/5/2016 3:23:14 PM EDT | "secret" |
| 42 | Khan, Jennifer | 5/5/2016 3:23:40 PM EDT | "secret" |
| 43 | Khan, Jennifer | 10/31/2016 9:05:52 AM EDT | "Theo" AND "Strous" |
| 44 | Khan, Jennifer | 10/31/2016 9:06:58 AM EDT | "Theo" AND "Strous" |
| 45 | Khan, Jennifer | 10/31/2016 9:07:48 AM EDT | "Theo" AND "Strous" |
| 46 | Khan, Jennifer | 10/31/2016 9:08:23 AM EDT | "Theo" AND "Strous" |
| 47 | Khan, Jennifer | 10/31/2016 9:09:12 AM EDT | "Theo" AND "Strous" |
| 48 | Khan, Jennifer | 10/31/2016 9:09:43 AM EDT | "Theo" AND "Strous" |
| 49 | Khan, Jennifer | 10/31/2016 9:10:23 AM EDT | "Theo" AND "Strous" |
| 50 | Khan, Jennifer | 10/31/2016 9:12:23 AM EDT | "Theo" AND "Strous" |
| 51 | Khan, Jennifer | 10/31/2016 9:12:53 AM EDT | "Theo" AND "Strous" |
| 52 | Khan, Jennifer | 10/31/2016 9:13:26 AM EDT | "Theo" AND "Strous" |
| 53 | Khan, Jennifer | 10/31/2016 9:13:56 AM EDT | "Theo" AND "Strous" |
| 54 | Khan, Jennifer | 10/31/2016 9:14:28 AM EDT | "Theo" AND "Strous" |
| 55 | Khan, Jennifer | 10/31/2016 9:16:13 AM EDT | "Theo" AND "Strous" |
| 56 | Khan, Jennifer | 10/31/2016 9:18:31 AM EDT | "Theo" AND "Strous" |
| 57 | Khan, Jennifer | 10/31/2016 9:19:09 AM EDT | "Theo" AND "Strous" |
| 58 | Khan, Jennifer | 10/31/2016 9:19:45 AM EDT | "Theo" AND "Strous" |
| 59 | Khan, Jennifer | 10/31/2016 9:22:09 AM EDT | "Theo" AND "Strous" |
| 60 | Khan, Jennifer | 10/31/2016 9:22:54 AM EDT | "Theo" AND "Strous" |
| 61 | Khan, Jennifer | 10/31/2016 9:23:44 AM EDT | "Theo" AND "Strous" |
| 62 | Khan, Jennifer | 10/31/2016 9:24:54 AM EDT | "Theo" AND "Strous" |
| 63 | Khan, Jennifer | 10/31/2016 9:25:31 AM EDT | "Theo" AND "Strous" |
| 64 | Khan, Jennifer | 10/31/2016 9:26:22 AM EDT | "Theo" AND "Strous" |

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 65 | Khan, Jennifer | 10/31/2016 9:27:19 AM EDT | "Theo" AND "Strous" |
| 66 | Khan, Jennifer | 10/31/2016 9:27:43 AM EDT | "Theo" AND "Strous" |
| 67 | Khan, Jennifer | 10/31/2016 9:28:13 AM EDT | "Theo" AND "Strous" |
| 68 | Khan, Jennifer | 10/31/2016 9:28:43 AM EDT | "Theo" AND "Strous" |
| 69 | Khan, Jennifer | 10/31/2016 9:29:10 AM EDT | "Theo" AND "Strous" |
| 70 | Khan, Jennifer | 10/31/2016 10:14:13 AM EDT | "Theo" AND "Strous" |
| 71 | Khan, Jennifer | 10/31/2016 10:14:28 AM EDT | "josh" AND "reilly" |
| 72 | Khan, Jennifer | 10/31/2016 10:16:38 AM EDT | "josh" AND "reilly" |
| 73 | Khan, Jennifer | 10/31/2016 10:17:58 AM EDT | "josh" AND "reilly" |
| 74 | Khan, Jennifer | 10/31/2016 10:18:42 AM EDT | "josh" AND "reilly" |
| 75 | Khan, Jennifer | 10/31/2016 10:19:41 AM EDT | "josh" AND "reilly" |
| 76 | Khan, Jennifer | 10/31/2016 10:20:20 AM EDT | "josh" AND "reilly" |
| 77 | Khan, Jennifer | 10/31/2016 10:21:02 AM EDT | "josh" AND "reilly" |
| 78 | Khan, Jennifer | 10/31/2016 10:21:35 AM EDT | "josh" AND "reilly" |
| 79 | Khan, Jennifer | 10/31/2016 10:22:17 AM EDT | "josh" AND "reilly" |
| 80 | Khan, Jennifer | 10/31/2016 10:30:57 AM EDT | "josh" AND "reilly" |
| 81 | Khan, Jennifer | 10/31/2016 10:31:31 AM EDT | "josh" AND "reilly" |
| 82 | Khan, Jennifer | 10/31/2016 10:32:46 AM EDT | "josh" AND "reilly" |
| 83 | Khan, Jennifer | 10/31/2016 10:33:30 AM EDT | "josh" AND "reilly" |
| 84 | Khan, Jennifer | 10/31/2016 10:34:07 AM EDT | "josh" AND "reilly" |
| 85 | Khan, Jennifer | 10/31/2016 10:35:28 AM EDT | "josh" AND "reilly" |
| 86 | Khan, Jennifer | 10/31/2016 10:37:07 AM EDT | "josh" AND "reilly" |
| 87 | Khan, Jennifer | 10/31/2016 10:39:52 AM EDT | "josh" AND "reilly" |
| 88 | Khan, Jennifer | 10/31/2016 10:41:01 AM EDT | "josh" AND "reilly" |
| 89 | Khan, Jennifer | 10/31/2016 10:41:28 AM EDT | "josh" AND "reilly" |
| 90 | Khan, Jennifer | 10/31/2016 10:42:19 AM EDT | "josh" AND "reilly" |
| 91 | Khan, Jennifer | 10/31/2016 10:42:44 AM EDT | "josh" AND "reilly" |
| 92 | Khan, Jennifer | 10/31/2016 10:43:35 AM EDT | "josh" AND "reilly" |
| 93 | Khan, Jennifer | 10/31/2016 10:44:05 AM EDT | "josh" AND "reilly" |
| 94 | Khan, Jennifer | 10/31/2016 10:44:51 AM EDT | "josh" AND "reilly" |
| 95 | Khan, Jennifer | 10/31/2016 10:45:55 AM EDT | "josh" AND "reilly" |
| 96 | Khan, Jennifer | 10/31/2016 10:47:10 AM EDT | "josh" AND "reilly" |

Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Agent Khan

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 97 | Khan, Jennifer | 10/31/2016 10:47:54 AM EDT | "josh" AND "reilly" |
| 98 | Khan, Jennifer | 10/31/2016 10:48:30 AM EDT | "josh" AND "reilly" |
| 99 | Khan, Jennifer | 10/31/2016 10:51:36 AM EDT | "josh" AND "reilly" |
| 100 | Khan, Jennifer | 10/31/2016 10:52:32 AM EDT | "josh" AND "reilly" |
| 101 | Khan, Jennifer | 10/31/2016 10:54:58 AM EDT | "josh" AND "reilly" |
| 102 | Khan, Jennifer | 10/31/2016 10:55:40 AM EDT | "josh" AND "reilly" |
| 103 | Khan, Jennifer | 10/31/2016 10:56:15 AM EDT | "josh" AND "reilly" |
| 104 | Khan, Jennifer | 10/31/2016 10:56:48 AM EDT | "josh" AND "reilly" |
| 105 | Khan, Jennifer | 10/31/2016 10:57:15 AM EDT | "josh" AND "reilly" |
| 106 | Khan, Jennifer | 10/31/2016 10:58:12 AM EDT | "josh" AND "reilly" |
| 107 | Khan, Jennifer | 10/31/2016 10:58:42 AM EDT | "josh" AND "reilly" |
| 108 | Khan, Jennifer | 10/31/2016 10:59:29 AM EDT | "josh" AND "reilly" |
| 109 | Khan, Jennifer | 10/31/2016 11:00:11 AM EDT | "josh" AND "reilly" |
| 110 | Khan, Jennifer | 10/31/2016 11:05:03 AM EDT | "josh" AND "reilly" |
| 111 | Khan, Jennifer | 10/31/2016 11:05:33 AM EDT | "josh" AND "reilly" |
| 112 | Khan, Jennifer | 10/31/2016 11:06:21 AM EDT | "josh" AND "reilly" |
| 113 | Khan, Jennifer | 10/31/2016 11:07:42 AM EDT | "josh" AND "reilly" |
| 114 | Khan, Jennifer | 10/31/2016 11:08:11 AM EDT | "josh" AND "reilly" |
| 115 | Khan, Jennifer | 10/31/2016 11:28:00 AM EDT | "josh" AND "reilly" |
| 116 | Khan, Jennifer | 10/31/2016 11:28:45 AM EDT | "josh" AND "reilly" |
| 117 | Khan, Jennifer | 10/31/2016 11:29:18 AM EDT | "josh" AND "reilly" |
| 118 | Khan, Jennifer | 10/31/2016 11:29:48 AM EDT | "josh" AND "reilly" |
| 119 | Khan, Jennifer | 10/31/2016 11:30:22 AM EDT | "josh" AND "reilly" |
| 120 | Khan, Jennifer | 10/31/2016 12:12:38 PM EDT | "josh" AND "reilly" |
| 121 | Khan, Jennifer | 10/31/2016 12:49:48 PM EDT | "josh" AND "reilly" |
| 122 | Khan, Jennifer | 10/31/2016 12:50:31 PM EDT | "josh" AND "reilly" |
| 123 | Khan, Jennifer | 10/31/2016 12:55:52 PM EDT | "josh" AND "reilly" |
| 124 | Khan, Jennifer | 10/31/2016 1:14:52 PM EDT | "josh" AND "reilly" |
| 125 | Khan, Jennifer | 10/31/2016 1:15:55 PM EDT | "josh" AND "reilly" |
| 126 | Khan, Jennifer | 10/31/2016 2:53:17 PM EDT | "josh" AND "reilly" |
| 127 | Khan, Jennifer | 10/31/2016 2:53:47 PM EDT | "josh" AND "reilly" |
| 128 | Khan, Jennifer | 10/31/2016 3:13:07 PM EDT | "josh" AND "reilly" |

**Keyword searches from "All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx" – Agent Khan**

|  | User Name | Timestamp | Details |
|---|---|---|---|
| 129 | Khan, Jennifer | 10/31/2016 3:13:45 PM EDT | "josh" AND "reilly" |
| 130 | Khan, Jennifer | 10/31/2016 3:15:04 PM EDT | "josh" AND "reilly" |
| 131 | Khan, Jennifer | 10/31/2016 3:16:17 PM EDT | "josh" AND "reilly" |
| 132 | Khan, Jennifer | 10/31/2016 3:18:56 PM EDT | "josh" AND "reilly" |
| 133 | Khan, Jennifer | 10/31/2016 3:19:41 PM EDT | "josh" AND "reilly" |
| 134 | Khan, Jennifer | 10/31/2016 3:20:15 PM EDT | "josh" AND "reilly" |
| 135 | Khan, Jennifer | 10/31/2016 3:20:58 PM EDT | "josh" AND "reilly" |
| 136 | Khan, Jennifer | 10/31/2016 3:23:15 PM EDT | "josh" AND "reilly" |
| 137 | Khan, Jennifer | 10/31/2016 3:23:45 PM EDT | "josh" AND "reilly" |
| 138 | Khan, Jennifer | 10/31/2016 3:24:37 PM EDT | "josh" AND "reilly" |
| 139 | Khan, Jennifer | 10/31/2016 3:25:10 PM EDT | "josh" AND "reilly" |
| 140 | Khan, Jennifer | 10/31/2016 3:25:44 PM EDT | "josh" AND "reilly" |
| 141 | Khan, Jennifer | 10/31/2016 3:26:38 PM EDT | "josh" AND "reilly" |
| 142 | Khan, Jennifer | 10/31/2016 3:26:58 PM EDT | "scio" AND "volume" AND "list" |
| 143 | Khan, Jennifer | 10/31/2016 3:27:20 PM EDT | "theo" AND "strous" |
| 144 | Khan, Jennifer | 10/31/2016 3:28:36 PM EDT | "theo" AND "strous" |
| 145 | Khan, Jennifer | 10/31/2016 3:29:26 PM EDT | "theo" AND "strous" |
| 146 | Khan, Jennifer | 10/31/2016 3:30:53 PM EDT | "theo" AND "strous" |
| 147 | Khan, Jennifer | 10/31/2016 3:31:47 PM EDT | "theo" AND "strous" |

User Names and Dates of Activity from
"All Activity Deliverable 2017-12-15 Final Prosecution team.xlsx"

<u>Belich, Brandon</u>

5/12/16
6/6/16
7/13/16

<u>Harris, Martin</u>

4/4/17
4/6/17
5/12/17
5/15/17
6/6/17

<u>Khan, Jennifer</u>

5/5/16
7/8/16
7/13/16
10/31/16

<u>Kroells, Christine</u>

5/5/16
5/10/16
5/11/16
5/12/16
5/17/16
5/25/16
5/31/16
6/28/16
11/2/16
11/8/16
11/17/16
11/18/16
11/28/16
11/29/16
11/30/16
12/1/16
12/13/16
4/27/17
5/16/17
8/21/17

**EXHIBIT DX-88**

<u>Maria, David</u>

5/2/16
5/4/16
5/5/16
5/9/16
5/17/16
5/20/16
5/24/16
5/25/16
5/27/16
6/6/16
6/7/16
6/27/16
7/8/16
7/18/16
8/29/16
8/30/16
9/6/16
9/7/16
9/9/16
9/16/16
9/19/16
9/23/16
10/5/16
10/6/16
10/17/16
10/18/16
10/19/16
10/20/16
10/31/16
11/1/16
11/2/16
11/29/16
12/6/16
1/10/17
1/23/17
3/1/17
3/9/17
4/4/17

2

DSM-000823

<u>O'Reilly, Sara</u>

3/7/2017
3/8/2017
4/3/2017

<u>Petersen, Coryn</u>

9/12/2016
9/13/2016
11/3/2016
2/15/2017

3

DSM-000824

| LWP Number | Date(s) submitted to LTSC | Date(s) Completed | Summary | Documents moved to secure folders | Documents not in secure folders |
|---|---|---|---|---|---|
| LWP 1 | 3/18/2016 | 4/12/2016 | Processing email files from Yahoo! thumb drive | | 146522 |
| LWP 2 | 4/27/2016 | 5/3/2016 | First-round filtering for potential attorney-client privileged information | 33161 | 113361 |
| LWP 3-4 | 6/7-9/2016 | 6/9-10/2016 | Second-round filtering for potential attorney-client privileged information | 1494 | 111867 |
| LWP 5-7 | 10/19/2016 - 11/7/2016 | 10/20/2016 - 11/07/2016 | Third-round filtering for search term adamsmonahan | 105185 -105185 | 111867 |
| LWP 8 | 4/4/2017 | 4/4/2017 | Fourth-round filtering for relevance search terms | 68940 | 42927 |



GOVERNMENT
EXHIBIT
Zeitz 3
17-CR-64 (DWF/KMM)

LWP #2

## Maria, David (USAMN) 1

| | |
|---|---|
| **From:** | Maria, David (USAMN) 1 |
| **Sent:** | Thursday, April 14, 2016 8:45 AM |
| **To:** | Kokkinen, John (USAMN) |
| **Subject:** | ADAMS – Search Terms for Privilege Filter.docx |

Here is my initial cut at a list of search terms that could be used to filter the potentially privileged documents in the email database.  Once you've reviewed, let me know, and we can shoot to Tim for his input.





**GOVERNMENT EXHIBIT**

Zeitz 4
17-CR-64 (DWF/KMM)

## SEARCH TERMS TO ISOLATE POTENTIALLY PRIVILEGED DOCUMENTS
## ADAMS/MONAHAN

### [AS OF 4/14/2016]

#### General Terms

privilege!
attorney
lawyer
advice
counsel
acp
"work product"
"law firm"

#### Terms related to law firms used by Apollo/ADGC/Adams

adamsmonahan
adamsgrumbles
sankovitz
amllp
wc.com
merchantgould
zouvas
dorsey
"K&L"
klgates
schwegman
slwip
Fredrikson
fredlaw
anthonyostlund
Kopecky
ksblegal
latham
watkins
lw.com
Sikora

2

Thoughts on this?  If everyone is good with this approach, we should be able to open up for review the database with the documents that did not hit on these search terms.

Obviously, this will be an ongoing process to identify potentially relevant documents, and, if we see additional firms or lawyers show up in the emails, we can run searches to segregate these documents.

**Czapko, Daniel (USAMN)**

| | |
|---|---|
| **From:** | Czapko, Daniel (USAMN) |
| **Sent:** | Monday, April 25, 2016 4:30 PM |
| **To:** | Maria, David (USAMN) 1 |
| **Subject:** | Adams Search terms |
| **Attachments:** | Spedific Search Terms.xlsx |

David,

These are the breakdowns of number of documents. The earlier number of 20,000 was lower due to overlap (more than one hit in a document).

Thanks,
Dan

1

| TERM | Doc Hits |
|---|---:|
| adamsgrumbles | 1,495 |
| adamsmonahan | 8,003 |
| amllp | 1,733 |
| anthonyostlund | 15 |
| dorsey | 2,438 |
| fredlaw | 89 |
| fredrikson | 633 |
| K&L | 174 |
| klgates | 34 |
| kopecky | 306 |
| ksblegal | 328 |
| latham | 3,968 |
| lw.com | 3,134 |
| merchantgould | 94 |
| sankovitz | 1,299 |
| schwegman | 1,531 |
| sikora | 736 |
| slwip | 1,394 |
| watkins | 3,604 |
| wc.com | 96 |
| zouvas | 1,006 |
| **Total** | **32,110** |

**Maria, David (USAMN) 1**

| | |
|---|---|
| From: | Maria, David (USAMN) 1 |
| Sent: | Tuesday, April 26, 2016 2:15 PM |
| To: | Rank, Timothy (USAMN); Kokkinen, John (USAMN) |
| Subject: | Adams Privilege/Taint Review |

Dan ran the search terms, and the "general" search terms ("privilege!," "attorney," etc.) were hitting on 70-80% of the documents, due in large part to standard disclaimers that appeared on many/most of the emails.

The more specific terms also had a substantial amount of hits. The specific terms used and the number of each are set forth below:

| TERM | Doc Hits |
|---|---|
| adamsgrumbles | 1,495 |
| adamsmonahan | 8,003 |
| amllp | 1,733 |
| anthonyostlund | 15 |
| dorsey | 2,438 |
| fredlaw | 89 |
| fredrikson | 633 |
| K&L | 174 |
| klgates | 34 |
| kopecky | 306 |
| ksblegal | 328 |
| latham | 3,968 |
| lw.com | 3,134 |
| merchantgould | 94 |
| sankovitz | 1,299 |
| schwegman | 1,531 |
| sikora | 736 |
| slwip | 1,394 |
| watkins | 3,604 |
| wc.com | 96 |
| zouvas | 1,006 |
| Total | 32,110 |

Because our specific search term list was comprehensive, I believe that we are okay just sticking with these terms and dispensing with the general terms. My suggestion would be to segregate/eliminate from our review all of the documents that hit on all of the specific search terms except for "adamsmonahan," "adamsgrumbles," "amllp," and "zouvas," as they were all firms that performed legal work for Apollo/Scio, or are firms that have assisted in defending Adams and Monahan in connection with the SEC action (and our investigation). We would then have the taint team review these approx. 12,000 documents for privilege, releasing to us those that are determined not to be privileged. If we think that 12,00 docs are too many for the taint team to review, we can come up with "relevance search terms" to cull this down to a more manageable number.

1

**Czapko, Daniel (USAMN)**

| | |
|---|---|
| **From:** | Czapko, Daniel (USAMN) |
| **Sent:** | Wednesday, April 27, 2016 4:11 PM |
| **To:** | USALTSC-Coordinators |
| **Cc:** | Zeitz, Mark (USAMN) |
| **Subject:** | RE: Edward Adams : C1948W10173 : LWP Approval Request – ACTION REQUIRED |

Approve        This is for the Edward Adams II workspace.

Thanks,
Dan

**Daniel Czapko | Litigation Support Specialist**
U.S Attorney's Office | District of Minnesota
600 U.S Courthouse | 300 South Fourth Street | Minneapolis, MN 55415
612-664-5790 | daniel.czapko@usdoj.gov

**From:** USALTSC-Coordinators
**Sent:** Wednesday, April 27, 2016 3:51 PM
**To:** Czapko, Daniel (USAMN); USALTSC-Coordinators
**Cc:** Zeitz, Mark (USAMN)
**Subject:** Edward Adams : C1948W10173 : LWP Approval Request – ACTION REQUIRED
**Importance:** High

# LTSC
## *EOUSA Litigation Technology Service Center*
1600 Hampton Street, Room 207 - Columbia, SC 29208

**LTSC Litigation Work Plan Approval Request**

Work Order: C1948W10173
Case Name: Edward Adams
Work Due On: 5/2/2016

To: Dan Czapko

Thank you for submitting a Preliminary Work Order (PWO) to EOUSA's Litigation Technology Service Center (LTSC). After reviewing your PWO, we request your approval of the following proposed Litigation Work Plan (LWP).

Please read the following Summary of Work and Important Notices below **carefully**. The Summary of Work describes exactly how your Work Order will be fulfilled. Make sure that the Summary of Work is **accurate** and **complete**. Please also make sure you have read and understand the Important Notices below.

1

7

If you approve this LWP as it is written, please reply to this email and type "Approve" in the response.

If there is any change needed to this LWP as it is written, please reply to this email with updates needed in the response.

For LTSC Container #44805:
The LTSC will create a new secured folder named "Taint Review". This folder should be accessible to the district admins.

Results of the following saved searches will be moved into the "Taint Review" folder:
Pot Priv - adamsgrumbles
Pot Priv - adamsmonahan
Pot Priv - amllp
Pot Priv - zouvas

For LTSC Container #44806:
The LTSC will create a new secured folder named "Not For Review". This folder should be accessible only to the LTSC.

Results of the following saved searches will be moved into the "Not For Review" folder:
Pot Priv - anthonyosthund
Pot Priv - dorsey
Pot Priv - fredlaw
Pot Priv - fredrikson
Pot Priv - K&L
Pot Priv - klgates
Pot Priv - kopecky
Pot Priv - ksblegal
Pot Priv - latham
Pot Priv - lw.com
Pot Priv - merchantgould
Pot Priv - sankovitz
Pot Priv - schwegman
Pot Priv - sikora
Pot Priv - slwip
Pot Priv - watkins
Pot Priv - wc.com

Summary of Work

For work order "C1948W10173," we will be processing 2 containers of the following type: "Electronic Folder." We will be applying a label to each container received.

2 Electronic Folders will be processed with "Relativity Folder Updates" and the following tasks will be performed:

- Coordinator Review and Assign
- Create New Secured Folder

- Move Documents
- Tech QC of Deliverable
- Coordinator QC/Sign-off

The following hosting jobs will be completed:

- **W10173-19306:** 0.00 GB consisting of 11381 docs, 0 pages, and 0 native files loaded to Relativity
- **W10173-19305:** 0.00 GB consisting of 10457 docs, 0 pages, and 0 native files loaded to Relativity

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

## IMPORTANT NOTICES: READ BEFORE APPROVING

- **SECURE SHIPPING PROCEDURES:** Before you ship materials to the LTSC, please note that the LTSC requires strict compliance with the Secure Shipping USAP, No. 3-13.200.005, and noncompliance may result in loss or damage to sensitive materials and require the filing of a formal Security Incident Report with your District Office Security Manager (DOSM) and others in accordance with the LTSC USAP, No. 3-16.000.002 (Part 6.B, "Project Security"). The Secure Shipping USAP mandates the use of either the new FedEx Secure Shipping Admin web portal or Registered Mail on all shipments of information protected from disclosure by law. Furthermore, such shipments must be packaged in accordance with the Secure Shipping USAP's dual-container requirements – using the special secure shipping tape/labels identified in USAP Attachment 1 as appropriate – and you must provide the LTSC with your shipment's tracking number(s) prior to shipping your materials. Also note that Electronically Stored Information (ESI) must be copied and encrypted per the LTSC USAP before shipment (do not send original ESI). Please contact your LTSC Project Coordinator for more information, and carefully review the LTSC Shipping Requirements for tips regarding how to securely ship your materials.

- **HARD COPY REASSEMBLY:** For projects involving the scanning of hard copy documents, the LTSC provides "physical unitization" services by inserting prep sheets : (1) where there are physical breaks among materials (e.g., staples, clips, rubber bands); or (2) pursuant to clearly specified box/folder instructions from the District. Upon completion, documents will be returned to the folder/binder/etc from which they were removed, but staples, clips, rubber bands, etc. will not be reapplied. Rather, color-coded prep sheets will be included within the returned documents, and the prep sheets will contain markings evidencing the type of fastener that the LTSC removed.

- **LTSC RETENTION PRACTICES MANDATE PROMPT NOTIFICATIONS OF CHANGE REQUESTS:** The LTSC retains only temporarily the documents and electronic data that Districts provide to the LTSC, as well as the electronic data that the LTSC generates in connection with processing those materials. As a result, if you require modifications to an LTSC deliverable, *you must make the modification request as soon as possible, and in no event later than 60 days of the fulfilment of your request.* If you send the LTSC hard copy documents, the LTSC will return those documents to you. If you provide the LTSC electronic data on physical storage media (e.g., hard drives, CDs, etc.), the LTSC will return that physical storage media (with the data) to you. If you provide electronic data to the LTSC by copying the data to the LTSC's District file share, the data copied to the share will not be returned to you. Rather, data copied to the District file share will be deleted quickly—typically immediately after the data has been staged. In addition, all data the LTSC generates when processing hard copy documents or electronic data, *except data a District has*

*requested be loaded into a hosting platform (i.e., Relativity or iCONECT)* , will be removed from LTSC servers within 60 days of the fulfillment of your service request. Therefore, if you require modifications to an LTSC deliverable, it is imperative that you notify the LTSC as soon as possible, and in no event later than 60 days of the fulfillment of your request. If you do not make modification requests within 60 days, a modification request will not receive priority over the LTSC's current workload, and you will have to submit a new Preliminary Work Order, send the documents or electronic data to the LTSC again, and allow for the time needed for the LTSC to re-do all its prior processing work.

---

[ LTSC User's Guide ]          [ About the LTSC ]          [ Contact Us ]          (803) 705-5432

10

**Czapko, Daniel (USAMN)**

| | |
|---|---|
| **From:** | Czapko, Daniel (USAMN) |
| **Sent:** | Tuesday, May 3, 2016 4:18 PM |
| **To:** | Maria, David (USAMN) 1 |
| **Subject:** | RE: Adams II |

Yes. You will only have access to that material. There is a Taint Review folder that you won't see that we can give the review team access to. The other material is set aside separately which only the LTSC has access to at this time.

Dan

**From:** Maria, David (USAMN) 1
**Sent:** Tuesday, May 03, 2016 3:48 PM
**To:** Czapko, Daniel (USAMN)
**Subject:** Re: Adams II

Thanks. Does that mean that all potentially privileged docs have bee removed from the main database?

Sent from my iPhone

On May 3, 2016, at 3:41 PM, Czapko, Daniel (USAMN) <dczapko@usa.doj.gov> wrote:

> David,
>
> The Adams II Relativity Taint review folder has been set up. Let me know if you have any questions and when you have a list of the review team.
>
> Thanks,
> Dan