UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-64 (DWF/KMM)

UNITED STATES OF AMERICA,

Plaintiff,

v.

EDWARD S. ADAMS,

Defendant.

**GOVERNMENT'S POST-HEARING MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and John Kokkinen, Assistant United States Attorney, respectfully submits this post-hearing response to defendant Edward S. Adams's motion to suppress [Dkt 147].

Dated: July 23, 2018

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

BY:  JOHN KOKKINEN
Assistant U.S. Attorney
Attorney Id No. 0388356
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415
612-664-5600

## TABLE OF CONTENTS

I.  INTRODUCTION .......................................................................................... 1

II. BACKGROUND ........................................................................................... 4

III. ARGUMENT ................................................................................................ 6

   A.  THE SEARCH WARRANT WAS SUFFICIENTLY PARTICULARIZED AND
      WAS NOT OVERBROAD. ........................................................................ 6

     1.  Legal Standards ............................................................................... 6
     2.  The Search Warrant Was Sufficiently Particularized ..................... 7
     3.  The Search Warrant Was Not Overbroad. ..................................... 13
     4.  The Good Faith Exception ............................................................ 17

   B.  THE EXECUTION OF THE SEARCH WARRANT WAS REASONABLE AND
      COMPLIED WITH RULE 41. ................................................................ 18

     1.  Legal Standards ............................................................................. 21
     2.  The Government Searched Based On The Scope Of The Warrant. ................. 22
     3.  The Government Did Not Make Unauthorized Uses Of Documents. ............. 28
     4.  The Government Did Not Review Documents More Than Was Necessary. ... 33

       a.  The government is not limited to a single review of documents to
         determine whether they fall within the scope of the warrant. ................... 33
       b.  Most of the documents that Mr. Adams claims were reviewed
         repeatedly actually fall within the scope of the warrant ............................ 38

     5.  The Government Seized Documents Based On The Terms Of The Warrant. . 44
     6.  The Government Took Reasonable Measures To Minimize Exposure
       To Privileged Material. .................................................................. 47

       a.  The documents at issue ............................................................... 47
       b.  Procedures used to avoid exposure to potentially privileged documents. .. 48
       c.  Draft communications (in camera Exhibits A, D, and G) ........................... 54
       d.  Communication with Mr. Hopeman (*in camera* Exhibit J) ....................... 59
       e.  Communication with Mr. Brever (*in camera* Exhibits K and L) ............... 62
       f.  Communications with the Murry firm (*in camera* Exhibits M through T). 64

         i.  The government had a substantial basis for believing that the
           communications with the Murry firm were not privileged ................... 67
         ii.  Inconsistencies in privilege assertions. .................................................. 70
         iii. Waiver by the filing of amended returns. ............................................... 73
         iv.  The crime-fraud exception. .................................................................... 76
       g.  Communications with Mr. Hartman (*in camera* Exhibit U) ..................... 82

   C.  THERE WAS NO FLAGRANT DISREGARD FOR THE SCOPE OF THE WARRANT....... 83
   D.  MR. ADAMS'S REQUESTED RELIEF ........................................................ 85

IV. CONCLUSION .......................................................................................... 87

# I.      INTRODUCTION

In support of his argument that the search warrant violated his Fourth Amendment rights, Mr. Adams makes three primary arguments. *First*, he claims that the warrant lacked particularity and was overbroad. He argues that the list of items to be seized, Attachment B, lacked particularity and was overbroad because, he claims, it was untethered to the probable cause articulated in the affidavit. The Court should reject this argument.

The affidavit established probable cause to believe that Mr. Adams was involved in a scheme to commit mail and wire fraud involving Apollo Diamond, Inc. ("Apollo Diamond") and Apollo Diamond Gemstone Corporation (collectively, "Apollo" or "the Apollo companies"). The affidavit indicated that the victims of that fraud scheme were investors in Apollo and their successor company, Scio Diamond Technology Corporation. The warrant appropriately identified specific categories of evidence to be seized that were related to that fraud scheme during a specific time period. Mr. Adams's suggestion that the government was not permitted to seize documents not directly connected to the precise manner and means identified in the affidavit is meritless. The plain language of the warrant covers Mr. Adams's fraud scheme and is not limited to a single manner and means of perpetrating that fraud. In essence, Mr. Adams argues that in a complex fraud case, the government's search must be limited to only the executions of the fraud explicitly mentioned in the affidavit and the government cannot look for and ultimately seize additional evidence of the same fraud scheme—against the same victims. Under Mr. Adams's conception, a warrant would permit the government to seize only the evidence that corroborates what it already knows. But there is no Eighth Circuit or Supreme Court

1

case that stands for such a proposition.  To the contrary, the Supreme Court rejected a very similar argument in *Andresen v. Maryland.*

*Second*, he claims that the government searched for, reviewed, and used documents outside the scope of the warrant and that the efforts made to ultimately separate documents that were outside the scope of the warrant was unreasonable and in reckless disregard of Rule 41 of the Federal Rules of Criminal Procedure.  He elaborates that the government ran searches for documents he claims are outside the scope of the warrant; made unauthorized use of documents (e.g., to prepare for witness interviews and prepare a tax case); reviewed documents he claims are outside the scope of the warrant for too long a period of time or on too many occasions; unreasonably categorized as "seized," documents that were based on "relevance" search terms rather than "scope" search terms; and employed measures he claims were inadequate and unreasonable to prevent privileged communications from being reviewed.  The Court should reject this argument.

The search warrant was executed in a way that was designed to find evidence related to the fraud scheme alleged in the affidavit and that fell within the scope of the warrant. Under the applicable law, the government would have been authorized to view every single email in the accounts to determine whether the email was within the scope of the warrant. Instead, the government used keyword searches to limit its review to only those documents that would be reasonably likely to contain information pertinent to the investigation.  The government ran searches designed to retrieve documents that would illustrate exactly what Mr. Adams's role was within the Apollo companies at various points and how his role changed over time.  The government ran searches designed to retrieve documents that

2

would show the nature of the roles of other individuals and entities connected to the Apollo companies and provide insight into the dynamics of Mr. Adams's relationships with those other individuals and entities. The government also searched for documents that might give a picture of the overall financial health of the Apollo companies at any given moment and what prospects the companies had to become a profitable endeavor. And the government ran searches to find documents that would show consciousness of wrongdoing by using, for example, search terms such as "jail," "criminal," "fbi," and "prison," to name a few.

All of these searches were calculated to (and generally did) find documents within the scope of the warrant: to show Mr. Adams's opportunity to commit the fraud crimes alleged (e.g., his role in the companies, vis-à-vis others, over the years, including those in the years prior to the Apollo/Scio transaction), his motive to do so (e.g., the overall financial health and likely prospects of the companies, including in the years prior to the Apollo/Scio transaction), and his intent to do so (e.g., the use of certain words in discussing matters touching on the Apollo companies and the Apollo/Scio transaction). Likewise, the government used and ultimately "seized" documents that bore a logical connection to the warrant and the probable cause articulated in the affidavit. Mr. Adams's arguments to the contrary are wrong because they are based on a characterization of the warrant's scope that is inconsistent with both the law and a common sense reading of the warrant's language.

*Third*, he claims the government ultimately seized a large number of documents that are outside the scope of the warrant or were privileged, exhibiting what he refers to as a flagrant disregard for the scope of the warrant. According to him, nearly half of the

3

documents seized are outside the scope of the warrant and a number of privileged documents were viewed or seized, or both. The Court should reject this argument.

Mr. Adams's cramped definition of the scope of the warrant is contrary to the plain language of the list of items to be seized and to controlling Eighth Circuit precedent. The majority of the documents that Mr. Adams claims are outside the scope of the warrant are, in fact, within the scope of the warrant. In addition, the government took precautions to prevent exposure to privileged communications, both prior to and during the review of the Yahoo! accounts. Those precautions succeeded in removing large numbers of potentially privileged documents, and the Relativity activity log demonstrates that on those handful of occasions when a team member was exposed to a potentially privileged communication, typically, they quickly moved onto the next document or conducted a new search.

The execution of the search warrant in this case was not perfect. But the Fourth Amendment does not require perfection; it requires reasonableness. "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014). Mr. Adams's motion to suppress should be denied.

## II.    BACKGROUND

Both parties have submitted extensive written submissions summarizing the relevant background. The government incorporates by reference its previous submissions [Dkt. 49, 52, 52-1], supplemented by a brief summary of the case and citations to the record in the applicable argument section of this memorandum.

4

Mr. Adams executed a scheme to defraud the Apollo companies. The fraud started in 2006 when Mr. Adams was involved in soliciting individuals to invest in Apollo with the understanding that their investments would be used to fund Apollo's operations and, with any luck, turn Apollo into a profitable endeavor. But the investors were deceived. Mr. Adams directed that their investments (millions of dollars) be deposited into accounts that were unknown to the principals of Apollo and over which Mr. Adams had sole control, after which he used much of the investor funds for his own benefit. When the Apollo companies were on the brink of insolvency and the companies and their officers were facing potential litigation from disgruntled shareholders, Mr. Adams orchestrated the transfer of Apollo's assets to the Scio company in an effort to lull the investors and prevent them from learning that large amounts of their money (and, in some cases, all of their money) never made it to Apollo and instead went to Mr. Adams. And, of course, Mr. Adams did not report the proceeds of this fraud on his tax returns, and later misreported them on amended returns to avoid the substantial tax burden that they generated. As the superseding indictment indicates, all three aspects (the misleading of investors in the earlier years, the lulling efforts designed to prevent detection in the later years, and the misrepresentations in tax returns) are intertwined in a single scheme and course of criminal conduct.

III.    **ARGUMENT**

    **A. The Search Warrant Was Sufficiently Particularized And Was Not Overbroad**

        1.  <u>Legal Standards</u>

The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." A search warrant complies with the Fourth Amendment when it includes three elements: it must be issued by a neutral magistrate; it must be based on a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense;" and it must satisfy the particularity requirement. *Dalia v. United States*, 441 U.S. 238, 255 (1979).

"To satisfy the particularity requirement of the Fourth Amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014) (citation omitted). "[W]hether a warrant fails the particularity requirement cannot be decided in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (citation omitted). Moreover, the particularity requirement "is one of practical accuracy rather than of hypertechnicality." *Sigillito*, 759 F.3d at 923 (citation and internal quotation marks omitted).

Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure specifies that a warrant "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." The Advisory Committee Notes explain that the two-step process is "inherent in searches for electronically stored information." Fed. R. Crim. P. 41, Advisory Committee's Notes to 2009 Amendments. The Notes recognize that electronic storage media "commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location." *Id.* The Rule accordingly "acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." *Id.*

2. The Search Warrant Was Sufficiently Particularized

The Yahoo! warrant described with particularity the information to be seized and followed Rule 41's two-step approach for the seizure of electronic evidence. The warrant in step one sets forth with particularity the location to be searched, namely, information associated with Mr. Adams's two email accounts stored at the premises of Yahoo! Inc. *See* DX Ex. 11, Attachment A & Attachment B, Section I.[1] In step two, the warrant particularized the information the government was authorized to seize. It included an

---

[1] All references to exhibits that have the prefix "DX" are from the binders that Mr. Adams submitted at the suppression hearing on January 8-9, 2018.

opening provision that referred to the email accounts targeted in step one and contained a

description of the crimes, individuals, and dates for information to be seized:

> All information described above in Section I that constitutes fruits,
> contraband, evidence and instrumentalities of violations of 18 United States
> Code, Sections 1341 and 1343, those violations involving Edward S. Adams
> and Michael R. Monahan and occurring after October 25, 2006, including,
> for each account or identifier listed on Attachment A, information pertaining
> to the following matters:

This opening paragraph was followed by a list of examples of the types of documents to

be seized that pertained to specified business entities and the records, communications, and

transactions of those entities.  *See id.*, Attachment B.  Judge Rau's authorization of the

disclosure of the entire account is wholly consistent with Rule 41's acknowledgment that

"officers may seize or copy the entire storage medium and review it later to determine what

electronically stored information falls within the scope of the warrant."  Fed. R. Crim. P.

41, Advisory Committee's Notes to 2009 Amendments.

First, by referencing the "information described above in Section I," the warrant

was limited to the email accounts edwardsadams@yahoo.com, jafman1@yahoo.com, and

michaelrmonahan@yahoo.com.  Second, the warrant was limited to "fruits, contraband,

evidence, and instrumentalities" of mail and wire fraud.  Third, the warrant was limited to

evidence of criminal violations involving "Edward S. Adams and Michael R. Monahan."

Fourth, the warrant specified a time frame, seeking information from "after October 25,

2006."  Fifth, the warrant includes a list of examples of documents and records that pertain

to specified business entities:  paragraphs II.a.1, II.a.2, and II.a.3 of Attachment B describe

records relating to ADI, ADGC, Private Scio, Public Scio, Focus, and ESA.

Taken together, these criteria were "sufficiently definite to enable the searching officers to identify the property authorized to be seized." *Sigillito*, 759 F.3d at 923 (citation omitted). Even without the list of specific documents and records, the warrant's opening provision would likely satisfy the Fourth Amendment's particularity requirement. *See, e.g.*, *United States v. Dockter*, 58 F.3d 1284, 1288 (8th Cir. 1995) (stating that "a statutory reference can sufficiently limit the scope of a search" and upholding a warrant provision seeking evidence of a violation of 18 U.S.C. § 922). Here, however, in addition to the opening provision specifying the targeted email accounts, crimes, individuals, and date range, the warrant includes a further illustrative list of records to be seized.

The Eighth Circuit and the Supreme Court have held that provisions in warrants broader than the one here are sufficiently particular when read in the context of an accompanying illustrative list of specific categories of records. *See Fiorito*, 640 F.3d at 347; *Andresen v. Maryland*, 427 U.S. 463, 479 (1976). In *Fiorito*, the defendant challenged a search warrant authorizing a search for "[e]ntire files involving [Fiorito], including but not limited to" a specific list of records. *Fiorito*, 640 F.3d at 346. The opening phrase of this provision—"[e]ntire files involving [Fiorito]"—is far broader than the opening provision of the warrant here, which also includes limitations based on crimes, dates, and specified email accounts. But the Eighth Circuit held that the *Fiorito* warrant was sufficiently particular. It instructed that "[t]he broad phrase at the opening must be read in the context of the specific list that follows." *Id*. at 347 (citing *Andresen*, 427 U.S. at 480). In light of the specific list, "[t]he warrant did not authorize a blanket search of documents for no particular purpose, but rather for the purpose of discovering evidence of an ongoing,

9

well-defined equity-stripping scheme." *Id*. The court held that "in light of the illustrative list of items to be seized and the overarching purpose of the search, we conclude that the warrant was sufficiently particularized." *Id*.

Similarly, in *Andresen*, the Supreme Court considered a challenge to a warrant issued in the investigation of a real estate transaction; the warrant authorized seizure of "other fruits, instrumentalities and evidence of crime at this (time) unknown." 427 U.S. at 479. Despite the breadth of this provision, the Supreme Court upheld the warrant. The Court reasoned that that the broad phrase followed "a lengthy list of specified and particular items to be seized, all pertaining to Lot 13T" was sufficiently particular and concluded that "[w]e think it clear from the context that the term 'crime' in the warrants refers only to the crime of false pretenses with respect to the sale of Lot 13T." *Id*. at 480-81.

Under the reasoning of *Fiorito* and *Andresen*, the warrant here is more than sufficient to satisfy the Fourth Amendment's particularity requirement. The opening provision alone is reasonably particular, given that it is limited by targeted email accounts, as well as specified crimes, individuals, and dates. The illustrative list that follows, which seeks records pertaining to ADI, ADGC, Private Scio, Public Scio, Focus, and ESA, demonstrates that the opening provision authorized a search to discover evidence of fraud in conjunction with those business entities. The warrant was sufficiently particular.

Mr. Adams's argument that the warrant lacks particularity ignores the warrant's illustrative list of specific examples of categories of records to be seized. Nor does he address the principle of *Fiorito* that the opening phrase of a warrant "must be read in the context of the specific list that follows." Indeed, none of the cases cited by Mr. Adams

involved a warrant that included specific lists of records like the ones here.  *See, e.g.*, *In re Grand Jury Proceedings*, 716 F.2d 493, 497 (8th Cir. 1983); *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987).  Under binding Eighth Circuit and Supreme Court precedent, the illustrative list of specific items must be considered when assessing particularity, and the list in this case renders the Yahoo! search warrant sufficiently particular.

For the above reasons, the warrant was sufficiently particularized.  Even if it were lacking in particularity, however, the affidavit and the illustrative list provides any necessary additional particularity.  *See United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008) (allegations in an affidavit, combined with a warrant's list of general items to be seized, satisfied particularity requirement).  Contrary to Mr. Adams's suggestion, the government did not seek, and the warrant did not give, authority to search for and seize information of the generic crime of mail and wire fraud but of the specific crime of mail and wire fraud involving the Apollo/Scio companies.  In this regard, the warrant here is readily distinguishable from the warrants in the cases on which Mr. Adams relies.

The warrant in *Rickert v. Sweeney* authorized a general search limited only by references to the general conspiracy[2] and tax evasion statutes.  813 F.2d 907, 909 (8th Cir. 1987).  The affidavit in *Rickert* could not save the warrant for two reasons.  First, the warrant in *Rickert* did not incorporate or attach the affidavit, nor was the affidavit present at the search.  *Id*.  Here, by contrast, the affidavit accompanied the warrant when it was

---

[2] The warrant in *Rickert* cited 18 U.S.C. § 371.  On its face, § 371 is highly generic and unparticularized, unlike the mail or wire fraud statutes, because § 371 could encompass any conspiracy to commit virtually any substantive offense as well as a conspiracy to defraud the United States.

presented to Judge Rau—as evidenced by the warrant's reference to the affidavit and Judge Rau's signature at the bottom of the affidavit—the warrant incorporated the attachments and referenced the affidavit, which also incorporated the attachments, and the warrant and the affidavit were available to guide the agents when executing the warrant. *See United States v. Hamilton*, 591 F.3d 1017, 1026 (8th Cir. 2010) (explaining that a warrant's reference to a sealed affidavit was analogous to the warrant's incorporation of the affidavit considering that the affidavit had been signed by the magistrate, thus making it clear that the magistrate had the opportunity to restrict the scope of the search). Second, the affidavit in *Rickert* established probable cause to search for evidence of crimes in connection with one particular real estate project but the warrant authorized the government to search for evidence of crimes in connection with all real estate projects in which the businesses searched were involved. 813 F.2d 909. Here, the warrant, in combination with the list of items to be seized and the affidavit, authorized the government to search for evidence of a scheme to defraud investors in the Apollo/Scio companies rather than authorizing a search for evidence of a generic scheme to defraud involving any unspecified individuals or entities.

Similarly, the warrant in *In re Grand Jury Proceedings*, 716 F.2d 493, 497-99 & n.9 (8th Cir. 1983) was insufficiently particularized because it (1) did not limit its scope to specific transactions, individuals (namely, clients of the defendant's bail bonding company), specific files, or specific victims (namely, surety companies) and (2) did not even specify the type of criminal offense, instead referring only to an "interstate fraud." Here, the warrant specified the type of criminal offense and, when read in conjunction with

12

the illustrative list of specific items to be seized, provided additional particularity as to transactions, individuals, and, importantly, the alleged victims of the fraud.

And likewise, in *United States v. Roche*, the warrant was insufficiently particularized and overbroad because it authorized a search for all documents pertaining to all types of insurance rather than just automobile insurance, which was the foundation of probable cause.  614 F.2d 6, 7-8 (1st Cir. 1980).  The warrant and the list of items to be seized in this case made clear that the search was for documents pertaining to fraud involving the specific entities identified in Attachment B, including the Apollo companies.

### 3.  The Search Warrant Was Not Overbroad

The breadth of items authorized by the warrant to be seized was appropriate because of (1) the latitude afforded to the government in complex fraud cases to put together the pieces of a paper puzzle and (2) the affidavit having identified a logical basis for looking at communication as far back as October 2006.

Mr. Adams invokes the affidavit in an attempt to make his overbreadth argument. Specifically, Mr. Adams claims that the affidavit provides probable cause pertaining only to one manner and means of the execution of the fraud scheme, namely, the 2011-2012 asset purchase transactions between Apollo and Scio.  Mr. Adams concludes that although the affidavit supported probable cause to investigate fraud surrounding those transactions, it did not provide probable cause to search for evidence of fraud unrelated to those transactions even if it is evidence that still involves suspected fraud involving Apollo/Scio. In other words, Mr. Adams's argument is one over what level of specificity—that is, what scope—the affidavit imparts to the items authorized by the warrant to be seized.  Under

13

Mr. Adams's view, the affidavit imparts to the warrant a scope strictly limited to only what the affiant knew when she applied for the warrant—in essence, the government may look for and review only those documents that corroborate what is already known.[3]  As an initial matter, Mr. Adams's attempt to segregate the fraud on Apollo investors in the earlier years from the Apollo/Scio transactions and characterize them as two separate fraud schemes should be rejected; they are both part of the same, single fraud scheme.

To be sure, "[t]he scope of the warrant, and the search, is limited by the extent of the probable cause . . . .  [P]robable cause must exist to seize all the items of a particular type described in the warrant," and "[t]hus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular things named in the warrant." *In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991).  However, in complex financial fraud cases, courts, including the Supreme Court, permit breadth in a warrant out of a recognition of "the need to assemble a 'paper puzzle.'" *United States v. Maali*, 346 F. Supp. 2d 1226, 1240 (M.D. Fla. 2004) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982)).  In *Andresen*, the Supreme Court elaborated on this "paper puzzle" concept:

> Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's false-pretense scheme with respect to [the real estate lot at issue] could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show

---

[3] The importance of resolving the dispute over the scope of the warrant goes not only to Mr. Adams's overbreadth argument but also to his later arguments about the execution of the warrant.  That is because, as discussed more fully below, a substantial portion of the documents that Mr. Adams claims are outside the scope of the warrant are so only because of the way that he seeks to define the scope.

comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.

427 U.S. at 480 n.10.

The affidavit here alleged a complex fraud scheme that involved the Apollo/Scio companies, Mr. Adams's various roles over time in those companies and other companies, including Focus Capital and ESA Consulting, and the significance of the Apollo/Scio transaction to that complex fraud scheme.  Many documents would be pertinent to that fraud scheme, and the "[t]he Government was, quite reasonably, interested in the various businesses and the *sources and flow of funds among the individuals and entities involved*." *Maali*, 346 F. Supp. 2d at 1241 (emphasis added).  Indeed, the warrant appropriately authorized the seizure (from October 25, 2006) forward, of documents, records, and communications related to the business and financial transactions of the Apollo/Scio companies, Focus Capital, and ESA Consulting, including "bookkeeping ledgers, journals, reports, and other bookkeeping records . . . which record, identify, and itemize the dates, amounts, and nature and classification of *all income and expenses of the above business entities*," as well as "documents and records reflecting *communications with shareholders or prospective shareholders of [the Apollo companies]*."  DX 11, Attachment B ¶¶ II.a.1.ii, II.a.3 (emphasis added).  Just as in *Maali*, the specific categories of documents—and the time-frame for those documents—"are not so far removed from the crimes alleged that they are not connected to the probable cause allegations, and they do not render the warrant[] unconstitutionally overbroad."  346 F. Supp. 2d at 1241.

15

The weakness of Mr. Adams's argument is further demonstrated by the fact that he ignores critical portions of the affidavit.  Mr. Adams contends that the affidavit identifies the first alleged misrepresentation as taking place in the spring of 2011.  Thus, he seems to suggest, there was no probable cause to search for and seize evidence prior to that date.  But one of the misrepresentations or omissions that was alleged to have occurred during the course of the Apollo/Scio transactions was Mr. Adams's and Monahan's "roles in [the Apollo companies]," *see* DX 10, Affidavit ¶ 19, which were detailed in the affidavit going back as far as 2004 and included a description of his role with the Apollo companies made in an SEC filing on October 25, 2006, *see id.*, Affidavit ¶ 8, and in a communication on November 30, 2009, *see id.*, Affidavit ¶ 30.  Any documents tending to show the nature and extent of Mr. Adams's control over the affairs of Apollo, including those in the years prior to 2011, is pertinent to the scheme alleged in the affidavit as they provide further indication of the significance of the alleged misrepresentations during the Apollo/Scio transactions and of Mr. Adams's opportunity to use his position(s) to orchestrate the Apollo/Scio transaction to his benefit.  The affidavit also described Mr. Adams's role in entities such as Focus Capital and ESA Consulting dating back to 2005, *see id.*, Affidavit ¶ 10, and later explained the significance of those entities with respect to the Apollo/Scio transaction, *see id.*, Affidavit ¶¶ 20, 27.  Based on the affidavit, Judge Rau logically authorized the seizure of evidence within Mr. Adams's email accounts going back to October 25, 2006, that related to the Apollo companies, Scio, Focus Capital, and ESA Consulting.

16

4.   The Good Faith Exception[4]

Even if the warrant lacked particularity and was overbroad (as noted above, it is neither), the good faith exception applies and suppression is not required based on the alleged lack of particularity and overbreadth in the warrant.  In *United States v. Leon*, the Supreme Court rejected suppression of evidence obtained by officers acting in objectively reasonable reliance on a search warrant:  "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  468 U.S. 897, 926 (1984).  Consistent with *Leon*, the Eighth Circuit has held that "[e]ven if evidence had been seized pursuant to overly broad warrants, courts need not exclude evidence seized by law enforcement officers acting in objectively reasonable reliance on a warrant issue by a neutral magistrate."  *United States v. Stelten*, 867 F.2d 446, 451 (8th Cir. 1989); *see also United States v. Curry*, 911 F.2d 72, 77 (8th Cir. 1990) ("[T]he *Leon* exception is not automatically inapplicable in every case where a warrant is found invalid on the ground that it is insufficiently particular."); *United States v. Powers*, No. 8:08CR331, 2008 WL 5121925, at *3 (D. Neb. Dec. 1, 2008) ("[The] good faith exception is equally applicable to warrants that violate the particularity requirement of the Fourth Amendment.") (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984)).  Indeed, the good faith exception

---

[4] As explained at the suppression hearing, the government's reliance on the good faith exception applies only to Mr. Adams's facial challenges to the warrant and not to the manner in which the warrant was executed.

generally will be applied to an overly-broad warrant unless "the warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid." *United States v. Travers*, 233 F.3d 1327, 1330 (11th Cir. 2000).

There is no indication that the agent who applied for the warrant in this case, Postal Inspector Kroells, did not believe that the warrant authorized the seizure of the items listed in Attachment B.  Inspector Kroells took all steps that could be reasonably expected of her in applying for the warrant.  She prepared an affidavit, which was reviewed and approved by an AUSA, Jan. 8, 2018 Hr'g Tr. [Dkt. 106] at 92, and presented that affidavit to Judge Rau.  Judge Rau concluded that the affidavit established probable cause to search the email accounts and authorized the search and seizure *as requested*.  A reasonable officer would have concluded that the warrant validly authorized a search of the listed email accounts in Attachment A to seize the list of items in Attachment B.

## B. The Execution Of The Search Warrant Was Reasonable And Complied With Rule 41

Before launching into the analysis, a brief review of the numbers that ultimately inform the analysis of Mr. Adams's arguments is set forth in the table below:

| Description | Count | Citation |
|---|---|---|
| Number of documents produced | 146,522 | Zeitz Ex. 3 (Jan. 8-9 Hr'g) |
| Number of documents after privilege filter on 5/3/16 | 113,361 | Zeitz Ex. 3 |
| Number of documents after privilege filter on 6/10/16 | 111,867 | Zeitz Ex. 3 |

| Number of documents seized after filter on 4/4/17 | 42,927 | Zeitz Ex. 3 |
|---|---|---|
| Number of documents viewed[5] | 7,092 | Maier Decl. [Dkt 148] ¶ 3 |
| Number of documents viewed and seized | 5,485 | Maier Decl. ¶ 3 |
| Number of documents viewed and seized from Mr. Adams's accounts | 3,877 | Maier Decl. ¶ 3 |
| Number of documents viewed and seized not claimed to be privileged | 3,350 | Maier Supp'l Decl. [Dkt 150] ¶ 2 |
| Number of documents viewed and seized claimed to be outside the scope | 1,594 | Maier Supp'l Decl. ¶ 3 |
| Number of documents viewed but not seized | 41 | Maier Decl. ¶¶ 4-9 |
| Number of documents viewed that are claimed to be privileged for purposes of Mr. Adams's motions | 50[6] | Def's Exs. [Dkt 142] 1 and 2, Gov't Ex. 1 |

---

[5] The term "viewed" includes documents that were merely looked at in Relativity, as well as those documents, which in addition to being looked at, were subsequently printed, saved, or emailed, whether that subsequent action happened within the Relativity application, a native application, or the user's email system.  If done through the applicable native application or the user's email system, that subsequent action would not be logged. *See* Lyons Decl. [Dkt 143] ¶¶ 5-6.

[6] Mr. Adams has previously claimed a total of **192** privileged documents/groups of documents, 129 that were part of the final seizure (though not necessarily viewed) and 61 that were viewed but not part of the final seizure.  The declarations submitted in support of his motions state that there were 3,877 of his documents that were part of the final seizure, Maier Decl. ¶ 3, and that 3,350 of those documents are not privileged, Maier Supp'l Decl. ¶ 2, suggesting a total of **527** documents that he claims are privileged.  The government understands that as to the difference (527-192=**335**), Mr. Adams's claims that those documents are subject to a claim of privilege by someone else (Apollo/Scio as Mr. Adams's client and other clients of Mr. Adams) or are subject to a claim of spousal privilege belonging to Mr. Adams and his spouse.  But for purposes of both the pending motion to suppress, as well as the motion to dismiss, Mr. Adams has recently taken the position that only **50** distinct Document IDs—the documents submitted *in camera* as Exhibits A through U, minus Exhibit B, C, E, F, H, and I, which were neither viewed nor seized and were

Several points are worth highlighting:

- Of the original 146,522 documents, nearly 35,000 were removed as part of the privilege filtering processes and the majority of those, more than 33,000, were removed before members of the prosecution team began their review (with the exception, of course, of the brief period of time that Inspector Kroells reviewed documents directly from the thumb drive while taking precautions to avoid reviewing the contents of any potentially privileged information). *See* Zeitz Ex. 3; Jan. 8 Hr'g Tr. 101-104.

- In stark contrast to the picture Mr. Adams tries to paint of the government's review of the email accounts as being unfettered fishing expeditions and general, exploratory rummaging, only 7,092 of the 146,522 were ever viewed and those views were the result of keyword searches that had a logical connection to the crimes being investigated. *See* Zeitz Ex. 10, Kroells Ex. 8, Khan Ex. 2, Belich Ex. 1. The keywords were designed to find documents related to the Apollo companies, Scio, Focus Capital, ESA; the individuals involved in those various companies, what their respective roles were, and how those roles changed over time; the financial and business transactions of those businesses and which individuals were involved in

---

instead provided by Mr. Adams for context to support his privilege assertions—form the basis for his claim that the alleged intrusion into privileged material renders the execution of the warrant unreasonable. *See* Gov't Exhibit 1. In deciding this motion, the Court should not accept assertions of privilege as to any document not provided to the Court for its own review.

those transactions; and the mental states of the individuals involved in those companies and their various transactions.

- Of the 7,092 that were viewed, 5,485 documents were seized, and 3,877 of those documents came from Mr. Adams's account; the rest came from Mr. Monahan's account.

- Of the 1,594 seized documents that Mr. Adams claims are outside the scope of the warrant, only 750 might arguably be outside the scope of the warrant, *see* Maier Supp'l Dec'l ¶¶ 3 and 4, when the scope is defined properly rather than the way Mr. Adams defines it. The other 830, *id*. ¶¶ 5, 6, 7, 8, 9, and 10, fall within the scope of paragraphs II.a.1 and II.a.3 of Attachment B because they relate to the dealings and transactions of the listed entities or reflect communications with shareholders or prospective shareholders of the Apollo/Scio companies, or both.

In short, the numbers, coupled with the search terms that were employed, reveal exactly what one would hope would happen when the government executes a search warrant: that reasonable steps were taken to view and ultimately seize only those documents that were pertinent to the fraud scheme alleged in the warrant, that reasonable steps were taken to avoid exposure to privileged documents, and that those steps were reasonably successful in eliminating documents that were either privileged or beyond the scope of the warrant, as properly understood.

    1. <u>Legal Standards</u>

The Fourth Amendment requires that search warrants be executed in a reasonable manner. *Hummel-Jones v. Strope*, 25 F.3d 647, 653 (8th Cir. 1994). "The manner in which

21

a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness." *Id*. at 650. The test for whether the execution of a search warrant was reasonable is an objective one that ignores the subjective intent of the officers. *Lykken v. Brady*, 622 F.3d 925, 930 (8th Cir. 2010). That "test of reasonableness . . . is not capable of precise definition or mechanical application," and "[i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Accordingly, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

### 2.  The Government Searched Based On The Scope Of The Warrant

Mr. Adams asserts that the government searched for documents outside the scope of the warrant. But as noted above, much of his argument fails because of his erroneous interpretation of the warrant's scope.

In general, when executing a search warrant, the government may look anywhere in the place to be searched that may contain evidence that falls within the scope of the warrant. *See United States v. Ross*, 456 U.S. 798, 823 (1982) ("A container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause."). In the computer context, this principle permits file-by-file review. *See, e.g., United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010) ("the warrant impliedly authorized officers to open each file on the computer and view its contents, at least

22

cursorily, to determine whether the file fell within the scope of the warrant's authorization"); *United States v. Hill*, 459 F.3d 966, 978 (9th Cir. 2006) ("There is no way to know what is in a file without examining its contents"); *United States v. Fumo*, 2007 WL 3232112, at \*6 (E.D. Pa. Oct. 30, 2007) ("Regardless of the search protocols or keywords used by the government, the government may open and briefly examine each computer file to determine whether it is within the description recited in the warrant.").

Nevertheless, because of the large volume of information stored on computers, manual, file-by-file review can be unmanageable. Keyword searches, though imperfect, can speed an investigation. They can help investigators find files that fall within the scope of a warrant. Some keywords may be chosen not because they conclusively demonstrate that a responsive file falls within the scope of the warrant, but instead because they indicate that the file is worthy of further scrutiny to determine whether it falls within the scope of the warrant. Use of keyword searches also protects privacy interests, as it can eliminate the need for a complete file-by-file review of the contents of the computer.

It is true that the government cannot search for information that falls outside the scope of a warrant, as was done in *United States v. Dallman*, No. 13-03081-01-CR-S-MDH, 2016 WL 6123250, at \*3 (W.D. Mo. Oct. 12, 2016). There, a search warrant was obtained to search for and seize "evidence relevant to . . . identity theft and . . . failure to register as a sex offender" but the officer executing the search applied a computer program to the defendant's computer that the officer knew would automatically search specifically for child pornography, including through the use of certain keyword searches related to child

23

pornography.  *Id*. at *2-3.  On that record, the court concluded that "the search exceeded the scope of the warrant from the beginning."  *Id*. at *4.

In contrast, the keyword searches here were for information that falls within the scope of the warrant.  The first set of keyword searches to which Mr. Adams objects (including "RL," "DL," "ADR," "secret," and "sale of warrants") are all geared towards finding documents that mentioned the "sale of warrants," or that mentioned "secret" bank accounts—"RL," DL," and "ADR"—that received the proceeds from those sales.  Such documents clearly constitute (1) "documents, records, and communications related to financial bookkeeping, transactional, and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, [and] Public Scio," and which "record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above businesses;" or (2) "documents reflecting communications with shareholders or prospective shareholders of [the Apollo companies]."  DX 1, Attachment B ¶¶ II.a.1.ii, II.a.3.  The warrants Mr. Adams sold in 2006-2010 were warrants for the Apollo companies and so search terms designed to find documents reflecting those transactions is perfectly compatible with what was authorized by the items to be seized described in Attachment B.  In addition, in defending against the accusation during the SEC investigation that Mr. Adams orchestrated the Apollo/Scio transaction in a way that resulted in him improperly acquiring a greater ownership interest in Apollo's assets, Mr. Adams specifically relied on the unexercised warrants he claimed to have to make the argument that the transaction did not result in dilution of the other shareholders' ownership interests.

24

The second set of keyword searches to which Mr. Adams objects (including "bribe," "lie," "indicted," "criminal," and "fbi," and more colorful keyword searches such as "asshole" and "shit")[7] are also geared towards finding documents that fall within the scope of the warrant.  They are terms that, if included in a document, signaled to investigators that further scrutiny of the document would be worthwhile.  As explained during the January 8-9, 2018 hearing, such keyword searches were designed to return documents that might contain *mens rea* evidence of individuals allegedly involved in the fraud scheme concerning the Apollo/Scio companies.  *See* Jan. 8 Hr'g at 121:18-3.

No case supports the notion suggested by Mr. Adams that the government must specify keywords in advance or use only keywords specifically mentioned in the affidavit.  *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017) ("it will often be impossible to identify in advance the words or phrases that will separate relevant files or documents before the search takes place, because officers cannot readily anticipate how a suspect will store information related to the charged crimes").  Nor can it be predicted

---

[7] Mr. Adams points to the fact that former AUSA David Maria ran keyword searches for his own name, "maria."  Far from showing that the government exceeded the scope of the warrant, the use of that keyword search is further proof of the caution that has been employed in this investigation and litigation.  In two letters in May 2016 from Jon Hopeman, Mr. Adams's former counsel, Mr. Hopeman questioned Mr. Maria's involvement in the case given that Mr. Adams had been represented by Latham and Watkins and Mr. Maria had previously worked for Latham and Watkins.  The letters from Mr. Hopeman and the response by the U.S. Attorney's Office are attached as Government Exhibits 2, 3, and 4.  Therefore, the keyword searches for "maria" likely indicate simply that Mr. Maria was attempting to confirm his recollection that during his time at Latham and Watkins, he did not acquire any knowledge of any of the individuals or entities implicated in the investigation.

with perfect precision what specific words or phrases will be used by a suspect to describe actions and conduct related to the crimes being investigated.

Regarding search terms designed to find Mr. Adams's personal tax returns, such terms also fall within the scope of the warrant.  To the extent that Mr. Adams realized any income from his dealings with the Apollo companies, including any income realized through the sale of stocks, options, or warrants, documents showing how he prepared and ultimately filed his tax returns would indeed reflect, relate to, and incorporate information about the business and financial transactions of the Apollo companies, including information about the financial transactions conducted through the Apollo companies' bank accounts and other financial accounts.  DX 11, Attachment B ¶¶ II.a.1.ii, II.a.3.  They are also related to the crimes alleged in the warrant.  If Mr. Adams reported the proceeds from the sale of warrants as income on his tax returns, that would be evidence that he believed those proceeds belonged to him and would rebut the notion that he was merely maintaining control over those funds for someone else, namely the Apollo companies, and thus lacked any fraudulent intent.  Conversely, if he failed to report the proceeds from the sale of warrants as income on his tax returns, that would be evidence that he was aware of the wrongfulness of his receipt of those proceeds and would be circumstantial evidence of his fraudulent intent.  *See United States v. Hogan*, 886 F.2d 1497, 1507 (7th Cir.1989) ("evidence that [defendant] did not report the money he received from attorneys suggests that he knew that the payments were unlawful"); *United States v. Deutsch*, 451 F.2d 98, 116 (2d Cir. 1975) (evidence of failure to report transactions was "independently probative of [defendant's] guilt" because it "showed evasive conduct aimed at concealing the

26

transaction and constituted circumstantial evidence of guilty consciousness"); *United States v. Hatfield*, 685 F.Supp.2d 320, 324 (E.D.N.Y. 2010) (admitting alleged but uncharged tax fraud in securities fraud prosecution because the defendants' failure to report certain earnings to the IRS "demonstrates [their] consciousness of guilt").[8]

In asserting that the government searched for documents outside the scope of the warrant, Mr. Adams emphasizes that there was no pre-search plan or briefing to guide the government agents through their review of the accounts. But the terms of the warrant, accompanied by the affidavit, provided that guidance, and each of the agents had a copy of the warrant, including Inspector Kroells who wrote it. *See* Jan. 8 Hr'g Tr. at 246 (Inspector Kroells); Jan 9 Hr'g Tr. [Dkt. 87] at 55, 73 (Special Agent Khan); Jan. 8 Hr'g Tr. at 273 (Special Agent Belich).

Lastly, Mr. Adams contends that it was unreasonable for the government to continue searching under the authority of the warrant as its investigation "evolved" to encompass areas beyond the probable cause specified in the affidavit, including what he claims were the newly developed tax crimes. As already explained, even if the searches returned documents that were more directly pertinent to the fraud involving investor funds raised for Apollo in the earlier part of the scheme or ended up also being pertinent to the tax charges that were later alleged, such information still bore a logical relationship to the fraud alleged in the warrant and fell within the ambit of the specific items to be seized described

---

[8] This same analysis demonstrates why the keyword searches for "murryllc" and "murry" were proper given that the Murry firm was involved in preparing and filing Mr. Adams's second amended tax returns for 2008, 2009, and 2010. The analysis of the privilege arguments associated with documents involving the Murry firm are discussed below.

in Attachment B.  Furthermore, as discussed in more detail below, the Supreme Court's decision in *Andresen* is contrary to Mr. Adams's claim that the government is forbidden from going beyond the manners and means specifically alleged in the affidavit.

### 3.   The Government Did Not Make Unauthorized Uses Of Documents

Mr. Adams makes several arguments in support of his claim that the government made improper uses of documents.  First, he stresses that the government had no process in place for keeping track of which documents were within the scope of the warrant and which documents were not and that the government even used documents that ultimately were not retained after the final filter was performed on April 4, 2017.[9]  Second, he claims that the government improperly used documents from his email accounts to prepare for witness interviews.  Third, he contends that the government used documents from his email accounts to develop a tax case against him.  These arguments are without merit.

The Court should reject Mr. Adams's contention that it is unreasonable or otherwise constitutionally improper for the government not to keep track of which records fall outside the scope of the warrant or fail to segregate such documents within a certain period of time. In *United States v. Lee,* No. 1:14-cr-227-TCB-2, 2015 WL 5667102, at *6 (N.D. Ga. Sept. 25, 2015), the government received, in response to a search warrant, a production from Google that "included emails that were not related to the investigation, [the agent] did not segregate those emails from those that were related to the investigation, nor did [the agent]

---

[9] According to Mr. Adams, there were only 41 such documents that were not ultimately retrained after the April 4, 2017 seizure. This includes documents that were saved, printed, or emailed using a native application or the user's email system given that such actions to a document cannot occur without first viewing the document in Relativity. *See supra* n. 5.

make a list identifying which emails were subject to seizure according to the parameters set forth in Attachment B of the warrants." The court observed that the government's procedures under the warrant were "incomplete" but rejected the defendant's suppression argument and concluded that those procedures "were not inconsistent with the terms of the warrant or the procedure described in the affidavits in support of the warrant applications because neither put a time limit on completing the seizure." *Id*. at *14. The court concluded, therefore, that the government had not flagrantly disregarded the terms of the warrant in a way that would justify the extreme remedy of blanket suppression, and the court further found no constitutional infirmity in the government retaining the entirety of the Google production while the criminal case remained pending. *Id*. at *14, n.15.

The government's procedures in this case exceeded those employed in *Lee*. First, although no list was created to differentiate between the documents that were within the scope of the warrant from those that were not, the government employed keyword searches that were clearly designed to, and generally did, return documents that were within the scope of the warrant, as properly defined. In that regard, the keyword searches and the documents that were viewed as a result of the keyword searches, all of which were recorded in the Relativity activity log, is the functional equivalent of the list Mr. Adams complains was not kept. Second, unlike in *Lee* where the government retained its ability to access the entire production from Google while the criminal case was pending, here the government took the additional step of applying a filtering procedure designed to limit its access to only those documents within the Yahoo! production that were within the scope of the warrant.

29

The Court should also reject Mr. Adams's claim that it is improper to use documents obtained in response to an email search warrant to prepare for witness interviews or further develop a case.  Contrary to Mr. Adams's proclamation, confidently stated but without citing any authority, that for much of American history using documents with witnesses or to prepare charges without first seizing them would have been physically impossible, it is not at all difficult to not only imagine such a scenario but to also suppose that such scenarios are quite common.  For example, in the search of a business, it would not be physically impossible for agents to show documents found during the search to witnesses, such as employees of the company who are present during the search, and interview them about those documents before ultimately deciding to seize them . . . or not seize them.

The decision in *Lee* provides a real-world example of the government "using" documents before they are ultimately seized, and, in fact, it occurred in the precise context of an email search warrant.  There, an FBI agent "selected certain emails from Lee's Gmail accounts that 'were of importance in the investigation for creating additional leads,' e.g., 'for additional search warrants or to prepare other agents to conduct interviews in the investigation.'"  *Id.* at *6.  The court rejected Lee's argument that the execution of the warrant was unreasonable.  *Id*. at *12-15.  The critical requirement is that the documents seized should fall within the scope of the warrant.  As already explained, the vast majority of the documents that were viewed by the government—which, by inference, includes the smaller universe of those that were used—fall within the scope of the warrant.

Nor is there any merit to Mr. Adams's argument that the government made improper uses of documents from the Yahoo! production to prepare a tax case.  As an initial matter,

30

Mr. Adams's characterization of the inception and progression of the tax investigation is incorrect.[10]  The IRS became involved in this investigation in May 2015.  In early March 2016, before the government had received the response from Yahoo! to the email warrant, the government sought and received approval for an ex parte order requiring the disclosure of Mr. Adams's tax returns and return information for tax years 2007 through 2015.  Shortly after that submission, in the middle of March 2016, the government met with attorneys representing Mr. Adams, including one of his current attorneys, Mr. Petrosinelli, for purposes of a reverse proffer.  *See* DX Ex. 48.  At that reverse proffer, the government showed Mr. Adams's attorneys analyses of bank records, including ones for the allegedly "secret" Venture Bank accounts that received the proceeds of warrant sales.  The government received the requested tax information on May 9, 2016, which included Mr. Adams's first set of amended returns for 2007-2010—the ones filed in December 2011— more than four months before, according to Mr. Adams, the government improperly "used" information from his Yahoo! accounts to prepare a tax case.  A simple perusal of those returns revealed that Mr. Adams had failed to report the income realized from of the proceeds of warrant sales deposited into the Venture Bank accounts, which is the basis of the tax charges in the indictment.

---

[10] The most obvious proof of this point is the fact that the tax case against Mr. Adams is based on his filing of amended returns in 2011 and were built on a review of bank account records and comparing the contents of those records to what he reported on the returns he filed in 2011.  The communications that Mr. Adams claims were used improperly— because they were outside the scope of the warrant and/or were privileged—to build a tax case related to Mr. Adams's second set of amended returns, which were filed three years later in 2014.

Paragraphs 6 and 7 of the Maier Declaration [Dkt. 148], which reference Suppression Brief Exhibits 4 and 13 [Dkt. 149], describe seven documents Mr. Maria emailed to SA Belich in September 2016. Those seven documents, which appear to also be all or part of *in camera* Exhibit Q, consist of an email from Mr. Adams to the Murry firm that attached Mr. Adams's first set of amended tax returns for 2007-2010—the ones filed in December 2011—and two letters to the Minnesota Department of Revenue. As discussed previously, *see* supra II.B., these documents are within the scope of the warrant because they reflect financial and business transactions of Apollo by virtue of those tax returns showing that Mr. Adams realized revenue or capital gains from Apollo.

In addition, Mr. Adams fails to acknowledge that those same documents were also obtained either from the response to the *ex parte* request for tax returns and return information, the Murry firm's production of non-privileged communications with Mr. Adams in response to a grand jury subpoena, or from Larson Allen's production in response to a grand jury subpoena. *See* [Dkt 39-1] Pre-hearing Defense Ex. 10. Under these circumstances, where Mr. Adams's tax returns had long been an area of interest to the investigation, the "use" of those documents by sending them to SA Belich in September 2016 would not require suppression because the inevitable discovery exception to the exclusionary rule would apply. *See United States v. James*, 353 F.3d 606, 617 (8th Cir. 2003) (inevitable discovery exception applies if it is shown that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of the claimed misconduct and that the government was actively pursuing a substantial, alternative line of investigation at the time of the claimed misconduct); *United States v.*

*Ford*, 184 F.3d 556, 577 (6th Cir. 1999) ("The government can satisfy its burden [to avail itself of the inevitable discovery exception] by showing that routine procedures[11] that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.").

   4.   The Government Did Not Review Documents More Than Was Necessary

      a. *The government is not limited to a single review of documents to determine whether they fall within the scope of the warrant*

At a minimum, the government is permitted to briefly look at every document from the Yahoo! production to determine whether it falls within the scope of the warrant. *See Andresen*, 427 U.S. at 482 n.11; *United States v. Heldt*, 668 F.2d 1238, 1267 (D.C. Cir. 1981). Mr. Adams concedes this point, as he must, and instead presents an argument that suggests that such a brief review must be limited to a single review of a given document to determine whether it falls within the scope of the warrant. In none of the cases that Mr. Adams cites does a court actually embrace such an unreasonable and unrealistic view. The only case that perhaps comes close is *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017). But *Wey* is readily distinguishable.

First, the warrants in *Wey* were both unparticularized and overbroad. They "neither cite[d] criminal statutes nor in any way describe[d] any suspected criminal conduct," *id*. at 384, "set[] forth expansive categories of often generic items subject to seizure—several of a 'catch-all' variety—without, crucially, any linkage to the suspected criminal activity, or

---

[11] The routine nature of the issuance of grand jury subpoenas in this case is demonstrated by the fact that more than 90 grand jury subpoenas had been issued prior to the issuance of the subpoenas to the Murry firm and Larson Allen, and another ten were issued afterward.

indeed any meaningful content-based parameter or other limiting principle," *id*. at 385, and lacked any temporal limitation, *id*. at 387.  Here, the warrant cited the criminal statutes being investigated, set forth an illustrative list of categories of items to be seized that bore a logical connection to the suspected fraud scheme, and contained both content-based and time-based limitations that were tethered to the allegations in the affidavit.

Second, *Wey* is further distinguishable given the volume of data that was seized and then later subjected to continuing, repeated keyword searches. The database out of which the searches were conducted in *Wey* was one that held the data from: (1) at least 24 computers or electronic devices taken from the offices of a business—a number that consisted of the *cell phones of all employees present* during the search and *all* laptop computers, flash drives, and desktop computers throughout the entire office; and (2) at least 25 computers and electronic devices taken from the defendants—a number that represented most, if not all, of the electronic devices and computer equipment found within the home, including the personal cell phone of the defendant's spouse  *Id*. at 368-73.  The sheer number of computers and devices that were seized, without any persuasive indication that genuine efforts were employed to discriminate between devices reasonably likely to contain pertinent evidence from those unlikely to contain such evidence, weighed heavily in the court's determination that the continuing and repeated searches of the data from *all* these devices, *even those that had already been sorted out as impertinent*, was unreasonable.  *Id*. at 405-408.

In short, *Wey* involved facial deficiencies in the warrants that were then acted upon—indeed compounded by—indiscriminate seizures of all computers and electronic

devices and indiscriminate searches of all seized computers and devices, including those that had already been deemed impertinent. There are no facial deficiencies in the warrant here, and the keyword searches were clearly designed to return pertinent documents.

Rather than applying the analysis employed in *Wey*, as Mr. Adams urges, the Court should employ the analysis in *Lee*, *supra*, and *United States v. Lustyik*, No. 2:12-CR-645-TC, 2014 WL 1494019 (D. Utah Apr. 26, 2014), and *United States v. Johnston*, 789 F.3d 934 (9th Cir. 2015). The analysis in those cases compels the conclusion that neither the Fourth Amendment nor Rule 41 require the government to "complete" the execution of the warrant by making a determination—one that can never be revisited—of which documents fall within the scope of the warrant within a certain (largely, arbitrary) time period.

In *Lee*, the court stated: "although the government has not completed the review and seizure of all records authorized by the warrants, it has not violated the terms of the warrants by not doing so. By merely failing to seize all responsive information from Google's production, the government has not flagrantly disregarded the terms of the warrants in a way that would justify the extreme remedy of blanket suppression of the evidence." *Lee*, 2015 WL 5667102 at *15. The *Lee* court went further and rejected the suggestion that after the government reviewed the entire email account, it should have returned or destroyed those documents that fell outside the scope of the warrant:

> There is no requirement, however, either in the warrants or in the Constitution, that the government return or destroy lawfully obtained evidence relevant to an ongoing criminal investigation while the criminal proceedings related to that investigation remain pending. Indeed, "[t]he general rule is that lawfully seized property bearing evidence relevant to trial should be returned to its rightful owner once the criminal proceedings have terminated, not before," and Lee "offers no reason to think [his] case an

35

exception to this general rule." The government's search and seizure of information within the production obtained pursuant to the warrants is not incompatible with the temporary or conditional retention of the remaining production, which may be necessary for authentication, as well as establishing Lee's identity and his alleged ownership of the accounts. Accordingly, the Court finds no constitutional infirmity in the government's retention of Google's production while these proceedings remain pending. *See In the Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F.Supp.3d at 167 n. 10 (citation and internal marks omitted) (discussing the government's "valid" concerns that destroying or returning the emails received from an online service provider "could either expose the government to accusations that it destroyed exculpatory evidence," or "hinder the government's ability to lay a foundation for evidence and establish authenticity"); *In the Matter of a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F.Supp.3d at 399 (noting that "it may be necessary for the Government to maintain a complete copy of the electronic information to authenticate evidence responsive to the warrant for purposes of trial"); *Brooks*, 2014 WL 292194, at *15 (citation omitted) (rejecting "[d]efendant's argument that the Government's retention of [ ] non-contraband items . . . justifies suppression of lawfully-seized evidence"). Thus, the Court declines to impose a deadline on the government's retention of the Google production while the case remains pending, and Lee has other remedies available short of blanket suppression of the evidence seized pursuant to the warrants should he contend that the government has improperly retained the records.

*Id*. at *14 n.15.

Under the reasoning of *Lee*, the government is permitted to go back to the entire Yahoo! production—in Mr. Adams's parlance, to treat it as a "litigation database"—if a legitimate need (e.g, an evidentiary need) to do so arises during the pendency of the criminal case. The circumstances here are even more circumscribed than in *Lee* given that the government has taken that next step and limited itself to just the approximately 40,000 documents that remained after the final filtering process on April 4, 2017, only a year after receiving the Yahoo! production.

The salient facts in *Lustyik*, which bear a remarkable resemblance to those in this case, were that "[a]s the Government learned new details, the Government would go back and conduct targeted searches in the Relativity database using search terms for additional documents responsive to the warrants. From time to time, and based on developing knowledge of the investigation, documents that were previously marked as irrelevant were re-reviewed and marked as relevant." 2014 WL 1494019, at *5. The *Lustyik* court upheld this manner of execution as reasonable: "Here, as the document review progressed, those executing the warrants gained a better understanding of the illegal conduct at issue in the warrants. . . . The additional targeted searches were a reasonable method for locating additional documents responsive to the warrants." *Id.* at *13.

*Johnston* also demonstrates that the government's execution of a search warrant is reasonable where it seeks evidence that falls within the scope of a warrant, regardless of whether investigators review potentially responsive information more than a single time. In *Johnston*, the court considered a challenge to a search that had included three successive searches over a period of years. *Id.* at 942. First, in 2006, pursuant to a warrant to search for child pornography, agents did a forensic preview of a computer and then browsed the images on the computer. *Id.* In the spring of 2011, an agent reviewed images on the computer and also reviewed its internet history and email correspondence. *Id.* Finally, in July 2011, the agent did an even more thorough search of the computer, including a search of email, chat logs, and unallocated space. *Id.* The Ninth Circuit upheld these searches, finding that "[e]ach of the search methods [the agent] employed related directly to this mandate [of the search warrant]." *Id.*

37

b. *Most of the documents that Mr. Adams claims were reviewed repeatedly actually fall within the scope of the warrant*

Mr. Adams's claim that the government unreasonably focused on documents that are outside the scope of the warrant depends on his prior argument about the scope of the warrant. Mr. Adams is vague in his identification of the specific documents that were viewed "repeatedly" despite being outside the scope of the warrant. He cites obliquely to Exhibits 7, 8, and 9 to the Maier Supplemental Declaration as the documents that were "viewed . . . repeatedly as [the government's] theory of the case 'evolved.'" Def's Post-hearing Mem. [Dkt 147] at 42. Those three exhibits appear to consist of 50 total documents, but Mr. Adams simply declares them to be outside the scope of the warrant without any further explanation or analysis. *See* Maier Suppl. Decl. ¶¶ 8-10. A review of those documents shows that all are in fact within the scope of the warrant.

As a preliminary matter, the opening provision to section II defines the scope of the items to be seized as evidence of mail fraud and wire fraud involving Mr. Adams and occurring after October 25, 2006, "*including* . . . information pertaining to the following matters." DX 11, Attachment B ¶¶ II.a (emphasis added). The plain language of this provision—the use of the word "including"—makes clear that the more specific examples that follow, which reference the years 2010 to the present, are an illustrative, but not exhaustive, list of the items to be seized. Courts frequently approve warrants that make use of the word "including" and have rejected arguments that such warrants fail the particularity requirement or render the warrant overbroad. *See United States v. Lustyik*, 57 F. Supp. 3d 213, 227-229 (S.D.N.Y. 2014); *United States v. Riley*, 906 F.2d 841, 843 (2d

38

Cir. 1990); *United States v. Jacobson*, 4 F. Supp. 3d 315, 519, 523-527 (E.D.N.Y. 2014); *United States v. D'Amico*, 734 F. Supp. 2d 321, 358, 359-360 (S.D.N.Y. 2010).

The list of the types of documents that would constitute evidence of mail and wire fraud crimes occurring after October 2006 is appropriately broad and includes documents that would help the investigators understand what happened, when it happened, why it happened, how it happened, and who made it happen. When alleging that an individual has defrauded a company, such as Apollo, the government necessarily needs to understand and obtain evidence regarding how that business operates, who operates it, and what its financial health is at various points in time. Indeed, the government would not be doing its job if it did not so educate itself about the business, the people involved in it, and the various external forces affecting the business because, to state the obvious, it might ultimately yield evidence of wrongdoing, but, equally important, it might ultimately yield exculpatory evidence. Under Mr. Adams's cramped view of the scope of the warrant, the government would be permitted to look for and review only those documents that corroborate what is already known.

A review of the documents referenced in Exhibit 7 to the Maier Supplemental Declaration reveals that they are within the scope of the warrant because they relate to financial and business transactions of the Apollo companies, and all were transmitted after October 25, 2006—the earliest of the emails was sent on December 3, 2009. The documents consist of emails and spreadsheets containing information about financial transactions of the Apollo companies. Specifically, the information contained in the spreadsheets includes the Apollo companies' capitalization tables, warrant lists, balance

sheets, cash flow summaries, and historical financials. Such documents squarely fall within the scope of "documents, records, and communications related to financial, bookkeeping, transactional, and tax records reporting the business and financial transactions of [the Apollo companies]." DX 11, Attachment B ¶¶ II.a.1.

For example, one of the documents referenced in Exhibit 7 to the Maier Supplemental Declaration (Doc Id 00004082) is a December 2009 email exchange between an Apollo employee, L.L., and Mr. Adams in which the two exchange information needed for tax reporting purposes and to determine why certain payments were made on behalf of the Apollo companies. Gov't Ex. 7. Another (Doc Id 00004624) is a blank email sent from one of Mr. Adams's email accounts to the other account, containing two attachments: financial statements from 2009, and an Apollo Diamond Warrant List from May 2005. Gov't Ex. 8. The email was transmitted in December 2009, and it clearly relates to and reflects the business and financial transactions of the Apollo companies. The other emails described by Exhibit 7 to the Maier Supplemental Declaration attached spreadsheets that summarized the capitalization (i.e., the breakdown of the various shareholders' ownership) of the Apollo companies (Doc Id 00004611, 00004612, 00004624, 00004625) or other information bearing on the business and financial transactions of Apollo, such as the Apollo companies' balance sheets, cash flow statements, operating budgets, tax information, bank statements, and stock ledgers (Doc Id 00004082, 00005707, 00005709, 00007915, 00007928, 00008489, 00008490, 00017852, 00287363, 00290207).

The documents referenced in Exhibit 8 to the Maier Supplemental Declaration also fall within the properly defined scope of the warrant. The documents consist of emails and

attachments that were transmitted between October 2007 and February 2010, and they relate to the Apollo companies and their business and financial transactions. For example, some of the documents reflect communications about (1) possibly adding an individual to the board of directors for Apollo Gemstone (Doc Id 00292669), (2) thoughts on how to market the diamonds that were to be produced by the Apollo companies' technology (Doc ID 00280488), (3) the status of diamond production and inventory (Doc ID 00280492), and (4) legal fees paid by the Apollo companies (Doc Id 00280683). Other documents reflect financial and business transactions of the Apollo companies (Doc Id 00282160) communications with current or prospective shareholders (Doc Id 0270801, 00271125, 00289379, 00291027), or discussions about the sale of warrants (Doc Id 00282159, 00270801), which (in addition to being relevant to the allegations in the superseding indictment) do indeed reflect business and financial transactions of the Apollo companies.

Exhibit 9 to the Maier Supplemental Declaration consists of 26 documents. All of these documents fall within the scope of the warrant. They all were transmitted after October 25, 2006, and they all provide information about the affairs of the Apollo companies or the other entities referenced in section II of Attachment B or provide additional context to the alleged fraud scheme that was under investigation and alleged in the warrant. In fact, 17 of the 26 documents explicitly reference the name Apollo, ADI, or ADGC, and most of these discuss financial transactions of those entities, which would fall within the ambit of "documents, records, and communications related to . . . the business and financial transactions of [the Apollo companies]." For example, one of the documents is an email exchange with the subject line "Money to Apollo" (Doc Id 00287437). Gov't

Ex. 9.  In addition to this document being, as Mr. Adams puts it, "relate[d] to the alleged embezzlement scheme [or the] sale of Apollo warrants," the very language of the subject line shows that it does indeed relate to the business and financial transactions of the Apollo companies, the seizure of which was within the scope of the warrant.

Although some of the documents do not explicitly name the entities referenced in section II to Attachment B, the contents of the documents show that they fall within the scope of the warrant. For example, in one document (Doc Id 00284912) an individual emails Mr. Adams asking "i assume michael knows about the adr account that was suppose to be super secret."  Gov't Ex. 10.  Mr. Adams replies, "He does not. Do not discuss." *Id*. Although this document does not explicitly mention Apollo, the fact that Mr. Adams is describing a bank account for ADR, which was known to be associated with the Apollo companies and used to receive the proceeds of warrant sales, as "super secret" shows that this communication not only relates to the business and financial transactions of the Apollo companies but also that it constitutes "evidence and instrumentalities" of the crimes of mail and wire fraud.

The touchstone of the Fourth Amendment is reasonableness.  The manner in which the warrant was executed in this case was reasonable.  Rather than conducting repeated and indiscriminate reviews of the entire Yahoo! production multiple times to determine which documents fall within the scope of the warrant, similar to what happened in *Wey*, the government ran keyword searches that were clearly designed to find documents that were within the scope of the warrant.  To the extent that on more than one occasion, keyword searches returned the same document or set of documents that were truly outside the scope

of the warrant, that does not change the fact that the keyword searches were properly designed to find documents within the scope of the warrant.

One more observation about reasonableness, both with respect to the specific issue of the number of times that documents were reviewed and, more broadly, to the overall execution of the warrant: the Relativity activity log provides unprecedented and granular transparency into how the government conducted its review of the Yahoo! production. Importantly, the prosecution team did not even know that their activities—searches, views, downloads, prints, etc.—were being automatically logged by the Relativity program. *See* Jan. 9 Hr'g Tr. 112-113. And although they did not know that their activities were being recorded, the activity logs show unwavering and admirable efforts by the government to stay within the contours of the Fourth Amendment.[12]   Rather than review every single document within the Yahoo! production, the government used keyword searches to try to identify only those documents that would relate to the matters identified in the warrant. Rather than using keyword searches that could have only been likely to identify documents of a sordid or salacious nature, the keyword searches bore a rational connection to the individuals, entities, and events described in the warrant.  Rather than using keyword searches that could only have been likely to identify documents that had no relevance to the crimes specified in the warrant and instead pertained to entirely new suspected crimes,

---

[12] The complete Relativity activity log is attached hereto as Government Exhibit 42.  In addition, excerpts of the Relativity activity log pertaining to the arguments involving Mr. Adams's claim that the government reviewed privileged communications are attached hereto as Government Exhibits 13-15, 19, 21, 27, and 41, are discussed more fully below. In each of these exhibits, the Doc Ids that are contained within *in camera* Exhibits A-U are highlighted yellow.

the keyword searches consistently sought to find evidence of the fraud scheme involving the Apollo/Scio companies. And to the extent that those keyword searches returned documents that were truly outside the scope of the warrant, the government did not unduly linger on those documents and, overwhelmingly, they were ultimately excluded from the documents that were determined to be within the scope of the warrant.

     5.   <u>The Government Seized Documents Based On The Terms Of The Warrant</u>

Mr. Adams is correct that the government may seize documents that fall within the scope of the warrant (unless the plain-view doctrine applies). But, as explained above, he reaches his conclusion that the government went beyond the scope of the warrant only by advancing an incorrectly narrow definition of its scope.

Mr. Adams argues that the government misunderstood its function under the warrant, which is to find and seize documents that fell within the ambit of Attachment B's items to be seized, and instead searched for any documents that might be relevant. In this regard, Mr. Adams contends that there is a difference between the concepts of "relevance" and "scope" (i.e., the terms of the warrant) and that the government conflated the two concepts. He fails to recognize, however, that when evaluating the reasonableness of search warrants and their executions, courts, including the Supreme Court, generally make no such distinction between those concepts. *See, e.g., Andresen*, 427 U.S. at 481-82 ("The warrants, accordingly, did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence *relevant to the crime of false pretenses* and Lot 13T.") (emphasis added); *United States v. Frederickson*, 846 F.2d 517, 520-21 (8th Cir. 1988) ("In this case, the warrant was as specific as possible under the

circumstances. . . . [T]he detailed twenty-five page affidavit accompanying the warrant provided context for the warrant, and limited the scope of the search to those documents which would be *relevant to the specific crime charged*, income tax evasion.") (emphasis added); *Lee*, 2015 WL 5667102, at *9 ("[T]he warrants authorized the searching agents to review the information obtained from Lee's Gmail accounts only for evidence *relevant* to the government's investigation of the crime of copyright infringement, and not for evidence of general criminal activity or evidence otherwise defined by some open-ended criteria that would permit a free-range seizure of information from Google's disclosure.") (emphasis added); *Ulbricht*, 858 F.3d at 102 (explaining that a "warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of *potentially relevant material*," without necessarily "violating the particularity requirement") (emphasis added); *Lustyik*, 2014 WL 1494019, at *5 ("Each file was marked as '*relevant*' if it was responsive to the warrant in question and '*not relevant*' if it was not responsive to the warrant.") (emphasis added); *In re Search of Information Associated with [redacted]@mac.com*, 13 F. Supp. 3d 157 (D.D.C. 2014) ("[T]he practical realities of searches for electronic records may require the government to examine information outside the scope of the search warrant to determine whether specific information is *relevant to the criminal investigation and falls within the scope of the warrant*") (emphasis added); *Wey*, 256 F. Supp. 3d at 393-94 ("[T]he sheer scope of the Warrants—reaching . . . essentially all documents pertaining to NYGG and/or the Weys *unlimited by relevance to criminal conduct* or by timeframe—precludes a finding that the seizure authorization remained within the bounds of the Government's probable cause showing.") (emphasis added).

In *Andresen*, the Supreme Court endorsed the view that a search warrant does not violate the Fourth Amendment when it permits the government to seize documents related to another transaction that is not the specific subject of the search warrant affidavit if those documents are *relevant* to show, for example, intent or absence of mistake with respect to the transaction(s) specifically alleged in the affidavit:

> Although these records [pertaining to a transaction not mentioned in the affidavit] subsequently were used to secure additional charges against petitioner, suppression of this evidence in this case was not required. The fact that the records could be used to show intent to defraud with respect to [the transaction mentioned in the affidavit] permitted the seizure and satisfied the requirements of [a warrant being particularized and not overbroad].

*Andresen*, 427 U.S. at 484.

The only case that Mr. Adams specifically cites to in support of his argument about the distinction between the concepts of relevance and the terms of the warrant is the Ninth Circuit's decision in *United States v. Sedaghaty*, 728 F.3d 885 (9th Cir. 2013). But *Sedaghaty* is inapposite. The documents that were seized in *Sedaghaty*, although relevant to the issue of the defendant's *mens rea*, were outside the scope limitations in the warrant itself. 728 F.3d at 913. Specifically, the warrant in *Sedaghaty* authorized the government to seize a very limited set of documents—"financial records and communications related to the preparation of the 2000 tax return"—but the government "emerged from the search . . . with much more: news articles, records of visits to various websites about Chechnya, photographs of Chechen war scenes, and other documents that were introduced at trial as evidence of [the defendant's] desire to fund the Chechen mujahideen." *Id*. at 910. Thus, the seizure of those documents that were outside the scope of the list of specific items to

46

be seized could not be justified by the fact that those documents were relevant to the allegations set forth in the affidavit. *Id*. at 913.

The issue here is not one of the list of items to be seized being under-inclusive as compared to the documents that were actually seized. The documents that were seized fit within the scope of the items to be seized, and, as explained previously, Mr. Adams's arguments to the contrary fail because they are premised on an incorrect view of that scope. To put it in the specific terms of this case, *Sedaghaty* would perhaps be instructive if the affidavit had made allegations about both the Apollo/Scio transaction and the earlier, relevant and related transactions involving warrant sales and the Venture Bank accounts but the items to be seized was narrower and authorized the seizure of only those documents that pertained specifically to the Apollo/Scio transaction. And even that sort of an attempted application of *Sedaghaty* should be rejected. The dissent in *Sedaghaty*, which comports with the Supreme Court's discussion in *Andresen* of the concept of relevance, explains why: "The materials collected by the government were relevant to [the topics alleged in the affidavit] and helped establish the necessary *mens rea* for conviction. . . . [T]o interpret [the affidavit] as [the majority] suggests renders a large portion of the affidavit superfluous." *Id*. at 922 (Tallman, J. dissenting).

6. Underline The Government Took Reasonable Measures To Minimize Exposure To Privileged Material

a. *The documents at issue*

Mr. Adams has recently and unequivocally taken the position that a total of only 50 unique Document Ids form the basis for his claim that the alleged intrusion into privileged

material requires blanket suppression or dismissal of the superseding indictment, or both. *See* Gov't Ex. 1.  As to the other 212 documents identified on his personal privilege logs as having been viewed and/or seized (262 – 50 = 212), Mr. Adams has disavowed that those documents support his requests for blanket suppression and/or dismissal.  *Id*.  Mr. Adams has furthermore maintained that they need not even be provided to the Court *in camera* to assist the Court in its consideration of his motions.  *See* Gov't Ex. 11. Respectfully, therefore, the Court must reject any argument suggesting that the government unreasonably reviewed/seized some number of purportedly privileged documents larger than the 50 that Mr. Adams has decided, as a strategic matter, to put before the Court.

### b.  *Procedures used to avoid exposure to potentially privileged documents*

Before addressing the reasonableness of the procedures that were employed during the execution of the search warrant, it is important that those procedures be placed in the proper context.  Mr. Adams starts his argument by noting that the search of the premises of an attorney's law practice (or of the email account for the attorney's law practice) is an investigative act that is subject to internal DOJ policies that recommend additional precautions to avoid intrusions into privileged material.  In that context, practically every email within the law firm email account carries a relatively high chance of being privileged. But in this case, the government elected not to execute a search warrant on Mr. Adams's law firm email account.  The government made this decision precisely because of the high likelihood that the law firm account would contain such a large number of potentially privileged material that a privilege review would be overly burdensome.  *See* Jan. 8 Hr'g Tr. at 89-91; Jan. 9 Hr'g Tr. at 10.  Instead, the government executed a search warrant on

48

email accounts that appeared to be ones that Mr. Adams used in a capacity other than as an attorney. *See* DX Exs. 52, 63 (Maria Suppl. Decl.) ¶¶ 13; Jan. 8 Hr'g Tr. at 89-91, 151, 269; Jan. 9 Hr'g Tr. at 9. Thus, there was no reason to make a similar presumption that practically every email could potentially be privileged. Thus, the search warrant here is distinguishable from the cases Mr. Adams cites, where taint teams were employed right from the beginning, *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 959 (3d Cir. 1984); *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020 (2d Cir. 1980); and *Michael D. Cohen v. United States*, No. 18-mj-03161 (S.D.N.Y. Apr. 13, 2018), because all of those cases involved the search of an attorney's law offices.

Although he does not come right out and say it, Mr. Adams's argument, taken to its logical conclusion, seems to be that any communication he sends using his personal Yahoo! accounts—even if he is just sending it to himself or a codefendant, Mr. Monahan, in a civil suit—is presumptively privileged simply because he is an attorney. In essence, the simple fact that he is an attorney requires the heightened scrutiny and automatic use of a taint team, even if the search is of an account that is not his law practice account. Such an argument is untenable. Attorneys are not entitled to special treatment in their personal dealings, especially when those personal dealings are alleged to be criminal. The investigation of Mr. Adams was not into suspected crimes in his capacity as an attorney but in his personal capacity, which is why his personal email rather than his law firm email was searched. The U.S. Attorney's Manual ("USAM"), which Mr. Adams cites in support of his claim that the search here was unreasonable, speaks in terms of the search being one of the premises of the attorney. The USAM even acknowledges that the specific safeguarding procedures

49

need to be tailored to the unique circumstances of each case and that the best test is not whether a certain procedure—i.e., a taint team—is used but whether the procedures used are adequate. [Dkt. 36] DX Ex. 44, Section 9-13.420.D.

When considered in the proper context, the government's procedures were reasonable. *See United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1038-39 (D. Nev. 2006) (rejecting the suggestion that it was *per se* improper for the prosecution team, as opposed to a taint team, to carry out the function of segregating the items that appeared to contain privileged material considering that the search warrant was directed at seizing non-privileged business records and tax returns and not at seizing presumptively privileged documents, as would be the case in the search of an attorney's law office). The agents involved in reviewing the Yahoo! accounts described the standard practice they employ of exercising caution while reviewing emails. *See* Jan. 8 Hr'g Tr. 66-69, 103, 196 (Kroells); Jan. 9 Hr'g Tr. 5-9 (Khan), 270-271 (Belich); [Dkt. 36] DX Ex. 1 (Kroells Decl.) ¶¶ 3-4, 12; DX Ex. 2 (Khan Decl.) ¶¶ 3-4; DX Ex. 3 (Belich Decl.) ¶¶ 3-4; DX Ex. 5 (Maria Decl.) ¶ 9. If, during their review, they encounter a document that could be privileged, they stop reviewing it and notify the other agents and the prosecutors. *Id*. They remain on the lookout for the names of attorneys or law firms that they know had represented the subject or target of the investigation. *Id*. In conducing the review in this case, the agents employed those procedures, keeping specifically in mind the names of attorneys and law firms that they knew had represented Mr. Adams in connection with an SEC investigation and civil lawsuits by disgruntled shareholders. *Id*. During the approximately one-week period in March 2017 when Inspector Kroells reviewed documents directly from the thumb

50

drive produced by Yahoo! before the production was loaded into a Relativity database,[13] Inspector Kroells employed these same procedures.  Jan. 8 Hr'g Tr. at 100-105; Kroells Decl. ¶ 12.

Even before the prosecution team began reviewing the Relativity database on May 4, 2016, heightened filtering procedures were formulated and implemented to filter out potentially privileged material.  Kroells Decl. ¶¶ 14-15, [Dkt. 36] DX Ex. 4 (Zeitz Decl.) ¶ 9.  Those heightened procedures consisted of the use of search terms that could be run against the database to identify and exclude potentially privileged material.  Kroells Decl. ¶ 15.  As Mr. Adams points out, the initial search terms used to filter out privileged communications hit on more than 70% of the documents, but that was because the initial set of terms (e.g., "attorney," "lawyer," "advice," and "counsel") proved to be too generic—they would hit on any document mentioning any one of those terms regardless of the context in which the terms were used.  Jan. 9 Hr'g at 172-175; Zeitz Ex. 4.[14]

Accordingly, revised search terms were used, specifically, the names of attorneys and law firms that were known to the prosecution at that time to have represented Mr. Adams, including Latham & Watkins, the attorneys representing Mr. Adams in connection

---

[13]  Inspector Kroells received the thumb drive from Yahoo! on March 7, 2016, and terminated her review of documents directly from the thumb drive by March 14 or March 17, 2016, at which point custody of the thumb drive was transferred to Special Agent Khan in anticipation of the contents being loaded into a Relativity database.  Kroells Decl. ¶¶ 14-15; Jan. 8 Hr'g 184-185.

[14]  As an illustration of this point, the attorneys representing Mr. Adams have sent emails to the Court and the government (for example, an email on May 9, 2018) that contain privilege banners that would have been excluded under the generic search terms even though such email are clearly not privileged.

with the SEC investigation.  Zeitz Ex. 4.  The process of running the new search terms against the database was completed on May 3, 2016, and was successful in excluding more than 32,000 documents.  Zeitz Ex. 3; Maria Decl. ¶ 7.  Nonetheless, the government continued to proceed with caution, as team members were instructed to continue to employ their standard procedures and remain vigilant for other potentially privileged material that might not have been not excluded as a result of the May 3, 2016 mechanical filtering process.  Kroells Decl. ¶¶ 16-18; Khan Decl. ¶¶ 10-11; Belich Decl. ¶¶ 9-10; Maria Decl. ¶ 9.  And team members followed those instructions, as evidenced by the fact that less than two weeks later (May 16, 2016), team members had identified the names of additional attorneys, including Mr. Brever and Mr. Hopeman, and informed other team members. Kroells Decl. ¶ 20; Khan Decl. ¶ 13; Belich Decl. ¶ 12; Zeitz Decl. ¶ 18; Maria Decl. ¶ 10. By June 6, 2016, additional search terms were formulated to identify and exclude documents involving those attorneys and law firms, and those search terms succeeded in removing an additional 1,494 documents on June 9-10, 2016.  DX Ex. 12; Zeitz Ex. 3.

A major theme of Mr. Adams's argument is his criticism of the government's decision to opt for mechanical filtering procedures rather than immediately resort to the use of a taint team, or return the entire Yahoo! production to Mr. Adams's then defense attorney, Mr. Hopeman, so he could make privilege determinations.  As to the former alternative, a taint team is not necessarily less fallible than a mechanical filtering process like the one used here.  For example, the search terms used here, such as "dorsey," "kopecky," "latham," and "fredrickson," would have excluded every single document that had any reference to any of those terms, even if the document itself was not privileged.  In

other words, the mechanical filtering process likely cast a wider net than a taint team would have.  In addition, when dealing with large databases, it is not uncommon for taint teams to do precisely what was done here and use search terms to make the review process efficient and manageable.  As to the latter alternative, Mr. Adams cites no authority for the proposition that the government is required to turn over the entire email production to his attorney for a privilege review.  It was not unreasonable, therefore, for the government to decline Mr. Hopeman's request.[15]

In the end, as stated before, the mechanical filtering process that was employed here resulted in the exclusion of more than 34,000 documents out of a total of more than 140,000.  Out of this vast universe, Mr. Adams's motion claims that the failure to catch approximately 50 documents requires a determination that the government acted unreasonably.  However, 50 is an over-count for multiple reasons.  First, two of the documents—the email and attachment to Mr. Hopeman—were viewed for only a matter of seconds before they too were excluded.  Second, some of the documents that are drafts of communications that Mr. Adams later sent to the attorneys at Latham are just multiple iterations of the same draft.  Specifically, *in camera* Exhibit D consists of 12 consecutive Doc Ids all bearing the same date of September 10, 2015, indicating that they are just multiple iterations that ended up being saved as discrete drafts.  And, as explained below,

---

[15] As noted below, there has been an over-assertion of privilege by Mr. Adams.  For example, as this Court found in its March 12, 2018 Report and Recommendation ("R&R") [Dkt. 117], Mr. Adams wrongly claimed privilege over all communications between himself the Apollo companies.  The Court therefore significantly narrowed the number of documents Mr. Adams sought to characterize as privileged.

each of those 12 iterations were viewed for a matter of just a few seconds. In other words, it would be an exaggeration to think of those as 12 discrete documents. Third, as discussed below, there was (and still is) a substantial basis to believe that the communications with the Murry firm are not privileged or the privilege has been waived, which means that it was not unreasonable to view those documents before any privilege assertions had been made over them, nor was it unreasonable to decide not to exclude them based on that privilege assertion, the extent of which, by the way, has evolved multiple times.

### c. Draft communications (in camera Exhibits A, D, and G)[16]

Mr. Adams has identified draft communications intended to be sent (and, he claims, later were sent) to his attorneys at Latham that were viewed by the government. It would appear that these were drafts that either Mr. Adams had sent to himself or saved as drafts in his Yahoo! accounts, but that did not include the names of his attorneys (Sikora or

---

[16] In addressing Mr. Adams's arguments regarding these draft communications, as well as the other documents he claims are privileged, the government, as the Court is aware, does not have access to the documents claimed to be privileged. Accordingly, the government has done its best, based on the general descriptions of the dates of, participants to, and topics addressed in those documents, to make reasonable assumptions about the contents of those documents and compare those hypothesized contents to other documents for purposes of assessing whether the documents are privileged, whether the privilege has been waived, and what prejudice, if any, resulted from the government being exposed to those documents. The government sought permission to have a taint team review Mr. Adams's *in camera* exhibits and make the appropriate arguments, as the government has a broad understanding of the facts of the case that may be relevant to a determination of privilege, but the Court declined the government's request. Accordingly, the Court, when reviewing the allegedly privileged documents, must put itself in the position of the government and attempt to make the best arguments on behalf of the government as to why the documents are not privileged, or the privilege has been waived, or any failure to exclude particular privileged documents was not unreasonable, or the exposure to privileged documents did not result in prejudice because the same information is reflected in other, nonprivileged sources.

Kopecky), either aspect of the law firm's name (Latham or Watkins), or the law firm's domain (lw.com) either in the body of the email or in the list of recipients. As such, they were not excluded as a result of the mechanical filtering process.

Mr. Adams claims that these communications provide insight into what the strategy was in defending against the SEC investigation and, thus, by extension, provide insight into what the strategy would be in defending against the current criminal case. To assess this argument, which pertains more to Mr. Adams's motion to dismiss but is also pertinent to the motion to suppress, will require a comparison of those draft communications to Mr. Adams's SEC deposition, DX Exhibits 50-51, and a December 2015 presentation that Mr. Adams's attorneys at Latham gave to the SEC accompanied by approximately 1,000 pages of supporting documents, Gov't Ex. 12. The reason the Court will need to conduct this review is that it goes to the issue of prejudice. If the draft communications do indeed reveal Mr. Adams's mental impressions about the Apollo/Scio transactions and/or discussion about the defense strategy for the SEC investigation, it is likely that those mental impressions and strategy discussions were ultimately published during Mr. Adams's deposition testimony or in Latham's presentation to the SEC, or both. The presentation, for example, appears to do exactly that. Most of the 60 slides of the presentation are devoted to discussions about (1) Mr. Adams's and Mr. Monahan's various roles in the Apollo companies, (2) the events leading up to the Apollo/Scio transaction, (3) the sufficiency of the disclosures made during that transaction (including disclosures about conflicts of interest), and (4) the authority that members of Apollo's management had historically possessed to exercise discretion over how to use investor proceeds. Mr.

Adams's deposition likewise included testimony about the Venture Bank accounts, the exercise/sale of warrants, the disclosures made in the lead up to the Apollo/Scio transaction, and what Mr. Adams claimed he was trying to accomplish with the Apollo/Scio transaction.  If, as would seem likely, the mental impressions and strategy discussed in the draft communications were incorporated into Mr. Adams's deposition testimony and Latham's presentation to the SEC, there would seem to be not much left of Mr. Adams's claim that he was prejudiced by the government being exposed to those draft communication.

According to Mr. Adams, *in camera* Exhibit A is a draft memo that Mr. Adams emailed to himself that contained his thoughts about the Apollo/Scio transaction.  This draft memo was later completed into a final version that was sent to his attorneys at Latham and then into an updated version that was sent to Mr. Hopeman.  Both of those versions that were actually transmitted to Mr. Adams's attorneys were excluded as a result of the filtering process.  If, as Mr. Adams represents, the draft was later transmitted in substantially the same form to an attorney for the purpose of seeking legal advice, the government does not contest that the draft is privileged.  *Cf. United States v. DeFonte*, 441 F.3d 92, 95 (2d Cir. 2006) ("[A]n outline of what a client wishes to discuss with counsel— and which is subsequently discussed with one's counsel—would seem to fit squarely within our understanding of the scope of the privilege.").  In terms of whether the government acted reasonably in failing to identify the draft as privileged, Mr. Adams emphasizes that the draft bore a privilege banner at the top of the memo advising that the

document consisted of attorney-client communications and attorney work product.[17]  But, as discussed in other portions of this response and in the government's motion contesting the application of the privilege as to certain communications, there has been an over-assertion of privilege as to Mr. Adams's email communications.  Most glaringly, Mr. Adams has claimed that discussions between himself and Mr. Monahan about potential civil litigation that they might be facing as individual co-defendants are subject to the attorney-client and work-product privileges despite the fact that those communications took place eight months before the lawsuit was filed and before any communications with a third-party lawyer representing them.  As noted before, it seems as if Mr. Adams's position is that his discussions with other lawyers (i.e., Mr. Monahan) about allegations that might be made against them for their dealings with Apollo are privileged simply by virtue of the fact that he and the other participants to the discussion just happened to be lawyers.  So it is not without precedent for Mr. Adams to claim privilege over emails that occurred in the absence of a then-existing relationship with an attorney who was actually representing him.  In addition, the fact that it was a draft that evidently did not clearly indicate who the intended recipient was is an important consideration in assessing the reasonableness of the government's conduct.

---

[17] It should be noted that the way that the privilege banner appears on the printed version that Mr. Adams submitted to the Court *in camera* is not necessarily identical to the way it would appear when viewed in Relativity, depending on what viewer mode was being used. In order for the Court to see what the government saw, the documents should be reviewed by the Court in Relativity.  If the Court wishes to conduct such a review, the government stands ready to make the arrangements to provide the Court with ability to do so.

In contrast to Mr. Adams's assertion that Mr. Maria focused intently on the draft contained within *in camera* Exhibit A, the Relativity log indicates that at most, Mr. Maria perhaps viewed the document for  approximately four minutes on May 4, 2016, and then encountered it several other times that afternoon for durations of 7 seconds, 4 seconds, 1 second, and 4 seconds; once on June 6, 2016, for 5 seconds; once on August 30, 2016, for less than two minutes; once on September 16, 2016, for 7 seconds; and once on September 23, 2016, for 30 seconds.  Gov't Ex. 13.  These views were the result of the document being responsive to keyword searches, which explains why Mr. Maria encountered them more than once.  No other team members viewed the document at any point.  *Id*.

Regarding *in camera* Exhibit D, a draft email that was saved as 12 discrete versions on the same day (September 10, 2015), Mr. Maria's first "view" of a version of that draft was at 1:30:31 PM on September 6, 2016, and that first view and the other eleven "views" took place over the course of 51 seconds.  Gov't Ex. 14.  The Relativity activity log shows that the views, in order, lasted 15 seconds, 2 seconds, 11 seconds, 3 seconds, 2 seconds, 4 seconds, 2 seconds, 2 seconds, 6 seconds, 1 second, 1 second, and 2 seconds.  *Id.*  In other words, Mr. Maria ran a keyword search and he spent an average of 4 seconds viewing each iteration of the draft as he clicked through the various documents returned by the keyword search.  It strains credulity to suggest that this sequence of extraordinarily brief "views" of drafts that were not addressed to a known lawyer is evidence of a cavalier disregard on the part of the government for potential privileges held by Mr. Adams.

*In camera* Exhibit G is described by Mr. Adams as a draft confidential analysis that Mr. Adams sent to himself.  He explains that he had sent a previous version of this draft to

Latham and Mr. Hopeman (this version was not viewed by the government), then he emailed it to himself (this is the version that was viewed), and finally, edited the analysis and sent the revised version to Latham (this version was not viewed). As with *in camera* Exhibit A, *in camera* Exhibit G was not excluded because it apparently did not contain the names of the attorneys, the law firms, or the law firm email domains. Thus, it would seem that nothing on the face of the document revealed who the intended recipient was, or whether Mr. Adams ever intended to send it as opposed to intending to memorialize certain thoughts in diary-like fashion. In addition, unlike *in camera* Exhibit A, *in camera* Exhibit G apparently bore no privilege banner. Finally, as with the other drafts, Inspector Kroells's "views" of the document were quite brief, lasting a matter of just under three minutes on the afternoon of May 17, 2016. Gov't Ex. 15. Thereafter, the document was never viewed again by the government in Relativity, although Inspector Kroells had printed it.

### d. *Communication with Mr. Hopeman (in camera Exhibit J)*

Mr. Adams's argument seeks to give the impression that Mr. Adams retained Mr. Hopeman in response to the U.S. Attorney's Office opening a criminal investigation of Mr. Adams. Def's Post-hearing Mem. [Dkt. 147] at 23. There is no basis in the record for such a suggestion. Although a criminal investigation was indeed opened in 2014 and Mr. Adams retained Mr. Hopeman that same year, Mr. Adams would not have learned about the fact of the criminal investigation until December 17, 2015, when the government approached one of the attorneys representing Mr. Adams and his law partner, Mr. Monahan, in connection with the SEC investigation to inform them of the fact of a criminal investigation. Gov't Ex. 16. Mr. Hopeman then reached out to the U.S. Attorney's Office

on February 16, 2016, to notify the government that he was representing Mr. Adams. Gov't Ex. 17; *see also* Maria Suppl. Decl. ¶ 15. Prior to that point, the government had no notice or knowledge of Mr. Hopeman's representation of Mr. Adams. As such, the government had no reason to know that there would be any emails with Mr. Hopeman contained in the Yahoo! production, which covered the period of October 25, 2006, through January 7, 2017, the date the warrant was signed by Judge Rau.

If there were any doubt about the timing of when Mr. Adams learned about the fact of the criminal investigation, when Mr. Adams filed his amended returns in November 2014 after working with Mr. Hopeman, Mr. Brever, and the Murry firm, he completed a "Domestic Voluntary Disclosure," in which he denied, under penalty of perjury, that he was "currently under criminal investigation by a law enforcement authority." Gov't Ex. 18. It is misleading, therefore, to claim that "*After* the U.S. Attorney's Office opened a criminal investigation of Mr. Adams, he was represented *in that investigation* by Jon M. Hopeman of Felhaber Larson," which seems designed to leave the impression that at the moment Mr. Adams retained Mr. Hopeman in 2014, it was specifically in response to this criminal investigation by this U.S. Attorney's Office.

In claiming that the government failed to take adequate steps to avoid exposure to privileged communications, Mr. Adams points to one communication (an email and an attachment) to Mr. Hopeman and copied to Mr. Brever that was accessed by the government, and he has submitted that communication as *in camera* Exhibit J. Although the Relativity activity log shows that Mr. Maria and Inspector Kroells "viewed" that one communication between Mr. Adams and Mr. Hopeman on six occasions between May 5

and May 11, 2016, those "views" were exceedingly brief.[18]  *See* Gov't Ex. 19.  Specifically, the activity log shows a "view" by Mr. Maria on May 5, 2016, at 11:08:32 AM, but Mr. Maria had tagged the document (the attachment to the email) as privileged—a function that would take up some amount of time—and moved onto the next document, all within 40 seconds.  *See id.*  Similarly, Inspector Kroells "viewed" the document (the attachment) on May 11, 2016, at 3:48:30, but had moved onto the next document within 18 seconds, and her subsequent four "views" nine minutes later, beginning at 3:57:16, lasted 3 seconds (the attachment), 3 seconds (the attachment), 26 seconds (the email), and 2 seconds (the attachment) before promptly moving onto a new document.  *See id.*

In short, the Relativity activity log corroborates the declarations and testimony of the prosecution team members that the government followed its standard, careful procedures to remain vigilant for indications that a communication might be privileged and to promptly stop reviewing any such communications if they were encountered.  And again, although several weeks elapsed before new search terms were run against the database to mechanically filter out the communication with Mr. Hopeman and Mr. Brever, no members of the prosecution team viewed that communication in the interim period (or ever again for that matter).  The search terms were successful, as Mr. Adams has not identified any

---

[18] Mr. Adams criticizes the approximately three-week gap that took place between the team members alerting each other to the presence of one communication with Mr. Hopeman and the exclusion of that communication (and any others with Mr. Hopeman) from Relativity. He fails to acknowledge, however, that no team members viewed that or any other communication with Mr. Hopeman during that three-week period.  *See* Def's Post-hearing Ex. [Dkt. 149] 18.  And, as shown in Government Exhibit 19, the views lasted a matter of only seconds, and to the extent that repeated viewings occurred, they often were the result of new searches as opposed to team members specifically seeking out that communication.

communications with either Mr. Hopeman or Mr. Brever that remained in the database after the second round of filtering was completed on June 10, 2016.

### e. Communication with Mr. Brever (in camera Exhibits K and L)

In support of his claim that the government disregarded the privilege, Mr. Adams cites one communication from him to Mr. Brever and the Murry firm (*in camera* Exhibit K), which consists of an email on October 29, 2014, and an attachment titled "ESA Tax Questions," that was viewed by Mr. Maria in May 2016 before it was excluded in early June 2016. As an initial matter, and similar to some of the communications with the Murry firm discussed below, Mr. Brever, on behalf of the Murry firm, *produced the October 29, 2014 email* (but not the attachment) in response to a grand jury subpoena *with no assertion of privilege*. Gov't Ex. 20. Yet Mr. Adams now claims that the email is privileged.

Mr. Maria's first view took place on May 4, 2016, at 3:49:13 PM, and concluded no more than 28 seconds later. Gov't Ex. 21. Three subsequent, consecutive views (two of the attachment and one of the email) took place over the course no more than three minutes and one second, and half of that time was spent on the email that was not withheld by Mr. Brever as being privileged. *Id.* A fifth view, which was of the attachment, later that same day lasted three seconds. *Id.* Five days later, the attachment was viewed for no more than 14 seconds, and a month later (June 6, 2016), just days before it was removed as a result of the second round of filtering, the attachment was viewed for four seconds. *Id.*

Although the views of this document were longer than those of some of the other document at issue, they still show that the government spent relatively little time on the documents Mr. Adams claims is privileged. And, of course, it appears that the position on

what is privileged has changed given that Mr. Brever made no privilege assertion over the email—just the attachment—whereas Mr. Adams now claims privilege over both the email and the attachment.  Further, Mr. Maria's views of the document occurred at a time when the government had no notice that Mr. Adams had an attorney-client relationship with Mr. Brever.  Finally, the attachment is described by Mr. Adams as an Excel spreadsheet, and he claims that "it was clear to anyone who viewed it that it was conveyed to seek legal advice from Mr. Brever" given that the spreadsheet header stated "Attorney-Client Privileged Communication for Tom Brever and Pat Murry."  See Mem. in Supp. of Mot. to Dismiss [Dkt. 141] at 12.  What Mr. Adams glosses over, however, is that it is entirely possible, and perhaps even likely, that Mr. Maria was not able to see the header that indicated the privileged nature of the spreadsheet for the reasons discussed below.

In the course of this litigation, Mr. Adams's attorneys provided the government with native Excel versions of Mr. Adams's two personal privilege logs.  *See* Gov't Exs. 22, 23. As a test case, those Excel files, which contained headers, were loaded into Relativity, selected, and then opened in their native application, Excel, as well as viewed in the viewer mode and the extracted text mode.  Screenshots of those actions are attached hereto as Government Exhibit 25.  The first page of Government Exhibit 25 is a screenshot of the placeholder that appears when the user is operating under the viewer mode and navigates to the document.  The second page is a screenshot showing the dialogue box that appears when the user elects to open the file in its native format.  The third page shows the spreadsheet once it has been opened in the Excel application, and, as noted above, the header is not visible.  Only by taking additional actions, *see* page four, does the header

become visible to the user, *see* page five.  The sixth page is a screenshot of the file when the user is employing Relativity's viewer mode.  Again, the header is not visible.  Page seven is a screenshot of what the user would see when using Relativity's extracted text function.  Again, the header does not appear at the top, and instead appears only several pages later at the very bottom of the extracted text, see page 8.[19]

*In camera* Exhibit L is three emails by Mr. Adams to Mr. Brever on September 25, 2014.  There were five, nonconsecutive views of these three emails between May 4, 2016, and May 12, 2016, and they lasted no more than 3 seconds, 2 seconds, 5 seconds, 5 seconds, and 4 seconds.  Gov't Ex. 27.  The durations speak for themselves.  The documents were removed as a result of the filtering process in early June 2016.

f.   *Communications with the Murry firm (in camera Exhibits M through T)*

In the Murry firm's production in response to a grand jury subpoena, Mr. Brever claimed there were a total of 192 privileged communications.  *See* [Dkt. 93-5].  Of those, 68 were communications in which Mr. Brever was neither a sender nor recipient.  Approximately three weeks after the Murry firm's production, the view of what actually was privileged evolved and resulted in the production of 31 communications that had

---

[19] Given the current posture of this litigation, the government is precluded from attempting to determine whether the same is true of the header in the spreadsheet from *in camera* Exhibit K.  But, as the above discussion indicates, the spreadsheet, as it appears on the computer screen when using the Relativity program, would not look identical to the printed copies that Mr. Adams has submitted as part of his *in camera* exhibits.  If the Court concludes that knowing the answer to questions such as this one is necessary to the resolution of Mr. Adams's motions, the government is prepared to make arrangements to allow the Court to view the documents at issue using the Relativity program as opposed to the paper versions that have been submitted to the Court *in camera*.

previously been withheld as privileged. *See* Brever Decl. [Dkt. 93]; [Dkt. 93-6].  There are a total of seven communications with the Murry firm that are in issue by virtue of Mr. Adams's pending motions, which Mr. Adams has submitted as *in camera* Exhibits M, N, O, P, R, S, and T.[20]  *See also* [Dkt. 91-22] Ex. 22.  All seven occurred over the course of approximately two weeks, between the date that the Murry firm was retained under a *Kovel* arrangement (October 27, 2014) and the date that Mr. Adams was told that the amended returns were complete and ready to be signed (November 12, 2014):

- Mr. Adams to P. Murry and A. Miller on 10/28/15 at 8:38:31 PM (*in camera* Ex. R)

- A. Miller to Mr. Adams on 10/29/14 at 5:53:08 PM (*in camera* Ex. O)

- Mr. Adams to A. Miller on 10/29/14 at 6:02:40 PM (*in camera* Ex. M)

- Mr. Adams to A. Miller on 10/29/14 at 7:25:49 PM (*in camera* Ex. N)

- Mr. Adams to P. Murry and A. Miller on 11/4/13 at 10:15:01 AM (*in camera* Ex. P)

- Mr. Adams to A. Miller on 11/8/14 at 12:44:53 PM (*in camera* Ex. S)

- Mr. Adams to P. Murry on 11/10/14 at 6:59:25 AM (*in camera* Ex. T)

---

[20] Mr. Adams describes *in camera* Exhibit Q as a collection of documents that were sent by Mr. Maria to Special Agent Belich.  Although it is not entirely clear, it appears that *in camera* Exhibit Q consist of a repeat of some of the documents contained within *in camera* Exhibits M, N, O, P, R, S, and T.  It seems from Mr. Adams's description that it includes three emails between Mr. Adams and the Murry firm that are claimed to be privileged and several documents that were attached to those three emails, including two letters from the Minnesota Department of Revenue and four sets of previously filed amended returns. Setting aside the emails themselves for the moment, it is unclear how Mr. Adams could assert that two letters from the Minnesota  Department of Revenue and four sets of previously filed tax returns are privileged, even if they were attached to an email that ultimately is determined to be privileged.

The remainder of the communications with the Murry firm either have not been claimed to be privileged or were excluded as a result of the second round of privilege filters or the final filter in April 2017. The filtering process excluded any communication with the Murry firm in which Mr. Brever was also a recipient, as well as any communication in which the name "Brever" appeared. Thus, the filtering process cast a wider net than was necessary, as evidenced by the fact that it excluded a number of communications over which no privilege assertion has been made. *See, e.g.*, [Dkt. 93-3].

With regard to the seven Murry communications at issue, the government contends that those seven communications are not privileged or, if they were, the privilege has been waived—at least as to some portions of those communications. The government recognizes that the Court has already ruled, as a general matter, that the Murry documents are, broadly speaking, covered by privilege but understands the Court's prior rulings as having reserved the issue of whether specific documents within that category are privileged and whether the privilege has been waived or undermined by, for example, the crime-fraud exception. *See* Report and Recommendation ("R&R") [Dkt. 117] at 4 n.3, 14. By the filing of this memorandum, and the contemporaneous filing of a motion contesting the application of the privilege as to certain communications claimed by Mr. Adams to be privileged, the government submits that the issue is ripe for the Court's determination. In addition, the government respectfully maintains that several aspects of the privilege analysis of the Murry documents must be viewed through the prism of assessing the reasonableness of the government's conduct, even if the Court rejects the government's below arguments regarding waiver and the crime-fraud exception.

66

### i. The government had a substantial basis for believing that the communications with the Murry firm were not privileged

First, it is relevant to the Court's assessment of reasonableness to assess just how clear the privileged nature of the communications were when the government encountered them. As noted above, the filtering process excluded all communications in which Mr. Brever was either a recipient or his name was mentioned. This would include the communication establishing the *Kovel* arrangement with the Murry firm. Thus, it was not until the Murry firm produced documents in response to the grand jury subpoena, many months after the email database had been filtered for any documents mentioning Brever, that the government was notified that a *Kovel* arrangement existed.

More importantly, as the government has consistently maintained, there is a substantial basis to believe that the seven communications at issue are not privileged because a significant purpose of those communications was to prepare tax returns. In its R&R, the Court held that record demonstrated that preparing tax returns was not the *sole* purpose of the communications with the Murry firm. The government respectfully submits that this is an incorrect statement of the applicable test.[21] In fact, the inverse is the correct

---

[21] This erroneous statement of the test appears to be due largely to the fact that the government asserted in a prior submission [Dkt. 109] that the communications with the Murry firm appear to have been solely for the purpose of obtaining tax-preparation services. But the conclusion that communications with the Murry firm were not solely for the purpose of tax-preparation services does not mean that the communications with the Murry firm were solely, predominantly, or primarily for the purpose of obtaining legal advice. The R&R also concludes that Mr. Adams retained Mr. Brever before the decision was made to file amended returns and that the Mr. Brever's services were not limited to preparing taxes and included legal advice as well. But for purposes of determining whether the communications with the Murry firm are privileged, the salient questions are whether the Murry firm was retained before the decision was made to file amended returns and

test: when a communication is made for more than one purpose, one of which is to obtain legal advice, the communication is privileged only if the "sole," "primary," or "predominant" purpose was to obtain legal advice. *See In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("[I]nformation transmitted to an attorney or to the attorney's agent is privileged if it was not intended for subsequent appearance on a tax return and was given to the attorney for the *sole purpose* of seeking legal advice.") (emphasis added) (citing *United States v. Frederick*, 182 F.3d 496, 501 (7th Cir. 1999)); *see also Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 628 (D. Nev. 2013) ("[I]n order for a communication that pertains to both business and legal advice to be considered privileged, the '*primary purpose*' must be to obtain legal advice.") (emphasis added); *In re County of Erie*, 473 F.3d 413, 420 (2d Cir. 2007) ("We consider whether the *predominant purpose* of the communication is to render or solicit legal advice.") (emphasis added).  As applied here, therefore, Mr. Adams must demonstrate that the communications were predominantly, primarily, or solely for the purpose of obtaining legal advice as opposed to tax-preparation services.  The text of the communications that immediately preceded and succeeded the communications at issue would seem to preclude Mr. Adams from satisfying this test.

The government, of course, is unable to assess the communications themselves, but the communications that are available to the government are revealing.  On October 27, 2014, the Murry firm wrote to Mr. Brever:

---

whether the Murry firm's services were limited to tax-preparation services or if they also included services that facilitated Mr. Brever's provision of legal services.

> **From:** Patrick M. Murry [mailto:pmurry@murryllc.com]
> **Sent:** Monday, October 27, 2014 2:03 PM
> **To:** Thomas Brever
> **Cc:** edwardsadams@yahoo.com
> **Subject:** RE: Amended Returns
>
> Tom –
>
> We would be happy to prepare any amended returns that are required.  If we can get all of the necessary information (the original returns and the information on the omitted income) we can get right on preparing the returns.
>
> Please let me know if you would like me to work through you or to contact Mr. Adams directly for the information.
>
> Pat

[Dkt 109-8].   The plain language of this communication shows the need for the transmission of information—the purpose of the communications—that followed shortly thereafter was so the Murry firm could "get right on preparing the returns."  There was nothing said in the email that indicated that the Murry firm would use the information about the "omitted income" to "get right on assisting Mr. Brever in providing legal advice."  That is because by the time the Murry firm was brought on board, Mr. Adams had already told Mr. Brever that income from a return had been "mistakenly omitted."  *See* [Dkt 109-8].  Accordingly, Mr. Brever had already given the only "legal advice" he could give, which is that amended returns would be needed.[22]  Thus, Mr. Adams saying the same thing to the Murry firm was not necessary to enable Mr. Brever to give advice he had already given.  And if Mr. Adams then told the Murry firm that the genesis of that income was the proceeds from the sale of Apollo stock or warrants—again, the amended returns that were filed prove that this was the case—such a communication was necessary for the Murry firm to know

---

[22] This shows why the idea that the Murry firm assisted Mr. Brever in giving legal advice about whether to file amended returns is illusory.  It is not as if the Murry firm's accounting work on the omitted income could change Mr. Brever's legal advice to Mr. Adams that amended returns were needed.

69

how to prepare the amended returns.  Perhaps Mr. Brever could have provided legal advice about how to present all of this to the IRS, but that would not cloak the underlying facts about the transactions with the privilege given that those underlying facts were necessary to the Murry firm carrying out its function of preparing the amended returns.[23]

Regardless of the Court's final determination with regard to the seven communications with the Murry firm, the fact that those seven communications were viewed and were not excluded does not support Mr. Adams's claim that under the totality of the circumstances, the government's execution of the search warrant was unreasonable. In light of the discussion above and the numerous issues discussed below, it is not at all clear that they are privileged or that the privilege has not been waived, and the same was true back in December 2016 when Mr. Brever first alerted the government to the *Kovel* arrangement.  If it turns out that the government erred in its conclusion that the communications with the Murry firm are not privileged or the privilege has been waived, that was a reasonable mistake of law that would not be incompatible with the conclusion that the government acted reasonably.  *See Heien*, 135 S.Ct. at 536.

### ii.  Inconsistencies in privilege assertions

Closer examination of the record reveals additional flaws in Mr. Adams's privilege claim over the Murry documents.  On October 28, 2014, at 8:38:31 PM, Mr. Adams sent an email to Murry that attached a spreadsheet titled "ESA Tax Summary for P. Murry."

---

[23] It is difficult to imagine, for example, how a six-page spreadsheet, *see in camera* Exhibits R and Q, [Dkt 91-22] at Tab 1, that presumably summarized historical transactions from prior years was not primarily to assist the accounting/tax-return preparation function of the Murry firm as opposed to the claimed function of helping Mr. Brever provide legal advice.

Mr. Adams has submitted both the email and the attachment as *in camera* Exhibit R.  *See also* [Dkt 91-22] at Tab 1.  Despite now claiming that both the email and the attachment are privileged, it appears that Mr. Brever claimed privilege over only the attachment and produced as unprivileged the same email—the timestamp is identical—in responding to the grand jury subpoena on behalf of the Murry firm.  Gov't Ex. 28.

Mr. Brever likewise asserted no claim of privilege over an email sent by Mr. Adams to the Murry firm on November 8, 2014, at 12:44 PM, but Mr. Adams now claims that email—the timestamps match—as privileged and included it in his submission of *in camera* Exhibit S.  *Compare* [Dkt 91-22] at Tab 6 to Gov't Ex. 29.  Moreover, in Mr. Adams's privilege log submitted to the Court back in February 2018, he listed three other associated documents—presumably they were attachments to the email—but those three associated documents do not appear on the privilege logs submitted in support of his most current motions.  *Compare* [Dkt. 91-20, 91-22] at Tab 6 *with* [Dkt 142] Def's Exs. 1 and 2.  The production from Mr. Brever, on behalf of Murry, indicates that the three attachments might be "2009 Adams E Form 1040 Individual Tax Return.PDF"; "DLA Tax Return Stock Trades (2009).xls"; and "ESA Tax Return Stock Trades (2009).xls."  Mr. Brever, on behalf of the Murry firm, produced all three of those attachments.  Given the current posture of this case, the government has no way of knowing whether these three attachments are indeed the ones that were attached to the November 8, 2014 email, but the description, date, and time of the email suggest that they are.  In addition, the total length of these three documents produced by Mr. Brever appears to correspond to the total number of redacted pages in Tab 6 of [Dkt 91-22].

71

Yet another of the Murry communications that Mr. Adams now claims is privileged appears to have been released by Mr. Brever as not privileged.  On November 10, 2014, at 6:59:25 AM, Mr. Adams sent an email to the Murry firm, which Mr. Adams has submitted as *in camera* Exhibit T, along with three attachments to the email.  *See* [Dkt 91-22] at Tab 7.  The same email—the timestamps match—was produced by Mr. Brever without any assertion of privilege.  Gov't Ex. 30.  The attachments appear to be the same ones that were attached to the prior email from November 8, 2014, which were produced by Mr. Brever.  Again, those three attachments appear on Mr. Adams's February privilege log but not on his most current privilege logs. *Compare* [Dkt. 91-20, 91-22] at Tab 7 *with* [Dkt 142] Def's Exs. 1 and 2.  The description, date, and time of the email all match and the total length of these three documents produced by Mr. Brever appears to correspond to the total number of redacted pages in Tab 7 of [Dkt 91-22].

In light of the above, it appears that it necessary to provide the Court with the entirety of Mr. Brever's production on behalf of the Murry firm in response to the grand jury subpoena so that the Court can evaluate the apparent inconsistencies between the privilege assertion in the Murry production and Mr. Adams's current privilege assertions, which appear to have evolved since February.[24]  These apparent inconsistencies are telling in that they suggest that Mr. Adams's own attorneys are not certain about what documents

_____

[24] The production by the Murry firm is attached as Government Exhibit 43.  The government respectfully urges the Court to compare the information therein to the information contained in the seven communications at issue to determine whether they undermine the current privilege assertions or support the view that the privilege has been waived by the Murry firm's production.

72

really are subject to a *Kovel* arrangement and that their views change depending on the circumstances.  Indeed, as alluded to above, Mr. Brever had to re-review the caselaw to come to the conclusion that he had improperly withheld 31 communications as covered by the *Kovel* arrangement when he made his first production on behalf of the Murry firm.  *See* Brever Decl. ¶ 13.

### iii. Waiver by the filing of amended returns.

As noted above, the email on October 27, 2014, strongly suggests that any raw factual information that Mr. Adams was compiling and then sending to the Murry firm would be used more by the Murry firm to prepare amended returns than to assist Mr. Brever in providing legal advice.  Mr. Brever's email to Mr. Adams on November 12, 2014, removes any lingering uncertainty regarding the purpose behind Mr. Adams's transmission of information to Murry about the "omitted income":

**Ariel Scott**

| | |
|---|---|
| From: | Thomas Brever <tbrever@fosterbrever.com> |
| Sent: | Wednesday, November 12, 2014 11:40 AM |
| To: | edwardsadams@yahoo.com; Patrick M. Murry |
| Subject: | Signing Returns |

Ed,

Pat has prepared the amended returns based on the documents and information provided. They can be signed by you and your wife. I have sent a disclosure statement to Pat for comment. This can be added to the returns for filing.

Tom

[Dkt. 109-9].  It is conceivable that there could be portions of the seven communications that were primarily for the purpose of obtaining legal advice.  For example, if the communications revealed discussions about *why* Mr. Adams had not previously reported

the income or what impact, if any, filing amended returns might have on the SEC investigation or civil lawsuits that were pending at the time, such discussions could be primarily for the provision of legal advice rather than tax preparation services.  To the extent that is the case, those portions should be redacted.  But the compilation of factual information about previously completed financial transactions and explanations about the nature of those transactions simply gave the Murry firm the information needed to log the transactions on a schedule that supported the calculations on the amended returns and decide which type of tax rate was applicable—e.g., ordinary income, short term capital gains, long term capital gains, etc.   And even if Mr. Adams's transmission of such information to the Murry firm was privileged in the first instance (an argument with which the government disagrees), the subsequent filing of those amended returns operates as a waiver to the portions of the communications with the Murry firm that ended up being incorporated into the amended returns.

In the R&R, the Court reserved ruling on the issue of whether the privilege has been waived over certain communications with the Murry firm.  *See* R&R at 4 n.3, 14.  An analysis of the amended returns that were prepared and filed with the assistance of the Murry firm,[25] along with additional information produced by the Murry firm without any assertion of privilege, indicates that the privilege has been waived as to much if not all of the seven communications at issue. The production from the Murry firm in response to the grand jury subpoena discloses that the previously "omitted income" that prompted the need

---

[25] Those amended returns for 2008, 2009, and 2010 are attached hereto as, respectively, Government Exhibits 31, 32, and 33.

for Mr. Adams to amend his returns a second time—the first was in 2011 with the assistance of Larson Allen—was capital gains from the sale of Apollo stock. The amended returns that Mr. Adams filed with the IRS with the assistance of the Murry firm were accompanied by the following disclosure statement:

---

**DISCLOSURE STATEMENT**

Pursuant to Regulations, the taxpayer hereby discloses the basis for the 2008, 2009 and 2010 amended returns.

In 2003, the taxpayer exercised stock warrants and received stock. The taxpayer sold some stock in 2008. The 2008 amended return recognizes the gain and applies Section 1202 to the income received from the sale of stock.

In 2009, the amended return includes additional income from the sales of stock previously received on the exercise of stock warrants in 2003 and applies Section 1202 to the income received from the sale of stock.

In 2010, the amended return includes additional income from sales of stock previously received on the exercise of stock warrants and applies Section 1202 to the income received from the sale of stock.

The warrant exercises and stock sales were effected in part through an LLC that conducted no business activity and had no operations. This entity is disregarded for purposes of reporting the gain on the sales.

---

Gov't Ex. 31 at Page 7.

There is no doubt that the information Mr. Adams provided to the Murry firm during the course of the two-week period was used to prepare the returns. Just as importantly, that

information (or at least a summary thereof) was then included in the returns *that were filed with the IRS*, which, as this Court has recognized, operates as a waiver of the privilege both as to the information included in the returns and the "'details underlying that information.'" R&R at 12-13 (*citing United States v. Cote*, 456 F.2d 142, 144-45 (8th Cir. 1972). The simple fact that Mr. Adams filed amended returns necessarily means that the raw factual information had to have been used to prepare and file those returns.[26]  And so, if the spreadsheets and other documents that were attached to the communications with the Murry firm listed various transactions—for example, the receipt of proceeds from the sale of Apollo stock created as a result of exercising a warrant—then those spreadsheets and other documents formed the basis for what was disclosed on the amended returns, which is exactly what is indicated by the disclosure statement identified above.

### iv. The crime-fraud exception.

The above disclosure statement raises an issue over whether the crime-fraud exception applies to the communications with the Murry firm—and to the communications with Mr. Brever, as well.  The disclosure statement claims that Mr. Adams "exercised stock warrants and received stock" in 2003 and then realized income from selling that stock in 2008, 2009, and 2010.  As described in the superseding indictment, although Mr. Adams may have received warrants in 2003, he did not purport to exercise them until much later.

---

[26] As noted in the government's previous submissions, there is persuasive authority for the view that whether or not the amended returns are filed is irrelevant given that if the information was transmitted with the understanding that it might be included on an amended return, the privilege never attaches in the first place.  *See United States v. Schussel*, 291 Fed. Appx. 336, 347 (1st Cir. 2008).

Indeed, the investigation indicates that the proceeds that were deposited into the allegedly secret accounts at Venture Bank were the result of Mr. Adams having purported to sell unexercised warrants to new investors, which were then exercised to create the new stock. All of these warrant sales happened, not in 2003, but in 2006 through 2010.

One such example is a transaction with investor B.E., which occurred on November 17, 2007. Gov't Ex. 34. The instrument, which was titled "Agreement to Purchase and Exercise Including Investment Representations," provides that "you have agreed to purchase and exercise . . . 50,000 warrants, each warrant exercisable into one share of common stock of Apollo Diamond, Inc. . . . at a price of . . . $5.55 per warrant in the aggregate amount of . . . $277,500. For purposes of this agreement, the term 'Securities' shall mean the *warrants purchased and corresponding stock into which such warrants are converted by the exercise of such warrants purchased by you hereby*." *Id.* (Emphasis added). The corresponding payment several months later from B.E. was deposited into the RL Investments account at Venture Bank, which Mr. Adams then used (along with the proceeds from other investors who similarly acquired their shares through Mr. Adams simultaneously selling and exercising warrants) to pay himself, his consulting firm, his law firm partner (Mr. Monahan), and his law firm partner's consulting firm. None of the money in the RL Investments account was ever sent to the Apollo companies' operating accounts.

Documents purporting to record the fact and timing of the exercise of warrants also confirm that proceeds deposited into the Venture Bank accounts were the result of the sale of unexercised warrants in 2006-2010. For example, on June 15, 2008, Mr. Adams executed a subscription form, which included the heading "To be signed upon exercise of

77

Warrant," whereby Mr. Adams "elect[ed] to exercise the purchase right represented by such Warrant for, and to purchase thereunder, 11,500 shares of Common Stock, par value $1.00 per share, of APOLLO DIAMOND, INC. ("the Company") to which such Warrant relates and herewith makes payment of $11,500 therefor by check and or other credit requests that the certificate for such shares be issued in the name of, and be delivered to . . . ESA Consulting."   Gov't Ex. 35.   Similarly, on September 8, 2008, Mr. Adams executed a subscription form in which he "elect[ed] to exercise the purchase right represented by such Warrant for, and to purchase thereunder, 198,000 of the shares of Common Stock of APOLLO DIAMOND, INC., to which such Warrant relates and herewith makes payment of $9900 therefor in cash or by certified check and requests that the certificate for such shares be issued in the name of, and be delivered to, RL."   Gov't Ex. 36.   And on December 10, 2009, Mr. Adams executed a subscription form in which he "elect[ed] to exercise the purchase right represented by such Warrant for, and to purchase thereunder, 10,500 of the shares of Common Stock of APOLLO DIAMOND, INC. to which such Warrant relates and herewith makes payment of $42,000 [illegible handwriting] therefor in cash or by certified check and requests that the certificate for such shares be issued in the name of, and be delivered to, ADR Parties Spreadsheet."   Gov't Ex. 37.   Yet again, on January 5, 2010, Mr. Adams executed a similar subscription form related to 26,000 warrants, while simultaneously executing an assignment form transferring to ADR Investments the right to purchase the 26,000 shares generated by his exercise of the warrants on the same day.   Gov't Ex. 38.   There are numerous additional examples showing that the previously unreported income generated in 2006-2010 and deposited into the

Venture Bank accounts before much of it was then disbursed to Mr. Adams, was not the result of selling stock that had been created through the exercise of warrants in 2003 but as a result of selling unexercised warrants in 2006-2010 that were then exercised as a part of that transaction.

Or as Mr. Adams himself put it in a letter he produced in response to a grand jury subpoena, which letter was dated October 17, 2007, and addressed to J.Z. (an individual referenced in the superseding indictment):

> I want to again point out the mechanics of the transaction . . . . Warrant holders/shareholders in Apollo Diamond—the core—*will be selling warrants/shares that will be exercised by the buyer.* So, the company, Apollo, will get the modest exercise price (although, if they are cashless, it will not get that) either in cash or other consideration (services) and the seller will get the difference—if exercise price of $.05 to company and seller gets $5.50

Gov't Ex. 39 (emphasis added). A November 27, 2008 memorandum created by Mr. Adams likewise makes crystal clear that Mr. Adams did not exercise the warrants in 2003, as falsely claimed on the amended returns filed with the assistance of the Murry firm:

Re:   Warrants Sales

Per your request and as a further summary record of approval to date, the following is another total summary of warrant sales in 2006, 2007, and 2008. To confirm, the sellers were: Adams, Monahan & Sankovitz, LLP, Me, You, Bryant, Pat, and Larry Zipkin. I previously faxed the schedules of the sellers for approval and for the corporate records. Let me know if you need copies.

2006: RL Investments $909,000

2007: Apollo Diamond Escrow $800,000

2007: DL Investments $1,771,500

2008: RL Investments $1,498,000

Gov't Ex. 40.

So it would seem that there can be no genuine dispute that the amended returns filed with the assistance of the Murry firm, and the disclosure statement that accompanied them, were based on false information.  The remaining question, therefore, is "to what end?" Why lie on the amended returns filed with the assistance of Mr. Brever and the Murry firm? The difference between Mr. Adams having exercised the warrants in 2003 and then sold the stock in 2008-2010, as falsely claimed on the amended returns, as opposed to having sold unexercised warrants in 2008-2010, would affect his ability to take advantage of a lower tax rate.  *See* 26 U.S.C. § 1223(5) ("In determining the period for which the taxpayer has held stock or securities acquired from a corporation by the exercise of rights to acquire such stock or securities, there shall be included only the period *beginning with the date on which the right to acquire was exercised*.") (emphasis added).[27]  A lower, long-term rate applies to any capital gain realized on a stock held for over one year.  Thus, if Mr. Adams exercised the warrants in 2003, thereby acquiring the stock, and did not sell that stock until 2008 or later, then the lower, long term rate would apply.  But if Mr. Adams simply sold unexercised warrants in 2006-2010, which resulted in the warrants being exercised, then the proceeds of those sales would be taxed as ordinary income subject to the much higher marginal rates.  *See Svoboda v. Comm'r*, 92 T.C.M. (CCH) 393, 2006 WL 3103064, at *4 (2006) (holding that a taxpayer's gains from the exercise of options on the same day that

---

[27] Mr. Adams agrees that a warrant is not a stock or security itself and instead is an instrument that merely gives the holder "'an option to purchase shares of corporate stock at a fixed price.'"  Def's Post-hearing Mem. [Dkt. 147] at 5 n.1 (quoting *Merrimac Assocs., Inc. v. Daig Corp*, 799 F.2d 1251, 1253 (8th Cir. 1986)).

the stock generated by exercising those options was sold was subject to taxation as ordinary income).  In addition, the amended returns prepared with the assistance of the Murry firm claimed that Mr. Adams held the stock created as a result of his exercise of warrants for more than five years, which allowed him to claim a partial exclusion (50% of the gains) under 26 U.S.C. § 1202.  In short, the disclosure statement indicates that Mr. Adams gave false information to the Murry firm so that he could fraudulently take advantage of a lower tax rate that would be applied to only 50% of the proceeds of the warrant sales that occurred in 2008-2010.

Under the crime-fraud exception, the attorney-client privilege "does not extend to communications made for the purpose of getting advice for the commission of a fraud or a crime." *In re Green Grand Jury Proceedings*, 492 F.3d 976, 979 (8th Cir. 2007) (citing *United States v. Zolin*, 491 U.S. 554, 563 (1989)).  Accordingly, under the crime-fraud exception, "[a]ttorney-client communications lose their privileged character when the lawyer is consulted not with respect to past wrongdoings but rather to further a continuing or contemplated criminal fraud or scheme." *Id.* (quoting *Gundacker v. Unisys Corp.*, 151 F.3d 842, 848 (8th Cir. 1998)).  Similarly, "a client who has used his attorney's assistance to perpetrate a crime or fraud cannot assert the work product privilege as to any documents generated in furtherance of his misconduct." *Id.* at 980.  To warrant an *in camera* inspection by the Court to determine whether the crime-fraud exception applies requires a "threshold showing 'of a factual basis adequate to support a good faith belief by a reasonable person' that the crime-fraud exception applies." *Id.* at 983 (citing *Zolin*, 491 U.S. at 572). "To overcome a claim of privilege using the 'crime-fraud' exception, the

81

government must merely make a *prima facie* showing that the legal advice has been obtained in furtherance of an illegal or fraudulent activity." *United States v. Horvath*, 731 F.2d 557, 562 (8th Cir. 1984) (citations omitted).

The above discussion of the disparity between how Mr. Adams actually realized the proceeds in 2008 through 2010 from the transactions involving the Apollo warrants and how those proceeds were reported on the amended returns prepared with the assistance of the Murry firm supports a good-faith belief that the crime-fraud exception applies. For this reason, and for all of the other reasons identified above, the government has, contemporaneously to its filing of this response, filed a motion contesting the application of the privilege as to the communications with the Murry firm.

### g. Communications with Mr. Hartman (in camera Exhibit U)

Mr. Hartman represented Mr. Adams and Mr. Monahan in connection with allegations by two whistleblowers, Messrs. Mack and Rapello, who were involved with Mr. Adams and Mr. Monahan in Focus Capital. As alluded to above, Mr. Mack and Mr. Rapello sent a demand letter to Mr. Adams and Mr. Monahan in March 2012, and a lawsuit was filed in May 7, 2012, although it settled five days later on May 12, 2012. Unlike the pending criminal case, which alleges that the Apollo/Scio transaction was a means by which Mr. Adams perpetuated and attempted to cover up the money he took from the proceeds of warrant sales deposited into the Venture Bank accounts, the litigation by Mr. Mack and Mr. Rapello alleged that Mr. Adams orchestrated the Apollo/Scio transaction in a way that fraudulently increased his ownership interest while extracting fees along the way.

Mr. Hartman worked for Anthony, Ostlund, Baer & Louwagie, which has the domain name anthonyostlund.com.  That domain name was employed in the first round of filtering and, although it succeeded in excluding 15 documents, Zeitz Ex. 4, a number apparently were not excluded because Mr. Hartman used an email address that bore the domain name aoblaw.com.  Most of the views of the documents that made it through the filtering process occurred between May 24, 2016, and May 31, 2016, with one view in late June 2016, and several views in December 2016.  As was the case with many of the documents discussed previously, the durations of the views of these documents were brief, including one view that lasted less than one second, numerous views that lasted only 1 to 3 seconds, a handful of views that lasted 10 to 18 seconds, and three "longer" views that lasted 25 seconds, 36 seconds, and 46 seconds.  Gov't Ex. 41.  The numbers yet again show that the government's review proceeded much the way that was explained in the declarations and during the evidentiary hearing: team members remained vigilant for potentially privileged communications and, on the few times that they encountered them, they quickly moved onto other documents and searches.

### C.  There Was No Flagrant Disregard For The Scope Of The Warrant

Mr. Adams's argument that the government over-seized documents and displayed a flagrant disregard for the scope of the warrant fails because, as previously explained, it suffers from an incorrect interpretation of the scope of the warrant and, as a result, a massive over-count of the number of documents viewed or seized that were outside the scope of the warrant.  More than 140,000 documents were produced by Yahoo!, approximately 108,000 of which came from Mr. Adams's accounts.  The government

83

ultimately declared nearly 43,000 documents (approximately 29,000 came from Mr. Adams's accounts) as being potentially relevant (i.e., within the scope of the warrant).  But only 7,092 unique documents were ever viewed, and only 3,877 of those (a mere fraction of the total 108,000 that were produced from Mr. Adams's accounts) were among the 43,000 (29,000 of which were from Mr. Adams's accounts) that were ultimately retained. Without even getting to the issue of how many of those 3,877 were truly outside the scope of the warrant, the numbers, by themselves, belie the notion that the government's review of Mr. Adams's Yahoo! accounts was unreasonable . . . a "fishing expedition," "general rummaging," an "over-seizure," or a display of "flagrant disregard" for the terms of the warrant or Rule 41.  After correcting Mr. Adams's erroneous assessments of the number of viewed/seized documents that were outside the scope of the warrant, at best, only 750 conceivable pertain to matters outside the scope of the warrant (Maier Supp'l Decl. ¶¶ 3-4), and even those can be justified because, as the *Lee* court correctly observed, they could have evidentiary or foundational value to issues such as authentication, attribution, identity, motive, intent, and opportunity.

With regard to documents that Mr. Adams claims are privileged, more than 33,000 potentially privileged documents were removed before the government even began its search efforts in earnest, and an additional 1,494 were removed a month later.  The government exercised prudence when reviewing the Yahoo! production.  The members of the prosecution team remained mindful of the need to quickly move off any documents if they appeared to potentially be privileged.  Filtering procedures were employed to remove all documents that mentioned terms such as "latham," "watkins," "wc," "felhaber,"

84

"hopeman," and "brever," among others.  The filtering procedures were redoubled to increase the "fuzziness" of the privilege terms.  Zeitz Decl. ¶ 23.  Those procedures resulted in the removal of a large number of documents.

It is true that the filtering procedures were not perfect.  It appears that a small number of documents were not filtered out as a result of these procedures either because the documents were drafts Mr. Adams emailed to himself (which he later sent in some form to an attorney) that did not include one of the privilege terms or because they were communications with Mr. Hartman, who used an email address that contained a different domain name.  The government does not contest that the drafts, which Mr. Adams's claims were later transmitted in substantially the same form to an attorney for the purpose of seeking legal advice, are subject to an assertion of privilege.  But the fact that it was a draft that did not clearly indicate who the ultimate recipient was intended to be should be considered in judging the reasonableness of the government's efforts.

The Relativity activity log, when viewed in a more complete context rather than the excerpts that Mr. Adams provides, shows that the government generally spent no more than seconds on the privileged documents.  Insofar as certain documents were purportedly viewed multiple times, the additional views were frequently the product of new keyword searches and the additional views likewise lasted for only a few seconds.

### D.  Mr. Adams's Requested Relief

The Court should deny Mr. Adams's primary form of requested relief, the blanket suppression of all documents obtained from the Yahoo! production of his two email accounts, because (1) the warrant was sufficiently particularized and the list of items to be

seized was not overbroad; (2) the government reasonably executed the warrant by using search terms to identify only those documents that fell within the scope of the warrant and exclude documents that might contain privileged information; and (3) the government's efforts were largely successful in eliminating documents that truly were outside the scope of the warrant or were potentially subject to a claim of privilege.

Despite Mr. Adams's efforts to paint it as such, this is not a case of the government acting unreasonably or in reckless disregard of the proper procedure under Rule 41. The Court can readily fashion a remedy that vindicates Mr. Adams's interests: suppression of those documents that are truly outside the scope of the warrant and/or are subject to a valid claim of privilege that has not been waived. Although *Lee* suggests that the Court need not suppress the documents that have not yet been viewed (even though they were retained after April 4, 2017) or were not retained (even though they were viewed prior to April 4, 2017), the government does not object to the Court fashioning such a remedy. And, of course, the government does not object to suppression of the documents that span Exhibits A through U if the Court, after its *in camera* review, concludes that they are indeed privileged and that the privilege has not been waived.

*       *       *

## IV.    CONCLUSION

For the reasons stated, the government respectfully request that the Court deny Mr. Adams's motion for blanket suppression and instead order suppression of only those documents that are truly outside the scope of the warrant and/or are subject to a claim of privilege that has not been waived.

Dated: July 23, 2018                                   Respectfully Submitted,

                                                       ERICA H. MacDONALD
                                                       United States Attorney

                                                       *s/ John Kokkinen*

                                                       BY:  JOHN KOKKINEN
                                                       Assistant U.S. Attorney
                                                       Attorney Id No. 0388356
                                                       600 U.S. Courthouse
                                                       300 South Fourth Street
                                                       Minneapolis, Minnesota 55415
                                                       612-664-5600