UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-64 (DWF/KMM)

UNITED STATES OF AMERICA,

                Plaintiff,

     v.

EDWARD S. ADAMS,

                Defendant.

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and John Kokkinen, Assistant United States Attorney, respectfully submits this post-hearing response to defendant Edward S. Adams's motion to dismiss [Dkt. 141].

Dated: July 27, 2018

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

BY:  JOHN KOKKINEN
Assistant U.S. Attorney
Attorney Id No. 0388356
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415
612-664-5600

I.   INTRODUCTION ........................................................................................ 1

II.  BACKGROUND .......................................................................................... 1

III. ARGUMENT .............................................................................................. 2

   A.  The Court Should Deny Mr. Adams's Motion To Dismiss. ................... 2

     1.  No Sixth Amendment Violation Occurred ....................................... 3

     2.  No Fifth Amendment Violation Occurred ........................................ 7

       a.  Objective awareness of a personal attorney-client relationship .................... 8

       b.  Deliberate intrusion ..................................................... 8

         i.   The alleged intrusions were brief ........................... 9

         ii.  The alleged intrusions were not severe ................... 12

       c.  Actual and Substantial Prejudice .............................. 17

     3.  The Court's Supervisory Power .................................................... 28

   B.  The Court Should Deny Mr. Adams's Request For Disqualification ................... 29

   C.  The Court Should Deny Mr. Adams's Request For A *Kastigar*-Like Hearing ..... 41

IV. CONCLUSION ......................................................................................... 43

# I.    INTRODUCTION

As set forth in the government's response to Mr. Adams's motion to suppress, the government here implemented reasonable processes in a good faith effort to protect Mr. Adams's attorney-client privilege.  Mr. Adams contends that in the course of reviewing and ultimately seizing documents from two of his Yahoo! email accounts, the government was exposed to privileged attorney-client communications between him and attorneys who represented him in other matters that involved individuals, entities, transactions, and conduct similar to those involved in this criminal case.  He argues that the alleged exposures constitute a deliberate intrusion into the attorney-client relationship, that the alleged exposures resulted in prejudice to him in this criminal case, and that nothing short of dismissal (all charges or at least the tax charges) or disqualification of the prosecution team (all members or at least certain members) is sufficient to cure that prejudice.  For multiple reasons, Mr. Adams's argument fails.

First, the extent, duration, nature, and severity of the alleged exposures do not support Mr. Adams's characterization of the exposures as deliberate intrusions.  Second, Mr. Adams's assertions that he was prejudiced by the exposures are greatly exaggerated. Lastly, the remedy typically afforded for exposures to privileged communications is suppression of those communications, and Mr. Adams's arguments that a more drastic remedy is required here are unpersuasive.

# II.    BACKGROUND

Both parties have submitted extensive briefing summarizing the relevant background.  The government incorporates by reference the background provided in its

prior submissions [Dkt. 49, 52, 52-1], including the summaries contained within the government's post-hearing memorandum in opposition to Mr. Adams's motion to suppress [Dkt. 172].   To the extent that any additional background and factual information is informative of the issues raised in Mr. Adams's motion to dismiss, that information is set forth below in the argument section of this memorandum.

## III.   ARGUMENT

### A.  The Court Should Deny Mr. Adams's Motion To Dismiss.

Mr. Adams argues that dismissal of the superseding indictment, or portions thereof, is required because, he claims, the government viewed, and in some cases used, documents containing or reflecting privileged communications between him and his attorneys.   As noted in the government's post-hearing memorandum in opposition to Mr. Adams's motion to suppress [Dkt. 172], the factual basis for Mr. Adams's dismissal argument is 50 such documents, the Document Ids identified in *in camera* Exhibits A through U (not including Exhibit B, C, E, F, H, and I).   The legal bases for Mr. Adams's dismissal argument are the Sixth Amendment, the Fifth Amendment, and the Court's inherent supervisory powers. The Court should reject all three of those bases.

Mr. Adams lacks any basis to allege a Sixth Amendment violation given that all of the alleged intrusions were into attorney-client relationships that predated the initiation of formal charges.   Mr. Adams's claim of a Fifth Amendment violation fails because there was no deliberate intrusion into an ongoing attorney-client relationship that would rise to the level of outrageous government conduct and, in any event, the alleged intrusions did not result in actual and substantial prejudice to Mr. Adams.  Dismissal as an exercise of the

2

Court's supervisory authority is not warranted given that the alleged intrusions do not amount to systematic and persistent abuses of power, and, again, the alleged intrusions did not result in the type of prejudice that would make dismissal necessary.

1. No Sixth Amendment Violation Occurred

It is well settled that an individual's Sixth Amendment right to counsel attaches only upon the initiation of formal criminal charges. *United States v. Gouveia*, 467 U.S. 180, 187-188 (1984). This is so even if the individual is a target of a criminal investigation that has not yet proceeded to formal charges and is represented by counsel in connection with that criminal investigation. *United States v. Ingle*, 157 F.3d 1147, 1151 (8th Cir. 1998). Accordingly, alleged intrusions upon an attorney-client relationship that predate the initiation of formal charges simply cannot form the basis of a Sixth Amendment violation. Numerous courts have so held. *See generally United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000) ("Government intrusions into pre-indictment attorney-client relationships do not implicate the Sixth Amendment."); *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112, 1117 (10th Cir. 1998) (holding that the district court abused its discretion in dismissing an indictment and clearly erred in concluding that the government's pre-indictment seizure of a notepad containing privileged communications violated the Sixth Amendment): *United States v. Rogers*, 751 F.2d 1074, 1077-78 (9th Cir. 1985) (holding that the Sixth Amendment right to counsel was not implicated by the defendant's former attorney disclosing to the government during a pre-indictment criminal investigation the legal advice the attorney had given the defendant regarding tax shelters that were the subject of the investigation); *United States v. White*, 970 F.2d 328, 333 (7th

3

Cir. 1992) (holding, in a bankruptcy fraud prosecution, that no Sixth Amendment violation had occurred by virtue of the government having interviewed and taken grand jury testimony from the defendants' former bankruptcy attorney); *United States v. Fortna*, 796 F.2d 724, 731 (5th Cir. 1986) ("Although government intrusion into the attorney-client relationship may constitute a violation of a defendant's Sixth Amendment right to counsel, . . . we note that this Sixth Amendment right does not attach until at or after the initiation of adversary judicial criminal proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.") (quotation omitted); *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1048 (D. Nev. 2006) ("The Court need not reach these issues under the Sixth Amendment, however, because the seizure of Defendants' allegedly privileged attorney-client communications substantially predates the filing of the indictment or other formal criminal proceedings."). *Accord United States v. Smith*, No. 13-CR-14-RMP-1, 2014 WL 5543420, at *7 (E.D. Wash. Oct. 31, 2014); *United States v. Santopietro*, 809 F. Supp. 1008, 1012 (D. Conn. 1992); *United States v. Mower*, No. 2:09CR460 DS, 2010 WL 3938265, at *5 (D. Utah Oct. 6, 2010); *United States v. Boffa*, 513 F. Supp. 517, 522 (D. Del. 1981); *United States v. Sabri*, 973 F. Supp. 134, 141 (W.D.N.Y. 1996).

Not surprisingly, therefore, all of the cases that Mr. Adams cites are ones where the alleged intrusion was into a post-indictment relationship between the defendant and the criminal defense attorney representing him on those charges. In *United States v. Singer*, the defendant was represented by Ronald Meshbesher during a trial in 1980. 785 F.2d 228, 229 (8th Cir. 1986). Following an appeal, the case was remanded for a new trial, which

4

was set to begin in September 1983. *Id.* Just days before that trial, it was revealed that not long after the first trial, a co-conspirator of Singer had provided the government with 56 documents from Meshbesher's attorney-client file relating to his representation of Singer. *Id.* at 229-231. Included within those documents was information bearing on the defense's trial strategy. *Id.* at 232. On these facts, where the government obtained communications between an attorney and a client that had taken place after formal charges had been initiated, a Sixth Amendment violation had occurred. *Id.* at 235. But even under that extreme set of facts, the Eighth Circuit held that dismissal was not required given that the district court fashioned remedial measures that adequately protected Singer's Sixth Amendment rights. *Id.* at 236-37.

Likewise, *United States v. Davis* involved an intrusion after criminal charges had been filed. 646 F.2d 1298 (8th Cir. 1981). There, after the defendants had been arrested and attorneys had been appointed to represent them, a DEA agent spoke to the defendants, without permission from their attorneys, and recorded the conversation. *Id.* at 1300-01. The Eighth Circuit concluded that the government had intruded into the attorney-client relationship but held that dismissal of the indictment was not required because there was "no nexus between the intrusion and some benefit to the prosecution." *Id.* at 1302-03.

The other cases cited by Mr. Adams all involved intrusions that occurred after the defendant had been formally charged. *See State v. Robinson*, 2018 WL 2085066, at *1-2 (Del. Super. Ct. May 1, 2018) (seizure of evidence from the defendant's jail cell eleven days before trial that included attorney-client communication about the defense's trial strategy); *Shillinger v. Haworth*, 70 F.3d 1132, 1134 (10th Cir. 1995) (government learned

from a sheriff's deputy about the substance of a defendant's trial-prep sessions with his attorney and then used that knowledge to craft cross-examination questions and closing arguments); *Clark v. Wood*, 823 F.2d 1241, 1249 (8th Cir. 1987) (surreptitious monitoring of phone calls between the defendant and his attorney while the defendant was in jail awaiting trial); *United States v. Crow Dog*, 532 F.2d 1182, 1197 (8th Cir. 1976) (alleged placing of informants in the "defense camp" in advance of trial); *United States v. Levy*, 577 F.2d 200, 202-03 (3d Cir. 1978) (government used an indicted defendant as a cooperator to learn about the defense strategy during meetings between that defendant, a co-defendant, and the attorney who represented both of them).

The alleged intrusions here all were into Mr. Adams's attorney-client relationships that predated the initiation of formal charges. Mr. Adams was indicted on March 22, 2017, and he made his first appearance on March 23, 2017 [Dkt. 5]. The latest emails within Yahoo!'s production of Mr. Adams's email accounts would be January 7, 2016, the date the warrant was signed. *See* DX[1] Ex. 11, Search and Seizure Warrant. The latest purportedly privileged communication reflected on Mr. Adams's privilege logs is from November 12, 2015. *See* [Dkt. 142] Ex. 1 at 17. But of course, as explained in the government's response to Mr. Adams's motion to suppress [Dkt. 170], the only purportedly privileged communications that can be considered by the Court in deciding Mr. Adams's suppression and dismissal motions are the 50 contained within the *in camera* exhibits, and

---

[1] All references to exhibits that have the prefix "DX" are from the binders that Mr. Adams submitted at the suppression hearing on January 8-9, 2018.

the latest of those communications is from September 23, 2015. *See* [Dkt. 142] Ex. 2 at 7; *in camera* Ex. J. Because the alleged intrusions were into pre-indictment attorney-client relationships, there can be no Sixth Amendment violation.[2]

### 2. No Fifth Amendment Violation Occurred

Mr. Adams's argument that his Fifth Amendment rights were violated is premised on the assertion that the alleged intrusions into the attorney-client relationship deprived him of his due process rights. To establish such a Fifth Amendment violation requires a determination that the government's conduct was "so outrageous" that it must "shock the conscience of the court." *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003). In the specific context of an alleged government intrusion into the attorney-client relationship during the pre-indictment investigation of a case, courts require a defendant to demonstrate an issue of fact as to each of the three following elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3) as a result, the defendant suffered actual and substantial prejudice. *Voigt*, 89 F.3d at 1067. This test, known as the *Voigt* test, has been adopted by the Ninth Circuit and the Third Circuit, and has been cited approvingly by the Eighth Circuit. *See United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008); *United States v. Kennedy*, 225 F.3d 1187, 1195 (10th Cir. 2000); *United States v. Williams*, 720

---

[2] Mr. Adams's attempts to shoehorn the issues in this case into a Sixth Amendment analysis are designed to take advantage of the standard applicable in that context, which is less burdensome than the standard applicable in the Fifth Amendment context. The Sixth Amendment standard requires only a "substantial threat of prejudice," *Singer*, 785 F.2d at 234, whereas the Fifth Amendment standard, as discussed below, requires "actual and substantial prejudice," *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996).

7

F.3d 674, 686 (8th Cir. 2013) (suggesting that the *Voigt* test applies to such a claim but concluding that it "need not proceed to analyze [the defendant's] claim under the *Voigt* test" because no attorney-client relationship existed in the first place).

### a. *Objective awareness of a personal attorney-client relationship*

As to the first element, the record supports the conclusion that as of March-May 2016 when the government began reviewing the Yahoo! production, it was objectively aware of Mr. Adams's personal, attorney-client relationship with Mr. Hartman, Latham & Watkins, and Mr. Hopeman.  Conversely, there appears to be no dispute that as of March-May 2016, the government was not objectively aware of Mr. Adams's personal, attorney-client relationship with Mr. Brever and the Murry firm and did not become aware of the relationship until December 2016.

### b. *Deliberate intrusion*

As explained in more detail in the government's response to Mr. Adams's motion to suppress (*see* pages 55 to 84), it is quite a stretch to characterize the circumstances surrounding the government's exposure to some of the documents at issue as "deliberate intrusions."  With regard to the documents that were viewed for longer periods of time and/or were printed or saved by members of the prosecution team, those alleged intrusions still were not of the kind and severity that would rise to the level of a due process violation. Those few cases where the courts have found a deliberate intrusion during a pre-indictment investigation that arose to the level of a due process violation requiring dismissal have been where the government used the defendant's attorney in some ongoing way.  In essence, the government in those cases turned the attorney into an informant who then gathered

8

evidence for the government to use to build a criminal case.  The alleged intrusions here were incidental, minimal, and related to historical communications—some from nearly five years prior to the indictment.

### i.   The alleged intrusions were brief

The government's exposures to the communications between Mr. Adams and Latham & Watkins, Mr. Hopeman, and Mr. Brever were brief.  At most, the draft communication to Latham contained within *in camera* Exhibit A was viewed for approximately four minutes on May 4, 2016, and then encountered several other times that afternoon for durations of 7 seconds, 4 seconds, 1 second, and 4 seconds; once on June 6, 2016, for 5 seconds; once on August 30, 2016, for less than two minutes; once on September 16, 2016, for 7 seconds; and once on September 23, 2016, for 30 seconds.  Gov't Ex. 13 to Mem. in Opp. to Mot. to Suppress.  In addition, the views were the result of the prosecution team members clicking through documents that hit in response to keyword searches ("sold warrants," "rl investments," "dl investments" "adr investments," "adr," and "rbe"), as opposed to deliberate efforts to seek out privileged documents.  Such conduct is not indicative of a deliberate intrusion, particularly given the fact that (1) the "viewed" document was a draft communication that was not addressed to an attorney and (2) the version that was actually transmitted to the attorneys had been successfully filtered from the Relativity database through the use of search terms designed to pull attorney-client communications from those viewable by the prosecution team.

The communication within *in camera* Exhibit D, which was 12 iterations of the same draft email to Latham, all saved on the same day, was viewed 12 times (i.e., one view

of each iteration) for the following durations: 15 seconds, 2 seconds, 11 seconds, 3 seconds, 2 seconds, 4 seconds, 2 seconds, 2 seconds, 6 seconds, 1 second, 1 second, and 2 seconds. Gov't Ex. 14 to Mem. in Opp. to Mot. to Suppress. Again, each iteration hit in response to an unobjectionable search term ("krossbow"), as opposed to a search term calculated to find a potentially privileged communication. *Id*. As with *in camera* Exhibit A, it was a draft that did not indicate it was intended to be sent to Latham, and the version that was in fact transmitted to Latham had been successfully filtered from the Relativity database. Unlike *in camera* Exhibit A, *in camera* Exhibit D apparently did not contain a privilege banner, which is further proof of the lack of deliberateness to this alleged intrusion.

The details of the alleged intrusion regarding *in camera* Exhibit G tell much the same story. It was a draft that was not filtered out because it evidently did not contain the names of the attorneys, law firms, or law firm email domains. As with the other emails, it was reviewed because it was one of a number of documents that hit in response to search terms logically related to the fraud scheme, as opposed to search terms calculated to specifically identify communications with an attorney. Gov't Ex. 15 to Mem. in Opp. to Mot. to Suppress. And the sum total of the views of the document took place over the course of just under three minutes on one afternoon, and thereafter, the document was never again viewed by the government in Relativity, although it had been printed by Inspector Kroells. *Id*. The record belies the idea that the alleged intrusion in this case was of the deliberate kind present in the cases where the courts have found the government's conduct to be conscience-shocking.

The communications contained within *in camera* Exhibits J, K, and L are communications with either Mr. Hopeman or Mr. Brever, or both.  The government's exposure to these communications also was brief.  *In camera* Exhibit J was viewed and immediately tagged by Mr. Maria as "privileged" within the course of only 40 seconds before he moved onto another document, and Inspector Kroells's views of the document several days later lasted only 18 seconds, 3 seconds, 3 seconds, 26 seconds, and 2 seconds.[3] Gov't Ex. 19 to Mem. in Opp. to Mot. to Suppress.  The circumstances surrounding the exposures to *in camera* Exhibit K are discussed in detail at pages 62 to 65 of the government's memorandum in opposition to Mr. Adams's motion to suppress.  See also Gov't Ex. 21 to Mem. in Opp. to Mot. to Suppress.  Those circumstances are not indicative of a deliberate intrusion.  And the exposures to *in camera* Exhibit L lasted no more than 3 seconds, 2 seconds, 5 seconds, 5 seconds, and 4 seconds.  Gov't Ex. 27 to Mem. in Opp. to Mot. to Suppress.  Again, the documents from *in camera* Exhibits J, K, and L hit in response to search terms that were perfectly appropriate under the terms of the warrant, as opposed to search terms indicating an intent to specifically seek out privileged communications.

The circumstances surrounding the alleged intrusion into the communications with Mr. Hartman, *in camera* Exhibit U, also were neither deliberate nor conscience-shocking.

---

[3] Mr. Adams's claims that Mr. Maria and Inspector Kroells did not notify the other members of the prosecution team of these emails and that the emails were not removed for another three weeks would perhaps be a worthy argument if it were not for the fact that no other members of the prosecution team were ever exposed to the emails during that interim period.  In other words, the alleged failure to act more quickly had no impact.

11

The exposure to those communications was the result of the fact that although the government filtered out documents that hit on the domain name anthonyostlund.com, Mr. Hartman apparently used an email address that bore the domain name aoblaw.com. A "deliberate intrusion" means that the exposure was done intentionally or on purpose; that the conduct was done with full consciousness of its nature and effect. The exposure here was inadvertent and the result of an imperfect filtering process. Moreover, the exposures to the communications with Mr. Hartman were generally brief, with most lasting a matter of a few seconds and the longest view lasting 46 seconds. Gov't Ex. 41 to Mem. in Opp. to Mot. to Suppress.

## ii. The alleged intrusions were not severe

Mr. Adams declines to cite any cases analyzing alleged intrusions into the attorney-client relationship in the context of a Fifth Amendment due process claim. But a number of such cases exist, and they overwhelmingly show that the alleged intrusions in this case do not amount to outrageous government conduct. Indeed, the above "intrusions" stand in stark contrast to the kinds of severe intrusions that have been found in other cases to be deliberate and conscience-shocking. "Most cases finding deliberate intrusion into the attorney-client relationship involve government informants who somehow penetrate the attorney-client relationship to obtain confidential or privileged information, and then feed that information to the government." *Stringer*, 535 F.3d at 941.

For example, *United States v. Schell* involved a criminal defense attorney, Jividen, who had represented a number of individuals, including John Cain and Freda Wilson, in connection with grand jury appearances relating to an investigation of a drug trafficking

organization. 775 F.2d 559, 562 (4th Cir. 1985). Approximately four months later, Jividen became an Assistant United States Attorney and participated in an investigation, indictment, and prosecution of that same drug trafficking organization. *Id*. at 562-65. The Fourth Circuit held that Cain's and Wilson's due process rights had been violated, explaining that "[b]ecause Jividen represented Wilson and Cain concerning the very matter about which he later helped to prosecute and convict them, we are compelled to reverse their convictions and dismiss the indictment as to them." *Id.* at 566.

*United States v. Marshank*, 777 F. Supp. 1507, 1512 (N.D. Cal. 1991), similarly involved "the shocking tale of a criminal defense attorney [Minkin] who was oblivious to the professional norms of ethical behavior and a cast of overzealous government agents and prosecutors who facilitated the attorney's unethical conduct in an attempt to catch 'a big fish.'" As the court summarized, Minkin was instrumental in actively helping the government bring a case against his current and former clients, including Marshank:

> The government collaborated with [Minkin] to build a case against [Marshank], to effect his arrest, and to ensure that he would cooperate with the government rather than contest the charges against him. Marshank was first identified as a prospective target for criminal investigation as a result of information provide to the government by Minkin and two of his other clients. The government then actively worked with Minkin to develop a case against Marshank.
>
> . . . .
>
> Worse yet, the record makes clear that the government plotted with Minkin to ensure Marshank's arrest and then steered Marshank in Minkin's direction to guarantee his cooperation.

*Id*. at 1519-20.

As best as the government can tell, these are the only two federal cases where a court has found that an intrusion into an attorney-client relationship shocked the conscience such that it constituted a Fifth Amendment due process violation requiring dismissal of the indictment. The other side of the ledger includes cases involving intrusions more severe than the alleged intrusions here, and yet dismissal was not ordered. *See Kennedy*, 225 F.3d at 1196-97 (concluding that alleged conduct by the government of interviewing the defendant's former attorney and gathering evidence from the former attorney was not sufficiently outrageous to constitute a Fifth Amendment due process violation). Perhaps the most extreme example is *United States v. Ofshe*, 817 F.2d 1508 (11th Cir. 1987). There, an attorney who was representing the defendant in a criminal case learned that he himself was the target of a criminal investigation and so offered to cooperate with the government. *Id*. at 1511. After the government agreed, the attorney, who was acting as counsel for the defendant, provided information to the government about the defendant and wore a body bug to record a conversation with the defendant. *Id*. at 1511-12. Astonishingly, the court found the conduct to be "reprehensible" but "not so outrageous as to 'shock the universal sense of justice,'" particularly given that the conduct produced no evidence that was actually used against the defendant. *Id*. at 1516, n.6.

There are a number of cases where the alleged intrusions are similar to the alleged intrusion in this case—the seizure of evidence during the pre-indictment investigation. As far as the government has been able to identify, every such case has found that no Fifth Amendment violation occurred and, accordingly, ruled that the appropriate remedy, if any, was suppression of the privileged information rather than dismissal of the indictment. One

14

case in particular, *United States v. Segal*, bears some similarities to this case.  313 F. Supp. 2d 774 (N.D. Ill. 2004).  There, the government seized over 200 boxes of documents and a significant amount of electronic information from the defendant.  *Id*. at 776.  After the seizure but before charges were brought, the defendant moved the court for a return of property—something Mr. Adams never did—of all seized attorney-client privileged communications.  *Id*.  Given the volume of electronic information, the government used search programs to try to find relevant documents.  *Id*. at 777.  The individuals involved in conducting the review made conscious efforts to avoid exposure to privileged documents, but acknowledged that they might have inadvertently reviewed such documents.  *Id*.

Two aspects of the court's ruling in *Segal* are instructive.  First, the district court rejected the argument that not only should the government be precluded from using privileged documents at trial but that the government should also be barred from using any evidence derived from the alleged violation of the attorney-client privilege.  *Id*. at 780.  As the court succinctly explained, "the attorney-client privilege is an evidentiary privilege, not a constitutional right," and, thus, "[a] violation of a defendant's attorney-client privilege [] does not require the suppression of derivative evidence."  *Id.*; *see also United States v. Marashi*, 913 F.2d 724, 731 n.11 (9th Cir. 1990) ("no court has ever applied [the fruit of the poisonous tree doctrine] to *any* evidentiary privilege").  Second, the Segal court held that any "ill-advised failure" by the government to employ better screening procedures to avoid inadvertent exposures to privileged communications was not indicative of a due process violation.  *Id*. at 780-81.

*Lin Lyn Trading* involved a pre-indictment seizure of a notepad belonging to the defendant that the defendant claimed to contain privileged information. 149 F.3d at 1113-14. Similar to Mr. Adams, the defendant in *Lin Lyn Trading* claimed that notepad provided a roadmap to the investigation, which never would have matured into a criminal indictment had it not been for the seizure of the notepad. *Id*. at 1314. Accordingly, the defendant moved to dismiss the indictment on Fifth and Sixth Amendment grounds. *Id*. The district court agreed and dismissed the indictment. *Id*. at 1315. In reversing the district court, the Tenth Circuit found that (1) the district court had clearly erred with regard to the Sixth Amendment analysis because the seizure and review of the allegedly privileged information pertained to a pre-indictment attorney-client relationship and (2) in failing, with regard to the Fifth Amendment analysis, to consider alternative remedies to outright dismissal. *Id*. at 1117-18. The court suggested that suppression of evidence would suffice to protect the defendant's right because "[b]y suppressing the evidence as a result of the illegal seizure, the prosecution is unable to benefit from the government's unconstitutional conduct. *Id*. at 1118.

The summary above of the circumstances surrounding the exposures to communications connected to Mr. Adams's attorney-client relations with Mr. Brever, Mr. Hopeman, Latham, and Mr. Hartman, show that those alleged intrusions were not of a deliberate nature. With regard to the Murry communications, the government acknowledges that the exposure to those communications was of a more deliberate nature. But as explained in the response to the motion to suppress, there was and still is a substantial basis to believe that the seven communications with the Murry firm are not

privileged because their primary purpose was not to obtain legal advice—even if that was a purpose—and any raw factual information contained within those communications was subsequently included in (or formed the underlying basis for) the amended returns, which operates as a waiver as to that information and the underlying details.  Mr. Adams faults the government for making this determination unilaterally, and, in retrospect, it would have been better practice to seek court review of the privilege assertion to confirm the government's positon that the privilege assertion was without merit.  But it still is not on par with the kinds of deliberate intrusions that constitute Fifth Amendment violations, particularly considering that, as discussed below, it did not result in prejudice to Mr. Adams.  *See United States v. DeLuca*, 663 F. App'x 875, 877-879 (11th Cir. 2016) (holding that a prosecutor's decision to permit team members to review communications that he had unilaterally decided were not privileged "falls short of [the outrageous government conduct] standard" under the Fifth Amendment).

### c.  Actual and Substantial Prejudice

The final element of the *Voigt* test requires that the alleged intrusion cause actual and substantial prejudice.  This final element is fatal to Mr. Adams's argument.  As a result of Mr. Adams's misplaced efforts to frame the issues in this case as a Sixth Amendment violation, it is not clear what prejudice, as that term is understood in the Fifth Amendment context, he claims as a result of the alleged intrusions.  At times, he appears to contend that the prejudice he suffered is that privileged information was allegedly used to further the investigation and obtain an indictment.  *See* Def's Mot. to Dismiss [Dkt. 141] at 21.  But this argument fails both legally and factually.  As a legal matter, the courts have rejected

17

the argument that being indicted as the result of the alleged use of privileged information amounts to prejudice justifying dismissal under the Fifth Amendment. As a factual matter, Mr. Adams simply is wrong in his assertion that he would not have been indicted had it not been for the alleged intrusions.

The courts, including the Supreme Court, have unequivocally rejected the idea that being indicted is proof of actual and substantial prejudice sufficient to justify dismissal. In *United States v. Rogers*, which involved a claim that a law enforcement agent induced an attorney to breach his ethical duty to his client by disclosing confidential communications to the agent, the Ninth Circuit held that the proper remedy, if any, was suppression of the communications, not dismissal. 751 F.2d 1074, 1078-79 (9th Cir. 1985). The court rejected the precise argument now made by Mr. Adams, that the investigation and prosecution would never have happened but for the attorney's disclosure:

> The fact that [the attorney's] disclosures might have encouraged the IRS to continue its investigation of [the defendant] and, ultimately, to seek an indictment does not justify dismissing the indictment. The prejudice relates only to the investigatory stage and does not affect [the defendant's] ability to defend himself at trial. There is a fundamental distinction between the use of privileged information at trial, and its use during the investigatory period.

*Id.* at 1079; *see also United States v. Mackey*, 405 F. Supp. 854, 861 (E.D.N.Y. 1975) (because an otherwise valid indictment cannot be challenged on the ground that it was based on information obtained in violation of the Fifth Amendment privilege against self-incrimination, "[i]t would seem to follow, *a fortiori*," that the right to invoke the attorney-

client privilege, which stands on common-law rather than constitutional footings, "does not imply any right to a dismissal of an indictment").

Even if the argument Mr. Adams was not legally barred, it is factually barred. With regard to the pending criminal fraud charges, the critical essence of those charges—the "heart," to borrow Mr. Adams's language—is that Mr. Adams was involved in soliciting individuals to invest in Apollo under circumstances where those prospective investors had been misled to believe that their investments would be used to fund Apollo's operations. Unbeknownst to them, as well as the individual who recruited many of them (J.Z.) and the leadership at Apollo's operations location on the East Coast (R.L. and B.L.), a substantial portion of the investor funds—and in some cases all of their funds—were instead used to divest Mr. Adams of substantial portions of his putative interest in the companies (i.e., unexercised warrants). To state the obvious, buying newly issued shares in a company is drastically different from buying someone else's interest in the company. Mr. Adams himself has articulated this drastic difference in a letter that he *purportedly* sent to J.Z. *See* Gov't Ex. 39 to Mem. in Opp. to Mot. to Suppress. The former ends up growing the pot of money that the company has to be able to fund research and development and other operations; the latter simply puts the new investor in the shoes of the old investor and, because of the way Adams carried out these transactions, does not result in the company realizing more capital for the operation of the business. And it would be especially important to the new investors to know that the person whose interest—or putative interest, as it were—they are assuming is an insider such as Mr. Adams. Such a revelation would raise obvious questions in the minds of the new investor that perhaps Mr. Adams knows

something they do not about Apollo and is divesting some of his interest to mitigate potential losses.

Mr. Adams cannot seriously contend that the government built its fraud case against him based on the alleged exposure to privileged communications given that the government met with Mr. Adams's attorneys in March 2016, before the review of the Yahoo! production had begun, and discussed with Mr. Adams's attorneys the bank analysis and what had been learned from interviews of a number of investors whose investment funds ended up in the Venture Bank accounts. The analyses of the Venture Bank accounts showed, among other things, that of the more than $11 million in investment funds deposited into those accounts, only about $2.6 million went to the Apollo companies while more than $5 million went to Mr. Adams's law firm and $3 million went to Mr. Adams or his consulting firm. The government made crystal clear at that meeting in March 2016 that it intended on pursuing fraud charges based on that information. The government did not "build" its fraud case on privileged information.

Mr. Adams's contention that the government built a tax case against him based on the alleged exposure to privileged communications is equally flimsy. Just like the fraud charges, the tax charges were based on the bank analysis, which showed the substantial amount of money that Mr. Adams received from the Venture Bank accounts in 2008, 2009, and 2010. By the time the Yahoo! production had been received, an *ex parte* order had already been issued requiring the disclosure of Mr. Adams's tax returns. The response to that order, which included Mr. Adams's amended returns filed in 2011 with the assistance of Larson Allen, was received in early May 2016, around the same time that the prosecution

20

team began reviewing the Yahoo! production in Relativity.  A brief perusal of Mr. Adams's amended returns to determine their evidentiary value to the fraud scheme showed that Mr. Adams failed to report more than $1.2 million in 2008, more than $50,000 in 2009, and more than $330,000 in 2010.

Mr. Adams's contention suffers from a flaw even more fundamental.  Mr. Adams's communications with his *Kovel* accountant, the Murry firm, pertained to his second set of amended returns, *which were filed in 2014*.  But it is the amended returns filed in 2011 that form the basis of the tax charges.  It is entirely unclear how Mr. Adams can seriously assert that information taken from communications pertaining to the 2014 amended returns formed the basis for charges predicated on the 2011 amended returns.[4]  Furthermore, the alleged intrusions into the communications bearing on the tax charges could not have caused Mr. Adams any prejudice given that Mr. Adams ultimately *filed* amended returns, thereby disclosing to the IRS the fact of, dates of, and nature of the transactions that gave rise to the previously unreported income.[5]

---

[4] This is not to say, however, that the amended returns filed in 2014 are irrelevant.  They clearly are relevant as to the elements of knowledge and intent in both the fraud charges and the tax charges based on the 2011 amended returns.  They are also relevant because, as explained in the government's response to Mr. Adams's motion to suppress, the amended returns in 2014 were based on false information so Mr. Adams could take advantage of a much lower tax rate that applied to only half of the gains he realized in 2008-2010 from having sold unexercised warrants.  In that regard, the amended returns filed in 2014 probably would support additional tax charges.  Communications with Murry about the amended returns filed in 2014, however, would not be needed to file such charges.

[5] It defies logic to think that the information that was reflected on spreadsheets that bore file names such as "ESA Tax Summary for P. Murry" and "ESA Tax Questions" did not end up somewhere on the amended returns or the accounting work-papers that served as the foundation for those amended returns, neither of which are privileged.

Mr. Adams also contends that he was prejudiced by the alleged intrusions because, according to him, certain communications, for example *in camera* Exhibits J and K, revealed how Mr. Adams "would explain and address certain critical allegations that later appeared in the Indictment."  Def's Mot. to Dismis at 21.  As noted above, the exposure to *in camera* Exhibit J can hardly be characterized as a deliberate intrusion given how brief it was.  Because the government does not know what is behind the redacted portions of Mr. Adams's motion or in his *in camera* exhibits, it has no ability to compare the claimed explanation of "critical allegations" to the actual allegations in the indictment.  It seems unlikely, however, given what the government does know about what had been alleged in the SEC investigation or the civil litigation that preceded it, that Mr. Adams would have been consulting with his attorneys about the critical allegations in this case.  To be sure, the content of those communications likely mentioned some of the same topics that are discussed in the superseding indictment, such as the March 11, 2011 proxy solicitation, the nature and circumstances of the Apollo/Scio transaction, the alleged concealment from the Apollo investors of Mr. Adams and Mr. Monahan's role in Scio, and the fact that the transaction resulted in Mr. Adams receiving more than 4 million shares in public Scio at no cost.  Although those topics are relevant to the story told by the superseding indictment, the moral of story told in the superseding indictment is that the investors in 2006-2010 were defrauded and that the Apollo/Scio transaction was a means to cover that up.  That was not a part of the overarching narratives in the prior civil matters or the SEC

---

investigation. While Mr. Adams would have consulted with his attorneys about the adequacy of the disclosures that were made in connection with the Apollo/Scio transaction and why it was proper for him to receive 4 million shares in public Scio at no additional cost, it is unlikely that Mr. Adams would have consulted with his attorneys about having orchestrated that transaction to prevent investors from learning that much of their investments went to Mr. Adams and others but not to Apollo.

Even more problematic to Mr. Adams's prejudice argument is that it must be the case that the information contained within the privileged communications that are the subject of this motion was discussed during his two days of deposition testimony before the SEC, DX Exs. 50-51, or in his attorneys' 60-page presentation to the SEC, Gov't Ex. 12 to Mem. in Opp. to Mot. to Suppress, or both.[6] Mr. Adams gave extensive testimony regarding the Apollo/Scio transactions and the disclosures made in connection with those transactions, including his "thoughts" and "analysis" regarding (1) who was involved in drafting the proxy solicitation for the Apollo/Scio transaction, (2) the details behind specific paragraphs within the proxy solicitation, (3) what percentage of the outstanding liabilities mentioned in the proxy solicitation were owed to Mr. Adams or his law firm, (4) the claimed tax advantage that the shareholders would realize as a result of the proposed transaction, (5) the goal of giving shareholders the opportunity to participate in the new entity that would emerge after the transaction, (6) what would happen to outstanding

---

[6] Again, the government is making reasonable assumptions about what information is revealed in the communications and then comparing that hypothesized information to what was revealed in his deposition testimony.

warrants held by individuals, including Mr. Adams, (7) how, according to him, the shareholders would end up with a greater percentage of ownership "[o]n a fully diluted basis," (8) the risks factors disclosed to shareholders, (9) why the proxy solicitation did not specifically identify the large outstanding liabilities owed by Apollo to Mr. Adams's law firm, (10) why the proxy solicitation did not specify that the proceeds of the transaction would be used to pay Mr.Adams's law firm, (11) the potential bankruptcy implications of having more detail in the disclosures, (12) the reasons why the proxy solicitation did not disclose that Mr. Adams and M.M. were the majority shareholders of private Scio, (13) the various roles that various individuals would end up playing in the transaction, (14) whether the private placement memorandum for private Scio had been disclosed to the Apollo shareholders, (15) why, according to Mr. Adams, the proxy solicitation proposing the Apollo/Scio transaction was not even required because it could have just been approved by the majority shareholder, his in-laws, and that it was done anyway because he was trying to give the rest of the shareholders a "second bite at the apple," and (16) work that had been done to estimate the value of Apollo's assets both in terms of sunk costs and in terms of actual market value. DX 50 at 229-258.  It sure seems that much of this testimony constitutes not only his thoughts and analysis about the critical allegations in the SEC investigation but also the execution of strategy on how to defend against those allegations.

Mr. Adams's testimony on the second day of his deposition revealed his "thoughts" and "analysis" about (1) how private Scio determined the allocation of shares among its shareholder, (2) the nature of the work that that various people who received Scio shares had performed for Apollo and Scio, (3) some of the disagreements Mr. Adams had with

24

Mr. Mack and any concerns Mr. Mack had raised that ultimately lead to the civil lawsuit by Messers. Mack and Rapello, in which Mr. Adams claims he was represented by Mr. Hartman, (4) the details of the asset purchase agreement with Krossbow, the public company that eventually became public Scio, (5) how Mr. Adams became a shareholder of public Scio, (6) who decided the numbers of shares in public Scio that were issued to various people, including Mr. Adams, as a result of the asset purchase agreement with Krossbow, and (7) why entering into the transaction with Krossbow would be beneficial to accomplishing the goals of the earlier transaction with private Scio.  DX 51 at 325-386.

The point of all the above is to give the Court an idea of the breadth and depth of Mr. Adams's SEC deposition so that the Court can compare the entirety of the information discussed in that deposition, as well as in Latham's defense presentation to the SEC, against the information contained within the *in camera* exhibits.  It seems inevitable that there will be significant overlap between the two.  Thus, it not at all clear how Mr. Adams can persuasively argue that he was prejudiced by the revelation of information in privileged communications when that same information was revealed in his testimony and the defense presentation.  In this regard, this case is plainly distinguishable from other cases where the government intruded into the attorney-client relationship and learned information and strategy *before* that information and strategy became public, which gave the government the unfair advantage of being able to anticipate and prepare for defense testimony and defense strategy.  *See Robinson*, 2018 WL 2085066, at *1-2 (seizure of evidence from the defendant's jail cell eleven days before trial that included attorney-client communication about the defense's trial strategy); *Shillinger*, 70 F.3d at 1134 (government learned from a

25

sheriff's deputy about the substance of a defendant's trial-prep sessions with his attorney and then used that knowledge to craft cross-examination questions and closing arguments); *Clark*, 823 F.2d at 1249 (surreptitious monitoring of phone calls between the defendant and his attorney while the defendant was in jail awaiting trial); *Levy*, 577 F.2d at 202-03 (government used an indicted defendant as a cooperator to learn about the defense strategy during meetings between that defendant, a co-defendant, and the attorney who represented both of them). That is not the case here. If, as Mr. Adams claims, the analysis and strategy discussed in his communications with Latham in preparation for his deposition is so similar to what his defense would be in this case, then it would seem that the same analysis and strategy would be reflected in the deposition transcript, which is lawfully in the government's possession.

Mr. Adams attempts mightily to tell a story that is based on more than the alleged intrusion into the communications with the Murry firm; that the government deliberately intruding into his attorney-client relationships with Latham, Mr. Hopeman, Mr. Brever, and Mr. Hartman. But the record, including the Relativity activity log, does not support his story, and so, his request for dismissal ends up focusing primarily on the communications with the Murry firm and their connection to the tax charges. As explained above, the communications with the Murry firm were not used to build a tax case against Mr. Adams. The analysis of bank records as compared to his first set of amended returns, with which the Murry firm and Mr. Brever had no involvement, was used to build the tax case. The analyses of bank records was completed *before* the government received the Yahoo! production. The tax returns had been ordered to be disclosed pursuant to an *ex*

26

*parte* request *before* the government received the Yahoo! production. Those tax returns reveal that Mr. Adams did not report income from his warrant sales, which is both circumstantial evidence of his intent as to the fraud charges and an obvious sign that the government would also be able to pursue tax charges against him if it chose to do so.

Ultimately, the Court will have to make a determination regarding prejudice without the benefit of specific arguments by the government comparing the allegedly privileged communications to the full scope of information that the government obtained in its criminal investigation. To aid the Court in that determination, the government has submitted transcripts of the testimony presented to the grand jury (attached hereto as Government Exhibits A through F) and a copy of the Special Agent Report (attached hereto as Government Exhibit G), which served as the basis for requesting the necessary authority to present the tax charges found in the superseding indictment to the grand jury. The type of prejudice that would need to be established to justify dismissal would have to rise to the level of giving the government direct insight into what Mr. Adams's defense would be in this criminal case . . . not insight into what his defense would be in a civil case from 2012 or an SEC investigation from 2014-2015. Although the civil case and the SEC investigation do involve some of the entities, individuals, and transactions that are involved in this case, the general thrust of those prior matters is different from the overarching theme of this case. The prior matters focused on alleged inadequacies in the disclosures during the Apollo/Scio transaction and how Mr. Adams allegedly orchestrated the Apollo/Scio transaction to realize an inflated ownership interest in the assets that were the subject of the transaction. This case is about how Mr. Adams allegedly misled investors in 2006-

27

2010 about how their investment funds would be used and then orchestrated the Apollo/Scio transaction as a means to prevent others from finding out about the fact that those investors' funds had not been used as had been promised. That is how the first two paragraphs of the superseding indictment describe the "overview" of the case. Given the substantial differences between the focus of the prior matters and the focus of this criminal case, it is difficult to believe Mr. Adams's assertion that the alleged intrusions somehow gave the government such an unfair advantage that it would be impossible to have a fair trial, especially considering that the Court could fashion a less drastic remedy, such as suppression of just those documents that are indeed privileged.

### 3. The Court's Supervisory Power

In a pair of appeals stemming from the same case, the Eighth Circuit indicated that an indictment should be dismissed under the court's supervisory powers only upon (1) a finding of prejudice and (2) systematic and persistent abuse of power. *United States v. Solomon*, 679 F.2d 1246, 1253 n.12 (8th Cir. 1982); *United States v. Peterson*, 698 F.2d 921, 923 (8th Cir. 1982); *see also United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1437-38 (D. Md. 1986) (stating that the supervisory power to dismiss should be "exercised sparingly and only on a showing of demonstrated and longstanding prosecutorial misconduct" or "[r]epeated instances of deliberate and flagrant misconduct"). Like with the Sixth Amendment and Fifth Amendment analyses, the supervisory power analysis requires that the relief chosen be proportional to the alleged misconduct. *See United States v. Banks*, 383 F. Supp. 389, 392 (D.S.D. 1974).

28

This case is not a candidate for exercise of the Court's supervisory power of dismissal.  As noted above, Mr. Adams's assertion of prejudice is unpersuasive.  The alleged intrusions that form the basis for Mr. Adams's motions are the exposure to 50 documents—most of those exposures being brief—out of well over 100,000 documents. And of those 50 documents, many are draft iterations of the same document that hit in response to a single search.  Even if he is right that all 50 of those documents are privileged—the government's response to the motion to suppress shows that he is not right about all 50 documents—the circumstances surrounding the exposures to those 50 documents do not come anywhere close to a "systematic and persistent abuse of power" or "repeated instances of deliberate and flagrant misconduct."  The evidence of the government's good faith are ample: the government took extensive efforts to prevent exposure to potentially privileged documents; advised team members to look out for an avoid attorney-client communications; and used keyword searches to target its review to matters relevant to the investigation.  The Court should decline to exercise its supervisory power to order the drastic remedy of dismissal.

## B. The Court Should Deny Mr. Adams's Request For Disqualification

Mr. Adams requests that the Court disqualify the entire prosecution team.  As an alternative to disqualification of the entire prosecution team, Mr. Adams requests disqualification of Mr. Maria, Postal Inspector Kroells, and Special Agent Belich.[7]

---

[7] Mr. Adams's disqualification request is moot as to Special Agent Belich and Mr. Maria given that Special Agent Belich left the IRS in February 2017 to join the United States Marshal Service, *see* Jan. 8 Hr'g [Dkt. 106], and Mr. Maria left the United States Attorney's

"The disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *Bullock v. Carver*, 910 F.Supp. 551, 559 (D. Utah 1995). "Courts have allowed disqualification of government counsel in limited circumstances." *United States v. Bolden*, 353 F.3d 870, 878-79 (10th Cir. 2003) (citing *Young v. United States*, 481 U.S. 787, 807 (1987); *United States v. Heldt*, 668 F.2d 1238, 1275 (D.C. Cir. 1981); *United States v. Prantil*, 764 F.2d 548, 552-53 (9th Cir. 1985)). "Further, because disqualifying government attorneys implicates separation of powers issues,[8] the generally accepted remedy is to disqualify a specific Assistant United States Attorney . . ., not all the attorneys in the office." *Id.* at 878 (citation omitted); *see also United States v. Silva-Rosa*, 275 F.3d 18, (1st Cir. 2001).

Mr. Adams cites only one case where a court has disqualified a prosecutor or agent based on the prosecutor or agent having accessed privileged information. *See United States v. Horn*, 811 F. Supp. 739, 752 (D.N.H. 1992) *reversed in part on other grounds by United States v. Horn*, 29 F.3d 754 (1st Cir. 1994). The disqualification in *Horn*, however, was not based solely on the exposure to privileged information but rather on the prosecutor having repeatedly disobeyed the court's orders that the prosecutor refrain from reviewing

---

Office in May 2018 to join a law firm in Washington, DC, *see* June 20, 2018 Letter from USAO to Magistrate Judge Katherine M. Menendez [Dkt. 162].

[8] It is for this reason that the civil cases to which Mr. Adams cites, including this Court's recent decision in *Shields v. Gen. Mills Inc.*, No. 16-cv-00954, 2017 WL 6520685, at *2-3 (D. Minn. Dec. 1, 2017), are inapposite.

privileged work-product materials impermissibly obtained from the defendants.[9]  *Id.*  As best as the government can ascertain, there has only been one other such case, and the disqualification order in that case (disqualification of a prosecutor from further participation in a grand jury investigation) was subsequently vacated by the Fourth Circuit as being moot, notwithstanding that the government procured that mootness by apparently unilaterally violating that disqualification order (the disqualified prosecutor fully participated in the presentation of the case to the grand jury, which returned an indictment). *See United States v. (Under Seal)*, 757 F.2d 600, 602-03 (4th Cir. 1985) (disqualification of a prosecutor who had access to several privileged communications between the defendants and their defense counsel).

On at least three occasions, courts have explicitly refused to order disqualification of prosecutors or agents who were allegedly exposed to privileged communications.  *See United States v. Skeddle*, 989 F. Supp. 890, 899 (N.D. Ohio 1997) (holding that prosecutors' access to attorney-client and work product-protected documents did not compel their disqualification when those documents did not give the prosecutors "insight . . . to the strategies, theories, and tactics of the lawyers representing the defendants"); *Omni Int'l Corp.*, 634 F. Supp. at 1421 (holding that the alleged breaches, which included information provided to the defendant by the defendant's attorney in a court-approved off-the-record proffer, "do not rise to the level at which this Court would consider dismissal of

---

[9] On a related note, the court in *Horn* refused to disqualify the other prosecutors working on the case given that they appeared to have had little if any exposure to the privileged documents.  *Id*. at 752.

31

the indictment or disqualification of the AUSA or IRS agents"); *United States v. Koerber*, No. 2:17-cr-37-RJS-PMW, 2017 WL 3172809, at *1-2 (D. Utah. July 25, 2017) (government's exposure to a letter determined to contain privileged information did not require disqualification of the prosecution team).

Disqualification of any of the members of the prosecution team is not warranted here because it is not necessary to cure any prejudice that Mr. Adams has suffered. Setting aside the Murry communications (*in camera* Exhibits M, N, O, P, R, S, and T), which should be deemed not privileged or waived for the reasons stated in the government's response to the motion to suppress, the government's exposures to the other documents claimed to be privileged (*in camera* Exhibits A, D, G, J, K, L, and U) were the result of clicking through documents that had hit in response to search terms as opposed to intentional attempts to deliberately seek out those documents. And the exposures to those documents were brief, generally lasting a matter of just a few seconds. *See* Gov't Exs. 13-15, 19, 21, 27, 41, and 42 to Mem. in Opp. to Mot. to Suppress. In addition, the government has taken steps to avoid any further exposures. Upon Mr. Adams's counsel informing the government on August 23, 2017, see DX 40, that they had located privileged documents among those that were retained after the final filter in April 2017, the government instructed all members of the prosecution team to refrain from accessing the Relativity database. No members of the prosecution team have accessed the Relativity database since August 21, 2017. Gov't Ex. 42 to Mem. in Opp. to Mot. to Suppress.

The arguments that Mr. Adams makes for how he was prejudiced are not persuasive. The government built both the fraud charges and the tax charges on the analysis of bank

32

records; interviews of investors, employees of Apollo, and others (such as J.Z. and L.Z.);
records produced by the SEC; records produced by Mr. Adams; and the tax returns that
had been filed with the IRS in 2011. A fair-minded review of the complete Relativity
activity refutes Mr. Adams's claim that his privileged communications were used
heavily—and in some cases, at all—against him. There are 14,400 line items on the activity
log. *See id.* Out of all of that activity, only 132 line items involved one of the allegedly
privileged documents contained within the *in camera* exhibits, most of which were
reviewed for mere seconds. *Id*. The case simply was not built on the communications
Adams had with his attorneys or his *Kovel* accountant.

Mr. Adams focuses much of his argument on the communications with the Murry
firm. Likewise, the government has devoted extensive analysis in support of its position
that those communications are not subject to a valid claim of privilege or that the privilege
has been waived. Having had the benefit of hindsight, the government would have pursued
a different course with respect to the seven communications with the Murry firm after Mr.
Brever made the *Kovel* assertion in December 2016.[10] As has been stated previously,
however, it certainly appears from the descriptions that are presently available to the
government that, at a minimum, the information contained within those communications
was used to prepare amended tax returns and a "disclosure statement," both of which were

---

[10] It is fair to point out, however, that not all of the communications with the Murry firm
were claimed to be privileged, and Mr. Brever's privilege log did not provide any
granularity that gave the government the ability to differentiate between the privileged and
non-privileged communications. *See* DX 67.

*actually filed* with the IRS.  In other words, it is not as if the government, after hearing from Mr. Brever, revisited documents that were *undisputedly privileged*.  Rather, given the description of the documents on Mr. Adams's privilege logs, the documents that were revisited were ones that fall outside the scope of *Kovel* because their primary purpose was not to obtain legal advice and because any privilege was waived by virtue of the information contained on those documents being included on filed amended returns.[11]  After Mr. Brever's letter was received, the following documents were reviewed:

- Doc Id 00224269 (*in camera* Exhibit R), a 10/28/14 email from Mr. Adams to the Murry firm, attaching a spreadsheet titled "ESA Tax Summary for P. Murry."[12]

- Doc Id 00224366 (*in camera* Exhibit M), a 10/29/14 email from Mr. Adams to the Murry firm.

- Doc Id 00224368 (*in camera* Exhibit N), a 10/29/14 email from Mr. Adams to the Murry firm.

---

[11] Mr. Adams exaggerates the record with regard to this point.  He claims that after Mr. Brever made the *Kovel* assertion, Mr. Maria "searched for (and later viewed) *more* documents referencing 'murry' and 'murryllc,' so that he could view *more* privileged information."  Def's Mot. to Dismiss at 39 (emphasis added).  The documents that were viewed after Mr. Brever made the *Kovel* assertion were documents that had already been viewed prior to Mr. Brever's assertion.   *See* Gov't Ex. 42 to Mem. in Opp. to Mot. to Suppress.

[12] As noted in the response to the motion to suppress, Mr. Brever produced the email reflected in Doc Id 00224269 without any privilege assertion.

- Doc Id 00224409 (*in camera* Exhibit O), a 10/29/14 email from the Murry firm to Mr. Adams posing questions.

- Doc Id 00224497 (*in camera* Exhibit P), a 11/4/14 email from Adams to the Murry firm.

*See* Gov't Ex. 42 to Mem. in Opp. to Mot. to Suppress.  Given the timing, participants, and descriptions of these documents, coupled with the communications that preceded and succeeded these documents, it seems inescapable that the questions posed and the information provided in these communications was used by the Murry firm to prepare amended returns.  That simple fact shows that, at a minimum, these were dual purpose communications, one purpose perhaps having some tenuous connection to obtaining legal advice but the other, much more obvious purpose, being to prepare amended returns. Under the law on which the government has relied in its privilege briefing [Dkt. 109, 119] and its response to the motion to suppress [Dkt. 172].  Such communications are not privileged.  And even if they were, the privilege was waived when Mr. Adams filed those amended returns.  Admittedly, the better practice would have been to make these arguments to the Court, but the government had a good faith basis for disagreeing with Mr. Brever's expansive view of the scope of *Kovel*, which seemingly gives no consideration to whether the filing of the amended returns operates as a waiver.

Mr. Maria and Special Agent Belich are no longer on the prosecution team and of the remaining members, only Inspector Kroells had any significant activity within the Relativity database.  But again, the Relativity activity log refutes Mr. Adams's contention that whatever exposure Inspector Kroells had to allegedly privileged communications has

35

tainted her.  An extraordinarily small percentage of her activity within Relativity related to Mr. Adams's *in camera* exhibits. [13]  And on those handful of occasions when Inspector Kroells was exposed to a communication within the *in camera* exhibits, the exposures generally were very brief.  *See* Gov't Ex. H at pgs. 26-27, 42, 45, 60-62, 72, 78-79, 181-183.  Under those circumstances, suppression of those documents that are truly privileged, as opposed to disqualification, is sufficient to protect Mr. Adams's interests, particularly given that Mr. Adams's prejudice arguments are unpersuasive.

As noted at the outset, Mr. Adams relies on cases involving disqualification of attorneys in the civil context rather than in the specific context that is present here: disqualification of government counsel in a criminal case.  Accordingly, the factors he identifies from those cases as driving the analysis are not applicable.  In addition, he misapplies those factors to the record in this case.

*First*, as noted in the response to the motion to suppress, Mr. Adams claims that the *in camera* exhibits are the only documents that the Court needs to review in order to rule on his motions.  However, despite having unequivocally taken that position, Mr. Adams *repeatedly* alludes to other privileged documents and repeatedly insinuates that they too were viewed, all in an effort to bolster his claim that he has been prejudiced.  The Court cannot accept assertions of privilege, much less prejudice, that cannot be tested by reviewing the allegedly privileged documents.

---

[13] Of the approximately 5600 lines in the Relativity activity log that pertain to Inspector Kroells, 47 of them, or 0.8%, relate to the documents contained within the *in camera* exhibits.

36

For example, he points to the brief period of time[14] when Inspector Kroells reviewed emails directly from the thumb drive that had been provided by Yahoo!, before the mechanical filtering excluded approximately 34,000 documents as being potentially privileged. He notes that there were nearly 4,000 communications within those 34,000 that hit in response to Latham search terms, although, tellingly, he does not actually assert that all 4,000 of those communications are privileged. Next, he claims that some unspecified number of communications within the 4,000 "contain discussions with and information from Mr. Adams relating to the Apollo/Scio transactions and other core features of the Indictment." Mot. to Dismiss at 30. He concludes by stating that "[i]t is no answer for the government to speculate that Inspector Kroells did not review Latham (or other privileged) materials during this initial time period." *Id*.

To the contrary, it is Mr. Adams who is relying on speculation. He wants the Court to go along with the speculation that all of the nearly 4,000 documents that hit in response to a Latham search term are privileged and that they reveal information relating to "core features" of this criminal case. He asks the Court to go along with this speculation despite the fact that he has never provided any of these other documents to the Court. In contrast to such speculation, the government actually has evidence in support of its position: Inspector Kroells's declaration states that "[w]hen searching on those two dates, I do not recall seeing any emails that gave me concern regarding the attorney-client privilege." DX 1 ¶ 12. And unlike Mr. Adams's assertion, Inspector Kroells's declaration is corroborated

---

[14] The record indicates that, at most, Inspector Kroells spent some period of time reviewing the Yahoo! production directly off of the thumb on two days in March 2016. DX 1 ¶ 12.

by the fact that **not one** of the 22 emails that she printed on the days that she reviewed documents directly from the thumb drive is among the *in camera* exhibits, or even the larger universe of documents that Mr. Adams has included on his two privilege logs. *Compare* Maier Decl. [Dkt. 148] ¶ 4 *to* [Dkt. 142] Exs. 1, 2.

*Second*, Mr. Adams claims that the measures taken to prevent or mitigate exposure to privileged communications were insufficient and, therefore, weigh in favor of disqualification. As stated in the response to the motion to suppress, the government did employ significant measures to prevent and mitigate exposure. Those measures resulted in excluding more than 34,000 documents. And although the measures were not perfect, at the end of the day, Mr. Adams's complaint is that approximately 50 documents (many of which were duplicative) out of more than 100,000 were missed, and a number of those were missed because they were drafts that Mr. Adams had sent to himself.

Echoing his motion to suppress, Mr. Adams again raises the idea that he is entitled to a search warrant execution that employed heightened precautions simply because he is an attorney. See Mot. to Dismiss at 31 ("[T]he prosecution team employed measures that were inadequate for reviewing any lawyer's email . . . .") There is no authority in support of such a proposition. As noted in the response to the motion to suppress, this was not a search of an attorney's law firm email account to find evidence of the attorney using his status as a lawyer to commit a crime; it was a search of what was believed to be an attorney's personal email account to find evidence of the attorney committing a crime in his personal, non-attorney capacity.

*Third*, Mr. Adams contends that the government should have used a taint team rather than rely on mechanical filtering procedures.  The government response to the motion to suppress analyzes this argument, which is incorporated herein by reference.  In addition to those arguments, the government notes that in *SDI Future Health*, the court observed that there is no authority for the proposition that when the government "seizes voluminous business records, it must first employ a taint team to review all of the records to identify potentially privileged documents."  464 F. Supp. 2d at 1039.

*Fourth*, Mr. Adams cites DX 15 for the proposition that Mr. Maria "knew that Mr. Adams had used his Yahoo! email account to communicate with lawyers about the government's investigation."  There is absolutely nothing in DX 15 that says anything of the sort.  All DX 15 shows is that the search terms that were proposed included Latham just in case it turned out that Mr. Adams had used his Yahoo! accounts to communicate with Latham.  The reference to DX 15 is misleading given that DX 15 is dated April 26, 2016, which was more than a week before Mr. Maria could have gained any "knowledge" about whether Mr. Adams had used his Yahoo! accounts to communicate with the attorneys at Latham.  This is so because he could not have gained such knowledge until he began looking at documents within the database, which did not begin until May 4, 2016.

*Fifth*, in claiming that disqualification is required, Mr. Adams again invokes his exaggerated claim that privileged documents were viewed and his unfounded claim that they were used.  The story told by Government Exhibit 42 to the Response to the Motion to Suppress is that privileged documents were very rarely encountered and that when they were, they generally were viewed for only a matter of seconds.

*Lastly*, Mr. Adams claims that disqualification is required because the government acted in bad faith or in reckless disregard of the danger of accessing privileged materials. The government has acknowledged that some potentially privileged communications were viewed by the prosecution team. But it seems entirely gratuitous to accuse the agents and attorneys assigned to this case of having deliberately set out to trample all over Mr. Adams's rights. That simply is not the case, and the record developed at the suppression hearing, as supplemented by the evidence that has been attached as exhibits to the post-hearing briefing, including the Relativity activity logs, refutes this accusation.

The idea that the agents and attorneys assigned to this case were acting with improper intent or in bad faith is irreconcilable with the efforts that were employed. As the Court knows from the internal communications—a largely unprecedented level of access to how the government went about conducting its investigation—considerable thought was given to developing a method that would facilitate efficient and timely review of Mr. Adams's email accounts while also safeguarding potentially privileged communications. As noted in the government's response to the motion to suppress, the prosecution team was unaware of the fact that its activity was being logged by the Relativity program. And yet the search terms show that the government limited itself to searches reasonably calculated to find relevant, unprivileged communications.

With regard to Mr. Adams's claim that Mr. Maria misstated the government's access to allegedly privileged documents, the claim is wrongly premised on imparting an unwarranted intent to the communications. The purpose of the first two communications, DX 34 and 37, was to correct an error regarding the way in which the different databases

produced to the defense had been labeled and to clarify that the database containing approximately 40,000 emails was the one that contained the documents that the government had determined were within the scope of the warrant and not potentially privileged. The third statement, DX 40, conveyed that the databases had been set up such that the prosecution team's access to documents from Mr. Adams's email accounts ultimately was limited to just those roughly 40,000 left after the April 2017 filter.

In the end, the government submits that the correct test that the Court is to apply in evaluating Mr. Adams's arguments for disqualification is one that takes into account the lack of real prejudice to him in this criminal case. Of course, an intrusion into an attorney-client relationship works a harm on the privilege holder simply by virtue of the fact that confidential information was compromised. But that is not the type of harm that warrants disqualification—or, for that matter, any of the other remedies Mr. Adams seeks. The prejudice required to justify disqualification requires a determination that the currently constituted prosecution team has access to information, unavailable from any other source (e.g., Mr. Adams's deposition testimony, his amended tax returns, or his attorney's defense presentation to the SEC), that gives the government an unfair advantage such that it would be likely that Mr. Adams would be unable to receive a fair trial. For all the reasons discussed previously, no prejudice of that type has occurred in this case.

### C. The Court Should Deny Mr. Adams's Request For A *Kastigar*-like Hearing

Mr. Adams requests that the Court conduct a *Kastigar*-like hearing to determine whether the other members of the prosecution team have been tainted by the access to the communications alleged to be privileged. The Court should reject Mr. Adams's invitation.

41

The constitutional interests that *Kastigar* seeks to vindicate are qualitatively different from the interests at stake here. *Kastigar* applies in the limited situation where the government allegedly uses a defendant's compelled testimony given under a grant of immunity to institute a prosecution against that defendant. *United States v. McDaniel*, 482 F.2d 305, 308-09 (8th Cir. 1973). No court within the Eighth Circuit has ever imposed a *Kastigar*-type standard in the context of a claim of intrusion into the attorney-client relationship. Looking outside the Eighth Circuit, other courts have applied *Kastigar* to a claim of intrusion into the attorney-client relationship, but only in a context where Sixth Amendment rights were implicated. *See United States v. Danielson*, 325 F.3d 1054, 1059 (9th Cir. 2003); *United States v. Schwimmer*, 882 F.2d 22, 27 (2d Cir. 1989). As noted above, the alleged intrusions here only implicate Mr. Adams's Fifth Amendment rights, not his Sixth Amendment rights. And in that context, a defendant is not entitled to a *Kastigar*-like hearing in light of the enormous differences between the right against self-incrimination and the right of due process. *See United States v. Warshak*, 631 F.3d 266, 293-95 (6th Cir. 2010) ("[T]his court has hinted, in dicta, that the leaking of privileged materials to investigators would raise the spectre of *Kastigar*-like evidentiary hearings. However, no other appellate court appears to have joined us in suggesting that *Kastigar* is implicated whenever investigators come into possession of materials subject to the attorney-client privilege. . . . We . . . hold that, absent compelled testimony, the full protections of *Kastigar* are inapplicable.") (quotation omitted); *see also DeLuca*, 663 F. Appx. at 880 (expressing doubt that a *Kastigar*-like hearing would be proper in a case involving anything other than the situation where the claim is that compelled testimony

42

under a grant of immunity has been used to secure charges).   The Fourth Circuit has also rejected the applicability of a *Kastigar*-type standard in the analogous context of a due process claim predicated on a criminal investigation's alleged intrusion into the psychotherapist-patient privilege.  *United States v. Squillacote*, 221 F.3d 542, 558-60 (4th Cir. 2000) ("[B]ecause the government's right to compel testimony in the face of a claim of privilege is the issue at the heart of *Kastigar*, its protections do not apply in cases where there is privileged evidence, but no compelled testimony.").

## IV.    CONCLUSION

For the reasons stated above, as well as those stated in the government's response to Mr. Adams's motion to suppress, the Court should deny Mr. Adams's motion to dismiss, or, in the alternative, for disqualification.

Dated: July 27, 2018                                Respectfully Submitted,

                                                    ERICA H. MacDONALD
                                                    United States Attorney

                                                    *s/ John Kokkinen*

                                                    BY:  JOHN KOKKINEN
                                                    Assistant U.S. Attorney
                                                    Attorney Id No. 0388356
                                                    600 U.S. Courthouse
                                                    300 South Fourth Street
                                                    Minneapolis, Minnesota 55415
                                                    612-664-5600