UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-64 (DWF/KMM)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDWARD S. ADAMS,

    Defendant.

**GOVERNMENT'S MOTION CONTESTING THE APPLICATION OF PRIVILEGE**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and John Kokkinen, Assistant United States Attorney, respectfully submits this motion contesting the application of privilege as to certain documents identified on Mr. Adams's privilege log contained in Exhibit 1[1] to Mr. Adams's motion to dismiss.

Broadly speaking, there are four categories of documents on Mr. Adams's privilege log that the government is contesting in this motion.[2] The government does not have access to any of the documents identified below and so the challenges are based on what the government is able to glean from the descriptions in Mr. Adams's privilege log, coupled

---

[1] All references in this memorandum are to Exhibit 1 [Dkt 142] to Mr. Adams's motion to dismiss.

[2] The parties met and conferred regarding disputes documents and categories of documents on Mr. Adams's privilege log. As a result of those efforts, the government agreed not to contest certain communications, and Mr. Adams agreed to withdraw his assertion of privilege as to 22 documents challenged by the government. *See* Gov't Exhibit J.

with the government's understanding from the investigation of the relationships between the individuals included in the communications.

1. **<u>Communications with the Murry firm.</u>**

First, the government is contesting the application of privilege as to Mr. Adams's communications with the Murry firm (*see* rows 101-107 of Ex. 1), an accounting firm that prepared his amended tax returns for the years 2008 through 2010 under a purported *Kovel* arrangement with Mr. Brever, an attorney who represented Mr. Adams's in connection with those amended returns. The basis for this challenge is set forth in the government's responses to Mr. Adams's motions to suppress and to dismiss. *See* [Dkt. 172] at 64-82; [Dkt. 179] at 16, 21, 33-35.

As an initial matter, the government observes that Mr. Adams's privilege log is inadequate to demonstrate that the communications with the Murry firm are privileged. Although it provides the identities of the sender/recipient and a vague description of the alleged purpose of the communications, it says nothing about (1) whether the information in the communications was created in order to communicate with the attorney or whether it was pre-existing, (2) whether the information in the communications was communicated to third parties, (3) whether the communication included data intended to be reported to the IRS, and (4) whether the communication contains underlying details of information already reported on tax returns. As the proponent of the privilege, it is Mr. Adams's burden to establish that each of the above considerations supports his claim that the communications are privileged. *United States v. Willis*, 565 F. Supp. 1186, 1212-13 (S.D. Iowa 1983). In addition, given the extremely high likelihood that, at a minimum, only

2

some portions of the communications are properly deemed as privileged, Mr. Adams must produce the non-privileged portions. *Id*. at 1213.

As the Court knows, one of the bases for the government's challenge to the privilege assertion over the Murry communications is the crime-fraud exceptions. The government believes that the materials already before the Court—the seven communications with the Murry firm that are at issue (rows 101-107 on Mr. Adams's privilege log, Exhibit 1), Mr. Adams's *in camera* exhibits, the entire production from Murry (Gov't Ex. 43 to the response to the motion to suppress), and the amended returns that were filed with Murry's assistance (Gov't Exs. 31-33 to the response to the motion to suppress)—demonstrate the applicability of the crime-fraud exception. If the Court determines that it needs to see the entire Murry file regarding the amended returns filed in 2014 (i.e., everything in Gov't Ex. 43, plus all "*Kovel* communications") to decide whether the crime-fraud exceptions applies, then Mr. Adams should be ordered to produce those additional portions of Murry's file to the Court *in camera*.

2. **Communications with M.M. and/or Mr. Reilly**

The second category of documents for which the government is contesting the assertion of privilege is communications between Mr. Adams and his law firm partner, M.M., and/or a non-lawyer employee of the law firm, Mr. Reilly. Mr. Adams claims that these communications were in anticipation of litigation, that he and M.M. were in a common interest and/or joint defense agreement, and, therefore, the communications are subject to the work-product doctrine or attorney-client privilege, or both (*see* rows 16, 43, 63-68, 71-73, and 76-91 of Ex. 1). The government contends that Mr. Adams may not

3

validly assert privilege as to these documents. These communications appear to be nothing more than communications between putative co-defendants in disputes that eventually ended up as civil lawsuits (although one did not even get that far).

Specifically, as noted in the government's response to the motion to suppress, Mr. Adams and M.M. were in a dispute with Messrs. Mack and Rapello pertaining to the Apollo/Scio transactions. That dispute ultimately resulted in a lawsuit that was filed in May 2012, in which Mr. Adams and M.M. were, according to Mr. Adams, represented by Mr. Hartman. Among the communications that Mr. Adams claims are privileged—specifically, work-product—is a communication between him and M.M. regarding that dispute even though that communication did not include Mr. Hartman as a recipient and, indeed, appears to predate Mr. Hartman's involvement in allegedly representing Mr. Adams (*see* row 16 of Ex. 1). Instead, the argument appears to be that simply because it is in anticipation of litigation and Mr. Adams and M.M. just happen to be attorneys, the communication is privileged.

The same analysis applies to a communication regarding the so-called "Fink litigation," which was a dispute with a shareholder of Apollo that ultimately resulted in a lawsuit. Among the documents claimed to be privileged—again, work-product—is a communication between Mr. Adams and M.M. regarding that dispute (*see* row 43 of Ex. 1), but, again, no outside attorney is copied on the communication, and there is no indication that it reflects any communication with an attorney who was representing Mr. Adams and M.M. in connection with that litigation or potential litigation, or anything done at the direction of an attorney representing Mr. Adams of M.M.

A third dispute that had the potential to result in civil litigation involved a law firm named Nelson Mullins. Among the documents claimed to be privileged—both attorney-client and work-product—are a number of communications between Mr. Adams and M.M. regarding that dispute (*see* rows 63-68, 71-73, and 76-91 of Ex. 1). Again, there is no outside attorney copied on the email and no indication that it is reflects the substance of some communication from an outside lawyer representing Mr. Adams in connection with that dispute. These appear instead to be just communications between putative co-plaintiffs, who just happen to be lawyers, about a dispute they are having with Nelson Mullins that might end up maturing into a civil lawsuit.

Mr. Adams's invocation of the attorney-client privilege as to these communications appears to be without merit given that the communications were between putative co-defendants (or co-plaintiffs) who happen to be lawyers and a non-lawyer employee of their law firm. Mr. Adams's invocation of the work product doctrine as to these communications is misplaced. The seminal case on the work product doctrine is *Hickman v. Taylor*, 67 S.Ct 385 (1947), which makes clear that the work product doctrine is intended to protect the legal profession by creating a zone of privacy to enable attorneys to effectively protect the interest of their clients:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and necessary way in which lawyers act within the framework of our system of

>   jurisprudence to promote justice and to protect their clients' interests.  This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways – aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore inviolate, would not be his own.  Inefficiency, unfairness and sharp practices would inevitably develop on the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

*Id.* at 393-94.

The work-product doctrine applies to the work that an attorney performs on behalf of a client.  A conversation between two lawyers about how they plan to defend against accusations of fraud in a putative civil lawsuit (or about how to bring a malpractice suit against a law firm) should be no more protected than a conversation between two non-lawyers about how they plan to defendant against accusations of fraud.  *See McKenzie v. McNeil*, No. 4;11cv45-RH/WCS, 2012 WL 695108, at *1 (N.D. Fla. March 1, 2012) (rejecting the assertion that because a plaintiff was representing himself, his handwritten notes were privileged under the work-product doctrine).  Neither the truth-seeking function of the adversary system, nor the integrity of the legal profession, are served by allowing Mr. Adams to claim privilege over what he and M.M. said to each other allegedly in anticipation of the Mack/Rapello litigation, Fink litigation, and Nelson Mullins litigation simply because both men happened to be lawyers.  The Court should order that the above-identified rows from Mr. Adams's privilege log be deemed not privileged and that the government may use those documents at trial.

3. **Communications with Mr. Spitzer.**

Mr. Adams claims that a number of communications with Mr. Spitzer (rows 44-46, 69, and 74) are privileged because Mr. Spitzer represented Mr. Adams in his personal capacity in connection with some of the same disputes identified above. The government contests this application of privilege on the basis that it appears from Mr. Adams's deposition testimony before the SEC that Mr. Spitzer's communications with Mr. Adams was perhaps an initial consultation for purposes of Mr. Spitzer representing Apollo and/or Scio but not Mr. Adams in his personal capacity. Specifically, when asked about Mr. Spitzer during his deposition, Mr. Adams stated that Mr. Spitzer received shares in Scio in exchange for having provided business consulting, that Mr. Spitzer provided legal services to Apollo and Scio, and that outside of those legal services, Mr. Adams's personal, or individual relationship with Mr. Spitzer was confined to having "invested in some real estate deals together." DX 51 at 346-47. Mr. Adams said nothing about consulting with Mr. Spitzer about representing Mr. Adams personally.

Based on the above described portions of Mr. Adams's deposition testimony, there is reason to believe that Mr. Adams's communications with Mr. Spitzer were in Mr. Adams's capacity as an employee/officer of Apollo/Scio but not is his individual, personal capacity. The burden is on Mr. Adams to establish the elements of the attorney-client relationship, not on the government to disprove those elements. The Court should require that Mr. Adams substantiate his assertion that he holds a personal attorney-client privilege over his communications with Mr. Spitzer.

**4.**     **Communications with Nelson Mullins.**

The final category is Mr. Adams's communications with the law firm Nelson Mullins (*see* rows 47-62). Mr. Adams did indeed consult with Nelson Mullins for the purpose of seeking legal advice but, similar to the communications with Mr. Spitzer, it appears that those communications were in Mr. Adams's capacity as a representative of Scio not in his personal, individual capacity. In fact, the lawyers at Nelson Mullins unequivocally deny that Nelson Mullins ever represented Mr. Adams in his individual or personal capacity. Gov't Ex. K. Accordingly, the Court should order that the communications with Nelson Mullins are not privileged and that the government may use those communications at trial.

Dated: July 27, 2018                                         Respectfully Submitted,

                                                             ERICA H. MacDONALD
                                                             United States Attorney

                                                             *s/ John Kokkinen*

                                                             BY:  JOHN KOKKINEN
                                                             Assistant U.S. Attorney
                                                             Attorney Id No. 0388356
                                                             600 U.S. Courthouse
                                                             300 South Fourth Street
                                                             Minneapolis, Minnesota 55415
                                                             612-664-5600