UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 17-cr-64-DWF-KMM ) |
| EDWARD S. ADAMS, | ) ) |
| Defendant. | ) ) ) ) |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT OR, IN THE ALTERNATIVE, FOR DISQUALIFICATION**

As with its response to the suppression motion, the government attempts to rewrite the history of the investigation and concoct after-the-fact excuses to justify its deep invasions into attorney-client communications. Notwithstanding its 138 pages of briefing, the government cannot avoid the record showing it was on clear notice of the pertinent privileged relationships, was well aware the very documents it was reviewing were "Attorney-Client Privileged Communication[s]," it had this knowledge and information in the early days of its case development (before the tax case really started, before key interviews, and before much of its document review), and it knew that the privileged materials were central to the "lulling" theory on which its entire fraud case depends. Having found these materials, it did not stop and segregate them or remedy these invasions. Instead, it knowingly and purposefully ran full steam ahead—and repeatedly reviewed the sensitive privileged materials during the period that it was

PUBLIC VERSION

interviewing witnesses and reviewing documents for its case, and it specifically incorporated the privileged materials into the IRS SAR it submitted to gain authorization for tax charges against Mr. Adams. The violations are clear, egregious, and prejudicial. Suppression is obvious but wholly insufficient to address the prejudice. Dismissal or, in the alternative, disqualification are warranted. While those remedies are admittedly rare, so too is evidence of misconduct this intentional and prejudicial of an individual's rights.

## I.     The Record of Privilege Invasions and Prejudice Is Clear

The government concedes that it viewed the privileged documents at issue, but it spends the bulk of its opposition making post-hoc justifications for why its intrusions were not prejudicial. It argues that its unprecedented access to Mr. Adams's privileged communications is ultimately meaningless (and requires no remedy) because it would have encountered the same information and pursued the same charges regardless. But the government's self-serving conjecture cannot overcome the facts: The government reviewed dozens of privileged communications squarely focused on the same matters on which it ultimately brought charges. It actually used some of those communications in deciding to bring the tax charges—and in obtaining authorization from Main Justice to bring those charges. The unprecedented level of insight the government gained into Mr. Adams's legal concerns and potential defenses cannot be remedied by mere after-the-fact suppression of those communications. Dismissal of the indictment is warranted.

*__The government built its tax investigation on privileged communications.__* As explained in greater detail in Mr. Adams's Suppression Reply, the government's claim that the tax charges were based on its bank statement analysis and "a brief perusal" of

2

Mr. Adams's tax returns is contradicted by the record.  *See* Opp. 20-21; Suppression Reply 11-14.  It is beyond dispute that AUSA Maria had reviewed the key Murry and Brever spreadsheets (despite the obvious privilege header) and emails many times before he ever "perused" Mr. Adams's tax returns.  Supp. Reply 11-12.  And it is beyond dispute that key privileged communications with Murry LLC were sent to the IRS agent who was developing tax charges, and that they were used by the government to seek approval of those charges.  *Id.* 12-13.  These privileged communications were attached to the IRS Special Agent Report ("SAR")[1] and actually discussed therein.  *Id.*; *in camera* Ex. V.  Thereafter, Main Justice approved tax charges against Mr. Adams in reliance on the information provided in the SAR—including these sensitive, privileged communications.

*__The fraud investigation also relied on privileged documents.__*  In stark contrast to its representations throughout the entirety of this matter and the indictment itself, the government now downplays the 2011-12 Apollo/Scio transaction as being outside the "heart" of Mr. Adams's alleged fraud scheme, Opp. 19, something "relevant to the story told by the superseding indictment" but not "the moral of" that story, *id.* 22, and ultimately part of a "substantial[ly] differen[t]" line of inquiry, *id.* 28.  Because the non-tax privileged communications the government repeatedly reviewed dealt with this transaction, the government reasons that Mr. Adams cannot have been prejudiced as a result of the review.  But the government ignores a key fact:  Without the Apollo/Scio

---

[1] A SAR is a report the IRS prepares for the Tax Division of Main Justice to obtain permission to bring tax charges against an individual.  This authorization is required by DOJ policy.  *See* DOJ Criminal Tax Manual at 1.04[2].

3

transaction, Mr. Adams's alleged fraud in 2008, 2009, and 2010 would have been outside the five-year statute of limitations for mail and wire fraud by the time the government claims it had unraveled the scheme in early 2016.  *See* 18 U.S.C. § 3282; Opp. 20.  That is why allegations about "[t]he Scio . . . Lulling Scheme" comprise nineteen paragraphs of the superseding indictment.  *See* ECF 70 ¶¶ 41-59.  Without the Apollo/Scio transaction, the government had no case, so the privileged documents conveying Mr. Adams's thoughts on and defenses related to that transaction went to the heart of its investigation and the charges it brought thereafter.[2]

*__The government gained unprecedented insight into Mr. Adams's trial strategy and possible defenses.__*  Under the Fifth Amendment, prejudice results from any "use by the prosecution of confidential information regarding defense plans and strategy."  *United States v. Marshank*, 777 F. Supp. 1507, 1521 (N.D. Cal. 1991).[3]  Here, the government learned Mr. Adams's possible defenses to many of the allegations ultimately contained in the indictment, as well as possible areas of cross-examination of government witnesses at trial—information not available elsewhere.  *See* Br. 22-23 (comparing the indictment to

---

[2] To be clear, the supposed "lulling scheme" is the government's invented theory, unsupported by evidence, to try to solve a clear statute of limitations problem.  That theory's lack of merit is beyond the scope of this motion; the fact that it was constructed through a careful review of Mr. Adams's most sensitive privileged documents is not.

[3] *See also id.* ("It is also apparent that the government's misconduct in this case was designed to and would give the prosecution an unfair advantage at trial."); *accord United States v. Orman*, 417 F. Supp. 1126, 1136 (D. Colo. 1976) ("What was learned by the agents would be of help to them in structuring an answer to the affirmative defense they anticipated, and knowledge on the part of the agents of defense plans and strategy is all I think is necessary to require dismissal [of the indictment].").

4

PUBLIC VERSION

the contents of privileged communications reviewed by the government).[4]

The government's arguments that Mr. Adams was not prejudiced are unavailing. It contends that any truly important defense strategy or analysis must have been revealed by Mr. Adams's SEC depositions or presentation, so its exposure to this already-public information cannot prejudice Mr. Adams. Opp. 23-26.[5] Its argument misunderstands the purpose and practice of privileged communications. The attorney-client privilege exists "to encourage *full* and *frank* communication between attorneys and their clients" and "recognizes that sound legal advice or advocacy . . . depends upon the lawyer's being *fully informed* by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (emphasis added). Consistent with this purpose, Mr. Adams did not send his attorneys mere tidbits of information to be included in the SEC presentation. Nor did he respond to the SEC's deposition questions in the same manner that he communicated with his counsel; he simply answered the questions asked. Instead, Mr. Adams communicated openly with his attorneys who then worked with him to marshal the most compelling

---

[4] "A party whose trial strategy had been disclosed would be at a substantial disadvantage and an exclusionary remedy would not be responsive." Eric D. McArthur, "The Search and Seizure of Privileged Attorney-Client Communications," 72 U. Chi. L. Rev. 729, 739 (2005). Indeed, "even the suppression of derivative evidence along with the privileged communications may not adequately deter illegal searches and seizures . . . or provide corrective justice" when "the government's ability to make tactical decisions in light of this information could work to the defendant's substantial disadvantage." *Id.* at 753.

[5] Mr. Adams does not understand the government to argue he has made a subject matter waiver of the attorney-client privilege with respect to topics he discussed in his SEC depositions or presentation. If that were how the privilege worked, a client would never candidly communicate with his lawyer about any issue on which he planned to testify.

5

evidence and arguments to respond to the specific questions posed by the SEC.

Two examples illustrate the error of the government's prejudice arguments. First, the September 23, 2014 memo that Mr. Adams wrote to Mr. Hopeman and Mr. Brever, and which also bore an obvious privilege legend, provided the government with insights into Mr. Adams's defenses and trial strategy. *In camera* Ex. J. This memo discusses ▮▮▮▮▮▮▮▮▮▮ None of these possible topics came up in Mr. Adams's SEC depositions or presentation. AUSA Maria viewed this document twice and Inspector Kroells viewed it five times. ▮▮▮▮▮▮▮▮▮▮ *See* Br. Ex. 4. Having access to this document was surely invaluable to the government during witness interviews—and, of course, it is those tainted memos that would be the foundation for preparing the witnesses to testify at trial. *See United States v. Levy*, 577 F.2d 200, 207-08 (3d. Cir. 1978) (dismissing indictment where "the government's knowledge of . . . defense strategy might benefit the government . . . in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself").[6] That prejudice cannot be undone.

---

[6] *See also Briggs v. Goodwin*, 698 F.2d 486, 494-95 (D.C. Cir. 1983) ("Mere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant."), *vacated on other grounds* 715 F.2d 1444 (D.C. Cir. 1983).

PUBLIC VERSION

Another example of insights the government gained into Mr. Adams's defenses to the charges in the indictment comes from the June 18, 2014 memo he drafted for his counsel at Latham, which bore an obvious privilege legend. This document gave Mr. Adams's candid, detailed explanation of ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See in camera* Ex. A. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *Id.* at 3. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ It would be hard to prove greater prejudice than this. The government could not have learned this from the SEC depositions or some pre-trial presentation, where the topic was barely discussed.[7] AUSA Maria viewed this document *twelve times* on five different days while he was presenting witnesses to the grand jury and preparing the indictment. Br. Ex. 4.

---

[7] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

PUBLIC VERSION

**II.     The Government's Misconduct Requires Dismissal**

The proper remedy for the government's prejudicial intrusions into Mr. Adams's privileged communications about the issues that are at the heart of the indictment is to dismiss the indictment. The record of the government's use of Mr. Adams's privileged communications to generate the tax charges against him is especially overwhelming. It is hard to imagine how the evidence could be any clearer than the SAR, which justified bringing tax charges both by quoting from privileged communications and by attaching privileged documents. Because AUSA Maria was responsible for coordinating the tax case but successfully fought testifying at the evidentiary hearing, the government has proffered no evidence supporting its unsworn argument that privileged information was not necessary to bringing the tax charges. These charges especially merit dismissal.

Even under the test from *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), suggested by the government, the true record (as opposed to the government's revisionist history) merits dismissal. This test requires (1) the government's objective awareness of a privileged relationship, (2) its deliberate intrusion into that relationship, and (3) actual and substantial prejudice. *Id.* at 1067. The actual and substantial prejudice to Mr. Adams has been set forth above and in his initial motion. Br. 21-25. If the other two factors are necessary to state a Due Process violation, the government's conduct here satisfies both.

The government was objectively aware of Mr. Adams's attorney client relationships. It admits to awareness of the relationships with Mr. Hartman, Latham & Watkins, and Mr. Hopeman, but claims that it was not objectively aware of Mr. Brever's representation (or Murry LLC's involvement in that representation) until December 2016.

8

PUBLIC VERSION

Opp. 8. As explained in greater detail in Mr. Adams's Suppression Reply, this claim is contradicted by the record. *See* Suppression Reply 5. The IRS was aware of Mr. Brever's representation from at least December 2014, and on May 4, 2016, AUSA Maria viewed the privileged "ESA Tax Questions" spreadsheet (*in camera* Ex. K) *five times*. *See* Br. Ex. 4 at 5. That document conspicuously states: "Attorney-Client Privileged Communication for Tom Brever and Pat Murry."[8] Thus, the record demonstrates that the government was objectively aware of all of Mr. Adams's privileged relationships—including with Murry LLC—no later than the first day that it searched in Relativity.[9]

And the government's conduct was unquestionably "deliberate." From their first days reviewing documents in the Relativity database, AUSA Maria and Inspector Kroells repeatedly viewed documents that contained obvious privilege legends. *See* Br. 7, 9-10 & Ex. 4 at 1 (Latham); 11-12 & Ex. 4 at 4 (Hopeman); 12-13 & Ex. 4 at 4-5 (Brever); 13-14 & Ex. 4 at 5 (Murry LLC). Moreover, AUSA Maria pursued privileged communications with Murry LLC by searching for "murry" and "murryllc" less than a week after receiving a letter from Mr. Brever explaining the privileged nature of Murry LLC's work under *Kovel*. *See* Br. 29.[10] For her part, Inspector Kroells sought out and

---

[8] All of the privilege headers identified by Mr. Adams were visible in all Relativity viewing modes. *See* Suppression Reply 4-5 & Supp. Ex. 23.

[9] The government successfully quashed Mr. Adams's attempt to elicit AUSA Maria's testimony on this subject, so this documentary evidence is the only evidence from which the Court can determine whether the government was objectively aware of the relationship. *See* ECF 65; ECF 100.

[10] The government concedes "that the exposure to [the Murry] communications was of a more deliberate nature." Opp. 16.

9

reviewed privileged documents about a lawsuit touching on topics relevant to the prosecution by searching for "ed" AND "settlement" AND "lawsuit." Br. 17-18. All deliberate acts. The prosecution team's failure to act in the face of its affirmative ethical duties is also evidence of deliberateness. *See Voigt*, 89 F.3d at 1070. Here, AUSA Maria and Inspector Kroells did not immediately act to remove privileged documents they came across from the database, Suppression Br. 25-27, did not effectively use a privilege tag, Suppression Reply 7, and did not take advantage of offers by Mr. Brever and Mr. Hopeman to engage in a process for identifying privileged documents, Suppression Br. 27-29. These were not innocent mistakes.[11]

The cases the government cites in no way excuse its misconduct. Some of them involve prosecutors or agents working with defense attorneys betraying clients to save themselves. *See United States v. Schell*, 775 F.2d 559, 562 (4th Cir. 1985); *Marshank*, 777 F. Supp. at 1512. It is true that none of Mr. Adams's attorneys betrayed him, but the government never explains why the fact that it invaded his privilege directly—and deliberately—as opposed to working through an intermediary makes its intrusion any less severe.[12] And it is not the case, as the government contends, *see* Opp. 18, that intrusion

---

[11] The government also claims that privileged documents were viewed so fleetingly that the intrusions cannot have been deliberate. Opp. 9-12. As Mr. Adams explains in his contemporaneous suppression reply, the timing data the government uses is not reliable, so this argument is unavailing. Suppression Reply 8-10 (citing M. Lyon Supp. Decl.).

[12] *United States v. Stringer*, 535 F.3d 929 (9th Cir. 2008), is inapposite because Mr. Adams's attorneys did not fail to invoke privilege on information they possessed; indeed, they invoked it vigorously. So are *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112 (10th Cir. 1998) (holding that the district court abused its discretion by not *considering* lesser remedies than dismissal of the indictment like suppression of privileged evidence

10

PUBLIC VERSION

into the attorney-client relationship during the investigatory stage of a prosecution is never prejudicial enough to require dismissal of an indictment. *See, e.g.*, *United States v. Valencia*, 541 F.2d 618, 621 (6th Cir. 1976); *Marshank*, 777 F. Supp. at 1521.

The Sixth Amendment also requires dismissal. The government's only argument on this point is that Mr. Adams had no Sixth Amendment rights at the time the government scrutinized his privileged communications because those rights had not yet attached. There is no binding precedent on point,[13] and other case law is not nearly as clear as the government insists. *See In re Grand Jury Proceedings*, 33 F.3d 1060, 1062 (9th Cir. 1994) ("Supreme Court cases regarding timing of a criminal defendant's confession and attachment of the right to counsel are inapposite and misleading in the context of this case. The Sixth Amendment *can apply* when the government's conduct [interfering with an attorney] occurs pre-indictment.").[14]

---

and disqualification of every agent who was tainted by it), and *United States v. Segal*, 313 F. Supp. 2d 774, 777-81 (N.D. Ill. 2004) (there was no evidence that the government actually viewed any privileged communications during its search, and the court found that the government agents affirmatively sought to avoid viewing privileged material).

[13] The only Eighth Circuit or Supreme Court cases the government cites analyze a suspect's right to the appointment or presence of an attorney, not his right to be free of interference with that relationship. *See, e.g.*, *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (no right to counsel in prison administrative detention). In fact, the Eighth Circuit case closest on point supports Mr. Adams's position, albeit in dicta. *See United States v. Solomon*, 679 F.2d 1246, 1248-51 & n.7 (8th Cir. 1982) (without mentioning attachment, stating "there is little doubt . . . that [the defendant's] Sixth Amendment rights were violated" by police interference with his relationship with counsel in March 1981 before he was charged in May 1981, but ultimately holding there was no prejudice).

[14] *See* Steven J. Mulroy, *The Bright Line's Dark Side: Pre-Charge Attachment of the Sixth Amendment Right to Counsel*, 92 Wash. L. Rev. 213 (2017) (collecting cases for the proposition that "[t]he circuit courts are split on the issue" of pre-charge attachment and

11

PUBLIC VERSION

Courts applying the Sixth Amendment pre-charge have relied on two theories, both of which are applicable. First, the Sixth Amendment applies whenever "the defendant finds himself faced with the prosecutorial forces of organized society" and facing "the intricacies of substantive and procedural criminal law." *United States v. Gouveia*, 467 U.S. 180, 189 (1984); *see, e.g.*, *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892-93 (3d Cir. 1999) (en banc) (holding uncharged arrestee's right to counsel attached because he was in custody, was represented by counsel, and was confronted with an ongoing investigation by government actors who knew he was represented). This applies to Mr. Adams—starting in July 2014, the government issued 67 grand jury subpoenas before ultimately securing the Yahoo! warrant,[15] Mr. Adams was already represented in a related SEC enforcement investigation, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, *see in camera* Ex. J. Second, the Sixth Amendment applies where pre-charge conduct by the government has post-charge consequences. *See, e.g.*, *United States v. Stein*, 435 F. Supp. 2d 330, 366-67 (S.D.N.Y. 2006) ("The fact that events were set in motion prior to indictment with the object of having, or with knowledge that they were likely have, an unconstitutional effect upon indictment cannot save the government.").[16] This applies to Mr. Adams because the knowledge that the

---

explaining that "[t]he Eighth Circuit has given differing indications").

[15] *See* Opp. Ex. E at Ex. 1 (list of subpoenas)

[16] The Eighth Circuit arguably endorsed this approach in *Solomon*. *See* 679 F.2d at 1246 (stating in the context of pre-charge police conduct that "defendant must show that the

12

government obtained through its misconduct relates to Mr. Adams's defenses and his potential testimony, *see* Br. 21-25, which has the potential to seriously hamper Mr. Adams's ability to defend himself at trial. Thus, on indictment, the government's privilege violation ripened into a Sixth Amendment violation.

Finally, the Court may dismiss the indictment under its supervisory powers. The government's argument that a systemic and persistent abuse of power must exist before an indictment can be dismissed on these grounds is also unavailing. *See* Opp. 28. First, no such requirement exists.[17] Second, even if there were a requirement of systemic and persistent abuse of power, that requirement would be met here. Despite the government's attempts to rewrite history, Mr. Adams has produced uncontroverted evidence that the government repeatedly reviewed privileged documents over the course of its investigation, even going so far as to use privileged documents to obtain approval to bring tax charges. That level of misconduct warrants dismissal.

### III. At Minimum, The Prosecution Team Must Be Disqualified.

The taint that resulted from the prosecution team's intrusion into Mr. Adams's privileged communications requires dismissal of all members of the team that was

---

representation he received or the proceedings leading to the conviction were adversely affected by virtue of the Sixth Amendment violation in order to obtain a dismissal").

[17] Several years after the cases cited by the government, the Supreme Court made clear that a court could dismiss an indictment using its supervisory powers for, among other things, constitutional error or "misconduct by the prosecution that," although it did not infringe on the grand jury's independence, "otherwise may have influenced substantially the grand jury's decision to indict or whether there is grave doubt as to whether the decision to indict was so influenced." *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 258-59 (1988).

13

PUBLIC VERSION

involved in the investigation of Mr. Adams's case and that the government's investigation begin anew, untainted by access to privileged communications. The government barely responds substantively to Mr. Adams's disqualification arguments—it spends most of its opposition arguing that dismissal is an unnecessarily extreme remedy, yet it offers no alternative besides the bare minimum of suppression.

Disqualification of the prosecution team is merited for the same unreasonable conduct that violates the Fourth Amendment and merits dismissal. There is no dispute that prosecution team members viewed *dozens* of privileged documents, which went to the heart of the case against Mr. Adams—far more than were reviewed in other cases supporting disqualification. *See, e.g.*, *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112, 1113 (10th Cir. 1998) (a single notepad); *United States v. Horn*, 811 F. Supp. 739, 741 (D.N.H. 1992) (twenty-two pages).[18] The record of the shortcomings of the prosecution team's measures—which did not include the use of a taint team, privilege tags, or even the immediate segregation of identified privileged documents, but instead relied on a list of (some but not all) attorney names—is extensive, and the government's arguments to the contrary are unconvincing. *See* Br. 31-37; Suppression Reply 7-8, 10-

---

[18] The government's response suggests that only a tiny portion of the documents it seized were privileged, Opp. 36-38, but as addressed by Mr. Adams in his Suppression Reply, these statistics are misleading, *see* Suppression Reply 15-16, and they are irrelevant. The government also argues that because none of the documents Inspector Kroells printed were privileged, she did not review any privileged documents before privilege filtering had been conducted—but this ignores Inspector Kroells's testimony that it was likely she encountered privileged documents in those early searches that informed her understanding of Mr. Adams's privileged relationships. *See* Suppression Br. 10 (citing Jan. 8 Hr'g Tr. at 103:1-104:13; 110:2-10).

14

11, 14-16.[19]  It is undisputed that the prosecution team actually viewed and used privileged information in developing its case.  The prosecution team's overall approach evidenced a bad-faith reckless disregard for Mr. Adams's privileged materials.[20]

The government's argument that separation of powers prevents the Court from dismissing the prosecution team is without merit.  *See* Opp. 30 n.8.  Federal prosecutors and agents are not above the law.  The question is not separation of powers but whether the Court has the authority to supervise its bar in the best interests of justice.  To that end, the government's argument runs directly counter to Eighth Circuit precedent and local rules.  "The district court is charged with the responsibility of supervising the members of its bar."  *United States v. Agosto*, 675 F.2d 965, 969 (8th Cir. 1982), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259, 263 n.2 (1984).  This Court has

---

[19] *See* Opp. 38-39.  For example, the government's denial that its review database contained Mr. Adams's privileged communications with Latham attorneys disregards reason.  *See* Opp. 39 citing DX 15.  DX 15 is a hit report showing that nearly 4,000 communications in the database hit on the term Latham, and several hundred more hit on the name Sikora (one of Mr. Adams's Latham attorneys).  The fact that the hit report came out before AUSA Maria started using the database only proves that he should have known that the database was riddled with privileged communications.

[20] The government argues that the logging of the Relativity data somehow evidences good faith, and it relies on its internal communications about a privilege review process that was then jettisoned.  It also repeats its justification for AUSA Maria's misstatements regarding the government's access to privileged communications (and those outside the warrant's scope), but the record of these misstatements is clear.  *See* Br. 8 (quoting AUSA Maria's three separate misleading communications, in which he flatly denied that the prosecution team "*has had*, or will have, access to those documents" that it did not purport to seize); DX 34; DX 37; DX 40.  The first two of these communications predated the error Mr. Adams identified in the government's document labeling that the government claims provides necessary context to the misstatements.  *See* Opp. 40-41.

15

chosen to do so by applying the Minnesota Rule of Professional Conduct to *all attorneys* "who . . . practice[] before the court." LR 83.6 (emphasis added). These ethical rules apply to prosecutors, defenders, and private practitioners alike.[21] The sole case the government cites actually supports disqualification. *See United States v. Bolden*, 353 F.3d 870, 879 (10th Cir. 2003).[22] So, too, does *Lin Lyn Trading*, a case the government cites repeatedly in other parts of its opposition. *See* 149 F.3d at 1118 (explaining that a new investigation could be "conducted by personnel—*both investigatory and prosecutorial*—untouched by the taint of the yellow notepad" containing privileged information (emphasis added)). Federal prosecutors, like all lawyers, are subject to the Court's supervision.[23]

---

[21] *See, e.g.*, *Gajewski v. United States*, 321 F.2d 261, 267-68 (8th Cir. 1963) (applying the "Canons of Professional Ethics" in determining whether U.S. Attorney should have been disqualified from prosecuting his former client on a totally unrelated matter).

[22] *Bolden* considered an attempt to disqualify an entire United States Attorney's office and concluded *that* action gave rise to separation of powers issues. *See* 353 F.3d at 875. Here, Mr. Adams seeks the disqualification of the prosecution team, whose remaining members include Inspector Kroells, Agent Khan, Mr. Kokkinen, and Mr. Rank. Only AUSAs Kokkinen and Rank are prosecutors, and if they are disqualified, any of the rest of the "more than fifty (50) Assistant U.S. Attorneys" in the office would still be able to prosecute the case. D.O.J., *About Us*, https://www.justice.gov/usao-mn/about-us.

[23] The government misunderstands Mr. Adams's request for a *Kastigar*-like hearing. He merely suggests that an evidentiary hearing focused on taint, along the lines of *Kastigar*, may be necessary to determine who should be disqualified. Mr. Adams recently learned, for example, that the SAR contains privileged information, so anyone who reviewed it should be disqualified. In the absence of a hearing, the Court should presume that all remaining members of the prosecution team (Inspector Kroells, Agent Khan, and AUSAs Kokkinen and Rank) are tainted.

PUBLIC VERSION

## IV. Conclusion

For the reasons stated, the Court should dismiss the superseding indictment or, in the alternative, dismiss the tax charges and disqualify the prosecution team.

Dated:  August 17, 2018                             Respectfully submitted,


   /s/ *Lance Wade*

Joseph G. Petrosinelli (DC Bar #434280)
Lance Wade (DC Bar #484845)
Gloria Maier (DC Bar #1012208)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
jpetrosinelli@wc.com
lwade@wc.com
gmaier@wc.com

James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com


*Attorneys for Defendant Edward S. Adams*