# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17-cr-64-DWF-KMM |
| | ) | |
| EDWARD S. ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT'S POST-HEARING REPLY
## IN SUPPORT OF MOTION TO SUPPRESS

With former AUSA Maria having suddenly left the U.S. Attorney's Office in the middle of the briefing on this motion, his former colleagues are left to try to explain his actions. Given the undisputed facts, the government is now forced to concede that its execution of the warrant was "not perfect" and "in retrospect" should have been handled differently, but what happened here was much worse than that. The government attempts to avoid that conclusion by offering after-the-fact speculation about why certain things may have happened—for example, why government agents repeatedly viewed documents that are privileged on their face—to suggest that, if this speculation is correct, then the actions of AUSA Maria and others, though "imperfect," were reasonable.

There are two main problems with this argument. First, having successfully quashed Mr. Adams's subpoena for AUSA Maria's testimony on the basis of their argument that AUSA Maria's subjective reasoning is not relevant, the government cannot

now ask the Court to accept conjecture about why AUSA Maria did or did not do certain

things, particularly when the record reflects much more likely explanations.

Second, the record flatly contradicts the government's revisionist narrative.  For

example, in trying to explain why AUSA Maria and the prosecution team repeatedly

viewed documents with "attorney-client privilege" headers, which suggests completely

unreasonable (or worse) conduct, the government speculates that the headers may not

have been visible in Relativity.  But, as discussed below, they were—on each of the

documents, in every Relativity viewer.  And in trying to explain why AUSA Maria and

the prosecution team reviewed privileged documents multiple times, the government

claims that the Relativity timestamps show the viewings were brief, and speculates that

must mean the agents quickly stopped viewing the documents because they recognized

the documents as privileged.  But, as the government's own IT witness testified, the

Relativity timestamps cannot be interpreted in the way the government now suggests.

And even if they could, these documents never would have been available for multiple

viewings if the government agents truly were respecting privilege because they would

have been removed from the database immediately.  But they were not.

The government now concedes that it does not object to the suppression of 93% of

the documents that it seized.  Opp. 86.  This is an implicit concession that the

government's seizure of nearly 43,000 documents was unreasonable and indefensible.

The government plainly never reviewed these 37,442 documents it agrees to suppress to

determine if they fell within the scope of the warrant—it never so much as glanced at the

documents.  But even for the roughly 3,000 emails that the government has not conceded,

its conduct was fundamentally unreasonable:  for these documents too, the government did not review them to determine if they fell within the scope of the warrant.  Instead, members of the prosecution team looked at very few documents in the database after they applied the "seizure" search terms in April 2017.  And even this subset of the seized documents contains dozens of sensitive privileged documents and hundreds of documents that fall outside the scope of the warrant.

At bottom, the record reflects that the government *never took the second step of the two-step warrant*.  The government seized Mr. Adams's entire Yahoo! account and, as though it had obtained a general warrant, freely used the email data.  In violation of Rule 41, the government never took the second step of reviewing the data to determine what fell within the warrant's scope.  And then, in an effort to cover up the government's unreasonable conduct, AUSA Maria misrepresented the government's actions to make it look as though the government had complied with Rule 41—when in reality, it had not.

The Court should reject the current government team's efforts to rewrite history, and should not reward the government's unreasonable conduct.  The decision in this case will set the bar for future searches pursuant to Rule 41(e)(2)(B).  This Court should require the government to take Rule 41's second step in a meaningful way, and should not permit the government to treat two-step warrants as general warrants or to rummage through obviously privileged communications.  Blanket suppression is warranted.[1]

---

[1] Mr. Adams is cognizant of the vast record that is presently before the Court and will not repeat the arguments raised in his prior suppression briefs.  *See* ECF 37, 147.

I.     **The Government Attempts to Rewrite History to Excuse Its Unreasonable Violations of Mr. Adams's Attorney-Client Privileges**

The government obviously wishes AUSA Maria had not done what he did, and that the record was not what it is.  So it now attempts to distance itself from the true evidentiary record by crafting a more favorable narrative based on conjecture.  The actual record demonstrates that the government was on greater notice than it admits with respect to the privilege issues, but that it did not act reasonably to avoid violating Mr. Adams's attorney-client privileges throughout the search.  The record contradicts the government's claims of "vigilance," and it reveals that the government relied on Mr. Adams's privileged documents to build its tax charges.

*The government's conjecture that the "Attorney-Client Privilege" headers may not have been visible is wrong.*  The government realizes that it would be unreasonable on its face for a member of its team to have reviewed documents with headers stating "Attorney-Client Privilege."  So it suggests that the privilege headers in the printed versions of *in camera* Exhibits A, J, and K might not have been visible to AUSA Maria and other members of the team when they viewed the documents in Relativity.  This speculation is simply wrong:  the headers are visible and appear identically in all Relativity view options.  *See* Ex. 23 (screenshots of headers using all Relativity viewers).  This is the case even for the "ESA Tax Questions" Excel file.[2]  The government agents

---

[2] The privilege header was typed as normal text into the first cell of the spreadsheet and was therefore visible, unlike the separate header from Mr. Adams's privilege log that the government apparently cannot view in Relativity.  *See* Gov't Ex. 25.

who viewed these documents clearly saw the privilege headers, and yet continued to review them, on multiple occasions. Nothing could be more unreasonable.

>    ***The record shows that the government was on notice of Mr. Adams's privileged relationships that it now claims to have been ignorant of.*** The government's argument that it was not aware of Mr. Adams's attorney-client relationships with Mr. Brever, Murry LLC, and Mr. Hopeman is contradicted by the record.

First, the government claims that it was not on notice of Mr. Adams's attorney-client relationship with Mr. Brever when it viewed *in camera* Ex. K on the first day of its Relativity searches, and contends that it was unaware of the *Kovel* relationship between Mr. Brever and Murry LLC until Murry LLC's grand jury subpoena response in December 2016. Opp. 63, 67. But Mr. Brever's representation of Mr. Adams was known to the IRS from at least December 2014. *See* Opp. Ex. 18 at 1. The IRS became involved in the criminal investigation against Mr. Adams in May 2015, Opp. 31, so the prosecution team would have been aware of the representation from that date. Moreover, even without such prior notice, AUSA Maria was on notice from the first time he opened *in camera* Ex. K because that document stated at the top: "Attorney-Client Privileged Communication for Tom Brever and Pat Murry." As explained above, he could and did see this header four times on the first day of the Relativity searches, and two more times thereafter.[3] *In camera* Ex. K & Br. Ex. 4.

---

[3] On his second day in the Relativity database, AUSA Maria viewed *in camera* Ex. J, which also bore an "Attorney-Client Privileged Communication" legend and was addressed to Mr. Brever (in addition to Mr. Hopeman). Br. Ex. 4 at 4.

Second, the government contends that it "had no reason to know" there would be communications with Mr. Hopeman in the database, Opp. 59-60, but the record shows that the government had already met with him (in March 2016) when it chose not to include him in its privilege filtering.  Br. 23-25.  It was unreasonable for the government to assume that there would *not* be communications with Mr. Hopeman in the database, given the active SEC investigation and issuance of more than 60 grand jury subpoenas by the time the government officially informed Mr. Adams of the criminal investigation.[4]

***The government minimizes Inspector Kroells's unfettered access.***  The government proclaims, as if this were a helpful fact for it, that "more than 33,000 potentially privileged documents were removed before the government even began its search efforts *in earnest*."  Opp. 84 (emphasis added).  The Fourth Amendment does not apply only when the government decides that it is searching "in earnest."  A search is a search, and Inspector Kroells was permitted to rummage in Mr. Adams's unfiltered email database for at least two days.  Br. 8-10.  The government predictably argues that Inspector Kroells was "vigilant" during these early searches—suggesting that the post-hoc assertion of "vigilance" of a member of the prosecution team is an adequate substitute for a special master or taint team.  Opp. 50-51.  However, as described below, the record reflects that a member of the prosecution team (Inspector Kroells) only once stopped to notify the rest of the team about encountering privileged documents—a key component of its supposed "vigilant" procedure.

---

[4] *See* Gov. *in camera* Ex. E at Ex. 1 (list of grand jury subpoenas).

***The record contradicts the government's claimed "vigilance."***  The government's claim that the prosecution team "stopp[ed] reviewing [potentially privileged documents] and notif[ied] the other agents and the prosecutors" when they encountered privileged documents, Opp. 50, is demonstrably untrue.  Even in the one instance where AUSA Maria admittedly identified a document as privileged and applied a "privileged" tag, Opp. 61, he unreasonably failed to take any further action—to notify the other agents, to have the document removed from the database, or to filter out similar documents.  As a result, Inspector Kroells later viewed this privileged memo.  The government also concedes that it meant to exclude privileged communications involving Mr. Hartman from the database, but that its filter terms were insufficient, and as a result Inspector Kroells reviewed such communications multiple times.  *See* Opp. 83.  Rather than notifying AUSA Maria or other agents that these obviously privileged communications remained in the database, as anyone acting with "vigilance" would do, Inspector Kroells continued to view them.  *Id.*

The government states that some of the document views at issue were brief, based on the Relativity log timestamps, and that this shows that the reviewer recognized the document as privileged and stopped reviewing it.  That cannot be true:  if agents recognized these documents as privileged, then based on the testimony the government offered at the evidentiary hearing, the agents not only would have stopped reviewing the documents but also immediately would have notified AUSA Maria and other members of the prosecution team so the privileged documents could be excluded from the review database.  *See* Opp. 50-51 (describing process).  Indeed, that is a key feature of the

"vigilant" process the government claimed it followed.  But except in one instance,[5] this did not happen—when prosecution team members reviewed privileged documents, for however long, they did not advise anyone that these documents should be removed from the database.  The post-hoc conjecture that reviewers cut their review short upon realizing a document was privileged simply does not square with the fact that there is no record of reviewers notifying team members at any other time.  That leaves two possibilities: either the reviewers knew documents were privileged and allowed them to remain in the database so others could review them, or they didn't recognize documents as privileged despite "Attorney-Client Privileged" headers and other clear indicia of privilege.  In either case, the government's conduct was not "vigilant," and was not reasonable.

***The government insists that its document views were brief, but Relativity timestamps are an unreliable indicator of total time spent viewing a document.***  The government relies heavily on the Relativity log timestamps to support its argument that it viewed many of the privileged documents only for a short length of time.  *See* Opp. 61, 83.  This argument is contradicted by the government's direct examination of its own IT specialist, Mr. Zeitz; it asked, "Is Relativity able to tell you how long I spent in a particular document?," and he testified "it is not."  Jan. 9 Hr'g Tr. 157 (ECF 87).  Mr. Zeitz was correct.  Although the timestamp provides "the date and time [an] action was performed," *id.* 137, there are a variety of reasons why one cannot reliably extrapolate the

---

[5] On May 16, 2016, when Inspector Kroells notified AUSA Maria that she had seen communications with Mr. Hopeman in the database.  Br. 28.

*duration* of time a user spent reviewing a document by reading the next line on the log.

At least three reasons are readily apparent for why attempting to extrapolate a view duration in this manner would yield an underestimate: (1) the user could have viewed the document in Relativity's native mode, which would have opened the document in a new window (the native application); (2) the user could have opened the document in Relativity's standalone viewer (a separate window); and (3) the user could have opened the document in a separate window by right-clicking the document link and selecting "open in new tab" or "open in new window." *See* Supp. Decl. Mark Lyon ¶¶ 5-7. In all of these scenarios, the user's ability to view the document in the separate window would be unaffected by subsequent activity in Relativity. *Id.* Thus, comparing the time of a particular document view recorded on the Relativity log with the time of the next document view does not necessarily mean that the user "mov[ed] onto a new document." Opp. 61. The first document could still remain open in the native application, the documents could be viewed simultaneously using Relativity's two viewers, or the document could remain visible in a separate tab or window.

As one example, the Excel document from *in camera* Exhibit R was sent to Agent Belich and then attached to and submitted with the IRS Special Agent Report ("SAR"), yet the Relativity log does not reflect that this document was ever printed or saved. The Relativity log timestamps for AUSA Maria's multiple views of this document, if one simply compares the time of the views with the next lines in the log, make it appear that AUSA Maria viewed the document for an average of 30 seconds each time. *See* Ex. 24 (excerpt of Relativity log for *in camera* Ex. R); *in camera* Ex. Q, *in camera* Ex. V (SAR).

It simply defies belief that AUSA Maria viewed this document, which he believed was important enough to send to Agent Belich for inclusion in the SAR, for only a matter of seconds each time he opened it.  How would he have known that it was important enough to send to Agent Belich?  As to other *in camera* exhibits, there is no way to know whether they likewise were printed or saved from the native viewer, or viewed for longer periods of time, without creating a Relativity record.[6]

**The government's excuses for violating Mr. Adams's privileges demonstrate that its procedures were unreasonable.**  The government admits that communications between Mr. Adams and his attorneys at Latham sent for the purpose of legal advice are privileged, Opp. 56, and that the government repeatedly viewed them, Opp. 58-59.  But it argues that its actions were reasonable because those communications did not contain the government's filter search terms.  This demonstrates exactly why the government's action were unreasonable, not the other way around.  The government was on notice through its search term reports that Mr. Adams's Yahoo! emails contained his communications with his own lawyers.[7]  And yet the government did not use any of the methods required by DOJ guidelines that are standard practice in this District and others

---

[6] Even taking the government's argument at face value, it often only takes less than a minute for a reviewer to read the content of a short email or memorandum.  So even if one accepts the government's timestamp theory, AUSA Maria spent four minutes reviewing *in camera* Exhibit A—despite the clear privilege header.  Opp. 58.  And the government admits that Inspector Kroells printed *in camera* Exhibit G from Relativity, Opp. 59—again, making the duration of her views in Relativity irrelevant.

[7] *See* DX 15 (including 3,968 hits for "latham" and 736 for "sikora").

(i.e., involving the court, a special master, or a taint team) for handling data possibly containing privileged communications, which would have avoided these intrusions.

The government also complains that Mr. Adams over-asserts privilege, and complains particularly about assertions of privilege relating to communications with Mr. Monahan. *See* Opp. 49, 57.[8]  Mr. Adams's privilege logs underscore the complicated privilege issues presented in his email—issues relating to the SEC investigation, the civil lawsuits, Mr. Adams's taxes, Adams Monahan LLP clients, common interest relationships, expert witness engagements, and the spousal privilege.  All of these issues create a tangled web of privilege issues that the prosecution team, if it was acting reasonably, would have handed over to a taint team or raised with the Court, rather than barreling through the documents with red lights flashing all around them.

***Despite the government's revisionist history, evidence disclosed by the government demonstrates that it used privileged Yahoo! emails to develop the tax charges.***  Without citation to the record, the government now claims Mr. Adams is "incorrect" about the inception and progression of the tax investigation, and that instead, Venture Bank records and a "simple perusal" of Mr. Adams's tax returns formed the

---

[8] The validity of Mr. Adams's claims of privilege relating to certain communications with Mr. Monahan (addressed in Mr. Adams's Opposition to the Government's Motion Contesting the Application of Privilege) has nothing to do with the validity of his privilege claims for communications with Latham, Mr. Hopeman, Mr. Brever, or Murry LLC.  And Mr. Adams clearly has not asserted a privilege merely because he is an attorney, or because he was communicating with Mr. Monahan—he has asserted privilege over fewer than 15% of the emails the government viewed and seized from his accounts, *see* Br. 20, and he has identified as non-privileged the vast majority of the communications between him and Mr. Monahan.

basis of the tax charges.  Opp. 30-31.  But the government's own disclosures actually *confirm* that it used the privileged Murry LLC emails to develop the tax case.  The government admits that the prosecution team did not receive Mr. Adams's tax returns until May 9, 2016, Opp. 31—mere days after AUSA Maria viewed the "ESA Tax Questions" spreadsheet four times, viewed the "ESA Tax Summary for P. Murry" spreadsheet seven times, and viewed and printed other emails between Mr. Adams and Murry LLC.[9]  Thus AUSA Maria reviewed Mr. Adams's tax returns only *after* he had recently and repeatedly reviewed Mr. Adams's privileged communications with his tax counsel and *Kovel* accountant about the very tax years that are at now at issue.[10]

Thereafter, the record reflects that AUSA Maria sent Agent Belich *in camera* Exhibit R ("ESA Tax Summary for P. Murry") and *in camera* Exhibits M and N (emails with Murry LLC) on September 7, 2016.  *See* Ex. Q.[11]  And due to the government's very

---

[9] *See in camera* Exs. K, M, N, & R; Br. Ex. 4.

[10] The government argues that the tax case is based on Mr. Adams's amended returns filed in 2011, whereas the communications at issue with Messrs. Brever and Murry relate to Mr. Adams's second set of amended returns that were filed in 2014.  Opp. 31 n.10. Both sets of amended returns related to tax years 2008, 2009, and 2010, and the Indictment alleges that the first set of amended returns contained false statements.  ECF 70.  Mr. Adams's privileged communications with his tax counsel in 2014 about issues relating to those very same tax years that resulted in the filing of a second set amended returns are plainly related to the tax charges that are based on the same tax years, as evidenced by the fact that the second amended returns and Mr. Adams's communications with Murry LLC are discussed in the SAR.  *See* SAR discussion *infra*.

[11] The government's discussion of Ex. Q on page 32 of its Opposition is confused.  While AUSA Maria did provide Agent Belich with the documents the government describes (including tax returns and a letter to the Minnesota Department of Revenue), AUSA Maria *also* provided Belich with *in camera* Exhibits M, N, and R.

recent disclosure of the SAR, it is now clear that the government attached *in camera*

Exhibits M, N, and R to the SAR, which recommends that Mr. Adams be prosecuted for

willfully filing false tax returns.  *See in camera* Ex. V (SAR).  These documents are

referenced and quoted on pages 10-11 of the SAR, in the section titled "Adams' Income

from the Venture Accounts in 2008, 2009, and 2010."  *Id.* (highlighted portions).

In both its suppression and dismissal oppositions, the government claims the tax

charges were based on analyzing bank accounts as part of the fraud investigation rather

than reviewing Mr. Adams's privileged tax communications.  Opp. 31; Dismissal Opp.

20-21.  But the only record evidence on point rebuts this unsubstantiated claim.  At the

hearing, Agent Belich testified he became involved in the case to investigate money

laundering, not tax crimes.  *See* Jan. 8 Hr'g Tr. 279, 298 (ECF 106).  He also testified he

relied on documents sent to him by the rest of the prosecution team.  *Id.* 271-72, 278,

289, 296-97.  All those documents—including the privileged ones—were sent to him in

spring and early fall of 2016, before the investigation "became a tax matter" in November

2016.  *Id.* 280-281, 303; *see in camera* Ex. Q.  Agent Belich never testified he reviewed

bank records.  Thus, the evidence is that the government repeatedly viewed privileged tax

documents and used them in investigating and deciding to bring tax charges.[12]

The government offers a laundry list of other excuses as to why its repeated

---

[12] The government also argues that the inevitable discovery exception applies to these tax
documents.  Opp. 34-35.  It does not.  Although the government obtained Mr. Adams's
tax *returns* from the IRS, it should never have obtained privileged communications.  *See*
Privilege Opp. 6-8 (discussing privileged documents sent to Agent Belich).

review and use of the Murry LLC documents was reasonable—including an effort to seek reconsideration of the Court's ruling as to the validity of Mr. Adams's claims of privilege covering his communications with Murry LLC, and a new argument that the crime-fraud exception should apply and should excuse the government's violations[13]—but it was fundamentally unreasonable for the government to forge ahead with its review and use of these documents to develop a tax case against Mr. Adams, for all of the reasons noted in Mr. Adams's opening brief.

***The government's claim that it sought to avoid intruding into Mr. Adams's communications as a lawyer is contradicted by the facts.***   The government argues that it consciously avoided searching Mr. Adams's law firm account and instead elected to search only email accounts that Mr. Adams appeared to use "in a capacity other than as an attorney."  Opp. 48-49.  But the record reflects that the government was on notice that Mr. Adams, a practicing lawyer, used his Yahoo! addresses for *both* business and personal correspondence.  *See* DX 52 at 2.[14]  Once the government accessed the Yahoo! data, the contents of the emails and the earlier privilege keyword searches would have confirmed that Mr. Adams used this account for many kinds of privileged

---

[13] Mr. Adams addresses these arguments, which are procedurally, factually, and legally baseless, in his Opposition to the Government's Motion Contesting the Application of Privilege.

[14] In comparison, it knew that his EAdams@adamsmonahan.com account was used for business but had been inactive since December 2012.  DX 52 at 2.  As an email account associated with a private web domain, and not an internet-based email provider, the inactive Adams Monahan account was simply not one that the government could easily have executed a search warrant on (particularly without notice to Mr. Adams).

communications, and Mr. Hopeman even provided the government with explicit notice of Mr. Adams's client legal work contained in the emails.  DX 58.  The government's failure to minimize its exposures to Mr. Adams's privileged communications and failure to follow the *United States Attorneys' Manual* guidelines were unreasonable.[15]

*The government is wrong about the scope of the privilege issue*.  In an effort to minimize the privilege issues, the government suggests that only 50 of the more than 40,000 documents that it seized are privileged.  This is inaccurate.  Rather, Mr. Adams submitted approximately 50 privileged documents to the Court in connection with his requests for relief, because these are documents that the government unquestionably viewed during its review, and, particularly for the Murry LLC documents, were plainly put to use to develop the charges against Mr. Adams.[16]  Mr. Adams has logged additional privileged documents that the government viewed and has provided those logs to the

---

[15] The lone case the government cites—*United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1038-39 (D. Nev. 2006)—supports the proposition that searches of law offices and areas identified as containing privileged documents should be conducted by a taint team.  The government's position about the Yahoo! accounts not being analogous to a law office is fundamentally inconsistent with both the fact that so many documents in this account hit on the general privilege search terms (including "attorney," "lawyer," etc.) and the government's claim that team members assumed this was the case because of the prevalence of standard legal privilege disclaimers.  *See* Opp. 51 n.14; DX 15.

[16] As contemplated by this Court's orders, *see* ECF 88, Mr. Adams has not engaged in a document-by-document privilege review of those documents that the government did not access in Relativity.  Beyond the documents viewed by the government (according to the Relativity records), Mr. Adams has previously stated he lacks the resources to thoroughly review for privilege the entire Yahoo! database to which Inspector Kroells had access (146,522 items), or even the universe of 37,502 items the government never viewed in Relativity.  Br. 21 n.17.  Now that the government concedes that the documents it never viewed can be suppressed, it will not be necessary to review all such items for privilege.

government, but the examples submitted to the Court highlight the most significant

privilege violations that justify the relief sought.  Also, the government's suggestion that

50 attorney-client privileged documents is somehow a small number for an opposing

party to surreptitiously review is truly remarkable.  As the Court knows, disputes of this

sort generally involve one or two privileged documents that made their way into the

hands of an adversary in litigation; that is bad enough.  But the damage done by the

government reviewing 50 documents containing core mental impressions from Mr.

Adams and his lawyers about the very matters at issue in the Indictment is, in the

experience of Mr. Adams's counsel (and as reflected in the case law), unprecedented.

## II.      The Government's Conduct Was Unreasonable and It Recklessly Disregarded Rule 41

At the end of the two-day evidentiary hearing, the Court asked for clarity about

what was seized and when:  "Is the seizure happening on April 7th?  Is the seizure

happening during the searches?  Is the seizure happening when Yahoo turned it over?"

Jan. 9 Hr'g Tr. 209 (ECF 87).  The government's response provides no answer, but an

examination of the government's actions does:  From the start of and throughout its

investigation, the government used all of Mr. Adams's emails for whatever purposes it

desired.  Thus, the government seized the entire contents of the Yahoo! database from the

very beginning.  Even though Rule 41(e)(2)(B) and decades of case law about searching

voluminous documents make clear that the government was authorized to hold Mr.

Adams's emails only for the limited purpose of executing the warrant, the government

never even attempted to fulfill that responsibility.  It never meaningfully executed the

second step of the two-step warrant.

**This Court should decline the government's invitation to render Rule 41's two-step requirement meaningless.**  The government urges the Court to adopt its position that Rule 41 does not actually require the government to perform the second step of the warrant.  It relies heavily on *United States v. Lee*, 2015 WL 5667102 (N.D. Ga. Sept. 25, 2015), which centered on the government's failure to ever complete its execution of the warrant.  Here, by contrast, the government did purport to complete its execution by seizing 42,927 documents, the vast majority of which it had never viewed.  *Lee* says nothing about the reasonableness of this "execution."[17]  *Lee* is more factually similar to *United States v. Debbi*, 244 F. Supp. 2d 235 (S.D.N.Y. 2003), than the instant case, but *Lee* and *Debbi* came to the opposite conclusion on the same issue.  *See* Br. 45, 58-59.

The court in *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), provided a powerful analysis of why it is improper for the government to treat a database of

---

[17] The *Lee* defendant never challenged the government's search for or use and seizure of items outside the warrant's scope.  Mr. Adams does.  In a footnote the government quotes, *see* Opp. 35-36, *Lee* states "[t]here is no requirement . . . the government return or destroy lawfully obtained evidence relevant to an ongoing criminal investigation," meaning the government need not dispose of any email until after the completion of the case.  *See* 2015 WL 5667102, at *15 n.15.  The government takes this to mean that it is allowed to return again and again to Mr. Adams's emails until the case is complete, but that is not what *Lee* states; rather, it permitted the "conditional retention" of the remaining emails for the limited purpose of "authentication" and proving "identity."  *Id.* As explained in *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), there is "no authority suggesting that simply because [the government] has retained all originally searchable electronic materials, [it] is permitted to return to the proverbial well months or years after the relevant Warrant has expired to make another sweep for relevant evidence, armed with newly refined search criteria and novel case theories."  *Id.* at 406.

electronic information seized pursuant to a two-step warrant as a litigation database that can be continuously searched—because such warrants become, for "all intents and purposes, general warrants." *Id.* at 405-08. The government urges the Court to follow *United States v. Lustyik*, 2014 WL 1494019 (D. Utah Apr. 16, 2014), instead, yet the reasoning of *Lustyik* is thin; *Wey* is much more persuasive. Moreover, the Eighth Circuit has explained that the government may not later re-check an item not initially found to be within the scope of a warrant under that same warrant's authority (albeit in a non-digital context). *See United States v. Robbins*, 21 F.3d 297, 299-302 (8th Cir. 1994).[18]

**The government offers no credible explanation for its use of documents that it purportedly did not seize.** The government used Mr. Adams's emails—which it had access to solely in order to execute the Yahoo! warrant—for a variety of other purposes, including conducting witness interviews and developing tax charges.[19] *See* Br. 38-41. *At least* 41 of the documents that it used were never purportedly seized.[20] In one of its post-

---

[18] The government cites *United States v. Johnston*, 789 F.3d 934 (9th Cir. 2015), but that case does not help it. There is nothing in *Johnston* to suggest the government there re-reviewed files plainly outside the warrant's scope—it only says that the government may re-review files *within* the warrant's scope. Both *Lustyik* and *Johnson* involved searches of computer hard drives, which present issues not at play in a comparatively simple emails search. *See United States v. Christie*, 717 F.3d 1156, 1166 (10th Cir. 2013).

[19] As for witness interviews, the government hypothesizes there would be no problem asking employees of a business to aid in executing a warrant served on it. *See* Opp. 30. This is not that case—the warrant related to Mr. Adams's emails and the government did not ask for *his* help executing a warrant for his documents. Instead, it violated his Fourth Amendment privacy interests by bringing in unrelated parties. *See* Br. 34 n.24. That is unreasonable. *See* Br. 39-40; *cf. Bills v. Aseltine*, 958 F.2d 697, 704-05 (6th Cir. 1992).

[20] *See* Maier Decl. ¶¶ 4-6, 8-9. Additional unseized documents may have been used with witnesses, as the government is unable to represent that its records are "comprehensive,"

hoc rationalizations, the government suggests that it could have shown such documents to witnesses "before ultimately deciding to seize them . . . or not seize them."  Opp. 30. And yet the government never made such an informed decision to seize or not seize documents after review because its purported seizure was accomplished solely through the post-indictment application of broad search terms.

**_The government misunderstands and fails to respond to Mr. Adams's arguments about multiple views, keywords, and relevance._**  With respect to multiple views, the government argues it is not limited to one view to determine whether a document falls within the scope of the warrant and that, in any event, most of the documents Mr. Adams claims it reviewed multiple times are within that scope.  _See_ Opp. 33-44.  Both points misunderstand Mr. Adams's arguments.  Mr. Adams never argued the government was limited to a single view of every item—he argued that the government's review must "be as 'brief' or 'cursory' as _reasonably necessary_."  Br. 41 (emphasis added).  Here, it was unreasonable for the government to fail to implement any system to separate documents within the scope of the warrant from those outside it.  _See id._ at 42.[21]

---

Br. 17, and it is unknown whether additional documents were used internally by the prosecution team without creating a Relativity record, _see_ Maier Decl. ¶¶ 7.  The government's summary table also misclassifies this category of documents as "viewed but not seized," when in fact the documents were viewed, not seized, and _used_.  Opp. 19.

[21] As for the documents the government repeatedly reviewed, the government spends six pages explaining why Exhibits 7, 8, and 9 to the Maier Supplemental Declaration are within the warrant's scope.  But Mr. Adams cited Exhibits 7, 8, and 9 to his _brief_, which are excerpts of the Relativity log for the documents viewed three or more times identified in Maier Supplemental Declaration Exhibits 2 ("Personal or Family), 3 ("Non-Apollo Business"), and 5 ("Sale of Apollo Warrants or Allegedly Secret Bank Accounts").  _See_ Br. 42.  Elsewhere in its brief, the government concedes that the 115 "Personal or

The government's argument about the use of keywords is also a red herring.  Mr. Adams never claimed the government could not use keywords or had to specify them in advance.  Rather, he argued that the government may not search for information that falls outside the warrant's scope.  *See* Br. 35-36.  In this respect, as elsewhere, the government is forced to offer post-hoc conjecture in an attempt to justify AUSA Maria's conduct.  For example, the government speculates that AUSA Maria's keyword searches for "maria" were "likely" because AUSA Maria was seeking to confirm that "during his time at Latham . . . he did not acquire any knowledge" of the case.  Opp. 25 n.7.  Having prevented the defense from cross-examining AUSA Maria at the evidentiary hearing, the government cannot now ask the Court to accept this innocuous (and totally implausible) explanation.[22]  The much more "likely" explanation is that AUSA Maria was fishing for documents outside the scope of the warrant (and ones that were likely to be privileged)— he was looking for instances where Mr. Adams used AUSA Maria's name in emails discussing the ongoing government investigation that AUSA Maria was leading.

Fundamentally, Mr. Adams and the government disagree on two related issues.  First, the parties disagree about the scope of the warrant and therefore what searches fall

---

Family" and 635 "Non-Apollo Business" documents are "arguably" outside the scope of the warrant.  *See* Opp. 21.  The government advances no argument about the documents identified by Mr. Adams, and thus effectively concedes that it did, in fact, review documents outside the scope of the warrant multiple times.  Doing so was unreasonable.

[22] AUSA Maria searched for his own name three weeks *after* the government wrote to Mr. Hopeman claiming that AUSA Maria allegedly "did not acquire any information whatsoever . . . let alone privileged or confidential information" regarding Mr. Adams or his companies.  Opp. Ex. 4 at 2.

within it.  For example, although searches for "RL," "DL," and "ADR" might fall within the scope of a warrant that the government would apply for today based on the current "thrust" of its investigation, *see* Dismissal Opp. 27-28, they had nothing to do with the Scio misrepresentation fraud alleged in the warrant affidavit, Br. 38.  Second, the parties disagree whether running a list of search terms against the Yahoo! database to determine the government's final "seizure" was unreasonable under the Fourth Amendment and in reckless disregard of proper procedure under Rule 41.  Here, the government's own reasoning defeats its arguments.  It argues that "[s]ome keywords may be chosen not because they conclusively demonstrate that a responsive file falls within the scope of the warrant, but instead because they indicate that a file is worthy of further scrutiny to determine whether it falls within the scope of the warrant."  Opp. 23.  And yet, the government performed no such process:  it applied broad search terms to reduce the database to 42,927 documents, then hardly used the database again, and deemed this the final seizure.  There is no evidence that the government subjected any documents to "further scrutiny" in this process, or that it spent any time determining that the purportedly seized documents fell within the scope of the warrant.

On the issue of relevance, the government yet again responds to a straw man.  Mr. Adams never argued that items relevant *under the terms of the warrant* are not within the warrant's scope.  Instead, Mr. Adams explained that "[i]n its briefing and at the hearing, the government referred to 'relevance,' that is *relevance to its investigation or case*."  Br. 43.  Mr. Adams's point is that the terms of a warrant are static, and a document either falls within those terms or does not.  By relying on "relevance" to an "evolving theory of

the case," *see* Br. 13, the government attempts to circumvent the very purpose of the

particularity requirement: "to leave nothing to the discretion of the officer executing the

warrant." *Berger v. New York*, 388 U.S. 41, 98 (1967) (alteration omitted).[23]

**The government failed to determine whether documents fell within the scope of**

**the warrant, and now it promotes an expansive view of the warrant scope to excuse its**

**conduct.**   To defend the seizure of most of the documents that Mr. Adams has identified

as outside the scope of the warrant, the government interprets that scope so broadly that it

includes nearly any email sent after October 2006 touching on business or financial

matters.   Thus the government argues that all of Mr. Adams's personal tax returns are

within the warrant's scope[24] because they reflect his "dealings with the Apollo

companies," Opp. 26, and that all transactional documents related to "RL, "DL," and

"ADR" are within the scope because they relate to "business and financial transactions

of" the Apollo companies, *id.* 24—despite the fact that these are separate entities having

nothing to do with the 2011-12 Apollo/Scio transactions, *see* Br. 38.[25]   But there is no

---

[23] It is unsurprising that the government found a number of cases using the word
"relevant" in a colloquial manner to mean "within the scope of the warrant."  Indeed, at
the hearing, the Court recognized this shorthand reference:  "I recognize that I'm using
relevance in a colloquial term.  I mean responsiveness to the search warrant when I say
relevance . . . ."  Jan. 9 Hr'g Tr. 209:6-9.  None of the government's cases support the
proposition that any and all documents referencing any of the individuals or companies in
any way associated with the government's "evolving" investigation fall within the scope
of the warrant.  *See* Br. 44.  It is this meaning of "relevance" that the Court must reject.

[24] Despite the fact that the government listed no tax crimes in the affidavit or warrant.

[25] Similarly, the government justifies certain seizures by claiming that the document
relates in some way to a topic mentioned in Inspector Kroells's affidavit.  It uses this
argument to justify its seizure of any document reflecting Mr. Adams's roles over time at

evidence the government ever made such determinations when executing the warrant—it simply disregarded the warrant's terms and treated the warrant like a general warrant.

## III.    The Warrant Violated the Fourth Amendment

The irreconcilable conflict in the government's scope and particularity arguments is evidence of the facial deficiency of the Yahoo! warrant.  When defending the warrant's scope, the government argues for breadth.  But when defending the warrant's particularity, the government takes a much narrower view, contending the warrant is particular by relying on a combination of five restrictions.  *See* Opp. 8.[26]  The government cannot have it both ways:  If the warrant is particular only because of *all* the restrictions it now relies on, then the government vastly exceeded the warrant's scope when executing it.[27]  By contrast, if the warrant reasonably could be read by executing officers to have the broad scope the government claims, then it cannot be particular.

The government cites a number of cases in support of its particularity argument, but these cases fail to save the Yahoo! warrant.  In *United States v. Fiorito*, 640 F.3d 338

---

Apollo—which is essentially any document discussing Apollo—because the affidavit discusses Mr. Adams's roles with Apollo.  *See* Opp. 16 (citing DX 10 ¶¶ 8, 19, 30).  The warrant does not establish probable cause to seize all such documents.

[26] These restrictions include limiting the search to:  Mr. Adams's two email accounts; "'fruits, contraband, evidence, and instrumentalities' of mail and wire fraud;" evidence involving Mr. Adams (although every document in his email account necessarily involves him); evidence after October 25, 2006; and reference to an illustrative list of documents.

[27] For example, the illustrative list includes "financial and business transactions," the category the government relies on for nearly all of its scope arguments.  Despite this item being limited to "calendar, fiscal, and federal tax years 2010 to present," DX 11 att.B pt.II.a.I, the government claims many pre-2010 documents somehow fit this category. *See United States v. Reeves*, 2012 WL 1806164, at *8-11 (D.N.J. May 17, 2012).

(8th Cir. 2011), the Eighth Circuit upheld a search for the essential transactional documents involved in a "well-defined" scheme. *Id.* at 346-47. *Fiorito* does not support the argument that all documents reflecting any "financial and business transactions" may be seized, no matter how attenuated from the scheme at issue in the indictment.[28]  The government repeatedly cites *Andresen v. Maryland*, 427 U.S. 463 (1976), for its discussion of illustrative lists and the breadth of warrants in fraud cases. *See* Opp. 9, 14-15.  But the Eighth Circuit has cabined the portions of *Andresen* on which the government relies. *In re Grand Jury Proceedings* explained that the broad warrant in *Andresen* was permissible because "the warrant expressly relate[d] the documents to a single transaction under investigation," 716 F.2d at 498, namely the sale of a specific, identified lot of land, *Andresen*, 427 U.S. at 466.  Even with the broad language of its warrant, the specific focus on that transaction resulted in the seizure of a tiny portion of the files in the offices of the defendant or his real estate company. *Andresen*, 427 U.S. at 466-67 (3% and 5% of the files).  If the Yahoo! warrant had authorized a search only for documents related to the "fixed or specific transaction" set out in the affidavit—the Apollo/Scio transactions—*Andresen* would be on point, but that is not this warrant. *See In re Grand Jury Proceedings*, 716 F.2d at 498. *Andresen*, therefore, does not aid the

---

[28] Indeed, the Eighth Circuit permits the seizure of "a generic class of items" like this only when that class is limited to a specific crime or transaction. *United States v. Horn*, 187 F.3d 781, 788 (8th Cir. 1999) (relying on a case upholding a warrant for the seizure of records relating to a particular loansharking operation).  The crimes alleged in this warrant—generic fraud involving various businesses from 2006 onwards—are not sufficient. *See In re Grand Jury Proceedings*, 716 F.2d 493, 498-99 (8th Cir. 1983).

government.[29]

In response to Mr. Adams's overbreadth arguments, the government asserts that because it alleged *a* fraudulent transaction in the warrant, it is entitled to seize documents relating to *all* potential fraud. Not so.[30] With fraud, as with all crimes, the scope of the seizure the warrant authorizes must comport with the extent of the fraud for which the affidavit establishes probable cause. *See In re Motion for Return of Property Pursuant to Rule 41*, 681 F. Supp. 677, 681, 686 (D. Haw. 1988); *see also United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988). A different rule "would virtually eliminate the need to particularize a warrant in cases of fraud because the fraud specified could be taken to infer a much broader ranging fraudulent scheme." *In re Motion*, 681 F. Supp. at 681.[31]

---

[29] The government's affidavit argument also fails. An affidavit can cure a non-particular warrant if "a) the affidavit [actually] accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein." *United States v. Johnson*, 541 F.2d 1311, 1315 (8th Cir. 1976). Here, there is no incorporation. The warrant references the affidavit twice: Under the place to be searched, it states "See Attachment A." DX 11. Under the items to be seized, it says "See Attachment B." *Id.* It thus incorporates the affidavit's attachments but not its body. As for physical presence, the government does not cite any evidence supporting its contention that the affidavit was available to guide agents executing the warrant. *See* Opp. 12. Finally, the affidavit cannot cure the warrant's lack of particularity because the warrant is overbroad.

[30] Elsewhere, the government recognizes the difference between the Scio transactions and alleged embezzlement scheme: "Although the civil case and the SEC investigation . . . do involve some of the entities, individuals, and transactions . . . involved in this case, the general thrust of those prior matters is different." Dismissal Opp. 27. Mr. Adams agrees that there are "substantial differences," *id.* at 27-28, between the alleged fraud for which the affidavit established probable cause and what the government investigated.

[31] The government's key overbreadth case, *United States v. Maali*, 346 F. Supp. 2d 1226 (M.D. Fla. 2004), is distinguishable. There, a lengthy "Master Affidavit" described an intricate scheme by ten companies and multiple individuals to illegally employ more than 50 named non-citizens and hide their wage payments over the course of nearly four years.

The good faith exception does not excuse the Yahoo! warrant.  No reasonable officer executing the warrant could read it to sweep as broadly as the government claims. But if an officer could read it that way, then this would be one of those cases where "a warrant was so facially deficient . . . that the executing officers [could not] reasonably presume it to be valid," *United States v. Leon*, 468 U.S. 897, 923 (1984).  The same goes for overbreadth:  No reasonable officer reading Inspector Kroells's affidavit could believe it provided probable cause to conduct the search the government contends the warrant authorized here.  *See United States v. Strand*, 761 F.2d 449, 457 (8th Cir. 1985) (declining to apply good faith exception to overbroad seizure where items seized "went far beyond the seizure contemplated by the affidavit submitted to the magistrate).

## IV.   Although the Court Should Suppress All Documents Effectively Conceded by the Government, Blanket Suppression Is Also Warranted

The Court should order the suppression of all documents the government has effectively conceded:  the **37,442** documents "seized" but not viewed, Opp. 86; the **750** documents viewed by the government it concedes are "arguably" outside the warrant's scope (and does not attempt to argue),[32] Opp. 21 & Maier Suppl. Decl. ¶¶ 3, 4; and

---

*Id.* at 1230-36.  The affidavit described the scheme as pervading the finances of the businesses, so the warrant's authorization to seize financial records dating from two years before the scheme was supported by probable cause.  *See id.* at 1231, 1240.  Here, the government attempts to parlay one allegedly fraudulent transaction in the affidavit into a warrant covering all Mr. Adams's business and financial dealings over a decade.

[32] The government also notes that it does not object to the suppression of the documents that "were not retained."  Opp. 86.  While Mr. Adams agrees that the government should not have access to these 68,940 documents, they were never seized and so are beyond the scope of this motion—the government has already effectively relinquished them.

privileged documents.

Thus, of the 42,927 documents that were seized, the government argues against the suppression of *at most* **3,127** documents.[33]  Opp. 86.  That the government can only defend 7% of its seizure is telling.  And even in that 7%, Mr. Adams has identified dozens of privileged documents and 844 documents that are outside the terms of the warrant or the scope of the probable cause supporting it.  *See* Br. 58-59; Maier Suppl. Decl. ¶¶ 5-8.  The Court should also suppress these documents.

Beyond this, the Court should consider the "totality of the circumstances," as described above and in Mr. Adams's opening brief, and conclude that the government's conduct requires blanket suppression of the Yahoo! emails.  *United States v. Winningham*, 953 F. Supp. 1068, 1077 (D. Minn. 1996).  Separate and apart from Fourth Amendment reasonableness, Mr. Adams has provided two other reasons for blanket suppression:  an utter lack of particularity and reckless disregard for proper procedure under Rule 41.[34]  Br. 58-59.

## V.    CONCLUSION

For the reasons stated, the Court should suppress all Yahoo! emails obtained via the warrant at issue.

---

[33] This does not include "seized" and viewed documents from Mr. Monahan's email.

[34] The government effectively ignores Mr. Adams's Rule 41 argument, lumping it in with his unreasonableness argument.  Rule 41 requires a separate and distinct analysis and requires blanket suppression even in the absence of a Fourth Amendment violation.  *See generally* Br. 34-35, 51-52, 57 (setting out Rule 41 standards and analysis).

Dated:  August 17, 2018

Respectfully submitted,

_____/s/ *Lance Wade*_____

Joseph G. Petrosinelli (DC Bar #434280)
Lance Wade (DC Bar #484845)
Gloria Maier (DC Bar #1012208)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
jpetrosinelli@wc.com
lwade@wc.com
gmaier@wc.com

James L. Volling (#113128)
Deborah A. Ellingboe (#26216X)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55420
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
james.volling@faegrebd.com
debbie.ellingboe@faegrebd.com

*Attorneys for Defendant Edward S. Adams*