# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kristoffer Mack and Paul Rapello, Derivatively on Behalf of Nominal Defendant Loblolly, Inc. (f/k/a Scio Diamond Technology Corporation), <br><br> Plaintiffs, <br><br> -against- <br><br> Edward S. and Denise L. Adams, Michael R. and Julie C. Monahan, Adams Monahan LLP, Joseph Lancia and Scio Diamond Technology Corporation (f/k/a Krossbow Holding Corporation) <br><br> Defendants, <br><br> -and- <br><br> Loblolly, Inc. (f/k/a Scio Diamond Technology Corporation), <br><br> Nominal Defendant. | Case No.:_____ |

## VERIFIED COMPLAINT

Plaintiffs for their Complaint against Defendants, and each of them, state as follows:

## INTRODUCTION

1.      Edward S. Adams ("**Adams**") and Michael R. Monahan ("**Monahan**") are attorneys and partners in the law firm, Adams Monahan LLP.   Adams and Monahan collectively have also owned numerous broker-dealers that have solicited investments for a variety of early stage companies.  Adams was not only a shareholder and officer of Apollo Diamond, Inc. ("**Apollo Diamond**"), but he was a family member of its founder.  In his own words, Adams insisted on these roles in order to generate personal profits to the harm of the shareholders of various entities.

1

Exhibit 4

2. Defendant Adams has spent the past decade attempting to work numerous deals through Apollo Diamond for his own personal profit. Apollo Diamond has developed a unique process for creating synthetic diamonds. Even more, Apollo Diamond's unique process purports to produce high quality diamonds with characteristics unique to synthetic diamonds. These unique characteristics are represented to be desirable in the marketplace for diamonds. Various parties have valued the technology developed by Apollo Diamond upwards of $40 million.

3. Apollo Diamond was controlled by Adams, members of Adams's family, and Adams' related business partners and enterprises. This control existed through various capacities, including the parties' roles as directors, officers, attorneys and placement agents. Using this control and influence, Adams and Monahan concocted and implemented a scheme to defraud shareholders. Having exhausted the market for investment in Apollo Diamond, Adams and Monahan transferred Apollo Diamond assets to an entity originally known as Scio Diamond Technology Corporation (now known as Loblolly, Inc.) ("**Private Scio**") for the purpose of raising further capital and generating additional fees.

4. After issuing additional shares of Private Scio, Adams and Monahan refined their scheme and acquired control of Krossbow Holding Corporation (now known as Scio Diamond Technology Corporation) ("**Public Scio**")—an entity with publicly traded securities. Adams and Monahan yet again transferred the assets to Public Scio and are continuing to raise capital for these same assets that originated at Apollo Diamond.

5. In short, Adams and Monahan have now sold the same assets three times while increasing their percentage ownership in the respective entities and extracting professional fees at each stage. The conduct of Adams and Monahan has worked and is continuing to work a fraud on the shareholders in each company.

6.     The Plaintiffs are shareholders of Private Scio.  Not only were Defendants Adams and Monahan directors, officers, shareholders and counsel of Private Scio, they have served in these same roles for the other entities described herein as well.  Adams and Monahan abused their influence and control over Apollo Diamond, Private Scio and Public Scio in order to extract improper legal and other fees from the entities while at the same time increasing their percentage ownership, all to the detriment of the various entities and their respective shareholders.

7.     In this action, Private Scio seeks damages and rescission associated with Defendants' wrongful conduct.  The improper transaction between Private Scio and Public Scio should be unwound to place the parties back in the status quo and the Defendants should be compelled to disgorge their improperly obtained fees.

## THE PARTIES

8.     Plaintiff Kristoffer Mack ("**Mack**") is a New York citizen residing at 850 Park Avenue, Apartment 8D, New York, NY 10075.  Mack is currently a shareholder of Private Scio. Mack owns 125,000 shares of the stock of Private Scio and has continuously owned such shares of stock of Private Scio since April 1, 2011.  Attached as Exhibit A is a true and correct copy of Plaintiff Mack's share certificate in Private Scio.

9.     Plaintiff Paul Rapello ("**Rapello**") is a Tennessee citizen residing at 4208 Estes Road, Nashville, TN 37215.  Rapello is currently a shareholder of Private Scio.  Rapello owns 125,000 shares of the stock of Private Scio and has continuously owned such shares of stock of Private Scio since April 1, 2011.  Attached as Exhibit B is a true and correct copy of Plaintiff Rapello's share certificate in Private Scio.

10. Defendant Edward Adams ("**Adams**") is a Minnesota citizen with a place of business at 60 South Sixth Street, Suite 2540, Minneapolis, MN 55402. Adams is an attorney and partner in the firm, Adams Monahan LLP.

11. Defendant Denise L. Adams is a Minnesota citizen with a personal residence at 2010 West 49th Street, Minneapolis, MN 55419.

12. Defendant Michael Monahan ("**Monahan**") is a Minnesota citizen with a place of business at 60 South Sixth Street, Suite 2540, Minneapolis, MN 55402. Monahan is an attorney and partner in the firm, Adams Monahan LLP.

13. Defendant Julie C. Monahan is a Minnesota citizen with a personal residence at 4824 Thomas Avenue, Minneapolis, MN 55410.

14. Defendant Adams Monahan LLP ("**AMLLP**") is a limited liability partnership organized under the laws of the State of Minnesota with its principal place of business at 60 South Sixth Street, Suite 2540, Minneapolis, MN 55402. Upon information and belief, Adams and Monahan are the sole owners of AMLLP.

15. Defendant Joseph Lancia ("**Lancia**") is a South Carolina citizen residing at residing at 109 Thornblade Avenue, Greer, SC 29650.

16. Defendant Scio Diamond Technology Corporation (f/k/a Krossbow Holding Corporation) is a corporation organized under the laws of the State of Nevada and is referred to as "**Public Scio**" herein.

17. Nominal Defendant Loblolly, Inc. is a Nevada corporation with a principal place of business in Minnesota. Loblolly was formerly known as Scio Diamond Technology Corporation and is referred to as "**Private Scio**" herein. According to solicitation documents prepared by AMLLP, Private Scio has no more than 2,530,033 shares issued and outstanding.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to the Securities Exchange Act of 1934, 15

U.S.C. § 78aa and 28 U.S.C. § 1331.  This Court has jurisdiction to hear and determine

Plaintiffs' pendant state law claims for relief for breach of fiduciary duty and legal malpractice

pursuant to 28 U.S.C. §§ 1331 and 1367 in that such claims arise from a common nucleus of

operative facts and are so intertwined as to make this Court's exercise of jurisdiction

appropriate.

19.     Venue is proper in the District of Minnesota under 28 U.S.C. §1391(b) as some of

the Defendants reside in the District of Minnesota and a substantial part of the events or

omissions giving rise to the claims occurred within the District of Minnesota.

## FACTUAL ALLEGATIONS

20.     This action is a shareholders' derivative action brought pursuant to Rule 23.1 of

the Federal Rules of Civil Procedure.

**A.     Adams' Initial Efforts with Apollo Diamond: the DRI Transaction**

21.     Apollo Diamond, Inc. was formerly known as Linares Management Associates

("**LMA**").  LMA was formed as a Massachusetts corporation in 1990.  LMA was founded by

Robert Linares.  LMA was jointly managed by Robert Linares and Bryant Linares.  Robert

Linares and Bryant Linares are the father-in-law and brother-in-law, respectively, of Adams.

22.     Apollo Diamond developed a process called "chemical vapor deposition" or

"CVD" for the production of synthetic diamond crystals.  Apollo Diamond possesses several

U.S. patents for its CVD process.

23.     Adams' involvement with Apollo Diamond began by 2001.

24.     On or about February 20, 2001, LMA changed its name to Apollo Diamond.

5

25.     In 2001, Adams was a director and shareholder of Dental Resources Inc. ("DRI") DRI was a publicly listed company that was looking to sell itself to other companies seeking a fast track to become publicly listed.

26.     DRI's auditor for its annual financial statements was Wallace Niedzwiecki.

27.     In 2001, Apollo Diamond entered into an agreement with DRI to become a public company (the "**DRI Transaction**"). A letter of intent between the parties was signed on or about June 26, 2001. The price for the DRI Transaction in 2001 was $500,000.

28.     Upon information and belief, Adams or an affiliated law firm acted as counsel for Apollo Diamond, DRI, or both, in connection with the DRI Transaction I and received legal fees from the contemplated transaction.

29.     The DRI Transaction was formally cancelled on November 24, 2001 after 9/11 sent the financial markets into turmoil.

**B.      Adams Tries Again: the DRI Transaction II**

30.     Despite the failure of the DRI Transaction, Adams remained a director of DRI. After the cancellation of the DRI Transaction, DRI was involved in a number of other potential deals, including the development of casinos and leisure resorts. By 2004, DRI had changed its name to DTLL Inc. (For purposes of continuity, DTLL is referred to as "**DRI**" herein.)

31.     Undaunted by the failure of the DRI Transaction, Adams remained committed in his efforts to take Apollo Diamond public.

32.     A new Apollo Diamond, Inc. was formed on or about January 2, 2004 under the laws of Delaware. Upon information and belief, the new Apollo Diamond merely continued the business operations of the original Apollo Diamond. The original Apollo Diamond was dissolved on May 23, 2006—the same date on which the new Apollo Diamond registered to do

business in Massachusetts. (For purposes of continuity, both Apollo Diamond entities are referred to as "Apollo Diamond" herein.)

33.     In 2004, DRI entered into yet another agreement with Apollo Diamond (the "**DRI Transaction II**").

34.     In 2004, DRI and Apollo Diamond signed yet another letter of intent in connection with the DRI Transaction II.

35.     Upon information and belief, Adams or an affiliated law firm acted as counsel for Apollo Diamond, DRI, or both, in connection with the DRI Transaction II and received legal fees from the contemplated transaction.

36.     Adams' brokerage entity, Equity Securities Investments, Inc. ("**ESII**"), acted as advisor for both Apollo Diamond and DRI.

37.     However, no final agreement was reached between Apollo Diamond and DRI with regard to the DRI Transaction II. The letter of intent was cancelled approximately five months after its execution.

**C.     Adams Focuses His Efforts on Apollo Diamond**

38.     Over the same time period that Adams was working on the DRI Transaction I and the DRI Transaction II, he continued to seek to independently raise capital for Apollo Diamond.

39.     Beginning on or about May 8, 2002, Apollo Diamond submitted numerous Regulation D filings with the Securities Exchange Commission in support of an offering of securities. The May 8, 2002 SEC filing indicates that Apollo Diamond was seeking to raise a total of $2.2 million in capital of which it had purportedly already sold $400,000. The May 8, 2002 filing was signed by Denise L. Adams (Adams' wife) in the capacity of Apollo Diamond's General Counsel.

40.     Apollo Diamond's Regulation D filing dated May 8, 2002 identifies ESII as a broker engaged by Apollo Diamond to solicit purchasers of its stock pursuant to the Regulation D filing. Upon information and belief, Adams was a shareholder, director and officer in ESII. The May 8, 2002 filing estimated that $200,000 in sales commissions would be paid to ESII.

41.     Apollo Diamond's Form D filing dated May 8, 2002 also identifies estimated legal fees of $10,000 in connection with the offering.

42.     Apollo Diamond submitted a new Regulation D filing on or about September 30, 2002. Apollo Diamond's Form D filing dated September 30, 2002 represented that it was a "New Filing." Five months after its original Regulation D filing, the Form D filing date September 30, 2002 offered an additional $6 million in securities. Adams' brokerage firm, ESII, remained the broker for the offering and the Form D estimated sales commissions to be $600,000. The September 30, 2002 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

43.     Apollo Diamond's Form D filing dated September 30, 2002 estimated legal fees to be $15,000 in connection with the offering.

44.     Apollo Diamond submitted a new Regulation D filing on or about February 20, 2003. Apollo Diamond's Form D filing dated February 20, 2003 represented that it was a "New Filing." The Form D filing date February 20, 2003 offered an additional $3.5 million in securities. Adams' brokerage firm, ESII, remained the broker for the offering and the Form D estimated sales commissions to be $350,000. The February 20, 2003 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

45.     Apollo Diamond's Form D filing dated February 20, 2003 estimated legal fees to be $15,000 in connection with the offering.

46.     On or about August 27, 2003, Apollo Diamond amended its Regulation D filing dated February 20, 2003. According to the amendment, $2,012,500 of the $3.5 million offering had already been sold. The August 27, 2003 amendment reflected a change in the broker for the offering. The August 27, 2003 amendment states that the broker for the offering was "Oak Ridge Financial (formerly known as Equity Securities)." The address for Oak Ridge Financial was reported to be the same address that was used by ESII. Upon information and belief, Adams remained an owner, director and officer of Oak Ridge Financial. The August 27, 2003 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

47.     Apollo Diamond submitted a new Regulation D filing on or about January 31, 2004. Apollo Diamond's Form D filing dated January 31, 2004 represented that it was a "New Filing." The Form D filing date January 31, 2004 offered an additional $7.5 million in securities of which $4.625 million were already purportedly sold. Oak Ridge Financial remained the broker for the offering and the Form D estimated sales commissions to be $750,000. The January 31, 2004 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

48.     Apollo Diamond's Form D filing dated January 31, 2004 estimated legal fees to be $25,000 in connection with the offering.

49.     On or about September 15, 2004, Apollo Diamond amended its Regulation D filing dated January 31, 2004. According to the amendment, $16,043,000 of the $7.5 million offering had already been sold. The expected sales commissions to Oak Ridge Financial from the offering was increased from $750,000 to $1,604,300. The September 15, 2004 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

50.     Apollo Diamond submitted a new Regulation D filing on or about October 25, 2006. Apollo Diamond's Form D filing dated October 25, 2006 represented that it was a "New Filing." The Form D filing dated October 25, 2006 offered an additional $11 million in securities of which $1,000,000 was purportedly already sold. The Form D filing dated October 25, 2006 does not identify any broker engaged for the offering or any estimated sales commissions.

51.     Apollo Diamond's Form D filing dated October 25, 2006 identifies Adams as an officer of Apollo Diamond and identifies Adams' address as the same address reported for ESII and Oak Ridge Financial. Apollo Diamond's Form D filing dated October 25, 2006 is signed by Adams in the capacity of Secretary of Apollo Diamond.

52.     Apollo Diamond's Form D filing dated October 25, 2006 estimated legal fees to be $250,000 in connection with the offering.

53.     Apollo Diamond submitted a new Regulation D filing on or about November 13, 2007. Apollo Diamond's Form D filing dated November 13, 2007 represented that it was a "New Filing." The Form D filing dated November 13, 2007 offered an additional $10 million in securities of which $2,400,005 was purportedly already sold. The Form D filing dated October 25, 2006 does not identify any broker engaged for the offering or any estimated sales commissions.

54.     Apollo Diamond's Form D filing dated November 13, 2007 identifies Adams as an officer of Apollo Diamond and identifies Adams' address as the same address reported for ESII and Oak Ridge Financial. Apollo Diamond's Form D filing dated November 13, 2007 is signed by Adams in the capacity of Secretary of Apollo Diamond.

55.     Adams, Monahan, or their firm, AMLLP, was counsel for Apollo Diamond.
Upon information and belief, Adams, Monahan, AMLLP or some other law firm affiliated with
Adams performed the legal services and received the legal fees disclosed in connection with
Apollo Diamond's numerous Regulation D offerings.

56.     Apollo Diamond's auditor during the time period of the efforts to raise capital by
Adams and Monahan was Wallace Niedzwiecki, the same auditor used by DRI.

57.     A media outlet in the industry has reported that the Apollo Diamond technology
cost $40 million to develop. If Apollo Diamond's securities offerings pursuant to its numerous
Regulation D filings were fully subscribed, Apollo Diamond would have raised $48,743,000 in
capital. Similarly, Adams' affiliated brokerage firms would have received $2,754,300 in sales
commissions and AMLLP or another law firm affiliated with Adams would have received
$565,000 in legal fees.

58.     Apollo Diamond's Regulation D filings, however, do not accurately state the total
amounts paid to parties related to Adams for such services. Apollo Diamond's audited financial
statements for the period ending December 31, 2004 state as follows:

**Note 8 – Related Party Transactions**

Minority stockholders received fees for services in the amount of $375,000 in
April 2004. In addition, since January 9, 2001, commissions of $3,345,825 were
paid to the company of a minority stockholder for services related to investment
activities for Apollo Diamond, Inc.

These figures only represent amounts paid through December 31, 2004. Accordingly, Apollo
Diamond's Regulation D filings understate the amounts paid to Adams' related brokerage firms
by a minimum of several hundred thousand dollars.

**D.     Adams and Monahan Conjure Up Apollo Gemstone**

59.     By 2004, Apollo Diamond was well on its way to raising millions of dollars with
the resulting benefit to Adams and Monahan of increased sales commissions and/or legal fees.
Despite Apollo Diamond's fundraising successes, Adams and Monahan conceived a new
strategy for raising capital and a source for diverting additional fees to themselves.

60.     On or about April 2, 2004, Apollo Diamond formed Apollo Diamond Gemstone
Corporation ("**Apollo Gemstone**") under the laws of Delaware. Apollo Gemstone was a wholly
owned subsidiary of Apollo Diamond.

61.     According to Apollo Gemstone's Private Placement Memorandum, Apollo
Diamond granted to Apollo Gemstone "an exclusive license to manufacture whereby Apollo
Gemstone [would] manufacture, sell and distribute laboratory-created or "cultured" diamonds
produced through Apollo Diamond's proprietary, highly scalable and efficient production
process."

62.     Adams' vision for Apollo Gemstone remained similar to his failed DRI
transactions. According to its Private Placement Memorandum, Apollo Gemstone "intends to
take the necessary steps to become a publicly-traded company . . . At present, [Apollo
Gemstone] has entered into a non-binding letter of intent with a publicly-traded 'shell' company
that trades on the Over-The-Counter Bulletin Board."

63.     Adams was an officer and director of Apollo Gemstone. Adams served as
Secretary and Chief Financial Officer for Apollo Gemstone. In some instances, Apollo
Gemstone's Regulation D filings reported that Adams' address was the same as that used for
ESII and Oak Ridge Financial, while in the final Regulation D filing, Apollo Gemstone reported
that his address was the same as the address of AMLLP.

64.     Monahan was an officer of Apollo Gemstone. Apollo Gemstone's Regulation D filings reported that Monahan's address was the same as the address of AMLLP.

65.     AMLLP served as legal counsel to and received legal fees from Apollo Gemstone.

66.     Focus Capital Group, Inc. ("**Focus**") was engaged by Apollo Gemstone to serve as a broker to solicit investments. Prior to December 4, 2009, Focus Capital was owned entirely by Adams and Monahan. After December 4, 2009, Adams and Monahan collectively owned 75% of the outstanding stock of Focus Capital.

67.     Apollo Gemstone submitted three Regulation D filings to the SEC dated November 13, 2007, July 20, 2009, and July 20, 2010. In the first two Regulation D filings, Apollo Gemstone sought to raise a total of $20,750,000. Apollo Gemstone estimated legal fees of $300,000 associated with the first offering. In addition, although the second Regulation D filing did not specifically identify any additional legal fees associated with the offering, Apollo Gemstone reported that a portion of the proceeds would be used to pay legal services to AMLLP.

68.     Apollo's Gemstone's July 20, 2010 Form D filing sought to raise an additional $6,500,000. This filing estimated that $845,000 would be paid to Focus as sales commissions. In addition, this filing estimated that $1.2 million from the proceeds of the offering would be paid to related parties, including as compensation to officers and directors, which upon information and belief, included Adams and Monahan. Apollo's Gemstone's July 20, 2010 Form D filing was signed by Adams as Chief Financial Officer.

### E.  Adams and Monahan Launch Private Scio

69.  By 2010, the efforts by Adams and Monahan to raise capital for Apollo Diamond and Apollo Gemstone had run out of steam.  Adams and Monahan needed to devise a new strategy to continue generating sales commissions and legal fees.

70.  Monahan came up with an idea to increase the ownership percentage of Adams and Monahan while generating additional legal fees and sales commissions.

71.  On February 12, 2011, Monahan sent an e-mail that outlined a strategy whereby Adams and Monahan would form a "NEWCO" to acquire the assets of Apollo Diamond.  *See* Ex. C.  The proposed newly formed entity referred to as "NEWCO" in Monahan's February 12, 2011 letter became Private Scio.  Monahan's February 12, 2011 email described a scheme to redeem substantially all of the outstanding shares from Apollo Diamond's existing shareholders in exchange for $0.01 per share.  Going further, Monahan stated that "[a]fter the proposed claw backs from [Apollo Diamond's shareholders] there will be approximately 6.8 [million] shares of the 22,608,066 shares to be allocated to NEWCO's founders, notably Ed and me.  I will propose Focus Capital (through a separate entity owned equally by the five partners) receive an allocation of those shares (e.g., 10%)."

72.  On February 13, 2011, Monahan sent another email providing a "rough chronological outline" for the "NEWCO" transaction.  *See* Ex. D.  According to Monahan, the second step was to "[o]btain proxies from founders of ADI and ADGC for impending vote on asset sales to NEWCO and stock redemption agreements between them and ADI and ADGC."  Step four and five were to "te[a]m up Joe Lancia (or whomever we select to head NEWCO" and "[i]dentify location for NEWCO's operations (Ed, Joe and [Monahan])."  After "[m]eet[ing] with key ADI and/or ADGC investors to explain the situation and plan" (step 8), the list was

14

rounded out with "[h]old[ing] shareholder meetings for ADI and ADGC (likely in Boston)," "[e]ffectuat[ing] asset sale," and "NEWCO off and running."

73.     In February 2011 when Monahan devised the NEWCO plan, Adams was a shareholder and officer to Apollo Diamond and officer and director of Apollo Gemstone. Similarly, Monahan was an officer of Apollo Gemstone. AMLLP was legal counsel to both Apollo Diamond and Apollo Gemstone. In spite of these multiple roles, Monahan's "back of the napkin" strategy proved to be an effective approach to expanding their ownership while extracting additional fees from the entities to the detriment of existing Apollo Diamond shareholders.

74.     Less than twenty (20) days after Monahan's February 12, 2011 email, Adams and Monahan formed Private Scio to serve as the "NEWCO" described in Monahan's plan. Private Scio was formed under the laws of Nevada on March 1, 2011. Adams and Monahan each owned shares of Private Scio. In addition, Adams was (and is) serving as the President and Treasurer of Private Scio as well as a director. Monahan is the Secretary of Private Scio as well as a director. Adams and Monahan were the sole officers and directors of Private Scio. AMLLP served as counsel to Private Scio.

75.     Adams and Monahan proceeded to use their influence arising out of their multiple roles as officers, directors, shareholders and counsel to execute Monahan's "back of the napkin" plan as described in his emails. Apollo Diamond and Apollo Gemstone entered into two asset purchase agreements (the "Apollo Asset Purchase Agreements") with Private Scio on or about March 11, 2011 and March 18, 2011.

76.     At the time that the Apollo Asset Purchase Agreements were executed, Private Scio was known as Scio Diamond Technology Corporation.

77.    At the time that the Apollo Asset Purchase Agreements were executed, Public Scio was known as Krossbow Holding Corporation and had no relationship to the transaction.

78.    Pursuant to the Apollo Asset Purchase Agreements, Private Scio was to acquire all assets of Apollo Diamond for $2,000,000 and all assets of Apollo Gemstone for $10,000.

79.    The Asset Purchase Agreement between Apollo Diamond and Private Scio was executed by Robert C. Linares, who is Adams' father-in-law, on behalf of Apollo Diamond.

80.    The Asset Purchase Agreement between Apollo Diamond and Private Scio was executed by Lancia, who was identified in Monahan's "back of the napkin" outline, on behalf of Private Scio as its Chief Executive Officer.

81.    Having used their positions of influence to manufacture and create the Apollo Asset Purchase Agreements between Apollo Diamond, Apollo Gemstone and Private Scio, Adams and Monahan needed to obtain approval from the Apollo Diamond shareholders for the transaction.

82.    On March 11, 2011—the same date on which the Asset Purchase Agreement between Apollo Diamond and Private Scio was executed—Adams' father-in-law, Robert Linares, sent a letter to Apollo Diamond shareholders.  The March 11, 2011 letter attached a proxy statement soliciting proxies from shareholders to approve (1) the sale of all of Apollo Diamond's assets for $2 million and (2) a Stock Repurchase program whereby Apollo Diamond would repurchase securities for $0.01 per share.

83.    The March 11, 2011 letter instructed the Apollo Diamond shareholders that Apollo Diamond had exhausted its cash resources and been unable to raise sufficient additional resources to continue its developmental operations.  The March 11, 2011 letter stated that Apollo

Diamond had outstanding liabilities in the amount of $2 million that it could not satisfy along with outstanding debts owed to "founders and other related parties."

84.    As related by the March 11, 2011 letter, "[g]iven [Apollo Diamond's] recent history and the current economic environment, [Apollo Diamond's] board of directors has determined that a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology."

85.    Going further, the March 11, 2011 letter stated:

[t]o that end, the Company has entered into an Asset Purchase Agreement with Scio Diamond Technology Corporation ("SDTC")—a company formed for the purpose of this transaction and to capitalize on the technology developed by Apollo—whereby Apollo has agreed to sell substantially all of our assets for approximately $2,000,000 to SDTC. The cash obtained from the asset sale will largely be applied toward existing liabilities and contractual obligations of the Company.

86.    With regard to the stock redemption, the March 11, 2011 letter stated that

[i]n an effort to create what may prove to be a tax-advantaged event for many of our shareholders, we are offering to repurchase the outstanding shares of common stock held by our stockholders at a price of $0.01 per share.

\*       \*       \*

In addition to repurchasing your shares in the Company, we have negotiated an agreement with SDTC whereby our stockholders whose shares are repurchased by the Company will be permitted to invest in SDTC at a price of $.01 per share. Each stockholder will be provided an opportunity to purchase a number of shares of SDTC equal to the number of the Company's shares currently held by the stockholder. This will permit our stockholders to preserve the continued potential opportunity of your investment in the Company and to maintain a largely pro-rata interest in the opportunity developed by the Company through ownership of SDTC stock.

87.    The Proxy Statement attached to the March 11, 2011 letter is consistent with the representations in the March 11, 2011 letter. AMLLP acted as counsel for Apollo Diamond in conducting the proxy solicitation. In its summary, the Proxy Statement stated as follows:

Apollo Diamond, Inc. seeks approval from its stockholders to enter into a series of transactions through which the Company would initially sell substantially all of its assets to Scio Diamond Technology Corporation ("[Private Scio]") for approximately $2.0 million (the "Asset Sale") and subsequently repurchase all of the outstanding shares of its single series common stock (the "Stock"). The proceeds from the Asset Sale would be utilized to satisfy the Company's outstanding debts and liabilities as well as to repurchase the Company's outstanding stock at a value of $.01 per share (the stated par value of the Company's outstanding stock). Every [Apollo Diamond] stockholder consenting to the stock repurchase transaction (the "Stock Repurchase") will enter into an agreement with the Company to sell the stockholder's Stock to the Company at a value of $.01. In connection with the Asset Sale, [Apollo Diamond] has negotiated an option for [Apollo Diamond] stockholders to purchase shares of [Private Scio] common stock under a separate subscription agreement with [Private Scio] (the "SDTC Subscription Agreement"). Each [Apollo Diamond] stockholder . . . will be permitted to purchase a number of shares of [Private Scio's] common stock equal to the stockholders' current [Apollo Diamond] Stock ownership. The [Private Scio] common stock will be offered at an initial purchase price of $.01 per share.

88.     The Proxy Statement continued as follows:

As a result of these transactions, if approved and consented to, [Private Scio] will own substantially all of the assets of [Apollo Diamond] and [Apollo Gemstone]. You will also own shares in [Private Scio] which actually exceed, on a fully-diluted basis, your existing share ownership in [Apollo Diamond]. In other words, as a result of this transaction, your ownership in [Private Scio] will on a fully-diluted percentage ownership basis exceed that of your existing percentage share ownership in [Apollo Diamond].

89.     According to Adams, the outstanding liabilities of Apollo Diamond at the time of the Apollo Asset Purchase Agreements ranged between approximately $1.85 million and $2.2 million. The outstanding liabilities included legal fees owed to AMLLP in the amount of $575,000 and loans or "Monies Advanced to ADI by Principals" ranging between $431,282.77 to $478,222.

90.     Upon information and belief, the loans or "Monies Advanced to ADI by Principals" included in Apollo Diamond's outstanding liabilities were purportedly owed to Adams and/or his family members. Monahan has represented that those loans were fraudulent

and were not actually owed by Apollo Diamond. In an email from Monahan to Mack and Rapello, Monahan states that "[y]ou can also push for back-up on 'loans by principals to ADI' if you desire. From my perspective, that will be difficult to establish absent a forensic accounting exercise (not complex, just timely) and that, more relevant is an Apollo problem not a Scio problem. If there are shenanigans relating thereto[,] the 'principals' will have personal exposure to Apollo shareholders." *See* Ex. G.

91. The March 11, 2011 letter and Proxy Statement included a number of material misrepresentations and omissions of material facts regarding the Apollo Asset Purchase Agreements and the stock repurchase plan. The March 11, 2011 letter and Proxy Statement failed to disclose or misrepresented *inter alia* that (a) Adams, Monahan and/or AMLLP had acted as counsel to both Apollo Diamond and Private Scio in connection with the transaction, (b) Adams and Monahan were the controlling shareholders of Private Scio while also serving as fiduciaries of Apollo Diamond and Apollo Gemstone, (c) the Apollo Asset Purchase Agreements were not arrived at through arms length negotiations, (d) aside from the amounts used to repurchase shares, the bulk of the funds received from the Apollo Asset Purchase Agreements were paid to satisfy purported loans from Adams or his family and to AMLLP, (e) no purported option to purchase shares in Private Scio had been negotiated, (f) the purported warrants in favor of former Apollo Diamond shareholders for $0.01 per share of Private Scio were never authorized, and (g) the price to be paid for the assets was far below their value.

92. The law firm owned by Adams and Monahan, AMLLP, acted as counsel for both Apollo Diamond and Private Scio in connection with the Apollo Asset Purchase Agreements.

93. Having secured the Apollo Asset Purchase Agreements in favor of their new company, Private Scio, Adams and Monahan turned to the task of raising capital to fund the

Apollo Asset Purchase Agreements. For this purpose, Adams and Monahan decided to use one of their other businesses, Focus Capital Group, Inc. ("Focus")

94. Focus was formed on or about July 13, 2005 under the laws of the State of Minnesota. Focus was founded by Adams and Monahan. On or about December 4, 2009, Adams and Monahan sold a portion of their shares in Focus to Plaintiffs Mack and Rapello and to a third individual, David Platt. After joining Focus in December 4, 2009, Mack, Rapello and Platt worked as brokers out of a New York office of Focus, while Adams and Monahan continued their brokerage functions in Minnesota.

95. In a document dated April 16, 2011, Monahan forwarded to Mack and Rapello a Private Placement Memorandum seeking to raise $5.4 million for Private Scio. Monahan—who was an officer of Apollo Gemstone and whose law firm was performing work on behalf of Apollo Diamond and Apollo Gemstone—forwarded this Private Placement Memorandum for Private Scio outlining the acquisition under the Apollo Asset Purchase Agreements before Apollo Diamond had even held its special shareholder meeting to approve the measures.

96. At the conclusion of the proposed offering by Private Scio, Adams and Monahan anticipated collectively owning 16% of the outstanding shares of Private Scio. This percentage ownership in Private Scio was greater than their collective percentage ownership in Apollo Diamond.

97. The Special Meeting to adopt the vote on the sale of Apollo Diamond's assets and repurchase shares occurred on April 18, 2011 in—as outlined in Monahan's February 13, 2011 email—Boston, Massachusetts. Upon information and belief, both the proposed measures to approve the Apollo Asset Purchase Agreements and the share repurchase arrangement were adopted at the Special Meeting on April 18, 2011.

98.     By May 4, 2011, Adams began sending solicitation emails to potential purchasers

of Private Scio securities under the private placement. Adams' emails to potential investors

explained that Private Scio—the only Scio entity in existence at the time—"had reached an

agreement to acquire proprietary technology to produce laboratory-created diamond gemstones

. . . from [Apollo Diamond and Apollo Gemstone]." Adams' email went further and stated that

"My firm, Focus Capital Group, Inc., is presently engaged to raise $5.0 million for Scio. We

have approximately $2.0 million raised (and $3.5 million in tax credits and other incentives

pledged to us from the State of South Carolina over the next five years), but we still require an

additional $3.0 million to close the transaction by the end of May." *See* Ex. E.

99.     Adams email soliciting investment in Private Scio included a number of false

statements. Private Scio had not already raised $2.0 million by May 4, 2011. Upon information

and belief, Private Scio had not secured $3.5 million in tax credits and other incentives from

South Carolina. Further, Private Scio did not require an additional $3.0 million by the end of

May to close the transaction as it only needed a total of $2.0 million under the terms of the

Apollo Asset Purchase Agreements to close the transaction.

100.     Even Monahan, who was complicit in Adams' scheme to defraud investors,

agreed that Adams' solicitation email was improper. As stated in a May 4, 2011 email sent by

Monahan, "we CANNOT send this email to potential investors." *See* Ex. E.

101.     Further discussion ensued between Monahan and Adams on the issue. As stated

by Monahan, "[Adams] thought it was okay to send [the proposed solicitation email] to investors

so long as he sen[t] it via his law firm email. This, of course, strongly implies [Adams]

recognized the problems with the email, not to mention it being a regulatory problem. The email

below was, indeed, sent via the @adamsmonahan account." *See* Ex. E.

102.    On May 4, 2011, Monahan scheduled a call amongst Focus' five owners, Adams,

Mack, Rapello, Platt and himself, to discuss various issues, including the impending Private Scio

offering.  During the call, Mack raised concerns about the multiple roles that Adams and

Monahan were playing by using Focus to solicit investments while at the same time occupying a

number of corporate governance roles at Apollo Diamond and Private Scio.  Adams and

Monahan rejected these concerns.

103.    In an email dated May 5, 2011, Adams continued to dismiss these objections to

his and Monahan's conflicts of interest.  Adams claimed the risk presented by the conflicts of

interest should be disregarded because the control would allow him and Monahan to make more

money:

> Also, I thought more about the roles Michael and I are playing at Scio.  I guess I
> assumed they were not a problem because various partners have served on the
> boards of various entities with which we have sought engagements in the past.  In
> a small firm such as [Focus], the use of [Deustche Bank] protocols and policies
> (which might make complete sense in that setting) will probably make it almost
> impossible for us to utilize our relationships (the thing we have of most value) to
> maximize our collective outcomes.  I fear that we will be left to only work as
> agents on behalf of other parties who seemingly all feel free not to pay us.
>
> I acknowledge there is some risk on our involvement, but there is also control.
> Control which we can utilize to effectuate a favorable outcome.  To be clear, no
> one in NY would have any shares in Scio if we were not the drivers of the
> opportunity.  Surely no board that is not influenced by us would have seen fit to
> issue them.  We did it because we recognize the value you will all collectively
> play to ensure the long-term success of the enterprise.  To also be clear, there is
> no Scio opportunity—none—without us.  This transaction was our idea, we have
> managed it, and we need to continue to manage it to a successful outcome.

*See* Ex. F (emphasis added).

104.    The issue of Adams' and Monahan's conflicts resurfaced the next day.  In an

email dated May 6, 2011, Mack wrote to Adams stating "I have a real problem with the firm[']s

heavy board involvement in the deal.  [I] don't see any reason for more than one board

representative from this firm. A real company should have a diverse independent board. [W]e all know that. So, is [Private Scio] going to be a real company or not?? I think it has a chance to be very successful but if it's the latter I have zero interest in being involved and don't want this firm to be either. I hope that I am being clear." *See* Ex. F.

105.    Adams again responded by emphasizing the amount of money that he wanted to make. In a subsequent email of May 6, 2011, Adams stated "[t]o provide perspective on this transaction <u>Scio is acquiring the assts of Apollo for $2 million. The equipment being acquired alone is valued from a replacement perspective at $15-23 million.</u>" *See* Ex. F (emphasis added). In this May 6, 2011 email, Adams also attached a list of Private Scio shareholders and the outstanding liabilities of Apollo Diamond that would be satisfied by the $2 million to be paid under the Apollo Asset Purchase Agreements. The list of outstanding liabilities provided by Adams included legal fees owed to AMLLP in the amount of $575,000 and loans or "Monies Advanced to ADI by Principals" ranging between $431,282.77 to $478,222.

106.    Mack and Rapello insisted that if Focus was going to continue to participate in Private Scio's offering of securities, a supplemental disclosure had to be prepared that described the numerous conflicts of interest arising from the various fiduciary roles held by Adams and Monahan. Nevertheless, because of the extraordinary conflicts of interest presented by the participation of Adams and Monahan, Mack and Rapello refused to permit Focus to participate in the transaction as of on or about May 9, 2011.

**F.    Adams and Monahan Concoct a Series of Fraudulent Transactions to Further Defraud Private Scio and Apollo Diamond Shareholders.**

107.    Having redeemed the Apollo Diamond shareholders through the fraudulent Proxy Statement and secured all the assets through an agreement in favor of Private Scio, which Adams

and Monahan controlled, Adams and Monahan had the control to structure a transaction in whatever manner they pleased.

108.    At some point after Mack and Rapello refused to permit Focus to participate in the transaction, Adams and Monahan were reminded of Adams' longtime strategy to take Apollo Diamond through a merger with a Pink Sheets company just as Adams had attempted with the DRI Transaction I and the DRI Transaction II.

109.    Krossbow Corporation ("Krossbow") was a Nevada corporation formed on or about September 17, 2009.   Krossbow was founded by Jason Kropp.

110.    Krossbow was initially capitalized through the sale of 1,000,000 shares of stock issued to Kropp on December 30, 2009.  Krossbow sold another 2,200,000 shares of stock to a small group of individuals on March 10, 2010.  Krossbow securities were registered securities and traded on an over-the-counter market much like DRI.

111.    According to its Form S-1, Krossbow was formed "to produce Verified Emission Reduction (VER) and Reduced emissions from Deforestation and Degradation (REDD) carbon offsets through global restoration projects."  Despite such lofty goals, Krossbow made little progress with regard to its business plans and sat largely idle on the Pink Sheets until Adams and Monahan discovered it.

112.    Krossbow's board of directors approved a 2-for-1 stock split of its issued and outstanding common shares on July 13, 2011.  The stock split was to be effective on August 5, 2011.  After this stock split, Kropp would hold 2,000,000 shares of stock while the other existing shareholders would hold 4,400,000.

113.    On July 21, 2011, Adams, in his capacity of Chairman of Scio Diamond Technology, gave consent to Kropp to use the name "Scio Diamond Technology Corporation" in

conjunction with Krossbow. On the same day, Kropp filed a Certificate of Amendment with the Nevada Secretary of State, changing the name of Krossbow to "Scio Diamond Technology Corporation." "Krossbow" is referred to as "Public Scio" hereafter.

114. As of July 21, 2011, two Nevada companies existed under the name of "Scio Diamond Technology Corporation." Adams and Monahan founded and controlled the first ("Private Scio"), and one can only conclude that they effectively controlled the second ("Public Scio").

115. On August 4, 2011, Private Scio and Public Scio entered into an Asset Purchase Agreement (the "Scio Asset Purchase Agreement"), whereby Public Scio acquired "substantially all assets, properties and rights of [Private Scio] . . . including without limitation those assets listed on Schedule 1.1(a) . . . ." The sole asset identified on Schedule 1.1(a) is the name "Scio Diamond Technology Corporation."

116. In exchange for the Acquired Assets, Private Scio received 13 million shares of Public Scio stock. Pursuant to Schedule 1.4 of the Scio Asset Purchase Agreement, the 13,000,000 shares of Public Scio were not distributed to Private Scio, but instead were distributed to the Defendants and certain friends and relatives of the Defendants. Pursuant to Schedule 1.4, Adams and his wife received 4.1 million shares. Similarly, Monahan and his wife received 4.1 million shares. Among others also receiving some portion of the 13 million shares were Adams' father-in-law (Robert Linares), Joseph Lancia, and colleagues of AMLLP, Christopher J. Mumm and J.R. Maddox. Neither Rapello nor Mack received any of the 13 million Public Scio shares obtained in consideration for all assets of Private Scio.

117. The Scio Asset Purchase Agreement includes a number of representations and warranties by Private Scio as "Seller" and Public Scio and "Buyer."

118.    Paragraph 2.2 of the Scio Asset Purchase Agreement expressly represents and warrants that Private Scio had the authority to enter into the agreement.

> **2.2    Authorization of Agreement.** Each of Seller and the Shareholder has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other agreements and instruments executed or to be executed by the parties hereto in connection herewith . . . have been duly and validly approved by the Board of Directors of Seller . . . and by Seller's shareholders and no other proceeding on the part of Seller are necessary to approve this Agreement and to consummate the transactions contemplated hereby. This Agreement . . . have been (or upon execution will have been) duly executed and delivered by Seller and the Shareholder, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of Seller and the Shareholder . . . .

119.    Paragraph 2.14 of the Scio Asset Purchase Agreement expressly represents and warrants that none of the representations or warranties provided by the Seller contain any untrue statement of a material fact or omits to state any material fact necessary to make the statements and facts set forth therein not false or misleading.

120.    Paragraphs 2.2 and 2.14 of the Scio Asset Purchase Agreement contain material representations in connection with the purchase and sale of a security. Private Scio did not have authority to enter into the Scio Asset Purchase Agreement. Private Scio's shareholders, including Mack and Rapello, were never informed of nor approved the transaction. The Scio Asset Purchase Agreement was not duly executed by Private Scio or an authorized representative of Private Scio. Given that the representations and warranties made by Private Scio were untrue and omitted to state material facts, Private Scio also misrepresented the representation and warranty that all information was accurate.

121.    Paragraph 3.1 of the Scio Asset Purchase Agreement expressly represents and warrants that Public Scio had the authority to enter into the agreement and that it was duly executed.

**3.1    Organization and Corporate Authority**.  Buyer . . . has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  This Agreement and the other Transaction Documents have been (or upon execution will have been) duly executed and delivered by Buyer, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of Buyer . . . .

122.    Paragraph 3.3 of the Scio Asset Purchase Agreement expressly represents and warrants that none of the representations or warranties provided by the Buyer contain any untrue statement of a material fact or omits to state any material fact necessary to make the statements and facts set forth therein not false or misleading.

123.    Paragraphs 3.1 and 3.3 of the Scio Asset Purchase Agreement contain material representations in connection with the purchase and sale of a security.  The Scio Asset Purchase Agreement was not duly executed by Public Scio or an authorized representative of Public Scio. Given that the representations and warranties made by Public Scio were untrue and omitted to state material facts, Public Scio also misrepresented the representation and warranty that all information was accurate.

124.    The address identified for Private Scio in Paragraph 5.2 of the Scio Asset Purchase Agreement is AMLLP's address.

125.    The Scio Asset Purchase Agreement is executed on behalf of Public Scio by Joseph D. Lancia as its "President and CEO."  According to Public Scio's SEC filings, Kropp was Public Scio's President and CEO on August 4, 2011.

126.    The Scio Asset Purchase Agreement is executed on behalf of Private Scio by Joseph D. Lancia as its "President and CEO."

127.    Despite executing the Scio Asset Purchase Agreement as President and CEO of both Private Scio and Public Scio on August 4, 2011, both representations by Lancia were

untruthful. Lancia was not the President and CEO of Private Scio or Public Scio as of August 4, 2011 and he possessed no such authority. With regard to Private Scio, Lancia has made clear in a telephone conversation on March 26, 2012 that he had no involvement with the entity and was never employed by or an officer of Private Scio. Put simply, he "was not involved in that original private company." With regard to Public Scio, Lancia admits that he only "got involved" on August 5, 2011. Even then, Lancia admits that was not employed by Public Scio until December 15, 2011 and was only an independent contractor prior to that.

128. According to its public SEC filings, Public Scio publicly changed its name to Scio Diamond Technology Corporation on August 5, 2011. However, Adams had already granted Public Scio and Kropp the rights to the name on July 21, 2011, when Public Scio filed a Certificate of Amendment with the Nevada Secretary of State, changing the name to "Scio Diamond Technology Corporation."

129. On August 5, 2011—the day after the date of the fraudulent Scio Asset Purchase Agreement—Adams and Monahan each acquired 1 million shares of stock from Kropp for $165,614. Combined with the shares that they and their spouses received as set forth in Schedule 1.4 of the Scio Asset Purchase Agreement, Adams and Monahan each controlled 5.1 million shares of Public Scio's stock. In some undisclosed transaction, an additional 290,000 shares were credited to Adams and Monahan, respectively, so that by the time of Public Scio's 8-K dated August 17, 2011, Adams and Monahan were each attributed 5,390,000 shares of Public Scio's stock. Such holdings meant that Adams and Monahan each controlled 27.78% of Public Scio for a combined total of 55.56%. Such percentage ownership is a dramatic increase from the combined 16% they were to hold in Private Scio and the even smaller percentage owned of Apollo Diamond.

130. Public Scio's SEC filings report that on August 5, 2011, Kropp resigned as President and Chief Executive Officer of Public Scio.

131. Public Scio's SEC filings report that on August 5, 2011—the day after the date of the Scio Asset Purchase Agreement—Lancia was appointed Chief Executive Officer of Public Scio and a member of Public Scio's board.

132. Public Scio's SEC filings report that on August 5, 2011, Adams was appointed the chairman of Public Scio's board.

133. Public Scio's SEC filings report that on August 5, 2011, Monahan was appointed to the board of Public Scio.

134. In an 8-K filing with the SEC dated August 17, 2011, Public Scio reported that it had "a two stage two year plan beginning in June of 2011." In June of 2011, the only Scio entity then in existence was Private Scio.

135. Further, the 8-K dated August 17, 2011 states that "company has entered into agreements to purchase proprietary chemical vapor deposition ("CVD") diamond growth technology, equipment relating thereto and the intellectual property (collectively the "Diamond Technology") of Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation (collectively the "Apollo Companies") for the stipulated sum of $2,010,000." Not only is the $2,010,000 figure the same amount as agreed to in the Apollo Asset Purchase Agreements, but as of August 17, 2011, the Apollo Asset Purchase Agreements were the only agreements in existence for the purchase of the assets of Apollo Diamond and Apollo Gemstone. Accordingly, Public Scio's 8-K dated August 17, 2011 affirmed that not only did Public Scio possess the rights granted in favor of Private Scio, but that Public Scio was relying upon those agreements in support of its business.

136.    On August 31, 2011, Public Scio filed another 8-K with the SEC. In Public

Scio's 8-K dated August 31, 2011, Public Scio represented that it had entered into an Asset

Purchase Agreement with Apollo Diamond on August 31, 2011 (the "Apollo Asset Purchase

Agreement II"). According to its 8-K dated August 31, 2011, Public Scio had agreed to pay $1

million "as stipulated between the parties" and a $1 million promissory note in consideration for

Apollo Diamond's "Diamond Growing Machines and Intellectual Property related thereto."

Public Scio's 8-K dated August 31, 2011 is nonsensical as Public Scio had already affirmed in

its prior SEC filings the prior Apollo Asset Purchase Agreements, which conveyed all assets of

Apollo Diamond and Apollo Gemstone. To date, Public Scio has not filed the Apollo Asset

Purchase Agreement II with the SEC.

137.    Having transferred the Apollo Diamond assets to yet another entity with a

resulting increase in their respective percentage ownership, Adams and Monahan proceeded to

renew their efforts to raise capital through additional investment. Between the time Adams and

Monahan acquired Public Scio and Public Scio's 10-Q filing for the period ended December 31,

2011, Public Scio had sold 6,566,193 shares at $0.70 per share, which totals $4,596,335.10.

However, Public Scio's 10-Q reports that after discounting the total proceeds after fees, the total

receipts for Public Scio equal $4,048,622.74. Accordingly, $547,712.36 were received as fees in

connection with the placement of Public Scio shares. Upon information and belief, Adams,

Monahan or AMLLP received, directly or indirectly, a significant portion of the fees associated

with the shares sold by Public Scio in 2011.

138.    To date, numerous former shareholders of Apollo Diamond have never received

warrants for the purchase of Public Scio stock for $0.01 per share as set forth in the March 11,

2011 Proxy Statement. Upon information and belief, to date, none of the former shareholders of

Apollo Diamond or Apollo Gemstone have received warrants for the purchase of Public Scio

stock for $0.01 per share as set forth in the March 11, 2011 Proxy Statement. Any such warrants

are not disclosed in Public Scio's SEC filings, and upon information and belief, have never been

authorized.

139.    On March 23, 2012, Mack and Rapello sent a demand letter to Adams with regard

to the wrongful conduct identified herein. Adams did not respond to the March 23, 2012 letter.

Instead, Adams and Monahan attempted to further cover up their fraudulent conduct by changing

Private Scio's name to "Loblolly, Inc." on April 13, 2012.

## DERIVATIVE ACTION ALLEGATIONS

140.    The Plaintiffs fairly and adequately represent the interests of the shareholders of

Private Scio that are similarly situated in enforcing the rights of Private Scio.

141.    Private Scio has been controlled by the Defendants Adams and Monahan since

the date of Private Scio's formation.

142.    To the extent he is deemed its President and CEO Private Scio, Lancia has also

controlled Private Scio.

143.    The Plaintiffs have made no effort to secure action from the officers and directors

of Private Scio for the reason that the Defendants are the sole officers and directors of Private

Scio and any demand on the officers and directors of Private Scio that they bring an action in the

name of Private Scio against the Defendants would have been futile.

144.    The Plaintiffs attempted to locate the other shareholders of Private Scio by

sending a demand dated April 13, 2012 to The Corporation Trust Company of Nevada, the

registered agent for Private Scio, to inspect and copy Private Scio's stock ledger or, in the

alternative, a statement naming the custodian of Private Scio's stock ledger, in accordance with Section 78.105 of the Nevada Revised Statutes.

145. In response to the Plaintiffs' demand, The Corporation Trust Company of Nevada represented that it does not possess a copy of Private Scio's stock ledger or a statement naming the custodian of Private Scio's stock ledger, which is a violation by Private Scio of Section 78.105 of the Nevada Revised Statutes.

146. Accordingly, based on the foregoing, the Defendants and/or their agents are the only parties that could maintain the list of shareholders.

147. Since it would be futile to request the Defendants to provide the Plaintiffs with a list of shareholders, the Plaintiffs have not made a demand on the shareholders to take action against the Defendants.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Sections 10(b) and 20(a) of the 1934 Act,

### Violation of S.E.C. Rule 10b-5 Promulgated Thereunder)

### (Asserted Against Adams, Monahan, AMLLP, Lancia and Public Scio)

148. The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

149. All of the Defendants, in connection with the purchase and sale of the Public Scio shares to Private Scio, directly and indirectly, singly and in concert, recklessly, knowingly or with an intention to defraud, engaged in, offered for sale and sold to Private Scio securities by means of one or more misrepresentations of failures to disclose material facts, which material facts were necessary in order to make the statement made in connection with those offerings and

sales not misleading in light of the circumstances under which those statement were made and, in addition, employed a device, scheme or artifice to defraud Private Scio and engaged in acts, practices and a course of business which operated as a fraud or deceit upon each Private Scio, all in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and subsections 2(a), (b) and (c) of SEC Rule 10b-5 promulgated thereunder.

150.    Defendants Adams, Monahan and Lancia are each, individually, persons who directly or indirectly controlled Private Scio and Public Scio within the meaning of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].

151.    To the extent the violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and SEC Rule 10b-5 relate to misrepresentations as opposed to omissions of material fact, Private Scio reasonably relied upon the Scio Asset Purchase Agreement and other representations in connection with the exchange of Public Scio securities.

152.    The purpose, effect and result of the Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and SEC Rule 10b-5 promulgated thereunder were to induce Private Scio to purchase the Public Scio securities.

153.    All of the Defendants conspired to fraudulently conceal their fraud from Private Scio, the Plaintiffs and other parties by virtue of all of the hereinabove alleged conduct attributable to the Defendants and events which occurred in connection with and subsequent to Private Scio's acquisition of Public Scio's securities.  As a result of such fraudulent concealment, Plaintiffs, in the exercise of reasonable diligence, did not discover their claims against the Defendants until some time within one year prior to filing this Complaint.  This claim was brought by Plaintiffs on behalf of Private Scio within one year after the discovery of the

facts giving rise to this cause of action and within three years of the date of the purchase of the securities.

154.    As a direct and proximate result of the hereinabove-alleged violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and SEC Rule 10b-5 promulgated thereunder, Private Scio has suffered damages in an amount to be proven at trial.

155.    As a direct and proximate result of the hereinabove-alleged violations of Section 20(a) of the Securities Exchange Act of 1934, Private Scio has suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**(Minnesota Securities Act,**

**Minn. Stat. § 80A.68 and 80A.76)**

**(Asserted Against Adams, Monahan, AMLLP, Lancia and Public Scio)**

156.    The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

157.    All of the Defendants, in connection with the purchase and sale of the Public Scio shares to Private Scio, directly and indirectly, singly and in concert, recklessly, knowingly or with an intention to defraud, engaged in, offered for sale and sold to Private Scio securities by means of one or more misrepresentations of failures to disclose material facts, which material facts were necessary in order to make the statement made in connection with those offerings and sales not misleading in light of the circumstances under which those statement were made and, in addition, employed a device, scheme or artifice to defraud Private Scio and engaged in acts, practices and a course of business which operated as a fraud or deceit upon each Private Scio, all in violation of Sections 80A.68 and 80A.76 of the Minnesota Securities Act.

158. Defendants Adams, Monahan and Lancia are each, individually, persons who directly or indirectly controlled Private Scio and Public Scio within the meaning of Section 80A.76(g)(1) of the Minnesota Securities Act.

159. To the extent the violation of Sections 80A.68 and 80A.76 of the Minnesota Securities Act relate to misrepresentations as opposed to omissions of material fact, Private Scio reasonably relied upon the Scio Asset Purchase Agreement and other representations in connection with the exchange of Public Scio securities.

160. The purpose, effect and result of the Defendants' violations of Sections 80A.68 and 80A.76 of the Minnesota Securities Act were to induce Private Scio to purchase the Public Scio securities.

161. All of the Defendants conspired to fraudulently conceal their fraud from Private Scio, the Plaintiffs and other parties by virtue of all of the hereinabove alleged conduct attributable to the Defendants and events which occurred in connection with and subsequent to Private Scio's acquisition of Public Scio's securities. As a result of such fraudulent concealment, Plaintiffs, in the exercise of reasonable diligence, did not discover their claims against the Defendants until some time within one year prior to filing this Complaint. This claim was brought by Plaintiffs on behalf of Private Scio within two years after the discovery of the facts giving rise to this cause of action and within five years of the date of the purchase of the securities.

162. As a direct and proximate result of the hereinabove-alleged violations of Sections 80A.68 and 80A.76 of the Minnesota Securities Act, Private Scio has suffered damages and is entitled to the remedy of rescission.

163.    As a direct and proximate result of the hereinabove-alleged violations of the Minnesota Securities Act, Defendants Adams, Monahan and Lancia are liable under Section 80A.76(g)(1) of the Minnesota Securities Act for Private Scio's damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### (Against Adams, Monahan, AMLLP and Lancia)

164.    The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

165.    Persons acting in a fiduciary capacity on behalf of another, whether as a lawyer, corporate executive, broker, director, transfer agent, or agent, possess a fiduciary relationship with the represented person, and are required to act with utmost good faith and fair dealing with the highest possible degree of ethical conduct.  Among other responsibilities, fiduciaries must provide competent representation to the represented party by having sufficient knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

166.    Defendants Adams and Monahan were directors, officers and attorneys of Private Scio.  As directors and officers of Private Scio, Adams and Monahan owed fiduciary duties of care and loyalty in the performance of their duties.

167.    Defendant AMLLP was counsel to Private Scio and owed fiduciary duties of care and loyalty in its representation.

168.    To the extent Defendant Lancia is or was an officer of Private Scio, Lancia owed a fiduciary duty of care and loyalty in the performance of his duties.

169. As discussed in more detail above, Defendants breached their fiduciary duties by failing to act with the utmost good faith and for the benefit of Private Scio or to disclose all facts concerning the transactions that might affect Private Scio, all as described in detail in the preceding paragraphs.

170. As a direct and proximate result of Defendants' breach of their fiduciary duties, Private Scio suffered direct and consequential damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Malpractice)

### (Against Adams, Monahan and AMLLP)

171. The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

172. Private Scio had an attorney-client relationship with Adams, Monahan and AMLLP. As part of this relationship, Adams, Monahan, and AMLLP owed Private Scio a duty of good faith and fair dealing. Adams, Monahan and AMLLP also owed Private Scio a duty to exercise the degree of care, skill, diligence and knowledge commonly possessed by a reasonable, careful and prudent lawyer in the practice of law in the community. Adams, Monahan and AMLLP further owed Private Scio a duty to comply with the Rules of Professional Conduct. Adams, Monahan, and AMLLP owed Private Scio a fiduciary duty of loyalty.

173. As a result of the conduct outlined above, Adams, Monahan and AMLLP breached their good faith, fair dealing, care and loyalty owed to Private Scio.

174. Adams, Monahan and AMLLP conduct constituted malpractice for numerous reasons, including the existence of numerous conflicts of interest in representing numerous parties in the same transactions while also serving their own personal interests.

175.    As a direct and proximate result of the malpractice by Adams, Monahan and AMLLP, Private Scio suffered damages and other compensable injuries in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment)

### (Against All Defendants)

176.    The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

177.    The Plaintiffs seek a declaration that the Scio Asset Purchase Agreement was executed without proper authority as alleged in detail in the preceding paragraphs, an *ultra vires* action on the part of Defendants and void pursuant to the Minnesota Declaratory Judgments Act, Minn. Stat. §§ 555.01 *et seq*.

19.    There exists an actual, justiciable and genuine controversy with regard to the Defendants' execution of the Scio Asset Purchase Agreement.

20.    Plaintiffs seek a declaration that (a) the Scio Asset Purchase Agreement is void, (b) the parties must be returned to the status quo immediately prior to execution of the Scio Asset Purchase Agreement, (c) Public Scio must return all assets received from Private Scio, and (d) the individuals identified on Schedule 1.4 of the Scio Asset Purchase Agreement must return the 13 million shares of Public Scio.

## SIXTH CAUSE OF ACTION

### (Rescission)

### (Against All Defendants)

178.    The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

179.    As alleged in detail in the preceding paragraphs, the Scio Asset Purchase Agreement was fraudulent and executed without proper authority.

180.    Sufficient grounds in equity exist for rescission of the Scio Asset Purchase Agreement.

181.    Private Scio has not lost its right to rescission by affirmance, laches or otherwise.

182.    The commencement of this action is notice of Private Scio's election of its right to rescission.

183.    Private Scio demands rescission of the Scio Asset Purchase Agreement and return of the consideration exchanged pursuant to the Scio Asset Purchase Agreement. Private Scio hereby tenders the 13 million shares of Public Scio stock purportedly transferred to individuals identified on Schedule 1.4 of the Scio Asset Purchase Agreement.

## SEVENTH CAUSE OF ACTION

### (Usurpation of a Corporate Opportunity)

### (Against Adams, Monahan and Lancia)

184.    The Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

185.    Defendants Adams and Monahan were directors, officers and attorneys of Private Scio. As directors and officers of Private Scio, Adams and Monahan owed fiduciary duties of care and loyalty in the performance of their duties.

186.    To the extent Defendant Lancia is or was an officer of Private Scio, Lancia owed a fiduciary duty of care and loyalty in the performance of his duties.

187. Private Scio possessed assets and corporate opportunities, including without limitation the rights under the Apollo Asset Purchase Agreements.

188. Private Scio's assets and corporate opportunities, including without limitation the rights under the Apollo Asset Purchase Agreements, were closely associated with Private Scio's existing or prospective activities and were in line with its business.

189. Defendants Adams, Monahan and Lancia diverted Private Scio's corporate opportunities to their own personal interests, by causing Private Scio to enter into transactions with Public Scio, a company they controlled. Defendants exploited their positions as "insiders" by appropriating to themselves business opportunities belonging to Private Scio. Defendants' conduct in diverting these corporate opportunities was a breach of their fiduciary duties of loyalty, good faith and fair dealing in favor of Private Scio and constituted a usurpation of Private Scio's corporate opportunities.

190. Any property or profit acquired by Defendants Adams, Monahan and Lancia in connection with their usurpation of Private Scio's corporate opportunities is subject to a constructive trust for the benefit of Private Scio.

191. As a direct and proximate result of the malpractice by Adams, Monahan and AMLLP, Private Scio suffered damages and other compensable injuries an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against defendants as follows:

1. For a judgment against defendants, jointly and severally, awarding direct and consequential damages sustained by Private Scio in an amount to be established through proof at trial, plus pre-judgment and post-judgment interest.

2.      For a judgment against Defendants awarding Private Scio appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties.

3.      For declaratory judgment declaring that (a) the Scio Asset Purchase Agreement is void, (b) the parties must be returned to the status quo immediately prior to execution of the Scio Asset Purchase Agreement, (c) Public Scio must return all assets received from Private Scio, and (d) the individuals identified on Schedule 1.4 of the Scio Asset Purchase Agreement must return the 13 million shares of Public Scio.

4.      For rescission of the Scio Asset Purchase Agreement.

5.      For a constructive trust in favor of Private Scio based upon Defendants' usurpation of Private Scio's corporate opportunities.

6.      For a judgment against defendants, jointly and severally, awarding Private Scio reasonable attorneys' fees and costs incurred in prosecuting this action.

7.      Such other and further relief as the Court deems just and proper.


                              Respectfully submitted,

Date:  May 7, 2012.           s/Annamarie A. Daley
                              Annamarie A. Daley (MN Bar No. 158112)
                              Stephanie M. Seidl (MN Bar No. 392743)
                              BARNES & THORNBURG LLP
                              225 South Sixth Street
                              Minneapolis, MN 55402
                              Phone: (612) 333-2111
                              Fax: (612) 333-6798
                              Email: annamarie.daley@btlaw.com
                                     stephanie.seidl@btlaw.com