# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Kenneth Fink, | |
| Plaintiff, | |
| -against- | |
| Edward S. and Denise L. Adams, Michael R. and Julie C. Monahan, Robert C. Linares, Adams Monahan LLP, Loblolly, Inc. (f/k/a Scio Diamond Technology Corporation), Scio Diamond Technology Corporation (f/k/a Krossbow Holding Corporation), and John Does 1-10, | Case No.:_____ |
| Defendants, | |
| -and- | |
| Apollo Diamond, Inc., | |
| Nominal Defendant. | |

<u>**VERIFIED COMPLAINT**</u>

Plaintiff for his Complaint against Defendants, and each of them, states as follows:

<u>**INTRODUCTION**</u>

1.      Edward S. Adams ("Adams") and Michael R. Monahan ("Monahan") are attorneys and partners in the law firm, Adams Monahan LLP.   Adams and Monahan collectively have also owned numerous broker-dealers that have solicited investments for a variety of early stage companies.  Adams was not only a shareholder and officer of Apollo Diamond, Inc. ("Apollo Diamond"), but he was a family member of its founder.

2.      Defendant Adams has spent the past decade attempting to work numerous deals through Apollo Diamond for his own personal profit.  Apollo Diamond has developed a unique

1

Exhibit 5

process for creating synthetic diamonds. Even more, Apollo Diamond's unique process purports to produce high quality diamonds with characteristics unique to synthetic diamonds. These unique characteristics are represented to be desirable in the marketplace for diamonds. Apollo Diamond raised upwards of $40 million based upon this technology.

3.      Apollo Diamond was controlled by Adams, members of Adams's family, and Adams' related business partners and enterprises. This control existed through various capacities, including the parties' roles as directors, officers, attorneys and placement agents. Using this control and influence, Adams and Monahan concocted and implemented a scheme to defraud shareholders. Having exhausted the market for investment in Apollo Diamond, Adams and Monahan transferred Apollo Diamond assets to an entity originally known as Scio Diamond Technology Corporation (now known as Loblolly, Inc.) ("Private Scio") for the purpose of raising further capital and generating additional fees. Private Scio was owned and controlled by Adams and Monahan.

4.      After transferring Apollo Diamond's assets and technology to Private Scio, Adams and Monahan refined their scheme and acquired control of Krossbow Holding Corporation (now known as Scio Diamond Technology Corporation) ("Public Scio")—an entity with publicly traded securities. Adams and Monahan yet again transferred the assets to Public Scio and are continuing to raise capital for these same assets that originated at Apollo Diamond.

5.      In short, Adams and Monahan have now sold the same assets three times while increasing their percentage ownership in the respective entities and extracting professional fees at each stage. The conduct of Adams and Monahan has worked and is continuing to work a fraud on the shareholders in each company.

6.      Plaintiff was a shareholder of Apollo Diamond. Not only were Defendants Adams and Monahan directors, officers, shareholders and counsel of Apollo Diamond, they have

served in these same roles for the other entities described herein as well. Adams and Monahan abused their influence and control over Apollo Diamond, Private Scio and Public Scio in order to extract improper legal and other fees from the entities while at the same time increasing their percentage ownership, all to the detriment of the various entities and their respective shareholders.

7.      In this action, Plaintiff, as a former shareholder of Apollo Diamond, seeks damages, rescission, and other equitable relief in light of Defendants' wrongful conduct. The improper transactions between the corporate entities should be unwound to place the parties back in the status quo and the Defendants should be compelled to disgorge their improperly obtained fees.

## THE PARTIES

8.      Plaintiff Kenneth Fink ("Fink") is a Minnesota resident. Fink was an investor and shareholder of Apollo Diamond. Before the wrongful conduct alleged herein, Fink owned 10,000 shares of the stock of Apollo Diamond.

9.      Defendant Edward Adams ("Adams") is a Minnesota citizen with a place of business at 60 South Sixth Street, Suite 2540, Minneapolis, MN 55402. Adams is an attorney and partner in the firm, Adams Monahan LLP.

10.     Defendant Denise L. Adams is a Minnesota citizen with a personal residence at 2010 West 49th Street, Minneapolis, MN 55419.

11.     Defendant Michael Monahan ("Monahan") is a Minnesota citizen with a place of business at 60 South Sixth Street, Suite 2540, Minneapolis, MN 55402. Monahan is an attorney and partner in the firm, Adams Monahan LLP.

12.     Defendant Julie C. Monahan is a Minnesota citizen with a personal residence at 4824 Thomas Avenue, Minneapolis, MN 55410.

13.     Upon information and belief, Defendant Robert C. Linares ("Linares") is a Massachusetts resident.  Linares was chairman of the boards of Apollo Diamond and Apollo Gemstone, and also the executive officer of Apollo Diamond.

14.     Defendant Adams Monahan LLP ("AMLLP") is a limited liability partnership organized under the laws of the State of Minnesota with its principal place of business at 60 South Sixth Street, Suite 2540, Minneapolis, MN 55402.  Upon information and belief, Adams and Monahan are the sole owners of AMLLP.

15.     Defendant Scio Diamond Technology Corporation (f/k/a Krossbow Holding Corporation) is a corporation organized under the laws of the State of Nevada and is referred to as "Public Scio" herein.

16.     Defendant Loblolly, Inc. is a Nevada corporation with a principal place of business in Minnesota.  Loblolly was formerly known as Scio Diamond Technology Corporation and is referred to as "Private Scio" herein.

17.     Nominal Defendant Apollo Diamond, Inc. is a Delaware corporation.  Apollo Diamond is named as a nominal defendant in the event that it is a necessary party to effectuate any of the relief sought herein.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

19.     Venue is proper in the District of Minnesota under 28 U.S.C. §1391(b) as some of the Defendants reside in the District of Minnesota and a substantial part of the events or omissions giving rise to the claims occurred within the District of Minnesota.

## FACTUAL ALLEGATIONS

**A.     Adams' Initial Efforts with Apollo Diamond: the DRI Transaction**

4

20.     Apollo Diamond, Inc. was formerly known as Linares Management Associates ("LMA").  LMA was formed as a Massachusetts corporation in 1990.  LMA was founded by Robert Linares.  LMA was jointly managed by Robert Linares and Bryant Linares.  Robert Linares and Bryant Linares are the father-in-law and brother-in-law, respectively, of Adams.

21.     Apollo Diamond developed a process called "chemical vapor deposition" or "CVD" for the production of synthetic diamond crystals.  Apollo Diamond possesses several U.S. patents for its CVD process.

22.     Adams' involvement with Apollo Diamond began by 2001.

23.     On or about February 20, 2001, LMA changed its name to Apollo Diamond.

24.     In 2001, Adams was a director and shareholder of Dental Resources Inc.  ("DRI") DRI was a publicly listed company that was looking to sell itself to other companies seeking a fast track to become publicly listed.

25.     DRI's auditor for its annual financial statements was Wallace Niedzwiecki.

26.     In 2001, Apollo Diamond entered into an agreement with DRI to become a public company (the "DRI Transaction I").  A letter of intent between the parties was signed on or about June 26, 2001.  The price for the DRI Transaction in 2001 was $500,000.

27.     Upon information and belief, Adams or an affiliated law firm acted as counsel for Apollo Diamond, DRI, or both, in connection with the DRI Transaction I and received legal fees from the contemplated transaction.

28.     The DRI Transaction I was formally cancelled on November 24, 2001 after 9/11 sent the financial markets into turmoil.

**B.      Adams Tries Again: the DRI Transaction II**

29.     Despite the failure of the DRI Transaction, Adams remained a director of DRI. After the cancellation of the DRI Transaction, DRI was involved in a number of other potential

deals, including the development of casinos and leisure resorts. By 2004, DRI had changed its

name to DTLL Inc. (For purposes of continuity, DTLL is referred to as "DRI" herein.)

30.     Undaunted by the failure of the DRI Transaction I, Adams remained committed in

his efforts to take Apollo Diamond public.

31.     A new Apollo Diamond, Inc. was formed on or about January 2, 2004 under the

laws of Delaware. Upon information and belief, the new Apollo Diamond merely continued the

business operations of the original Apollo Diamond. The original Apollo Diamond was

dissolved on May 23, 2006—the same date on which the new Apollo Diamond registered to do

business in Massachusetts. (For purposes of continuity, both Apollo Diamond entities are

referred to as "Apollo Diamond" herein.)

32.     In 2004, DRI entered into yet another agreement with Apollo Diamond (the "DRI

Transaction II").

33.     In 2004, DRI and Apollo Diamond signed yet another letter of intent in

connection with the DRI Transaction II.

34.     Upon information and belief, Adams or an affiliated law firm acted as counsel for

Apollo Diamond, DRI, or both, in connection with the DRI Transaction II and received legal fees

from the contemplated transaction.

35.     Adams' brokerage entity, Equity Securities Investments, Inc. ("ESII"), acted as

advisor for both Apollo Diamond and DRI.

36.     However, no final agreement was reached between Apollo Diamond and DRI

with regard to the DRI Transaction II. The letter of intent was cancelled approximately five

months after its execution.

**C.     Adams Focuses His Efforts on Apollo Diamond**

37.     Over the same time period that Adams was working on the DRI Transaction I and the DRI Transaction II, he continued to seek to independently raise capital for Apollo Diamond.

38.     Beginning on or about May 8, 2002, Apollo Diamond submitted numerous Regulation D filings with the Securities Exchange Commission in support of an offering of securities.  The May 8, 2002 SEC filing indicates that Apollo Diamond was seeking to raise a total of $2.2 million in capital of which it had purportedly already sold $400,000.  The May 8, 2002 filing was signed by Denise L. Adams (Adams' wife) in the capacity of Apollo Diamond's General Counsel.

39.     Apollo Diamond's Regulation D filing dated May 8, 2002 identifies ESII as a broker engaged by Apollo Diamond to solicit purchasers of its stock pursuant to the Regulation D filing.  Upon information and belief, Adams was a shareholder, director and officer in ESII. The May 8, 2002 filing estimated that $200,000 in sales commissions would be paid to ESII.

40.     Apollo Diamond's Form D filing dated May 8, 2002 also identifies estimated legal fees of $10,000 in connection with the offering.

41.     Apollo Diamond submitted a new Regulation D filing on or about September 30, 2002.  Apollo Diamond's Form D filing dated September 30, 2002 represented that it was a "New Filing."  Five months after its original Regulation D filing, the Form D filing dated September 30, 2002 offered an additional $6 million in securities.  Adams' brokerage firm, ESII, remained the broker for the offering and the Form D estimated sales commissions to be $600,000.  The September 30, 2002 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

42.     Apollo Diamond's Form D filing dated September 30, 2002 estimated legal fees to be $15,000 in connection with the offering.

43.    Apollo Diamond submitted a new Regulation D filing on or about February 20, 2003. Apollo Diamond's Form D filing dated February 20, 2003 represented that it was a "New Filing." The Form D filing dated February 20, 2003 offered an additional $3.5 million in securities. Adams' brokerage firm, ESII, remained the broker for the offering and the Form D estimated sales commissions to be $350,000. The February 20, 2003 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

44.    Apollo Diamond's Form D filing dated February 20, 2003 estimated legal fees to be $15,000 in connection with the offering.

45.    On or about August 27, 2003, Apollo Diamond amended its Regulation D filing dated February 20, 2003. According to the amendment, $2,012,500 of the $3.5 million offering had already been sold. The August 27, 2003 amendment reflected a change in the broker for the offering. The August 27, 2003 amendment states that the broker for the offering was "Oak Ridge Financial (formerly known as Equity Securities)." The address for Oak Ridge Financial was reported to be the same address that was used by ESII. Upon information and belief, Adams remained an owner, director and officer of Oak Ridge Financial. The August 27, 2003 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

46.    Apollo Diamond submitted a new Regulation D filing on or about January 31, 2004. Apollo Diamond's Form D filing dated January 31, 2004 represented that it was a "New Filing." The Form D filing dated January 31, 2004 offered an additional $7.5 million in securities of which $4.625 million were already purportedly sold. Oak Ridge Financial remained the broker for the offering and the Form D estimated sales commissions to be $750,000. The January 31, 2004 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

47.     Apollo Diamond's Form D filing dated January 31, 2004 estimated legal fees to be $25,000 in connection with the offering.

48.     On or about September 15, 2004, Apollo Diamond amended its Regulation D filing dated January 31, 2004.  According to the amendment, $16,043,000 of the $7.5 million offering had already been sold.  The expected sales commissions to Oak Ridge Financial from the offering was increased from $750,000 to $1,604,300.  The September 15, 2004 filing was again signed by Adams' wife in the capacity of Apollo Diamond's General Counsel.

49.     Apollo Diamond submitted a new Regulation D filing on or about October 25, 2006.  Apollo Diamond's Form D filing dated October 25, 2006 represented that it was a "New Filing."  The Form D filing dated October 25, 2006 offered an additional $11 million in securities of which $1,000,000 was purportedly already sold.  The Form D filing dated October 25, 2006 does not identify any broker engaged for the offering or any estimated sales commissions.

50.     Apollo Diamond's Form D filing dated October 25, 2006 identifies Adams as an officer of Apollo Diamond and identifies Adams' address as the same address reported for ESII and Oak Ridge Financial.  Apollo Diamond's Form D filing dated October 25, 2006 is signed by Adams in the capacity of Secretary of Apollo Diamond.

51.     Apollo Diamond's Form D filing dated October 25, 2006 estimated legal fees to be $250,000 in connection with the offering.

52.     Apollo Diamond submitted a new Regulation D filing on or about November 13, 2007.  Apollo Diamond's Form D filing dated November 13, 2007 represented that it was a "New Filing."  The Form D filing dated November 13, 2007 offered an additional $10 million in securities of which $2,400,005 was purportedly already sold.  The Form D filing dated October

25, 2006 does not identify any broker engaged for the offering or any estimated sales commissions.

53.     Apollo Diamond's Form D filing dated November 13, 2007 identifies Adams as an officer of Apollo Diamond and identifies Adams' address as the same address reported for ESII and Oak Ridge Financial.  Apollo Diamond's Form D filing dated November 13, 2007 is signed by Adams in the capacity of Secretary of Apollo Diamond.

54.     Adams, Monahan, or their firm, AMLLP, was counsel for Apollo Diamond. Upon information and belief, Adams, Monahan, AMLLP or some other law firm affiliated with Adams performed the legal services and received the legal fees disclosed in connection with Apollo Diamond's numerous Regulation D offerings.

55.     Apollo Diamond's auditor during the time period of the efforts to raise capital by Adams and Monahan was Wallace Niedzwiecki, the same auditor used by DRI.

56.     A media outlet in the industry has reported that the Apollo Diamond's technology cost $40 million to develop.  If Apollo Diamond's securities offerings pursuant to its numerous Regulation D filings were fully subscribed, Apollo Diamond would have raised $48,743,000 in capital.  Similarly, Adams' affiliated brokerage firms would have received $2,754,300 in sales commissions and AMLLP or another law firm affiliated with Adams would have received $565,000 in legal fees.

57.     Apollo Diamond's Regulation D filings, however, do not accurately state the total amounts paid to parties related to Adams for such services.  Apollo Diamond's audited financial statements for the period ending December 31, 2004 state as follows:

**Note 8 – Related Party Transactions**

Minority stockholders received fees for services in the amount of $375,000 in April 2004.  In addition, since January 9, 2001, commissions of $3,345,825 were

paid to the company of a minority stockholder for services related to investment activities for Apollo Diamond, Inc.

These figures only represent amounts paid through December 31, 2004. Accordingly, Apollo Diamond's Regulation D filings understate the amounts paid to Adams' related brokerage firms by a minimum of several hundred thousand dollars.

**D.    Adams and Monahan Conjure Up Apollo Gemstone**

58.    By 2004, Apollo Diamond was well on its way to raising millions of dollars with the resulting benefit to Adams and Monahan of increased sales commissions and/or legal fees. Despite Apollo Diamond's fundraising successes, Adams and Monahan conceived a new strategy for raising capital and a source for diverting additional fees to themselves.

59.    On or about April 2, 2004, Adams and Monahan formed Apollo Diamond Gemstone Corporation ("Apollo Gemstone") under the laws of Delaware. Apollo Gemstone was a subsidiary of Apollo Diamond.

60.    Apollo Diamond granted to Apollo Gemstone a license to manufacture and sell diamonds created using Apollo Diamond's technology.

61.    Adams was an officer, director and shareholder of Apollo Gemstone. Adams served as Secretary and Chief Financial Officer for Apollo Gemstone. In some instances, Apollo Gemstone's Regulation D filings reported that Adams' address was the same as that used for ESII and Oak Ridge Financial, while in the final Regulation D filing, Apollo Gemstone reported that his address was the same as the address of AMLLP.

62.    Monahan was an officer and shareholder of Apollo Gemstone. Apollo Gemstone's Regulation D filings reported that Monahan's address was the same as the address of AMLLP.

11

63.     AMLLP served as legal counsel to and received legal fees from Apollo Gemstone.

64.     Focus Capital Group, Inc. ("Focus") was engaged by Apollo Gemstone to serve as a broker to solicit investments.  Focus Capital was owned and controlled by Adams and Monahan.

65.     Apollo Gemstone submitted three Regulation D filings to the SEC dated November 13, 2007, July 20, 2009, and July 20, 2010.  In the first two Regulation D filings, Apollo Gemstone sought to raise a total of $20,750,000.  Apollo Gemstone estimated legal fees of $300,000 associated with the first offering.  In addition, although the second Regulation D filing did not specifically identify any additional legal fees associated with the offering, Apollo Gemstone reported that a portion of the proceeds would be used to pay legal services to AMLLP.

66.     Apollo's Gemstone's July 20, 2010 Form D filing sought to raise an additional $6,500,000.  This filing estimated that $845,000 would be paid to Focus as sales commissions. In addition, this filing estimated that $1.2 million from the proceeds of the offering would be paid to related parties, including as compensation to officers and directors, which upon information and belief, included Adams and Monahan.  Apollo's Gemstone's July 20, 2010 Form D filing was signed by Adams as Chief Financial Officer.

**E.      Adams and Monahan Launch Private Scio**

67.     By 2011, the efforts by Adams and Monahan to raise capital for Apollo Diamond and Apollo Gemstone had run out of steam.  In February 2011, Adams was a shareholder and officer to Apollo Diamond and officer and director of Apollo Gemstone.  Similarly, Monahan was an officer of Apollo Gemstone.  AMLLP was legal counsel to both Apollo Diamond and Apollo Gemstone.  In spite of these multiple roles, Adams and Monahan devised a new strategy

to continue generating sales commissions and legal fees and expand their ownership in the technology to the detriment of Apollo Diamond shareholders.

68.    On March 1, 2011, Adams and Monahan formed Private Scio under the laws of Nevada.  Adams and Monahan each owned shares of Private Scio.  In addition, Adams was (and is) serving as the President and Treasurer of Private Scio as well as a director.  Monahan is the Secretary of Private Scio as well as a director.  Adams and Monahan were the sole officers and directors of Private Scio.  AMLLP served as counsel to Private Scio.

69.    Using their influence as officers, directors, shareholders and legal counsel for the entities, Adams and Monahan proceeded to orchestrate Private Scio's acquisition of Apollo Diamond's technology.  Apollo Diamond and Apollo Gemstone entered into two asset purchase agreements (the "Apollo Asset Purchase Agreements") with Private Scio on or about March 11, 2011 and March 18, 2011.

70.    At the time that the Apollo Asset Purchase Agreements were executed, Private Scio was known as Scio Diamond Technology Corporation.

71.    At the time that the Apollo Asset Purchase Agreements were executed, Public Scio was known as Krossbow Holding Corporation and had no relationship to the transaction.

72.    Pursuant to the Apollo Asset Purchase Agreements, Private Scio was to acquire all assets of Apollo Diamond for $2,000,000 and all assets of Apollo Gemstone for $10,000.

73.    The Asset Purchase Agreement between Apollo Diamond and Private Scio was executed by Robert C. Linares, who is Adams' father-in-law, on behalf of Apollo Diamond.

74.    Having used their positions of influence to manufacture and create the Apollo Asset Purchase Agreements between Apollo Diamond, Apollo Gemstone and Private Scio, Adams and Monahan needed to obtain approval from the Apollo Diamond shareholders for the transaction.

75.     On March 11, 2011—the same date on which the Asset Purchase Agreement between Apollo Diamond and Private Scio was executed—Adams' father-in-law, Robert Linares, sent a letter to Apollo Diamond shareholders.  The March 11, 2011 letter attached a proxy statement soliciting proxies from shareholders to approve (1) the sale of all of Apollo Diamond's assets for $2 million and (2) a Stock Repurchase program whereby Apollo Diamond would repurchase securities for $0.01 per share.

76.     The March 11, 2011 letter instructed the Apollo Diamond shareholders that Apollo Diamond had exhausted its cash resources and been unable to raise sufficient additional resources to continue its developmental operations.  The March 11, 2011 letter stated that Apollo Diamond had outstanding liabilities in the amount of $2 million that it could not satisfy along with outstanding debts owed to "founders and other related parties."

77.     As relayed by the March 11, 2011 letter, "[g]iven [Apollo Diamond's] recent history and the current economic environment, [Apollo Diamond's] board of directors has determined that a sale of the Company's assets and, correspondingly, new management offers the best chance to successfully lead future initiatives to monetize our proprietary technology."

78.     Going further, the March 11, 2011 letter stated:

[t]o that end, the Company has entered into an Asset Purchase Agreement with Scio Diamond Technology Corporation ("SDTC")—a company formed for the purpose of this transaction and to capitalize on the technology developed by Apollo—whereby Apollo has agreed to sell substantially all of our assets for approximately $2,000,000 to SDTC.  The cash obtained from the asset sale will largely be applied toward existing liabilities and contractual obligations of the Company.

79.     With regard to the stock redemption, the March 11, 2011 letter stated that

[i]n an effort to create what may prove to be a tax-advantaged event for many of our shareholders, we are offering to repurchase the outstanding shares of common stock held by our stockholders at a price of $0.01 per share.

*       *       *

14

In addition to repurchasing your shares in the Company, we have negotiated an agreement with SDTC whereby our stockholders whose shares are repurchased by the Company will be permitted to invest in SDTC at a price of \$.01 per share. Each stockholder will be provided an opportunity to purchase a number of shares of SDTC equal to the number of the Company's shares currently held by the stockholder. This will permit our stockholders to preserve the continued potential opportunity of your investment in the Company and to maintain a largely pro-rata interest in the opportunity developed by the Company through ownership of SDTC stock.

80.     The Proxy Statement attached to the March 11, 2011 letter is consistent with the representations in the March 11, 2011 letter. AMLLP acted as counsel for Apollo Diamond in conducting the proxy solicitation. In its summary, the Proxy Statement stated as follows:

Apollo Diamond, Inc. seeks approval from its stockholders to enter into a series of transactions through which the Company would initially sell substantially all of its assets to Scio Diamond Technology Corporation ("[Private Scio]") for approximately \$2.0 million (the "Asset Sale") and subsequently repurchase all of the outstanding shares of its single series common stock (the "Stock"). The proceeds from the Asset Sale would be utilized to satisfy the Company's outstanding debts and liabilities as well as to repurchase the Company's outstanding stock at a value of \$.01 per share (the stated par value of the Company's outstanding stock). Every [Apollo Diamond] stockholder consenting to the stock repurchase transaction (the "Stock Repurchase") will enter into an agreement with the Company to sell the stockholder's Stock to the Company at a value of \$.01. In connection with the Asset Sale, [Apollo Diamond] has negotiated an option for [Apollo Diamond] stockholders to purchase shares of [Private Scio] common stock under a separate subscription agreement with [Private Scio] (the "SDTC Subscription Agreement"). Each [Apollo Diamond] stockholder . . . will be permitted to purchase a number of shares of [Private Scio's] common stock equal to the stockholders' current [Apollo Diamond] Stock ownership. The [Private Scio] common stock will be offered at an initial purchase price of \$.01 per share.

81.     The Proxy Statement continued as follows:

As a result of these transactions, if approved and consented to, [Private Scio] will own substantially all of the assets of [Apollo Diamond] and [Apollo Gemstone]. You will also own shares in [Private Scio] which actually exceed, on a fully-diluted basis, your existing share ownership in [Apollo Diamond]. In other words, as a result of this transaction, your ownership in [Private Scio] will on a fully-diluted percentage ownership basis exceed that of your existing percentage share ownership in [Apollo Diamond].

15

82.     The Special Meeting to adopt the vote on the sale of Apollo Diamond's assets and repurchase shares occurred on April 18, 2011 in Boston, Massachusetts.  Upon information and belief, both the proposed measures to approve the Apollo Asset Purchase Agreements and the share repurchase arrangement were adopted at the Special Meeting on April 18, 2011.

83.     In contrast to the disclosures set forth in the Proxy Statement, Adams sent an email on May 6, 2011 stating "[t]o provide perspective on this transaction Scio is acquiring the assets of Apollo for $2 million.  The equipment being acquired alone is valued from a replacement perspective at $15-23 million."

84.     Purported liabilities owed to Adams or his family members comprised a component of the liabilities to be satisfied with the payment of funds to Apollo Diamond under the Apollo Asset Purchase Agreements.  Monahan has represented that those loans were fraudulent and were not actually owed by Apollo Diamond.  In an email dated May 7, 2011, Monahan stated that "loans by principals to ADI" were also an area to "push for back-up."  As Monahan stated, "[f]rom my perspective, that will be difficult to establish absent a forensic accounting exercise (not complex, just timely) and that, more relevant is an Apollo problem not a Scio problem.  If there are shenanigans relating thereto[,] the 'principals' will have personal exposure to Apollo shareholders."

85.     The March 11, 2011 letter and Proxy Statement included a number of material misrepresentations and omissions of material facts regarding the Apollo Asset Purchase Agreements and the stock repurchase plan.  The March 11, 2011 letter and Proxy Statement failed to disclose or misrepresented *inter alia* that (a) Adams, Monahan and/or AMLLP had acted as counsel to both Apollo Diamond and Private Scio in connection with the transaction, (b) Adams and Monahan were the controlling shareholders of Private Scio while also serving as fiduciaries of Apollo Diamond and Apollo Gemstone, (c) the Apollo Asset Purchase Agreements

were not arrived at through arms length negotiations, (d) the fair market value of the assets sold to Private Scio far exceeded the price paid; (e) aside from the amounts used to repurchase shares, a substantial amount of the funds received from the Apollo Asset Purchase Agreements were to pay for fraudulent loans from Adams or his family and to AMLLP, (f) no purported option to purchase shares in Private Scio had been negotiated, and (g) the purported warrants in favor of former Apollo Diamond shareholders for $0.01 per share of Private Scio were never authorized.

86.     The law firm owned by Adams and Monahan, AMLLP, acted as counsel for both Apollo Diamond and Private Scio in connection with the Apollo Asset Purchase Agreements.

87.     Having secured the Apollo Asset Purchase Agreements in favor of their new company, Private Scio, Adams and Monahan turned to the task of raising capital to fund the Apollo Asset Purchase Agreements.  For this purpose, Adams and Monahan decided to use one of their other businesses, Focus Capital Group, Inc. ("Focus")

**F.     Adams and Monahan Concoct a Series of Fraudulent Transactions to Further Defraud Private Scio and Apollo Diamond Shareholders.**

88.     Having redeemed the Apollo Diamond shareholders through the fraudulent Proxy Statement and secured all the assets through an agreement in favor of Private Scio, which Adams and Monahan controlled, Adams and Monahan had the control to structure a transaction in whatever manner they pleased.

89.     At some point, Adams and Monahan were reminded of Adams' longtime strategy to take Apollo Diamond public through a merger with a Pink Sheets company just as Adams had attempted with the DRI Transaction I and the DRI Transaction II.

90.     Krossbow Corporation ("Krossbow") was a Nevada corporation formed on or about September 17, 2009.   Krossbow was founded by Jason Kropp.

91.     Krossbow was initially capitalized through the sale of 1,000,000 shares of stock issued to Kropp on December 30, 2009.  Krossbow sold another 2,200,000 shares of stock to a small group of individuals on March 10, 2010.  Krossbow securities were registered securities and traded on an over-the-counter market much like DRI.

92.     According to its Form S-1, Krossbow was formed "to produce Verified Emission Reduction (VER) and Reduced emissions from Deforestation and Degradation (REDD) carbon offsets through global restoration projects."  Despite such lofty goals, Krossbow made little progress with regard to its business plans and sat largely idle on the Pink Sheets until Adams and Monahan discovered it.

93.     Krossbow's board of directors approved a 2-for-1 stock split of its issued and outstanding common shares on July 13, 2011.  The stock split was to be effective on August 5, 2011.  After this stock split, Kropp would hold 2,000,000 shares of stock while the other existing shareholders would hold 4,400,000.

94.     On July 21, 2011, Adams, in his capacity of Chairman of Scio Diamond Technology, gave consent to Kropp to use the name "Scio Diamond Technology Corporation" in conjunction with Krossbow.  On the same day, Kropp filed a Certificate of Amendment with the Nevada Secretary of State, changing the name of Krossbow to "Scio Diamond Technology Corporation."  "Krossbow" is referred to as "Public Scio" hereafter.

95.     As of July 21, 2011, two Nevada companies existed under the name of "Scio Diamond Technology Corporation."  Adams and Monahan founded and controlled the first ("Private Scio"), and one can only conclude that they effectively controlled the second ("Public Scio").

96.     On August 4, 2011, Private Scio and Public Scio entered into an Asset Purchase Agreement (the "Scio Asset Purchase Agreement"), whereby Public Scio acquired "substantially

18

all assets, properties and rights of [Private Scio] . . . including without limitation those assets listed on Schedule 1.1(a) . . . ." The sole asset identified on Schedule 1.1(a) is the name "Scio Diamond Technology Corporation."

97.    In exchange for the Acquired Assets, Private Scio received 13 million shares of Public Scio stock. Pursuant to Schedule 1.4 of the Scio Asset Purchase Agreement, the 13,000,000 shares of Public Scio were not distributed to Private Scio, but instead were distributed to the Defendants and certain friends and relatives of the Defendants. Pursuant to Schedule 1.4, Adams and his wife received 4.1 million shares. Similarly, Monahan and his wife received 4.1 million shares. Among others also receiving some portion of the 13 million shares were Adams' father-in-law (Robert Linares), Joseph Lancia, and colleagues of AMLLP, Christopher J. Mumm and J.R. Maddox.

98.    The Scio Asset Purchase Agreement includes a number of representations and warranties by Private Scio as "Seller" and Public Scio as "Buyer."

99.    Paragraph 2.2 of the Scio Asset Purchase Agreement expressly represents and warrants that Private Scio had the authority to enter into the agreement.

**2.2    Authorization of Agreement.** Each of Seller and the Shareholder has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other agreements and instruments executed or to be executed by the parties hereto in connection herewith . . . have been duly and validly approved by the Board of Directors of Seller . . . and by Seller's shareholders and no other proceeding on the part of Seller are necessary to approve this Agreement and to consummate the transactions contemplated hereby. This Agreement . . . have been (or upon execution will have been) duly executed and delivered by Seller and the Shareholder, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of Seller and the Shareholder . . . .

100.    Paragraph 2.14 of the Scio Asset Purchase Agreement expressly represents and warrants that none of the representations or warranties provided by the Seller contain any untrue

statement of a material fact or omits to state any material fact necessary to make the statements and facts set forth therein not false or misleading.

101.     Paragraphs 2.2 and 2.14 of the Scio Asset Purchase Agreement contain material representations in connection with the purchase and sale of a security.  Private Scio did not have authority to enter into the Scio Asset Purchase Agreement.  Private Scio's shareholders were never informed of nor approved the transaction.  The Scio Asset Purchase Agreement was not duly executed by Private Scio or an authorized representative of Private Scio.  Given that the representations and warranties made by Private Scio were untrue and omitted to state material facts, Private Scio also misrepresented the representation and warranty that all information was accurate.

102.     Paragraph 3.1 of the Scio Asset Purchase Agreement expressly represents and warrants that Public Scio had the authority to enter into the agreement and that it was duly executed.

> **3.1     Organization and Corporate Authority**.  Buyer . . . has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  This Agreement and the other Transaction Documents have been (or upon execution will have been) duly executed and delivered by Buyer, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of Buyer . . . .

103.     Paragraph 3.3 of the Scio Asset Purchase Agreement expressly represents and warrants that none of the representations or warranties provided by the Buyer contain any untrue statement of a material fact or omits to state any material fact necessary to make the statements and facts set forth therein not false or misleading.

104.     Paragraphs 3.1 and 3.3 of the Scio Asset Purchase Agreement contain material representations in connection with the purchase and sale of a security.  The Scio Asset Purchase Agreement was not duly executed by Public Scio or an authorized representative of Public Scio.

Given that the representations and warranties made by Public Scio were untrue and omitted to state material facts, Public Scio also misrepresented the representation and warranty that all information was accurate.

105. The address identified for Private Scio in Paragraph 5.2 of the Scio Asset Purchase Agreement is AMLLP's address.

106. Paragraph 1.2 of the Scio Asset Purchase Agreement makes clear that Public Scio was not accepting any liability of Private Scio. Further, nothing in the Scio Asset Purchase Agreement obligates Public Scio to grant any warrants or other share purchase rights in favor Apollo Diamond shareholders.

107. The Scio Asset Purchase Agreement is executed on behalf of Public Scio by Joseph D. Lancia as its "President and CEO." According to Public Scio's SEC filings, Kropp was Public Scio's President and CEO on August 4, 2011.

108. The Scio Asset Purchase Agreement is executed on behalf of Private Scio by Joseph D. Lancia as its "President and CEO."

109. According to its public SEC filings, Public Scio publicly changed its name to Scio Diamond Technology Corporation on August 5, 2011. However, Adams had already granted Public Scio and Kropp the rights to the name on July 21, 2011, when Public Scio filed a Certificate of Amendment with the Nevada Secretary of State, changing the name to "Scio Diamond Technology Corporation."

110. On August 5, 2011—the day after the date of the fraudulent Scio Asset Purchase Agreement—Adams and Monahan each acquired 1 million shares of stock from Kropp for $165,614. Combined with the shares that they and their spouses received as set forth in Schedule 1.4 of the Scio Asset Purchase Agreement, Adams and Monahan each controlled 5.1 million shares of Public Scio's stock. In some undisclosed transaction, an additional 290,000 shares

were credited to Adams and Monahan, respectively, so that by the time of Public Scio's 8-K dated August 17, 2011, Adams and Monahan were each attributed 5,390,000 shares of Public Scio's stock. Such holdings meant that Adams and Monahan each controlled 27.78% of Public Scio for a combined total of 55.56%. Such percentage ownership is an increase of more than 25 times the combined ownership of Adams and Monahan in Apollo Diamond.

111.   Public Scio's SEC filings report that on August 5, 2011, Kropp resigned as President and Chief Executive Officer of Public Scio.

112.   Public Scio's SEC filings report that on August 5, 2011—the day after the date of the Scio Asset Purchase Agreement—Lancia was appointed Chief Executive Officer of Public Scio and a member of Public Scio's board.

113.   Public Scio's SEC filings report that on August 5, 2011, Adams was appointed the chairman of Public Scio's board.

114.   Public Scio's SEC filings report that on August 5, 2011, Monahan was appointed to the board of Public Scio.

115.   In an 8-K filing with the SEC dated August 17, 2011, Public Scio reported that it had "a two stage two year plan beginning in June of 2011." In June of 2011, the only Scio entity then in existence was Private Scio.

116.   Further, the 8-K dated August 17, 2011 states that "company has entered into agreements to purchase proprietary chemical vapor deposition ("CVD") diamond growth technology, equipment relating thereto and the intellectual property (collectively the "Diamond Technology") of Apollo Diamond, Inc. and Apollo Diamond Gemstone Corporation (collectively the "Apollo Companies") for the stipulated sum of $2,010,000." Not only is the $2,010,000 figure the same amount as agreed to in the Apollo Asset Purchase Agreements, but as of August 17, 2011, the Apollo Asset Purchase Agreements were the only agreements in existence for the

purchase of the assets of Apollo Diamond and Apollo Gemstone. Accordingly, Public Scio's 8-K dated August 17, 2011 affirmed that not only did Public Scio possess the rights granted in favor of Private Scio, but that Public Scio was relying upon those agreements in support of its business.

117. On August 31, 2011, Public Scio filed another 8-K with the SEC. In Public Scio's 8-K dated August 31, 2011, Public Scio represented that it had entered into an Asset Purchase Agreement with Apollo Diamond on August 31, 2011 (the "Apollo Asset Purchase Agreement II"). According to its 8-K dated August 31, 2011, Public Scio had agreed to pay $1 million "as stipulated between the parties" and a $1 million promissory note in consideration for Apollo Diamond's "Diamond Growing Machines and Intellectual Property related thereto." Public Scio's 8-K dated August 31, 2011 is nonsensical as Public Scio had already affirmed in its prior SEC filings the prior Apollo Asset Purchase Agreements, which conveyed all assets of Apollo Diamond and Apollo Gemstone. To date, Public Scio has not filed the Apollo Asset Purchase Agreement II with the SEC.

118. Having transferred the Apollo Diamond assets to yet another entity with a resulting increase in their respective percentage ownership, Adams and Monahan proceeded to renew their efforts to raise capital through additional investment. Between the time Adams and Monahan acquired Public Scio and Public Scio's 10-Q filing for the period ended December 31, 2011, Public Scio had sold 6,566,193 shares at $0.70 per share, which totals $4,596,335.10. However, Public Scio's 10-Q reports that after discounting the total proceeds after fees, the total receipts for Public Scio equal $4,048,622.74. Accordingly, $547,712.36 were received as fees in connection with the placement of Public Scio shares. Upon information and belief, Adams, Monahan or AMLLP received, directly or indirectly, a significant portion of the fees associated with the shares sold by Public Scio in 2011.

119. In an effort to remedy the fraud disclosed herein, Public Scio issued a Form 8-K dated May 15, 2012. In that Form 8-K, Public Scio announced that it would issue roughly 16 million warrants to former shareholders of Apollo Diamond and Apollo Gemstone, including 1,250,000 warrants to Robert Linares and Bryant Linares—Apollo Diamond's founders and Adams father-in-law and brother-in-law, respectively.

120. Far from curing the fraud, Public Scio's Form 8-K exacerbates the fraud. Public Scio never disclosed the existence of these warrants or corresponding liability to shareholders that purchased Public Scio shares between August 5, 2012 and May 15, 2012. Neither the Apollo Asset Purchase Agreements nor the Scio Asset Purchase Agreement disclose the existence of these warrant obligations, and further, these agreements disclaim any such undisclosed liabilities.

121. Public Scio's Form 8-K dated May 15, 2012 states "Scio intends to acquire substantially all of the assets of [Apollo Gemstone]" based upon the consideration disclosed therein. However, this representation is in stark contrast with Public Scio's Form 8-K dated August 17, 2011, which states that Public Scio had already "entered into agreement to purchase" the technology, assets and equipment of both Apollo Diamond and Apollo Gemstone. Likewise, Apollo Diamond's Proxy Solicitation in March 2011 provided that "[a]s a result of these transactions . . . [Scio] will own substantially all of the assets of [Apollo Diamond and Apollo Gemstone.]" Thus, according to the prior representations of Public Scio and Apollo Diamond, Public Scio already possessed Apollo Gemstone's assets, equipment and intellectual property.

122. Similarly, Public Scio's Form 8-K dated May 15, 2012 goes on to state that "[s]ubstantially concurrently with the anticipated closing of the [Apollo Gemstone] Transaction, [Public Scio] intends to issue warrants to acquire approximately 16 million shares of common stock . . . to certain current and former stockholders of ADI . . . ." Thus, Public Scio's Form 8-K

24

dated May 15, 2012 attempts to bootstrap the issuance of warrants to Apollo Diamond shareholders to the fraudulently manufactured Apollo Gemstone transaction. But again, Public Scio's public filings make numerous representations that Public Scio already possessed the assets of Apollo Diamond and Apollo Gemstone prior to selling millions of dollars worth of securities with no disclosed liability for 16 million warrants.

123.    Despite offering to sell warrants to purchase Public Scio shares to former Apollo Diamond shareholders, Public Scio's Form 8-K dated May 15, 2012 does not resolve the many material misrepresentations and omissions in connection with Apollo Diamond's Proxy Statement, including without limitation, the improper payment of funds to or receipt of shares by Adams, Monahan and/or their law firm or broker-dealers, the undisclosed conflicts of interests between Adams, Monahan, Private Scio or Public Scio, the below market value paid for Apollo Diamond assets and other material issues associated with the offering the Public Scio warrants.

124.    Despite the various transactions concocted to transfer all assets of Apollo Diamond and Apollo Gemstone to the Scio entities, Public Scio did not, in fact, receive all assets of Apollo Diamond and Apollo Gemstone. During the course of their operations, Apollo Diamond and Apollo Gemstone manufactured a large inventory of diamonds. This inventory was viewed by many individuals and was reported on the books of the companies. However, upon receipt of "all" assets of Apollo Diamond and Apollo Gemstone, Public Scio did not receive any inventory of the diamonds manufactured by Apollo Diamond or Apollo Gemstone.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Sections 10(b) and 20(a) of the 1934 Act,**

**Violation of S.E.C. Rule 10b-5 Promulgated Thereunder)**

**(Asserted Against Adams, Monahan, Linares, AMLLP and Public Scio)**

125.    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

126.    Defendants Adams, Monahan, AMLLP and Public Scio, in connection with the redemption of the Apollo Diamond shares and subsequent offer of Public Scio warrants, directly and indirectly, singly and in concert, recklessly, knowingly or with an intention to defraud, engaged in, offered to both purchase securities from Plaintiff and sell securities to Plaintiff by means of one or more misrepresentations of failures to disclose material facts, which material facts were necessary in order to make the statement made in connection with those offerings and sales not misleading in light of the circumstances under which those statement were made and, in addition, employed a device, scheme or artifice to defraud Plaintiff and engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiff, all in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and subsections 2(a), (b) and (c) of SEC Rule 10b-5 promulgated thereunder.

127.    Defendants Adams, Monahan, and Linares are each, individually, persons who directly or indirectly controlled Apollo Diamond, Private Scio and Public Scio within the meaning of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].

128.    To the extent the violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and SEC Rule 10b-5 relate to misrepresentations as opposed to omissions of material fact, Plaintiff reasonably relied upon the representations of Defendants in connection with the offer to sell Apollo Diamond securities and purchase Public Scio securities.

129.    The purpose, effect and result of the Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and SEC Rule 10b-5 promulgated thereunder were to induce Plaintiff to sell the Apollo Diamond securities and purchase Public Scio securities.

130.     All of the Defendants conspired to fraudulently conceal their fraud from Plaintiff and other parties by virtue of all of the hereinabove alleged conduct attributable to the Defendants and events which occurred in connection with subsequent transfers of assets and securities.  As a result of such fraudulent concealment, Plaintiff, in the exercise of reasonable diligence, did not discover his claims against the Defendants until some time within one year prior to filing this Complaint.  This claim was brought by Plaintiff within one year after the discovery of the facts giving rise to this cause of action and within three years of the date of selling the Apollo Diamond securities.

131.     As a direct and proximate result of the hereinabove-alleged violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and SEC Rule 10b-5 promulgated thereunder, Plaintiff has suffered damages in an amount to be proven at trial.

132.     As a direct and proximate result of the hereinabove-alleged violations of Section 20(a) of the Securities Exchange Act of 1934, Plaintiff has suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Minnesota Securities Act,

### Minn. Stat. § 80A.68 and 80A.76)

### (Asserted Against Adams, Monahan, Linares, AMLLP and Public Scio)

133.     The Plaintiff repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

134.     Defendants Adams, Monahan, AMLLP and Public Scio, in connection with the redemption of the Apollo Diamond shares and subsequent offer of Public Scio warrants, directly and indirectly, singly and in concert, recklessly, knowingly or with an intention to defraud, engaged in, offered to both purchase securities from Plaintiff and sell securities to Plaintiff by

means of one or more misrepresentations of failures to disclose material facts, which material facts were necessary in order to make the statement made in connection with those offerings and sales not misleading in light of the circumstances under which those statement were made and, in addition, employed a device, scheme or artifice to defraud Plaintiff and engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiff, all in violation of Sections 80A.68 and 80A.76 of the Minnesota Securities Act.

135.    Defendants Adams, Monahan, and Linares are each, individually, persons who directly or indirectly controlled Apollo Diamond, Private Scio and Public Scio within the meaning of Section 80A.76(g)(1) of the Minnesota Securities Act.

136.    To the extent the violation of Sections 80A.68 and 80A.76 of the Minnesota Securities Act relate to misrepresentations as opposed to omissions of material fact, Plaintiff reasonably relied upon the representations of Defendants in connection with the offer to sell Apollo Diamond securities and purchase Public Scio securities.

137.    The purpose, effect and result of the Defendants' violations of Sections 80A.68 and 80A.76 of the Minnesota Securities Act were to induce Plaintiff to sell the Apollo Diamond securities and purchase Public Scio securities.

138.    All of the Defendants conspired to fraudulently conceal their fraud from Plaintiff and other parties by virtue of all of the hereinabove alleged conduct attributable to the Defendants and events which occurred in connection with subsequent transfers of assets and securities.  As a result of such fraudulent concealment, Plaintiff, in the exercise of reasonable diligence, did not discover his claims against the Defendants until some time within one year prior to filing this Complaint.  This claim was brought by Plaintiff within one year after the discovery of the facts giving rise to this cause of action and within three years of the date of selling the Apollo Diamond securities.

139.     As a direct and proximate result of the hereinabove-alleged violations of Sections 80A.68 and 80A.76 of the Minnesota Securities Act, Plaintiff has suffered damages in an amount to be proven at trial.

140.     As a direct and proximate result of the hereinabove-alleged violations of the Minnesota Securities Act, Defendants Adams and Monahan are liable under Section 80A.76(g)(1) of the Minnesota Securities Act for Plaintiff's damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (CONSTRUCTIVE FRAUD—RESCISSION OF SECURITY REDEMPTION)

### (Against Defendants Adams, Monahan, Linares, and AMLLP)

141.     The Plaintiff repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

142.     A confidential and/or fiduciary relationship existed between Plaintiffs and Defendants Adams, Monahan, Linares, and AMLLP through their respective roles as directors, officers, shareholders, and counsel for Apollo Diamond, Private Scio, and Public Scio, as well as their roles as investment bankers and counsel overseeing the funding and legal composition of the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

143.     By virtue of this relationship, Defendants Adams, Monahan, Linares, and AMLLP gained the confidence of Plaintiff and held themselves out as acting in Plaintiff's best interest. Plaintiff placed utmost confidence in Defendants Adams, Monahan, Linares, and AMLLP and justifiably relied upon their representations that they would provide truly objective, accurate, and reliable financial information and legal counsel regarding the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

144.     By virtue of this relationship, Defendants Adams, Monahan, Linares, and AMLLP owed Plaintiff a duty to act in Plaintiff's best interest by providing truly objective, accurate, and reliable financial information and legal counsel regarding the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

145.     Defendants Adam, Monahan, and AMLLP were compensated for their role as investment bankers and counsel overseeing the funding and legal composition of the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

146.     Through their respective roles as directors, officers, shareholders, and counsel for Apollo Diamond, Private Scio, and Public Scio, as well as their roles as investment bankers and counsel overseeing the funding and legal composition of the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock, Defendants Adams, Monahan, Linares, and AMLLP issued correspondence and a Proxy Statement to Apollo Diamond shareholders which contained numerous material misrepresentations and omissions of material facts regarding, among other things, an option to buy shares in Private Scio and purported warrants in favor of Apollo Diamond shareholders.

147.     As a direct proximate result of the conduct of Defendants Adams, Monahan, Linares, and AMLLP described herein, including, without limitation the numerous material misrepresentations and omissions of material facts in the March 11, 2011 letter to Apollo Diamond shareholders and corresponding Proxy Statement, Plaintiff assented to the repurchase of his Apollo Diamond shares.  Plaintiff's assent was foreseeable at the time Defendants Adams, Monahan, Linares, and AMLLP decided to omit or misrepresent facts regarding the valuation and financial condition of Apollo Diamond, their relationship to certain entities benefiting from the Apollo Asset Purchase Agreement, and the nature of certain options and warrants granted by the Apollo Diamond stock redemption.

148.    Because such harm is irreparable and has no remedy at law, Plaintiff is entitled to equitable remedies, including without limitation, rescission.

## FOURTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUD—RESCISSION)

### (Against All Defendants)

149.    The Plaintiff repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

150.    A confidential and/or fiduciary relationship existed between Plaintiffs and Defendants through their respective roles as directors, officers, shareholders, and counsel for Apollo Diamond, Private Scio, and Public Scio, as well as their roles as investment bankers and counsel overseeing the funding and legal composition of the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

151.    By virtue of this relationship, Defendants gained the confidence of Plaintiff and held themselves out as acting in Plaintiff's best interest.  Plaintiff placed utmost confidence in Defendants and justifiably relied upon their representations that they would provide truly objective, accurate, and reliable financial information and legal counsel regarding the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

152.    By virtue of this relationship, Defendants owed Plaintiff a duty to act in Plaintiff's best interest by providing truly objective, accurate, and reliable financial information and legal counsel regarding the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

153.    Defendants Adams, Monahan, and AMLLP were compensated for their role as investment bankers and counsel overseeing the funding and legal composition of the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock.

154.    Through their respective roles as directors, officers, shareholders, and counsel for Apollo Diamond, Private Scio, and Public Scio, as well as their roles as investment bankers and counsel overseeing the funding and legal composition of the Apollo Asset Purchase Agreements and redemption of Apollo Diamond stock, Defendants sought to gain control of Apollo's "proprietary technology" and other corporate assets for a sum below their market value.

155.    As a direct proximate result of Defendants' conduct described herein, including, without limitation the numerous material misrepresentations and omissions of material facts in the March 11, 2011 letter to Apollo Diamond shareholders, Plaintiff assented to the sale of his shares and relinquishment of his interest in Apollo's "proprietary technology" for a sum far below their value as represented by Defendants.  Such losses were foreseeable at the time Defendants Adams, Monahan, and AMLPP decided to omit or misrepresent facts regarding the valuation and financial condition of Apollo Diamond and their relationship to certain entities benefiting from the Apollo Asset Purchase Agreement.

156.    Because such harm is irreparable and has no remedy at law, Plaintiff is entitled to equitable remedies, including without limitation, rescission of the transactions that transferred the intellectual property, technology, equipment and assets of Apollo Diamond and Apollo Gemstone to the Scio entities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against defendants as follows:

1.    For a judgment against defendants, jointly and severally, awarding direct and consequential damages sustained by Plaintiff in an amount to be established through proof at trial, plus pre-judgment and post-judgment interest.

2.    For a judgment against Defendants awarding Plaintiff appropriate equitable relief to remedy the Defendants' wrongful acts.

3.      For a constructive trust in favor of Apollo Diamond based upon Defendants' usurpation of Apollo Diamond's corporate opportunities.

4.      For a constructive trust in favor of Apollo Diamond based upon Defendants' usurpation of Apollo Diamond's corporate opportunities.

5.      For a judgment against Defendants, jointly and severally, awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting this action.

6.      Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Date:  August 2, 2012.

/s/ William E. Manske
David A. Gotlieb (MN Bar No. 150368)
William E. Manske (MN Bar No. 392348)
BARNES & THORNBURG LLP
225 South Sixth Street
Minneapolis, MN 55402
Phone: (612) 333-2111
Fax: (612) 333-6798
Email: david.gotlieb@btlaw.com
        william.manske@btlaw.com