UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-64 (DWF/KMM)

UNITED STATES OF AMERICA,

Plaintiff,

v.

EDWARD S. ADAMS,

Defendant.

**GOVERNMENT'S REPLY IN
SUPPORT OF MOTION
CONTESTING THE
APPLICATION OF PRIVILEGE**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and John Kokkinen, Assistant United States Attorney, respectfully submits this reply in support of its motion contesting the application of privilege.

The communications with the Murry firm are not privileged because a purpose of the communications was to provide Murry with information needed to prepare amended tax returns and that information formed the basis for how the previously unreported income was characterized on the amended returns. Even if the Court were to reject that argument, as well as the related argument regarding wavier, the communications still are not privileged—and never were privileged—because of the crime-fraud exception. The amended returns misrepresented the nature of the underlying transactions that gave rise to the previously unreported income in order to fraudulently save Mr. Adams hundreds of thousands of dollars in tax liabilities. The government has provided a factual basis adequate to support a good faith belief by a reasonable person that the crime-fraud

exception applies, thus warranting an *in camera* review by the Court of all the communications with Murry and Mr. Brever.

1. <u>**Communications with the Murry firm.**</u>

    A. **The Challenge Is Properly Before The Court.**

    Mr. Adams's primary response to the government's challenge regarding the communications with the Murry firm is to ask the Court simply to ignore the merits of the argument because, according to Mr. Adams, they are not properly before the Court.[1]  The argument should be rejected because the Report and Recommendation ("R&R") [Dkt. 117] explicitly stated that the ruling was limited to articulating only general principles that were to inform the later consideration, if necessary, of specific documents over which a dispute remained.

    In its R&R, the Court advised the parties that "[i]f the Court finds that either category of documents is, broadly speaking, covered by privilege, the parties have reserved for another day questions of which specific documents are privileged and whether the 'crime-fraud exception' or any other exception undermines that privilege as to certain documents."  R&R at 4 n.3.  The Court echoed this point later in the R&R when it stated that "[i]n the interest of clarity, the Court orders that Mr. Adams be required to proceed with the creation of privilege logs as to those documents which he alleges *remain*

---

[1] Mr. Adams claims that the government's challenge to the communications with the Murry firm runs afoul of Local Rule 7.1(j).  It is unclear how that rule, which applies to "civil motion practice," governs in this, a criminal case.

*privileged in light of this Court's analysis* and that documents that are not protected as discussed above continue to be provided as requested." R&R at 14 (emphasis added).

The above language from the R&R shows that the Court reserved for later consideration the determination of which documents were privileged in light of the general principles that the Court had articulated in the R&R. As contemplated by the R&R, the government's motion properly requested that the Court consider whether the specific Murry documents featured in Mr. Adams's *in camera* exhibits were privileged in light of the Court's analysis or whether the privilege had been undermined by, for example, a waiver or the crime-fraud exception.[2]

Even if Mr. Adams were correct that the Court has already ruled on this issue, that does not mean that the Court is precluded from re-assessing the issue in light of the different context in which it is now being raised. Mr. Adams is the one who sought to leverage the issues regarding the Murry documents into requests for the extreme relief of blanket suppression, dismissal of all or part of the superseding indictment, and/or disqualification of the prosecution team. It would be imprudent to forbid any further consideration of the

---

[2] Mr. Adams continues to misunderstand the government's insistence that the Court require Mr. Adams to produce the entire Murry file and the entire Brever file to the Court *in camera*. The government is not asking, as Mr. Adams has suggested, that the Court order that those entire files be produced to the government. The government has asked only that the Court hold Mr. Adams to his burden, which is to demonstrate that the documents are privileged and that the privilege has not been waived, by requiring that he produce those files to the Court so that the Court has a complete basis on which to make its ruling, as opposed to the cherry-picked files that Mr. Adams has chosen to provide. If the Court determines that the crime-fraud exception applies, the government is aware of the procedural mechanism it will need to invoke—subpoenas to Murry and Mr. Brever—to obtain those records itself.

Murry documents given the extreme remedies that Mr. Adams seeks.   Indeed, the law-of-the-case doctrine, which Mr. Adams attempts to invoke to avoid getting to the substance of the government's arguments, is a doctrine that takes into account prudential considerations.  *See United States v. Castellanos*, 668 F.3d 1010, 1015 (8th Cir. 2010) ("The law of the case doctrine and the related concept of waiver are prudential rather than jurisdictional . . . .")  Furthermore, the typical application of the law-of-the-case doctrine is when a district court is presented with a request on remand from an appellate court to reconsider issues that would essentially contradict the appellate court's ruling on the same issue in the same case.  Here, to the extent that the government's motion constitutes a request to consider previously decided issues, it is a request that the Court reconsider its own previous rulings as opposed to reconsidering the rulings of an appellate court.  As the Eighth Circuit has explained, "[l]aw of the case is a doctrine of discretion," and, thus, a district court has discretion not to defer to its previous rulings in the same case.  *Estrada-Rodriguez v. Lynch*, 825 F.3d 397, 402 (8th Cir. 2016).

### B.  The Purpose of the Communications and Waiver

Mr. Adams suggests that the government misstated the record in arguing that the Court held that the record demonstrated that preparing tax returns was not the sole purpose of the communications with the Murry firm.  There are numerous points in the R&R where the Court appeared to view the privilege question as turning on whether the sole purpose was to prepare amended returns rather than on whether the primary or predominant purpose was to obtain legal advice.  For example, in discussing a Seventh Circuit case, the R&R summarized the holding from that case as being that "if a client relays information *only* for

4

use on a tax return, 'such a transmission destroys any expectation of confidentiality which might have otherwise existed.'"  R&R at 13 (quoting *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)) (emphasis added).  But *Lawless* does not limit the analysis to whether the *sole or only purpose* was to prepare amended returns and instead contemplates that if *a purpose* of the transmission was so that it might end up on a tax return, such a transmission undermines any claim of privilege.  Later in the R&R, the Court explained that "counsel provided advice outside the narrow, accounting-services scope of preparing and filing amended returns."[3]  *Id.*  A third time, the R&R concludes that "the Court agrees that [the] attorney-client privilege does not apply to Mr. Adams's communications with Mr. Brever and Murry LLC accountants that were made *only* for the purpose of using the contained information on tax returns."  *Id*. at 14 (emphasis added).  In other words, just as the government argued in its July 27, 2018 submissions, the R&R seemed to frame the question as being whether the *only* purpose for the communication was to put the information on tax returns.

As the government has argued previously, the proper test is whether the communications were for the sole, primary, or predominant purpose of obtaining legal advice.  If, by contrast, the communications were for two purposes, to obtain legal advice and to prepare amended returns, and obtaining legal advice was not the primary or

---

[3] Again, the question is not whether Mr. Brever provided services beyond the narrow, accounting-services scope of preparing and filing amended returns.  The question is whether Murry provided services beyond the narrow, accounting-services scope of preparing and filing amended returns.  If all Murry did was provide accounting services that were aimed at preparing and filing amended returns, then those services were not necessary to whatever legal services Mr. Brever was providing.

predominant purpose, then the communications are not privileged.  A closer examination of the question of waiver reveals why this must be the case.  If the question of waiver turned, as the R&R suggested, on whether the communications were made "only for the purpose of using the contained information on tax returns," then there would be no need to ever get to the question of waiver.  That is because if the communication was solely for the purpose of preparing a tax return, then it was not privileged in the first place.

Mr. Adams claims that the Court "plainly concluded that the purpose of [the communications with Murry] was to obtain legal advice."  Def's Opp. to Mot. Contesting Appl. of Privilege [Dkt. 201] at 5.  The government does not read the R&R that way, but the Court is in the best position to determine what it held.  But the questions remain, and Mr. Adams refuses to answer them, was there another purpose to the communications and, if so, was that other purpose so that Murry could prepare amended returns?  The answer is "yes."  And that takes us right back to the whole point of this dispute, which is how to segregate the communications that were only for the purpose of obtaining legal advice from those that were also for the purpose of preparing amended returns.  It simply cannot be the case that Mr. Adams can legitimately claim to have an expectation in confidentiality vis-à-vis the IRS in the very basis on which he sought a particular tax treatment of previously unreported income on his amended returns.

Mr. Adams wrongly claims that the government misunderstands the import of *In re Grand Jury Proceedings*, 220 F.3d 568 (7th Cir. 2000) and *United States v. Frederick*, 182 F.3d 496 (7th Cir. 1999).  Those cases quite clearly stand for the proposition claimed by the government.  The court in In re Grand Jury Proceedings unambiguously held that

6

"information transmitted to an attorney or to the attorney's agent is privileged if it was not intended for subsequent appearance on a tax return and was given to the attorney for the sole purpose of seeking legal advice. . . .  Documents used in both preparing tax returns and litigation are not privileged."  220 F.3d at 571.  Likewise, the court in *Frederick* held that a "dual-purpose document—a document prepared for use in preparing tax returns and for use in litigation—is not privileged; otherwise, people in or contemplating litigation would be able to invoke, in effect, an accountant's privilege, provided that they used their lawyer to fill out their tax returns."  182 F.3d at 501.  The *Frederick* court elaborated,

> And likewise if a taxpayer involved in or contemplating litigation sat down with his lawyer (who was also a tax preparer) to discuss both legal strategy and the preparation of his tax returns, and in the course of the discussion bandied about numbers related to both consultations: the taxpayer could not shield these numbers from the Internal Revenue Service.  This would be not because they were numbers, but because, being intended (though that was not the only intention) for use in connection with the preparation of tax returns, they were an unprivileged category of numbers.

*Id*. at 501-02.[4]

Again, without knowing the substance of the seven communications with Murry, it is difficult to make more specific arguments, but some reasonable assumptions can be made based on what was reflected in the amended returns.  First, Mr. Adams must have disclosed

---

[4] As the Court knows, Mr. Adams's filings have redacted, and thus the government does not know, the precise subject of the legal advice that Mr. Brever provided.  But to the extent that Mr. Brever was providing Mr. Adams with legal advice about his obligation to file truthful and accurate tax returns and to amend them if doing so is necessary to render them truthful and accurate, it is worth noting that the attorney-client privilege does not apply to communications with an accountant when the accountant does not act as a mere translator but instead gives additional legal advice on such tax issues, even when doing so thereby assists the attorney in advising the client.  *See United States v. Chevron Corp.*, 241 F. Supp. 2d 1065, 1072 (N.D. Cal. 2002).

to Murry how much total income he realized from the sale of warrants, the dates on which those sales took place, how many warrants/shares were involved in each transaction, and how much money was involved in each transaction.  Second, given his ultimate invocation of the long-term capital gains rate and the exclusion provided in 26 U.S.C. § 1202, he must have also disclosed to Murry when he acquired the warrants he was selling, when he exercised those warrants, and how much he paid to exercise those warrants—e.g., $.05 per share or a "cashless exercise." Each one of these pieces of information is necessary for Murry to determine the amount of unreported income, the year in which it was realized, which rate to apply, and what Mr. Adams's cost-basis was in the warrant (i.e., the exercise price).  To put it a different way, had Mr. Brever never been involved and Mr. Adams were simply using Murry to file amended returns, he would have needed to provide all the same information to Murry so that Murry could prepare the returns.  To the extent that Mr. Brever might also have used that information for whatever legal advice he was giving shows that the communications to Murry were dual-purpose communications just like those mentioned in *Frederick* as not being privileged.

Mr. Adams points to the declarations from Mr. Brever that all non-privileged communications that contained information that showed up on or formed the basis for the amended returns have already been provided.  That cannot be the case.  The government's review of the Murry production, Government Exhibit 43, failed to reveal any worksheets or lists that contain any of the detail described above in the Murry production, Government Exhibit 43.  All that the amended returns, Government Exhibits 31-33, say about the income Mr. Adams realized from the sale of warrants is the total amount in each year:

8

**2008**

| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
|---|---|---|---|---|---|---|
| **Part II** | **Long-Term Capital Gains and Losses—Assets Held More Than One Year** | | | | | |
| 8 | LT GAIN ON REPAYMENT OF SHAREHOLDER LOAN | | | | | 22,183 |
| | SEE ATTACHED | VARIOUS | VARIOUS | 107,953 | 183,880 | −75,927 |
| | SEE ATTACHED | VARIOUS | VARIOUS | 873,725 | 1,179,724 | −305,999 |
| | APOLLO DIAMOND | VARIOUS | VARIOUS | 991,750 | | 991,750 |

| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
|---|---|---|---|---|---|---|
| **Part II** | **Long-Term Capital Gains and Losses—Assets Held More Than One Year** | | | | | |
| 8 | SECTION 1202 50% EXCLUSION | | | | | −495,875 |

**2009**

| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
|---|---|---|---|---|---|---|
| **Part II** | **Long-Term Capital Gains and Losses – Assets Held More Than One Year** | | | | | |
| 8 | SEE ATTACHED | VARIOUS | VARIOUS | 29,497 | 110,718 | −81,221 |
| | APOLLO DIAMOND STOCK | 01/02/02 | 10/15/09 | 169,250 | | 169,250 |
| | SECTION 1202 50% EXCLUSION | | | | | −84,625 |

**2010**

| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
|---|---|---|---|---|---|---|
| **Part II** | **Long-Term Capital Gains and Losses – Assets Held More Than One Year** | | | | | |
| 8 | SEE ATTACHED | VARIOUS | VARIOUS | 387,160 | 543,634 | −156,474 |
| | APOLLO DIAMOND | VARIOUS | VARIOUS | 280,050 | | 280,050 |
| | SECTION 1202 50% EXCLUSION | | | | | −140,025 |

The schedules to the tax returns (specifically, schedule D) provide the type of detail discussed above as to the other items of capital gains and losses.  *See* Gov't Ex. 31 at pgs.

10-12; Gov't Ex. 32 at pgs. 8-11;Gov't Ex. 33 at pgs. 15-18.  Nothing in those schedules, however, provides any details about the transactions that gave rise to the capital gains on the sale of Apollo assets.[5]  There are two spreadsheets in the Murry production that mention the sale of an Apollo asset on October 15, 2009, that generated $112,500 in gains, *see* Gov't Ex. 43 at ECL-00031117, ECL-00033188.  Notably absent though is any information showing when the asset(s) were bought or acquired (i.e., when the warrant was exercised).  Furthermore, the $112,500 reflected on those two spreadsheets is different from the amount ultimately reported on the amended returns, which is $169,250.  All of this (1) begs the question of what Murry's basis was for characterizing the gains as a long-term gain on an asset held for more than one year that, in addition, qualified for the 50% exclusion under § 1202 because it was held for more than five years and (2) demonstrates that Murry did not provide all "computational documents used to generate tax returns," Brever Decl. [Dkt. 93] ¶¶ 11, 13.  Mr. Adams cannot seriously contend that a *Kovel* arrangement can properly be invoked to throw the robe of privilege over "unpublished information" that would be necessary to justify to the IRS the characterization on the amended returns of the gains as long-term versus short-term gains that also qualified for the § 1202 exclusion.

---

[5] It seems a fair guess that the spreadsheets that were attached to some of the emails that Mr. Adams claims are privileged contain the additional information about the various details of the transactions that gave rise to the previously unreported income.  As discussed below, when the accountants at the Murry firm were provided this information by Mr. Adams, it appears that they concluded that the gains should be reported as short-term capital gains.  Sometime thereafter, the categorization was changed to long-term capital gains that also qualified for the 50% exclusion under § 1202.

### C. Crime fraud

Mr. Adams's arguments in opposition to the evidence indicating crime-fraud are entirely unpersuasive. The government is cognizant of the fact that the Court has already received a tremendous amount of briefing and supporting materials. However, one of Mr. Adams's responses to the crime-fraud argument is to contend that the government has failed to point to enough specific documents to make a *prima facie* showing that would justify the Court conducting an *in camera* review of the entirety of the Murry and Brever files to then determine whether there is probable cause to believe that a crime or fraud has been perpetrated. Accordingly, the government offers the following additional arguments and supporting materials.

Although the government never actually argued, as defense counsel claimed in its response, that Mr. Adams hid information from Murry and Mr. Brever, there are numerous documents (discussed below) that appear not to have been provided to Murry and Mr. Brever. These documents make abundantly clear that Mr. Adams sold warrants, not stock, to generate the income that had not previously been reported. In addition, it is true that there are documents that were provided to Murry and Mr. Brever that contradict the way the gains were ultimately reported on the amended returns—in other words, they indicate that the gains were the result of the sale of warrants as opposed to stock as falsely claimed on the amended returns. Indeed, whatever information Mr. Adams provided to Murry led Murry first to conclude that the gains should be reported as short-term capital gains not eligible for the § 1202 exclusion. As discussed more thoroughly below, Murry prepared a draft return listing the proceeds of the sales of Apollo assets as short-term gains. It appears

11

that sometime shortly later, the conclusion was abandoned and the decision was made to instead report the gains as long-term gains that were eligible for the § 1202 exclusion, which had the convenient effect of saving Mr. Adams hundreds of thousands of dollars.

Among the records produced by the Murry firm in response to a grand jury subpoena is a draft version of the 2008 amended returns. *See* Gov't Ex. 43 at ECL-00030662-671. Unlike the final version that was filed, which reported $991,750 in long-term capital gains from the sale of Apollo assets, this draft return placed all $991,750 in the short-term capital gains section for assets held one year or less.

| Part I | Short-Term Capital Gains and Losses—Assets Held One Year or Less | | | | |
|---|---|---|---|---|---|
| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
| 1 | SEE ATTACHED | VARIOUS | VARIOUS | 837,873 | 893,136 | -55,263 |
| | SEE ATTACHED | VARIOUS | VARIOUS | 2,390,032 | 2,428,044 | -38,012 |
| | APOLLO DIAMOND | VARIOUS | VARIOUS | 991,750 | | 991,750 |
| 2 | Enter your short-term totals, if any, from Schedule D-1, | | | | | |

*Id.* at ECL-00030666. When this "hypothetical amended return" was evidently "test[ed]," Brever Decl. [Dkt. 93] at ¶ 5, it resulted in Mr. Adams owing $182,348 to the IRS. *See id.* at ECL-00030662, line 21. That hypothetical return was then scrapped, and the filed version re-categorized the gains under the long-term capital gains section in addition to claiming the exclusion under § 1202. As a result, Mr. Adams owed the IRS only $34,064. Gov't Ex. 31, line 21.

The production from Murry includes a draft of the 2010 amended return that shows the same apparent evolution of the truth regarding events that had occurred as much as ten years earlier. *See* Gov't Ex. 43 at ECL-00031611-620. Unlike the final 2010 amended

return that was filed, which reported $280,050 in long-term capital gains from the sale of Apollo assets and invoked the 50% exclusion under § 1202, the draft 2010 amended return placed all $280,050 in the short-term capital gains section:

| Part I | Short-Term Capital Gains and Losses – Assets Held One Year or Less | | | | | |
|---|---|---|---|---|---|---|
| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
| 1 | SEE ATTACHED | VARIOUS | VARIOUS | 3,297,765 | 3,280,196 | 17,569 |
| | SEE ATTACHED | VARIOUS | VARIOUS | 18,098,735 | 17,818,198 | 280,537 |
| | APOLLO DIAMOND | VARIOUS | VARIOUS | 280,050 | | 280,050 |
| 2 | Enter your short-term totals, if any, from Schedule D-1. | | | | | |

*See id.* at EC:-00031615. The end result of rejecting this "hypothetical amended return" in favor of the amended return that was filed was that it reduced the amount Mr. Adams owed the IRS for 2010 from $80,517 to $31,354. *Compare* Gov't Ex. 43 at ECL-00031611, line 19 *with* Gov't Ex. 33, line 19.

It is difficult to comprehend what the basis could possibly be for this change. Clearly, the information Mr. Adams had initially provided led Murry to conclude that the previously unreported income should be categorized as short-term gains. Such a categorization is entirely consistent with all of the evidence discussed below proving that Mr. Adams sold warrants, not stock. And yet the final version represented that the income was realized from the sale of stock that had been held for more than five years after warrant exercises. There has to be an explanation for the change, and that explanation cannot be privileged. Either it justifies the basis for how the gains were characterized on the amended returns and thus constitutes "details underlying that information," *United States v. Cote*,

13

456 F.2d 142, 144-45 (8th Cir. 1972), or it fails to justify how the gains were characterized and thus is a troubling indication of crime-fraud.

> 1. *Numerous documents provided by Mr. Adams to Murry show that Mr. Adams's realized income from the sale of warrants, not stock*

A closer review of the Murry production, Government Exhibit 43, only strengthens the *prima facie* showing that Mr. Adams used the services of Murry and Mr. Brever "in furtherance of an illegal or fraudulent activity." *In re Green Grand Jury Proceedings*, 492 F.3d 976, 982 (8th Cir. 2007). The folder identified within Government Exhibit 43 as ECL-00031260 contains twelve pages. The first is a letter purportedly from R.L. to Mr. Adams dated June 17, 2009, that unequivocally states that the proposed ADR transaction involved the sale of previously unexercised warrants, not stock:

> [C]ertain existing holders of warrants in Apollo Diamond, Inc., including, you, Bryant, Mike and/or me will be effectively assigning our rights to warrants to prospective shareholders via ADR who will direct payment to ADR for their purchase. Apollo will then cancel our rights to such warrants (on a cashless exercise basis). Through this process Apollo will receive the payment for our effective assignment/cancelation of warrants that we have in a way that does not dilute our shareholders (when our low exercise price warrants are taken into account). As we have discussed, we agreed and I approve of the sale individually of warrants by any of us such that we will personally receive proceeds from such sales as compensation for the assignment of our warrants for Apollo's benefit.

Gov't Ex. 43 at ECL-00031260. The other documents in this folder likewise describe the transactions that resulted in money going into the ADR Venture Bank account as being the sale of warrants, not stock.

Another folder, which is labeled in Government Exhibit 43 as ECL-00031272, contains eight pages. The first page, which purports to be the minutes of the board of

directors of Apollo dated July 31, 2009, shows that Apollo authorized a "recapitalization transaction through the entity ADR Investments, LLC" by which the directors and Mr. Adams "thanked each other . . . for their respective contributions back to Apollo of certain warrants issued to them [that] they were now surrendering to Apollo after they exercised such warrants thereby converting them into common stock in Apollo for sale by Apollo via ADR to prospective investors." *Id.* The next page identifies Mr. Adams as a "warrant holder" who contributed 225,000 warrants with an exercise price of $.05 as part of the ADR transaction. *Id.* at ECL-00031273.

A September 15, 2009 memorandum purportedly from Mr. Adams to R.L also describes the ADR transaction as including a feature in which "some parties *may be selling warrants directly to third party investors.* The current sales transactions and their origins are found on Annex A attached hereto." *Id.* at ECL-00031274 (emphasis added). Annex A reveals that as of September 15, 2009, Mr. Adams had sold 132,500 "warrants" he received in 2004, not ones he had received in 2001 and then exercised in 2003, as falsely claimed on the disclosure statement that accompanied the amended returns prepared by Murry. Compare *id.* at ECL-00031275 *with* Gov't Ex. 31 at 3. A copy of the minutes of the Apollo board of directors from May 1, 2010, similarly describes Mr. Adams as having sold warrants to certain parties, and the attached exhibit shows Mr. Adams as having sold 125,000 warrants, not stock. *Id.* at ECL-00031276-277.

Also among the Murry production is a July 1, 2009 "confidential summary of transaction." *See id.* at ECL-00031280. The document explains that "[i]n the Transaction, Purchasers will either purchase common stock directly from the Company and/or purchase

warrants from willing sellers prior to their expiration and, with regard to the warrants, correspondingly exercise such warrants." *Id*. at ECL-00031287.

The list of documents among the Murry production that clearly state that it was warrant sales, not stock sales, that funded the ADR account at Venture Bank goes on:

- A July 20, 2009 memorandum in which Mr. Adams states, "this will confirm that the following may be selling warrantholders in the [ADR Investments] transaction: . . . Edward S. Adams . . . ." *See id.* at ECL-00031332.

- A July 15, 2009 "written action of ADR Investments, LLC," advising that a number of individuals, including Mr. Adams, would be assigning their Apollo warrants to ADR so that ADR could sell the warrants. *See id.* at ECL-00031365.

- A July 21, 2009 "written action of ADR Investments, LLC" stating that a number of individuals would be permitted to retain the proceeds of certain "warrant sales," including Mr. Adams's sale, via ADR, of 125,000 warrants at a "cashless" exercise price of $.05 per warrant. *See id.* at ECL-00031368.

- A July 22, 2009 "minutes of ADR Investments, LLC" indicating that Mr. Adams and several other individuals would be using ADR to sell their Apollo warrants to new investors and that instead of paying over the exercise price to Apollo, Apollo would make a corresponding reduction in the amounts it owed to Mr. Adams for past due compensation. *See id.* at ECL00031369-372.

16

- A November 20, 2009 "minutes of ADR Investments, LLC" stating that ADR and Apollo had previously agreed that Mr. Adams and others "might sell warrants they own," that "such sales have taken place or are contemplated to take place in the amounts found in Exhibit A," including 36,813 "warrants" owned by Mr. Adams. *See id.* at ECL-00031373-374.

- A February 22, 2010 "minutes of ADR Investments, LLC" indicating that Mr. Adams had and/or would be selling a total of 75,000 "warrants" in Apollo. *See id.* at ECL-00031375-376.

To be sure, in the production from Murry, there is one document that appears to describe some of the sales carried out through ADR as being the sale of stock as opposed to the sale of warrants. *Id.* at ECL-00031279. It purports to claim that between September 15, 2009, and May 4, 2010, Mr. Adams sold 106,825 shares of Apollo stock via the ADR transaction. All of the other documents, however, unambiguously describe Mr. Adams and all of the other individuals as having sold warrants.

2. *Numerous documents* <u>not</u> *provided by Mr. Adams to Murry show that Mr. Adams's realized income from the sale of warrants, not stock*

Equally as important as what was provided to Murry is what was not provided to Murry by Mr. Adams. Mr. Adams produced a number of warrant subscription forms in response to a grand jury subpoena. The warrant subscription forms—none of which appear to have been provided to Murry—and the bank records demonstrate that Mr. Adams was selling warrants, not stock. On December 1, 2009, Mr. Adams signed a subscription form exercising 12,000 warrants at an exercise price of $.05, as well as an assignment form

stating that he was transferring to "Apollo via ADR the right to purchase 12,000 shares of common stock of [Apollo]." Gov't Ex. 44. On December 4, 2009, a check to Mr. Adams from the ADR account cleared in the amount of $47,250, which would be consistent with how Mr. Adams described the transactions as being at a price of $4 per warrant[6] less the $.05 exercise price, suggesting a payment to him of $47,400. Gov't Ex. 45.

Similarly, on January 5, 2010, Mr. Adams signed a subscription form exercising 26,000 warrants at an exercise price of $.05, as well as an assignment form stating that he was transferring to "ADR Investments the right to purchase 26,000 shares of common stock of [Apollo]." Gov't Ex. 46. On January 8, 2010, a check to Mr. Adams from the ADR account cleared in the amount of $100,000, just shy of the $102,700 that would be expected for having sold 26,000 warrants at $4 per warrant less the exercise price of $.05 per warrant. Gov't Ex. 47.

And on February 14, 2010, Mr. Adams signed a subscription form exercising 43,000 warrants at an exercise price of $.05, as well as an assignment form stating that he was transferring to "ADR the right to purchase 43,000 shares of common stock of [Apollo]." Gov't Ex. 48. A check to Mr. Adams from the ADR account cleared on February 16, 2010, in the amount of $167,350, within just a couple thousand dollars of the $169,850 that would be expected for having sold 43,000 warrants at $4 per warrant less the exercise price of $.05 per warrant. Gov't Ex. 49.

---

[6] Other records from that same time-frame indicate that the transactions that funded the ADR account at Venture Bank were at a price of $4 per warrant. *See* Gov't Ex. 43 at ECL-00031287.

There are, as Mr. Adams notes in his response, a handful of subscription forms that indicate that Mr. Adams exercised warrants in 2003. Gov't Ex. 50. Not one of those subscription forms is among the materials that were provided to the Murry firm, which again raises the troubling question of what the basis was for the disclosure statement that accompanied the amended returns.[7] In addition, only one of those subscription forms, which appears to be for either 15,000 or 150,000 warrants—the amount owed for the exercise, $750, suggest that it was only 15,000 warrants (15,000 X $.05 = $750)— references ADR. By contrast, there are at least six subscription forms or accompanying assignment forms that were exercised in 2009 or later, and each explicitly reference ADR, in stark contrast to the subscription forms exercised in 2003. Gov't Ex. 51. There are also a number of subscription forms that specifically reference (and/or coincide with transactions within) one of the other Venture Bank account entities (e.g., RL, DL, RBE), which similarly establishes that Mr. Adams was selling warrants, not stock. Gov't Ex. 52.

The evidence is overwhelming that the money that went into the ADR bank account, and then went out to Mr. Adams, in 2009 and 2010 was the proceeds of the sale of warrants, not the sale of stock that had been created as a result of Mr. Adams having exercised warrants in 2003. Therefore, the disclosure statement that accompanied the amended returns was false and the characterization of the gains as long-term gains eligible for the exclusion under § 1202 was fraudulent. The same is true of the money that went into the

---

[7] Given that these subscription forms were not provided to Murry, Murry could not have relied on them to decide to characterize the gains in 2008, 2009, and 2010 as long-term capital gains on the sale of stock subject to the exclusion in § 1202.

RL Investments and DL Investments accounts at Venture Bank, and then out to Mr. Adams, in 2008 and 2009.  That money was the result of the sales of warrants, not the sale of stock that had been held for five years prior to being sold.

There are numerous documents produced by Mr. Adams in response to a grand jury subpoena that leave no room for doubt that the transactions that went through the Venture Bank accounts were the sales of warrants, not stock.  It appears that none of these documents were provided to Murry.  Some of those documents are discussed in the government's response to Mr. Adams's motion to suppress.  In addition, among the documents that Mr. Adams apparently did not provide to Murry but did provide in response to a grand jury subpoena was a June 10, 2010 "minutes of the board of governors of ADR Investments, LLC" discussing warrant sales and indicating that the sellers of those warrants, including Mr. Adams, would be contributing the proceeds of those sales back to Apollo in the form of either a loan or a capital contribution, and that the amount of such proceeds contributed by Mr. Adams was $486,933.  Gov't Ex. 53.  Similarly, a June 20, 2010 "minutes of board of governors of ADR Invesments, LLC" states that Mr. Adams had "sold warrants in Apollo through ADR to fund the amounts owed or to be owed to [him]" for prior, uncompensated work, to the tune of $655,700.  Gov't Ex. 54.

Numerous documents pertaining to two of the other Venture Bank accounts, RL Investments and DL Investments, tell the same story, which is that Mr. Adams's receipt of money out of those accounts over several years, including 2008, consisted of the proceeds of warrant sales, not stock sales.  Among Mr. Adams's production is an August 18, 2006 memorandum titled "RL Investments, LLC (and/or otherwise) (collectively, 'RL')."  Gov't

Ex. 55.  The memo discusses Mr. Adams's "desire . . . to potentially sell warrants owned by him in [Apollo]."  *Id*.  A second version of this same memo included some additional handwriting by Mr. Adams at the bottom of the page that explains:

> As of June of 2008, the parties hereby agree additionally as follows:  (1) ESA will be permitted to sell up to an additional $1.8 million in warrants—using a cashless exercise conversion formula; (2) the parties intend to treat and mandate the sale be considered as a non-final, contingent sale, meaning ESA shall have an obligation to provide or reinvest all of the funds received by RL, if and when required by Apollo in its sole discretion under commercially reasonable market terms . . . .

Gov't Ex. 56.

Mr. Adams's production includes a document dated February 23, 2007, and bearing the subject line "DL Investments, (and/or otherwise) ('DL')" that purports to memorialize Mr. Adams informing R.L. that "I am interested in again potentially selling warrants owned by me in [Apollo]."  Gov't Ex. 57.  The production also includes a handwritten letter by Mr. Adams dated July 23, 2007, that talks about getting assistance "with  potential warrant sales of our warrants and others.," Gov't Ex. 58, and a handwritten document by Mr. Adams bearing the date October 16, 2017, that discusses DL Investments and explains that "[a] number of shareholders/warrantholders in Apollo are interested in potentially selling shares/warrants.  My partner and I may be sellers if things come together.  We own warrants for a capital raise we did [illegible]," Gov't Ex. 59.

The production also includes a document titled "Repayment Commitment Relating To [Apollo] Commitment of Services" and dated December 31, 2007.  Gov't Ex. 60.  In it, Mr. Adams "agrees and acknowledges that he has sold warrants issued to him by Apollo through DL" and that "he has received approximately $857,000 in connection with his sales

21

of warrants in Apollo through DL to third party accredited investors and that Apollo has approved of such sales." *Id*.[8]  In addition, the production includes a nearly identically-worded document pertaining to RL Investments that states that as of the date of the document, September 30, 2008, Mr. Adams "acknowledges that he has received approximately $952,000 in connection with his sales of warrants in Apollo through RL to third party accredited investors and that Apollo has approved of such sales." Gov't Ex. 61. The Venture Bank records show payments from the RL Investments account to Mr. Adams or his consulting company of $52,000 on July 9, 2008; $550,000 on September 12, 2008; and $350,000 on September 19, 2008; for a grand total of $952,000. Gov't Ex. 62.

A purported fax from Mr. Adams to R.L dated March 22, 2008, unequivocally explains that the transactions as involving the sale of warrants, not stock:

> Attached is a document that will likely be used with RL [Investments] (the sale of warrants by existing shareholders).  It is similar to the one used in connection with DL [Investments] last year (a similar transaction) . . . .  You will note it is different than transactions where there are selling shareholders and the company is raising money; this one only involves selling warrantholders (hence the decision to form/use an entity other than Apollo to further highlight to people they are not buying directly from Apollo).

Gov't Ex. 63.  The attached "confidential summary of transaction," which is dated April 1, 2008, explains that investors entering into the transaction would be "purchas[ing] warrants from willing sellers prior to their expiration and, with regard to the warrants,

---

[8] Mr. Adams dismisses the transactions from prior to 2008 as being irrelevant because the tax returns that are at issue are for 2008, 2009, and 2010.  But the evidence showing how the transactions in 2007 were described is absolutely relevant in that they too show that the transactions were warrant sales, not stock sales, just like the way the transactions in 2008 through 2010 were described in virtually every document except for the one discussed previously.  See Gov't Ex. 43 at ECL-00031279.

correspondingly exercise such warrants." *Id*. at ESA001645.  The purchase agreement that follows the confidential summary specifies that investor would be agreeing to "purchase and exercise [the specified number of] warrants" and that payment would be submitted to "RL Investments, LLC." *Id*. at ESA001654.

In short, the amended returns filed in 2014 falsely represented the gains that had been realized in 2008, 2009, and 2010 in order to fraudulently take advantage of a more favorable tax treatment.   This is not a situation of a litigant merely alleging that a fraud had occurred and asserting that disclosure of allegedly privileged communications may help prove the fraud.  *See* Def's Opp. to Mot. Contesting Appl. of Privilege at 16-17 (quoting *In re BankAmerica Corp. Sec. Litig*., 270 F.3d 639, 642 (8th Cir. 2001)).  The government has pointed to numerous specific documents demonstrating that Mr. Adams realized gains from the sale of warrants and yet the amended returns filed with the assistance Murry and Mr. Brever falsely characterized the gains as having come from the sale of stock.  The government has also demonstrated that this mischaracterization was fraudulent in that it allowed Mr. Adams to wrongfully avoid hundreds of thousands of dollars of taxes.  The government has therefore made the threshold showing of a factual basis adequate to support a good faith belief by a reasonable person that the crime-fraud exception applies.  *See In re Green Grand Jury Proceedings*, 492 F.3d 976, 983 (8th Cir. 2007).

As Mr. Adams has made abundantly clear, he used the services of Murry and Mr. Brever to prepare and file his amended returns.  That is the whole basis for his assertion of privilege.  But the evidence demonstrates that those services were used to commit a new

fraud on the IRS. Therefore, Mr. Adams's communications with Murry and Mr. Brever were never privileged in the first instance. Crime-fraud is different from waiver in that regard. A privileged communication subject to the waiver doctrine is one that was initially privileged but then loses its privileged nature by an express or implied waiver. But a communication subject to the crime-fraud exception was never privileged to begin with. *See United States v. Lentz*, 524 F.3d 501, 524 (4th Cir. 2008) ("[U]nder the crime-fraud exception, the privilege does not apply in the first instance."). There appears to be no legitimate explanation for why it was not false and fraudulent for Mr. Adams to claim on his amended returns that the gains had come from the sale in 2008-2010 of stock that had been held for five years when the documents created contemporaneously to the transactions show that the gains had instead come from the sale of warrants.

The above analysis not only establishes a *prima facie* case of crime-fraud—i.e., a factual basis adequate to support a good faith belief by a reasonable person that the crime-fraud exception applies—but also perfectly illustrates why the communications with Murry cannot be privileged. There is an answer to the question of what the basis was for the change in the characterization on the draft versions of the amended returns from short-term capital gains—i.e., gains on assets held *less than a year*—to long term gains eligible for exclusion under § 1202—i.e., gains on assets held for *at least five years*. The answer to that question cannot be privileged because it formed the basis for the characterization on the final versions that were filed. The government is unaware of any authority for the proposition that a taxpayer can use the attorney-client privilege or work-product doctrine to hide the factual and legal basis on which the taxpayer relied to claim a particular type of

24

tax treatment.  Mr. Adams seems to hint at a good-faith reliance on advice of counsel explanation in asserting that he made extensive disclosures to Mr. Brever and Murry who then advised him on how to file his amended returns.  But there is no support for that assertion because the defense is insisting that the communications that led up to that decision are privileged.

Mr. Adams next suggests that the tax laws are more nuanced and that it may be permissible to include within the holding period the period during which a warrant was held before being exercised, such that the taxpayer can avail himself of the long-term capital gains rate and the 50% exclusion under § 1202.[9]  Thus, he contends that the government's crime-fraud assertion amounts to nothing more than the government disagreeing with his (and his advisors') invocation of the long-term gains rate and the exclusion under § 1202.  Mr. Adams might have a point if he had provided factually truthful information on his amended returns—that is, had he reported the gains as having come from the sale of warrants—and then espoused the legal theory that there is an interpretation of the tax code that nonetheless allows him to claim those gains as long-term gains eligible for the § 1202 exclusion.  But that is not what happened here.  The tax returns are facially false.  They are premised on the lie that what Mr. Adams sold in 2008-2010 that gave rise to the unreported income was stock as opposed to warrants.  Even if there were merit to Mr. Adams's argument that the gains from the warrants he sold should be subject to the

---

[9] Aside from his citation to a provision of the Internal Revenue Code that does not even mention warrants or options, 26 U.S.C. § 1223(1), Mr. Adams fails to cite any authority in support of this newly-minted legal theory that, importantly, appears nowhere on his amended returns.

long-term gains rate and the § 1202 exclusion, that was not the basis advanced on the amended returns. And surely Mr. Brever and Murry did not inform Mr. Adams that they believed his warrant sales could receive such a tax treatment but nonetheless advised him that it would be a good idea to instead mischaracterize those warrant sales as stock sales.

Mr. Adams next claims that the invocation of the crime-fraud exception is improper given the current procedural posture. He claims that the proper way to raise the crime-fraud exception is before the allegedly privileged communications have been viewed. But again, the need to raise the issue is because of the relief Mr. Adams is seeking. Mr. Adams sought to use the government's exposure to his communications with Murry as a vehicle to seeking suppression, dismissal, or disqualification. Having done so, he put the issue back into controversy. If, as strongly appears from the record, Mr. Adams did indeed use the services of Murry and Mr. Brever to submit a new set of false returns to the IRS, it would be an absurd result to refuse to consider the crime-fraud exception and thereby allow Mr. Adams to use his privilege assertion as both a shield and a sword.

In an additional effort to avoid the merits of the crime-fraud issue, Mr. Adams claims that the government's crime-fraud argument is at odds with the indictment. He explains that if, as the crime-fraud argument goes, his receipt of funds from the Venture Bank accounts was the result of the sale of his own warrants, then he cannot have committed a theft or embezzlement. But of course, Mr. Adams has been charged with fraud, not theft or embezzlement. The superseding indictment makes perfectly clear that the basis for the fraud charges is that Mr. Adams misled investors about how the proceeds of the transactions would be used. *See* Superseding Indictment [Dkt. No. 70] at ¶ 1. Mr.

Adams, directly and indirectly through others, allegedly led the investors to believe that their investment funds would go to Apollo, as opposed to what really happened, which is that much of the proceeds were used to divest Mr. Adams of portions of his putative interest (i.e., warrants) in Apollo. *Id.* at ¶¶ 17-22, 24-28, 31-33, 36-40. The crime-fraud argument posits that Mr. Adams mischaracterized the nature of the transactions to fraudulently avoid hundreds of thousands of dollars in tax liabilities. That argument is valid regardless of whether the government ultimately proves that the sale of warrants was fraudulent. If, as the government contends, Mr. Adams was not entitled to keep the proceeds of those transactions because doing so contradicted the representations made to the investors, his reporting of the proceeds on the amended returns was false and fraudulent not because they were ill-gotten but because it mischaracterized the nature of the transaction and the chronology of events. If, as Mr. Adams presumably contends, he was entitled to keep the proceeds of the transactions because he did not mislead the investors, his reporting of the proceeds on the amended returns was still false and fraudulent because it mischaracterized the nature of the transaction and the chronology of events.

Mr. Adams's final attempt to distract from the issue is to suggest that the crime-fraud argument must be without merit given the unsupported conjecture by Mr. Adams that the argument has not been vetted by the "subject-matter experts" at the Tax Division of DOJ. The reasons why a particular charging theory *has not yet been pursued* is irrelevant to the analysis of the crime-fraud argument. The government is unaware of any authority saying that it is, and Mr. Adams cites none. Suffice it to say that the government is fully

aware of the procedures it will need to go through to get approval to bring new charges based on the amended returns filed in 2014.

**2.     Communications among Mr. Adams, Mr. Monahan, and Mr. Reilly**

The touchstone of Mr. Adams's argument regarding this set of communications is that he and Mr. Monahan had a common interest in the various civil lawsuits (Mack/Rapello, Fink, and Nelson Mullins) and, therefore, the communications among themselves, or with Mr. Reilly, their agent, constitute attorney-client communications and work product.  In his discussion of the law governing the common interest doctrine, Mr. Adams glosses over an important point, which is that communications are not privileged simply because a common-interest relationship exists.  Indeed, one of the very cases that Mr. Adams cites, *Puckett v. Hot Springs School Dist. No. 23-2*, makes this point explicitly: "Just because Spitzer and the Pucketts[--two parties whom the court found were in a common-interest relationship--]communicated about this case, however, does not make that communication per se privileged. . . .  Instead, the underlying substance of the communication must be privileged in that it must involve either work product or the solicitation or giving of legal advice."  239 F.R.D. 572, 584 (D.S.D. 2006).

The government does not have access to the documents or Mr. Adams's apparent explanations for why the documents were communications for the purpose of soliciting legal advice as opposed to simply communications.  The government respectfully urges the Court not to rely on Mr. Adams's after-the-fact assertions that the communications were for such a purpose and instead examine the substance of those documents to determine whether they truly were for one of those purposes.  For example, Mr. Adams asserts that

28

an April 30, 2012 email between him and Mr. Monahan related to their dispute with former

business partners Mack and Rapello.  But the mere fact that it related to the dispute does

not establish that it was a communication between Mr. Adams and Mr. Monahan that was

for the purpose of soliciting or giving legal advice.  Nor does it establish that it was work-

product prepared in anticipation of litigation.  It would seem that the best test of whether

the communications are for one of those purposes is if the emails themselves indicate that

Mr. Adams and/or Mr. Monahan were preparing a memorandum or written summary for

the specific purpose of being included in, for example, an answer to a civil complaint, or if

they were communicating about something for the specific purpose of then communicating

that same information to their attorney.  If the emails themselves lack any such indication,

that would seem to undercut the validity of Mr. Adams's assertions now that they were for

such a purpose.[10]

## 3.   <u>Communications with Mr. Spitzer</u>

Mr. Adams dodges the question that was posed by the government's motion.  Did

Mr. Spitzer represent Mr. Adams personally or did Mr. Spitzer represent Apollo?  Given

---

[10] It appears that a number of the communications at issue consist of Mr. Adams, Mr. Monahan, or Mr. Reilly collecting pre-existing documents and records, perhaps with the idea that those documents or records would then be sent to an attorney or would be used in litigation.  Mr. Adams suggests that efforts to "gather information to facilitate the provision of legal advice" fall within the work product protection. *See* Def's Opp. to Mot. Contesting Appl. of Privilege at 28 (citing *Tatum v. R.J. Reynolds Tobacco Co.*, 247 F.R.D. 488, 501 (M.D.N.C. 2008)).  Contrary to Mr. Adams's suggestion, *Tatum* does not hold that the gathering of pre-existing documents falls within the work product protection.  Instead, the documents found to be covered by the work product doctrine in *Tatum* were "documents [that] contain information gathered at the request of counsel in anticipation of litigation, and *were created 'because of'* the genuine prospect of litigation."  247 F.R.D. at 501 (emphasis added).

Mr. Adams's response, it would appear that the question is more properly framed as whether Mr. Spitzer was consulted for the purpose of potentially providing legal advice to Apollo or to Mr. Adams personally.  If Mr. Spitzer was consulted for the purpose of potentially providing legal advice to Apollo, then the privilege is not Mr. Adams's to assert. The fact that Mr. Adams was also a party or potential party is not sufficient to support a claim of privilege.  Instead, Mr. Adams must show that he consulted with Mr. Spitzer for the purpose of Mr. Spitzer potentially providing legal advice to Mr. Adams, personally, as opposed to Mr. Adams as a representative of Apollo.  Again, Mr. Adams's own statements in his deposition with the SEC contradict his assertion now that he consulted with Mr. Spitzer in any capacity other than as a representative of Apollo.  DX 51 at 346-47.

**4.**     **Communications with Nelson Mullins**

Mr. Adams's basis for claiming that his communications with Nelson Mullins are privileged and that it is his privilege to assert rather than Apollo's is an August 10, 2012 email in which Mr. Manning of Nelson Mullins communicated a settlement offer to the plaintiffs' attorney in the Fink litigation.  Mr. Adams further claims to have been a party to a phone call the day prior, August 9, 2012, in which, according to him, Mr. Manning stated that he would represent the interests of all the defendants in the Fink litigation in conducting settlement negotiations.  Mr. Adams fails to cite any authority for the proposition that in a multi-defendant suit, the attorney for one party taking the lead in settlement negotiations and representing the interests of all defendants results in that attorney having an attorney-client relationship with the other defendants.  In addition, Mr. Adams's other privilege assertions maintain that Mr. Adams was represented in his

30

personal capacity in the Fink litigation by Mr. Hartman of Anthony Ostlund Baer.  Mr. Manning and the other lawyers at Nelson Mullins represented Apollo.


Dated: September 5, 2018                         Respectfully Submitted,

                                                ERICA H. MacDONALD
                                                United States Attorney

                                                *s/ John Kokkinen*

                                                BY:  JOHN KOKKINEN
                                                Assistant U.S. Attorney
                                                Attorney Id No. 0388356
                                                600 U.S. Courthouse
                                                300 South Fourth Street
                                                Minneapolis, Minnesota 55415
                                                612-664-5600