# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.

Edward S. Adams,

      Defendant.

Case No. 0:17-cr-00064-DWF-KMM

**REPORT AND RECOMMENDATION**

David M. Genrich, David J. MacLaughlin and John E. Kokkinen, Assistant United States Attorneys, counsel for the United States of America

Lance A. Wade, Gloria K. Maier, Joseph G. Petrosinelli and Sarah Lochner O'Connor, Williams & Connolly LLP; Deborah A. Ellingboe and James L. Volling, Faegre Baker Daniels LLP; counsel for Mr. Adams

## I.  Introduction

The government has charged Edward S. Adams with eight counts of mail fraud (18 U.S.C. § 1341), six counts of wire fraud (18 U.S.C. §§ 1343), and three counts of making and subscribing false tax returns (18 U.S.C. § 7206). Now before the Court are three of Mr. Adams's pretrial motions. First, Mr. Adams asks the Court to suppress information the government obtained from his Yahoo! email accounts pursuant to a federal search warrant. He asserts that blanket suppression of all material seized is appropriate because, in executing the warrant, the government reviewed non-privileged information beyond the scope of the warrant and disregarded the privileged nature of several communications. (Mot. to Suppress, ECF No. 36; Def.'s Post-Hr'g Mem. in Supp. of Mot. to Suppress ("Def.'s Suppression Mem."), ECF No. 147.) Second, because agents and prosecuting attorneys reviewed his privileged communications, Mr. Adams asks the Court to dismiss the indictment or, in the

alternative, to disqualify the prosecution team. (Mot. to Dismiss or Disqualify, ECF No. 144.) And third, Mr. Adams asks the Court to dismiss Counts 15 through 17 of the indictment, which charge him with tax fraud, or in the alternative, to require the government to file a bill of particulars. (Mot. to Dismiss Tax Counts, ECF No. 140.)

The government's execution of the search warrant was not without flaws, and the prosecution team's efforts to protect Mr. Adams's attorney-client privileged communications at times fell short. However, the Court concludes that, although mistakes were made that exposed the government to some privileged documents, the remedies of complete suppression, dismissal, and disqualification are not justified in this case. The Court also concludes that the government did not improperly review emails and other materials that were beyond the scope of the search permitted by the Yahoo! warrant. For the reasons that follow, the Court recommends that: (1) Mr. Adams's motion to suppress be denied; (2) his motion to dismiss the indictment be denied; (3) his request for disqualification be denied; and (4) his motion to dismiss the tax counts or for a bill of particulars be denied. However, the Court also recommends that certain limitations be made on the government's use of privileged materials.

## II.    Factual Background

Resolution of Mr. Adams's remaining pretrial motions requires a careful consideration of three things: the charges set forth in the First Superseding Indictment; the Yahoo! email search warrant and the application on which it was based; and the circumstances surrounding the execution of the warrant.

### A.  First Superseding Indictment

For several years, Mr. Adams held various positions in management and on the boards of two companies engaged in the business of creating laboratory-grown diamonds and diamond materials. (First Superseding Indict. ¶ 3, ECF No. 70.) These companies were called Apollo Diamond Inc. and Apollo Diamond Gemstone Corporation. (*Id.* ¶¶ 3–4.)

In laying out the scheme to defraud, the indictment first describes an embezzlement scheme involving the Apollo companies. Around 2003, the Apollo companies raised several million dollars of investment funds for the operations of the Apollo companies. (*Id.* ¶ 10.) Although the Apollo companies had boards of directors, the board members allegedly placed trust in the management of the businesses and investment fund raising to Mr. Adams. (*Id.* ¶¶ 11–13.) Mr. Adams created several bank accounts for the Apollo companies, but allegedly transferred millions of dollars of investment funds to his own personal bank accounts and the accounts of his law firm. (*Id.* ¶ 14.) Generally, the government alleges that Mr. Adams was engaged in a scheme to defraud investors in the Apollo companies by misrepresenting that the investors' money would be used to fund those companies' operations; instead, he misappropriated and embezzled millions of dollars for his own use. (*Id.* ¶ 1.)

Mr. Adams allegedly set up a bank account with Venture Bank in Golden Valley, Minnesota, for a company called RL Investment Holdings LLC, to funnel the Apollo investors' funds to himself. (*Id.* ¶¶ 16–22.) Similarly, he is accused of diverting investment funds to himself through another Venture Bank account in the name of DL Investments LLC. (*Id.* ¶¶ 23–28.) He also allegedly opened accounts in the names of the Apollo companies, but diverted portions of the investors' funds for his own use without the knowledge of the companies or the other board members and without disclosing that he did so to investors. (*Id.* ¶¶ 29–33.) Mr. Adams allegedly embezzled funds from the Apollo companies through another entity, ADR Investments LLC, and its account at Venture Bank. (*Id.* ¶¶ 34–40.)

Following the embezzlement-scheme allegations, the indictment describes a "lulling scheme." (*Id.* at 11; *id.* ¶ 42.) Around 2008, the Apollo companies were having difficulties meeting financial obligations, problems allegedly caused or compounded by Mr. Adams's embezzlement. By the end of 2010, the Apollo companies had become insolvent and "teetered on the brink of bankruptcy." (*Id.* ¶ 41.) In 2011, Mr. Adams allegedly designed and structured a new company, purportedly to acquire the assets of the Apollo companies. (*Id.* ¶ 6.) When the Apollo companies were nearly

insolvent, Mr. Adams allegedly convinced investors in the Apollo companies to convert their shares of stock into shares of this new company, which Adams also controlled, a fact he did not disclose to those investors. He allegedly did this to lull investors into believing that their previous investments in the Apollo companies retained value, even though they did not. (*Id.* ¶ 42.)

Mr. Adams and Michael Monahan, who was Mr. Adams's partner in the law firm Adams Monahan LLP, first created a privately held company called Scio Diamond Technology Corporation ("Private Scio") and made themselves the sole shareholders and the only members of the board of directors. (*Id.* ¶ 43.) They told Apollo shareholders that the Apollo companies were in financial peril, but that Apollo had agreed to sell both companies' assets to Private Scio for just over $2M. (*Id.* ¶ 44.) Mr. Adams and Mr. Monahan told Apollo shareholders that they could sell back all their Apollo shares for a penny and purchase the same number of shares in Private Scio for a penny, but they allegedly did not disclose that they had created Private Scio, were its only shareholders, were the only members of its board of directors, or that it did not have the funds to complete the asset purchase. (*Id.* ¶¶ 45–46.) Mr. Adams allegedly required Apollo shareholders to sign covenants not to sue as a condition of becoming shareholders in Private Scio and did so to prevent potential shareholder litigation and to conceal his embezzlement from the Apollo companies. (*Id.* ¶ 47.)

The Apollo shareholders approved the Private Scio transaction. Mr. Adams and Mr. Monahan attempted to raise the money to fund the asset purchase of the Apollo companies, but they were unsuccessful. (*Id.* ¶¶ 48–51.) To prevent litigation by disgruntled shareholders and conceal prior embezzlement, Mr. Adams and Mr. Monahan allegedly arranged another transaction whereby Private Scio would be acquired by a publicly traded shell entity called Krossbow Holding Corporation. Private Scio would then become a publicly traded company called Scio Diamond Technology Corporation ("Public Scio"). (*Id.* ¶ 52.) The government alleges that Mr. Adams also structured the formation of Public Scio for his own benefit, including

diverting new Public Scio investors' funds to himself and to his own law firm. (*Id.* ¶¶ 53–59.)

Lastly, the government charges Mr. Adams with tax fraud for the years 2008 through 2010, asserting that he earned more income than he reported when he filed his tax returns.[1] (*Id.* ¶¶ 64–67.) While Mr. Adams was allegedly engaging in the scheme to defraud outlined above, he is accused of willfully failing to disclose most of the investor funds he diverted to himself when he filed his taxes. (*Id.* ¶¶ 64–65.) He allegedly made and subscribed the following false tax returns: (1) in 2008, he reported taxable income of $674,763, whereas his taxable income exceeded that amount; (2) in 2009, he reported taxable income of $581,795, whereas his taxable income was higher; and (3) in 2010, he reported taxable income of $783,327, despite having a higher taxable income. (*Id.*, Counts 15–17.)

### B. The Yahoo! Search Warrant Application and Affidavit

The charges in the indictment developed from a lengthy investigation that involved, among other things, a search warrant for Mr. Adams's Yahoo! email accounts. On January 7, 2016, United States Postal Inspector Christie Kroells applied for and obtained a search warrant authorizing the search and seizure of three Yahoo! email accounts related to suspected mail- and wire-fraud crimes. (Jan. 8–9, 2018 Hr'g, DX 10.)[2] Inspector Kroells provided an affidavit in support of the search warrant, asserting that there was probable cause to believe that Mr. Adams and Mr. Monahan

---

[1]     The original Indictment did not include Counts 15–17. The addition of these tax counts is the primary difference between the original Indictment and the First Superseding Indictment.

[2]     The Court refers to the exhibits admitted at the hearing held on January 8 and 9, 2018, by the abbreviations "DX" for the defense exhibits and "GX" for the government's exhibits. In addition, the Court notes that several of the parties' briefs include tables of contents, which creates a divergence between the page numbers generated by ECF and the numbers at the bottom of each page of the brief. Throughout this Report and Recommendation, whenever the Court cites to a document in ECF, it refers to the page number generated by the ECF system.

had committed mail and wire fraud by concealing and failing to disclose material information to Apollo shareholders prior to seeking their approval of transactions that personally benefited them. (DX 10 at 1; *id.*, Kroells Aff. ¶ 4.) Inspector Kroells's affidavit focuses on Mr. Adams's alleged failure to make material disclosures in connection with the asset purchase arrangements for the Apollo companies by Private Scio and Public Scio.

The affidavit generally describes Mr. Adams's and Mr. Monahan's involvement in the Apollo entities and the formation of Private Scio and Public Scio. (Kroells Aff. ¶¶ 6–11.) Inspector Kroells averred that in issuing proxy statements to the Apollo shareholders regarding the Private Scio transaction, Mr. Adams did not disclose that his law firm was in fact Apollo Diamond's largest creditor. Nor did the proxy statements disclose that Mr. Adams and Mr. Monahan were the founders of Private Scio and the only members of its board of directors. (Kroells Aff. ¶ 12.) The affidavit also states that when Apollo shareholders were told about the planned asset purchase by Private Scio, Mr. Adams failed to disclose that Private Scio was unable to pay the purchase prices for the Apollo companies at the time of the agreements. (Kroells Aff. ¶ 13.)

Inspector Kroells's affidavit alleges that Mr. Adams and Mr. Monahan made other misrepresentations regarding the Private Scio asset purchase. For example, they allegedly failed to disclose their roles and ownership interests in Private Scio when a cover letter was sent to Apollo shareholders about Private Scio's "new management" by an individual identified as J.D.L. However, J.D.L. stated that he was not involved in Private Scio. (Kroells Aff. ¶ 15–16.) Adams and Monahan also allegedly failed to disclose their interests in Private Scio in connection with a private placement memorandum sent to potential investors in May of 2011.[3] (Kroells Aff. ¶ 19.)

---

[3]      Inspector Kroells explained in the affidavit that Mr. Adams used his email to discuss controlling Private Scio and in communicating with officers of Public Scio. (Kroells Aff. ¶¶ 20, 29.) She also described other bases for believing that evidence of

Further, Inspector Kroells discussed the establishment of Public Scio through the shell company, Krossbow Holdings Corporation. (Kroells Aff. ¶ 21.) The affidavit asserts that funds purportedly destined for purchasing the assets of Private Scio were distributed to Mr. Adams and his wife, Mr. Monahan and his wife, and others. (Kroells Aff. ¶ 22.) The formation of Public Scio created significant interests in the company for Mr. Adams and others and made Mr. Adams Chairman of the Public Scio Board. (Kroells Aff. ¶¶ 23–24.) SEC filings for Public Scio did not disclose that Mr. Adams and Mr. Monahan had previous roles in the Apollo companies, Mr. Adams's relationship to the board members of the Apollo companies, or his law firm's representation of the Apollo entities. (Kroells Aff. ¶ 25.) Mr. Adams also allegedly made misrepresentations to Public Scio's Chief Financial Officer, C.N., regarding his and Mr. Monahan's previous roles in the Apollo entities. (Kroells Aff. ¶¶ 29–30.)

### C. The Yahoo! Search Warrant

Based on Inspector Kroells's application and affidavit, United States Magistrate Judge Steven E. Rau concluded that there was probable cause to conduct the search of Mr. Adams's emails.[4] (DX 11.) The search warrant incorporates a statement of "Particular Things to be Seized" in Attachment B, which authorizes the government to seize the following:

> a. All information [within the subject email accounts] that constitutes fruits, contraband, evidence and instrumentalities of violations of [the mail- and wire-fraud statutes], those violations involving Edward S. Adams and Michael R. Monahan and occurring

criminal activity would likely be found in Mr. Adams' Yahoo! email addresses. (*See* Kroells Aff. ¶¶ 33–41.)

---

[4]     The Yahoo! email accounts for Mr. Adams were his personal email accounts. He had a separate email account for his law firm that is not at issue here, and was never searched by the government. The warrant authorized the seizure of material from an email account that did not belong to Mr. Adams, but to Mr. Monahan.

after October 25, 2006, including for each account or identifier listed on Attachment A, information pertaining to the following matters:

1. All documents, records, and communications related to financial, bookkeeping, transactional and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to present; to include, but not limited to:

   i. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which itemize and record the dates, amounts, purpose, and expense category and classification of all financial transactions conducted in and through the business bank accounts and other financial accounts of the above business entities.

   ii. All bookkeeping ledgers, journals, reports, and other bookkeeping records, and computer printouts thereof, which record, identify, and itemize the dates, amounts, and nature and classification of all income and expenses of the above business entities.

2. All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/ADGC and Private Scio, the stock-repurchase program, and the private offering.

3. All documents and records reflecting communications with shareholders or prospective shareholders of ADI, ADGC, Private Scio, and Public Scio.

(DX 11, Attach. B, Part II.)

Inspector Kroells served the warrant on Yahoo! on January 8, 2016. (DX 1, Nov. 30, 2017 Decl. of Christie Kroells ("Kroells Decl.") ¶ 8, ECF No. 52-1; DX 11 at 2.) On March 7, 2016 Yahoo! provided the government with a flash drive

containing records for the relevant email addresses, two of which belonged to Mr. Adams, and one to Mr. Monahan. (DX 11, Return.) The flash drive contained over 145,000 documents covering a 10-year period between October 25, 2006, and January 7, 2016.

### D. Execution of the Yahoo! Warrant – Scope

Mr. Adams's motion to suppress asserts, in part, that the government reviewed the emails obtained pursuant to the Yahoo! warrant without any regard for the warrant's proper scope. Because the probable cause provided in the warrant application focused on the Apollo/Scio transactions in 2011 and 2012, Mr. Adams maintains that information related to his earlier alleged embezzlement from Apollo and the tax counts were off limits. With that context in mind, the following facts are relevant to Mr. Adams's challenge concerning the scope of the warrant.

### 1. Inspector Kroells's Initial Searches

Shortly after the government obtained the flash drive from Yahoo!, the government began arrangements to use a software program for document review, Relativity, to examine and organize the Yahoo! documents. (DX 4, Zeitz Decl. ¶¶ 4–8.) However, Inspector Kroells reviewed material directly from the flash drive for a short time before the Relativity platform was in place. Between March 7, 2016 and March 14 or 17, 2016, Inspector Kroells reviewed some of the information on the flash drive on a computer in her office to verify that the flash drive contained emails from Mr. Adams's and Mr. Monahan's accounts. (Tr. of Jan. 8, 2018 Hr'g ("Jan. 8 Hr'g Tr.") 101:1–10, ECF No. 106.) She also ran some keyword searches to review information in preparation for witness interviews. (Kroells Decl. ¶¶ 11–13; Jan. 8 Hr'g Tr. 101:25–102:5.) Inspector Kroells spoke with Assistant United States Attorney David Maria ("AUSA Maria") in early March 2016 about reviewing the information on the flash drive to find communications between Mr. Adams and employees of the Apollo and Scio companies. (Kroells Decl. ¶ 9.)

When Inspector Kroells began searching through the information obtained pursuant to the Yahoo! warrant, her "goal was to specifically find e-mails that were relevant to the fraud scheme [described in] the search warrant." (Jan. 8 Hr'g Tr. 80:5–10.) Inspector Kroells "[t]ried to use search terms that would be relevant to finding actual evidence of the fraud scheme." (Jan. 8 Hr'g Tr. 81:9–21.) During the week when she reviewed material directly from the flash drive, Inspector Kroells encountered some material that did not appear relevant to the investigation and notified AUSA Maria about this. (Kroells Decl. ¶ 13.) She acknowledged that in a complex case like this one, the process of trying to arrive at the final number of emails relevant to the investigation is not perfect and that investigators will necessarily review information that is not relevant. (Jan. 8 Hr'g Tr. 84:1–7.)

Inspector Kroells also printed some emails during this initial phase of reviewing. In preparing for interviews with several potential witnesses, she "printed 22 emails from the flash drive and included those printouts with other materials [she] was using to prepare for [the] witness interviews." (Kroells Decl. ¶ 12.) Inspector Kroells shared some of these documents with Investigator Belich on March 15, 2016.

## 2.  The Prosecution Team's Keyword Searches

After the Relativity database was created, the government engaged in an initial filtering for privileged documents in March and April of 2016, a process explored in detail below. Then, in early May of 2016, members of the prosecution team began searching through materials that remained in a "For Review Folder" to continue their investigation. On May 4, 2016, the prosecution team started running keyword searches in the Relativity database, viewing emails and attachments that hit on those terms, and developing the case against Mr. Adams. This examination lasted eleven months until, on April 4, 2017, the government applied a final list of search terms to the Relativity database "to cull [the database] down to relevant documents" so that the documents "that hit on these search terms should remain in the database[.]" (DX 24.)

AUSA Maria ran 611 keyword searches between May 4, 2016 and April 4, 2017. (DX 79.) Inspector Kroells ran 385 keyword searches between May 5, 2016 and August 21, 2017. (DX 81.) A number of AUSA Maria's and Inspector Kroells's searches were run using the same keywords. (DXs 79, 81.) FBI Special Agent Jennifer Khan ran 147 searches between May 5, 2016 and October 31, 2016. (DX 83.) Internal Revenue Service Agent Brandon Belich ran 5 searches on July 13, 2016. (DX 85.)[5]

Particular keyword searches run by Inspector Kroells and AUSA Maria during this time period track allegations that Mr. Adams used secret accounts to divert investor funds from the Apollo companies to himself and that he represented to an Apollo employee that the ADR Investments account would be funded by the sale of "warrants" owned by Apollo. For example, Inspector Kroells ran the following searches:

- "sandy" AND "ward" AND "secret";[6]
- "sandy" AND "ward" AND "apollo" AND "bank" AND "account";
- "sale" AND "warrants";
- "sale" AND "warrants" AND "jill";
- "jill" AND "zipkin" AND "ed";
- "dl investment";
- "rl investment";
- "ed" AND "sell" AND "shares" AND "warrants" AND "apollo";
- "ADR";
- "RL"; and

---

[5]   It appears that the government ran fewer unique searches than these numbers suggest. Where the logs show repeated lists of the same search terms in close succession, a person using the Relativity database is returning to a search and then picking a new document that is responsive to the same search term rather than clicking directly through a list of documents. (Tr. of Jan. 9, 2018 Hr'g ("Jan. 9 Hr'g Tr.") at 162:15–164:17, ECF No. 87.)

[6]   Inspector Kroells testified that "Sandy Ward was an assistant of Mr. Adams" who "had some communications with Mr. Adams about some secret bank accounts that were of particular interest in the fraud scheme." (Jan. 8 Hr'g Tr. 119:20–25.)

- "sell" AND "warrants" AND "apollo."

(DX 81 at 1–3, 6, 10; Def.'s Suppression Mem. at 15.)[7] As early as May 4, 2016, AUSA Maria searched for similar terms, including: "zipkin"; "warrant"; "jail"; "authorized the sale of warrants"; "sold warrants"; "rl investments"; "dl investments"; "adr investments"; "adr"; "indicted"; "accused"; "fraud"; "rl & investment"; "rbe"; and "moron." (DX 79 at 1.) And FBI Agent Khan ran searches for "ward" or "secret," which was related to her understanding that Mr. Adams used secret bank accounts in connection with his alleged embezzlement from the Apollo companies. (DX 83 at 1–2 (indicating searches for "'ward' OR 'secret'" and "secret"); Tr. of Jan. 9, 2018 Hr'g ("Jan. 9 Hr'g Tr.") at 29: 12–30:7, ECF No. 87.)

Other searches related to the investigation into Mr. Adams's personal taxes and tax-related communications. For example, on September 6 and 7, 2016, AUSA Maria ran searches for "murryllc." (DX 79 at 7 (entries 295–99).) Murry LLC is an accounting firm that the prosecution team learned was working for Mr. Adams. He also ran searches for "murry" and "murryllc" on December 6, 2016. (DX 79 at 17 (entries 573–76).) On April 27, 2017, Inspector Kroells ran searches for "murry," which she acknowledged was based on her understanding that Murry LLC was acting as an accountant for Mr. Adams. (DX 81 at 10; Jan. 8 Hr'g Tr. at 217:10–13.) Inspector Kroells indicated those searches were related to tax issues and thought she

---

[7]     Jill Zipkin, referred to as J.Z. in the indictment, "is an individual employed in the financial services industry who assisted Apollo in its fundraising efforts. [She] was responsible for raising millions of dollars of investment money for Apollo." (First Superseding Indictment ¶ 9.) The indictment alleges that because of Mr. Adams's misrepresentations to Ms. Zipkin, she "unknowingly conveyed false and misleading information to investors and potential investors in Apollo." (*Id.*) In particular, the indictment asserts that through Ms. Zipkin, Mr. Adams misrepresented to investors that their funds made payable to RL Investment Holdings, DL nvestments, and ADR Investments would be used to fund Apollo's operations, but he diverted those investment funds to himself. (*See id.* ¶¶ 17–22, 24–28, 35–40.) The fundraising efforts through ADR Investments involved the sale of "warrants." (*Id.* ¶ 35.)

might have run them to duplicate specific messages that the government had received from another source. (*See* Jan. 8 Hr'g Tr. 201:15–18, 217:17–25, 222:11–223:8.)

IRS Agent Belich also reviewed information from the Relativity database in connection with the government's investigation. Agent Belich was originally brought into the investigation in 2014 to investigate tax-related matters under Title 26 of the U.S. Code as well as Title 18, including money laundering. (Jan. 8 Hr'g Tr. at 268:4–11, 282:13–25.) Agent Belich did not recall receiving specific instructions for how to conduct any searches within the database. (Jan. 8 Hr'g Tr. at 287:6–13, 288:20–22.) He had difficulty connecting to the Relativity database directly due to connection issues in his office in Duluth, MN, and ultimately ran no more than 5 searches on a single day.[8] (Jan. 8 Hr'g Tr. at 271:23–272:4; DX 85.) However, as explored below, AUSA Maria and Inspector Kroells provided Agent Belich with tax-related documents from the database, including communications between Murry LLC and Mr. Adams. (*See* Jan. 8 Hr'g Tr. at 278:13–15, 289:13–21, 304:3–305:5.) In the fall of 2016 through early 2017, Inspector Belich was involved in developing the tax investigation and eventually obtained permission to present the results of that investigation to the grand jury. (Jan. 8 Hr'g Tr. 280:16–19, 302:14–303:10.)

During its review of the Relativity database, the government ran several searches including profane or colorful language. AUSA Maria ran searches for terms like: "idiot"; "crap"; "jackass"; "bribe"; "lie"; "shenanigans"; and "traitor." (DX 79.) Inspector Kroells ran searches like: "crap"; "'maddox' AND 'monahan' AND 'shit'"; and "'maddox' AND 'fuck.'"[9] (DX 81 at 2, 5, 7.) Inspector Kroells explained that she searched for these kinds of terms because "[i]n [her] experience when fraud schemes are going downhill, things are starting to unravel, people will start getting cryptic in

---

[8]     Agent Belich searched for the term "rothman" five times in on July 13, 2016. (DX 85.) Rothman was the last name of two investors. (Jan. 9 Hr'g Tr. at 272:17–273:2.)

[9]     Mr. Maddox was an attorney who worked at Mr. Adams's law firm and was involved in the Apollo and Scio transactions. (Jan. 8 Hr'g Tr. 122: 9–14.)

their e-mails, but they also start using foul language or getting upset, and those were the e-mails that [she] was looking for relevant to this scheme." (Jan. 8 Hr'g Tr. 121:18–122:14.)

Another matter placed into issue here is AUSA Maria's search, on June 27, 2016, for his own name. (DX 79 at 7 (entry 239).) AUSA Maria had worked at Latham & Watkins prior to his employment in the United States Attorney's Office. On May 13 and 16, 2016, Mr. Hopeman sent a letter to the U.S. Attorney asserting that AUSA Maria's prior employment by the Latham firm created a conflict of interest. (Gov't's Exs. 2 & 3, ECF Nos. 173-2, 173-3.) AUSA Maria advised James Kopecky, one of the lawyers representing Mr. Adams in connection with the SEC investigation in January of 2016, that he had previously worked for Latham in the Washington, D.C. office. (Gov't's Ex. 4 at 3, ECF No. 173-4.) AUSA Maria indicated that he had no recollection of doing any work for Mr. Adams's companies that had been represented by Latham and that he "did not acquire any information whatsoever from or regarding th[o]se entities, let alone privileged or confidential information." (Gov't's Ex. 4 at 3.)

### 3.  Final Relevance Culling and the "Seizure"

Ultimately, on April 4, 2017, the government applied its final list of search terms to the database to purportedly "seize" documents relevant to its investigation and segregate the material that was not relevant. (DX 24.) The final list of search terms were: "Apollo, Diamond, ADI, ADGC, Gemstone, DL, RL, ADR, RBE, ESA MRM, Scio, SDTC, Krossbow, Linares, Lancia, Zipkin, Nichols, LisaL, LMAInc, Mack, Rapello, Platt, Robb, Larson, McMahon, Bern, McPheely." (DX 24; Maria Decl. ¶ 13.) When the government applied these search terms to the database, they hit on 42,927 documents. (GX Zeitz 3.) "Any document that failed to contain at least one of these terms was removed from the For Review Folder." (Maria Decl. ¶ 14.)

The prosecution team has viewed a total of 7,092 documents within the Relativity database. (Decl. of Gloria Maier ("Maier Decl.") ¶ 3, ECF No. 148.) Of that

number, 5,485 of those documents were included in the final "For Review Folder."
(Maier Decl. ¶ 3.) Over 1,600 of these emails came from Mr. Monahan's email
address, and are not relevant today. (*See* Maier Decl. ¶ 3.) There are 3,350 documents
that the government has viewed and that were obtained from Mr. Adams's email
accounts for which he does not claim privilege. (Maier Decl. ¶ 3.)

Mr. Adams indicates that several of the 3,350 documents are either unrelated to
this case altogether or are "outside the scope of the warrant." (*See* Suppl. Decl. of
Gloria Maier ("Suppl. Maier Decl.") ¶¶ 3–10, ECF No. 150.) By his count, 115 of
these documents are related to personal matters. (Suppl. Maier Decl. ¶ 3.) Another
635 documents concern business interests that are not related to Apollo or Scio.
(Suppl. Maier Decl. ¶ 4.) Over 550 documents "relate to Apollo or Scio matters"
which Mr. Adams asserts are "entirely unrelated to the issues described in either the
superseding indictment or the warrant application." (Suppl. Maier Decl. ¶ 5.) Still
other documents are allegedly beyond the scope of the warrant because they relate to
the sale of Apollo warrants, allegedly secret bank accounts, or Mr. Adams's personal
tax returns. (Suppl. Maier Decl. ¶¶ 6–8.)

### E. Execution of the Yahoo! Warrant – Privilege

Central to both Mr. Adams's motion to suppress and his motion to dismiss are
his claims that the government deliberately intruded on confidential communications
he had with several attorneys about matters that are related to the charges in the
indictment. The Court provides a detailed discussion of the relevant factual record
concerning these privilege issues.

### 1. Inspector Kroells' Initial Review

As noted above, Inspector Kroells reviewed material directly from the flash
drive provided by Yahoo! for a short period before the Relativity database was
created. According to Inspector Kroells, AUSA Maria authorized her to search for
communications between Mr. Adams and Apollo and Scio employees, in part,
because "the company would be waiving the [attorney-client] privilege" that might

have otherwise been applicable to some of the communications Mr. Adams had with Apollo and Scio personnel in his capacity as an attorney. (Kroells Decl. ¶ 9.) Indeed, in February or March of 2016, Scio's counsel informed AUSA Maria that the company "did not intend to assert any attorney-client privilege or related attorney work product protection with respect to the period when Edward Adams or his law firm may have provided legal advice to Apollo Diamond, Inc., or Apollo Diamond Gemstone Corporation." (Decl. of David Young ("Young Decl.") ¶ 5, ECF No. 109-7.)

Though Inspector Kroells does not specifically recall seeing any attorney-client privileged information during her initial review, she thought it was "likely" that she did. (Jan. 8 Hr'g Tr. 103:23–25.) She states that if she had come across potentially privileged information she would have followed her standard practice, which was to stop reviewing the document, memorialize its location, contact the AUSA assigned to the case to advise them of this concern, and continue reviewing other emails. (Kroells Decl. ¶ 12; *see* Jan. 8 Hr'g Tr. 66:18–67:4, 68:16–25, 69:1–14, 104:1–4.)

## 2. Mechanical Privilege Filtering

AUSA Maria asked the U.S. Attorney's Office's litigation support staff to use a "mechanical filtering" process to segregate potentially privileged documents from those documents that could later be reviewed. This process involved applying keywords at the outset to the entire database to excise potentially privileged communications that hit on those keywords from the reviewable information that did not. (Maria Decl. ¶ 5.) AUSA Maria generated two initial lists of search terms around April 14, 2016. (DX 14.) The litigation support staff ran both lists of search terms against the entire database to filter out potentially privileged information. The first, a list of general search terms like "privilege," "work product," "lawyer," and "attorney," resulted in a "disproportionately large number of hits," which was attributed to standard language and disclaimers in many of the emails within the database, so AUSA Maria decided a more tailored approach was necessary. (Maria Decl. ¶¶ 6–7.)

The second list included keywords related to specific lawyers and law firms that the investigators and prosecutors working on this case believed had some connection with Mr. Adams during the time he was associated with the Apollo and Scio companies. (Maria Decl. ¶ 5.) The filtering process with this second list alone resulted in more than 32,000 documents being segregated into secure folders identified as the "Taint" and "Not for Review" folders. (Maria Decl. ¶ 8.) No member of the prosecution team ever reviewed the information in these "Taint" or "Not for Review" folders generated from the mechanical filtering. (Maria Decl. ¶ 8.) The other remaining materials were placed into a Relativity database that could be reviewed by members of the prosecution team. This initial round of filtering took place in early May of 2016. (Jan. 8 Hr'g Tr. 71:8–72:14; Zeitz Decl. ¶¶ 15–17.)

When the Relativity database was created, the government did not employ a so-called "taint team" to further review the information obtained that was considered acceptable for examination, nor to review the materials segregated as potentially privileged. (Maria Decl. ¶ 8.) "Initially, the government considered using a taint team to review the contents of the secure Taint Folder . . . but, ultimately, the government determined that it would not undertake this task." (Maria Decl. ¶ 8.) Instead, the prosecution team reviewed only the documents that remained accessible in the Relativity database. "On May 4, 2016, before any member of the prosecution team accessed the For Review Folder, [AUSA Maria] instructed all members of the prosecution team that, if they encountered any documents that appeared to have the names of lawyers or law firms that had not been on [the] initial list of search terms, they should cease reviewing the document and contact [AUSA Maria]." (Maria Decl. ¶ 9.) This process resulted in members of the prosecution team being exposed, sometimes repeatedly, to certain privileged communications.

As the government went through the Relativity database, additional efforts were made to segregate potentially privileged information from the for-review environment. A second round of mechanical filtering occurred in early June of 2016, further excluding materials that contained additional attorney-related keywords. (Jan. 8

Hr'g Tr. 73:23–74:1; Zeitz Decl. ¶¶ 18–21.) This process excluded approximately 1,000 more documents. (Zeitz Decl. ¶ 20.)

### 3. Length of Views

The parties' briefing presents a fact dispute concerning how long the investigators had access to or "viewed" the allegedly privileged communications they encountered in the Relativity database, and the Court resolves that disagreement here.[10] The government takes the position that its agents viewed several privileged communications only very briefly. Mr. Adams asserts that the record does not support such a conclusion.

The Relativity logs before the Court show a timestamp indicating when an item within the Relativity database was initially "viewed" by a person and then another timestamp indicating when that person took action to "view" another document. According to the government, these logs establish that reviewers spent only the length of time between these "views" looking at a particular document on each occasion that a view appears. (*See, e.g.*, Gov't Ex. 13, ECF No. 173-11.)

Relying on the Supplemental Declaration of Mark H. Lyon, Mr. Adams disputes that the Relativity logs, in fact, prove that the investigators had only fleeting access to the documents at issue. (Def. Reply in Supp. of Suppression Mot. at 8–9, ECF No. 197; Suppl. Decl. of Mark Lyon ("Suppl. Lyon Decl."), ECF No. 200.) According to Mr. Lyon, the Relativity logs do not necessarily demonstrate how long a reviewer spent with a document because the program has different viewing modes that would allow a document to be opened and set aside in some way to be viewed indefinitely. (Suppl. Lyon Decl. ¶¶ 3–5.) Documents could be downloaded in "native" form, allowing the document to be viewed indefinitely in the native application, which

---

[10]     The question of how long the investigators and attorneys reviewed privileged information is relevant to both the alleged egregiousness of the government's conduct and to whether Mr. Adams suffered any prejudice. The Court analyzes these legal issues below, but makes the relevant proposed findings of fact here.

would not be recorded in a Relativity log. (*Id.* ¶ 5.) Documents could also be opened in a "standalone" viewer which would place the document in a separate browser window where the user's review of the document would not be recorded in the primary Relativity window. (*Id.*) Or a user could right-click on a link and open that document in a new tab or window in an internet browser, permitting the document to remain open in that tab or window until it is later closed. (*Id.* ¶ 6.) For these reasons, Mr. Lyon indicates that "trying to calculate the amount of time a user spent viewing the document based on the time between one action and the next in the [Relativity logs] would be futile." (*Id.* ¶ 7.) Mr. Adams also notes that Mark Zeitz, the Supervisory IT Specialist for the U.S. Attorney's Office in the District of Minnesota, testified that a Relativity log would not be able to show how long a user spent within a particular document. (*See* Jan. 9 Hr'g Tr. 157:8–10.)

Based on Mr. Lyon's supplemental declaration and the testimony of Mr. Zeitz, the Court cannot determine that the record conclusively establishes that any particular view lasted a specific duration. However, Court finds that it is more likely than not that the length of the Relativity user's exposure to the *in camera* documents is demonstrated by the duration between document views shown in the Relativity logs.[11] A careful examination of the Relativity logs as a whole suggests that AUSA Maria and Inspector Kroells were not opening the privileged documents in the ways that Mr. Lyon indicates Relativity would fail to record. For example, when looking at the Relativity log for *In Camera* Exhibit J (discussed below), there are short durations between several of the "view" entries linked to Inspector Kroells of the privileged material. (Gov't's Ex. 19 ("Relativity Log for *In Camera* Ex. J"), ECF No. 173-17.) On May 11 there is an entry for a view of one Document ID number associated with the privileged content at 3:57:16 PM EDT, a second for the same ID number at 3:57:22 PM EDT, and a third view at 3:57:51 PM EDT. (Relativity Log for *In Camera* Ex. J at 4 (entries for Doc ID 00219515).) The Court finds it very unlikely that Inspector

---

[11]    The Court reaches findings of fact in connection with a suppression hearing based on a preponderance of the evidence. *See United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

Kroells would have any need to access this document three separate times in a short span if she had engaged in one of the actions described by Mr. Lyon that would have provided her indefinite access to the privileged document, such as opening the document in another tab or window. Other view entries for the remaining *in camera* documents similarly suggest that the user was quickly clicking between documents and moving on to other entries in the Relativity database in a comparably short span.[12]

### 4. The Hopeman Memorandum

Perhaps most concerning among the privileged documents that were seen by members of the prosecution team is a memorandum that Mr. Adams prepared in September of 2014 for Jon Hopeman, a well-known criminal defense attorney with the Minneapolis law firm of Felhaber Larson. (*In Camera* Ex. J, ECF No. 145.) This memo contains information that could reveal aspects of the defense strategy in this case.

Shortly before the government received the flash drive from Yahoo!, in early mid-February or early March of 2016, prosecutors working on this case were contacted by Mr. Hopeman on Mr. Adams's behalf, and the two sides attempted to arrange a meeting. (*See* DX 48 (Mar. 3, 2016 email from J. Kokkinen to J. Hopeman arranging a meeting concerning Mr. Adams's case).) However, when the USAO litigation support staff were first asked to engage in mechanical filtering, no keywords were used to segregate communications with Mr. Hopeman from the for-review environment. (*See* Maria Decl. ¶ 6.) Although the U.S. Attorney's Office had been contacted by Mr. Hopeman on behalf of Mr. Adams in early March of 2016, the record indicates that members of the prosecution team did not realize that

---

[12]     In reaching this conclusion, the Court notes that the members of the prosecution team were in fact unaware that their work within the database was being so precisely tracked. The record does not support an inference that agents would have used one of the pathways described by Mr. Lyon—processes that necessarily took longer than simply moving onto the next view—to hide their improper review of privileged documents. (*See, e.g.,* Jan. 8 Hr'g Tr. 120:10–19.)

Mr. Hopeman had represented Mr. Adams prior to the January 7, 2016 cut off for the information obtained pursuant to the Yahoo! search warrant. (Suppl. Maria Decl. ¶ 15.) They were unaware that any attorney-client relationship had been formed months or years before that initial contact.

The Relativity database log shows that on May 5, 2018, when he began reviewing the material in the database, AUSA Maria encountered the September 2014 memo from Adams to Hopeman.[13] (Relativity Log for *In Camera* Ex. J at 2.) The Relativity log indicates that AUSA Maria spent about 40 seconds with the memo and "update[d]" the document to indicate its privileged status before he clicked on another document. (Relativity Log for *In Camera* Ex. J at 2.) However, despite AUSA Maria's efforts to designate the document as privileged, it was not removed from the for-review Relativity database.

Inspector Kroells then encountered the memo four times on May 11, 2016, about a week after AUSA Maria viewed the memo. (Relativity Log for *In Camera* Ex. J at 3, 4.) Each time she encountered it, she clicked to view another document in the database quickly. Her first encounter lasted 18 seconds before her next click and the next 3 "views" lasted 3 seconds each. (*Id.*) She also saw the email to which Mr. Adams attached the memo on May 11, 2016, and that "view" lasted a total of 26 seconds. (*Id.* at 4.)

On May 16, 2016, in an email exchange both Inspector Kroells and AUSA Maria indicated that they had come across email addresses that appeared to contain privileged communications, including for Mr. Hopeman's firm. (DX 21.) Several weeks later, on June 6, 2016, the prosecution team updated the list of keywords to be used to quarantine additional potentially privileged materials, including "felhaber (and felhaber.com)," and "hopeman." (Maria Decl. ¶ 10; DX 22.) No members of the prosecution team encountered the memo to Mr. Hopeman or the email to which it

---

[13]     There is no indication that AUSA Maria ever viewed the email from Mr. Adams to Mr. Hopeman to which the memo was attached.

was attached in the Relativity database between May 11, 2016 and June 6, 2016. There is no indication that it has been viewed by the government aside from these encounters.

### 5.  Drafts of Communications with Latham & Watkins

Members of the prosecution team also encountered drafts of privileged communications between Mr. Adams and certain attorneys at the law firm of Latham & Watkins LLP ("Latham"). (*In Camera* Exs. A, D, and G.) Prior to the criminal investigation, Mr. Adams had been the subject of an investigation by the Securities and Exchange Commission. Generally, the SEC was investigating suspected violations of federal securities laws in connection with the asset purchase agreements involving the Apollo and Scio companies. During the SEC's investigation, Mr. Adams was represented by attorneys James Farrell and John Sikora of Latham and attorney James Kopecky of Kopecky Schumacher Bleakley & Rosenburg, PC. (DX 43, Decl. of Lance Wade in Supp. of Mot. to Suppress ("Wade Decl.") ¶ 6, ECF No. 38.) Because members of the prosecution team were aware of the SEC's investigation and that Mr. Adams had been represented during those proceedings, the initial round of mechanical filtering keywords described by AUSA Maria reflects an effort to remove communications with these attorneys from the for-review environment in Relativity. (Jan. 8 Hr'g Tr. 71:19–72:2; Suppl. Decl. of David Maria ("Suppl. Maria Decl.") ¶ 14, ECF No. 79.) The list of specific terms that was ultimately used to segregate these potentially privileged communications includes terms like "Kopecky," "ksblegal," "latham," "watkins," "lw.com," and "Sikora." (Maria Decl. ¶ 6.) Despite those efforts at removing such communications from the reviewable material, certain draft communications were not captured by the mechanical filtering and remained available for the prosecution team's review.

One such document is a 4-page draft of a memorandum that Mr. Adams eventually emailed to his attorneys at Latham. The version encountered by the prosecution team in their review of the Relativity database was attached to an email

Mr. Adams sent to himself.[14] (*In Camera* Ex. A.) AUSA Maria encountered the email once and clicked on the attached memo seven times on May 4, 2016. (Gov't's Ex. 13 ("Relativity Log for *In Camera* Ex. A"), ECF No. 173-11.) AUSA Maria accessed Mr. Adams's email to himself for 31 seconds. (Relativity Log for *In Camera* Ex. A at 2.) Each time he "viewed" the memo, the Relativity log shows the following durations before his next "view" of a document in the program: (1) 1:33; (2) 1:54; (3) 9 seconds; (4) 7 seconds; (5) 4 seconds; (6) 1 second; and (7) 4 seconds. (Relativity Log for *In Camera* Ex. A at 2, 4, 13.) On June 6, 2016, he encountered the memo again for a total of 5 seconds before clicking another, and on August 30, 2016, he "viewed" it again for 11 seconds. (Relativity Log for *In Camera* Ex. A at 13.) AUSA Maria "viewed" the memo again on September 16, 2016 for 7 seconds and, finally, on September 23, 2016 for 30 seconds before the log shows his next "view." (Relativity Log for *In Camera* Ex. A at 14, 15.) However, AUSA Maria never reviewed the emails with which Mr. Adams ultimately sent the memo to his attorneys.[15]

---

[14]     Although the email is sent by Mr. Adams and to Mr. Adams rather than to any lawyer at Latham, the memo has a header that reads: "<u>ATTORNEY-CLIENT PRIVILEGE/ATTORNEY WORK PRODUCT</u>." (*In Camera* Ex. A.) The government has shown that when looking at a spreadsheet created in Microsoft Excel within a certain viewing mode in the Relativity program, a viewer may not necessarily see a privilege banner if it is included in a header in an Excel spreadsheet. (*See* Gov't's Ex. 25, ECF No. 173-22.) The attachment to *In Camera* Exhibit A is in Microsoft Word format, and because the government does not have access to this exhibit, it invited the Court to review the document in the Relativity platform. However, doing so is unnecessary. Mr. Adams has provided screenshots showing that the privilege banner atop *In Camera* Exhibit A (and the other *in camera* exhibits), is visible in all Relativity viewing modes. (Index of Exs. to Def.'s Post-Hearing Reply in Supp. of Mot. to Suppress, Ex. 23, ECF No. 199.) Based on this record, the Court finds that it is more likely than not that the privilege headers in the *in camera* documents were visible in the Relativity program when Inspector Kroells and AUSA Maria reviewed the documents.

[15]     No member of the prosecution team viewed *In Camera* Exhibits B or C, which are later versions of the draft memo in *In Camera* Exhibit A. Mr. Adams emailed *In*

Another privileged document encountered by the prosecution team during its review of the Relativity database consists of several draft iterations of an email that Mr. Adams eventually sent to his attorneys John Sikora and James Kopecky. (*In Camera* Ex. D (draft iterations); *In Camera* Ex. E[16] (final email).) This document, *In Camera* Exhibit D, includes 12 separate iterations of the same draft email. Each iteration bears only Mr. Adams's name in the "From" field, but no name of any intended recipient. (*In Camera* Ex. D.) AUSA Maria viewed these drafts multiple times on September 6, 2016 as he was working through the Relativity database, with each "view" lasting a few seconds before the Relativity log shows he clicked on another document. The durations between these clicks are as follows: 15 seconds; 2 seconds; 11 seconds; 3 seconds; 2 seconds; 4 seconds; 2 seconds; 2 seconds; 6 seconds; 1 second; and 1 second. (Gov't Ex. 14 ("Relativity Log for *In Camera* Ex. D"), ECF No. 173-12.)

*In Camera* Exhibit G is similarly a version of an email and an attached spreadsheet that Mr. Adams sent to his attorneys at Latham and Mr. Hopeman in October of 2014. The October 2014 version was not viewed by the government because it was filtered out of the Relativity database. (*See In Camera* Ex. H.) However, the draft that was seen by the government along with the attached spreadsheet were sent by Mr. Adams to himself several months later (September of 2015) without including the names or email addresses of any of his attorneys.[17] (*In Camera* Ex. G.) As a result, the email was not filtered by the government's attempts to separate

_____

*Camera* Exhibits B and C to his attorneys at Latham, which likely explains why those messages were removed from the reviewable Relativity database while the draft memo for *In Camera* Exhibit A was not. (Def.'s Index of *In Camera* Documents at 1, ECF No. 145.)

[16]     No member of the prosecution team ever viewed *In Camera* Exhibit E, which is the final version of the email that includes the names of Mr. Adams's lawyers in the SEC proceeding. (Def.'s Index of *In Camera* Documents at 2.)

[17]     Mr. Adams later sent this same message to lawyers at Latham and Mr. Kopecky (*In Camera* Ex. I), and the government did not see this correspondence.

potentially privileged information. Neither Mr. Adams's message to himself nor the spreadsheet includes an attorney-client privilege legend. Inspector Kroells "viewed" Mr. Adams's email for 3 seconds before clicking on the attached document in the Relativity program, and she printed the message from Relativity twice. (Gov't's Ex. 15 ("Relativity Log for *In Camera* Ex. G") at 2, ECF No. 173-13.) That same day, she "viewed" the spreadsheet for 19 seconds before her next click, and then later on two more occasions for 2:08, and 11 seconds, respectively. (Relativity Log for *In Camera* Ex. G at 2.)

### 6. Communications with Tom Brever and Murry LLC

Members of the prosecution team also viewed communications between Mr. Adams and Tom Brever, who Mr. Adams retained in September 2014 for tax-related issues. (Decl. of Thomas Brever ("Brever Decl.") ¶ 2, ECF No. 93 (public version), and 97 (sealed version).) Prosecution team members also had access to several communications between Mr. Adams and accountants at Murry & Associates LLC as a result of the Yahoo! search warrant. Murry LLC had been retained by Mr. Brever under a so-called *Kovel* agreement.[18] (*In Camera* Exs. K, L, M, N, O, P, Q,[19]

---

[18]     Pursuant to *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), the attorney-client privilege may apply to an individual's communications with an accountant if the communications are "made in confidence for the purpose of obtaining legal advice from the lawyer." *Id.* at 922. The Court has previously addressed the applicability of the attorney-client privilege generally to the Murry LLC communications, but has not yet made any ruling with respect to any specific communications. (R&R (Mar. 12, 2018) at 12–14, ECF No. 117.)

[19]     *In Camera* Exhibit Q largely contains additional copies of the same communications reflected in *In Camera* Exhibits M, N, O, P, R, S, and T. Included in *In Camera* Exhibit Q are also communications between Mr. Adams and others for which the defense has confirmed that there is no claim of privilege and the government has copies of those materials. (E-mail from G. Maier to Menendez Chambers (Aug. 9, 2018 04:19 PM) ("The documents over which Mr. Adams asserts a

R, S, and T; Brever Decl. ¶ 3.) The Court finds that when members of the prosecution team began reviewing the database in early May of 2016, they were not yet aware that Mr. Adams had retained Mr. Brever to represent him for any tax-related legal issues.[20] However, after they began reviewing the database and saw communications between Messrs. Brever and Adams, AUSA Maria and Inspector Kroells discussed adding Brever to the privilege filter list in the Relativity database. (*See* DX 21 (E-mail from D. Maria to C. Kroells, et al. (May 16, 2016) (discussing the need to add Mr. Brever's name and "@fosterbrever.com" to list of filter terms).) Mr. Brever's name was added to the filter list on June 6, 2016. (Maria Decl. ¶10; DX 22.)

The Yahoo! production was not the government's only source for communications involving Mr. Brever and Murry LLC with Mr. Adams. On November 4, 2016, Murry LLC received a grand jury subpoena for documents from AUSA Maria. (Brever Decl. ¶ 10.) Mr. Brever wrote a letter to AUSA Maria on December 1, 2016, explaining that Murry LLC had been hired under a *Kovel* arrangement by Mr. Brever's firm to provide legal advice to Mr. Adams. (Brever Decl.

---

privilege are pages 12–22 of the 22-page PDF. Mr. Adams does not assert any privilege over pages 1–11 of the PDF. . . .") (on file with the Court).)

[20]     Mr. Adams asserts that the government was on notice of Mr. Brever's representation much earlier because: (1) he listed Brever as his representative in a December 2014 Domestic Voluntary Disclosure to the IRS; and (2) the IRS became involved in the investigation of this case in May of 2015. (Def.'s Reply in Supp. of Suppression Mot. ("Def.'s Suppression Reply") at 5 (citing Gov't's Ex. 18, ECF No. 173-16, and Gov't Resp. to Suppression Mot. ("Gov't's Suppression Resp."), at 33 ("The IRS became involved in this investigation in May 2015.")).) Mr. Adams also points to the fact that an *in camera* document AUSA Maria saw on the first day he began reviewing the Relativity database bears a privilege legend stating "Attorney-Client Privileged Communication for Tom Brever and Pat Murry." (Def.'s Suppression Reply at 5 (quoting *In Camera* Ex. K).) These references do not persuade the Court that the government knew about Brever's representation of Mr. Adams prior to beginning its review process. AUSA Maria's May 16, 2016 message to Inspector Kroells makes it more likely than not that the government learned of Mr. Brever's involvement only after review began.

¶ 10 & Ex. E.) Mr. Brever asserted privilege over some communications, disclosed others, and then withdrew his privilege designation of still more material and disclosed it as well.

AUSA Maria viewed emails dated September 25, 2014 that had been sent from Mr. Adams to Mr. Brever regarding DL Investments, RL Investments, and ADR Investments. (*In Camera* Ex. L.) On May 4, 2016, AUSA Maria "viewed" these emails for the following durations before "viewing" another document in Relativity: (1) 3 seconds; (2) 2 seconds; (3) 5 seconds; and (4) 5 seconds. (Gov't's Ex. 27 ("Relativity Log for *In Camera* Ex. L") at 2, 4, and 12, ECF No. 173-23.) On May 12, 2016, Inspector Kroells saw one of these emails as well. (Relativity Log for *In Camera* Ex. L at 12.)

The communications between Mr. Adams and Murry LLC present a more complicated chain of events, and an understanding the full context in which the disputed issues in this case arise requires a detailed examination. Murry LLC became involved in Mr. Adams's tax matters in October of 2014. On October 27, 2014, Mr. Brever emailed Patrick Murry of Murry LLC to retain the firm under a *Kovel* arrangement. The government was not aware of this arrangement until much later, in December of 2016, when Mr. Brever responded to the grand jury subpoena and notified the government of it. On October 27, 2014, Patrick Murry of Murry LLC responded to Mr. Brever's *Kovel* engagement email by explaining that Murry LLC "would be happy to prepare any amended returns that are required," and that once they received all the necessary information, they could "get right on preparing the returns." [21] (ECF No. 109-8; Brever Decl. ¶ 14, Ex. F (ECL-00033098–00033099); *see also* Gov't's Resp. to Mot. to Suppress at 69.) Mr. Brever provided this message to the government on December 20, 2016 after determining that those communications

---

[21]    The government points to this October 27, 2014 message as an indication that certain communications between Mr. Adams and Murry LLC were for the purpose of preparing amended tax returns, and not for the purpose of assisting Mr. Brever in providing legal advice.

were not covered under attorney-client privilege nor protected by the work-product doctrine. (Brever Decl. ¶ 14, Ex. F.)

One allegedly privileged communication between Mr. Adams and Murry LLC occurred on October 28, 2014. Mr. Adams emailed Mr. Murry and Ashley Miller of Murry LLC an Excel spreadsheet entitled "ESA Tax Summary for P. Murry" and asked them to let him know what else they would need "so we can resolve and file." (Gov't's Ex. 28, ECF No. 173-24.) In response to the grand jury subpoena, on December 20, 2016, Mr. Brever provided this same email, which is identical to Mr. Adams's *In Camera* Exhibit R. (*Compare* Gov't's Ex. 28 *with In Camera* Ex. R *and* Brever Decl. ¶ 14, Ex. F (ECL-00033080).) Mr. Brever did not claim privilege over the email, but he did assert privilege over the attachment. Members of the prosecution team reviewed the attachment on several occasions. (Gov't's Ex. 42 ("Complete Relativity Log") at 17, 24, 55, 133, 171, 225, 249, 269, 400, ECF No. 173-35.)

Another allegedly privileged communication involving Murry LLC is an October 29, 2014 email that Mr. Adams sent to Mr. Murry and Ms. Miller at Murry LLC. Mr. Brever was copied on that email. (*In Camera* Ex. K.) Attached to the email was an Excel spreadsheet entitled "ESA Tax Questions." (*In Camera* Ex. K; Gov't's Ex. 20, ECF No. 173-18.)[22] On May 4, 2016, AUSA Maria "viewed" the spreadsheet for 28 seconds and again for 1:42 before clicking on the next document in Relativity. (Gov't's Ex. 21 ("Relativity Log for *In Camera* Ex. K"), ECF No. 173-19.) Later that day, AUSA Maria "viewed" the email for 1 minute and 19 seconds and again looked at the spreadsheet for an additional 3 seconds. (Relativity Log for *In Camera* Ex. K at 3, 12.) On May 9 and June 6, 2016, AUSA Maria "viewed" the spreadsheet for 14 seconds and 4 seconds respectively. (Relativity Log for *In Camera* Ex. K at 12.) Mr. Brever also provided this same message in response to the grand jury subpoena

---

[22]   The government has a copy of this email because Mr. Brever provided it to the government in response to the grand jury subpoena. Mr. Brever did not assert that the email itself is privileged. (Gov't's Resp. to Motion to Suppress ("Gov't's Suppression Resp."), at 62, ECF No. 172.)

without asserting any claim of privilege. (Brever Decl. ¶ 14 and Ex. F (ECL-00033079).)

During its review of the Relativity database, the government accessed three additional October 29, 2014 communications between Mr. Adams and Murry LLC, which Mr. Adams claims are privileged. (*In Camera* Exs. M, N, and O.) AUSA Maria viewed and printed some of these messages on May 4, 2016, September 7, 2016, September 23, 2016, and January 23, 2017. (Complete Relativity Log at 17, 221, 249, 395.) Mr. Brever was not a party to these communications. However, in responding to the grand jury subpoena in this case, Mr. Brever produced an October 29, 2014 email from Mr. Adams to Murry LLC attaching his amended returns, again without asserting privilege. (Brever Decl. ¶ 14, Ex. F (ECL-00033078).) This message is identical to one of the communications that forms part of the email strings reflected in *In Camera* Exhibits M, N, and O. (*Compare id.* (ECL-00033078) *with In Camera* Ex. M at 2 (Doc ID 00224367), *and In Camera* Ex. N at 1–2 (Doc ID 0024368–69), *and In Camera* Ex. O at 1–2 (Doc ID 00224409–10).)

The government also saw a November 4, 2014 message from Mr. Adams to Murry LLC. (*In Camera* Ex. P.) Again, Mr. Brever was not a part of these communications. AUSA Maria viewed this document on May 4, 2016, September 7, 2016, September 23, 2016, and January 23, 2017. (Complete Relativity Log at 17, 221, 249, 395.)

Another allegedly privileged communication with Murry LLC is dated November 8, 2014. (*In Camera* Ex. S.) AUSA Maria viewed this communication twice on September 7, 2016. (Complete Relativity Log at 221.) This message has three attachments: "2009 Adams E Form 1040 Individual Tax Return.pdf"; "DLA Tax Return Stock Trades (2009).xls"; and "ESA Tax Return Stock Trades (2009).xls." (Gov't's Ex. 28, ECF No. 173-25.) Mr. Brever provided the email and all three of those attachments to the government in response to a grand jury subpoena without asserting privilege. (Gov't's Resp. to Mot. to Suppress at 71; Brever Decl. ¶ 14, Ex. F (ECL-00033077).)

Similarly, at issue here is an email Mr. Adams sent to Murry LLC on November 10, 2014. (*In Camera* Ex. T.) Mr. Brever produced this same email without asserting privilege in response to the grand jury subpoena. (Gov't Ex. 30, ECF No. 173-26; Brever Decl. ¶ 14, Ex. F (ECL-00033104).)

### 7.  Dissemination of Some Murry LLC Communications

Some of the allegedly privileged communications between Mr. Adams and Murry LLC were shared among members of the prosecution team, specifically with Agent Belich.[23] On September 7, 2016, AUSA Maria sent Agent Belich several pieces of information relevant to Mr. Adams's claims that the government improperly intruded on his privileged communications. One was the October 28, 2014 email from Mr. Adams to his accountants at Murry LLC with the attached Excel spreadsheet entitled "ESA Tax Summary for P. Murry." (*Compare In Camera* Ex. Q at 18–24 *with In Camera* Ex. R.) As noted above, Mr. Brever later disclosed this email, but not the attachment, in response to the grand jury subpoena.

AUSA Maria also provided Agent Belich with emails from October 29, 2014, where Mr. Adams communicated with his accountants at Murry LLC. One of these messages is the same as in *In Camera* Exhibit M described above. (*Compare In Camera* Ex. Q *with In Camera* Ex. M.) As noted above, disavowing any privilege for the document, Mr. Brever disclosed one of the communications from Adams to Murry LLC in response to the grand jury subpoena. (Brever Decl. ¶ 14, Ex. F (ECL-00033078).)

Finally, among the documents AUSA Maria sent Investigator Belich on September 7, 2016 was another October 29, 2014 email from Mr. Adams to Murry

---

[23]     On March 15, 2016, Inspector Kroells provided several emails to Agent Belich, but it does not appear that these are among the Murry LLC communications for which Mr. Adams has asserted privilege. (*In Camera* Ex. Q at 1 (discussing "1.31.09 email"); *id.* at 3–13 (email correspondence between Adams and others affiliated with Apollo companies).)

LLC for which Adams has claimed privilege. This message is identical to Mr. Adams's communication reflected in *In Camera* Exhibit N. (*Compare In Camera* Ex. Q at 16 *with In Camera* Ex. N.)[24]

### 8.   Communications with Aaron Hartman and Michael Monahan

A final category of allegedly privileged communications that Mr. Adams contends the government unreasonably reviewed concern civil litigation in which Mr. Adams and Mr. Monahan were represented by Aaron Hartman of the Anthony Ostlund Baer & Louwagie law firm. (*In Camera* Ex. U; Wade Decl. ¶ 12.) When the government first generated its list of filtering terms to exclude potentially privileged communications from the Relativity database, one of the terms it used was "anthonyostlund," which corresponds to an email domain used by Mr. Hartman's firm. (Maria Decl. ¶ 5.) The government's filtering did not include the term "aoblaw," which is another email domain that Mr. Hartman used when emailing Mr. Adams and Mr. Monahan. (*See In Camera* Ex. U.)

Some of the emails between Messrs. Adams, Monahan and Hartman that were viewed by the government concern claims brought by Paul Rapello and Kristoffer Mack, investors in Focus Capital Group[25] and Private Scio. Their lawsuit generally alleged: that Mr. Adams "spent the past decade attempting to work numerous deals through Apollo Diamond for his own personal profit"; and that he and Monahan set up Private Scio and Public Scio for their own benefit and defrauded shareholders. (Mot. to Dismiss Exhibit 8 ("MTD Ex."), ECF No. 142.) The communications now at issue involve May 2012 efforts to resolve the Rapello and Mack claims through a

---

[24]   Though the content of Mr. Adams's communication to Murry LLC reflected in these two items in the record is the same, the version in *In Camera* Exhibit Q is dated Thursday, October 30, 2014 at 12:25 AM and the version in *In Camera* Exhibit N is dated Wednesday, October 29, 2014 at 7:25 PM.

[25]   As Inspector Kroells's affidavit in support of the search warrant indicated, Focus Capital Group was in investment banking firm created and operated by Mr. Adams and Mr. Monahan. (Kroells Aff. ¶ 10.)

settlement and include draft settlement agreements. Other emails in *In Camera* Exhibit U relate to discussion of a potential lawsuit Mr. Adams and Mr. Monahan contemplated bringing in July of 2012.

AUSA Maria and Inspector Kroells viewed messages within *In Camera* Exhibit U a total of 35 times on May 24th, 25th, and 31st, June 28th, and December 13th, 2016. The majority of these views were by Inspector Kroells. (Gov't's Ex. 41 ("Relativity Log for *In Camera* Ex. U") at 10, 13, 14, 15, 21, and 22, ECF No. 173-34.) Several of AUSA Maria's and Inspector Kroells's views of these messages were very brief, lasting between 1 and 3 seconds each.[26] A handful of other views lasted between 5 and 15 seconds.[27] The remaining views were of the following durations: 1:54; 25 seconds; 46 seconds; 40 seconds; 18 seconds; 23 seconds; and 36 seconds.[28]

---

[26]    *See* Relativity Log for *In Camera* Ex. U at 10 (2 views of 3 seconds), 13 (1 view of 3 seconds), 14 (10 views of 3 seconds or less), 21 (2 views of 3 seconds), 22 (2 views of 3 seconds).

[27]    Relativity Log for In Camera Ex. U at 13 (1 view of 12 seconds), 14 (one view of 11 seconds), 15 (2 views of 12 and 15 seconds), 21 (views of 5, 6, and 15 seconds), 22 (views of 7 and 12 seconds).

[28]    Relativity Log for In Camera Ex. U at 10 (1:54), 13 (25 seconds), 14 (46 seconds), 15 (40 seconds), 21 (views of 18 and 23 seconds), 22 (36 seconds). The view lasting 1:54 may be an overestimation. AUSA Maria opened Document ID 00447095 at 10:14:29 AM on May 24, 2016. His next action in Relativity was running a search at 10:16:25 AM. (Relativity Log for In Camera Ex. U at 10.) AUSA Maria had just viewed the email string with the same Document ID for 3 seconds at 10:14:23 AM and then a nearly identical email string with Document ID 00447097 at 10:14:26 AM (*Id.*) The Court finds it is unlikely that AUSA Maria studied the largely innocuous email string for nearly two minutes.

III.   **Motion to Dismiss Indictment or to Disqualify Prosecution Team**

Asserting that the government intentionally intruded on his attorney-client privilege, used privileged information to develop charges against him and anticipate his defenses, and learned information relevant to his trial strategy, Mr. Adams asks the Court to dismiss the indictment. He contends that this result is appropriate under the Sixth Amendment, the Fifth Amendment, and the Court's supervisory powers. He also asserts that, at a minimum, the tax charges against him must be dismissed because the government directly used his privileged communications to develop those charges. Alternatively, as relief for the same alleged improprieties, Mr. Adams contends that the prosecution team must be disqualified.

### A. Sixth Amendment

Mr. Adams asserts that the indictment should be dismissed because the prosecution team violated his Sixth Amendment right to effective assistance of counsel by viewing privileged communications. (Def.'s Mot. to Dismiss Mem. ("Def.'s MTD Mem."), ECF No. 144.) Mr. Adams argues that by viewing his communications with Latham & Watkins attorneys, Mr. Hopeman, Mr. Brever, Murry LLC, and Mr. Hartman, the government learned important details about how he views certain facts that are directly related to allegations in the indictment. (Def.'s MTD Mem. at 5.) Mr. Adams's argument cannot succeed, however, because at the time of the complained-of intrusions, his Sixth Amendment right to counsel had not attached.

A Sixth Amendment claim based on violation of the attorney-client privilege, requires a two-part showing by the defendant: (1) a knowing intrusion into the attorney-client relationship by the government; and (2) that the defendant was prejudiced or that there was a substantial threat of prejudice. *United States v. Tyerman*, 701 F.3d 552, 559 (8th Cir. 2012); *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986). However, a person's Sixth Amendment "right to counsel attaches only after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972). The Supreme Court has plainly held that Sixth

Amendment rights are not implicated by events that occur prior to formal criminal charges. *See United States v. Gouveia*, 467 U.S. 180, 187–88 (1984) (relying on *Kirby*, 406 U.S. at 688–89, for the proposition that adversary judicial criminal proceedings are initiated and the Sixth Amendment right to counsel attaches when there is a formal charge, preliminary hearing, indictment, information, or arraignment, and rejecting the argument that the Sixth Amendment right to counsel can attach upon arrest).

Nothing in later Supreme Court or Eighth Circuit precedent suggests any softening of the attachment requirement. Indeed, all of the Eighth Circuit decisions cited by Mr. Adams concern Sixth Amendment claims arising in the context of post-indictment intrusion on attorney-client relationships, and are therefore simply not instructive in this case.[29] *See Singer*, 785 F.2d at 230 (describing how the government acquired and reviewed portions of his trial counsel's trial-strategy file following initiation of formal criminal proceedings); *Clark v. Wood*, 823 F.2d 1241, 1249–50 (8th Cir. 1987) (evaluating claim that jail officials "surreptitiously monitored his conversations with his attorney" after he was indicted); *United States v. Davis*, 646 F.2d 1298, 1302–03 (8th Cir. 1981) (finding that an agent who entered conversations with the defendant without consent from his appointed attorney following his arrest intruded on the defendant's privacy rights, "but no sixth amendment violation existed because no incriminating information was gleaned"); *United States v. Crow Dog*, 532 F.2d 1182, 1197 (8th Cir. 1976) (addressing alleged post-indictment government misconduct during the prosecution of the defendants). None of this authority supports Mr. Adams's argument that the analysis should be the same in this case where Mr. Adams had not yet been charged or even arrested at the time of the

---

[29]     Mr. Adams also cites the Third Circuit's decision in *United States v. Levy*, 577 F.2d 200 (3d Cir. 1978). *Levy* too involves a defendant's Sixth Amendment claim based on the government's use of a DEA informant who had the opportunity to obtain attorney-client communications between the defendant and their mutual attorney after an indictment was returned. *See id.* at 202–03. The same is true of the Tenth Circuit's decision in *Shillinger v. Haworth*, 70 F.3d 1132, 1134 (10th Cir. 1995), which concerned the government's use of information obtained from the defendant's trial-preparation meetings with his attorney during cross examination.

complained-of conduct. *See also Isaacson v. State of Minnesota*, No. 14-cv-4592
(JNE/JSM), 2016 WL 1714462, at *22–24 (D. Minn. Jan. 11, 2016) (rejecting habeas
petitioner's Sixth Amendment claim premised on allegation of interference with right
to counsel by attempting to record phone call by drunk-driving arrestee with an
attorney because his "Sixth Amendment rights had not even attached. Accordingly,
even if Deputy Pedersen had intentionally interfered with Petitioner's ability to
consult with counsel, no Sixth Amendment violation occurred"), *R&R adopted by* 2016
WL 1651800, (D. Minn. Apr 26, 2016).

Even though no adversary criminal proceedings had been initiated against him
at the time AUSA Maria and Inspector Kroells viewed privileged communications,
Mr. Adams nonetheless argues that their conduct violated his Sixth Amendment
rights and requires dismissal of the indictment. Mr. Adams disagrees that the
precedent discussed above is directly relevant to these circumstances. He asserts that
there is no binding precedent from the Supreme Court and the Eighth Circuit and he
cites cases from other jurisdictions to suggest that the Sixth Amendment can be
applied when the government's conduct occurs prior to the indictment. (Def.'s Reply
in Supp. of Mot. to Dismiss ("Def.'s MTD Reply") at 11–13, ECF No. 198.) He
contends that his Sixth Amendment rights were violated here because, by the time the
prosecution team began reviewing his emails: (1) he was faced with an SEC
enforcement investigation, there had been 67 grand jury subpoenas issued, and he had
already communicated with Mr. Hopeman; and (2) the government's conduct prior to
formal indictment "has post-charge consequences." (Def.'s MTD Reply at 12.) These
creative arguments are unpersuasive.

The Court is not persuaded by Mr. Adams's suggestion that the existence of an
SEC investigation or the issuance of several grand jury subpoenas triggered his Sixth
Amendment right to counsel. Citing to *Gouveia* and these events, Mr. Adams asserts
that he was faced with the "'prosecutorial forces of organized society, and immersed
in the intricacies of substantive and procedural criminal law.'" (Def.'s MTD Reply
(quoting *Gouveia*, 467 U.S. at 189 (quoting *Kirby*, 406 U.S. at 689)). While Mr. Adams

correctly quotes the lofty language of the Supreme Court from *Gouveia* and *Kirby*, he ignores their holdings. *Gouveia* rejected the defendants' claims that they were entitled to appointment of counsel while they were held in administrative segregation for suspicion that they murdered another inmate before any adversary judicial proceedings had been initiated against them. 467 U.S. at 192–93. The Supreme Court also rejected the notion that its earlier precedent held that the right to counsel attaches at the time of arrest. *Id.* at 190 ("[W]e have never held that the right to counsel attaches at the time of arrest."). Considering its holding and its explicit rejection of an earlier point of attachment, *Gouveia* provides no support for Mr. Adams's position.

Mr. Adams also cites *United States v. Solomon*, 679 F.2d 1246 (8th Cir. 1982), and argues that the court found a Sixth Amendment violation occurred "without mentioning attachment" based on "police interference with his relationship with counsel" two months before the defendant was charged. (Def.'s MTD Reply at 11 n.13.) This Court is not persuaded that the Eighth Circuit's comment in a footnote that "there is little doubt that the lower court's holding is correct that Solomon's Sixth Amendment rights were violated" somehow abrogates substantial contrary precedent that directly addresses the issue of attachment. *See* 679 F.2d at 1250 n.7. As Mr. Adams's own parenthetical description of this case concedes, *Solomon* says nothing about attachment of the Sixth Amendment right to counsel. No part of *Solomon*'s holding, or even its reasoning, can be used to conclude that the Eight Circuit intended to adopt a theory that the Sixth Amendment right to counsel attaches prior to initiation of adversary criminal proceedings. And indeed the Court's own search of relevant precedent does not reveal any hint of softening of the bright-line attachment rule that has governed for more than four decades.

The Court is also unpersuaded by Mr. Adams's reliance on out-of-circuit cases in his attempt to unsettle the settled. First, whatever the value of the assertion that "[t]he Sixth Amendment *can apply* when the government's conduct occurs pre-indictment" found in *In re Grand Jury Proceedings (Goodman)*, 33 F.3d 1060, 1062 (9th Cir. 1994), that case says nothing about dismissing an indictment in such a situation.

Similarly, the unique circumstances facing the defendant that led to a finding that the Sixth Amendment right to counsel had attached in *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892–93 (3d Cir. 1999), do not support such a conclusion in Mr. Adams's case. When Matteo's telephone conversations with his attorney were taped by the government in that case, he was arrested on a warrant charging him with murder, he was in custody, he was represented by counsel, and "he had undergone preliminary arraignment." *Id.* at 893. No comparable immersion in the intricacies of substantive or procedural criminal law were similarly at play in Mr. Adams case.[30]

Much more persuasive is the out-of-circuit authority cited by the government in its response to the motion to dismiss. (Gov't MTD Resp. at 3–4 (citing cases).) In *United States v. Kennedy*, 225 F.3d 1187, 1194 (10th Cir. 2000), for example, the Tenth Circuit squarely held that "[g]overnment intrusions into pre-indictment attorney-client relationships do not implicate the Sixth Amendment." *Id.* (citing *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112, 1117 (10th Cir. 1998), and *United States v. Kingston*, 971 F.2d 481, 491 (10th Cir. 1992)). Just as Mr. Adams argues in this case, in *Kennedy* the defendant claimed that the government violated his Sixth Amendment right to counsel when it obtained information from his attorney before the indictment was issued. Because the right had not attached, however, the Tenth Circuit rejected the

---

[30]    Mr. Adams also relies on *United States v. Stein*, 435 F. Supp. 2d 330, 366-67 (S.D.N.Y. 2006), an idiosyncratic decision in which a district court concluded that the Sixth Amendment right to counsel attached early due to the government's pre-indictment conduct. In *Stein*, prior to the initiation of adversary judicial proceedings, the government implemented a policy to compel a business to refuse to pay for the representation of its employees in a criminal case. *Id.* at 366. The court reasoned that the Sixth Amendment right to counsel attached under these circumstances because "events were set in motion prior to indictment with the object of having, or with knowledge that they were likely to have, an unconstitutional effect" when the indictment was eventually returned. *Id.* This novel theory contradicts, without real discussion, caselaw from the Supreme Court that squarely limits the attachment of the Sixth Amendment right to counsel to events that occur after the initiation of adversary criminal proceedings. In the face of the settled precedent, this Court will not extend *Stein* to the circumstances of this case.

defendant's argument that he was entitled to an evidentiary hearing to explore the alleged invasion of the attorney-client relationship during that pre-indictment period. *Id.*

Perhaps even more analogous to the situation here is *Lin Lyn Trading*, where the Tenth Circuit found that the district court erred in dismissing an indictment for a Sixth Amendment violation based on the pre-indictment seizure of attorney-client communications. 149 F.3d at 1117. In an investigation for violations of customs laws, when the defendant was apprehended re-entering the United States from Asia, a customs agent seized a notepad that the defendant told him documented his conversations with legal counsel. *Id.* at 1113. The notepad contained information related to the prosecution, was shared within the customs office, and the customs agent had retained copies of the notepad in an unmarked folder. *Id.* Though the district court found that the entire investigation was tainted by the government's familiarity with the contents of the notepad and dismissed the indictment on Sixth Amendment grounds, the Tenth Circuit reversed because the right to counsel "attaches only 'at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.* at 1117 (quoting *Kirby*, 406 U.S. at 689). The Tenth Circuit also rejected the argument that the illegal seizure of the privileged communications transformed into a Sixth Amendment violation "immediately upon return of the indictment" because the investigation used the tainted evidence. *Id.* (concluding, based on *Maine v. Moulton*, 474 U.S. 159 (1985), that "we do not agree that the Sixth Amendment was violated immediately upon return of the indictment where the illegal seizure had occurred previously").

All the alleged invasions of Mr. Adams's attorney-client relationships that underlie his Sixth Amendment claim occurred prior to his indictment. The same reasoning that led the Tenth Circuit to conclude that it was error to dismiss the indictment based on the Sixth Amendment in *Lin Lyn Trading* precludes the Court from recommending dismissal of the indictment against Mr. Adams in this case. *See*

*also United States v. Voigt*, 89 F.3d 1050, 1071 n.10 (3d Cir. 1996) ("We also reject Voigt's claim that the government's *pre* indictment use of [alleged attorney] as a confidential informant, even assuming she was his attorney, implicates Sixth Amendment concerns.").

For these reasons, the Court concludes that Mr. Adams is not entitled to dismissal of the indictment pursuant to the Sixth Amendment because his right to counsel had not yet attached.

## B. Fifth Amendment

Mr. Adams next argues that dismissal of the indictment is required because the government's review of his privileged communications violated his Fifth Amendment right to due process. He asserts that "the prosecution team's intentional, repeated viewing of multiple unambiguously privileged documents going to the heart of a criminal investigation is shocking behavior." (Def.'s MTD Mem. at 27.) He contends that it also shocks the conscience for the government to have searched for and used communications with Murry LLC. (Def.'s MTD Mem. at 28.) As explained below, the Court concludes that Mr. Adams has failed to demonstrate a due-process violation requiring dismissal of the indictment, and his motion should be denied.

### 1. Outrageous conduct and prejudice

The Eighth Circuit has observed that "there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process bars the government from invoking the judicial process to obtain a conviction[.]" *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003) (citing *United States v. Russell*, 411 U.S. 423, 431–32 (1973)); *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir. 1990) ("We recognize due process bars the government from invoking judicial process to obtain a conviction when the investigatory conduct of law enforcement agents is outrageous."), *rev'd on other grounds in Jacobson v. United States*, 503 U.S. 540 (1992).

To establish a due process claim sufficiently egregious to require dismissal of an indictment, a defendant must satisfy a two-prong test. First, the conduct at issue must be outrageous. A due-process violation occurs when the government engages in conduct that "shocks the conscience of the court." *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993) (internal citations omitted). This constitutional basis for dismissal of the indictment is limited to situations involving only "the most intolerable government conduct." *Pardue*, 983 F.2d at 847 (quoting *United States v. Musslyn*, 865 F.2d 945, 947 (8th Cir. 1989)). "[T]he doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by the courts." *United States v. Voigt*, 89 F.3d 1050, 1065 (3d Cir. 1996).

Second, to secure a remedy for a Fifth Amendment due process violation, a defendant must demonstrate actual prejudice resulting from the government's misdeeds. *United States v. Morrison*, 449 U.S. 361, 365–66 & n.3 (1981) (stating that a where a "Fifth Amendment violation has occurred" dismissal is "plainly inappropriate" unless there has been a showing of prejudice and citing *United States v. Blue*, 384 U.S. 251 (1966)); *Voigt*, 89 F.3d at 1066 ("[A] claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice.").

## 2. *United States v. Voigt*

Both the government and Mr. Adams pay close attention to the Third Circuit's decision in *Voigt* in addressing the motion to dismiss, and the Court agrees it merits exploration. In relevant part, the *Voigt* court considered whether to overturn the defendant's convictions on wire fraud, money laundering, and tax-evasion charges based on allegations of outrageous government conduct, namely alleged pre-indictment intrusion into the defendant's attorney-client relationship. 89 F.3d at 1061–71. On appeal, Voigt argued that the district court should have dismissed the indictment because the government had used a codefendant, Travis, as a confidential informant even though Travis had allegedly acted as Voigt's attorney during the

investigation and represented a trust through which Voigt perpetrated his fraudulent scheme. *Id.* at 1068.

The Third Circuit considered three factors in evaluating Voigt's due-process claim: "(1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." *Id.* at 1067.[31] In the portion of the decision most relevant to the analysis here, the court determined that after the government became objectively aware that Travis was representing both the trust and Voigt, the record failed to "establish[] the sort of purposeful intrusion into her attorney-client relationship with Voigt that would rise to the level of outrageousness." *Id.* at 1069. In rejecting Voigt's contention that a deliberate intrusion of outrageous proportion had occurred during the relevant post-knowledge period, the court relied on evidence that the government took affirmative steps to avoid exposure to privileged communications from the informant and found that there was no evidence that any disclosure of privileged information was "at the behest of the government." *Id.*

Later decisions applying *Voigt*'s test to claims of government interference with attorney-client relationships demonstrate that a significant showing is required. For example, in *United States v. Stringer*, 535 F.3d 929, 941–42 (9th Cir. 2008), the Ninth Circuit reversed a district court's dismissal of an indictment on due process grounds and suppression of evidence. In *Stringer*, the attorney for one defendant, Mr. Samper, also represented his former company, FLIR, and despite a conflict of interest known to the government, voluntarily provided information adverse to Samper to the

---

[31]     The Eighth Circuit referenced the *Voigt* test in *United States v. Williams*, 720 F.3d 674 (8th Cir. 2013), but did not explicitly apply it because the evidence demonstrated that there was no mutual understanding that an attorney-client relationship existed between the defendant and the individual he claimed was his counsel for purposes of his Fifth Amendment challenge. *Id.* at 689–90. Although not controlling, the Court considers the test in *Voigt* to be a useful guide in analyzing Mr. Adams's Fifth Amendment claim.

government. *See id.* at 935–36 (describing how disclosure of information helped form the basis of the charges against Samper in the indictment). Nonetheless, the Ninth Circuit held that this was insufficient to warrant a remedy under the Fifth Amendment, reasoning that the government did not deliberately intrude on the attorney-client relationship by accepting evidence from the conflicted attorney. *Id.* at 942.

### 3.  Analysis: No Outrageous Conduct or Purposeful Intrusion

In this case, the Court concludes that the prosecution team did not engage in outrageous conduct that shocks the conscience during its review of the Yahoo! email production. The Court reaches this conclusion for several reasons. Nothing in the record suggests that the prosecution team went hunting for Mr. Adams's privileged communications with his attorneys. Rather, the government took repeated affirmative steps to avoid exposure to communications between Adams and his known attorneys. The team's efforts succeeded in removing many privileged communications from the database, but its process did not catch every allegedly privileged document. However, the circumstances surrounding the instances in which the government actors encountered privileged material indicate that the government's actions were either reasonable but imperfect or, at worst, in one instance, careless. Carelessness, as the caselaw demonstrates, presents no legal basis to hold that a due-process violation has been committed or that an indictment should be dismissed.

### a.  No Targeting of Known Privileged Communications

First, and perhaps most importantly, there is no evidence that members of the prosecution team ever intentionally targeted Mr. Adams's privileged communications with his own attorneys.[32] As such, this case does not involve the kind of "purposeful

---

[32]     It is true that the government intentionally searched for communications between Mr. Adams and his *Kovel* accountants at Murry LLC. However, the unique circumstances surrounding those inquiries undermine a conclusion that the

intrusion" by the government that would shock the conscience. *See Voigt*, 89 F.3d at 1069.

Indeed, the record shows that the prosecution team took reasonable measures before reviewing the emails and other documents in the Relativity database to exclude any communications between Adams and attorneys representing him that were known to the government.[33] They did so through an initial "mechanical filtering" that excluded many potentially privileged documents that they never reviewed. And later—after learning that their list of names and email accounts that might be associated with privileged communications was incomplete—they supplemented that filtering to exclude additional documents. Demonstrably, this process allowed some privileged communications to slip through the cracks, but the fact that the government engaged in these efforts tells a different story than the blatant trampling of privilege that Mr. Adams describes. The government's seemingly sincere and largely successful efforts to remove privileged communications from the database undermines an argument that it deliberately intruded on known attorney-client relationships. *See Voigt*, 89 F.3d at 1069–70 (reasoning that the government did not engage in outrageous conduct where it took steps to avoid exposure to privileged

---

prosecution team was intentionally violating a known privilege. The Murry LLC communications are separately explored below.

[33]   Mr. Adams focuses on the fact that Inspector Kroells reviewed material received directly from the thumb drive provided by Yahoo! before any privilege filtering occurred and he highlights her testimony that it is likely she came across some privileged communications when she conducted that initial review. However, the Court credits Inspector Kroells's testimony that she began this review with the limited purpose of confirming the contents of the thumb drive received from Yahoo! and there is no evidence that she deliberately went in search of privileged communications during this period, undercutting any suggestion that her actions evince a conscience-shocking "purposeful intrusion" into known attorney-client relationships. Moreover, the Court does not consider Kroells's actions here to be outrageous given that she proceeded only after she received approval from AUSA Maria to review Adams's communications with employees of Apollo and Scio based on the companies' waiver of privilege.

communications between the attorney-informant, never solicited the attorney-informant's calls after learning of the representation, and where the "government's actions … demonstrated sensitivity to potential ethical problems," including an AUSA's "efforts to steer clear of privileged information").

### b. Mechanical Filtering Does Not Show Deliberate Intrusion

Mr. Adams argues that the government's framing of the terms used in the filtering is evidence that it intended to review, rather than exclude, privileged communication, or that it was at least culpably reckless as to that outcome. Specifically, Mr. Adams emphasizes that the prosecution team decided to proceed with a second, narrower list of mechanical-filtering terms to weed out privileged documents, because an initial, more general list, would have quarantined too many documents. However, a close examination of the record demonstrates that this decision was neither outrageous conduct, nor a deliberate attempt to intrude on attorney-client relationships. Instead, it was a reasonable effort to remove privileged documents from view without unnecessarily excluding relevant and non-privileged ones. It was particularly sensible for the government to conclude, as the evidence shows, that its general list of filtering terms (e.g., attorney, privilege) was unworkable here in light of general disclaimer language on many emails and the Apollo/Scio waiver of privilege. The Court and presumably all counsel have experienced first-hand the reality that emails from attorneys often contain such disclaimer language, even when they do not contain a shred of privileged content. While intentional disregard of genuine privilege is unacceptable, the Court declines to find that the government's decision to run a targeted list of filtering terms shocks the conscience.

Because the government quickly learned that mechanical filtering for the list of general terms was unworkable, it was reasonable for it to try a more precise approach. The government was aware of several attorneys and law firms who had represented Mr. Adams at the time the prosecution team's review of the database occurred; the use of their names and related keywords in a more targeted list of mechanical filtering

terms that it selected still excluded many documents from the database, without improperly segregating voluminous non-privileged information.

Similarly, the prosecution team's decision to forego the use of a "taint team" after initially considering one does not evince a sinister motivation to penetrate attorney-client confidentiality. (*See* Def.'s MTD Mem. at 33–34 (suggesting the government should have used a "taint team," but also indicating asserting that "even taint teams violate constitutional rights").) He also suggests, without authority, that returning to the emails to Jon Hopeman, Mr. Adams's criminal defense attorney at the time, would have been the preferred approach. The Court disagrees that the Constitution requires the government to follow such a process.

Mr. Adams points to no authority that supports the proposition that the government's choice between alternative methods for screening out privileged communications from seized electronic documents is outrageous. And his suggestion that the decision to forego a taint team is evidence of improper intent is at odds with his position, taken elsewhere in this litigation, that taint teams are always constitutionally suspect. To the contrary, the fact that the government weighed several options when it was determining how to proceed in the execution of the search warrant, and selected one that it believed was the best fit for its investigation and would exclude communications with his known attorneys demonstrates that the prosecution team took affirmative steps to avoid exposure to privileged material.

### c.  Viewing Documents With Privilege Banners

The Court is not persuaded by Mr. Adams's specific argument that it was an outrageous, deliberate intrusion into known attorney-client relationships for the government to have viewed documents that contained "attorney-client privilege" or "work product" banners or headers. Certainly, a more cautious practice might have been for investigators encountering such documents to immediately close them, flag them as potentially privileged, sequester them from the reviewable database (if possible), and proceed with a prophylactic approach, such as referring the documents to a "taint team" for a determination of their status, or using a review of the to-and-

from lines of the emails to gather further information about privilege. However, the mere fact that the government did not follow that path does not mean, as Mr. Adams suggests, that the government forged ahead with blatant disregard for his rights to confidentiality in those communications.

The evidence relating to the use of privilege banners and the unique facts of this case undermine Mr. Adams's argument on this point. For instance, prior to reviewing the email production from Yahoo!, the prosecution team learned that Apollo and Scio were waiving any claims of privilege with respect to communications between the companies and Mr. Adams. It appears that this waiver affects a large volume of communications in the database over which Mr. adams would otherwise have attempted to assert privilege. Armed with that knowledge, it was reasonable (and certainly not outrageous) for reviewers to conclude that there would be many items in Mr. Adams's email account that would facially suggest privilege existed, but for which no privilege was going to apply. Therefore, the prosecution team was not required to proceed with the assumption that every email or other document in the Yahoo! production bearing a privilege banner was protected.

### d.  Draft Memo Sent From Mr. Adams to Mr. Adams

Mr. Adams also claims that it was outrageous for the government to view a draft of a memo (*In Camera* Ex. A) he later transmitted to his SEC counsel at Latham & Watkins and to Mr. Kopecky because it had a privilege banner. However, once again an examination of the full circumstances surrounding this document undermines Mr. Adams's argument. The version of this memo that Mr. Adams actually sent to his attorneys was properly segregated into the not-for-review database by the mechanical filtering efforts the government employed and was never accessed. AUSA Maria and Inspector Kroells only saw the draft of that memo that was attached to the email Mr. Adams sent from himself to himself. The body of the memo includes the name of no attorney with whom Mr. Adams had an attorney-client relationship known to the government. Although it contains a privilege banner, as discussed above, the government had valid reasons for not allowing that to control its analysis,

and nothing about the document aside from the banner suggested that the document was prepared for counsel. And there is no indication from the face of the document that it would later be sent to a third party, let alone a lawyer. It was not, therefore, an obviously privileged communication between a client and an attorney, and the Court cannot conclude that the government engaged in outrageous conduct in light of these circumstances.

### e.  The Hopeman Memo

Mr. Adams properly places significant emphasis on the government's review of the Hopeman Memo. However, the Court disagrees with Mr. Adams's contention that the circumstances in which AUSA Maria and Inspector Kroells accessed the document (*In Camera* Exhibit J) reflect outrageous government conduct. Mr. Adams notes that the Hopeman Memo included an attorney-client privilege banner and that Mr. Hopeman's name was clearly visible near the top of the document. He also stresses that Mr. Hopeman had contacted the government on Adams's behalf in March of 2016, before the government began searching through his emails. Certainly, if the government took the most cautious approach, it should have added Mr. Hopeman's name to its list of mechanical filtering terms at that point, before the review of the emails was underway. Doing so may have meant that the litigation over this clearly privileged document would have been avoided. However, the fact that the prosecution team did not do so does not mean that its conduct was outrageous. This is particularly true in light of the clear efforts made by the government after discovering the document remained in the database.

At the time they began reviewing documents in May of 2016, members of the prosecution team knew that the database contained communications from October 2006 through January 2016. Though Mr. Hopeman contacted AUSA Kokkinen in March of 2016 on Mr. Adams's behalf, nothing in the record suggests that Mr. Hopeman informed him he had represented Adams, or even communicated with him, prior to January of 2016. Because the prosecution team had not received any notice making them objectively aware that Mr. Adams and Mr. Hopeman had

established an attorney-client relationship prior to January 7, 2016, the Court does not infer from the government's failure to add Mr. Hopeman's name to the list of mechanical filtering terms following the March 2016 communication that the prosecution team deliberately intruded on the attorney-client relationship.

Further, as soon as AUSA Maria encountered the document he took action to protect Mr. Adams's privilege. As the Court's above proposed findings of fact indicate, when AUSA Maria viewed the memo on May 5, 2016, he "updated" or tagged the document as privileged during that encounter. Mr. Adams speculates that AUSA Maria may have lingered over the document or that he could have taken any number of other actions that were not recorded in the Relativity logs. However, Maria's tagging of the document as privileged is inconsistent with such speculation or a conclusion that his view of the memo constitutes a deliberate intrusion on an attorney-client relationship.

The Court also finds nothing outrageous about the government's subsequent conduct concerning the Hopeman Memo or Mr. Adams's attorney-client relationship with Mr. Hopeman. The record permits no inference that the communication with Mr. Hopeman remained in the for-review folder after AUSA Maria tagged it as part of a deliberate effort to intrude on an attorney-client relationship. A lack of understanding of the technical difference between how to flag a document as privileged and how to remove it from view or, at most, carelessness appears to explain the memo's continued availability to reviewers in the database. Moreover, when Inspector Kroells later encountered the memo (on May 11, 2016) and the email to which it was attached during her subsequent searches, each of her views lasted a very short period, suggesting no concerted effort to subvert Mr. Adams's private communications. Instead, she thereafter communicated with AUSA Maria about communications with Mr. Hopeman being in the database and the need to sequester them.

Mr. Adams also suggests that the Court should find outrageous government conduct given that the prosecution team did not add Mr. Hopeman's name to the list

of attorneys whose communications were sequestered until June 6, 2016. The Court disagrees. The fact that the prosecution team added Mr. Hopeman to that list, even if the action was delayed, undermines the insinuation that the government purposefully intruded on an attorney-client relationship. During that three-week gap, there is no evidence that Maria, Kroells, or any other member of the prosecution team sought out the Hopeman Memo or email in any way again. Indeed, the record indicates no one else saw them after Inspector Kroells's May 11, 2016 encounter. Although the handling of the Hopeman Memo is a source of concern in this case because of its content, none of the government's conduct in handling the memo comes close to the sort of intentional and unscrupulous behavior required to invoke the "rarely applied" doctrine of outrageous government conduct. *See Voigt*, 89 F.3d at 1065. Imperfect or even careless handling of a sensitive document falls far short.

### f.  Murry LLC

The one set of allegedly privileged communications which the government purposefully sought and used were Mr. Adams's communications with Murry LLC, the accounting company with whom Mr. Adams worked pursuant to a *Kovel* agreement. Mr. Adams urges that the intentional nature of the government's actions in this arena requires a remedy. The government concedes that its actions with respect to the Murry LLC communications were of a "more deliberate nature." (Gov't MTD Resp. at 18.) Nevertheless, for several reasons, Mr. Adams is unable to show that the government's intentional searches for and review of Murry LLC material was outrageous or conscience shocking.

First, AUSA Maria's initial search for communications with Murry LLC came before the prosecution team was reasonably on notice that there was any potential that communications with the accounting firm might have been privileged pursuant to *Kovel*. His first searches for the term "murryllc" came in early September of 2016, but Mr. Brever did not inform members of the prosecution team that there was any *Kovel* arrangement with Murry LLC until December 1, 2016. (DX 67.) The Court cannot infer a deliberate effort to interfere with the attorney-client relationship based on

these searches. The Court does not credit Mr. Adams's argument that the prosecution team should have known earlier that communications with Murry LLC were potentially privileged because Mr. Adams had listed Mr. Brever as his representative in a December 2014 Domestic Voluntary Disclosure to the IRS and a separate division of the IRS became involved in the investigation of this criminal case in May 2015. There is no suggestion in the record that these events alerted the prosecution team that communications with Murry LLC were potentially covered by a *Kovel* agreement. Because the government was not on notice of any privileged relationship with Murry LLC in September of 2016, AUSA Maria looking for Murry LLC documents at that time cannot form the basis of a claim that there was a deliberate intrusion on a known attorney-client relationship.

Second, even the searches that the prosecution team ran for "murry" and "murryllc" after receiving Mr. Brever's December 1, 2016 letter mentioning a *Kovel* arrangement with the accounting firm did not occur under circumstances that demonstrate a deliberate intrusion into an attorney-client relationship. Well before Inspector Kroells searched for communications with "murry" or "murryllc" in April of 2017, Mr. Brever himself had already disclosed several communications between Mr. Adams and Murry LLC reversing an earlier assertion that they were privileged. *See* discussion, *supra*, at p. 26–30 (describing several items Brever disclosed in response to the grand jury subpoena); (Brever Decl. ¶ 14, Ex. F (letter dated December 20, 2016); Gov't's Suppression Resp. at 70–73 (discussing disclosures made by Mr. Brever without privilege assertions).) Inspector Kroells testified that she likely ran the April 2017 searches because she was attempting to pull documents that Mr. Brever had disclosed from an alternative source. (*See* Jan. 8th Hr.'g Tr. 222:11–223:4.)

Third, without deciding at this time whether any specific conversation between Mr. Adams and Murry LLC satisfies the test of *Kovel*, the issue remains in dispute. Although this Court concluded that "the communications between Mr. Adams, Mr. Brever and Murry & Associates accountants were made in confidence and for the purpose of obtaining legal advice," and required Mr. Adams to provide a privilege log

in a Report and Recommendation and Order dated March 12, 2018 (ECF No. 117 at 13–14), the landscape surrounding the issue has changed. The government now seeks to challenge the application of privilege to the specific communications between Murry LLC and Mr. Adams on the ground that even if some communications between them could be covered by *Kovel*, the specific documents at issue in the database are not. (Gov't's Mot. Contesting Application of Privilege, ECF No. 192.) Though the Court has not yet ruled on the privileged status of any specific communication, the content of at least some of the communications at issue supports the reasonableness of the government's belief that the emails were made so that the accountant could prepare amended tax returns, not for the purpose of providing legal advice, and that they are therefore not privileged. An October 27, 2014 email from Mr. Murry to Mr. Brever, which copied Mr. Adams, indicated that the accountant "would be happy to prepare any amended returns that are required," and indicated that Murry LLC would "get right on preparing the returns" once they received "all of the necessary information." (ECF No. 109-8.) Subsequent communications between Mr. Adams and Murry LLC in which Mr. Adams provided information in response Murry LLC's questions also likely suggested to members of the prosecution team that they were reviewing communications that were not being provided so Mr. Brever could provide legal advice, but so that Murry LLC could prepare amended returns. Finally, the reasonableness of the investigators' conclusion that these documents were not protected by any privilege is reinforced by the fact that Mr. Brever later withdrew any claim of privilege for several of the documents when he was responding to the grand jury subpoena that was served on Murry LLC.[34]

---

[34]   The government also suggests that it was reasonable for the government to have viewed Murry LLC communications because reviewers could reasonably have believed that they were made to further a fraud scheme, thereby vitiating any claim of privilege. (Gov't's Suppression Resp. at 78–84.) Because the Court has already found that the government's review of the Murry LLC documents was not outrageous for other reasons, it does not address this issue.

### g.  Communications With Hartman

Mr. Adams further suggests that the government deliberately invaded his attorney-client relationship with Mr. Hartman of the Anthony Ostlund firm, and points the Court to privileged communications that were viewed by the prosecution team. (*In Camera* Exhibit U.) The Court does not find the government's conduct shocks the conscience. The government knew that Mr. Adams had been represented by attorneys at Anthony Ostlund when it began reviewing the information in the database. The prosecution team took affirmative steps to filter out any communications with lawyers at that firm by using the domain name "anthonyostlund" in its initial filter list. And before the prosecution team began reviewing documents in the Relativity database, it knew that the "anthonyostlund" filter term had excluded several emails from the database. (DX 15 at 1.)

As noted above, Mr. Hartman used a different domain name with his email address—"aoblaw.com"—causing some of his communications with Mr. Adams to remain in the for-review database. There is no evidence that the government was aware of this second domain name and deliberately chose to eliminate it from the filter list. Nor is there any reason supported by the record that reviewers should have known communications with an Anthony Ostlund lawyer would remain in the for-review portion of the database. This is especially true given that the "anthonyostlund" term had already filtered material from the database.

The Relativity log related to *In Camera* Exhibit U causes the Court some concern about the adequacy of the government's subsequent efforts to ensure that privileged material involving Mr. Hartman did not remain in the reviewable portion of the database. After AUSA Maria encountered a relatively innocuous communication between Mr. Hartman and Mr. Adams on May 24, 2016, there is no indication that he attempted to tag the email as potentially privileged (as he had with the Hopeman Memo) or removed it from the database. However, the Court notes that he also never returned to any of the communications in *In Camera* Exhibit U.

Like Mr. Maria, Inspector Kroells viewed several of the emails in *In Camera* Exhibit U, and she also did not follow up to ensure that these documents were filtered out in subsequent rounds. The Relativity log further indicates that Inspector Kroells spent enough time to read the contents of the few messages in which Mr. Adams shared his thoughts about the substance of a potential lawsuit. (*See* Relativity Log for *In Camera* Ex. U at 15 (40 second entry for Doc. ID 00051832; 12 second entry for Doc. ID 00051833; and 15 second entry for Doc. ID 00051841).) One of the emails she reviewed includes a signature block clearly noting that Mr. Hartman worked for the Anthony Ostlund firm (Doc. ID 00447156),[35] and although the others have no signature block, they include a standard disclaimer mentioning his firm's name.

AUSA Maria's and Inspector Kroells's failures to flag these conversations with Mr. Hartman as potentially privileged or add his name to the filter list for subsequent rounds of privilege filtering is a notable shortcoming in the government's efforts to screen out potentially privileged communications. This conduct was sloppy and should have been avoided. But the Court concludes that it was not outrageous or shocking to the conscience given that: (1) the government attempted to remove Mr. Adams's communications with lawyers at Anthony Ostlund before it reviewed his emails; (2) the prosecution team knew that emails were excluded pursuant to that effort; and (3) the government was unaware that Mr. Hartman used an email address associated with a different domain name. Moreover, when looked at in the context of the government's overall efforts to avoid privileged communications, their imperfect handling of this discrete set of documents does not support a finding of outrageous conduct.

---

[35]   It is possible that Inspector Kroells did not notice Mr. Hartman's signature block or spend enough time with the email for it to register that was one of the firms that had represented Mr. Adams in the past. The Relativity log indicates that Inspector Kroells spent only 3 seconds with that message.

### 4.  Prejudice

Because the Court finds that the prosecution team did not engage in outrageous conduct as needed to establish a Fifth Amendment violation in this context, we do not need to decide whether Mr. Adams has demonstrated actual and substantial prejudice in order to recommend denial of Mr. Adams's motion. Nevertheless, the Court concludes that Mr. Adams has failed to make a sufficient demonstration of prejudice, which is an independent bar to the relief Mr. Adams seeks.

First, the government has represented that it "does not object to suppression of the documents that span Exhibits A through U if the Court, after its *in camera* review, concludes that they are indeed privileged and that the privilege has not been waived."[36] (Gov't's Suppression Resp. at 88.) This indicates that the government has no intention of offering any of Mr. Adams's legitimately privileged communications during its presentation to the jury, and the Court recommends, below, the suppression of these communications and their exclusion from use at trial. That reality severely undercuts Mr. Adams's claims of actual and substantial prejudice because the jury will not be making its determination on the merits of this case based on any privileged communications with his attorneys. *See United States v. Rogers*, 751 F.2d 1074, 1079 (9th Cir. 1985) ("We are satisfied that any prejudice to Rogers from the Miller disclosures to Taylor, if these disclosures were improper, can be neutralized by the exclusion of improperly obtained evidence at trial."); *see also United States v. Kriens*, 270 F.3d 597, 603 (8th Cir. 2001) ("[E]ven assuming [defendant's former attorney] disclosed confidential communications [to the government], the proper remedy would be suppression of the information.") (citing *Solomon*, 679 F.2d at 1251–52, for the proposition that "when government agents obtained information by means of a

---

[36]     The Court reserves ruling on the application of privilege to any specific communication until it decides the currently pending government motion contesting the application of certain privileges.

constitutional intrusion the proper remedy, absent a showing of prejudice, is exclusion of the information not dismissal of the indictment")).

Second, the alleged intrusions into Mr. Adams's attorney-client relationships were generally quite brief and circumscribed. As such, members of the prosecution team who were exposed to privileged information did not have sufficient opportunity to become so familiar with the materials they viewed that those communications would likely influence the government's case against Mr. Adams during the investigation or at trial. Given what is certainly a substantial volume of evidence being marshaled by both sides in this litigation, the very limited contact with a known and limited number of privileged documents cannot be said to unduly prejudice Mr. Adams.

Third, the alleged intrusions took place a significant time ago, and no member of the prosecution team has looked at any of the privileged communications provided to the Court *in camera* for over a year. This passage of time, coupled with the brief exposure to the privileged material itself, suggests that even if it intended to, the government is unable to use Mr. Adams's communications with his attorneys to develop its trial strategy against him. For example, Mr. Adams suggests that the review of the Hopeman Memorandum (*In Camera* Exhibit J), exposed AUSA Maria and Inspector Kroells to information that could potentially be used to anticipate how the defense might cross-examine trial witnesses. However, the memo was written almost four years ago, making its value for the purposes of deducing trial strategy somewhat doubtful. It was seen by only one prosecutor, AUSA Maria, and he is no longer a member of the prosecution team or the United States Attorney's Office for the District of Minnesota. There is no indication that any member of the prosecution team other than Inspector Kroells ever reviewed the contents of that memo, making

it highly doubtful under these circumstances, that Mr. Adams's right to a fair trial is in jeopardy.[37]

Fourth, the Court finds that AUSA Maria's and Inspector Kroells's review of the draft memo Mr. Adams sent to his SEC lawyers at Latham and Mr. Kopecky (*In Camera* Ex. A) does not create actual and substantial prejudice to Mr. Adams. Mr. Adams complains that the government obtained a window into his own thoughts and analysis, to be shared with his attorneys, concerning the SEC's assertions that he made misrepresentations in connection with the Apollo/Scio transactions. However, the Court has closely reviewed the draft memorandum in *In Camera* Exhibit A and compared it to both the presentation Mr. Adams's SEC lawyers made to the SEC and Mr. Adams's testimony during his deposition, both of which are validly and independently in the hands of the government. That review demonstrates an almost note-for-note correspondence, indicating that Mr. Adams largely disclosed many of the same details he shared with his SEC attorneys outside of a privileged setting. (*Compare In Camera* Ex. A *with* DX 50 at 230–82 *and* Gov't's Ex. 12 at 1–60, ECF No. 173-10.)

Fifth, to the extent Mr. Adams asserts that he would not have been charged with certain criminal conduct absent intrusions into his privileged communications,

---

[37]   Mr. Adams suggests that he is prejudiced by the government's exposure to the communication with Mr. Hartman because the civil suit with disgruntled shareholders, Mack and Rapello, relates to the same subject matter as this prosecution. However, having reviewed each of the communications in *In Camera* Exhibit U, the Court notes that the vast majority of those emails discuss proposed terms for an agreement to settle a lawsuit. The Court cannot discern any way in which the prosecution team's exposure to such information would deprive Mr. Adams of a fair trial. Inspector Kroells only saw the more substantive discussion in Document IDs 00051832, 00051833, and 00051841, for relatively short periods on May 31, 2016. (Relativity Log for *In Camera* Ex. U at 15, 21.) The same reasons the Court finds no prejudice with respect to the Hopeman Memorandum apply to these communications as well.

the Court is not persuaded. Mr. Adams first suggests that without viewing his allegedly privileged communications with Murry LLC, the government would not have developed tax charges against him. But the government persuasively represents that the tax charges were forthcoming independent of any review of his emails. (*See* Gov't's MTD Resp. at 22–23.) The government represents that its analysis of Mr. Adams's allegedly secret accounts at Venture Bank showed that he received a substantial amount of money between 2008 and 2010, and "[b]y the time the Yahoo! production had been received, an *ex parte* order had already been issued requiring the disclosure of Mr. Adams's tax returns." (Gov't's MTD Resp. at 22.) After the government received those returns in May 2016, the prosecution team determined that Mr. Adams significantly underreported his income.[38] (Gov't's MTD Resp. at 22– 23.) The government would have had access to Mr. Adams's tax returns, both initial and amended, directly from the IRS, and the basis for the tax allegations would have been apparent from those documents and a comparison to the bank records the government otherwise obtained. Further, the government's tax counts concern Mr. Adams's allegedly fraudulent filing of amended returns for the tax years 2008, 2009, and 2010 in December of 2011, which occurred three years prior to his communications with Murry LLC about filing additional amended returns in 2014. This suggests that the tax charges are not the product of any review of allegedly privileged material. Moreover, the Court's own experience and consideration of indictments from this District involving allegations of mail- and wire-fraud reveal that charges related to tax crimes are so commonly found in fraud indictments as to almost be the norm.

In *United States v. Kennedy*, 225 F.3d 1187 (10th Cir. 2000), the defendant argued that his conviction should be overturned because the record demonstrated the

---

[38]   In addition to the Court's conclusion that the government did not engage in any outrageous conduct, the Court also disagrees with Mr. Adams's assertion that, at a minimum, the tax charges should be dismissed because the government built its tax case against him based on review of privileged communications. (*See* Def.'s MTD Mem. at 29.)

government had significantly built its case off of his privileged information. *Id.* at 1196. The Tenth Circuit rejected this claim "after examining all of the information Mr. Kennedy alleges the government discovered in violation of his attorney-client relationship." *Id.* The court concluded Mr. Kennedy was not entitled to an evidentiary hearing on his claim despite his assertion that the government obtained the following evidence through his attorney:

> 1) a confidential attorney-client letter from his counsel which later surfaced in the prosecutor's files; 2) a photocopy of the check used to discredit Mr. Korpi [a trial witness]; 3) the so-called "speculation" letter from Mr. Danley to Mr. Kennedy urging him to "stop speculating"; 4) information concerning potential prosecution and defense witnesses; 5) information that the prosecution had seized Western documents [from Mr. Kennedy's business] considered most important to Mr. Kennedy's defense team; 6) information concerning Mr. Kennedy's plans to repay Western's creditors; 7) information concerning a privately published novel about Mr. Kennedy which he alleges provided the prosecution with a "road map" for its case.

*Id.* at 1196 n.6. Mr. Adams likewise contends that the prosecution team received significant information from privileged communications with his attorneys that provides valuable insights, allowing the government to anticipate his defenses. Like the Tenth Circuit in *Kennedy*, this Court has closely reviewed each of the *in camera* documents that Mr. Adams has provided and concludes that he has not shown the requisite prejudice "resulting from the alleged intrusions into his relationship[s] with" his various attorneys. *See id.*

## 5. Conclusion

Mr. Adams has failed to make a showing that the circumstances of this case involve outrageous conduct on the part of the prosecution team. He cannot demonstrate the intentionality required to indicate that the government's actions could shock the conscience of the Court. Nor has he shown the existence of real prejudice that cannot be otherwise remedied. Accordingly, he has failed to meet his burden to establish that his Fifth Amendment right to due process was violated by the

government's pre-indictment intrusion into his privileged communications. His motion to dismiss the indictment should therefore be denied.

### C. Supervisory Powers

Mr. Adams also argues that the indictment should be dismissed under the Court's supervisory powers even if no constitutional violation occurred because the government "may not use privileged communications in building its cases." (Def.'s MTD Mem. at 28.)

Dismissal of an indictment under a district court's supervisory powers is "a drastic remedy" requiring a showing that the government engaged in "a systematic and persistent abuse of power." *Solomon*, 679 F.2d at 1253 n.12 (finding no "showing of such a systematic and persistent abuse of power to support such a drastic remedy" of dismissal) (citing *United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979)). It is a "well-settled proposition that the supervisory power still exists for 'truly extreme cases.'" *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1437 (D. Md. 1986) (quoting *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979)). Any such dismissal also requires a showing of prejudice. *Solomon*, 679 F.2d at 1253 n.12.

For all the reasons that the Court did not find outrageous conduct that would warrant dismissal under the Fifth Amendment, the Court concludes that there has been no showing of a systematic and persistent abuse of power in this case. The government's conduct in this case is not at all comparable to the actions of the prosecutors in *United States v. Marshank*, 777 F. Supp. 1507, 1528-30 (N.D. Cal. 1991), where Assistant United States Attorneys actively encouraged a defense attorney to assist them in developing a case against one of his clients. The court in *Marshank* found it necessary to exercise its supervisory power to dismiss the indictment to protect the defendant's constitutional rights, preserve judicial integrity, and deter future prosecutorial misconduct. *Id.* at 1529. The drastic remedy Mr. Adams seeks here is not required to achieve those ends. Nor has Mr. Adams demonstrated the prejudice necessary to make dismissal of the indictment an appropriate remedy.

Although the Court agrees that the government should be precluded from introducing Mr. Adams's privileged communications at trial, and recommends the issuance of an order to that effect, Mr. Adams's request for dismissal of the indictment under the court's supervisory power should be denied.

## D. Disqualification

As an alternative to dismissal, Mr. Adams moves for the disqualification of the entire prosecution team. If the Court finds that remedy inappropriate, he asks that the Court disqualify AUSA Maria, Inspector Kroells, and Investigator Belich.[39]

### 1. Legal standard

The parties have not cited, and this Court has not located, any Supreme Court or Eighth Circuit precedent cleanly articulating the standards applicable to a criminal defendant's request to disqualify a prosecution team or specific members of a prosecution team. Nevertheless, several decisions guide the Court's analysis of Mr. Adams's motion.

Disqualifying government counsel "implicates separation of powers issues." *United States v. Bolden*, 353 F.3d 870, 879 (10th Cir. 2003). Though disqualification of the entire United States Attorney's Office for the District of Minnesota is not requested here, such a disqualification order is rare and would only be provided "where necessary." *See id.* at 878 (reversing district court order disqualifying entire US Attorney's office and calling such relief "drastic"); *United States v. Rehak*, No. 08-cr-072

---

[39]     Mr. Adams cites *United States v. Agosto*, 675 F.2d 965 (8th Cir. 1982), a case which was later abrogated in part on other grounds, in support of the proposition that a district court's supervisory responsibilities for the members of its bar includes disqualification of counsel in criminal cases. (Def.'s MTD Mem. at 29–30.) However, *Agosto* provides little guidance given the circumstances here. It is not a case where a prosecutor and investigators are alleged to have engaged in misconduct exposing them to privileged information, thereby tainting the entire prosecution team; rather, it is a case addressing the disqualification of *defense* counsel based on an alleged conflict of interest.

(PJS/SRN), 2008 WL 11434554, at *2 (D. Minn. June 5, 2008) ("The disqualification of an entire United States Attorney's office is a rare and drastic measure.") (citing *Bolden*, 353 F.3d at 878, and *United States v. Radosh*, 490 F.3d 682, 686 (8th Cir. 2007)).

Any disqualification remedy must be measured by what is required under the circumstances to ensure a fair trial. *United States v. Koerber*, No. 2:17-cr-37-RJS-PMW, 2017 WL 3172809, at *4 (D. Utah July 25, 2017) ("[T]he sanction of disqualification of counsel should be measured by the facts of each particular case as they bear upon the impact of counsel's conduct upon the trial.") (internal quotation marks and alterations omitted); *cf. United States v. Kehoe*, 310 F.3d 579, 589–90 (8th Cir. 2002) (concluding that disqualification of entire US Attorney's Office was not required where an attorney who worked for a defendant's appointed counsel during pre-trial proceedings was later hired by the US Attorney's Office early in the case, but was walled off from the case).

One federal district court recently set forth the following standard for disqualification of a prosecutor in a case involving alleged prosecutorial misconduct:

> The Court "may disqualify an attorney to prevent a lawyer's presence from tainting a trial, for perceived conflict of interest, to protect the integrity of the judicial process, to enforce its rules against transgressors, or to maintain public confidence in the legal profession." *United States v. Kouri–Pérez*, 992 F. Supp. 511, 511 (D.P.R. 1997) (Fusté, J.) (citing *In re Bushkin Assocs., Inc.*, 864 F.2d 241, 246 (1st Cir. 1989)). The Court should only disqualify an attorney, however, "in the rare instance where other sanctions may not achieve the necessary effect." *Id.* at 512. Disqualification should be "a measure of last resort." *Id.* (quoting *In re Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir. 1988)).

*United States v. Pereira*, 312 F. Supp. 3d 262, 275 (D.P.R. 2018) (denying defendant's motion to disqualify prosecutor); *see also United States v. Whittaker*, 268 F.3d 185, 194–96 (3d Cir. 2001) (reversing district court's order disqualifying the United States Attorney's Office for the Eastern District of Pennsylvania because the record provided no evidence of bad faith and at most suggested negligence).

Another recent federal district court decision addresses a motion to disqualify members of the prosecution team for, among other reasons, their exposure to privileged information. *Koerber*, 2017 WL 3172809, at *3, 6. The *Koerber* decision applies a test weighing: "[t]he egregiousness of the violation, the presence or absence of prejudice to the other side, and whether and to what extent there has been a diminution of effectiveness of counsel." *Id.*

In *United States v. Horn*, 811 F. Supp. 739 (D.N.H. 1992), *rev'd in part on other grounds*, 29 F.3d 754 (1st Cir. 1994), a similar set of factors led to disqualification of a lead prosecutor who made the deliberate decision to learn defense counsel's trial strategy by having an assistant make duplicate copies of any documents reviewed by defense counsel. *See id.* at 741–42 (describing the prosecutor's initial intrusion into confidential work product of trial counsel for the defense). After the lead prosecutor took affirmative steps to invade trial counsel's confidential work product, she exacerbated the problem with her subsequent actions after being put on notice that the defendants would be filing a motion with the court, including reviewing again the material at issue. Later, she disobeyed court orders respecting the handling of that information during pre-trial proceedings. *See id.* at 748–51 (describing the prosecutorial misconduct involved). The court in *Horn* declined to dismiss the indictment for a Sixth Amendment violation, but disqualified the lead prosecutor given her "serious misconduct." *Id.* at 752. In fashioning a remedy the court noted:

> Important rights of the defendants have been trespassed upon by the lead prosecutor impairing their right to effective assistance of counsel and a fair trial; the lead prosecutor has not been candid with the court and failed to comply with an order of the court; the defendants have been put to unnecessary additional expense to defend themselves; the time and resources of the court have been unnecessarily expended on addressing this issue; and the integrity of the process has been damaged.

*Id.*

The above authority all derives from the criminal context, which is important to the Court's analysis. It is difficult to derive much guidance from the civil cases on

which Mr. Adams relies in his request for disqualification because the strong public interest in prosecuting criminal conduct is not implicated in those decisions. (*See* Def.'s MTD Mem. at 29–31 (citing *Arnold v. Cargill, Inc.*, No. 01-cv-2086, 2004 WL 2203410 (D. Minn. Sept. 24, 2004), *Shields v. Gen. Mills Inc.*, No. 16-cv-954, 2017 WL 6520685 (D. Minn. Dec. 1, 2017)). While courts considering disqualification of counsel to protect privilege in civil litigation can afford that concept the highest weight in their calculus, a court considering disqualification of prosecutors must also weigh the defendant's due process rights, the issue of separation of powers, and the strong public interest in the prosecution of alleged crime. The Court has nevertheless considered the disqualification rules set forth and applied in the cited civil cases as instructive, though not controlling, in reaching its determination here.

### 2. Analysis

In light of the caselaw discussed above, the Court concludes that disqualification of the current prosecution team is unwarranted,[40] and the disqualification of Mr. Maria, Inspector Kroells, and Investigator Belich is not necessary to ensure that Mr. Adams receives a fair trial.

The record establishes that the government did not access privileged information through egregious conduct. There is no indication that the indictment was procured through the use of privileged information, and there is no indication that Mr. Adams's extraordinarily able defense team will be unable to effectively represent him at trial. *See Koerber*, 2017 WL 3172809, at *4 (considering "egregiousness" of conduct, prejudice, and ability of counsel to provide effective

---

[40]   Regarding the possibility that information within privileged material seen by AUSA Maria and Inspector Kroells has tainted the other members of the prosecution team, Mr. Adams requests a "*Kastigar*-like hearing to determine whether any remaining members of the current prosecution were tainted as well." (Def.'s MTD Mem. at 31 n.14 (citing *Kastigar v. United States*, 406 U.S. 441 (1972)). The Court finds no basis on this record to hold a hearing to explore whether other members of the prosecution team have been tainted by any privileged information.

representation). As discussed at length above in the context of Mr. Adams's Fifth Amendment arguments, the Court has concluded that this is not a case in which the government engaged in serious misconduct or purposefully intruded on Mr. Adams's attorney-client privilege. The government did not use Mr. Adams's privileged information to procure the indictment and did not seek out or access information disclosing the trial strategy of the defense. The government has not failed to show candor to the Court or disobeyed any Court orders. And, as also addressed above, the exposure to privileged material that did occur did not result in prejudice to Mr. Adams.

Moreover, the Court notes that arguably the most culpable actor on the government's side, AUSA David Maria, is no longer in the United States Attorney's Office. Indeed, a largely reconstituted prosecution team was formed last fall to handle the pretrial motions currently being addressed. And this Court recommends the issuance of an Order prohibiting the government from using any privileged communications at trial. The fact that Mr. Maria will not be involved in that trial further prevents Mr. Adams's privileged communications from inadvertently informing trial strategy.

For these reasons, the Court recommends that Mr. Adams's requests for (1) disqualification of the entire prosecution team; or (2) disqualification of Mr. Maria, Inspector Kroells, and Investigator Belich be denied.

### E. Exclusion of Privileged Commuications

Although the Court has found that no due process or Sixth Amendment violation occurred in this case, the Court nonetheless recommends that the government be prohibited from using at Mr. Adams's upcoming trial any privileged communications between himself and his attorneys. "It would be improper to prosecute a defendant on the basis of facts wholly or partially acquired by the prosecutor from the accused's private attorney." *United States v. Kriens*, 270 F.3d 597, 603 (8th Cir. 2001) (citing *Gajewski v. United States*, 321 F.2d 261, 267 (8th Cir. 1963)).

The government has already properly asserted no objection to an Order suppressing documents that span Exhibits A through U if the Court ultimately concludes that they are privileged and the privilege has not been waived. (Gov't's Suppression Resp. at 88.) Accordingly, this Court will recommend that the District Court Order that no such evidence be admitted at trial.

## IV.   Motion to Suppress Evidence

Mr. Adams asks the Court to suppress all of his emails and the fruits of their seizure. First, he contends that the Yahoo! warrant itself failed to describe with particularity the things to be seized in violation of his Fourth Amendment rights. Second, he asserts that the Yahoo! warrant was overbroad because Inspector Kroells's affidavit only provided probable cause to seize evidence of the alleged fraud scheme related to the 2011-2012 Apollo/Scio transaction, yet the warrant authorized seizure of a broader scope of evidence. Third, he argues that the government's execution of the Yahoo! warrant was unreasonable under the Fourth Amendment and that the government recklessly disregarded Federal Rule of Criminal Procedure 41. In support of this third argument, he asserts that the government: (1) searched for emails outside the scope of the warrant, (2) made unauthorized use of documents it reviewed; (3) reviewed emails more than necessary to execute the warrant; (4) based its final "seizure" of emails on search terms and "relevance" rather than on the terms of the warrant; and (5) disregarded attorney-client privilege.

### A. Particularity

The Fourth Amendment provides that "no Warrants shall issue … [unless] particularly describing the place to be searched, and the persons or things to be seized. U.S. Const., amend. IV. This requirement that a warrant describe particularly the things to be seized exists to prevent "a general, exploratory rummaging in a person's belongings" because "[g]eneral warrants … are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citing *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 467 (1971)); *see also United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008).

Courts judge compliance with the particularity requirement according to "a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (internal quotation marks omitted). "The fourth amendment requires that a search warrant's description of the evidence to be seized be 'sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized.'" *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (quoting *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir.1978)). How specific a warrant must be varies "depending on the circumstances and the type of items involved." *Frederickson*, 846 F.3d at 519 (internal quotations omitted). As such, courts do not resolve issues concerning particularity "in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Fiorito*, 640 F.3d at 346 (internal quotation marks omitted).

Taking into account the Yahoo! warrant's purpose, the items it authorizes the government to seize, and the total circumstances of this case, the Court concludes that the warrant satisfies the Fourth Amendment's particularity requirement. The warrant authorizes the government to seize "[a]ll information [in Mr. Adams's email account] that constitutes fruits, contraband, evidence and instrumentalities of violations of [the mail and wire fraud statutes]" for a 10-year period. (DX 11, Attach. B.) It further explains that the government could seize "[a]ll documents, records, and communications related to financial, bookkeeping, transactional and tax records reporting the business and financial transactions of ADI, ADGC, Private Scio, Public Scio, Focus, and ESA during and for the calendar, fiscal, and federal tax years 2010 to [January of 2016]." (*Id.*) But its illustrative list of things to be seized did not end there. The warrant authorizes the government to obtain bookkeeping records showing financial transactions conducted in and through Apollo's and other

businesses' bank accounts and other financial accounts. It also authorizes the seizure of records showing the income and expenses related to several business entities. (*Id.*) Further, the government is authorized to seize documents regarding a March 2011 proxy statement for the Apollo companies, the Apollo/Scio asset purchase agreement, a stock-repurchase program, and a private offering. (*Id.*) And finally, the search warrant authorizes the seizure of all communications with Apollo and Scio shareholders and prospective shareholders. (*Id.*) This list reasonably informs the officers executing the warrant what items may be seized according to its terms.

Mr. Adams contends that the warrant lacked the particularity required by the Fourth Amendment because it "authorized the seizure of all emails that were evidence of a scheme or artifice to defraud … occurring after October 25, 2006." (Def.'s Suppression Mem. at 33.) This argument lacks merit. Mr. Adams ignores the illustrative list of communications, records, and other documents that the Yahoo! warrant includes in Attachment B, an illustrative list that is sufficiently definite. *Frederickson*, 846 F.2d at 519.

The Eighth Circuit found that a similar authorization for the seizure of a broad list of documents was sufficiently particular in *Fiorito*. There, the government was investigating Mr. Fiorito, a mortgage broker, for mail fraud and conspiracy to commit mail fraud in connection with an equity-stripping scheme. 640 F.3d at 343. "Fiorito's basic scheme was to convince financially desperate homeowners to refinance or sell their homes to him and then clandestinely intercept their proceeds checks— representing the equity realized in the sale or refinance—and deposit them into his bank account." *Id.* A law enforcement officer obtained a warrant to search Mr. Fiorito's "residence for incriminating documents." *Id.* The warrant application was supported "by an affidavit that alleged facts related to only one victim, Constance Dang." *Id.* at 344. The detective, however, obtained a warrant that authorized "a search for [the] entire files involving Fiorito…." *Id.* at 346. On appeal, Mr. Fiorito argued that the district erred in denying his motion to suppress evidence because the search warrant lacked particularity, which the Eighth Circuit rejected, reasoning that

Mr. Fiorito's argument focused only on the broad entire-files phrase that appeared "at the opening of an extensive list of specific documents sought…." *Id.* Instead, the court explained that phrase needed to be read "in the context of the specific list that follows." *Id.* (citing *Andresen*, 427 U.S. at 480). The court further reasoned that the warrant "did not authorize a blanket search of document for no particular purpose, but rather for the purpose of discovering evidence of an ongoing, well-defined equity-stripping scheme." *Id.* at 347.

Applying the reasoning of *Fiorito*, the warrant in this case satisfies the particularity requirement. Like Mr. Fiorito, Mr. Adams's argument reads a broad introductory phrase out of context and elides the entire illustrative list of specific documents the government was authorized to search for and seize.[41] The purpose of the Yahoo! search warrant was to discover evidence of a fraud scheme involving misrepresentations to investors about a transaction to sell Apollo's assets to Scio. Those misrepresentations included failures to disclose Mr. Adams's ownership interest and position on the board of directors for Scio, Apollo's significant indebtedness to his law firm, and his law firm's representation of the Apollo entities, among others. To prove that the representations and failures to disclose were material misrepresentations intended to defraud investors, and to show that they were in fact untrue, it would be necessary for the government to establish, for example, that Apollo had become indebted to Mr. Adams's law firm. The government would also need to obtain documentary evidence establishing Mr. Adams's previous roles in the Apollo companies to show that it was a material misrepresentation not to disclose such involvement to the Public Scio investors. Considering the overarching purpose of the search of his emails to obtain this and related information, and in light of the

---

[41]   Mr. Adams's suggestion that "[a] warrant authorizing a general search of records for evidence of fraud occurring over a nearly ten-year period lacks particularity on its face" and his assertion that the reference in the warrant "to the mail and wire fraud statutes cannot save it" also depend upon his disregarding the illustrative list of items to be seized. (*See* Def.'s Suppression Mem. at 33.)

illustrative list of items to be seized, the Yahoo! search warrant was sufficiently particularized.

## B. Overbreadth

In an argument closely related to his particularity challenge, Mr. Adams asserts that the Yahoo! warrant was overbroad on its face because the affidavit supporting the warrant only laid out probable cause concerning the Apollo/Scio transaction, but the warrant authorized a far broader seizure. He asserts that Inspector Kroells's affidavit "did not provide probable cause for the broad warrant that was issued…. Rather, it only provided probable cause to seize evidence of the alleged fraud scheme related to the 2011–2012 asset purchase transactions" involving the Apollo and Scio entities. (Def.'s Suppression Mem. at 34.) He continues, stating: "although the affidavit may have supported probable cause to investigate the asset purchase agreements and misrepresentations about them, it could not provide probable cause to search for documents of all fraud over the nearly 10 year period included in the warrant." (*Id.*) In response, the government takes the position that "[t]he affidavit here alleged a complex fraud scheme that involved the Apollo/Scio companies, Mr. Adams's various roles over time in those companies and other companies, including Focus Capital and ESA Consulting, and the significance of the Apollo/Scio transaction to that complex fraud scheme." (Gov't Resp. to Suppression Mem. at 17.)

For a warrant to be sufficiently specific to satisfy the Fourth Amendment, it must "clearly state what is sought" (*i.e.*, particularity), and "the scope of the warrant [must] be limited by the probable cause on which the warrant is based" (*i.e.*, breadth). *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856–57 (9th Cir. 1991). Here, the Court concludes that the warrant was not constitutionally overbroad.

As noted above, the illustrative list in Attachment B authorized the seizure of an array of documents relating to a complex wire-fraud scheme. Even a narrow reading of the fraud scheme described in the affidavit supports a search for a wide

array of information within the database, spanning many years. The alleged
misrepresentations constituting wire fraud related, for example, to Mr. Adams's
various roles in the Apollo organization over the years. The affidavit indicated that he
made a material misrepresentation by failing to disclose to investors that he had held
various positions with Apollo. To prove the government's accusation that Mr. Adams
held those positions and that it was criminally fraudulent to leave that information out
of a message to investors, it would be unworkable to limit the government's search
and seizure to documents specifically discussing the 2011–2012 asset purchase
proposals. The government would necessarily have to review evidence from an earlier
period to prove Mr. Adams's previous involvement, and indeed, the warrant
authorized the seizure of documents responsive to its terms back to October of 2006.

Mr. Adams also allegedly defrauded investors by failing to disclose the fact that
his law firm previously represented the Apollo entities and was Apollo's largest
creditor. For the government to piece together evidence that would demonstrate these
were criminally significant misrepresentations, the prosecution team would necessarily
have to gather evidence showing how Adams was involved in the Apollo companies
over the years preceding the asset purchase transactions. The government would
similarly be entitled to see evidence showing that Mr. Adams's firm had represented
Apollo in the years prior to the Apollo/Scio transactions and that Apollo owed
Mr. Adams and his law firm more money than any of its other creditors. Moreover,
the government would need to uncover evidence to prove that Mr. Adams made the
misrepresentations with the intent to defraud investors. This authorization for the
seizure of documents showing intent could not realistically be limited to documents
solely and directly related to the Apollo/Scio asset purchase transaction. These
considerations appropriately expand the scope of the seizure authorized by the
warrant beyond the very narrow set of information advocated by Mr. Adams, but that
does not mean such authorization was untethered to probable cause.

The Supreme Court's reasoning about the investigation of complex fraud schemes supports the Court's conclusion. In *Adresen v. Maryland*, the Supreme Court made the following observations:

> Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole 'picture' of petitioner's false-pretense scheme with respect to Lot 13T could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.

427 U.S. at 480 n.10. This reasoning undermines Mr. Adams's contention that the probable cause in Inspector Kroells's affidavit failed to authorize the scope of the warrant actually issued in this case. That affidavit described a complex fraud scheme that could be proved only by piecing together various pieces of evidence to show a greater whole. The affidavit articulated probable cause to believe that the crime of wire fraud had been committed, and Mr. Adams may not hide behind the complexity of that alleged scheme to avoid detection of the various means the government claims he used to commit such violations. *See also United States v. Maali*, 346 F. Supp. 2d 1226, 1240-41 (M.D. Fla. 2004) (rejecting defendants' argument that search warrants were unconstitutionally overbroad because investigators needed to piece together a "paper puzzle," and citing *Andresen* to support the conclusion that "at least in cases involving fraudulent schemes where the proof of guilt involves the piecing together of seemingly innocuous documents, some breadth and generality in warrant descriptions have been tolerated").[42]

---

[42]    Mr. Adams's position that the probable cause in Inspector Kroells's affidavit could only authorize a much narrower seizure of records than was permitted by the Yahoo! warrant also informs a substantial portion of his argument that the government's execution of the warrant was unreasonable because the government

In support of his overbreadth argument, Mr. Adams cites *In re Grand Jury Proceedings*, 716 F.2d 493 (8th Cir. 1983), but that case does not help him. There, the Eighth Circuit held that law enforcement obtained what amounted to a general warrant because the warrant authorized the seizure of "all records pertaining to [Robert Young's] bail bonding business," but was "otherwise unlimited." *Id.* at 497–98. The affidavit at issue in *In re Grand Jury Proceedings* set forth probable cause that Young had defrauded two surety companies that he had represented. As a result, the warrant's authorization for the seizure of every document that Young's business possessed simply went too far. *See id.*

The Yahoo! warrant, by contrast, did not authorize the government to search for and seize all of Mr. Adams's emails without any limitation. Instead, Magistrate Judge Rau found the Yahoo! warrant was supported by probable cause for a violation of federal statutes prohibiting wire and mail fraud, and the warrant authorized the seizure of emails and documents that are "narrowly tailored" to the crime Mr. Adams is suspected of committing. Therefore, it is sufficiently limited in scope to make it constitutionally permissible. *See United States v. Dockter*, 58 F.3d 1284, 1289 (8th Cir. 1995) (distinguishing *In re Grand Jury Proceedings*, 716 F.2d at 497–98, on grounds that it "did not confine the search to specific types of documents for particular crimes 'but authorized the seizure of all documents in Young's bail bond operations without any enumeration or specificity'").

Accordingly, the Court concludes both that Mr. Adams reads the legitimate scope of the warrant too narrowly and that the scope of the warrant was appropriately

---

allegedly searched for, reviewed, and seized documents that were beyond the warrant's scope. As explored in greater depth below, many of the same bases for the Court's conclusion that the warrant was not overbroad on its face also establish that the execution of the warrant was not unreasonable.

tied to the probable cause in Inspector Kroells's affidavit. The Yahoo! warrant was not unconstitutionally overbroad on its face.[43]

## C. Execution of the Search Warrant

Mr. Adams next asserts that even if the Yahoo! warrant is valid on its face, suppression of the information seized by the government from his email account is required because the government's execution of the warrant was unreasonable, thus violating both the Fourth Amendment and the requirement of Federal Rule of Criminal Procedure 41. For the reasons that follow, the Court disagrees.

### 1. Legal Framework: Reasonableness

"[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States,* 441 U.S. 238, 257 (1979). "Although how best to proceed in performing a search is generally left to the discretion of officers executing a warrant, possession of a search warrant does not give the executing officers a license to proceed in whatever manner suits their fancy. … The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription on unreasonableness." *Hummel-Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994); *see also United States v. Weinbender*, 109 F.3d 1327, 1329–30 (8th Cir. 1997) (same). The "general touchstone of reasonableness" applies equally in the context of executing a warrant permitting the search and seizure of emails. *See In the Matter of a Warrant for All Content and Other Information Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.* ("In

---

[43]    Because the Court finds the search warrant was facially constitutional in both its particularity and breadth, it need not explore in depth the application of the good-faith exception. Nonetheless, based on the same reasoning, the Court alternatively holds that any deficiencies on the face of the warrant would not require suppression of evidence under *United States v. Leon*, 468 U.S. 897, 926 (1984).

*re Gmail Account*"), 33 F. Supp. 3d 386, 396 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014) (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998) and *Dalia*, 441 U.S. at 258).

The Supreme Court has noted the difficulties that arise when officers execute a warrant "authorizing the search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable." *Andresen v. Maryland*, 427 U.S. 463, 481 n.11 (1976). Officers can make a cursory review of documents to determine if they are "among those papers authorized to be seized," which will inevitably cause "some innocuous documents" to be reviewed. *Id.* However, this requires "responsible officials" to "take care to assure that [a search of a person's papers is] conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.*

Ultimately, "[t]he Fourth Amendment does not demand perfection from law enforcement officers; it only requires that their conduct be reasonable under the totality of the circumstances." *Wright v. United States*, 813 F.3d 689, 699 (8th Cir. 2015) (concluding that detention of a plaintiff in a *Bivens* case by two deputies in the United States Marshals was not an unreasonable seizure).

### 2. Analysis: No Fourth Amendment Violation

Against this legal backdrop, the Court concludes that although the government's execution of the search warrant could have been conducted more cautiously, it did not rise to the level of a Fourth Amendment violation. Mr. Adams's arguments to the contrary are unpersuasive.

### a. Scope of the Warrant

First, Mr. Adams argues that the government acted unreasonably because it searched for emails outside the scope of the warrant. (Def.'s Suppression Mem. at 37–40.) Mr. Adams notes that the indictment ultimately issued in this case alleges not only that Mr. Adams made material misrepresentations to investors in connection with the Apollo/Scio transaction (Inidct., Counts 1–14), but also accuses him of embezzling

significant sums of money from Apollo as part of the scheme that allegedly preceded the securities fraud by several years (*id.* ¶¶ 10–40). Specifically, Mr. Adams complains that AUSA Maria, Inspector Kroells, and Agent Khan ran searches in the Relativity database "designed to find documents relating to the alleged 2006–2009 embezzlement scheme, not discussed at all in the warrant," and he takes issue with the government's use of search terms directed at allegedly secret accounts and the sale of warrants (Def.'s Suppression Mem. at 38.) Mr. Adams also contends that the government acted unreasonably because Inspector Kroells and AUSA Maria "ran searches designed to find Mr. Adams's personal tax returns and privileged communications with his *Kovel* accountant." (Def.'s Suppression Mem. at 38.) And finally, he argues that the "prosecution team conducted finishing expeditions by searching for general terms untethered to the warrant," including several profane terms and AUSA Maria's own name. (Def.'s Suppression Mot. at 38.)

The Court concludes that the government did not act unreasonably based on its use of search terms in reviewing the Relativity database. Mr. Adams's argument suffers from the same flaw as his argument that the warrant was overbroad on its face—he offers an unreasonably narrow reading of what the Yahoo! warrant legitimately allowed the government to seize. As discussed above, the affidavit in support of the search warrant demonstrated probable cause to believe that Mr. Adams had made several misrepresentations to shareholders and prospective shareholders of the Apollo and Scio entities in connection with the Apollo/Scio asset purchase transactions; the proof of that alleged fraud required and the warrant permitted review of a broader array of documents than he claims was appropriate. The Yahoo! warrant specifically authorized the search and seizure of Mr. Adams's emails for fruits, contraband, evidence and instrumentalities of wire fraud, including documents, records, and communications related to financial, bookkeeping, transactional and tax records reporting the business and financial transaction of several companies related to the Apollo and Scio entities. The warrant also authorized the search and seizure of documents showing all financial transactions conducted in and through the business and other financial accounts associated with those business entities as well as records

showing the companies' income and expenses. Further the warrant authorized the search and seizure of all documents and records reflecting communications with shareholders or prospective shareholders of the Apollo and Scio entities.[44]

Mr. Adams's reliance on *United States v. Dallman*, 13-03081-01-CR-S-MDH, 2016 WL 6123250 (W.D. Mo. Oct. 12, 2016), *R&R adopted by*, 2016 WL 6133849 (W.D. Mo. Oct. 19, 2016), is misplaced. In *Dallman*, a deputy of the United States Marshal's Service obtained a search warrant for Dallman's residence based on suspicion that Dallman had committed identity theft and had failed to register as a sex offender after living in Missouri for over a year. 2016 WL 6123250, at *1–2. When the deputy arrived at Dallman's home, although the warrant did not include the search and seizure of child pornography and no permission was sought to search for such evidence, the officer inserted a thumb drive into Dallman's computer which executed a program that automatically searched for child pornography. *Id.* at *2. Based on the use of this tool, the court concluded that "the search exceeded the scope of the warrant from the beginning." *Id.* at *4. The warrant authorized the search of Dallman's computer, but only for "items related to Defendant's travel, residency, and identity," and the program on the thumb drive "immediately began searching for items not related to travel or residency." *Id.* As a result, the court suppressed video evidence containing child pornography that was located in the search of Dallman's computer. *Id.* at *5.

---

[44]     One of the subparts of the list of Particular Things To Be Seized in Attachment B to the warrant authorizes the search and seizure of: "All documents, records, and communications related to Private Scio, Public Scio, to include all such documents, records, and communications regarding the ADI/ADGC proxy statement from March 2011, the asset purchase agreement between ADI/ADGC and Private Scio, the stock-repurchase program, and the private offering." If the warrant only authorized the government to search Mr. Adams's email account for information directly linked to the representations made in connection with the 2011-2012 Apollo/Scio transaction, it makes no sense that the warrant provided for the search and seizure of significant additional categories of information beyond this specific list.

The unauthorized search in *Dallman* is quite unlike the keyword searches the prosecution team performed in this case to find evidence of a complex fraud scheme. In *Dallman*, there was absolutely no relationship between the suspected crimes of failure to register and identity theft for which the warrant was authorized and the deputy's search for child pornography. Here, the government was investigating a complex wire fraud scheme, the proof of which requires the government to assemble numerous pieces of evidence into a coherent picture.

Again, Mr. Adams's position is undermined by the Supreme Court's recognition in *Andresen* that investigation of complex fraud schemes authorizes the review of many pieces of information to put together a whole picture of the unlawful conduct. 427 U.S. at 480 n.10. The search warrant in *Andresen* was to obtain documents relating to a suspected crime of false pretenses in violation of the laws of the State of Maryland. Andresen allegedly committed this offense by defrauding a property purchaser, and that transaction was detailed in the probable cause statement in the warrant. Specifically, Andresen was suspected of lying to the purchaser when he represented that the lot was free of liens, when, in fact, he knew there were multiple liens on the property. The Court ultimately concluded that it was not unreasonable for the law enforcement officers executing a search warrant to seize information that related to an entirely different lot because the trained investigators could reasonably have believed that information relating to the other lot could be used to show Andresen's intent with respect to the specific transaction described in the warrant. *Id.* at 483–84.

Adopting Mr. Adams's theory that the prosecution team acted unreasonably here would require this Court to ignore the rationale underlying *Andresen*. The prosecution team's search terms in this case were reasonably calculated to locate financial records, bookkeeping documents, communications with investors, account information, and other similar documents that would help piece together the context and circumstances relating to the misrepresentations that established probable cause to believe he committed wire fraud. For example, the prosecution team's searches for

documents regarding RL Investments, DL Investments, and ADR Investments were seeking accounts that would show income and expense information regarding the business. Their searches for the alleged sale of warrants and for documents related to Ms. Zipkin's actions sought another piece in the paper puzzle showing the whole picture of Mr. Adams's suspected fraud scheme. The searches for several profane terms were reasonably targeted toward communications that could be used show Mr. Adams exhibited the requisite intent.[45] And the government's requirement to prove that Mr. Adams acted with fraudulent intent during the Apollo/Scio transactions permitted the prosecution team to look for evidence in earlier emails that would demonstrate criminal intent and refute any claim of good faith.

Mr. Adams also complains that the prosecution team unreasonably ran searches and reviewed documents related to his personal tax records when the warrant application contained no showing that Mr. Adams violated tax laws. (Def.'s Suppression Mem. at 38, 39.) Here again, the Court concludes that information relating to Adams's personal tax returns falls within the scope of the warrant and it was not unreasonable for the government to search for such information. Mr. Adams's personal tax return documents could reveal income Mr. Adams obtained

---

[45]   Mr. Adams also argues that it was unreasonable for AUSA Maria to search for his own name, which he did on June 27, 2016. (DX 79 at 7 (entry 239).) Mr. Adams characterizes such a search as a "fishing expedition" and suggests that it is "untethered" to the warrant. (Def.'s Suppression Mem. at 38.) But the record permits perfectly reasonable inferences for AUSA Maria's search. If Mr. Adams was aware that he was the subject of an ongoing criminal investigation prior to January of 2016 (the end-point of the Yahoo! email production), and sent an email mentioning Mr. Maria's name, such a communication could demonstrate consciousness of guilt. AUSA Maria's search for his own name also occurred a little over a month after Mr. Hopeman had argued in two letters that AUSA Maria's previous employment at Latham & Watkins created a conflict of interest, with which the government disagreed given Mr. Maria's stated lack of involvement in any representation of Mr. Adams. This reality also supports a reasonable inference that the search for his own name may have simply been to confirm that Mr. Maria had not communicated with Mr. Adams during his pervious employment. In any case, the search simply cannot be read to render the execution of the warrant unreasonable.

from his work with or on behalf of Apollo and Scio, evidencing the reality that his firm was a large creditor of Apollo. The search warrant and Agent Kroells's affidavit specifically discussed misrepresentations Mr. Adams made about his law firm's role as Apollo's largest creditor. His personal tax returns would also provide information about Apollo's and Scio's financial transactions, the seizure of which was specifically authorized by the search warrant.

Mr. Adams's personal tax returns are also within the scope of the warrant because they could be used as evidence to show that Mr. Adams had the requisite intent to defraud and knowledge of a fraudulent scheme; if personal tax records demonstrate a failure to report certain income, that may suggest that Mr. Adams knew it was illegally obtained. *Cf. United States v. Johnson*, 262 F.R.D. 410, 415–16 (D. De. 2009) (granting the government's motion in limine to admit evidence of the defendant's tax returns for certain years as intrinsic evidence of intent in a mail and wire fraud case) (citing *United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005), as follows: "holding that in a mail fraud, wire fraud, and conspiracy to commit mail and wire fraud prosecution, the defendant's tax return was intrinsic evidence because it reported the income defendant had received from the fraudulent scheme, and it was suggestive of defendant's knowledge of the fraudulent scheme because not all income was reported").

In sum, nothing about the search terms used by the government persuades the Court that the government's execution of the warrant was unreasonable. This is true for both the search terms used during the many months of work in the Relativity database and for those used in doing the final "sort" of the database's contents on April 4, 2017. If anything, given that almost all of the search terms are reasonably designed to elicit evidence which the government could use to prove up the scheme alleged in the affidavit, the use of those terms bolsters rather than undermines the Court's Fourth Amendment conclusion. Mr. Adams does not suggest that the Fourth Amendment would have prohibited Inspector Kroells or AUSA Maria from reviewing the entire Yahoo! production document-by-document. But searching the documents

one-by-one to sort them into responsive and non-responsive piles would surely have exposed the prosecution team to far more documents that, though interesting or even perhaps incriminating, were not contemplated by the search warrant.

### 3.  "Unauthorized" Use of Documents

Second, Mr. Adams contends that the government made unauthorized use of documents it reviewed. (Def.'s Suppression Mem. at 40–43.) Specifically, Mr. Adams asserts that members of the prosecution team: (1) looked for information in the Relativity database to prepare for witness interviews, but used emails from outside the scope of the warrant in conducting those interviews; and (2) sent Investigator Belich documents that included Mr. Adams's personal tax returns and privileged communications with Murry LLC, leading to the investigation of tax charges. (Def.'s Suppression Mem. at 41–42.)

The Court is not persuaded by Mr. Adams's complaint that the government acted unreasonably because it used communications during witness interviews that it did not ultimately claim to "seize" when it ran its final search terms. Mr. Adams cites no applicable authority for the proposition that this would constitute a Fourth Amendment violation, and the Court finds none. *Cf. United States v. Lee*, 1:14-cr-227-TCB-2, 2015 WL 5667102, at *6, 14–15 (N.D. Ga. Sept. 25, 2015) (noting that the FBI agent reviewed a Google email production, searched the database with keywords, located documents with importance to the investigation, and used documents in preparing other agents to conduct interviews and concluding that the execution of the search warrant was reasonable).

Moreover, for the purpose of this Court's Fourth Amendment analysis, it is treating the documents located by search terms between May of 2016 and April 4, 2017 that were printed or otherwise used in interviews as having been seized regardless of whether they were in the "final cull" done by AUSA Maria at the end of the search within the database. To hold otherwise would be to allow the government to avoid Fourth Amendment scrutiny by working extensively within a database but

not including all of the document upon which they relied during their investigation in the final officially declared seizure. Despite this searching review, however, there is no indication that the government used any documents to prepare for witness interviews or otherwise that were actually beyond the scope of the warrant.

In addition, providing tax-related documents to Investigator Belich was not unreasonable under these circumstances. As the Court has noted above, the tax-related materials were within the scope of the warrant, so there was nothing "unauthorized" about having an IRS investigator review them to determine their import to the investigation. Moreover, for the same reasons that the Court concluded that the prosecution team's handling of the Murry LLC documents submitted *in camera* did not merit a finding of outrageous conduct, the Court also concludes that the government did not act unreasonably for Fourth Amendment purposes. The Court reiterates that the Murry LLC documents were originally shared with Investigator Belich prior to Mr. Brever's December 1, 2016 notification of any *Kovel* arrangement, several of the communications between Mr. Adams and Murry LLC suggest that they may have been intended for the non-privileged purpose of preparing amended returns, and Mr. Brever later disclosed several of the communications at issue without any claim of privilege in response to the grand jury subpoena to Murry LLC. To the extent Mr. Adams argues that suppression is required by handling these potentially privileged documents unreasonably, the Court disagrees.

### 4. Cursory Review

Third, Mr. Adams argues that the government reviewed emails more than was necessary to execute the warrant because it did not limit itself to the merely "cursory" review of documents to determine whether they fell within the scope of the warrant. Mr. Adams similarly complains that the government returned to documents it had previously reviewed as the case evolved. He contends that the government's "repeated inspection of documents exceeded what the government was authorized to do in executing the warrant." (Def.'s Suppression Mem. at 44.) The Court concludes that

the length of time the government reviewed information in the Relativity database or its return to documents it previously viewed was unreasonable.

The Fourth Amendment allows government actors to return to a seized database in a case like this repeatedly over time to review or collect responsive documents. When executing a search warrant for a suspect's emails, the government "has a need to retain materials as an investigation unfolds for the purpose of retrieving material that is authorized by the warrant." *In re Gmail Account*, 33 F. Supp. 3d at 398. For this reason, a court may refuse to impose specific requirements *ex ante* for how the government executes an email search and suppression of evidence is not an appropriate remedy for an investigator's return to certain emails multiple times as her understanding evolves regarding whether the information fits within the scope of the warrant. *See id.* at 398–99 (citing *United States v. Lustyik*, No. 2:12-cr-645-TC, 2014 WL 1494019, at *5 (D. Utah April 16, 2014)).

The district court decision in *Lustyik* is particularly instructive. During the government's investigation of a fraud scheme for the procurement of government contracts regarding logistics and weapons maintenance support in Afghanistan, investigators reviewed emails of Mr. Taylor and discovered communications suggesting that an FBI agent, Mr. Lustyik, was attempting to derail a potential indictment of Taylor by having him treated as a confidential informant. *See id.* at *2 (describing discovery of communications); *id.* at *2 n.6 (discussing the FBI agent's suspected conduct of making Taylor an informant to foreclose indictment in exchange for financial gain). Investigators obtained warrants to review the communications between Taylor, the FBI agent, and a third co-conspirator, including emails that third-party service providers produced to the government. *Id.* at *3–4. In describing the execution of the warrant the court noted the following:

> [Law enforcement agents] did not cull the information down using key word searches because, in [a law enforcement agent's] experience, people sometimes use coded language to hide illegal activities, and it is difficult at the beginning of an investigation to know about any coded language persons might be using. Without knowledge

of the coded language being used, it is often not feasible to use search terms to capture all files responsive to the warrants….

The Government's knowledge of the activity being investigated developed over time. As the Government learned new details, the Government would go back and conduct targeted searches in the Relativity database using search terms for additional documents responsive to the warrants. From time to time, and based on developing knowledge of the investigation, documents that were previously marked as irrelevant were re-reviewed and marked as relevant.

2014 WL 1494019, at *5; *see also In re Gmail Account*, 33 F. Supp. 3d at 398–99.

In denying the defendants' motions to suppress, the *Lutsyik* court rejected the argument that the execution of the search warrant was unreasonable. *Id.* at *12–14. Relying on Tenth Circuit precedent, the court began by noting that "'a computer search may be as extensive as reasonably required to locate the items described in the warrant.'" *Id.* at *12 (quoting *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006)). The court reasoned that it was not improper for the government to open every file to determine what was and was not relevant to the investigation, and cited cases that suggest the challenges in tailoring searches of electronic data make adoption of specific search plans difficult. *Id.* (citing *United States v. Christie*, 717 F.3d 1156, 1166 (10th Cir. 2013) ("Computer files can be misnamed by accident, disguised by intention, or hidden altogether, leaving investigators at a loss to know *ex ante* what sort of search will prove sufficient to ferret out the evidence they legitimately seek."). Further, the court found that "as the document review progressed, those executing the warrants gained a better understanding of the illegal conduct at issue in the warrants…. The additional targeted searches were a reasonable method for locating additional documents responsive to the warrants." *Id.* at *13 (citing *United States v. Burgess*, 576 F.3d 1078, 1091 (10th Cir. 2009), for the proposition that "the process of developing search methods is 'dynamic'").

Adopting this analysis, the Court concludes that no Fourth Amendment violation occurred in this case simply because the members of the prosecution team

looked at some documents multiple times over the period that the Relativity database was being searched. The record demonstrates that as the prosecution team reviewed Mr. Adams's emails they gained a better understanding of the fraud scheme they were investigating. The realities of such an investigation may require dynamic methods of searching an email production like the one at issue in this case, and the fact that such methods may require an investigator to return to or even change her mind about a document does not make the execution of a search warrant unreasonable.

### 5. Attorney-Client Privilege

Mr. Adams argues that the government's disregard of his attorney-client privilege also leads to a conclusion that the execution of the search warrant violated the Fourth Amendment requiring suppression of the entire Yahoo! database. The Court disagrees for three reasons. First, Mr. Adams has not cited any authority for the premise that a violation of the evidentiary privilege protecting his attorney-client communications would justify suppression under the Fourth Amendment of all the emails and documents that surrounded the privileged materials. *Cf. United States v. Segal*, 313 F. Supp. 2d 774, 780 (N.D. Ill. 2004) (rejecting a defendant's argument that the government should be barred from introducing at trial any evidence derived from its violation of his attorney-client privilege as fruit of the poisonous tree because "[t]he attorney-client privilege is an evidentiary privilege, not a constitutional right," and "[t]he violation of a defendant's attorney-client privilege thus does not require the suppression of derivative evidence").

Second, Mr. Adams's reliance on cases that discuss the heightened concerns raised by searches of law-office records in support of his assertion that the government should have used a different protocol for executing the search warrant is misplaced. (*See* Def.'s Suppression Mem. at 48–51.)[46] For example, Mr. Adams relies on *Klitzman Klitzman & Gallagher v. Krut*, 744 F.2d 955, 959–62 (3d Cir. 1984), a case in

---

[46]     Mr. Adams also relies on *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020 (2d Cir. 1980), and *Michael D. Cohen v. United States*, No. 18-mj-03161 (S.D.N.Y. Apr. 13, 2018). These cases likewise involve the government's search of a law office.

which the Third Circuit affirmed a district court order requiring the government to return materials seized from a law firm, following the government's indiscriminate seizure of all of the firm's working files. The *Klitzman* court explained that its "[m]ost important" consideration was the effect of the seizure on third parties other than the target of the search. *Id.* at 960. The court was concerned that the government's disregard of privilege "potentially or actually invaded the privacy of every client of the Klitzman firm." *Id.* at 961. The concern in a case like *Klitzman* is whether the government's actions interfere with the privilege belonging to a law firm's clients who had nothing to do with the underlying investigation. Here, the government was not seizing every communication of Mr. Adams's law firm, but his personal emails. *Klitzman* says nothing about applying more elaborate protections against privilege when looking at a lawyer's personal communications. The government's decision to forego any search warrant for the Adams & Monahan law firm indicates that the prosecution team was, indeed, concerned about avoiding privileged communications between the clients of that firm and their lawyers. And the privilege which Mr. Adams highlights as having been disregarded is his own, not that of third-party clients.

Third, as described above, the government did not "disregard" the protection of privileged communications between Mr. Adams and the attorneys that represented him.[47] They did not search for or seek to deliberately intrude on Mr. Adams's attorney-client relationships or try to review privileged communications to help better develop their case. Instead, government took reasonable steps to exclude from the information available to reviewers any communications between Mr. Adams and his own attorneys. This included supplementing the list of filter terms that would remove potentially privileged information from the reviewable database as the prosecution

---

[47]     This also makes Mr. Adams's analogy to *Klitzman* unpersuasive. There, the court found that "[t]he government well knew, prior to the search, that the client files contained privileged communications, yet the government took not one step to minimize the extent of the search or to prevent the invasion of the clients' privacy guaranteed by the attorney-client privilege." 744 F.2d at 961. Here, the same is not true, as the government made efforts to protect Mr. Adams's interest in the confidentiality of his communications with his lawyers.

team became aware of additional attorneys' names. These efforts were imperfect and privileged communications were encountered, but the government did not act recklessly or with improper intent. Under these circumstances, the Court finds that the government's handling of privileged material does not support Mr. Adams's argument that suppression of the Yahoo! evidence is required by the Fourth Amendment.

For these reasons and the other observations made elsewhere in this report and recommendation, the Court finds that the government's handling of privileged material was not unreasonable and that suppression is not an appropriate remedy.

### 6. Rule 41

Mr. Adams also relies on Rule 41 in support of his argument that the entire Yahoo! database should be suppressed. Generally speaking, he argues that the government recklessly disregarded the requirements of Rule 41 when it executed the warrant because it: (1) developed no specific search plan to locate information among Mr. Adams's emails that was responsive to the warrant; (2) improperly based its final "seizure" of emails on search terms and "relevance" rather than on the terms of the warrant; (3) worked in the Relativity database for over a year as a "litigation database," even using documents that it ultimately claimed not to seize during witness interviews; and (4) otherwise failed to fulfill its obligation to seize information pursuant to the Rule's two-step procedure for executing search warrants for electronic media. While the government's approach to executing the warrant in this case was certainly not beyond criticism, the Court concludes that no blanket suppression remedy is required.

The exclusionary rule is applied to violations of Rule 41 only where "a defendant is prejudiced or reckless disregard of proper procedure is evident." *United States v. Turner*, 781 F.3d 374, 386–87 (8th Cir. 2015). "Reckless disregard" of Rule 41 requires a showing of bad faith. *Id.* at 387 (citing *United States v. Berry*, 113 F.3d 121 (8th Cir. 1997)). As to prejudice, "we ask whether the search would have occurred had

the rule been followed. If so, there is no prejudice to the defendant." *Turner*, 781 F.3d at 387.

Mr. Adams's argument that Rule 41 requires suppression in this case does not carry the day for several reasons. First, there is no showing that the government acted in reckless disregard of proper procedure. The government obtained the full database from Yahoo! and began to review it after trying to filter out potentially privileged communications. The commentary to Rule 41 specifically observes that review of large volumes of electronic information can take a significant amount of time, and the rule declines to place any specific limit on how long that review can last. *See* Fed. R. Crim. P. 41, advisory committee notes to 2009 amendments (rejecting a "presumptive national or uniform time period within which any subsequent off-site … review of the media or electronically stored information would take place"). Here, the government's review of the Yahoo! database certainly lasted a long time, and a swifter, more focused review may have been preferable. But given the complexity of the case and the government's clear efforts to explore the database for information responsive to the warrant, it cannot be said that the execution of the warrant reflected bad faith as required for suppression for a Rule 41 violation. *See Turner*, 781 F.3d at 387 (rejecting Rule 41 suppression claim where the defendant did not suggest that the government acted in bad faith despite a significant number of Rule 41 violations); *see also United States v. Beckmann*, 786 F.3d 672, 680–81 (8th Cir. 2015) (rejecting the defendant's argument that suppression was required for violations of Rule 41 because the government did not demonstrate reckless disregard for proper procedure when it failed to comply with a deadline for a warrant's execution and delayed in returning the warrant).

Second, Mr. Adams is simply unable to establish that, absent the alleged Rule 41 violations caused by the process employed in this case, the search which occurred would not have happened, and therefore he cannot demonstrate prejudice. *See Turner*, 781 F.3d at 387 (asking whether the search would have occurred if Rule 41 had been followed). There can be no question that the government would have

conducted the searches and obtained the same information even had they adopted a more conservative protocol. Indeed, it seems likely that the government would have reviewed a far greater number of allegedly non-responsive documents and would probably have seized many more if they reviewed every document individually during a manual sort.

Finally, the Court declines Mr. Adams's implicit invitation to blend the analysis of the Fourth Amendment and Rule 41 so that full technical compliance with the procedural rule becomes a functional prerequisite to a finding that a search was conducted with the reasonableness the Constitution requires. Although clearly related, Mr. Adams has pointed to no authority that supports such a position. And, as explored above, courts have instead found that suppression—an extreme but important remedy for constitutional violations—should be rarely applied for violations of many of Rule 41's provisions. *See Berry*, 113 F.3d at 123 (concluding that a night search conducted in technical violation of Rule 41's requirement that a warrant must be executed during the daytime, unless a judge expressly authorizes it, was not conducted in bad faith because the circumstances suggested that the executing officers believed that the applicant for the warrant had "sought and received authority for a night search"). The rare circumstances justifying suppression for a Rule 41 violation are not present here.

## V.   Motion to Dismiss Tax Counts or for a Bill of Particulars

As noted above, when the government superseded the indictment in December of 2017, it added counts 15–17, which allege that Mr. Adams committed tax fraud by intentionally underreporting his income for 2008, 2009, and 2010. (First Superseding Indict. ¶¶ 64–67.) The government incorporated all of the allegations concerning Mr. Adams's alleged fraud scheme into the tax-fraud allegations. (*Id.* ¶ 66.) The government alleges that "during the course of his scheme to defraud, [Mr. Adams] diverted large portions of investors' funds to personal accounts controlled by [Mr. Adams] for his personal use and benefit." (*Id.* ¶ 64.) "In filing his personal income tax returns with the [IRS, Mr. Adams] failed to disclose most of

these funds on his tax returns and, accordingly, did not pay income tax on these amounts." (*Id.* ¶ 65.) Specifically, the government asserts that when he filed his tax returns on or about December 29, 2011, Mr. Adams reported income of $674,763 in 2008, $581,795 in 2009, and $783,327 in 2010, but his taxable income exceeded those amounts. (*Id.* ¶ 67 (chart listing Counts 15–17).) For these years, the government asserts that Mr. Adams "did willfully make and subscribe false tax returns for the years [2008–2010], which were verified by written declarations that they were made under the penalty of perjury, and which the defendant did not believe to be true and accurate as to every material matter[.]" (*Id.*)

Mr. Adams argues that Counts 15–17 of the First Superseding Indictment must be dismissed because they do not provide him sufficient notice of the conduct he allegedly engaged in that subjects him to the charges. (*See* Def.'s Mot. to Dismiss Tax Counts ("Def.'s Tax Mot."), ECF No. 140.) He contends that the years 2008–2010, "amounts of income Mr. Adams reported, the elements of the statute (26 U.S.C. § 7206(1)], and the general facts of the alleged conspiracy incorporated by reference, are the only information the Indictment sets forth regarding these charges." [48] (*Id.* at 1.) He also asserts that the indictment is flawed because it "does not even estimate the amount by which Mr. Adams allegedly understated his income, or which 'income' he purportedly misstated[.]" (*Id.*) Alternatively, he argues that the government should be required to provide him with a bill of particulars with respect to these counts. (*Id.* at 2.)

---

[48]     The statute prohibiting making and filing a false tax return prohibits "[w]illfully mak[ing] and subscrib[ing] any return …, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." *United States v. Fairchild*, 819 F.3d 399, 406 (8th Cir. 2016) (quoting 26 U.S.C. § 7206(1)) (alterations in *Fairchild*). "[T]he government must put forth evidence 'that the document in question was false as to a material matter, that the defendant did not believe the document to be true and correct as to every material matter, and that he acted willfully with the specific intent to violate the law.'" *Id.* (quoting *Kawashima v. Holder*, 565 U.S. 478, 483 (2012)).

### A. Legal Standard

An "indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. … For each count, the indictment … must give the official or customary citation of the statute … the defendant is alleged to have violated." Fed. R. Crim. P. 7(c). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994). "An indictment is normally sufficient if its language tracks the statutory language," *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008), "as long as it is accompanied by a statement of the facts and circumstances to adequately inform the accused of the specific offense," *United States v. Hecker*, No. 10-cr-32 (JNE/SRN), 2010 WL 3463393, at *8 (D. Minn. July 6, 2010) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)), *R&R adopted in*, 2010 WL 3463396 (D. Minn. Aug. 30, 2010). The indictment will be deemed sufficient "unless no reasonable construction can be said to charge the offense." *Morris*, 18 F.3d at 568 (internal quotations omitted).

The Rules of Criminal Procedure also provide that "[t]he court may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). The decision whether to order a bill of particulars is left to the district court's discretion. *United States v. Maull*, 806 F.2d 1340, 1345 (8th Cir. 1986). A bill of particulars is a "formal, detailed statement of the claims or charges brought by a plaintiff or prosecutor." *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (quoting Black's Law Dictionary 177 (8th ed. 2004)). It is meant to both inform the defendant of the nature of the charge against him so he may prepare for trial and to avoid or limit the risk of unfair surprise at trial. *United States v. Livingstone*, 576 F.3d 881, 883 (8th Cir. 2009). "However, a bill of particulars is not intended to supplement discovery or to provide for the acquisition of evidentiary detail." *United States v. Afremov*, 2007 WL 2475972, at *2 (D.

Minn. Aug. 27, 2007) (citing *United States v. Shepard*, 462 F.3d 847, 860 (8th Cir. 2006) and *United States v. Matlock*, 675 F.2d 981, 986 (8th Cir. 1982)).

## B. Application

Applying the governing legal standard, the Court concludes that dismissal of the tax counts is not required due to an alleged failure to put Mr. Adams on notice of the charges against him. The indictment provides a citation to the statute Mr. Adams is accused of violating, § 7206(1), tracks the language of the statute, and lists the elements of the offense. The indictment also contains a statement of facts and circumstances that adequately inform Mr. Adams of the specific offense alleged against him. The paragraphs specifically related to the tax-fraud counts incorporate the indictment's allegations concerning Mr. Adams's mail- and wire-fraud scheme. That scheme alleges that Mr. Adams used secret bank accounts at Venture Bank to divert Apollo investors' funds for his personal use and benefit during the relevant period. By this conduct, Mr. Adams allegedly "embezzled millions of dollars from Apollo and its investors," during the years in question. Read as a whole, the indictment plainly informs Mr. Adams that he is accused in Counts 15–17 of failing to report the income in excess of the identified amounts that he received in 2008, 2009, and 2010 through this alleged embezzlement.

Mr. Adams suggests that he is unable to defend himself because the indictment does not specifically identify the additional amounts of income he received that he allegedly failed to report during the years in question.[49] It is noteworthy that the government is not required to precisely prove at trial the true amount of income Mr. Adams was required to report, but must prove that the amount reported was

---

[49]   To the extent Mr. Adams seeks additional information about the evidence the government will offer at trial to prove he committed tax fraud, a request for a bill of particulars is not the appropriate vehicle. *See United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011) ("A bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial.") (internal quotation marks omitted).

wrong. Manual of Model Criminal Jury Instructions for the District Courts of the
Eighth Circuit § 6.26.7206 n.6 (citing *United States v. Hedman*, 630 F.2d 1184, 1196 (7th
Cir. 1980)). Moreover, the government represents that it provided Mr. Adams with
information from which the specific underreporting of income can be derived at a
reverse proffer session and through extensive disclosures provided more than a year
ago. (Gov't's Resp. to Def.'s Tax Mot. at 5–7, ECF No. 166.) These disclosures
provide Mr. Adams with the information sought in his motion for a bill of particulars
and allow him "to understand the nature of the charges, prepare a defense, and avoid
unfair surprise." *Huggans*, 650 F.3d at 1220; *Livingstone*, 576 F.3d at 883 (affirming
denial of motion for bill of particulars where the district court concluded that "the
indictment and the government's disclosures were sufficient to enable
Mr. Livingstone to understand the nature of the charges, prepare a defense, and avoid
unfair surprise") (internal quotation marks omitted).

Mr. Adams also contends that without a more precise indictment, he is exposed
to a double jeopardy risk. (Def.'s Tax Mot. at 4–5.) He argues that the government's
tax-fraud allegations could evolve between the grand jury and trial without more
detailed information in the indictment and "without pinning down the actual amount
and source of allegedly unreported taxable income now, nothing would prevent the
government from re-indicting Mr. Adams for failure to disclose 'other' income
allegedly not disclosed during the same period." (*Id.*) This argument is more
compelling, though it ultimately fails. In theory, the government could refuse to
specify the income a defendant failed to report when filing tax returns, run a trial
addressing the defendant's alleged embezzlement income, end up with an acquittal,
and then try to run a second trial dealing with different income it alleges was
separately unreported. However, if the government brought the second prosecution
envisioned by that hypothetical, it would bear the burden of having previously
charged a vague and over-broad crime. Those fears are misplaced in Mr. Adams's
case. Here, given that the government has provided additional detail to the defense,
including bank records showing how many transactions are at issue and when they
took place, and has shown the defense "spreadsheets that summarize the transactions

from the bank accounts referenced in the superseding indictment," (Gov't's Resp. to Def.'s Tax Mot. at 5–6), there is little risk that it will be able to prosecute Mr. Adams a second time for other unreported income. *See United States v. Haynor*, No. 1:09-cr-172, 2012 WL 5342410, at *4 (S.D. Ohio Oct. 29, 2012) ("The Court must conclude that the indictment, now augmented by discovery and the Government's impending *Jencks/Giglio* and Rule 404(b) disclosures, is sufficient to apprise the Defendants of the nature and basis of the charges, and to preclude a second prosecution against them for the same offenses.").

For these reasons, the Court concludes that the indictment should not be dismissed for failure to provide Mr. Adams sufficient notice of the tax charges against him. Nor is a bill of particulars necessary to inform him of the nature of the charges or to prevent any unfair surprise at trial.

## RECOMMENDATION

Based on the foregoing, **IT IS HEREBY RECOMMENDED THAT:**

1. Defendant's Motion to Suppress (**ECF No. 36**) be **DENIED**;

2. Defendant's Motion to Dismiss Counts 15–17 of the Superseding Indictment, or in the Alternative, for a Bill of Particulars (**ECF No. 140**) be **DENIED**;

3. Defendant's Motion to Dismiss the Superseding Indictment, or in the Alternative for Disqualification, for Privilege Violations (**ECF No. 141**) be **DENIED**; and

4. That an Order be issued which prohibits the government from using at trial any documents submitted in *In Camera* Exhibits A through U that are ultimately deemed privileged.

Date: September 17, 2018                    *s/ Katherine Menendez*
                                            Katherine Menendez
                                            United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation "*unless the court sets a different deadline.*"  (Emphasis added). The Court has previously ordered that objections shall be filed on or before March 19, 2018 and that responses to those objections shall be filed on or before March 26, 2018. All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.