UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-64(DWF/KMM)

UNITED STATES OF AMERICA,

                    Plaintiff,

            v.

EDWARD S. ADAMS,

                    Defendant.

**GOVERNMENT'S RESPONSE
TO DEFENDANT'S
OBJECTIONS TO REPORT AND
RECOMMENDATION**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and John Kokkinen, Assistant United States Attorney, respectfully submits this response to Edward S. Adams's Objections [Dkt 222] to Magistrate Judge Katherine Menendez's September 17, 2018 Report and Recommendation ("R&R") [Dkt 221].   Adams seeks review of Judge Menendez's recommendation that the Court deny his motion to suppress [Docket No. 36], motion to dismiss or, in the alternative, disqualify [Dkt 141], and motion to dismiss or, in the alternative, for a bill of particulars [Dkt 140].   The issues that are implicated by Adams's motions have been briefed extensively by the parties, including in the context of a motion that is currently pending before Judge Menendez [Dkt 192, 201, 217].   Rather than repeat those arguments, the government incorporates by reference all of the arguments made in its prior submissions, *see* [Dkt 48, 49, 109, 119, 125, 166, 172, 179, 192, and 217], as supplemented by the below response to specific arguments made in Adams's objections.

I.     **The Magistrate Judge Correctly Recommended that Adams's Motion to Suppress be Denied.**

A. Standard of Review

A district judge must consider de novo any objection to a magistrate judge's recommendation on a motion to suppress, and may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions. Fed. R. Crim. P. 59(a); 28 U.S.C. § 636(b)(1).

B. Analysis

The total number of documents produced in response to the Yahoo! search warrant was 146,522, and consisted of emails from two of Adams's accounts as well as emails from the account of Adams's law partner, M.M. Zeitz Ex. 3. The total number retained after the Relativity database was filtered in April 2017 (i.e., the seized documents) was 42,927. Of that number, 5,485 were viewed. Maier Decl. [Dkt 148] ¶ 3. Adams claims that the difference—the 37,422 that were not viewed—should have been suppressed by Judge Menendez. For several reasons, the objection should be overruled.[1]

---

[1] Adams contends that the refusal to suppress the 37,422 documents that were not viewed will result in case management complications because, he claims, many of those documents might contain privileged information. Thus, if the government decided to examine the 37,422 documents and seek to use any of them, that could prompt additional motions by Adams. Adams asserts, without citation to any authority, that there is no basis to force him to spend the time and resources going through these 37,422 documents to determine whether any of them are privileged. But, of course, the basis is that as the proponent of the privilege, he bears the burden of establishing that any of the documents are in fact privileged. In the interest of attempting to mitigate the feared case management complications and save the defense the time and cost of reviewing the 37,422 documents themselves, the government proposes instituting a taint team to examine those 37,422 documents before the prosecution team is permitted to access them. Given the history of this litigation, however, it seems unlikely that Adams would agree to such a proposal.

First, as Judge Mendenez ruled, it was not unreasonable for the government to use search terms during its final sort of the database in April 2017, particularly given the fact that "almost all of the search terms were reasonably designed to elicit evidence that the government could use to prove up the scheme alleged in the affidavit." R&R at 79. And even though there were 22 emails that were viewed and used during the course of the investigation that were not ultimately retained as part of the "final cull" in April 2017, Judge Menendez properly concluded that these 22 emails were nonetheless seized given that they had been used and that the seizure of those 22 emails was proper because there was no indication that they "were actually beyond the scope of the warrant." *Id*. at 80-81.

Second, as Judge Menendez correctly explained, "[t]he Fourth Amendment allows government actors to return to a seized database in a case like this repeatedly over time to review or collect responsive documents." *Id*. at 81. If the seizure was reasonable because it was designed to capture only those documents that were within the scope of the warrant, that is the end of the inquiry from a Fourth Amendment perspective and suppression of all evidence, or even the 37,422 that have not been reviewed, is not the appropriate remedy.[2] *See id*. A lengthy footnote in *United States v. Lee*, NO. 1:14-cr-227-TCB-2, 2015 WL 56671002, at *14 n.15 (N.D. Ga. Sept. 25, 2015), which was quoted in the government's response to Adams's motion to dismiss [Docket No. 172 at 35-36], explains why.

---

[2] Adams seems to forget that if the government seeks to admit at trial any of the documents that were seized, including the ones he claims are entirely unrelated to the allegations that form the basis of the charges against him, the government will have to show those documents to be probative of a fact of consequence and that he retains the ability to seek to prevent the admission of such documents as being irrelevant.

Third, Adams makes no attempt to distinguish between his emails and those of M.M.  The record shows that a number of emails within the 42,927 were from M.M.'s email account, not Adams's.  *See* Zeitz Ex. 3, Maier Decl ¶¶ 2-3.  Adams has no Fourth Amendment basis to request suppression of emails from M.M.'s account that are among the 42,927, regardless of whether those documents were ever viewed.[3]

Adams also objects to Judge Menendez's refusal to recommend suppression of 750 emails that, according to Adams, the government has not defended as being within the scope of the warrant.  Specifically, he claims that more than 100 related to purely personal matters and more than 600 pertained to business dealings unrelated to Apollo.  For the same reasons explained above, Judge Menendez correctly concluded that suppression was not warranted because these emails were included in the final cull in April 2017, which consisted of reasonable efforts to identify documents that were within the scope of the warrant.  Adams's argument also overlooks the reasoning, advanced by the government in *defending* the seizure of these 750 emails, that the retention of such emails can be justified because they could have evidentiary or foundational value to issues such as authentication, attribution, identity, motive, intent, and opportunity.  *See* [Dkt 172] at 84.

---

[3] Adams cites *United States v. Metter*, 860 F. Supl 2d 205, 211 (E.D.N.Y. 2012), apparently for the proposition that the government acted unreasonably in failing to determine for itself whether the 37,422 emails that were not viewed actually fell within the scope of the warrant.  But the government did take steps to determine for itself whether they fell within the scope of the warrant.  Those 37,422, as well as the other 5,485 that make up the 42,927, were identified as within the scope of the warrant as a result of search terms that Judge Menendez correctly found to be "reasonably calculated" to locate documents within the scope of the warrant and were emblematic of "clear efforts to explore the database for information responsive to the warrant."  R&R at 77, 79, 87.

With regard to Judge Menendez's conclusion that the search terms were reasonably calculated to locate documents within the scope of the warrant, Adams argues that Judge Menendez failed to cite any evidence in support of that conclusion and instead relied on the "incantation that the fraud here was 'complex.'" *See* [Dkt 222] at 6.   Adams is mistaken.   Judge Menendez explained why each of the various search terms were reasonably calculated to locate documents that fit within the illustrative categories of documents identified in the items to be seized and explained the nexus or relevance of those categories to the scheme alleged in the affidavit.[4] *See* R&R at 10-15,69-72, 77-80.

Adams next argues that the government disregarded proper procedure under Rule 41 by never meaningfully executing the warrant.   Judge Menendez rightly rejected Adams's argument on the grounds that (1) the government's execution of the warrant, though lasting a comparatively long time, was not reckless and did not reflect any bad faith, (2) Adams failed to establish any prejudice as that term is defined in the context of alleged Rule 41 violations, and (3) there is no authority for the proposition—implicit in Adams's motion—that "full technical compliance with [Rule 41 is] a functional prerequisite to a finding that a search was conducted with the reasonableness the Constitution requires." R&R at 87-88.

---

[4] Adams argues that Judge Menendez erred in relying on the "business and financial transactions" language in the illustrative list of categories of documents without limiting that category to documents from 2010 to the present.  But as explained in the government's response, the "2010 to the present" language was inclusive, not exclusive, and thus the warrant, on its face, authorized the seizure of records within that category that preceded 2010. *See* [Dkt. 172] at 38.

5

In addition, Adams argues that the R&R's suppression ruling will have "consequences far beyond this case" and will "render[] the Fourth Amendment meaningless in the digital context." *See* [Dkt. 222] at 7-8. Adams's ominous warnings are incompatible with the story told by the evidence in the record, which is that the government, as Judge Menendez found, made considerable efforts to execute the warrant in a way that identified only those documents that fell within the scope of the warrant and to protect Adams's interest in the confidentiality of his communications with his lawyers.

## II. The Magistrate Judge Correctly Recommended that Adams's Motions Requesting Dismissal be Denied.

Two of Adams's motions requested the relief of dismissal of all or part of the superseding indictment. The first [Dkt 140] requests dismissal of the tax charges on the ground that the charges, as set forth in the superseding indictment, fail to provide enough information to put Adams on notice of the charges, as required by the Sixth Amendment, and to permit him to raise Fifth Amendment challenges to future prosecutions for the same offense. The second [Docket No. 141] requests dismissal of all charges or, at a minimum, the tax charges on the ground that alleged invasions into privileged communications violated his Fifth and Sixth Amendment rights. Adams's objections are without merit and should be overruled.

### A. Standard of Review

A district judge must consider de novo any objection to a magistrate judge's recommendation on a dispositive motion, and may accept, reject, or modify the

recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions.  Fed. R. Crim. P. 59(a); 28 U.S.C. § 636(b)(1).

B.  <u>Analysis</u>[5]

Adams claims that the Fifth Amendment requires dismissal.  Adams argues that this conclusion is compelled by the R&R's finding that it is more likely than not that privilege headers were visible to members of the prosecution team when they were reviewing documents.  Judge Menendez thoughtfully and thoroughly addressed this argument and explained why, in the unique circumstances of this case, the presence of such banners did not automatically indicate a deliberate intrusion.  As Judge Menendez found, it was reasonable for the government to conclude that there would be many items in Adams's email accounts that would facially suggest a privilege—but would not, in fact, be privileged—due to the presence of "general disclaimer language on many emails."  R&R at 44.  Adams contends that there are no such emails in the record and that R&R fails to identify any.

The argument, however, ignores the evidentiary basis for Judge Menendez's finding and the reasonable inferences Judge Menendez drew in making that finding.  Just as Judge Menendez noted, the record did establish that there were many emails that were not privileged that nonetheless contained privilege disclaimers, banners, or legends.  As

---

[5] Adams does not advance any specific arguments regarding Judge Menendez's refusal to dismiss the tax charges on the theory that the superseding indictment fails to put him on notice as to the basis of the charges.  Judge Menendez applied the governing legal standard and correctly concluded that the charges cite the statute Adams is accused of violating, track the language of the statute, list the elements of the offense, and contain statements of fact that adequately inform him of the specific offenses alleged.  R&R at 89-90.

referenced in an email that explained why the general search terms were abandoned in favor of more specific search terms to weed out potentially privileged emails, Zeitz Exhibit 4, "the 'general' search terms ('privilege,' 'attorney,' etc.) were hitting on 70-80% of the documents, due in large part to standard disclaimers that appeared on many/most of the emails." *See also* DX 4 (Zeitz Decl.) [Docket 52-1] ¶ 14 and DX 5 (Maria Decl.) [Docket 52-1] ¶ 7. Judge Menendez's finding was also supported by testimony at the suppression hearing. *See* Jan. 9, 2018 Hr'g Tr. at 124-127. And Judge Menendez further supported her finding by relying on the reasonable, common-sense inference that "The Court and presumably all counsel have experienced first-hand the reality that emails from attorneys often contain such disclaimer language, even when they do not contain a shred of privileged content." R&R at 44. Therefore, Adams's argument that Judge Menendez's finding was erroneous is unavailing.

Despite being permitted to argue much of his motion to dismiss in sealed submissions to which the government was unable to specifically respond, Adams was unable to demonstrate prejudice by the alleged exposures to potentially privileged communications. In objecting to Judge Menendez's conclusion that he failed to demonstrate prejudice, Adams argues that the information contained within the communications that occurred many years prior to the criminal case and in the context of potential civil lawsuits and SEC investigations is "relevant" to the criminal charges pending against him. But even assuming the information is relevant, that does not establish prejudice, much less the type of prejudice required to warrant dismissal under the Fifth Amendment. Instead, as Judge Menendez correctly reasoned after having reviewed all of

Adams's *in camera* submissions, any fear of prejudice is negated by (1) the government having no intention of using any privileged communications in its presentation to the jury at trial; (2) the R&R's findings that the alleged intrusions were generally quite brief, circumscribed, occurred a long time ago, and had doubtful value to deducing the trial strategy in this case; (3) the content of many of the communications having been revealed "almost note-for note" in Adams's SEC deposition testimony and his lawyers' presentation to the SEC; and (4) the persuasive indications that the tax charges against Adams were based on a comparison of Adams's tax returns to bank records and not on any "allegedly privileged material." *See* R&R at 54-58.[6]

## III.    The Magistrate Judge's Denial of Adams's Requests for a Bill of Particulars and for Disqualification were not Contrary to Law or Clearly Erroneous.

A. <u>Standard of Review</u>

In considering an objection to a magistrate judge's ruling on a nondispositive matter, a district judge may modify or set aside the magistrate judge's ruling if it is contrary to law or clearly erroneous.  Fed. R. Crim. P. 59(a); 28 U.S.C. § 636(b)(1)(A).

B. <u>Analysis</u>

*Bill of Particulars*

Adams objects to Judge Menendez's determination that no bill of particulars is required to inform him of the nature of the tax charges, to prevent unfair surprise at trial,

---

[6] There is no merit to Adams's argument that the R&R misunderstood the issue of whether dismissal is required under the Sixth Amendment.  The R&R correctly distinguished the Sixth Amendment cases on which Adams relied in holding that no Sixth Amendment violation occurred given that the alleged intrusions into attorney-client communications occurred prior to the initiation of criminal proceedings.  *See* R&R at 35-39.

and to permit him to raise a Fifth Amendment double-jeopardy challenge to a future, hypothetical prosecution.  Judge Menendez identified the applicable legal test, applied that test in assessing the superseding indictment, and correctly concluded that no bill of particulars is "necessary to inform Mr. Adams of the nature of the charges or to prevent unfair surprise at trial."  R&R at 90-92.  In reaching this determination, Judge Menendez properly relied on the government's representations, which Adams does not dispute, that the defense has been provided extensive discovery and has even seen spreadsheets summarizing the transactions from the bank accounts referenced in the superseding indictment.  Aside from seeking review of Judge Menendez's determination, Adams fails to identify any specific portion of Judge Menendez's analysis that is clearly erroneous or contrary to law.  For that reason alone, his objection should be overruled.

*Disqualification*

Adams objects to Judge Menendez's refusal to disqualify the prosecution team.  Although he seems to quibble with the legal test and factors that Judge Menendez applied, he does not actually contend that those factors or that test were contrary to law.

The R&R reveals that Judge Menendez painstakingly examined the extraordinarily large record that has been developed over the past 13 month, which included a two-day evidentiary hearing, exhibits that likely exceed ten thousand pages, numerous declarations, and hundreds of pages of written memoranda.  Based on Judge Menendez's close familiarity with that record, including Judge Menendez's ability to assess the credibility of witnesses who testified at the two-day evidentiary hearing, Judge Menendez made the following findings that informed her analysis:

- "The record establishes that the government did not access privileged information through egregious conduct."

- "There is no indication that the indictment was procured through the use of privileged information, and there is no indication that Mr. Adams's extraordinarily able defense team will be unable to effectively represent him at trial."

- "The government has not failed to show candor to the Court or disobeyed any Court orders."

- "[T]he exposure to privileged material that did occur did not result in prejudice to Mr. Adams."

R&R at 63-64.  The R&R is littered with numerous other findings that bear on the issue of disqualification.  For example, the R&R includes findings regarding the brevity of the exposures to the allegedly privileged documents, findings regarding the content of certain allegedly privileged communications being "largely innocuous," findings that it is unlikely that any information gleaned from certain allegedly privileged communications would actually permit the government to deduce the defense's trial strategy in this case, and findings that much of the information contained within certain allegedly privileged documents is revealed in other materials that are "validly and independently in the hands of the government."  R&R at 32, 52, 55, 56, 64.  All of these findings, as well as all of the other findings in the R&R, are well-supported by evidence and reasonable inferences that Judge Menendez was permitted to draw from the enormous record.

    In an attempt to show bad faith on the part of the government where none exists, Adams renews his strained effort to characterize the government's communications to

defense counsel about the documents to which it had access as consisting of misrepresentations. As noted in the government's response to Adams's motion to dismiss, *see* [Dkt 179] at 40-41, Adams's characterizations impart to those communications a deceptive intent that is not there.

Lastly, Adams argues that Judge Menendez had no evidentiary basis for the determination that the tax charges would never have been secured had it not been for the government's exposures to Adams's communications with the Murry firm. The claim is meritless. Judge Menendez received and reviewed the special agent report that obtained authority from the Tax Division of DOJ to pursue those tax charges, Sealed Government Exhibit G to Response to Motion to Dismiss [Dkt 180], *and the transcript of the presentation of those tax charges to the grand jury*, Sealed Government Exhibit F to Response to Motion to Dismiss [Dkt 180], and properly found that the basis for the tax charges was apparent from a comparison of analyses of bank records to Adams's initial and first set of amended returns.

The Court should overrule Adams's objections to Judge Menendez's denial of his request for disqualification.

## **CONCLUSION**

Judge Menendez issued a thorough, 94-page R&R that painstakingly analyzed the factual record and the applicable law. Having the benefit of having presided over a two-day evidentiary hearing where witnesses' demeanor and credibility could be assessed in the context of exhibits that likely exceeded ten thousand pages, Judge Menendez determined that there was no government misconduct that would merit Adams's requests

for suppression, dismissal, or disqualification.   The government respectfully requests that the Court overrule Adams's objections, adopt Judge Menendez's R&R in full, and deny Adams's motions.

Dated: October 15, 2018                    Respectfully Submitted,

                                           ERICA H. MacDONALD
                                           United States Attorney

                                           *s/ John Kokkinen*

                                           BY:  JOHN KOKKINEN
                                           Assistant U.S. Attorney
                                           600 U.S. Courthouse
                                           300 South Fourth Street
                                           Minneapolis, Minnesota 55415
                                           612-664-5600