**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Edward S. Adams

Defendant.

Case No. 0:17-cr-00064-DWF-KMM

**ORDER**

---

The government filed a motion contesting the application of privilege to several documents that the Defendant, Edward S. Adams, claims are protected. (Gov't's Mot., ECF No. 192.) The government challenges the application of the attorney-client privilege and work-product doctrine to three categories of documents. First, there are communications between Mr. Adams and accountants at Murry LLC, which Adams claims are protected by the attorney-client privilege. The government claims these communications do not qualify for the protections of the privilege, that any such protections were waived by the filing of amended tax returns, and that even if they are protected, the crime-fraud exception vitiates the privilege. Second, Mr. Adams has asserted that several communications he had with his law and business partner, Michael Monahan, and their paralegal, Josh Reilly, are protected by the attorney-client privilege or work-product doctrine. The government contends that these protections do not apply. Finally, Mr. Adams claims privilege for communications he had with several lawyers that represented the Apollo and Scio companies. The government asserts that these communications are not protected because the lawyers represented the corporate entities and not Mr. Adams personally. For the reasons set forth below, the Court denies the government's motion in part, and grants it in part.

## II. Murry LLC Communications

Mr. Adams has invoked the attorney-client privilege over numerous communications between himself and accountants at Murry LLC, who were retained by his tax counsel under a so-called *Kovel* arrangement. *See United States v. Kovel*, 296 F.2d 918, 921–22 (2nd Cir. 1961) (holding that attorney-client privilege may apply to an individual's communications with an accountant if the communications are "made in confidence for the purpose of obtaining legal advice from the lawyer"). The government raises three challenges to this assertion of privilege. First, the government argues that the protections provided under *Kovel* are not applicable to the individual communications before the Court for *in camera* review. Even if the protections of *Kovel* did apply, the government asserts that any protection was waived by Mr. Adams's subsequent filing of amended tax returns. Finally, the government argues that the crime-fraud exception vitiates any claim of privilege.

The Court has conducted an *in camera* review of the following Murry communications: *In Camera* Exhibits M, N, O, P, R, S, and T. For the reasons set forth below, the Court rejects the government's challenge to the assertion of privilege regarding these documents. However, this Court's decisions regarding the privileged nature of the specific documents at issue is expressly limited to these documents. The Court's rulings should not be read to strengthen or weaken claims of privilege or discoverability as to other documents, evidence, or testimony as those issues are not now before the Court.

### A. Attorney-Client Privilege

Federal common law governs questions of privilege in a criminal case such as this. *United States v. Yielding*, 657 F.3d 688, 706 (8th Cir. 2011). The attorney-client privilege protects confidential communications between a client and an attorney that are made for the purpose of obtaining legal advice. *Id.* (citing *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984)). The party asserting that a communication is

protected by the attorney-client privilege has the burden to establish that it applies. *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985).

### B. Application of *Kovel*

With respect to the government's argument that the protections of *Kovel* do not apply to the Murry communications, the Court finds that Thomas Brever's Declaration and Supplemental Declaration sufficiently demonstrate that the attorney-client privilege extends to the documents at issue. (Brever Decl., ECF No. 97; Suppl. Brever Decl., ECF No. 114.) In these declarations, Mr. Brever thoroughly explains how communications with Murry LLC and the information Mr. Adams provided to the accountants assisted in Mr. Brever's provision of legal advice to his client regarding tax-related matters. This is sufficient to invoke the attorney-client privilege. *See Kovel*, 296 F.2d 921–22 (explaining that where an attorney retains an accountant to assist the lawyer in providing legal advice to a client concerning tax issues, the attorney-client privilege may extend to communications between the client and the accountant); *see also United States v. Cote*, 456 F.2d 142, 144 (8th Cir. 1972) (concluding that attorney-client privilege may apply where "the accountant's aid to the lawyer preceded the advice and was an integral part of it"). The Court's *in camera* review of the communications does not contradict Mr. Brever's explanation.

### C. Waiver By Filing Amended Returns

The Court also concludes that Mr. Adams's subsequent filing of amended tax returns for 2008, 2009, and 2010 do not result in a waiver of the privilege as to the Murry communications submitted for *in camera* review. In *Cote*, after concluding that the privilege could apply to communications between a client and an accountant who is retained to assist an attorney in providing legal advice on tax matters, the Eighth Circuit reasoned as follows:

> Notwithstanding our recognition that the attorney-client privilege attached to the information contained in the accountant's workpapers under the circumstances existing here, we find that by filing the amended returns the taxpayers communicated, at least in part, the substance of

> that information to the government, and they must now disclose the detail underlying the reported data.

456 F.2d at 144. However, the court cautioned that "[t]oo broad an application of the rule of waiver requiring unlimited disclosure by reason of filing an income tax return might tend to destroy the salutary purposes of the privilege which invite confidentiality between the attorney and his client." *Id.* at 145 n.4. The *Cote* court distinguished between "workpapers [that] contain detail of *unpublished* expressions which are not part of the data revealed on the tax returns," and other workpapers to which the rule of waiver would apply. *Id.* (emphasis in original).

Here, Mr. Brever explains in his Supplemental Declaration that in responding to a subpoena from the government, he provided copies of files that contain data and information that that was included on the amended returns for 2008–2010. However, he did not disclose information communicated by Mr. Adams in connection with requests for legal advice. (Suppl. Brever Decl. ¶ 7.) Mr. Brever's explanation distinguishes this case from *Cote*, where the accountant "testified that the information on his workpapers was later transcribed onto the amended returns which were filed by the taxpayers with the government," thereby waiving the privilege. *See* 456 F.2d at 145. The Court cannot conclude on this record, which includes the Court's *in camera* review, that Mr. Adams is claiming privilege over the underlying details for the data that was ultimately transmitted to the IRS when he filed amended returns. Instead, the record suggests that the information conveyed to the accountants at Murry LLC comprised the type of unpublished expressions that were not later revealed on the amended tax returns.

### D. Crime Fraud

Finally, the government asserts that even if Mr. Adams's claim of privilege for the Murry communications is valid, it is vitiated by the crime-fraud exception. The government's position begins with the premise that between 2008 and 2010, there is a consistent indication that Mr. Adams was involved in transactions purporting to involve warrants for Apollo stock (i.e., options to purchase stock at a set price on a

certain date). However, when he later filed amended tax returns in 2014 with the assistance of Murry LLC for the tax years 2008, 2009, and 2010, he disclosed income that he earned through the sale of stocks. Reporting that his income came from the sale of stocks, rather than through the sale of warrants, permitted Mr. Adams to obtain a significant tax savings because the tax rate for the sale of stocks is much lower. The government suggests that Mr. Adams communicated with Murry LLC and Mr. Brever to get advice that would further the submission of fraudulent tax returns—misrepresenting the nature of the transactions in which he engaged in order to take advantage of a lower tax rate.

"Under the crime-fraud exception, attorney-client privilege 'does not extend to communications made for the purpose of getting advice for the commission of a fraud or a crime.'" *In re Green Grand Jury Proceedings*, 492 F.3d 976, 979 (8th Cir. 2007) (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)). Though the attorney-client privilege protects an individual's consultation with a lawyer "with respect to past wrongdoings," the privilege is lost if the communication is made "to further a continuing or contemplated criminal fraud or scheme." *Id.* (internal quotations and alterations omitted). "Similarly, 'a client who has used his attorney's assistance to perpetrate a crime or fraud cannot assert the work product privilege as to any documents generated in furtherance of his misconduct.'" *In re Grand Jury Proceedings, G.S., F.S.*, 609 F.3d 909, 912 (8th Cir. 2010) (quoting *In re Green Grand Jury Proceedings*, 492 F.3d at 980).

Before the exception may be applied, the government must make a threshold showing that legal advice was obtained to further an illegal or fraudulent scheme. *See United States v. Horvath*, 731 F.2d 557, 562 (8th Cir. 1984) (citing *Clark v. United States*, 289 U.S. 1, 15 (1933)). This threshold requirement is not stringent. The party invoking the crime-fraud exception is only required to demonstrate "a factual basis adequate to support a good faith belief by a reasonable person … that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception

applies."[1] *Zolin*, 491 U.S. at 572; *In re Green Grand Jury Proceedings*, 492 F.2d at 982. To determine whether a prima facie showing has been made, the Court may review any relevant evidence that has not been adjudicated to be privileged. *Zolin*, 491 U.S. at 575.

Mr. Adams contends that the government did not meet this initial threshold burden to trigger an *in camera* review. The Court disagrees because, on this record, a reasonable person could form a good faith belief that the Murry communications may reveal that Mr. Adams sought legal advice in furtherance of filing fraudulent tax returns. Mr. Adams communicated with Murry in late October and early November of 2014. Shortly after these communications, he filed amended tax returns that indicated he earned income in the tax years 2008, 2009, and 2010 from the sale of stocks. However, the government points to several documents from the 2008–2010 period indicating that Mr. Adams was not selling stocks, but warrants. (*See* Gov't's Reply Mem. at 14–17 (citing evidence in the record describing transactions during the

---

[1] Even if the threshold showing is made, the Court has discretion to decline to review information *in camera* based on the case before it.

> The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply. The district court is also free to defer its *in camera* review if it concludes that additional evidence in support of the crime-fraud exception may be available that is not allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings.

*Id.* at 572. Neither party suggests that the Court should decline to review the Murry communications *in camera* based on these considerations. Mr. Adams himself has presented the Murry communications *in camera* in support of his own motions seeking dismissal of the indictment and suppression of evidence seized pursuant to a warrant. Given that the Court is already familiar with these materials, there is no reason to avoid reviewing them again in the context of the present dispute.

relevant period as sales of warrants), ECF No. 217.) These facts combine to satisfy the requirement of a prima facie showing.

To make the "ultimate showing" that the crime-fraud exception applies, and the purportedly privileged documents should be disclosed, however, requires a higher quantum of proof. *In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) (noting that the Supreme Court in *Zolin*, 491 U.S. at 563 n.7, "expressly declined to specify the 'quantum of proof' required to establish the crime/fraud exception," but that the standard is higher than the threshold showing required for *in camera* review). The parties point to no Supreme Court or Eighth Circuit case setting forth the test for the "ultimate showing" required to find that the crime-fraud exception applies, and this Court has not located such controlling authority. As articulated by another Court from this District, the ultimate showing involves a "two-part test." *Triple Five of Minnesota, Inc. v. Simon*, 213 F.R.D. 324, 326–27 (D. Minn. 2002).

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Id.* at 327 (quoting *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987). "The exception applies only when there is 'reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme.'" *United States v. Martin*, 278 F.3d 988, 1001 (9th Cir. 2002) (quoting *In re Grand Jury proceedings*, 87 F.3d 377, 381 (9th Cir. 1996)). This showing requires "'something less than a mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud.'" *United States v. Weed*, 99 F. Supp. 3d 201, 205 (D. Mass. 2015) (quoting *In re Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005)).

Though an admission of an intent to engage in future wrongdoing is not required for application of the crime-fraud exception, where the *in camera* review reveals such an admission, the privilege will certainly be overcome. *See United States v. Zolin*, 905 F.2d 1344, 1345–46 (9th Cir. 1990) (after remand from the Supreme Court, concluding that the transcripts of meetings showed the figures involved in the project at issue "admit that they are attempting to confuse and defraud the U.S. Government"). Importantly, however, the mere fact a privileged communication may help the prosecution prove its case against the defendant is not enough to trigger application of the exception. *See Pritchard-Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 283 (8th Cir. 1984) ("That the [attorney-client communication] may help prove that a [crime or] fraud occurred does not mean that it was used in perpetrating the [crime or] fraud."). Instead, the communication must be made in furtherance of the alleged crime.

Because an in-depth discussion of the contents of the Murry communications themselves would reveal the assertedly privileged communications, the Court's discussion of the *in camera* documents must be circumspect. Having closely reviewed the Murry communications, the Court finds that although the government made the threshold showing, it has failed to make the ultimate showing that the crime-fraud exception applies. The specific Murry communications at issue do not provide reasonable cause to believe that the Mr. Adams obtained Mr. Brever's advice and consulted with the *Kovel* accountants with the intent to commit a fraud or crime by misrepresenting that he earned income from stocks instead of the sale of warrants. Therefore, the government's motion is denied to the extent it seeks disclosure of the Murry communications under the crime-fraud exception.

## II. Monahan and Reilly Communications

Mr. Adams also claims privilege for several email communications he had with Michael Monahan (a partner at Adams Monahan LLP) and Josh Reilly (an Adams Monahan LLP paralegal). Mr. Adams provided these communications for an *in camera* review as *In Camera* Exhibit W. Mr. Adams asserts that he and Monahan

communicated about what information to send to an attorney representing them in a dispute with former business partners Mack and Rapello. He also asserts that they compiled other documents, and asked Mr. Reilly to do the same, for transmission to counsel in connection with a lawsuit in which they were both defendants (the *Fink* litigation). And finally, Mr. Adams asserts that they selected a final group of documents to send to attorneys in anticipation of bringing a malpractice claim against the Nelson Mullins law firm. (Defs.' Opp'n at 28–29, ECF No. 202.) The government disagrees that these communications are protected. For the reasons set forth below, the Court finds that the communications at issue are protected by the work-product doctrine, but the underlying documents that Adams, Monahan, and Reilly gathered are not.

**A. Work-Product Doctrine**

In *Hickman v. Taylor*, 329 U.S. 495 (1947), the Supreme Court concluded that an attorney's work product is protected from discovery. Information collected or prepared by counsel that contains the mental impressions of the attorney in the preparation for actual or potential litigation cannot be discovered by a party's adversary. *Id.* at 511. "[R]elevant and non-privileged facts … hidden in an attorney's file" that are "essential to the preparation of one's case" might be discoverable upon a showing of sufficient need. *Id.* at 511–12. The protection of work product applies in the criminal context as well. *United States v. Nobles*, 422 U.S. 225, 238 (1975).

The protection recognized in *Hickman* led to the codification of Federal Rule of Civil Procedure 26(b)(3). This Rule creates two categories of information that are generally beyond the reach of discovery: ordinary work product and opinion work product. For ordinary work product, a party may not obtain discovery of documents and tangible things that are prepared in anticipation for litigation by or for another party or that other party's representative. Fed. R. Civ. P. 26(b)(3)(A). However, the protection for ordinary work product is qualified and disclosure may be required if the documents are otherwise discoverable and the party seeking them shows a substantial need. Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii). Even if a showing of substantial need is made

and a court orders disclosure of documents prepared in anticipation of litigation, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Thus opinion work product receives greater, near-absolute protection.

The party asserting the work-product protection as a bar to disclosure bears the burden of proving a factual basis for the applicability of the privilege. *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 925 (8th Cir. 1997) ("The White House bears the burden of establishing the elements of the work product immunity."); *Selective Ins. Co. of South Carolina v. Sela*, No. 16-cv-4077 (PJS/SER), 2017 WL 8315885, at *3 (D. Minn. Oct. 10, 2017) (same).

As explained in more detail below, the work-product issues that are raised here concern documents that are purportedly related to lawsuits filed against Mr. Adams or that he contemplated filing several years ago. However, the fact that the work product was created in connection with litigation that has now concluded does not vitiate the protection when the documents are sought in a later proceeding. "[T]he work product privilege applies to documents prepared in anticipation of terminated litigation." *In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977). To promote the policy of protecting an attorney's preparation for litigation recognized in *Hickman*, the work-product doctrine "extends beyond the termination of the litigation for which the documents were prepared." *Id.*

Several of the items that are in dispute are email communications that do not specifically include an attorney representing Mr. Adams. However, "'a lawyer need not be involved at all for the work product protection to take effect,'" and the protection for "documents and tangible things extends to emails. *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2015 WL 5693521, at *3 & n.1 (D. Ariz. Sept. 29, 2015)) (quoting *Goff v. Harrah's Operating Co., Inc.*, 240 F.R.D. 659, 660 (D. Nev. 2007) (quoting Roger Park et al., Hornbook on Evidence Law § 8.09 (West 2d ed. 2004)).

Based on both the Court's *in camera* review of the communications at issue and on the entire record submitted in connection with the government's motion, the Court finds that Mr. Adams has met his burden to show that the emails in this category are protected communications. However, as explored below, that protection does not extend to the documents themselves that were gathered.

**B. Mack/Rapello and Fink Litigation Emails**

Based on the Court's *in camera* review the April 30, 2012 email at Row 16 and the August 1, 2012 email at Row 43 of Mr. Adams's privilege log qualify for the work-product protection. Though no attorney is included on these communications between Mr. Adams and Mr. Monahan, that fact alone does not render the work-product protection inapplicable. The emails themselves support Mr. Adams's claim of protection as these communications were clearly drafted because of the Mack and Rapello and Fink litigations.

**C. Gathering or Selecting Documents for Use In Litigation**

For the majority of the remaining emails that are in dispute, Mr. Adams claims that the work-product doctrine applies because they are communications reflecting the gathering of information for use in pending or contemplated litigation. (*See* Def.'s Opp'n at 29.) Emails that reflect the collection or selection of documents for use in litigation may qualify for work-product protection under certain circumstances. *Cf. Sporck v. Peil*, 759 F.2d 312 (3rd Cir. 1985) ("We believe that the selection and compilation of documents by counsel in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product."); *Tatum v. RJ Reynolds Tobacco Co.*, 247 F.R.D. 488, 501 (M.D.N.C. 2008) (reasoning that three documents at issue contained "information gathered at the request of counsel in anticipation of litigation" so the work-product doctrine applied and finding that the information at issue was "opinion work product as it is a reflection of counsel's mental impressions and legal theories concerning the litigation, and thus is not discoverable").

However, the application of the work-product rule to materials that reveal the selection or compiling of specific documents in preparation of litigation does not cloak the underlying materials themselves in the protection of the work-product doctrine. *See, e.g.*, *McClurg v. Mallinckrodt, Inc.*, No. 4:12-cv-00361-AGF, 2016 WL 880388, at *1 (E.D. Mo. Mar. 8, 2016) ("As an initial matter, there appears to be no dispute that the underlying third-party documents in this case were not prepared in anticipation of litigation by another party or its representatives. As such, the documents themselves are not protected by the work product doctrine.").

Assuming that the rule applied in cases like *Sporck* and *Tatum* protecting the "selection and compilation of documents by counsel" or at counsel's direction extends to the circumstances here, Mr. Adams has adequately shown that two August 18, 2012 emails he sent to his paralegal, Mr. Reilly, are protected by the work-product doctrine. (Def.'s Privilege Log (rows 63 & 64).) Both the content of the emails themselves and the surrounding circumstances support Mr. Adams's assertion that he asked Mr. Reilly to gather documents for use in the *Fink* litigation. Mr. Adams has further shown that the documents he asked Mr. Reilly to gather were later transmitted to counsel at Latham & Watkins. (*See In Camera* Exhibit Z.) The documents Mr. Reilly was asked to obtain are not attached to these emails. (*In Camera* Ex. W at 5–8.)

Mr. Adams has also demonstrated that a number of emails reflect his and Monahan's requests for Mr. Reilly to gather materials in connection with a contemplated action for legal malpractice against the Nelson Mullins law firm. These communications are from December of 2012 and were sent or received on the 22nd, 23rd, 26th, and 27th, and they are found in Rows 65–68, 71–73, and 76–89. (*In Camera* Exhibit W at 9–88.) In these emails, which were submitted *in camera*, the underlying documents that Mr. Reilly gathered are incorporated into or appended to the communications between Adams, Monahan, and Reilly.

Finally, Mr. Adams has shown that the purpose of two emails from February 16th and 19th in 2013 was to gather documents to send to counsel at Bland Richter in connection with the potential malpractice claim against Nelson Mullins. (*In Camera*

Exhibit W at 89–107; Def.'s Privilege Log at 14 (rows 90–91);[2] *In Camera* Exhibits AA & BB.) The record supports Mr. Adams's assertion that the purpose of these communications was gathering information that would later be transmitted to counsel in connection with anticipated litigation.

**D. The Underlying Documents**

However, the fact that Mr. Adams has demonstrated that the email communications between himself, Mr. Monahan, and Mr. Reilly were made in anticipation of litigation does not end the inquiry. The underlying documents that were gathered by the above-described communications include emails between third parties, corporate governance documents, and internal memoranda. As noted above, some of these underlying documents are attachments, (Def.'s Privilege Log (row 91)), and others are copied and pasted just below the Adams/Monahan/Reilly emails regarding gathering documents, (*e.g.*, *In Camera* Ex. W. at 9–88). These underlying documents are not themselves protected under the work-product doctrine or attorney-client privilege.[3] Neither *Tatum*, 247 F.R.D. at 501, on which Mr. Adams

---

[2] Mr. Adams describes the document at Row 91 of his privilege log, which is a memorandum, as an attachment to a confidential email between himself and Monahan. (Def.'s Privilege Log at 14 (row 91).)

[3] Mr. Adams also asserts that some of these emails regarding gathering information are protected by the attorney-client privilege. (Def.'s Opp'n at 29; Def.'s Privilege Log (rows 71–73, 76).) These gathering emails are not themselves communications with counsel for the purpose of obtaining legal advice, and Mr. Adams has not clearly shown that they fall under the rule articulated in *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 239 F.R.D. 572 (D.S.D. 2006), which Adams cites in his memorandum. (Def.'s Opp'n at 27.) However, the Court need not decide whether the attorney-client privilege applies to these communications. As discussed in this Order, the Court has applied the work-product rule protecting the gathering of documents to these emails themselves. Even if the attorney-client privilege also applies, a client cannot use that privilege to shield documents from disclosure that are not themselves protected. "A document, which would be subject to discovery in the client's

(*footnote continued on next page*)

relies, nor the other cases protecting the selection of documents under the work-product doctrine extends that protection to the compiled documents themselves, and Mr. Adams makes no argument in support of such a conclusion. Based on the Court's *in camera* review, there is no basis to support any claim of protection for these underlying documents. Therefore, even if the work-product doctrine protects the Adams/Monahan/Reilly communications because they involve the gathering of information in anticipation of litigation, the work-product rule cannot be used to shield the underlying documents.

Because the underlying documents are not protected, they must be produced. In an ordinary civil case, the underlying documents would have been independently produced in discovery. For example, *Sporck* involved a plaintiff's request for the specific documents compiled by defense counsel to prepare for his client's deposition. 759 F.2d at 313–14. Defense counsel made that selection out of the more than 100,000 documents that the defense produced during the litigation, and defense counsel refused to identify the documents he selected. However, he noted that all the documents he chose were from the larger set that had already been produced. *Id.* at 314. Because all the documents at issue had already been provided there was no doubt that the plaintiff in *Sporck* had access to the non-privileged information and the work-product doctrine was not being used to shield the discovery of non-privileged, relevant facts.

Here, but for Mr. Adams's assertion of privilege shielding the underlying documents from review, the government would have obtained them when executing the search warrant. It is possible that the government has obtained the underlying documents through investigative tools other than the execution of the search warrant, but on this record the Court does not know whether the claim of work-product protection is preventing that access. If Mr. Adams can confirm that the government

---

possession, does not become privileged because the client sends it to the attorney." 8 Fed. Prac. & Proc. Civ. § 2017 (3d ed.).

has access to these underlying documents, then no production of them is necessary. If, however, the government does not already have access to the underlying documents, the parties are required to meet and confer regarding the proper means by which production of them should be accomplished.[4]

## III. Spitzer and Nelson Mullins Communications

The last two categories of documents at issue in the government's privilege challenges involve communications between Mr. Adams and lawyers at two firms. The government specifically argues that, although the email communications at issue might be privileged, that privilege belongs to the Apollo/Scio corporate entities, and has been waived in full. Mr. Adams asserts that the privilege was individual as well as corporate, so it remains his to invoke.

First, Mr. Adams claims that both the attorney-client privilege and work-product doctrine protect certain communications he had with Gregory Spitzer at a law firm called Paul Hastings, LLP. He asserts that he sent several documents to Mr. Spitzer to obtain legal advice concerning the *Fink* litigation and in connection with a contemplated malpractice action against Nelson Mullins. These communications are dated August 4, 2012, August 5, 2012, and December 22, 2012. (*In Camera* Ex. X; Def.'s Privilege Log (rows 44–46, 69, 74).) Second, Mr. Adams's claims attorney-client privilege and work-product protection for communications with the law firm of Nelson Mullins. (*In Camera* Ex. Y; Def.'s Privilege Log (rows 47–62).) This dispute hinges upon whether Mr. Adams had a personal, individual attorney-client relationship with Mr. Spitzer or Nelson Mullins, or whether he instead

[4] It is possible that one solution would be for the documents at issue to be produced with new document identifiers so that the government could not readily infer which documents were believed to be important for which pieces of litigation and for what purposes. But the Court does not require that this method be used and the parties are free to arrive at a different agreement.

communicated with these attorneys only as a representative of the Apollo/Scio entities.

### A. Legal Standards

Because corporations "can only act through agents, courts have held that any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee…." *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 215 (2d Cir. 1997); *see also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 n.5 (8th Cir. 1977) ("Ordinarily, the privilege belongs to the corporation and an employee cannot himself claim the attorney-client privilege and prevent disclosure of the communications between himself and the corporation's counsel if the corporation has waived the privilege."). It is certainly possible for a corporate employee to seek legal advice from the corporation's attorney or for that attorney to act as a "joint attorney," giving the individual a claim of privilege as well. *Diversified Indus.*, 572 F.2d at 611 n.5. Nevertheless, "[t]he default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption." *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001).

The Third Circuit has set forth a useful test to address this question. For a corporate employee to demonstrate that he retains a personal privilege over a communication with corporate counsel requires a showing that: (1) the employee sought legal advice from the attorney; (2) the employee made it clear that he was seeking advice individually rather than in a representative capacity; (3) the attorney communicated with the employee in his individual capacity, knowing that a possible conflict of interest could arise; (4) the communications with counsel were confidential; and (5) the substance of the communications with counsel did not relate to company matters. *Teamsters*, 119 F.3d at 215 (quoting *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123, 125 (3d Cir. 1986)). Even where this multi-factor test has not been expressly adopted, courts "have nevertheless required an employee

to make it clear to corporate counsel that he seeks legal advice on personal matters in order to assert a privilege over ensuing communications with corporate counsel." *Id.* (citing *In re Grand Jury Proceedings, Detroit, Mich., August, 1977 (Jackier)*, 434 F. Supp. 648, 650 (E.D. Mich. 1977); *United States v. Sawyer*, 878 F. Supp. 295, 296 (D. Mass. 1995); and *United States v. De Lillo*, 448 F. Supp. 840, 842–43 (E.D.N.Y. 1978)).

**B. Spitzer Communications**

Mr. Adams has demonstrated that his communications to Mr. Spitzer were for the purpose of obtaining legal advice, but he has shown little else that would substantiate his claim of a personal privilege. Aside from the fact that he may have been an individual plaintiff in contemplated litigation and that he was sued as an individual defendant, he has not even alleged that he made it clear to Mr. Spitzer that he was seeking advice individually rather than in a representative capacity. There has also been no showing that Mr. Spitzer communicated with him in his individual capacity despite an awareness that a possible conflict could arise. For example, there is no indication that Mr. Spitzer ever asked Mr. Adams to sign a conflict waiver or even discussed the issue with him. Nothing in the *in camera* communications themselves makes it clear that Adams was seeking advice in an individual, as opposed to a representative, capacity. Indeed, the government highlights that in Mr. Adams's deposition testimony in connection with the SEC investigation, he testified that Mr. Spitzer represented the Apollo/Scio entities, and he only had a personal or individual relationship with Mr. Spitzer on "some real estate deals" they invested in together. (DX 51 at 345–47.) Mr. Adams does not refute the clear implications of that testimony in defending his claim of privilege. In short, based on the record before the Court, Mr. Adams has not demonstrated that any discussions with Mr. Spitzer were pursued in an individual capacity rather than as a representative of an entity. Therefore, the government's motion contesting privilege is granted with respect to the Spitzer communications.

### C. Nelson Mullins

With respect to Mr. Adams's communications with Nelson Mullins there is a factual dispute. On the one hand, Mr. Adams filed a Declaration in which he describes his communications with Cory Manning, an attorney at Nelson Mullins. (Adams Decl., ECF No. 204.) Mr. Adams states that on August 2, 2012, Kenneth Fink, who was an Apollo shareholder and investor, filed a lawsuit against Adams, Monahan, and Scio. (*Id.* ¶ 1.) Before that time, Nelson Mullins had represented Scio in connection with SEC filings. (*Id.* ¶ 2.) A week after the lawsuit was filed by Mr. Fink, Mr. Adams "participated in a telephone call with Cory Manning … and others about the *Fink* litigation." (*Id.* ¶ 3.) Mr. Adams states that during that call, Mr. Manning "confirmed that he was representing the interests of all of the defendants in the *Fink* litigation, including Mr. Monahan and [Mr. Adams], in connection with the settlement negotiations that he was conducting with counsel for the *Fink* plaintiffs." (*Id.* ¶ 4.) Mr. Adams states that based on that call he believed he was personally represented by Nelson Mullins and he has not authorized Nelson Mullins to disclose privilege information. (*Id.* ¶¶ 5–7.) Mr. Adams also points out that Mr. Manning prepared a memorandum that discussed strategies for the "defendants" in the *Fink* litigation, suggesting that he would have only referenced Scio if his representation was limited to the corporation. (*In Camera* Ex. CC.) An additional email communication (*In Camera* Ex. DD) allegedly supports Mr. Adams's assertion that Mr. Manning and Nelson Mullins were representing him personally in connection with the *Fink* litigation until Mr. Adams retained Latham & Watkins less than a month later.

Nelson Mullins denies ever representing Mr. Adams in his individual or personal capacity. In a letter to Assistant United States Attorney John Kokkinen, Mr. Manning stated that Nelson Mullins "had an attorney-client relationship with Scio Diamond, the company. My firm did not have, and has never had, an attorney-client relationship with Mr. Adams in his individual capacity." (Gov't's Ex. K, ECF No. 193-2.) In addition, the government notes that Mr. Adams has also claimed he

was represented in the *Fink* litigation by Aaron Hartman of the Anthony Ostlund Baer law firm. (Gov't's Reply at 30–31; Def.'s Privilege Log (rows 41–42, 59–60).)

There is little guidance in the case law regarding the standard of proof Mr. Adams must meet in order to establish that the privileges in this context was personal rather than corporate. However, the presumption is that Nelson Mullins had a relationship with Scio, and not with Mr. Adams. *See In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001) ("The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption."); *Diversified Indus.*, 572 F.2d at 611 n.5. Given this presumption, the Court believes that Mr. Adams must provide at least a preponderance of the evidence that he established a personal, individual attorney-client relationship with the law firm representing Scio's interests. *See* 48 Am. Jur. Proof of Facts 2d *Existence of Attorney-Client Relationship* § 20, Burden of Proof, Westlaw (September 2018 Update) ("Regardless of which party has the burden of establishing the existence of an attorney-client relationship, the degree or standard of proof required appears to be proof by a preponderance of the evidence.") (citing *In re Olson*, 21 B.R. 123, 126 (Bankr. D. Neb. June 4, 1982)).

The Court finds that Mr. Adams has not met that burden. There has been no showing that Mr. Adams made it clear that he was seeking advice from Mr. Manning individually, rather than in a representative capacity for Scio. The closest the record comes to suggesting something of that sort occurred is Mr. Adams's reference to an August 9, 2012 phone call in which he avers that Mr. Manning "confirmed" he would be representing all defendants in the *Fink* litigation in connection with the settlement negotiations. Even if this recollection is accurate, it does not show that Mr. Adams clearly conveyed that he was seeking legal counsel in his individual capacity from Nelson Mullins attorneys. Moreover, Mr. Adams's recollection is contradicted by Mr. Manning's own letter to AUSA Kokkinen in which Mr. Manning disavows any personal attorney-client relationship between any Nelson Mullins attorney and Mr. Adams personally. The reference to "defendants" found in *In Camera* Exhibit CC

also does not establish that Mr. Adams formed a personal attorney-client relationship with Nelson Mullins. The memorandum is addressed to the Scio Board of Directors, not to Mr. Adams personally. Nor does the August 29, 2012 email conversation comprising *In Camera* Exhibit DD imply that prior to that date Mr. Adams had made it clear he was seeking representation in his individual capacity. In addition, the substance of the emails at issue themselves, which the Court has also reviewed *in camera*, does not demonstrate that Mr. Manning was communicating with or advising Mr. Adams in his individual capacity.

Other considerations support the Court's conclusion. Mr. Adams has presented no evidence that Nelson Mullins ever sent him an engagement letter, presented an invoice for services rendered, or requested a potential waiver of the conflict of interest that may arise if there were joint representation of Scio and Mr. Adams in the same lawsuit. The Court would expect something of this nature to have been in the files of a sophisticated client if he had indeed entered into a personal attorney-client relationship with a large law firm like Nelson Mullins. However, no such documentation has been provided. *Cf. United States v. Graf*, 610 F.3d 1148, 1162 (9th Cir. 2010) (concluding that a corporation's agent did not establish a personal attorney-client relationship with corporate counsel, in part, because he "acknowledged that he never paid the [law firm] during the [alleged] representation").

For these reasons, the government's motion is granted with respect to the Nelson Mullins communications.

## IV. ORDER

As set forth in this Order, the government's motion contesting the application of privilege **(ECF No. 192)** is **DENIED IN PART** and **GRANTED IN PART**.

Date: October 27, 2018

*s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge