**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 17-cr-64-DWF-KMM |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S MOTION TO** |
| v. | ) | **DISMISS COUNTS 15–17 OF THE** |
| | ) | **SUPERSEDING INDICTMENT** |
| EDWARD S. ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**INTRODUCTION**

As to the tax charges in the superseding indictment, the government seeks to reopen a matter it resolved long ago. Over a period spanning nine months between 2014 and 2015, the government carefully analyzed Mr. Adams's 2008, 2009, and 2010 tax returns after Mr. Adams approached the government through the Internal Revenue Service's ("IRS") Voluntary Disclosure Program. The IRS's Voluntary Disclosure Program permits taxpayers to address potential tax issues, while offering the government an opportunity to clarify complex tax issues and potentially receive additional tax revenue. Upon completing its review, the government determined that it was in its best interest to fully settle any civil and criminal tax liability Mr. Adams may have had for his 2008, 2009, and 2010 returns. In exchange for Mr. Adams's agreement to tender payment for potential tax deficiencies, the government agreed to a "final and conclusive" resolution of Mr. Adams's tax liabilities for those three years. Mr. Adams upheld his end of the bargain, tendering payment in the amount of $118,000. The government now attempts to evade its corresponding promise of

finality. In violation of Mr. Adams's written agreement and the statute under which it was executed, the government charged Mr. Adams with understating his taxable income for the three years in question, based on amended returns he filed in 2011. *See* ECF No. 70 ¶¶ 64–67 ("the tax charges"). In advancing these charges, the government ignored the import of the closing agreement it executed with Mr. Adams in connection with his 2014 amendment of those same three returns. The United States must honor its agreement. The tax charges are fundamentally inconsistent with the parties' valid and binding agreement on this subject. They should be dismissed.

## BACKGROUND

### A.   The Government Agreed To Fully Resolve Any Liability Mr. Adams Might Have For His 2008, 2009, And 2010 Returns.

In October 2014, Mr. Adams approached the IRS through experienced tax counsel to explore a possible voluntary disclosure in connection with tax years 2008, 2009, and 2010. The IRS's Voluntary Disclosure Program has long provided a path for taxpayers to address tax issues outside the audit and litigation processes. The program benefits the government and taxpayers alike. The government is given the opportunity to clarify complex tax issues and potentially receive additional tax revenue, while taxpayers are able to resolve tax issues with finality.

The voluntary disclosure process involves multiple stages of review. A voluntary disclosure is submitted in the first instance to the IRS Criminal Investigation Division ("CI"), which is responsible for "investigating potential criminal violations of the Internal Revenue Code." I.R.M. 9.1.1.2; *see also* I.R.M. 9.5.11.1 (identifying the Voluntary

2

Disclosure Program as one of several "specialized investigations" CI undertakes). Upon receipt of the submission, CI agents evaluate the disclosure to determine whether it satisfies all relevant criteria, and make recommendations concerning the same. *See* I.R.M. 9.5.11.9.7. As part of the voluntary disclosure process, taxpayers typically also submit amended returns to the IRS. The IRS carefully reviews the amended returns, and may raise any questions or issues with the taxpayer before deciding whether to fully settle the matter. A taxpayer remains at risk of criminal prosecution throughout the voluntary disclosure evaluation process. *See* I.R.M. 9.5.11.9. However, if the IRS ultimately determines that it is in the government's best interest to fully resolve a matter, the IRS will execute a final closing agreement with the taxpayer, which represents a full settlement of *all* tax liability.

Mr. Adams followed this process in connection with his 2014 voluntary disclosure submission—coordinating with both the criminal and civil components of the IRS to resolve outstanding issues. Mr. Adams thereafter filed amended tax returns and tendered payment to the IRS in the amount of $118,000. Following negotiations and discussions involving Mr. Adams's tax counsel, the IRS and Mr. Adams executed a binding closing agreement pursuant to section 7121 of Title 26 of the United States Code. *See* Ex. A, Closing Agreement at 2. That statute authorizes the Treasury Secretary to enter "final and conclusive" agreements relating to the civil and criminal tax liability of any person. 26 U.S.C. § 7121(b). The parties' closing agreement provided that it was "mutually advantageous" to fully and finally settle questions surrounding Mr. Adams's 2008, 2009, and 2010 tax returns. *See* Closing Agreement at 2, cl. 10. The agreement set forth the

amount of what the IRS determined was previously underreported income and provided that, absent evidence of fraud or falsity, the "agreement is final and conclusive." *Id.* at 4.

### B. The Government Charged Mr. Adams With Understating Taxable Income In His 2008, 2009, And 2010 Returns.

On March 22, 2017, the government charged Mr. Adams with mail and wire fraud in connection with an alleged scheme to defraud Apollo Diamond, Inc., and its subsidiary, Apollo Diamond Gemstone Corporation (collectively, "Apollo"). *See* ECF No. 1. The original indictment alleged that Mr. Adams diverted funds he was raising for Apollo to himself and others. *See id.* There were no tax charges.

Shortly after securing this indictment, then-Assistant United States Attorney David Maria—who left the office last year—sought authorization to bring tax charges against Mr. Adams based on Mr. Adams's purported failure to report the proceeds of the alleged scheme on his tax returns. In support of that request, the IRS prepared a Special Agent Report ("SAR"), which neglected to evaluate—or even raise—multiple legal issues posed by the contemplated charges, including but not limited to: (i) whether the contemplated charges violated the terms of Mr. Adams's closing agreement; (ii) whether there was any valid basis to set aside Mr. Adams's closing agreement, *see, e.g.*, 26 U.S.C. § 7121(b) (closing agreements may be set aside only "upon a showing of fraud or malfeasance, or misrepresentation of a material fact"); and (iii) whether the IRS had complied with the procedures for formally setting aside the closing agreement, *see, e.g.*, I.R.M. 8.13.1.7.2.1;

*id.* 8.13.1.7.2.1.1.[1]  Notwithstanding the absence of that analysis, the SAR recommended that charges be brought in connection with Mr. Adams's 2008, 2009, and 2010 tax returns.

On December 20, 2017, the government filed a superseding indictment charging Mr. Adams with understating his taxable income for the years 2008, 2009, and 2010, in violation of 26 U.S.C. § 7206(1).  The theory set forth in the superseding indictment is that Mr. Adams failed to report proceeds obtained from the alleged scheme in his *2011 amended returns* for tax years 2008, 2009, and 2010.  *See* ECF No. 70 ¶¶ 64–67.  Mr. Adams twice amended his 2008, 2009, and 2010 tax returns.  First, in December 2011, Mr. Adams amended these three returns principally to modify Schedule E's treatment of active and passive income.  Second, in 2014, Mr. Adams amended the three returns to modify Schedule D's treatment of capital gains.  The tax charges set forth in the superseding indictment relate to the 2011 amended returns.  *See id.*

### C. The Government Fundamentally Altered Its Tax Theory, Prompting Discussions Concerning The Import Of The Closing Agreement.

The fundamental defects in the government's tax charges first came to light last summer, in connection with briefing on Mr. Adams's motion to suppress.  There, in an effort to justify its improper access to privileged correspondence between Mr. Adams's tax counsel and Mr. Adams's *Kovel* accountant, the government altered its theory of the case.  Specifically, the government argued for the first time that Mr. Adams made material misrepresentations to the IRS in connection with his *2014 amended returns*.  *See* ECF No.

---

[1] Should the Court wish to review the SAR, Mr. Adams will file a copy under seal.

5

172, at 76–82; *id.* at 79 (alleging that Mr. Adams falsely represented that he obtained proceeds from selling "stock that had been created through the exercise of warrants in 2003," when in fact such proceeds were obtained "as a result of selling unexercised warrants in 2006–2010 that were then exercised as part of that transaction"). The government argued that Mr. Adams had waived any privilege associated with the communications at issue pursuant to the crime-fraud exception. *See id.*

The government's revised tax theory brought the 2015 closing agreement into focus for the first time, prompting discussion and analysis concerning its impact on the tax charges. Had this Court sided with the government—finding that the closing agreement had been fraudulently obtained—the agreement may not have provided any protection vis-à-vis the tax charges. *See* Ex. A, Closing Agreement at 4 (IRS may set aside agreement "in the event of fraud, malfeasance, or misrepresentation of material fact"). In December 2018, however, the Court rejected the government's crime-fraud argument, confirming that there was no reasonable cause to believe that Mr. Adams obtained the advice of his counsel or *Kovel* accountant "with the intent to commit a fraud or crime by misrepresenting that he earned income from stocks instead of the sale of warrants." ECF No. 225 at 8; *see also* ECF No. 232 at 5 (adopting report and recommendation).

Within days of the Court's final decision on this issue, Mr. Adams initiated correspondence with the government in an effort to confirm the continuing enforceability of the closing agreement. *See* Ex. B, Dec. 14, 2018 Letter from L. Wade to J. Kokkinen at 2. Throughout the spring of 2019, the parties discussed the impact of the closing agreement on the tax charges, and Mr. Adams propounded discovery requests designed to

6

resolve points of contention. *See* Ex. C, Apr. 1, 2019 Letter from J. Kokkinen to L. Wade; Ex. D, May 22, 2019 Letter from L. Wade to J. Kokkinen. Upon reviewing the government's summer 2019 document production, Mr. Adams learned that the government never nullified his closing agreement on the basis of any misrepresentation or fraud, nor did it ever initiate any of the required regulatory procedures for setting aside a closing agreement. *See, e.g.*, I.R.M. 8.13.1.7.2.1; *id.* 8.13.1.7.2.1.1. Accordingly, Mr. Adams's closing agreement remains binding and enforceable.

In light of this information, Mr. Adams repeatedly urged the government to dismiss the tax charges, but the Minnesota U.S. Attorney's Office refused to do so. *See* Ex. E, Jul. 15, 2019 Letter from L. Wade to J. Kokkinen; Ex. F, Jul. 19, 2019 Letter from J. Kokkinen to L. Wade. Mr. Adams thereafter raised this issue with the Tax Division of the Department of Justice, but on August 29, 2019, the Division refused to consider the substance of Mr. Adams's request to dismiss the tax charges, pursuant to its internal policies. Ex. G, Jul. 30, 2019 Letter from L. Wade to R. Zuckerman; Ex. H, Aug. 29, 2019 Letter from R. Zuckerman to L. Wade. Although Mr. Adams initially believed that the fundamental defects in the tax charges could and should be resolved without the Court's involvement, he now respectfully requests this Court intervene and dismiss these charges.[2]

---

[2] Mr. Adams raises this issue prior to trial, pursuant to Federal Rule of Criminal Procedure 12(b)(1), in the interest of judicial economy. Now that the government has proffered its intent to rely on Mr. Adams's representations in connection with his 2014 amended returns and closing agreement, Mr. Adams seeks a ruling that the tax charges violate the terms of that agreement and the statute under which it was executed. *Cf. United States v. Plascencia-Orozco*, 852 F.3d 910, 920 (9th Cir. 2017) ("If the government indicts a

**ARGUMENT**

Four years ago, the government agreed to resolve all issues concerning any civil and criminal liability Mr. Adams might have for his 2008, 2009, and 2010 tax returns. Having committed to a "final and conclusive" resolution, and having accepted payment from Mr. Adams concerning the same, the government cannot now renege on its agreement. Yet that is precisely what the government attempts to do via criminal charges based on these same three tax returns. Because the tax charges violate the terms of Mr. Adams's binding closing agreement, they must be dismissed.

### A. The Closing Agreement Fully Resolved Any Civil Or Criminal Liability Mr. Adams Might Have For His 2008, 2009, And 2010 Returns.

Mr. Adams's closing agreement represents the full and final resolution of all issues surrounding his 2008, 2009, and 2010 tax returns. The government executed this agreement pursuant to 26 U.S.C. § 7121 ("Section 7121"). *See* Ex. A, Closing Agreement at 1. That statute broadly authorizes the Treasury Secretary to "enter into an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." 26 U.S.C. § 7121(a). Section 7121 places a single restriction on the term "liability": it must be "in respect of any internal revenue tax." *Id.*

---

defendant on charges that the defendant believes are barred by a preexisting plea agreement, the defendant may move to dismiss those charges" pursuant to Rule 12(b)(1)); *United States v. Verrusio*, 803 F.2d 885, 888–89 (7th Cir. 1986) (indicating that such a motion may be made pre- or post-trial). Such a ruling would both streamline the issues in the upcoming trial, and eliminate the risk that an erroneous conviction on the tax charges would require a retrial on all of the charges.

8

In other words, the agreements the Secretary is authorized to execute must relate to tax liability. And tax liability, of course, has both civil and criminal components.[3]

Courts and commentators alike have recognized the far-reaching scope of Section 7121 closing agreements. The Eighth Circuit has explained that "the purpose" of Section 7121 "is to enable the taxpayer and the government finally and completely to settle *all controversies* in respect of the tax liability for any previous taxable period, and to *protect the taxpayer against the reopening of the matter* at a later date." *Wolverine Petroleum Corp. v. Comm'r of Internal Revenue*, 75 F.2d 593, 595 (8th Cir. 1935) (emphasis added); *see also Bankers' Reserve Life Co. v. United States*, 42 F.2d 313, 383–84 (Fed. Cl. 1930). Leading commentators have likewise recognized that Section 7121 enables the government and the taxpayer to "conclusively" resolve *all* "tax controversies" related to a particular issue or year. 14A Scott D. Shimick, *Mertens Law of Federal Income Taxation* § 52:5 (2019).

Several other provisions in the tax code similarly employ the broad term, "liability," in a manner designed to encompass *both* civil and criminal tax liability. Section 7217, for example, makes it unlawful for "any applicable person" (defined to include high-level executive branch officials) to request that an IRS officer or employee "conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax ***liability*** of

---

[3] It should thus come as no surprise that CI agents play an integral role in the process for reviewing and evaluating voluntary disclosures and making recommendations concerning their disposition. *See* pp. 2–3, *supra*. Indeed, if closing agreements implicated only *civil* liability, there would be no reason to require the involvement of CI.

9

such taxpayer." 26 U.S.C. § 7217(a) (emphasis added). If this broad reference to "liability" is interpreted to encompass only civil tax liability, then the statute would criminalize executive branch interference with a *civil* tax audit or investigation, but not the same interference with a *criminal* audit or investigation. Such an artificial distinction would make no sense. Instead, where, as here, a statute employs the broad term "liability," there is no reason to limit that term to civil liability.

Section 7122 provides yet another illustrative example. *See id.* § 7122. It authorizes the Secretary to compromise an existing "civil or criminal *case* arising under the internal revenue laws." *Id.* § 7122(a) (emphasis added). The Section thereafter prescribes guidelines for IRS employees to follow when evaluating offers-in-compromise, *id.* § 7122(c)–(d), including guidelines to follow "in the *case* of an offer-in-compromise which relates only to issues of *liability* of the taxpayer[,]" *id.* § 7122(d) (emphasis added). Because Section 7122 unquestionably embraces both civil and criminal "cases," it necessarily follows that the term "liability" likewise encompasses both civil and criminal liability.

To the extent this Court believes Section 7121 is ambiguous with respect to the type of liability it encompasses, the Court should apply the rule of lenity and construe the statute to encompass both civil and criminal liability. Although the rule of lenity generally applies only to criminal statutes, the Supreme Court has applied this principle to a civil tax statute that had "criminal applications," insofar as a separate statute established criminal sanctions for failure to comply therewith. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality opinion). So too here. Section 7206 sets forth criminal

10

penalties for anyone who willfully makes any false statement "in connection with any closing agreement under section 7121." 26 U.S.C. § 7206(5)(B). Section 7121 is thus a civil statute with criminal applications, and the rule of lenity mandates that it be read in the manner Mr. Adams advances.

### B. The Government Remains Bound By The Parties' Closing Agreement.

During the parties' discussions concerning the import of Mr. Adams's closing agreement, the government repeatedly suggested that it is not bound by the terms of that agreement for two reasons. First, the government contends that the IRS alone is bound by the closing agreement. Second, the government suggests that Mr. Adams's purported misconduct voids the agreement. Both arguments fail.

#### 1. Closing Agreements Bind All Government Agencies, Not Just The IRS.

Section 7121(b) mandates that closing agreements "shall be final and conclusive," and expressly delineates the contours of this finality. *Id.* § 7121(b). Absent circumstances not present here, the statute prohibits "*any* officer, employee, or agent of the United States" from modifying the closing agreement or otherwise reopening "the case." *Id.* § 7121(b)(1) (emphasis added). Section 7121 further mandates that the agreement, and any determination contained therein, "shall not be annulled, modified, set aside or disregarded" in "*any* suit, action, or proceeding." *Id.* § 7121(b)(2) (emphasis added).

Consistent with this broad statutory mandate, the Eighth Circuit has recognized that closing agreements enable "the taxpayer and *the government*" to settle controversies concerning civil and criminal tax liability. *Wolverine*, 75 F.2d at 595 (emphasis added).

11

Accordingly, *"[n]ot only the IRS staff but also the staffs of the Treasury and Justice Departments are barred from acting contrary to the agreement*." IRS National Office Procedures – Rulings, Closing Agreements, Tax Portfolio No. 621-4th (Bloomberg Tax 2019) (emphasis added). Any other interpretation would make no sense. If, as the government contends, the DOJ and other federal agencies may freely breach, disregard, or exploit closing agreements to serve their own ends, then taxpayers would have no incentive to voluntarily execute such agreements with the IRS in the first place. In addition, the IRS would have no ability to resolve any matter with the "[f]inality" Congress intended to provide. 26 U.S.C. § 7121(b). For these reasons, taxpayers are entitled to "assum[e] that the closing agreement is final, and that another executive agency, in this case the Department of Justice, will not attempt to unscramble it." *Temple-Inland, Inc. v. United States*, 68 Fed. Cl. 561, 569 (Ct. Fed. Cl. 2005); *see also Bankers' Reserve*, 42 F.2d at 383–84.

### 2. The IRS Alone May Formally Set Aside Closing Agreements, And It Has Not Done So Here.

Section 7121 contemplates that closing agreements may be voided only in those limited circumstances where there has been "a showing of fraud or malfeasance, or misrepresentation of a material fact." 26 U.S.C. § 7121(b). The statute does not specifically set forth the process for nullifying a closing agreement, but the IRS has established detailed procedures to be followed where it suspects fraud or malfeasance in connection with a closing agreement. Out of respect for the finality Congress intended for closing agreements to achieve, the IRS requires the Commissioner to "*personally approve*

12

*any set-aside*," and has further cautioned that "[t]he standards for setting aside a closing agreement are strict; they will be met only rarely." I.R.M. 8.13.1.7.2(1) (emphasis added).

The IRS's set-aside process involves multiple phases. When an examining officer suspects fraud or malfeasance in connection with a closing agreement, he or she must first draft a "report of the available facts," without any "reexamination of the taxpayer's books or records." I.R.M. 8.13.1.7.2.1(1). This report is then submitted to the Compliance Operating Division, which must determine whether there are sufficient facts to set aside the agreement. *Id.*; I.R.M. 8.13.1.7.2.1(2). If the Compliance Operating Division finds that the facts do *not* warrant setting aside the closing agreement, it must issue a written directive that the closing agreement continue to be adhered to. I.R.M. 8.13.1.7.2.1(2).

If, however, the Division instead concludes that further investigation is necessary, and will require reexamination of the taxpayer's books, it must issue a written notice pursuant to 26 U.S.C. § 7605(b). I.R.M. 8.13.1.7.2.1.1(2). At the conclusion of the investigation, the division must draft a written report. I.R.M. 8.13.1.7.2.1.1(3). That report must "clearly set forth" any alleged misrepresentations the taxpayer made. I.R.M. 8.13.1.7.2.1.1(3)(a). If the Compliance Operating Division believes the agreement should be set aside, it must determine whether to recommend criminal prosecution. *See* I.R.M. 8.13.1.7.2.1.1(3), (4). If criminal prosecution is not recommended, the Division must send a "special preliminary letter" to the taxpayer providing him or her 30 days in which to file a protest. I.R.M. 8.13.1.7.2.1.1(4). If prosecution is recommended, the Division must follow the procedures set forth in the IRS Fraud Handbook. I.R.M. 8.13.1.7.2.1.1(3)(c).

The IRS has never set aside Mr. Adams's closing agreement, nor, for that matter, initiated any of the foregoing procedures. Mr. Adams specifically asked the government to provide documents concerning any contemplated or finalized decision to void his closing agreement, but the government found none. *See* Ex. D, May 22, 2019 Letter from L. Wade to J. Kokkinen. This is not surprising. In the four years since the execution of the closing agreement, the IRS has never challenged its validity or otherwise complained about any material misstatement. Instead, the government first suggested that Mr. Adams had breached his closing agreement one year after filing the tax charges, in an effort to convince the Court that Mr. Adams had committed a fraud that would justify the government's improper review of Mr. Adams's privileged communications involving his tax counsel. Because the IRS has never formally set aside Mr. Adams's closing agreement, that agreement continues to bind the government and Mr. Adams alike. The Minnesota U.S. Attorney's Office cannot void this final, binding agreement through post hoc, unproven allegations of fraud.[4] Because the government previously agreed to resolve all issues concerning any liability Mr. Adams might have for his 2008, 2009, and 2010 tax returns—and remains bound by that agreement—the tax charges must be dismissed.

---

[4] Even if the Minnesota U.S. Attorney's Office had the authority to set aside Mr. Adams's closing agreement, it could not make the requisite showing here. *See* 26 U.S.C. § 7121(b) (requiring "a showing of fraud or malfeasance, or misrepresentation of a material fact"). The Court has already rejected the suggestion that Mr. Adams made a misrepresentation to his tax counsel or *Kovel* accountant in connection with his closing agreement. *See* ECF No. 225 at 4–8. Mr. Adams is confident that *in camera*, *ex parte* review of relevant documents will similarly demonstrate that he made no misrepresentation to the IRS in connection with his voluntary disclosure or closing agreement.

## CONCLUSION

The tax charges in this matter are unwarranted and nearly unprecedented. In the months spent analyzing this issue, Mr. Adams has not located a single decision upholding criminal charges based on the exact matters previously resolved pursuant to a closing agreement. The dearth of case law on this issue underscores the highly unusual nature of the government's charging decision. For the reasons set forth above, Mr. Adams respectfully requests that the Court dismiss the tax charges in the superseding indictment.

Dated:  September 3, 2019				Respectfully submitted,


						  /s/ *Lance Wade*

						Joseph G. Petrosinelli (DC Bar #434280)
						Lance Wade (DC Bar #484845)
						Gloria Maier (DC Bar # 1012208)
						Jena Neuscheler (DC Bar # 187814)
						WILLIAMS & CONNOLLY LLP
						725 Twelfth Street, N.W.
						Washington, DC  20005
						Telephone:  (202) 434-5000
						jpetrosinelli@wc.com
						lwade@wc.com
						gmaier@wc.com
						jneuscheler@wc.com

						James L. Volling (#113128)
						Deborah A. Ellingboe (#26216X)
						FAEGRE BAKER DANIELS LLP
						2200 Wells Fargo Center
						90 South Seventh Street
						Minneapolis, MN  55420
						Telephone:  (612) 766-7000
						Facsimile:  (612) 766-1600
						james.volling@faegrebd.com
						debbie.ellingboe@faegrebd.com

						*Attorneys for Defendant Edward S. Adams*