# EXHIBIT E

LAW OFFICES
# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

LANCE WADE
(202) 434-5755
lwade@wc.com

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 15, 2019

<u>Via Email</u>

John Kokkinen, Esq.
Joe Thompson, Esq.
Assistant U.S. Attorneys
District of Minnesota, Criminal Division
U.S. Department of Justice
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415

  Re: <u>United States v. Edward S. Adams – Cr. 17-64 (DWF/KMM)</u>

Dear Counsel:

  This follows up on your April 1, 2019 letter, your June 28, 2019 production of documents, and your July 12, 2019 disclosure of tax-related 302s, as well as recent discussions regarding the impact of Mr. Adams's 2015 closing agreement and voluntary disclosure in this case.

  As I have previously maintained, the government's decision to pursue the tax charges in this matter violates the plain terms of Mr. Adams's closing agreement. The statute under which that agreement was executed broadly authorizes the Treasury Secretary to resolve issues of civil and criminal tax liability with finality. Your office is bound by the terms of Mr. Adams's closing agreement, and may not unilaterally set it aside with allegations of fraud. The tax charges also suffer from a second fundamental defect: they undermine the very policies on which the Voluntary Disclosure Program rests. If, as your office contends, the government may freely use information received during the voluntary disclosure process to later prosecute individual taxpayers, the Voluntary Disclosure Program would cease to exist; the risks of disclosure would always outweigh the benefits of addressing potential tax disputes with the Internal Revenue Service.

  The tax charges—which we understand were initiated by the former lead prosecutor in this matter—should never have been brought. As discussed below, these highly unusual

WILLIAMS & CONNOLLY LLP

Page 2

charges contravene federal statutes, regulations, and Mr. Adams's binding closing agreement. We request that your office dismiss these charges promptly.

## I. CLOSING AGREEMENTS

The justifications you have offered for pursing these charges in the face of the closing agreement rest on a series of flawed premises, discussed below.

### A. Section 7121 Closing Agreements Resolve Both Civil and Criminal Liability

Your April 1, 2019 letter incorrectly contends that "agreements entered pursuant to Section 7121 focus solely on the tax liabilities of the parties who sign and do not cover criminal cases." This interpretation contradicts the plain text of the statute, which does not confine Section 7121 closing agreements to civil liability. Section 7121 authorizes the Secretary to execute agreements broadly relating to an individual's "liability." The statute places a single restriction on the term "liability": it must be "in respect of any internal revenue tax." *Id.* 7121(a). In other words, the agreements must relate to tax liability. And tax liability, of course, has both civil and criminal components. The government may not simply read the word "civil" into a statute that does not so specify.

If, as the government contends, the term "liability" in Section 7121 is interpreted to mean "civil tax liability," then the statute would provide as follows:

> The Secretary is authorized to enter into an agreement in writing with any person relating to the *civil tax liability* of such person . . . *in respect of any internal revenue tax* for any taxable period.

Such a reading would render superfluous the latter italicized phrase, as Congress would not have needed to twice specify tax liability had it intended for this section to be read in this manner. Instead, a far more natural reading is that Section 7121 authorizes the Secretary to execute agreements relating to an individual's civil *and* criminal tax liability.

This interpretation not only gives effect to all clauses of the statute, it is also more consistent with other provisions in the tax code that employ the broad term, "liability," in a manner designed to encompass both civil and criminal tax liability. For example, 26 U.S.C. § 7217(a) makes it unlawful for "any applicable person" (defined to include high-level executive branch officials) to request that an IRS officer or employee "conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax **liability** of such taxpayer." *Id.* (emphasis added). If this broad reference to "liability" is interpreted to encompass only civil tax liability, then the statute would criminalize executive branch interference with a *civil* tax audit or investigation, but not the same interference with a *criminal* audit or investigation. Such an artificial distinction would make no sense. Instead, where, as here, a statute employs the broad term "liability," there is no reason to limit that term to civil liability.

WILLIAMS & CONNOLLY LLP

Page 3

Courts and commentators alike have recognized the far-reaching scope of Section 7121 closing agreements. The Eighth Circuit has explained that "the purpose" of section 7121 "is to enable the taxpayer and the government finally and completely to settle *all controversies* in respect of the tax liability for any previous taxable period, and to *protect the taxpayer against the reopening of the matter* at a later date." *Wolverine Petroleum Corp. v. Commissioner of Internal Revenue*, 75 F.2d 593, 595 (8th Cir. 1935) (emphasis added); *see also Bankers' Reserve Life Co. v. United States*, 42 F.2d 313, 383–84 (Ct. Fed. Cl. 1930). Leading commentators have likewise recognized that Section 7121 enables the government and the taxpayer to "conclusively" resolve *all* "tax controversies" related to a particular issue or year. 14A *Mertens Law of Federal Income Taxation* § 52:5 (2019). And the December 2013 IRM the government has recently produced further provides that "[c]losing agreements are final and are intended to *completely dispose of debatable matters*." If, as the government now contends, Section 7121 encompasses only civil liability, then closing agreements could hardly be said to resolve with finality all controversies related to a particular year.

Your April 1, 2019 letter argues that Section 7121 covers only civil tax liability because it "stands in stark contrast to Section 7122, which authorizes the Secretary to compromise any civil or criminal case." This argument is flawed for two reasons. *First*, it rests on a comparison of two statutes that serve fundamentally different purposes. The Secretary may invoke Section 7122 only where a discrete "civil or criminal case" is pending, and the Secretary wishes to compromise that case (typically for an amount less than that due). 26 U.S.C. § 7122(a). In contrast, Section 7121 is available where no civil or criminal case yet exists, and the Secretary desires to enter into an agreement relating to *potential* civil and criminal liability. *Second*, and more fundamentally, Section 7122 embraces the same broad use of the term "liability." Section 7122(d)(2)(B) prescribes guidelines for IRS employees to follow when evaluating offers-in-compromise, including "in the *case* of an offer-in-compromise which relates only to issues of *liability* of the taxpayer." *Id.* (emphasis added). Section 7122 unquestionably embraces both civil and criminal "cases." *See id.* § 7122(a) ("The Secretary may compromise any *civil or criminal case*." (emphasis added)). Accordingly, it necessarily follows that the term "liability" likewise encompasses both civil and criminal liability.

To the extent they fail to recognize the foregoing, the nonbinding decisions in *United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1991), and *United States v. Khanu*, 664 F. Supp. 2d 35 (D.D.C. 2009), were wrongly decided. Both cases relied heavily on the same flawed comparison between Sections 7121 and 7122. *See Mohney*, 949 F.2d at 1408; *Khanu*, 664 F. Supp. 2d at 38–39. Moreover, both cases are readily distinguishable on their facts. The closing agreement at issue in *Khanu* did not involve the defendant in his personal capacity; rather, it was an agreement between the government and various corporations the defendant controlled. *See* 664 F. Supp. 2d at 37–38. For its part, the closing agreement in *Mohney* did not address the precise matters at issue in the indictment. *See* 949 F.3d at 1400, 1408 (indictment alleged that defendant filed false tax returns, while the closing agreement "relate[d] only to suits brought by [the defendant] to claim refunds"). Ultimately, neither case supports the government's tax charges in this case.

WILLIAMS & CONNOLLY LLP

Page 4

### B. Closing Agreements Bind All Government Agencies, Not Just the IRS

During our May 24, 2019 telephone call, you suggested that the IRS alone is bound by the terms of closing agreements. But this, again, contravenes the plain text of Section 7121. Section 7121(b) mandates that closing agreements "shall be final and conclusive," and expressly delineates the contours of this "[f]inality." The statute provides that, absent circumstances not present here, "*any* officer, employee, or agent of the United States" may not modify the closing agreement or otherwise reopen "the case." *Id.* § 7121(b)(1) (emphasis added). The statute further mandates that the agreement, and any determination contained therein, "shall not be . . . annulled, modified, set aside or disregarded" in "*any* suit, action, or proceeding." *Id.* § 7121(b)(2) (emphasis added).

Consistent with this broad statutory mandate, the Eighth Circuit has recognized that closing agreements enable "the taxpayer and *the government*" to settle controversies concerning civil and criminal tax liability. *Wolverine*, 75 F.2d at 595 (emphasis added). Accordingly, ***"[n]ot only the IRS staff but also the staffs of the Treasury and Justice Departments are barred from acting contrary to the agreement.***" *IRS National Office Procedures – Rulings, Closing Agreements*, Tax Portfolio No. 621-4th (Bloomberg Tax 2019) (emphasis added). Any other interpretation would make no sense. If, as the government contends, the DOJ and other federal agencies may freely breach, disregard, or exploit closing agreements to serve their own ends, then taxpayers would have no incentive to voluntarily execute such agreements with the IRS in the first place. In addition, the IRS would have no ability to resolve any matter with the "[f]inality" Congress intended to provide. 26 U.S.C. § 7121(b). For these reasons, taxpayers are entitled to "assum[e] that the closing agreement is final, and that another executive agency, in this case the Department of Justice, will not attempt to unscramble it." *Temple-Inland, Inc. v. United States*, 68 Fed. Cl. 561, 569 (Ct. Fed. Cl. 2005); *see also Bankers' Reserve*, 42 F.2d at 383–84.

### C. The IRS Alone May Formally Set Aside Closing Agreements, and It Has Not Done So Here

Your April 1, 2019 letter suggests that you possess the authority to set aside Mr. Adams's closing agreement by demonstrating fraud or falsity in connection with his agreement. Not so.

Although Section 7121 contemplates that closing agreements may be voided "upon a showing of fraud or malfeasance, or misrepresentation of a material fact," 26 US.C. § 7121(b), it does not address the process for doing so. Instead, the IRS has established detailed procedures to be followed where it suspects fraud or malfeasance in connection with a closing agreement. Out of respect for the finality Congress intended for closing agreements to achieve, the IRS requires the Commissioner to "***personally approve any set-aside***," and has further cautioned that "[t]he standards for setting aside a closing agreement are strict; they will be met only rarely." I.R.M. 8.13.1.7.2(1) (emphasis added).

The IRS's set-aside process involves multiple phases. When an examining officer suspects fraud or malfeasance in connection with a closing agreement, he or she must first draft a

WILLIAMS & CONNOLLY LLP

Page 5

"report of the available facts," without any "reexamination of the taxpayer's books or records." I.R.M. 8.13.1.7.2.1(1). This report is then submitted to the Compliance Operating Division, which must determine whether there are sufficient facts to set aside the agreement. *Id.*; I.R.M. 8.13.1.7.2.1(2). If the Compliance Operating Division finds that the facts do *not* warrant setting aside the closing agreement, it must issue a written directive that the closing agreement continue to be adhered to. I.R.M. 8.13.1.7.2.1.1(1).

If, however, the division concludes that further investigation is necessary, and will require reexamination of the taxpayer's books, it must issue a written notice pursuant to 26 U.S.C. 7605(b). I.R.M. 8.13.1.7.2.1.1(2). At the conclusion of the investigation, the division must draft a written report. I.R.M. 8.13.1.7.2.1.1(3). That report must "clearly set forth" any alleged misrepresentations the taxpayer made. I.R.M. 8.13.1.7.2.1.1(3). Finally, if the Compliance Operating Division ultimately recommends that the agreement be set aside, it must send a "special preliminary letter" to the taxpayer providing him or her 30 days in which to file a protest. I.R.M. 8.13.1.7.2.1.1(4).

On May 22, 2019, Mr. Adams requested all documents relating to or arising out of any IRS investigation into misrepresentations in connection with his 2015 closing agreement. Mr. Adams also requested documents concerning any contemplated or finalized decision to set aside his closing agreement. On June 28, 2019, the government indicated that it had exhausted its efforts to identify additional records concerning Mr. Adams's 2015 closing agreement. Although it produced some additional documents, none of these documents reflect any IRS contemplation or formal determination to set aside Mr. Adams's closing agreement. Accordingly, Mr. Adams's closing agreement remains valid and binding on the government. Your office cannot now unilaterally set aside this final, binding agreement through post hoc allegations of fraud.[1]

Your office has repeatedly acted contrary to, and thereby breached, Mr. Adams's valid and binding closing agreement. Among other things, it has: directed the IRS to reinvestigate the circumstances surrounding Mr. Adams's amended tax returns; directed the IRS to draft a Special Agent Report; devised and authorized illegitimate tax charges; and threatened to use evidence derived from Mr. Adams's voluntary disclosure and closing agreement to support those tax charges. Enough is enough. Because the terms of Mr. Adams's closing agreement plainly preclude the tax charges, they should be dismissed.

---

[1] And even assuming your office had the authority to set aside Mr. Adams's closing agreement, it has not made the requisite showing here. *See* 26 U.S.C. § 7121(b) (requiring "a showing of fraud or malfeasance, or misrepresentation of a material fact"). The Court has already rejected the government's suggestion that Mr. Adams made a material misrepresentation in connection with his closing agreement. *See* Order (Oct. 27, 2018), Docket No. 225. But in any event, we are confident that *in camera*, *ex parte* review of relevant documents will conclusively demonstrate that Mr. Adams made no misstatement in connection with his voluntary disclosure or closing agreement. Moreover, in the nearly four years since the execution of the closing agreement, the IRS has never challenged its validity or otherwise complained about any material misstatement.

WILLIAMS & CONNOLLY LLP

Page 6

## II. THE VOLUNTARY DISCLOSURE PROGRAM

The tax charges not only violate Mr. Adams's binding closing agreement, they also undermine the policies on which the Voluntary Disclosure Program rests.

For nearly a century, the Voluntary Disclosure Program has provided a path for taxpayers to voluntary comply with the tax laws. The purpose of the program is simple: to encourage taxpayers to come forward and address potential tax liabilities without fear of retribution. The program benefits the government and taxpayers alike. The government is given the opportunity to clarify complex tax issues and receive additional tax revenue. Taxpayers, on the other hand, are able to "put [the] problem behind them and get on with their lives."[2] To that end, the government has long refrained from prosecuting taxpayers who voluntarily disclose their potential tax liabilities—at least where, as here, the taxpayer is truthful and makes no misrepresentations to the government during the voluntary disclosure process.

Your office's conduct contradicts the purpose of the Voluntary Disclosure Program and undermines the finality it was designed to achieve. By seeking to use evidence derived from Mr. Adams's voluntary disclosure to prove the tax charges, the government retains the benefits of that Program (a payment with respect to a potential tax dispute), but not the burdens (final resolution). If the government can use such evidence to criminally prosecute all taxpayers who come forward in good faith, there is no incentive for such taxpayers to disclose potential tax issues in the first place.

## III. CONCLUSION

The tax charges in this matter should never have been brought, and we urge you to dismiss them now. We appreciate your response no later than Friday, July 19, 2019, as absent dismissal Mr. Adams intends to raise this issue with the Tax Division of the Department of Justice and, if necessary, the Court.

Thank you for your attention to these matters. Please contact me with any questions you may have.

Sincerely,

Lance Wade

---

[2] *See IRS Reaches Out To Bring Nonfilers Back Into the Tax System*, IR-News Rel., 1992-94 (Sept. 30, 1992).