UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-64 (DWF/KMM)

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

EDWARD S. ADAMS,

                Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNTS 15-17 OF THE SUPERSEDING INDICTMENT**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and John Kokkinen and Joseph H. Thompson, Assistant United States Attorneys, respectfully submits this response to Edward S. Adams's motion to dismiss counts 15-17 of the superseding indictment [Docket No. 241].

## INTRODUCTION

This is Mr. Adams's third motion to dismiss the tax counts in the superseding indictment. This time, Mr. Adams claims that the tax charges should be dismissed because they breached a closing agreement he entered into with the IRS. Mr. Adams's motion is untimely—fifteen months after the Court's motions filing deadline—and it fails to state a valid basis for dismissal of an indictment. Therefore, the Court should deny Mr. Adams's motion without reaching the merits.

Even if the Court considers the merits of Mr. Adams's claims, his motion to dismiss the tax counts should be denied. The plain language of the closing agreement makes clear

that it does not apply to criminal prosecution, and the only two courts ever to have considered an argument like the one Mr. Adams makes have rejected it.  Moreover, in order to obtain the closing agreement, Mr. Adams was required to represent that all of his income came from a legal source and to agree that the closing agreement could be reopened in the event of fraud, malfeasance, or misrepresentation of material fact.  The income Mr. Adams failed to report did *not* come from a legal source—rather, it was proceeds from his fraud scheme charged in Counts 1 through 14 of the superseding indictment.  Moreover, Mr. Adams also made material misrepresentations in the amended returns he filed under the closing agreement.  Specifically, he falsely characterized the income he previously failed to include on his returns as sales of stock he held for longer than five years (or, long-term capital gains) instead of as sales of unexecuted warrants (or, short-term capital gains).  By misrepresenting the nature and source of this income, Mr. Adams reduced his tax liability significantly.

Finally, if the Court considers the merits of Mr. Adams's motion, the Court should find that Mr. Adams has affirmatively placed the substance of his communications with his accountant and his tax lawyer at issue.  Mr. Adams argues that selected communications with his lawyer and accountant would show that his amended returns did not misrepresent material facts.  If the Court permits Mr. Adams to rely upon these communications in support of his motion, he must waive the privilege and should be ordered to disclose all records regarding the substance of his communications with his lawyer and accountant related to tax years 2008 through 2010.

## BACKGROUND

Between 2006 and 2011, Mr. Adams paid himself approximately $3.4 million from a series of accounts that he controlled at Venture Bank. *See* Gov't Ex. 1. Mr. Adams opened the Venture Bank accounts on behalf of a series of limited liability companies that he created. Mr. Adams was the sole signatory on the accounts. The money Mr. Adams paid himself from the accounts were the proceeds from Mr. Adams's sale of warrants in the Apollo companies. As set forth in the superseding indictment, those warrant sales were some of the initial steps in Mr. Adams's scheme to defraud Apollo and its investors. [Docket No. 70 at 5-11.]

In the three years of the tax charges, 2008 through 2010, Mr. Adams received more than $2.4 million from these warrant sales:

- In 2008, he received $1,808,790.30 ($1,578,186.05 payable to himself and $230,604.25 payable to his company, ESA Consulting).

- In 2009, he received $296,418.95 ($281,418.95 payable to himself and $15,000 payable to ESA Consulting).

- And in 2010, he received $380,050 (all payable to himself).

*See* Gov't Ex. 1.

Mr. Adams initially filed self-prepared tax returns on April 15, 2009, April 14, 2010, and April 15, 2011. On his 2008 return, Mr. Adams omitted more than $1.1 million that he had paid directly to himself from the Venture bank accounts. For 2009, he omitted more than $160,000 that he had paid directly to himself from the Venture bank accounts. And

for 2010, he omitted more than $330,000 that he had paid directly to himself from the Venture bank accounts.

In May 2011, the Minnesota Department of Revenue audited Mr. Adams.  He hired the CPA firm of CliftonLarsonAllen, LLP to assist him in responding to the audit.  As a result of that audit, Mr. Adams filed amended returns with the IRS for 2008, 2009, and 2010.  Despite being the subject of an audit and being assisted by a prominent accounting firm, Mr. Adams's amended returns again failed to report the full amount of money he received from the Venture Bank accounts.  The false returns Mr. Adams filed in response to the 2011 audit are the returns charged in counts 15 through 17 of the superseding indictment.

Three years later, in May 2014, the Securities and Exchange Commission issued a subpoena to Mr. Adams requiring that he produce, among other things, documents related to any bank account "in which you have any ownership interest, signatory authority or beneficial interest or over which you exercise or have exercised direct or indirect control." Gov't Ex. 2.  Notably, the SEC subpoena called for the production of the Venture Bank accounts from which Mr. Adams had received the $2.4 million in unreported income. Shortly thereafter, in the fall of 2014, Mr. Adams hired attorney Thomas Brever to represent him in connection with a matter involving the Internal Revenue Service.  On October 9, 2014, Mr. Brever sent correspondence to the IRS requesting Mr. Adams's "acceptance into a voluntary disclosure pursuant to the [IRS's] longstanding policy." Gov't Ex. 3.

On October 27, 2014, Mr. Brever retained a CPA firm, Murry & Associates, to prepare amended returns to report "[s]ome income arising from an entity [that] was mistakenly omitted from a return."  Gov't Ex. 4.  Over the next several days, Mr. Adams provided information to Murry for use in preparing amended returns, which Murry used to prepare draft amended returns for 2008, 2009, and 2010.  On each of these draft returns, Murry characterized the income Mr. Adams realized through warrant transactions conducted using the Venture bank accounts as short-term capital gains, meaning that the asset had been held for one year or less.  On November 12, 2014, Mr. Brever emailed Mr. Adams to let him know that Murry had completed the amended returns *based on the documents and information provided* by Mr. Adams and that they were ready to be signed and filed.  Gov't Ex. 5.

On November 14, 2014, the IRS informed Mr. Adams that he had been "Pre-Cleared to make a voluntary disclosure" and that he should "complete and sign the enclosed Domestic Voluntary Disclosure Letter."  Gov't Ex. 6.  On November 24, 2014, Mr. Brever sent a completed Domestic Voluntary Disclosure letter on behalf of Mr. Adams that claimed "[u]pon review of prior transactions, we determined that income from sales of securities had not been included in income in 2008-2010.  The amended returns include the previously omitted capital gain income."  Gov't Ex. 7.  The letter, signed by Mr. Adams on November 21, 2014, under penalty of perjury, estimated that the total amount of unreported income was $0 to $100,000 for 2008, $100,000 to $1,000,000 for 2009, and $0 to $100,000 for 2010.

Mr. Adams attached the amended returns for 2008 through 2010, signed and dated November 17, 2014, to the disclosure letter. But the returns Mr. Adams's sent to the IRS differed from the drafts prepared by Murry only a few days earlier. The drafts prepared by Murry using documents and information provided by Mr. Adams correctly characterized the income as short-term capital gains resulting from the sale of stock warrants in 2008 and 2010. In contrast, the returns Mr. Adams ultimately filed falsely claimed that the source of the previously unreported income was the sale of stock that Mr. Adams had acquired by exercising warrants more than five years before he sold the stock. This change was significant because the IRS taxes long-term capital gains at a lower rate than short-term capital gains and because Mr. Adams was able to exclude 50% of his gains from taxation by claiming that he had exercised the warrants five years before selling the stock.[1]

Relying on Mr. Adams's representation that he had provided the IRS with true, correct, and complete information about the nature and amount of the previously-unreported income, the IRS preliminarily accepted Mr. Adams into the domestic voluntary disclosure program on January 20, 2015. Gov't Ex. 8. The IRS informed Mr. Adams that "a domestic voluntary disclosure may result in prosecution not being recommended," but the IRS specifically emphasized that "[a] domestic voluntary disclosure will not automatically guarantee immunity from prosecution." *Id.* The IRS also advised Mr. Adams that his acceptance into the voluntary disclosure program depended on whether the

---

[1] The second amended 2008, 2009, and 2010 returns that Mr. Adams submitted as part of his voluntary disclosure also appear to have failed to report all of the income he earned from the warrant transactions in those years—omitting more than $100,000 in income each year. *See* Gov't Ex. 1.

information he provided in the voluntary disclosure was "truthful and complete," that his voluntary disclosure "will be forwarded for necessary *civil action* and the determination of correct tax liability," and that his voluntary disclosure will only be deemed complete when "final *civil resolution* is reached between [Mr. Adams] and the IRS." *Id*. (emphasis added).

On March 20, 2015, the IRS sent Mr. Adams an IRS Form 906, Closing Agreement. Def's Ex. A [Docket No. 241-1]. The closing agreement provided that it was an agreement between Mr. Adams and the Commissioner of Internal Revenue. It also provided that the parties' intent was "to enter into an agreement with the Internal Revenue Service regarding the proper amount of Federal income taxes . . . for the years 2008, 2009, and 2010." *Id*. at 3. Elsewhere, the agreement made clear that it was being executed to "resolve the income tax liabilities" for Mr. Adams for 2008-2010 and was "being made by the Commissioner solely for settlement purposes." *Id*.

In the closing agreement, Mr. Adams expressly represented that he "engaged in legitimate business activities and all of [his] income was legal source income." *Id*. Mr. Adams further represented that he had provided correct amended returns for 2008 through 2010, and agreed that "[i]f any information provided is not materially accurate and complete, the Internal Revenue Service [would] not be bound by any agreements or understandings heretofore reached with the Taxpayers or recited within this closing agreement." *Id*. at 3, 6 ¶ 7. Mr. Adams signed the agreement on March 31, 2015, and the Commissioner of Internal Revenue signed it on August 17, 2015.

But Mr. Adams was not engaged in legitimate business activities and the unreported income was not legal income, but rather the proceeds of his fraud scheme. And even setting

aside his fraud scheme, Mr. Adams did not provide complete and correct information about this income. The unreported income was not the result of Mr. Adams's sale of stock he had received years earlier and therefore taxable as long-term capital gains. The income came from the sale of unexercised warrants that were taxable at the higher short-term capital gains rate. Indeed, the government's previous filings have set forth at least 29 examples of records purportedly created around the time of these transactions that clearly demonstrate that the transactions involved the sale of unexercised warrants, not stock. *See* Gov't Resp. [Docket No. 179] at 77-79; Gov't Reply [Docket No. 217] at 14-22. And Mr. Adams himself previously testified that the transactions involved the sale of warrants, not stock:

```
12        A    If I remember correctly, Bob, Bryant and I had
13   warrants in Apollo which we contributed to ADR so that money
14   could be raised through the sale of those to capitalize
15   Apollo in a way that was non-dilutive to Apollo or its
16   shareholders.
```

Aug. 27, 2015 Depo. Tr. at 137. Because this description differed from the explanation Mr. Adams provided to the IRS in his voluntary disclosure only a few months earlier, Mr. Adams hedged a bit:

```
18        Q    Maybe if you can explain for me again, because I
19   think I am a little unclear what ADR was actually doing or
20   why it was formed.
21        A    I am going off of memory that's old.  I think ADR
22   was essentially an effort to not dilute the shareholders of
23   Apollo by having Bob, Bryant and I sell our stock in Apollo
24   or warrants, and reinvest that largely in Apollo.
25             So rather than dilute the shareholders of Apollo
1    by selling stock, new stock, it was selling our stock,
2    reducing our ownership or warrants, and then reinvesting it
3    in the company.
4         Q    So it sold your stock, your warrants?
5              So ADR was selling your stock, or was it selling
6    your warrants?
7         A    I don't remember.
```

*Id*. at 140-41.

**ARGUMENT**

**I.    The Motion Is Untimely.**

During the January 2018 motions hearing, this Court spent considerable time addressing the litigation plan moving forward. This Court emphasized that "[o]ur practice is overwhelmingly a unitary single-bite-at-the-apple motion hearing, followed by motions in limine narrowly tailored to trial issues.  The kind of rolling motions thing doesn't happen here."  Jan. 9, 2018 Mtns. Hrg. T. 246:5-7.  This Court then issued a scheduling order instructing the parties to "submit any new motions arising from the superseding indictment . . . on or before April 30, 2018."  January 23, 2018 Order [Docket No. 88] ¶ 4.  The Court

9

ultimately extended the deadline to June 1, 2018, when Mr. Adams filed a number of motions, including two seeking dismissal of the tax charges. Neither of those motions raised the breach-of-contract claim Mr. Adams now raises—15 months after the pretrial-motions deadline and just two months before his November 4, 2019 trial.

"[A] motion alleging a defect in instituting the prosecution" must be made before trial. Fed. R. Crim. P. 12(b)(3). Rule 12 provides that "[t]he court may, at the arraignment or as soon afterword as practicable, set a deadline for the parties to make pretrial motions . . ." Fed. R. Crim. P. 12(c)(1). "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3).

Mr. Adams's motion does not acknowledge that it is 15 months late, nor does it expressly assert "good cause" to excuse the untimeliness. Mr. Adams appears to suggest that this issue "first came to light" only after the government "altered its theory of the case." But Mr. Adams possessed all the information he needed to raise his breach-of-contract claim on the day that the superseding indictment was returned. An experienced criminal tax lawyer, Mr. Brever, represented Mr. Adams in connection with the closing agreement. Mr. Brever continued to actively represent Mr. Adams well after the closing agreement was finalized in August 2015 and, in fact, has provided assistance to Mr. Adams in connection with this criminal case. *See* Feb. 5, 2018 Brever Decl. [Docket No. 93]; Feb. 26, 2018 Suppl. Brever Decl. [Docket No. 112] and Ex. H [Docket No. 112-1]. Indeed, Mr. Brever's February 5, 2018 declaration in this case specifically notes the existence of the closing agreement and the fact that it covers the 2008, 2009, and 2010 tax years. *See*

10

Brever Decl. ¶ 9.  Despite all of this, Mr. Adams never raised the closing agreement as a defense to the tax charges.

Mr. Adams's additional excuse fares no better.  Mr. Adams claims that the availability of this defense did not become apparent until after receiving a production of materials in June and July 2019 that showed that the IRS "never nullified his closing agreement" and learning that the government had rejected his request to dismiss the tax charges.  But Mr. Adams always knew that the closing agreement had not been nullified.  As Mr. Adams acknowledges in his motion, he would have been notified had the closing agreement been nullified or set aside.  *See* IRM 8.13.1.7.2 (discussing the procedures for setting aside closing agreements including the form of the correspondence sent to the taxpayer) *cited in* Mot. to Dismiss at 12-14.  Thus, Mr. Adams's claim to have "learned" that fact only recently, upon reviewing the government's document production, is simply untrue.

Mr. Adams could have raised this issue 15 months ago.  He chose not to do so.  He should not be allowed a third "bite at the apple," and his motion to dismiss should be denied as untimely.

## II.    The Motion Fails To Articulate A Valid Basis For Dismissal.

In addition to being untimely, Mr. Adams's motion does not invoke a basis for dismissal recognized by the Constitution, the Federal Rules of Criminal Procedure, or any binding or persuasive court decisions.  Mr. Adams does not claim, for example, that his Constitutional rights were violated (*e.g.*, double jeopardy, due process, the constitutionality of a statute), that jurisdiction is lacking, that the superseding indictment fails to state an

11

offense, or that he has previously been granted immunity for the offenses charged.  In a footnote, Mr. Adams cites Rule 12(b)(1) of the Federal Rules of Criminal Procedure, makes a reference to "judicial economy," and explains that he seeks a ruling that the tax charges violate the terms of the closing agreement and the statute under which it was executed.  He then analogizes his situation to one in which a prosecution was deemed barred by an earlier plea agreement.  But, of course, Mr. Adams has not pleaded guilty, his closing agreement is not a plea agreement, and his analogy is inapposite.

Some of Mr. Adams's arguments claim that the prosecution of the tax charges in this case is contrary to public policy or the intent of Congress regarding the domestic voluntary disclosure program and closing agreements under 26 U.S.C. § 7121.  The government disagrees with Mr. Adams's policy arguments, which would grant a free pass for filing false tax returns so long as a defendant can evade detection during the voluntary disclosure process.  In any case, public policy arguments are not valid bases for dismissal.  *See United States v. Mann*, 517 F. 2d 259, 271 (5th Cir. 1975) ("If an indictment alleges a violation of the laws of the United States, and the prosecution of that indictment is not precluded on constitutional grounds, . . . the courts may not dismiss an indictment on grounds of public policy.").

The crux of Mr. Adams's motion is his claim that the tax charges violate the terms of his closing agreement.  In other words, it is a breach-of-contract claim.  Although courts have dismissed prosecutions that violated preexisting plea, immunity, non-prosecution, deferred prosecution, diversion, or proffer agreements, Mr. Adams fails to identify any cases recognizing the authority to dismiss a prosecution based on some other type of

contract to which neither the U.S. Attorney's Office nor the Department of Justice is a party.  Therefore, Mr. Adams's motion should be denied.

## III.    The Closing Agreement Does Not Address Criminal Prosecution.

Mr. Adams spends little time discussing the terms of the closing agreement itself. This is understandable given that those terms reveal no intent by either party to bind the government as to the issue of criminal liability.  Instead, Mr. Adams focuses on the statutory authorization allowing the IRS to enter into closing agreements, 26 U.S.C. § 7121.  But Mr. Adams's suggested analysis of the statute fails to save his motion.

Section 7121 authorizes the Secretary of the Treasury to "enter into an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." *Id*. § 7121(a).  Such agreements are deemed to be "final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact . . . shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States." *Id*. § 7121(b).

Mr. Adams's entire argument depends on his attempt to graft onto § 7121 a word not actually found in the statute, namely, the word "criminal."  At least two courts have squarely rejected this argument. *United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1991); *United States v. Khanu*, 664 F. Supp. 2d 35 (D.D.C. 2009).  In doing so, the courts have noted that § 7121 "stands in stark contrast" to the very next section of the Internal Revenue Code, 26 U.S.C. § 7122. *Khanu*, 664 F. Supp. 2d at 38; *Mohney*, 949 F.2d at 1408.  Unlike § 7121, § 7122 expressly employs the word "criminal," authorizing the Secretary of the

Treasury to "compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense." 26 U.S.C. § 7122(a). As the Sixth Circuit succinctly observed in *Mohney*, although § 7121 "does not expressly state whether it covers criminal prosecutions, its failure to address a matter clearly stated in the following section may suggest it is not intended to cover criminal cases." 949 F.2d at 1408. The obvious conclusion, therefore, is that "[a]greements entered pursuant to § 7122 explicitly address matters of civil or criminal liability, whereas agreements entered pursuant to § 7121 focus solely on the tax liability of the parties who sign and do not cover criminal cases." *Khanu*, 664 F. Supp. 2d at 38; *Mohney*, 949 F.2d at 1408 ("section 7122, not section 7121, covers compromises regarding criminal prosecutions").

Mr. Adams ignores *Mohney* and *Khanu*. Instead, he claims that § 7121 is ambiguous because there is no specification of whether the word "liability" relates to civil liability, criminal liability, or both. But *Mohney* rejected this very argument.

The Eighth Circuit has likewise rejected a similar argument attempting to find ambiguity regarding the scope of a civil settlement agreement where none existed. *See United States v. Brekke*, 97 F.3d 1043 (8th Cir. 1996). In *Brekke*, the defendants were indicted in the District of Minnesota on charges of bank fraud, making false statements to a financial institution, mail fraud, and conspiracy to commit mail fraud and bank fraud. *Id.* at 1045. Prior to being indicted, the defendants entered into a civil settlement agreement with the Small Business Administration in the District of North Dakota regarding the allegation that the defendants made false and fraudulent representations to the SBA and

14

conspired to defraud the United States.  *Id*.  The district court dismissed the indictment, finding that the prosecution was barred by the prior settlement agreement.  *Id*. at 1049.  In doing so, the district court focused on the "catch-all release" of "any or all statutory or common law causes of action" and concluded that the settlement agreement included criminal prosecution.  *Id*. at 1049-50.

The Eighth Circuit reversed, holding that the settlement agreement "did not relieve the defendants of criminal responsibility for their actions."  *Id*.  The court explained that "[n]owhere in the agreement did the parties mention crimes, criminal action, prosecution, or similar concepts."  *Id*. at 1050.  Because the agreement did not mention such criminal concepts and instead included specific concepts necessarily related to the civil matter, the Eighth Circuit concluded that the inclusion of a "catch-all release" did not render the settlement agreement ambiguous.  *Id*.  In reaching this conclusion, the court observed that there had not been any allegation that the defendants subjectively believed that their settlement agreement extended to criminal liability.  *Id*.

Just as in *Brekke*, Mr. Adams's closing agreement does not use any words or phrases implicating any criminal concepts.  Just as in *Brekke*, there is no suggestion that Mr. Adams subjectively believed that the closing agreement extended to criminal liability.  In fact, the record suggests the opposite—that Mr. Adams knew that his closing agreement did not extend to criminal liability.  The IRS specifically informed Mr. Adams in January 2015 that his acceptance into the voluntary disclosure program would not guarantee him immunity from prosecution.  Gov't Ex. 8.  The IRS also made clear that whatever final agreement Mr. Adams reached with the IRS as a result of the voluntary disclosure program

would cover only civil matters, not criminal ones: "Your . . . domestic voluntary disclosure will be deemed complete when final *civil resolution is reached between [you] and the IRS*." *Id*. (Emphasis added.)   In short, Mr. Adams entered into this process knowing that any resolution would pertain only to civil, not criminal, matters.

The specific terms of Mr. Adams's closing agreement crystalize this conclusion. Nothing in the actual terms of Mr. Adams's closing agreement indicates an intent to extend the agreement to criminal matters.   To the contrary, the terms of the closing agreement refute any such intent.   The closing agreement articulates Mr. Adams's stated purpose as his "desire to enter into an agreement with the [IRS] regarding the proper amount of Federal income taxes, applicable penalties and interest for the years 2008, 2009, and 2010." Similarly, the closing agreement states that "the parties have determined it is mutually advantageous for them to enter into an agreement finally determining the Taxpayers' correct income, correct taxable income, correct income tax liability, additions to the tax, applicable penalties and interest for the tax years 2008, 2009 and 2010 on terms acceptable to the [IRS]."   The word "criminal" appears nowhere in the closing agreement, and nowhere is there any implication that the agreement prevents the U.S. Attorney's Office from criminally prosecuting Mr. Adams.   Instead, the terms of the closing agreement refer to the simple, non-criminal issue of the proper amount of income, taxable income, and income taxes owed by Mr. Adams.

The Court should follow the reasoning of *Khanu*, *Mohney*, and *Brekke* and conclude that the closing agreement does not apply to this criminal case.   Therefore, Mr. Adams's motion to dismiss should be denied.

16

IV.     **The Closing Agreement Does Not Apply Because Mr. Adams's Unreported Income Consisted of Proceeds from His Fraud Scheme and Because Mr. Adams Included False Information on His Second Amended Returns.**

Even if a closing agreement between a taxpayer and the IRS was binding on the U.S. Attorney's Office—a non-party to the agreement—and applied to prevent a criminal prosecution, *this* closing agreement could not act as a bar to *this* criminal prosecution because Mr. Adams breached the closing agreement in at least two different ways. First, Mr. Adams represented in the closing agreement that all of his underreported income for tax years 2008 through 2010 was "legal source income." Def's Ex. A at 3. But the income Mr. Adams failed to report did *not* come from a legal source—rather, it was proceeds from the fraud scheme charged in Counts 1 through 14 of the superseding indictment. [Docket No. 70 at 5-11.] As set forth in the superseding indictment, Mr. Adams's sales of his own unexecuted warrants to people who believed they were investing directly in Apollo was part of his scheme to defraud Apollo and its shareholders. *See United States v. Birbragher*, 603 F.3d 478, 481 (8th Cir. 2010) (explaining that courts accept allegations in indictment as true when considering a motion to dismiss). The closing agreement was never intended to apply to unreported fraud proceeds, and it cannot act as a bar to a criminal prosecution for failing to report those fraud proceeds.

Second, when he signed the closing agreement, Mr. Adams agreed that it would not apply "in the event of fraud, malfeasance, or misrepresentation of material fact." Def. Ex. A at 5. However, the information that Mr. Adams provided to the IRS in connection with the voluntary disclosure program and the closing agreement included materially inaccurate information and descriptions. Instead of truthfully reporting that he sold unexecuted

17

warrants (which would have been taxable as short-term capital gains), Mr. Adams's second amended returns falsely claimed that the income was realized through the sale of stock received after having executed warrants five years prior to the sales. This resulted in excluding half the income from taxation altogether and subjecting the remaining half to the much lower long-term capital gains rate. Thus, the description provided to the IRS in connection with the voluntary disclosure and the closing agreement—that the income was realized through the sale of stock received after having executed warrants five years prior to the sales—was not materially accurate and complete. In addition, Mr. Adams omitted from his amended returns more than $100,000 a year in payments be made to himself from the Venture Bank accounts for the warrant sales.

In *Khanu*, the court concluded that even if a § 7121 closing agreement could be construed as binding on the government as to a criminal prosecution, "the Government's allegation that Defendant unlawfully skimmed the $1.9 million from the corporations would constitute a showing of fraud, malfeasance, or misrepresentation of material fact sufficient to undermine the finality of the Closing Agreement." 664 F. Supp. 2d at 39. This conclusion is mandated not only by the language of § 7121 but also by the particular language of this specific closing agreement. The closing agreement provides that "[i]f any information provided is not materially accurate and complete, the Internal Revenue Service will not be bound by any agreements or understandings heretofore reached with the Taxpayers or recited within this closing agreement." Def's Ex. A at 6 ¶ 7. This is a self-executing clause. There is no need to initiate any "set-aside" proceedings. Instead, it is automatically triggered if the information provided is not materially accurate and complete.

18

Mr. Adams claims that the Court already rejected the government's assertion that the second set of amended returns mischaracterized the transactions as stock sales rather than warrant sales. Mr. Adams is wrong. The Court accepted the government's prima facie showing that the second set of amended returns characterized the transactions differently from what actually occurred. Oct. 27, 2018 Order [Docket No. 225] at 6-7. The Court ultimately declined to apply the crime-fraud exception to the attorney-client privilege based on an inability to find evidence of "intent to commit a fraud or crime by misrepresenting that [Mr. Adams] earned income from stocks instead of the sale of warrants." *Id*. at 8. In reaching this conclusion, it does not appear that the Court was rejecting the government's assertion—supported by ample evidence—that the second set of amended returns described the transactions inaccurately. Instead, the Court seemed unable to find that the inaccuracy was accompanied by any intent to defraud or deceive. In other words, the conclusion that Mr. Adams provided inaccurate information in connection with the voluntary disclosure and the closing agreement would not be inconsistent with the Court's determination not to apply the crime-fraud exception to the purportedly privileged communications.

Mr. Adams claims that the government cannot unilaterally decide to set aside the closing agreement on the basis of fraud, malfeasance, or misrepresentation of material; that only the IRS, not the Department of Justice, may set aside the closing agreement; and that the closing agreement has never been set aside. In support, Mr. Adams points to a number of provisions of the Internal Revenue Manual ("IRM") pertaining to closing agreements and the procedures employed to set aside closing agreements. The Court need not consider

these arguments because compliance (or lack thereof) with the IRM is irrelevant to whether the closing agreement bars prosecution.  In the very section of the IRM that Mr. Adams cites, the IRM provides that "[t]he information contained in this IRM pertaining to the interpretation and application of [26 U.S.C. §] 7121 is advisory only and is not to be cited or relied upon as authority in disposing of issues.  Such material is presented merely as a guide for applying [§] 7121 to help Service personnel reach uniform results in those areas not expressly covered by regulations and court decisions."  IRM 8.131.2(4).

Mr. Adams's failure to comply with the terms of his closing agreement provides the Court with an additional basis to conclude that the closing agreement cannot bar his criminal prosecution for filing false tax returns.  Therefore, the motion to dismiss should be denied.

## V.   The Court Should Reject Mr. Adams's Invitation to Review Selected Emails with His Lawyer and Accountant.

Mr. Adams suggests that he should be permitted to choose documents that he deems relevant to show to the Court, *ex parte* and *in camera*, to establish that he "made no misrepresentation to the IRS in connection with his voluntary disclosure or closing agreement."  Mot. at 14 n.4.  The Court should decline to permit Mr. Adams to make selective disclosures—to the Court, but not the government—in order to use the privilege as both a shield and a sword.

"A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."  *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).  "To selectively disclose privileged

20

communications would cause the attorney-client privilege to be used as both a sword and a shield, resulting in fundamental unfairness." *Weizmann Institute of Science v. Neschis*, 2004 WL 540480, at *3 (S.D.N.Y. Mar. 17, 2004); *see also Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club, L.P.*, 210 F.R.D. 673, 675 (D. Minn. 2002) ("Fairness dictates that a party may not use the attorney-client privilege as both a sword and a shield.").

Finally, in his motion to dismiss and throughout the pretrial litigation, Mr. Adams has indicated an intent to rely on an advice-of-counsel defense at trial. *See, e.g.,* Def's Aug. 17, 2018 Resp. [Docket No. 201] at 24 (arguing that Mr. Adams relied on the assistance of Mr. Brever and Murry in invoking the long-term capital gains rate). It also appears that Mr. Adams has withheld at least several hundred communications and documents that are potentially relevant to the privilege issues previously litigated and to such an advice-of-counsel defense.[2] If Mr. Adams is going to rely on an advice-of-counsel defense at trial, he is going to have to make full disclosures to the government regarding the information he provided to his lawyers and accountants and the advice they provided based on that information. If Mr. Adams is permitted to wait until trial begins to make these voluminous disclosures to the government, this will create the need for a potentially lengthy delay in the trial to allow the government a fair opportunity to review the

---

[2]     *See* Feb. 5, 2018 Mot. [Docket No. 90] at 26-27 (cataloguing 18 phone calls and emails between 10/28/14 and 12/29/14); Brever Decl. ¶¶ 2, 7, 8 (suggesting at the existence of notes or records reflecting the substance of numerous telephone conversations between Mr. Adams and Mr. Brever; numerous telephone conversations between Mr. Brever and Murry; and numerous emails between Mr. Brever and Murry); *see also* Gov't Ex. 9, Dec. 1, 2016 Murry Privilege Log (identifying well in excess of 200 emails and more than 70 other records, including billing records, notes of interview, and summaries).

disclosures.  Therefore, the Court should impose a reasonable deadline on Mr. Adams, if he intends to rely on an advice-of-counsel defense, to disclose these communications to the government.

## CONCLUSION

Mr. Adams's third motion to dismiss is 15 months late and premised on information known to Mr. Adams since the time of charging.  The motion therefore should be denied as untimely without good cause.  But the motion also fails on the merits.  The closing agreement plainly does not bar criminal prosecution and, even if it did, Mr. Adams violated its terms by misrepresenting material facts as to the nature and source of his income.  For all these reasons, the government respectfully requests that Mr. Adams's motion to dismiss be denied.

Dated: September 16, 2019                    Respectfully Submitted,

ERICA H. MACDONALD
United States Attorney

*s/ John Kokkinen*

BY:  JOHN KOKKINEN
JOSEPH H. THOMPSON
Assistant U.S. Attorneys