UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>EDWARD S. ADAMS,<br><br>    Defendant. | )<br>) 17-cr-64-DWF-KMM<br>)<br>) **DEFENDANT'S REPLY IN**<br>) **SUPPORT OF HIS MOTION TO**<br>) **DISMISS COUNTS 15–17 OF THE**<br>) **SUPERSEDING INDICTMENT**<br>)<br>)<br>)<br>) |

## INTRODUCTION

On August 17, 2015, the IRS signed off on a binding closing agreement that resolved Mr. Adams's liability—both criminal and civil—for all internal tax revenue matters in tax years 2008, 2009, and 2010. These "final and conclusive" agreements bind "any officer, employee, or agent of the United States"—including the United States Attorney's Office for the District of Minnesota. 26 U.S.C § 7121(b), (b)(1). These binding agreements "shall not be annulled, modified, set aside, or disregarded" in "any suit, action, or proceeding." 26 U.S.C § 7121(b)(2). But the government ignored the law as well as its own procedures and indicted Mr. Adams for matters relating to his taxes for these same years, despite that binding closing agreement. And now, in response to Mr. Adams's motion, the government twists procedural rules, misstates the law and facts, and assumes Mr. Adams's guilt. The closing agreement continues to bind the parties, and Counts 15–17 should be dismissed.

## ARGUMENT

The government's defense of its prosecution of Mr. Adams in violation of the binding 2015 closing agreement is fourfold.  It maintains that:  (1) closing agreements under Section 7121 can never resolve criminal liability, despite Section 7121's statement that such agreements resolve all "liabilities . . . in respect to internal tax revenue"; (2) the closing agreement in this case did not contemplate the resolution of criminal liability, despite clear evidence to the contrary; (3) Mr. Adams breached that agreement via allegedly illegal activities and dishonest dealings with the IRS; and (4) Mr. Adams's motion comes too late.  All of these arguments should be rejected.

### A.  The Binding 2015 Closing Agreement Resolved Mr. Adams's Criminal Liability.

The government's opposition makes two assertions:  (1) that an IRS closing agreement can *never* resolve the criminal liability of a taxpayer; and (2) that the binding closing agreement in this case, negotiated with the involvement and consent of the *criminal* wing of the IRS, did not contemplate such a resolution of liability.  The government is wrong on both points.

#### 1.  IRS Closing Agreements Can Resolve Criminal Liability.

The government acknowledges that Section 7121 agreements are binding on "any officer, employee, or agent of the United States," Opp., ECF 243, at 13 (quoting 26 U.S.C. § 7121)—which plainly includes the prosecutors in this case.  Yet the government fails to explain how an agreement can bind federal prosecutors and investigators but not resolve criminal liability.  Similarly, the government never grapples with the rule of lenity's application to this case, *see* Mot., ECF 241, at 10–11, nor does it dispute that the tax code's

2

use of the term "liability" often refers to both civil and criminal cases—including Section 7122, *see id.* at 9–10. The government has no good answers to these arguments.

Instead, the government pivots and argues that Section 7121 closing agreements cannot resolve criminal liability because that function is already served by agreements made under 26 U.S.C. § 7122. Opp. at 13–14. That argument is misguided. Section 7122 provides authorization and specific procedures for the Secretary of the Treasury to resolve any "civil or criminal case" that the Secretary has *already opened* against a given taxpayer (typically for an amount less than that due). Section 7121 rounds out this statutory scheme by permitting the Treasury Department to enter into an agreement relating to all potential liability (civil and/or criminal), and which could be before any such civil or criminal case exists. *See Kennedy v. United States*, 965 F.2d 413, 420 (7th Cir. 1992) (noting that Section 7121, and not 7122, was applicable in the circumstances of that case because "no suit had been instituted" at the relevant time). The difference between these statutes and the agreements they authorize is merely one of timing.

It is of no moment that only Section 7122 uses the word "criminal" in its statutory text. After all, Section 7122 does not state that it is the exclusive means of resolving a taxpayer's criminal liability. Moreover, even though most of Section 7122 details the procedures for offers-in-compromise, it pointedly references other procedural mechanisms. *See* 26 U.S.C. § 7122(e)(2) (mandating that the secretary establish procedures for the appeal of a rejection of either an "offer *or agreement*" that compromises liability (emphasis added)). Indeed, if taken to its logical conclusion, the government's argument would suggest that the IRS's power to resolve criminal liability turns entirely on the formality of

3

opening a "case" against a given taxpayer. That conclusion would inevitably thwart Section 7121's purposes. *See Wolverine Petroleum Corp. v. Comm'r of Internal Revenue*, 75 F.2d 593, 595 (8th Cir. 1935) (noting section 7121 is designed to "finally and completely [] settle *all controversies* in respect of the tax liability for any previous taxable period, and to *protect the taxpayer against the reopening of the matter* at a later date" (emphasis added)).

Thus, a Section 7121 closing agreement is a permissible vehicle for finally and conclusively resolving criminal liability with regard to internal tax revenue. The nonbinding cases the government cites are wrongly decided and do not support the tax charges against Mr. Adams. Both *United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1991), and *United States v. Khanu*, 664 F. Supp. 2d 35 (D.D.C. 2009), rely heavily on the same flawed comparison between Sections 7121 and 7122, and do not recognize the distinction described above. *See Mohney*, 949 F.2d at 1408; *Khanu*, 664 F. Supp. 2d at 38–39. Neither case addresses the effect of the rule of lenity on the interpretation of Section 7121, even though *Mohney* seems to have acknowledged that section's potential ambiguity. *See Mohney*, 949 F.2d at 1408 (noting only that Section 7122 "*may suggest* [that Section 7121] is not intended to cover criminal cases" (emphasis added)).[1]

---

[1] Both cases are also distinguishable on their facts. The closing agreement at issue in *Khanu* did not involve the defendant in his personal capacity; rather, it was an agreement between the government and various corporations the defendant controlled. *See* 664 F. Supp. 2d at 37–38. And the closing agreement in *Mohney* did not address the precise matters at issue in the indictment. *See* 949 F.3d at 1400, 1408 (indictment alleged that defendant filed false tax returns, while the closing agreement "relate[d] only to suits brought by [the defendant] to claim refunds").

4

### 2. The Binding 2015 Closing Agreement in This Case Resolved All Criminal Liability Regarding the Relevant Tax Years.

Mr. Adams and the IRS intended for their closing agreement to be a "final and conclusive" resolution of "all controversies" relating to Mr. Adams's tax liability—including any potential criminal tax liability. 26 U.S.C. § 7121; *Wolverine*, 75 F.2d at 595. Contrary to the government's arguments, that intent was apparent from the terms of the agreement, from the involvement of the IRS Criminal Investigation Division, and from the circumstances of Mr. Adams's closing agreement—which took place *after* the statute of limitations for civil tax liability had run.

The terms of the agreement between Mr. Adams and the IRS contained provisions that objectively signaled that the parties intended to resolve criminal liability, and there were no provisions to the contrary. That agreement provided that the parties intended "to resolve the income tax liabilities" that Mr. Adams faced "for the tax years 2008, 2009, and 2010." Mot. Ex. A at 2. Again, in the tax context, the phrase "tax liabilities" commonly encompasses both the criminal and civil exposure that a taxpayer faces in relation to his taxes. *See* Mot. at 9–10. Also, the binding closing agreement specifically acknowledged that it would be treated like a Section 7122 agreement (which is indisputably capable of addressing criminal liability) with regard to its legal effect. Mot. Ex. A at 4. And the binding closing agreement contained no disclaimer indicating that it was *not* resolving Mr. Adams's criminal liability—nor did it state that Mr. Adams could still be prosecuted for crimes relating to tax years 2008, 2009, or 2010.

The involvement of the IRS Criminal Investigation ("CI") Division, and Mr. Adams's communications with that branch of the IRS, also demonstrate that the parties

5

envisioned resolving his criminal liability through a binding closing agreement. From the outset of his attempts to secure a closing agreement, Mr. Adams, through his counsel, was communicating with members of the CI unit. Mr. Brever sent a letter to the CI Division to begin the voluntary disclosure process. Opp. Ex. 3 at 1. The CI Division responded and granted Mr. Adams preclearance to make a voluntary disclosure. Opp. Ex. 4 at 1. Mr. Adams's Voluntary Disclosure letter was submitted to the CI Division, Opp. Ex. 7 at 1, and the CI Division granted preliminary acceptance of his Voluntary Disclosure, Opp. Ex. 8 at 1. These CI agents with whom Mr. Adams's tax counsel communicated included high-level officials such as the Director of International Strategy and Planning—individuals who could credibly represent that the government would forego future prosecution. *See id.* Mr. Adams thus "subjectively believed that [he was] negotiating for a non-prosecution agreement." *United States v. Brekke*, 97 F.3d 1043, 1050 (8th Cir. 1996).[2]

The government contends that this record does not support the conclusion that Mr. Adams and the IRS intended for the binding closing agreement to resolve criminal liability because the CI Division's January 2015 letter stated that "[a] domestic voluntary disclosure

---

[2] Considering such parol evidence is appropriate here for three reasons. First, the closing agreement itself nods to other "agreements or understandings heretofore reached with the Taxpayers" besides those "recited within this Closing Agreement" and that speak to the parties' intent. Mot. Ex. A at 5. Second, the agreement lacks the sort of integration clause that would usually preclude the introduction of parol evidence. *Cf. United States v. Quesada*, 607 F.3d 1128, 1132 (6th Cir. 2010) (noting that "integration clause[s] normally prevent[] a criminal defendant" from relying on "oral promises" not in a "plea agreement" (internal quotation marks and citation omitted)). And third, in the event that the Court did not find the closing agreement to unambiguously resolve criminal liability, it is at least ambiguous on that point, and parol evidence may be considered. *St. Louis Union Tr. Co. v. United States*, 617 F.2d 1293, 1300 (8th Cir. 1980).

will not automatically guarantee immunity from prosecution." Opp. Ex. 8 at 1; Opp. at 15–16. Yet the government ignores the distinction between voluntary disclosures and binding closing agreements. *Compare* I.R.M. 9.5.11.9 (describing voluntary disclosures) *with* I.R.M. 8.13.1.2.1 (describing closing agreements). Mr. Adams had no expectation that he would receive immunity because of his *voluntary disclosure*—*i.e.*, his informing the IRS of the inadvertent omission of previous capital gains income in his 2008, 2009, and 2010 tax returns, in connection with complicated securities transactions. Instead, he reasonably believed, based on the government's representations, that the execution of his *closing agreement*—*i.e.*, his payment of money in exchange for resolving potential outstanding civil and criminal tax liabilities—would confer that protection. *See* Mot. at 2–3.

Finally, this understanding of the closing agreement—that it resolved both civil and criminal tax liabilities—is the only reasonable one, given that the statute of limitations for civil liability regarding tax years 2008, 2009, and 2010 had already run. Civil tax liability has a three-year statute of limitations, *see* 26 U.S.C. § 6501(a), and Mr. Adams entered his closing agreement in March 2015, Mot. Ex. A at 4. Mr. Adams had no reason to enter into a closing agreement if it only resolved civil tax liability. The only reasonable interpretation is that the closing agreement resolved criminal liability.

Given all of the above, the binding closing agreement that Mr. Adams negotiated with the IRS is a far cry from the agreement in *Brekke*. *See* 97 F.3d at 1050. Unlike in *Brekke*, Mr. Adams had grounds for his subjective belief that that the closing agreement would resolve his criminal liability, and the terms that the parties purposefully inserted or

7

omitted in the closing agreement confirmed as much. *See id.* Moreover, Mr. Adams's agreement was of a type (Section 7121) that could resolve criminal liability, *see* Section A.1, and even invoked the provision in the United States Code that explicitly discussed resolving criminal liability (Section 7122). At the very least, Mr. Adams's binding closing agreement was ambiguous about its resolution of criminal tax liability. And any ambiguity in the closing agreement must be "construed against the government." *United States v. Stobaugh*, 420 F.3d 796, 800 (8th Cir. 2005); I.R.M. 8.13.1.2.1 ("Closing agreements must be drafted with great caution due to this finality. If a closing agreement contains an ambiguity, the ambiguity is resolved against the drafter of the agreement."). This Court should thus interpret the binding closing agreement to have resolved any potential criminal tax liability on Mr. Adams's part.

### B. Mr. Adams Did Not Enter into His Binding Closing Agreement Through Fraud, Nor Has He Breached the Terms of That Agreement.

The government also assumes Mr. Adams's guilt and contends that Mr. Adams "breached the closing agreement in at least two different ways." Opp. at 17. First, it claims that he engaged in "fraud, malfeasance, or misrepresentation of a material fact" when he signed the closing agreement because he misrepresented income from the sale of warrants as income from the sale of stocks. *Id.* Second, it states that the income Mr. Adams reported prior to executing the binding closing agreement was not "legal source income[,]" as he indicated when he signed the agreement. *Id.* The government fails to meet its burden of proof on either of these arguments. *See* I.R.M. 32.3.4.7.5 ("In the event of litigation . . . the burden of proof for setting aside a closing agreement has been held to be upon the party desiring to do so." (citing *Holmes & Janes, Inc. v. Commissioner*, 30 B.T.A. 74 (B.T.A

8

1934); *Ingram v. Commissioner*, 32 B.T.A. 1063 (B.T.A. 1935), *aff'd*, 87 F.2d 915 (3d Cir. 1937)).

This Court's prior ruling on the crime-fraud exception addresses the government's first argument. The Court concluded that the *in camera* evidence "do[es] not provide reasonable cause to believe that Mr. Adams obtained Mr. Brever's advice and consulted with the *Kovel* accountants with the intent to commit a fraud or crime by misrepresenting that he earned income from stocks instead of the sale of warrants." ECF No. 225 at 8. And for good reason. Mr. Adams committed no fraud and made no misrepresentations. He made a good faith voluntary tax disclosure of highly technical securities transactions. The disclosure statement at the center of the government's misrepresentation theory was prepared by tax professionals.[3] *See* Opp. Ex. 5 at 1. The government's misrepresentation theory is simply in error. It appears not to understand Mr. Adams's securities transactions—in which Mr. Adams executed nominal exercise price warrants with a common cashless exercise feature that resulted in stock that was transmitted to purchasers, while also having other older holdings of the same securities. Or it now disagrees with Mr. Adams's tax treatment of those transactions.

---

[3] To remove any doubt, Mr. Adams could also make an *in camera* showing to give the Court additional insights regarding the nature of the voluntary disclosure and privileged deliberations that went into them. But that should not be necessary here because the agreement remains binding—and the government has not followed its regulations to set that agreement aside. Until it does so, further action by the government in violation of the agreement should be barred. *See* 26 U.S.C. § 7121(b)(2). And Mr. Adams should not be required to waive his attorney-client privilege unless and until he makes a decision to do so at trial.

Whatever the government's current views on tax treatment, these transactions were disclosed and thoroughly reviewed by trained tax experts at the IRS who made numerous inquiries of Mr. Adams's representatives regarding the transactions and approved the tax treatment. *See* Ex. I (IRS Examining Officer C. John Activity Record); Ex. J (IRS Examining Officer K. Becker Activity Record); Ex. K (T. Brever billing records reflecting contact between Brever and IRS personnel prior to approval of the closing agreement). Indeed, they not only approved of the accounting treatment of the transactions, they sought no penalties for prior non-payment, *see* Ex. L (Civil Penalty Approval Form, reflecting that no penalties asserted against Mr. Adams)—an indication that they understood that the tax questions involved were complex. And the IRS has never sought to revisit the tax issues by seeking to void the agreement via the established procedures that its regulations contemplate. *See* Mot. at 12–14. Nor could it make the showing required to set aside the agreement under those procedures. As detailed in Mr. Adams's motion, there are specific federal regulations that set forth what the IRS must do to determine if fraud exists and justifies setting aside a closing agreement.[4] *Id.* This process entails a multi-step review, where tax experts carefully consider the issues and the taxpayer is provided notice and an opportunity to be heard. *See* I.R.M. 8.13.1.7.2.1. And for good reason—because sometimes (as here) there are complicated tax questions that are best suited for assessment by tax experts, not laypeople (like prosecutors who do not specialize in tax). That point is

---

[4] Notably, the government's power to enter into closing agreements is specifically granted to the Secretary of the Treasury, and further delegated to the Commissioner of the IRS. *See* IRM 8.13.1.2.4.

10

made all too clear here where the government alleges fraud because it simply refuses to recognize the tax implications of complicated securities transactions. Thus, substantively and procedurally, purported "misrepresentation" does not justify voiding the binding closing agreement.[5]

To the extent that the government is suggesting that it can discard the closing agreement due to a taxpayer's arguable mere mistake by asserting there was a material inaccuracy, *see* Opp. at 18, this flies in the face of Section 7121(b)(1), which provides that a closing agreement "shall be final and conclusive" except upon a showing of fraud, malfeasance, or material misrepresentation, *see also* I.R.M. 8.13.1.7.2(4) ("The term 'misrepresentation,' when used as a ground for setting aside a closing agreement, connotes intentional deceit. It does not refer to a mere mistake of fact or law, whether unilateral or mutual, no matter how material. . . . 'Otherwise the entire rationale of a closing agreement would be lost. Congress intended that innocent mistakes should be buried in a closing agreement.'" (quoting *Ingram*, 32 B.T.A. at 1066)).[6] And, again, this Court concluded

---

[5] Indeed, if the government truly believed that Mr. Adams lied in his disclosure statement in order to conceal income subject to taxation, it could have indicted Mr. Adams for a false statement in his tax return under 26 U.S.C. § 7206(5) (fraud and false statements in compromises and closing agreements). While Mr. Adams is confident in his ability to defend such an action, he is equally confident the Tax Division of the DOJ would never authorize it.

[6] The government insists that the provisions of the Internal Revenue Manual are not binding and do not carry the force of law. Opp. at 19–20. Yet it is not merely these regulations that support Mr. Adams's argument—it is the statute, which authorizes the Secretary of the Treasury to enter into such agreements, mandates that such agreements are "final and conclusive" and binding on all officers, employees, and agents of the government, and mandates that such agreements not be set aside or disregarded in subsequent litigation. 26 U.S.C. § 7121. The statute does not provide any authority for a non-party such as the Department of Justice to disregard a binding closing agreement, nor do the regulations.

11

based on evidence that there was no "reasonable cause to believe" that Mr. Adams acted "with the intent to commit a fraud or crime by misrepresenting" the source of his income. ECF No. 225 at 8.

In its second argument—that Mr. Adams's reported income was not "legal source income" and was instead a product of the alleged "fraud scheme"—the government attempts to justify its improper avoidance of the binding closing agreement by assuming Mr. Adams's guilt. This violates the presumption of innocence and due process.[7] A mere "allegation of fraud" is "not enough" to set aside a closing agreement—the government (specifically, the IRS) must "prove by convincing evidence that fraud was actually committed" in order to sustain its burden to set aside the closing agreement. *Holmes*, 30 B.T.A. at 79.

At best, the government's argument that the alleged fraud scheme justifies setting aside the binding closing agreement and bringing the tax charges provides reason to sever the fraud and tax charges for trial. The government must sustain its burden to prove that Mr. Adams committed a misrepresentation on the amended tax returns that he submitted

---

And even if the regulations themselves are merely advisory, the agency's expertise in administering the tax code and its various provisions suggests that this Court should accord the Internal Revenue Manual *Skidmore* deference when construing the provisions of Section 7121. *United States v. Living Word Christian Ctr.*, Civ. No. 08-mc-37 (ADM/JJK), 2008 WL 5456381, at *7–*8 (D. Minn. Nov. 18, 2008) ("In such situations, the agency's interpretation is to be afforded 'respect proportional to its "power to persuade."'").

[7] The government's suggestion that "courts accept allegations in [an] indictment as true when considering a motion to dismiss" is only true for motions to dismiss under Rule 12(b)(3). *See United States v. Birbragher*, 603 F.3d 478, 481 (8th Cir. 2010). Mr. Adams's motion is not such a motion. *See* Section C.1.

in 2015 or fraud in order to set aside the closing agreement and litigate Mr. Adams's criminal liability for his 2008, 2009, and 2010 tax returns. If a jury finds that Mr. Adams made no misrepresentation, and that the income was not illegally obtained from mail or wire fraud, the tax charges will have to be dismissed because Mr. Adams's liability for those tax years was resolved by the binding closing agreement. If the Court does not dismiss Counts 15–17, Mr. Adams thus requests that those tax charges be severed from the wire and mail fraud charges, to be tried separately, after the jury renders a verdict on the mail and wire fraud charges. A jury should only consider the tax charges if it first concludes that the income that Mr. Adams reported in his voluntary disclosure was illegally obtained.

        **C.**    **Mr. Adams's Motion to Dismiss Counts 15–17 Comports with Rule 12 of the Federal Rules of Criminal Procedure.**

The government relies on a mistaken understanding of Rule 12 to argue that Mr. Adams's motion comes too late. Yet that effort founders because (1) Mr. Adams's motion is not "untimely" under Rule 12(c)(3) as it is a *Rule 12(b)(1)* motion, not a *Rule 12(b)(3)* motion; and (2) Mr. Adams had good cause for filing this motion when he did. Mr. Adams addressed the procedural history regarding the timing of this motion in the opening brief. *See* Mot. at 5–7. The motion did not need to be filed at the time of the prior motions date; it was discretionary then, *see* Fed. R. Crim. P. 12(b)(1), and Mr. Adams was within his rights to defer this issue and raise the defense at trial, *see id.* 29. However, as the government's increased focus on the 2014–15 events became clear, and the full record of the government's actions (and inactions) around the closing agreement came to light in discovery, it became plain that these issues would present a "case within a case," with

13

complicated evidentiary and legal issues that could significantly lengthen and complicate the trial. Accordingly, Mr. Adams decided to raise the motion pre-trial—as he believes the matter can be dealt with now without taxing the judicial resources of the court at trial.

### 1.     Mr. Adams's Rule 12(b)(1) Motion Is Timely.

"Rule 12 recognizes distinctions among different classes of motions." 1A Charles Alan Wright, et al., Fed. Prac. & Proc. Crim. § 193 (4th ed. 2019 Update). First, there are motions "alleging lack of jurisdiction." *Id.*; Fed. R. Crim. P. 12(b)(2). Second, there are "motions that must be filed prior to trial, namely, defenses and objections based on defects in the institution of the prosecution or in the indictment or information, as well as motions to suppress evidence, requests for discovery, and requests for severance." Wright, Fed. Prac. & Proc. Crim. § 193; Fed. R. Crim. P. 12(b)(3). And finally, there are motions concerning "all other defenses and objections that can be determined without a trial on the merits." Wright, Fed. Prac. & Proc. Crim. § 193; Fed. R. Crim. P. 12(b)(1) (providing that defendants may "in general" bring such motions). This third group of motions "include[s] such matters as former jeopardy, immunity, and res judicata[,]" and may be made before or at trial. Wright, Fed. Prac. & Proc. Crim. § 193.

With respect to these motions, Rule 12(c) permits a district court to set a pretrial motions deadline. *See* Fed. R. Crim. P. 12(c)(1). That rule also prescribes that motions that must be filed prior to trial pursuant to "Rule 12(b)(3)" will be deemed "untimely" if they are not filed by the court's imposed deadline. *Id.* 12(c)(3). It says nothing regarding the timeliness of other motions to dismiss and thus only "expressly tie[s] the [Rule

12(c)(3)] standard to motions listed under Rule 12(b)(3)". *United States v. Doost*, 1:17-CR-00109-APM, 2019 WL 3344277, at *2 (D.D.C. July 24, 2019).

Mr. Adams's motion to dismiss Counts 15 through 17 is a timely motion to dismiss under Rule 12(b)(1). It is a motion based on a plea or immunity agreement, which implicates his "due process rights." *United States v. Raifsnider*, 663 F.3d 1004, 1009 (8th Cir. 2011); *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002). Such motions fall under Rule 12(b)(1), and thus Rule 12(c)(3)'s timing requirement does not apply. Wright, Fed. Prac. & Proc. Crim. § 193.

The government assumes, without explanation, that Mr. Adams's motion is in fact a Rule 12(b)(3) motion because it is one "alleging a defect in instituting the prosecution." Opp. at 10 (internal quotation marks and citation omitted). That is wrong. Mr. Adams has not faulted the government's *method* or *means* of prosecution with regard to Counts 15–17; he has faulted the government for prosecuting him *at all* since these issues have been long since resolved. His motion thus does not point out a defect in how the prosecution brought this case—*e.g.*, on the basis of an improper venue or error in the grand jury proceedings. *See* Fed. R. Crim. P. 12(b)(3)(A). Nor does it address a defect in the indictment—*e.g.*, errors of duplicity or improper joinder. *See id.* 12(b)(3)(B). Finally, his motion is not a motion to suppress, motion to sever, or motion for discovery. *See id.* 12(b)(3)(C)–(E). In other words, this is not a Rule 12(b)(3) motion.

> 2. **Mr. Adams Has Good Cause for Filing His Motion To Dismiss at This Point in Time.**

A court may "consider" even an untimely "defense, objection, or request if the party shows good cause[,]" *id.* 12(c)(3), which requires "a showing of cause and prejudice[,]"

15

*United States v. Reichel*, 911 F.3d 910, 916 (8th Cir. 2018) (internal quotation marks and citation omitted).

Mr. Adams had cause for filing this motion when he did. As explained in his opening brief, the government has advanced an ever-mutating theory of tax fraud, and thus the relevance of the 2015 closing agreement in this case was not immediately clear. *See* Mot. at 5–7. That document's relevance finally solidified in December 2018—*i.e.*, after this Court's crime-fraud ruling. Mr. Adams then discussed the closing agreement with the government, *see* Mot. Ex. E, F, G, H, and requested discovery as to whether the agreement remained in force. He received this discovery in June and July, 2019, reviewed those records, and filed the instant motion on September 3, 2019. Given this chronology and the shift in the government's tax theory in July 2018, Mr. Adams could not have filed this motion by the June 1, 2018 deadline. He thus had "cause" for filing this motion after that deadline. *See United States v. Mohammed*, 501 F. App'x 431, 438 (6th Cir. 2012) (per curiam) (finding cause after a change in the government's legal theory made evidence newly relevant); *United States v. Salahuddin*, 509 F.3d 858, 861 (7th Cir. 2007) (finding cause in the absence of "negligence, oversight, or laziness" (internal quotation marks and citation omitted)).

Meanwhile, Mr. Adams will suffer prejudice if this Court refuses to entertain the instant motion to dismiss. The dismissal of the tax counts in this case would "have a significant impact" on his "odds of conviction." *United States v. Gonzalez*, 81 F. Supp. 3d 1212, 1224 (D.N.M. 2015). Refusing to consider his motion would accordingly prejudice him. The government does not disagree. *See* Opp. at 10–11.

16

To the extent the government argues that Mr. Adams "always knew that the closing agreement had not been nullified[,]" *id.* at 11, the government is mistaken. Although the IRS is supposed to notify him if it nullifies that agreement, *see id.* I.R.M. 8.13.1.7.2.1.(4), Mr. Adams had no way of knowing whether the agency followed those guidelines. That uncertainty was compounded by the fact that he was being prosecuted for events that he believed the parties had long ago addressed. *See supra*, Section A.2. He thus rightly worried that the IRS did not follow its protocols, and needed discovery from the government before filing this motion.

## CONCLUSION

For the reasons set forth above, Mr. Adams respectfully requests that the Court dismiss the tax charges in the superseding indictment.

Dated: September 23, 2019　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　／s／ *Lance Wade*

　　　　　　　　　　　　　　　　　　　　Joseph G. Petrosinelli (DC Bar #434280)
　　　　　　　　　　　　　　　　　　　　Lance Wade (DC Bar #484845)
　　　　　　　　　　　　　　　　　　　　Gloria Maier (DC Bar # 1012208)
　　　　　　　　　　　　　　　　　　　　Jena Neuscheler (DC Bar # 187814)
　　　　　　　　　　　　　　　　　　　　WILLIAMS & CONNOLLY LLP
　　　　　　　　　　　　　　　　　　　　725 Twelfth Street, N.W.
　　　　　　　　　　　　　　　　　　　　Washington, DC  20005
　　　　　　　　　　　　　　　　　　　　Telephone:  (202) 434-5000
　　　　　　　　　　　　　　　　　　　　jpetrosinelli@wc.com
　　　　　　　　　　　　　　　　　　　　lwade@wc.com
　　　　　　　　　　　　　　　　　　　　gmaier@wc.com
　　　　　　　　　　　　　　　　　　　　jneuscheler@wc.com

                James L. Volling (#113128)
                Deborah A. Ellingboe (#26216X)
                FAEGRE BAKER DANIELS LLP
                2200 Wells Fargo Center
                90 South Seventh Street
                Minneapolis, MN  55420
                Telephone:  (612) 766-7000
                Facsimile:  (612) 766-1600
                james.volling@faegrebd.com
                debbie.ellingboe@faegrebd.com

                *Attorneys for Defendant Edward S. Adams*