UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 0:17-cr-00064-DWF-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| EDWARD S. ADAMS, | |
| Defendant. | |

This matter is before the Court on Edward S. Adams's Motion to Dismiss Counts 15–17 of the Superseding Indictment. [Def.'s Mot., ECF No. 241.] Counts 15–17 charge Mr. Adams with making and subscribing false tax returns for the years 2008, 2009, and 2010. [First Superseding Indict. ¶¶ 66–67.] Mr. Adams argues that he cannot be prosecuted for allegedly submitting false returns during these years because he entered an agreement with the government through the Internal Revenue Service's ("IRS") Voluntary Disclosure Program that fully resolved any civil and criminal tax liability he may have had. [*See* Def.'s Mot. at 1.] For the reasons that follow, the Court recommends that Mr. Adams's motion be denied.

**I.     Background**

Counts 15–17 of the Superseding Indictment allege that Mr. Adams violated 26 U.S.C. § 7206(1) in 2011 when he amended filed tax returns for the years 2008, 2009, and 2010. Section 7206(1) provides that "[a]ny person who … [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter … shall be guilty of a felony."

In all, Mr. Adams filed three separate sets of personal tax returns for the years in question. First, Mr. Adams filed tax returns he prepared himself in 2008, 2009, and 2010. The government asserts that in each of these self-prepared returns, Mr. Adams failed to

1

disclose income he obtained from certain accounts he controlled at Venture Bank. He allegedly made payments to himself and his consulting company from the Venture accounts and the funds he received purportedly came from the sale of warrants he held in Apollo stocks.

In May 2011, he filed amended tax returns for 2008–10 with the help of a CPA firm, but the government alleges that these amended returns also failed to report the full amount of money he received in each of those tax years from the Venture accounts. False statements allegedly made in the 2011 amended returns underlie the criminal charges in the First Superseding Indictment. [First Superseding Indict. at 20 (Chart); Govt's Resp. at 4.]

In May 2014, the SEC subpoenaed documents from Mr. Adams regarding his bank accounts. [Gov't Ex. 2, ECF No. 243-2.] In addition to being represented by counsel before the SEC, later that year, Mr. Adams hired Thomas Brever, an experienced tax attorney, to represent him in tax matters. In early October 2014, Mr. Brever contacted the IRS asking it to accept Mr. Adams into a voluntary disclosure program. [Gov't Ex. 3, ECF 243-3.] On October 27, 2014, Mr. Brever retained a CPA firm, Murry & Associates, to assist in the preparation of new returns. [Gov't Ex. 4, ECF No. 243-4.] The Murry firm prepared draft returns for Mr. Adams that characterized the income he obtained in 2008, 2009, and 2010 from the sale of warrants as short-term capital gains.

On November 14, 2014, the IRS notified Mr. Adams that he was cleared for participation in the Voluntary Disclosure Program. [Gov't Ex. 6, ECF No. 243-6.] In response, Mr. Adams represented that he was not under criminal investigation at that time and that the income he intended to report was not obtained from illegal activity. [Gov't Ex. 7, ECF No. 243-7.] He indicated that he was submitting the voluntary disclosure because "upon review of prior transactions, we determined that income from the sales of securities had not been included in income in 2008 – 2010. The amended returns include the previously omitted capital gain income." [Gov't Ex. 7, ECF No. 243-7.] According to the government, the amended returns for 2008–10 that Mr. Adams actually submitted in connection with the Voluntary Disclosure Program changed the characterization of the income received in those years from the drafts prepared by the Murry firm. Instead of

describing the income at issue as deriving from the sale of warrants as the accountant had done, Mr. Adams described it as resulting from the sale of stock that he held for several years. This change was significant because income realized from long-term capital gains, such as from the sale of securities, are taxed at a lower rate than income realized from short-term capital gains, like that obtained through the sale of warrants. The government alleges that this characterization of Mr. Adams's income was false, and was submitted in an unlawful effort to reduce his tax burden, even after his agreement to participate in the Voluntary Disclosure Program. [Gov't Resp. at 6 & n.1, ECF No. 243.]

On January 20, 2015, the IRS sent Mr. Brever a letter regarding the acceptance of Mr. Adams and his wife[1] into the domestic Voluntary Disclosure Program. [Gov't Ex. 8, ECF No. 243-8.] The letter states, "A domestic voluntary disclosure will not automatically guarantee immunity from prosecution; however, a domestic voluntary disclosure may result in prosecution not being recommended." [*Id.*] Further, it advises that "[a]cceptance of your client's domestic voluntary disclosure will also depend upon whether it is truthful and complete and whether you client cooperates with the IRS in determining the correct tax liability and makes good faith arrangements with the IRS to pay in full the tax, interest, and penalties determined by the IRS to be applicable." [*Id.*]

Two months later, on March 20, 2015, the IRS sent Mr. Adams a Form 906 Closing Agreement. [Def.'s Ex. A ("Closing Agreement"), ECF No. 241-1.] Mr. Adams signed the agreement on March 31, 2015, and the Commissioner of the IRS signed the agreement on August 17, 2015. [Closing Agreement at 3.] The Closing Agreement provides that it is between Mr. Adams and the Secretary of Treasury and it is made under 26 U.S.C. § 7121 (which is discussed in more detail below). [*Id.* at 1.] In the agreement, Mr. Adams represents that he was engaged in legitimate business activities, that all his income was "legal source income," and that he provided correct amended income tax returns for 2008, 009, and 2010. [*Id.*] Further, the contract states that:

> the parties have determined it is mutually advantageous for them to enter into an agreement finally determining the Taxpayers' correct income,

---

[1] Mr. Adams and his wife had filed a joint tax return. She has not been charged with any crime by the United States.

correct taxable income, correct income tax liability, additions to the tax, applicable penalties and interest for the tax years 2008, 2009, and 2010 on terms acceptable to the Internal Revenue Service.

[*Id.* at 1.] Attached terms and conditions of the Closing Agreement state: "If any information provided is not materially accurate and complete, the Internal Revenue Service will not be bound by any agreements or understandings heretofore reached with the Taxpayers or recited within this Closing Agreement." [*Id.* at 4.] And the agreement states that it "is final and conclusive except: … the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact…." [*Id.* at 3.]

## II.  Discussion

Mr. Adams seeks dismissal of the tax charges against him, Counts 15–17 of the First Superseding Indictment, because he asserts that his prosecution for those offenses is barred by the 2015 Closing Agreement. The government argues that Mr. Adams's motion should be denied because: (1) it is untimely; (2) it does not present a valid basis for dismissal under Fed. R. Crim. P. 12; (3) the agreement he entered with the government did not address criminal prosecution; and (4) even if the agreement did address criminal prosecution, Mr. Adams provided false information to the IRS, thereby vitiating the agreement. [Gov't's Resp., ECF No. 243.] The Court concludes it is unnecessary to consider most of the government's arguments to determine the appropriate disposition of the motion to dismiss. Because the Closing Agreement's language and context evinces no intent to provide Mr. Adams any form of immunity from criminal prosecution, that agreement does not provide him the protection he seeks. And the text of 26 U.S.C. § 7121 does not require a different interpretation of the agreement at issue. The motion should be denied.

### A.  No Protection from Criminal Prosecution

For two related reasons, the Court concludes that the Closing Agreement does not require dismissal of the tax counts in the First Superseding Indictment. First, the Closing Agreement itself does not indicate that it prohibits a criminal prosecution with respect to the tax years at issue. Second, the statute under which the Closing Agreement was entered does not require a different interpretation of the parties' bargain.

4

### 1. Language and Context

Closing agreements entered under 26 U.S.C. § 7121 are governed "by federal common law contract principles." *United States v. National Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996); *see also United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 796 (8th Cir. 2001) ("Federal common law governs the interpretation and construction of a contract between the United States and another party."). This requires courts to resort to general contract principles in interpreting such documents. *See United States v. Britt*, 917 F.2d 353, 359 (8th Cir. 1990) (noting that plea agreements "are generally governed by ordinary contract principles"). Courts attempt to "discern the intent of the parties as expressed in the plain language of the agreement when viewed as a whole." *United States v. Lewis*, 673 F.3d 758, 762 (8th Cir. 2011)). The agreement's meaning is determined "as a matter of law when its language is clear and unambiguous, … but may use extrinsic evidence to clarify the meaning of an ambiguous contract." *Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 139 (3rd Cir. 2001).

The Court finds that the language in the Closing Agreement is plain and unambiguous. Its purpose is to carry out Mr. Adams's interest in resolving any disagreements about the amounts he owed in income tax for the years in question. The agreement states, for example, that Mr. Adams "desire[s] to resolve the proper amount of taxable income, Federal income taxes, penalties and interest for the years 2008, 2009 and 2010, with payment of the agreed liabilities for the income tax, penalties, and interest on terms acceptable to the [IRS]." [Closing Agreement at 1.] The agreement references a specific source for the shortfall in Mr. Adams's payment of income taxes for those tax years—namely, "missed capital gain income that was not previously reported." [*Id.*]

The terms attached to the Agreement reinforce this reading as well. [Closing Agreement at 4–5.] Among other matters unrelated to criminal prosecution, the separately numbered paragraphs of Attachment A to the contract: (1) discuss the specific amounts of income tax that Mr. Adams underpaid; (2) explain that interest and penalties are due pursuant to the Internal Revenue Code; (3) prohibit any suit by Mr. Adams for a refund; (4) relieve the IRS from any of its obligations under the agreement if the information provided is materially inaccurate or incomplete; (5) authorize to the IRS to

treat the agreement as null and void if any provision in it is held to be invalid; and (6) recognize that Mr. Adams consented to assessment and collection of the liabilities for the income tax, penalties, and interest, and waived several defenses. [*Id.*] These provisions overwhelmingly indicate that the purpose of the Closing Agreement was for Mr. Adams to buy peace with the IRS over his outstanding obligation to pay the income tax he purportedly owed, not to conclusively foreclose prosecution.

Meanwhile, nothing in the Closing Agreement explicitly states that the contract fully and finally resolved the possibility of criminal proceedings. Indeed, the agreement never mentions criminal prosecution in any way. If Mr. Adams and his tax lawyer believed they were bargaining for such an important assurance, one would expect them to have insisted on clear language to that effect. One would expect the government to have done the same if it was relinquishing the power to seek to hold Mr. Adams accountable for any suspected criminal activity. However, the contract merely states that the agreement "is being made by the Commissioner solely for settlement purposes." [Closing Agreement at 1.] The absence of explicit language referencing any potential criminal charges is strong evidence that the parties did not intend the Closing Agreement to foreclose that possibility. Indeed, the title of the Closing Agreement itself indicates that it is only "Covering Specific Matters." [*Id.*] There is nothing specific in the contract indicating that it applies to criminal prosecutions, and given the significant focus of the agreement on finalizing underpaid amounts of income tax, such silence is a sign that immunity or non-prosecution were not terms agreed upon by the parties. *Cf. Bethlehem Steel Corp.*, 270 F.3d at 144 ("In light of the Agreement's self-consciously limited scope, its silence regarding [the amount of a refund of the method for refund calculation] unambiguously demonstrates that they were simply not terms agreed upon by the parties."). For these reasons, the Court concludes that the Closing Agreement plainly does not embody an agreement to preclude criminal prosecution or to provide immunity regarding the tax years at issue.

Mr. Adams argues that several aspects of the Closing Agreement show the parties intended to foreclose a future tax-related prosecution. For example, he argues that the contract's references to resolving the taxpayer's tax "liabilities" shows that the parties

6

intended to resolve not only civil, but also criminal liability for the tax years at issue.[2] He also asserts that the agreement "invoked the provision in the United States Code that explicitly discussed resolving criminal liability (Section 7122)." [Def.'s Reply at 8.] Neither of these arguments persuades the Court that the Closing Agreement supports Mr. Adams's motion to dismiss. The Closing Agreement's references to "income tax liabilities" and Attachment A's references to "liabilities for the income tax" appear in a context clearly aimed at resolving a dispute about how much Mr. Adams would have to pay. And the Closing Agreement mentions § 7122 only on the signature page, providing that the contract "is final and conclusive except … it is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for Code section 7122) notwithstanding any other law or rule of law." [Closing Agreement at 3.] Mr. Adams does not explain how this reference to § 7122 indicates that the parties intended to forbid a criminal prosecution and the Court cannot find the reference to support such a conclusion. The Court finds neither the use of the word "liability" nor the mention of a provision of § 7122 evince an intent to extend criminal immunity; nor do they create an ambiguity about that issue.

Mr. Adams also argues that consideration of the broader context in which the Closing Agreement was obtained reveals that the parties intended the contract to foreclose any future criminal prosecution for the tax years at issue. For example, he notes that "[a] voluntary disclosure is submitted in the first instance to the IRS Criminal Investigation Division ("CI"), which is responsible for investigating potential criminal violations of the Internal Revenue Code." [Def.'s Mot. at 2.] He asserts that he "coordinat[ed] with both the criminal and civil components of the IRS to resolve outstanding issues" with "his 2014 voluntary disclosure submission." [*Id.* at 3.] He also notes that Mr. Brever "sent a letter to the CI Division to begin the voluntary disclosure process"; that the "CI Division responded and granted Mr. Adams preclearance to make a

---

[2] *See* Def.'s Mot. at 1 ("Upon completing its review [of Mr. Adams's voluntary disclosure documents], the government determined that it was in its best interest to fully settle any civil and criminal tax liability Mr. Adams may have had for his 2008, 2009, and 2010 returns."); *id.* at 7–11 (arguing that the reference to liability in § 7121 and in the agreement applies to criminal and civil tax liability).

7

voluntary disclosure"; that his "Voluntary Disclosure letter was submitted to the CI Division"; and that "the CI Division granted preliminary acceptance of his Voluntary Disclosure." [Def.'s Reply at 6 (citing Gov't Exs. 3, 4, 7, and 8).]

Even if the Closing Agreement's context should be consulted to determine the contract's meaning, the Court finds that the evidence does not support Mr. Adams's contention that the parties intended to resolve his potential criminal responsibility through the agreement. The simple inclusion of the Criminal Investigation Division on some communications cannot reasonably be read to import a silent-but-binding promise to foreswear future prosecution. Mr. Adams, an attorney, is not only a sophisticated taxpayer, but he was represented by counsel throughout this process. If the inclusion of representatives of the CI in communications about the closing agreement was intended to secure immunity from criminal liability, it seems impossible to imagine that such an understanding wouldn't have been demanded as an explicit provision of the ultimate contract.

Perhaps most importantly with respect to the "context" of the agreement, before it was signed, the IRS informed Mr. Adams in writing that "a domestic voluntary disclosure will not automatically guarantee immunity from prosecution," but could only "result in prosecution not being recommended." [Gov't Ex. 8.] Given this warning upon the government's preliminary acceptance of his Voluntary Disclosure, the absence of clear language in the Closing Agreement referencing criminal prosecutions demonstrates that criminal issues were not covered by the contract.

### 2. Section 7121

Mr. Adams suggests that the Court should read the Closing Agreement differently based on 26 U.S.C. § 7121, the statute under which the agreement was made. [Def.'s Mot. at 8–11.] Section 7121(a) provides that "[t]he Secretary [of Treasury] is authorized to enter into an agreement in writing with any person relating to the liability of such person … in respect of any internal revenue tax for any taxable period." The statute itself does not explicitly state that it authorizes the Secretary to make an agreement concerning criminal matters, and indeed the relatively short statute never mentions criminal matters or uses terms such as prosecution.

Though § 7121 does not expressly authorize resolution of criminal liability, Mr. Adams claims that its scope is "far-reaching" and that it permits the formation of agreements that finally resolve all controversies regarding tax liability, including criminal matters. [Def.'s Mot. at 9.] In support of this argument, however, he cites only broad language from non-criminal cases that do not address the applicability of § 7121 closing agreements to criminal matters. [*Id.* (citing *Wolverine Petroleum Corp. v. Comm'r of Internal Revenue*, 75 F.2d 593, 595 (8th Cir. 1935), and *Bankers' Reserve Life Co. v. United States*, 42 F.2d 313, 383–84 (Fed. Cl. 1930)).] He also relies on a federal income tax law treatise, but the commentary in the cited section neither discusses the application of § 7121 closing agreements to criminal matters, nor cites any caselaw doing so. [*Id.* (citing 14A Scott D. Shimick, *Mertens Law of Federal Income Taxation* § 52:5 (2019), for the unsupported notion that closing agreements under § 7121 are intended to conclusively resolve all tax liabilities, including criminal matters).] Mr. Adams's reliance on the text of § 7121 to read criminal immunity into his closing agreement is unpersuasive.

The Eighth Circuit has not addressed whether § 7121 closing agreements can protect against criminal prosecution. The Court's own research and the parties' briefing suggests this question has not been a subject of frequent litigation. However, the few cases that have considered the issue undermine Mr. Adams's position. *See United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1991); *United States v. Kahnu*, 664 F. Supp. 2d 35 (D.D.C. 2009).

In *United States v. Mohney*, the government charged Harry Mohney with filing false individual tax returns under § 7206(1) and with aiding the filing of false tax returns for his corporation under § 7206(2). 949 F.2d at 1400. A federal investigation revealed that Mr. Mohney had failed to declare income collected from coin-operated "peep machines" used by one of his businesses. *Id.* at 1399. He had entered into a closing agreement with the government pursuant to § 7121, and moved to dismiss the tax counts based on that contract. *Id.* at 1408. "The district court denied the motion to dismiss

because section 7122,[3] not section 7121, covers compromises regarding criminal prosecutions, and because there was no evidence on the face of the document indicating that the parties intended it to preclude criminal prosecution." *Id.* The Sixth Circuit rejected Mohney's claim that the district court erred in denying the motion because the failure to mention criminal prosecutions in Section 7121 "suggest[s] that it is not intended to cover criminal cases," especially given that Section 7122 clearly addresses criminal matters. *Id.* The court also reviewed the closing agreement itself, and concluded that "[i]t does not discuss criminal liability, penalties, or any obligation on the part of the government to cease its investigation." *Id.* As a result, it was not error for the district court to conclude that the IRS would not have credibly agreed to have the Section 7121 closing agreement apply to criminal case "'without reducing that understanding to an explicit writing.'" *Id.*

Mr. Adams argues that *Mohney* is "distinguishable on [its] facts." [Def. Reply at 4 n.1.] Unlike his own Closing Agreement, he argues that the contract at issue in *Mohney* "did not address the precise matters at issue in the indictment." [*Id.*] However, the *Mohney* court rejected the argument for dismissal because the agreement itself did not cover criminal matters and because § 7121's language does not address criminal liability, not because of a disconnect between the tax issue covered by the agreement and those at issue in the criminal case. Mr. Adams's attempt to distinguish *Mohney* does not succeed.[4]

In *Kahnu*, Abdul Kahnu was accused of skimming funds from the operation of several night clubs, and the government eventually executed a search warrant on his home, discovery approximately $1.9 million in cash inside a safe. 664 F. Supp. 2d at 37. Kahnu represented that the money belonged to two corporations he controlled. *Id.* He entered a closing agreement with the IRS as the corporations' president, which essentially

---

[3]    Section 7122 authorizes the Secretary of Treasury to "compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense…."

[4]    Mr. Adams also argues that the statutory interpretation analysis in *Mohney* is flawed because the court did not address the application of the rule of lenity to § 7121. [Def.'s Reply at 4; *see also* Def.'s Mot. at 10–11.] The relevant of the rule of lenity to Mr. Adams's motion to dismiss is addressed below in Part II.A.3.

10

provided that the $1.9 million would be used to satisfy the companies' tax liabilities. *Id.* at 37–38. In the government's subsequent prosecution of Mr. Kahnu for aiding the filing of false tax returns, the government sought to use the seized $1.9 million as evidence showing that he had indeed skimmed funds from the nightclubs. *Id.* at 38. Mr. Kahnu asked the district court to prevent the government from offering evidence of the seized cash, relying on the closing agreement. *Id.* The court denied Kahnu's motion, reasoning in part that the agreement was "not binding on the government with respect to criminal prosecutions" because it was entered pursuant to § 7121, and not 7122. *Id.* at 38–39 (citing *Mohney*, 949 F.2d at 1408)). The *Kahnu* court also observed that nothing in the closing agreement demonstrated that "the parties intended it to extend to the criminal liability of the Defendant." *Id.* at 39.

Mr. Adams also attempts to distinguish *Kahnu*, but these efforts fall short as well. [Def.'s Reply at 4, n.1.] He correctly notes that the *Kahnu* court rejected the defendant's attempted reliance on the closing agreement in part because he was not a party to it and had merely signed it as president of corporate entities. 664 F. Supp. 2d at 39. But Mr. Adams ignores the court's very relevant, direct rejection of the central premise of his position—*i.e.*, that a § 7121 closing agreement applies to criminal liability, *id.* at 38–39.

### 3. The Rule of Lenity

Mr. Adams argues that the rule of lenity requires the Court to read both § 7121 and his Closing Agreement as prohibiting his criminal prosecution. He asserts that § 7121 is ambiguous as to whether it provides criminal immunity, and that lack of clarity must be resolved in Mr. Adams's favor. [*See* Def.'s Reply at 4; *see also* Def.'s Mot. at 10–11 (arguing that the rule of lenity applies to construction of Section 7121 and characterizing it as a "civil statute with criminal applications" because 26 U.S.C. § 7206(5)(B) makes it a crime to make false statements in connection with a § 7121 closing agreement).] For two reasons, Mr. Adams's reliance on the lenity doctrine is misplaced. First, the rule of lenity is only applied where "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute … such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (cleaned up). Section 7121 does not suffer from any ambiguity or uncertainty leaving the

11

Court simply to guess at what Congress meant. Additionally, this Court agrees with the *Mohney* court that the explicit reference in § 7122 to criminal immunity demonstrates that its omission from 7121 is not ambiguous, but clear and intentional. 949 F.2d at 1048. Any lurking question about the meaning of § 7121 is resolved through traditional rules of statutory construction, so reference to the rule of lenity is unnecessary.

Second, the rule of lenity is of no help to Mr. Adams because even were there ambiguity in § 7121, which is not a criminal statute, it does not generate uncertainty about the scope of conduct that the law criminalizes. *See Liparota v. United States*, 471 U.S. 419, 427 (1985) ("[T]he rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal…."). Mr. Adams protests that this is no barrier to application of the rule because § 7121 has consequences in the criminal arena, at least according to his reading. He asserts: "[T]he Supreme Court has applied this principle to a civil tax statute that had 'criminal applications,' insofar as a separate statute established criminal sanctions for failure to comply therewith…. So too here. Section 7206 sets forth criminal penalties for anyone who willfully makes any false statement 'in connection with any closing agreement under section 7121.'" [Def.'s Mot. at 10–11 (citing 26 U.S.C. § 7206(5)(B)).]

To support this argument, Mr. Adams cites the plurality opinion in *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), but that case is different in at least one critical respect. At issue in *Thompson/Center* was a civil tax provision of the National Firearms Act ("NFA") that imposes a tax on anyone who "makes" a short-barreled rifle, which constitutes a regulated "firearm" for purposes of the NFA. The plurality found ambiguity in that provision. Even after resorting to several tools of statutory construction, the plurality was left with uncertainty about whether Thompson/Center "made" a "firearm" by mailing a pistol with a carbine conversion kit that could later be assembled into either a long-barrel or short-barreled rifle. The plurality invoked the rule of lenity to resolve that uncertainty because "[m]aking a firearm without approval" also provides a basis for criminal punishment in a separate but related statutory provision. *Id.* at 518. Even though *Thompson/Center* was a civil, tax-refund lawsuit initiated by the manufacturer, resort to the rule of lenity was appropriate because the uncertainty about congressional intent in the civil tax provision regarding "making" a firearm necessarily

12

carried over to a provision that imposes criminal penalties for "making" a firearm. To ensure that the criminal provision gave appropriate notice of what conduct was prohibited, application of the rule of lenity to adopt a narrow interpretation in the civil statute was appropriate.

This case does not present an analogous situation. The conduct prohibited by 26 U.S.C. § 7206(5)(B)—making false statements in connection with any § 7121 closing agreement—does not incorporate or depend upon any term in § 7121, ambiguous or clear. They do not share any language which risks confusion about what conduct by a taxpayer is criminally prohibited. Accordingly, the Court concludes that the application of the rule of lenity in *Thompson/Center* does not support an interpretation that closing agreements under § 7121 foreclose criminal prosecutions. Mr. Adams's reliance is misplaced.

In sum, the Court concludes that the Closing Agreement did not resolve any issues related to Mr. Adams's possible criminal liability. It did not include any immunity from criminal prosecution and it does not foreclose the government from bringing the tax counts against Mr. Adams in this case.

### B. Additional Arguments About the Agreement

Because Mr. Adams's Closing Agreement does not prohibit trial on the government's tax counts, the Court need not address the government's other arguments— *i.e.*, that "[t]he motion fails to articulate a valid basis for dismissal" [Gov't Resp. at 11– 13]; and that Mr. Adams's false statements to the IRS vitiated the agreement [*id.* at 17– 20]. However, the Court would not recommend denial of the motion based on the first of these arguments.

Contrary to the government's assertion that Mr. Adams "does not claim … that he has previously been granted immunity for the offenses charged" [Gov't Resp. at 11–12], that is precisely what he claims that the Closing Agreement did. It seems that if a defendant has an agreement with the government that he cannot or will not be prosecuted for certain conduct, the only effective way to challenge the government's breach of such an agreement (*i.e.*, preventing the prosecution from taking place), is to have the issue

decided by a pretrial motion. It cannot be that such an argument is only properly raised at trial or after conviction, and the Court declines to recommend dismissal on this basis.

With respect to the government's alternative fraud theory, the Court offers only one observation. Contrary to Mr. Adams's assertions, the Court strongly disagrees that its earlier conclusions regarding the application of the crime-fraud exception to the attorney-client privilege somehow reflected a final determination that Mr. Adams was truthful in his 2014 disclosures. Such a question was not before the Court, and its previous ruling on privilege does not control the government's prosecution on the tax counts.

### C. Timeliness

The government also argues that Mr. Adams's motion to dismiss should be denied because it is untimely. Specifically, the government correctly notes that the time for filing pretrial motions is long past, that the Court specifically advised Mr. Adams that "rolling motions" were not allowed, and that Mr. Adams already moved unsuccessfully for dismissal of the tax counts and should have raised his challenge based on the Closing Agreement then. Although the Court agrees with all of these observations, there is an argument to be made that a motion to dismiss based on a claimed promise of immunity can be raised at any time and is not governed by the deadlines of Fed. R. Crim. P. 12(b)(3). For this reason, the Court finds it appropriate to address the merits of the motion rather than decline to do so on procedural grounds.

Rule 12 of the Federal Rules of Criminal Procedure governs the filing of pretrial motions, providing that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Though motions to dismiss for lack of subject matter jurisdiction can be made at any time, certain defenses "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits…." Fed. R. Crim. P. 12(b)(2)–(3). "The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions and may also schedule a motion hearing." Fed. R. Crim. P. 12(c)(1).

If a defense is one that must be raised by pretrial motion pursuant to Rule 12(b)(3),[5] it is untimely unless raised by the motion-filing deadline set by the court. Fed. R. Crim. P. 12(c)(3). However, "a court may consider [such a] defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). "Good cause … requires a showing of cause and prejudice." *United States v. Reichel*, 911 F.3d 910, 916 (8th Cir. 2018) (quoting *United States v. Paul*, 885 F.3d 1099, 1104 (8th Cir. 2018)).

There is no dispute that Mr. Adams filed his pending motion to dismiss the tax counts well after the June 1, 2018 deadline established by the Court.[6] Referencing Rule 12(b)(3)(A), the government suggests that Mr. Adams's motion to dismiss asserts a "defect in instituting the prosecution," which is waived or forfeited if not filed by the deadline. [Gov't Resp. at 10.] And Mr. Adams's motion could reasonably be construed as raising a "defect in instituting the prosecution" because it essentially claims that the government should not have brought tax charges against him that were resolved by the Closing Agreement. If Mr. Adams's motion falls in this category, his failure to raise the Closing Agreement as a basis for dismissal earlier in this case would mean that his motion is untimely and his argument is forfeit absent a showing of good cause.

But it is not clear that Mr. Adams's motion is governed by Rule 12(b)(3), and the government cites no caselaw to support its assertion. Mr. Adams's argument that he cannot or should not be prosecuted because of the Closing Agreement is, in substance,

---

[5] The types of defenses, objections, and requests that must be raised by pretrial motions pursuant to Rule 12(b)(3) include "defect[s] in instituting the prosecution" and "defect[s] in the indictment or information." Fed. R. Crim. P. 12(b)(3)(A) & (B). In the first category, examples include, but may not be limited to: "improper venue;" "preindictment delay;" speedy trial violations; "selective or vindictive prosecution;" and grand jury errors. Fed. R. Crim. P. 12(b)(3)(A)(i)–(v). On the other hand, defects in the indictment include: "duplicity" and "multiplicity" challenges; "lack of specificity" in the indictment; "improper joinder;" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(i)–(v).

[6] ECF No. 88 ¶ 4 (setting an Apr. 30, 2018 deadline); ECF No. 138 ¶ 1 (extending deadline to 7 days after the District Court's Order regarding the Mar. 2, 2018 Report and Recommendation); ECF No. 139 (June 25, 2019 Order adopting Mar. 2, 2018 Report and Recommendation).

akin to a defendant's reliance on an immunity or non-prosecution agreement. Both similarly assert that the government made an enforceable promise not to prosecute and breached that promise by filing charges against him. There is some authority for the proposition that immunity agreements are not Rule 12(b)(3) motions that are forfeit unless they are made by a court-imposed deadline. *See United States v. Pelletier*, 898 F.2d 297, 301 (2d Cir. 1990) ("Because the Pelletiers raised their immunity defense to the indictment at trial along with their evidentiary challenge to the admission of the immunized evidence at trial, they properly preserved the challenge."); 1A Wright & Miller, *Fed. Prac. & Proc. Crim.* § 193, n.58 & accompanying text (Aug. 2019 Update) (discussing how the timing for raising an "immunity" defense under Rule 12(b)(3) is not clear, but suggesting that it does not fall within the class of motions that are forfeit unless filed by the deadline established by the district court). Thus, Mr. Adams's motion may not be the type of motion that can be forfeited, and no discussion of good cause is required.[7]

Ultimately, however, the Court does not need to decide the correct application of Rule 12(b)(3) to this issue. Mr. Adams's motion raises an important issue—he claims that the government agreed not to prosecute him for any matters relating to the tax years in dispute but has now reneged on that promise. Although the Court rejects his argument and recommends that the motion be denied, the Court thinks that reaching its merits is the best path forward.

**Recommendation**

Based on the foregoing, the Court makes the following recommendation:

1. The Defendant's Motion to Dismiss Counts 15–17 of the Superseding Indictment **[ECF No. 241]** should be **DENIED**.

---

[7] If the Court were to address the issue of good cause for the late filing of this motion, it would be hard pressed to rule in Mr. Adams's favor on this point. The Court is unpersuaded that the government's theory of the case for the tax counts has changed much, if at all, since the first motions were filed. And it is difficult to imagine that, if counsel really believed the Closing Agreement precluded prosecution for matters related to the tax returns from 2008–2010, they wouldn't have filed a motion to dismiss on that basis at the first opportunity. They have certainly known of the agreement all along.

2. Ordinarily, a party has 14 days to file an objection to a magistrate judge's report and recommendation and a party may respond to those objections another 14 days later. *See* Local Rule 72.2. Because the motion to dismiss was only recently filed and fully briefed, and because trial in this matter is set for November 4, 2019, the time for objections is shortened. Objections to this report and recommendation shall be filed **within 7 days after being served a copy of the R&R**. Any response to those objections shall be filed **within 7 days of being served with a copy of the objections**.

Date: October 3, 2019                                                  *s/Katherine Menendez*
                                                                                            Katherine Menendez
                                                                                            United States Magistrate Judge