## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 17-cr-64-DWF-KMM |
| Plaintiff, ) | |
| ) | **DEFENDANT'S OBJECTION TO** |
| v. ) | **REPORT AND** |
| ) | **RECOMMENDATION FOR** |
| EDWARD S. ADAMS, ) | **MOTION TO DISMISS COUNTS** |
| ) | **15–17 OF THE SUPERSEDING** |
| Defendant. ) | **INDICTMENT** |
| ) | |
| ) | |

Mr. Adams files this objection to the Report and Recommendation (ECF 246) (the "R&R"), which recommended that the Court deny Mr. Adams's Motion to Dismiss Counts 15–17 of the Superseding Indictment (ECF 241). Mr. Adams seeks review of the Magistrate Judge's erroneous conclusion that the closing agreement and the statute under which it was executed provide no protection against the tax charges in this case. This conclusion cannot be reconciled with leading Eighth Circuit precedent, which confirms that the purpose of 26 U.S.C. § 7121 ("Section 7121)—the statute under which Mr. Adams's agreement was executed—is to "enable the taxpayer and the government finally and completely to settle *all controversies* in respect of the tax liability for any previous taxable period, and to *protect the taxpayer against the reopening of the matter* at a later date." *Wolverine Petroleum Corp. v. Comm'r of Internal Revenue*, 75 F.2d 593, 595 (8th Cir. 1935) (emphasis added). On August 17, 2015, the IRS executed a binding closing agreement with Mr. Adams pursuant to Section 7121. That agreement plainly resolved Mr. Adams's liability—both civil and criminal—for all internal tax revenue matters in tax years

2008, 2009, and 2010.  Because the tax charges violate the terms of Mr. Adams's binding agreement, they must be dismissed.

## BACKGROUND

### A. The Government Agreed To Fully Resolve Any Liability Mr. Adams Might Have For His 2008, 2009, And 2010 Returns.

In October 2014, Mr. Adams approached the IRS through experienced tax counsel to explore a possible voluntary disclosure in connection with tax years 2008, 2009, and 2010.  The IRS's Voluntary Disclosure Program has long provided a path for taxpayers proactively to address complex tax issues outside the audit and litigation processes.  The program benefits the government and taxpayers alike.  The government is given the opportunity to clarify complex tax matters and potentially receive additional tax revenue, while taxpayers are able to resolve tax issues with finality.

The voluntary disclosure process involves multiple stages of review.  A voluntary disclosure is submitted in the first instance to the IRS Criminal Investigation Division ("CI"), which is responsible for "investigating potential criminal violations of the Internal Revenue Code."  I.R.M. 9.1.1.2; *see also* I.R.M. 9.5.11.1 (identifying the Voluntary Disclosure Program as one of several "specialized investigations" CI undertakes).  Upon receipt of the submission, CI agents evaluate the disclosure to determine whether it satisfies all relevant criteria, and make recommendations concerning the same.  *See* I.R.M. 9.5.11.9.7.  As part of the voluntary disclosure process, taxpayers typically also submit amended returns to the IRS.  The IRS carefully reviews the amended returns, and may raise any questions or issues with the taxpayer before deciding whether to fully settle the matter.

A taxpayer remains at risk of criminal prosecution throughout the voluntary disclosure evaluation process. *See* I.R.M. 9.5.11.9. However, if the IRS ultimately determines that it is in the government's best interest to fully resolve a matter, the IRS will execute a final closing agreement with the taxpayer, which represents a settlement of *all* tax liability.

Mr. Adams followed this process in connection with his 2014 voluntary disclosure submission—coordinating with both the criminal and civil components of the IRS to address potential issues. Mr. Adams thereafter filed amended tax returns and tendered payment to the IRS in the amount of $118,000. Following negotiations and discussions involving Mr. Adams's tax counsel, the IRS and Mr. Adams executed a binding closing agreement pursuant to Section 7121. *See* ECF 241-1 at 2. That statute authorizes the Treasury Secretary to enter "final and conclusive" agreements relating to the civil and criminal tax liability of any person. 26 U.S.C. § 7121(b). The parties' closing agreement provided that it was "mutually advantageous" to fully and finally settle questions surrounding Mr. Adams's 2008, 2009, and 2010 tax returns. *See* ECF 241-1 at 2, cl. 10. The agreement set forth the amount of what the IRS determined was previously underreported income and provided that, absent evidence of fraud or falsity, the "agreement is final and conclusive." *Id.* at 4.

### B. The Government Charged Mr. Adams With Understating Taxable Income In His 2008, 2009, And 2010 Returns.

On March 22, 2017, the government charged Mr. Adams with mail and wire fraud in connection with an alleged scheme to defraud shareholders of Apollo Diamond, Inc., and its subsidiary, Apollo Diamond Gemstone Corporation (collectively, "Apollo"). *See*

ECF No. 1. The original indictment alleged that Mr. Adams diverted funds that were being raised for Apollo to himself and others. *See id.* There were no tax charges.

Shortly after securing this indictment, then-Assistant United States Attorney David Maria—who left the office last year—sought authorization to bring tax charges against Mr. Adams based on Mr. Adams's purported failure to report the proceeds of the alleged scheme on his tax returns. On December 20, 2017, the government filed a superseding indictment charging Mr. Adams with understating his taxable income for the years 2008, 2009, and 2010, in violation of 26 U.S.C. § 7206(1). The theory set forth in the superseding indictment is that Mr. Adams failed to report proceeds obtained from the alleged scheme in his *2011 amended returns* for tax years 2008, 2009, and 2010. *See* ECF No. 70 ¶¶ 64–67. Mr. Adams twice amended his 2008, 2009, and 2010 tax returns. First, in December 2011, Mr. Adams amended these three returns principally to modify Schedule E's treatment of active and passive income. Second, in 2014, Mr. Adams amended the three returns to modify Schedule D's treatment of capital gains. The tax charges set forth in the superseding indictment relate to the 2011 amended returns. *See id.*[1]

## LEGAL STANDARD

"The district judge must consider de novo any objection to the magistrate judge's recommendation. The district judge may accept, reject, or modify the recommendation,

---

[1] Additional relevant background is set forth in Mr. Adams's motion and is incorporated herein. *See* ECF 241 at 2–7.

4

receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1); LR 72.2(b)(3).

## ARGUMENT

The R&R rests on two erroneous conclusions: *first,* that Section 7121 provides no protection against criminal prosecution, and *second*, that Mr. Adams's closing agreement unambiguously encompasses only civil tax liability. For the reasons set forth below, both conclusions are fundamentally flawed.[2]

### A. Section 7121 Closing Agreements Can Resolve Criminal Liability

The government executed Mr. Adams's closing agreement pursuant to 26 U.S.C. § 7121 ("Section 7121"). *See* ECF 241-1 at 1. That statute broadly authorizes the Treasury Secretary to "enter into an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." 26 U.S.C. § 7121(a). Section 7121 places a single restriction on the term "liability": it must be "in respect of any internal revenue tax." *Id.* In other words, the agreements the Secretary is authorized to execute must relate to tax liability. And tax liability, of course, has both civil and criminal components.

Courts and commentators alike have recognized the far-reaching scope of Section 7121 closing agreements. The Eighth Circuit has explained that "the purpose" of Section

---

[2] The government raised two additional arguments in its opposition to Mr. Adams's motion to dismiss, *see* ECF 243 at 9–11 (arguing Mr. Adams's motion is untimely), 17–20 (arguing Mr. Adams vitiated the closing agreement), but the Magistrate Judge declined to resolve the motion on these grounds. Mr. Adams's responses to these contentions are set forth in his motion to dismiss and reply in support thereof, which are fully incorporated herein. *See* ECF 241 at 5–7, 12–14; ECF 244 at 8–17.

5

7121 "is to enable the taxpayer and the government finally and completely to settle ***all controversies*** in respect of the tax liability for any previous taxable period, and to *protect the taxpayer against the reopening of the matter* at a later date." *Wolverine Petroleum*, 75 F.2d at 595 (emphasis added); *see also Bankers' Reserve Life Co. v. United States*, 42 F.2d 313, 383–84 (Fed. Cl. 1930). The court further emphasized that the general "policy has been to ***broaden***, rather than limit, the scope of [§ 7121] settlements" in order to "facilitate the settlement of ***many items*** affecting a taxpayer's liability." *Wolverine Petroleum*, 75 F.2d at 595 (emphasis added). Consistent with these principles, the Eighth Circuit has never restricted Section 7121 closing agreements to civil tax controversies; indeed, had it intended to do so, it would not have employed the phrase "*all* controversies." Leading commentators have likewise recognized that Section 7121 enables the government and the taxpayer to "conclusively" resolve *all* "tax controversies" related to a particular issue or year. 14A Scott D. Shimick, *Mertens Law of Federal Income Taxation* § 52:5 (2019).

Several other provisions in the tax code similarly employ the broad term, "liability," in a manner designed to encompass *both* civil and criminal tax liability. Section 7217, for example, makes it unlawful for "any applicable person" (defined to include high-level executive branch officials) to request that an IRS officer or employee "conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax ***liability*** of such taxpayer." 26 U.S.C. § 7217(a) (emphasis added). If this broad reference to "liability" is interpreted to encompass only civil tax liability, then the statute would criminalize executive branch interference with a *civil* tax audit or investigation, but not the same interference with a *criminal* audit or investigation. Such an artificial distinction would

6

make no sense. Instead, where, as here, a statute employs the broad term "liability," there is no reason to limit that term to civil liability.

To the extent this Court believes Section 7121 is ambiguous with respect to the type of "liability" it encompasses, the Court should apply the rule of lenity and construe the statute to encompass both civil and criminal liability. Although the rule of lenity generally applies only to criminal statutes, the Supreme Court has applied this principle to a civil tax statute that had "criminal applications," insofar as a separate statute established criminal sanctions for failure to comply therewith. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality opinion). So too here. Section 7206 sets forth criminal penalties for anyone who willfully makes any false statement "in connection with any closing agreement under section 7121." 26 U.S.C. § 7206(5)(B). Section 7121 is thus a civil statute with criminal applications, and the rule of lenity mandates that it be read in the manner Mr. Adams advances.

The R&R erroneously rejects the foregoing textual reading, analysis, and application of the rule of lenity. *See* R&R at 8–13. Its interpretation of Section 7121 instead is based on a comparison between Section 7121 and section 7122 of Title 26 of the United States Code ("Section 7122"). *See* R&R at 8–13.

Section 7122 provides authorization and specific procedures for the Secretary of the Treasury to resolve any "civil or criminal case" that the Secretary has *already opened* against a given taxpayer (typically for an amount less than that due). Section 7121 rounds out this statutory scheme by permitting the Treasury Department to enter into an agreement relating to all potential liability (civil and/or criminal), and which could be before any such

7

civil or criminal case exists.  *See Kennedy v. United States*, 965 F.2d 413, 420 (7th Cir. 1992) (noting that Section 7121, and not 7122, was applicable in the circumstances of that case because "no suit had been instituted" at the relevant time).  The difference between these statutes and the agreements they authorize is merely one of timing.

Echoing two non-controlling cases, while ignoring the import of *Wolverine Petroleum*, the R&R nevertheless holds that "the explicit reference in § 7122 to criminal immunity demonstrates that its omission from § 7121 is not ambiguous, but clear and intentional."  R&R at 12.  It is, however, of no moment that only Section 7122 uses the word "criminal" in its statutory text.  After all, Section 7122 does not state that it is the exclusive means of resolving a taxpayer's criminal liability.  Moreover, even though most of Section 7122 details the procedures for offers-in-compromise, it pointedly references other procedural mechanisms.  *See* 26 U.S.C. § 7122(e)(2) (mandating that the secretary establish procedures for the appeal of a rejection of either an "offer *or agreement*" that compromises liability (emphasis added)).  Indeed, if taken to its logical conclusion, the R&R's argument would suggest that the IRS's power to resolve criminal liability turns entirely on the formality of opening a "case" against a given taxpayer.  That conclusion would inevitably thwart Section 7121's purposes.  *See Wolverine Petroleum*, 75 F.2d at 595 (noting section 7121 is designed to "finally and completely [] settle *all controversies in respect of the tax liability for any previous taxable period, and to protect the taxpayer against the reopening of the matter* at a later date" (emphasis added)).

In support of its reliance on Section 7122, the R&R cites two nonbinding cases—*United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1991), and *United States v. Khanu*, 664

8

F. Supp. 2d 35 (D.D.C. 2009)—neither of which supports the tax charges against Mr. Adams. *See* R&R at 9–11. To begin with, both cases rely heavily on the same flawed comparison between Sections 7121 and 7122, and do not recognize the distinction described above. *See Mohney*, 949 F.2d at 1408; *Khanu*, 664 F. Supp. 2d at 38–39. Neither case addresses the effect of the rule of lenity on the interpretation of Section 7121, even though *Mohney* seems to have acknowledged that section's potential ambiguity. *See Mohney*, 949 F.2d at 1408 (noting only that Section 7122 "*may suggest* [that Section 7121] is not intended to cover criminal cases."). Both cases are also readily distinguishable on their facts. The closing agreement at issue in *Khanu* did not involve the defendant in his personal capacity; rather, it was an agreement between the government and various corporations the defendant controlled. *See* 664 F. Supp. 2d at 37–38. And the closing agreement in *Mohney* did not address the precise matters at issue in the indictment. *See* 949 F.3d at 1400, 1408 (indictment alleged that defendant filed false tax returns, while the closing agreement "relate[d] only to suits brought by [the defendant] to claim refunds").

### B. The 2015 Closing Agreement Fully Resolved Any Civil Or Criminal Liability Mr. Adams Might Have For His 2008, 2009, And 2010 Amended Returns.

The terms of Mr. Adams's closing agreement—together with the context in which was executed—demonstrate that the parties intended to resolve all criminal liability regarding the relevant tax years.

The closing agreement provided that the parties intended "to resolve the income tax liabilities" that Mr. Adams faced "for the tax years 2008, 2009, and 2010." ECF 241-1 at 2. In the tax context, the phrase "tax liabilities" commonly encompasses both the criminal

9

and civil exposure that a taxpayer faces in relation to his taxes. *See* ECF 241 at 9–10, ECF 244 at 5. By invoking this phrase in its broadest sense—and declining to incorporate any language narrowing or restricting it—the IRS and Mr. Adams evidenced their intent to resolve all criminal liability regarding the relevant tax years. Had the parties intended to limit the agreement solely to civil tax liability, they would have so specified.

At the very least, the use of the phrase "tax liability"—together with the agreement's silence as to the nature of liability it encompasses—raises an ambiguity that warrants consideration of parol evidence. "Where a written contract is ambiguous or obscure, parol evidence is admissible to show the intention of the parties." *St. Louis Union Tr. Co. v. United States*, 617 F.2d 1293, 1300 (8th Cir. 1980). A contract is ambiguous if it is susceptible to two reasonable but conflicting meanings, "as when the contract employs a critical term which is not defined . . . or because a double meaning is present." 11 Richard A. Lord, *A Treatise on the Law of Contracts* § 30:4 (West 4th ed. 2019); *see also Marquette Bus. Credit, Inc. v. Int'l Wood, LLC*, No. 08-cv-1383, 2010 WL 760248, at *3 (Mar. 3, 2010). Here, "tax liability" unquestionably has multiple meanings, and the agreement proffers no definition for the term. Accordingly, the Court may consider parol evidence to determine the intention of the parties. *St. Louis Union Tr.*, 617 F.2d at 1300.

The parties' intent to foreclose criminal prosecution is apparent from the involvement of the IRS Criminal Investigation (CI) Division and from the timing of Mr. Adams's closing agreement—which took place *after* the statute of limitations for civil tax liability had run. From the outset of his attempts to secure a closing agreement, Mr. Adams, through his counsel, was communicating with members of the CI unit. His counsel Mr.

10

Brever repeatedly exchanged correspondence with members of the CI Division, including high-level officials such as the Director of International Strategy and Planning—individuals who could credibly represent that the government would forego future prosecution. In addition, the timing of Mr. Adams's closing agreement likewise indicates that the parties intended for it to resolve criminal liability. Civil tax liability has a three-year statute of limitations, *see* 26 U.S.C. § 6501(a), and Mr. Adams entered his closing agreement in March 2015, ECF 241-1 at 4. Mr. Adams had no reason to enter into a closing agreement if it only resolved civil tax liability.

Tellingly, the R&R failed to address Mr. Adams's statute-of-limitations argument, or otherwise to explain why Mr. Adams would have entered an agreement limited solely to matters for which the limitations period had expired. Instead, the R&R focused on inapposite parol evidence. It insisted that the "most important[]" contextual factor underpinning its conclusion was a letter from the IRS informing Mr. Adams at the time of his initial *voluntary disclosure* application that such a disclosure would not guarantee immunity from prosecution. R&R at 8. But the R&R overlooked the distinction between voluntary disclosures and binding closing agreements. *Compare* I.R.M. 9.5.11.9 (describing voluntary disclosures) *with* I.R.M. 8.13.1.2.1 (describing closing agreements). Mr. Adams had no expectation that he would receive immunity because of his *voluntary disclosure*—*i.e.*, his informing the IRS of the inadvertent omission of previous capital gains income in his 2008, 2009, and 2010 tax returns, in connection with complicated securities transactions. He did reasonably believe, however, based on the government's representations and the text of Section 7121, that the execution of his *closing agreement*—

11

*i.e.*, his payment of money in exchange for resolving potential outstanding civil and criminal tax liabilities—would confer that protection. *See* ECF 241 at 2–3.

The foregoing facts demonstrate that the parties intended for the closing agreement to resolve any potential criminal tax liability on Mr. Adams's part. To the extent any lingering ambiguity remains, that ambiguity must be "construed against the government." *United States v. Stobaugh*, 420 F.3d 796, 800 (8th Cir. 2005); I.R.M. 8.13.1.2.1 ("Closing agreements must be drafted with great caution due to this finality. If a closing agreement contains an ambiguity, the ambiguity is resolved against the drafter of the agreement.").

## CONCLUSION

The tax charges in this matter are unwarranted and nearly unprecedented. In the months spent analyzing this issue, Mr. Adams has not located a single decision upholding criminal charges based on the exact matters previously resolved pursuant to a closing agreement. The dearth of case law on this issue underscores the highly unusual nature of the government's charging decision. For the reasons set forth above, Mr. Adams respectfully requests that the Court reject the Report and Recommendation, and grant his motion to dismiss the tax charges in the superseding indictment.

Dated:  October 10, 2019				Respectfully submitted,


					   /s/ *Lance Wade*				

					Joseph G. Petrosinelli (DC Bar #434280)
					Lance Wade (DC Bar #484845)
					Gloria Maier (DC Bar # 1012208)
					Jena Neuscheler (DC Bar # 187814)
					WILLIAMS & CONNOLLY LLP
					725 Twelfth Street, N.W.
					Washington, DC  20005
					Telephone:  (202) 434-5000
					jpetrosinelli@wc.com
					lwade@wc.com
					gmaier@wc.com
					jneuscheler@wc.com

					James L. Volling (#113128)
					Deborah A. Ellingboe (#26216X)
					FAEGRE BAKER DANIELS LLP
					2200 Wells Fargo Center
					90 South Seventh Street
					Minneapolis, MN  55420
					Telephone:  (612) 766-7000
					Facsimile:  (612) 766-1600
					james.volling@faegrebd.com
					debbie.ellingboe@faegrebd.com

					*Attorneys for Defendant Edward S. Adams*